*1* FILED
2023 Jun-07  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

1               UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
2                  SOUTHERN DIVISION

3

4  KATHRYN HENDRIX,          *

5        Plaintiff,      *   2:21-cv-300-MHH

6    vs.                *   February 6, 2023
                       11:00 a.m.
7  CRC INSURANCE SERVICES, INC., *
  et al.,                Birmingham, Alabama
8                  *

        Defendants.
9                  *

10  * * * * * * * * * * * * * * * * * * * * * * *

11              **TRANSCRIPT OF HEARING**
    **BEFORE THE HONORABLE MADELINE HUGHES HAIKALA**
12         **UNITED STATES DISTRICT JUDGE**

13  * * * * * * * * * * * * * * * * * * * * * * *

14

  For the Plaintiff:  Leslie A. Palmer
15                   Cynthia F. Wilkinson

16

17  For the Defendant:  Jenna M. Bedsole
                   Kayla Michelle Wunderlich
18

19

  Court Reporter:     Leah S. Turner, RMR, CRR
20                   Federal Official Court Reporter

21

22

23

24

25

1      This cause came to be heard and was heard on the
2  6th day of February 2023, before the Honorable Madeline Hughes
   Haikala, United States District Judge, holding court for
3  United States District Court, Northern District of Alabama,
   Southern Division, in Birmingham, Alabama.

4          Proceedings continued as follows:

5              P R O C E E D I N G S

6              (COURT CALLED TO ORDER.)

7          THE COURT:  We are here this morning in case 21-cv-

8  300.  This is Hendrix vs. CRC, and we are here for a discovery

9  conference.

10         Let me start just by asking you all to please update

11 the Court on the work that you all have accomplished in

12 discovery since we met in June of last year.

13         MS. PALMER:  Your Honor, after we met in June of

14 last year, we had a brief conversation in the elevator,

15 Ms. Gill and myself, and believed at that point we had come to

16 some agreement on exchanging some documents.

17         After a month passed and we still had not received

18 the documents, I reached out to Ms. Bedsole, at which time I

19 received a response to Rule 37 letter that mostly stood by the

20 objections but did include counsel's position on certain

21 responses to interrogatories.

22         From that point, we let Ms. Bedsole know that we

23 intended to file a motion to compel, and we continued our

24 conversations back and forth and ultimately had over --

25         THE COURT:  Let me interrupt you for a minute,

1  please.  Tell me what you have received in discovery since we

2  met.

3          I understand that there are lots disputes.  I'm

4  trying to understand what work has been done since we met last

5  June.

6          MS. PALMER:  Yes, Your Honor.  We have received a

7  number of emails.  I think some are over the 3,000 range.

8  Most of these emails are related to either events like

9  networking-type events that the company was holding or our

10  client's issuance of insurance policies to her clients, which

11  included like a two-page email along with a very lengthy

12  insurance policy.  So that's the majority of the number of

13  documents.

14          Since we filed the motion a couple of weeks ago, we

15  have received what appear to be portions of Mr. Segrest's

16  personnel file as well as a couple of specific documents that

17  we requested related to the agency split and like the

18  percentage of work assigned to each agent.

19          We also have received a couple of charts, one that

20  appears to be two jobs that were filled without any other

21  information related to whether those jobs were posted or how

22  many applications were received, and a chart related to

23  compensation structures, which I believe is just base

24  compensation.

25          And then we received one chart that appears to

```
1    indicate assignments of teams, like who was working under

2    Mr. Daugherty, which is the team that the plaintiff is on, and

3    who wasn't.  But that's just the basic information.

4              And that is all that we have received.

5              MS. WILKINSON:  And, Your Honor, we did a chart.  I

6    will be happy to -- if you would like a copy and defense

7    counsel a copy, of what we got and what we did not get, which

8    may be helpful.  I just wrote a note on that one.

9              THE COURT:  Any depositions so far?

10             MS. PALMER:  No, Your Honor.  As of Friday we

11   received a notice of deposition from Ms. Bedsole for the

12   plaintiff's deposition, but we have not been able to schedule

13   any other depositions because of the outstanding discovery.

14             At this point we don't even have contact

15   information.  We have no employee roster to show us who was on

16   her team or anything like that.  The few individuals that were

17   listed on the initial disclosures are listed contact care of

18   counsel, and I think at least one of those is not a manager,

19   but we have no contact information beyond Ms. Bedsole.

20             And the initial disclosures, I think, only identify

21   four individuals.

22             THE COURT:  Well, you're not planning to contact any

23   of these employees directly, are you?

24             MS. PALMER:  The employees, we believe we would be

25   allowed to contact, yes, Your Honor.  They are not covered
```

1  under the manager rule, and so we would like to be able to

2  contact them to see if they have discoverable information; and

3  if they do and they are not willing to talk to us directly,

4  then we would like to see about scheduling them for

5  depositions if we believe they have information necessary.

6          THE COURT:  And you haven't scheduled a 30(b)(6)

7  deposition?

8          MS. PALMER:  Correct.

9          THE COURT:  Ms. Hendrix had some health issues.  Is

10  she doing better?

11          MS. PALMER:  She is.  She is a hundred percent

12  healed and ready to participate in litigation.

13          THE COURT:  Ms. Bedsole, let me hear the defendant's

14  version of where discovery is.

15          MS. BEDSOLE:  Thank you, Your Honor.  With our

16  initial disclosures, we did produce the plaintiff's personnel

17  file.  We produced the employee handbook.  We produced some

18  additional documents.

19          One of the issues in this case is the plaintiff

20  contends that she was excluded from meetings and was not

21  allowed to attend dinners or she was not invited to dinners.

22          We did a thorough search of her inbox and outbox and

23  produced almost over 3,000 emails which demonstrated that she

24  was not excluded.

25          In addition, one of the issues in this case relates

1    to what her job duties are as an inside broker versus an

2    associate broker.  We have produced information related to her

3    duties.  Again, those are included in some of the emails and

4    the attachments.

5           With respect to the personnel files, there is a

6    dispute about what -- we contend that -- and I believe this

7    was discussed in that elevator.  We objected then to the

8    production of personnel files.  We discussed that if they

9    identified a comparator, we could talk about it.  They have

10   contended that Mr. Segrest is a comparator.  We dispute that

11   fact.  But we did produce portions of his personnel file.

12   Likewise, although we do not believe that her supervisor,

13   Corey Daugherty, is a comparator, we also produced a portion

14   of his personnel files.

15          They have asked for documents that simply don't

16   exist and we have tried to convey that.  But regardless,

17   overall, I think we are over 4,000 documents that have been

18   produced.

19          Admittedly, Your Honor, we thought we had produced

20   verified responses.  That's on us.  We did not.  We sent a

21   Rule 37 letter that outlines what our responses were going to

22   be.  Admittedly, I should have double-checked and made sure

23   that those went out.  They did not.  And that is on me, Your

24   Honor.

25          So we stand before you.  We believe that we have

1    conferred in good faith.  We have some disputes that the
2    parties just can't agree on some of the scope.

3         We have produced the names of the team members.  We
4    have produced information about those who worked within the
5    Birmingham office but were not on Ms. Hendrix's team.  We
6    believe that the scope is based upon Ms. Hendrix's team, or
7    Corey Daugherty's team.

8         So we have a dispute over the scope of discovery in
9    this case, Your Honor.

10        THE COURT:  Let's go back.  Mr. Daugherty, you said
11   was Ms. Hendrix's supervisor, correct?

12        MS. BEDSOLE:  That's correct, Your Honor.

13        THE COURT:  What did you omit from his personnel
14   file when you produced it?

15        MS. BEDSOLE:  We omitted health information.  There
16   aren't any disciplinary records, so we stated that.  I believe
17   we produced -- and I will submit to Your Honor the personnel
18   files don't look like a traditional personnel file.  They are
19   in a system called Workday, so it provides a lot of
20   information with respect to title, date of hire, but it looks
21   more like a computer program than it does what we're used to
22   with individual papers that reflect the hire date or such.

23        THE COURT:  So in that system, if somebody does
24   receive a disciplinary notice, whether it's a record of a
25   verbal warning or a written warning, do those appear in that

1   program or are they maintained elsewhere?

2           MS. BEDSOLE:  Should be reflected in the program,

3   Your Honor.  The program also sets forth the evaluations as

4   well, at least from a high level.  It doesn't go into the

5   multiple pages of the evaluations, but it does state on there

6   meets expectations.

7           THE COURT:  Where are the written evaluations

8   maintained?

9           MS. BEDSOLE:  They are in a separate file,

10  electronic file.

11          THE COURT:  Are there any paper files for the

12  employees?

13          MS. BEDSOLE:  Not that I'm aware of, Your Honor.

14          THE COURT:  So have you produced the evaluation

15  records for Mr. Daugherty?

16          MS. BEDSOLE:  I don't believe we have produced the

17  entire evaluations, multipage evaluations, Your Honor.

18          THE COURT:  Is that because you don't consider them

19  part of his personnel file?

20          MS. BEDSOLE:  Well, we suggested that we produce

21  documents that related to any complaints that related -- were

22  the same or similar complaints raised by the plaintiff.  We

23  reviewed and did not see any.

24          THE COURT:  Give me the name again, please, of the

25  comparator.

1    MS. BEDSOLE:  They have indicated that Clay Segrest

2    is a comparator, Your Honor.  It is our opinion, our position,

3    that he is not.  Ms. Hendrix was an inside broker.  He was an

4    associate broker.  They have different job duties.  For

5    example, an inside broker doesn't have to travel.  They do

6    serve clients, but they are not required to go out and solicit

7    new business like an associate broker does.

8    THE COURT:  My understanding from reading the

9    complaint is that that's precisely what Ms. Hendrix was trying

10   to do, that she wanted to be able to solicit business for the

11   company.  Is that right?

12   MS. PALMER:  Yes, Your Honor, and there are actually

13   some emails that have been produced, or it may actually be in

14   Ms. Hendrix's evaluations, that reference her solicitation of

15   business as a job duty even as an inside worker.

16   THE COURT:  All right.  And so what have you

17   omitted, please, from the personnel documents that you have

18   produced for Mr. Segrest?

19   MS. BEDSOLE:  I believe we produced his Workday

20   profile.

21   THE COURT:  So no evaluations?

22   MS. BEDSOLE:  Correct.

23   MS. PALMER:  Your Honor, I have a copy of that if

24   you would like to look at it.

25   THE COURT:  We will see.  Maybe we'll get there.

1        Is it the plaintiff's position that Mr. Segrest is

2   the only comparator?

3        MS. PALMER:  No, Your Honor.  We have asked for

4   personnel files from the entire team and actually the entire

5   department, and the issue there is because job titles appear

6   to not matter; and that's part of our claim, is that

7   Ms. Hendrix was initially an account executive and at some

8   point received a title change, or they call it a promotion, to

9   inside broker.

10        At the time that she received the title change to

11   inside broker, her account executive duties actually increased

12   instead of decreased, and she was doing more secretarial-type

13   work versus broker-type work, and so that's part of our whole

14   claim here.

15        And with regard to the pay structures and the bonus

16   structures, because there is no procedure in place to

17   determine what percentage is given to who, it's necessary to

18   look outside of Mr. Daugherty's team into the rest of the

19   department to see how they are divvying up their bonuses and

20   their compensation, because it seems to be controlled under

21   the umbrella of the professional liability department and it's

22   left to, it seems, like each individual team leader to divvy

23   out the percentages.

24        And so that's part of our claim here is that that

25   structure that's promoted by CRC has led to discriminatory

conduct in the pay structures and the bonus structures of the females within the department.

So we've produced a list of specific team members and specific department members that we believe we're entitled to the personnel files for.  And if there is an issue with health information or anything like that, I do believe it's covered under the Court's protective order.  But to date, all we have received is the Workday printout for Mr. Segrest.  We do have evaluations for Mr. Segrest —- not the....that's correct.

And I believe Ms. Bedsole may be mistaken.  We have not received any for Mr. Daugherty.  There has been no production related to Mr. Daugherty.

And with regard to plaintiff's personnel file, we don't appear to have the Workday printout for plaintiff.  We have portions that show the documents that she signed, like the handbook, but comparing her personnel file to Mr. Segrest's personnel file, they're not the same, and that's why we have continued to ask for hers as well.

We don't know what's maintained in this Workday system.  We don't know what's maintained in any kind of paper file, and that's why we've asked.  We even offered to go and review some of the files in person to see if there was some agreement that we could come to with regard to that.  But we have provided specific names of individuals we believe that we

1   are entitled to their information, at the very least the

2   account executives that Ms. Hendrix once was, before she was

3   promoted, to show if they complained or if they were aware of

4   her complaints and they had discussions and what types of

5   disciplinary actions they received, what types of

6   commendations they received, their bonus structure.

7          We have instances where account executives are

8   receiving enormous bonuses compared to brokers, and I believe

9   it's necessary to review the personnel files of these

10  individuals to determine what's the course there, what's

11  happening.

12         THE COURT:  So, something that caught my eye when I

13  was reviewing the complaint -- and I apologize.  I can't

14  remember everything we discussed back in June, so you may have

15  to refresh my memory on some of this, please.

16         There are allegations in the complaint about leads

17  for potential customers being shared among male brokers.  And

18  I can't remember the two formats that were used for that

19  information sharing.

20         Have you received any documents with respect to

21  that?  And for the record, put on the record, please, the two

22  ways in which that information allegedly was shared with male

23  employees.

24         MS. PALMER:  Yes, Your Honor.  I believe the ways

25  you're referencing are through possibly an iChat, which may

1   have been on personal cell phones, so we may not have that

2   information, but also email distribution lists that existed

3   with any Outlook program.

4          We haven't received any of that information.  There

5   was a response to the interrogatories that identified the one

6   email distribution list that the plaintiff was on, but

7   plaintiff is aware and has identified others and we don't know

8   where those are, if they exist, if they were deleted, what

9   happened to those, because nothing has been produced in

10  relation to that.

11         THE COURT:  What do you say on that, Ms. Bedsole?

12         MS. BEDSOLE:  Your Honor, we have asked for this

13  texts or iChats and they don't have any documents with respect

14  to the personal -- they don't have any documents for personal

15  cell phones.  But they have asked for those.

16         With respect to the email distributions, the emails

17  that we have produced, they are listservs within the

18  department, so it includes Ms. Hendrix on these emails about

19  who is coming to dinner and who wants to go to dinner and the

20  people that are invited to dinner.  So we have produced that.

21         We have not been able to locate a different listserv

22  or a different group in which only males.  The distributions

23  that we have seen and produced include the entire team,

24  identifying who is coming to town and who is having dinner,

25  where they are having dinner and what times.

1    THE COURT:  And who has been looking for that

2    information for CRC, please, Ms. Bedsole?

3    MS. BEDSOLE:  We have been working with their

4    e-discovery team, Your Honor.

5    THE COURT:  My initial reaction -- and I'm happy to

6    receive everyone's thoughts on this -- is that it seems like

7    maybe a way to cut to the chase on some of this -- because I

8    understand the plaintiff's position about why they need the

9    breadth of discovery that the plaintiff's team has requested,

10   and I understand the defendant's position about this is

11   extremely broad discovery and there's reluctance to respond to

12   all of the requests.

13   It seems to me that if a 30(b)(6) deposition was

14   taken and a deposition was taken of a representative of the

15   e-discovery team to try to learn more about how CRC is

16   organized, get just some preliminary information to help start

17   connecting the dots among all the emails and what you have

18   received in paper discovery, help understand what kind of

19   electronic information is available, what has been searched,

20   what hasn't been searched yet, that might be really helpful.

21   I understand that in terms of sequencing, you're

22   always going to want to have as many documents ahead of a

23   30(b)(6) deposition as possible, but this may be a situation

24   where it makes sense to have an initial 30(b)(6) deposition.

25   After the 30(b)(6) deposition, plaintiff may be in a

better position to narrow discovery requests.  Defendant can
then consider those narrow discovery requests.  And once you
all see whether you can reach any kind of agreement on
discovery requests after those two depositions, once
additional documents if any are produced, if there was a need
to resume the 30(b)(6) deposition to examine the witness about
documents that are produced after that deposition, I would
suggest that the defendant consider that request.

          If you all can't reach an agreement on that, we
could have a conversation to try to work through that.

          But it seems there's a certain amount of just kind
of shooting in the dark right now that maybe isn't terribly
productive.

          What is your reaction to that, Ms. Palmer or
Ms. Wilkinson?

          MS. WILKINSON:  Your Honor, I think that's a great
idea.  I would just ask one thing; that the 30(b)(6) either
not count against our total number of depositions or that this
just be one topic in our total 30(b)(6) list of examinations
so that we don't lose a deposition by doing it.

          But I think that is a great idea.  And could we
expand that not only just to e-documents or e-discovery, but
anybody that has information about how paper documents are
stored in addition to electronic documents.

          THE COURT:  Which I would think that's something

1    that would make sense to ask of the 30(b)(6) representative.

2    And I was thinking of two depositions, one of a 30(b)(6)

3    representative and one of someone on the e-discovery team.

4    That probably isn't going to be the same person, I would

5    imagine.

6         But that's my initial take on how you understand the

7    scope of what's available and maybe what is really going to be

8    helpful to Ms. Hendrix attempting to prove her allegations as

9    opposed to casting perhaps an unnecessarily broad net.  I

10   don't know yet whether the requests that are out there right

11   now are unnecessarily broad.

12        Ms. Bedsole, what are you thoughts, please?

13        MS. BEDSOLE:  Your Honor, we are amenable.  And when

14   we talked on the 19th of January after the filing of the

15   motion to compel, we did set aside the week of March 6th,

16   which is why we sent the plaintiff's deposition notice.  So

17   we've already set aside some time to take depositions.

18        MS. WILKINSON:  Your Honor, may we do the 30(b)(6)

19   before the plaintiff's deposition so we can see what is out

20   there, try to resolve these discovery issues before we move

21   forward with anything else; just as an initial, these two

22   people about the documents?

23        THE COURT:  What do you say, Ms. Bedsole?

24        MS. BEDSOLE:  I don't have a problem with that, as

25   long as -- I mean, we can talk about this.  But we have set

1    aside that week.  I would like to go ahead if we can and keep

2    that week.  I've got an arbitration going in Fort Lauderdale

3    the beginning of April.

4            THE COURT:  I'm thinking y'all probably aren't going

5    to meet the discovery deadline and that you're going to be

6    asking for some additional time.  I understand that.  Better

7    to get this work done than to be maybe scheduling more

8    depositions than you need.  So I think this initial work will

9    hopefully help everyone get a better sense of what information

10   is available and what information really is going to be

11   pertinent.

12           All right.  Thank you all for agreeing to proceed in

13   this way.

14           MS. PALMER:  Your Honor, if I may, what is the

15   Court's preference with regard to the personnel files and what

16   we do regarding the scope of those?  Because that is an issue

17   that I believe even in our meet and confers where we're just

18   not going to agree on the scope of discovery with regard to

19   whether it's just Mr. Segrest or the entire team or the entire

20   department.

21           And then we also have an issue with the defendant's

22   privilege log and I'm not sure what the Court's preference is

23   with regard to taking up that issue.

24           THE COURT:  My thoughts with respect to the

25   personnel files is that once you understand better the

1   structure of CRC from the defendant —— I know Ms. Hendrix has

2   given you information about that —— I anticipated that you

3   might have a better sense of who is a comparator under the

4   Lewis decision, which I think is going to have to guide your

5   analysis there.

6          The Eleventh Circuit, I think, gave some pretty

7   clear parameters about who is and who isn't a comparator.  You

8   all may feel like there's other case law out there that helps

9   inform that analysis.  But I think that's at least a good

10  starting point.

11         So, again, my thought was that after the 30(b)(6)

12  deposition, you at least would have information from a

13  spokesperson for CRC that would allow you to come back, if you

14  all can't agree, allow you to come back and say, well, the

15  company representative explained this; therefore, we believe

16  these people, even though their titles are different —— which

17  is what I'm hearing, I think —— their job responsibilities are

18  effectively the same, and they do count as comparators; that's

19  why we've asked for their personnel information.

20         The defendant, understandably, may not see things

21  eye to eye, and we will just have to see if we can get to the

22  bottom of that.  Does that make sense?

23         MS. PALMER:  Yes, Your Honor.

24         THE COURT:  Tell me the privilege log issue, please.

25  I had not gotten to that, so you're writing on a blank slate.

1          MS. PALMER:  Your Honor, that's a new issue.  We

2    received an updated privilege log after --

3          MS. BEDSOLE:  Your Honor, it's a new issue.  This is

4    the first time I have heard about it, so I would really prefer

5    that we try to meet and confer.

6          MS. PALMER:  That's fine.  We can do that.  I just

7    didn't know what the Court's preference is, but we can try to

8    address that with each other.

9          THE COURT:  It sounds like you guys likely are going

10   to have a busy month just getting ready for the depositions

11   that you have, that you are going to have to be talking to be

12   able to coordinate.

13         It sounds like there were some gaps in communication

14   in part because of Ms. Hendrix having to address her health

15   concerns.  I would anticipate that those gaps will disappear

16   in the next month while you all are marching towards these

17   depositions.

18         If you run into problems, please do not file 30-page

19   written submissions.  Send a joint email to our chamber's

20   address, we will set up a phone call, and let's just talk and

21   see if we can get to the bottom of it.

22         Of course, consistent with the information in the

23   Court's scheduling order, if after a conversation the parties

24   feel they need to file something to preserve the record, the

25   Court is never going to prohibit you from doing that.  I just

1    find that as a matter of efficiency, for everyone, we can

2    usually solve most problems with a good conversation.  So

3    let's work toward that, please.

4            I will be curious to hear what y'all learn in these

5    depositions, and we will go from there.

6            Anything else we can discuss today to help you all

7    move towards depositions?

8            MS. WILKINSON:  I don't think so.  Just to be clear,

9    Your Honor, we are going to do our -- it sounds like full

10    30(b)(6) first.

11            THE COURT:  It's a 30(b)(6) that allows you to get

12    the information you need about the organizational structure,

13    all of that background information that allows you to try to

14    see who the comparators are, who may be -- there's a lot

15    alleged in the complaint, so it is broad by nature of the

16    broad allegations in the complaint.

17            It may be that after a 30(b)(6) deposition,

18    Ms. Hendrix decides that she maybe needs to narrow some of her

19    factual allegations that form the basis of her claims for

20    discrimination and retaliation; maybe not.

21            But, yes, the 30(b)(6) is a pretty broad 30(b)(6)

22    deposition, but it's meant to help you ultimately narrow, if

23    possible, discovery requests and the number of employees who

24    may need to become part of discovery because the plaintiff has

25    a sound footing for arguing that they are comparators.  It

1  allows you all to understand what personnel material is

2  available so that you can say what you have, what you don't

3  have, what you believe you legitimately need for discovery.

4  And Ms. Bedsole and Ms. Wunderlich can take their positions

5  about what they think is relevant from their perspective.

6  Does that --

7          MS. WILKINSON:  It does.  And I just wanted to make

8  sure that if we do this and we find there are more documents

9  that we need and we have a phone conference with the Court,

10 can we --

11         THE COURT:  After you talk to each other and you

12 haven't been able to agree.

13         MS. WILKINSON:  Correct, absolutely.  Then would we

14 get more time to then schedule depositions once we have

15 documents?

16         THE COURT:  Correct, yes.  That's the whole point of

17 the exercise.  That would work out really well if everything

18 falls into place that way.

19         MS. WILKINSON:  Thank you, Judge.

20         THE COURT:  Anything else for the defendant?

21         MS. BEDSOLE:  No, Your Honor.

22         THE COURT:  Thank you all for being here.  I hope

23 y'all have a great week.

24              (End of proceedings.)

25

<u>C E R T I F I C A T I O N</u>

    I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**