FILED

2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

# Video Deposition of Rusty Hughes

January 19, 2024

Hendrix v. CRC Insurance Services, Inc., et al.

2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ALABAMA
3        SOUTHERN DIVISION
4
5   CASE NUMBER: 2:21-CV-0300-MHH
6
7   KATHRYN HENDRIX,
8        Plaintiff,
9        vs.
10  CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL
11  CORP., and TRUIST BANK,
12       Defendants.
13
14
15      VIDEO DEPOSITION TESTIMONY OF:
16          RUSTY HUGHES
17
18
19      JANUARY 19, 2024
20          10:02 A.M.
21
22
23

Page 2

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their respective
4    counsel that the video deposition of RUSTY
5    HUGHES may be taken before Tanya D. Cornelius,
6    RPR, CSR, and Notary Public, at the offices of
7    Wilkinson Law Firm, P.C., 1717 3rd Avenue North,
8    Suite A, Birmingham, Alabama, on the 19th day of
9    January, 2024, commencing at approximately 10:02
10   a.m.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is NOT waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws
16   and rules of Court relating to the taking of
17   depositions.
18       IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any
20   objections to be made by counsel to any
21   questions, except as to form or leading
22   questions, and that counsel for the parties may
23   make objections and assign grounds at the time

Page 3

1    of the trial, or at the time said deposition is
2    offered in evidence, or prior thereto.
3        IT IS FURTHER STIPULATED AND AGREED
4    that notice of filing of the deposition by the
5    Commissioner is waived.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1           I N D E X
2   EXAMINATION BY:              PAGE NUMBER
3       MS. WILKINSON               9
4
5   SEALED TESTIMONY               277
6       * * * * * * * * * * * * * *
7           EXHIBIT INDEX
8   PLAINTIFF'S EXHIBIT NO:       PAGE NUMBER

9   24  EEOC Charge               34
10  25  Module Training           54
11  26  Handbook                  60
12  27  List                  89
13  28  E-mail                226
14  29  E-mail                235
15  30  Taylor documents       241
16  31  Document              247
17  32  Document              248
18  33  Document              249
19  34  Document              249
20  35  Advertisement         253
21  36  Module Training       255
22  37  Code of Conduct       272
23  38  E-mail                290

Page 5

1        A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:

4        PALMER LAW, LLC

5        BY:  Leslie A. Palmer, Esq.

6        104 23rd Street South, Suite 100

7        Birmingham, Alabama  35233

8

9

10       WILKINSON LAW FIRM, P.C.

11       BY:  Cynthia Forman Wilkinson, Esq.

12       1717 3rd Avenue North, Suite A

13       Birmingham, Alabama 35203

14

15

16       BARRETT & FARAHANY

17       BY: Patricia A. Gill, Esq.

18       2 20th Street North, Suite 900

19       Birmingham, Alabama 35203

20

21

22

23

Page 6

1        APPEARANCES (Continuing)

2

3

4  FOR THE DEFENDANTS:

5        BAKER, DONELSON, BEARMAN, CALDWELL

6            & BERKOWITZ, P.C.

7        BY:  Rachel Barlotta, Esq.

8        420 North 20th Street, Suite 1400

9        Birmingham, Alabama  35203

10

11

12  ALSO PRESENT:

13       Kat Hendrix

14       Caroline Zoghby, Videographer

15

16

17

18

19

20

21

22

23

Page 7

1        I, Tanya D. Cornelius, RPR, CSR, and

2  Notary Public, acting as Commissioner, certify

3  that on this date, as provided by the Federal

4  Rules of Civil Procedure, there came before me at

5  stipulation of counsel, there came before me at

6  the offices of Wilkinson Law Firm, P.C., 1717 3rd

7  Avenue North, Suite A, Birmingham, Alabama,

8  beginning at 10:02 a.m., RUSTY HUGHES, witness in

9  the above cause, for oral examination, whereupon

10  the following proceedings were had:

11

12

13

14        VIDEOGRAPHER:  We are on the record

15  at 10:02 on Friday, January 19th, 2024.  My name

16  is Caroline Zoghby, and the court reporter is

17  Tanya Cornelius.  We're here on behalf of Cite

18  Court Reporting of Montgomery, Alabama.

19        This is the video deposition of Rusty

20  Hughes, was which noticed by Cynthia Wilkinson,

21  for case Hendrix versus CRC Insurance Services,

22  Inc., et al., in the District Court for the

23  Northern Division of Alabama, Southern Division,

Page 8

1  Case Number 2:21-CV-0300-MHH.

2        Counsel, please identify yourself for

3  the record, starting with the plaintiff.

4        MS. WILKINSON:  Cynthia Wilkinson.  I

5  represent the plaintiff, Kathryn Hendrix.

6        MS. PALMER:  Leslie Palmer for the

7  plaintiff, Kathryn Hendrix.

8        MS. GILL:  Patricia Gill, attorney

9  for the plaintiff, Kathryn Hendrix.

10        MS. BARLOTTA:  Rachel Barlotta,

11  counsel for defendant, CRC Insurance and Truist.

12        VIDEOGRAPHER:  Will the court

13  reporter please administer the oath to the

14  witness?

15

16        RUSTY HUGHES,

17        being first duly sworn, was

18        examined and testified as follows:

19

20        THE REPORTER:  Will this be usual

21  stipulations?

22        MS. WILKINSON:  Yes.

23        MS. BARLOTTA:  We're going to read

Page 9

1   and sign.
2       MS. WILKINSON:  But otherwise, usual
3   stipulations?
4       MS. BARLOTTA:  Uh-huh (positive
5   response).
6
7           EXAMINATION
8   BY MS. WILKINSON:
9       Q.   Will you please state your full name
10  for the record?
11      A.   Rusty Hughes.
12      Q.   Rusty, I introduced myself earlier.
13  I'm Cynthia Wilkinson, one of the lawyers that
14  represent Kat Hendrix, and we're here today to
15  take your deposition.
16           Have you ever done this before, given
17  a deposition?
18      A.   First time.
19      Q.   Okay.  And I'm certain that your
20  lawyer has gone over with you to kind of prepare
21  you, so I don't want to know anything that you
22  have talked with Rachel about, okay?  So
23  understand when I ask you a question today, I'm

Page 10

1   not asking about anything you've discussed with
2   counsel, okay?
3       A.   Okay.
4       Q.   Just to kind of go over a few of the
5   ground rules, it's important today that we answer
6   verbally so that you get -- we get your answer on
7   the record.  So sometimes we nod our head or we
8   go uh-huh (positive response) and huh-uh
9   (negative response), which I say all the time,
10  because I'm Southern.
11           So if we prompt you to say yes or no,
12  we're not trying to be rude.  We just want to
13  make sure the record is clear.  Is that okay?
14      A.   Sure.
15      Q.   At any time today if you need to take
16  a break, you just let us know.  This is not an
17  endurance test.  I would just ask that before we
18  take a break, you answer any question that I've
19  presented.  Is that okay?
20      A.   Fine.
21      Q.   Okay.  Did you do anything to prepare
22  for your deposition?  Just did you meet with
23  counsel?

Page 11

1       A.   We had a video call.
2       Q.   Okay.  Did you look in any documents,
3   review any documents to prepare for your
4   deposition?
5       A.   One e-mail.
6       Q.   And who -- do you recall who that
7   e-mail was from or to?
8       A.   From John Cadden.
9       Q.   And did that e-mail have to do with
10  Kat Hendrix?
11      A.   No.
12      Q.   Okay.  What was that e-mail about?
13      A.   It was in reference to a bonus.
14      Q.   A bonus for someone in particular?
15      A.   Just in general, a general question.
16      Q.   Okay.  And what was the question?
17      A.   I believe it said, Hang on before
18  releasing.
19      Q.   Releasing the bonus?
20      A.   No.  Before the actual bonus
21  calculations.
22      Q.   And what was the purpose of this
23  e-mail?

Page 12

1       MS. BARLOTTA:  Object to form.
2       Q.   You can answer.
3       MS. BARLOTTA:  If you know.
4       A.   It was a general e-mail
5   communication, as normal around bonus time.
6       Q.   And Mr. Cadden sent the e-mail?
7       A.   He did.
8       Q.   And were you one of the individuals
9   that had received the e-mail?
10      A.   I did.
11      Q.   And who else was the e-mail sent to?
12      A.   I did not look at the distribution
13  list.  I don't know.
14      Q.   Do you recall the date of the e-mail?
15      A.   I don't.
16      Q.   Did you respond to the e-mail?
17      A.   I don't think so.
18      Q.   Did -- when it talked about bonuses,
19  did it apply to -- you said it was a question.
20  Did it apply to particular positions?
21      A.   No.
22      Q.   Okay.  And was it for a particular
23  department?

Page 13

1   A.  No.

2   Q.  Do you know why Mr. Cadden was

3   sending the e-mail?

4   A.  I don't recall.

5   Q.  Okay.  Do you recall the year the

6   e-mail was sent?

7   A.  I do not.

8   Q.  And did you look at this yesterday?

9   A.  Yes.

10  Q.  What time?

11  A.  It would have been around 10:30.

12  Q.  Do you have a copy of the e-mail?

13  A.  I do not.

14      MS. BARLOTTA:  It's been produced.

15  Y'all have it.

16  Q.  Did you look at any other documents

17  to prepare for your deposition?

18  A.  I did not.

19  Q.  Did you talk to anybody?  Not

20  counsel, but anybody at Truist or CRC about your

21  deposition?

22  A.  I did not.

23  Q.  We deposed Mr. Helveston.  Have you

Page 14

1   spoken to him since his deposition?

2   A.  I have not.

3   Q.  Okay.  What's your current position?

4   A.  I am vice-president and senior broker

5   at CRC.

6   Q.  And CRC is owned by what company?

7   A.  Truist.

8   Q.  And do you recall when Truist bought

9   CRC?

10  A.  Truist became part of CRC as a merger

11  between SunTrust and BB&T.  I don't know the

12  exact year, but the Truist name was formed out of

13  the BB&T and SunTrust merger, and BB&T acquired

14  us in '02.

15      I don't remember the year that

16  SunTrust and BB&T merged, and out of that the

17  name Truist was born.  But I don't remember.  It

18  was about four or five years ago.

19  Q.  And were you employed with CRC before

20  the merger?

21  A.  I was.

22  Q.  What was your position before the

23  merger?

Page 15

1   A.  I was in the same position.

2   Q.  How long have you been the

3   vice-president and senior broker?

4   A.  Twelve years in that role.

5   Q.  What was your position?  Just kind of

6   go through your work history a little bit.  What

7   was your position before you were the

8   vice-president and senior broker?

9   A.  I was -- I began in 1999 at CRC as a

10  technical assistant, and rose up through the

11  ranks to broker.  And then when my mentor retired

12  in 2012, I assumed her role as leader of the

13  department, professional liability.

14  Q.  Was there a title when you were the

15  leader of professional liability?

16  A.  Not official.  It wasn't written

17  official, but they called it the president of

18  professional liability at the time, but it was

19  never an official title.  It was for marketing

20  purposes.

21  Q.  Okay.  And is professional liability

22  a particular department for CRC?

23  A.  It is.

Page 16

1   Q.  Just in general, what does CRC do?

2   A.  We are a wholesale broker.  We are

3   the middleman between the insurance company and

4   the insurance agency, and we provide insurance

5   coverage to mutual clients.

6   Q.  What type coverage?

7   A.  It ranges from directors and officers

8   liability, architects and engineers.  We

9   specialize in healthcare liability insurance.  We

10  do property, we do casualty, cyber liability.

11  There's so many different coverages in

12  professional liability.

13  Q.  Cyber liability has to be huge right

14  now.

15  A.  It's probably one of the fastest

16  growing products for us.

17  Q.  Especially with the AI, I assume.

18  A.  It is.

19  Q.  Yeah.  What about do y'all cover

20  employee liability policies for companies?

21  A.  By employee liability, you mean

22  employee benefits liability or do you mean --

23  what sort of employee liability?

Page 17

1    Q.    Coverage for employees' actions,

2  misconduct.

3        A.    We do broker insurance coverage for

4  employment practices liability.

5    Q.    And what does that mean?

6        MS. BARLOTTA:  Object to form.

7    Q.    Explain that type of coverage.

8        MS. BARLOTTA:  Object to form.

9        A.    By that, do you mean what does it

10  cover?

11    Q.    Right.

12        A.    Employment practices liability covers

13  a broad range, but from sexual harassment,

14  discrimination, racial discrimination, gender

15  discrimination.  It covers a broad range of

16  employment-related liability claims.

17    Q.    Does it cover retaliation?

18        MS. BARLOTTA:  Object to form.  It

19  would depend on the policy, I suppose.

20        A.    It depends.  It does depend.

21    Q.    Are there some that cover

22  retaliation?

23        MS. BARLOTTA:  Object to form.

Page 18

1        A.    There --

2        MS. BARLOTTA:  You can answer if you

3  know.

4        A.    There are some policy forms that will

5  provide coverage for allegations of retaliation.

6    Q.    Now, when you say that you are

7  vice-president and senior broker, are those two

8  different hats that you wear?

9        A.    In my position, it kind of molds into

10  one in the same.  I'm responsible for driving the

11  sales within our department.

12    Q.    And that's professional liability

13  department?

14        A.    Correct.

15    Q.    Okay.  Tell me -- is it okay if I

16  call you Rusty?

17        A.    Sure.

18    Q.    Okay, Rusty, I'm Cynthia.

19        A.    Sure.

20    Q.    Tell me what are your duties and

21  responsibilities as the vice-president?

22        A.    So we have seven teams within

23  professional liability in Birmingham, and my

Page 19

1  responsibility is to lead them from a sales

2  perspective to make sure that all the teams have

3  good market relationships and that they are

4  driving business with their agency relationships

5  and making sure that we have the products that we

6  need from those markets and driving sales.

7            We are a sales organization

8  ultimately, and my responsibility is to help the

9  teams grow.

10    Q.    And then as a senior broker, do you

11  have your own team within your department?

12        A.    I do.

13    Q.    Okay.

14        A.    I should clarify that.  I -- a

15  gentleman named Tyler O'Connor and myself co-lead

16  that individual team, but yes.

17    Q.    And how many -- and I'm talking about

18  currently, like right now, how many people are on

19  that team that you and Tyler O'Connor co-lead?

20        A.    Including the two of us, eleven.

21    Q.    And what are the positions within

22  your team?

23            And let me back up.  What's Tyler

Page 20

1  O'Connor's title?

2        A.    He is a senior broker.

3    Q.    And then what are the other positions

4  on your team?

5        A.    So we have -- let me make sure I get

6  this right.

7    Q.    These are the hard questions.

8        A.    We have account executives, and we

9  have inside broker, and our most recent hire was

10  a broker.  So those are the positions within our

11  team.

12    Q.    Are there any associate brokers on

13  your team?

14        A.    There are not currently associate

15  brokers on our team.

16    Q.    Have there been any in the past?

17        A.    There has been one.

18    Q.    And who was that?

19        A.    Ross Robertson.

20    Q.    Is he still with the company?

21        A.    He is.

22    Q.    And what's his current title?

23        A.    He is a broker as part of our launch

Page 21

1  program, which is another program.
2      Q.  Okay.  When did he become a broker?
3      A.  About a year and a half ago.
4      Q.  But -- so when he became a broker,
5  did he stay on your team?
6      A.  He is.
7      Q.  Okay.  Tell me about the launch
8  program.
9          MS. BARLOTTA:  Object to form.
10     Q.  You said he's a broker on the launch,
11 did I get that right, program?
12     A.  Yes.
13     Q.  What's the launch program?
14     A.  It's a training program that is led
15 corporately by Truist and CRC that he went
16 through, along with many other people around the
17 country.
18     Q.  To -- what's the training program
19 about?
20     A.  Product knowledge, market knowledge.
21 Product knowledge, market knowledge, forming
22 relationships with colleagues around the country,
23 and ultimately down the road, there's no timeline

Page 22

1  to it, but down the road, hopefully some sort of
2  leadership.
3      Q.  For Ross?
4      A.  For anyone who has the opportunity to
5  go through that program.
6      Q.  And when did the launch program come
7  about?  Like when did that become a program?
8      A.  I'm not exactly sure of the year.  So
9  this is a guess.  I'm going to say 2000 -- I
10 think it was right before Covid in '19.
11     Q.  End of the year 2019?
12     A.  Uh-huh (positive response), yeah.
13     Q.  Okay.
14     A.  Fourth quarter, if I recall.
15     Q.  Okay.  And when you said others would
16 attend the launch program, is that something
17 that's just here in Alabama or is that something
18 that's nationwide with Truist?
19     A.  Nationwide.
20     Q.  Okay.  Did anybody else -- and,
21 Rusty, most of my questions are going to be
22 around the Birmingham office.  If I shift where I
23 go outside of that, I'm going to try to let you

Page 23

1  know.
2      A.  Okay.
3      Q.  But if you think we're not on the
4  same page, let me know.
5          But who else, if anybody, from
6  Birmingham attended the launch program?
7      A.  We've had one additional teammate
8  attend.  I'm not sure about property and
9  casualty, but in professional, one additional
10 person.
11     Q.  Who was that?
12     A.  His name is Steele Cadden.
13     Q.  Is he related to John Cadden?
14     A.  He is.
15     Q.  Is he John Cadden's son?
16     A.  He is.
17     Q.  And is he on your team?
18     A.  He is not.
19     Q.  Whose team is he on?
20     A.  Cory Daugherty's.
21     Q.  But he is in property, in your
22 department?
23     A.  Professional.

Page 24

1      Q.  I'm sorry.  Professional?
2      A.  Uh-huh (positive response).
3      Q.  And does he -- tell me the chain of
4  command in your department.
5          MS. BARLOTTA:  Object to form.
6      Q.  Tell me who -- currently, who do you
7  report to?
8      A.  John Cadden.
9      Q.  Okay.  And what's Mr. Cadden's title?
10     A.  He's president of the Alabama office.
11     Q.  And are there other individuals in
12 your department that report to Mr. Cadden?
13     A.  No.
14     Q.  Okay.  And who all reports to you?
15     A.  Just the lead team brokers.  So that
16 would be James Powell, Trey Reich, Truitt Taylor,
17 Lee McClure, Scott Trigg.
18     Q.  Trigg?
19     A.  Trigg.
20     Q.  Okay.
21     A.  I'm leaving someone out.  Let's see.
22 Did I say Truitt?
23     Q.  You did.

Video Deposition of Rusty Hughes                                    1/19/2024
                                                                   7 (25 - 28)

Page 25

1   A.   Truitt.
2   Q.   James, Trey, Truitt, Lee, and Scott.
3   A.   And Tyler.
4   Q.   And for the record, John Cadden is
5   male?
6   A.   He is.
7   Q.   And then are all of the lead team
8   brokers men, the ones you just named?
9   A.   Currently.
10  Q.   Okay.  Does Corey Daugherty report to
11  you?
12  A.   Yes.
13  Q.   And what is his title?
14  A.   He is senior broker.
15  Q.   Is he -- you both have a senior
16  broker title, but are you over him because you
17  have the vice-president title?
18  A.   Only because I was charged with
19  leading the department twelve years ago.
20  Q.   When you were charged with leading
21  the department twelve years ago, was Ron
22  Helveston there?
23  A.   He was.

Page 26

1   Q.   And what was his title?
2   A.   He was president of brokerage at the
3   time, I believe.
4   Q.   For?
5   A.   For -- corporately for CRC.
6   Q.   Okay.  Currently, do you know who Mr.
7   Cadden reports to?
8   A.   Brent Tredway.
9   Q.   And where is he located?
10  A.   Houston, Texas.
11  Q.   Do you know his title?
12  A.   He is president of brokerage.
13  Q.   Is he considered a Truist or a CRC
14  employee?
15  A.   He would be a CRC employee.
16  Q.   And do you know who Mr. Tredway
17  reports to?
18  A.   He would report to Neil Kessler.
19  Q.   And do you know where Neil is?
20  A.   Neil is in Dallas.
21  Q.   And do you know his title?
22  A.   He's CEO of brokerage.
23  Q.   And is he considered Truist or CRC?

Page 27

1   A.   CRC.
2   Q.   Okay.  Do you have any report to
3   anybody that has a Truist job title, any dual
4   reporting?
5   A.   I do not.
6   Q.   Do you know if Mr. Cadden does?
7   A.   Clarify.  Are you asking does he
8   report to anyone who is employed by Truist and
9   not CRC?
10  Q.   Right.  Is there a dual reporting?
11  Like you've told me who he reports to there at
12  CRC above him.
13  A.   Right.
14  Q.   Is there any dual reporting where he
15  reports to anybody at Truist?
16  A.   No.
17  Q.   What's the supervision or oversight
18  of Truist for CRC for your department?
19        MS. BARLOTTA:  Object to form.
20  A.   I'm trying to -- okay.  So do you
21  mean from -- just from a pure business
22  perspective what do we report to them?
23  Q.   Right.

Page 28

1         MS. BARLOTTA:  Same objection.  Go
2   ahead.
3   A.   The only oversight is financial
4   reporting to us -- I mean from us to them on
5   results, and Truist handles all of the benefits
6   and HR functions.
7   Q.   And does Mr. --
8   A.   And I'm not an expert in that, but
9   that's the best way I can explain it.
10  Q.   That's fine.  Is Mr. Kessler on the
11  board of Truist?
12  A.   He is an executive officer.
13  Q.   And is John Howard on the board of
14  Truist?
15  A.   He is the -- he's the chairman of
16  Truist Insurance Holdings.
17  Q.   Are there -- going back to your team,
18  Rusty, are there currently any females on your
19  team?
20  A.   Yes.
21  Q.   Who?  Who are they?
22  A.   We have a female broker.  Her name is
23  Erin Pelham.

Page 29

1   Q.   Pelham?
2   A.   P-e-l -- like the city, Pelham.
3   Q.   Like the city?
4   A.   Uh-huh (positive response).
5   Q.   And anybody else?
6   A.   Yeah.  We have Logan Sanderson.
7   Q.   And what's Logan's title?
8   A.   She's an account executive.
9   Q.   Anybody else?
10  A.   Shelby Hodge.
11  Q.   And Shelby's title?
12  A.   She's inside broker.
13  Q.   Anybody else?
14  A.   Brandy Russell.
15  Q.   And Brandy's title?
16  A.   Inside broker.
17  Q.   Anybody else?
18  A.   Bridget Powell.
19  Q.   And Bridget's title?
20  A.   She's account executive.
21  Q.   Okay.  Anybody else?
22  A.   Amber Finch.
23  Q.   And Amber's title?

Page 30

1   A.   Account executive.
2   Q.   Okay.  Anybody else?
3   A.   How many is that?
4   Q.   One, two, three, four, five, six.
5   Missing somebody?
6   A.   That's it.
7   Q.   Are these in the department or are
8   they on your team?
9   A.   On my team.  On our team.
10  Q.   You and the co-team?
11  A.   Our team.
12  Q.   Okay.  So out of the eleven team
13  members, these six are included in that eleven?
14  A.   Yes.
15  Q.   Okay.  When was Shelby Hodge hired?
16  A.   The fall of 2022.
17  Q.   And Logan Sanders?
18  A.   I think she was spring of '22.
19  Q.   Erin Pelham?
20  A.   About five days ago.
21  Q.   Okay.  Amber Finch?
22  A.   2000 -- she transferred to our team
23  from property in 2020.

Page 31

1   Q.   Do you recall what part of the year?
2   A.   It was the Covid year, I remember.
3   Q.   Pre-shutdown, post-shutdown?
4   A.   That's the only thing I remember.  I
5   can't recall exactly when.
6   Q.   That's okay.  If you think about it,
7   let me know.
8   A.   Yeah.
9   Q.   What about Bridget Powell?
10  A.   2021.
11  Q.   And Brandy Russell?
12  A.   She's been with us since 2001, I
13  believe.  I'm not certain on that date, but it's
14  a long time.
15  Q.   Okay.  Was there ever a discussion
16  that you had with anybody in the Birmingham
17  office in any of the departments about the need
18  to hire more women?
19       MS. BARLOTTA:  Object to form.
20  A.   I don't recall that conversation.  I
21  don't recall that.
22  Q.   Did you ever say to anybody, you
23  know, Look, I think we need to hire more women or

Page 32

1   we need to look at promoting more women or --
2       MS. BARLOTTA:  Object to form.
3   A.   I don't recall saying that.
4   Q.   Did you ever see a copy of Ms.
5   Hendrix's charge of discrimination that she filed
6   with the EEOC?
7   A.   I remember a notice coming through,
8   but I don't remember reading it.
9   Q.   What do you understand Ms. Hendrix's
10  complaints to be?
11      MS. BARLOTTA:  Object to form.
12  A.   The only thing I know is gender
13  discrimination.
14  Q.   Did you or do you understand that one
15  of the things that Ms. Hendrix is complaining
16  about is that women were not afforded the same
17  opportunities as men?
18      MS. BARLOTTA:  Object to form.
19  A.   Yes.
20  Q.   And that -- do you understand that
21  she was complaining about a lack of diversity,
22  that there weren't a lot of women in the
23  department?

Page 33

1          MS. BARLOTTA:  Object to form.
2     Q.   In broker positions?
3          MS. BARLOTTA:  Object to form.
4  Complaining when?  In this case?
5          MS. WILKINSON:  Yes.
6     A.   **Do you mean am I aware that she**
7  **complained at any time?**
8     Q.   (BY MS. WILKINSON:)  Well, I'm going
9  to get to that, but like as far as her claims in
10 this lawsuit, do you understand that one of the
11 things that she's saying is that there weren't a
12 lot of women that were given opportunities to be
13 brokers?
14         MS. BARLOTTA:  Object to form.
15    A.   **Yes.**
16    Q.   Did you ever have a discussion with
17 anybody after you became aware of -- and I'm not
18 talking about counsel -- but after you became
19 aware of Ms. Hendrix's claims about, Look, we
20 probably need to get some more women in broker
21 positions?
22         MS. BARLOTTA:  Object to form.
23 Assumes facts not in evidence.

Page 34

1     A.   **No.  It's not something that I think**
2  **about.**
3     Q.   Okay.  I think this is already
4  marked, but let me show you -- I'll go ahead and
5  mark it.
6          Rusty, let me show you what I'm going
7  to mark as Plaintiff's Exhibit 24.  This is Ms.
8  Hendrix's EEOC charge.
9          (Whereupon, Plaintiff's Exhibit No.
10 24 was marked for identification and a copy of
11 same is attached hereto.)
12    Q.   Have you seen a copy of that before
13 today?
14    A.   **Maybe briefly.  I don't recall**
15 **reading it thoroughly.**
16    Q.   It was filed in December of 2019,
17 Rusty.  Do you know when you might have seen it
18 in relation to when it was filed?
19    A.   **I don't.**
20    Q.   Okay.  Did you talk -- and I'm not
21 talking about lawyers, but did you talk to
22 anybody employed with CRC or Truist about the
23 claims in Ms. Hendrix's EEOC charge?

Page 35

1     A.   **No.**
2     Q.   You never had any discussions with
3  Mr. Cadden?
4     A.   **No.**
5     Q.   Okay.  What about human resources for
6  Truist?  Did you ever talk to anybody at human
7  resources about Ms. Hendrix's claims in her
8  charge?
9     A.   **I don't recall that.**
10    Q.   Who was the HR person -- you said
11 Truist handled HR for Birmingham.  Who was the HR
12 person when Kat Hendrix was there?
13    A.   **There was a time, and I don't**
14 **remember when she left the company, but Melody**
15 **Banks was there, I believe, during Ms. Hendrix's**
16 **tenure.  But I think it overlapped with Stefani**
17 **Petty, who took over when Melody Banks left.**
18    Q.   Okay.  And --
19    A.   **And I don't recall a year.**
20    Q.   Okay.  But you recall Melody being
21 there when Kat was there?
22    A.   **I believe so.  I believe she was**
23 **still there.**

Page 36

1     Q.   Okay.  And what was Melody Banks'
2  title, if you know?
3     A.   **Human resources.**
4     Q.   Where was she located?
5     A.   **She was in Birmingham.**
6     Q.   And what about Stefani Petty?  Do you
7  recall her title?
8     A.   **She is human resources for Truist.**
9     Q.   Was Melody human resources for Truist
10 or CRC?
11         MS. BARLOTTA:  Object to form.
12    A.   **For CRC.**
13    Q.   And did she remain the human
14 resources for CRC after the merger with Truist?
15         MS. BARLOTTA:  Object to form.
16    A.   **I don't believe Melody was still**
17 **there at that time.**
18    Q.   Okay.  And where was Stefani Petty
19 located?
20    A.   **She's in North Carolina.**
21    Q.   Rusty, what's the difference between
22 an associate broker and an inside broker?
23    A.   **An inside broker is charged with**

Video Deposition of Rusty Hughes

1  bringing revenue inside the team or having
2  responsibility for a piece of revenue within the
3  team.
4         An associate broker is on a track, on
5  a development track to ultimately become a broker
6  and develop their own relationships. And both
7  can remain within a team.
8      Q.  Okay. And what do you mean by bring
9  in revenue?
10     A.  Is that a reference to the inside
11 broker?
12     Q.  Yes. I'm sorry. Yeah. And thanks
13 for --
14     A.  Yeah, yeah. Develop relationships
15 with agents that may already exist or may not
16 already exist and produce that revenue within the
17 team.
18     Q.  And how -- let's say you're a new
19 broker, any type position, any of the ones we've
20 talked about, because I think there was only
21 inside, associate, and senior, right?
22     A.  At the time or now?
23     Q.  At the time.

1      A.  That would have been --
2      Q.  The type positions.
3          MS. BARLOTTA: Object to form.
4      A.  That sounds correct.
5      Q.  Has that changed?
6          MS. BARLOTTA: Object to form.
7      A.  No.
8      Q.  Any other broker titles other than
9  inside, associate, or senior?
10     A.  No.
11     Q.  Okay. Let's say you're a brand new
12 broker or a brand new inside broker. How do you
13 develop those relationships to bring in revenue?
14         MS. BARLOTTA: Object to form.
15     A.  Two ways. You can identify agents
16 that you want to visit or there are relationships
17 with -- inside a book that currently exist that
18 aren't being calling on, and you can go call on
19 them. It's very team specific. Each team really
20 handles it differently.
21     Q.  And when you say a book, is that like
22 a book of business?
23     A.  Uh-huh (positive response), yes.

1      Q.  And are those agencies that y'all
2  have already developed a relationship with, but
3  it's just not being cultivated?
4          MS. BARLOTTA: Object to form.
5      A.  It can be. It can be that or it can
6  be an agency that's brand new that is known but
7  has never been called on.
8      Q.  Okay. How do you get leads? Do you
9  just cold call or is there somebody within the
10 company that helps with that when you're a new
11 broker?
12         MS. BARLOTTA: Object to form.
13     A.  Most of the time the individual
14 person cultivates those leads within the company.
15 We have agency contracts with thousands of agents
16 that barely know who CRC is in some instances.
17 So it's not difficult to generate warm calls.
18         So oftentimes, it's agency
19 relationships that already are a part of the CRC
20 company.
21     Q.  Okay. And who assigns or gives a new
22 broker those leads or that book?
23         MS. BARLOTTA: Object to form.

1      A.  Typically, the lead broker can work
2  with that person to help them identify targets.
3  So that's one way. The other way is there are
4  individuals that do it solely on their own.
5      Q.  But if there's already -- you said
6  there was like thousands that CRC already has a
7  relationship with. If you're a new broker, does
8  somebody say, Hey, I want you to call on these
9  who we have a relationship with already? Does
10 somebody give them those names or --
11         MS. BARLOTTA: Object to form.
12     A.  Sometimes. But many times the way
13 that it can be done is you identify a region of
14 the country that you want to travel, and you
15 identify agencies within that region, and you go
16 see them.
17     Q.  Does CRC, your department, do y'all
18 do any kind of functions to introduce brokers so
19 that they can get business?
20         MS. BARLOTTA: Object to form.
21     A.  We do a lot of introductions to
22 markets, markets that we place business with, not
23 necessarily a lot of functions with the agency

Page 41

1  side. Those are typically team and individual
2  dependent.
3       Q.   Okay. So each team can do their own
4  kind of business development?
5       A.   Correct.
6       Q.   Okay. Is there any -- or has there
7  been, Rusty, while you've been there any kind of
8  written policy about how you train or develop a
9  new broker?
10          MS. BARLOTTA: Object to form.
11      A.   Train or develop a new broker, no.
12      Q.   Is that just left up to each team or
13  whoever leads the team?
14          MS. BARLOTTA: Object to form.
15      A.   There are training mechanisms for the
16  systems, for, you know, using our -- how to
17  quote, how to bind, how to do all of the basics.
18  There's a way to train for that, but not
19  necessarily for lead generation or calling on
20  agents, no.
21      Q.   The launch program, does that do some
22  of that as part of that leads to the new brokers?
23          MS. BARLOTTA: Object to form.

Page 42

1       A.   The launch program is a -- more of a
2  training program on how to navigate the wholesale
3  business. That may include market introductions,
4  like I said, and -- but, again, it's not
5  necessarily agency focused. That's not the goal
6  of that.
7       Q.   How long does the launch program take
8  for you to go through it start to finish?
9       A.   Two years.
10      Q.   Wow.
11      A.   Yeah.
12      Q.   And how much time each year do you
13  spend in that training program?
14      A.   It's -- there are quarterly meetings,
15  quarterly face-to-face meetings, and there are
16  calls in between those visits. So there are
17  regular -- there's a regular engagement. It's a
18  corporate function.
19      Q.   Who conducts those meetings or who
20  kind of oversees the launch program?
21          MS. BARLOTTA: Object to form.
22      Q.   Not teacher, not --
23      A.   Yeah, I'm not sure who the person is

Page 43

1  that is ultimately over it.
2       Q.   Okay.
3       A.   I'm not sure.
4       Q.   But under that person, like who are
5  the people that are handling the quarterly
6  meetings or --
7          MS. BARLOTTA: Object to form.
8       A.   Our training team is involved in
9  that. Again, I'm not sure who leads that
10  initiative.
11      Q.   Do you do anything with the launch
12  program?
13      A.   I do not.
14      Q.   Okay. Where is the training team?
15  Where are they located?
16          MS. BARLOTTA: Object to form.
17      A.   They're in different places. Some
18  are remote. Some -- again, I'm not exactly sure
19  who all is on the team.
20      Q.   That's okay.
21      A.   It's not something that I oversee, so
22  --
23      Q.   Right.

Page 44

1       A.   Yeah.
2       Q.   Is there a written policy for the
3  launch program? Like is there a -- y'all have
4  got a lot of written policies. Like a PowerPoint
5  or a policy or anything that says, Hey, here's
6  the launch program, and here's what we're going
7  to do through the launch program?
8          MS. BARLOTTA: Object to form.
9       A.   I'm sure there's an agenda, but I
10  don't know where that is.
11      Q.   Have you seen it?
12      A.   No.
13      Q.   Okay. Okay. So there's your team.
14  In the Birmingham office, how many other teams
15  are there?
16      A.   Are we talking about professional?
17      Q.   Yes.
18      A.   Okay. So there's seven in total.
19      Q.   Who are the other leaders or heads of
20  those other teams?
21      A.   James Powell, Trey Reich.
22      Q.   Oh, the ones you told me earlier?
23      A.   Yeah, those are the team leads.

Page 45

```
1    Q.   Okay.  Okay.  Sorry about that.
2    A.   Yeah.
3    Q.   It's just it's a complicated
4  structure, like it's not your typical kind of
5  corporate structure, so thanks.  That's very
6  helpful for me.
7         So back over to your duties, do you
8  do any training for new hires?
9    MS. BARLOTTA:  Object to form.
10   A.   I train with people on my team on how
11 to negotiate.  I let them sit with me, with other
12 people on the team to listen to phone calls, but
13 as far as the training side with regard to the
14 systems or anything like that, no.
15   Q.   Do you give --
16   A.   I mentor.  I do mentor.
17   Q.   Okay.  And I didn't mean to interrupt
18 you, Rusty.  I'm sorry.
19        Do you get involved with hiring
20 anybody for your team?
21   MS. BARLOTTA:  Object to form.
22   A.   For my direct team?  Yes.
23   Q.   And what's your involvement with
```

Page 46

```
1  hiring for your direct team?
2    A.   Interview, introduction to other team
3  members.  And we are involved in the offer, the
4  offering process.  But then once the offer is
5  made, it's turned over to our recruiters and HR.
6    Q.   Okay.  Do you have any involvement
7  with hiring for the department as a whole?
8    MS. BARLOTTA:  Object to form.
9    A.   Not directly involved in hiring for
10 the department as a whole, no.
11   Q.   Interviewing with the department?
12   A.   I may speak with a candidate if
13 someone asks me to, but that's the extent of it.
14   Q.   But it's not the normal practice for
15 you to interview anybody who's coming into the
16 department outside of your team?
17   A.   No.
18   Q.   As far as hiring for your team, do
19 you interview for all positions that are being
20 hired?
21   A.   Yes.
22   Q.   And is anybody else involved in that
23 process other than you?
```

Page 47

```
1    A.   Tyler can be.
2    Q.   Anybody else?
3    A.   We may ask a candidate to speak to
4  other teammates, as I mentioned, but -- and that
5  can be typical.
6    Q.   To make sure everybody gets along
7  kind of thing?
8    A.   Yeah, uh-huh (positive response).
9    Q.   And as far as offers, you're talking
10 about pay, like what to offer a new hire?
11   A.   Uh-huh (positive response).
12   Q.   Do you decide what pay somebody is
13 going to receive if they're a new hire?
14   MS. BARLOTTA:  Object to form.
15   A.   I'm not -- I can make suggestions or
16 find out where their pay currently is if they're
17 coming from a different company.  But in terms of
18 the ultimate decision, no.
19   Q.   Who's the ultimate decisionmaker as
20 far as pay?
21   MS. BARLOTTA:  Object to form.
22   A.   I would say the -- most hiring
23 decisions go just above John Cadden to Brent
```

Page 48

```
1  Tredway in terms of actual offer, the approval of
2  that offer.
3    Q.   Okay.
4    A.   Yeah.
5    Q.   So you can suggest, but they're the
6  ones that have to say yes or no?
7    MS. BARLOTTA:  Object to form.
8    A.   That's where it's ultimately
9  approved, yes.
10   Q.   And does John Cadden also review your
11 suggestions for hire and pay?
12   MS. BARLOTTA:  Object to form.
13   A.   Yes.
14   Q.   What about bonuses?  It's my
15 understanding that a new hire is given an offer
16 letter?
17   A.   Correct.
18   Q.   Are bonuses mentioned or talked about
19 in the offer letter?
20   MS. BARLOTTA:  Object to form.
21   A.   I don't believe so, specifically in
22 the offer letter.
23   Q.   Okay.
```

Page 49

1    A.   Bonuses are mentioned as -- I believe
2 they may be referred to as discretionary.
3    Q.   Okay.  And we're going to come back
4 to bonuses.
5    A.   Okay.
6    Q.   Anything else that you do in the
7 department or with your team with regard to
8 hiring?
9         MS. BARLOTTA:  Object to form.
10   A.   Are there -- anything specific I can
11 answer around that?
12   Q.   Right.  Anything that you haven't
13 told me about that you do with regard to hiring.
14        MS. BARLOTTA:  Object to form.
15   A.   No.
16   Q.   What about terminating an employee?
17 Do you have involvement -- let's just start with
18 your team -- in making decisions as far as
19 terminating an employee?
20   A.   Ultimately, that would be a decision
21 that would be made within the team, yes.
22   Q.   And as the person over the team,
23 would you have final say about terminating an

Page 50

1 employee or would you have to go above you?
2    A.   Above.
3    Q.   Who would you have to get --
4    A.   That would be Stefani Petty.
5    Q.   What about Mr. Cadden or Mr. Tredway?
6    A.   If it got to that point, they would
7 absolutely be involved in that.
8    Q.   If somebody is going to be terminated
9 in the department outside of your team, do you
10 get involved with that?
11   A.   No.
12   Q.   Okay.  That would be up to whoever is
13 over that team?
14   A.   Right.
15   Q.   Okay.  What about discipline?  Do you
16 get involved if an employee is going to be
17 disciplined?
18        MS. BARLOTTA:  Object to form.
19   A.   That would be HR.
20   Q.   Can you recommend discipline?
21        MS. BARLOTTA:  Object to form.
22   A.   Sure.
23   Q.   Do you do any type of training for

Page 51

1 your employees related to -- and, Rusty, I call
2 them EEO policies, like policies regarding
3 discrimination, harassment, or retaliation.  Do
4 you teach or do any training like that for your
5 employees?
6         MS. BARLOTTA:  Object to form.  You
7 can answer if you understand the question.
8    A.   Do you mean do I directly have
9 training responsibilities with employees on my
10 team?
11   Q.   Right, right.
12   A.   No, but that is a function of the
13 Truist HR system.  There are tests and procedures
14 that each new employee and current employees have
15 to complete as part of your employment.
16   Q.   When the merger happened and it
17 became Truist, did CRC then use Truist's handbook
18 and policies?
19        MS. BARLOTTA:  Object to form.
20   A.   Meaning did -- let me make sure I
21 understand the question.  Meaning did it go from
22 CRC HR practices over to Truist practices at that
23 point?

Page 52

1    Q.   Yes.
2    A.   Okay.  Yes.
3    Q.   And throughout the time that -- just
4 let's start with the merger.  Throughout the time
5 that the merger happened, has there been an
6 employee handbook?
7         MS. BARLOTTA:  Object to form.
8    A.   There's an employee handbook.
9    Q.   And is that employee handbook a
10 Truist or BB&T handbook?
11   A.   Truist.
12   Q.   Truist.  Is there a different
13 handbook for employees and then managerial or
14 supervisory employees or is it the same handbook?
15   A.   Same handbook.
16   Q.   Okay.
17   A.   To my knowledge.
18   Q.   And do -- go ahead.
19   A.   To my knowledge, that --
20   Q.   And do employees go over the Truist
21 handbook -- and I'm talking about, again, after
22 the merger -- every year?
23        MS. BARLOTTA:  Object to form.

Page 53

1    A.   I don't believe so.  Not every year.

2    Q.   Have you gone through training since

3  the merger on any policies related to harassment,

4  discrimination, retaliation?

5    A.   Yes.

6    Q.   How often are you trained?  And,

7  again, since the merger.

8    A.   That is a yearly task that we have to

9  complete within our intranet through the Truist

10  HR site, and that -- I believe that is outside of

11  the employee handbook.  That's separate.

12    Q.   Is that done electronically?

13    A.   Uh-huh (positive response).

14    Q.   And do you kind of go -- tell me how

15  the -- just tell me what you see and how that

16  training is presented electronically.

17    A.   They are done in modules.  There's a

18  reading part that you go through, and then at the

19  end there's a test usually.  And some parts --

20  some of them require a written test or an

21  electronic test, and some just require an

22  acknowledgement.

23    Q.   Okay.  Let me show you -- and this is

Page 54

1  -- I'm so sorry --

2    A.   Yeah.

3    Q.   -- a bad copy when we copied it.

4    MS. WILKINSON:  Leslie, do you see my

5  copy of this one?

6    Q.   (BY MS. WILKINSON)  Rusty, let me

7  show you what I'm going to mark as Plaintiff's

8  Exhibit 25.  And all I'm asking right now is:  Is

9  this one of the module trainings that you would

10  go through with Truist?

11    (Whereupon, Plaintiff's Exhibit No.

12  25 was marked for identification and a copy of

13  same is attached hereto.)

14    MS. WILKINSON:  Here you go, Rachel.

15    MS. BARLOTTA:  Thanks.

16    MS. WILKINSON:  I probably have it.

17  Oh, here it is right here.  It's right in front

18  of me.

19    A.   It looks similar.  It's still labeled

20  BB&T.  It looks similar to what we would -- the

21  modules that we would complete.

22    Q.   Okay.  Do --

23    A.   I'm not sure it's exact, but it's

Page 55

1  similar.

2    Q.   Okay.  And do all employees have to

3  go through some type of training module annually

4  regarding harassment, discrimination, and

5  retaliation?

6    MS. BARLOTTA:  Object to form.

7    A.   Through the electronic modules, I

8  believe so.

9    Q.   Okay.  What is discrimination under

10  Truist's policy?  What do you understand

11  discrimination to be?

12    MS. BARLOTTA:  Object to form.

13    A.   By that, do you mean types of

14  discrimination or --

15    Q.   What is discrimination?

16    MS. BARLOTTA:  Object to form.  In

17  what sense?

18    MS. WILKINSON:  In the sense of the

19  policy.

20    Q.   (BY MS. WILKINSON)  How does Truist

21  define what conduct or actions would be

22  discrimination?

23    MS. BARLOTTA:  Like you're asking him

Page 56

1  to quote a policy?

2    MS. WILKINSON:  No.

3    Q.   (BY MS. WILKINSON)  Just what do you

4  understand is the policy?

5    MS. BARLOTTA:  Object to form.

6    A.   I'm not sure I know how to understand

7  -- how to answer that clearly.

8    Q.   Let me back up a little bit.

9    A.   Okay.

10    Q.   As the VP and the senior broker who's

11  over your team, do you have any responsibility

12  for making sure that in the department and on

13  your team there is no discrimination?

14    MS. BARLOTTA:  Object to form.

15    A.   That's not my ultimate

16  responsibility, no.

17    Q.   Is it part of your responsibility?

18    MS. BARLOTTA:  Object to form.

19    A.   No.

20    Q.   Do you have any duty or

21  responsibility to make sure there's no

22  retaliation in your department?

23    MS. BARLOTTA:  Object to form.

Page 57

1    A.  I would refer that to HR.
2    Q.  But do you as somebody who's over
3  that department have any duty or responsibility
4  over your team to make sure that there's no
5  retaliation taking place?
6    MS. BARLOTTA:  Asked and answered.
7  Object to form.
8    A.  I would report it to HR.
9    Q.  Would you do anything to make sure
10  your employees were not being retaliated against?
11    MS. BARLOTTA:  Object to form.
12    A.  I would report that to HR.
13    Q.  Have you ever been trained on -- and
14  this is, again, after the merger -- any examples
15  of what would be discriminatory conduct that
16  would violate Truist's policies?
17    MS. BARLOTTA:  Object to form.
18    A.  Only through the module, the modules
19  that are completed through the website.
20    Q.  And when you've taken any of these
21  modules, were you ever trained that employees
22  were to be treated equally?
23    MS. BARLOTTA:  Object to form.

Page 58

1    A.  I believe it makes mention of that.
2    Q.  And that one way there could be
3  discrimination is if you don't treat employees
4  equally, let's say you treat, you know, whites
5  better than blacks or men better than women, that
6  that can sometimes create discrimination?  Were
7  you trained on that?
8    MS. BARLOTTA:  Object to form.
9    A.  That may be part of the gender
10  discrimination module.
11    Q.  Did you have any duty to make sure
12  that the women in your department were being
13  treated equally to the men?
14    MS. BARLOTTA:  Object to form.  Asked
15  and answered.
16    A.  Could you ask that again?
17    MS. BARLOTTA:  You can answer if you
18  understand.
19    Q.  Sure.  Did you have any duty or
20  responsibility, either on your team or within the
21  department, Rusty, to make sure that the women
22  were treated equally to the men?
23    MS. BARLOTTA:  Object to form.

Page 59

1    A.  I -- not me directly.  I think that
2  is -- I certainly think we have a culture where
3  it exists, that women and men are treated
4  equally.
5    Q.  Who -- you said not you directly.
6  Who would have -- since the merger, who would
7  have responsibility for the professional
8  department or your team making sure that women
9  are treated equally to men?
10    MS. BARLOTTA:  Object to form.
11    A.  Again, if that were something that
12  needed to be addressed, it would be directed to
13  HR.
14    Q.  Ms. Petty?
15    A.  Yes.
16    Q.  Who was in North Carolina?
17    A.  Correct.
18    MS. BARLOTTA:  Cynthia, I need a
19  restroom break when you get to a stopping point.
20    MS. WILKINSON:  We can go now.
21    Yeah, any time.  Just let me know.
22  Rusty, but be sure to take your mic off.  I pull
23  mine off all the time.  But hold on.  Let her

Page 60

1  take us off the record.
2    VIDEOGRAPHER:  We are now off the
3  record.  The time is 11:02.
4    (Whereupon, a brief recess was
5  taken.)
6    VIDEOGRAPHER:  We are now on the
7  record.  The time is 11:13.
8    Q.  (BY MS. WILKINSON:)  Okay.  Rusty,
9  we're back on the record.  Anything you want to
10  change about your prior testimony?
11    A.  No.
12    Q.  Okay.  Rusty, let me show you what
13  I'm going to mark as Plaintiff's Exhibit 26.
14  This is a 2019 -- it says BB&T at the top, but
15  it's my understanding this was a handbook that
16  CRC and Truist used.
17    (Whereupon, Plaintiff's Exhibit No.
18  26 was marked for identification and a copy of
19  same is attached hereto.)
20    Q.  Have you ever -- and my first
21  question is:  Have you ever seen this either
22  electronically or in paper form?
23    A.  It looks familiar.

Page 61

1    Q.   Okay.  When CRC and Truist responded
2  to Ms. Hendrix's EEOC charge, this is the
3  handbook or portions of the handbook that they
4  submitted to the EEOC.  Would you have had --
5  back up.
6         When handbooks were distributed to
7  employees, there was a new handbook, were they
8  distributed in paper copy or electronically?
9         MS. BARLOTTA: Object to form.
10   **A.   I'm sure at one point they were paper**
11 **copies.  I'm not sure when they switched to**
12 **electronic, but I believe now they're electronic.**
13   Q.   Was there a new handbook every year
14 or only if there was a change in a policy?
15        MS. BARLOTTA: Object to form.
16   **A.   I don't know.**
17   Q.   Look at -- and, Rusty, there are two
18 different numbers in documents that I'll show
19 you.  There's a Bates number in the bottom
20 right-hand corner that's 000286.  If you'll turn
21 to that page.  It will be Page 3.  It will be
22 like the third page back, Rusty, or fourth page.
23 It'll be towards the front, sweetie.

Page 62

1    **A.   Oh, sorry.  Sorry.**
2    Q.   That's okay.  See in the right-hand
3  corner, you see those little numbers?
4    **A.   Uh-huh (positive response).**
5    Q.   And it will be 286.
6    **A.   With Kelly King on the front.**
7    Q.   Yes.  Is Kelly King still the
8  chairman and CEO?
9    **A.   She is not.**
10   Q.   Who is the chairman and CEO now?
11   **A.   Bill Rogers.**
12   Q.   When did Kelly King leave?
13   **A.   I believe he stayed one year as**
14 **co-CEO with Bill Rogers when the merger occurred.**
15 **And, again, I can't remember what year the**
16 **SunTrust and BB&T merger happened.  I think he**
17 **retired at the end of '20.**
18   Q.   Okay.  When --
19   **A.   Again, not certain on that date.**
20   Q.   Okay.  When SunTrust and BB&T merged,
21 was there some criticism about that?
22        MS. BARLOTTA: Object to form.
23   **A.   When you say criticism, do you mean**

Page 63

1  **from a financial institution like the market**
2  **standpoint or do you mean employees?**
3    Q.   Publicly.  I mean, was there -- were
4  there protests or lawsuits filed about the
5  merger?
6         MS. BARLOTTA: Object to form.
7    **A.   Not to my knowledge.**
8    Q.   Were you aware of any complaints that
9  a merger would create racial issues for
10 customers?
11        MS. BARLOTTA: Object to form.
12   **A.   No.**
13   Q.   Any complaints about the merger and
14 racism?
15        MS. BARLOTTA: Object to form.
16   **A.   No.**
17   Q.   There's some articles online about
18 it.  There are actually some lawsuits filed about
19 it.  You didn't hear about any of that?
20        MS. BARLOTTA: Object to the form and
21 move to strike.
22   **A.   I didn't know about that.**
23   Q.   Look at the next page, Rusty, 287.

Page 64

1  When you've been trained, either before or after
2  the merger, has honesty been an important value
3  for either CRC or Truist?
4         MS. BARLOTTA: Object to form.
5    **A.   Of course.**
6    Q.   You expect employees to tell the
7  truth?
8    **A.   Yes.**
9    Q.   Look at Bates Number 288.  When you
10 were trained on -- and this is since the
11 merger -- the handbook, did they go over the
12 history of BB&T?
13        MS. BARLOTTA: Object to form.
14   **A.   Perhaps.  I don't recall that**
15 **specifically.**
16   Q.   Has there been a new handbook issued
17 since 2019 that has changed anything about the
18 history of BB&T?
19        MS. BARLOTTA: Object to form.
20   **A.   I don't know.**
21   Q.   Do you recall a time in 2020, I
22 believe it was the summer of 2020, where -- I
23 think it was Bill King actually submitted a press

Page 65

```
 1   release where he talked about the racist history
 2   of the founders of BB&T?
 3         MS. BARLOTTA: Object to form.
 4      A.  I don't have knowledge of that.
 5      Q.  Where he denounced the founders'
 6   actions?
 7         MS. BARLOTTA: Same objection.
 8      A.  I don't recall that.
 9      Q.  In the history at Bates Number 288,
10   it talks about in the aftermath of the Civil War,
11   and it mentions Alpheus Branch as one of the
12   founders. They were in North Carolina.
13         Did you -- were you given copies or
14   did you receive any statements submitted by
15   Truist, BB&T, CRC, anybody in 2020 about the
16   company denouncing the racist conduct of the
17   owners, the founders?
18      A.  I don't remember that.
19         MS. BARLOTTA: Object to form.
20      Q.  Do you recall there being any
21   statements or any discussions about the founders
22   taking slaves as collateral?
23         MS. BARLOTTA: Object to form.
```

Page 66

```
 1      A.  I don't recall that.
 2      Q.  Do you recall there being any press
 3   releases or statements by anybody at BB&T,
 4   Truist, or CRC where they talked about being
 5   ashamed of the racist history?
 6         MS. BARLOTTA: Object to form.
 7      A.  I don't recall that.
 8      Q.  I mean, it -- from what I've seen, it
 9   was a pretty big deal. I mean, you know, King
10   came out and issued this release that said, We
11   are ashamed. We are going to move past this. We
12   are going to take steps to make sure that we are
13   inclusive and don't discriminate. And we
14   understand that the founders engaged in some
15   conduct that was racially offensive and
16   discriminatory.
17         You don't remember anything about
18   that?
19      A.  I do not.
20         MS. BARLOTTA: Object to form. Move
21   to strike.
22      Q.  When there was discussion about --
23         MS. BARLOTTA: Let me get my
```

Page 67

```
 1   objections in, okay?
 2         THE WITNESS: Okay.
 3         MS. BARLOTTA: Thank you. Just a
 4   reminder.
 5      Q.  Yeah, just to make sure she can get
 6   them on the record.
 7         When there were discussions about the
 8   merger with BB&T that later became Truist, when
 9   CRC was talking about that, was there any
10   discussion about the prior history of the
11   company?
12         MS. BARLOTTA: Object to form.
13      A.  I don't remember that.
14      Q.  Do you recall there being any
15   discussions after 2020 about needing to change
16   the handbook to take the history out of the
17   handbook talking about the Civil War?
18         MS. BARLOTTA: Object to form.
19      A.  I don't remember that.
20      Q.  You don't recall groups protesting
21   Truist because of this racist history?
22      A.  I don't.
23         MS. BARLOTTA: Object to the form.
```

Page 68

```
 1   Move to strike.
 2      Q.  Well, in the 2019 handbook that BB&T
 3   submitted to the EEOC, or portions of it to the
 4   EEOC, sends three pages, Bates Number 288, 289,
 5   and 290, talking about the history of BB&T and
 6   the founders. Has that been removed from any
 7   handbook --
 8         MS. BARLOTTA: Object.
 9      Q.  -- after 2019?
10         MS. BARLOTTA: Object to form. Move
11   to strike.
12      A.  I don't know.
13      Q.  Look at Page 290. Under Management
14   Beliefs, Rusty, in the bottom right-hand corner
15   of that bottom paragraph says: On the following
16   pages, the members of BB&T's executive management
17   team, and then the next pages are photographs of
18   the executive management team.
19         And if you'll flip the page, Rusty,
20   it's got Kelly King and then Daryl Bible. Is Mr.
21   Bible still there?
22      A.  I'm not sure if he retired or not.
23      Q.  Okay. Did you ever meet him or work
```

Page 69

1   with Mr. Bible?
2       A.   Never did.
3       Q.   Okay.  And both Mr. King and Mr.
4   Bible are white males; is that correct?
5            MS. BARLOTTA:  Object to form.
6       A.   By appearance, it seems.
7       Q.   Flip to the next page, Bates Number
8   292.  It lists -- it shows a photograph of W.
9   Bennett Bradley, the manager of operations.  Is
10  Mr. Bradley still there?
11      A.   I have no idea.
12      Q.   And he is a white male, correct?
13           MS. BARLOTTA:  Object to form.
14      A.   Appears to be.
15      Q.   And then it's got at Bates Number
16  292, Barbara Duck as the chief information
17  officer.  Is Ms. Duck still there?
18      A.   I'm not sure.  I'm not familiar.
19      Q.   She appears to be a white female?
20           MS. BARLOTTA:  Object to form.
21      A.   Appears to be.
22      Q.   Okay.  The next page, 293, it's got a
23  picture of Jim Gordon, the chief credit officer.

Page 70

1   Do you know if Mr. Gordon is still there?
2       A.   I don't know him.
3       Q.   He appears to be a white male?
4            MS. BARLOTTA:  Object to form.
5       A.   Yes.
6       Q.   And then it's got Donna Goodrich,
7   SEVP and treasurer.  Do you know if she's still
8   there?
9       A.   I don't know her.
10      Q.   And she appears to be a white female?
11           MS. BARLOTTA:  Object to form.
12      A.   Appears to be.
13      Q.   The next page, 294, it lists
14  Christopher Henson as the president and chief
15  operating officer of BB&T Corporation.  Do you
16  know if Mr. Henson is still there?
17      A.   I don't -- I don't think so.
18      Q.   Do you know when he would have left?
19      A.   I don't.
20      Q.   Do you know who replaced him?
21      A.   I do not.
22      Q.   And he appears to be a white male?
23      A.   Appears to be.

Page 71

1       Q.   Okay.  And in the bottom there's
2   Robert -- again, Bates Number 294, Robert J.
3   Johnson, Jr., SEVP, general counsel, and
4   secretary and chief corporate governance officer.
5   Is Mr. Johnson still with the company?
6       A.   I have no idea.  I don't know him.
7       Q.   And he appears to be a white male?
8            MS. BARLOTTA:  Object to form.
9       A.   Appears to be.
10      Q.   And flip to Bates Number 295.
11  There's Brant Standridge, president retail
12  banking.  Is Mr. Standridge still there?
13      A.   I don't know.
14      Q.   And he appears to be a white male?
15           MS. BARLOTTA:  Object to form.
16      A.   Appears to be.
17      Q.   And then there's Clark Starnes, SEVP
18  and chief risk officer.  Is Mr. Starnes still
19  there?
20      A.   I don't know.
21      Q.   And he appears to be a white male?
22           MS. BARLOTTA:  Object to form.
23      A.   Appears to be.

Page 72

1       Q.   And then the next page, 296, is David
2   Weaver, SEVP, president community banking.  Is
3   Mr. Weaver still there if you know?
4       A.   I don't know.
5       Q.   Okay.  He appears to be a white male?
6            MS. BARLOTTA:  Object to form.
7       A.   Appears to be.
8       Q.   And then Donta L. Wilson, SEVP, chief
9   digital and client experience officer.  He
10  appears to be a black male.
11           MS. BARLOTTA:  Object to form.
12      A.   Appears to be.
13      Q.   Do you know if Mr. Wilson is still
14  there?
15      A.   I don't know.
16      Q.   And then at Bates Number 297, Rufus
17  Yates is the SEVP, president, and CEO of BB&T
18  Securities, LLC, financial services and
19  commercial finance manager.  Do you know if Mr.
20  Yates is still there?
21      A.   I do not know.
22      Q.   He appears to be a white male?
23           MS. BARLOTTA:  Object to form.

Page 73

1    A.   Appears to be.
2        Q.   Out of the thirteen, there are two
3    women and one person of color.  Have you ever
4    been a part of any discussions at BB&T about the
5    lack of diversity at the executive management
6    level?
7        MS. BARLOTTA:  Object to form.  Move
8    to strike.
9        A.   I have not.
10       Q.   When you've been trained on the
11   handbook annually, are the pictures of the
12   executive managers included in that training?
13       MS. BARLOTTA:  Object to form.
14       A.   I don't believe so.  I don't know.
15       Q.   Okay.  When you've been trained after
16   the merger, were there discussions about the
17   heritage and culture of BB&T?
18       MS. BARLOTTA:  Object to form.
19       Q.   And Truist?
20       A.   I don't recall that.
21       Q.   At Bates Number 297, Rufus Yates in
22   the handbook is talking about:  We are fortunate
23   to be a part of a company with a strong heritage

Page 74

1    of developing great industry and community
2    leaders, and he talks about our culture.  Do you
3    recall any of that, any talk about heritage or
4    culture in any of the training that you've
5    attended since the merger?
6        MS. BARLOTTA:  Object to form.
7        A.   I don't recall any of that.
8        Q.   Okay.  Look at Bates Number 330,
9    Rusty, under Introduction.  It will be 300.  I'm
10   sorry.  300.  I told you the wrong one.
11       A.   Oh, 300.  Okay.
12       Q.   There we go.  The second paragraph,
13   kind of toward the bottom, it says:  These
14   policies apply to BB&T Corporation and its
15   subsidiaries and affiliates.  And that would
16   include CRC?
17       MS. BARLOTTA:  Object to form.
18       Q.   Is that correct?
19       A.   I can only assume affiliate means an
20   associated company.
21       Q.   And over on the right-hand side,
22   there's a BB&T -- excuse me -- code of ethics for
23   associates.  And the first paragraph says:  Our

Page 75

1    commitment to excellence is grounded in the BB&T
2    code of ethics for associates.  BB&T was built on
3    its strong values and high ethical standards.
4        Was there any talk after -- you know,
5    at any time in 2020 or after about BB&T being
6    built on racism?
7        MS. BARLOTTA:  Object to form.  Asked
8    and answered.
9        A.   No.
10       Q.   Look at the next page, Rusty, 301,
11   under Personal Responsibility.  About midway
12   down, it talks about if there's a violation of
13   the code of conduct or the handbook, you should
14   advise your manager immediately.
15       Is that what you understood was the
16   way for an employee to complain?
17       MS. BARLOTTA:  Object to form.
18       A.   That's what it says.
19       Q.   And did BB&T, CRC, Truist, have an
20   open door policy where if you thought that there
21   was any kind of harassment, discrimination, or
22   retaliation, you could complain to anybody?
23       MS. BARLOTTA:  Object to form.

Page 76

1        A.   I would say yes.
2        Q.   And is that because they would want
3    to know about the complaint, so they keep it open
4    for employees to come to anybody?
5        MS. BARLOTTA:  Object to form.
6        A.   Yes.
7        Q.   And does BB&T, CRC, Truist, want to
8    know about any complaints of discrimination,
9    harassment, or retaliation so that they can stop
10   it if it's actually happening at work?
11       MS. BARLOTTA:  Who at Truist and
12   BB&T?
13       Q.   Does the company -- have you been
14   trained that the company wants to know about
15   complaints so that they can stop it if there is
16   any discrimination, harassment, or retaliation at
17   work?
18       MS. BARLOTTA:  Object to the form.
19       A.   So by training, you mean through the
20   modules that we're given?  Is that what that is
21   in reference to?
22       Q.   Well, I mean, do you have any
23   understanding through any training or any

Page 77

1  discussions with anybody at CRC, Truist, BB&T
2  that they want to -- if discrimination,
3  harassment, or retaliation is reported, they want
4  to investigate it and stop it if it's happening?
5       MS. BARLOTTA: Object to form. I
6  guess I'm -- I don't know. You're asking him in
7  general like what the companywide people think on
8  the executive level?
9       **A.  You're asking me that do I think the**
10 **company would want -- simply put, do I think the**
11 **company would want to know about discrimination,**
12 **retaliation, or harassment so that they could**
13 **intervene and stop it --**
14      Q.  Yes.
15      **A.  -- basically?**
16      Q.  Yes.
17      **A.  I think yes.**
18      Q.  And do you understand that
19 discrimination, harassment, and retaliation in
20 the workplace is illegal?
21      MS. BARLOTTA: Object to form.
22      Q.  That it violates federal laws?
23      MS. BARLOTTA: Object to form.

Page 78

1       **A.  Yes.**
2       Q.  Look at Bates Number 304 under the --
3  Rusty, on the right-hand side, it's Equal
4  Opportunity and Affirmative Action. Did BB&T
5  have an affirmative action policy?
6       MS. BARLOTTA: Object to form. If
7  you know.
8       **A.  I don't know. Affirmative action? I**
9  **don't know.**
10      Q.  Well, it mentions equal opportunity
11 and affirmative action. Were you ever trained on
12 affirmative action?
13      MS. BARLOTTA: Object to form. Move
14 to strike.
15      **A.  On affirmative action specifically,**
16 **no.**
17      Q.  Any time that you've gone over the
18 handbook annually or any of the policies, in any
19 of the modules, was there any discussion about
20 affirmative action?
21      MS. BARLOTTA: Object to form.
22      **A.  I don't recall that specifically.**
23      Q.  And what do you understand

Page 79

1  affirmative action to mean?
2       MS. BARLOTTA: Object to form. Just
3  his personal understanding in general?
4       Q.  I'm asking your understanding as
5  somebody who's over a department who's a
6  vice-president --
7       MS. BARLOTTA: Well, if you're asking
8  him his understanding of the policy, he's already
9  said he was not familiar with it. If you're
10 asking his understanding in general, that's
11 different about what he in general knows about
12 affirmative action.
13      MS. WILKINSON: I wasn't through
14 speaking, but --
15      MS. BARLOTTA: I'm sorry.
16      Q.  (BY MS. WILKINSON:) But, I mean,
17 you've heard the term before, right?
18      **A.  I have.**
19      Q.  And it's in the handbook, correct?
20      **A.  It appears to be, yes.**
21      Q.  And what do you understand
22 affirmative action to mean?
23      MS. BARLOTTA: Again, are we asking

Page 80

1  him about what it means in -- you're asking him
2  to interpret the handbook or are you just asking
3  him in general what his understanding of
4  affirmative action is?
5       MS. WILKINSON: Just in general, and
6  then we'll go further.
7       **A.  Just my basic definition of**
8  **affirmative action would be a company making sure**
9  **that there are -- that there's not racial**
10 **discrimination, that there's not gender**
11 **discrimination, and that positions within a**
12 **company are equally occupied by people of all**
13 **ethnicities and race, gender. That's the best**
14 **definition that I can come up with.**
15      Q.  (BY MS. WILKINSON:) Okay.
16      **A.  Without Googling it.**
17      Q.  Thanks, Rusty.
18      Flip to the next page, 305. On the
19 left-hand side is the equal opportunity policy.
20 And it says: BB&T is committed to equal
21 opportunity for all associates and applicants.
22 BB&T will not discriminate against applicants,
23 and then it lists the specific categories.

Page 81

1      Did -- and this is after the merger,
2  Rusty.  Did CRC also have a separate equal
3  opportunity policy?
4      MS. BARLOTTA:  Object to form.
5      Q.    Separate and apart from this one from
6  BB&T or Truist?
7      A.    No.  Everything that we -- that is
8  part of the handbook is a part of Truist.
9      Q.    Okay.  So CRC didn't keep any
10  individual policies?  They were all those after
11  the merger from BB&T and Truist?
12     A.    Yes, correct.
13     Q.    And look at on the same Bates Number
14  305, Affirmative Action.  It says:  BB&T is an
15  affirmative action employer and strives to make
16  certain that women, people of color, the disabled
17  and protected, or disabled veterans are fairly
18  represented at all levels within the
19  organization.
20         Do you recall in any of the training
21  that you've had any discussion about making sure
22  that women were fairly represented at all levels?
23     MS. BARLOTTA:  Object to form.

Page 82

1      A.    Not specifically.
2      Q.    Generally?
3      A.    Generally maybe, but I would hire
4  based on the person's ability, experience.
5      Q.    When Kat was there, when Ms. Hendrix
6  was in the department, you were still over a
7  team?
8      A.    Correct.
9      Q.    And you were -- were you also the
10  vice-president during Kat's employment?
11     A.    I believe -- yes, I was, yes, since
12  2012.
13     Q.    And Kat left end of 2019.  Her
14  employment ended end of 2019, kind of early 2020,
15  and we'll go over all that, but do you recall how
16  many women were on your team at the time that Ms.
17  Hendrix's employment ended?
18     A.    On my direct team?
19     Q.    Yes.
20     A.    Give me just a second.  Let me think.
21     Q.    Sure.
22     A.    At that time, I believe two, if
23  memory serves.

Page 83

1      Q.    Was Kat one of those?
2      A.    On my direct team?
3      Q.    Yes.
4      A.    On my direct team, no.
5      Q.    Who were the two women?
6      A.    Brandy Russell and Karissa Cooley.  I
7  think she was still there at that time.
8      Q.    And what was Brandy's title at that
9  time?
10     A.    At that time, account executive.
11     Q.    And what about Karissa?
12     A.    Account executive.
13     Q.    Did you have any female brokers in
14  late 2019, early 2020?
15     A.    And clarify, on my direct team?
16     Q.    Yes.
17     A.    On my direct team, no.
18     Q.    And just total number on your team in
19  late 2019, early 2020, how many members were on
20  your team?
21     A.    Let's see.  I believe five.
22     Q.    And department-wise, how many women
23  were in the professional department?  And I'm

Page 84

1  talking again about late 2019, early 2020.
2      A.    Yeah.  I would have to give that some
3  thought.  But I think around twelve or thirteen.
4      Q.    Out of how many?
5      A.    At that time -- we've grown.  So at
6  that time, probably -- probably thirty-five or
7  so.
8      Q.    And were most of the women in the
9  whole department --
10     A.    But, again, let me clarify.  That's
11  an estimate.  I haven't written them down.
12     Q.    Right.  No, no.  That's fine.
13     A.    Okay.
14     Q.    In 20 -- late 2019 and early 2020,
15  were most of the women in the whole department --
16  the majority of their positions were account
17  executives?
18     A.    We had Susan Phillips was a broker.
19  We had Kathy Reeves was an inside broker.  I'm
20  trying to remember at that time what Lauren
21  Lindberg's title was.  It was either account
22  executive or inside broker.  I can't recall
23  exactly at that time.

Page 85

1     Q.   When did Kathy Reeves become a
2  broker?
3     **A.   She was a broker within our team.**
4  **'19 or so, '19 or '20.  I'm trying to remember**
5  **when she retired.  It may have been as far back**
6  **as '18.**
7     Q.   Was -- when Kathy Reeves became a
8  broker, this may help, was Kat still there or was
9  it after Kat's employment ended?
10    **A.   And, again, let me clarify.  I can't**
11 **remember if Kathy's official title was inside**
12 **broker or broker.  I mean, she brokered business**
13 **on our team.**
14    Q.   What's the difference?  I mean, what
15 would be -- I mean, you've got -- you told me
16 there was senior, inside, and associate.  What's
17 the difference in inside broker or broker for her
18 title?
19       MS. BARLOTTA:  Object to form.
20    **A.   Well, I can kind of -- I can tell you**
21 **-- I can kind of set up what an account executive**
22 **is, what an inside broker is, and what a broker**
23 **is.**

Page 86

1        **An account executive is someone who**
2  **sets up files and who quotes, binds, and issues.**
3  **An inside broker is in charge of marketing,**
4  **securing business.  And then a broker, again, is**
5  **in charge of developing their own relationships**
6  **within the team or outside.  It doesn't really**
7  **matter.**
8        **That's the clarification.**
9     Q.   Was Kathy an inside broker before she
10 became just a broker?
11    **A.   She was an inside broker, yes.**
12    Q.   Okay.  So she went from account
13 executive at some point to inside broker?
14    **A.   I believe that's correct.  And I**
15 **can't remember the official year that Kathy was**
16 **hired.  But I believe she came to us as an**
17 **account executive from another broker and was**
18 **then made inside broker.  And I can't remember**
19 **the distinction between inside and broker for**
20 **her.**
21    Q.   What about Lauren?  When did she
22 become an inside broker?  Do you know what year?
23    **A.   I'm going to say around 2019.  I'm**

Page 87

1  speculating.
2     Q.   My understanding is that Lindsey
3  became a broker after Kat was no longer there.
4     **A.   Lindsey?**
5     Q.   Do you recall -- Lauren.  I'm sorry.
6     **A.   Lauren?  That could be right.  The**
7  **years run together.  I'm not sure.**
8     Q.   Okay.  And then when did Susan
9  Phillips become a broker?
10    **A.   Oh, she was a broker -- she's always**
11 **been a broker.**
12    Q.   Since you've had the team?
13    **A.   Yes.  Now, remember, Susan Phillips**
14 **was not on my direct team.**
15    Q.   Well, whose team was she on?
16    **A.   For a while she had her own team, and**
17 **then along 2017 or so when Lee McClure came to**
18 **the department as a broker, she merged into his**
19 **team.**
20    Q.   And then who was over the team?
21    **A.   Lee McClure.**
22    Q.   Do you recall what year that was?
23    **A.   I don't.  It's been a while.**

Page 88

1     Q.   Did Lee come from the outside?
2     **A.   No.  He came from the underwriting**
3  **side.  He was in charge of underwriting our**
4  **London long-term care slip.**
5     Q.   Who had been at CRC longer, Lee
6  McClure or Susan Phillips?
7     **A.   Susan Phillips.**
8     Q.   Who made the decision to put Lee over
9  the team instead of Susan?
10    **A.   It was a joint decision, as I recall,**
11 **between Susan and Lee.**
12    Q.   He then became Susan's supervisor?
13       MS. BARLOTTA:  Object to form.
14    **A.   She would -- she was in his -- under**
15 **his team, yes.**
16    Q.   Did she raise any objections to that?
17    **A.   Not that I recall.**
18    Q.   So she could have?  You just don't
19 recall?
20       MS. BARLOTTA:  Object to form.
21    **A.   I don't recall.**
22    Q.   Did you participate in the decision
23 to put Lee McClure over the team?

Page 89

1   MS. BARLOTTA: Object to form.

2      A.   I was a part of the discussions, but

3   not a part of the ultimate decision. That was

4   left up to them.

5      Q.   Who -- well, did somebody above them

6   have to approve that?

7      A.   Ultimately, that would be John

8   Cadden's.

9      Q.   Did Susan Phillips ever at any time

10  raise any concerns about women being treated

11  differently than men?

12     MS. BARLOTTA: Object to form.

13     A.   No.

14     Q.   Okay. It's only in a deposition that

15  I lose my document. But I'll find it in just a

16  second.

17     (Whereupon, a discussion off the

18  record was held.)

19     Q.   Okay. Rusty, let me show you what

20  I'm going to mark as Plaintiff's Exhibit 27.

21     (Whereupon, Plaintiff's Exhibit No.

22  27 was marked for identification and a copy of

23  same is attached hereto.)

Page 90

1   MS. WILKINSON: Here you go, Rachel.

2   MS. BARLOTTA: Thank you.

3      Q.   (BY MS. WILKINSON:) Have you ever

4   seen this list before?

5      A.   I've not seen this.

6      Q.   Have you ever seen a list like this

7   throughout your tenure with either CRC or Truist?

8      A.   I've seen a list similar to this, but

9   not in this form.

10     Q.   Do you know who drafted it or where

11  it came from?

12     A.   I have no idea.

13     Q.   Okay. This was sent to the EEOC.

14  And my first question, Rusty, is it lists -- you

15  see at the top it's got Manager Level 1, Manager

16  Level 2? Do you know what those headings mean?

17  Because it's got you listed in both columns.

18     A.   I can only assume that it means the

19  person that is leading the team, and then I guess

20  where it has me, it has me as the leader of the

21  department.

22     Q.   Okay. So Manager Level 2 would be

23  the leader of the department?

Page 91

1      A.   I can --

2      MS. BARLOTTA: Object to form. Go

3   ahead, answer.

4      A.   I can only assume that.

5      Q.   Do you know -- can you tell from

6   looking at this what time period this would be

7   for your team, the department?

8      A.   I was trying to see who was on my

9   team. So let me -- I don't know the time period.

10  I'm assuming between '17 and '20 or '16 and '20.

11     Q.   Okay.

12     A.   Just a guess.

13     Q.   The compensation that's listed on the

14  very last column, is that just salary or does

15  that include bonus?

16     MS. BARLOTTA: Object to form.

17     A.   It appears to be salary.

18     Q.   Okay. I count fourteen account

19  executives, and out of those fourteen, twelve are

20  women. Do you recall that sometime late 2019,

21  early 2020, that the huge majority of the account

22  executives were women?

23     MS. BARLOTTA: Object to form.

Page 92

1      A.   That's what it lists here.

2      Q.   Is Ross Robertson still either on

3   your team or in the department?

4      A.   He is.

5      Q.   And what's his current position?

6      A.   He is a broker on our team.

7      Q.   Inside, associate, senior?

8      A.   I believe he is an inside broker. I

9   will have to check on that. I'm not sure of his

10  official title.

11     Q.   Okay. But he's on your team?

12     A.   Yes.

13     Q.   That you oversee?

14     A.   Yes.

15     Q.   When did he become a broker?

16     A.   He's been with us six years. I'm

17  trying to think of the time. Around '22.

18     Q.   Okay. Did he go through the -- that

19  training we talked about, the launch training?

20     A.   He did.

21     Q.   Does he broker or does he get

22  business he's referred?

23     MS. BARLOTTA: Object to form.

Page 93

1    Q.   I mean, does he -- you know, you kind
2    of told me the difference in what they do.  Is he
3    one of those that's a broker that gets business
4    or what does he do?
5        MS. BARLOTTA:  Object to form.
6    A.   So he --
7        MS. BARLOTTA:  Go ahead.
8    A.   So he is currently in the process of
9    beginning to develop his agency base and his
10   customer base.  So he is in the middle of the
11   ramp-up phase.
12   Q.   When he first moved into any type of
13   broker position, what was he doing?
14   A.   He was still doing anything that was
15   asked of him, frankly.
16   Q.   Well -- and fair enough.  Let me
17   clarify, and we'll talk about all of them.  But
18   what was he doing with regard to any broker
19   duties?
20       Like you said, he's just now kind of
21   getting his business.  So when he first moved
22   into that job, what did y'all have him doing as a
23   broker?

Page 94

1        MS. BARLOTTA:  Object to form.
2    A.   At that time, we had him handling a
3    part of the book of business.
4    Q.   Where did he get the part of the book
5    of business?
6    A.   There were agencies that already
7    existed within our book.
8    Q.   Who gave him that particular part of
9    the book?  Who decided, This is what we're going
10   to give Ross Robertson?
11       MS. BARLOTTA:  Object to form.
12   A.   They were not necessarily given to
13   him and are still not given to him.  It's just
14   accounts that he came up in training working, and
15   so they are part of his everyday business cycle
16   now.
17   Q.   Was that position posted, the one
18   that Ross Robertson got?
19       MS. BARLOTTA:  Object to form.
20   A.   No.  There was no need to.
21   Q.   So who decided that Ross would move
22   from account executive into broker?
23   A.   That would be Tyler and I ultimately.

Page 95

1    Q.   Okay.  Did anybody recommend him for
2    the job?
3    A.   Didn't have to.  He did everything
4    that was tasked of him through the development
5    process, and he was given that position as part
6    of that -- as part of his career path.
7    Q.   Had any of the twelve account
8    executives that were working either in the
9    department or on your team, the female account
10   executives, ever indicated that they wanted to
11   move into a broker position?
12       MS. BARLOTTA:  Object to form.
13   A.   To a broker position?  I think it's
14   -- that's individual teams that develop that.  So
15   not necessarily to me.
16   Q.   Let's just go through them.  Had
17   Kathy Cochran ever indicated any interest in
18   moving into a broker job?
19       MS. BARLOTTA:  Object to form.
20   A.   She may have verbalized that she
21   wanted to do more, but, again, that would be a
22   discussion with Trey, who is the team lead.
23   Q.   When did Kathy Cochran say she wanted

Page 96

1    to do more?
2        MS. BARLOTTA:  Object to form.
3    A.   The timeline, I have no idea of the
4    timeline.  I can't remember.  Just at some point
5    in her career.
6    Q.   Do you recall that coming up like
7    pre- or post-Covid?
8    A.   I would say -- if memory serves, I
9    remember, I think, pre-Covid.
10   Q.   Okay.  Did it come up more than once?
11   Did she say I want to do more more than once?
12   A.   Not that I recall.
13   Q.   And by do more, did you understand
14   that she was expressing interest in being a
15   broker?
16       MS. BARLOTTA:  Object to form.
17   A.   To me, it wasn't necessarily being a
18   broker, but doing more on the team is the way
19   that it was understood to me.
20   Q.   Did you ask her, What do you mean by
21   do more?
22       MS. BARLOTTA:  Object to form.
23   A.   No.

Page 97

1    Q.   Did you ever ask her if she wanted to
2  be a broker?
3         MS. BARLOTTA:  Object to form.
4    A.   No.
5    Q.   Do you think she would be a good
6  broker?
7         MS. BARLOTTA:  Object to form.
8    A.   If she wanted to do that, she's
9  smart.  Yes.
10   Q.   Do brokers make more money than
11 account executives?
12        MS. BARLOTTA:  Object to form.
13   Q.   Either through salary or bonus?
14        MS. BARLOTTA:  Same objection.
15   A.   More money?  They can.
16   Q.   And they have the potential to make a
17 lot more money than an account executive; would
18 you agree?
19        MS. BARLOTTA:  Object to form.
20   A.   Yes.
21   Q.   And is that in part because of the
22 potential bonus that they could receive?
23        MS. BARLOTTA:  Object to form.

Page 98

1    A.   Yes.
2    Q.   What about Rhonda Brasher?  Did she
3  ever express any interest in wanting to be a
4  broker?
5    A.   Not to my knowledge.
6    Q.   Is -- do you think Rhonda Brasher
7  would be a good broker?
8         MS. BARLOTTA:  Object to form.
9    A.   I don't know.
10   Q.   Do you get involved with performance
11 evaluations for employees that are on your team?
12   A.   I do.
13   Q.   Do you fill out the performance
14 evaluations for the employees on your team?
15   A.   I do.
16   Q.   And is one of the things that you
17 discuss with them, either through filling out the
18 evaluation form or meeting with them, their
19 goals?
20   A.   There are goals listed within the
21 performance review.
22   Q.   And do you meet with the employees on
23 your team to go over their performance

Page 99

1  evaluations?
2    A.   Not necessarily.  It's mostly done
3  through our Internet website.
4    Q.   Do you ever meet with your employees
5  on your team, or have you ever, to go over what
6  their future goals are, like where do you see
7  yourself in a year, where do you want to be in
8  two, three, five years?
9         MS. BARLOTTA:  Object to form.
10   A.   We do that sometimes informally, and
11 we -- of course, we're always encouraging and
12 trying to help our teammates do more, do better,
13 do what they want to do, accomplish their goals,
14 of course.
15   Q.   Is it the goal of you with your team
16 to promote from within?
17        MS. BARLOTTA:  Object to form.
18   A.   It would be.
19   Q.   And is that because if you promote
20 from within, those are people who understand the
21 business and the company?
22        MS. BARLOTTA:  Object to form.
23   Q.   And the team?

Page 100

1         MS. BARLOTTA:  Same objection.
2    A.   Yes.
3    Q.   And at any time did you ever talk
4  with Kathy Cochran or Rhonda Brasher about their
5  goals, where they wanted to go within the
6  company?
7         MS. BARLOTTA:  Object to form.
8    A.   I don't recall with Rhonda.
9    Q.   Did you ever ask Rhonda, Hey, Rhonda,
10 any desire to be a broker?
11        MS. BARLOTTA:  Object to form.
12   A.   I have not.
13   Q.   Do you think she would be a good
14 broker?
15        MS. BARLOTTA:  Asked and answered.
16        MS. WILKINSON:  No, I haven't asked
17 about Rhonda.
18        MS. BARLOTTA:  Yeah, you did.  He
19 said he didn't know.
20   A.   Yeah, I said I don't know.
21   Q.   (BY MS. WILKINSON:)  Oh, I'm sorry.
22 Okay.
23        What about Brandy Russell?  Has she

Page 101

1  ever expressed any interest in being a broker?
2      A.  No.
3      Q.  Was she on your team?
4      A.  Is she on my team?
5      Q.  Yes.
6      A.  Yes.
7      Q.  And just for the record, Rhonda
8  Brasher is not on your team?
9      A.  She's not on my direct team.
10     Q.  Okay.  And Kathy Cochran is not on
11  your direct team?
12     A.  She's not on my direct team.
13     Q.  Did you ever talk with Brandy Russell
14  about whether she had any interest in being a
15  broker, like you asked her, you know, Where do
16  you want to be in a few years?  Do you want to
17  move up?
18         MS. BARLOTTA:  Object to form.
19     A.  Because she works so closely with me
20  and has for twenty plus years, we've had
21  conversations over the years, and she's indicated
22  to me that she was extremely happy doing exactly
23  what she was doing.

Page 102

1      Q.  So did she specifically tell you, I
2  don't want to be a broker?
3         MS. BARLOTTA:  Object to form.
4      A.  I don't recall that specific
5  statement.
6      Q.  What's -- anything in general about
7  that?  You said specific.  Anything in general?
8         MS. BARLOTTA:  Object to form.
9      A.  Okay.
10     Q.  About her talking about whether or
11  not she wanted to be a broker?
12     A.  I mean, I talk to her every single
13  day, and so she's never indicated to me that she
14  wants to be a broker.
15     Q.  What's her current job title?
16     A.  She's an inside broker.
17         MS. BARLOTTA:  Object to form.
18     Q.  When did she move from account
19  executive to inside broker?
20     A.  I'm not sure of the exact date, but
21  approximately two years ago.
22     Q.  2021 then?
23     A.  Roughly.

Page 103

1      Q.  Okay.
2      A.  And, again, I'm not sure of the exact
3  date right now.
4      Q.  But she's an inside broker?
5      A.  She is.
6      Q.  And who decided she would be an
7  inside broker as opposed to a broker like Ross
8  Robertson?
9         MS. BARLOTTA:  Object to the form.
10     A.  Me.  I did.
11     Q.  How did you determine that that would
12  be her title, that she would be an inside broker
13  as opposed to associate, senior, or just broker?
14     A.  I thought about her strengths, her
15  organizational skills, her ability to stay
16  organized, stay on task, be dependable, and that
17  fit her and her tenure, the amount of time that
18  she has been with CRC, and it was the right fit
19  for that position within our team.  She's a
20  remote employee.
21     Q.  She's been there since 2003?
22     A.  That's correct.
23     Q.  And after she became broker, has her

Page 104

1  title always been inside broker?
2      A.  Say that again.  I'm sorry.
3      Q.  Has she always been an inside broker?
4      A.  No.  She was account executive.
5      Q.  I mean after she became the broker,
6  her title has always been inside broker?
7      A.  Yes, since being --
8      Q.  Moved to inside broker?
9      A.  -- promoted to inside broker.
10     Q.  Did she do the launch program?
11     A.  She did not.
12     Q.  Why not?
13     A.  The launch program is designed more
14  for newer entry-level teammates.
15     Q.  Well, Ross Robertson did it.
16         MS. BARLOTTA:  Object to form.
17     A.  At the time, he had only been
18  there -- and, again, I can't remember the exact
19  year that he began the launch program.  But at
20  the time, I know he had only been there for a
21  couple of years.  Brandy has been at CRC for
22  twenty plus.
23     Q.  Who else did you tell me attended the

Page 105

1   launch program?
2       A.   Steele Cadden.
3       Q.   And had he been employed for a while
4   before he attended the program?
5       A.   No.
6       Q.   Did Brandy ask to go to the launch
7   program?
8       A.   Not that I recall, no.
9       Q.   And would her participating in the
10  launch program help her do her job better?
11      A.   No.
12           MS. BARLOTTA:  Object to the form.
13      Q.   Isn't that the purpose of the launch
14  program?
15           MS. BARLOTTA:  Object to form.
16      Q.   Help you develop your book, help you
17  develop sales?
18           MS. BARLOTTA:  Object to form.
19      A.   If -- yes, if you want to be a broker
20  and you want to assume that role, then, yes, I
21  would assume that the launch program would be
22  helpful.
23      Q.   Maria Powell, she was not on your

Page 106

1   team --
2       A.   Maria Poe?
3       Q.   Poe.  I'm sorry.
4       A.   Yeah, yeah.  Making sure.
5       Q.   Yeah, yeah.  Sorry, sorry.  She was
6   not on your team, but she's in the department.
7   Do you recall if she ever talked about being a
8   broker?
9       A.   I don't recall that.
10      Q.   Is she still an account executive in
11  the department?
12      A.   She is.
13      Q.   Okay.  Do you know enough about her
14  to know whether or not she would be a good
15  broker?
16      A.   She is on James Powell's team.  I do
17  not have a lot of interaction with her.
18      Q.   Right.
19      A.   She's not in the office, so I can
20  only assume that she is doing a good job doing
21  her current role.
22      Q.   Okay.  And then what about Denisa
23  Lovoy, who is -- at one point was on your team?

Page 107

1   Is she still on your team?
2       A.   She is not.
3       Q.   She was an account executive.  How
4   did her employment end?
5       A.   She transferred teams to Lee
6   McClure's team.  He needed someone to fill a
7   service role for renewals, for follow-ups, and so
8   she moved to his team.
9       Q.   And is she still an account executive
10  on his team if you know?
11      A.   She is.
12      Q.   Did she ever express any interest in
13  being a broker?
14      A.   Not to me.
15      Q.   Did you ever talk to her about being
16  a broker?
17      A.   No.
18      Q.   Do you think she would be a good
19  broker?
20           MS. BARLOTTA:  Object to form.
21      A.   Knowing her, I don't think that she
22  wants to be a broker.
23      Q.   But you don't know for sure?

Page 108

1       A.   I don't know for sure.
2           MS. BARLOTTA:  Object to form.
3       Q.   Okay.  And then what about Andrea
4   Sutton?  She was not on your team but in the
5   department.  Is she still in the department?
6       A.   Oh, yeah.
7       Q.   Is she still an account executive?
8       A.   She is.
9       Q.   Did you ever talk to her about being
10  a broker?
11      A.   She's on Corey's team.  I personally
12  have not spoken with her about being a broker.
13      Q.   She's been there since, it looks
14  like, 1995.  Do you think she would be a good
15  broker?
16           MS. BARLOTTA:  Object to form.
17      A.   I know over the years she has been
18  extremely happy doing what she's doing.
19      Q.   Do you think she would be a good
20  broker?
21           MS. BARLOTTA:  Same objection.
22      A.   I do.
23      Q.   And then what about Yvette Talsma?

Page 109

1   Am I pronouncing that right?
2       A.  Uh-huh (positive response).
3       Q.  She was in the department but not on
4   your team.  Is she still in the department?
5       A.  She is.
6       Q.  Is she still an account executive?
7       A.  Uh-huh (positive response).
8       Q.  Did you ever talk to her about
9   whether she wanted to be a broker or not?
10      A.  No.
11      Q.  Do you think -- she's been there
12  since 1990.  Do you think she would be a good
13  broker?
14          MS. BARLOTTA:  Object to form.
15      A.  Sure.
16      Q.  Danielle Levingston?
17      A.  Danielle Levingston.
18      Q.  Okay.  She was in the department, not
19  on your team.  Is she still in the department?
20      A.  She is.
21      Q.  Is she still an account executive?
22      A.  I believe she is an inside broker.
23      Q.  So when did she move -- because

Page 110

1   they've got it listed as an account executive.
2   Do you know when she moved to inside broker?
3       A.  Okay.  Where is she listed -- excuse
4   me.  Where is she listed as an account executive,
5   here (indicating)?
6       Q.  Right.  She's kind of halfway down,
7   Rusty.  It's got her hire date 9/7/2010.  It's
8   got her listed as an account executive since
9   2013.  Do you know if that's changed or --
10      A.  I'm almost certain she's an inside
11  broker.
12      Q.  Do you know when she became one?
13      A.  It would have been, I believe, a
14  couple of years ago.
15      Q.  So maybe 2021?
16      A.  Maybe.  Again, that's a guesstimate.
17  I'm not certain of the date, no.
18      Q.  But certainly after Kat left?
19          MS. BARLOTTA:  Object to form.
20      A.  Yes.
21      Q.  And has she been allowed to go
22  through the launch program?
23          MS. BARLOTTA:  Object to form.

Page 111

1       A.  It's not been requested, and she has
2   been in the insurance business for a long time.
3       Q.  So no?
4           MS. BARLOTTA:  Object to form.  You
5   say allowed.
6           MS. WILKINSON:  I didn't hear him say
7   allowed.
8           MS. BARLOTTA:  No, you said allowed,
9   so it just made it seem like that there had to be
10  some sort of like a --
11      A.  Do you mean --
12      Q.  (BY MS. WILKINSON:)  Is she part of
13  the launch program?
14          MS. BARLOTTA:  That she had applied
15  for it and had been rejected or something.
16      A.  No, no.
17      Q.  Well, do you have to request the
18  launch program or does somebody tell you, Hey,
19  I'm putting you in the launch program?
20      A.  There is a -- I'm not sure of the
21  formal process, but I think there's communication
22  that says -- I think it goes to all offices -- if
23  there's anyone that's interested, let us know.

Page 112

1       Q.  Do you know if she expressed any
2   interest in it?
3       A.  I do not.
4       Q.  And are you certain you've seen that
5   communication or are you just guessing?
6           MS. BARLOTTA:  Object to form.
7       A.  I think I remember an e-mail.
8       Q.  Who sent the e-mail?
9       A.  Now, that, I don't recall.
10      Q.  When was it sent?
11          MS. BARLOTTA:  Object to form.
12      A.  I believe the first formation of a
13  launch program was in '19, I believe, as I
14  mentioned.  I recall an e-mail around that time,
15  but a subsequent e-mail, I'm not sure.
16      Q.  But you said earlier that y'all were
17  only letting kind of new hires go through the
18  launch program.  Do you remember telling me that?
19          MS. BARLOTTA:  Object to the form.
20  Mischaracterization of testimony.  That's not
21  what he said.
22      A.  Yeah, I'll clarify.  We're not --
23  it's not us letting.  It's the program is

Page 113

1  designed specifically for newer hires and people
2  that are newer to the insurance business.  That's
3  what it's designed for.
4      Q.   And how did you get that
5  understanding?  Is there like some document or
6  did somebody tell you that?
7      A.   Just general discussions.
8      Q.   New hire meaning within what
9  timeframe?
10         MS. BARLOTTA:  Object to form.
11     Q.   That year or --
12         MS. BARLOTTA:  Object to form.
13     A.   Specific timeframe, I don't know.  I
14  don't know the specific timeframe, just a
15  presumed person new to the -- newer to the
16  insurance business.
17     Q.   Do you have, based on your
18  understanding, because you have people in the
19  launch program, how new that has to be?
20         MS. BARLOTTA:  Object to form.
21     Q.   Based on how you send people to the
22  launch program or let them participate?
23         MS. BARLOTTA:  Object to form.

Page 114

1  Mischaracterization and move to strike counsel's
2  testimony.
3         You can answer if you understand her
4  question.  There was maybe a question somewhere
5  in there, but I'm not sure.
6         MS. WILKINSON:  There was.
7      Q.   (BY MS. WILKINSON:)  And, Rusty, if
8  you don't understand my question --
9      A.   Clarify.
10     Q.   -- you'll let me know.
11     A.   Sure.  Clarify that if you would,
12  yeah.
13     Q.   And let's just back up.  You've got
14  employees that -- you've told me Ross Robertson
15  has been part of the launch program.
16     A.   Uh-huh (positive response).
17     Q.   And Steele Cadden.
18     A.   Yes.
19     Q.   Correct?  And I'm sorry.  I'm just
20  making sure we have the yes on the record.
21     A.   Gotcha.
22     Q.   And you said it's for new people who
23  don't know the insurance industry.  Based on your

Page 115

1  definition of new, what do you mean by that, like
2  how new to the insurance industry?
3         MS. BARLOTTA:  Asked and answered.
4  We've already been over this.  You can answer
5  again.
6      A.   In my mind, new to the insurance
7  business can be zero to five years.  That's
8  still, in my mind, a person newer to the business
9  that is still developing.
10         And look, you can develop on after
11  that, of course.  I still learn things every day
12  that I didn't know about the insurance business.
13  But I would say zero to five years is a good
14  timeline as a guideline.
15     Q.   Can an employee participate in the
16  launch program on their own or do they have to
17  get approval from somebody above them?
18         MS. BARLOTTA:  Object to form.
19     A.   They typically would express
20  interest, and then, of course, that would have to
21  be approved in some sort, and I don't know the
22  exact steps that go along with that.  But they
23  certainly couldn't just show up and say, I'm

Page 116

1  here.  They would have to be approved.
2      Q.   Okay.  Sarah Dunston, in the
3  department but not on your team.  Is she still an
4  account executive?
5      A.   She's no longer with the company.
6      Q.   When did she leave, Rusty?  Do you
7  know?
8      A.   '17 or '18.  I don't recall exactly.
9  It could have been after that.
10     Q.   Truist and CRC has her on this list
11  in late 2019, 2020 as still being employed.  Do
12  you think she was there then?
13         MS. BARLOTTA:  Object to form.
14     A.   Okay.  If she's on this list, then
15  yeah.  I don't remember when she left.
16     Q.   Do you know why she left?
17         MS. BARLOTTA:  Object to form.
18     A.   I think she took another job in a
19  different industry as I recall.
20     Q.   And when she left, was she still an
21  account executive?
22     A.   To my knowledge, yeah.
23     Q.   Did she ever talk about wanting to be

Page 117

1  a broker?
2       MS. BARLOTTA:  Object to form.
3       A.   Not to me.  I don't recall that.
4       Q.   Okay.  Spencer Whitlock, in the
5  department but not on your team.  Is Spencer
6  Whitlock still in the department?
7       A.   He is not.
8       Q.   And when did Spencer leave?
9       A.   I'm guessing around -- if this says
10 that Sarah left in '19 or '20, he probably would
11 have left -- I believe he left before that.  He's
12 an underwriter now, I believe.
13      Q.   With the company?
14      A.   No.  With a market that we do
15 business with.
16      Q.   Okay.  And when he left, was he an
17 account executive?
18      A.   I believe he was.
19      Q.   Did he ever do broker duties?
20      A.   No.
21      MS. BARLOTTA:  Object to form.
22      Q.   Did he hire in as an account
23 executive, if you remember?

Page 118

1       A.   I think so.  I do think so.
2       Q.   And then Amber Varner, in the
3  department but not on your team as an account
4  executive.  Is Amber still there?
5       A.   She is.
6       Q.   Is she still an account executive?
7       A.   She is an inside broker.
8       Q.   Okay.  When did she become an inside
9  broker?
10      A.   I'm guessing eighteen months ago,
11 roughly.
12      Q.   Okay.  So sometime maybe '22?
13      A.   That's a guess, yeah.
14      Q.   But after 2021?
15      A.   Uh-huh (positive response).
16      Q.   And has she been a part of the launch
17 program?
18      A.   No.
19      Q.   And then let me ask you this:  Before
20 Amber became an inside broker, had she ever
21 expressed any interest in being one?
22      MS. BARLOTTA:  Object to form.
23      A.   Not to me personally.

Page 119

1       Q.   Okay.  And this chart has Lauren
2  Lindberg listed as an inside broker.  It's my
3  understanding that she didn't get that job until
4  later in, you know, 2020, 2021.  Do you know when
5  -- does this refresh your recollection about when
6  she became an inside broker?
7       MS. BARLOTTA:  Object to form.  I
8  don't understand your question.  This just has
9  hire date on it.
10      A.   Does this indicate a date when she
11 became --
12      Q.   It does not.  I'm just asking if any
13 of this information is triggering any kind of
14 recollection on your part.
15      A.   I can't recall exactly when she
16 became an inside broker.
17      Q.   And did she do the launch program?
18      A.   She did not.
19      Q.   And Tonya Vance, in the department
20 but not on your team.  Is Tonya still account
21 executive?
22      A.   No.  I'm not -- Tonya Vance, I'm not
23 familiar with that name.

Page 120

1       Q.   You don't know her?
2       A.   No.
3       Q.   Amanda Moore, in the department but
4  not on your team as an account executive.  Is
5  Amanda still there?
6       A.   I don't know an Amanda Moore.  Could
7  it be referencing someone else with a changed
8  last name?
9       Q.   It could be.  What Amanda are you
10 thinking of?
11      A.   Amanda Pender.
12      Q.   Is she an account executive?
13      A.   Yes.
14      Q.   Has she been there since around 2017?
15      A.   That's about right.
16      Q.   Okay.  Is she in the department but
17 not on your team, Amanda Pender?
18      A.   Correct.
19      Q.   Okay.  Do you know if Ms. Pender ever
20 expressed any interest in being a broker?
21      A.   Not to me.
22      Q.   Okay.  Tiffany Sanders, in the
23 department on Corey's team.  Is Tiffany still

Page 121

1  there?
2      A.  She is.
3      Q.  Is she still an account executive?
4      A.  Yes.
5      Q.  Do you know if she ever expressed any
6  interest in being a broker?
7      A.  Not to my knowledge.
8      Q.  Okay.  Did anybody ever talk to you
9  in late 2019, 2020 about there needing to be more
10 diversity in the department with regard to female
11 brokers?
12     MS. BARLOTTA:  Object to form.  We
13 went over this earlier today, but you can testify
14 again.
15     A.  Needing to be specifically more
16 female brokers?  Not to me.
17     Q.  When you got -- when you say you got
18 charts similar to this, did it have -- tell me
19 what information, the charts that you would see
20 that listed employees, what information would it
21 have about the employee.
22     MS. BARLOTTA:  Object to form.
23     A.  It's similar to this for my specific

Page 122

1  team that lists similar information but for my
2  specific team.
3      Q.  Okay.  What about do you see charts
4  like this for the whole department?
5      A.  I do not.
6      Q.  Okay.  This does not list Lee McClure
7  as a senior broker.
8      A.  You're talking about Gary McClure?
9      Q.  Is that who it is?  Is it Gary?
10     A.  Yeah, that's his middle name.  I
11 guess they have that listed.
12     Q.  The only senior brokers this lists,
13 though, is David Sloneker and Susan.  Was David
14 Sloneker a senior broker at some point?
15     A.  He is.
16     Q.  He's still currently a senior broker?
17     A.  He is.
18     Q.  What job did David Sloneker have
19 before he was senior broker?
20     A.  He has been a senior broker for as
21 long as I can remember.
22     Q.  And he's on your team?
23     A.  He's in the department.  He's not on

Page 123

1  my team.  He's on Lee McClure's team.
2      Q.  So this lists him, Rusty, as being on
3  your team, Manager Level 1.  Do you know was he
4  ever on your team?
5      A.  I originally was involved in hiring
6  Lee, I believe, in 2000 -- I can't remember the
7  exact year he came to CRC, but we hired him as an
8  underwriter for the senior living program, and
9  that may be why that is still listed under me.
10     Q.  I mean, Lee McClure's name is not
11 anywhere on here.  Do you know why?
12     A.  It is.
13     Q.  Oh, I see it, Gary McClure.
14     A.  Yeah, yeah.
15     Q.  But it just lists him as a broker,
16 not a senior broker.  So in 2019, early 2020, was
17 he a broker and not a senior broker?
18     A.  He would have been a broker.  And,
19 again, I've not seen this exact list.
20     Q.  Right.
21     A.  So I'm not sure where this
22 information is coming from.  So I can't speak to
23 the accuracy of this information.

Page 124

1      Q.  Okay.  But did he have a broker title
2  before he was senior broker?
3      A.  Yes.
4      Q.  Okay.  Do you know how long he was a
5  broker before he was senior broker?
6      A.  He probably -- I'm going to say six
7  or seven years.
8      Q.  Do you know -- was he on your team
9  when he was just a broker?
10     A.  No.  He was on, at that time, George
11 Bennett's team, who is no longer with us.
12     Q.  Okay.  And then it lists Corey
13 Daugherty just as a broker.  Do you know if late
14 2019, 2020 he was a broker or a senior broker?
15     A.  He would be a senior broker.
16     Q.  Okay.  So that's incorrect?  It
17 should be a senior broker?
18     A.  Yeah.  And, again, I'm not sure where
19 this information came from.
20     Q.  Right.  No, no.  I understand.
21     A.  Yeah.
22     Q.  Was Corey -- how long -- was he a
23 broker before he was a senior broker?

Page 125

1    A.   Yes.
2    Q.   Okay.  Do you know how long he was a
3  broker before he was a senior broker?
4    A.   Seven or eight years.  I'm guessing.
5    Q.   Do you know when he became a senior
6  broker?  I'm talking about Corey.
7    A.   It would have been around 2000 --
8  Hmph.  Around 2012, '13, somewhere in that
9  neighborhood.  I'm, again, speculating really on
10 the date.  I don't know the exact date.  He --
11   Q.   That's okay.
12   A.   He runs his own team, and so I'm not
13 sure when --
14      MS. BARLOTTA:  He testified.  So they
15 have his testimony.
16      THE WITNESS:  Okay.
17   Q.   (BY MS. WILKINSON:)  So do you recall
18 a time when David Sloneker asked for Kat to be a
19 broker on his team?
20      MS. BARLOTTA:  Object to the form.
21 Assumes facts not in evidence.
22   A.   I don't recall that.
23   Q.   Did you ever have any discussions

Page 126

1  with David Sloneker about Kat Hendrix?
2    A.   No.
3    Q.   If David said, Hey, I want Kat to be
4  on my team as a broker, anything wrong with
5  moving Kat to a broker position?
6       MS. BARLOTTA:  Object to form.
7    A.   I don't think so.
8    Q.   Was Kat a good account executive?
9       MS. BARLOTTA:  Object to form.
10   A.   Yes.
11   Q.   Did -- was she on your team?
12   A.   Not directly.
13   Q.   How long do you recall working around
14 Kat?
15   A.   I think she came -- I think she was
16 in our department about seven years.  I'm
17 guessing.  So about that time, six or seven
18 years.
19   Q.   Did you ever have any conversations
20 with Kat about her wanting to be a broker?
21      MS. BARLOTTA:  Object to form.
22   A.   I don't remember that conversation.
23   Q.   Did anybody ever tell you or have any

Page 127

1  conversations with anybody about Kat expressing
2  an interest in being a broker?
3    A.   I know there was a conversation with
4  Corey about wanting to do more on the team, and I
5  don't know if that was termed exactly being a
6  broker, but to be in an elevated role within the
7  team, as I understood it.
8    Q.   How do you know about that
9  conversation?
10   A.   Corey and I spoke about that one time
11 that I recall.
12   Q.   Tell me everything Corey told you.
13      MS. BARLOTTA:  Object to form.
14   A.   I'm -- I think that he -- I remember
15 that he told me that he had a meeting with Kat
16 and that they were making the decision to move
17 her to an inside broker role within the team.
18      I don't know the exact comments.  I
19 can't remember the exact words around that
20 conversation, but I remember that being his
21 decision.
22   Q.   And did he say anything about Kat
23 being moved to an inside broker because she asked

Page 128

1  to go into that job or had requested it?
2    A.   I don't recall that specifically
3  being a part of the conversation.
4    Q.   Anything else that you recall that
5  Corey said in this conversation about Kat, Rusty?
6    A.   I just -- I just remember a general
7  sense of encouragement around it.  I don't --
8  again, don't remember any specific comments or
9  words as it related to that decision to move her
10 on that role on the team.
11   Q.   Do you recall when this conversation
12 with Corey took place?
13   A.   I don't know the exact time.
14   Q.   Do you recall what year?
15   A.   It would have been '18 or '19, right?
16 Somewhere in that neighborhood.
17   Q.   Did you express to Corey any thoughts
18 about whether or not Kat would be a good broker?
19   A.   I fully supported it.
20   Q.   Did you think at that time that Kat
21 would be a good broker?
22   A.   Sure.
23   Q.   And she was being moved into an

Page 129

1  inside broker?

2      A.  I believe so.

3      Q.  Did you have any other conversations

4  with Corey about Kat asking or requesting or

5  being moved into an inside broker position other

6  than this one?  Any other conversations with

7  Corey?

8      A.  No.  I recall it being a very general

9  conversation.  And I fully trust the team leads

10  to run their teams as they see fit, and I do

11  remember it was a fully supported and glad to do

12  it.

13      Q.  Did you participate in the decision

14  to move Kat into an inside broker job or was that

15  all Corey?

16      A.  Just a general conversation.  I

17  remember supporting his decision, thinking that

18  it was a good decision.  But, ultimately, it --

19  ultimately, it's his decision on running his

20  team.

21      Q.  Okay.  And that's what I was asking.

22      A.  And he obviously saw it as a good

23  move.

Page 130

1      Q.  Did you ever fill out any performance

2  evaluations for Kat?

3      A.  I did not.  I think that would be

4  Corey.

5      Q.  All Corey?

6      A.  Yeah.

7      Q.  Did you ever sit down and talk to Kat

8  about her being an inside broker?  Before she was

9  moved into the job, did you ever sit down and

10  talk about that possibility with her?

11      A.  I don't recall that conversation.

12      Q.  Okay.  When Ross Robertson and Steele

13  Cadden got moved into broker positions, neither

14  of those were posted it's my understanding; is

15  that correct?

16      MS. BARLOTTA:  Object to form.

17      A.  I don't know.  I don't know.

18      Q.  Well, you were over the department.

19  I mean, was any announcement sent out to all the

20  employees to say, Hey, we're going to move

21  somebody into a broker position; who's

22  interested?

23      MS. BARLOTTA:  Object to form.

Page 131

1      A.  I'll clarify --

2      MS. BARLOTTA:  Object to the form.

3  Move to strike.  You can answer.

4      A.  I'll clarify by saying I don't know.

5  I mean, I know that we didn't post Ross'.

6      Q.  Okay.

7      A.  I don't know if the position for

8  Steele was posted or not.  I vaguely remember

9  maybe some other candidates being talked to

10  perhaps, but I can't be certain about that.

11      Q.  If a position is posted, how is it

12  done?

13      MS. BARLOTTA:  Object to form.

14      A.  It can be posted internally.

15  Sometimes -- now we'll post them on LinkedIn

16  sometimes.  A lot of our hires are referral

17  based.  That's how it has been, and that's how it

18  -- we've been very fortunate with that, but most

19  of the time it's an internal posting, and then

20  they'll -- I'm assuming that they still post

21  on -- our recruiters still post on job boards.

22      Q.  Who decides whether a job is going to

23  be posted or not?

Page 132

1      MS. BARLOTTA:  Object to form.

2      A.  That would ultimately be our

3  recruiter once a position is approved or the need

4  for a position is approved.

5      Q.  Is there a policy that says any

6  position has to be posted?

7      MS. BARLOTTA:  Object to form.

8      A.  Not to my knowledge, not that it's

9  mandatory.

10      Q.  Okay.  When Ross Robertson got the

11  broker job, was anybody else interviewed other

12  than Ross getting the job?

13      A.  No, because it was -- he was -- it

14  wasn't an add position or a new position.  It was

15  a move into a different role.  It wasn't

16  necessarily a position to be posted.

17      Q.  Okay.  But nobody else was

18  interviewed?

19      A.  There wasn't a need to.

20      Q.  Wouldn't you want to know if anybody

21  else was interested just so you could kind of

22  compare everybody?  I mean, you've talked about

23  some of these female account executives who would

Page 133

1  make good brokers. Didn't you want to go to them
2  and say, Hey, guys we've got this job open,
3  anybody else interested?
4      MS. BARLOTTA: Object to form. Move
5  to strike.
6      A.  We've typically not operated that
7  way.  Typically, we've promoted from within
8  teams, within specific teams, silo teams.
9  There's not movement between teams.
10     Q.  Has there ever been movement between
11 teams?
12     A.  Sometimes, but that's very rarely,
13 very rarely.
14     Q.  But you've told me you wanted to
15 promote from within, and you're over the whole
16 department. I mean -- let me ask you this --
17 back up. Withdraw that.
18         Was there a policy that says you
19 can't go from one team to the other?
20     MS. BARLOTTA: Object to form.
21     A.  There's no written policy for that
22 that I'm aware of. I've never been made -- I've
23 never been made aware of that if there is one.

Page 134

1      Q.  Okay. But isn't treating employees
2  equally making sure that everybody gets a fair
3  shot at applying for a promotion or a position?
4      MS. BARLOTTA: Object to form.
5      A.  Every situation is very different.
6      Q.  And who gets to decide the difference
7  in those situations, how they'll be handled
8  differently within that department? Is that you
9  or somebody else?
10     MS. BARLOTTA: Object to form.
11     A.  Each team lead is responsible for
12 hiring for their team for the position that's
13 needed and for the duties that need to be
14 handled.
15     Q.  What's the purpose of posting a job?
16 I mean, what do you hope to gain when you post a
17 job?
18     MS. BARLOTTA: Object to form.
19     A.  Qualified candidates.
20     Q.  And internally, because you said you
21 want to promote from within, if you post a job,
22 doesn't that -- the purpose is to let everybody
23 know, Hey, this job is open; if anybody is

Page 135

1  interested, put in your application?
2      MS. BARLOTTA: Object to form.
3      A.  And let me clarify that there could
4  be instances where jobs that were -- jobs are
5  posted that I'm not even aware of. If there's a
6  team need for a candidate, it may be posted
7  unbeknownst to me, and I don't know that until
8  after the fact.
9      Q.  Isn't one of the ways that you can
10 hopefully prevent discrimination is to post the
11 position so that anybody that's qualified and
12 interested can apply?
13     MS. BARLOTTA: Object to form.
14     A.  I would -- it depends, but I guess.
15     Q.  I mean, isn't one of the ways that
16 somebody can say there's been discrimination in
17 the department if there's handpicking or hand
18 selecting of men over women?
19     MS. BARLOTTA: Object to form.
20     Q.  Wouldn't that indicate that there
21 might be a problem?
22     MS. BARLOTTA: Object to the form.
23     A.  I don't think that happens.

Page 136

1      Q.  Jonathan Morgan, was his position
2  posted when he became an inside broker?
3      MS. BARLOTTA: Object to form.
4      A.  I don't know. He's on Trey's team.
5  I'm not sure.
6      Q.  Did he go through the or is he part
7  of the launch program?
8      A.  No.
9      Q.  What about Corey Underwood? Was his
10 position posted?
11     A.  Corey Woodworth? Corey Woodworth?
12     Q.  Yes.
13     A.  He's on Trey's team. Corey was a
14 transfer from the property department, and I
15 don't recall if that position was posted or not
16 for an internal transfer like that.
17     Q.  What about Steele Cadden? Was
18 anybody else interviewed for his position?
19     MS. BARLOTTA: Object to the form.
20 Asked and answered.
21     A.  They may have had conversations with
22 other candidates, but I'm not sure who they were,
23 and I'm not sure if it was posted.

Page 137

1    Q.   But you don't know of anybody else
2  being interviewed for that job?
3         MS. BARLOTTA:  Object to form.
4    A.   I couldn't name them.  I'm not sure.
5    Q.   Rusty, do you see how it looks bad
6  that you put somebody in a broker position and
7  it's not posted to allow others to be considered?
8  Do you see how that looks bad?
9         MS. BARLOTTA:  No, that's
10 argumentative.  You don't need to answer that
11 question.
12   Q.   Yes, you do.
13        MS. BARLOTTA:  No, you don't.  No,
14 you don't.
15   Q.   Do you see how that looks like that
16 could potentially be discrimination?
17        MS. BARLOTTA:  Object.
18        THE WITNESS:  Do I answer?
19   A.   No.
20   Q.   You need to answer.
21        MS. BARLOTTA:  Do you understand the
22 question?  She's arguing with you really is what
23 she's doing.

Page 138

1    Q.   I'm not arguing, Rusty.  And --
2         MS. BARLOTTA:  Yes, you are.
3    Q.   And hopefully we're not going to talk
4  over each other.
5         But, Rusty, I'm not arguing with you.
6  You know, you've been trained every year on
7  discrimination and that employees need to be
8  treated equally.  And there's even an affirmative
9  action that we're going to make sure that we --
10 it specifically mentions women in the handbook.
11        Do you see how that can look like
12 discrimination when you just put a male in a
13 position and don't open it up for the women to be
14 considered?
15        MS. BARLOTTA:  Object to form.  Move
16 to strike counsel's testimony and assumes facts
17 not in evidence.
18   A.   I think --
19        MS. BARLOTTA:  Because we have --
20   A.   I think our -- I think our -- I think
21 each situation is different.  I think each team
22 is very fair.  And if there is an opportunity,
23 they promote from within.  And I think that has

Page 139

1  been fair.
2         MS. BARLOTTA:  We've been going
3  almost two hours.  Are we getting close to a
4  lunch break?  It's almost 1:00.
5    Q.   Yeah, let me ask one more question,
6  and then we'll take a break, Rusty.
7         What have you done to determine if
8  when Ross Robertson got promoted, if that was
9  done fairly, equally, and there was no
10 discrimination?  What have you done to review
11 that to make sure there was no discrimination?
12        MS. BARLOTTA:  Object to form.
13   A.   That wasn't part of the process.  It
14 wasn't an open position.  He is -- it is in title
15 only, and it was not an open position.
16        And so it was an internal team move.
17 It had nothing to do with any other candidates or
18 potential job opening.
19   Q.   Have you done anything to review him
20 being given the inside broker position to
21 determine whether or not there's been any
22 discrimination?
23        MS. BARLOTTA:  Object to the form.

Page 140

1    A.   No.
2         MS. BARLOTTA:  Asked and answered.
3         MS. WILKINSON:  Okay.  We can take a
4  lunch break.  How long do you want to take,
5  Rachel?
6         MS. BARLOTTA:  I guess just an hour.
7         MS. WILKINSON:  Okay.  And you know
8  there's tons of stuff down here.
9         VIDEOGRAPHER:  We are now off the
10 record.  The time is 12:43.
11        (Whereupon, a lunch recess was
12 taken.)
13        VIDEOGRAPHER:  We are now on the
14 record.  The time is 1:44.
15   Q.   (BY MS. WILKINSON:)  Okay.  Rusty, we
16 are back on the record after a lunch break.  Is
17 there anything you want to change about your
18 prior testimony?
19   A.   No.
20   Q.   Okay.  We're going to shift gears a
21 little bit.  I want to talk to you about some
22 complaints that have come up as evidence in this
23 lawsuit.

Page 141

1      Do you recall around 2017 you having
2  a conversation in your office with Kat Hendrix
3  about women being overlooked in the department?
4      **A.   I don't recall that.**
5      Q.   Okay.  Are you saying it didn't
6  happen or you just don't recall?
7      **A.   I don't recall.**
8      Q.   Okay.  So Kat says that you called
9  her into your office, and y'all had a beer
10 together in the afternoon.  Do you recall talking
11 with Kat at some point where y'all were sitting
12 in your office having a beer?
13     **A.   I don't recall that meeting.  I mean**
14 **--**
15     Q.   She says that you told her Sarah
16 Dunston had talked to you about women being
17 overlooked in the department.  Do you recall
18 having any conversations with Sarah Dunston about
19 women being overlooked in the department?
20     MS. BARLOTTA:  Object to form.
21     **A.   I don't recall that conversation.**
22     Q.   Okay.  And, again, just so the record
23 is clear, are you saying absolutely that did not

Page 142

1  happen or I just don't remember?
2      **A.   I don't remember.**
3      Q.   Okay.  Who is Sarah Dunston?
4      **A.   Sarah Dunston worked on James**
5  **Powell's team, and she was an account executive**
6  **on James Powell's team.**
7      Q.   Did she have any other position that
8  you know of other than account executive?
9      **A.   Not to my knowledge.**
10     Q.   Is she still there?
11     **A.   No.**
12     Q.   Do you know when Sarah left?
13     **A.   I don't recall the exact time.  I**
14 **guess it was somewhere along '18 or '19,**
15 **somewhere in that neighborhood.**
16     Q.   Do you know why she left?
17     **A.   I vaguely remember that she went into**
18 **a completely different industry.**
19     Q.   Did she ever to your knowledge talk
20 about wanting to be a broker?
21     **A.   Not to me.**
22     Q.   To anybody?  Did that ever come up?
23     **A.   Not to my knowledge.**

Page 143

1      Q.   If Sarah Dunston had said to you,
2  Women are overlooked in the department, would you
3  understand that to be a complaint of gender
4  discrimination?
5      MS. BARLOTTA:  Object to form.
6      **A.   If someone made that comment to me, I**
7  **wouldn't necessarily view it as automatic gender**
8  **discrimination, no.**
9      Q.   Why not?
10     **A.   Because I'm -- because that's not**
11 **what was said.  That's not what would have been**
12 **said.**
13     Q.   Well, you don't remember.  Okay.  So
14 you're not denying that it happened.  You're
15 saying I don't recall.
16     **A.   I don't recall.**
17     Q.   If a woman says to you, I think women
18 are being overlooked in the department, is it
19 your testimony that you wouldn't think that that
20 could potentially be a claim of gender
21 discrimination?
22     MS. BARLOTTA:  Object to form.
23     Q.   I'm not saying it's true.

Page 144

1      **A.   Right.**
2      Q.   I'm just saying would you look at
3  that as a potential complaint of discrimination?
4      MS. BARLOTTA:  Object to form.
5      **A.   Not necessarily.**
6      Q.   Do you think that that's -- if a
7  woman said that to you, do you believe you had
8  any duty to report that to anybody to be
9  investigated?
10     MS. BARLOTTA:  Object to form.
11     **A.   If someone said that directly to me,**
12 **I would encourage them to raise that to HR.**
13     Q.   Okay.  And did you -- if somebody
14 said that to you, do you believe you had any duty
15 to report that to HR?
16     MS. BARLOTTA:  Object to form.
17     **A.   I don't think so.  I would encourage**
18 **them to talk with their team lead if they felt**
19 **that way and work within the team to figure out**
20 **opportunity.**
21     Q.   If somebody came to you and said,
22 Hey, Rusty, I'm black, and I think blacks are
23 being overlooked in the department, would you

Page 145

1   understand that to be a complaint of race
2   discrimination?
3        MS. BARLOTTA: Object to form.
4        **A.   I would encourage that person to take**
5   **that to HR if that's the way they felt.**
6        Q.   But would you consider that to be a
7   complaint of race discrimination under the
8   policies?
9        MS. BARLOTTA: Object to form.
10       **A.   It depends on if it were true.  If**
11  **someone said they felt like that they were being**
12  **racially discriminated against, I would ask --**
13  **advise them to take that to human resources.**
14       Q.   Well, even if you don't believe a
15  complaint to be true, if a complaint is made that
16  indicates any type of discrimination under the
17  policy, that's supposed to be investigated,
18  right?
19       MS. BARLOTTA: Object to form.
20       **A.   If someone made that complaint, I**
21  **would direct them to human resources.  I've not**
22  **ever been made aware directly of that -- of a**
23  **complaint such as that.**

Page 146

1        Q.   Okay.  Did you understand under the
2   policy, though, that BB&T, Truist would
3   investigate any complaint that was made of
4   discrimination, harassment, or retaliation?
5        MS. BARLOTTA: Object to form.
6        **A.   If it were brought through the proper**
7   **channels, including HR, I would expect them to**
8   **investigate that.**
9        Q.   Look, Rusty, back at the handbook,
10  right there, and if you'll turn to Bates Number
11  306.
12       **A.   Okay.**
13       Q.   You said proper channels.  I just
14  want to make sure that we're all under the same
15  understanding.
16       The section that says Reporting
17  Incidents of Harassment, Discrimination, do you
18  see that on the right-hand side?
19       **A.   I do.**
20       Q.   The last paragraph at the bottom, the
21  very last sentence says:  Such a report or
22  complaint should be made to the associate
23  supervisor or to the department manager, the

Page 147

1   regional associate relations manager, or the
2   corporate associate relations manager.
3        Did I read that properly?
4        **A.   Yes.**
5        Q.   And did you understand that that was
6   the policy as of 2019 as to who you should
7   complain to if you had a complaint of harassment
8   or discrimination?
9        MS. BARLOTTA: Object to form.
10       **A.   That's what it says.**
11       Q.   Okay.  It doesn't say anything about
12  human resources, does it?
13       MS. BARLOTTA: Object to form.
14       **A.   Not here.  It doesn't appear to have**
15  **that, no.**
16       Q.   So would you be -- in this list of
17  managers, would you be the department manager?
18       **A.   Yes.**
19       Q.   Okay.  And who would be the -- let's
20  say 2019, 2020, the regional associate relations
21  manager, who would that be?
22       **A.   2019?  Regional associates relations**
23  **manager?  I'm assuming that's human resources.**

Page 148

1        Q.   Oh, you think that -- okay.
2        **A.   I mean, that's the only thing that I**
3   **can assume, because that -- I'm assuming that**
4   **would be Stefani Petty.**
5        Q.   But you said she had the title of
6   human resources manager.  Have you ever known
7   anybody to have a regional associate relations
8   manager title, that specific title?
9        MS. BARLOTTA: Object to form.
10       **A.   I've not directly paid attention to**
11  **that title, no.**
12       Q.   Who would have been the corporate
13  associate relations manager in 2019, 2020?
14       **A.   It would have to be Stefani Petty.**
15       Q.   Okay.  And then below that under
16  Investigations, it says:  BB&T will thoroughly,
17  promptly, and fairly investigate all claims of
18  harassment or discrimination.
19       So under the policy, you knew that
20  any claim of harassment or discrimination had to
21  be investigated?
22       MS. BARLOTTA: Object to form.
23       **A.   That's what it says here.**

Page 149

1    Q.   Okay.  So, again, just to make sure
2  that I kind of wrap this up, if -- do you believe
3  that you would have had a duty to contact anybody
4  in human resources and tell them if a woman came
5  to you and said, Women are being overlooked in
6  the department?  Do you think that you would have
7  had a duty to report that to HR?
8        MS. BARLOTTA:  Object to form.
9    **A.   If someone came to me and claimed any**
10 **sort of discrimination, I would -- I would**
11 **involve Stefani Petty.  I would get that to**
12 **Stefani Petty.**
13   Q.   And if a woman says to you, Women are
14 being overlooked in the department, you would
15 understand that that could potentially be a
16 complaint of discrimination?
17       MS. BARLOTTA:  Object to form.
18   **A.   I don't think that we discriminated**
19 **in the department.**
20   Q.   I'm not asking that, Rusty.  And fair
21 enough.  I'm not asking whether it's true or not.
22 I'm just saying if a woman said that to you, you
23 would know under the policy that is a

Page 150

1  complaint of discrimination, and I need to report
2  that to HR so they can investigate it?
3        MS. BARLOTTA:  Object to form.
4    **A.   If someone came to me and claiming**
5  **discrimination, I would advise -- I would**
6  **escalate that to the human resources.**
7    Q.   I think I'm asking a little bit
8  different question, though.  So I just want to
9  make sure what you understand.  If a woman said
10 to you that was in your department, Women are
11 being overlooked in the department, a female said
12 that to you, would you understand that to be a
13 complaint or concern about discrimination?
14       MS. BARLOTTA:  Object to form.
15   **A.   Not -- no, not necessarily.**
16   Q.   We talked earlier about
17 discrimination is when you don't treat men and
18 women equally.  And if women are being
19 overlooked, wouldn't that indicate -- and I'm not
20 saying it's true, but wouldn't that indicate that
21 this person felt like that men and women were not
22 being treated equally?
23       MS. BARLOTTA:  Object to form.  You

Page 151

1  can answer that if you can.  She's asking you
2  about what a hypothetical person might think or
3  believe.
4    **A.   All right.  Say that again.  I**
5  **apologize.**
6    Q.   Sure.  No, I mean, I'll rephrase it.
7  We talked about discrimination is when men or
8  women or whatever protected categories are not
9  treated equally.  So would you understand if a
10 woman says, Women are not getting opportunities
11 in the department, they're being overlooked,
12 would you understand that they were -- just when
13 you heard that, that they were raising concerns
14 about not being treated equally to the men?
15       MS. BARLOTTA:  You've already
16 answered this question.  You don't answer it
17 anymore.  You can move on.
18       MS. WILKINSON:  No, he hasn't
19 answered this one, Rachel.
20       MS. BARLOTTA:  He has.
21       MS. WILKINSON:  He has not.
22       MS. BARLOTTA:  He has.  You've asked
23 it twenty-five different ways.

Page 152

1        MS. WILKINSON:  He has not answered.
2        MS. BARLOTTA:  You've asked it
3  twenty-five different ways trying to get a
4  different answer.  Please move on.
5    Q.   (BY MS. WILKINSON:)  No, I need you
6  to answer this one, Rusty.
7    **A.   It depends on -- it would depend on**
8  **the circumstances.  If someone came to me and**
9  **didn't make -- and wasn't formally telling me**
10 **that they feel like they're being discriminated**
11 **against, I -- if there were allegations of**
12 **discrimination, if I heard that they felt like**
13 **they were being discriminated against, whether**
14 **gender, racially, for disability, whatever the**
15 **case might be, I would escalate that to human**
16 **resources without question.**
17   Q.   Is it your testimony that they would
18 have to use the word "discrimination" for you to
19 escalate that to HR?
20       MS. BARLOTTA:  Object to form.
21   **A.   Not necessarily.**
22   Q.   Sometimes the person can say words to
23 indicate discrimination; would you agree?

Page 153

1      MS. BARLOTTA:  Object to form.  I
2  don't know what that means.
3      A.   To -- I'm not sure what words would
4  be used to indicate discrimination.  I -- I'm --
5      Q.   Have you been trained at any time
6  after the merger that employees saying, Hey, I've
7  been treated differently or I'm not being treated
8  fairly, I'm not being treated equally, that those
9  can be complaints of discrimination?
10      MS. BARLOTTA:  Object to form.  We've
11  been over this a million times.
12      A.   I've seen what's in the handbook.
13      Q.   So do you understand from what's in
14  the handbook or your training that those
15  statements can be statements of discrimination?
16      MS. BARLOTTA:  Object to form.  The
17  document speaks for itself.
18      A.   If there were -- if someone alleged
19  discrimination to me, I would escalate that to
20  human resources --
21      Q.   I'm asking a different question,
22  though, Rusty.
23      A.   -- end of story.

Page 154

1      Q.   I'm asking if -- because I guess I'm
2  a little confused.  I mean, if -- did you
3  understand from your training and the handbook,
4  which was gone over every year, that you don't as
5  an employee have to say specifically, I've been
6  discriminated against; you can say things to
7  indicate it?
8      MS. BARLOTTA:  You're asking him if
9  that's in the handbook or in the training
10  specifically?
11      MS. WILKINSON:  Either/or.  I'm just
12  asking from his understanding from both.
13      MS. BARLOTTA:  He's already said he
14  doesn't remember that verbatim.
15      MS. WILKINSON:  Rachel, don't testify
16  for the witness.
17      MS. BARLOTTA:  I'm not testifying.
18  I'm pointing out the unfair nature of your
19  question.
20      MS. WILKINSON:  You're suggesting an
21  answer.
22      MS. BARLOTTA:  No, I didn't suggest
23  anything.

Page 155

1      Q.   (BY MS. WILKINSON:)  Go ahead, Rusty.
2      A.   Say that again.  I'm sorry.
3      Q.   Based on your training or the
4  handbook, I mean, do you understand that there
5  are words or phrases that an employee can use to
6  indicate discrimination without using the word
7  "discrimination"?
8      MS. BARLOTTA:  Object to form.  Do
9  you recall that being in any policy or training
10  is what she's asking.
11      A.   That specific reference, I'm only
12  used to seeing the term "discrimination," racial
13  discrimination, gender discrimination, or
14  otherwise.  That's what's in the handbook.
15      Q.   Okay.  So they have to use the word
16  "discrimination"?
17      MS. BARLOTTA:  Object to form.
18      A.   If someone came to me with a concern
19  that I felt like was alleging discrimination in
20  any way, I would report that.
21      Q.   Okay.
22      A.   I would escalate that to HR.
23      Q.   Thank you.  And you used the term

Page 156

1  "formal."  So what did you mean -- a minute ago
2  you said if they came to me and made a formal
3  complaint.  What did you mean by formal?
4      A.   I'm not sure what I meant by that.
5  That was probably just a word that I used that I
6  probably -- it wouldn't -- I guess it wouldn't
7  have to necessarily be formal.  If someone
8  verbally expressed that concern to me, I would
9  escalate that.
10      Q.   Okay.  Did you ever have any
11  conversations with Ms. Petty or anybody in human
12  resources about any concerns that women were
13  being overlooked in the department?
14      MS. BARLOTTA:  Object to form.
15      A.   I did not.  I did not.
16      Q.   Ms. Hendrix testified -- we're going
17  back to that conversation that you don't recall
18  whether it happened or not in 2017.
19      Kat Hendrix testified that you shared
20  with her that Sarah Dunston told you women are
21  overlooked in the department, and Kat says that
22  she told you she had those same concerns, and she
23  was glad that it had been brought to y'all's

Page 157

1  attention.
2      Do you recall Kat ever making that
3  statement to you or words to that effect?
4      MS. BARLOTTA: Object to form.
5      A.  I don't recall that.
6      Q.  Okay.  Do you recall Kat Hendrix ever
7  saying to you that she felt like women were
8  overlooked in the department?
9      A.  No.
10     Q.  Do you recall there ever being an
11 investigation about whether or not women were
12 overlooked for positions in the department?
13     MS. BARLOTTA: Object to form.
14     A.  If there were an investigation during
15 Kathryn's tenure at --
16     Q.  At any point, do you recall there
17 ever being an investigation about whether or not
18 women were overlooked for positions?
19     MS. BARLOTTA: Object to form.
20     A.  No.
21     Q.  Do you ever recall sitting in your
22 office and sharing a beer with Kat?
23     MS. BARLOTTA: Object to form.

Page 158

1      A.  I mean, I don't, but -- what year did
2  you say that that occurred?
3      Q.  2017.
4      A.  I don't.
5      Q.  Did you keep alcoholic beverages at
6  the office?
7      A.  There is beer and wine in -- in --
8  on-site, yeah.
9      Q.  Did employees drink during what would
10 be called normal working hours between 8:00 and
11 5:00 in the department?
12     MS. BARLOTTA: Object to form.
13     A.  No, that's not a normal course of
14 business.
15     Q.  Did it happen from time to time?
16     MS. BARLOTTA: Object to form.
17     A.  It has happened from time to time.
18 If we celebrate a big deal or, you know, it was
19 something of that nature or a celebration of some
20 sort, it has happened, sure.
21     Q.  Where are the alcoholic beverages
22 kept within the department, beer and wine I think
23 you said?

Page 159

1      A.  There are bottles of wine in various
2  offices that are -- that have been given to
3  people for gifts.  There are small refrigerators
4  in various offices that -- where there's beer.
5      Q.  When you say offices, small
6  refrigerators are in an individual's offices?
7      A.  There are some.
8      Q.  Do you have one in your office?
9      A.  I do not.
10     Q.  Who are the employees that have
11 refrigerators in their office that have alcoholic
12 beverages in them?
13     A.  Let's see.
14     MS. BARLOTTA: You're asking now?
15     A.  Alex Gould has a small refrigerator.
16 I'm trying to go around the offices and
17 visualize.  I think that's it.
18     Q.  When Kat was there, do you recall who
19 would have had any kind of alcoholic beverages in
20 their office, whether in a fridge or sitting out?
21     A.  I mean, at that time, I don't
22 specifically recall exactly who, but it could
23 have been some that someone brought, and it was

Page 160

1  in the general refrigerator in the break room.
2      Q.  Was wine and beer also in the general
3  refrigerator in the break room?
4      A.  From time to time there could be a
5  bottle of wine in there, sure.
6      Q.  When Kat was there, did Corey
7  Daugherty have a refrigerator in his office?
8      A.  I don't remember a refrigerator being
9  in his office while he was there.
10     Q.  What about Alex, did he have a
11 refrigerator in his office?
12     A.  I believe that's been there for quite
13 some time.  I believe, yeah.
14     Q.  And when Kat was there, what was
15 Alex's -- and for the record, Alex's last name
16 is?
17     A.  Gould.
18     Q.  And what was his title when Kat was
19 there?
20     A.  He would have been -- he's a broker.
21     Q.  Okay.  Would people go to Alex's
22 office and get beers in the afternoon?
23     A.  I'll clarify that -- I want to

Page 161

1  clarify that it's not a consistent where people
2  would go in there on a regular basis, but
3  occasionally, yes.
4      Q.   How often?  Monthly, weekly?
5         MS. BARLOTTA:  Object to form.
6      A.   I mean, every couple of weeks maybe,
7  you know.  It's not a regular -- it's not a
8  regular occurrence.  I mean, we're not -- we've
9  got work to do.  We don't have a lot of time to
10  sit in the office and drink wine and beer, so --
11     Q.   So we've heard that the department
12  was referred to as Mad Men, a Mad Men type
13  environment.  Did you ever hear that?
14        MS. BARLOTTA:  Object to form.  Move
15  to strike counsel's testimony.  You can answer.
16     A.   I've never heard the term "Mad Men"
17  reference to our department.
18     Q.   Did you watch that show?
19     A.   I know of it.  I never watched it.  I
20  never watched it, but yeah.  It's a familiar term
21  to me, but not used in reference to our
22  department.
23     Q.   You never heard any women refer to it

Page 162

1  as like a Mad Men environment where people would
2  drink and -- in the office?
3         MS. BARLOTTA:  Object to form.
4  Assumes facts not in evidence.
5      A.   That they were -- okay.  Hold on.
6  Make sure I understand the question.  You're
7  saying --
8      Q.   I'm going to break it down in two
9  parts.
10     A.   Okay.
11     Q.   Did you ever hear anybody call it
12  like a Mad Men environment?
13        MS. BARLOTTA:  Object to the form.
14     A.   I've never heard it termed that.
15     Q.   As far as drinking in the office?
16     A.   No.
17     Q.   Did you ever hear anybody refer to it
18  as Mad Men environment with how women were
19  treated?
20        MS. BARLOTTA:  Object to the form.
21     A.   No, I did not.
22     Q.   Did you know that Kat had complained
23  to Corey Daugherty about being treated as a

Page 163

1  secretary when she was a broker?
2      A.   I did not know that.
3      Q.   If Kat came to Corey and said, Look,
4  I'm being treated like a secretary, would you
5  understand that that was a complaint of gender
6  discrimination?
7         MS. BARLOTTA:  Object to form.
8      A.   That wouldn't mean gender
9  discrimination to me.
10     Q.   Okay.  Mr. Segrest, do you work with
11  Mr. Segrest?
12     A.   He's a colleague.  He's not on my
13  direct team, but yes.
14     Q.   Is he in the department?
15     A.   Yes.
16     Q.   And for the record, what's his first
17  name?
18     A.   Clay.
19     Q.   And what's his current title?
20     A.   Clay is a -- I believe he's a broker.
21  He's a broker.
22     Q.   Does he have a specific title like
23  inside, associate, or senior?

Page 164

1      A.   No.  Just broker.
2      Q.   How long has he been a broker?
3      A.   I'm guessing seven or eight years or
4  more.
5         Sorry that was me.  Sorry.
6      A.   At least seven or eight years.  At
7  least seven or eight years, yeah.
8      Q.   Sorry about that.  What was his job
9  before he was a broker?
10     A.   At CRC or outside CRC or what period?
11     Q.   Did he have a position at CRC before
12  he was a broker?
13     A.   He was an account executive, I
14  believe.  He may have been hired as -- a long
15  time ago when it was referred to as a technical
16  assistant, he may have been hired as a technical
17  assistant then learning the job.  But I know for
18  sure account executive.
19     Q.   Do you know how long he was an
20  account executive before he became a broker?
21     A.   I don't know length between the
22  official title change.
23     Q.   Do you know about how many years?

Page 165

1          MS. BARLOTTA:  Object to form.
2     A.   Six or seven years, I'm guessing.
3 And, again, that's -- it may be longer than that,
4 but that's just a guess.
5     Q.   Okay.  Were there broker retreats?
6     A.   There are what's referred to as a
7 leadership conference, yes.
8     Q.   And who all attends those -- I've
9 heard them referred to as broker retreats.  Have
10 you ever heard them called that?
11    A.   I have.  Years ago they referred to
12 them as a broker retreat, and I can't remember
13 when the name changed.  But it was a -- that was
14 a function of the bank that changed the name to
15 leadership conference versus broker retreat.
16    Q.   And who would kind of put on the
17 brokers' retreat or kind of organize that?
18    A.   Our corporate marketing team.  And
19 all of our executive level folks were involved in
20 that, involved in presenting financial results,
21 growth plans, kind of the plan forward for the
22 year.
23    Q.   And would all the brokers for

Page 166

1 Birmingham attend or would it be just by team?
2     A.   Each team -- each team would have
3 invitees based on production, based on revenue.
4     Q.   Well, what about the inside brokers
5 that weren't generating revenue?  Did they get to
6 go?
7     A.   Occasionally.  Again, it's up to the
8 individual team lead to -- again, the invitees
9 are based on level of production by team.  So
10 once you get to a certain level, you have one
11 invite.  The next level production is two invites
12 and so on depending on what your revenue is.
13    Q.   So is it left up to the discretion of
14 the team leader as to who to invite?
15         MS. BARLOTTA:  Object to form.
16    A.   Ultimately, it would be, yes.
17    Q.   Was there a limit on who you could
18 invite or could you invite all the brokers on
19 your team?
20    A.   No.  There's a limit.  It's based on
21 revenue by team.  So if you're one of the larger
22 teams, you could possibly have multiple invites
23 because the revenue is more.  If you're a smaller

Page 167

1 team, you could have fewer invites because you
2 have less revenue.
3     Q.   Who else attends besides the brokers
4 and the executive level folks?
5     A.   Our marketing team.  Oftentimes the
6 -- someone representing the bank.  But more often
7 than not, it's the brokers, their invitee list,
8 marketing team, and our executive manager.
9     Q.   When you say executive level manager,
10 are you talking about you and Cadden?
11    A.   No, I'm not executive level manager.
12    Q.   Who are you talking about?
13    A.   I'm talking about folks like Neil
14 Kessler, Dave Obenauer, Brent Tredway.  Those are
15 the folks that attend and present.
16    Q.   What is Dave's title or --
17    A.   Dave Obenauer, I think now he --
18 there's been some recent changes in the executive
19 management team.  I think his title now is
20 chairman of Truist Insurance Holdings.
21    Q.   What was it before that?
22    A.   It was CEO of the insurance holdings
23 company.

Page 168

1     Q.   Anybody else on the executive level
2 team that would come to the broker retreats?  You
3 said Mr. Kessler, Mr. Obenauer, and Tredway.  Is
4 it Tredway?
5     A.   Yeah.
6     Q.   Yeah.  I couldn't read my
7 handwriting.  Thank you.
8     A.   That's okay.  It can differ based on
9 the year.  There's not a set group of folks that
10 attend every single year.  So it can vary.
11         I'm not -- I can't remember who all
12 is there every year, but I know it's executive
13 management level representation, marketing team
14 level representation, and then the brokerage
15 community representation.
16         And the brokerage community
17 represents our binding business, our brokerage
18 business, our employee benefits business, our
19 life insurance business, all that, so --
20    Q.   Okay.  The three executive team
21 members you named are all white men?
22    A.   Yes.
23    Q.   Have there --

Page 169

1     A.   Oh, and our marketing executive level
2   person is Jessica Marshall.  She's executive
3   management.  She is the --
4     Q.   Over marketing, though?
5     A.   Oh, yeah.
6     Q.   Okay.
7     A.   She's an executive level manager.
8   She runs the entire marketing world for CRC
9   corporate.
10    Q.   While you've been employed with CRC
11  and then after the merger, have there ever been
12  any female team leaders?
13    A.   Quite a few, yeah.  Our largest
14  production team in the country is a female lead.
15    Q.   Okay.  But under your department,
16  have there ever been any female team leaders?
17    A.   Susan Phillips led her team.
18    Q.   And then McClure took over?
19    A.   Uh-huh (positive response).
20    Q.   Anybody besides her?
21    A.   Well, Betsy Barnett was the female
22  who started our department.
23    Q.   Back when?

Page 170

1     A.   She founded our department in '92 and
2   retired in '13, I believe.
3     Q.   When she retired, did she tell
4   anybody that she felt like there had been some
5   discrimination in the department, that women had
6   been treated differently?
7     MS. BARLOTTA:  Object to form.
8     A.   I don't know.  Not me.
9     Q.   Was there a retirement party for her?
10    A.   There was a retirement party for her.
11    Q.   Did anybody report to you or tell you
12  that Betsy had raised concerns about how women
13  were treated when she was retiring?
14    MS. BARLOTTA:  Object to form.
15    A.   Not me.
16    Q.   Who replaced Betsy?
17    A.   Me.
18    Q.   Did you -- after Betsy left, did you
19  still stay in touch with her?
20    A.   Occasionally.  She recently passed
21  away about a week and a half ago.
22    Q.   Oh, sorry about that.
23    A.   Yeah.  But yeah, occasionally, sure.

Page 171

1   But not frequently at all.  She moved to the
2   lake, and we didn't see a whole lot of her.
3     Q.   Good for her.
4     A.   Yeah, yeah.
5     Q.   After she left at any time you had
6   any contact with her, did she ever say anything
7   to indicate she felt like that women were treated
8   differently than the men in the department?
9     MS. BARLOTTA:  Object to form.
10    A.   Not to me.
11    Q.   Okay.  To anybody that you know of?
12    MS. BARLOTTA:  Object to form.
13    A.   No, not to my knowledge.
14    Q.   Okay.  Do you recall an incident in
15  2018 where Kat had raised some concerns about not
16  being invited to a brokers' retreat?
17    MS. BARLOTTA:  Object to form.
18    A.   To our corporate broker retreat?
19    Q.   To any brokers' retreat.
20    MS. BARLOTTA:  Object to form.
21    Q.   That she raised some concerns about
22  being excluded from the retreat.
23    A.   Not to me, not to my knowledge.

Page 172

1     Q.   Do you recall, Rusty, a time when you
2   actually saw Kat, and she was upset about some
3   issue with a brokers' retreat?
4     MS. BARLOTTA:  Object to form.
5     A.   No, I don't recall seeing her upset.
6     Q.   Because it's my understanding the
7   testimony is that you saw Kat upset because she
8   had been excluded from and not been invited to a
9   brokers' retreat, and you told Corey about her
10  being upset and instructed Corey to call her.
11     Do you recall anything about that?
12    MS. BARLOTTA:  Object to form.  Move
13  to strike.
14    A.   I don't remember that.  I don't
15  remember that.  About -- upset about a broker
16  retreat, being excluded from a broker retreat?
17    Q.   Right.  Do you recall anything about
18  Kat being upset -- it was the MedPro.  I think it
19  was a MedPro retreat.
20    A.   So not the broker retreat.  You're
21  talking about a -- it wasn't -- as it related to
22  a broker retreat.  A MedPro outing?  We have
23  those, but I don't remember anyone being excluded

Page 173

1   from those.
2       Q.   What's a MedPro outing?
3       A.   It's when a market will -- various
4   markets will come in and take us to dinners or
5   take us to an outing.  Like MedPro, for example,
6   sometimes, they've done it a few times, they've
7   taken us out to Pursell Farms for golf and for
8   dinner.
9       Q.   Will they pay for it?
10      A.   They do.  They do.
11      Q.   And do you recall any time that Kat
12  was upset about not being invited to the MedPro
13  outing?
14      A.   I can -- I vaguely remember -- I
15  vaguely remember the MedPro -- I do vaguely
16  remember.  I don't remember the exact
17  circumstances or what happened, but after the
18  fact, finding out that I think she got invited
19  after the fact or something.  I don't know the
20  specifics around it, but vaguely I remember that.
21      Q.   What else do you recall?
22           MS. BARLOTTA:  Object to form.
23      A.   I mean, we've done a lot of those.

Page 174

1   And so I don't recall the specific circumstances
2   around that one outing.
3       Q.   How did you learn that Kat had gotten
4   invited after the fact?
5            MS. BARLOTTA:  Object to the form.
6       A.   I remember -- how did I learn that
7   she got invited after the fact?
8       Q.   Because you said that's all you
9   recall.
10      A.   I guess someone made me aware of it.
11  I don't remember exactly how.
12      Q.   Do you ever recall talking to Kat
13  about her being invited after the fact or her
14  being upset in any way about --
15           MS. BARLOTTA:  Object to form.
16      A.   Not about that, no, not about that
17  MedPro event.
18      Q.   Did you ever instruct Rusty [sic] to
19  speak with Kat about an issue related to a MedPro
20  outing?
21           MS. BARLOTTA:  Object to form.
22      A.   Wait, did I instruct who?
23      Q.   Corey.  Sorry.  Corey.

Page 175

1       A.   I don't recall doing that.
2       Q.   Okay.  You're not saying it didn't
3   happen.  You just don't recall?
4       A.   I don't recall it.
5       Q.   Now, who all would it get to attend a
6   MedPro outing?
7       A.   Well, typically, the way that works
8   is that they give us -- they invite the people,
9   and we're typically not involved in the invitee
10  list.  That's how it usually works with a lot of
11  the dinners and a lot of the outings that we do.
12  From a marketing -- from a company standpoint,
13  they're usually the ones inviting the folks to an
14  outing like that.
15      Q.   And would they invite brokers to
16  come?
17      A.   In some instances brokers, and
18  account executives in some instances.  Just
19  depending on the outing, where it was.  I don't
20  really know the rhyme or reason to their invitee
21  list.  That's not something that they would
22  consult me with.
23      Q.   Did you ever talk to -- let's just

Page 176

1   say MedPro, for example, about them only inviting
2   men to these outings?
3            MS. BARLOTTA:  Object to form.
4   Assumes facts not in evidence.
5       A.   No.
6       Q.   Did you ever notice that they would
7   only invite men or predominantly the male
8   employees to these outings?
9            MS. BARLOTTA:  Object to form.
10  Assumes facts not in evidence.
11      A.   It wasn't -- it wasn't something that
12  I paid attention to.  It wasn't something that
13  was present on my mind.  So no.
14      Q.   And you don't recall Kat saying, Hey,
15  I think there's a problem.  I've been excluded
16  from this MedPro event, and it's basically all
17  guys going?
18           MS. BARLOTTA:  Object to form.
19      A.   I don't recall her saying that to me.
20      Q.   Okay.  You're not saying it didn't
21  happen.  Again, you just don't recall?
22           MS. BARLOTTA:  Object to form.
23      A.   I don't recall her saying that to me.

Page 177

1    Q.   Do you recall e-mailing Kat and
2    telling her to bring beer to the MedPro outing
3    that she was upset she had been excluded from?
4         MS. BARLOTTA:  Object to form.
5    A.   I don't recall that.  E-mailing her
6    to bring --
7    Q.   Right.  You don't remember that?
8    A.   I don't remember e-mailing that
9    specifically, no.
10   Q.   Have you been asked to search for
11   e-mails related to Kat or that you sent to Kat?
12   A.   I have not.
13   Q.   Do you know if you have -- still have
14   e-mails back to 2018, 2017 related to Kat?
15        MS. BARLOTTA:  Object to form.
16   A.   I don't know.  I'm -- the only way
17   that -- I don't know the answer to that.  I don't
18   know if I --
19   Q.   Because you haven't looked?
20   A.   I haven't looked.
21   Q.   Have you been given a preservation
22   notice that you were to preserve, like a
23   litigation hold, you were to preserve documents

Page 178

1    related to Kat Hendrix?
2         MS. BARLOTTA:  Object to form.
3    A.   I'm not sure exactly how it read, but
4    I remember early on receiving a notice that said
5    that -- something in reference to preservation,
6    which I took to mean don't do anything, so I
7    didn't do anything.
8    Q.   So you haven't deleted anything?
9    A.   No, no.
10   Q.   Okay.  What e-mail program is used or
11   has been used, let's say, since 2016 for you?
12   A.   Outlook.
13   Q.   Okay.  And what happens to old
14   e-mails?  Like do you delete them?  Do you
15   archive them?  What do you do?
16        MS. BARLOTTA:  Object to form.
17   A.   As a matter of course, you know, I
18   send and delete e-mails every day.  And I have
19   folders that I put e-mails in.  But I don't --
20   nothing, I don't think, is permanently deleted in
21   Outlook.  I think that they archive -- I forget
22   how far it goes back, but, I mean, I haven't
23   permanently deleted anything.

Page 179

1    Q.   Is there a policy at CRC, Truist, you
2    know, the companies as to how far back it will
3    keep or retain e-mails?
4         MS. BARLOTTA:  Object to form.
5    Q.   Like a retention policy?
6    A.   Yeah.
7         MS. BARLOTTA:  Object to form.
8    A.   I'm not sure of the exact policy.  I
9    know that on my direct Outlook program, I think
10   it states two years.  I think that I can have
11   access to e-mails, searchable by me, I think up
12   to two years, and I'm sure that they're preserved
13   after that.
14   Q.   So they maybe get archived and --
15   A.   Yeah.
16   Q.   Okay.  Have you been asked to look
17   for any documents related to Kat, like notes or
18   anything related to Kat?
19   A.   Nothing.
20        MS. BARLOTTA:  Object to form.
21   Q.   Did you know that we had requested
22   e-mails related to Kat and her employment?
23        MS. BARLOTTA:  Object to form.

Page 180

1    Q.   No?
2    A.   I don't know that, no.
3    Q.   Okay.  At any time did Mr. Daugherty
4    ever talk to you about Kat making any complaints
5    to him?
6    A.   Complaints, no.  Just the one
7    instance where he came to me and said that they
8    were moving her to an inside broker, and I
9    supported that decision.
10   Q.   Did he say that was because she had
11   complained that she hadn't gotten the job?
12   A.   No.
13        MS. BARLOTTA:  Object to form.
14   Q.   But, I mean, because you said -- I
15   just want to make sure.  Was that in relation to
16   any complaint when Corey came to talk to you
17   about that?
18        MS. BARLOTTA:  Object to form.
19   A.   Not to my knowledge.
20   Q.   Kat had a breakfast with Ron
21   Helveston in June of 2019 where she told him that
22   there was some inequality with regard to gender.
23   Did you ever talk to Ron Helveston about any

Page 181

1  complaints that Kat made?

2       MS. BARLOTTA:  Object to form.  Move

3  to strike.

4       A.  Never.

5       Q.  Did you ever talk to Ron Helveston

6  about Kat raising any issues with any of her job

7  duties or assignments?

8       A.  No.

9       Q.  Did Mr. Helveston -- just so I can

10  kind of wrap this up -- ever come to you and say,

11  Kat has raised some concerns to me?

12      A.  Not to me.

13      Q.  You didn't know anything about that?

14      A.  No.

15      Q.  Okay.  How did you learn or come to

16  know that Kat was no longer going to be employed

17  with CRC/Truist?

18      A.  I can't remember the exact day, but I

19  remember Corey told me that she was not coming

20  back to CRC.

21      Q.  Do you recall whether that was in

22  2019 or 2020?

23      A.  We were still in the office.  It had

Page 182

1  to be '19.

2       Q.  Was anybody else present when y'all

3  had this conversation?

4       A.  I think it was a phone call.

5       Q.  Did he say anything else?

6       A.  No.

7       Q.  Did he say why?

8       A.  He didn't elaborate at that time.  He

9  just said she was not coming back.

10      Q.  Did you ask him?

11      A.  I probably did.  I don't remember

12  exactly if I -- what I said to him.  I don't

13  remember if I asked him why or not.  I don't

14  remember.

15      Q.  I mean, Kat had been there thirteen

16  years at that time.  Do you think that's

17  something that you would have done?  I mean, this

18  is a long-term employee, that you would have

19  said, Hey, why is Kat leaving?

20      MS. BARLOTTA:  Object to form.

21      A.  Well, I knew she had been out, and I

22  -- I don't know that it caught me off guard.  I

23  don't know what my mood was that day.  I don't

Page 183

1  know why -- I don't know what I said.  I couldn't

2  tell you what I said in response to it.

3       I'm sure that I was sympathetic to

4  it, because that's the nature of how I am.  I

5  certainly didn't want her to leave.  I don't

6  think anyone did, for that matter.  And so I'm

7  sure that if we could look back on it, my

8  response would have been empathetic and sad to

9  see her go.

10      Q.  Kat has testified that when she

11  complained to Mr. Helveston, that he said to her,

12  you know, If I report your complaints, you can no

13  longer work in the department.

14      Did you have any conversations with

15  anybody about Kat being transferred or moved out

16  of the department?

17      MS. BARLOTTA:  Object to form.  Move

18  to strike.

19      A.  No.

20      Q.  Did Mr. Helveston ever talk with you

21  about, Hey, is there some other place we can put

22  Kat or we can move Kat?

23      A.  No.

Page 184

1       Q.  But people did that.  They would move

2  from department to department, because you got

3  people coming in to your department from other

4  areas, right?

5       MS. BARLOTTA:  Object to form.

6       A.  We have had that, yeah.

7       Q.  And you've been trained on

8  retaliation?

9       MS. BARLOTTA:  Object to form.

10      A.  That may be in the handbook.  I'm not

11  a hundred percent on that, but --

12      Q.  Do you know what retaliation is under

13  Truist's policies?

14      MS. BARLOTTA:  Object to form.

15      A.  Retaliation would be retaliatory

16  actions toward an employee for various reasons,

17  for reporting things, various reasons, sure.

18      Q.  And if Kat had raised some concerns

19  about equality and some gender issues and she was

20  told that, Look, if I report your concerns up

21  through the structure, you can't stay in the

22  department, could that be retaliatory if somebody

23  is moved out of their department because of their

Page 185

1   complaints?
2        MS. BARLOTTA:  Object to form.  Move
3   to strike.
4        A.   I don't know that that would be
5   retaliatory if they're granted to move, if that
6   was one of their wishes.  I don't think so.
7        Q.   What if they were -- they didn't ask
8   but they were told, You will not be able to go
9   back to your department because of these
10  complaints?
11       MS. BARLOTTA:  Object to form.
12       A.   I can't imagine saying that, but I
13  don't have any knowledge of that being said.
14       Q.   But could that be retaliatory?
15       MS. BARLOTTA:  Object to form.
16       A.   I suppose.
17       Q.   Did you ever talk to Ron Helveston
18  about Kat's employment ending?
19       A.   No.
20       Q.   Who replaced Kat?
21       MS. BARLOTTA:  Object to form.
22       A.   Her position was open for some time,
23  and we left it open for her, as I recall, while

Page 186

1   she was out.  Maybe Lauren Greene.  I'm not sure
2   that she was the actual replacement, like person
3   for person replacement, but I think it may have
4   been Lauren Greene at that time, I believe.
5        Q.   Was Lauren Greene a new hire or was
6   she already there?
7        A.   She was a new hire.
8        Q.   Is she still there?
9        A.   She is.
10       Q.   And what's her job title now?
11       A.   She's account executive.  She works
12  from home.
13       Q.   And what was she hired in, what
14  position?
15       A.   I believe account executive.
16       Q.   When Kat's employment ended, she was
17  a broker, right?
18       A.   Uh-huh (positive response).
19       Q.   So who replaced her as a broker?
20       MS. BARLOTTA:  Object to form.
21       A.   I don't remember a replacement for
22  that exact position.  I think some job duties
23  were shifted around as a result.

Page 187

1        Q.   Who got Kat's job duties as a broker?
2        MS. BARLOTTA:  Object to form.
3        A.   Let's see.  I think maybe Tiffany
4   Sanders had taken over those duties, I believe.
5        Q.   When you become a broker and you've
6   been an account executive, are you supposed to
7   then shift to broker duties so you can develop
8   your book and grow as a broker?
9        MS. BARLOTTA:  Object to form.  You
10  can answer.
11       A.   There's no clear-cut way to do it.
12  There's no blueprint, no handbook that says,
13  Okay, now that you're an inside broker or a
14  broker, you magically get to only do those
15  duties.  There's always a blend.
16            I mean, to this day, I still do
17  duties that are not necessarily just attached to
18  my title.  If someone needs a quote, I can still
19  do that.  If someone needs a binder, I can still
20  do that.  So no.
21            There's no -- I think the distinction
22  between account executive and inside broker can
23  sometimes be mixed in terms of actual job duties,

Page 188

1   because you can't be an inside broker and just
2   say, Okay, I'm not going to do anything else but
3   try to write new business and not pay attention
4   to anything else.  So that would be difficult.
5        Q.   So did you ever understand that Kat
6   raised issues about, after she became a broker,
7   that the majority of her duties were still
8   account executive duties, that she wasn't able to
9   develop as a broker because she was still being
10  told to do account executive duties?
11       MS. BARLOTTA:  Object to form.
12       A.   That was not told to me.
13       Q.   Did you ever see any documents where
14  Kat had typed up the percentage of work she was
15  performing as an account executive versus a
16  broker?  Did you ever see any documents like
17  that?
18       A.   I did not see that document.
19       Q.   Okay.  I thought Tiffany was an
20  account executive.  When did she become a broker?
21       A.   No, she is an account executive, but
22  she handles some inside broker duties as well.  I
23  mean, she markets and negotiates renewals and new

Page 189

1  business.

2      Q.  When did she start doing that?

3      A.  I would have to ask Corey

4  specifically, but I'm assuming -- she came to us

5  from ProAssurance.  So she was a -- she had a

6  decent amount of experience already.  And so I

7  would assume that she started doing that

8  instantly.  I can't remember her hire date, but

9  probably close to when -- shortly after she

10 started.

11     Q.  Does she do more account executive or

12 more broker duties?

13     MS. BARLOTTA:  Object to form.

14     A.  I would say she's a -- she has the

15 ability to do both, and she probably often does

16 both, account executive and inside broker duties.

17     Q.  But are they equal or is one more

18 than the other?

19     MS. BARLOTTA:  Object to form.

20     A.  I wouldn't say they're equal.

21 They're different.

22     Q.  But, I mean, does she spend more time

23 doing one or the other?

Page 190

1      MS. BARLOTTA:  Object to form.

2      A.  Probably more time on account

3  executive I would say.

4      Q.  Because account executive --

5      A.  I'm guessing, because, again, she's

6  not on my direct team.  So I'm just -- I'm

7  assuming that that's her role, just understanding

8  how their team operates.

9      Q.  Account executives are not exempt.

10 So they get overtime.

11     MS. BARLOTTA:  Object to form.

12     A.  They have to enter their time,

13 correct.

14     Q.  But inside brokers are exempt, right?

15     A.  Correct.

16     MS. BARLOTTA:  Object to form.

17     Q.  So she's doing both exempt and

18 nonexempt work?  Is she classified doing both?

19     MS. BARLOTTA:  Object to form.

20     A.  I don't -- I don't think she's

21 working -- I don't think she's doing overtime, I

22 don't believe, if that's what you're --

23     Q.  Is she classified as exempt or

Page 191

1  nonexempt?

2      MS. BARLOTTA:  Object to form.

3      A.  As an account executive, she would be

4  nonexempt.

5      Q.  You said her title is account

6  executive, though.  So if that's her title, have

7  y'all classified her as nonexempt even though

8  she's an account executive?

9      MS. BARLOTTA:  Object to form.

10     A.  No, she's an account executive, so

11 that would be nonexempt, right?

12     Q.  Right.

13     A.  Right.  So yes.

14     MS. BARLOTTA:  That's what you said.

15     Q.  Okay.  Sorry.  And I may have gotten

16 that confused.  I'm sorry.

17     A.  No, that's fine.

18     Q.  Thank you for clearing that up.

19        So when Ross Robertson got promoted

20 to account executive from -- I mean, excuse me --

21 to broker from account executive, did he have to

22 still do account executive duties?

23     MS. BARLOTTA:  Object to form.

Page 192

1      A.  Yes.

2      Q.  Do you know how much?

3      A.  Percentage-wise, no.  But I know he

4  did, yeah.

5      Q.  Have you ever talked to any of these

6  employees who are brokers to see how much time --

7  that had been account executives, how much time

8  they spend doing account executive versus broker

9  duties?

10     MS. BARLOTTA:  Object to form.

11     A.  I don't, because, again, each team

12 lead has a responsibility to structure that team

13 in terms of work duties and percentage on

14 renewals, new business, whatever it might be.  So

15 I let the team -- I don't let them.  That's what

16 they're charged to do.

17        And so it's up to the individual team

18 leads to divvy up the work, and I've not heard

19 anyone say that the percentage of work in either

20 silo is a bad thing.

21     Q.  Do you tell them to keep documents of

22 this is -- you've got to track your time as an

23 account executive and track your time as broker?

Page 193

1    A.   No.

2    Q.   Why not?

3    A.   Because it's -- we all do different

4  -- we can all -- just because there's a title

5  doesn't mean that you're alleviated from doing

6  certain work.  I think that applies in any

7  business, or I know it does.

8        I don't think that in a business like

9  ours, to think that we could go to somebody and

10 say, Now you're an inside broker, and all you

11 have to do is X, Y, or Z.  You don't have to

12 worry about anything else after there may be

13 clients that you've been dealing with for ten

14 years or more or whatever it might be.  I don't

15 think that it's reasonable to assume that a

16 person can only do certain duties and not be

17 asked to touch anything else.

18   Q.   And fair enough, Rusty.  I guess

19 my -- have you been trained on the wage and hour

20 policies, overtime policies?

21        MS. BARLOTTA:  Object to form.

22   A.   That's Truist payroll, so no.

23   Q.   Have you ever been told or trained

Page 194

1  while you've been at CRC or Truist that you

2  cannot have an exempt employee performing

3  nonexempt duties?

4        MS. BARLOTTA:  That's not true,

5  Cynthia.

6    Q.   And not pay them overtime if it's a

7  substantial amount, like you've got to classify

8  employees correctly so that you make sure they're

9  paid overtime if they're doing overtime?

10        MS. BARLOTTA:  That's a misstatement

11 of the law, first of all.  You're not here to

12 testify as a legal expert on what overtime is.

13   Q.   I'm not asking you as a legal expert.

14 I'm just asking you if you've been trained on

15 that while you were at Truist?

16        MS. BARLOTTA:  If you've been trained

17 on that, it would be wrong, because that's not a

18 correct statement of the law.  Exempt employees

19 can perform nonexempt duties and vice versa.

20        MS. WILKINSON:  Again, I would like

21 to finish whatever I'm saying before you speak,

22 Rachel.

23   Q.   (BY MS. WILKINSON:)  I'm just asking

Page 195

1  if you've ever been trained on the requirements

2  for classifying and -- duty assignments for

3  exempt and nonexempt employees?

4        MS. BARLOTTA:  Object to form.

5    A.   That is handled by -- I've not been

6  formally trained on that.  That is handled by

7  Truist payroll and the time entry by employees

8  that are required to enter their time.

9        So I would say I've not been formally

10 trained on that, and I don't know that I

11 understand that law fully, because it's not my --

12        MS. BARLOTTA:  You're not a lawyer.

13   A.   Right.  And my only involvement in

14 that is when -- and any other team lead is to

15 sign off when an employee enters their time into

16 our payroll system.  You simply have to click an

17 approve button showing that they've entered their

18 work time for that week.

19   Q.   And when Ross Robertson was moved

20 into a broker position, did he have to enter his

21 time?

22   A.   He did while he was an account

23 executive.  You do not in a broker position.

Page 196

1    Q.   But Tiffany has to enter her time?

2        MS. BARLOTTA:  Object to form.

3    A.   I do think that she's still

4  classified as an account executive.  And if that

5  is the case, then she would have to enter her

6  time in.

7    Q.   You review that, so you've reviewed

8  time for her?

9    A.   Not for Tiffany.  Corey would do

10 that, because he's on her team.

11   Q.   Sorry about that.

12   A.   That's okay.

13   Q.   Look back, Rusty, at Plaintiff's

14 Exhibit 27, this chart we've been talking about.

15 It's right there.  I think it's under your phone,

16 sweetie.

17   A.   Okay.

18   Q.   Yeah, right there (indicating).  We

19 talked earlier about who determines pay, and you

20 said it depends on like whose team they're on, I

21 believe.

22   A.   Uh-huh (positive response).

23   Q.   But as the department head, like the

Page 197

1    VP over the department, would you see what each
2    employee in the department is getting paid?
3         A.   Occasionally, I might, but the
4    payroll per team wouldn't come to me necessarily.
5    But not as a matter of course, I wouldn't, no.
6         Q.   But you -- and correct me if I'm
7    wrong on this, but I thought you said, Rusty,
8    that Mr. Cadden was the one that approved pay.
9         A.   He is the one that distributes bonus
10   calculations from accounting when it's time. He
11   doesn't -- he doesn't necessarily approve. If
12   you're saying approve like the pay that they're
13   entering in to --
14        Q.   Salary. Like who approves their
15   hourly or salary?
16            MS. BARLOTTA: Object to form.
17        A.   Okay. So you mean who approves it
18   when they're hired? Is that what you're saying?
19        Q.   Right. Who determines what amount
20   they're going to get paid? Not bonus but, you
21   know, basic.
22        A.   Basic salary?
23        Q.   Yes.

Page 198

1         A.   Okay. So that would -- a position
2    requisition form would be completed for a new
3    hire. That form would go to John Cadden as
4    office president, and then that position
5    requisition form, that would include the
6    suggested salary that's usually a range, would
7    then go to Brent Tredway, and he would ultimately
8    provide approval for that position or that pay.
9         Q.   And do you see those forms before
10   Cadden and Tredway see them?
11        A.   Sometimes, if -- sometimes. Not
12   every time, no.
13        Q.   And if somebody goes from an account
14   executive to a broker, is there that form also
15   filled out to change their pay that Mr. Cadden
16   and Mr. Tredway have to review?
17        A.   If it's someone in an existing
18   position, it's normally -- it can be in the form
19   of an e-mail request that would get distributed
20   on at that point. And if it's approved, and then
21   that task would appear in our payday task, if you
22   will, to approve it once it gets approved.
23        Q.   Okay. And do you see those e-mails

Page 199

1    if it's, you know, so-and-so has moved into this
2    position, here's what I want to pay them? Do you
3    get copied on those e-mails?
4         A.   Sometimes the team leads will copy
5    me, but not every time. But sometimes.
6         Q.   This Exhibit 27 has salaries or it
7    says compensation listed on the right-hand side.
8    Let's just -- for any of these people that were
9    actually on your team, did you have input in what
10   they would be paid?
11        A.   For my direct team, yes.
12            (Whereupon, a discussion off the
13   record was held.)
14        Q.   (BY MS. WILKINSON:) So, for example,
15   looking at Plaintiff's Exhibit 27, Ross
16   Robertson, when he was an account executive, was
17   paid sixty-two five a year. Did you have any
18   input in that?
19        A.   I did.
20        Q.   Okay. And were you the one that
21   suggested he be paid sixty-two five?
22        A.   I can't remember if that's his
23   initial starting salary. I don't remember that,

Page 200

1    because he came from outside of the insurance
2    business. He was in a sales role.
3             But yes, I would have ultimately
4    suggested that salary. And it may have been
5    based on what he was making. I'm not entirely
6    sure.
7         Q.   When you determined what Rusty [sic]
8    Robertson would make as an account executive, did
9    you go back and look what other account
10   executives were making?
11            MS. BARLOTTA: Object to form.
12        A.   Try to keep it level on my direct
13   team per person, yeah, close.
14        Q.   Why is it important to keep that
15   level?
16            MS. BARLOTTA: Object to form.
17        A.   Just to make sure that we're keeping
18   up with salary trends in the industry by
19   position.
20        Q.   What about keeping it level so that
21   men and women are paid comparably? Is that
22   important?
23            MS. BARLOTTA: Object to form.

Page 201

1    A.   I think so.

2    Q.   And did you have a duty to make sure

3  that men and women were paid comparably on your

4  team?

5        MS. BARLOTTA:  Object to form.

6    A.   I have a duty to -- I have a duty to

7  make sure that teammates are paid according to

8  their tenure, according to what they bring to the

9  team, according to what their job

10  responsibilities are.  I have a duty in that way.

11    Q.   And by tenure, you mean how long

12  they've been with the company?

13    A.   Correct.

14    Q.   So I've looked at this chart, and

15  Rusty Robertson was paid more than nine of the

16  account executives, who were women, that were

17  hired before him.  Seven of those women were

18  hired in 2013, five years before him, and he is

19  paid sixty-two five.

20        And, for example, Denise Lovoy is

21  paid forty-six two; Yvette Talsma is paid fifty

22  thousand.  These are women who were hired in 2013

23  to do the same job.  Sarah Dunston was paid

Page 202

1  thirty-nine nine ninety-eight.  Danielle

2  Levingston was paid fifty-nine thousand a year.

3        Do you know why he was paid

4  substantially more than these women who were

5  account executives who they're doing the same job

6  and have substantial tenure on him?

7        MS. BARLOTTA:  Object to form.  Move

8  to strike counsel's testimony.

9    A.   I can only speculate that he -- I can

10  only speculate that if you look at total

11  compensation, total annual compensation, that we

12  would likely find that in many instances, he was

13  paid less overall than some of the account

14  executives mentioned when you talk about overall

15  compensation.

16    Q.   You're talking about bonuses?

17    A.   Uh-huh (positive response), yes.

18    Q.   Okay.  There's been testimony that

19  bonuses are purely discretionary.  Is that your

20  understanding?

21    A.   It is.

22    Q.   Okay.  But when you decided that you

23  were going to give Ross Robertson sixty-five five

Page 203

1  to be an account executive, did you go back and

2  look at what these women were making?

3        MS. BARLOTTA:  Object to the form.

4    A.   On my direct team?

5    Q.   Either that or the department, either

6  one.  Because you're over the whole department.

7    A.   Yeah.

8        MS. BARLOTTA:  Object to form.

9    A.   I am over the whole department.  But,

10  again, it's up to each team lead that -- to

11  decide the pay for their individual teams.

12    Q.   But if you're over the department,

13  it's your responsibility to make sure -- let me

14  -- that you keep it level, right, so there's no

15  discrimination, right?

16        MS. BARLOTTA:  Object to form.

17    Q.   Do you agree with that?

18        MS. BARLOTTA:  Object to form.

19    A.   I would hope.

20    Q.   Well, I mean, that was a duty of

21  yours, wasn't it, under the policies, to make

22  sure that pay is level and there's no

23  discrimination with regard to pay, right?

Page 204

1        MS. BARLOTTA:  Object to form.

2    A.   To that, I would say that if you look

3  at total compensation, including many of these

4  people listed in here, I would say that, male or

5  female, that tenure matters, and that that goes

6  into total overall compensation, and that you

7  would probably find that many of these referenced

8  actually make more and still make more than Mr.

9  Robertson does even though their salary might be

10  listed as lower.

11    Q.   And I don't want you to guess, Rusty,

12  I mean, but --

13        MS. BARLOTTA:  Well, except you've

14  asked him to guess pretty much all day and

15  speculate, but that's only when it suits you, you

16  want him to guess.

17        MS. WILKINSON:  Are you through?

18    Q.   (BY MS. WILKINSON:)  Rusty, bonuses

19  are dependent on a lot of things, right?

20    A.   Uh-huh (positive response).

21    Q.   And if they're up to the discretion

22  of your manager or team leader, then you don't

23  know what you're going to get for a bonus, do

Page 205

1  you?
2       MS. BARLOTTA:  Object to form.
3       **A.  You should.  Bonuses are discussed**
4  **prior to delivery in most cases.  So the employee**
5  **should know what the expectations are around**
6  **their total annual compensation, including salary**
7  **and bonus, yep.**
8       Q.   And what are they told about how much
9  of a bonus they'll get so that they have this
10  expectation?
11       MS. BARLOTTA:  Object to form.
12       **A.   Yeah.  Usually for my direct team --**
13  **and most teams are the same.  For my direct team,**
14  **I'll sit down with that person and lay out what**
15  **they were paid at the same time last year, what**
16  **their salary is, and what they can expect at the**
17  **next bonus cycle so that it gives a full annual**
18  **picture of their pay.  And so there shouldn't be**
19  **surprises around what people receive for bonuses.**
20       Q.   Pay and bonuses are confidential.
21  Like employees aren't supposed to talk to other
22  employees about it.  Is that the policy?
23       MS. BARLOTTA:  Object to form.

Page 206

1       **A.   That -- I don't know that there's a**
2  **written policy.  It's people generally don't talk**
3  **about it.**
4       Q.   So you and the team leaders and those
5  that are in management are the only ones that
6  really know what everybody is making?
7       MS. BARLOTTA:  Object to form.
8  Assumes facts not in evidence.
9       **A.   In some cases, but not all.  I mean,**
10  **not every team lead chooses to involve me in**
11  **their bonus payout or their -- it's very**
12  **subjective, and it's discretionary and up to each**
13  **team lead to --**
14       Q.   Employees that are below a team lead,
15  brokers or account executives, they don't see
16  what other people are making.  They don't see
17  this chart like Exhibit 27 that lists salary or
18  compensation.
19       MS. BARLOTTA:  Object to form.
20       **A.   No.**
21       Q.   That's only for the eyes of team
22  leaders and above.
23       MS. BARLOTTA:  Object to form.

Page 207

1       Q.   Right?
2       MS. BARLOTTA:  Object to the form.
3       **A.   Correct.**
4       Q.   So it's the responsibility of the
5  team leaders and you and those that see all of
6  this in totality to look at it and make sure that
7  it's -- you keep it level so there's no
8  discrimination, right?
9       MS. BARLOTTA:  Object to form.
10       **A.   That would be the hope.  I mean, I**
11  **would say when bonuses are discussed -- when**
12  **bonuses are discussed with team leads or if team**
13  **leads discuss them with an employee, if there**
14  **ever is an issue or if there ever was an issue**
15  **about the amount or whatever not agreeing with**
16  **that, that teammate always, always has the**
17  **opportunity to go talk to that team lead and**
18  **discuss that pay.**
19       Q.   Yeah, but did you go to Sarah Dunston
20  or Denisa Lovoy and say, Okay, I mean, I know
21  y'all are making a lot less than Ross Robertson?
22  You never went and talked to them about it or
23  told them that, did you?

Page 208

1       MS. BARLOTTA:  Object to form.
2       Q.   Did they know they were making --
3       MS. BARLOTTA:  Mischaracterization.
4       Q.   -- ten thousand, twenty thousand less
5  than Ross Robertson just on their compensation?
6       MS. BARLOTTA:  Object to form.
7       **A.   Again, I want to clarify that this**
8  **lists salary, and if -- I'm not sure that at that**
9  **time that you're referencing that Denisa Lovoy**
10  **was making less than what Ross Robertson was**
11  **overall.  I'm not.**
12       Q.   I'm talking about just the
13  compensation.
14       **A.   Right.**
15       Q.   Like you didn't go to them and tell
16  them, Hey, I've given him a higher salary than
17  you.  You never told them that, did you?
18       MS. BARLOTTA:  Object to form.
19       **A.   I did not tell them that.**
20       Q.   Okay.  So they wouldn't even know to
21  raise any issue, because they didn't know what
22  others were getting paid, right?
23       MS. BARLOTTA:  Object to form.

Page 209

1  You're assuming -- you don't know if they know,
2  what they know.  He can't testify to what they
3  knew or what somebody else may have told them.
4      Q.   Is there another chart that lists all
5  the employees in the department that has another
6  column to it that lists their bonus?  Have you
7  seen that?
8      A.  I see that --
9          MS. BARLOTTA:  Object to form.
10     A.  I see that by my team.
11     Q.   Have you seen any for the department?
12     A.  Each team.  Not for the department.
13     Q.   And what you see as far as bonuses
14 for your team, what does that look like?  What
15 does that document or chart or information look
16 like, Rusty?
17     A.  So it lists a lot of the information
18 that is here.  It lists the hire date, their
19 salary, their position, and it lists their
20 previous bonus the year prior for the same
21 period, and then it has a spot where we can list
22 their bonus that they will be receiving for the
23 upcoming -- upcoming period.

Page 210

1      Q.   Who creates that or puts that
2  information in there?
3          MS. BARLOTTA:  Object to form.
4      A.  Accounting.
5      Q.   Where do they get that information?
6      A.  They get that, I'm assuming, through
7  the payroll dashboard website.  I'm assuming that
8  they have that information.
9      Q.   As far as bonuses, though, for your
10 team, that's something that you're deciding,
11 right?  You send amount that each person is going
12 to get for bonuses up for approval, up the chain
13 of command above you?
14         MS. BARLOTTA:  Object to form.
15     A.  I do send that ultimately for
16 approval when it's due.  I send that, yeah, for
17 my team.
18     Q.   And who do you send that to?
19     A.  I send that to John Cadden, and right
20 now we copy someone in accounting that's
21 responsible for bonus calculations.
22     Q.   And you're the one that determines
23 the amount each person is to get as far as their

Page 211

1  bonus?
2      A.  Pretty much.  I mean, you know, for
3  my direct team, Tyler and I co-lead it.  So we're
4  -- so we will discuss that and have discussions
5  with the teammates about what they can expect and
6  why, and so yeah.
7      Q.   And then do you take the bonus that
8  you and Tyler have agreed each employee on
9  y'all's team will get and enter that or document
10 that somewhere?
11         MS. BARLOTTA:  Object to form.
12     A.  We will enter that amount into the
13 bonus calculation worksheet.
14     Q.   And what program operates the bonus
15 calculation worksheet?
16     A.  It looks to be some form of Excel.
17     Q.   And is that on your computer?
18         MS. BARLOTTA:  Object to form.
19     A.  The program itself where it's
20 calculated is not on my computer.  I receive the
21 spreadsheet that's completed by accounting.
22     Q.   And then you put the numbers in?
23     A.  Uh-huh (positive response), for that

Page 212

1  period.
2      Q.   And then do you save it on your
3  computer or keep a copy in some folder in some
4  manner?
5          MS. BARLOTTA:  Object to form.
6      A.  I save a copy.
7      Q.   And how do you save that?
8      A.  Usually in a folder.
9      Q.   Electronically or paper?
10     A.  Normally e-mail.
11     Q.   And how do you save it e-mail?  Tell
12 me your process for doing that.
13     A.  Many times I'll save it into a
14 spreadsheet and save it under My Documents.
15     Q.   On your hard drive?
16     A.  Yeah, at my local computer.
17     Q.   Is that on a network or just in your
18 documents?
19     A.  It would be a network.
20     Q.   Okay.  Who else has access to that
21 folder?
22         MS. BARLOTTA:  Object to form.
23     A.  I mean, IT ultimately, but, I mean,

Page 213

1   me personally day-to-day, yeah.
2       Q.   What's that folder called?
3       A.   It's under Documents in my local
4   computer.
5       Q.   So when you go to Documents -- but
6   what have you named that particular folder?
7       A.   My Documents.
8       Q.   But underneath My Documents, do you
9   have a subfolder or a file that says Bonuses or
10  something where you identify that?
11      A.   I'll name the individual spreadsheet
12  oftentimes Bonus Q4/23 or whatever, you know,
13  whatever the case may be.
14      Q.   Okay.  So you'll give the quarter and
15  the year?
16      A.   Usually, yeah.
17      Q.   And how far back do those go that are
18  on your computer?
19      A.   For me to access, two years.
20      Q.   Okay.  What happens to the ones that
21  are prior to 2021?
22      A.   I don't know.  I'm assuming -- I
23  assume accounting has a record of those.

Page 214

1       Q.   Do you delete them after a period of
2   time?
3       A.   No, I don't delete them.  They're
4   just -- they're not going to be kept on my local
5   computer after two years, or at least that's my
6   assumption.
7       Q.   But, I mean, how are they taken off
8   your local computer if it's your local hard drive
9   other than you doing it?  How are they removed or
10  deleted from that?
11           MS. BARLOTTA:  Object to the form.
12      A.   I don't know.  I'll have to -- I can
13  do a look back, but I don't know.
14      Q.   Do you have any of those bonus
15  calculation worksheets that have any bonuses for
16  Kat Hendrix?
17           MS. BARLOTTA:  Object to form.
18      A.   Not to my knowledge.
19      Q.   Have you looked?
20           MS. BARLOTTA:  Object to form.
21      A.   I have not.
22      Q.   Okay.
23           MS. WILKINSON:  We're going to be

Page 215

1   requesting -- we've actually requested those, so
2   we're going to --
3           MS. PALMER:  Where are the ones that
4   we used yesterday?
5           MS. WILKINSON:  That's everything
6   that was marked.  Wait, wait.  They may be here.
7   Give me one second.
8       Q.   (BY MS. WILKINSON:)  Is this what
9   you're talking about, Plaintiff's Exhibit 23,
10  Rusty?
11           MS. BARLOTTA:  Object to form.
12      A.   That is.
13      Q.   Okay.  And did you create those bonus
14  calculation worksheets, I mean, or put the
15  bonuses in those?
16           MS. BARLOTTA:  Object to form.
17      A.   I did not.
18      Q.   So those aren't for your team?
19      A.   No.  This is for -- it looks to be
20  Team Daugherty.
21      Q.   Okay.  But at some point you would
22  have had these bonus calculation worksheets for
23  Kat Hendrix?

Page 216

1           MS. BARLOTTA:  Object to the form.
2       A.   Not necessarily, because the team
3   leads don't always share that with me.
4   Oftentimes they'll do it on their own and send
5   them directly to John Cadden.
6       Q.   This is missing some of the
7   information that you were talking about.  You
8   said it had hire date.  Is this different from
9   the spreadsheet that you kept?  Because it looks
10  like -- you said it would have hire date,
11  information similar to this.
12      A.   It says original hire date, yeah.
13      Q.   Okay.  Have you seen a chart that has
14  any additional information different from what
15  Plaintiff's Exhibit 23 has?
16      A.   No, this is customary.
17           MS. BARLOTTA:  Object to form.
18      Q.   Mr. Helveston testified that there
19  was a hard copy of what they called the bonus
20  sheet that had kind of how you calculated
21  bonuses, and he said it wasn't on a computer.
22  Everybody just had a hard copy of it.  Do you
23  know what he's referring to?

Page 217

1          MS. BARLOTTA:  Object to form.
2      A.   A hard copy of -- a hard copy of the
3  bonus sheet?
4      Q.   Not this, not where bonuses were
5  entered, but a sheet that talked about how you
6  calculate bonuses, the percentage.
7          MS. BARLOTTA:  Object to form.
8      A.   This is exactly what everyone
9  receives to my knowledge.
10     Q.   Okay.  And I'm talking about
11 something different.  Let me see if I can --
12 because I wrote it down.  Let me see if I can
13 find it in my notes from his depo.
14         He talked about there is a sheet that
15 lists how you calculate the -- the bonus scale is
16 what he called it.  He said it's a paper copy,
17 and everyone had a copy.  Do you know what he's
18 talking about?
19     A.   I don't have a paper copy of any sort
20 of bonus.
21         MS. BARLOTTA:  Are you talking about
22 the formula that he --
23     Q.   Yeah, he's talking about the formula,

Page 218

1  not actual numbers.
2          MS. BARLOTTA:  The formula that talks
3  about what the pot of money that each broker had.
4  I think that's what -- I could be wrong, but I
5  think that may be --
6      Q.   He said there was just a standard
7  scale sheet that talked about the formula, not
8  about a specific bonus for each person, but the
9  formula on how you calculated it once you had the
10 pot of money to be distributed.
11     A.   You're talking about the percentage
12 from the actual revenue what the percentage is,
13 how it's calculated?
14     Q.   Right.
15     A.   I don't know.  I don't know where
16 that document is.  I don't.
17     Q.   Have you seen it?
18     A.   I don't know a hard document of that.
19 It's always on this calculation right here.  It
20 shows -- I can't hardly read that, but this is --
21     Q.   That's how we got it, and we couldn't
22 blow it up.  So sorry about that.
23     A.   It should show the percentage.

Page 219

1      Q.   And how were -- Rusty, how were
2  broker bonuses calculated?  Like what was the
3  percentage?
4      A.   There are -- it's by different
5  revenue bands.  Is that what you mean?
6      Q.   Like is there a policy about how much
7  and the percentage and how much you can get if
8  you're a broker?  Because it's my understanding
9  there's a document that says, Here's how -- the
10 percentages a broker can get; if they're a
11 broker, they can get between X and X percentage.
12     A.   Yeah.
13     Q.   And here's how you calculate it.  So
14 is there a document or something written
15 somewhere that says, This is how you calculate
16 the percentages, go from this to this for a
17 broker?
18     A.   I've just always known it.  I don't
19 know where that document exists.  I'm sure it
20 might.
21     Q.   What do you know it to be?
22     A.   The different -- the different
23 revenue bands for production.  So there's zero to

Page 220

1  -- is that what you mean, the percentages by
2  revenue?  Is that what we're asking?
3      Q.   What are the percentages that a
4  broker can get?
5      A.   Yeah.
6      Q.   Because I know what he testified to.
7  I just want to know what --
8      A.   Yeah.
9      Q.   -- you understand the scale or that
10 you can calculate.
11     A.   Yeah.  So there's zero to four
12 hundred thousand in revenue is twenty-five
13 percent.
14     Q.   Okay.
15     A.   That's the money available for that
16 team, zero to four hundred thousand.
17     Q.   What if you go over four hundred?
18     A.   And so I'll try to lay it out for
19 you.  So over four hundred thousand, and I don't
20 have it in front of me, but I'm -- but over
21 four hundred thousand, four hundred thousand to
22 seven hundred fifty thousand, I believe, is
23 twenty-seven and a half percent.

Page 221

1    Q.   Okay.
2    A.   And then seven fifty to a million is
3    thirty percent.
4    Q.   Okay.
5    A.   And -- is this what you're asking?
6    Q.   Yes.  That's exactly, yeah.  Thank
7    you.  Thank you.
8    A.   Seven fifty to a million is thirty
9    percent, and then a million to a million and a
10   half in revenue is thirty-two and a half percent,
11   and then a million and a half to two and a half,
12   I believe, is thirty-five percent, and then two
13   and a half to four million is thirty-seven and a
14   half percent.  And then from there, it's
15   incremental.  There's no set gauge.  I think at
16   four million, it starts at forty percent.
17        And then above that, it's, you know,
18   for teams with exponentially amount more revenue
19   than that, it becomes, as I understand it,
20   negotiable, but --
21   Q.   You said -- go ahead.  I'm sorry.
22   A.   Yeah.  But did that answer your
23   question?

Page 222

1    Q.   It did.  It did, yeah, but keep
2    going.  I didn't mean to interrupt you.
3    A.   No, I was just making sure that that
4    answered what you --
5    Q.   It did.  Yeah, thank you.  And I'm
6    sorry.  Thank you for answering that.
7        You said I don't have this in front
8    of me.  Is this documented anywhere?
9        MS. BARLOTTA:  Object to form.
10   A.   I'm sure it is, but I don't know
11   where it is.  I just -- I've always known it.
12       MS. WILKINSON:  Okay.  Let's take a
13   break for just a minute, Rusty.
14       VIDEOGRAPHER:  We are now off the
15   record.  The time is 3:15.
16       (Whereupon, a brief recess was
17   taken.)
18       VIDEOGRAPHER:  We are now on the
19   record.  The time is 3:30.
20   Q.   (BY MS. WILKINSON:)  All right,
21   Rusty.  We're back on the record after a break.
22   Is there anything you want to change about your
23   prior testimony?

Page 223

1    A.   No.
2    Q.   Okay.  What would we need -- because
3    I don't know that we have everything.  Is there
4    one document or chart or something that would
5    show the compensation for everybody in the
6    department?
7        MS. BARLOTTA:  Object to form.
8    A.   I have to assume there would be.  I'm
9    not sure who has ultimate responsibility for
10   that, but I don't know where that is.  I don't
11   own that.
12   Q.   But all bonuses are documented
13   somewhere?
14   A.   Yeah.
15   Q.   Okay.  All right.  Did you ever hear
16   anything or know anything about Lauren Lindberg
17   e-mailing or complaining to Lee McClure about she
18   had too many account executive duties to do the
19   inside broker?
20       MS. BARLOTTA:  Object to form.
21   Q.   Like she couldn't do her job, because
22   they were assigning her too many account
23   executive duties?

Page 224

1        MS. BARLOTTA:  Object to form.
2    A.   No.  I was not made aware of that.
3    Q.   Was there a time when Lauren
4    transferred to a different department or a
5    different job?
6    A.   I don't remember the exact year, but
7    I believe Lauren came to our department from the
8    property department.  I don't remember the exact
9    year that that was, but there was a period of
10   time where she moved away from Birmingham, and
11   she was still with Lee McClure's team working
12   remotely, and that was for a short period of
13   maybe eight months.
14   Q.   Did she ever move to a different team
15   or outside the supervision of Lee McClure?
16   A.   Lauren did not, no.
17   Q.   What about Andrea Sutton?  Were you
18   ever aware that she complained about an issue
19   with her bonus and then she transferred?
20       MS. BARLOTTA:  Object to form.
21   A.   Andrea Sutton, did she complain about
22   her bonus?  No.
23   Q.   You don't remember anything about it?

Page 225

1    A.  Huh-uh (negative response).

2    Q.  What about Christy Smith?  Are you

3  ever aware of her complaining about a bonus?

4    A.  No.

5    Q.  Are you aware of her sending any

6  e-mails where she raised any issues about a

7  bonus?

8        MS. BARLOTTA:  Object to form.

9    A.  I don't remember them.

10   Q.  Okay.  There could be?  You just

11  don't recall?

12       MS. BARLOTTA:  Object to form.

13   A.  I don't recall.

14   Q.  Were employees told that you don't

15  put things in writing to indicate discrimination,

16  because that would trigger the policy, you know,

17  that would trigger --

18   A.  I wouldn't think so.

19       MS. BARLOTTA:  Object to the form.

20   A.  No.

21   Q.  And would that be --

22   A.  No.

23   Q.  Would that violate any policy if you

Page 226

1  told an employee, Listen, don't put anything in

2  writing about discrimination?

3        MS. BARLOTTA:  Object to form.

4    A.  I assume so.

5    Q.  Okay.  I may have gotten my facts

6  wrong.  I think Leslie just corrected me.  Do you

7  recall Denise transferring to work under Lee

8  because of any issues or complaints?

9        MS. BARLOTTA:  Object to form.

10   A.  Denisa did transfer to work under

11  Lee's team, yeah.

12   Q.  Do you know if that had anything to

13  do with her raising any concerns about that she

14  was transferred because she needed to help Lauren

15  so that Lauren wouldn't transfer out?

16   A.  I don't recall that being the

17  reasoning for her transfer, no.

18   Q.  Do you recall there being any

19  concerns raised about her being brought over to

20  help Lauren so that Lauren wouldn't transfer out?

21   A.  I do not recall that being the

22  reason, no.

23   Q.  Okay.  Rusty, let me show you what

Page 227

1  I'm going to mark as Plaintiff's Exhibit 28.

2  This is an e-mail, and it is Bates numbered

3  Truist/Hendrix 1569.

4        (Whereupon, Plaintiff's Exhibit No.

5    28 was marked for identification and a copy of

6    same is attached hereto.)

7    Q.  Do you recall seeing this e-mail?

8    A.  I do.

9    Q.  And this is with regard to bonuses;

10  is that correct?

11   A.  It is.

12   Q.  So there's a -- let's start at the

13  bottom.  There's an e-mail from John Cadden to

14  you, and it's mid-year 2018 bonuses.  You said

15  you kept them by quarter.  So what was a mid-year

16  bonus?

17   A.  Mid-year bonus would have been the

18  bonuses that are delivered in August.

19   Q.  Okay.  So this e-mail is July.  So

20  bonuses would have gone out in August.  And then

21  he says:  Please return the bonus allocation by

22  Wednesday, 7/25, to me.  And it's got an

23  allocation file password.  What does that go to?

Page 228

1    A.  That would go to the spreadsheet that

2  lists the bonus payments or bonus allocations.

3    Q.  The ones you told me about earlier

4  that you kept on your computer?

5        MS. BARLOTTA:  Object to form.

6    A.  For my specific team, yes.

7    Q.  But would this be a password that

8  went through the -- that showed them for the

9  whole department?

10       MS. BARLOTTA:  Object to form.

11   A.  I don't believe so.

12   Q.  So the allocation file password in

13  this e-mail is just to access your team?

14   A.  As I recall, that would be what this

15  is for.

16   Q.  Okay.  And that would be a file that

17  had bonuses that went to everybody on your team?

18   A.  It would have -- yes, it would have

19  the spreadsheet that lists, as I mentioned, the

20  original hire date, their position, and their

21  bonuses the two prior periods and then the period

22  for what they're being paid, which in this case

23  would have been August.

Page 229

1    Q.   So two prior bonuses and then the
2  current bonus they're about to get?
3    A.   Correct.
4    Q.   And was there -- if you know, Rusty,
5  was there a file for every team that had the same
6  spreadsheet?
7    A.   There would be.
8    Q.   And was this maintained by Mr.
9  Cadden?
10       MS. BARLOTTA:  Object to form.
11   A.   Distributed.  I don't necessarily
12  know that it's maintained.  It would have come
13  from accounting to him.
14   Q.   Okay.
15   A.   Yeah.
16   Q.   And then did you then -- when he says
17  return the bonus allocation, did you e-mail that
18  to him or did you put it into the allocation
19  file?
20       MS. BARLOTTA:  Object to form.
21   A.   I would have -- I would have e-mailed
22  it to him.
23   Q.   Okay.  So there should be an e-mail

Page 230

1  where you sent a spreadsheet to John Cadden every
2  quarter for the allocation bonuses?
3       MS. BARLOTTA:  Object to the form.
4    A.   For my specific team, yes.
5    Q.   And have you been asked to look for
6  those?
7    A.   I have not.
8       MS. WILKINSON:  Can you make a note?
9    Q.   (BY MS. WILKINSON:)  Okay.  And do
10  you know how far back those e-mails go?  I mean,
11  would you still have some that you sent that
12  would have bonuses for Kat Hendrix on it?
13       MS. BARLOTTA:  Object to form.
14   A.   I would not.
15   Q.   Because she wasn't on your team?
16   A.   Yeah.
17   Q.   I got you.  Sorry about that.
18   A.   That's all right.
19   Q.   Then Mr. Cadden e-mails you back on
20  the 18th and says:  Hold up on these.  After I
21  reviewed mine, they're missing data.
22       Do you know what he was referring to?
23       MS. BARLOTTA:  Object to form.

Page 231

1    A.   I don't.  I imagine maybe they were
2  missing data for certain -- for a certain
3  employee, whether it could be a hire date.  It
4  could be the salary.  It could have been a blank
5  space in a spreadsheet.  I don't -- there's no --
6  the attachment is not here, so I don't know.
7    Q.   Right.  And this has an attachment,
8  professional zip.  Is that the worksheet or the
9  spreadsheet you were telling me about that was
10  attached in that zip file?
11       MS. BARLOTTA:  Object to form.
12   A.   Yes, it would be a spreadsheet,
13  uh-huh (positive response).
14   Q.   For the professional department?
15   A.   It looks like that is referencing the
16  professional department.
17   Q.   Which would be the whole department,
18  not just your team?
19       MS. BARLOTTA:  Object to form.
20   A.   Yeah, but I don't -- I don't really
21  understand the purpose of this, because I don't
22  -- I know for the last many years, I don't
23  receive the professional department bonus

Page 232

1  allocations.  I only receive my specific team
2  bonus allocations.
3    Q.   Well, at some point did you receive
4  the professional -- the bonus allocations for the
5  whole professional department?
6       MS. BARLOTTA:  Object to the form.
7    A.   It may have.  I don't know.  I don't
8  know exactly what this is -- contains in this.
9    Q.   Do you still have this e-mail where
10  you could pull up what is attached in the zip
11  file?
12       MS. BARLOTTA:  Object to form.
13   A.   I don't know if I have it on my
14  personal -- on my e-mail or not.
15   Q.   But, I mean, he's only sending this
16  to you, and he's sending it for the professional
17  department.  So as VP, do you believe there was a
18  time where you got the information on bonuses for
19  the whole department?
20       MS. BARLOTTA:  Object to form.  Move
21  to strike.
22   A.   I may have seen a document that
23  referenced them at one point but not as a regular

Page 233

1  course.

2      Q.   Do you know the last time you would

3  have seen documents for bonuses for the whole

4  department?

5      A.   It looks to be -- if this was '18, if

6  this is indeed what this references, which I

7  don't know for sure, that was like almost six

8  years ago, date-wise, so --

9      Q.   Why as the VP -- because you're in

10  charge of that whole department.  The buck kind

11  of stops with you.  Why as the VP wouldn't you

12  see bonuses for all of the teams under your

13  supervision?

14      MS. BARLOTTA:  Object to form.  Move

15  to strike.

16      A.   Because I think that, again, each

17  team lead is responsible for their own P&L

18  statement.  We operate as -- if you really look

19  at the way that our businesses operate, we are

20  truly almost viewed as individual independent

21  contractors.  Teams are run by team leads.  They

22  operate their P&Ls as they see fit.  They have a

23  certain T&E parameters that they can spend.  They

Page 234

1  manage that.  They manage travel expenses, all of

2  that stuff.  And so it ultimately comes down to

3  the team leads.

4      So I'm only assuming that at some

5  point, it doesn't necessarily make sense for me

6  to know all of that information when the team

7  leads are ultimately responsible for it.

8      Q.   But Mr. Cadden would know all that,

9  because he had to approve it all?

10      MS. BARLOTTA:  Object to form.

11      A.   I would think he has this

12  information.

13      Q.   And did -- and he approved the

14  bonuses that had been going to his son, Steele

15  Cadden, right?

16      MS. BARLOTTA:  Object to form.

17      Q.   It would have been one of the teams

18  he's over?

19      MS. BARLOTTA:  Object to form.

20      Q.   Not over directly, but, I mean,

21  indirectly in his --

22      MS. BARLOTTA:  Object to form.

23      A.   He would have received the allocation

Page 235

1  spreadsheet.

2      Q.   And ultimately approved them for his

3  son?

4      MS. BARLOTTA:  Object to form.

5      A.   They would have been approved in some

6  format, yeah, yeah.

7      Q.   Rusty, let me show you what I'm going

8  mark as Plaintiff's Exhibit 29.  It is

9  Truist/Hendrix Bates Number 1559 through 1560.

10      (Whereupon, Plaintiff's Exhibit No.

11  29 was marked for identification and a copy of

12  same is attached hereto.)

13      Q.   And I know you're not on this e-mail

14  exchange.  It's from Corey Daugherty to John

15  Cadden, and it references bonuses.  It's dated

16  August 5th, 2019.

17      Have you -- my question is:  Have you

18  seen the chart that's attached listing bonuses

19  for this quarter for Mr. Daugherty's team?

20      A.   I've seen one that looks similar, but

21  not this specific one to this team.

22      Q.   But have you seen charts like this

23  that list Kat and other team members?

Page 236

1      MS. BARLOTTA:  Object to form.

2      A.   Possibly in the past, but not --

3  apparently not since before '18, probably right

4  before '18.

5      Q.   This doesn't --

6      A.   But I don't routinely receive these

7  for every team.

8      Q.   This doesn't list the job title.  You

9  said the one that you have lists the job title.

10  Do you know why?

11      A.   I may have misspoke.  Possibly, I'm

12  just imagining in my mind, and maybe I misspoke,

13  that it lists the job title.  I can't be a

14  hundred percent certain on that.

15      Q.   Wouldn't it be important to list the

16  job title, because weren't bonuses allocated

17  differently for the account executives versus

18  brokers?

19      MS. BARLOTTA:  Object to form.

20      A.   I think bonuses are -- they are

21  indeed discretionary, and I think it's important

22  to understand that bonuses are -- they take so

23  many different factors into play.  They take

Page 237

1  tenure. They take the amount of business that
2  you're handling, whether it be in a new or
3  renewal position, the amount of premium volume
4  that you're handling, the -- so there's so many
5  factors that go into it that I'm not necessarily
6  -- I think the team lead is looking at the
7  individual and what they do on the team.
8      I don't know that the job title is
9  necessarily that important of something to list
10  in a bonus allocation when that team lead knows
11  what each individual teammate is responsible for.
12     Q.   None of that information is on this
13  chart, though, right, the things that all are to
14  be considered?  It doesn't even reflect any of
15  that, does it?
16     A.   It does not.
17     Q.   So the breakdown you told us, like
18  zero to four hundred thousand, twenty-five
19  percent; four hundred thousand to seven fifty,
20  twenty-seven and a half percent, those -- that
21  scale, does that apply to an account executive
22  bonus or just to a broker bonus?
23     A.   That's the team lead broker overall

Page 238

1  bonus.
2      Q.   Okay.  And then account executives,
3  though, get a bonus that's calculated different
4  and outside of how it's calculated for a broker,
5  right?
6          MS. BARLOTTA:  Object to form.
7      A.   They are discretionary and based on
8  what that person does within that team.
9      Q.   Well, I understand.  Is there a scale
10  for an account executive bonus?
11         MS. BARLOTTA:  Object to form.
12     Q.   Like how much percentage they get, or
13  is that just left up to the discretion of the
14  team leader?
15     A.   Discretion of the team leader.
16     Q.   But if you're a broker, there is some
17  scale and calculation involved?
18     A.   If you're the lead broker, yes.
19     Q.   If you're below the lead broker, if
20  you're an associate or an inside broker, does
21  this formula still apply or how do they determine
22  how much those brokers get?  How do y'all
23  determine?

Page 239

1          MS. BARLOTTA:  Object to form.
2      A.   Say that -- ask that again.  I'm
3  sorry.
4      Q.   You keep saying lead broker, that
5  there's a scale or a formula.  Does that apply
6  also to an inside or associate broker, regular
7  broker?
8          MS. BARLOTTA:  Object to form.
9      Q.   Or is that just discretion?
10         MS. BARLOTTA:  Same objection.
11     A.   It varies by team.  Some teams have
12  agreements with inside brokers that their bonus
13  can be based on production that they bring in.
14  And it varies so widely amongst teams that
15  there's no actual written formula for inside
16  brokers.
17     Q.   So, basically, as a team lead, you
18  can do whatever you want to do as far as
19  calculating a bonus for inside broker however you
20  want to do it, no matter?
21     A.   It's very dependent upon the
22  individual.  But at the end of the day, yes.  But
23  there is always a position and a seat at the

Page 240

1  table for any person on any team, regardless of
2  what team they're on, to voice concerns,
3  suggestions, negotiations within those bonus
4  structures on how they're to be paid, and that
5  varies widely by team.
6      Q.   Rusty, are you -- just to kind of
7  wrap up this complaint issue, are you aware of
8  any female employee raising any concern about
9  there being potential discrimination while you've
10  been employed -- let's say since the merger?
11     A.   No.
12     Q.   Are you aware of any time that any
13  complaint of discrimination in your department
14  was elevated to HR after the merger?
15         MS. BARLOTTA:  Object to form.
16     A.   Not to my knowledge, no.
17     Q.   Do you know Truitt Taylor?
18     A.   I know Truitt.
19     Q.   Is Truitt on your team?
20     A.   He is not.
21     Q.   Whose team is Truitt on?
22     A.   He heads up his own team.
23     Q.   Okay.  Is he --

Page 241

1    A.   He's a part of our office, but he
2  lives in Mississippi.
3    Q.   Okay.  What's his title?
4    A.   He's a senior broker, lead broker.
5    Q.   Has he ever been an inside broker?
6    A.   Oh, Truitt started on Susan Phillips'
7  team many, many, many years ago, probably
8  eighteen, nineteen years ago, if I recall, and
9  that's just a guesstimate, that he started on her
10 team.
11        So he came up as an assistant and
12 then account executive, and then I can't remember
13 what year, but at some year he went out on his
14 own and established his own brokerage team.
15   Q.   Okay.  Let me show you what I'm going
16 to mark as Plaintiff's Exhibit 30.
17        (Whereupon, Plaintiff's Exhibit No.
18 30 was marked for identification and a copy of
19 same is attached hereto.)
20   Q.   These are some documents we received
21 for Truitt Taylor.  It lists his hire date,
22 recruiting start date, target hire date 9/7/18,
23 primary location, Birmingham.  Do you know what

Page 242

1  that's referring to?
2    A.   I can only -- I guess that's when the
3  merger happened between SunTrust and Truist and
4  hire dates got all -- I'm assuming.
5    Q.   Oh, back up.
6    A.   Okay.
7        MS. WILKINSON:  Thank you, Leslie.
8    Q.   (BY MS. WILKINSON:)  It's my
9  understanding that Plaintiff's Exhibit 30 is when
10 Truitt Taylor put in a request to hire Jonathan,
11 and it says for the Birmingham --
12   A.   Oh, okay.
13   Q.   -- office to hire Jonathan Morgan.
14 Do you know anything about this?  Flip to the
15 second page.  It actually lists Jonathan Morgan.
16       MS. WILKINSON:  Thank you, Leslie.
17   A.   Okay.
18   Q.   (BY MS. WILKINSON:)  It looks like he
19 applied 9/7/2018.  Truitt was the hiring manager.
20 Do you know anything about this?
21   A.   I've not seen this exact document
22 before.  All I would have seen is I probably -- I
23 may have been copied on a position requisition

Page 243

1  form when he needed to hire someone.  But I've
2  not seen this document before.
3    Q.   Okay.  And then what position in 2018
4  was Jonathan Morgan hired into?  Was it inside
5  broker?
6    A.   I'm trying to find it on this
7  document.  I'm not a hundred percent sure if he
8  came in as an account executive or inside broker.
9  I don't recall the -- I don't recall if he came
10 in as an AE or inside broker.
11   Q.   Was he a new hire?
12   A.   He was a new hire.
13   Q.   This indicates inside broker, though,
14 Plaintiff's Exhibit 30.
15   A.   Does it?  Okay.
16   Q.   Do you see where it says at the top,
17 it says, inside broker field, the very top, that
18 little line at the very top up there, Rusty?
19   A.   Oh, okay.  Yeah.  Okay.
20   Q.   And was this position posted?  Do you
21 know?
22   A.   I don't recall if it was posted or
23 not.  I'm assuming that it was.

Page 244

1    Q.   You would have supervised Truitt
2  Taylor, though, right, as the department head?
3    A.   Yes.
4    Q.   Okay.  It looks like the website
5  lists him as an associate broker.  Is he an
6  inside broker or an associate broker?  Morgan?
7    A.   It would be an inside broker.  I'm
8  not sure what the -- is that our corporate CRC
9  group website currently?
10   Q.   I believe so.  Can you see it okay?
11   A.   Yeah.  I'm not sure why this says
12 inside broker and that says associate broker.  I
13 can't speak to that.  That's --
14   Q.   What do you understand that his job
15 duties are?  Is he performing the duties of an
16 inside broker or an associate broker?
17   A.   He would be more classified as an
18 inside broker.  He is charged with doing some
19 traveling and growing a book of business within
20 the book, within Truitt's book.
21        And he just recently made several
22 trips to brand new agents that no one had ever
23 heard of, Wyoming, Montana, a couple of other

Page 245

1  places.

2      Q.   Do you know Brandon Hayes?

3      A.   I know Brandon.

4      Q.   And is he currently employed in the

5  department?

6      A.   He is not.

7      Q.   And was he at some point employed in

8  the department?

9      A.   He was.

10     Q.   And when did his employment end?

11     A.   Brandon?  I'm -- if I recall, I'm

12 guessing again, he is probably -- his employment

13 ended pre-Covid is all I can guesstimate.

14     Q.   Whose team was he on?

15     A.   He was on Dave Sloneker -- he worked

16 with Dave Sloneker.

17     Q.   And what was his position?

18     A.   He would have been an inside broker.

19     Q.   Did you interview Brandon when he was

20 hired as an inside broker?

21     A.   I remember speaking with him briefly

22 with Dave.  I want to say, if memory serves, that

23 he came to us from the -- he was a lawyer.

Page 246

1      Q.   Did Sloneker ever -- around this

2  time, did Sloneker ask that Kat be moved to his

3  team as a broker around the time that Brandon

4  Hayes was hired?

5      A.   I don't recall that.

6      Q.   So it could have happened?  You just

7  don't recall?

8      A.   I don't recall it.

9           MS. BARLOTTA:  Object to form.

10     Q.   You're not saying it didn't happen.

11 You're just saying I don't remember?

12          MS. BARLOTTA:  Object to the form.

13     A.   I don't remember that.

14     Q.   And you understand he was hired as an

15 inside broker, not an associate broker?

16          MS. BARLOTTA:  Object to form.

17     A.   I believe that's correct.

18     Q.   And when he was hired or became a

19 broker, was the program available -- what's it

20 called?  The training program you said?

21     A.   No.  You're referencing the launch

22 program?

23     Q.   Yes.

Page 247

1      A.   It was not.  It was not.

2      Q.   Did Brandon leave as a result of any

3  issues with his performance?

4      A.   Brandon actually transferred to the

5  casualty department.  I don't recall it being as

6  a result of performance.

7      Q.   Okay.

8      A.   I think it was just related to the

9  nature of the business that he was seeing based

10 on relationships that he had that didn't quite

11 fit professional liability coverage.  It was more

12 driven toward casualty lines.

13     Q.   Let me show you Plaintiff's Exhibit

14 31.

15          MS. WILKINSON:  I'm sorry, Rachel.  I

16 don't have another copy.

17          (Whereupon, Plaintiff's Exhibit No.

18 31 was marked for identification and a copy of

19 same is attached hereto.)

20     Q.   (BY MS. WILKINSON:)  This is

21 CRC/Hendrix 4964 through 4978.  This lists

22 Brandon being hired as an associate broker.  You

23 understood that he did the duties of an inside

Page 248

1  broker; is that correct?

2          MS. BARLOTTA:  Object to form.

3          MS. WILKINSON:  Sorry, Rachel.

4      A.   I don't remember.  I don't remember

5  his actual title.

6      Q.   (BY MS. WILKINSON:)  Okay.

7      A.   I couldn't tell you if it was

8  associate broker or --

9          MS. WILKINSON:  Here, Rachel.  I've

10 got one.  I'm sorry.

11          Thank you, Leslie.

12          MS. BARLOTTA:  This is 31?

13          MS. WILKINSON:  Yes.

14     Q.   (BY MS. WILKINSON:)  Rusty, next I'm

15 just going to show you a few documents that have

16 been produced in this case and just see if you

17 kind of recognize them as documents that are

18 maintained by CRC, Truist.

19          (Whereupon, Plaintiff's Exhibit No.

20 32 was marked for identification and a copy of

21 same is attached hereto.)

22     Q.   Let me show you Plaintiff's Exhibit

23 32.  Have you ever seen this document before?

Page 249

1    A.   I've never seen this document.

2    Q.   But this is not how bonuses are kept

3    in this format?  There's a spreadsheet, like an

4    Excel spreadsheet, correct?

5         MS. BARLOTTA:  Object to form.

6    A.   Correct.  This appears to be a Word

7    document.

8    Q.   Do you know who drafted this?

9    A.   I have no idea.

10   Q.   Let me show you what I've marked as

11   Plaintiff's Exhibit 33.

12        (Whereupon, Plaintiff's Exhibit No.

13   33 was marked for identification and a copy of

14   same is attached hereto.)

15   Q.   Have you ever seen this document

16   before?

17   A.   First time seeing this document.

18   Q.   Is there one of these for your team?

19   Have you ever seen anything like this for your

20   team?

21        MS. BARLOTTA:  Object to form.

22   A.   No.

23   Q.   This is another document -- and these

Page 250

1    are documents that were given to the EEOC by CRC,

2    Truist.

3         (Whereupon, Plaintiff's Exhibit No.

4    34 was marked for identification and a copy of

5    same is attached hereto.)

6    Q.   Let me show you what I've marked as

7    Plaintiff's Exhibit 34.  Have you ever seen this

8    document before?

9    A.   First time seeing this document.

10   Q.   Okay.  And this lists Brandon Hayes

11   as an associate broker, and this was given to the

12   EEOC, and it lists Jonathan Morgan as an inside

13   broker.  But based on your testimony, Brandon

14   Hayes' job title is incorrect, right?

15        MS. BARLOTTA:  Cynthia, that's

16   totally incorrect of what he just testified to.

17   Object to the form.  Move to strike.

18   A.   I think I said I wasn't a hundred

19   percent certain on whether Brandon was listed as

20   an associate broker or inside broker.  I couldn't

21   be a hundred percent on which one it was.  But it

22   appears as though he was listed as an associate

23   broker.

Page 251

1    Q.   But you understood he had the duties

2    of an inside broker?

3         MS. BARLOTTA:  Object to form.

4    Mischaracterization of testimony.

5    A.   I understood him to work within a

6    broker's team to try and generate business.

7    Q.   But --

8    A.   That was his duty.

9    Q.   But did you understand that he was --

10   he was doing the duties of an inside broker

11   versus an associate broker?  Because there's a

12   difference.

13        MS. BARLOTTA:  Object to form.

14   A.   The -- I didn't view -- I didn't view

15   his duties as title related.  I viewed his duties

16   as generating business.  And whether or not it

17   was listed as associate broker or inside broker,

18   he was charged with developing a book of business

19   within the team that he was --

20   Q.   All brokers are charged with that.

21   A.   Sure.

22   Q.   But you've testified about the

23   difference in what an associate broker did and

Page 252

1    what an inside broker did.  Did you understand

2    that Brandon Hayes did the duties of an inside

3    broker?

4         MS. BARLOTTA:  Object to form.  Asked

5    and answered.

6    A.   Apparently, because I wasn't clear on

7    if he was an associate broker or inside broker, I

8    wasn't clear on what his title was.  So I don't

9    know that I can say that I necessarily understood

10   what his official title was.

11   Q.   I mean, you interviewed him.  You met

12   with John Cadden and him.  Is it your

13   understanding that he was being brought in to do

14   the duties of an inside broker?

15        MS. BARLOTTA:  Object to form.

16   A.   He would be an inside broker in my

17   opinion.

18   Q.   Okay.  I'm getting close to being

19   through, Rusty.

20   A.   It's no problem.

21   Q.   Famous last words, but I really am

22   getting close to being through.

23   A.   No problem.  I'm good.

Page 253

1    Q.   You talked a little bit about -- let
2  me make sure I get it right -- like the policies
3  that covered employee conduct.
4    **A.   Uh-huh (positive response).**
5    Q.   This is a document that's been
6  produced.  I'm marking it Plaintiff's --
7    MS. WILKINSON:  What?
8    Q.   Oh, I'm sorry.  I thought this --
9  well, I'm not going to ask you but one question
10  about this document.  I thought it had been sent
11  to opposing counsel.
12    (Whereupon, Plaintiff's Exhibit No.
13  35 was marked for identification and a copy of
14  same is attached hereto.)
15    Q.   It's Plaintiff's Exhibit 35, and I'm
16  not going to ask you anything but one question:
17  Have you ever seen this policy?
18    MS. BARLOTTA:  Where is this from?
19    MS. WILKINSON:  The Truist website,
20  Rachel.  We'll e-mail it to you.
21    MS. BARLOTTA:  Yeah, but it's like
22  a -- it's selling insurance.  That's what I'm
23  trying to -- it looks like they're selling

Page 254

1  insurance.
2    MS. WILKINSON:  Oh, it's an
3  advertisement.  I'm sorry.
4    Q.   (BY MS. WILKINSON:)  Have you ever
5  seen this advertisement selling -- promoting this
6  insurance?
7    **A.   Not this exact document, no.  This is**
8  **-- this comes from the internal website from**
9  **Truist?  I don't necessarily know that I've seen**
10  **this exact document, no.**
11    Q.   But on your team, this is one of
12  the --
13    MS. BARLOTTA:  I'm sorry.  I don't
14  think she said it's from the internal website.  I
15  think she said it's from the external website.
16    MS. WILKINSON:  Yes.  I'm sorry,
17  Rachel.
18    Q.   (BY MS. WILKINSON:)  Up at the top,
19  it says --
20    **A.   Oh, okay.  So yeah, this is just from**
21  **the public Truist website.**
22    Q.   Right.
23    **A.   Okay.  Sorry.  Yeah, no, I have not**

Page 255

1  seen this.
2    Q.   Your team sold these policies,
3  though, right?
4    **A.   Our teams actively sell these**
5  **policies, yeah.  It's part of the policies that**
6  **we offer.**
7    Q.   Okay.  Have you ever had diversity,
8  equity, and inclusion training while you've been
9  at Truist after the merger?
10    MS. BARLOTTA:  Object to form.
11    **A.   That was a module that is included in**
12  **the HR training site, yes.**
13    Q.   It's my understanding that that
14  started at some point in 2020.  Do you remember
15  that the first time y'all had DEI training was in
16  2020?
17    **A.   I believe it was -- I think it came**
18  **about in 2020.**
19    Q.   Let me show you what's been produced,
20  and I'm marking it Plaintiff's Exhibit 36.
21    (Whereupon, Plaintiff's Exhibit No.
22  36 was marked for identification and a copy of
23  same is attached hereto.)

Page 256

1    MS. WILKINSON:  Here you go, Rachel.
2    Q.   (BY MS. WILKINSON:)  And it is Bates
3  numbered CRC/Hendrix 5204 to 5233.  Is this the
4  diversity module that you would have taken in
5  2020?
6    **A.   It looks familiar.  I don't know that**
7  **this would have been the -- in 2020 the exact**
8  **one, because it still lists BB&T and Insights.**
9  **And I think by that time, we were post-BB&T, I**
10  **believe.**
11    Q.   Okay.  But this looks similar to what
12  you had taken?
13    **A.   Similar, but not exact.  I mean, not**
14  **to my recollection, I couldn't say that it was**
15  **exactly.**
16    Q.   And fair enough.  In the diversity
17  training, did they talk about implicit bias?
18    MS. BARLOTTA:  Object to form.
19    **A.   That's a familiar term that I've**
20  **heard in the past.  I haven't looked through it,**
21  **but I would assume that that's in these**
22  **documents.**
23    Q.   Look at the second page, Rusty.  It's

Page 257

1  Bates Number 5205.  And it says -- the second
2  page, Rusty.
3      A.  Okay.
4      Q.  Yeah.  It says some buzz worthy
5  topics, diversity biases, stereotypes, and
6  inclusion.  And then throughout this course, we
7  will address these terms.
8         So do you recall that being -- biases
9  being addressed when you took your diversity
10 training?
11        MS. BARLOTTA:  Object to form.
12     A.  I remember those phrases.
13     Q.  Okay.  And what about diversity?  Did
14 they talk about diversity?
15        MS. BARLOTTA:  Object to form.
16     A.  In the training, I would assume it's
17 in there, yeah, in the diversity training, sure.
18     Q.  And what did you understand diversity
19 to mean?
20        MS. BARLOTTA:  Object to form.
21     A.  Diversity means a well-rounded
22 inclusive team.
23     Q.  Look at Bates Number 5206, Rusty.

Page 258

1  It's the third page back.
2      A.  Okay.
3      Q.  The very top module says:  Diversity
4  equals differences.  How diverse is BB&T?  Do you
5  see that one?
6      A.  Uh-huh (positive response).
7      Q.  And it says:  Well, how many
8  associates do we have?  How many total employees
9  are there nationwide with Truist?
10        MS. BARLOTTA:  Object to form.
11     A.  Oh, I mean, I know at one -- I know
12 before the merger, BB&T was about thirty-two
13 thousand.  With the combination of SunTrust, I
14 don't know, fifty thousand plus.  I'm guessing.
15 I haven't looked at the -- I haven't looked at
16 the numbers.  I'm just guessing.
17     Q.  How many in Birmingham?
18     A.  Between property, casualty, and
19 professional, probably a hundred and fifty.
20     Q.  A hundred and fifty thousand?
21     A.  A hundred and fifty.
22     Q.  Oh, a hundred and fifty?
23     A.  People, right?

Page 259

1      Q.  Gotcha.  Okay.
2      A.  That doesn't include accounting or --
3  I'm not -- that's not -- I'm just referencing the
4  brokerage side.
5      Q.  Okay.  And then it says:  Think about
6  all the things that make us, quote, diverse.
7  Sure, there are regulatory requirements driven by
8  the Equal Employment Opportunity Commission,
9  EEOC, and affirmative action such as race,
10 national origin, sexual orientation, religion,
11 marital status, just to name a few.
12        It doesn't list gender, does it?
13     A.  I don't see gender there, no, not in
14 that document.
15     Q.  But gender should certainly be
16 included, correct?
17        MS. BARLOTTA:  Object to form.
18     A.  I -- I didn't write this, so I -- I
19 don't -- it's not in there, so --
20     Q.  And look at the one below it.
21 Diversity is our uniqueness, and it lists
22 categories, physical ability, socioeconomic
23 status, religious affiliation, gender

Page 260

1  identification, age, ethnicity, sexual
2  orientation, geographic location, political and
3  other social identities, cultural affiliations,
4  race.
5         It doesn't list gender as a separate
6  category.  It specifically states gender
7  identification, correct?
8         MS. BARLOTTA:  Object to form.
9      A.  That's what it says.
10     Q.  And what do you understand gender
11 identification is?
12     A.  Gender identification is whether you
13 identify as male or female.
14     Q.  Around the time that the diversity,
15 equity, and inclusion, this training came into
16 effect at Truist, did anybody do a review of the
17 hundred and fifty employees that were on the
18 business side that you were talking about as to
19 how many were men and how many are women in each
20 category?
21        MS. BARLOTTA:  Object to form.
22     A.  If they did, I'm not aware of it.  It
23 would not have been known to me.

Page 261

1    Q.   Has anybody since 2020 done a review
2  of the Birmingham offices to see if there is, in
3  fact, gender diversity?
4    A.   I don't know.
5       MS. BARLOTTA:  Object to form.
6    Q.   Not that you know of?
7    A.   I don't know.
8       MS. BARLOTTA:  Object to form.
9    Q.   And you've not done that?
10      MS. BARLOTTA:  Object to form.
11   A.   I've not done that.
12   Q.   Did you ever want to know after
13  taking this training module?
14      MS. BARLOTTA:  Object to form.  He
15  didn't testify that he took this one, but --
16   A.   Did I ever want to know if the -- did
17  I ever want to know what, if we were diverse or
18  what's --
19   Q.   Sure.  After you took a diversity
20  module sometime in 2020 and thereafter, did you
21  ever want to know how diverse the Birmingham
22  offices are with regard to gender?
23      MS. BARLOTTA:  Object to form.

Page 262

1    A.   Sure.
2    Q.   But you've never answered that
3  question, right?
4       MS. BARLOTTA:  Object to form.
5    A.   I've never asked -- which question
6  did I not --
7    Q.   You've never researched to see the
8  diversity between men and women in the Birmingham
9  office.
10      MS. BARLOTTA:  Object to form.
11   A.   I've not personally.
12   Q.   What is the Business Resource Group?
13  And I'm looking at Bates Number 5208.  It said:
14  BB&T has established Business Resource Group to
15  help connect associates with common interests to
16  support the organization's mission, vision, and
17  business objectives around specific diversity,
18  demographics, and characteristics.
19      Do you know what the Business
20  Resource Group is?
21   A.   I do not, nope.
22   Q.   Okay.  Did you ever see any
23  documentation from anybody at Truist, BB&T that

Page 263

1  talks about the company's objectives with regard
2  to gender diversity?
3       MS. BARLOTTA:  Object to form.
4    A.   I'm sorry.  Repeat that.  I'm sorry.
5    Q.   Did you from 2020 on -- well, at any
6  time since the merger, did you ever see anything
7  documented anywhere with regard to the company's
8  objectives related to gender diversity?
9       MS. BARLOTTA:  Object to form.
10   A.   With gender diversity specifically,
11  nothing sticks out.  I can't point to a place
12  where I remember seeing that personally.
13   Q.   What about racial diversity?  Did you
14  ever see anything that talked about the company's
15  goals with regard to racial diversity?
16      MS. BARLOTTA:  Are you talking about
17  quotas?
18   Q.   Anything that said, Hey, here's our
19  goal with regard to racial diversity.
20      MS. BARLOTTA:  Object to form.
21   A.   A goal?  I don't -- I remember that
22  word being referenced in earlier documents, but I
23  don't remember a goal being set forth as to if

Page 264

1  you're referencing a number of people per race or
2  -- is that what you mean by that?
3    Q.   Right.
4    A.   Okay.  No, I don't.
5    Q.   Look at 5209, Rusty.  The very first
6  section says:  What can stop us?  And it's
7  talking about what can stop us from diversity.
8  Some barriers to diversity include improper
9  hiring practices.  It says:  Rest assured BB&T
10  not only follows the law, we go above and beyond
11  to support diversity in our hiring practices.
12  Refer to the human systems corporate diversity
13  mission.
14      Do you know what that is?
15   A.   The corporate diversity mission?
16   Q.   Yes.
17   A.   I don't know exactly what the
18  corporate diversity mission is, no.  I'm not --
19  I'm on the insurance side of the business.
20   Q.   But when you did this training, could
21  you click on that?  Is that a link you could
22  click on and pull up the human resources
23  corporate diversity mission?

Page 265

1          MS. BARLOTTA:  Object to form.
2       A.  It looks to be a link, but I don't
3    remember clicking on that.  But it looks like
4    it's a link.
5       Q.  And when it talks about hiring
6    practices, that's also referring to internal
7    hiring practices for positions, not just outside
8    hires, right?
9          MS. BARLOTTA:  Object to the form.
10   You're asking him what the person who wrote this
11   was trying to communicate.
12      Q.  I'm absolutely not.  I'm asking you
13   do you understand that when it says hiring
14   practices, it's referring to hiring for positions
15   within the company, not just people outside?
16         MS. BARLOTTA:  Object to form.
17      A.  I'm not sure I know the exact intent,
18   if it means inside or outside in this instance
19   here.
20      Q.  Well, don't you think that any policy
21   with regard to diversity would also apply to
22   hiring for positions?
23         MS. BARLOTTA:  Object to form.

Page 266

1       Q.  Internally, like what we've been
2    talking about, the broker positions?
3       A.  Yes.
4       Q.  Okay.  And one of the barriers to
5    diversity is poor interviewing skills.  Why is
6    interviewing important?
7          MS. BARLOTTA:  Object to form.
8    Important to what?
9       Q.  To make sure that you follow and go
10   above and beyond the law to support diversity in
11   hiring practices.  Why is interviewing important?
12         MS. BARLOTTA:  Are you asking him to
13   interpret what this means or what his personal
14   opinion is about how interviewing is important?
15      Q.  I'm asking you.
16         MS. BARLOTTA:  I don't know what
17   she's asking you.
18      A.  Is it -- you're asking me is
19   interviewing skill -- are interviewing skills
20   important?
21      Q.  Yes.
22      A.  I would say so.
23      Q.  And is it important to conduct

Page 267

1    interviews to make sure that you're hiring the
2    most qualified applicant for the position?
3       A.  If it is -- if it's a new position
4    and you're entertaining outside interviewees, I
5    would say yes.
6       Q.  And what about internal?
7       A.  If it's an internal move, it depends
8    on the team.  And if -- oftentimes, if it's not a
9    new created position, if it's an existing
10   position and that person is just being elevated
11   in title only, there's not necessarily the need
12   for an interview.
13      Q.  That's left up to their discretion?
14      A.  Because you're not interviewing for a
15   new person or a new position.
16      Q.  But that's left up to the discretion
17   of whoever is hiring?
18      A.  I think it's a generally accepted.
19      Q.  And you said change in title only.
20   What do you mean by that?
21      A.  If you take somebody from account
22   executive to inside broker or inside broker to
23   broker, it could be -- it could be a change, not

Page 268

1    necessarily a new position, but it could be just
2    a change in title only.
3       Q.  Meaning that they still do account
4    executive duties, but you're just giving them the
5    title of inside broker?
6          MS. BARLOTTA:  Object to form.
7       A.  Yeah, I want to be clear on the --
8    when someone is elevated to the position of
9    inside broker, there must be a held belief
10   that -- I've heard this -- that there's a
11   distinction that suddenly maybe certain duties of
12   an account executive stop when you're elevated to
13   the position of an inside broker, but that change
14   is a slow -- it's definitely a marathon for sure,
15   and it takes oftentimes several years to truly be
16   elevated to the position where you're building
17   your own book within a book so that you then have
18   the business that's being brought in to then hire
19   your own person to help you with your personal
20   book of business within a team.
21         So, oftentimes, when there's a title
22   change, it is in just in recognition of that
23   person beginning to start the next phase of that

Page 269

1  sales cycle.

2      Q.   Okay.  When you say change in title

3  only, though, you mean they're still

4  predominantly doing the account executive duties,

5  but they have the title of inside broker?

6          MS. BARLOTTA:  That's not what he

7  said.

8      A.   Not necessarily predominantly, but

9  that there are still instances where they have to

10 do some of the file work or the processing work

11 until they reach a point to where there's enough

12 business coming in under their responsibility so

13 that they could then bring somebody in underneath

14 them to help them with technical duties and

15 setting up files and doing things that an account

16 executive would do.

17     Q.   But when you say change in title

18 only, that is stating that their duties are

19 staying the same.  We're just going to change

20 their title.  I mean, those are your words, not

21 mine.

22     A.   Yeah.  And I mean that.  There's a

23 blended -- there is a blended -- many times

Page 270

1  across many teams across this entire company,

2  there are so many instances where account

3  executives that have been moved to inside

4  brokers, the inside broker, once they get

5  elevated to the inside broker position for -- it

6  can be -- I don't know.  The timeline is

7  different per team depending on that person, but

8  it can take two or three years, sometimes maybe

9  more, to be -- to cease all of the account

10 executive functions that it takes to solely be --

11 only be an inside broker.

12         So there's never this -- there's

13 never this cutoff where you're suddenly assigned

14 the name inside broker and you suddenly can set

15 aside everything else and think that someone else

16 is just going to pick that work up.

17         That individual has to be responsible

18 for that for a certain point.  There's no -- and

19 there's no blueprint for that.

20     Q.   And when they go to inside broker,

21 they no longer get overtime, right?  When their

22 title changes to inside broker, they no longer

23 get overtime?

Page 271

1          MS. BARLOTTA:  Object to form.

2      A.   That would make them exempt, correct?

3  Yes.  Okay.

4      Q.   How long did it take Mr. Ross to go

5  from account executive to broker?  I mean, he did

6  it really quickly, didn't he?

7      A.   He's been there six and a half years.

8  So four and -- four years, roughly.

9      Q.   For his title to change, it took four

10 years?

11     A.   To broker?

12     Q.   Right.

13     A.   He was originally hired as an account

14 executive.

15     Q.   Okay.  You said, quote, there must be

16 a held belief.  Why do you think that?

17         MS. BARLOTTA:  Object to form.

18     A.   It was referenced, I don't know

19 where, earlier where there's been a question

20 about someone having to continue doing account

21 executive duties when they're elevated to the

22 position of inside broker.  So that's why I

23 referenced that.

Page 272

1      Q.   But there's no --

2      A.   It may have just been an inference

3  made in conversation, but there's no written --

4  there's no written plan that says, Okay, once

5  you're an inside broker, you no longer have to do

6  X, Y, Z duties.

7      Q.   And no plans to say, Here's how long

8  you have to continue doing account executive even

9  though your title has changed.  There's nothing

10 in writing?

11     A.   No, there's nothing in writing.  That

12 is very much team dependent.

13     Q.   And left up to the discretion of

14 whoever is head of that team?

15     A.   Correct.  And the person -- the

16 critical factor is the individual in that

17 position that's charged with their certain career

18 path.  It's very much up to that individual to

19 stay the course.

20     Q.   Let me show you Plaintiff's Exhibit

21 37, Rusty.

22         (Whereupon, Plaintiff's Exhibit No.

23 37 was marked for identification and a copy of

Page 273

1 same is attached hereto.)
2    Q.   This is the BB&T Culture Code of
3 Conduct. It looks like this is a training
4 module. Do you recall taking this training
5 module?
6    A.   We do take -- we do take the code of
7 ethics, yes.
8    Q.   Okay. Is there any policy about
9 employees dating each other or being in any kind
10 of physical or sexual relationship?
11   A.   I'm not sure if there's something
12 written about that.
13   Q.   On your team do you have any practice
14 as to whether or not employees can date each
15 other or be in a sexual relationship?
16       MS. BARLOTTA: Object to form.
17   A.   We don't have a written practice, no.
18   Q.   Can team members be in any kind of
19 sexual or physical relationship with people that
20 they supervise?
21       MS. BARLOTTA: Object to form.
22   A.   I suppose they could. I wouldn't
23 advise it.

Page 274

1    Q.   But there's no policy against it?
2    A.   I don't know that there's necessarily
3 a written policy against it. I would have to
4 look through these documents, but it's certainly
5 not encouraged.
6    Q.   Has Birmingham ever had a black
7 broker?
8        MS. BARLOTTA: Object to form.
9    A.   I don't think so.
10   Q.   Does that concern you?
11       MS. BARLOTTA: Object to form.
12   A.   I'm not -- I'm not overly concerned
13 with it. It's not something, again, that I think
14 about. I don't -- I think about the individual
15 only.
16   Q.   Would that indicate there's an issue
17 with racial diversity if there's never been a
18 black broker?
19       MS. BARLOTTA: Object to form.
20   A.   I know that -- let me clarify. I do
21 think that there are black brokers within CRC in
22 total, but none in Birmingham to my knowledge.
23   Q.   Do you think that would indicate

Page 275

1 there is a problem with racial diversity in
2 Birmingham since there's never been a black
3 broker?
4        MS. BARLOTTA: Object to form.
5    A.   I don't know that it -- I don't know
6 that it would be -- I don't know that it's a
7 problem, because I can't recall a time when we've
8 had a candidate, a black candidate for a broker.
9 I don't recall that.
10   Q.   Is it your testimony that a person of
11 color has never applied to be a broker in
12 Birmingham?
13   A.   I -- to my knowledge, I'm not aware
14 of it. We have -- we have employees of color,
15 but none at the broker position to my knowledge.
16   Q.   And none --
17   A.   In Birmingham.
18   Q.   And none higher than broker?
19       MS. BARLOTTA: Object to form.
20   Q.   Right?
21   A.   Let me -- not in Birmingham.
22   Q.   Do you know the population, how much
23 of the population in Birmingham is black or

Page 276

1 identifies as black?
2    A.   I don't.
3    Q.   Anybody ever talk about there being
4 no racial diversity in Birmingham?
5        MS. BARLOTTA: Object to form.
6    A.   No.
7    Q.   Did anybody ever talk about not
8 posting positions outside of the company so that
9 blacks would not apply?
10   A.   No.
11   Q.   Because that would be illegal,
12 wouldn't it?
13   A.   We wouldn't do that.
14   Q.   It would be illegal, wouldn't it?
15       MS. BARLOTTA: Object to form.
16   A.   I'm assuming it would be.
17   Q.   And if a company would do something
18 illegal to discriminate against blacks, then it
19 would be easy to think that they would
20 discriminate against women as well, right?
21       MS. BARLOTTA: Object to form. Calls
22 for speculation. Argumentative.
23   A.   If that were the case, I would assume

Page 277

1    SO.

2

3         (Whereupon, the following testimony

4    was placed under seal and attached in a separate

5    transcript.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 278

1         (Whereupon, the deposition continued

2    as follows:)

3

4    Q.   (BY MS. WILKINSON:)  Okay.  Rusty, was

5    there ever a time that you saw Kat Hendrix crying

6    at work where she was physically upset; you

7    noticed she was physically upset?

8         MS. BARLOTTA:  Object to form.

9    A.   I don't recall that.

10   Q.   Okay.  And I'm just kind of going

11   through just some follow-ups, because I'm just

12   about through.

13   A.   Okay.

14   Q.   So I just kind of have some

15   follow-ups.

16        I know I asked you about Christy

17   Smith, and I think I had asked you if she had

18   ever complained about any bonus issues.  Do you

19   recall her ever raising -- just to kind of wrap

20   this up, Rusty -- any issues or concerns about a

21   problem with a bonus that she received where she

22   e-mailed you or spoke to you or talked to you

23   about it?

Page 279

1         MS. BARLOTTA:  Object to form.

2    A.   I don't recall that, not to me.

3    Q.   Okay.  You're not saying it didn't

4    happen.  You just don't recall?

5    A.   I just don't recall.

6    Q.   Okay.  Did CRC have EPLI, employee

7    conduct coverage?

8         MS. BARLOTTA:  Object to the form.

9    Q.   I know y'all sold it, and I may be

10   calling it the wrong name.  I know y'all sold it,

11   but did y'all also have that coverage for CRC?

12        MS. BARLOTTA:  Object to form.

13   Q.   As a policy?

14   A.   To my knowledge, CRC was covered

15   under the Truist or BB&T policy as a corporate

16   policy.

17   Q.   Okay.  And so if there was any

18   discrimination or reported discrimination, that

19   would trigger that policy?

20        MS. BARLOTTA:  Object to form.

21   A.   If reported to the carrier, yes.

22   Q.   And when would it need to be reported

23   to the carrier?  Let's say it was reported

Page 280

1    internally at CRC.  Was there a policy as to when

2    it needed to be reported to the carrier?

3         MS. BARLOTTA:  Object to form.

4    A.   Most language is as soon as

5    practicable, as soon as possible.  So yeah, it

6    would have to be the proper -- the proper steps

7    would have to be followed within the policy,

8    follow those steps and report the incident with

9    the allegations or whatever it may be.  But yes.

10   Q.   And are you supposed to report it to

11   the carrier as soon as possible to ensure

12   coverage?

13        MS. BARLOTTA:  Object to the form.

14   A.   Right.

15   Q.   And was that ever reported to the

16   carrier with regard to complaints made or claims

17   made by Kat Hendrix?

18        MS. BARLOTTA:  Object to form.

19   A.   I don't have knowledge of if that was

20   reported to our carrier.

21   Q.   Is that something that you would know

22   about?

23   A.   I wouldn't know whether or not it was

Page 281

1    reported to our insurance carrier, no.

2        Q.   You didn't get involved in any of

3    that?

4        A.   No, no.

5        Q.   Have y'all -- are y'all trained or do

6    you even train your customers what words will

7    trigger the need to report a concern to the

8    carrier?

9            MS. BARLOTTA:  Object to form.

10       A.   Not necessarily trained, but

11   oftentimes the incidents, examples are written in

12   the policy.  So you could find examples of what

13   to report.

14       Q.   Okay.  Do you recall what is written

15   in the policy that would trigger --

16           MS. BARLOTTA:  Object to form.

17       Q.    -- the need to report?

18           MS. BARLOTTA:  Just a policy in

19   general?

20           MS. WILKINSON:  Well, the one that

21   y'all have that covers CRC.

22           MS. BARLOTTA:  We don't have a

23   policy.

Page 282

1            MS. WILKINSON:  He just testified

2    there is one.

3        A.   No, no, no.  Again, you asked me if

4    it was reported to our insurance carrier, and I

5    said I don't know.

6        Q.   (BY MS. WILKINSON:)  No, no.  I

7    understand that, but you -- it's my understanding

8    that you said that CRC is covered under a policy.

9            MS. BARLOTTA:  Do you have personal

10   knowledge of whether or not BB&T or Truist has a

11   EPL policy that covers this claim?

12       A.   I know that we have EPL coverage as a

13   corporation.

14       Q.   Okay.

15       A.   Now, whether or not it covers this

16   claim, I don't know.

17       Q.   Do you know what words in the policy

18   would trigger the need -- regarding

19   discrimination, the need to report it to the

20   carrier?

21           MS. BARLOTTA:  Object to form.

22       A.   Most EPL policies contain language

23   that say alleged or actual complaints involving,

Page 283

1    and list out various things that would be treated

2    as covered under a natural employment practices

3    policy.

4        Q.   Can you give me any of those examples

5    of the things that would trigger it?

6            MS. BARLOTTA:  Object to form.

7        A.   Some may list out racial

8    discrimination, gender discrimination,

9    harassment.  Those are three examples.

10       Q.   If an employee said, I'm not being

11   treated equally, I think it's a gender issue, is

12   that something or those words that would create

13   the need to report that to the carrier?

14           MS. BARLOTTA:  Object to form.

15       A.   If a complaint were not lodged, I

16   don't think that that would be reportable to the

17   carrier.  That would be reportable to human

18   resources.

19       Q.   Okay.  So you're saying that if

20   that's reported to any member of management or

21   anybody at CRC, Truist, that wouldn't trigger the

22   requirement to report that to the carrier as

23   well?

Page 284

1            MS. BARLOTTA:  Object to form.

2        Q.   If they specifically said, I'm not

3    being treated equally, there's no equality, it's

4    a gender issue?

5            MS. BARLOTTA:  Object to form.

6        A.   I'm not sure what our corporate

7    compliance folks deem reportable or not.

8        Q.   Okay.

9        A.   I would have to ask them.

10       Q.   And what if an employee said, like

11   we've talked about, you know, women are being

12   overlooked in our department, is that something

13   that would trigger a requirement to report that

14   to the carrier?

15           MS. BARLOTTA:  Object to form.  If

16   you know.

17       A.   I don't think that that would

18   necessarily trigger a requirement to be reported

19   to the carrier.

20       Q.   But if a lawsuit were later filed

21   alleging that that complaint had been made, would

22   it be important to err on the side of caution and

23   report it to the carrier to make sure you have

Page 285

1  coverage?
2      MS. BARLOTTA:  Object to form.
3      A.  In most cases, yes.
4      Q.  Have you seen the policy that covers
5  CRC?
6      MS. BARLOTTA:  Object to form.
7      Q.  The corporate policy?  Have you ever
8  seen it?
9      MS. BARLOTTA:  Object.
10     A.  Never.
11     Q.  But you've seen several of these
12 before?
13     MS. BARLOTTA:  Object to form.
14     A.  I've seen policies that we've placed,
15 but never CRC's corporate policy.
16     Q.  Who is the policy with for the
17 corporation?  Do you know?
18     MS. BARLOTTA:  Object to form.
19     A.  I have -- I don't know that
20 information.
21     Q.  Is there a policy that's sold to
22 Beasley?
23     MS. BARLOTTA:  Object to form.

Page 286

1      A.  Is there a policy --
2      Q.  Oh.  That's sold by Beasley?
3      MS. BARLOTTA:  Object to form.
4      A.  Beasley is in the employment
5  practices space, yes.
6      Q.  Okay.  And you've seen some of their
7  policies that contain the language when you need
8  to report complaints of discrimination to the
9  carrier?
10     MS. BARLOTTA:  Object to form.
11     Q.  And they sell EPLI policies, right?
12     A.  Beasley does.
13     Q.  And you've seen those policies?
14     MS. BARLOTTA:  Object to form.
15     A.  Yes.
16     Q.  And you've read the language that
17 triggers the need or requirement to report a
18 complaint to the carrier?
19     MS. BARLOTTA:  Object to form.
20     A.  I've read it before, not in a long
21 time, but yes.
22     Q.  But those are policies y'all sell.
23 Your team sells those, right?

Page 287

1      A.  Yeah.
2      MS. BARLOTTA:  Object to form.
3      Q.  So you're very familiar with them?
4      MS. BARLOTTA:  Object to form.
5      Q.  Right?
6      MS. BARLOTTA:  Object to form.
7      A.  I'm familiar with employment
8  practices liability policies, yeah.  My expertise
9  lies in healthcare.
10     Q.  Gotcha.
11     A.  But yes, I'm familiar, yeah.
12     Q.  Let's take a break for just a minute,
13 Rusty, because I think I'm about through.  Let me
14 go through my notes and it will go a little
15 faster.  Thank you.
16     VIDEOGRAPHER:  We're off the record.
17 The time is now 4:43.
18     (Whereupon, a brief recess was
19 taken.)
20     VIDEOGRAPHER:  We are now on the
21 record.  The time is 4:54.
22     Q.  (BY MS. WILKINSON:)  All right,
23 Rusty.  We're back on the record after a break.

Page 288

1  Is there anything you want to change about your
2  prior testimony?
3      A.  No.
4      Q.  Okay.  Let me show you what I've
5  marked as Plaintiff's Exhibit 38.
6      (Whereupon, Plaintiff's Exhibit No.
7  38 was marked for identification and a copy of
8  same is attached hereto.)
9      Q.  This is an e-mail chain with Stefani
10 Petty and John Cadden.  And it says:  Rusty and
11 Corey are going to come upstairs to my office at
12 8:30.  Do you want to call my office?  We can go
13 from there.
14     It's my understanding this is in
15 reference to Kat Hendrix's termination.  Do you
16 recall a meeting where y'all were on a phone
17 call, you and John Cadden and Corey Daugherty
18 were on a call with Stefani?
19     MS. BARLOTTA:  And, Mr. Hughes, you
20 can testify whether or not you were on this call.
21 You're not going to go further than that, because
22 the judge has already ruled this is privileged,
23 and the plaintiffs can't get into this.

Page 289

1    A.   I don't recall the call or the meat
2  of it, but -- I don't recall that I was on this
3  particular call.
4    Q.   Okay.  Do you recall discussions with
5  John Cadden about Kat Hendrix's termination where
6  the two of you talked about it?
7        MS. BARLOTTA:  Object to form.
8  Termination?
9    A.   Can I clarify?  I don't remember her
10 being terminated.
11       MS. BARLOTTA:  Right, yeah.
12   Q.   Her employment ending, yeah.  Do you
13 recall talking to John Cadden about Kat's
14 employment ending where it was just the two of
15 you, either phone, in person?
16   A.   I'm sure we discussed it.  I don't
17 remember the -- I don't remember the
18 conversations specifically.
19   Q.   Okay.  Do you -- generally, do you
20 remember anything that was discussed?
21       (Whereupon, a discussion off the
22 record was held.)
23   Q.   (BY MS. WILKERSON:)  Generally,

Page 290

1  Rusty, do you recall anything that was discussed
2  with you and Mr. Cadden?
3    A.   I can remember a couple of quick
4  conversations in passing, but -- just referencing
5  it, but I don't remember.  I was not intimately
6  involved in the process from there.  That was in
7  the hands of Stefani.
8    Q.   Okay.  Did you see the resignation
9  letter submitted by Kat Hendrix?
10   A.   I don't recall seeing that.
11   Q.   Okay.  Did you ever talk with anybody
12 about whether or not Kat had ever complained to
13 you about any issues that could potentially be
14 discrimination?
15       MS. BARLOTTA:  Object to form.
16   A.   I didn't.
17   Q.   And I'm not talking about lawyers.
18 Did you talk to anybody --
19   A.   No, I didn't talk to anyone about
20 this matter.
21   Q.   Okay.  You've never been questioned
22 about it?
23       MS. BARLOTTA:  Object to form.

Page 291

1    A.   No.
2    Q.   Okay.
3        MS. WILKINSON:  I think that's all we
4  have.  Rachel, do you have anything?
5        MS. BARLOTTA:  No, we're good.  Thank
6  you.
7        VIDEOGRAPHER:  This concludes the
8  video deposition.  We are now off the record at
9  4:58.
10
11
12       FURTHER DEPONENT SAITH NOT
13
14
15
16
17
18
19
20
21
22
23

Page 292

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  JEFFERSON COUNTY )
5
6        I HEREBY CERTIFY that the above
7  and foregoing transcript was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness.
13       I FURTHER CERTIFY that I am
14 neither of counsel, nor of any relation to the
15 parties to the action, nor am I anywise
16 interested in the result of said cause.
17
18
19       /s/Tanya D. Cornelius
20       TANYA D. CORNELIUS, RPR
21       ACCR #378 Expires 10/1/2024
22       Notary Expires 9/13/26
23

Please return the signature page, correction sheet, and transcript within 30 days.  The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

 Tanya Cornelius
Certified Court Reporter

WITNESS SIGNATURE PAGE


In Re:  Read and sign of Video Deposition of Rusty Hughes


I, _____, hereby certify that I have read the

foregoing transcript of my deposition and it is a true and correct transcript of the

testimony given by me at the time and place stated with the corrections, if any, and the

reasons therefore noted on a separate sheet of paper and attached hereto.




_____
Video Deposition of Rusty Hughes



SWORN TO AND SUBSCRIBED before me this _____ day of _____,
202____.



_____
NOTARY PUBLIC



MY COMMISSION EXPIRES:

_____

Video Deposition of Rusty Hughes

Errata Sheet

Page Number          Line Number                          Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORD INDEX**

**< 0 >**
**000286**
61:*20*
**02** 14:*14*

**< 1 >**
**1** 90:*15*
123:*3*
**1:00** 139:*4*
**1:44** 140:*14*
**10/1/2024**
292:*21*
**10:02** 1:*20*
2:*9* 7:*8, 15*
**10:30** 13:*11*
**100** 5:*6*
**104** 5:*6*
**11:02** 60:*3*
**11:13** 60:*7*
**12:43**
140:*10*
**13** 125:*8*
170:*2*
**1400** 6:*8*
**1559** 235:*9*
**1560** 235:*9*
**1569** 227:*3*
**16** 91:*10*
**17** 91:*10*
116:*8*
**1717** 2:*7*
5:*12* 7:*6*
**18** 85:*6*
116:*8*
128:*15*
142:*14*
233:*5*
236:*3, 4*
**18th** 230:*20*

**19** 1:*19*
22:*10* 85:*4*
112:*13*
117:*10*
128:*15*
142:*14*
182:*1*
**1990**
109:*12*
**1995**
108:*14*
**1999** 15:*9*
**19th** 2:*8*
7:*15*

**< 2 >**
**2** 5:*18*
90:*16, 22*
**2:21-CV-0300-MHH**
1:*5* 8:*1*
**20** 62:*17*
84:*14* 85:*4*
91:*10*
117:*10*
**2000** 22:*9*
30:*22*
123:*6*
125:*7*
**2001** 31:*12*
**2003**
103:*21*
**2012** 15:*12*
82:*12*
125:*8*
**2013** 110:*9*
201:*18, 22*
**2016**
178:*11*
**2017** 87:*17*
120:*14*
141:*1*

156:*18*
158:*3*
177:*14*
**2018**
171:*15*
177:*14*
227:*14*
243:*3*
**2019** 22:*11*
34:*16*
60:*14*
64:*17* 68:*2, 9* 82:*13, 14*
83:*14, 19*
84:*1, 14*
86:*23*
91:*20*
116:*11*
121:*9*
123:*16*
124:*14*
147:*6, 20, 22* 148:*13*
180:*21*
181:*22*
235:*16*
**2020** 30:*23*
64:*21, 22*
65:*15*
67:*15* 75:*5*
82:*14*
83:*14, 19*
84:*1, 14*
91:*21*
116:*11*
119:*4*
121:*9*
123:*16*
124:*14*
147:*20*
148:*13*
181:*22*

255:*14, 16, 18* 256:*5, 7*
261:*1, 20*
263:*5*
**2021** 31:*10*
102:*22*
110:*15*
118:*14*
119:*4*
213:*21*
**2022** 30:*16*
92:*17*
118:*12*
**226** 4:*13*
**23** 215:*9*
216:*15*
**235** 4:*14*
**23rd** 5:*6*
**24** 4:*9*
34:*7, 10*
**241** 4:*15*
**247** 4:*16*
**248** 4:*17*
**249** 4:*18, 19*
**25** 4:*10*
54:*8, 12*
**253** 4:*20*
**255** 4:*21*
**26** 4:*11*
60:*13, 18*
**27** 4:*12*
89:*20, 22*
196:*14*
199:*6, 15*
206:*17*

**272** 4:*22*
**277** 4:*5*
**28** 4:*13*
227:*1, 5*
**286** 62:*5*
**287** 63:*23*
**288** 64:*9*
65:*9* 68:*4*
**289** 68:*4*
**29** 4:*14*
235:*8, 11*
**290** 4:*23*
68:*5, 13*
**292** 69:*8, 16*
**293** 69:*22*
**294** 70:*13*
71:*2*
**295** 71:*10*
**296** 72:*1*
**297** 72:*16*
73:*21*

**< 3 >**
**3** 61:*21*
**3:15** 222:*15*
**3:30** 222:*19*
**30** 4:*15*
241:*16, 18*
242:*9*
243:*14*
**300** 74:*9, 10, 11*
**301** 75:*10*
**304** 78:*2*
**305** 80:*18*
81:*14*
**306** 146:*11*
**31** 4:*16*
247:*14, 18*
248:*12*

**32**  4:17
248:20, 23
**33**  4:18
249:11, 13
**330**  74:8
**34**  4:9, 19
250:4, 7
**35**  4:20
253:13, 15
**35203**  5:13,
19  6:9
**35233**  5:7
**36**  4:21
255:20, 22
**37**  4:22
272:21, 23
**378**  292:21
**38**  4:23
288:5, 7
**3rd**  2:7
5:12  7:6

**< 4 >**
**4:43**  287:17
**4:54**  287:21
**4:58**  291:9
**420**  6:8
**4964**
247:21
**4978**
247:21

**< 5 >**
**5:00**  158:11
**5204**  256:3
**5205**  257:1
**5206**
257:23
**5208**
262:13
**5209**  264:5

**5233**  256:3
**54**  4:10
**5th**  235:16

**< 6 >**
**60**  4:11

**< 7 >**
**7/25**  227:22

**< 8 >**
**8:00**  158:10
**8:30**  288:12
**89**  4:12

**< 9 >**
**9**  4:3
**9/13/26**
292:22
**9/7/18**
241:22
**9/7/2010**
110:7
**9/7/2018**
242:19
**900**  5:18
**92**  170:1

**< A >**
**A**  2:1, 8
5:1, 5, 12,
17  7:7
9:11, 17, 18,
23  10:3, 4,
14, 16, 18,
20  11:1, 5,
8, 11, 13, 14,
15, 17, 20
12:4, 7, 10,
12, 15, 17,
19, 21, 22
13:1, 4, 7, 9,

11, 12, 13,
18, 22  14:2,
4, 7, 10, 21
15:1, 4, 6, 9,
14, 16, 22,
23  16:2, 7,
15, 18, 21
17:3, 9, 12,
13, 15, 20
18:1, 4, 9,
14, 17, 19,
22  19:1, 7,
10, 12, 14,
20  20:2, 5,
8, 10, 14, 17,
19, 21, 23
21:2, 3, 4, 6,
10, 12, 14,
20  22:4, 7,
8, 9, 12, 14,
19  23:2, 7,
12, 14, 16,
18, 20, 23
24:2, 8, 10,
13, 15, 19,
21  25:1, 3,
6, 9, 12, 14,
15, 18, 23
26:2, 5, 8,
10, 12, 13,
15, 18, 20,
22  27:1, 3,
5, 7, 10, 13,
16, 20, 21
28:3, 8, 12,
15, 20, 22
29:2, 4, 6, 8,
10, 12, 14,
16, 18, 20,
22  30:1, 3,
6, 9, 11, 14,
16, 18, 20,

22  31:2, 4,
8, 10, 12, 14,
15, 20  32:3,
4, 7, 12, 19,
21, 22  33:6,
11, 15, 16
34:1, 10, 12,
14, 19  35:1,
4, 9, 13, 19,
22  36:3, 5,
8, 12, 16, 20,
23  37:2, 4,
5, 7, 10, 14,
18, 22  38:1,
4, 7, 10, 11,
12, 15, 17,
21, 22, 23
39:2, 5, 10,
13, 19, 21
40:1, 6, 7, 9,
12, 13, 21,
23  41:5, 8,
11, 15, 18
42:1, 9, 11,
14, 17, 23
43:3, 8, 13,
17, 21  44:1,
2, 3, 4, 5, 9,
12, 16, 18,
21, 23  45:2,
3, 10, 16, 22
46:2, 7, 9,
10, 12, 17,
21  47:1, 3,
8, 10, 11, 13,
15, 17, 22
48:4, 8, 13,
15, 17, 21
49:1, 5, 10,
15, 20  50:2,
4, 6, 11, 14,
19, 22  51:8,

12, 20  52:2,
8, 9, 11, 12,
15, 17, 19
53:1, 5, 8,
13, 17, 19,
20  54:2, 3,
12, 19, 23
55:7, 13
56:1, 6, 8, 9,
15, 19  57:1,
8, 12, 18
58:1, 9, 16
59:1, 2, 11,
15, 17, 18,
19  60:4, 11,
14, 15, 18,
23  61:7, 10,
13, 14, 16,
19  62:1, 4,
6, 9, 11, 13,
19, 23  63:1,
7, 9, 12, 16,
22  64:5, 8,
14, 16, 20,
21, 23  65:4,
8, 18  66:1,
7, 9, 19
67:3, 13, 19,
22  68:12,
22  69:2, 6,
8, 11, 12, 14,
18, 19, 21,
22  70:2, 3,
5, 9, 10, 12,
17, 19, 21,
22, 23  71:6,
7, 9, 13, 14,
16, 20, 21,
23  72:4, 5,
7, 10, 12, 15,
21, 22  73:1,
4, 9, 14, 20,

23 74:7, 11, 19, 22 75:9, 12, 18 76:1, 6, 19 77:9, 15, 17 78:1, 8, 15, 22 79:5, 18, 20 80:7, 8, 11, 16 81:2, 7, 8, 12 82:1, 3, 6, 8, 11, 18, 20, 22 83:2, 4, 6, 10, 12, 15, 17, 21 84:2, 5, 10, 13, 18 85:1, 3, 7, 10, 20, 22 86:4, 10, 11, 14, 23 87:3, 4, 6, 9, 10, 11, 13, 16, 18, 21, 23 88:2, 7, 10, 14, 17, 21 89:2, 3, 7, 13, 14, 15, 17, 22 90:5, 6, 8, 12, 18 91:1, 4, 8, 12, 17 92:1, 4, 6, 8, 12, 14, 15, 16, 20 93:3, 6, 8, 14, 22 94:2, 6, 12, 20, 23 95:3, 11, 13, 18, 20, 21 96:3, 8, 12, 14, 17, 23 97:2, 4, 5, 8, 15, 16,

20 98:1, 3, 5, 7, 9, 12, 15, 20 99:2, 7, 10, 18 100:2, 8, 10, 12, 13, 20 101:1, 2, 4, 6, 9, 12, 14, 16, 19 102:2, 4, 9, 11, 12, 14, 16, 20, 23 103:2, 5, 7, 10, 14, 19, 22 104:2, 4, 7, 9, 11, 13, 17, 20 105:2, 3, 5, 8, 11, 19 106:2, 4, 7, 9, 12, 14, 16, 17, 19, 20 107:2, 5, 6, 11, 13, 14, 16, 17, 18, 21, 22 108:1, 6, 8, 10, 11, 12, 14, 17, 19, 22 109:2, 5, 7, 9, 10, 12, 15, 17, 20, 22 110:3, 10, 13, 16, 20 111:1, 2, 10, 11, 16, 20 112:3, 7, 9, 12, 15, 22 113:7, 13, 14 114:4, 9, 11, 16, 18, 21 115:6, 8,

13, 14, 19 116:5, 8, 14, 18, 22 117:1, 3, 7, 9, 14, 18, 20 118:1, 5, 7, 10, 13, 15, 16, 18, 23 119:10, 15, 18, 22 120:2, 6, 7, 11, 13, 15, 18, 20, 21 121:2, 4, 6, 7, 15, 23 122:5, 7, 8, 10, 14, 15, 16, 17, 20, 23 123:5, 12, 14, 15, 16, 17, 18, 21 124:1, 3, 4, 6, 9, 10, 13, 14, 15, 17, 18, 21, 22, 23 125:1, 2, 3, 4, 5, 7, 12, 18, 22 126:2, 4, 5, 7, 8, 10, 12, 15, 20, 22 127:2, 3, 5, 10, 14, 15 128:2, 3, 6, 13, 15, 18, 19, 21, 22 129:2, 8, 11, 16, 18, 22 130:3, 6, 11, 17, 21 131:1, 4, 7,

11, 14, 16, 22 132:2, 3, 4, 5, 8, 13, 14, 15, 16, 19 133:6, 12, 18, 21 134:2, 3, 5, 11, 15, 16, 19, 21 135:3, 5, 6, 14, 21, 23 136:4, 8, 11, 13, 21 137:4, 6, 19 138:12, 18, 20 139:3, 6, 13 140:1, 3, 11, 16, 19, 20 141:2, 4, 7, 9, 12, 13, 21 142:2, 4, 9, 11, 13, 17, 18, 20, 21, 23 143:3, 6, 10, 16, 17, 20 144:1, 3, 5, 6, 11, 17 145:1, 4, 6, 10, 14, 15, 20, 22 146:6, 12, 19, 21 147:4, 7, 10, 14, 18, 22 148:2, 7, 10, 14, 23 149:3, 4, 7, 9, 13, 15, 18, 22, 23 150:4, 7, 9, 11, 12, 15 151:2, 4, 9

152:3, 7, 21 153:3, 11, 12, 18, 21, 23 154:2 155:2, 11, 18, 22 156:1, 2, 4, 5, 15 157:5, 9, 14, 20, 22 158:1, 4, 7, 13, 17, 18, 19 159:1, 7, 9, 13, 15, 20, 21 160:4, 7, 8, 10, 12, 17, 20, 23 161:1, 2, 6, 7, 9, 12, 16, 19, 20 162:1, 5, 10, 12, 14, 16, 21, 23 163:1, 2, 4, 5, 8, 12, 15, 18, 20, 21, 22 164:1, 2, 3, 6, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21 165:2, 4, 6, 11, 12, 13, 14, 18 166:2, 7, 10, 16, 17, 20, 23 167:5, 11, 13, 17, 22 168:5, 8, 9, 22 169:1, 5, 7, 13, 14, 17, 19, 21 170:1, 8, 9,

10, 15, 17,
20, 21, 23
171:2, 4, 10,
13, 16, 18,
23 172:1, 3,
5, 8, 14, 15,
16, 19, 20,
21, 22
173:2, 3, 6,
10, 14, 23
174:6, 10,
16, 19, 22
175:1, 4, 5,
7, 10, 11, 12,
17 176:5,
11, 15, 19,
23 177:5, 8,
12, 16, 20,
21, 22
178:3, 4, 9,
12, 17
179:1, 5, 6,
8, 15, 19
180:2, 6, 12,
19, 20
181:4, 8, 12,
14, 18, 23
182:4, 6, 8,
11, 18, 21
183:19, 23
184:6, 10,
11, 15
185:4, 12,
16, 19, 22
186:5, 7, 9,
11, 15, 17,
18, 19, 21,
23 187:1, 3,
5, 8, 11, 13,
15, 18, 19
188:6, 9, 12,
15, 18, 20,

21 189:3, 5,
14, 20
190:2, 5, 12,
15, 20
191:3, 10,
13, 17
192:1, 3, 11,
12, 20
193:1, 3, 4,
8, 15, 22
194:6, 10,
12, 13, 17
195:5, 12,
13, 20, 22,
23 196:3, 9,
12, 17, 22
197:3, 5, 9,
17, 22
198:1, 2, 6,
11, 14, 17
199:4, 11,
12, 17, 19,
22 200:2,
12, 17
201:1, 2, 6,
10, 13
202:2, 9, 17,
21 203:4, 7,
9, 19, 20
204:2, 19,
20, 23
205:3, 9, 12,
17 206:1, 9,
14, 20
207:3, 10,
21 208:7,
14, 16, 19
209:8, 10,
12, 17, 21
210:4, 6, 15,
19 211:2,
12, 16, 19,

23 212:3, 6,
8, 10, 13, 16,
17, 19, 23
213:3, 7, 9,
11, 16, 19,
22, 23
214:1, 3, 12,
13, 18, 21
215:12, 17,
19 216:2,
12, 13, 16,
19, 21, 22
217:2, 5, 8,
14, 16, 17,
19 218:6, 8,
11, 15, 18,
23 219:4, 6,
8, 9, 10, 12,
14, 16, 18,
22 220:3, 5,
8, 11, 15, 18,
23 221:2, 5,
8, 9, 10, 11,
13, 22
222:3, 10,
12, 13, 16,
21 223:1, 8,
14 224:2, 3,
4, 6, 9, 12,
14, 16, 21
225:1, 3, 4,
6, 9, 13, 18,
20, 22
226:4, 10,
16, 21
227:5, 8, 11,
12, 15, 17
228:1, 6, 7,
11, 14, 16,
18 229:3, 5,
7, 11, 15, 21
230:1, 4, 7,

8, 14, 16, 18
231:1, 2, 3,
4, 5, 12, 15,
20 232:7,
13, 17, 22,
23 233:5,
16, 22
234:11, 23
235:5, 11,
20 236:2, 6,
11, 13, 20
237:2, 10,
16, 20, 22,
23 238:3, 4,
7, 9, 15, 16,
18 239:2, 5,
11, 17, 19,
21, 23
240:11, 16,
18, 20, 22
241:1, 4, 6,
9, 18 242:2,
6, 10, 12, 17,
21, 23
243:6, 7, 11,
12, 15, 19,
22 244:3, 7,
11, 17, 19,
23 245:3, 6,
9, 11, 15, 18,
21, 23
246:3, 5, 8,
13, 17, 18,
21 247:1, 2,
4, 6, 8, 18
248:4, 7, 15,
20 249:1, 3,
6, 9, 13, 17,
22 250:4, 9,
18, 21
251:5, 8, 11,
14, 18, 21

252:6, 16,
20, 23
253:1, 4, 5,
13, 22
254:7, 20,
23 255:4,
11, 17, 22
256:6, 13,
19 257:3,
12, 16, 21
258:2, 6, 11,
18, 19, 20,
21, 22, 23
259:2, 11,
13, 18
260:5, 9, 12,
16, 22
261:1, 4, 7,
11, 16, 19
262:1, 5, 11,
21 263:4,
10, 11, 21,
23 264:1, 4,
15, 17, 21
265:2, 4, 17
266:3, 18,
22 267:3, 7,
8, 14, 15, 18,
21, 23
268:1, 2, 7,
9, 10, 14, 17,
20, 21
269:8, 11,
22, 23
270:18
271:2, 7, 11,
13, 16, 18,
19 272:2,
11, 15, 23
273:3, 6, 11,
15, 17, 22
274:2, 3, 6,

*9, 12, 17, 20*
*275:1, 2, 5,*
*6, 7, 8, 10,*
*11, 13, 17,*
*21  276:2, 6,*
*10, 13, 16,*
*17, 23*
*277:4*
*278:5, 9, 13,*
*20, 21*
*279:2, 5, 13,*
*14, 15, 21*
*280:1, 4, 14,*
*19, 23*
*281:4, 7, 10,*
*18, 22*
*282:3, 8, 10,*
*12, 15, 22*
*283:2, 7, 11,*
*15  284:4, 6,*
*9, 13, 17, 18,*
*20  285:3,*
*10, 14, 19,*
*21  286:1, 4,*
*12, 15, 17,*
*20  287:1, 7,*
*11, 12, 14,*
*18, 23*
*288:3, 7, 16,*
*18  289:1, 9,*
*16, 21*
*290:3, 10,*
*16, 19*
*291:1*
*292:1, 11*
**A.M**  *1:20*
*2:10  7:8*
**ability**  *82:4*
*103:15*
*189:15*
*259:22*

**able**  *185:8*
*188:8*
**absolutely**
*50:7*
*141:23*
*265:12*
**accepted**
*267:18*
**access**
*179:11*
*212:20*
*213:19*
*228:13*
**accomplish**
*99:13*
**account**
*20:8  29:8,*
*20  30:1*
*83:10, 12*
*84:16, 21*
*85:21  86:1,*
*12, 17*
*91:18, 21*
*94:22  95:7,*
*9  97:11, 17*
*102:18*
*104:4*
*106:10*
*107:3, 9*
*108:7*
*109:6, 21*
*110:1, 4, 8*
*116:4, 21*
*117:17, 22*
*118:3, 6*
*119:20*
*120:4, 12*
*121:3*
*126:8*
*132:23*
*142:5, 8*
*164:13, 18,*

*20  175:18*
*186:11, 15*
*187:6, 22*
*188:8, 10,*
*15, 20, 21*
*189:11, 16*
*190:2, 4, 9*
*191:3, 5, 8,*
*10, 20, 21,*
*22  192:7, 8,*
*23  195:22*
*196:4*
*198:13*
*199:16*
*200:8, 9*
*201:16*
*202:5, 13*
*203:1*
*206:15*
*223:18, 22*
*236:17*
*237:21*
*238:2, 10*
*241:12*
*243:8*
*267:21*
*268:3, 12*
*269:4, 15*
*270:2, 9*
*271:5, 13,*
*20  272:8*
**accounting**
*197:10*
*210:4, 20*
*211:21*
*213:23*
*229:13*
*259:2*
**accounts**
*94:14*
**ACCR**
*292:21*

**accuracy**
*123:23*
**acknowledg**
**ement**
*53:22*
**acquired**
*14:13*
**acting**  *7:2*
**Action**
*78:4, 5, 8,*
*11, 12, 15,*
*20  79:1, 12,*
*22  80:4, 8*
*81:14, 15*
*138:9*
*259:9*
*292:15*
**actions**
*17:1  55:21*
*65:6*
*184:16*
**actively**
*255:4*
**actual**
*11:20  48:1*
*186:2*
*187:23*
*218:1, 12*
*239:15*
*248:5*
*282:23*
**add**  *132:14*
**additional**
*23:7, 9*
*216:14*
**address**
*257:7*
**addressed**
*59:12*
*257:9*
**administer**
*8:13*

**Advertisem**
**ent**  *4:20*
*254:3, 5*
**advise**
*75:14*
*145:13*
*150:5*
*273:23*
**AE**  *243:10*
**affiliate**
*74:19*
**affiliates**
*74:15*
**affiliation**
*259:23*
**affiliations**
*260:3*
**Affirmative**
*78:4, 5, 8,*
*11, 12, 15,*
*20  79:1, 12,*
*22  80:4, 8*
*81:14, 15*
*138:8*
*259:9*
**afforded**
*32:16*
**aftermath**
*65:10*
**afternoon**
*141:10*
*160:22*
**age**  *260:1*
**agencies**
*39:1  40:15*
*94:6*
**agency**
*16:4  19:4*
*39:6, 15, 18*
*40:23  42:5*
*93:9*

Video Deposition of Rusty Hughes

1/19/2024

agenda
44:*9*
agents
37:*15*
38:*15*
39:*15*
41:*20*
244:*22*
ago  14:*18*
21:*3*  25:*19,
21*  30:*20*
102:*21*
110:*14*
118:*10*
156:*1*
164:*15*
165:*11*
170:*21*
233:*8*
241:*7, 8*
agree
97:*18*
152:*23*
203:*17*
AGREED
2:*2, 11, 18*
3:*3*  211:*8*
agreeing
207:*15*
agreements
239:*12*
ahead  28:*2*
34:*4*  52:*18*
91:*3*  93:*7*
155:*1*
221:*21*
AI  16:*17*
al  *7:22*
ALABAMA
1:*1*  2:*8*
5:*7, 13, 19*
6:*9*  7:*7, 18,*

*23*  22:*17*
24:*10*
292:*3*
alcoholic
158:*5, 21*
159:*11, 19*
Alex
159:*15*
160:*10*
Alex's
160:*15, 21*
allegations
18:*5*
152:*11*
280:*9*
alleged
153:*18*
282:*23*
alleging
155:*19*
284:*21*
alleviated
193:*5*
allocated
236:*16*
allocation
227:*21, 23*
228:*12*
229:*17, 18*
230:*2*
234:*23*
237:*10*
allocations
228:*2*
232:*1, 2, 4*
allow  137:*7*
allowed
110:*21*
111:*5, 7, 8*
Alpheus
65:*11*

Amanda
120:*3, 5, 6,
9, 11, 17*
Amber
29:*22*
30:*21*
118:*2, 4, 20*
Amber's
29:*23*
amount
103:*17*
189:*6*
194:*7*
197:*19*
207:*15*
210:*11, 23*
211:*12*
221:*18*
237:*1, 3*
an  10:*16*
15:*19*  28:*8,
12*  29:*8*
36:*22, 23*
37:*4*  39:*6*
44:*9*  48:*15*
49:*16, 19,
23*  50:*16*
52:*5, 8*
53:*20, 21*
64:*2*  74:*19*
75:*16, 19*
78:*5*  81:*14*
84:*11, 19*
85:*21, 22*
86:*1, 3, 9,
11, 16, 22*
92:*8*  97:*17*
102:*16*
103:*4, 6, 12*
104:*3*
106:*10*
107:*3, 9*

108:*7*
109:*6, 21,
22*  110:*1, 4,
8, 10*  112:*7,
14*  115:*15*
116:*3, 20*
117:*12, 16,
22*  118:*3, 6,
7, 8, 20*
119:*2, 6, 16,
20*  120:*4, 6,
12*  121:*3*
123:*7*
127:*2, 6, 17,
23*  128:*23*
129:*5, 14*
130:*8*
131:*19*
132:*14*
136:*2, 16*
138:*8, 22*
139:*14, 15,
16*  140:*6*
142:*5*
154:*5, 20*
155:*5*
157:*10, 14,
17*  159:*6*
164:*13, 19*
169:*7*
171:*14*
173:*5*
174:*19*
175:*13*
180:*8*
184:*16*
187:*6, 13*
188:*1, 15,
19, 21*
191:*3, 8, 10*
192:*22*
193:*10*

194:*2*
195:*15, 16,
22*  196:*4*
198:*13, 17,
19*  199:*16*
200:*8*
203:*1*
207:*13, 14*
224:*18*
226:*1*
227:*2, 13,
22*  229:*23*
231:*7*
237:*21*
238:*10, 20*
239:*6*
241:*5, 11*
243:*8, 10*
244:*5, 6, 7,
15, 16, 17*
245:*18, 20*
246:*14, 15*
247:*22, 23*
249:*3*
250:*11, 12,
20, 22*
251:*2, 10,
11, 23*
252:*1, 2, 7,
14, 16*
254:*2*
267:*7, 9, 12*
268:*12, 13*
269:*15*
270:*11*
271:*13*
272:*2, 5*
274:*16*
283:*10*
284:*10*
288:*9*

Video Deposition of Rusty Hughes

1/19/2024

**and** 1:11
2:2, 6, 11,
12, 14, 16,
18, 22, 23
3:3  7:1, 4,
16  8:11, 18
9:1, 14, 19
10:8  11:6,
9, 16, 22
12:6, 8, 11,
22  13:8
14:4, 6, 8,
11, 13, 16,
19  15:3, 8,
10, 11, 21
16:3, 4, 7, 8
17:5  18:7,
12, 20, 23
19:3, 5, 6, 8,
10, 15, 17,
19, 21, 23
20:3, 8, 9,
18, 22  21:3,
15, 23  22:6,
15, 20  23:8,
17  24:3, 9,
11, 14  25:2,
3, 4, 7, 13
26:1, 9, 16,
19, 21, 23
27:8  28:5,
6, 7, 8, 13
29:5, 7, 11,
15, 19, 23
30:10, 17
31:11
32:20
33:17  34:4,
10, 20
35:13, 18,
19  36:1, 6,
13, 18, 22

37:6, 8, 12,
16, 18, 21
38:18, 21
39:1, 21
40:14, 15
41:1  42:4,
12, 15  44:6
45:17, 23
46:3, 5, 22
47:4, 9
48:10, 11
49:3, 22
51:1, 13, 14,
16, 18  52:3,
9, 13, 18, 20,
21  53:6, 10,
14, 15, 18,
19, 21, 23
54:8, 12
55:2, 4
56:10, 12
57:6, 13, 20
58:2, 15
59:3  60:16,
18, 20  61:1,
17  62:5, 8,
10, 15, 16,
20  63:13,
20  64:10
65:11
66:10, 13,
15  68:5, 17,
19, 20  69:3,
12, 15  70:6,
7, 10, 14, 22
71:1, 3, 4, 7,
10, 14, 17,
18, 21  72:1,
8, 9, 16, 17,
18  73:3, 17,
19  74:1, 2,
14, 15, 21,

23  75:3, 8,
19  76:2, 7,
11  77:4, 13,
18, 19  78:4,
11, 23
79:19, 21
80:5, 11, 13,
20, 21, 23
81:1, 5, 11,
13, 15, 17
82:9, 13, 15
83:6, 8, 11,
15, 18, 22,
23  84:8, 14
85:10, 16,
22  86:2, 4,
14, 17, 18,
19  87:8, 16,
20  88:11
89:22
90:14, 19
91:10, 19
92:5  93:9,
16, 17
94:13, 14,
23  95:5
96:13
97:16, 21
98:16, 22
99:10, 11,
19, 21, 23
100:3, 15
101:7, 10,
20, 21
102:13
103:2, 6, 16,
17, 18, 23
104:18
105:3, 9, 20
106:22
107:7, 9
108:3, 23

110:21
111:1, 15
112:4
113:1, 4
114:1, 7, 13,
17, 19, 22
115:3, 10,
20, 21, 23
116:10, 20
117:8, 16
118:2, 16,
19  119:1,
17, 19
122:13, 22
123:8, 17,
18  124:12,
18  125:12
127:4, 10,
16, 22
128:23
129:9, 10,
11, 21, 22
130:7, 9, 12
131:17, 19
133:2, 15
134:6, 13,
20  135:3, 7,
11  136:14,
20, 23
137:6
138:1, 3, 7,
8, 13, 16, 22,
23  139:6, 9,
15, 16
140:2, 7
141:9, 22
142:5
144:13, 19,
21, 22
146:10
147:5, 19
148:15, 17

149:4, 5, 9,
13, 20
150:1, 17,
18, 19, 21
152:8, 9
154:3
155:23
156:2, 21,
22  157:22
158:7, 10,
22  159:16,
23  160:2,
14, 15, 18,
22  161:10
162:2
163:3, 16,
19  165:3, 8,
12, 16, 18,
23  166:12
167:4, 8, 10,
15  168:3,
14, 16
169:1, 11,
18  170:1,
21  171:2
172:2, 8, 9,
10  173:4, 7,
11  174:1
175:9, 11,
15, 17
176:14, 16
177:1
178:13, 18
179:12, 14,
22  180:7, 8
181:10
182:21
183:6, 8
184:7, 18,
19  185:23
186:10, 13
187:5, 8, 22

Video Deposition of Rusty Hughes

188:*1, 3, 23*
189:*6, 15,
16*  190:*17*
191:*15*
192:*13, 17,
18, 23*
193:*9, 10,
16, 18, 19*
194:*6, 19*
195:*2, 3, 7,
10, 13, 14,
19*  196:*4,
19*  197:*6*
198:*4, 7, 9,
10, 13, 16,
20, 23*
199:*20*
200:*4, 9, 21*
201:*2, 3, 11,
14, 18, 20*
202:*6*
203:*1, 22*
204:*5, 6, 8,
11, 14, 21*
205:*7, 8, 13,
14, 16, 18,
20*  206:*4,
12, 22*
207:*5, 6, 17,
20, 22*
208:*8, 15*
209:*13, 19,
21*  210:*18,
19, 22*
211:*3, 4, 5,
6, 7, 8, 9, 14,
17, 22*
212:*2, 7, 11,
14*  213:*14,
17*  215:*13*
216:*4, 21*
217:*10, 17*

218:*21*
219:*1, 7, 11,
13*  220:*18,
19, 23*
221:*2, 5, 9,
10, 11, 12,
13, 14, 17*
222:*5*
224:*10, 12,
19*  225:*21*
227:*2, 5, 9,
14, 20, 22*
228:*16, 20,
21*  229:*1, 4,
8, 16*  230:*5,
9, 20*  231:*7*
232:*16*
234:*2, 13*
235:*2, 11,
13, 15, 23*
236:*12, 21*
237:*7, 20*
238:*2, 4, 7,
17*  239:*14,
23*  240:*4*
241:*8, 11,
12, 14, 18*
242:*3, 11*
243:*3, 20*
244:*12, 19,
21*  245:*4, 7,
10, 17*
246:*14, 18*
247:*18*
248:*16, 20*
249:*13, 23*
250:*4, 10,
11, 12*
251:*6, 16,
23*  252:*5,
12*  253:*13,
15*  255:*8,

20, 22*
256:*2, 8, 9,
16*  257:*1, 5,
6, 13, 18*
258:*7, 18,
19, 20, 21,
22*  259:*5, 9,
20, 21*
260:*2, 10,
15, 17, 19*
261:*9, 20*
262:*8, 13,
16, 18*
264:*6, 10,
22*  265:*5*
266:*4, 9, 10,
23*  267:*4, 6,
8, 10, 19*
268:*15*
269:*14, 15,
22*  270:*14,
15, 18, 20*
271:*7, 8*
272:*7, 13,
15, 23*
275:*16, 18*
276:*17*
277:*4*
278:*10, 17*
279:*9, 17,
22*  280:*8,
10, 15*
282:*4*
283:*1*
284:*10, 22*
286:*6, 11,
13, 16*
287:*14*
288:*7, 10,
17, 19, 23*
290:*2, 17*

292:*7, 8, 10,
11*
**Andrea**
108:*3*
224:*17, 21*
**announcem
ent** 130:*19*
**annual**
202:*11*
205:*6, 17*
**annually**
55:*3*  73:*11*
78:*18*
**answer**
10:*5, 6, 18*
12:*2*  18:*2*
49:*11*  51:*7*
56:*7*  58:*17*
91:*3*  114:*3*
115:*4*
131:*3*
137:*10, 18,
20*  151:*1,
16*  152:*4, 6*
154:*21*
161:*15*
177:*17*
187:*10*
221:*22*
**answered**
57:*6*  58:*15*
75:*8*
100:*15*
115:*3*
136:*20*
140:*2*
151:*16, 19*
152:*1*
222:*4*
252:*5*
262:*2*

**answering**
222:*6*
**answers**
292:*8*
**anybody**
13:*19, 20*
22:*20*  23:*5*
27:*3, 15*
29:*5, 9, 13,
17, 21*  30:*2*
31:*16, 22*
33:*17*
34:*22*  35:*6*
45:*20*
46:*15, 22*
47:*2*  65:*15*
66:*3*  75:*22*
76:*4*  77:*1*
95:*1*  121:*8*
126:*23*
127:*1*
132:*11, 20*
133:*3*
134:*23*
135:*11*
136:*18*
137:*1*
142:*22*
144:*8*
148:*7*
149:*3*
156:*11*
162:*11, 17*
168:*1*
169:*20*
170:*4, 11*
171:*11*
182:*2*
183:*15*
260:*16*
261:*1*
262:*23*

276:*3*, *7*
283:*21*
290:*11*, *18*
**anymore**
151:*17*
**anywise**
292:*15*
**apart**  81:*5*
**apologize**
151:*5*
**apparently**
236:*3*
252:*6*
**appear**
147:*14*
198:*21*
**appearance**
69:*6*
**APPEARAN
CES**  6:*1*
**Appears**
69:*14*, *19*,
*21*  70:*3*, *10*,
*12*, *22*, *23*
71:*7*, *9*, *14*,
*16*, *21*, *23*
72:*5*, *7*, *10*,
*12*, *22*  73:*1*
79:*20*
91:*17*
249:*6*
250:*22*
**applicant**
267:*2*
**applicants**
80:*21*, *22*
**application**
135:*1*
**applied**
111:*14*
242:*19*
275:*11*

**applies**
193:*6*
**apply**
12:*19*, *20*
74:*14*
135:*12*
237:*21*
238:*21*
239:*5*
265:*21*
276:*9*
**applying**
134:*3*
**approval**
48:*1*
115:*17*
198:*8*
210:*12*, *16*
**approve**
89:*6*
195:*17*
197:*11*, *12*
198:*22*
234:*9*
**approved**
48:*9*
115:*21*
116:*1*
132:*3*, *4*
197:*8*
198:*20*, *22*
234:*13*
235:*2*, *5*
**approves**
197:*14*, *17*
**approximate
ly**  2:*9*
102:*21*
**architects**
16:*8*
**archive**
178:*15*, *21*

**archived**
179:*14*
**areas**  184:*4*
**arguing**
137:*22*
138:*1*, *5*
**argumentati
ve**  137:*10*
276:*22*
**articles**
63:*17*
**ashamed**
66:*5*, *11*
**aside**
270:*15*
**Asked**
57:*6*  58:*14*
75:*7*  93:*15*
100:*15*, *16*
101:*15*
115:*3*
125:*18*
127:*23*
136:*20*
140:*2*
151:*22*
152:*2*
177:*10*
179:*16*
182:*13*
193:*17*
204:*14*
230:*5*
252:*4*
262:*5*
278:*16*, *17*
282:*3*
**asking**
10:*1*  27:*7*
54:*8*  55:*23*
77:*6*, *9*
79:*4*, *7*, *10*,

*23*  80:*1*, *2*
119:*12*
129:*4*, *21*
149:*20*, *21*
150:*7*
151:*1*
153:*21*
154:*1*, *8*, *12*
155:*10*
159:*14*
194:*13*, *14*,
*23*  220:*2*
221:*5*
265:*10*, *12*
266:*12*, *15*,
*17*, *18*
**asks**  46:*13*
**assign**  2:*23*
**assigned**
270:*13*
**assigning**
223:*22*
**assignment
s**  181:*7*
195:*2*
**assigns**
39:*21*
**assistant**
15:*10*
164:*16*, *17*
241:*11*
**associate**
20:*12*, *14*
36:*22*  37:*4*,
*21*  38:*9*
85:*16*  92:*7*
103:*13*
146:*22*
147:*1*, *2*, *20*
148:*7*, *13*
163:*23*
238:*20*

239:*6*
244:*5*, *6*, *12*,
*16*  246:*15*
247:*22*
248:*8*
250:*11*, *20*,
*22*  251:*11*,
*17*, *23*
252:*7*
**associated**
74:*20*
**associates**
74:*23*  75:*2*
80:*21*
147:*22*
258:*8*
262:*15*
**assume**
16:*17*
74:*19*
90:*18*  91:*4*
105:*20*, *21*
106:*20*
148:*3*
189:*7*
193:*15*
213:*23*
223:*8*
226:*4*
256:*21*
257:*16*
276:*23*
**assumed**
15:*12*
**Assumes**
33:*23*
125:*21*
138:*16*
162:*4*
176:*4*, *10*
206:*8*

**assuming**
91:*10*
131:*20*
147:*23*
148:*3*
189:*4*
190:*7*
209:*1*
210:*6, 7*
213:*22*
234:*4*
242:*4*
243:*23*
276:*16*
**assumption**
214:*6*
**assured**
264:*9*
**attached**
34:*11*
54:*13*
60:*19*
89:*23*
187:*17*
227:*6*
231:*10*
232:*10*
235:*12, 18*
241:*19*
247:*19*
248:*21*
249:*14*
250:*5*
253:*14*
255:*23*
273:*1*
277:*4*
288:*8*
**attachment**
231:*6, 7*
**attend**
22:*16   23:8*

166:*1*
167:*15*
168:*10*
175:*5*
**attended**
23:*6   74:5*
104:*23*
105:*4*
**attends**
165:*8*
167:*3*
**attention**
148:*10*
157:*1*
176:*12*
188:*3*
**attorney**
8:*8*
**August**
227:*18, 20*
228:*23*
235:*16*
**automatic**
143:*7*
**available**
220:*15*
246:*19*
**Avenue**
2:*7   5:12*
7:*7*
**aware**   33:*6,*
*17, 19*   63:*8*
133:*22, 23*
135:*5*
145:*22*
174:*10*
224:*2, 18*
225:*3, 5*
240:*7, 12*
260:*22*
275:*13*

**< B >**
**back**   19:*23*
28:*17*   45:*7*
49:*3*   56:*8*
60:*9*   61:*5,*
*22*   85:*5*
114:*13*
133:*17*
140:*16*
146:*9*
156:*17*
169:*23*
177:*14*
178:*22*
179:*2*
181:*20*
182:*9*
183:*7*
185:*9*
196:*13*
200:*9*
203:*1*
213:*17*
214:*13*
222:*21*
230:*10, 19*
242:*5*
258:*1*
287:*23*
**bad**   54:*3*
137:*5, 8*
192:*20*
**BAKER**   6:*5*
**bands**
219:*5, 23*
**BANK**   1:*11*
165:*14*
167:*6*
**banking**
71:*12   72:2*

**Banks**
35:*15, 17*
36:*1*
**Barbara**
69:*16*
**barely**
39:*16*
**Barlotta**
6:*7   8:10,*
*23   9:4*
12:*1, 3*
13:*14   17:6,*
*8, 18, 23*
18:*2   21:9*
24:*5   27:19*
28:*1   31:19*
32:*2, 11, 18*
33:*1, 3, 14,*
*22   36:11,*
*15   38:3, 6,*
*14   39:4, 12,*
*23   40:11,*
*20   41:10,*
*14, 23*
42:*21   43:7,*
*16   44:8*
45:*9, 21*
46:*8   47:14,*
*21   48:7, 12,*
*20   49:9, 14*
50:*18, 21*
51:*6, 19*
52:*7, 23*
54:*15   55:6,*
*12, 16, 23*
56:*5, 14, 18,*
*23   57:6, 11,*
*17, 23   58:8,*
*14, 17, 23*
59:*10, 18*
61:*9, 15*
62:*22   63:6,*

*11, 15, 20*
64:*4, 13, 19*
65:*3, 7, 19,*
*23   66:6, 20,*
*23   67:3, 12,*
*18, 23   68:8,*
*10   69:5, 13,*
*20   70:4, 11*
71:*8, 15, 22*
72:*6, 11, 23*
73:*7, 13, 18*
74:*6, 17*
75:*7, 17, 23*
76:*5, 11, 18*
77:*5, 21, 23*
78:*6, 13, 21*
79:*2, 7, 15,*
*23   81:4, 23*
85:*19*
88:*13, 20*
89:*1, 12*
90:*2   91:2,*
*16, 23*
92:*23   93:5,*
*7   94:1, 11,*
*19   95:12,*
*19   96:2, 16,*
*22   97:3, 7,*
*12, 14, 19,*
*23   98:8*
99:*9, 17, 22*
100:*1, 7, 11,*
*15, 18*
101:*18*
102:*3, 8, 17*
103:*9*
104:*16*
105:*12, 15,*
*18   107:20*
108:*2, 16,*
*21   109:14*
110:*19, 23*

Video Deposition of Rusty Hughes

1/19/2024

111:*4, 8, 14*
112:*6, 11,*
*19* 113:*10,*
*12, 20, 23*
115:*3, 18*
116:*13, 17*
117:*2, 21*
118:*22*
119:*7*
121:*12, 22*
125:*14, 20*
126:*6, 9, 21*
127:*13*
130:*16, 23*
131:*2, 13*
132:*1, 7*
133:*4, 20*
134:*4, 10,*
*18* 135:*2,*
*13, 19, 22*
136:*3, 19*
137:*3, 9, 13,*
*17, 21*
138:*2, 15,*
*19* 139:*2,*
*12, 23*
140:*2, 6*
141:*20*
143:*5, 22*
144:*4, 10,*
*16* 145:*3, 9,*
*19* 146:*5*
147:*9, 13*
148:*9, 22*
149:*8, 17*
150:*3, 14,*
*23* 151:*15,*
*20, 22*
152:*2, 20*
153:*1, 10,*
*16* 154:*8,*
*13, 17, 22*

155:*8, 17*
156:*14*
157:*4, 13,*
*19, 23*
158:*12, 16*
159:*14*
161:*5, 14*
162:*3, 13,*
*20* 163:*7*
165:*1*
166:*15*
170:*7, 14*
171:*9, 12,*
*17, 20*
172:*4, 12*
173:*22*
174:*5, 15,*
*21* 176:*3, 9,*
*18, 22*
177:*4, 15*
178:*2, 16*
179:*4, 7, 20,*
*23* 180:*13,*
*18* 181:*2*
182:*20*
183:*17*
184:*5, 9, 14*
185:*2, 11,*
*15, 21*
186:*20*
187:*2, 9*
188:*11*
189:*13, 19*
190:*1, 11,*
*16, 19*
191:*2, 9, 14,*
*23* 192:*10*
193:*21*
194:*4, 10,*
*16* 195:*4,*
*12* 196:*2*
197:*16*

200:*11, 16,*
*23* 201:*5*
202:*7*
203:*3, 8, 16,*
*18* 204:*1,*
*13* 205:*2,*
*11, 23*
206:*7, 19,*
*23* 207:*2, 9*
208:*1, 3, 6,*
*18, 23*
209:*9*
210:*3, 14*
211:*11, 18*
212:*5, 22*
214:*11, 17,*
*20* 215:*11,*
*16* 216:*1,*
*17* 217:*1, 7,*
*21* 218:*2*
222:*9*
223:*7, 20*
224:*1, 20*
225:*8, 12,*
*19* 226:*3, 9*
228:*5, 10*
229:*10, 20*
230:*3, 13,*
*23* 231:*11,*
*19* 232:*6,*
*12, 20*
233:*14*
234:*10, 16,*
*19, 22*
235:*4*
236:*1, 19*
238:*6, 11*
239:*1, 8, 10*
240:*15*
246:*9, 12,*
*16* 248:*2,*
*12* 249:*5,*

*21* 250:*15*
251:*3, 13*
252:*4, 15*
253:*18, 21*
254:*13*
255:*10*
256:*18*
257:*11, 15,*
*20* 258:*10*
259:*17*
260:*8, 21*
261:*5, 8, 10,*
*14, 23*
262:*4, 10*
263:*3, 9, 16,*
*20* 265:*1, 9,*
*16, 23*
266:*7, 12,*
*16* 268:*6*
269:*6*
271:*1, 17*
273:*16, 21*
274:*8, 11,*
*19* 275:*4,*
*19* 276:*5,*
*15, 21*
278:*8*
279:*1, 8, 12,*
*20* 280:*3,*
*13, 18*
281:*9, 16,*
*18, 22*
282:*9, 21*
283:*6, 14*
284:*1, 5, 15*
285:*2, 6, 9,*
*13, 18, 23*
286:*3, 10,*
*14, 19*
287:*2, 4, 6*
288:*19*
289:*7, 11*

290:*15, 23*
291:*5*
**Barnett**
169:*21*
**BARRETT**
5:*16*
**barriers**
264:*8*
266:*4*
**base** 93:*9,*
*10*
**based** 82:*4*
113:*17, 21*
114:*23*
131:*17*
155:*3*
166:*3, 9, 20*
168:*8*
200:*5*
238:*7*
239:*13*
247:*9*
250:*13*
**basic** 80:*7*
197:*21, 22*
**basically**
77:*15*
176:*16*
239:*17*
**basics**
41:*17*
**basis** 161:*2*
**Bates**
61:*19* 64:*9*
65:*9* 68:*4*
69:*7, 15*
71:*2, 10*
72:*16*
73:*21* 74:*8*
78:*2* 81:*13*
146:*10*
227:*2*

Video Deposition of Rusty Hughes

235:*9*
256:*2*
257:*1, 23*
262:*13*
**BB&T**
14:*11, 13,*
*16*  52:*10*
54:*20*
60:*14*
62:*16, 20*
64:*12, 18*
65:*2, 15*
66:*3*  67:*8*
68:*2, 5*
70:*15*
72:*17*  73:*4,*
*17*  74:*14,*
*22*  75:*1, 2,*
*5, 19*  76:*7,*
*12*  77:*1*
78:*4*  80:*20,*
*22*  81:*6, 11,*
*14*  146:*2*
148:*16*
256:*8*
258:*4, 12*
262:*14, 23*
264:*9*
273:*2*
279:*15*
282:*10*
**BB&T's**
68:*16*
**BEARMAN**
6:*5*
**Beasley**
285:*22*
286:*2, 4, 12*
**beer**  141:*9,*
*12*  157:*22*
158:*7, 22*
159:*4*

160:*2*
161:*10*
177:*2*
**beers**
160:*22*
**began**
15:*9*
104:*19*
**beginning**
7:*8*  93:*9*
268:*23*
**behalf**  7:*17*
**belief**
268:*9*
271:*16*
**Beliefs**
68:*14*
**believe**
11:*17*  26:*3*
31:*13*
35:*15, 22*
36:*16*
48:*21*  49:*1*
53:*1, 10*
55:*8*  58:*1*
61:*12*
62:*13*
64:*22*
73:*14*
82:*11, 22*
83:*21*
86:*14, 16*
92:*8*
109:*22*
110:*13*
112:*12, 13*
117:*11, 12,*
*18*  123:*6*
129:*2*
144:*7, 14*
145:*14*
149:*2*

151:*3*
160:*12, 13*
163:*20*
164:*14*
170:*2*
186:*4, 15*
187:*4*
190:*22*
196:*21*
220:*22*
221:*12*
224:*7*
228:*11*
232:*17*
244:*10*
246:*17*
255:*17*
256:*10*
**benefits**
16:*22*  28:*5*
168:*18*
**Bennett**
69:*9*
**Bennett's**
124:*11*
**BERKOWIT**
**Z**  6:*6*
**best**  28:*9*
80:*13*
**Betsy**
169:*21*
170:*12, 16,*
*18*
**better**  58:*5*
99:*12*
105:*10*
**beverages**
158:*5, 21*
159:*12, 19*
**beyond**
264:*10*

266:*10*
**bias**  256:*17*
**biases**
257:*5, 8*
**Bible**
68:*20, 21*
69:*1, 4*
**big**  66:*9*
158:*18*
**Bill**  62:*11,*
*14*  64:*23*
**bind**  41:*17*
**binder**
187:*19*
**binding**
168:*17*
**binds**  86:*2*

**Birmingham**
2:*8*  5:*7, 13,*
*19*  6:*9*  7:*7*
18:*23*
22:*22*  23:*6*
31:*16*
35:*11*  36:*5*
44:*14*
166:*1*
224:*10*
241:*23*
242:*11*
258:*17*
261:*2, 21*
262:*8*
274:*6, 22*
275:*2, 12,*
*17, 21, 23*
276:*4*
**bit**  15:*6*
56:*8*
140:*21*
150:*7*
253:*1*

**black**
72:*10*
144:*22*
274:*6, 18,*
*21*  275:*2, 8,*
*23*  276:*1*
**blacks**
58:*5*
144:*22*
276:*9, 18*
**blank**  231:*4*
**blend**
187:*15*
**blended**
269:*23*
**blow**
218:*22*
**blueprint**
187:*12*
270:*19*
**board**
28:*11, 13*
**boards**
131:*21*
**bonus**
11:*13, 14,*
*19, 20*  12:*5*
91:*15*
97:*13, 22*
197:*9, 20*
204:*23*
205:*7, 9, 17*
206:*11*
209:*6, 20,*
*22*  210:*21*
211:*1, 7, 13,*
*14*  213:*12*
214:*14*
215:*13, 22*
216:*19*
217:*3, 15,*
*20*  218:*8*

Video Deposition of Rusty Hughes

224:*19, 22*
225:*3, 7*
227:*16, 17,
21*  228:*2*
229:*2, 17*
231:*23*
232:*2, 4*
237:*10, 22*
238:*1, 3, 10*
239:*12, 19*
240:*3*
278:*18, 21*
**bonuses**
12:*18*
48:*14, 18*
49:*1, 4*
202:*16, 19*
204:*18*
205:*3, 19,
20*  207:*11,
12*  209:*13*
210:*9, 12*
213:*9*
214:*15*
215:*15*
216:*21*
217:*4, 6*
219:*2*
223:*12*
227:*9, 14,
18, 20*
228:*17, 21*
229:*1*
230:*2, 12*
232:*18*
233:*3, 12*
234:*14*
235:*15, 18*
236:*16, 20,
22*  249:*2*
**book**
38:*17, 21,*

22  39:*22*
94:*3, 4, 7, 9*
105:*16*
187:*8*
244:*19, 20*
251:*18*
268:*17, 20*
**born**  14:*17*
**bottle**
160:*5*
**bottles**
159:*1*
**bottom**
61:*19*
68:*14, 15*
71:*1*  74:*13*
146:*20*
227:*13*
**bought**
14:*8*
**Bradley**
69:*9, 10*
**Branch**
65:*11*
**brand**
38:*11, 12*
39:*6*
244:*22*
**Brandon**
245:*2, 3, 11,
19*  246:*3*
247:*2, 4, 22*
250:*10, 13,
19*  252:*2*
**Brandy**
29:*14*
31:*11*  83:*6*
100:*23*
101:*13*
104:*21*
105:*6*

**Brandy's**
29:*15*  83:*8*
**Brant**  71:*11*
**Brasher**
98:*2, 6*
100:*4*
101:*8*
**break**
10:*16, 18*
59:*19*
139:*4, 6*
140:*4, 16*
160:*1, 3*
162:*8*
222:*13, 21*
287:*12, 23*
**breakdown**
237:*17*
**breakfast**
180:*20*
**Brent**  26:*8*
47:*23*
167:*14*
198:*7*
**Bridget**
29:*18*  31:*9*
**Bridget's**
29:*19*
**brief**  60:*4*
222:*16*
287:*18*
**briefly**
34:*14*
245:*21*
**bring**  37:*8*
38:*13*
177:*2, 6*
201:*8*
239:*13*
269:*13*
**bringing**
37:*1*

**broad**
17:*13, 15*
**broker**
14:*4*  15:*3,
8, 11*  16:*2*
17:*3*  18:*7*
19:*10*  20:*2,
9, 10, 23*
21:*2, 4, 10*
25:*14, 16*
28:*22*
29:*12, 16*
33:*2, 20*
36:*22, 23*
37:*4, 5, 11,
19*  38:*8, 12*
39:*11, 22*
40:*1, 7*
41:*9, 11*
56:*10*
84:*18, 19,
22*  85:*2, 3,
8, 12, 17, 22*
86:*3, 4, 9,
10, 11, 13,
17, 18, 19,
22*  87:*3, 9,
10, 11, 18*
92:*6, 8, 15,
21*  93:*3, 13,
18, 23*
94:*22*
95:*11, 13,
18*  96:*15,
18*  97:*2, 6*
98:*4, 7*
100:*10, 14*
101:*1, 15*
102:*2, 11,
14, 16, 19*
103:*4, 7, 12,
13, 23*

104:*1, 3, 5,
6, 8, 9*
105:*19*
106:*8, 15*
107:*13, 16,
19, 22*
108:*10, 12,
15, 20*
109:*9, 13,
22*  110:*2,
11*  117:*1,
19*  118:*7, 9,
20*  119:*2, 6,
16*  120:*20*
121:*6*
122:*7, 14,
16, 19, 20*
123:*15, 16,
17, 18*
124:*1, 2, 5,
9, 13, 14, 15,
17, 23*
125:*3, 6, 19*
126:*4, 5, 20*
127:*2, 6, 17,
23*  128:*18,
21*  129:*1, 5,
14*  130:*8,
13, 21*
132:*11*
136:*2*
137:*6*
139:*20*
142:*20*
160:*20*
163:*1, 20,
21*  164:*1, 2,
9, 12, 20*
165:*5, 9, 12,
15*  168:*2*
171:*18*
172:*15, 16,*

Video Deposition of Rusty Hughes

1/19/2024

91

*20, 22*
180:*8*
186:*17, 19*
187:*1, 5, 7,*
*8, 13, 14, 22*
188:*1, 6, 9,*
*16, 20, 22*
189:*12, 16*
191:*21*
192:*8, 23*
193:*10*
195:*20, 23*
198:*14*
218:*3*
219:*2, 8, 10,*
*11, 17*
220:*4*
223:*19*
237:*22, 23*
238:*4, 16,*
*18, 19, 20*
239:*4, 6, 7,*
*19* 241:*4, 5*
243:*5, 8, 10,*
*13, 17*
244:*5, 6, 7,*
*12, 16, 18*
245:*18, 20*
246:*3, 15,*
*19* 247:*22*
248:*1, 8*
250:*11, 13,*
*20, 23*
251:*2, 10,*
*11, 17, 23*
252:*1, 3, 7,*
*14, 16*
266:*2*
267:*22, 23*
268:*5, 9, 13*
269:*5*
270:*4, 5, 11,*

*14, 20, 22*
271:*5, 11,*
*22* 272:*5*
274:*7, 18*
275:*3, 8, 11,*
*15, 18*
**brokerage**
26:*2, 12, 22*
168:*14, 16,*
*17* 241:*14*
259:*4*
**brokered**
85:*12*
**brokers**
20:*12, 15*
24:*15* 25:*8*
33:*13*
40:*18*
41:*22*
83:*13*
97:*10*
121:*11, 16*
122:*12*
133:*1*
165:*17, 23*
166:*4, 18*
167:*3, 7*
171:*16, 19*
172:*3, 9*
175:*15, 17*
190:*14*
192:*6*
206:*15*
236:*18*
238:*22*
239:*12, 16*
251:*20*
270:*4*
274:*21*
**broker's**
251:*6*

**brought**
146:*6*
156:*23*
159:*23*
226:*19*
252:*13*
268:*18*
**buck**
233:*10*
**building**
268:*16*
**built** 75:*2,*
*6*
**business**
19:*4* 27:*21*
38:*22*
40:*19, 22*
41:*4* 42:*3*
85:*12* 86:*4*
92:*22* 93:*3,*
*21* 94:*3, 5,*
*15* 99:*21*
111:*2*
113:*2, 16*
115:*7, 8, 12*
117:*15*
158:*14*
168:*17, 18,*
*19* 188:*3*
189:*1*
192:*14*
193:*7, 8*
200:*2*
237:*1*
244:*19*
247:*9*
251:*6, 16,*
*18* 260:*18*
262:*12, 14,*
*17, 19*
264:*19*

268:*18, 20*
269:*12*
**businesses**
233:*19*
**button**
195:*17*
**buzz** 257:*4*

**< C >**
**Cadden**
11:*8* 12:*6*
13:*2* 23:*12,*
*13* 24:*8, 12*
25:*4* 26:*7*
27:*6* 35:*3*
47:*23*
48:*10* 50:*5*
105:*2*
114:*17*
130:*13*
136:*17*
167:*10*
197:*8*
198:*3, 10,*
*15* 210:*19*
216:*5*
227:*13*
229:*9*
230:*1, 19*
234:*8, 15*
235:*15*
252:*12*
288:*10, 17*
289:*5, 13*
290:*2*
**Cadden's**
23:*15* 24:*9*
89:*8*
**calculate**
217:*6, 15*
219:*13, 15*
220:*10*

**calculated**
211:*20*
216:*20*
218:*9, 13*
219:*2*
238:*3, 4*
**calculating**
239:*19*
**calculation**
211:*13, 15*
214:*15*
215:*14, 22*
218:*19*
238:*17*

**calculations**
11:*21*
197:*10*
210:*21*
**CALDWELL**
6:*5*
**call** 11:*1*
18:*16*
38:*18* 39:*9*
40:*8* 51:*1*
162:*11*
172:*10*
182:*4*
288:*12, 17,*
*18, 20*
289:*1, 3*
**called**
15:*17* 39:*7*
141:*8*
158:*10*
165:*10*
213:*2*
216:*19*
217:*16*
246:*20*
**calling**
38:*18*

41:19
279:10
**calls** 39:17
42:16
45:12
276:21
**candidate**
46:12  47:3
135:6
275:8
**candidates**
131:9
134:19
136:22
139:17
**care** 88:4
**career**
95:6  96:5
272:17
**Carolina**
36:20
59:16
65:12
**Caroline**
6:14  7:16
**carrier**
279:21, 23
280:2, 11,
16, 20
281:1, 8
282:4, 20
283:13, 17,
22  284:14,
19, 23
286:9, 18
**CASE** 1:5
7:21  8:1
33:4
152:15
196:5
213:13
228:22

248:16
276:23
**cases**
205:4
206:9
285:3
**casualty**
16:10  23:9
247:5, 12
258:18
**categories**
80:23
151:8
259:22
**category**
260:6, 20
**caught**
182:22
**cause** 7:9
292:16
**caution**
284:22
**cease**
270:9
**celebrate**
158:18
**celebration**
158:19
**CEO** 26:22
62:8, 10
72:17
167:22
**certain**
9:19  31:13
62:19
81:16
110:10, 17
112:4
131:10
166:10
193:6, 16
231:2

233:23
236:14
250:19
268:11
270:18
272:17
**certainly**
59:2
110:18
115:23
183:5
259:15
274:4
**certify** 7:2
292:6, 13
**chain** 24:3
210:12
288:9
**chairman**
28:15  62:8,
10  167:20
**change**
60:10
61:14
67:15
140:17
164:22
198:15
222:22
267:19, 23
268:2, 13,
22  269:2,
17, 19
271:9
288:1
**changed**
38:5  64:17
110:9
120:7
165:13, 14
272:9

**changes**
167:18
270:22
**channels**
146:7, 13
**characteristi
cs** 262:18
**Charge** 4:9
32:5  34:8,
23  35:8
61:2  86:3,
5  88:3
233:10
**charged**
25:18, 20
36:23
192:16
244:18
251:18, 20
272:17
**chart**
119:1
196:14
201:14
206:17
209:4, 15
216:13
223:4
235:18
237:13
**charts**
121:18, 19
122:3
235:22
**check** 92:9
**chief** 69:16,
23  70:14
71:4, 18
72:8
**chooses**
206:10

**Christopher**
70:14
**Christy**
225:2
278:16
**circumstanc
es** 152:8
173:17
174:1
**Cite** 7:17
**city** 29:2, 3
**Civil** 7:4
65:10
67:17
**claim**
143:20
148:20
282:11, 16
**claimed**
149:9
**claiming**
150:4
**claims**
17:16  33:9,
19  34:23
35:7
148:17
280:16
**clarification**
86:8
**clarify**
19:14  27:7
83:15
84:10
85:10
93:17
112:22
114:9, 11
131:1, 4
135:3
160:23
161:1

Video Deposition of Rusty Hughes

1/19/2024

208:*7*
274:*20*
289:*9*
**Clark**  71:*17*
**classified**
190:*18, 23*
191:*7*
196:*4*
244:*17*
**classify**
194:*7*
**classifying**
195:*2*
**Clay**
163:*18, 20*
**clear**  10:*13*
141:*23*
252:*6, 8*
268:*7*
**clear-cut**
187:*11*
**clearing**
191:*18*
**clearly**  56:*7*
**click**
195:*16*
264:*21, 22*
**clicking**
265:*3*
**client**  72:*9*
**clients**
16:*5*
193:*13*
**close**
139:*3*
189:*9*
200:*13*
252:*18, 22*
**closely**
101:*19*
**co-CEO**
62:*14*

**Cochran**
95:*17, 23*
100:*4*
101:*10*
**Code**  4:*22*
74:*22*  75:*2,*
*13*  273:*2, 6*
**cold**  39:*9*
**co-lead**
19:*15, 19*
211:*3*
**collateral**
65:*22*
**colleague**
163:*12*
**colleagues**
21:*22*
**color**  73:*3*
81:*16*
275:*11, 14*
**column**
91:*14*
209:*6*
**columns**
90:*17*

**combination**
258:*13*
**come**  22:*6*
49:*3*  76:*4*
80:*14*  88:*1*
96:*10*
140:*22*
142:*22*
168:*2*
173:*4*
175:*16*
181:*10, 15*
197:*4*
229:*12*
288:*11*

**comes**
234:*2*
254:*8*
**coming**
32:*7*  46:*15*
47:*17*  96:*6*
123:*22*
181:*19*
182:*9*
184:*3*
269:*12*
**command**
24:*4*
210:*13*
**commencin
g**  2:*9*
**comment**
143:*6*
**comments**
127:*18*
128:*8*
**commercial**
72:*19*
**Commissio
n**  259:*8*
**Commissio
ner**  3:*5*
7:*2*

**commitment**
75:*1*
**committed**
80:*20*
**common**
262:*15*
**communicat
e**  265:*11*
**communicat
ion**  12:*5*
111:*21*
112:*5*

**community**
72:*2*  74:*1*
168:*15, 16*
**companies**
16:*20*
179:*2*
**company**
14:*6*  16:*3*
20:*20*
35:*14*
39:*10, 14,
20*  47:*17*
65:*16*
67:*11*  71:*5*
73:*23*
74:*20*
76:*13, 14*
77:*10, 11*
80:*8, 12*
99:*21*
100:*6*
116:*5*
117:*13*
167:*23*
175:*12*
201:*12*
265:*15*
270:*1*
276:*8, 17*
**company's**
263:*1, 7, 14*
**companywi
de**  77:*7*
**comparably**
200:*21*
201:*3*
**compare**
132:*22*
**compensati
on**  91:*13*
199:*7*
202:*11, 15*

**community**
204:*3, 6*
205:*6*
206:*18*
208:*5, 13*
223:*5*
**complain**
75:*16, 22*
147:*7*
224:*21*
**complained**
33:*7*
162:*22*
180:*11*
183:*11*
224:*18*
278:*18*
290:*12*

**complaining**
32:*15, 21*
33:*4*
223:*17*
225:*3*
**complaint**
76:*3*  143:*3*
144:*3*
145:*1, 7, 15,
20, 23*
146:*3, 22*
147:*7*
149:*16*
150:*1, 13*
156:*3*
163:*5*
180:*16*
240:*7, 13*
283:*15*
284:*21*
286:*18*
**complaints**
32:*10*  63:*8,
13*  76:*8, 15*

Video Deposition of Rusty Hughes

1/19/2024

94

140:22
153:9
180:4, 6
181:1
183:12
185:1, 10
226:8
280:16
282:23
286:8
**complete**
51:15   53:9
54:21
**completed**
57:19
198:2
211:21
**completely**
142:18
**compliance**
2:15   284:7

**complicated**
45:3
**computer**
211:17, 20
212:3, 16
213:4, 18
214:5, 8
216:21
228:4
**computer-
aided**   292:9
**concern**
150:13
155:18
156:8
240:8
274:10
281:7
**concerned**
274:12

**concerns**
89:10
151:13
156:12, 22
170:12
171:15, 21
181:11
184:18, 20
226:13, 19
240:2
278:20
**concludes**
291:7
**Conduct**
4:22   55:21
57:15
65:16
66:15
75:13
253:3
266:23
273:3
279:7
**conducts**
42:19
**conference**
165:7, 15
**confidential**
205:20
**confused**
154:2
191:16
**connect**
262:15
**consider**
145:6
**considered**
26:13, 23
137:7
138:14
237:14

**consistent**
161:1
**consult**
175:22
**contact**
149:3
171:6
**contain**
282:22
286:7
**contains**
232:8
**continue**
271:20
272:8
**continued**
278:1
**Continuing**
6:1
**contractors**
233:21
**contracts**
39:15
**conversatio
n** 31:20
126:22
127:3, 9, 20
128:3, 5, 11
129:9, 16
130:11
141:2, 21
156:17
182:3
272:3
**conversatio
ns**   101:21
126:19
127:1
129:3, 6
136:21
141:18
156:11

183:14
289:18
290:4
**Cooley**
83:6
**copied**
54:3   199:3
242:23
**copies**
61:11
65:13
**copy**   13:12
32:4   34:10,
12   54:3, 5,
12   60:18
61:8   89:22
199:4
210:20
212:3, 6
216:19, 22
217:2, 16,
17, 19
227:5
235:11
241:18
247:16, 18
248:20
249:13
250:4
253:13
255:22
272:23
288:7
**Corey**
25:10
124:12, 22
125:6
127:4, 10,
12   128:5,
12, 17
129:4, 7, 15
130:4, 5

136:9, 11,
13   160:6
162:23
163:3
172:9, 10
174:23
180:16
181:19
189:3
196:9
235:14
288:11, 17
**Corey's**
108:11
120:23
**Cornelius**
2:5   7:1, 17
292:19, 20
**corner**
61:20   62:3
68:14
**CORP**   1:11
**corporate**
42:18   45:5
71:4   147:2
148:12
165:18
169:9
171:18
244:8
264:12, 15,
18, 23
279:15
284:6
285:7, 15
**corporately**
21:15   26:5

**Corporation**
70:15
74:14

282:*13*
285:*17*
**Correct**
18:*14*  38:*4*
41:*5*  48:*17*
59:*17*  69:*4,*
*12*  74:*18*
79:*19*
81:*12*  82:*8*
86:*14*
103:*22*
114:*19*
120:*18*
130:*15*
190:*13, 15*
194:*18*
197:*6*
201:*13*
207:*3*
227:*10*
229:*3*
246:*17*
248:*1*
249:*4, 6*
259:*16*
260:*7*
271:*2*
272:*15*
292:*11*
**corrected**
226:*6*
**correctly**
194:*8*
**Cory**  23:*20*
**co-team**
30:*10*
**counsel**
2:*4, 20, 22*
7:*5*  8:*2, 11*
10:*2, 23*
13:*20*
33:*18*  71:*3*

253:*11*
292:*14*
**counsel's**
114:*1*
138:*16*
161:*15*
202:*8*
**count**
91:*18*
**country**
21:*17, 22*
40:*14*
169:*14*
**COUNTY**
292:*4*
**couple**
104:*21*
110:*14*
161:*6*
244:*23*
290:*3*
**course**
64:*5*  99:*11,*
*14*  115:*11,*
*20*  158:*13*
178:*17*
197:*5*
233:*1*
257:*6*
272:*19*
**COURT**
1:*1*  2:*16*
7:*16, 18, 22*
8:*12*
**cover**
16:*19*
17:*10, 17,*
*21*
**coverage**
16:*5, 6*
17:*1, 3, 7*
18:*5*

247:*11*
279:*7, 11*
280:*12*
282:*12*
285:*1*
**coverages**
16:*11*
**covered**
253:*3*
279:*14*
282:*8*
283:*2*
**covers**
17:*12, 15*
281:*21*
282:*11, 15*
285:*4*
**Covid**
22:*10*  31:*2*
**CRC**  1:*10*
7:*21*  8:*11*
13:*20*  14:*5,*
*6, 9, 10, 19*
15:*9, 22*
16:*1*  21:*15*
26:*5, 13, 15,*
*23*  27:*1, 9,*
*12, 18*
34:*22*
36:*10, 12,*
*14*  39:*16,*
*19*  40:*6, 17*
51:*17, 22*
60:*16*  61:*1*
64:*3*  65:*15*
66:*4*  67:*9*
74:*16*
75:*19*  76:*7*
77:*1*  81:*2,*
*9*  88:*5*
90:*7*
103:*18*

104:*21*
116:*10*
123:*7*
164:*10, 11*
169:*8, 10*
179:*1*
181:*20*
194:*1*
244:*8*
248:*18*
250:*1*
274:*21*
279:*6, 11,*
*14*  280:*1*
281:*21*
282:*8*
283:*21*
285:*5*
**CRC/Hendri**
**x**  247:*21*
256:*3*
**CRC/Truist**
181:*17*
**CRC's**
285:*15*
**create**
58:*6*  63:*9*
215:*13*
283:*12*
**created**
267:*9*
**creates**
210:*1*
**credit**
69:*23*
**critical**
272:*16*
**criticism**
62:*21, 23*
**crying**
278:*5*

**CSR**  2:*6*
7:*1*
**cultivated**
39:*3*
**cultivates**
39:*14*
**cultural**
260:*3*
**culture**
59:*2*  73:*17*
74:*2, 4*
273:*2*
**current**
14:*3*  20:*22*
51:*14*  92:*5*
102:*15*
106:*21*
163:*19*
229:*2*
**currently**
19:*18*
20:*14*  24:*6*
25:*9*  26:*6*
28:*18*
38:*17*
47:*16*  93:*8*
122:*16*
244:*9*
245:*4*
**customary**
216:*16*
**customer**
93:*10*
**customers**
63:*10*
281:*6*
**cutoff**
270:*13*
**cyber**
16:*10, 13*
**cycle**
94:*15*

Video Deposition of Rusty Hughes

205:17
269:1
**Cynthia**
5:11  7:20
8:4  9:13
18:18
59:18
194:5
250:15

**< D >**
**D**  2:5  4:1
7:1  292:19,
20
**Dallas**
26:20
**Danielle**
109:16, 17
202:1
**Daryl**  68:20
**dashboard**
210:7
**data**
230:21
231:2
**date**  7:3
12:14
31:13
62:19
102:20
103:3
110:7, 17
119:9, 10
125:10
189:8
209:18
216:8, 10,
12  228:20
231:3
241:21, 22
273:14

**dated**
235:15
**dates**  242:4
**date-wise**
233:8
**dating**
273:9
**Daugherty**
25:10
124:13
160:7
162:23
180:3
215:20
235:14
288:17

**Daugherty's**
23:20
235:19
**Dave**
167:14, 17
245:15, 16,
22
**Dave's**
167:16
**David**  72:1
122:13, 18
125:18
126:1, 3
**day**  2:8
102:13
115:11
178:18
181:18
182:23
187:16
204:14
239:22
**days**  30:20
**day-to-day**
213:1

**deal**  66:9
158:18
**dealing**
193:13
**December**
34:16
**decent**
189:6
**decide**
47:12
134:6
203:11
**decided**
94:9, 21
103:6
202:22
**decides**
131:22
**deciding**
210:10
**decision**
47:18
49:20  88:8,
10, 22  89:3
127:16, 21
128:9
129:13, 17,
18, 19
180:9
**decisionma
ker**  47:19
**decisions**
47:23
49:18
**deem**  284:7
**defendant**
8:11
**Defendants**
1:12  6:4
**define**
55:21

**definitely**
268:14
**definition**
80:7, 14
115:1
**DEI**  255:15
**delete**
178:14, 18
214:1, 3
**deleted**
178:8, 20,
23  214:10
**delivered**
227:18
**delivery**
205:4
**demographi
cs**  262:18
**Denisa**
106:22
207:20
208:9
226:10
**Denise**
201:20
226:7
**denounced**
65:5
**denouncing**
65:16
**denying**
143:14
**department**
12:23
15:13, 22
18:11, 13
19:11
23:22  24:4,
12  25:19,
21  27:18
30:7  32:23
40:17  46:7,

10, 11, 16
49:7  50:9
56:12, 22
57:3  58:12,
21  59:8
79:5  82:6
83:23  84:9,
15  87:18
90:21, 23
91:7  92:3
95:9  106:6,
11  108:5
109:3, 4, 18,
19  116:3
117:5, 6
118:3
119:19
120:3, 16,
23  121:10
122:4, 23
126:16
130:18
133:16
134:8
135:17
136:14
141:3, 17,
19  143:2,
18  144:23
146:23
147:17
149:6, 14,
19  150:10,
11  151:11
156:13, 21
157:8, 12
158:11, 22
161:11, 17,
22  163:14
169:15, 22
170:1, 5
171:8

Video Deposition of Rusty Hughes

1/19/2024

97

183:*13, 16*
184:*2, 3, 22,*
*23*  185:*9*
196:*23*
197:*1, 2*
203:*5, 6, 9,*
*12*  209:*5,*
*11, 12*
223:*6*
224:*4, 7, 8*
228:*9*
231:*14, 16,*
*17, 23*
232:*5, 17,*
*19*  233:*4,*
*10*  240:*13*
244:*2*
245:*5, 8*
247:*5*
284:*12*
**departments**  31:*17*
**department-wise**  83:*22*
**depend**
  17:*19, 20*
  152:*7*
**dependable**
  103:*16*
**dependent**
  41:*2*
  204:*19*
  239:*21*
  272:*12*
**depending**
  166:*12*
  175:*19*
  270:*7*
**depends**
  17:*20*
  135:*14*
  145:*10*

152:*7*
196:*20*
267:*7*
**depo**
  217:*13*
**DEPONENT**
  291:*12*
**deposed**
  13:*23*
**DEPOSITION**  1:*15*
  2:*4, 13, 14*
  3:*1, 4*  7:*19*
  9:*15, 17*
  10:*22*  11:*4*
  13:*17, 21*
  14:*1*  89:*14*
  278:*1*
  291:*8*
**depositions**
  2:*17*
**designed**
  104:*13*
  113:*1, 3*
**desire**
  100:*10*
**determine**
  103:*11*
  139:*7, 21*
  238:*21, 23*
**determined**
  200:*7*
**determines**
  196:*19*
  197:*19*
  210:*22*
**develop**
  37:*6, 14*
  38:*13*  41:*8,*
  *11*  93:*9*
  95:*14*
  105:*16, 17*

115:*10*
187:*7*
188:*9*
**developed**
  39:*2*
**developing**
  74:*1*  86:*5*
  115:*9*
  251:*18*
**development**  37:*5*
  41:*4*  95:*4*
**differ**  168:*8*
**difference**
  36:*21*
  85:*14, 17*
  93:*2*  134:*6*
  251:*12, 23*
**differences**
  258:*4*
**different**
  16:*11*  18:*8*
  43:*17*
  47:*17*
  52:*12*
  61:*18*
  79:*11*
  116:*19*
  132:*15*
  134:*5*
  138:*21*
  142:*18*
  150:*8*
  151:*23*
  152:*3, 4*
  153:*21*
  189:*21*
  193:*3*
  216:*8, 14*
  217:*11*
  219:*4, 22*
  224:*4, 5, 14*

236:*23*
238:*3*
270:*7*
**differently**
  38:*20*
  89:*11*
  134:*8*
  153:*7*
  170:*6*
  171:*8*
  236:*17*
**difficult**
  39:*17*
  188:*4*
**digital**  72:*9*
**dinner**
  173:*8*
**dinners**
  173:*4*
  175:*11*
**direct**
  45:*22*  46:*1*
  82:*18*  83:*2,*
  *4, 15, 17*
  87:*14*
  101:*9, 11,*
  *12*  145:*21*
  163:*13*
  179:*9*
  190:*6*
  199:*11*
  200:*12*
  203:*4*
  205:*12, 13*
  211:*3*
**directed**
  59:*12*
**directly**
  46:*9*  51:*8*
  59:*1, 5*
  126:*12*
  144:*11*

145:*22*
148:*10*
216:*5*
234:*20*
**directors**
  16:*7*
**disability**
  152:*14*
**disabled**
  81:*16, 17*
**discipline**
  50:*15, 20*
**disciplined**
  50:*17*
**discretion**
  166:*13*
  204:*21*
  238:*13, 15*
  239:*9*
  267:*13, 16*
  272:*13*
**discretionary**  49:*2*
  202:*19*
  206:*12*
  236:*21*
  238:*7*

**discriminate**
  66:*13*
  80:*22*
  276:*18, 20*
**discriminated**  145:*12*
  149:*18*
  152:*10, 13*
  154:*6*
**discrimination**  17:*14,*
  *15*  32:*5, 13*
  51:*3*  53:*4*
  55:*4, 9, 11,*

*14, 15, 22*
56:*13*  58:*3,*
*6, 10*  75:*21*
76:*8, 16*
77:*2, 11, 19*
80:*10, 11*
135:*10, 16*
137:*16*
138:*7, 12*
139:*10, 11,*
*22*  143:*4, 8,*
*21*  144:*3*
145:*2, 7, 16*
146:*4, 17*
147:*8*
148:*18, 20*
149:*10, 16*
150:*1, 5, 13,*
*17*  151:*7*
152:*12, 18,*
*23*  153:*4, 9,*
*15, 19*
155:*6, 7, 12,*
*13, 16, 19*
163:*6, 9*
170:*5*
203:*15, 23*
207:*8*
225:*15*
226:*2*
240:*9, 13*
279:*18*
282:*19*
283:*8*
286:*8*
290:*14*
**discriminato**
**ry**  57:*15*
66:*16*
**discuss**
98:*17*

207:*13, 18*
211:*4*
**discussed**
10:*1*  205:*3*
207:*11, 12*
289:*16, 20*
290:*1*
**discussion**
31:*15*
33:*16*
66:*22*
67:*10*
78:*19*
81:*21*
89:*17*
95:*22*
199:*12*
289:*21*

**discussions**
35:*2*  65:*21*
67:*7, 15*
73:*4, 16*
77:*1*  89:*2*
113:*7*
125:*23*
211:*4*
289:*4*
**distinction**
86:*19*
187:*21*
268:*11*
**distributed**
61:*6, 8*
198:*19*
218:*10*
229:*11*
**distributes**
197:*9*
**distribution**
12:*12*

**DISTRICT**
1:*1*  7:*22*
**diverse**
258:*4*
259:*6*
261:*17, 21*
**diversity**
32:*21*  73:*5*
121:*10*
255:*7*
256:*4, 16*
257:*5, 9, 13,*
*14, 17, 18,*
*21*  258:*3*
259:*21*
260:*14*
261:*3, 19*
262:*8, 17*
263:*2, 8, 10,*
*13, 15, 19*
264:*7, 8, 11,*
*12, 15, 18,*
*23*  265:*21*
266:*5, 10*
274:*17*
275:*1*
276:*4*
**DIVISION**
1:*3*  7:*23*
**divvy**
192:*18*
**Document**
4:*16, 17, 18,*
*19*  89:*15*
113:*5*
153:*17*
188:*18*
209:*15*
211:*9*
218:*16, 18*
219:*9, 14,*
*19*  223:*4*

232:*22*
242:*21*
243:*2, 7*
248:*23*
249:*1, 7, 15,*
*17, 23*
250:*8, 9*
253:*5, 10*
254:*7, 10*
259:*14*
**documentati**
**on**  262:*23*

**documented**
222:*8*
223:*12*
263:*7*
**documents**
4:*15*  11:*2,*
*3*  13:*16*
61:*18*
177:*23*
179:*17*
188:*13, 16*
192:*21*
212:*14, 18*
213:*3, 5, 7,*
*8*  233:*3*
241:*20*
248:*15, 17*
250:*1*
256:*22*
263:*22*
274:*4*
**doing**
93:*13, 14,*
*18, 22*
96:*18*
101:*22, 23*
106:*20*
108:*18*
137:*23*

175:*1*
189:*2, 7, 23*
190:*17, 18,*
*21*  192:*8*
193:*5*
194:*9*
202:*5*
212:*12*
214:*9*
244:*18*
251:*10*
269:*4, 15*
271:*20*
272:*8*
**DONELSON**
6:*5*
**Donna**  70:*6*
**Donta**  72:*8*
**door**  75:*20*
**drafted**
90:*10*
249:*8*
**drink**
158:*9*
161:*10*
162:*2*
**drinking**
162:*15*
**drive**
212:*15*
214:*8*
**driven**
247:*12*
259:*7*
**driving**
18:*10*  19:*4,*
*6*
**dual**  27:*3,*
*10, 14*
**Duck**
69:*16, 17*

Video Deposition of Rusty Hughes

1/19/2024

99

due 210:*16*
duly 8:*17*
**Dunston**
116:*2*
141:*16, 18*
142:*3, 4*
143:*1*
156:*20*
201:*23*
207:*19*
duties
18:*20* 45:*7*
93:*19*
117:*19*
134:*13*
181:*7*
186:*22*
187:*1, 4, 7,
15, 17, 23*
188:*7, 8, 10,
22* 189:*12,
16* 191:*22*
192:*9, 13*
193:*16*
194:*3, 19*
223:*18, 23*
244:*15*
247:*23*
251:*1, 10,
15* 252:*2,
14* 268:*4,
11* 269:*4,
14, 18*
271:*21*
272:*6*
duty 56:*20*
57:*3* 58:*11,
19* 144:*8,
14* 149:*3, 7*
195:*2*
201:*2, 6, 10*

203:*20*
251:*8*

**< E >**
E 4:*1* 5:*1*
292:*1*
earlier
9:*12* 44:*22*
112:*16*
121:*13*
150:*16*
196:*19*
228:*3*
263:*22*
271:*19*
early 82:*14*
83:*14, 19*
84:*1, 14*
91:*21*
123:*16*
178:*4*
easy
276:*19*
EEO 51:*2*
EEOC 4:*9*
32:*6* 34:*8,
23* 61:*2, 4*
68:*3, 4*
90:*13*
250:*1, 12*
259:*9*
effect 2:*14*
157:*3*
260:*16*
eight
125:*4*
164:*3, 6, 7*
224:*13*
eighteen
118:*10*
241:*8*

**either**
58:*20*
60:*21* 64:*1,
3* 84:*21*
90:*7* 92:*2*
95:*8* 97:*13*
98:*17*
192:*19*
203:*5*
289:*15*
**Either/or**
154:*11*
elaborate
182:*8*
electronic
53:*21* 55:*7*
61:*12*
electronicall
y 53:*12, 16*
60:*22* 61:*8*
212:*9*
elevated
127:*6*
240:*14*
267:*10*
268:*8, 12,
16* 270:*5*
271:*21*
eleven
19:*20*
30:*12, 13*
**E-mail**
4:*13, 14, 23*
11:*5, 7, 9,
12, 23* 12:*4,
6, 9, 11, 14,
16* 13:*3, 6,
12* 112:*7, 8,
14, 15*
178:*10*
198:*19*
212:*10, 11*

227:*2, 7, 13,
19* 228:*13*
229:*17, 23*
232:*9, 14*
235:*13*
253:*20*
288:*9*
e-mailed
229:*21*
278:*22*
e-mailing
177:*1, 5, 8*
223:*17*
e-mails
177:*11, 14*
178:*14, 18,
19* 179:*3,
11, 22*
198:*23*
199:*3*
225:*6*
230:*10, 19*
empathetic
183:*8*
employed
14:*19* 27:*8*
34:*22*
105:*3*
116:*11*
169:*10*
181:*16*
240:*10*
245:*4, 7*
employee
16:*20, 21,
22, 23*
26:*14, 15*
49:*16, 19*
50:*1, 16*
51:*14* 52:*6,
8, 9* 53:*11*
75:*16*

103:*20*
115:*15*
121:*21*
154:*5*
155:*5*
168:*18*
182:*18*
184:*16*
194:*2*
195:*15*
197:*2*
205:*4*
207:*13*
211:*8*
226:*1*
231:*3*
240:*8*
253:*3*
279:*6*
283:*10*
284:*10*
employees
17:*1* 51:*1,
5, 9, 14*
52:*13, 14,
20* 55:*2*
57:*10, 21*
58:*3* 61:*7*
63:*2* 64:*6*
76:*4* 98:*11,
14, 22* 99:*4*
114:*14*
121:*20*
130:*20*
134:*1*
138:*7*
153:*6*
158:*9*
159:*10*
176:*8*
192:*6*
194:*8, 18*

195:*3, 7*
205:*21, 22*
206:*14*
209:*5*
225:*14*
258:*8*
260:*17*
273:*9, 14*
275:*14*
**employer**
81:*15*

**employment**
17:*4, 12*
51:*15*
82:*10, 14,*
*17* 85:*9*
107:*4*
179:*22*
185:*18*
186:*16*
245:*10, 12*
259:*8*
283:*2*
286:*4*
287:*7*
289:*12, 14*
**employment**
**-related**
17:*16*
**encourage**
144:*12, 17*
145:*4*
**encouraged**
274:*5*
**encouragem**
**ent** 128:*7*
**encouragin**
**g** 99:*11*
**ended**
82:*14, 17*
85:*9*

186:*16*
245:*13*
**endurance**
10:*17*
**engaged**
66:*14*

**engagement**
42:*17*
**engineers**
16:*8*
**ensure**
280:*11*
**enter**
190:*12*
195:*8, 20*
196:*1, 5*
211:*9, 12*
**entered**
195:*17*
217:*5*
**entering**
197:*13*
**enters**
195:*15*

**entertaining**
267:*4*
**entire**
169:*8*
270:*1*
**entirely**
200:*5*
**entry** 195:*7*
**entry-level**
104:*14*
**environmen**
**t** 161:*13*
162:*1, 12,*
*18*

**EPL**
282:*11, 12,*
*22*
**EPLI** 279:*6*
286:*11*
**Equal** 78:*3,*
*10* 80:*19,*
*20* 81:*2*
189:*17, 20*
259:*8*
**equality**
184:*19*
284:*3*
**equally**
57:*22* 58:*4,*
*13, 22* 59:*4,*
*9* 80:*12*
134:*2*
138:*8*
139:*9*
150:*18, 22*
151:*9, 14*
153:*8*
283:*11*
284:*3*
**equals**
258:*4*
**equity**
255:*8*
260:*15*
**Erin** 28:*23*
30:*19*
**err** 284:*22*
**escalate**
150:*6*
152:*15, 19*
153:*19*
155:*22*
156:*9*
**Especially**
16:*17*

**Esq** 5:*5,*
*11, 17* 6:*7*
**established**
241:*14*
262:*14*
**estimate**
84:*11*
**et** 7:*22*
**ethical** 75:*3*
**ethics**
74:*22* 75:*2*
273:*7*
**ethnicities**
80:*13*
**ethnicity**
260:*1*
**evaluation**
98:*18*
**evaluations**
98:*11, 14*
99:*1* 130:*2*
**event**
174:*17*
176:*16*
**everybody**
47:*6*
132:*22*
134:*2, 22*
206:*6*
216:*22*
223:*5*
228:*17*
**everyday**
94:*15*
**evidence**
3:*2* 33:*23*
125:*21*
138:*17*
140:*22*
162:*4*
176:*4, 10*
206:*8*

**exact**
14:*12*
54:*23*
102:*20*
103:*2*
104:*18*
115:*22*
123:*7, 19*
125:*10*
127:*18, 19*
128:*13*
142:*13*
173:*16*
179:*8*
181:*18*
186:*22*
224:*6, 8*
242:*21*
254:*7, 10*
256:*7, 13*
265:*17*
**exactly**
22:*8* 31:*5*
43:*18*
84:*23*
101:*22*
116:*8*
119:*15*
127:*5*
159:*22*
174:*11*
178:*3*
182:*12*
217:*8*
221:*6*
232:*8*
256:*15*
264:*17*
**EXAMINATI**
**ON** 4:*2*
7:*9* 9:*7*

Video Deposition of Rusty Hughes

1/19/2024

101

examined
8:18
example
173:5
176:1
199:14
201:20
examples
57:14
281:11, 12
283:4, 9
Excel
211:16
249:4
excellence
75:1
exchange
235:14
excluded
171:22
172:8, 16,
23  176:15
177:3
excuse
74:22
110:3
191:20
executive
28:12  29:8,
20  30:1
68:16, 18
73:5, 12
77:8  83:10,
12  84:22
85:21  86:1,
13, 17
94:22
97:17
102:19
104:4
106:10
107:3, 9

108:7
109:6, 21
110:1, 4, 8
116:4, 21
117:17, 23
118:4, 6
119:21
120:4, 12
121:3
126:8
142:5, 8
164:13, 18,
20  165:19
167:4, 8, 9,
11, 18
168:1, 12,
20  169:1, 2,
7  186:11,
15  187:6,
22  188:8,
10, 15, 20,
21  189:11,
16  190:3, 4
191:3, 6, 8,
10, 20, 21,
22  192:8,
23  195:23
196:4
198:14
199:16
200:8
203:1
223:18, 23
237:21
238:10
241:12
243:8
267:22
268:4, 12
269:4, 16
270:10

271:5, 14,
21  272:8
executives
20:8  84:17
91:19, 22
95:8, 10
97:11
132:23
175:18
190:9
192:7
200:10
201:16
202:5, 14
206:15
236:17
238:2
270:3
exempt
190:9, 14,
17, 23
194:2, 18
195:3
271:2
EXHIBIT
4:7, 8  34:7,
9  54:8, 11
60:13, 17
89:20, 21
196:14
199:6, 15
206:17
215:9
216:15
227:1, 4
235:8, 10
241:16, 17
242:9
243:14
247:13, 17
248:19, 22
249:11, 12

250:3, 7
253:12, 15
255:20, 21
272:20, 22
288:5, 6
exist  37:15,
16  38:17
existed
94:7
existing
198:17
267:9
exists  59:3
219:19
expect
64:6  146:7
205:16
211:5
expectation
205:10
expectation
s  205:5
expenses
234:1
experience
72:9  82:4
189:6
expert
28:8
194:12, 13
expertise
287:8
Expires
292:21, 22
Explain
17:7  28:9
exponentiall
y  221:18
express
98:3
107:12

115:19
128:17
expressed
101:1
112:1
118:21
120:20
121:5
156:8
expressing
96:14
127:1
extent
46:13
external
254:15
extremely
101:22
108:18
eyes
206:21

< F >
F  292:1
face-to-face
42:15
fact  135:8
173:18, 19
174:4, 7, 13
261:3
factor
272:16
factors
236:23
237:5
facts  33:23
125:21
138:16
162:4
176:4, 10
206:8
226:5

Video Deposition of Rusty Hughes

1/19/2024
102

fair 93:*16*
134:*2*
138:*22*
139:*1*
149:*20*
193:*18*
256:*16*
fairly
81:*17, 22*
139:*9*
148:*17*
153:*8*
fall 30:*16*
familiar
60:*23*
69:*18* 79:*9*
119:*23*
161:*20*
256:*6, 19*
287:*3, 7, 11*
Famous
252:*21*
far 33:*9*
45:*13*
46:*18* 47:*9,
20* 49:*18*
85:*5*
162:*15*
178:*22*
179:*2*
209:*13*
210:*9, 23*
213:*17*
230:*10*
239:*18*
FARAHANY
5:*16*
Farms
173:*7*
faster
287:*15*

fastest
16:*15*
Federal
7:*3* 77:*22*
feel 152:*10*
felt 144:*18*
145:*5, 11*
150:*21*
152:*12*
155:*19*
157:*7*
170:*4*
171:*7*
female
28:*22*
69:*19*
70:*10*
83:*13* 95:*9*
121:*10, 16*
132:*23*
150:*11*
169:*12, 14,
16, 21*
204:*5*
240:*8*
260:*13*
females
28:*18*
fewer 167:*1*
field 243:*17*
fifty
201:*21*
220:*22*
221:*2, 8*
237:*19*
258:*14, 19,
20, 21, 22*
260:*17*
fifty-nine
202:*2*
figure
144:*19*

file 213:*9*
227:*23*
228:*12, 16*
229:*5, 19*
231:*10*
232:*11*
269:*10*
filed 32:*5*
34:*16, 18*
63:*4, 18*
284:*20*
files 86:*2*
269:*15*
filing 3:*4*
fill 98:*13*
107:*6*
130:*1*
filled
198:*15*
filling
98:*17*
final 49:*23*
finance
72:*19*
FINANCIAL
1:*10* 28:*3*
63:*1* 72:*18*
165:*20*
Finch
29:*22*
30:*21*
find 47:*16*
89:*15*
202:*12*
204:*7*
217:*13*
243:*6*
281:*12*
finding
173:*18*
Fine 10:*20*
28:*10*

84:*12*
191:*17*
finish 42:*8*
194:*21*
Firm 2:*7*
5:*10* 7:*6*
first 8:*17*
9:*18* 60:*20*
74:*23*
90:*14*
93:*12, 21*
112:*12*
163:*16*
194:*11*
249:*17*
250:*9*
255:*15*
264:*5*
fit 103:*17,
18* 129:*10*
233:*22*
247:*11*
five 14:*18*
30:*4, 20*
83:*21* 99:*8*
115:*7, 13*
199:*17, 21*
201:*18, 19*
202:*23*
flip 68:*19*
69:*7* 71:*10*
80:*18*
242:*14*
focused
42:*5*
folder
212:*3, 8, 21*
213:*2, 6*
folders
178:*19*
folks
165:*19*

167:*4, 13,
15* 168:*9*
175:*13*
284:*7*
follow
266:*9*
280:*8*
followed
280:*7*
following
7:*10* 68:*15*
277:*3*
follows
8:*18*
264:*10*
278:*2*
follow-ups
107:*7*
278:*11, 15*
force 2:*14*
foregoing
7:*4* 292:*7,
10*
forget
178:*21*
form 2:*21*
12:*1* 17:*6,
8, 18, 23*
21:*9* 24:*5*
27:*19*
31:*19* 32:*2,
11, 18* 33:*1,
3, 14, 22*
36:*11, 15*
38:*3, 6, 14*
39:*4, 12, 23*
40:*11, 20*
41:*10, 14,
23* 42:*21*
43:*7, 16*
44:*8* 45:*9,
21* 46:*8*

Video Deposition of Rusty Hughes

47:14, 21
48:7, 12, 20
49:9, 14
50:18, 21
51:6, 19
52:7, 23
55:6, 12, 16
56:5, 14, 18,
23  57:7, 11,
17, 23  58:8,
14, 23
59:10
60:22  61:9,
15  62:22
63:6, 11, 15,
20  64:4, 13,
19  65:3, 19,
23  66:6, 20
67:12, 18,
23  68:10
69:5, 13, 20
70:4, 11
71:8, 15, 22
72:6, 11, 23
73:7, 13, 18
74:6, 17
75:7, 17, 23
76:5, 18
77:5, 21, 23
78:6, 13, 21
79:2  81:4,
23  85:19
88:13, 20
89:1, 12
90:9  91:2,
16, 23
92:23  93:5
94:1, 11, 19
95:12, 19
96:2, 16, 22
97:3, 7, 12,
19, 23  98:8,

18  99:9, 17,
22  100:7,
11  101:18
102:3, 8, 17
103:9
104:16
105:12, 15,
18  107:20
108:2, 16
109:14
110:19, 23
111:4
112:6, 11,
19  113:10,
12, 20, 23
115:18
116:13, 17
117:2, 21
118:22
119:7
121:12, 22
125:20
126:6, 9, 21
127:13
130:16, 23
131:2, 13
132:1, 7
133:4, 20
134:4, 10,
18  135:2,
13, 19, 22
136:3, 19
137:3
138:15
139:12, 23
141:20
143:5, 22
144:4, 10,
16  145:3, 9,
19  146:5
147:9, 13
148:9, 22

149:8, 17
150:3, 14,
23  152:20
153:1, 10,
16  155:8,
17  156:14
157:4, 13,
19, 23
158:12, 16
161:5, 14
162:3, 13,
20  163:7
165:1
166:15
170:7, 14
171:9, 12,
17, 20
172:4, 12
173:22
174:5, 15,
21  176:3, 9,
18, 22
177:4, 15
178:2, 16
179:4, 7, 20,
23  180:13,
18  181:2
182:20
183:17
184:5, 9, 14
185:2, 11,
15, 21
186:20
187:2, 9
188:11
189:13, 19
190:1, 11,
16, 19
191:2, 9, 23
192:10
193:21
195:4

196:2
197:16
198:2, 3, 5,
14, 18
200:11, 16,
23  201:5
202:7
203:3, 8, 16,
18  204:1
205:2, 11,
23  206:7,
19, 23
207:2, 9
208:1, 6, 18,
23  209:9
210:3, 14
211:11, 16,
18  212:5,
22  214:11,
17, 20
215:11, 16
216:1, 17
217:1, 7
222:9
223:7, 20
224:1, 20
225:8, 12,
19  226:3, 9
228:5, 10
229:10, 20
230:3, 13,
23  231:11,
19  232:6,
12, 20
233:14
234:10, 16,
19, 22
235:4
236:1, 19
238:6, 11
239:1, 8
240:15

243:1
246:9, 12,
16  248:2
249:5, 21
250:17
251:3, 13
252:4, 15
255:10
256:18
257:11, 15,
20  258:10
259:17
260:8, 21
261:5, 8, 10,
14, 23
262:4, 10
263:3, 9, 20
265:1, 9, 16,
23  266:7
268:6
271:1, 17
273:16, 21
274:8, 11,
19  275:4,
19  276:5,
15, 21
278:8
279:1, 8, 12,
20  280:3,
13, 18
281:9, 16
282:21
283:6, 14
284:1, 5, 15
285:2, 6, 13,
18, 23
286:3, 10,
14, 19
287:2, 4, 6
289:7
290:15, 23

Video Deposition of Rusty Hughes

1/19/2024

104

formal
111:21
156:1, 2, 3,
7
formally
152:9
195:6, 9
Forman
5:11
format
235:6
249:3
formation
112:12
formed
14:12
forming
21:21
forms  18:4
198:9
formula
217:22, 23
218:2, 7, 9
238:21
239:5, 15
forth
263:23
fortunate
73:22
131:18
forty
221:16
forty-six
201:21
forward
165:21
founded
170:1
founders
65:2, 5, 12,
17, 21
66:14  68:6

four  14:18
30:4
220:11, 16,
17, 19, 21
221:13, 16
237:18, 19
271:8, 9
fourteen
91:18, 19
Fourth
22:14
61:22
frankly
93:15
frequently
171:1
Friday  7:15
fridge
159:20
front  54:17
61:23  62:6
220:20
222:7
full  2:15
9:9  205:17
fully
128:19
129:9, 11
195:11
function
42:18
51:12
165:14
functions
28:6  40:18,
23  270:10
FURTHER
2:11, 18
3:3  80:6
288:21
291:12

292:13
future  99:6

< G >
gain  134:16
Gary  122:8,
9  123:13
gauge
221:15
gears
140:20
gender
17:14
32:12  58:9
80:10, 13
143:3, 7, 20
152:14
155:13
163:5, 8
180:22
184:19
259:12, 13,
15, 23
260:5, 6, 10,
12  261:3,
22  263:2, 8,
10  283:8,
11  284:4
general
11:15  12:4
16:1  71:3
77:7  79:3,
10, 11  80:3,
5  102:6, 7
113:7
128:6
129:8, 16
160:1, 2
281:19
Generally
82:2, 3
206:2

267:18
289:19, 23
generate
39:17
251:6
generating
166:5
251:16
generation
41:19
gentleman
19:15
geographic
260:2
George
124:10
getting
93:21
132:12
139:3
151:10
197:2
208:22
252:18, 22
gifts  159:3
Gill  5:17
8:8
give  40:10
45:15
82:20  84:2
94:10
175:8
202:23
213:14
215:7
283:4
given  9:16
33:12
48:15
65:13
76:20
94:12, 13

95:5
139:20
159:2
177:21
208:16
250:1, 11
292:12
gives
39:21
205:17
giving
268:4
glad
129:11
156:23
go  10:4, 8
15:6  22:5,
23  28:1
34:4  38:18
40:15  42:8
47:23  50:1
51:21
52:18, 20
53:14, 18
54:10, 14
55:3  59:20
64:11
74:12  80:6
82:15  90:1
91:2  92:18
93:7  95:16
98:23  99:5
100:5
105:6
110:21
112:17
115:22
128:1
133:1, 19
136:6
155:1
159:16

Video Deposition of Rusty Hughes

1/19/2024
105

160:*21*
161:*2*
166:*6*
183:*9*
185:*8*
193:*9*
198:*3, 7*
200:*9*
203:*1*
207:*17, 19*
208:*15*
213:*5, 17*
219:*16*
220:*17*
221:*21*
227:*23*
228:*1*
230:*10*
237:*5*
256:*1*
264:*10*
266:*9*
270:*20*
271:*4*
287:*14*
288:*12, 21*
**goal** 42:*5*
99:*15*
263:*19, 21,
23*
**goals**
98:*19, 20*
99:*6, 13*
100:*5*
263:*15*
**goes**
111:*22*
178:*22*
198:*13*
204:*5*
**going** 8:*23*
22:*9, 21, 23*

28:*17* 33:*8*
34:*6* 44:*6*
47:*13* 49:*3*
50:*8, 16*
54:*7* 60:*13*
66:*11, 12*
86:*23*
89:*20* 94:*9*
124:*6*
130:*20*
131:*22*
138:*3, 9*
139:*2*
140:*20*
156:*16*
162:*8*
176:*17*
181:*16*
188:*2*
197:*20*
202:*23*
204:*23*
210:*11*
214:*4, 23*
215:*2*
222:*2*
227:*1*
234:*14*
235:*7*
241:*15*
248:*15*
253:*9, 16*
269:*19*
270:*16*
278:*10*
288:*11, 21*
**golf** 173:*7*
**good** 19:*3*
97:*5* 98:*7*
100:*13*
106:*14, 20*
107:*18*

108:*14, 19*
109:*12*
115:*13*
126:*8*
128:*18, 21*
129:*18, 22*
133:*1*
171:*3*
252:*23*
291:*5*
**Goodrich**
70:*6*
**Googling**
80:*16*
**Gordon**
69:*23* 70:*1*
**Gotcha**
114:*21*
259:*1*
287:*10*
**gotten**
174:*3*
180:*11*
191:*15*
226:*5*
**Gould**
159:*15*
160:*17*
**governance**
71:*4*
**granted**
185:*5*
**great** 74:*1*
**Greene**
186:*1, 4, 5*
**ground**
10:*5*
**grounded**
75:*1*
**grounds**
2:*23*

**group**
168:*9*
244:*9*
262:*12, 14,
20*
**groups**
67:*20*
**grow** 19:*9*
187:*8*
**growing**
16:*16*
244:*19*
**grown** 84:*5*
**growth**
165:*21*
**guard**
182:*22*
**guess** 22:*9*
77:*6* 90:*19*
91:*12*
118:*13*
122:*11*
135:*14*
140:*6*
142:*14*
154:*1*
156:*6*
165:*4*
174:*10*
193:*18*
204:*11, 14,
16* 242:*2*
**guessing**
112:*5*
117:*9*
118:*10*
125:*4*
126:*17*
164:*3*
165:*2*
190:*5*

245:*12*
258:*14, 16*

**guesstimate**
110:*16*
241:*9*
245:*13*
**guideline**
115:*14*
**guys** 133:*2*
176:*17*

**< H >**
**half** 21:*3*
170:*21*
220:*23*
221:*10, 11,
13, 14*
237:*20*
271:*7*
**halfway**
110:*6*
**hand**
135:*17*
**Handbook**
4:*11* 51:*17*
52:*6, 8, 9,
10, 13, 14,
15, 21*
53:*11*
60:*15* 61:*3,
7, 13* 64:*11,
16* 67:*16,
17* 68:*2, 7*
73:*11, 22*
75:*13*
78:*18*
79:*19* 80:*2*
81:*8*
138:*10*
146:*9*
153:*12, 14*

154:*3*, *9*
155:*4*, *14*
184:*10*
187:*12*
**handbooks**
61:*6*
**handled**
35:*11*
134:*7*, *14*
195:*5*, *6*
**handles**
28:*5*  38:*20*
188:*22*
**handling**
43:*5*  94:*2*
237:2, *4*

**handpicking**
135:*17*
**hands**
290:*7*
**handwriting**
168:*7*
**Hang**  11:*17*
**happen**
141:*6*
142:*1*
158:*15*
175:*3*
176:*21*
246:*10*
279:*4*
**happened**
51:*16*  52:*5*
62:*16*
143:*14*
156:*18*
158:*17, 20*
173:*17*
242:*3*
246:*6*

**happening**
76:*10*  77:*4*
**happens**
135:*23*
178:*13*
213:*20*
**happy**
101:*22*
108:*18*
**harassment**
17:*13*  51:*3*
53:*3*  55:*4*
75:*21*  76:*9*,
*16*  77:*3, 12*,
*19*  146:*4*,
*17*  147:*7*
148:*18, 20*
283:*9*
**hard**  20:*7*
212:*15*
214:*8*
216:*19, 22*
217:*2*
218:*18*
**hats**  18:*8*
**Hayes**
245:*2*
246:*4*
250:*10, 14*
252:*2*
**head**  10:*7*
196:*23*
244:*2*
272:*14*
**headings**
90:*16*
**heads**
44:*19*
240:*22*
**healthcare**
16:*9*  287:*9*

**hear**  63:*19*
111:*6*
161:*13*
162:*11, 17*
223:*15*
**heard**
79:*17*
151:*13*
152:*12*
161:*11, 16*,
*23*  162:*14*
165:*9, 10*
192:*18*
244:*23*
256:*20*
268:*10*
**held**  89:*18*
199:*13*
268:*9*
271:*16*
289:*22*
**help**  19:*8*
40:*2*  85:*8*
99:*12*
105:*10, 16*
226:*14, 20*
262:*15*
268:*19*
269:*14*
**helpful**
45:*6*
105:*22*
**helps**  39:*10*
**Helveston**
13:*23*
25:*22*
180:*21, 23*
181:*5, 9*
183:*11, 20*
185:*17*
216:*18*

**HENDRIX**
1:*7*  6:*13*
7:*21*  8:*5, 7*,
*9*  9:*14*
11:*10*
32:*15*
35:*12*  82:*5*
126:*1*
141:*2*
156:*16, 19*
157:*6*
178:*1*
214:*16*
215:*23*
230:*12*
278:*5*
280:*17*
290:*9*
**Hendrix's**
32:*5, 9*
33:*19*  34:*8*,
*23*  35:*7, 15*
61:*2*  82:*17*
288:*15*
289:*5*
**Henson**
70:*14, 16*
**hereto**
34:*11*
54:*13*
60:*19*
89:*23*
227:*6*
235:*12*
241:*19*
247:*19*
248:*21*
249:*14*
250:*5*
253:*14*
255:*23*

273:*1*
288:*8*
**heritage**
73:*17, 23*
74:*3*
**Hey**  40:*8*
44:*5*  100:*9*
111:*18*
126:*3*
130:*20*
133:*2*
134:*23*
144:*22*
153:*6*
176:*14*
182:*19*
183:*21*
208:*16*
263:*18*
**high**  75:*3*
**higher**
208:*16*
275:*18*
**hire**  20:*9*
31:*18, 23*
47:*10, 13*
48:*11, 15*
82:*3*  110:*7*
113:*8*
117:*22*
119:*9*
186:*5, 7*
189:*8*
198:*3*
209:*18*
216:*8, 10*,
*12*  228:*20*
231:*3*
241:*21, 22*
242:*4, 10*,
*13*  243:*1,*

11, 12
268:18
**hired**
30:15
46:20
86:16
123:7
164:14, 16
186:13
197:18
201:17, 18,
22   243:4
245:20
246:4, 14,
18   247:22
271:13
**hires** 45:8
112:17
113:1
131:16
265:8
**hiring**
45:19   46:1,
7, 9, 18
47:22   49:8,
13   123:5
134:12
242:19
264:9, 11
265:5, 7, 13,
14, 22
266:11
267:1, 17
**history**
15:6   64:12,
18   65:1, 9
66:5   67:10,
16, 21   68:5
**Hmph**
125:8

**Hodge**
29:10
30:15
**hold** 59:23
162:5
177:23
230:20
**Holdings**
28:16
167:20, 22
**home**
186:12
**honesty**
64:2
**hope**
134:16
203:19
207:10
**hopefully**
22:1
135:10
138:3
**hour** 140:6
193:19
**hourly**
197:15
**hours**
139:3
158:10
**Houston**
26:10
**Howard**
28:13
**HR** 28:6
35:10, 11
46:5   50:19
51:13, 22
53:10   57:1,
8, 12   59:13
144:12, 15
145:5
146:7

149:7
150:2
152:19
155:22
240:14
255:12
**huge**
16:13
91:21
**HUGHES**
1:16   2:5
7:8, 20
8:16   9:11
288:19
**huh-uh**
10:8   225:1
**human**
35:5, 6
36:3, 8, 9,
13   145:13,
21   147:12,
23   148:6
149:4
150:6
152:15
153:20
156:11
264:12, 22
283:17
**hundred**
184:11
220:12, 16,
17, 19, 21,
22   236:14
237:18, 19
243:7
250:18, 21
258:19, 20,
21, 22
260:17

**hypothetical**
151:2

**< I >**
**I** 2:1   4:1
7:1   8:4
9:12, 21, 23
10:9, 17
11:17
12:10, 12,
13, 15, 17
13:4, 7, 13,
18, 22   14:2,
4, 11, 15, 17,
21   15:1, 9,
12   16:17
17:19
18:15
19:12, 14
20:5   21:11
22:9, 14, 22
24:22
25:18   26:3
27:5   28:4,
9   30:18
31:2, 4, 12,
20, 23   32:3,
7, 8, 12
33:6   34:1,
3, 14, 19
35:9, 13, 15,
16, 19, 22
36:16
37:20   40:8
42:4   43:13,
21   44:9
45:10, 11,
16, 17
46:12   47:4,
15, 22
48:21   49:1,

10   51:1, 8,
20   53:1, 10
54:16   55:7
56:6   57:1,
8, 12   58:1
59:1, 2, 18,
22   61:12,
16   62:13,
15, 16   63:3,
22   64:14,
20, 21, 22
65:4, 8, 18
66:1, 7, 8, 9,
19   67:13,
19, 22
68:12
69:11   70:2,
9, 17, 19, 21
71:6, 13, 20
72:4, 15, 21
73:9, 14, 20
74:7, 10, 19
76:1, 22
77:5, 6, 9,
10, 17   78:8,
22   79:13,
16, 18
80:14   82:3,
11, 22   83:6,
21   84:2, 3,
11, 22
85:10, 12,
14, 15, 20,
21   86:14,
16, 18
87:23
88:10, 17,
21   89:2, 15
90:12, 18,
19   91:1, 4,
8, 9, 18
92:8   93:1

94:23
95:13  96:3, 4, 8, 9, 11, 12  98:9, 12, 15  100:8, 12, 16, 20
102:1, 4, 12
103:10, 14
104:5, 18, 20  105:8, 20  106:9, 16, 19
107:21
108:1, 11, 17, 22
109:1, 22
110:13
111:6, 21, 22  112:3, 7, 9, 12, 13, 14
113:13
115:11, 12, 13, 21
116:8, 15, 18, 19
117:3, 11, 12, 18
118:1
119:7, 15
120:6
122:5, 10, 21  123:5, 6, 10, 13, 22
124:20
125:10, 22
126:3, 7, 15, 22  127:3, 4, 7, 10, 11, 14, 18, 20
128:2, 6, 7, 13, 19
129:2, 8, 9,

10, 16, 21
130:3, 11, 17, 19
131:4, 5, 7, 8, 10
132:22
133:16
134:16
135:7, 14, 15, 23
136:4, 14
137:4, 18
138:18, 20, 21, 23
140:6, 21
141:4, 7, 13, 21  142:1, 2, 13, 17
143:6, 15, 16, 17
144:12, 17, 22  145:4, 12, 20
146:7, 13, 19  147:3
148:2
149:2, 10, 11, 18
150:1, 5, 7, 8  151:4, 6
152:5, 11, 12, 15
153:1, 4, 19
154:1, 2, 22
155:4, 19, 20, 22
156:4, 5, 6, 8, 15  157:5
158:1, 4, 22
159:9, 17, 21  160:8, 12, 13, 23

161:6, 8, 19
162:6, 21
163:2, 20
164:13, 17, 21  165:11, 12  167:17, 19  168:6, 11, 12
170:2, 8
172:5, 14, 18, 23
173:14, 15, 16, 18, 19, 20, 23
174:1, 6, 10, 11, 22
175:1, 4, 19
176:12, 15, 19, 23
177:5, 8, 12, 16, 17, 18, 20  178:4, 6, 17, 18, 19, 20, 21, 22
179:8, 9, 10, 11  180:2, 8, 14  181:9, 18  182:4, 11, 12, 13, 15, 17, 21, 22, 23
183:1, 2, 3, 4, 5, 12
184:20
185:4, 6, 12, 16, 23
186:3, 4, 15, 21, 22
187:3, 4, 16, 18, 19, 21
188:18, 19, 22  189:3, 6,

8, 14, 20, 22
190:3, 20, 21  191:15, 20  192:3, 11, 15
193:6, 7, 8, 14, 18
194:20
195:9, 10
196:3, 15, 20  197:3, 5, 7  199:2, 19, 22, 23
200:3
201:1, 6, 10
202:9
203:9, 19, 20  204:2, 4, 11, 12
206:1, 9
207:10, 20
208:7, 19
209:8, 10
210:15, 16, 19  211:2, 3, 20  212:6, 23  213:22
214:3, 7, 12, 13, 21
215:14, 17
217:11, 12, 19  218:4, 15, 16, 18, 20  219:18
220:6, 7, 19, 22  221:12, 15, 19
222:2, 3, 7, 10, 11
223:3, 8, 10
224:2, 6, 7, 8  225:9, 13,

18  226:4, 5, 6, 16, 21
227:8
228:11, 14, 19  229:11, 21  230:7, 10, 14, 17, 20  231:1, 5, 6, 20, 21, 22
232:1, 7, 13, 15, 22
233:6, 16
234:11, 20
235:13
236:6, 11, 12, 13, 20, 21  237:6, 8
238:9
240:18
241:8, 12
242:2, 22
243:9, 22
244:10, 12
245:3, 11, 13, 21, 22
246:5, 8, 11, 13, 17
247:5, 8, 15
248:4, 7
249:9
250:18, 20
251:5, 14, 15  252:6, 7, 8, 9, 11, 21
253:2, 8, 10
254:9, 13, 14, 23
255:17
256:6, 9, 13, 14, 20, 21
257:12, 16
258:11, 13,

15  259:13,
18  261:4, 7,
16, 17
262:6, 21
263:11, 12,
21, 22
264:4, 17
265:2, 17
266:16, 22
267:4, 18
268:7
269:20, 22
270:6
271:5, 18,
22  273:22
274:2, 3, 9,
13, 14, 20
275:5, 6, 7,
9, 13  276:2,
23  278:9,
14, 16, 17
279:2, 5, 9,
10  280:19,
23  282:4, 5,
6, 12, 16
283:11, 15
284:9, 17
285:19
287:13
289:1, 2, 9,
16, 17
290:3, 5, 10,
16, 19
291:3
292:1, 6, 13,
15
**idea**  69:11
71:6  90:12
96:3  249:9
**identificatio
n**  34:10
54:12

60:18
89:22
227:5
235:11
241:18
247:18
248:20
249:13
250:4
253:13
255:22
260:1, 7, 11,
12  272:23
288:7
**identifies**
276:1
**identify**
8:2  38:15
40:2, 13, 15
213:10
260:13
**identities**
260:3
**illegal**
77:20
276:11, 14,
18
**imagine**
185:12
231:1
**imagining**
236:12

**immediately**
75:14
**implicit**
256:17
**important**
10:5  64:2
200:14, 22
236:15, 21
237:9

266:6, 8, 11,
14, 20, 23
284:22
**improper**
264:8
**incident**
171:14
280:8
**Incidents**
146:17
281:11
**include**
42:3  74:16
91:15
198:5
259:2
264:8
**included**
30:13
73:12
255:11
259:16
**Including**
19:20
146:7
204:3
205:6
**inclusion**
255:8
257:6
260:15
**inclusive**
66:13
257:22
**incorrect**
124:16
250:14, 16
**incremental**
221:15

**independent**

233:20
**INDEX**  4:7
**indicate**
119:10
135:20
150:19, 20
152:23
153:4
154:7
155:6
171:7
225:15
274:16, 23
**indicated**
95:10, 17
101:21
102:13
**indicates**
145:16
243:13
**indicating**
110:5
196:18
**indirectly**
234:21
**individual**
19:16
39:13  41:1
81:10
95:14
166:8
192:17
203:11
213:11
233:20
237:7, 11
239:22
270:17
272:16, 18
274:14

**individuals**
12:8  24:11
40:4
**individual's**
159:6
**industry**
74:1
114:23
115:2
116:19
142:18
200:18
**inequality**
180:22
**inference**
272:2
**informally**
99:10
**information**
69:16
119:13
121:19, 20
122:1
123:22, 23
124:19
209:15, 17
210:2, 5, 8
216:7, 11,
14  232:18
234:6, 12
237:12
285:20
**initial**
199:23
**initiative**
43:10
**input**
199:9, 18
**inside**  20:9
29:12, 16
36:22, 23
37:1, 10, 21

38:*9, 12, 17*
84:*19, 22*
85:*11, 16,*
*17, 22*  86:*3,*
*9, 11, 13, 18,*
*19, 22*  92:*7,*
*8*  102:*16,*
*19*  103:*4, 7,*
*12*  104:*1, 3,*
*6, 8, 9*
109:*22*
110:*2, 10*
118:*7, 8, 20*
119:*2, 6, 16*
127:*17, 23*
129:*1, 5, 14*
130:*8*
136:*2*
139:*20*
163:*23*
166:*4*
180:*8*
187:*13, 22*
188:*1, 22*
189:*16*
190:*14*
193:*10*
223:*19*
238:*20*
239:*6, 12,*
*15, 19*
241:*5*
243:*4, 8, 10,*
*13, 17*
244:*6, 7, 12,*
*16, 18*
245:*18, 20*
246:*15*
247:*23*
250:*12, 20*
251:*2, 10,*
*17*  252:*1, 2,*

*7, 14, 16*
265:*18*
267:*22*
268:*5, 9, 13*
269:*5*
270:*3, 4, 5,*
*11, 14, 20,*
*22*  271:*22*
272:*5*
**Insights**
256:*8*
**instance**
180:*7*
265:*18*
**instances**
39:*16*
135:*4*
175:*17, 18*
202:*12*
269:*9*
270:*2*
**instantly**
189:*8*
**institution**
63:*1*
**instruct**
174:*18, 22*
**instructed**
172:*10*

**INSURANCE**
1:*10*  7:*21*
8:*11*  16:*3,*
*4, 9*  17:*3*
28:*16*
111:*2*
113:*2, 16*
114:*23*
115:*2, 6, 12*
167:*20, 22*
168:*19*
200:*1*

253:*22*
254:*1, 6*
264:*19*
281:*1*
282:*4*
**intent**
265:*17*
**interaction**
106:*17*
**interest**
95:*17*
96:*14*  98:*3*
101:*1, 14*
107:*12*
112:*2*
115:*20*
118:*21*
120:*20*
121:*6*
127:*2*
**interested**
111:*23*
130:*22*
132:*21*
133:*3*
135:*1, 12*
292:*16*
**interests**
262:*15*
**internal**
131:*19*
136:*16*
139:*16*
254:*8, 14*
265:*6*
267:*6, 7*
**internally**
131:*14*
134:*20*
266:*1*
280:*1*

**Internet**
99:*3*
**interpret**
80:*2*
266:*13*
**interrupt**
45:*17*
222:*2*
**intervene**
77:*13*
**Interview**
46:*2, 15, 19*
245:*19*
267:*12*
**interviewed**
132:*11, 18*
136:*18*
137:*2*
252:*11*
**interviewee**
s  267:*4*

**Interviewing**
46:*11*
266:*5, 6, 11,*
*14, 19*
267:*14*
**interviews**
267:*1*
**intimately**
290:*5*
**intranet**
53:*9*
**introduce**
40:*18*
**introduced**
9:*12*

**introduction**
46:*2*  74:*9*

**introduction
s** 40:*21*
42:*3*
**investigate**
77:*4*  146:*3,*
*8*  148:*17*
150:*2*

**investigated**
144:*9*
145:*17*
148:*21*
**investigatio
n** 157:*11,*
*14, 17*
**Investigatio
ns** 148:*16*
**invite**
166:*11, 14,*
*18*  175:*8,*
*15*  176:*7*
**invited**
171:*16*
172:*8*
173:*12, 18*
174:*4, 7, 13*
**invitee**
167:*7*
175:*9, 20*
**invitees**
166:*3, 8*
**invites**
166:*11, 22*
167:*1*
**inviting**
175:*13*
176:*1*
**involve**
149:*11*
206:*10*
**involved**
43:*8*  45:*19*

Video Deposition of Rusty Hughes

1/19/2024

46:*3, 9, 22*
50:*7, 10, 16*
98:*10*
123:*5*
165:*19, 20*
175:*9*
238:*17*
281:*2*
290:*6*

**involvement**
45:*23*  46:*6*
49:*17*
195:*13*
**involving**
282:*23*
**issue**
172:*3*
174:*19*
207:*14*
208:*21*
224:*18*
240:*7*
274:*16*
283:*11*
284:*4*
**issued**
64:*16*
66:*10*
**issues**
63:*9*  86:*2*
181:*6*
184:*19*
188:*6*
225:*6*
226:*8*
247:*3*
278:*18, 20*
290:*13*
**It'll**  61:*23*
**its**  74:*14*

75:*3*

**< J >**
**J**  71:*2*
**James**
24:*16*  25:*2*
44:*21*
106:*16*
142:*4, 6*
**JANUARY**
1:*19*  2:*9*
7:*15*
**JEFFERSO
N**  292:*4*
**Jessica**
169:*2*
**Jim**  69:*23*
**job**  27:*3*
93:*22*  95:*2,
18*  102:*15*
105:*10*
106:*20*
116:*18*
119:*3*
122:*18*
128:*1*
129:*14*
130:*9*
131:*21, 22*
132:*11, 12*
133:*2*
134:*15, 17,
21, 23*
137:*2*
139:*18*
164:*8, 17*
180:*11*
181:*6*
186:*10, 22*
187:*1, 23*
201:*9, 23*
202:*5*

223:*21*
224:*5*
236:*8, 9, 13,
16*  237:*8*
244:*14*
250:*14*
**jobs**  135:*4*
**John**  11:*8*
23:*13, 15*
24:*8*  25:*4*
28:*13*
47:*23*
48:*10*  89:*7*
198:*3*
210:*19*
216:*5*
227:*13*
230:*1*
235:*14*
252:*12*
288:*10, 17*
289:*5, 13*
**Johnson**
71:*3, 5*
**joint**  88:*10*
**Jonathan**
136:*1*
242:*10, 13,
15*  243:*4*
250:*12*
**Jr**  71:*3*
**judge**
288:*22*
**July**  227:*19*
**June**
180:*21*

**< K >**
**Karissa**
83:*6, 11*
**Kat**  6:*13*
9:*14*  11:*10*

35:*12, 21*
82:*5, 13*
83:*1*  85:*8*
87:*3*
110:*18*
125:*18*
126:*1, 3, 5,
8, 14, 20*
127:*1, 15,
22*  128:*5,
18, 20*
129:*4, 14*
130:*2, 7*
141:*2, 8, 11*
156:*19, 21*
157:*2, 6, 22*
159:*18*
160:*6, 14,
18*  162:*22*
163:*3*
171:*15*
172:*2, 7, 18*
173:*11*
174:*3, 12,
19*  176:*14*
177:*1, 11,
14*  178:*1*
179:*17, 18,
22*  180:*4,
20*  181:*1, 6,
11, 16*
182:*15, 19*
183:*10, 15,
22*  184:*18*
185:*20*
188:*5, 14*
214:*16*
215:*23*
230:*12*
235:*23*
246:*2*
278:*5*

280:*17*
288:*15*
289:*5*
290:*9, 12*
**KATHRYN**
1:*7*  8:*5, 7,
9*
**Kathryn's**
157:*15*
**Kathy**
84:*19*  85:*1,
7*  86:*9, 15*
95:*17, 23*
100:*4*
101:*10*
**Kathy's**
85:*11*
**Kat's**
82:*10*  85:*9*
185:*18*
186:*16*
187:*1*
289:*13*
**keep**  76:*3*
81:*9*  158:*5*
179:*3*
192:*21*
200:*12, 14*
203:*14*
207:*7*
212:*3*
222:*1*
239:*4*
**keeping**
200:*17, 20*
**Kelly**  62:*6,
7, 12*  68:*20*
**kept**
158:*22*
214:*4*
216:*9*
227:*15*

Video Deposition of Rusty Hughes

1/19/2024

112

228:4
249:2
**Kessler**
26:18
28:10
167:14
168:3
**kind**  9:20
10:4  15:5
18:9  40:18
41:4, 7
42:20  45:4
47:7  53:14
74:13
75:21
82:14
85:20, 21
93:1, 20
110:6
112:17
119:13
132:21
149:2
159:19
165:16, 17,
21  181:10
216:20
233:10
240:6
248:17
273:9, 18
278:10, 14,
19
**King**  62:6,
7, 12  64:23
66:9  68:20
69:3
**knew**
148:19
182:21
209:3

**know**  9:21
10:16  12:3,
13  13:2
14:11  18:3
23:1, 4
26:6, 11, 16,
19, 21  27:6
31:7, 23
32:12
34:17  36:2
39:16
41:16
44:10  56:6
58:4  59:21
61:16
63:22
64:20  66:9
68:12  70:1,
2, 7, 9, 16,
18, 20  71:6,
13, 20  72:3,
4, 13, 15, 19,
21  73:14
75:4  76:3,
8, 14  77:6,
11  78:7, 8,
9  86:22
90:10, 16
91:5, 9
93:1  98:9
100:19, 20
101:15
104:20
106:13, 14
107:10, 23
108:1, 17
110:2, 9, 12
111:23
112:1
113:13, 14
114:10, 23
115:12, 21

116:7, 16
119:4
120:1, 6, 19
121:5
123:3, 11
124:4, 8, 13
125:2, 5, 10
127:3, 5, 8,
18  128:13
130:17
131:4, 5, 7
132:20
134:23
135:7
136:4
137:1
138:6
140:7
142:8, 12,
16  149:23
153:2
158:18
161:7, 19
162:22
163:2
164:17, 19,
21, 23
168:12
170:8
171:11
173:19
175:20
177:13, 16,
17, 18
178:17
179:2, 9, 21
180:2
181:13, 16
182:22, 23
183:1, 12
184:12
185:4

192:2, 3
193:7
195:10
197:21
199:1
202:3
204:23
205:5
206:1, 6
207:20
208:2, 20,
21  209:1, 2
211:2
213:12, 22
214:12, 13
216:23
217:17
218:15, 18
219:19, 21
220:6, 7
221:17
222:10
223:3, 10,
16  225:16
226:12
229:4, 12
230:10, 22
231:6, 22
232:7, 8, 13
233:2, 7
234:6, 8
235:13
236:10
237:8
240:17, 18
241:23
242:14, 20
243:21
245:2, 3
249:8
252:9
254:9

256:6
258:11, 14
261:4, 6, 7,
12, 16, 17,
21  262:19
264:14, 17
265:17
266:16
270:6
271:18
274:2, 20
275:5, 6, 22
278:16
279:9, 10
280:21, 23
282:5, 12,
16, 17
284:11, 16
285:17, 19
**Knowing**
107:21
**knowledge**
21:20, 21
52:17, 19
63:7  65:4
98:5
116:22
121:7
132:8
142:9, 19,
23  171:13,
23  180:19
185:13
214:18
217:9
240:16
274:22
275:13, 15
279:14
280:19
282:10

Video Deposition of Rusty Hughes

1/19/2024

known
 39:6  148:6
 219:18
 222:11
 260:23
knows
 79:11
 237:10

< L >
L  2:1  72:8
labeled
 54:19
lack  32:21
 73:5
lake  171:2
language
 280:4
 282:22
 286:7, 16
larger
 166:21
largest
 169:13
late  83:14,
 19  84:1, 14
 91:20
 116:11
 121:9
 124:13
launch
 20:23  21:7,
 10, 13  22:6,
 16  23:6
 41:21  42:1,
 7, 20  43:11
 44:3, 6, 7
 92:19
 104:10, 13,
 19  105:1, 6,
 10, 13, 21
 110:22

111:13, 18,
 19  112:13,
 18  113:19,
 22  114:15
 115:16
 118:16
 119:17
 136:7
 246:21
Lauren
 84:20
 86:21  87:5,
 6  119:1
 186:1, 4, 5
 223:16
 224:3, 7, 16
 226:14, 15,
 20
Law  2:7
 5:4, 10  7:6
 194:11, 18
 195:11
 264:10
 266:10
laws  2:15
 77:22
lawsuit
 33:10
 140:23
 284:20
lawsuits
 63:4, 18
lawyer
 9:20
 195:12
 245:23
lawyers
 9:13  34:21
 290:17
lay  205:14
 220:18

lead  19:1
 24:15  25:7
 40:1  41:19
 95:22
 134:11
 144:18
 166:8
 169:14
 192:12
 195:14
 203:10
 206:10, 13,
 14  207:17
 233:17
 237:6, 10,
 23  238:18,
 19  239:4,
 17  241:4
leader
 15:12, 15
 90:20, 23
 166:14
 204:22
 238:14, 15
leaders
 44:19  74:2
 169:12, 16
 206:4, 22
 207:5
leadership
 22:2  165:7,
 15
leading
 2:21  25:19,
 20  90:19
leads  39:8,
 14, 22
 41:13, 22
 43:9  44:23
 129:9
 192:18
 199:4

207:12, 13
 216:3
 233:21
 234:3, 7
learn
 115:11
 174:3, 6
 181:15
learning
 164:17
leave
 62:12
 116:6
 117:8
 183:5
 247:2
leaving
 24:21
 182:19
led  21:14
 169:17
Lee  24:17
 25:2  87:17,
 21  88:1, 5,
 8, 11, 23
 107:5
 122:6
 123:1, 6, 10
 223:17
 224:11, 15
 226:7
Lee's
 226:11
left  35:14,
 17  41:12
 70:18
 82:13  89:4
 110:18
 116:15, 16,
 20  117:10,
 11, 16
 142:12, 16

166:13
 170:18
 171:5
 185:23
 238:13
 267:13, 16
 272:13
left-hand
 80:19
legal
 194:12, 13
length
 164:21
Leslie  5:5
 8:6  54:4
 226:6
 242:7, 16
 248:11
letter
 48:16, 19,
 22  290:9
letting
 112:17, 23
level  73:6
 77:8  90:15,
 16, 22
 123:3
 165:19
 166:9, 10,
 11  167:4, 9,
 11  168:1,
 13, 14
 169:1, 7
 200:12, 15,
 20  203:14,
 22  207:7
levels
 81:18, 22
Levingston
 109:16, 17
 202:2

Video Deposition of Rusty Hughes

1/19/2024
114

liability
  15:13, 15,
  18, 21  16:8,
  9, 10, 12, 13,
  20, 21, 22,
  23  17:4, 12,
  16  18:12,
  23  247:11
  287:8
lies  287:9
life  168:19
limit
  166:17, 20
Lindberg
  119:2
  223:16
Lindberg's
  84:21
Lindsey
  87:2, 4
line  243:18
lines
  247:12
link  264:21
  265:2, 4
LinkedIn
  131:15
List  4:12
  12:13  90:4,
  6, 8  116:10,
  14  122:6
  123:19
  147:16
  167:7
  175:10, 21
  209:21
  235:23
  236:8, 15
  237:9
  259:12
  260:5
  283:1, 7

listed
  90:17
  91:13
  98:20
  110:1, 3, 4,
  8  119:2
  121:20
  122:11
  123:9
  199:7
  204:4, 10
  250:19, 22
  251:17
listen
  45:12
  226:1
listing
  235:18
lists  69:8
  70:13
  80:23
  90:14  92:1
  122:1, 12
  123:2, 15
  124:12
  206:17
  208:8
  209:4, 6, 17,
  18, 19
  217:15
  228:2, 19
  236:9, 13
  241:21
  242:15
  244:5
  247:21
  250:10, 12
  256:8
  259:21
litigation
  177:23

little  15:6
  56:8  62:3
  140:21
  150:7
  154:2
  243:18
  253:1
  287:14
lives  241:2
living  123:8
LLC  5:4
  72:18
local
  212:16
  213:3
  214:4, 8
located
  26:9  36:4,
  19  43:15
location
  241:23
  260:2
lodged
  283:15
Logan
  29:6  30:17
Logan's
  29:7
London
  88:4
long  15:2
  31:14  42:7
  111:2
  122:21
  124:4, 22
  125:2
  126:13
  140:4
  164:2, 14,
  19  201:11
  271:4

272:7
286:20
longer
  87:3  88:5
  116:5
  124:11
  165:3
  181:16
  183:13
  270:21, 22
  272:5
long-term
  88:4
  182:18
look  11:2
  12:12  13:8,
  16  31:23
  32:1  33:19
  61:17
  63:23  64:9
  68:13  74:8
  75:10  78:2
  81:13
  115:10
  138:11
  144:2
  146:9
  163:3
  179:16
  183:7
  184:20
  196:13
  200:9
  202:10
  203:2
  204:2
  207:6
  209:14, 15
  214:13
  230:5
  233:18
  256:23

257:23
259:20
264:5
274:4
looked
  177:19, 20
  201:14
  214:19
  256:20
  258:15
looking
  91:6
  199:15
  237:6
  262:13
looks
  54:19, 20
  60:23
  108:13
  137:5, 8, 15
  211:16
  215:19
  216:9
  231:15
  233:5
  235:20
  242:18
  244:4
  253:23
  256:6, 11
  265:2, 3
  273:3
lose  89:15
lot  32:22
  33:12
  40:21, 23
  44:4  97:17
  106:17
  131:16
  161:9
  171:2
  173:23

Video Deposition of Rusty Hughes

1/19/2024
115

175:*10, 11*
204:*19*
207:*21*
209:*17*
**Lovoy**
106:*23*
201:*20*
207:*20*
208:*9*
**lower**
204:*10*
**lunch**
139:*4*
140:*4, 11, 16*

**< M >**
**Mad**
161:*12, 16*
162:*1, 12, 18*
**magically**
187:*14*
**maintained**
229:*8, 12*
248:*18*
**majority**
84:*16*
91:*21*
188:*7*
**making**
19:*5* 49:*18*
56:*12* 59:*8*
80:*8* 81:*21*
106:*4*
114:*20*
127:*16*
134:*2*
157:*2*
180:*4*
200:*5, 10*
203:*2*

206:*6, 16*
207:*21*
208:*2, 10*
222:*3*
**male** 25:*5*
69:*12* 70:*3,
22* 71:*7, 14,
21* 72:*5, 10,
22* 138:*12*
176:*7*
204:*4*
260:*13*
**males** 69:*4*
**manage**
234:*1*
**Managemen
t** 68:*13, 16,
18* 73:*5*
167:*19*
168:*13*
169:*3*
206:*5*
283:*20*
**manager**
69:*9* 72:*19*
75:*14*
90:*15, 22*
123:*3*
146:*23*
147:*1, 2, 17,
21, 23*
148:*6, 8, 13*
167:*8, 9, 11*
169:*7*
204:*22*
242:*19*
**managerial**
52:*13*
**managers**
73:*12*
147:*17*

**mandatory**
132:*9*
**manner**
212:*4*
**marathon**
268:*14*
**Maria**
105:*23*
106:*2*
**marital**
259:*11*
**mark** 34:*5,
7* 54:*7*
60:*13*
89:*20*
227:*1*
235:*8*
241:*16*
**marked**
34:*4, 10*
54:*12*
60:*18*
89:*22*
215:*6*
227:*5*
235:*11*
241:*18*
247:*18*
248:*20*
249:*10, 13*
250:*4, 6*
253:*13*
255:*22*
272:*23*
288:*5, 7*
**market**
19:*3* 21:*20,
21* 42:*3*
63:*1*
117:*14*
173:*3*

**marketing**
15:*19* 86:*3*
165:*18*
167:*5, 8*
168:*13*
169:*1, 4, 8*
175:*12*
**markets**
19:*6* 40:*22*
173:*4*
188:*23*
**marking**
253:*6*
255:*20*
**Marshall**
169:*2*
**matter**
86:*7*
178:*17*
183:*6*
197:*5*
239:*20*
290:*20*
**matters**
204:*5*
**McClure**
24:*17*
87:*17, 21*
88:*6, 23*
122:*6, 8*
123:*13*
169:*18*
223:*17*
224:*15*
**McClure's**
107:*6*
123:*1, 10*
224:*11*
**mean**
16:*21, 22*
17:*5, 9*
27:*21* 28:*4*

33:*6* 37:*8*
45:*17* 51:*8*
55:*13*
62:*23* 63:*2,
3* 66:*8, 9*
76:*19, 22*
79:*1, 16, 22*
85:*12, 14,
15* 90:*16*
93:*1* 96:*20*
102:*12*
104:*5*
111:*11*
115:*1*
123:*10*
130:*19*
131:*5*
132:*22*
133:*16*
134:*16*
135:*15*
141:*13*
148:*2*
151:*6*
154:*2*
155:*4*
156:*1, 3*
158:*1*
159:*21*
161:*6, 8*
163:*8*
173:*23*
178:*6, 22*
180:*14*
182:*15, 17*
187:*16*
188:*23*
189:*22*
191:*20*
193:*5*
197:*17*
201:*11*

Video Deposition of Rusty Hughes

1/19/2024

203:*20*
204:*12*
206:*9*
207:*10, 20*
211:*2*
212:*23*
214:*7*
215:*14*
219:*5*
220:*1*
222:*2*
230:*10*
232:*15*
234:*20*
252:*11*
256:*13*
257:*19*
258:*11*
264:*2*
267:*20*
269:*3, 20, 22*  271:*5*
**Meaning**
51:*20, 21*
113:*8*
268:*3*
**means**
74:*19*  80:*1*
90:*18*
153:*2*
257:*21*
265:*18*
266:*13*
292:*9*
**meant**
156:*4*
**meat**  289:*1*
**mechanism
s**  41:*15*
**MedPro**
172:*18, 19, 22*  173:*2, 5,*

*12, 15*
174:*17, 19*
175:*6*
176:*1, 16*
177:*2*
**meet**  10:*22*
68:*23*
98:*22*  99:*4*
**meeting**
98:*18*
127:*15*
141:*13*
288:*16*
**meetings**
42:*14, 15, 19*  43:*6*
**Melody**
35:*14, 17, 20*  36:*1, 9, 16*
**member**
283:*20*
**members**
30:*13*  46:*3*
68:*16*
83:*19*
168:*21*
235:*23*
273:*18*
**memory**
82:*23*  96:*8*
245:*22*
**men**  25:*8*
32:*17*  58:*5, 13, 22*  59:*3, 9*  89:*11*
135:*18*
150:*17, 21*
151:*7, 14*
161:*12, 16*
162:*1, 12, 18*  168:*21*

171:*8*
176:*2, 7*
200:*21*
201:*3*
260:*19*
262:*8*
**mention**
58:*1*
**mentioned**
47:*4*  48:*18*
49:*1*
112:*14*
202:*14*
228:*19*
**mentions**
65:*11*
78:*10*
138:*10*
**mentor**
15:*11*
45:*16*
**merged**
14:*16*
62:*20*
87:*18*
**merger**
14:*10, 13, 20, 23*
36:*14*
51:*16*  52:*4, 5, 22*  53:*3, 7*  57:*14*
59:*6*  62:*14, 16*  63:*5, 9, 13*  64:*2, 11*
67:*8*  73:*16*
74:*5*  81:*1, 11*  153:*6*
169:*11*
240:*10, 14*
242:*3*
255:*9*

258:*12*
263:*6*
**met**  252:*11*
**mic**  59:*22*
**middle**
93:*10*
122:*10*
**middleman**
16:*3*
**midway**
75:*11*
**mid-year**
227:*14, 15, 17*
**million**
153:*11*
221:*2, 8, 9, 11, 13, 16*
**mind**
115:*6, 8*
176:*13*
236:*12*
**mine**  59:*23*
230:*21*
269:*21*
**minute**
156:*1*
222:*13*
287:*12*
**Mischaracte
rization**
112:*20*
114:*1*
208:*3*
251:*4*
**misconduct**
17:*2*
**Missing**
30:*5*  216:*6*
230:*21*
231:*2*

**mission**
262:*16*
264:*13, 15, 18, 23*
**Mississippi**
241:*2*
**misspoke**
236:*11, 12*
**misstateme
nt**  194:*10*
**mixed**
187:*23*
**Module**
4:*10, 21*
54:*9*  55:*3*
57:*18*
58:*10*
255:*11*
256:*4*
258:*3*
261:*13, 20*
273:*4, 5*
**modules**
53:*17*
54:*21*  55:*7*
57:*18, 21*
76:*20*
78:*19*
**molds**  18:*9*
**money**
97:*10, 15, 17*  218:*3, 10*  220:*15*
**Montana**
244:*23*
**Montgomer
y**  7:*18*
**Monthly**
161:*4*
**months**
118:*10*
224:*13*

mood
182:23
Moore
120:3, 6
Morgan
136:1
242:13, 15
243:4
244:6
250:12
move
63:21
66:11, 20
68:1, 10
73:7  78:13
94:21
95:11
101:17
102:18
109:23
114:1
127:16
128:9
129:14, 23
130:20
131:3
132:15
133:4
138:15
139:16
151:17
152:4
161:14
172:12
181:2
183:17, 22
184:1
185:2, 5
202:7
224:14
232:20
233:14

250:17
267:7
moved
93:12, 21
104:8
107:8
110:2
127:23
128:23
129:5
130:9, 13
171:1
183:15
184:23
195:19
199:1
224:10
246:2
270:3
movement
133:9, 10
moving
95:18
126:5
180:8
multiple
166:22
mutual
16:5

< N >
N  2:1  4:1
5:1
name  7:15
9:9  14:12,
17  23:12
28:22
119:23
120:8
122:10
123:10
137:4

160:15
163:17
165:13, 14
213:11
259:11
270:14
279:10
named
19:15  25:8
168:21
213:6
names
40:10
national
259:10
nationwide
22:18, 19
258:9
natural
283:2
nature
154:18
158:19
183:4
247:9
navigate
42:2
necessarily
40:23
41:19  42:5
94:12
95:15
96:17  99:2
132:16
143:7
144:5
150:15
152:21
156:7
187:17
197:4, 11
216:2

229:11
234:5
237:5, 9
252:9
254:9
267:11
268:1
269:8
274:2
281:10
284:18
necessary
2:19
need  10:15
19:6  31:17,
23  32:1
33:20
59:18
94:20
132:3, 19
134:13
135:6
137:10, 20
138:7
150:1
152:5
223:2
267:11
279:22
281:7, 17
282:18, 19
283:13
286:7, 17
needed
59:12
107:6
134:13
226:14
243:1
280:2

needing
67:15
121:9, 15
needs
187:18, 19
negative
10:9  225:1
negotiable
221:20
negotiate
45:11
negotiates
188:23

negotiations
240:3
neighborho
od  125:9
128:16
142:15
Neil  26:18,
19, 20
167:13
neither
130:13
292:14
network
212:17, 19
never
15:19  35:2
39:7  69:2
102:13
133:22, 23
161:16, 19,
20, 23
162:14
181:4
207:22
208:17
249:1
262:2, 5, 7
270:12, 13

274:17
275:2, 11
285:10, 15
290:21
**new** 37:18
38:11, 12
39:6, 10, 21
40:7 41:9,
11, 22 45:8
47:10, 13
48:15
51:14 61:7,
13 64:16
112:17
113:8, 15,
19 114:22
115:1, 2, 6
132:14
186:5, 7
188:3, 23
192:14
198:2
237:2
243:11, 12
244:22
267:3, 9, 15
268:1
**newer**
104:14
113:1, 2, 15
115:8
**nine**
201:15
202:1
**nineteen**
241:8
**ninety-eight**
202:1
**nod** 10:7
**nonexempt**
190:18
191:1, 4, 7,

11 194:3,
19 195:3
**nope**
262:21
**normal**
12:5 46:14
158:10, 13
**normally**
198:18
212:10
**North** 2:7
5:12, 18
6:8 7:7
36:20
59:16
65:12
**NORTHERN**
1:1 7:23
**Notary** 2:6
7:2 292:22
**note** 230:8
**notes**
179:17
217:13
287:14
**notice** 3:4
32:7 176:6
177:22
178:4
**noticed**
7:20 278:7
**NUMBER**
1:5 4:2, 8
8:1 61:19
64:9 65:9
68:4 69:7,
15 71:2, 10
72:16
73:21 74:8
78:2 81:13
83:18
146:10

235:9
257:1, 23
262:13
264:1
**numbered**
227:2
256:3
**numbers**
61:18 62:3
211:22
218:1
258:16

**< O >**
**O** 2:1
**oath** 8:13
**Obenauer**
167:14, 17
168:3
**Object**
12:1 17:6,
8, 18, 23
21:9 24:5
27:19
31:19 32:2,
11, 18 33:1,
3, 14, 22
36:11, 15
38:3, 6, 14
39:4, 12, 23
40:11, 20
41:10, 14,
23 42:21
43:7, 16
44:8 45:9,
21 46:8
47:14, 21
48:7, 12, 20
49:9, 14
50:18, 21
51:6, 19
52:7, 23

55:6, 12, 16
56:5, 14, 18,
23 57:7, 11,
17, 23 58:8,
14, 23
59:10 61:9,
15 62:22
63:6, 11, 15,
20 64:4, 13,
19 65:3, 19,
23 66:6, 20
67:12, 18,
23 68:8, 10
69:5, 13, 20
70:4, 11
71:8, 15, 22
72:6, 11, 23
73:7, 13, 18
74:6, 17
75:7, 17, 23
76:5, 18
77:5, 21, 23
78:6, 13, 21
79:2 81:4,
23 85:19
88:13, 20
89:1, 12
91:2, 16, 23
92:23 93:5
94:1, 11, 19
95:12, 19
96:2, 16, 22
97:3, 7, 12,
19, 23 98:8
99:9, 17, 22
100:7, 11
101:18
102:3, 8, 17
103:9
104:16
105:12, 15,
18 107:20

108:2, 16
109:14
110:19, 23
111:4
112:6, 11,
19 113:10,
12, 20, 23
115:18
116:13, 17
117:2, 21
118:22
119:7
121:12, 22
125:20
126:6, 9, 21
127:13
130:16, 23
131:2, 13
132:1, 7
133:4, 20
134:4, 10,
18 135:2,
13, 19, 22
136:3, 19
137:3, 17
138:15
139:12, 23
141:20
143:5, 22
144:4, 10,
16 145:3, 9,
19 146:5
147:9, 13
148:9, 22
149:8, 17
150:3, 14,
23 152:20
153:1, 10,
16 155:8,
17 156:14
157:4, 13,
19, 23

158:*12, 16*
161:*5, 14*
162:*3, 13,
20*  163:*7*
165:*1*
166:*15*
170:*7, 14*
171:*9, 12,
17, 20*
172:*4, 12*
173:*22*
174:*5, 15,
21*  176:*3, 9,
18, 22*
177:*4, 15*
178:*2, 16*
179:*4, 7, 20,
23*  180:*13,
18*  181:*2*
182:*20*
183:*17*
184:*5, 9, 14*
185:*2, 11,
15, 21*
186:*20*
187:*2, 9*
188:*11*
189:*13, 19*
190:*1, 11,
16, 19*
191:*2, 9, 23*
192:*10*
193:*21*
195:*4*
196:*2*
197:*16*
200:*11, 16,
23*  201:*5*
202:*7*
203:*3, 8, 16,
18*  204:*1*
205:*2, 11,*

*23*  206:*7,
19, 23*
207:*2, 9*
208:*1, 6, 18,
23*  209:*9*
210:*3, 14*
211:*11, 18*
212:*5, 22*
214:*11, 17,
20*  215:*11,
16*  216:*1,
17*  217:*1, 7*
222:*9*
223:*7, 20*
224:*1, 20*
225:*8, 12,
19*  226:*3, 9*
228:*5, 10*
229:*10, 20*
230:*3, 13,
23*  231:*11,
19*  232:*6,
12, 20*
233:*14*
234:*10, 16,
19, 22*
235:*4*
236:*1, 19*
238:*6, 11*
239:*1, 8*
240:*15*
246:*9, 12,
16*  248:*2*
249:*5, 21*
250:*17*
251:*3, 13*
252:*4, 15*
255:*10*
256:*18*
257:*11, 15,
20*  258:*10*
259:*17*

260:*8, 21*
261:*5, 8, 10,
14, 23*
262:*4, 10*
263:*3, 9, 20*
265:*1, 9, 16,
23*  266:*7*
268:*6*
271:*1, 17*
273:*16, 21*
274:*8, 11,
19*  275:*4,
19*  276:*5,
15, 21*
278:*8*
279:*1, 8, 12,
20*  280:*3,
13, 18*
281:*9, 16*
282:*21*
283:*6, 14*
284:*1, 5, 15*
285:*2, 6, 9,
13, 18, 23*
286:*3, 10,
14, 19*
287:*2, 4, 6*
289:*7*
290:*15, 23*
**objection**
28:*1*  65:*7*
97:*14*
100:*1*
108:*21*
239:*10*
**objections**
2:*20, 23*
67:*1*  88:*16*
**objectives**
262:*17*
263:*1, 8*

**obviously**
129:*22*
**occasionall
y**  161:*3*
166:*7*
170:*20, 23*
197:*3*
**occupied**
80:*12*
**occurred**
62:*14*
158:*2*
**occurrence**
161:*8*
**O'Connor**
19:*15, 19*
**O'Connor's**
20:*1*
**offensive**
66:*15*
**offer**  46:*3,
4*  47:*10*
48:*1, 2, 15,
19, 22*
255:*6*
**offered**  3:*2*
**offering**
46:*4*
**offers**  47:*9*
**office**
22:*22*
24:*10*
31:*17*
44:*14*
106:*19*
141:*2, 9, 12*
157:*22*
158:*6*
159:*8, 11,
20*  160:*7, 9,
11, 22*
161:*10*

162:*2, 15*
181:*23*
198:*4*
241:*1*
242:*13*
262:*9*
288:*11, 12*
**officer**
28:*12*
69:*17, 23*
70:*15*  71:*4,
18*  72:*9*
**officers**
16:*7*
**offices**  2:*6*
7:*6*  111:*22*
159:*2, 4, 5,
6, 16*  261:*2,
22*
**official**
15:*16, 17,
19*  85:*11*
86:*15*
92:*10*
164:*22*
252:*10*
**oftentimes**
39:*18*
167:*5*
213:*12*
216:*4*
267:*8*
268:*15, 21*
281:*11*
**Oh**  44:*22*
54:*17*  62:*1*
74:*11*
87:*10*
100:*21*
108:*6*
123:*13*
148:*1*

Video Deposition of Rusty Hughes

1/19/2024
120

169:*1, 5*
170:*22*
241:*6*
242:*5, 12*
243:*19*
253:*8*
254:*2, 20*
258:*11, 22*
286:*2*
**Okay**  9:*19, 22*  10:*2, 3, 13, 19, 21*
11:*2, 12, 16*
12:*22*  13:*5*
14:*3*  15:*21*
18:*15, 18*
19:*13*  21:*2, 7*  22:*13, 15, 20*  23:*2*
24:*9, 14, 20*
25:*10*  26:*6*
27:*2, 20*
29:*21*  30:*2, 12, 15, 21*
31:*6, 15*
34:*3, 20*
35:*5, 18, 20*
36:*1, 18*
37:*8*  38:*11*
39:*8, 21*
41:*3, 6*
43:*2, 14, 20*
44:*13, 18*
45:*1, 17*
46:*6*  48:*3, 23*  49:*3, 5*
50:*12, 15*
52:*2, 16*
53:*23*
54:*22*  55:*2, 9*  56:*9*
60:*8, 12*

61:*1*  62:*2, 18, 20*  67:*1, 2*  68:*23*
69:*3, 22*
71:*1*  72:*5*
73:*15*  74:*8, 11*  80:*15*
81:*9*  84:*13*
86:*12*  87:*8*
89:*14, 19*
90:*13, 22*
91:*11, 18*
92:*11, 18*
95:*1*  96:*10*
100:*22*
101:*10*
102:*9*
103:*1*
106:*13, 22*
108:*3*
109:*18*
110:*3*
116:*2, 14*
117:*4, 16*
118:*8, 12*
119:*1*
120:*16, 19, 22*  121:*8*
122:*3, 6*
124:*1, 4, 12, 16*  125:*2, 11, 16*
129:*21*
130:*12*
131:*6*
132:*10, 17*
134:*1*
140:*3, 7, 15, 20*  141:*5, 8, 22*  142:*3*
143:*13*
144:*13*

146:*1, 12*
147:*11, 19*
148:*1, 15*
149:*1*
155:*15, 21*
156:*10*
157:*6*
160:*21*
162:*5, 10*
163:*10*
165:*5*
168:*8, 20*
169:*6, 15*
171:*11, 14*
175:*2*
176:*20*
178:*10, 13*
179:*16*
180:*3*
181:*15*
187:*13*
188:*2, 19*
191:*15*
196:*12, 17*
197:*17*
198:*1, 23*
199:*20*
202:*18, 22*
207:*20*
208:*20*
212:*20*
213:*14, 20*
214:*22*
215:*13, 21*
216:*13*
217:*10*
220:*14*
221:*1, 4*
222:*12*
223:*2, 15*
225:*10*
226:*5, 23*

227:*19*
228:*16*
229:*14, 23*
230:*9*
238:*2*
240:*23*
241:*3, 15*
242:*6, 12, 17*  243:*3, 15, 19*
244:*4, 10*
247:*7*
248:*6*
250:*10*
252:*18*
254:*20, 23*
255:*7*
256:*11*
257:*3, 13*
258:*2*
259:*1, 5*
262:*22*
264:*4*
266:*4*
269:*2*
271:*3, 15*
272:*4*
273:*8*
278:*4, 10, 13*  279:*3, 6, 17*  281:*14*
282:*14*
283:*19*
284:*8*
286:*6*
288:*4*
289:*4, 19*
290:*8, 11, 21*  291:*2*
**old**  178:*13*
**once**  46:*4*
96:*10, 11*

132:*3*
166:*10*
198:*22*
218:*9*
270:*4*
272:*4*
**ones**  25:*8*
37:*19*
44:*22*  48:*6*
175:*13*
206:*5*
213:*20*
215:*3*
228:*3*
**online**
63:*17*
**on-site**
158:*8*
**open**
75:*20*  76:*3*
133:*2*
134:*23*
138:*13*
139:*14, 15*
185:*22, 23*
**opening**
139:*18*
**operate**
233:*18, 19, 22*
**operated**
133:*6*
**operates**
190:*8*
211:*14*
**operating**
70:*15*
**operations**
69:*9*
**opinion**
252:*17*
266:*14*

Video Deposition of Rusty Hughes

1/19/2024

121

opportunities  32:17
33:12
151:10
opportunity
22:4  78:4,
10  80:19,
21  81:3
138:22
144:20
207:17
259:8
opposed
103:7, 13
opposing
253:11
oral  7:9

organization
19:7  81:19
organizational  103:15

organization's  262:16
organize
165:17
organized
103:16
orientation
259:10
260:2
origin
259:10
original
216:12
228:20
originally
123:5
271:13
outing
172:22

173:2, 5, 13
174:2, 20
175:6, 14,
19  177:2
outings
175:11
176:2, 8
Outlook
178:12, 21
179:9
outside
22:23
46:16  50:9
53:10  86:6
88:1
164:10
200:1
224:15
238:4
265:7, 15,
18  267:4
276:8
overall
202:13, 14
204:6
208:11
237:23
overlapped
35:16
overlooked
141:3, 17,
19  143:2,
18  144:23
149:5, 14
150:11, 19
151:11
156:13, 21
157:8, 12,
18  284:12
overly
274:12

oversee
43:21
92:13
oversees
42:20
oversight
27:17  28:3
overtime
190:10, 21
193:20
194:6, 9, 12
270:21, 23
owned  14:6
owners
65:17

< P >
P  2:1  5:1
P&L  233:17
P&Ls
233:22
P.C  2:7
5:10  6:6
7:6
PAGE  4:2,
8  23:4
61:21, 22
63:23
68:13, 19
69:7, 22
70:13  72:1
75:10
80:18
242:15
256:23
257:2
258:1
pages  68:4,
16, 17
paid
148:10
176:12

194:9
197:2, 20
199:10, 17,
21  200:21
201:3, 7, 15,
19, 21, 23
202:2, 3, 13
205:15
208:22
228:22
240:4
PALMER
5:4, 5  8:6
215:3
paper
60:22  61:8,
10  212:9
217:16, 19
paragraph
68:15
74:12, 23
146:20
parameters
233:23
part  14:10
20:23  31:1
39:19
41:22
51:15
53:18
56:17  58:9
73:4, 23
81:8  89:2,
3  94:3, 4, 8,
15  95:5, 6
97:21
111:12
114:15
118:16
119:14
128:3
136:6

139:13
241:1
255:5
participate
88:22
113:22
115:15
129:13
participating  105:9
particular
11:14
12:20, 22
15:22  94:8
213:6
289:3
parties  2:3,
22  292:15
parts
53:19
162:9
party
170:9, 10
passed
170:20
passing
290:4
password
227:23
228:7, 12
path  95:6
272:18
Patricia
5:17  8:8
pay  47:10,
12, 16, 20
48:11
173:9
188:3
194:6
196:19
197:8, 12

Video Deposition of Rusty Hughes

198:*8*, *15*
199:*2*
203:*11, 22, 23*   205:*18, 20*   207:*18*
**payday**
198:*21*
**payments**
228:2
**payout**
206:*11*
**payroll**
193:*22*
195:*7, 16*
197:*4*
210:*7*
**P-e-l**  29:*2*
**Pelham**
28:*23*  29:*1, 2*  30:*19*
**Pender**
120:*11, 17, 19*
**people**
19:*18*
21:*16*  43:*5*
45:*10, 12*
77:*7*  80:*12*
81:*16*
99:*20*
113:*1, 18, 21*  114:*22*
159:*3*
160:*21*
161:*1*
162:*1*
175:*8*
184:*1, 3*
199:*8*
204:*4*
205:*19*
206:2, *16*

258:*23*
264:*1*
265:*15*
273:*19*
**percent**
184:*11*
220:*13, 23*
221:*3, 9, 10, 12, 14, 16*
236:*14*
237:*19, 20*
243:*7*
250:*19, 21*
**percentage**
188:*14*
192:*13, 19*
217:*6*
218:*11, 12, 23*  219:*3, 7, 11*  238:*12*

**percentages**
219:*10, 16*
220:*1, 3*
**Percentage-wise**  192:*3*
**perform**
194:*19*
**performance**  98:*10, 13, 21, 23*
130:*1*
247:*3, 6*
**performing**
188:*15*
194:*2*
244:*15*
**period**
91:*6, 9*
164:*10*
209:*21, 23*
212:*1*

214:*1*
224:*9, 12*
228:*21*
**periods**
228:*21*

**permanently**
178:*20, 23*
**person**
23:*10*
35:*10, 12*
39:*14*  40:*2*
42:*23*  43:*4*
49:*22*  73:*3*
90:*19*
113:*15*
115:*8*
145:*4*
150:*21*
151:*2*
152:*22*
169:*2*
186:*2, 3*
193:*16*
200:*13*
205:*14*
210:*11, 23*
218:*8*
238:*8*
240:*1*
265:*10*
267:*10, 15*
268:*19, 23*
270:*7*
272:*15*
275:*10*
289:*15*
**Personal**
75:*11*  79:*3*
232:*14*
266:*13*

268:*19*
282:*9*
**personally**
108:*11*
118:*23*
213:*1*
262:*11*
263:*12*
**person's**
82:*4*
**perspective**
19:*2*  27:*22*
**Petty**
35:*17*  36:*6, 18*  50:*4*
59:*14*
148:*4, 14*
149:*11, 12*
156:*11*
288:*10*
**phase**
93:*11*
268:*23*
**Phillips**
84:*18*  87:*9, 13*  88:*6, 7*
89:*9*
169:*17*
241:*6*
**phone**
45:*12*
182:*4*
196:*15*
288:*16*
289:*15*
**photograph**
69:*8*
**photographs**  68:*17*
**phrases**
155:*5*
257:*12*

**physical**
259:*22*
273:*10, 19*
**physically**
278:*6, 7*
**pick**  270:*16*
**picture**
69:*23*
205:*18*
**pictures**
73:*11*
**piece**  37:*2*
**place**
40:*22*  57:*5*
128:*12*
183:*21*
263:*11*
**placed**
277:*4*
285:*14*
**places**
43:*17*
245:*1*
**Plaintiff**
1:*8*  5:*3*
8:*3, 5, 7, 9*
**plaintiffs**
288:*23*
**PLAINTIFF'S**  4:*8*  34:*7, 9*  54:*7, 11*
60:*13, 17*
89:*20, 21*
196:*13*
199:*15*
215:*9*
216:*15*
227:*1, 4*
235:*8, 10*
241:*16, 17*
242:*9*
243:*14*

247:*13, 17*
248:*19, 22*
249:*11, 12*
250:*3, 7*
253:*6, 12,
15* 255:*20,
21* 272:*20,
22* 288:*5, 6*
**plan**
165:*21*
272:*4*
**plans**
165:*21*
272:*7*
**play** 236:*23*
**please** 8:*2,
13* 9:*9*
152:*4*
227:*21*
**plus**
101:*20*
104:*22*
258:*14*
**Poe** 106:*2,
3*
**point** 50:*6*
51:*23*
59:*19*
61:*10*
86:*13* 96:*4*
106:*23*
122:*14*
141:*11*
157:*16*
198:*20*
215:*21*
232:*3, 23*
234:*5*
245:*7*
255:*14*
263:*11*

269:*11*
270:*18*
**pointing**
154:*18*
**policies**
16:*20* 44:*4*
51:*2, 18*
53:*3* 57:*16*
74:*14*
78:*18*
81:*10*
145:*8*
184:*13*
193:*20*
203:*21*
253:*2*
255:*2, 5*
282:*22*
285:*14*
286:*7, 11,
13, 22*
287:*8*
**policy**
17:*19* 18:*4*
41:*8* 44:*2,
5* 55:*10, 19*
56:*1, 4*
61:*14*
75:*20* 78:*5*
79:*8* 80:*19*
81:*3* 132:*5*
133:*18, 21*
145:*17*
146:*2*
147:*6*
148:*19*
149:*23*
155:*9*
179:*1, 5, 8*
205:*22*
206:*2*
219:*6*

225:*16, 23*
253:*17*
265:*20*
273:*8*
274:*1, 3*
279:*13, 15,
16, 19*
280:*1, 7*
281:*12, 15,
18, 23*
282:*8, 11,
17* 283:*3*
285:*4, 7, 15,
16, 21*
286:*1*
**political**
260:*2*
**poor** 266:*5*
**population**
275:*22, 23*
**portions**
61:*3* 68:*3*
**position**
14:*3, 22*
15:*1, 5, 7*
18:*9* 37:*19*
92:*5* 93:*13*
94:*17* 95:*5,
11, 13*
103:*19*
126:*5*
129:*5*
130:*21*
131:*7, 11*
132:*3, 4, 6,
14, 16*
134:*3, 12*
135:*11*
136:*1, 10,
15, 18*
137:*6*
138:*13*

139:*14, 15,
20* 142:*7*
164:*11*
185:*22*
186:*14, 22*
195:*20, 23*
198:*1, 4, 8,
18* 199:*2*
200:*19*
209:*19*
228:*20*
237:*3*
239:*23*
242:*23*
243:*3, 20*
245:*17*
267:*2, 3, 9,
10, 15*
268:*1, 8, 13,
16* 270:*5*
271:*22*
272:*17*
275:*15*
**positions**
12:*20*
19:*21* 20:*3,
10* 33:*2, 21*
38:*2* 46:*19*
80:*11*
84:*16*
130:*13*
157:*12, 18*
265:*7, 14,
22* 266:*2*
276:*8*
**positive**
9:*4* 10:*8*
22:*12* 24:*2*
29:*4* 38:*23*
47:*8, 11*
53:*13* 62:*4*
109:*2, 7*

114:*16*
118:*15*
169:*19*
186:*18*
196:*22*
202:*17*
204:*20*
211:*23*
231:*13*
253:*4*
258:*6*
**possibility**
130:*10*
**possible**
280:*5, 11*
**possibly**
166:*22*
236:*2, 11*
**post** 131:*5,
15, 20, 21*
134:*16, 21*
135:*10*
**post-BB&T**
256:*9*
**post-Covid**
96:*7*
**posted**
94:*17*
130:*14*
131:*8, 11,
14, 23*
132:*6, 16*
135:*5, 6*
136:*2, 10,
15, 23*
137:*7*
243:*20, 22*
**posting**
131:*19*
134:*15*
276:*8*

Video Deposition of Rusty Hughes

1/19/2024

124

post-
shutdown
31:*3*
pot 218:*3,
10*
potential
97:*16, 22*
139:*18*
144:*3*
240:*9*
potentially
137:*16*
143:*20*
149:*15*
290:*13*
Powell
24:*16*
29:*18* 31:*9*
44:*21*
105:*23*
Powell's
106:*16*
142:*5, 6*
PowerPoint
44:*4*
practicable
280:*5*
practice
46:*14*
273:*13, 17*
practices
17:*4, 12*
51:*22*
264:*9, 11*
265:*6, 7, 14*
266:*11*
283:*2*
286:*5*
287:*8*
pre 96:*7*

pre-Covid
96:*9*
245:*13*
predominan
tly 176:*7*
269:*4, 8*
premium
237:*3*
prepare
9:*20* 10:*21*
11:*3* 13:*17*
PRESENT
6:*12*
167:*15*
176:*13*
182:*2*
presented
10:*19*
53:*16*
presenting
165:*20*
preservatio
n 177:*21*
178:*5*
preserve
177:*22, 23*
preserved
179:*12*
Pre-
shutdown
31:*3*
president
15:*17*
24:*10* 26:*2,
12* 70:*14*
71:*11* 72:*2,
17* 198:*4*
press
64:*23* 66:*2*
presumed
113:*15*

pretty 66:*9*
204:*14*
211:*2*
prevent
135:*10*
previous
209:*20*
primary
241:*23*
prior 3:*2*
60:*10*
67:*10*
140:*18*
205:*4*
209:*20*
213:*21*
222:*23*
228:*21*
229:*1*
288:*2*
privileged
288:*22*
ProAssuran
ce 189:*5*
probably
16:*15*
33:*20*
54:*16* 84:*6*
117:*10*
124:*6*
156:*5, 6*
182:*11*
189:*9, 15*
190:*2*
204:*7*
236:*3*
241:*7*
242:*22*
245:*12*
258:*19*
problem
135:*21*

176:*15*
252:*20, 23*
275:*1, 7*
278:*21*
Procedure
7:*4*
procedures
51:*13*

proceedings
7:*10*
process
46:*4, 23*
93:*8* 95:*5*
111:*21*
139:*13*
212:*12*
290:*6*
processing
269:*10*
produce
37:*16*
produced
13:*14*
248:*16*
253:*6*
255:*19*
Product
21:*20, 21*
production
166:*3, 9, 11*
169:*14*
219:*23*
239:*13*
products
16:*16* 19:*5*

professional
15:*13, 15,
18, 21*
16:*12*
18:*12, 23*

23:*9, 23*
24:*1* 44:*16*
59:*7* 83:*23*
231:*8, 14,
16, 23*
232:*4, 5, 16*
247:*11*
258:*19*
program
21:*1, 8, 11,
13, 14, 18*
22:*5, 6, 7,
16* 23:*6*
41:*21* 42:*1,
2, 7, 13, 20*
43:*12* 44:*3,
6, 7* 104:*10,
13, 19*
105:*1, 4, 7,
10, 14, 21*
110:*22*
111:*13, 18,
19* 112:*13,
18, 23*
113:*19, 22*
114:*15*
115:*16*
118:*17*
119:*17*
123:*8*
136:*7*
178:*10*
179:*9*
211:*14, 19*
246:*19, 20,
22*
promote
99:*16, 19*
133:*15*
134:*21*
138:*23*

Video Deposition of Rusty Hughes

**promoted**
104:*9*
133:*7*
139:*8*
191:*19*
**promoting**
32:*1*  254:*5*
**promotion**
134:*3*
**prompt**
10:*11*
**promptly**
148:*17*
**pronouncin**
g  109:*1*
**proper**
146:*6, 13*
280:*6*
**properly**
147:*3*
**property**
16:*10*  23:*8,*
*21*  30:*23*
136:*14*
224:*8*
258:*18*
**protected**
81:*17*
151:*8*
**protesting**
67:*20*
**protests**
63:*4*
**provide**
16:*4*  18:*5*
198:*8*
**provided**
*7:3*
**Public**  2:*6*
7:*2*  254:*21*
**Publicly**
63:*3*

**pull**  59:*22*
232:*10*
264:*22*
**pure**  27:*21*
**purely**
202:*19*
**purpose**
11:*22*
105:*13*
134:*15, 22*
231:*21*
**purposes**
15:*20*
**Pursell**
173:*7*
**put**  77:*10*
88:*8, 23*
135:*1*
137:*6*
138:*12*
165:*16*
178:*19*
183:*21*
211:*22*
215:*14*
225:*15*
226:*1*
229:*18*
242:*10*
**puts**  210:*1*
**putting**
111:*19*

**< Q >**
**Q**  9:*9, 12,*
*19*  10:*4, 15,*
*21*  11:*2, 6,*
*9, 12, 14, 16,*
*19, 22*  12:*2,*
*6, 8, 11, 14,*
*16, 18, 22*
*13:2, 5, 8,*

*10, 12, 16,*
*19, 23*  14:*3,*
*6, 8, 19, 22*
*15:2, 5, 14,*
*21*  16:*1, 6,*
*13, 17, 19*
*17:1, 5, 7,*
*11, 17, 21*
*18:6, 12, 15,*
*18, 20*
*19:10, 13,*
*17, 21*  20:*3,*
*7, 12, 16, 18,*
*20, 22*  21:*2,*
*4, 7, 10, 13,*
*18*  22:*3, 6,*
*11, 13, 16,*
*20*  23:*3, 11,*
*13, 15, 17,*
*19, 21*  24:*1,*
*3, 6, 9, 11,*
*14, 18, 20,*
*23*  25:*2, 4,*
*7, 10, 13, 15,*
*20*  26:*1, 4,*
*6, 9, 11, 13,*
*16, 19, 21,*
*23*  27:*2, 6,*
*10, 14, 17,*
*23*  28:*7, 10,*
*13, 17, 21*
*29:1, 3, 5, 7,*
*9, 11, 13, 15,*
*17, 19, 21,*
*23*  30:*2, 4,*
*7, 10, 12, 15,*
*17, 19, 21*
*31:1, 3, 6, 9,*
*11, 15, 22*
*32:4, 9, 14,*
*20*  33:*2, 8,*
*16*  34:*3, 12,*

*16, 20*  35:*2,*
*5, 10, 18, 20*
*36:1, 4, 6, 9,*
*13, 18, 21*
*37:8, 12, 18,*
*23*  38:*2, 5,*
*8, 11, 21*
*39:1, 8, 21*
*40:5, 17*
*41:3, 6, 12,*
*21*  42:*7, 10,*
*12, 19, 22*
*43:2, 4, 11,*
*14, 20, 23*
*44:2, 11, 13,*
*17, 19, 22*
*45:1, 3, 15,*
*17, 23*  46:*6,*
*11, 14, 18,*
*22*  47:*2, 6,*
*9, 12, 19*
*48:3, 5, 10,*
*14, 18, 23*
*49:3, 6, 12,*
*16, 22*  50:*3,*
*5, 8, 12, 15,*
*20, 23*
*51:11, 16*
*52:1, 3, 9,*
*12, 16, 18,*
*20*  53:*2, 6,*
*12, 14, 23*
*54:3, 6, 22*
*55:2, 9, 15,*
*20*  56:*3, 8,*
*10, 17, 20*
*57:2, 9, 13,*
*20*  58:*2, 11,*
*19*  59:*5, 14,*
*16*  60:*8, 12,*
*20*  61:*1, 13,*
*17*  62:*2, 5,*

*7, 10, 12, 18,*
*20*  63:*3, 8,*
*13, 17, 23*
*64:6, 9, 16,*
*21*  65:*5, 9,*
*20*  66:*2, 8,*
*22*  67:*5, 14,*
*20*  68:*2, 9,*
*13, 23*  69:*3,*
*7, 12, 15, 19,*
*22*  70:*3, 6,*
*10, 13, 18,*
*20, 22*  71:*1,*
*7, 10, 14, 17,*
*21*  72:*1, 5,*
*8, 13, 16, 22*
*73:2, 10, 15,*
*19, 21*  74:*8,*
*12, 18, 21*
*75:10, 19*
*76:2, 7, 13,*
*22*  77:*14,*
*16, 18, 22*
*78:2, 10, 17,*
*23*  79:*4, 16,*
*19, 21*
*80:15, 17*
*81:5, 9, 13*
*82:2, 5, 9,*
*13, 19, 21*
*83:1, 3, 5, 8,*
*11, 13, 16,*
*18, 22*  84:*4,*
*8, 12, 14*
*85:1, 7, 14*
*86:9, 12, 21*
*87:2, 5, 8,*
*12, 15, 20,*
*22*  88:*1, 5,*
*8, 12, 16, 18,*
*22*  89:*5, 9,*
*14, 19*  90:*3,*

Video Deposition of Rusty Hughes

1/19/2024
126

6, 10, 13, 22
91:5, 11, 13,
18  92:2, 5,
7, 11, 13, 15,
18, 21  93:1,
12, 16  94:4,
8, 17, 21
95:1, 7, 16,
23  96:6, 10,
13, 20  97:1,
5, 10, 13, 16,
21  98:2, 6,
10, 13, 16,
22  99:4, 15,
19, 23
100:3, 9, 13,
21  101:3, 5,
7, 10, 13
102:1, 6, 10,
15, 18, 22
103:1, 4, 6,
11, 21, 23
104:3, 5, 8,
10, 12, 15,
23  105:3, 6,
9, 13, 16, 23
106:3, 5, 10,
13, 18, 22
107:3, 9, 12,
15, 18, 23
108:3, 7, 9,
13, 19, 23
109:3, 6, 8,
11, 16, 18,
21, 23
110:6, 12,
15, 18, 21
111:3, 12,
17  112:1, 4,
8, 10, 16
113:4, 8, 11,
17, 21

114:7, 10,
13, 17, 19,
22  115:15
116:2, 6, 10,
16, 20, 23
117:4, 8, 13,
16, 19, 22
118:2, 6, 8,
12, 14, 16,
19  119:1,
12, 17, 19
120:1, 3, 9,
12, 14, 16,
19, 22
121:3, 5, 8,
17  122:3, 6,
9, 12, 16, 18,
22  123:2,
10, 13, 15,
20  124:1, 4,
8, 12, 16, 20,
22  125:2, 5,
11, 17, 23
126:3, 8, 11,
13, 19, 23
127:8, 12,
22  128:4,
11, 14, 17,
20, 23
129:3, 13,
21  130:1, 5,
7, 12, 18
131:6, 11,
22  132:5,
10, 17, 20
133:10, 14
134:1, 6, 15,
20  135:9,
15, 20
136:1, 6, 9,
12, 17
137:1, 5, 12,

15, 20
138:1, 3
139:5, 19
140:15, 20
141:5, 8, 15,
22  142:3, 7,
10, 12, 16,
19, 22
143:1, 9, 13,
17, 23
144:2, 6, 13,
21  145:6,
14  146:1, 9,
13, 20
147:5, 11,
16, 19
148:1, 5, 12,
15  149:1,
13, 20
150:7, 16
151:6
152:5, 17,
22  153:5,
13, 21
154:1
155:1, 3, 15,
21, 23
156:10, 16
157:6, 10,
16, 21
158:3, 5, 9,
15, 21
159:5, 8, 10,
18  160:2, 6,
10, 14, 18,
21  161:4,
11, 18, 23
162:8, 11,
15, 17, 22
163:3, 10,
14, 16, 19,
22  164:2, 5,

8, 11, 19, 23
165:5, 8, 16,
23  166:4,
13, 17
167:3, 9, 12,
16, 21
168:1, 6, 20,
23  169:4, 6,
10, 15, 18,
20, 23
170:3, 9, 11,
16, 18, 22
171:3, 5, 11,
14, 19, 21
172:1, 6, 17
173:2, 9, 11,
21  174:3, 8,
12, 18, 23
175:2, 5, 15,
23  176:6,
14, 20
177:1, 7, 10,
13, 19, 21
178:8, 10,
13  179:1, 5,
14, 16, 21
180:1, 3, 10,
14, 20
181:5, 9, 13,
15, 21
182:2, 5, 7,
10, 15
183:10, 20
184:1, 7, 12,
18  185:7,
14, 17, 20
186:5, 8, 10,
13, 16, 19
187:1, 5
188:5, 13,
19  189:2,
11, 17, 22

190:4, 9, 14,
17, 23
191:5, 12,
15, 18
192:2, 5, 21
193:2, 18,
23  194:6,
13, 23
195:19
196:1, 7, 11,
13, 18, 23
197:6, 14,
19, 23
198:9, 13,
23  199:6,
14, 20
200:7, 14,
20  201:2,
11, 14
202:16, 18,
22  203:5,
12, 17, 20
204:11, 18,
21  205:8,
20  206:4,
14, 21
207:1, 4, 19
208:2, 4, 12,
15, 20
209:4, 11,
13  210:1, 5,
9, 18, 22
211:7, 14,
17, 22
212:2, 7, 9,
11, 15, 17,
20  213:2, 5,
8, 14, 17, 20
214:1, 7, 14,
19, 22
215:8, 13,
18, 21

Video Deposition of Rusty Hughes

1/19/2024

127

216:*6, 13, 18*  217:*4, 10, 23*
218:*6, 14, 17, 21*
219:*1, 6, 13, 21*  220:*3, 6, 9, 14, 17*
221:*1, 4, 6, 21*  222:*1, 5, 20*  223:*2, 12, 15, 21*
224:*3, 14, 17, 23*
225:*2, 5, 10, 14, 21, 23*
226:*5, 12, 18, 23*
227:*7, 9, 12, 19*  228:*3, 7, 12, 16*
229:*1, 4, 8, 14, 16, 23*
230:*5, 9, 15, 17, 19*
231:*7, 14, 17*  232:*3, 9, 15*  233:*2, 9*
234:*8, 13, 17, 20*
235:*2, 7, 13, 22*  236:*5, 8, 15*  237:*12, 17*  238:*2, 9, 12, 16, 19*
239:*4, 9, 17*
240:*6, 12, 17, 19, 21, 23*  241:*3, 5, 15, 20*
242:*5, 8, 13, 18*  243:*3,*

*11, 13, 16, 20*  244:*1, 4, 10, 14*
245:*2, 4, 7, 10, 14, 17, 19*  246:*1, 6, 10, 14, 18, 23*  247:*2, 7, 13, 20*
248:*6, 14, 22*  249:*2, 8, 10, 15, 18, 23*  250:*6, 10*  251:*1, 7, 9, 20, 22*
252:*11, 18, 21*  253:*1, 5, 8, 15*  254:*4, 11, 18, 22*
255:*2, 7, 13, 19*  256:*2, 11, 16, 23*
257:*4, 13, 18, 23*
258:*3, 7, 17, 20, 22*
259:*1, 5, 15, 20*  260:*10, 14*  261:*1, 6, 9, 12, 19*
262:*2, 7, 12, 22*  263:*5, 13, 18*
264:*3, 5, 16, 20*  265:*5, 12, 20*
266:*1, 4, 9, 15, 21, 23*
267:*6, 13, 16, 19*
268:*3*
269:*2, 17*

270:*20*
271:*4, 9, 12, 15*  272:*1, 7, 13, 20*
273:*2, 8, 13, 18*  274:*1, 6, 10, 16, 23*
275:*10, 16, 18, 20, 22*
276:*3, 7, 11, 14, 17*
278:*4, 10, 14*  279:*3, 6, 9, 13, 17, 22*
280:*10, 15, 21*  281:*2, 5, 14, 17*
282:*6, 14, 17*  283:*4, 10, 19*
284:*2, 8, 10, 20*  285:*4, 7, 11, 16, 21*
286:*2, 6, 11, 13, 16, 22*
287:*3, 5, 10, 12, 22*
288:*4, 9*
289:*4, 12, 19, 23*
290:*8, 11, 17, 21*
291:*2*
**Q4/23**
213:*12*
**Qualified**
134:*19*
135:*11*
267:*2*
**quarter**
22:*14*
213:*14*

227:*15*
230:*2*
235:*19*
**quarterly**
42:*14, 15*
43:*5*
**question**
9:*23*  10:*18*
11:*15, 16*
12:*19*  51:*7, 21*  60:*21*
90:*14*
114:*4, 8*
119:*8*
137:*11, 22*
139:*5*
150:*8*
151:*16*
152:*16*
153:*21*
154:*19*
162:*6*
221:*23*
235:*17*
253:*9, 16*
262:*3, 5*
271:*19*
**questioned**
290:*21*
**questions**
2:*21, 22*
20:*7*  22:*21*
292:*8*
**quick**  290:*3*
**quickly**
271:*6*
**quite**
160:*12*
169:*13*
247:*10*
**quotas**
263:*17*

**quote**
41:*17*  56:*1*
187:*18*
259:*6*
271:*15*
**quotes**
86:*2*

**< R >**
**R**  5:*1*
292:*1*
**race**  80:*13*
145:*1, 7*
259:*9*
260:*4*
264:*1*
**Rachel**  6:*7*
8:*10*  9:*22*
54:*14*  90:*1*
140:*5*
151:*19*
154:*15*
194:*22*
247:*15*
248:*3, 9*
253:*20*
254:*17*
256:*1*
291:*4*
**racial**
17:*14*  63:*9*
80:*9*
155:*12*
263:*13, 15, 19*  274:*17*
275:*1*
276:*4*
283:*7*
**racially**
66:*15*
145:*12*
152:*14*

Video Deposition of Rusty Hughes

1/19/2024
128

**racism**
63:*14*  75:*6*
**racist**  65:*1,*
*16*  66:*5*
67:*21*
**raise**  88:*16*
89:*10*
144:*12*
208:*21*
**raised**
170:*12*
171:*15, 21*
181:*11*
184:*18*
188:*6*
225:*20*
226:*19*
**raising**
151:*13*
181:*6*
226:*13*
240:*8*
278:*19*
**ramp-up**
93:*11*
**range**
17:*13, 15*
198:*6*
**ranges**
16:*7*
**ranks**
15:*11*
**rarely**
133:*12, 13*
**reach**
269:*11*
**read**  8:*23*
147:*3*
168:*6*
178:*3*
218:*20*
286:*16, 20*

**reading**
2:*12*  32:*8*
34:*15*
53:*18*
**really**
38:*19*  86:*6*
125:*9*
137:*22*
175:*20*
206:*6*
231:*20*
233:*18*
252:*21*
271:*6*
**reason**
175:*20*
226:*22*
**reasonable**
193:*15*
**reasoning**
226:*17*
**reasons**
184:*16, 17*
**recall**  11:*6*
12:*14*  13:*4,*
*5*  14:*8*
22:*14*  31:*1,*
*5, 20, 21*
32:*3*  34:*14*
35:*9, 19, 20*
36:*7*  64:*14,*
*21*  65:*8, 20*
66:*1, 2, 7*
67:*14, 20*
73:*20*  74:*3,*
*7*  78:*22*
81:*20*
82:*15*
84:*22*  87:*5,*
*22*  88:*10,*
*17, 19, 21*
91:*20*  96:*6,*

*12*  100:*8*
102:*4*
105:*8*
106:*7, 9*
112:*9, 14*
116:*8, 19*
117:*3*
119:*15*
125:*17, 22*
126:*13*
127:*11*
128:*2, 4, 11,*
*14*  129:*8*
130:*11*
136:*15*
141:*1, 4, 6,*
*7, 10, 13, 17,*
*21*  142:*13*
143:*15, 16*
155:*9*
156:*17*
157:*2, 5, 6,*
*10, 16, 21*
159:*18, 22*
171:*14*
172:*1, 5, 11,*
*17*  173:*11,*
*21*  174:*1, 9,*
*12*  175:*1, 3,*
*4*  176:*14,*
*19, 21, 23*
177:*1, 5*
181:*21*
185:*23*
225:*11, 13*
226:*7, 16,*
*18, 21*
227:*7*
228:*14*
241:*8*
243:*9, 22*
245:*11*

246:*5, 7, 8*
247:*5*
257:*8*
273:*4*
275:*7, 9*
278:*9, 19*
279:*2, 4, 5*
281:*14*
288:*16*
289:*1, 2, 4,*
*13*  290:*1,*
*10*
**receive**
47:*13*
65:*14*
97:*22*
205:*19*
211:*20*
231:*23*
232:*1, 3*
236:*6*
**received**
12:*9*
234:*23*
241:*20*
278:*21*
**receives**
217:*9*
**receiving**
178:*4*
209:*22*
**recess**
60:*4*
140:*11*
222:*16*
287:*18*
**recognition**
268:*22*
**recognize**
248:*17*

**recollection**
119:*5, 14*
256:*14*
**recommend**
50:*20*  95:*1*
**record**
7:*14*  8:*3*
9:*10*  10:*7,*
*13*  25:*4*
60:*1, 3, 7, 9*
67:*6*  89:*18*
101:*7*
114:*20*
140:*10, 14,*
*16*  141:*22*
160:*15*
163:*16*
199:*13*
213:*23*
222:*15, 19,*
*21*  287:*16,*
*21, 23*
289:*22*
291:*8*
**recruiter**
132:*3*
**recruiters**
46:*5*
131:*21*
**recruiting**
241:*22*
**Reeves**
84:*19*  85:*1,*
*7*
**refer**  57:*1*
161:*23*
162:*17*
264:*12*
**reference**
11:*13*
37:*10*
76:*21*

Video Deposition of Rusty Hughes

155:*11*
161:*17, 21*
178:*5*
288:*15*
**referenced**
204:*7*
232:*23*
263:*22*
271:*18, 23*
**references**
233:*6*
235:*15*
**referencing**
120:*7*
208:*9*
231:*15*
246:*21*
259:*3*
264:*1*
290:*4*
**referral**
131:*16*
**referred**
49:*2*  92:*22*
161:*12*
164:*15*
165:*6, 9, 11*
**referring**
216:*23*
230:*22*
242:*1*
265:*6, 14*
**reflect**
237:*14*
**refresh**
119:*5*
**refrigerator**
159:*15*
160:*1, 3, 7,
8, 11*

**refrigerators**
159:*3, 6, 11*
**regard**
45:*13*  49:*7,
13*  93:*18*
121:*10*
180:*22*
203:*23*
227:*9*
261:*22*
263:*1, 7, 15,
19*  265:*21*
280:*16*
**regarding**
51:*2*  55:*4*
282:*18*
**regardless**
240:*1*
**region**
40:*13, 15*
**regional**
147:*1, 20,
22*  148:*7*
**regular**
42:*17*
161:*2, 7, 8*
232:*23*
239:*6*
**regulatory**
259:*7*
**Reich**
24:*16*
44:*21*
**rejected**
111:*15*
**related**
23:*13*  51:*1*
53:*3*  128:*9*
172:*21*
174:*19*
177:*11, 14*

178:*1*
179:*17, 18,
22*  247:*8*
251:*15*
263:*8*
**relating**
2:*16*
**relation**
34:*18*
180:*15*
292:*14*
**relations**
147:*1, 2, 20,
22*  148:*7,
13*
**relationship**
39:*2*  40:*7,
9*  273:*10,
15, 19*
**relationship
s**  19:*3, 4*
21:*22*  37:*6,
14*  38:*13,
16*  39:*19*
86:*5*
247:*10*
**release**
65:*1*  66:*10*
**releases**
66:*3*
**releasing**
11:*18, 19*
**religion**
259:*10*
**religious**
259:*23*
**remain**
36:*13*  37:*7*
**remember**
14:*15, 17*
31:*2, 4*
32:*7, 8*

35:*14*
62:*15*
65:*18*
66:*17*
67:*13, 19*
84:*20*  85:*4,
11*  86:*15,
18*  87:*13*
96:*4, 9*
104:*18*
112:*7, 18*
116:*15*
117:*23*
122:*21*
123:*6*
126:*22*
127:*14, 19,
20*  128:*6, 8*
129:*11, 17*
131:*8*
142:*1, 2, 17*
143:*13*
154:*14*
160:*8*
165:*12*
168:*11*
172:*14, 15,
23*  173:*14,
15, 16, 20*
174:*6, 11*
177:*7, 8*
178:*4*
181:*18, 19*
182:*11, 13,
14*  186:*21*
189:*8*
199:*22, 23*
224:*6, 8, 23*
225:*9*
241:*12*
245:*21*
246:*11, 13*

248:*4*
255:*14*
257:*12*
263:*12, 21,
23*  265:*3*
289:*9, 17,
20*  290:*3, 5*
**reminder**
67:*4*
**remote**
43:*18*
103:*20*
**remotely**
224:*12*
**removed**
68:*6*  214:*9*
**renewal**
237:*3*
**renewals**
107:*7*
188:*23*
192:*14*
**Repeat**
263:*4*
**rephrase**
151:*6*
**replaced**
70:*20*
170:*16*
185:*20*
186:*19*

**replacement**
186:*2, 3, 21*
**report**  24:*7,
12*  25:*10*
26:*18*  27:*2,
8, 22*  57:*8,
12*  144:*8,
15*  146:*21*
149:*7*
150:*1*

Video Deposition of Rusty Hughes                    1/19/2024

155:*20*
170:*11*
183:*12*
184:*20*
280:*8, 10*
281:*7, 13,
17* 282:*19*
283:*13, 22*
284:*13, 23*
286:*8, 17*
**reportable**
283:*16, 17*
284:*7*
**reported**
*77:3*
*279:18, 21,
22, 23*
*280:2, 15,
20* 281:*1*
*282:4*
283:*20*
284:*18*
**reporter**
*7:16* 8:*13,
20*
**Reporting**
*7:18* 27:*4,
10, 14* 28:*4*
146:*16*
184:*17*
**reports**
*24:14* 26:*7,
17* 27:*11,
15*
**represent**
*8:5* 9:*14*
**representati
on** 168:*13,
14, 15*

**represented**
81:*18, 22*

**representin
g** 167:*6*
**represents**
168:*17*
292:*10*
**request**
111:*17*
198:*19*
242:*10*
**requested**
111:*1*
128:*1*
179:*21*
215:*1*
**requesting**
129:*4*
215:*1*
**require**
53:*20, 21*
**required**
195:*8*

**requirement**
283:*22*
284:*13, 18*
286:*17*
**requirement
s** 195:*1*
259:*7*
**requisition**
198:*2, 5*
242:*23*
**researched**
262:*7*
**resignation**
290:*8*
**Resource**
262:*12, 14,
20*
**resources**
35:*5, 7*
36:*3, 8, 9,*

*14* 145:*13,
21* 147:*12,
23* 148:*6*
149:*4*
150:*6*
152:*16*
153:*20*
156:*12*
264:*22*
283:*18*
**respective**
*2:3*
**respond**
*12:16*
**responded**
*61:1*
**response**
*9:5* 10:*8, 9*
22:*12* 24:*2*
29:*4* 38:*23*
47:*8, 11*
53:*13* 62:*4*
109:*2, 7*
114:*16*
118:*15*
169:*19*
183:*2, 8*
186:*18*
196:*22*
202:*17*
204:*20*
211:*23*
225:*1*
231:*13*
253:*4*
258:*6*
**responsibilit
ies** 18:*21*
51:*9*
201:*10*
**responsibilit
y** 19:*1, 8*

37:*2* 56:*11,
16, 17, 21*
57:*3* 58:*20*
59:*7* 75:*11*
192:*12*
203:*13*
207:*4*
223:*9*
269:*12*
**responsible**
18:*10*
134:*11*
210:*21*
233:*17*
234:*7*
237:*11*
270:*17*
**Rest** 264:*9*
**restroom**
59:*19*
**result**
186:*23*
247:*2, 6*
292:*16*
**results**
28:*5*
165:*20*
**retail** 71:*11*
**retain**
179:*3*
**retaliated**
57:*10*
**retaliation**
17:*17, 22*
18:*5* 51:*3*
53:*4* 55:*5*
56:*22* 57:*5*
75:*22* 76:*9,
16* 77:*3, 12,
19* 146:*4*
184:*8, 12,
15*

**retaliatory**
184:*15, 22*
185:*5, 14*
**retention**
179:*5*
**retired**
15:*11*
62:*17*
68:*22* 85:*5*
170:*2, 3*
**retirement**
170:*9, 10*
**retiring**
170:*13*
**retreat**
165:*12, 15,
17* 171:*16,
18, 19, 22*
172:*3, 9, 16,
19, 20, 22*
**retreats**
165:*5, 9*
168:*2*
**return**
227:*21*
229:*17*
**revenue**
37:*1, 2, 9,
16* 38:*13*
166:*3, 5, 12,
21, 23*
167:*2*
218:*12*
219:*5, 23*
220:*2, 12*
221:*10, 18*
**review**
11:*3* 48:*10*
98:*21*
139:*10, 19*
196:*7*
198:*16*

Video Deposition of Rusty Hughes

1/19/2024

131

260:*16*
261:*1*
**reviewed**
196:*7*
230:*21*
**Rhonda**
98:*2, 6*
100:*4, 8, 9,*
*17*  101:*7*
**rhyme**
175:*20*
**right**  16:*13*
17:*11*
19:*18*  20:*6*
21:*11*
22:*10*
27:*10, 13,*
*23*  37:*21*
43:*23*
49:*12*
50:*14*
51:*11*  54:*8,*
*17*  79:*17*
84:*12*  87:*6*
103:*3, 18*
106:*18*
109:*1*
110:*6*
120:*15*
123:*20*
124:*20*
128:*15*
144:*1*
145:*18*
146:*10*
151:*4*
172:*17*
177:*7*
184:*4*
186:*17*
190:*14*
191:*11, 12,*

*13*  195:*13*
196:*15, 18*
197:*19*
203:*14, 15,*
*23*  204:*19*
207:*1, 8*
208:*14, 22*
210:*11, 19*
218:*14, 19*
222:*20*
223:*15*
230:*18*
231:*7*
234:*15*
236:*3*
237:*13*
238:*5*
244:*2*
250:*14*
253:*2*
254:*22*
255:*3*
258:*23*
262:*3*
264:*3*
265:*8*
270:*21*
271:*12*
275:*20*
276:*20*
280:*14*
286:*11, 23*
287:*5, 22*
289:*11*
**right-hand**
61:*20*  62:*2*
68:*14*
74:*21*  78:*3*
146:*18*
199:*7*
**risk**  71:*18*

**road**  21:*23*
22:*1*
**Robert**
71:*2*
**Robertson**
20:*19*  92:*2*
94:*10, 18*
103:*8*
104:*15*
114:*14*
130:*12*
132:*10*
139:*8*
191:*19*
195:*19*
199:*16*
200:*8*
201:*15*
202:*23*
204:*9*
207:*21*
208:*5, 10*
**Rogers**
62:*11, 14*
**role**  15:*4,*
*12*  105:*20*
106:*21*
107:*7*
127:*6, 17*
128:*10*
132:*15*
190:*7*
200:*2*
**Ron**  25:*21*
180:*20, 23*
181:*5*
185:*17*
**room**
160:*1, 3*
**rose**  15:*10*
**Ross**
20:*19*  22:*3*

92:*2*  94:*10,*
*18, 21*
103:*7*
104:*15*
114:*14*
130:*12*
131:*5*
132:*10, 12*
139:*8*
191:*19*
195:*19*
199:*15*
202:*23*
207:*21*
208:*5, 10*
271:*4*
**Roughly**
102:*23*
118:*11*
271:*8*
**routinely**
236:*6*
**RPR**  2:*6*
7:*1*  292:*20*
**rude**  10:*12*
**Rufus**
72:*16*
73:*21*
**ruled**
288:*22*
**rules**  2:*16*
7:*4*  10:*5*
**run**  87:*7*
129:*10*
233:*21*
**running**
129:*19*
**runs**
125:*12*
169:*8*
**Russell**
29:*14*

31:*11*  83:*6*
100:*23*
101:*13*
**RUSTY**
1:*16*  2:*4*
7:*8, 19*
8:*16*  9:*11,*
*12*  18:*16,*
*18*  22:*21*
28:*18*  34:*6,*
*17*  36:*21*
41:*7*  45:*18*
51:*1*  54:*6*
58:*21*
59:*22*  60:*8,*
*12*  61:*17,*
*22*  63:*23*
68:*14, 19*
74:*9*  75:*10*
78:*3*  80:*17*
81:*2*  89:*19*
90:*14*
110:*7*
114:*7*
116:*6*
123:*2*
128:*5*
137:*5*
138:*1, 5*
139:*6*
140:*15*
144:*22*
146:*9*
149:*20*
152:*6*
153:*22*
155:*1*
172:*1*
174:*18*
193:*18*
196:*13*
197:*7*

Video Deposition of Rusty Hughes

1/19/2024

132

200:*7*
201:*15*
204:*11, 18*
209:*16*
215:*10*
219:*1*
222:*13, 21*
226:*23*
229:*4*
235:*7*
240:*6*
243:*18*
248:*14*
252:*19*
256:*23*
257:*2, 23*
264:*5*
272:*21*
278:*4, 20*
287:*13, 23*
288:*10*
290:*1*

**< S >**
**S**  *2*:*1*  *5*:*1*
**s/Tanya**
*292*:*19*
**sad**  *183*:*8*
**SAITH**
*291*:*12*
**salaries**
*199*:*6*
**salary**
*91*:*14, 17*
*97*:*13*
*197*:*14, 15,*
*22*  *198*:*6*
*199*:*23*
*200*:*4, 18*
*204*:*9*
*205*:*6, 16*
*206*:*17*

208:*8, 16*
209:*19*
231:*4*
**sales**
*18*:*11*  *19*:*1,*
*6, 7*  *105*:*17*
*200*:*2*
*269*:*1*
**Sanders**
*30*:*17*
*120*:*22*
*187*:*4*
**Sanderson**
*29*:*6*
**Sarah**
*116*:*2*
*117*:*10*
*141*:*15, 18*
*142*:*3, 4, 12*
*143*:*1*
*156*:*20*
*201*:*23*
*207*:*19*
**save**  *212*:*2,*
*6, 7, 11, 13,*
*14*
**saw**
*129*:*22*
*172*:*2, 7*
*278*:*5*
**saying**
*32*:*3*  *33*:*11*
*131*:*4*
*141*:*5, 23*
*143*:*15, 23*
*144*:*2*
*149*:*22*
*150*:*20*
*153*:*6*
*157*:*7*
*162*:*7*
*175*:*2*

176:*14, 19,*
*20, 23*
185:*12*
194:*21*
197:*12, 18*
239:*4*
246:*10, 11*
279:*3*
283:*19*
**says**  *44*:*5*
*60*:*14*
*68*:*15*
*74*:*13, 23*
*75*:*18*
*80*:*20*
*81*:*14*
*111*:*22*
*117*:*9*
*132*:*5*
*133*:*18*
*141*:*8, 15*
*143*:*17*
*146*:*16, 21*
*147*:*10*
*148*:*16, 23*
*149*:*13*
*151*:*10*
*156*:*21*
*187*:*12*
*199*:*7*
*213*:*9*
*216*:*12*
*219*:*9, 15*
*227*:*21*
*229*:*16*
*230*:*20*
*242*:*11*
*243*:*16, 17*
*244*:*11, 12*
*254*:*19*
*257*:*1, 4*
*258*:*3, 7*

259:*5*
260:*9*
264:*6, 9*
265:*13*
272:*4*
288:*10*
**scale**
*217*:*15*
*218*:*7*
*220*:*9*
*237*:*21*
*238*:*9, 17*
*239*:*5*
**Scott**
*24*:*17*  *25*:*2*
**seal**  *277*:*4*
**SEALED**
*4*:*5*
**search**
*177*:*10*
**searchable**
*179*:*11*
**seat**  *239*:*23*
**second**
*74*:*12*
*82*:*20*
*89*:*16*
*215*:*7*
*242*:*15*
*256*:*23*
*257*:*1*
**secretary**
*71*:*4*  *163*:*1,*
*4*
**section**
*146*:*16*
*264*:*6*
**securing**
*86*:*4*
**Securities**
*72*:*18*

**see**  *24*:*21*
*32*:*4*  *40*:*16*
*53*:*15*  *54*:*4*
*62*:*2, 3*
*83*:*21*
*90*:*15*  *91*:*8*
*99*:*6*
*121*:*19*
*122*:*3*
*123*:*13*
*129*:*10*
*137*:*5, 8, 15*
*138*:*11*
*146*:*18*
*159*:*13*
*171*:*2*
*183*:*9*
*187*:*3*
*188*:*13, 16,*
*18*  *192*:*6*
*197*:*1*
*198*:*9, 10,*
*23*  *206*:*15,*
*16*  *207*:*5*
*209*:*8, 10,*
*13*  *217*:*11,*
*12*  *233*:*12,*
*22*  *243*:*16*
*244*:*10*
*248*:*16*
*258*:*5*
*259*:*13*
*261*:*2*
*262*:*7, 22*
*263*:*6, 14*
*290*:*8*
**seeing**
*155*:*12*
*172*:*5*
*227*:*7*
*247*:*9*
*249*:*17*

Video Deposition of Rusty Hughes

1/19/2024

133

250:*9*
263:*12*
290:*10*
**seen** 34:*12,*
*17* 44:*11*
60:*21* 66:*8*
90:*4, 5, 6, 8*
112:*4*
123:*19*
153:*12*
209:*7, 11*
216:*13*
218:*17*
232:*22*
233:*3*
235:*18, 20,*
*22* 242:*21,*
*22* 243:*2*
248:*23*
249:*1, 15,*
*19* 250:*7*
253:*17*
254:*5, 9*
255:*1*
285:*4, 8, 11,*
*14* 286:*6,*
*13*
**Segrest**
163:*10, 11*
**selecting**
135:*18*
**sell** 255:*4*
286:*11, 22*
**selling**
253:*22, 23*
254:*5*
**sells**
286:*23*
**send**
113:*21*
178:*18*
210:*11, 15,*

*16, 18, 19*
216:*4*
**sending**
13:*3* 225:*5*
232:*15, 16*
**sends** 68:*4*
**senior**
14:*4* 15:*3,*
*8* 18:*7*
19:*10* 20:*2*
25:*14, 15*
37:*21* 38:*9*
56:*10*
85:*16* 92:*7*
103:*13*
122:*7, 12,*
*14, 16, 19,*
*20* 123:*8,*
*16, 17*
124:*2, 5, 14,*
*15, 17, 23*
125:*3, 5*
163:*23*
241:*4*
**sense**
55:*17, 18*
128:*7*
234:*5*
**sent** 12:*6,*
*11* 13:*6*
90:*13*
112:*8, 10*
130:*19*
177:*11*
230:*1, 11*
253:*10*
**sentence**
146:*21*
**separate**
53:*11* 81:*2,*
*5* 260:*5*
277:*4*

**serves**
82:*23* 96:*8*
245:*22*
**service**
107:*7*
**SERVICES**
1:*10* 7:*21*
72:*18*
**set** 85:*21*
168:*9*
221:*15*
263:*23*
270:*14*
**sets** 86:*2*
**setting**
269:*15*
**seven**
18:*22*
44:*18*
124:*7*
125:*4*
126:*16, 17*
164:*3, 6, 7*
165:*2*
201:*17*
220:*22*
221:*2, 8*
237:*19*
**SEVP** 70:*7*
71:*3, 17*
72:*2, 8, 17*
**sexual**
17:*13*
259:*10*
260:*1*
273:*10, 15,*
*19*
**share**
216:*3*
**shared**
156:*19*

**sharing**
157:*22*
**sheet**
216:*20*
217:*3, 5, 14*
218:*7*
**Shelby**
29:*10*
30:*15*
**Shelby's**
29:*11*
**shift** 22:*22*
140:*20*
187:*7*
**shifted**
186:*23*
**short**
224:*12*
**shortly**
189:*9*
**shot** 134:*3*
**show** 34:*4,*
*6* 53:*23*
54:*7* 60:*12*
61:*18*
89:*19*
115:*23*
161:*18*
218:*23*
223:*5*
226:*23*
235:*7*
241:*15*
247:*13*
248:*15, 22*
249:*10*
250:*6*
255:*19*
272:*20*
288:*4*
**showed**
228:*8*

**showing**
195:*17*
**shows**
69:*8*
218:*20*
**sic** 174:*18*
200:*7*
**side** 41:*1*
45:*13*
74:*21* 78:*3*
80:*19* 88:*3*
146:*18*
199:*7*
259:*4*
260:*18*
264:*19*
284:*22*
**sign** 9:*1*
195:*15*
**signature**
2:*12*
**silo** 133:*8*
192:*20*
**similar**
54:*19, 20*
55:*1* 90:*8*
121:*18, 23*
122:*1*
216:*11*
235:*20*
256:*11, 13*
**simply**
77:*10*
195:*16*
**single**
102:*12*
168:*10*
**sit** 45:*11*
130:*7, 9*
161:*10*
205:*14*

Video Deposition of Rusty Hughes

1/19/2024

134

site  53:10
255:12
sitting
141:11
157:21
159:20
situation
134:5
138:21
situations
134:7
six  30:4,
13  92:16
124:6
126:17
165:2
233:7
271:7
sixty-two
199:17, 21
201:19
202:23
skill  266:19
skills
103:15
266:5, 19
slaves
65:22
slip  88:4
Sloneker
122:13, 14,
18  125:18
126:1
245:15, 16
246:1, 2
slow
268:14
small
159:3, 5, 15
smaller
166:23
smart  97:9

Smith
225:2
278:17
so-and-so
199:1
social
260:3
socioecono
mic  259:22
sold  255:2
279:9, 10
285:21
286:2
solely  40:4
270:10
somebody
30:5  39:9
40:8, 10
47:12  50:8
57:2  79:5
89:5
111:18
113:6
115:17
130:21
134:9
135:16
137:6
144:13, 21
184:22
193:9
198:13
209:3
267:21
269:13
son  23:15
234:14
235:3
soon
280:4, 5, 11
sorry  24:1
37:12  45:1,

18  54:1
62:1  74:10
79:15  87:5
100:21
104:2
106:3, 5
114:19
155:2
164:5, 8
170:22
174:23
191:15, 16
196:11
218:22
221:21
222:6
230:17
239:3
247:15
248:3, 10
253:8
254:3, 13,
16, 23
263:4
sort  16:23
22:1
111:10
115:21
149:10
158:20
217:19
sounds
38:4
South  5:6
SOUTHERN
1:3  7:23
10:10
space
231:5
286:5
speak
46:12  47:3

123:22
174:19
194:21
244:13
speaking
79:14
245:21
speaks
153:17
specialize
16:9
specific
38:19
49:10
80:23
102:4, 7
113:13, 14
121:23
122:2
128:8
133:8
148:8
155:11
163:22
174:1
218:8
228:6
230:4
232:1
235:21
262:17
specifically
48:21
64:15
78:15, 22
82:1  102:1
113:1
121:15
128:2
138:10
154:5, 10
159:22

177:9
189:4
260:6
263:10
284:2
289:18
specifics
173:20
speculate
202:9, 10
204:15
speculating
87:1  125:9
speculation
276:22
Spencer
117:4, 5, 8
spend
42:13
189:22
192:8
233:23
spoke
127:10
278:22
spoken
14:1
108:12
spot
209:21
spreadsheet
211:21
212:14
213:11
216:9
228:1, 19
229:6
230:1
231:5, 9, 12
235:1
249:3, 4

Video Deposition of Rusty Hughes

1/19/2024

135

spring
30:18
standard
218:6
standards
75:3
standpoint
63:2
175:12
Standridge
71:11, 12
Starnes
71:17, 18
start   42:8
49:17  52:4
189:2
227:12
241:22
268:23
started
169:22
189:7, 10
241:6, 9
255:14
starting
8:3  199:23
starts
221:16
state   9:9
292:3
statement
102:5
157:3
194:18
233:18
statements
65:14, 21
66:3
153:15
STATES
1:1  179:10
260:6

stating
269:18
status
259:11, 23
stay   21:5
103:15, 16
170:19
184:21
272:19
stayed
62:13
staying
269:19
Steele
23:12
105:2
114:17
130:12
131:8
136:17
234:14
Stefani
35:16  36:6,
18  50:4
148:4, 14
149:11, 12
288:9, 18
290:7
stenotype
292:8
steps
66:12
115:22
280:6, 8
stereotypes
257:5
sticks
263:11
STIPULATE
D   2:2, 11,
18  3:3

stipulation
7:5
stipulations
8:21  9:3
stop   76:9,
15  77:4, 13
264:6, 7
268:12
stopping
59:19
stops
233:11
story
153:23
Street   5:6,
18  6:8
strengths
103:14
strike
63:21
66:21  68:1,
11  73:8
78:14
114:1
131:3
133:5
138:16
161:15
172:13
181:3
183:18
185:3
202:8
232:21
233:15
250:17
strives
81:15
strong
73:23  75:3
structure
45:4, 5

184:21
192:12
structures
240:4
stuff   140:8
234:2
subfolder
213:9
subjective
206:12
submitted
61:4  64:23
65:14  68:3
290:9
subsequent
112:15

subsidiaries
74:15
substantial
194:7
202:6
substantiall
y  202:4
suddenly
268:11
270:13, 14
suggest
48:5
154:22
suggested
198:6
199:21
200:4
suggesting
154:20

suggestions
47:15
48:11
240:3

Suite   2:8
5:6, 12, 18
6:8  7:7
suits
204:15
summer
64:22
SunTrust
14:11, 13,
16  62:16,
20  242:3
258:13
supervise
273:20
supervised
244:1
supervision
27:17
224:15
233:13
supervisor
88:12
146:23
supervisory
52:14
support
262:16
264:11
266:10
supported
128:19
129:11
180:9
supporting
129:17
suppose
17:19
185:16
273:22
supposed
145:17
187:6

Video Deposition of Rusty Hughes

1/19/2024

205:21
280:10
**sure**  10:13,
14  18:17,
19  19:2, 5
20:5  22:8
23:8  42:23
43:3, 9, 18
44:9  47:6
50:22
51:20
54:23  56:6,
12, 21  57:4,
9  58:11, 19,
21  59:8, 22
61:10, 11
66:12  67:5
68:22
69:18  80:8
81:21
82:21  87:7
92:9
102:20
103:2
106:4
107:23
108:1
109:15
111:20
112:15
114:5, 11,
20  123:21
124:18
125:13
128:22
134:2
136:5, 22,
23  137:4
138:9
139:11
146:14
149:1

150:9
151:6
153:3
156:4
158:20
160:5
162:6
164:18
170:23
178:3
179:8, 12
180:15
183:3, 7
184:17
186:1
194:8
200:6, 17
201:2, 7
203:13, 22
207:6
208:8
219:19
222:3, 10
223:9
233:7
243:7
244:8, 11
251:21
253:2
257:17
259:7
261:19
262:1
265:17
266:9
267:1
268:14
273:11
284:6, 23
289:16
**surprises**
205:19

**Susan**
84:18  87:8,
13  88:6, 7,
9, 11  89:9
122:13
169:17
241:6
**Susan's**
88:12
**Sutton**
108:4
224:17, 21
**sweetie**
61:23
196:16
**switched**
61:11
**sworn**  8:17

**sympathetic**
183:3
**system**
51:13
195:16
**systems**
41:16
45:14
264:12

**< T >**
**T**  2:1
292:1
**T&E**  233:23
**table**  240:1
**take**  9:15
10:15, 18
42:7  59:22
60:1  66:12
67:16
139:6
140:3, 4
145:4, 13

173:4, 5
211:7
222:12
236:22, 23
237:1
267:21
270:8
271:4
273:6
287:12
**taken**  2:5
57:20  60:5
140:12
173:7
187:4
214:7
222:17
256:4, 12
287:19
292:7
**takes**
268:15
270:10
**talk**  13:19
34:20, 21
35:6  74:3
75:4  93:17
100:3
101:13
102:12
107:15
108:9
109:8
116:23
121:8
130:7, 10
138:3
140:21
142:19
144:18
175:23
180:4, 16,

23  181:5
183:20
185:17
202:14
205:21
206:2
207:17
256:17
257:14
276:3, 7
290:11, 18,
19
**talked**  9:22
12:18
37:20
48:18  65:1
66:4  92:19
106:7
131:9
132:22
141:16
150:16
151:7
192:5
196:19
207:22
217:5, 14
218:7
253:1
263:14
278:22
284:11
289:6
**talking**
19:17
33:18
34:21
44:16  47:9
52:21  67:9,
17  68:5
73:22  84:1
102:10

Video Deposition of Rusty Hughes

1/19/2024

122:*8*
125:*6*
141:*10*
167:*10, 12,*
*13* 172:*21*
174:*12*
196:*14*
202:*16*
208:*12*
215:*9*
216:*7*
217:*10, 18,*
*21, 23*
218:*11*
260:*18*
263:*16*
264:*7*
266:*2*
289:*13*
290:*17*
**talks** 65:*10*
74:*2* 75:*12*
218:*2*
263:*1*
265:*5*
**Talsma**
108:*23*
201:*21*
**Tanya** 2:*5*
7:*1, 17*
292:*20*
**target**
241:*22*
**targets**
40:*2*
**task** 53:*8*
103:*16*
198:*21*
**tasked** 95:*4*
**Taylor**
4:*15* 24:*16*
240:*17*

241:*21*
242:*10*
244:*2*
**teach** 51:*4*
**teacher**
42:*22*
**team** 19:*11,*
*16, 19, 22*
20:*4, 11, 13,*
*15* 21:*5*
23:*17, 19*
24:*15* 25:*7*
28:*17, 19*
30:*8, 9, 11,*
*12, 22* 37:*1,*
*3, 7, 17*
38:*19* 41:*1,*
*3, 12, 13*
43:*8, 14, 19*
44:*13, 23*
45:*10, 12,*
*20, 22* 46:*1,*
*2, 16, 18*
49:*7, 18, 21,*
*22* 50:*9, 13*
51:*10*
56:*11, 13*
57:*4* 58:*20*
59:*8* 68:*17,*
*18* 82:*7, 16,*
*18* 83:*2, 4,*
*15, 17, 18,*
*20* 85:*3, 13*
86:*6* 87:*12,*
*14, 15, 16,*
*19, 20* 88:*9,*
*15, 23*
90:*19* 91:*7,*
*9* 92:*3, 6,*
*11* 95:*9, 22*
96:*18*
98:*11, 14,*

*23* 99:*5, 15,*
*23* 101:*3, 4,*
*8, 9, 11, 12*
103:*19*
106:*1, 6, 16,*
*23* 107:*1, 6,*
*8, 10* 108:*4,*
*11* 109:*4,*
*19* 116:*3*
117:*5*
118:*3*
119:*20*
120:*4, 17,*
*23* 122:*1, 2,*
*22* 123:*1, 3,*
*4* 124:*8, 11*
125:*12, 19*
126:*4, 11*
127:*4, 7, 17*
128:*10*
129:*9, 20*
133:*19*
134:*11, 12*
135:*6*
136:*4, 13*
138:*21*
139:*16*
142:*5, 6*
144:*18, 19*
163:*13*
165:*18*
166:*1, 2, 8,*
*9, 14, 19, 21*
167:*1, 5, 8,*
*19* 168:*2,*
*13, 20*
169:*12, 14,*
*16, 17*
190:*6, 8*
192:*11, 12,*
*15, 17*
195:*14*

196:*10, 20*
197:*4*
199:*4, 9, 11*
200:*13*
201:*4, 9*
203:*4, 10*
204:*22*
205:*12, 13*
206:*4, 10,*
*13, 14, 21*
207:*5, 12,*
*17* 209:*10,*
*12, 14*
210:*10, 17*
211:*3, 9*
215:*18, 20*
216:*2*
220:*16*
224:*11, 14*
226:*11*
228:*6, 13,*
*17* 229:*5*
230:*4, 15*
231:*18*
232:*1*
233:*17, 21*
234:*3, 6*
235:*19, 21,*
*23* 236:*7*
237:*6, 7, 10,*
*23* 238:*8,*
*14, 15*
239:*11, 17*
240:*1, 2, 5,*
*19, 21, 22*
241:*7, 10,*
*14* 245:*14*
246:*3*
249:*18, 20*
251:*6, 19*
254:*11*
255:*2*

257:*22*
267:*8*
268:*20*
270:*7*
272:*12, 14*
273:*13, 18*
286:*23*
**teammate**
23:*7*
207:*16*
237:*11*
**teammates**
47:*4* 99:*12*
104:*14*
201:*7*
211:*5*
**teams**
18:*22* 19:*2,*
*9* 44:*14, 20*
95:*14*
107:*5*
129:*10*
133:*8, 9, 11*
166:*22*
203:*11*
205:*13*
221:*18*
233:*12, 21*
234:*17*
239:*11, 14*
255:*4*
270:*1*
**technical**
15:*10*
164:*15, 16*
269:*14*
**Tell** 18:*15,*
*20* 21:*7*
24:*3, 6*
53:*14, 15*
64:*6* 85:*20*
91:*5* 102:*1*

104:23
111:18
113:6
121:18
126:23
127:12
149:4
170:3, 11
183:2
192:21
208:15, 19
212:11
248:7
telling
112:18
152:9
177:2
231:9
ten 193:13
208:4
tenure
35:16 90:7
103:17
157:15
201:8, 11
202:6
204:5
237:1
term 79:17
155:12, 23
161:16, 20
256:19
termed
127:5
162:14
terminated
50:8
289:10
terminating
49:16, 19,
23

termination
288:15
289:5, 8
terms
47:17 48:1
187:23
192:13
257:7
test 10:17
53:19, 20,
21
testified
8:18
125:14
156:16, 19
183:10
216:18
220:6
250:16
251:22
282:1
testify
121:13
154:15
194:12
209:2
261:15
288:20
testifying
154:17

TESTIMONY
1:15 4:5
60:10
112:20
114:2
125:15
138:16
140:18
143:19
152:17
161:15

172:7
202:8, 18
222:23
250:13
251:4
275:10
277:3
288:2
292:11
tests 51:13
Texas
26:10
Thank
67:3 90:2
155:23
168:7
191:18
221:6, 7
222:5, 6
242:7, 16
248:11
287:15
291:5
thanks
37:12 45:5
54:15
80:17
thereto 3:2
292:8
thing 31:4
32:12 47:7
148:2
192:20
things
32:15
33:11
98:16
115:11
154:6
184:17
204:19
225:15

237:13
259:6
269:15
283:1, 5
think
12:17
22:10 23:3
30:18 31:6,
23 34:1, 3
35:16
37:20 59:1,
2 62:16
64:23
70:17 77:7,
9, 10, 17
82:20 83:7
84:3 92:17
95:13 96:9
97:5 98:6
100:13
107:18, 21
108:14, 19
109:11, 12
111:21, 22
112:7
116:12, 18
118:1
126:7, 15
127:14
128:20
130:3
135:23
138:18, 20,
21, 23
143:17, 19
144:6, 17,
22 148:1
149:6, 18
150:7
151:2
158:22
159:17

167:17, 19
172:18
173:18
176:15
178:20, 21
179:9, 10,
11 182:4,
16 183:6
185:6
186:3, 22
187:3, 21
190:20, 21
193:6, 8, 9,
15 196:3,
15 201:1
218:4, 5
221:15
225:18
226:6
233:16
234:11
236:20, 21
237:6
247:8
250:18
254:14, 15
255:17
256:9
259:5
265:20
267:18
270:15
271:16
274:9, 13,
14, 21, 23
276:19
278:17
283:11, 16
284:17
287:13
291:3

Video Deposition of Rusty Hughes

1/19/2024

139

thinking
120:*10*
129:*17*
third  61:*22*
258:*1*
thirteen
73:*2*  84:*3*
182:*15*
thirty
221:*3, 8*
thirty-five
84:*6*
221:*12*
thirty-nine
202:*1*
thirty-seven
221:*13*
thirty-two
221:*10*
258:*12*
thoroughly
34:*15*
148:*16*
thought
75:*20*  84:*3*
103:*14*
188:*19*
197:*7*
253:*8, 10*
thoughts
128:*17*
thousand
201:*22*
202:*2*
208:*4*
220:*12, 16,
19, 21, 22*
237:*18, 19*
258:*13, 14,
20*
thousands
39:*15*  40:*6*

three  30:*4*
68:*4*  99:*8*
168:*20*
270:*8*
283:*9*
Tiffany
120:*22, 23*
187:*3*
188:*19*
196:*1, 9*
time  2:*23*
3:*1*  9:*18*
10:*9, 15*
12:*5*  13:*10*
15:*18*  26:*3*
31:*14*  33:*7*
35:*13*
36:*17*
37:*22, 23*
39:*13*
42:*12*  52:*3,
4*  59:*21, 23*
60:*3, 7*
64:*21*  75:*5*
78:*17*
82:*16, 22*
83:*7, 9, 10*
84:*5, 6, 20,
23*  89:*9*
91:*6, 9*
92:*17*  94:*2*
100:*3*
103:*17*
104:*17, 20*
111:*2*
112:*14*
124:*10*
125:*18*
126:*17*
127:*10*
128:*13, 20*
131:*19*

140:*10, 14*
142:*13*
153:*5*
158:*15, 17*
159:*21*
160:*4, 13*
161:*9*
164:*15*
171:*5*
172:*1*
173:*11*
180:*3*
182:*8, 16*
185:*22*
186:*4*
189:*22*
190:*2, 12*
192:*6, 7, 22,
23*  195:*7, 8,
15, 18, 21*
196:*1, 6, 8*
197:*10*
198:*12*
199:*5*
205:*15*
208:*9*
214:*2*
222:*15, 19*
224:*3, 10*
232:*18*
233:*2*
240:*12*
246:*2, 3*
249:*17*
250:*9*
255:*15*
256:*9*
260:*14*
263:*6*
275:*7*
278:*5*

286:*21*
287:*17, 21*
timeframe
113:*9, 13,
14*
timeline
21:*23*  96:*3,
4*  115:*14*
270:*6*
times
40:*12*
153:*11*
173:*6*
212:*13*
269:*23*
title  15:*14,
19*  20:*1, 22*
24:*9*  25:*13,
16, 17*  26:*1,
11, 21*  27:*3*
29:*7, 11, 15,
19, 23*  36:*2,
7*  83:*8*
84:*21*
85:*11, 18*
92:*10*
102:*15*
103:*12*
104:*1, 6*
124:*1*
139:*14*
148:*5, 8, 11*
160:*18*
163:*19, 22*
164:*22*
167:*16, 19*
186:*10*
187:*18*
191:*5, 6*
193:*4*
236:*8, 9, 13,
16*  237:*8*

241:*3*
248:*5*
250:*14*
251:*15*
252:*8, 10*
267:*11, 19*
268:*2, 5, 21*
269:*2, 5, 17,
20*  270:*22*
271:*9*
272:*9*
titles  38:*8*
today  9:*14,
23*  10:*5, 15*
34:*13*
121:*13*
told  27:*11*
44:*22*
49:*13*
74:*10*
85:*15*  93:*2*
114:*14*
127:*12, 15*
133:*14*
141:*15*
156:*20, 22*
172:*9*
180:*21*
181:*19*
184:*20*
185:*8*
188:*10, 12*
193:*23*
205:*8*
207:*23*
208:*17*
209:*3*
225:*14*
226:*1*
228:*3*
237:*17*
tons  140:*8*

Video Deposition of Rusty Hughes

1/19/2024

**Tonya**
119:*19, 20,*
*22*
**top** 60:*14*
90:*15*
243:*16, 17,*
*18* 254:*18*
258:*3*
**topics**
257:*5*
**total** 44:*18*
83:*18*
202:*10, 11*
204:*3, 6*
205:*6*
258:*8*
274:*22*
**totality**
207:*6*
**totally**
250:*16*
**touch**
170:*19*
193:*17*
**track** 37:*4,*
*5* 192:*22,*
*23*
**train** 41:*8,*
*11, 18*
45:*10*
281:*6*
**trained**
53:*6* 57:*13,*
*21* 58:*7*
64:*1, 10*
73:*10, 15*
76:*14*
78:*11*
138:*6*
153:*5*
184:*7*
193:*19, 23*

194:*14, 16*
195:*1, 6, 10*
281:*5, 10*
**Training**
4:*10, 21*
21:*14, 18*
41:*15* 42:*2,*
*13* 43:*8, 14*
45:*8, 13*
50:*23* 51:*4,*
*9* 53:*2, 16*
55:*3* 73:*12*
74:*4* 76:*19,*
*23* 81:*20*
92:*19*
94:*14*
153:*14*
154:*3, 9*
155:*3, 9*
246:*20*
255:*8, 12,*
*15* 256:*17*
257:*10, 16,*
*17* 260:*15*
261:*13*
264:*20*
273:*3, 4*
**trainings**
54:*9*
**transcribed**
292:*9*
**transcript**
277:*5*
292:*7, 11*
**transcriptio**
**n** 292:*10*
**transfer**
136:*14, 16*
226:*10, 15,*
*17, 20*
**transferred**
30:*22*

107:*5*
183:*15*
224:*4, 19*
226:*14*
247:*4*
**transferring**
226:*7*
**travel**
40:*14*
234:*1*
**traveling**
244:*19*
**treasurer**
70:*7*
**treat** 58:*3,*
*4* 150:*17*
**treated**
57:*22*
58:*13, 22*
59:*3, 9*
89:*10*
138:*8*
150:*22*
151:*9, 14*
153:*7, 8*
162:*19, 23*
163:*4*
170:*6, 13*
171:*7*
283:*1, 11*
284:*3*
**treating**
134:*1*
**Tredway**
26:*8, 16*
48:*1* 50:*5*
167:*14*
168:*3, 4*
198:*7, 10,*
*16*
**trends**
200:*18*

**Trey** 24:*16*
25:*2* 44:*21*
95:*22*
**Trey's**
136:*4, 13*
**trial** 3:*1*
**Trigg**
24:*17, 18,*
*19*
**trigger**
225:*16, 17*
279:*19*
281:*7, 15*
282:*18*
283:*5, 21*
284:*13, 18*
**triggering**
119:*13*
**triggers**
286:*17*
**trips**
244:*22*
**true**
143:*23*
145:*10, 15*
149:*21*
150:*20*
194:*4*
292:*11*
**TRUIST**
1:*10, 11*
8:*11* 13:*20*
14:*7, 8, 10,*
*12, 17*
21:*15*
22:*18*
26:*13, 23*
27:*3, 8, 15,*
*18* 28:*5, 11,*
*14, 16*
34:*22* 35:*6,*
*11* 36:*8, 9,*

*14* 51:*13,*
*17, 22*
52:*10, 11,*
*12, 20* 53:*9*
54:*10*
55:*20*
60:*16* 61:*1*
64:*3* 65:*15*
66:*4* 67:*8,*
*21* 73:*19*
75:*19* 76:*7,*
*11* 77:*1*
81:*6, 8, 11*
90:*7*
116:*10*
146:*2*
167:*20*
179:*1*
193:*22*
194:*1, 15*
195:*7*
242:*3*
248:*18*
250:*2*
253:*19*
254:*9, 21*
255:*9*
258:*9*
260:*16*
262:*23*
279:*15*
282:*10*
283:*21*
**Truist/Hendr**
**ix** 227:*3*
235:*9*
**Truist's**
51:*17*
55:*10*
57:*16*
184:*13*

Video Deposition of Rusty Hughes

1/19/2024

141

Truitt
24:16, 22
25:1, 2
240:17, 18,
19, 21
241:6, 21
242:10, 19
244:1
Truitt's
244:20
truly
233:20
268:15
trust   129:9
truth   64:7
try   22:23
188:3
200:12
220:18
251:6
trying
10:12
27:20
84:20   85:4
91:8   92:17
99:12
152:3
159:16
243:6
253:23
265:11
turn   61:20
146:10
turned   46:5
Twelve
15:4   25:19,
21   84:3
91:19   95:7
twenty
101:20
104:22
208:4

twenty-five
151:23
152:3
220:12
237:18
twenty-
seven
220:23
237:20
two   18:7
19:20   30:4
38:15   42:9
61:17   73:2
82:22   83:5
99:8
102:21
139:3
162:8
166:11
179:10, 12
201:21
213:19
214:5
221:11, 12
228:21
229:1
270:8
289:6, 14
Tyler
19:15, 19,
23   25:3
47:1   94:23
211:3, 8
type   16:6
17:7   37:19
38:2   50:23
55:3   93:12
145:16
161:12
typed
188:14
types   55:13

typical
45:4   47:5
Typically
40:1   41:1
115:19
133:6, 7
175:7, 9

< U >
U   2:1
Uh-huh
9:4   10:8
22:12   24:2
29:4   38:23
47:8, 11
53:13   62:4
109:2, 7
114:16
118:15
169:19
186:18
196:22
202:17
204:20
211:23
231:13
253:4
258:6
ultimate
47:18, 19
56:15   89:3
223:9
ultimately
19:8   21:23
37:5   43:1
48:8   49:20
89:7   94:23
129:18, 19
132:2
166:16
198:7
200:3

210:15
212:23
234:2, 7
235:2
unbeknown
st   135:7
underneath
213:8
269:13
understand
9:23   32:9,
14, 20
33:10   51:7,
21   55:10
56:4, 6
58:18
66:14
77:18
78:23
79:21
96:13
99:20
114:3, 8
119:8
124:20
137:21
143:3
145:1
146:1
147:5
149:15
150:9, 12
151:9, 12
153:13
154:3
155:4
162:6
163:5
188:5
195:11
220:9
221:19

231:21
236:22
238:9
244:14
246:14
251:9
252:1
257:18
260:10
265:13
282:7
understandi
ng   48:15
60:15
76:23   79:3,
4, 8, 10
80:3   87:2
113:5, 18
119:3
130:14
146:15
154:12
172:6
190:7
202:20
219:8
242:9
252:13
255:13
282:7
288:14
understood
75:15
96:19
127:7
247:23
251:1, 5
252:9
Underwood
136:9

underwriter
117:12
123:8
underwritin
g  88:2, 3
unfair
154:18
uniqueness
259:21
UNITED  1:1
upcoming
209:23
upset
172:2, 5, 7,
10, 15, 18
173:12
174:14
177:3
278:6, 7
upstairs
288:11
use  51:17
152:18
155:5, 15
usual  8:20
9:2
usually
53:19
175:10, 13
198:6
205:12
212:8
213:16

< V >
vaguely
131:8
142:17
173:14, 15,
20
value  64:2
values  75:3

Vance
119:19, 22
varies
239:11, 14
240:5
various
159:1, 4
173:3
184:16, 17
283:1
Varner
118:2
vary  168:10
verbalized
95:20
verbally
10:6  156:8
verbatim
154:14
versa
194:19
versus
7:21
165:15
188:15
192:8
236:17
251:11
veterans
81:17
vice  194:19
vice-
president
14:4  15:3,
8  18:7, 21
25:17  79:6
82:10
VIDEO
1:15  2:4
7:19  11:1
291:8

Videograph
er  6:14
7:14  8:12
60:2, 6
140:9, 13
222:14, 18
287:16, 20
291:7
view  143:7
251:14
viewed
233:20
251:15
violate
57:16
225:23
violates
77:22
violation
75:12
vision
262:16
visit  38:16
visits  42:16
visualize
159:17
voice  240:2
volume
237:3
VP  56:10
197:1
232:17
233:9, 11
vs  1:9

< W >
W  69:8
wage
193:19
Wait
174:22
215:6

waived
2:13  3:5
want  9:21
10:12
38:16  40:8,
14  60:9
76:2, 7
77:2, 3, 10,
11  96:11
99:7, 13
101:16
102:2
105:19, 20
126:3
132:20
133:1
134:21
140:4, 17,
21  146:14
150:8
160:23
180:15
183:5
199:2
204:11, 16
208:7
220:7
222:22
239:18, 20
245:22
261:12, 16,
17, 21
268:7
288:1, 12
wanted
95:10, 21,
23  97:1, 8
100:5
102:11
109:9
133:14

wanting
98:3
116:23
126:20
127:4
142:20
wants
76:14
102:14
107:22
War  65:10
67:17
warm  39:17
watch
161:18
watched
161:19, 20
way  28:9
40:3, 12
41:18  58:2
75:16
96:18
133:7
144:19
145:5
155:20
174:14
175:7
177:16
187:11
201:10
233:19
ways
38:15
135:9, 15
151:23
152:3
wear  18:8
Weaver
72:2, 3
website
57:19  99:3

210:*7*
244:*4*, *9*
253:*19*
254:*8*, *14*, *15*, *21*
**Wednesday**
227:*22*
**week**
170:*21*
195:*18*
**weekly**
161:*4*
**weeks**
161:*6*
**Well**  33:*8*
68:*2*  76:*22*
78:*10*  79:*7*
85:*20*
87:*15*  89:*5*
93:*16*
104:*15*
111:*17*
130:*18*
143:*13*
145:*14*
166:*4*
169:*21*
175:*7*
182:*21*
188:*22*
203:*20*
204:*13*
232:*3*
238:*9*
253:*9*
258:*7*
263:*5*
265:*20*
276:*20*
281:*20*
283:*23*

**well-
rounded**
257:*21*
**went**  21:*15*
86:*12*
121:*13*
142:*17*
207:*22*
228:*8*, *17*
241:*13*
**We're**  7:*17*
8:*23*  9:*14*
10:*12*  23:*3*
44:*6*  49:*3*
60:*9*  76:*20*
94:*9*  99:*11*
112:*22*
130:*20*
138:*3*, *9*
140:*20*
146:*14*
156:*16*
161:*8*
175:*9*
200:*17*
211:*3*
214:*23*
215:*2*
220:*2*
222:*21*
269:*19*
287:*16*, *23*
291:*5*
**We've**  23:*7*
37:*19*  84:*5*
101:*20*
115:*4*
131:*18*
133:*2*, *6*, *7*
139:*2*
153:*10*
161:*8*, *11*

173:*23*
196:*14*
215:*1*
266:*1*
275:*7*
284:*11*
285:*14*
**white**  69:*4*,
*12*, *19*  70:*3*,
*10*, *22*  71:*7*,
*14*, *21*  72:*5*,
*22*  168:*21*
**whites**  58:*4*
**Whitlock**
117:*4*, *6*
**wholesale**
16:*2*  42:*2*
**widely**
239:*14*
240:*5*
**WILKERSO
N**  289:*23*
**Wilkinson**
2:*7*  4:*3*
5:*10*, *11*
7:*6*, *20*  8:*4*,
*22*  9:*2*, *8*,
*13*  33:*5*, *8*
54:*4*, *6*, *14*,
*16*  55:*18*,
*20*  56:*2*, *3*
59:*20*  60:*8*
79:*13*, *16*
80:*5*, *15*
90:*1*, *3*
100:*16*, *21*
111:*6*, *12*
114:*6*, *7*
125:*17*
140:*3*, *7*, *15*
151:*18*, *21*
152:*1*, *5*

154:*11*, *15*,
*20*  155:*1*
194:*20*, *23*
199:*14*
204:*17*, *18*
214:*23*
215:*5*, *8*
222:*12*, *20*
230:*8*, *9*
242:*7*, *8*, *16*,
*18*  247:*15*,
*20*  248:*3*, *6*,
*9*, *13*, *14*
253:*7*, *19*
254:*2*, *4*, *16*,
*18*  256:*1*, *2*
278:*4*
281:*20*
282:*1*, *6*
287:*22*
291:*3*
**Wilson**
72:*8*, *13*
**wine**  158:*7*,
*22*  159:*1*
160:*2*, *5*
161:*10*
**wishes**
185:*6*
**Withdraw**
133:*17*
**witness**
2:*13*  7:*8*
8:*14*  67:*2*
125:*16*
137:*18*
154:*16*
292:*12*
**woman**
143:*17*
144:*7*
149:*4*, *13*,

*22*  150:*9*
151:*10*
**women**
31:*18*, *23*
32:*1*, *16*, *22*
33:*12*, *20*
58:*5*, *12*, *21*
59:*3*, *8*
73:3  81:*16*,
*22*  82:*16*
83:*5*, *22*
84:*8*, *15*
89:*10*
91:*20*, *22*
135:*18*
138:*10*, *13*
141:*3*, *16*,
*19*  143:*2*,
*17*  149:*5*,
*13*  150:*10*,
*18*, *21*
151:*8*, *10*
156:*12*, *20*
157:*7*, *11*,
*18*  161:*23*
162:*18*
170:*5*, *12*
171:*7*
200:*21*
201:*3*, *16*,
*17*, *22*
202:*4*
203:*2*
260:*19*
262:*8*
276:*20*
284:*11*
**Woodworth**
136:*11*
**word**
152:*18*
155:*6*, *15*

156:*5*
249:*6*
263:*22*
**words**
127:*19*
128:*9*
152:*22*
153:*3*
155:*5*
157:*3*
252:*21*
269:*20*
281:*6*
282:*17*
283:*12*
**work**  15:*6*
40:*1*  68:*23*
76:*10, 17*
144:*19*
161:*9*
163:*10*
183:*13*
188:*14*
190:*18*
192:*13, 18,*
*19*  193:*6*
195:*18*
226:*7, 10*
251:*5*
269:*10*
270:*16*
278:*6*
**worked**
142:*4*
245:*15*
**working**
94:*14*  95:*8*
126:*13*
158:*10*
190:*21*
224:*11*

**workplace**
77:*20*
**works**
101:*19*
175:*7, 10*
186:*11*
**worksheet**
211:*13, 15*
231:*8*
**worksheets**
214:*15*
215:*14, 22*
**world**
169:*8*
**worry**
193:*12*
**worthy**
257:*4*
**Wow**  42:*10*
**wrap**  149:*2*
181:*10*
240:*7*
278:*19*
**write**  188:*3*
259:*18*
**writing**
225:*15*
226:*2*
272:*10, 11*
**written**
15:*16*  41:*8*
44:*2, 4*
53:*20*
84:*11*
133:*21*
206:*2*
219:*14*
239:*15*
272:*3, 4*
273:*12, 17*
274:*3*
281:*11, 14*

**wrong**
74:*10*
126:*4*
194:*17*
197:*7*
218:*4*
226:*6*
279:*10*
**wrote**
217:*12*
265:*10*
**Wyoming**
244:*23*

< X >
**X**  4:*1*
193:*11*
219:*11*
272:*6*

< Y >
**Y**  193:*11*
272:*6*
**Y'all**  13:*15*
16:*19*  39:*1*
40:*17*  44:*3*
93:*22*
112:*16*
141:*9, 11*
182:*2*
191:*7*
207:*21*
238:*22*
255:*15*
279:*9, 10,*
*11*  281:*5,*
*21*  286:*22*
288:*16*
**y'all's**
156:*23*
211:*9*

**Yates**
72:*17, 20*
73:*21*
**Yeah**
16:*19*
22:*12*  29:*6*
31:*8*  37:*12,*
*14*  42:*11,*
*23*  44:*1, 23*
45:*2*  47:*8*
48:*4*  54:*2*
59:*21*  67:*5*
84:*2*
100:*18, 20*
106:*4, 5*
108:*6*
112:*22*
114:*12*
116:*15, 22*
118:*13*
122:*10*
123:*14*
124:*18, 21*
130:*6*
139:*5*
158:*8*
160:*13*
161:*20*
164:*7*
168:*5, 6*
169:*5, 13*
170:*23*
171:*4*
179:*6, 15*
184:*6*
192:*4*
196:*18*
200:*13*
203:*7*
205:*12*
207:*19*
210:*16*

211:*6*
212:*16*
213:*1, 16*
216:*12*
217:*23*
219:*12*
220:*5, 8, 11*
221:*6, 22*
222:*1, 5*
223:*14*
226:*11*
229:*15*
230:*16*
231:*20*
235:*6*
243:*19*
244:*11*
253:*21*
254:*20, 23*
255:*5*
257:*4, 17*
268:*7*
269:*22*
280:*5*
287:*1, 8, 11*
289:*11, 12*
**year**  13:*5*
14:*12, 15*
21:*3*  22:*8,*
*11*  31:*1, 2*
35:*19*
42:*12*
52:*22*  53:*1*
61:*13*
62:*13, 15*
86:*15, 22*
87:*22*  99:*7*
104:*19*
113:*11*
123:*7*
128:*14*
138:*6*

Video Deposition of Rusty Hughes

1/19/2024

145

154:*4*
158:*1*
165:*22*
168:*9, 10, 12*  199:*17*
202:*2*
205:*15*
209:*20*
213:*15*
224:*6, 9*
241:*13*
**yearly**  53:*8*
**years**
 14:*18*  15:*4*
 25:*19, 21*
 42:*9*  87:*7*
 92:*16*  99:*8*
 101:*16, 20, 21*  102:*21*
 104:*21*
 108:*17*
 110:*14*
 115:*7, 13*
 124:*7*
 125:*4*
 126:*16, 18*
 164:*3, 6, 7, 23*  165:*2, 11*  179:*10, 12*  182:*16*
 193:*14*
 201:*18*
 213:*19*
 214:*5*
 231:*22*
 233:*8*
 241:*7, 8*
 268:*15*
 270:*8*
 271:*7, 8, 10*
**yep**  205:*7*

**yesterday**
 13:*8*  215:*4*
**Yvette**
 108:*23*
 201:*21*

**< Z >**
**Z**  193:*11*
 272:*6*
**zero**  115:*7, 13*  219:*23*
 220:*11, 16*
 237:*18*
**zip**  231:*8, 10*  232:*10*
**Zoghby**
 6:*14*  7:*16*