FILED
2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 3

# Video Deposition
# of Corey Daugherty

June 21, 2023

Hendrix v. CRC Insurance Services, Inc., et al.

2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ALABAMA
3          SOUTHERN DIVISION
4
5   CASE NUMBER: 2:21-CV-0300-MHH
6
7   KATHRYN HENDRIX,
8        Plaintiff,
9        vs.
10  CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL
11  CORP, and TRUIST BANK,
12       Defendants.
13
14
15      VIDEO DEPOSITION TESTIMONY OF:
16          COREY DAUGHERTY
17
18
19          JUNE 21, 2023
20          9:32 A.M.
21
22
23

Page 2

1          S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and
3   between the parties through their respective
4   counsel that the deposition of COREY DAUGHERTY
5   may be taken before Tanya D. Cornelius, RPR,
6   CSR, and Notary Public, at the offices of
7   Barrett & Farahany, 2 20th Street North, Suite
8   900, Birmingham, Alabama, on the 21st day of
9   June, 2023, commencing at approximately 9:32
10  a.m.
11      IT IS FURTHER STIPULATED AND AGREED
12  that the signature to and the reading of the
13  deposition by the witness is NOT waived, the
14  deposition to have the same force and effect as
15  if full compliance had been had with all laws
16  and rules of Court relating to the taking of
17  depositions.
18      IT IS FURTHER STIPULATED AND AGREED
19  that it shall not be necessary for any
20  objections to be made by counsel to any
21  questions, except as to form or leading
22  questions, and that counsel for the parties may
23  make objections and assign grounds at the time

Page 3

1   of the trial, or at the time said deposition is
2   offered in evidence, or prior thereto.
3       IT IS FURTHER STIPULATED AND AGREED
4   that notice of filing of the deposition by the
5   Commissioner is waived.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1              I N D E X
2   EXAMINATION BY:                 PAGE NUMBER
3       MS. GILL                       9
4
5
6       * * * * * * * * * * * * * *
7
8          EXHIBIT INDEX
9   PLAINTIFF'S EXHIBIT NO:          PAGE NUMBER

10  1  Notice of Deposition          10
11  2  Dashboard                     62
12  3  Answers to Interrogatories    71
13  4  E-mail                        79
14  5  E-mail                        80
15  6  Form                          97
16  7  Learning History             106
17  8  Application                  129
18  9  Notes                        140
19  10 Employment Agreement        146
20  11 Marketing Document          147
21  12 Document                    149
22  13 Photo                       169
23  14 Document                    173

Page 5

EXHIBITS (Continuing)

1
2
3   15  E-mail                    179
4   16  E-mail                    182
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       PALMER LAW, LLC
5       BY:  Leslie A. Palmer, Esq.
6       104 23rd Street South, Suite 100
7       Birmingham, Alabama  35233
8
9       PATRICIA A. GILL, P.C.
10      BY:  Patricia A. Gill, Esq.
11      P.O. Box 55204
12      Birmingham, Alabama 35255
13
14  FOR THE DEFENDANTS:
15      BAKER, DONELSON, BEARMAN, CALDWELL
16          & BERKOWITZ, P.C.
17      BY: Rachel Barlotta, Esq.
18          Kayla M. Wunderlich, Esq.
19      420 North 20th Street, Suite 1400
20      Birmingham, Alabama  35203
21
22  ALSO PRESENT: Kathryn Hendrix
23          Taylor Holland, Videographer

Page 7

1        I, Tanya D. Cornelius, RPR, CSR, and
2   Notary Public, acting as Commissioner, certify
3   that on this date, as provided by the Federal
4   Rules of Civil Procedure, and the foregoing
5   stipulation of counsel, there came before me at
6   the offices of Barrett & Farahany, 2 20th Street
7   North, Suite 900, Birmingham, Alabama 35203,
8   beginning at 9:32 a.m., COREY DAUGHERTY, witness
9   in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11
12
13        VIDEOGRAPHER:  We are going on the
14  record.  The date is June 21st, 2023.  The time
15  on the monitor is 9:32 a.m. Central Standard.  My
16  name is Taylor Holland, and our court reporter is
17  Ms. Tanya Cornelius.  We're here on behalf of
18  Cite Court Reporting out of Montgomery, Alabama.
19        This is the video deposition of Mr.
20  Corey Daugherty, who is the corporate
21  representative of CRC Insurance Services,
22  Incorporated, which was noticed by Leslie Palmer
23  for the case Hendrix V CRC Insurance Services,

Page 8

1   Incorporated, et al.  It's filed in the U.S.
2   District Court for the Northern District of
3   Alabama, Southern Division, Case Number
4   2:21-CV-0300-MHH.
5        Counsel, please identify yourselves
6   for the record, and we'll start with the
7   plaintiffs.
8        MS. PALMER:  Leslie Palmer for
9   plaintiff Kathryn Hendrix.
10       MS. GILL:  Patricia Gill for
11  plaintiff Kathryn Hendrix.
12       MS. BARLOTTA:  Rachel Barlotta for
13  CRC Insurance, Truist Financial, and Truist Bank.
14       MS. WUNDERLICH: Kayla Wunderlich for
15  CRC, Truist Bank, and Truist Financial.
16       VIDEOGRAPHER:  Thank you.  Will our
17  reporter please administer the oath to the
18  witness?
19
20        COREY DAUGHERTY,
21   being first duly sworn, was examined
22        and testified as follows:
23

Page 9

1    THE REPORTER: Will this be usual
2  stipulations?
3    MS. BARLOTTA: We're going to read
4  and sign.
5    MS. GILL: Everybody ready?
6    THE WITNESS: Yep.
7
8    EXAMINATION
9  BY MS. GILL:
10    Q.   All right. If you could please state
11  your name for the record.
12    **A.   Corey Edward Daugherty.**
13    Q.   Mr. Daugherty, my name is Patricia
14  Gill, and I represent CRC in a lawsuit that
15  Kathryn Hendrix has filed against them. Have you
16  ever given a deposition before?
17    **A.   I have.**
18    Q.   Okay. As you know, because you've
19  done this before, if you can say yes or no out
20  loud for the court reporter so that she can
21  record it. This one is a little different,
22  because we are videoing it, but if you could do
23  that for her, that way we can read the transcript

Page 10

1  later; is that fair?
2    **A.   Yes. No.**
3    Q.   And if you don't understand any of my
4  questions, I would just ask that you let me know
5  you don't understand, and I'll gladly rephrase
6  it; is that fair?
7    **A.   Yes.**
8    Q.   And if you don't ask me to rephrase
9  it, I'm going to assume that you understand my
10  question; is that fair?
11    **A.   Yes.**
12    Q.   Are you on any drugs or medication
13  that would alter your ability to answer my
14  questions today?
15    **A.   No.**
16    Q.   Okay. Mr. Daugherty, I'm going to
17  show you what I've marked as Plaintiff's Exhibit
18  Number 1.
19    (Whereupon, Plaintiff's ==Exhibit No. 1==
20  was marked for identification and a copy of same
21  is attached hereto.)
22    Q.   It's a copy of the deposition notice.
23  Have you seen a copy of that?

Page 11

1    **A.   I have not.**
2    Q.   Okay. Do you understand that you're
3  here in the capacity of a 30(b)(6) corporate
4  representative for CRC?
5    **A.   Yes.**
6    Q.   And you understand that your answers
7  are binding on the company?
8    **A.   Yes.**
9    Q.   I'm just going to kind of go through
10  this notice if you want to flip through it. I
11  have some questions to ask about each of these
12  topics that are listed in the notice.
13    **A.   Okay.**
14    Q.   Well, first, what is your position at
15  CRC?
16    **A.   Professional liability broker, senior**
17  **vice-president.**
18    Q.   And what does CRC do?
19    **A.   We are a commercial insurance**
20  **wholesale brokerage firm.**
21    Q.   How long have you been at CRC?
22    **A.   I started April 1st, 1996.**
23    Q.   Okay. And my understanding is you're

Page 12

1  a broker now?
2    **A.   Correct.**
3    Q.   Okay. How long have you been a
4  broker?
5    **A.   I started July of 2000 after**
6  **graduating UAB as a broker in training and was on**
7  **a team that was led by Betsy Barnett at the time.**
8  **I was on her team in the training capacity for**
9  **approximately, I would say, five, six years, then**
10  **in 2008 rolled off of her team and started my own**
11  **team.**
12    Q.   And a lot of the questions today I
13  think are going to be of the structure of the
14  company. So I guess is broker the highest level
15  of position that you can get outside of
16  executives?
17    **A.   Correct, yes.**
18    Q.   I guess let's just start from the top
19  and go down, like the top would be the president
20  or CEO?
21    **A.   Yes.**
22    Q.   Who is that?
23    **A.   David Obenauer.**

Video Deposition of Corey Daugherty

Page 13

1   Q.   Okay.  And is he president or CEO or

2   both?

3   **A.   Both.  I believe he wears both titles**

4   **now.**

5   Q.   And who is below David?

6   **A.   Our office -- well, Brent Tredway is**

7   **who our office reports into.**

8   Q.   And what is his position?

9   **A.   I don't know Brent's exact title, but**

10  **he's out of our Houston office.**

11  Q.   You don't know if he's a

12  vice-president or anything like that?

13  **A.   He's -- president of wholesale**

14  **operations would be --**

15  Q.   And you said your office reports to

16  him?

17  **A.   Uh-huh (positive response).**

18       MS. BARLOTTA:  Is that a yes?

19  **A.   Yes.**

20  Q.   Who is below -- the next in line

21  below him?

22  **A.   John Cadden.**

23  Q.   And what is his position?

Page 14

1   **A.   He's office president, CRC**

2   **Birmingham.**

3   Q.   Okay.  And would it be fair to say --

4   how many offices do y'all have?

5   **A.   I don't know.**

6   Q.   I mean, are there offices more than

7   just the Birmingham and Houston office?

8   **A.   Oh, yes.**

9   Q.   And so would it be fair to say the

10  other offices in other cities would have a

11  structure similar to the Birmingham office?

12  **A.   Yes.**

13  Q.   Okay.  And that they would report to

14  David -- I missed his last name.

15  **A.   Obenauer.**

16  Q.   Obenauer as well?

17  **A.   Yes.**

18  Q.   Or Brett Tredway, I guess, would be

19  -- it's David, then Brett, and then each

20  individual city's office?

21  **A.   Office.**

22  Q.   Is that correct?

23  **A.   Yes.**

Page 15

1   Q.   Okay.  Below John Cadden, who is

2   that?

3   **A.   Each department has an individual**

4   **within their department that manages the**

5   **respective departments in the CRC Birmingham**

6   **office, which would be property, casualty, and**

7   **professional liability.**

8   Q.   Property, casualty, and then

9   professional liability?

10  **A.   Professional liability.**

11  Q.   Are those the only two departments in

12  Birmingham?

13  **A.   Three.  Property and casualty are**

14  **their own separate.**

15  Q.   Okay.  And so each of those

16  departments has a manager?

17  **A.   Yes.**

18  Q.   Who is the manager for the

19  professional liability?

20  **A.   Rusty Hughes.**

21  Q.   And who is the manager for property?

22  **A.   Paul Martin.**

23  Q.   And the manager for casualty?

Page 16

1   **A.   Peter Curtin.**

2   Q.   Are you familiar with the plaintiff

3   in this case, Kathryn Hendrix?

4   **A.   Yes.**

5   Q.   And I think she sometimes goes by

6   Kat?

7   **A.   Yes.**

8   Q.   Did she ever work in the property or

9   casualty departments?

10  **A.   Not that I'm aware of.**

11  Q.   And did Kat Hendrix work in the

12  professional liability department?

13  **A.   Yes.**

14  Q.   Who is below the manager, Rusty

15  Hughes?

16  **A.   Each individual broker team lead.**

17  Q.   I think you mentioned you trained

18  with Betsy Barnett.  Did she have her own team?

19  **A.   She's retired.**

20  Q.   At the time that Kathryn Hendrix was

21  there, did she have a team?

22  **A.   No.  She had already retired.**

23  Q.   I guess, name each team.

Page 17

1    A. **My team, of course. Rusty Hughes has**
2 **a team. He and Tyler O'Connor run that team.**
3 **James Powell and Alex Gould, G-o-u-l-d. Trey**
4 **Reich, T-r-e-y R-e-i-c-h, Lee McClure,**
5 **M-c-c-l-u-r-e.**
6    Q. Okay.
7    A. **And then Scott Trigg is head of our**
8 **underwriting programs.**
9    Q. So Scott Trigg has his own team, but
10 they're not brokers --
11    A. **Correct.**
12    Q. -- they're underwriting?
13    A. **Yes.**
14    Q. So if I count correctly, you have
15 seven broker teams and then the one underwriting
16 team?
17    A. **Yes.**
18    Q. Are each of the teams comprised of
19 the same number of brokers and subordinates or
20 are they different?
21    A. **Each is different.**
22    Q. Is the leader of each team the only
23 actual broker on the team?

Page 18

1    A. **No.**
2    Q. So some teams might have two brokers?
3    A. **Yes.**
4    Q. And does each team have inside
5 brokers?
6    A. **No.**
7    Q. Which teams do not have inside
8 brokers?
9    MS. BARLOTTA: Are you talking about
10 currently?
11    MS. GILL: I'm talking about when Kat
12 Hendrix was there.
13    A. **Oh, when Kat Hendrix was there. Let**
14 **me think back. Rusty Hughes did not have an**
15 **inside broker at that time. I do not recall.**
16 **James Powell did not have an inside broker at**
17 **that time. Truitt Taylor, I do not believe, had**
18 **an inside broker when she was hired. And Truitt**
19 **Taylor is another team lead. Sorry.**
20    Q. Okay. I was looking through my list.
21 I didn't see that name.
22    A. **Yeah.**
23    Q. So that is actually eight different

Page 19

1 broker teams?
2    A. **Yeah.**
3    Q. And then one underwriting team. You
4 don't think that Truitt had an inside broker?
5    A. **Not at that time of hire.**
6    Q. Did all the teams have associate
7 brokers?
8    A. **Let me think. 2014. I don't know at**
9 **that time what Corey Woodward's title would have**
10 **been or how long Corey Woodward had been with us,**
11 **but he's on Trey Reich's team. But all the other**
12 **teams would have had an associate broker or**
13 **another broker on the team at that time.**
14    Q. And I guess let's talk about that.
15 What are the different types of brokers that you
16 can have?
17    A. **Inside broker.**
18    Q. Okay.
19    A. **There's a title associate broker,**
20 **which we view that as another broker on a team,**
21 **and then, of course, the lead broker.**
22    Q. So associate broker is the same thing
23 as a broker?

Page 20

1    A. **Yeah. They're just another broker on**
2 **the team that's responsible for their production.**
3    Q. So there's really no difference in
4 job duties between associate broker and broker?
5    MS. BARLOTTA: Object to form.
6    A. **Some in terms of leadership and**
7 **management of the team and responsibility.**
8    Q. Excluding leadership and management
9 of the team, are the day-to-day duties of the
10 broker the same as an associate broker?
11    A. **Yes.**
12    Q. And the associate broker is revenue
13 producing?
14    A. **Yes.**
15    Q. Okay. Tell me what is the difference
16 between those two positions and an inside broker.
17    A. **An inside broker works on the team in**
18 **the capacity of supporting a team from a growth**
19 **perspective, primarily the responsibility of**
20 **helping to market existing business and place new**
21 **business from existing retail relationships.**
22 **Significantly less travel commitment.**
23    Q. I guess the emphasis is on the word

Page 21

1    "inside" as it relates to that?

2        A.   Correct, yes.

3        Q.   It's work that you already -- that

4    already exists and owns.  They just maintain it

5    and keep it going, I guess?

6        A.   Yes.  And inside also referring to

7    the fact that there's less of a travel

8    expectation or commitment or responsibility.

9        Q.   Is an inside broker revenue

10   producing?

11       A.   Not directly in terms of new

12   business.  An inside broker is responsible for

13   maintaining and generating revenue-existing

14   business.

15       Q.   Now, I've also seen some information

16   produced, I can't remember where, about an

17   account executive.  What is that position?

18       A.   An account executive is a

19   service-based role.  Account executives support

20   the team in the capacity of marketing some

21   business at the direction of the broker, sending

22   out submissions with cover letters that have

23   typically been prepared by the broker, issuing

Page 22

1    quotes, issuing binders, sending out requests to

2    bind, invoices, issuing endorsements, reviewing

3    policies in some capacity for accuracy, and then

4    just general service needs of our retail clients.

5            When somebody needs a change to a

6    policy or has a question about an invoice or

7    accounting function, typically the account

8    executive role is the person that handles that.

9        Q.   So would you characterize the account

10   executive as being more administrative or

11   secretarial?

12           MS. BARLOTTA:  Object to form.

13       A.   Administrative, not secretarial.

14   Administrative, but, I mean, they do things that

15   are extremely important in providing the customer

16   experience and making sure that our client

17   service needs are met efficiently and

18   effectively.

19       Q.   Are any of those duties that you just

20   listed, like issuing quotes for binders,

21   invoices, any of those things that you listed,

22   are brokers, associate brokers, or inside brokers

23   required to do those tasks?

Page 23

1        A.   Yes.  They do them every day.

2        Q.   And I believe you just said that the

3    account executive also markets at the direction

4    of the broker?

5        A.   Yes.

6        Q.   What do you mean by market?

7        A.   When we get -- so us being a

8    wholesaler, so when we get a submission from one

9    of our retail clients, that submission comes to

10   us.

11           Typically, the way that it works is

12   the broker looks at it, reviews the submission

13   documents, application, loss runs, the industry

14   that we're dealing with, the product line that

15   we're dealing with.

16           We will then put together what we

17   refer to as a cover letter, which will have

18   account name, it will have the account website,

19   it will have exposure, which could vary.  If

20   we're dealing with, you know, a general business,

21   revenue is going to be the exposure.  If we're

22   dealing with an employment practices liability

23   placement, employee counts is going to be the

Page 24

1    exposure basis.

2            We will reference on that cover

3    letter the current coverage, who they're with

4    right now on the insurance company side, their

5    loss history, attachments, identify what we're

6    looking for.

7            We will typically send that out to a

8    market, and then I or the broker will follow that

9    up with someone on the team and say, We also need

10   to send this to X, Y, Z markets.  It could be as

11   few as two or three markets or it could be as

12   many as twenty-five or thirty different markets.

13       Q.   So would you characterize that as

14   they're reaching out to potential new clients to

15   drum up business?

16       A.   No.

17       Q.   Okay.

18       A.   They're not reaching out to the

19   client in that capacity.  They're reaching out to

20   the insurance company.  The client is who sends

21   us the business.  We then send that out to the

22   insurance company.

23           So in that phase of the transaction,

Page 25

1   we got the account from our client.  It could be
2   a renewal.  It could be a piece of new business
3   from an existing client or it could be a piece of
4   new business from a brand new client we've never
5   worked with before.
6       Q.   Who is your client?  What is their
7   position?
8       A.   Retail insurance agency.
9       Q.   Okay.  So like if you go to your
10  local State Farm Insurance office, they could
11  potentially be your client?
12      A.   They would not.  State Farm is a
13  personal lines carrier.  We're commercial
14  insurance.
15      Q.   Commercial insurance?
16      A.   Yes.
17      Q.   Okay.  And I was just using State
18  Farm as an example.  They're the first company
19  that came to my mind, but okay.
20      A.   Right.  It happens often.
21      Q.   Okay.  But something like that, like
22  an agency?
23      A.   Yes.

Page 26

1       Q.   I mean an insurance company that has
2   different agencies with agents in their offices,
3   those agents would be your clients?
4       A.   Yes.
5       Q.   Okay.  I just want to make sure I
6   understand correctly.
7            Okay.  What about a broker assistant?
8       A.   Broker assistant, we've got one on
9   our team now.  A broker assistant is someone who
10  does not have any responsibility for quoting,
11  binding, marketing, reviewing coverage.
12           The role that I have on my team now,
13  the broker assistant handles all renewal
14  solicitations for our clients and --
15      Q.   That's what they do now?
16      A.   And tax documents.
17      Q.   Did they do that before -- when
18  Kathryn Hendrix was there?
19      A.   We didn't have a broker assistant on
20  the team at that time.
21      Q.   Are there any other members of the
22  team that I have missed?
23      A.   Currently or at the time?

Page 27

1       Q.   At the time that Kathryn Hendrix was
2   there.
3       A.   At the time she was there was myself,
4   Clay, Kathryn, Yvette, Andrea, and then Tiffany
5   joined in January of 2018.
6       Q.   All right.  Let's go through each one
7   of those.  Clay, what is Clay's last name?
8       A.   Segrest.
9       Q.   And what was his position?
10      A.   Broker.
11      Q.   He was a broker?
12      A.   Yes.
13      Q.   Was he a broker at the time that
14  Kathryn Hendrix was there?
15      A.   Yes.
16      Q.   Okay.  And then you mentioned Yvette?
17      A.   Uh-huh (positive response).
18      Q.   What was Yvette's last name?
19      A.   Talsma, T-a-l-s-m-a.
20      Q.   And what was her position?
21      A.   Account executive.
22      Q.   And then what was -- you mentioned
23  Tiffany?

Page 28

1       A.   Yes, Sanders.
2       Q.   And what was her position?
3       A.   Account executive.
4       Q.   Andrea?
5       A.   Andrea Sutton, S-u-t-t-o-n.
6       Q.   Okay.
7       A.   Account executive.
8       Q.   Okay.  And then, of course, Kathryn
9   Hendrix?
10      A.   Yes.
11      Q.   What was her position?
12      A.   She was hired as an account
13  executive.
14      Q.   Did she receive any promotions from
15  account executive?
16      A.   She did.
17      Q.   What promotion did she receive?
18      A.   Inside broker.
19      Q.   And do you remember when she received
20  that promotion?
21      A.   It was end of summer or early fall of
22  2017, I believe.
23      Q.   And why did Kathryn Hendrix get the

Page 29

1  promotion?

2      A.  It was something that she had shown

3  interest in.  We had talked about it, about her

4  wanting to get out of the account executive role.

5  We felt like she was capable, so we promoted her.

6      Q.  Okay.  When was Clay Segrest hired as

7  broker?

8      A.  He was hired in 2008 as a broker in

9  training.

10     Q.  2008?

11     A.  Uh-huh (positive response) -- excuse

12  me.  2009.  2009.

13     Q.  Okay.  And when did he become an

14  actual broker?

15     A.  I don't know the answer to that

16  question to be exact.  He was hired as a broker

17  in training, which at that time was kind of a

18  mentoring program that CRC had.

19         It was how I was hired.  I was hired

20  as a broker in training with Betsy Barnett.  I

21  was in that capacity with her for five to six

22  years.

23     Q.  So he also trained with Betsy

Page 30

1  Barnett?

2      A.  Yeah.  He was on Betsy's team with me

3  as well.

4      Q.  Did you offer the broker in training

5  position to Kathryn Hendrix?

6         MS. BARLOTTA:  Object to the form.

7      A.  No.

8      Q.  Not you personally but CRC?

9      A.  No.

10         MS. BARLOTTA:  Object to form.

11     Q.  Why not?

12     A.  That was not the position that we

13  were needing at that time.  Our position

14  requisition was for an account executive.  We

15  made the offer.  She accepted it.

16     Q.  And when Kathryn expressed an

17  interest in becoming -- getting out of the

18  account executive role and becoming a broker, did

19  y'all offer her broker in training at that point?

20         MS. BARLOTTA:  Object to form.

21     A.  We did not.

22     Q.  And so at that point is when you put

23  her in the inside broker position?

Page 31

1      A.  Yes.

2      Q.  Okay.  Did Kathryn Hendrix receive a

3  raise when she got the inside broker position?

4      A.  Yes.

5      Q.  Do you remember what her income was

6  before her promotion and after her promotion?

7      A.  I believe her base salary was sixty

8  thousand pre and sixty-five thousand post, if I

9  remember correctly.

10     Q.  My understanding is that employees at

11  CRC receive different bonuses.  Are you familiar

12  with that?

13     A.  Yes.

14     Q.  What is the -- how are bonuses

15  calculated?

16         MS. BARLOTTA:  Object to form.

17     A.  There is a formula that every broker

18  team abides by in terms of revenue and bonus pool

19  available to any particular team.

20     Q.  So there's a specific formula to

21  calculate the bonus?

22     A.  Yes, for the broker.

23     Q.  Does -- I know there's eight broker

Page 32

1  teams.  Do each of those eight teams use the same

2  formula?

3         MS. BARLOTTA:  Object to form.

4      A.  Yes.

5      Q.  Who -- do you know who created that

6  formula?

7      A.  I do not.

8      Q.  Okay.  And do you know if -- is there

9  any discretion whatsoever in calculating bonuses?

10         MS. BARLOTTA:  Object to form.

11     A.  Not from the corporate level to the

12  individual broker team there is not.

13     Q.  Okay.  Explain that to me.  Not from

14  the corporate level to the individual broker

15  team?

16     A.  There are -- I don't know the exact

17  number, but there are a couple hundred probably

18  at minimum broker teams throughout the country.

19  CRC has offices in probably thirty-five, maybe

20  forty -- thirty-five states, thirty, thirty-five

21  states, thousands of employees.

22         Twice a year we are compensated.

23  Brokers are given the bonus calculation

Video Deposition of Corey Daugherty                          6/21/2023
                                                             9 (33 - 36)

Page 33

1  worksheets.  Those are already calculated by
2  corporate.  They are sent to the broker team.
3  And on that worksheet it will have revenue that
4  that team has produced, then it will have the
5  various numbers that go into the formula.
6        It will have a two percent amount
7  that's provided by CRC for bonuses, and then
8  there will be a total aggregated amount that's
9  available to the broker.
10    Q.   Okay.  So if I'm understanding you
11 correctly, the bonus -- each broker team gets a
12 specific bonus based on that formula?
13    A.   Based on that formula --
14       MS. BARLOTTA:  Object to form.
15    A.   -- and based on that team's specific
16 revenue that they have produced over that period
17 of time.
18    Q.   Okay.  So based on what you produce,
19 but that's plugged into the formula?
20    A.   Yes.
21    Q.   And that determines what your team
22 makes?
23    A.   What you as the individual broker

Page 34

1  makes.
2     Q.   Okay.  How are the bonuses
3  distributed between the individuals on your team?
4     A.   It's the broker's discretion.
5     Q.   Okay.  Are there any checks and
6  balances to the decisions made by the broker?
7        MS. BARLOTTA:  Object to form.
8     A.   I think that varies by team.  It's
9  not something that is company wide.  It's
10 something that each individual team probably
11 looks at differently depending on their
12 structure.
13    Q.   And I think you may have answered my
14 question.  What you're saying is each broker
15 divvies it up differently within their team and
16 adds up to that team?
17    A.   Yes.
18    Q.   Is there anything that checks how
19 that broker is divvying it up?
20       MS. BARLOTTA:  Object to form.
21    Q.   Any rules or procedures?
22       MS. BARLOTTA:  Object to form.
23    A.   Not that I'm aware of.

Page 35

1     Q.   So it is entirely in that broker's
2  discretion who gets what on his team?
3        MS. BARLOTTA:  Object to form.
4     A.   Yes.
5     Q.   Do you -- once you make that decision
6  of the bonuses of the individuals on your team,
7  do you report that to the higher-ups like Rusty
8  or Mr. Cadden?
9     A.   Yes.
10    Q.   And do they have any veto power?
11    A.   Not -- I've never seen it if they do.
12    Q.   You've never seen it or they don't?
13    A.   I've never seen it.
14    Q.   Okay.  Is it possible they do, but
15 they haven't utilized it?
16       MS. BARLOTTA:  Object to form.
17    A.   I don't know.
18    Q.   Specifically as it relates to your
19 team, how did you determine who got what bonuses?
20    A.   There's several things that go into
21 it.  Tenure with the company, tenure with the
22 team.
23    Q.   Okay.

Page 36

1     A.   Relationships that are being handled,
2  accounts that are being handled, the volume of
3  premium, experience, knowledge, and whether that
4  individual is responsible for any level of
5  individual production.
6        What I mean by that is production
7  outside of any relationships that I may bring to
8  the table over the years.  Someone that is
9  traveling and going out and developing brand-new
10 relationships, bringing business into the firm
11 that I don't touch, that I don't see, that I have
12 no dealings with.
13    Q.   So would it be fair to say that that
14 factor cannot apply -- like an inside broker will
15 never meet that factor, because they're working
16 on inside business?
17    A.   Yeah.
18    Q.   Is there ever a situation where an
19 inside broker can go outside and create new
20 relationships?
21    A.   If they wanted -- yeah, if they
22 wanted to move into a broker role.
23    Q.   Were inside brokers ever prevented

Page 37

1  from traveling and creating new business?

2      A.  No, not that I'm aware of.

3      Q.  Were there ever situations where

4  inside brokers were being given so much account

5  executive duties that they were unable to travel?

6      MS. BARLOTTA:  Object to form.

7      A.  No, not that I'm aware of.  I would

8  add to that that in that capacity of an inside

9  broker, as an associate broker, as a broker in

10  general, when I'm traveling and I'm on the road,

11  there are tasks that I do, that any broker in our

12  firm does, that I would absolutely say are

13  administrative.

14      I'm constantly requesting loss funds

15  that are requested from our clients.  I'm

16  constantly sending requests for changes to a

17  policy to an insurance company because their

18  retailer calls me or sends me an e-mail and asks

19  me to do that.

20      Q.  I guess what my question is:  If an

21  inside broker is assigned so many executive

22  assistant duties that there's no additional time

23  to travel and create new business, has that ever

Page 38

1  happened?

2      MS. BARLOTTA:  Object to form.

3      A.  Not that I'm aware of.

4      Q.  So my understanding is since Ms.

5  Hendrix has been gone, there has been a change in

6  the structure of the teams, and there's no longer

7  an associate broker or inside broker.  Is that

8  the case?

9      MS. BARLOTTA:  Object to form.

10      A.  Are you talking about my team in

11  particular or are you talking about teams in

12  general?

13      Q.  I was talking about teams in general,

14  but we'll start with your team first.

15      A.  I don't have an inside broker

16  currently.

17      Q.  Do you have an associate broker?

18      A.  No.

19      Q.  And why did you make those changes?

20      MS. BARLOTTA:  Object to form.

21      A.  It was just a decision that we

22  decided to make in our day-to-day operations, and

23  we felt it was the best decision at the time for

Page 39

1  our direction forward.

2      Q.  When did you make that change?

3      A.  I never made the change.  Kathryn was

4  our inside broker, and she resigned.

5      Q.  Who was hired to replace her?

6      A.  No one.

7      Q.  Was anybody new hired to your team

8  after her?

9      A.  We have hired three new people since

10  Kathryn's departure.

11      Q.  Who are the three people that you

12  hired since she left?

13      A.  Lauren Green.

14      Q.  Okay.

15      A.  Steele Cadden, and Amy Ritenour,

16  R-i-t-e-n-o-u-r.

17      Q.  And what were they hired -- what

18  position was Lauren Green hired in?

19      A.  Broker assistant.

20      Q.  Steele Cadden?

21      A.  Steele Cadden, S-t-e-e-l-e.

22      Q.  Sorry.

23      A.  Account executive.

Page 40

1      Q.  Okay.  And then Amy Ritenour?

2      A.  Account executive.

3      Q.  So you're the broker on your team.

4  Are there any other brokers on your team?

5      A.  Yes.

6      Q.  Who are the brokers now?

7      A.  Clay Segrest.

8      Q.  Okay.  And yourself?

9      A.  Yes.

10      Q.  Is there anyone else on your team?

11      A.  No, not broker.

12      Q.  Okay.  Is there anyone else on your

13  team right now that we haven't -- Lauren, Steele,

14  Amy, Clay, and yourself?

15      A.  Andrea and Yvette and Tiffany.

16      Q.  Okay.  They're still there?

17      A.  Yes.

18      Q.  And are they all still in the account

19  executive position?

20      A.  They are, yes.

21      Q.  Do Steele Cadden, Amy Ritenour,

22  Andrea, Yvette, and Tiffany, do any of them

23  create new business?

Page 41

1   A.  Not currently, no.
2   Q.  When you say not currently, did they
3 in the past?
4   A.  No.
5   Q.  Okay.  And what about Lauren Green?
6 Does she create new business?
7   A.  She does not.
8   Q.  Okay.  I'm going to shift some gears
9 and talk about some other stuff.  I kind of got
10 off on a structure tangent.  Let's go through
11 this list here.
12   A.  Okay.
13   Q.  What is the e-mail program used by
14 the defendant from 2017 to 2020?
15   A.  Outlook.
16   Q.  Do you know what level of plan y'all
17 utilize?
18   A.  I do not.
19   Q.  I know that they have three different
20 -- for example, they have an E1, an E3, or E5.
21 Are you familiar with any of those plans?
22   A.  I am not.
23   Q.  Do you use any other programs for

Page 42

1 listservs?
2   A.  What do you mean by listserv?
3   Q.  Like when you -- I guess I'm thinking
4 of like Teams or what is it?  I can't think of
5 any all of the sudden off the top of my head.
6 Like -- okay.  Like do you have any organizations
7 created within the e-mails to chat and talk to
8 each other?
9   A.  There's no chat function that I'm
10 aware of in Outlook.
11   Q.  Okay.
12   A.  That we utilize.
13   Q.  Do y'all utilize Teams?
14   A.  We do now.
15   Q.  Okay.
16   A.  As of recently during the pandemic.
17   Q.  So would that have been after my
18 client left?
19   A.  Yes.
20   Q.  What did y'all use to communicate
21 with each other prior to that?
22   A.  E-mail.
23   Q.  You don't have any Slack or anything

Page 43

1 like that?
2   A.  No.
3   Q.  So you primarily used e-mail?
4   A.  Yes.
5   Q.  Did you have like e-mail groups?
6   A.  Yes.  There's several within the
7 firm.
8   Q.  Like I know, for example, like my
9 firm has an e-mail list that goes out to all
10 attorneys or it goes out to just the associates
11 or just the support staff.  Do y'all have things
12 like that?
13   A.  We had, and we still do have
14 Birmingham Professional e-mail group or list, I
15 guess you would refer to it as.  And then Bham
16 Professional Brokers, I think, is how it's
17 referred to.
18   Q.  Who all is included on the Bham
19 Professional Brokers list?
20   A.  I would not be able to tell you.
21   Q.  I mean, what positions?  Is it
22 broker, associate brokers, and inside brokers?
23   A.  It should be, but that's not

Page 44

1 something that we in the department amend,
2 change, have anything to do with.  Those are
3 default groups that are set up in our Outlook
4 network.
5   Q.  Who creates them?
6   A.  I do not know.
7   Q.  You don't amend them or change them
8 or -- each individual, like you as a broker, you
9 don't go and change and amend those groups?
10   A.  I do not.
11   Q.  What if somebody is left off a group
12 that should be on it?  How do you correct that?
13   A.  I do not know the answer to that.
14   Q.  Has that ever happened?
15   A.  Not that I'm aware of.
16   Q.  On the Birmingham Professional
17 e-mail, who all is included on that?
18   A.  I would not be able to confirm that
19 with any specificity.  It should be all staff
20 within our professional liability department.
21   Q.  I guess that's why it's called
22 professional, that's the professional liability
23 department?

Page 45

1    A.   Yes.
2    Q.   So that should include brokers'
3  assistants, account executives, inside brokers,
4  associate brokers, and brokers?
5    A.   Yes.
6    Q.   Okay.  Are there any other lists or
7  groups that you're aware of?
8    A.   Not that I'm aware of.
9    Q.   How does an employee when they get
10  hired get added to that list?
11    A.   I do not know the answer to that
12  question.
13    Q.   Are you familiar with Workday?
14    A.   I am.
15    Q.   And what is Workday?
16    A.   It's a program that was introduced to
17  us through BB&T and Truist, and it's where
18  functions -- it's where staff log time.  It's
19  where each teams' structure, teammates, benefit
20  information, compensation information is all
21  held.
22    Q.   So would you characterize it as like
23  a human resources program?

Page 46

1    A.   I don't know that I would
2  characterize it as a human resources program.  I
3  think it's probably a tool that our human
4  resources department uses.
5    Q.   Okay.  And it's just to store
6  different information about each employee and
7  about each of their accounts or clients?
8    A.   Not clients.  There's no client
9  information in Workday.
10    Q.   Okay.  And did you have Workday
11  between 2017 and 2019?
12    A.   We did.
13    Q.   And did each individual person in
14  each practice group, is what I'm -- your team --
15    A.   Uh-huh (positive response).
16    Q.   -- did they input information into
17  Workday?
18    A.   They did.
19    Q.   And what kind of information would
20  you put in Workday as a broker?
21    A.   It would be really just team
22  specific.  It would be individuals on your team.
23  It would be base salary, compensation.  It's

Page 47

1  where teammates can go and pull pay stubs, look
2  at pay stubs.  Like I said, log time.
3    Q.   Okay.
4    A.   Any notification that we get as far
5  as reviews, all is stored within Workday.
6    Q.   So I guess does the Workday program
7  generate like charts to show you productivity and
8  what people are producing and things like that?
9    A.   No.
10    Q.   Okay.  I think you said log time.  So
11  that's why I was wondering.  I don't know.  And
12  so it doesn't store revenues of those people?
13    A.   No.
14    Q.   What would -- would an associate
15  broker or inside broker be required to input
16  information in there?
17    A.   Any information about their
18  employment, yes, but I can't think of anything
19  else.
20    Q.   So you can go in -- or if I worked
21  for you, I could go in and modify my profile or
22  whatever on Workday?
23    A.   I don't know that there's even a --

Page 48

1  there's not really a profile in there to amend.
2  When we hire somebody, they're automatically put
3  into Workday.  When we hire someone, we have to
4  go in and complete a task in Workday.
5         When we terminate someone, we have to
6  go in and complete a termination form in Workday.
7  But it's really just --
8    Q.   Any kind of change in employment
9  information?
10    A.   Yes.
11    Q.   A promotion, a raise?
12    A.   Yes.
13    Q.   A bonus is -- is that all included in
14  there?
15    A.   Yes.
16    Q.   Is things like time off and leave
17  information contained on Workday as well?
18    A.   Yes.
19    Q.   And can you upload -- like say if
20  somebody goes on FMLA and they have a doctor's
21  excuse, would you upload that on Workday, or
22  where is that stored?
23    A.   That, I wouldn't know.

Video Deposition of Corey Daugherty

6/21/2023
13 (49 - 52)

---

Page 49

1   Q.   You as the lead -- as the broker of
2   your team, would you have access to everybody
3   else's information on Workday?
4       A.   Yes.
5       Q.   And would the lower subordinates have
6   access to other people's information on Workday?
7       A.   No.
8       Q.   If you wanted to pull up your own pay
9   stubs, do you have like a dashboard or something
10  to pull up and click on and it will list your pay
11  stubs?
12      A.   Within Workday, yes.
13      Q.   Okay.  And that's true of every
14  employee there?
15      A.   Yes.
16      Q.   Is there a way as a manager that you
17  could go in and say, This is everybody on my
18  team, and these are their pay stubs?
19          MS. BARLOTTA:  Object to form.
20      A.   I don't know that I could see their
21  pay stubs, but I know with certainty that I could
22  go and see their compensation.
23      Q.   Okay.

Page 50

1       A.   Their base salary comp.
2       Q.   Would it just generate a report?
3       A.   You just click their name, and it
4   shows -- or you click my team, and it shows every
5   individual person, and you can click their name,
6   and it shows their salary comp.
7       Q.   Other than storing employee
8   information or change of employment information,
9   do you use Workday for any other purposes?
10      A.   No.
11      Q.   Is there any kind of messaging or
12  chat information on Workday?
13      A.   No.
14      Q.   To get onto Workday, do you login
15  from your desktop?
16      A.   Yes.
17      Q.   Where does that data that you input
18  into Workday come from?
19          MS. BARLOTTA:  Object to form.
20      A.   What do you mean by data, what data?
21      Q.   For instance, you're trying to input
22  salary information of somebody, does that come
23  from just your knowledge of it or --

Page 51

1       A.   HR.
2       Q.   Okay.  Can you modify and change
3   that?
4       A.   No.
5       Q.   Has CRC produced Kathryn Hendrix's
6   entire Workday file?
7           MS. BARLOTTA:  Object to form.
8       A.   I don't know.
9       Q.   Is the Workday file considered a
10  personnel file?
11          MS. BARLOTTA:  Object to form.
12      A.   I don't know.
13      Q.   What system was used to track and
14  input sales goals and revenue streams at CRC?
15      A.   We have a dashboard.
16      Q.   Okay.  What is the -- what is the
17  dashboard called?  Is it just called dashboard?
18      A.   Dashboard, yeah.
19      Q.   Do you know what program it is?
20      A.   It's on our intranet.  It's like an
21  internal.
22      Q.   Intranet?
23      A.   Yeah, it's like an internal intranet

Page 52

1   site that was created by corporate.
2       Q.   I was going to say that's something
3   that was created specific to the company?
4       A.   CRC, proprietary.
5       Q.   Do you know what AIM is?
6       A.   Agency information management.  It's
7   another proprietary product that we use.  It's
8   been around for years.  Back to the transaction,
9   when an account comes in, that account is what we
10  refer to as cleared, which is the same as
11  entering it into our system.  We enter it into
12  AIM.
13      Q.   Okay.
14      A.   And AIM was initially a tool that was
15  used to document files.  It had a tab that you
16  could document conversation notes.  You could
17  attach e-mails to it.  We issued quotes out of
18  it.  We issued request to binds out of it.  We
19  issued binders out of it.  We still do those
20  things.  We issue policies out of it, but it's
21  just an account management system.
22      Q.   So it's just kind of like a -- okay,
23  exactly, account management system?

Video Deposition of Corey Daugherty

Page 53

1    A.   Yes.

2    Q.   So things are generated, like say you

3 want to get a quote and you input all the

4 information on that account, it will generate a

5 quote for you?

6    A.   No.

7    Q.   So it's not that advanced?

8    A.   No.  So when we were talking earlier

9 about when a submission comes in, we put the

10 cover letter together, we send that out to five

11 to twenty-five, thirty insurance companies.  When

12 that quote comes back to us, to the firm --

13    Q.   Okay.

14    A.   -- someone on a team will look at

15 that quote, if this is a quote, they would look

16 at this quote, and they would type the

17 information from that quote basically into a

18 quote document that CRC used at the time.

19    Q.   So would it have -- for example, say

20 you write new business.  Would it have like the

21 date that business was generated?  Like new

22 client information?  It's mostly client

23 information?

Page 54

1    A.   It's client information, yes.  But

2 client information from the standpoint of it is

3 the insured policyholder's information.  Our

4 client, again, is the retail insurance broker.

5         So it will have our client's

6 information in there and show that we received

7 that account from X, Y, Z insurance agency, but

8 the information that's contained in there is

9 specific to an insured policyholder that we've

10 placed their coverage for.

11    Q.   So the AIM would have all the private

12 information about the clients, and then the

13 intranet is more like this is the employee, and

14 this is the revenue that they've brought in, and

15 this is --

16    A.   Yes.

17         MS. BARLOTTA:  Object to form.

18    A.   AIM has nothing to do with revenue.

19 It doesn't show any dashboards or anything like

20 that as far as individual teams.

21    Q.   So if I'm working on your team and I

22 want to track my progress, I would go to the

23 intranet and look at the dashboard and say, Okay,

Page 55

1 I need to increase sales here or whatever?

2    A.   Yeah.

3    Q.   Whatever you're checking on?

4    A.   Yeah.

5    Q.   Okay.  Does any information from AIM

6 go onto the dashboard?

7    A.   I don't know the answer to that.

8    Q.   Okay.  Do all positions have a

9 dashboard?

10    A.   All teams have a dashboard.

11    Q.   Okay.  So I guess my question is:

12 Would an account executive have a dashboard?

13    A.   No.

14    Q.   Would an inside broker have a

15 dashboard?

16    A.   They have a subset of the dashboard

17 that shows --

18    Q.   I think that's where you get their

19 wage statements and things like that?

20    A.   No, that would just be -- wage

21 statements would come from Workday.

22    Q.   Oh.  Sorry.  I'm getting confused.

23    A.   Dashboard is the revenue.

Page 56

1    Q.   Okay.  And the same with associate

2 broker, they would be able to have a subset?

3    A.   Uh-huh (positive response).

4    Q.   Within?  I guess are you saying like

5 a tab or something that they would click on?

6    A.   It would just show their name.

7    Q.   Okay.  But -- so can anybody on the

8 team look at the team intranet dashboard?

9    A.   No.

10    Q.   So if you're an inside broker or an

11 associate broker and you want to look at the

12 dashboard to track your own progress, you

13 couldn't go onto the team dashboard.  How would

14 you get to your own?

15    A.   You can.

16    Q.   Oh, okay.  But you can't see the

17 other people's?

18    A.   But you can't see other teams.  It

19 would just be your specific team.

20    Q.   Okay.  And there's not a subset for

21 account executives or broker assistants?

22    A.   No.

23    Q.   So did Kathryn Hendrix have her own

Page 57

1  subset on your team on the dashboard?

2      A.   She should have.  We had intranet at

3  the time.  Dashboard was there.

4      Q.   Do you know whether CRC has produced

5  her dashboard at this time?

6      A.   I do not.

7      Q.   Can you -- to look up an employee's

8  dashboard, is it as simple as clicking on their

9  subset within the team dashboard?

10         MS. BARLOTTA:  Object to form.

11     A.   Yes.

12     Q.   But --

13     A.   Actually, when I go to the dashboard

14  site, it automatically pulls up our team's

15  information.

16     Q.   Because you're the broker?

17     A.   Uh-huh (positive response).

18     Q.   So -- but you don't have access to

19  other team's information?

20     A.   Not detailed information.  So our

21  dashboard is set up, and we're a sales

22  organization, so we're set up as -- if I open up

23  the dashboard on any given day, it pulls up our

Page 58

1  team's individual production.  That dashboard

2  shows how many submissions we've gotten in.  It

3  shows what our fee income is.  It shows what our

4  number of bound policies are.  It shows the

5  amount of total revenue, new revenue.  It shows

6  where you are in comparison to budget.

7          You can look at it by month.  You can

8  look at it by year to date.  You can go back and

9  look -- I think our system now goes back to 2018.

10  That's as far back as it goes -- excuse me --

11  2019 maybe, because 2018 is not there.

12          And you can see -- if you've got

13  multiple brokers on your team, you can see what

14  revenue that individual broker among the team is

15  handling.

16          We cannot see that same type of

17  information for other teams, but we do have it

18  set up to where there is a broker ranking.  I

19  mean, we're a sales organization, so I could

20  click on broker ranking and see what the total

21  revenue produced is for every single broker team

22  in the country.

23          So if we've got two hundred teams,

Page 59

1  I'm going to see the total aggregated revenue for

2  that team for all two hundred plus teams, and

3  we'll be able to see where you as an individual

4  team rank amongst the firm.

5      Q.   So you could have pulled up the other

6  eight teams and see what their revenue was?

7      A.   Yeah.

8      Q.   In the Birmingham Professional

9  liability?

10     A.   But I can't see -- but you're not

11  able to see -- I'm not going to be able to go to

12  James Powell's dashboard and see where his

13  business is coming from, where -- how many

14  submissions they have, how much, you know, fee

15  income they've generated.  It would just show an

16  aggregated total revenue number.

17     Q.   I would assume somebody above you

18  would have access to all the teams.

19         MS. BARLOTTA:  Object to form.

20     Q.   Who would that be?

21         MS. BARLOTTA:  Object to form.

22     A.   Yeah, I mean, we're a sales

23  organization, and we've got leadership that looks

Page 60

1  at revenue and looks at growth and production

2  trends.  And so within the Birmingham office,

3  Rusty is able to look at, John Cadden would be

4  able to look at, and it would go up the tower.

5      Q.   And you said 2018 is no longer there?

6      A.   Well, we --

7          MS. BARLOTTA:  Object to form.

8      A.   We used to be -- we had an intranet

9  site that was called Connect, and then they

10  updated our systems a few years ago, and now it's

11  called Dashboard.  I don't -- I don't know how

12  the data was archived or what came over or what

13  didn't come over.

14     Q.   Anything before 2019, if you needed

15  to access it, how would you do that?

16     A.   I do not know the answer to that.

17     Q.   But anything from 2019 forward would

18  be as simple as pulling up your team --

19     A.   Dashboard.

20     Q.   -- and just printing it off?

21     A.   Yeah.

22     Q.   Do you have a document retention

23  policy?

Video Deposition of Corey Daugherty

Page 61

1       MS. BARLOTTA: Object to form.

2       **A.   Yeah, we do.**

3       Q.   How long are you required to retain

4 documents?

5       MS. BARLOTTA: Object to form.

6       **A.   I don't know the answer to that.**

7       MS. GILL: We've been going about an

8 hour. Do you want to take a break?

9       MS. BARLOTTA: Sure.

10       THE WITNESS: Sure.

11       VIDEOGRAPHER: All right. We'll go

12 off the record at 10:33 a.m.

13       (Whereupon, a brief recess was

14 taken.)

15       VIDEOGRAPHER: We are back on the

16 record at 10:47 a.m.

17       Q.   (BY MS. GILL:) Before we went on

18 break we were talking about the dashboard, and I

19 believe you said it mentioned your team and, you

20 know, their stats, like the revenue and things

21 like that.

22       **A.   Uh-huh (positive response).**

23       Q.   So your board had Kathryn Hendrix on

Page 62

1 it?

2       **A.   It should have.**

3       Q.   Okay. Do you remember whether or not

4 she was on it?

5       **A.   I do not.**

6       Q.   Okay. And I can't remember, would it

7 also have the account executives as well on

8 there?

9       **A.   No.**

10       Q.   Okay. Do you know whether you've

11 produced your dashboard in this case?

12       MS. BARLOTTA: Object to form.

13       **A.   I do not.**

14       Q.   I'm just going to show you what I'm

15 marking as Plaintiff's ==Exhibit Number 2==.

16       (Whereupon, Plaintiff's ==Exhibit No. 2==

17 was marked for identification and a copy of same

18 is attached hereto.)

19       Q.   Have you seen these documents before?

20       **A.   Not this particular document.**

21       Q.   Okay. Is this an example of what

22 you're talking about with dashboard?

23       **A.   It is.**

Page 63

1       Q.   On this document it says Connect

2 dashboard. You said previously you had Connect.

3 Is that --

4       **A.   Yes.**

5       Q.   So is it different today?

6       **A.   It's still Connect today.**

7       Q.   Okay. Is the dashboard considered in

8 the bonuses?

9       MS. BARLOTTA: Object to form.

10       **A.   The dashboard isn't.**

11       Q.   Okay.

12       **A.   Revenue is.**

13       Q.   Okay. And I guess in the first page

14 of this exhibit at the bottom, it's got your

15 name, and it looks like two million two hundred

16 twenty-four nineteen. Is that your revenue?

17       **A.   That is.**

18       Q.   Okay.

19       **A.   I'm not sure what period of time this**

20 **represents. There's no month or date.**

21       Q.   I think I'm just using it as an

22 example.

23       **A.   Okay.**

Page 64

1       Q.   Yeah. If you look at the third page

2 of this exhibit, it says -- there's a tab that

3 says Broker Ranking. Do you see that?

4       **A.   Uh-huh (positive response).**

5       Q.   Is that just your team or is that

6 each individual broker listed?

7       **A.   That's each individual broker listed.**

8       Q.   Do you see whether Kathryn Hendrix is

9 on here?

10       **A.   She is not.**

11       Q.   How do you know it's each individual

12 broker?

13       **A.   Because each individual broker is**

14 **listed on this list.**

15       Q.   Okay.

16       **A.   So, for instance, casualty New York**

17 **is a casualty New York team. Jason Lewis has his**

18 **own separate team out of our Denver office. This**

19 **is each individual broker team.**

20       Q.   Gotcha. And so Clay Segrest should

21 be on here and Kathryn Hendrix if you're talking

22 about your team?

23       MS. BARLOTTA: Object to the form.

Page 65

1   A.   No, they would not.

2   Q.   Okay.

3   A.   Not on this particular screenshot of

4   this document.

5   Q.   Is there a tab where you can find

6   those?

7   A.   The way that this document works is

8   if we were at a computer, you could click -- I

9   would be able to click on my name.  I couldn't

10  click on anyone else's name on this list, but I

11  would be able to click on my name, and then it

12  would pull up on the screen what I mentioned to

13  you earlier, submission count, policy count, new

14  business revenue, total revenue, numbers compared

15  to budget.

16  Q.   Can you flip to the next page and see

17  is this what you're referring to?

18  A.   Yeah.

19  Q.   Okay.  Does it list each of the

20  individuals in the group?

21  A.   It doesn't list them all.  It lists

22  Clay, Kathryn, and Yvette.

23  Q.   Is Yvette a broker?

Page 66

1   A.   She is not.

2   Q.   Okay.  Okay.  In this, it lists Clay

3   Segrest as an inside broker?

4   A.   That's how it refers to all the --

5   that's just how the system is set up.  It refers

6   to all.

7   Q.   And if you look on the -- just below

8   the tabs it's got a date on there.  Do you see

9   that date?

10  A.   Uh-huh (positive response).

11  Q.   What is the date on there?

12  A.   September 24th, 2018, it appears.

13  Q.   Okay.  So that would have been,

14  obviously, when Kathryn was there?

15  A.   Yes.

16  Q.   Because she's listed on there.  Do

17  you know why Andrea Sutton and Tiffany Sanders

18  are not listed on there?

19  A.   No.  I mean, our system -- you know,

20  the way that our system is set up, this data that

21  comes into this dashboard is based on input from

22  team members and employees within the firm.

23  So when you clear a submission in

Page 67

1   AIM, which you asked me about earlier --

2   Q.   Okay.

3   A.   -- and with a name, you've got --

4   whatever team member on any specific team is

5   entering in that submission, they would put the

6   team name, which in this case it would be Team

7   Daugherty or Team Lewis, whatever broker you're

8   referring to.

9   There's a marketing rep spot that

10  shows the marketing rep, and then there's an

11  account exec spot.  It happens all the time where

12  if somebody is clearing a piece of business and

13  they mistakenly put Yvette Talsma, for instance,

14  somehow Yvette Talsma's name probably got dropped

15  into that marketing rep tab, and that is the way

16  the program is set up to where whatever account

17  is shown -- whatever account shows someone as a

18  marketing rep, their name would show up on this

19  document, so --

20  Q.   So would you say that Kathryn

21  Hendrix's stats on this document are input by

22  Kathryn?

23  MS. BARLOTTA:  Object to form.

Page 68

1   A.   I don't know the answer to that.

2   Q.   Okay.  Would you sometimes put the

3   stats in for your subordinates?

4   A.   Sure, sure.  I mean, most of the

5   time, you know, when a new piece of business

6   comes in, it's an account executive that clears

7   that piece of business.

8   But like I mentioned earlier, if I'm

9   sitting at my desk or Clay is sitting at his desk

10  or any broker is sitting at their desk and a

11  submission comes in, it's just as easy for me to

12  enter that submission in.

13  Q.   Okay.  So, generally, though, most of

14  the time it would be an account executive that

15  enters?

16  A.   Yeah.

17  Q.   And that basically was my question.

18  It's coming from everybody on your team, not --

19  there's not one specific person designated to

20  input the information?

21  A.   Correct.

22  Q.   Okay.  Can you, for example, just

23  pull up a date range and print up the dashboard

Video Deposition of Corey Daugherty                    6/21/2023
                                                       18 (69 - 72)

Page 69

1  for your team during that date range?
2       A.   Yeah.
3       Q.   Are you familiar with Trello?
4       A.   Yeah.
5       Q.   What is Trello?
6       A.   Trello has nothing to do with CRC.
7  It's not a corporate app.  It's an app that I
8  think I might have discovered it, but someone
9  within our group discovered it in the app store.
10          And it's basically an app that allows
11  you to create boards.  And our team started using
12  it for marketing purposes and just intellectual
13  capital purposes on our team.
14          So, for instance, you can create a
15  new board, and you could title that board, you
16  know, senior living, which in our industry refers
17  to nursing homes, assisted living.  We place a
18  lot of that business.
19          And on that particular board for
20  senior living, you could list all the insurance
21  companies that we do business with that will
22  insure nursing homes.
23          We could create a separate board for

Page 70

1  architects and engineers, lawyers professional,
2  physician medical/malpractice.  Any product that
3  we place as a wholesale insurance broker you
4  could create these board and put contact
5  information for those respective insurance
6  companies.
7          And the idea behind that was that
8  instead of us having to constantly talk about and
9  communicate which insurance companies are doing
10  what, it was a way for everyone to have data and
11  information in one spot.
12      Q.   Just kind of like an easy chart, if
13  you will, saying this company does this?
14      A.   Yeah.
15      Q.   Okay.
16      A.   So if somebody on the team got a
17  submission, you know, that was a nursing home,
18  they could pull up Trello on their phone, look at
19  the nursing home board and say, Okay, The Doctors
20  Company, MedPro, Ironshore, Berkley are all
21  markets that will look at this business, and
22  here's the contact information for the
23  underwriter at that company.

Page 71

1       Q.   Okay.  Did y'all ever chat or
2  communicate through Trello?
3       A.   No.
4       Q.   Is that true of -- do other
5  departments use Trello to chat?
6       A.   Not that I'm aware of.  I'm not even
7  aware of a chat function on Trello.
8       Q.   Okay.  I'm going to show you what I'm
9  marking as Plaintiff's Exhibit Number 3.
10          (Whereupon, Plaintiff's Exhibit No. 3
11  was marked for identification and a copy of same
12  is attached hereto.)
13          MS. GILL:  I only have two copies of
14  it.  It's the answers to interrogatories.
15          MS. BARLOTTA:  The initial ones, not
16  the supplemental ones?
17          MS. GILL:  Correct.
18          MS. PALMER:  No, that would be the
19  supplemental verified.
20          MS. GILL:  This one is verified, so I
21  think it's the supplemental one.
22          MS. BARLOTTA:  I think they said
23  supplemental on them, but that's fine.  Ask your

Page 72

1  question.
2       Q.   (BY MS. GILL:)  Did you participate
3  in the preparation of those, Plaintiff's Exhibit
4  Number 3?
5          MS. BARLOTTA:  Object to form.
6       A.   I was asked questions.
7       Q.   Okay.  And I don't want to know what
8  you and your attorney -- but did you provide
9  information to answer the questions?
10      A.   Yeah.
11      Q.   And did you review those prior to
12  submitting them to us in this case?
13      A.   Yes.
14      Q.   If you'll give me just a second, I'm
15  trying to locate a specific question.
16      A.   Sure.
17      Q.   If I could direct your attention to
18  Number 3.  In that question we asked CRC what
19  e-mail programs, chat programs, workflow and
20  other operating programs CRC utilized.  Do you
21  see your response where it says, Employees
22  communicate with one another through Trello?
23      A.   Yeah.

Page 73

1    Q.   Are you aware of that?
2    A.   Well, the term "communicate" was not
3  like realtime communication.  At some point that
4  app was opened up like a public forum, almost
5  like an open source type app to where other
6  people within the department if they wanted to
7  could download the app to their phone and then
8  could have access to those same boards that other
9  teams were using.  It was kind of a sharing of
10  information --
11    Q.   So it wasn't like --
12    A.   -- resource.
13    Q.   -- private messaging to each other?
14    A.   No, no, no.  Never.
15    Q.   Say a new client came up that also
16  writes this kind of business, the nursing home
17  business, you might add them on there?
18    A.   Yeah, if you had your own separate
19  team within the department and you got a nursing
20  home account in and you said, All right, I've got
21  access to Trello, I can get onto Trello and see
22  that Corey's team has created this board for
23  nursing homes.  You could look at that board and

Page 74

1  say, All right, these are the markets that are
2  writing nursing homes.  Thanks, Corey.
3    Q.   So it's stored on everybody's app on
4  their phones or desktops or wherever?
5       MS. BARLOTTA:  Object to form.
6    A.   It would be on anybody's phone or
7  iPad that chose to download the app and submit a
8  form for access to it.
9    Q.   So your understanding is there's no
10  private text messaging function?
11    A.   No.
12    Q.   Okay.  I just wanted to clarify that.
13    A.   Yeah.
14    Q.   How do you generally chat in the
15  office?  You said earlier you used e-mails.  Did
16  y'all use any other systems?
17    A.   No.
18    Q.   Did y'all use Trello to store tasks?
19    A.   No.
20    Q.   Do you know if the Trello -- do you
21  have Trello for Slack or Trello for Google Chat?
22    A.   I don't even know that the two are
23  related to one another.

Page 75

1    Q.   Okay.
2    A.   Or three.
3    Q.   And Trello and Share Point?
4    A.   I'm not aware of any correlation or
5  affiliation.
6    Q.   Do y'all use SharePoint?
7    A.   No, not that I'm aware of.
8    Q.   Okay.  I think in those same
9  responses you -- that CRC amended the response
10  and mentioned an Exchange Server for storage on
11  the premises of information.  Is that for -- what
12  do you use the Exchange Server for?
13       MS. BARLOTTA:  Object to form.
14    A.   That would just be the Outlook
15  Exchange, our normal day-to-day e-mail.
16    Q.   Okay.  So there's nothing new and
17  different stored on that other than Outlook?
18    A.   Outlook, yeah.  That I'm aware of.
19    Q.   Do you have a retention policy
20  related to Outlook or Exchange information?
21    A.   We do.
22    Q.   What is the retention policy?
23    A.   I do not know.

Page 76

1    Q.   I know like banks have retention
2  policies of ten years.  Is there anything for the
3  insurance that's comparable to that?
4    A.   There's not a standard that I'm aware
5  of.  We are owned by a bank, so I don't know if
6  their retention policy trickled down to us or
7  not.
8    Q.   Okay.
9    A.   But I'm not aware of any insurance
10  specific retention policy standard.
11    Q.   Okay.  Do y'all have any specific
12  document storage like servers or paper files or
13  anything?
14    A.   Not that I'm aware of.
15    Q.   Okay.  So is everything on the cloud
16  or on the computer?
17    A.   I don't know the answer to that.
18       MS. BARLOTTA:  Object to form.
19    A.   That would be something for IT.
20    Q.   Do y'all have any policies and
21  procedures in place in the Birmingham
22  Professional liability department relating to how
23  signature blocks are created and maintained?

Page 77

1       A.   No.  At that time we did not.  We
2  just recently within the past couple of months
3  had a signature block template sent to us by
4  corporate.  And the catalyst behind that was the
5  State of California passed legislation or
6  something to the insurance industry that requires
7  that any broker that does business in California
8  has to have their California license number on
9  their signature block.
10      But prior to that, I was not aware of
11 any mandated signature block template.
12      Q.   Did -- could anybody create their own
13 signature?
14      A.   Yeah, as far as I know.
15      Q.   And did anybody review employees'
16 signature blocks?
17      MS. BARLOTTA:  Object to form.
18      A.   Not that I'm aware of.
19      Q.   Did you instruct your team to include
20 certain information in their signature block?
21      A.   I did not.  I believe up until
22 recently most people just had their name, CRC
23 Insurance Services or CRC Group, and their

Page 78

1  e-mail, and their phone number.
2      Q.   I guess, for example, I've seen on
3  your e-mails, you would have your team listed,
4  each person on your team listed.
5      A.   Uh-huh (positive response).
6      Q.   Is that consistent throughout your
7  team?  Everybody is supposed to have that on
8  there or is that --
9      A.   I think most do.  I've not checked to
10 see, but I think most do at this point.
11      Q.   At this point they do.  Did they when
12 Kathryn Hendrix was there?
13      A.   I do not know.
14      Q.   Is there ever a situation where a
15 member would be omitted from a team?
16      MS. BARLOTTA:  Object to form.
17      A.   Not that I recall.
18      Q.   Was there ever a situation where
19 somebody misrepresented their position on their
20 signature block?
21      MS. BARLOTTA:  Object to form.
22      A.   Not that I recall.
23      Q.   On your e-mails -- well, I'll show

Page 79

1  you an example.
2      A.   Yeah.
3      Q.   Okay.  What about like when you're
4  out of the office, automatic replies, who creates
5  those?
6      A.   The person who's out of the office.
7      Q.   Okay.  And -- let me show you this.
8      MS. GILL:  What am I, 4?
9      THE REPORTER:  Yes.
10     A.   Uh-huh (positive response).
11     (Whereupon, Plaintiff's Exhibit No. 4
12 was marked for identification and a copy of same
13 is attached hereto.)
14     Q.   (BY MS. GILL:)  For example, on your
15 e-mail, you've got your team members listed at
16 the bottom.  Do you see that?
17     A.   Yes.
18     Q.   Is there a reason Kathryn Hendrix is
19 in there with Andrea and Tiffany?
20     A.   Yeah.  She's a member of the team.
21     Q.   Was she a broker at that point in
22 time?
23     A.   What is this date?  Yeah, she was an

Page 80

1  inside broker.
2      Q.   Is Yvette Talsma an account
3  executive?
4      A.   She is.
5      Q.   Okay.  On Page 2 of this exhibit, it
6  looks like there's a different e-mail from you.
7      A.   Uh-huh (positive response).
8      Q.   And the order is changed up of your
9  team members.  Do you remember changing that?
10     A.   I do not.
11     Q.   Do you know why you would change it?
12     A.   I do not.
13     Q.   Let me show you what I'm marking as
14 Plaintiff's Exhibit Number 5.
15     (Whereupon, Plaintiff's Exhibit No. 5
16 was marked for identification and a copy of same
17 is attached hereto.)
18     Q.   Let me show you Plaintiff's Exhibit
19 5.  I'm sorry.  Let me give you the one with the
20 sticker.
21     A.   Yeah.
22     Q.   Do you see Clay's automatic reply?
23     A.   I do.

Page 81

1    Q.   Do you know why Kathryn Hendrix is

2   omitted from being on his team?

3    A.   I do not.

4        MS. BARLOTTA:  Object to form.

5    A.   I don't know if Kathryn was out of

6   the office that day or if she had something else

7   going on that day or if Clay felt like anything

8   that might have come up when he was out of the

9   office that day could have been handled by the

10  account executives.

11   Q.   Okay.  So Clay would have done this?

12   A.   Clay would have done this, yes.

13   Q.   Did you see that e-mail when it came

14  through?

15   A.   I can't say specifically.  It wasn't

16  addressed to me.  It was addressed to Kathryn.

17  If I sent Clay an e-mail, I would have seen it.

18   Q.   Do you know who Jonathan Morgan is?

19   A.   I do.

20   Q.   And what was his position?

21   A.   He's on Truitt Taylor's team.

22   Q.   Was he a broker, inside broker,

23  associate broker?

Page 82

1    A.   I honestly think he was hired as an

2   inside broker, but I don't know for sure.  He

3   wasn't on my team.  I had no involvement with his

4   employment.

5    Q.   Do you know whether his signature

6   line said he was an associate broker when he was

7   an inside broker?

8    A.   I do not.

9    Q.   But that would have been up to him to

10  prepare the signature line?

11   A.   Yeah, him and his team.  Again, I had

12  no day-to-day involvement with Jonathan in terms

13  of business and how their team functions.  He's

14  on Truitt's team, which is a completely separate

15  group.

16   Q.   Did you ever give assignments to

17  people who were not on your team?

18   A.   No.

19   Q.   What about did you ever give

20  assignments to executive assistants that were not

21  on your team?

22   A.   Executive assistants?  You mean

23  account executives?

Page 83

1    Q.   I'm sorry.  Yeah, account executives.

2    A.   No.

3    Q.   Or broker assistants?

4    A.   No.

5    Q.   Or associate brokers?

6    A.   No.

7    Q.   Did anybody from other teams give

8   your people assignments?

9    A.   No, not that I'm aware of.  The only

10  time that brokers really -- the only time that

11  broker teams really interact with one another in

12  that capacity is situations where, you know,

13  another team may have an expertise or a

14  relationship that could benefit another broker

15  team, and you will agree to co-broke an account.

16   Q.   Okay.

17   A.   But that's an anomaly.  It doesn't

18  happen very often.

19   Q.   Was Brandon Hayes on your team?

20   A.   He was not.

21   Q.   Did you ever assign him any tasks?

22   A.   I did not.

23   Q.   Did -- what about the website?  Who

Page 84

1   creates the content for the website?

2    A.   I don't know the answer to that.  I

3   mean, now our marketing department does it.  They

4   should have done it then, but I can't say

5   precisely who would have done it.

6    Q.   When you hire somebody new, I think

7   you said you had hired three new people since

8   Kathryn has left --

9    A.   Uh-huh (positive response).

10   Q.   -- did you provide the marketing

11  department information on those new hires for

12  them to put on the website?

13   A.   I did not.  Now we have on the

14  intranet site, there's a spot where individual

15  employees can go and submit a request for their

16  picture to be on the website, for their title,

17  for their bio, for references, for any

18  publication that they may have put out to be

19  available.  That's employee specific.  They can

20  update and adjust their website presence as they

21  see fit.

22   Q.   Are you aware that Jonathan Morgan is

23  listed on the website as an associate broker?

Page 85

1    A.   I am not.
2    Q.   But your understanding is he was
3  hired as an inside broker?
4    A.   Yes.
5    Q.   I really don't want to attach all
6  this. I think I'm just going to show you. It
7  looks like it's CRC-Hendrix Bates Number 4979.
8  I'll just kind of show you. It's a big thing, so
9  I just --
10       MS. BARLOTTA: Are you marking this
11  as an exhibit?
12       MS. GILL: I'm not, because it's so
13  big.
14       MS. BARLOTTA: Okay. Can I see it?
15       THE WITNESS: Absolutely.
16       MS. GILL: I mean, I guess I could
17  pull that front page off. I guess I could do
18  Page 1 and 2.
19       MS. BARLOTTA: Okay.
20    Q.   (BY MS. GILL:) I guess I'm really
21  just referring to 4979 and 4980. That identifies
22  Mr. Morgan as an inside broker, doesn't it?
23    A.   It does.

Page 86

1    Q.   Okay. And that's what you thought he
2  was hired as?
3    A.   Yeah.
4    Q.   I just wanted to make sure. Okay.
5  Yeah, I didn't mark it.
6       Okay. I know we kind of touched on
7  Outlook and how you had different groups of
8  people like the Birmingham Professional and
9  different groups. Who was responsible for
10  creating those groups?
11       MS. BARLOTTA: Object to form.
12    A.   I don't know the answer to that.
13    Q.   Could any individual create a group?
14    A.   Not that I'm aware of. I've never
15  done it, wouldn't know how.
16    Q.   Do you know who created Birmingham
17  Professional?
18       MS. BARLOTTA: Object to form.
19    A.   I do not.
20    Q.   Are there any rules or procedures or
21  policies related to creation of groups?
22       MS. BARLOTTA: Object to form.
23    A.   Not that I'm aware of.

Page 87

1    Q.   Did you receive any e-mails from
2  groups other than Birmingham Professional?
3       MS. BARLOTTA: Object to form.
4    A.   Yeah.
5    Q.   What other groups did you receive
6  e-mails from?
7    A.   There's a group called CRC All.
8    Q.   Okay.
9    A.   Which that includes, should include
10  every employee within the organization
11  countrywide. It's used rarely, but from time to
12  time we do get e-mail correspondence from -- sent
13  to us through that CRC All distribution list.
14    Q.   Are there any other groups?
15       MS. BARLOTTA: Object to form.
16    A.   Yeah. Every -- just like Birmingham
17  has Birmingham Professional, Birmingham Brokers,
18  there's also similar groups set up for Birmingham
19  Casualty, Birmingham Property, and, you know, I
20  can't speak to other offices, because I'm not in
21  those offices, but every other office should have
22  some form of similar distribution e-mail list
23  specific to their office.

Page 88

1    Q.   When you receive an e-mail from, for
2  example, Birmingham Professional, would it say
3  Birmingham Professional or does it list the
4  people in the group?
5    A.   Birmingham Professional. I mean, I
6  think you can click Birmingham Professional and
7  double click, and it will expand to see who's in
8  that, but I've never done it. I think once you
9  do it, you can't get it back to the way that it
10  was or something.
11       But yeah, to answer your question, it
12  just shows that it came from CRC All or to
13  Birmingham Professional.
14    Q.   Are there any other groups that
15  you're aware of?
16    A.   Not that I'm aware of.
17    Q.   Is there a separate group Birmingham
18  Professional Broker?
19    A.   Yeah, Bham Professional Brokers,
20  yeah.
21    Q.   Do you have any reason or knowledge
22  why Kathryn would be omitted from an e-mail or a
23  listserv group?

Video Deposition of Corey Daugherty                                    6/21/2023

Page 89

1        MS. BARLOTTA:  Object to form.

2    **A.  I do not.**

3    Q.   Do you know whether she was omitted

4    from an e-mail or listserv group?

5    **A.  I do not.**

6    Q.   Do you have any information or

7    knowledge that brokers were told to no longer use

8    Birmingham Professional and to switch to another

9    group?

10   **A.  Not specifically, no.**

11   Q.   Do you generally have knowledge of

12   that?

13   **A.  No.  I don't remember --**

14   Q.   Did you hear rumors of that?

15   **A.  I don't remember a situation where we**

16   **would.  I mean, some of that depends on the**

17   **situation as to why one versus the other would be**

18   **used.  If there was something going on that the**

19   **entire department needed to be involved in or an**

20   **event or underwriter or a client coming into**

21   **town.**

22   Q.   So --

23   **A.  One versus the other could be used.**

Page 90

1    Q.   Okay.  But you are not -- are you

2    aware of any additional groups?  For example, you

3    said an event or an underwriter.  Like could

4    there be a group for that event?

5    **A.  No, not a separate group, no.**

6    Q.   Or a group of underwriters coming

7    into town --

8    **A.  No.**

9    Q.   -- we're going to dinner and drinks

10   with that group?

11   **A.  No, we would still use Birmingham**

12   **Professional, Birmingham Professional Brokers,**

13   **just depending on the event and who any**

14   **particular client or insurance company that's**

15   **coming to see us wanted to have invited.**

16   Q.   Would a group text be used for those

17   kind of situations?

18   **A.  No.**

19   Q.   Like somebody is coming to dinner,

20   let's invite these people?

21   **A.  No.**

22   Q.   That would never be used?

23   **A.  No.  The only time text would be used**

Page 91

1    **in that context would be once we knew who was**

2    **coming, who was attending the dinner.  You know,**

3    **obviously, there's text communication probably**

4    **that would have gone on to say, Hey, I'm going to**

5    **be late or I'm going to be there, I'll meet you**

6    **guys at the restaurant at 5:30 or whatever the**

7    **case may be.**

8        **But there was no text group or**

9    **anything like that used for anything business**

10   **related like that as far as appointments,**

11   **dinners, meetings, et cetera that I'm aware of.**

12   Q.   What about to communicate leads and

13   other business development information?  Would

14   y'all use text messages?

15   **A.  No.**

16   Q.   Never?

17   **A.  No.  Leads in our business within the**

18   **organization really just doesn't happen.  I mean,**

19   **we are, you know, seven, eight broker teams, if**

20   **you're including underwriting.  We operate our**

21   **own teams as our own businesses basically.**

22   Q.   Okay.

23   **A.  So we're -- you know, and it's a very**

Page 92

1    **healthy environment, but it's a competitive**

2    **environment with the other teams in our office.**

3    **So other teams in the office have their clients**

4    **that they call on that they go and try and get**

5    **business from.**

6        **Like I would never reach out to Rusty**

7    **Hughes and say, Hey, I've got a retail broker**

8    **that I've heard about in Colorado that you should**

9    **go try and get business from.  I'm going to try**

10   **and go get that.  So there's no referral program**

11   **within our department.**

12   Q.   Is there -- what about you also

13   wouldn't get Rusty's clients?

14   **A.  Correct.  No.**

15   Q.   What about say the person in Colorado

16   is open and you're going to go try to get that,

17   would you communicate with your team over text

18   message about what you're going to do to develop

19   that business?

20   **A.  No.  The team would know that I'm**

21   **traveling and where I am and who I'm going to**

22   **see, but that would be done either in person, I'm**

23   **going to be out of the office the next three days**

Page 93

1  traveling to Denver, Colorado seeing X, Y, Z
2  clients or send an e-mail saying, Hey, I'm going
3  to be out of the office the next three days
4  traveling on business.
5     Q.   Have you ever gotten a text from
6  someone's personal phone or company phone about
7  leads?
8          MS. BARLOTTA:  Object to form.
9     A.   I have not.
10    Q.   Do you have company phones?
11    A.   Yeah.
12    Q.   Okay.  And who all is issued a
13 company phone?
14    A.   Typically, it's broker roles.  I
15 can't say for sure whether there are exceptions
16 to that, but --
17    Q.   Do you know whether Kat had a company
18 phone or personal phone?
19    A.   She had a company phone.
20    Q.   And she had to turn it back in,
21 didn't she?
22    A.   She did.
23    Q.   And so the company would have been in

Page 94

1  possession and control of her phone once she
2  turned it in?
3          MS. BARLOTTA:  Object to form.
4     A.   Sure.
5     Q.   And so there would have been no
6  issues pulling information from her phone,
7  because it was the company phone?
8          MS. BARLOTTA:  Object to form.
9     A.   I don't -- I wouldn't know the answer
10 to that.  I never was in possession of her phone
11 after her departure.
12    Q.   Did you give new phones to Clay or
13 other new agents?
14         MS. BARLOTTA:  Object to form.
15    A.   Clay has a company phone.
16    Q.   Was it the phone produced from the
17 company?  I mean, like they didn't use their
18 personal phone number or anything, did he?
19         MS. BARLOTTA:  Object to form.
20    A.   No.  It's a company-issued phone.
21    Q.   Do you know whether Kat had her own
22 personal number?
23    A.   I don't know.

Page 95

1     Q.   Do you know whether CRC took steps to
2  preserve the contents of Kat's phone when she
3  turned it in?
4          MS. BARLOTTA:  Object to form.
5     A.   I do not.
6     Q.   Did you receive or see Kat's EEOC
7  charge?
8     A.   I did.
9     Q.   When did you see it?
10    A.   I don't recall exactly, but I do
11 remember seeing it.
12    Q.   And do you remember Page 2 of -- the
13 notice to the employer contains a preservation
14 request?
15    A.   I don't recall that.
16    Q.   Did y'all take any steps to try to
17 preserve her phone contents?
18         MS. BARLOTTA:  Object to form.
19    A.   I don't know.
20    Q.   Did you direct anybody to wipe the
21 phone clean?
22         MS. BARLOTTA:  Object to form.
23    A.   I do remember when an employee -- I

Page 96

1  don't remember when the EEOC charge came in.  It
2  did not come to my attention.  I never laid eyes
3  on it until much later once we got into the
4  litigation side of it.
5     Q.   You never laid eyes on the charge
6  until much later?
7     A.   Yes.  But there is a termination form
8  that when somebody is either terminated and/or
9  leaves the company that we have to complete for
10 the IT department to get back any equipment that
11 was issued to that employee.
12    Q.   Were you aware that Kat had
13 complained of a difference in treatment between
14 the males and females prior to her departure?
15         MS. BARLOTTA:  Object to form.
16    A.   I was not.
17    Q.   Did she not have any conversations
18 with you over lunch where she felt she was being
19 treated differently?
20    A.   Yeah, we went to lunch, but I don't
21 recall anything being a hundred percent based on
22 gender.  At that time I remember a lot of those
23 conversations being based around her feeling like

Page 97

1  she was doing more administrative work than she
2  wanted to do in an inside broker role.
3      Q.  I'm showing you what I'm marking as
4  Plaintiff's Exhibit Number 6.
5          (Whereupon, Plaintiff's Exhibit No. 6
6  was marked for identification and a copy of same
7  is attached hereto.)
8      Q.  I'm sorry.  You get the one with the
9  sticker.  Sorry.
10     A.  Yeah, sure.
11     Q.  On this form -- I'm just going to ask
12 you, did you fill out this form?
13     A.  There's no signature on it.  I don't
14 honestly remember exactly whether I did it or
15 someone else prefilled it.  I remember seeing
16 this form.
17     Q.  Okay.  It says requesting manager,
18 Corey Daugherty.
19     A.  Uh-huh (positive response).
20     Q.  So it's either you or somebody on
21 your behalf filled this out?
22     A.  Yep.
23     Q.  And at the bottom, it says to wipe

Page 98

1  the phone.  Do you see that?
2      A.  I do see that.
3      Q.  And to -- it says she's not a coded
4  producer.  Do you see that?
5      A.  Uh-huh (positive response).
6      Q.  What does that mean?
7      A.  So on our team, I was the only coded
8  producer.  So the team lead on any -- so if you
9  looked at that broker ranking from the dashboard
10 that we looked at earlier, if you saw any
11 individual's name, Jason Lewis, Rusty Hughes, any
12 other broker's name in the firm, that name that's
13 on that list would be the coded producer.
14         So any other broker on an individual
15 team would not have their own production code.
16     Q.  So Clay Segrest would not have a
17 production code?
18     A.  He would not.
19     Q.  So would it be fair to say as of
20 December 12th, 2019, you or somebody on your
21 behalf wiped the phone?
22         MS. BARLOTTA:  Object to form.
23     A.  Yes.  Based on that date, I would say

Page 99

1  that would be the case.  I personally did not
2  wipe the phone.  Like I said, I never had the
3  phone in my possession.
4      Q.  And I guess a better question is:  It
5  wasn't wiped before that date?
6      A.  Not.
7      Q.  It was either that date or later?
8          MS. BARLOTTA:  Object to form.
9      A.  I would say so, yes.
10     Q.  Do you know whether calls to HR were
11 recorded?
12     A.  I do not.
13     Q.  You don't know?
14     A.  I don't know.
15     Q.  Would that be a better question to
16 ask HR?
17     A.  Sure.
18         MS. BARLOTTA:  Object to form.
19     Q.  And I guess the same -- do you have
20 any information about documenting complaints of
21 discrimination and how that's done?
22     A.  I do not.
23     Q.  What were your duties as a broker of

Page 100

1  a team to document any complaints of
2  discrimination?
3          MS. BARLOTTA:  Object to form.
4      A.  If someone filed a formal complaint
5  with me about discrimination, I would take that
6  to HR.
7      Q.  How do you file a formal complaint
8  with you?
9          MS. BARLOTTA:  Object to form.
10     A.  With me?
11     Q.  Yeah.
12     A.  If an employee of mine made any
13 charge or comment about discrimination in any
14 way, I would immediately go to HR with that.  It
15 wouldn't have to be a filed formal complaint.
16     Q.  I just asked that because that's what
17 you said.
18     A.  Uh-huh (positive response), sure.
19     Q.  Someone could come to you verbally
20 and just complain --
21     A.  Sure.
22     Q.  -- and then you would go to HR?
23     A.  Yeah.

Page 101

1    Q.   Did you ever have to go to HR from
2  2017 to 2020?
3    A.   No.
4    Q.   For any employee?
5    A.   No.
6    Q.   Was there anybody else that would be
7  required to take it to HR if a complaint was
8  made?
9    A.   Not that I'm aware of.
10   Q.   Would Rusty Hughes or Mr. Cadden be
11 required to take it to -- or Helveston?
12        MS. BARLOTTA:  Object to form.
13   Q.   Would they be required to report to
14 HR if a complaint was made to them?
15        MS. BARLOTTA:  Let me just state for
16 the record that you can ask Mr. Daugherty his
17 opinions and what he knows about the subject, but
18 he's not designated on topics related to HR or
19 discrimination.
20        MS. GILL:  That's fine.
21        MS. BARLOTTA:  I just wanted to
22 clarify.
23   Q.   (BY MS. GILL:)  Do you know whether

Page 102

1  or have an opinion as to that?
2    A.   I don't know.  If a charge of
3  discrimination or somebody made a comment to me
4  about being discriminated against, I would
5  elevate it to HR, and I would talk to my
6  leadership team, which would have included Rusty
7  Hughes as the department manager and John Cadden
8  as our office president at that time.
9    Q.   Did you ever have to talk to Rusty
10 Hughes or John Cadden from 2017 to 2020?
11   A.   Not about discrimination, no.
12   Q.   Did you talk to them about any other
13 complaints?
14        MS. BARLOTTA:  Object to form.
15   A.   Over that period of time, there was
16 obviously some conversations between Rusty and I
17 about Cadden's -- I mean, excuse me, Kathryn's
18 sentiment towards being asked or still doing more
19 administrative work than she felt she needed to
20 be doing or should be doing based on her role as
21 an inside broker.
22   Q.   Did Kat ever say Clay wasn't required
23 to do more administrative work?

Page 103

1    A.   Not that I'm --
2        MS. BARLOTTA:  Object to form.
3    A.   Not that I'm aware of.
4    Q.   She didn't say that to you?
5    A.   Not that I recall.
6    Q.   Did Kat ever complain that people
7  were getting -- more males were getting broker
8  roles over females?
9        MS. BARLOTTA:  Object to form.
10   A.   Not that I recall specifically to me.
11   Q.   If she had made either of those two
12 complaints, would you have told HR?
13        MS. BARLOTTA:  Object to form.
14   A.   I would have had a conversation with
15 Rusty and with John about it.
16   Q.   Did you ever have a conversation with
17 either Rusty or John about more males getting
18 broker positions than females?
19        MS. BARLOTTA:  Object to form.
20   A.   No.
21   Q.   When Kat told you she was being given
22 more administrative work than inside broker work,
23 did she say whether that was fair?

Page 104

1        MS. BARLOTTA:  Object to form.
2    A.   No, she didn't make that comment that
3  I recall.
4    Q.   What was your response to her when
5  she said that she was being given more
6  administrative work than broker work?
7        MS. BARLOTTA:  Object to form.
8    A.   I don't remember exactly what the
9  response was.  I know that we talked about it.
10 We had a team meeting about it not very long
11 after that, and restructured our team agency
12 assignments to free her up, to try and free her
13 up to do more marketing of business, negotiation
14 and placement of business, and to focus on new
15 business more from existing retail clients that
16 we partnered with.
17   Q.   Are there any written policies on the
18 duties of yourself or others to document reports
19 of discrimination?
20        MS. BARLOTTA:  Object to form.
21   A.   Yeah, I mean, there's going to be
22 something in our employee handbook, and we have
23 training that gets pushed down to us from Truist,

Page 105

1  but I can't speak specifically to it at this
2  time.
3      Q.   And when you say training from
4  Truist, is that in-person training or is it on
5  the computer?
6      A.   Computer.
7      Q.   And is it -- how much training do you
8  do on EEO policies?
9      A.   I don't know the timetable, the
10 timeline when they roll it out, but there is
11 discrimination training that we do, that all
12 employees are required to do.
13     Q.   I mean, is it once a year?  Is it --
14     A.   I mean, at least once a year I would
15 say.  No more than twice a year.
16     Q.   How much of the training is devoted
17 to EEO?
18     A.   I don't know the answer to that.
19     Q.   Do you know whether any training was
20 provided after Kat complained of discrimination?
21     A.   I do not.
22         MS. BARLOTTA:  Object to form.
23     Q.   This is Plaintiff's Exhibit Number 7.

Page 106

1         (Whereupon, Plaintiff's Exhibit No. 7
2  was marked for identification and a copy of same
3  is attached hereto.)
4      Q.   Are you familiar with this document?
5      A.   I'm not.
6      Q.   You can look at it for a second.
7         (Whereupon, a discussion off the
8  record was held.)
9      Q.   Would you look at Page 2 of this
10 document?
11     A.   Uh-huh (positive response).
12     Q.   It has the titles of the different
13 classes that were taken?
14     A.   Yeah.
15     Q.   And it appears this was your learning
16 history.  Does that seem correct?
17     A.   Yeah, it appears to be.
18     Q.   Midway through that document, one of
19 the classes is Valuing Diversity and Promoting
20 Inclusion.  Do you see that?
21     A.   Yeah, I do.
22     Q.   And it looks like that was one hour?
23     A.   Yes.

Page 107

1      Q.   Okay.  And that was in 2016?
2      A.   Yep.
3      Q.   And the second one was Valuing
4  Diversity and Promoting Inclusion in August of
5  2019.  Do you see that?
6      A.   I do.
7      Q.   At the bottom?
8      A.   I do.
9      Q.   Is there any -- how long was that?
10 That was one hour?
11     A.   That was one hour.
12     Q.   Is there any other training that you
13 can see that has to do with EEO?
14     A.   No, not that I see.
15         MS. BARLOTTA:  We produced the
16 Workplace Harassment for Managers training, so
17 you have that.
18     A.   Yeah, I do see that, another one in
19 2018.
20         MS. GILL:  And I would object to
21 counsel testifying.
22         MS. BARLOTTA:  So the record is
23 clear, you have the document.

Page 108

1      Q.   (BY MS. GILL:)  Do you see Workplace
2  Harassment for Managers?
3      A.   I do.
4      Q.   And is that one hour?
5      A.   It is.
6      Q.   Does that have to do with like sexual
7  harassment?
8         MS. BARLOTTA:  Are you asking him --
9  I mean, you can show him the documents.  He's
10 certainly not going to have them memorized to
11 tell you the content.  You saw how many pages it
12 was, so it might be helpful if you showed it to
13 him.
14         MS. GILL:  Well, I would object to
15 counsel instructing the client on his testimony.
16         MS. BARLOTTA:  I'm not doing that.
17     A.   Yeah, I don't recall what all was
18 involved in that training course back then, but I
19 do see it.
20     Q.   (BY MS. GILL:)  Do you consider
21 assigning men broker tasks and females
22 administrative tasks harassment?
23         MS. BARLOTTA:  Object to form.

Page 109

1   A.   I do not.
2   Q.   Does the employee handbook apply to
3   all employees across the team?
4   A.   Yeah, as far as I know, yeah.
5   Q.   And so, for example, in your team,
6   you supervise everybody on your team?
7   A.   Correct.
8   Q.   They're subject to all the rules of
9   the employee handbook?
10       MS. BARLOTTA:  Object to form.
11  A.   Correct.
12  Q.   Do -- are employees of other teams
13  bound by those policies?
14       MS. BARLOTTA:  Object to form.
15  A.   Yes.
16  Q.   And you report to Rusty Hughes, Mr.
17  Cadden, and Mr. Helveston, correct?
18       MS. BARLOTTA:  Object to form.
19  A.   Not currently, no.
20  Q.   At the time that Kathryn was there?
21  A.   At the time, yes.
22  Q.   And did the other teams also report
23  to Rusty Hughes, Mr. Cadden, and Mr. Helveston?

Page 110

1        MS. BARLOTTA:  Object to form.
2   A.   The other teams within the
3   professional liability department reported to
4   Rusty Hughes.
5   Q.   Okay.  Did Kat ever tell you Clay
6   treated her like a secretary?
7   A.   I don't recall those exact words.  I
8   mean, there was -- she expressed that.  I mean, I
9   remember her expressing something similar to
10  that, but I don't remember those exact words.
11  Q.   And I understand this was a while
12  ago, but that was the gist of one of her
13  complaints?
14  A.   Yeah.  She was complaining about
15  administrative work.
16  Q.   And did she complain that she was
17  treated different from men?
18       MS. BARLOTTA:  Object to form.
19  A.   Not that I recall, not to me
20  directly.
21  Q.   Did she complain about the company as
22  a whole not hiring female brokers?
23       MS. BARLOTTA:  Object to form.

Page 111

1   A.   Not that I recall to me directly.
2   Q.   Did you document Kat's complaints
3   that Clay was treating her like a secretary?
4        MS. BARLOTTA:  Object to form.
5   A.   I don't remember.
6   Q.   Did you report that to HR?
7        MS. BARLOTTA:  Object to form.
8   A.   I did not.
9   Q.   How many conversations did you have
10  with Kat over this issue?
11       MS. BARLOTTA:  Object to form.
12  A.   Probably two that I recall.
13  Q.   Okay.  And were those lunch meetings?
14  A.   I recall one lunch meeting at Bistro
15  V, me and her and Clay.
16  Q.   Did you speak to Rusty Hughes or Mr.
17  Cadden about that specific complaint?
18  A.   I don't remember.
19  Q.   Or to HR?
20  A.   I did not speak to HR.
21  Q.   But it's possible you did talk to Mr.
22  Hughes; you just don't remember?
23       MS. BARLOTTA:  Object to form.

Page 112

1   A.   I don't remember.
2   Q.   The policies that you mentioned that
3   you probably have relating to documentation of
4   EEO complaints, do those apply to Rusty Hughes,
5   Mr. Cadden, and Mr. Helveston as well?
6        MS. BARLOTTA:  Object to the form.
7   And, again, for the record, Mr. Daugherty is not
8   designated on these types of issues, so you're
9   just asking him as a fact witness.
10       MS. GILL:  Okay.
11  Q.   (BY MS. GILL:)  You can answer.
12  A.   Repeat the question again, please.
13       MS. BARLOTTA:  You're asking him
14  those types of questions, so it is his fact
15  witness deposition.
16  Q.   Well, as a corporate representative,
17  do you have knowledge of whether Mr. Cadden, Mr.
18  Helveston, or Mr. Hughes are subject to the
19  policies relating to documentation of EEO
20  complaints?
21       MS. BARLOTTA:  He's not designated on
22  that topic.  You can ask him his opinion.
23  Q.   What is your opinion on that?

Page 113

1    MS. BARLOTTA:  As a fact witness.

2    Testify.

3        MS. GILL:  Well, are you putting

4    somebody else up to answer that question?

5        MS. BARLOTTA:  Yeah, we already told

6    you that.

7        MS. GILL:  Okay.  I just wanted to

8    make sure.  I wanted it to be clear.

9        Q.   (BY MS. GILL:)  What is your opinion

10   on that issue?

11       **A.   They should apply to all employees.**

12           (Whereupon, a discussion off the

13   record was held.)

14       Q.   And just to be clear, this is your

15   30(b)(6) deposition.

16       MS. BARLOTTA:  On the topics in which

17   he's designated.  Anything else outside of that

18   and his opinion is his fact witness testimony.

19       MS. GILL:  Well, we reserve the right

20   to take a separate fact witness deposition at

21   that time.

22       MS. BARLOTTA:  Well, you'll have to

23   take it up with the Court.  We've already gotten

Page 114

1    into many factual issues outside of the 30(b)(6)

2    notice.

3        MS. GILL:  We will.

4        MS. BARLOTTA:  Let's take a break.

5        VIDEOGRAPHER:  All right.  We'll go

6    off the record.  The time is 11:50 a.m.

7            (Whereupon, a lunch recess was

8    taken.)

9        VIDEOGRAPHER:  We are back on the

10   record at 1:03 p.m.

11       Q.   (BY MS. GILL:)  I'm just going to go

12   back and ask a couple of questions about the

13   structure again --

14       **A.   Yeah, sure.**

15       Q.   -- that I missed as I was going

16   through it.  Did you assign agents to Clay

17   Segrest or Kathryn Hendrix?

18       **A.   The way we do that is account**

19   **executives and inside brokers.  Every book of**

20   **business and most teams are set up like this.**

21   **There's a group of agents that every broker does**

22   **business with that makes up their book of**

23   **business, and depending on relationships and a**

Page 115

1    **lot of other factors, you know, how long somebody**

2    **has worked with a particular retailer, we always**

3    **try to divide the book of business up between**

4    **account executives so that one person takes**

5    **ownership hopefully.**

6            **We want them to take ownership of**

7    **those agents from a customer service and customer**

8    **experience perspective.**

9        Q.   So the account executives take

10   ownership of doing those responsibilities for

11   those particular --

12       **A.   For those particular --**

13       Q.   -- clients?

14       **A.   Yes.**

15       Q.   Okay.

16       VIDEOGRAPHER:  I'm sorry, Trish.  Do

17   you have your microphone?

18       MS. GILL:  Oh, I don't.  I'm sorry.

19       **A.   And the same thing with inside**

20   **brokers.**

21       Q.   (BY MS. GILL:)  Inside brokers are

22   assigned an account executive to be responsible?

23       **A.   No.  They have certain agencies that**

Page 116

1    **they handle among different -- like different**

2    **teams will have inside brokers handle certain**

3    **retail relationships as well.**

4        Q.   So an inside broker has account

5    executive duties that they're wholly responsible

6    for?

7        **A.   Not necessarily account executive**

8    **duties, but just as far as continued growth and**

9    **development with that particular agent on a new**

10   **business perspective, involvement with renewals.**

11       Q.   If an inside broker is assigned

12   agents -- I'm sorry -- clients that their duty is

13   to maintain, would they also be assigned an

14   account executive?

15       **A.   Yeah, in some cases.**

16       Q.   Was Kathryn assigned an account

17   executive?

18       **A.   Yeah, when we restructured the book,**

19   **I guess the last time, it would have been early**

20   **-- sometime the end of 2018, maybe early 2019, I**

21   **don't recall exactly the date, but there were a**

22   **few agencies.**

23           **There was AssuredPartners in**

Page 117

1  Columbus, Ohio.  There was Willis Birmingham.
2  There was Insure in North Carolina.  There was
3  McGriff in Raleigh-Durham, North Carolina where
4  she was the inside broker handling that business,
5  and Yvette was handling the quoting and some of
6  the administrative work for AssuredPartners.
7        Tiffany Sanders, I believe, was
8  assigned some of the administrative, quoting and
9  processing for Willis, and then Andrea took on
10 some of the administrative components of McGriff
11 North Carolina.  So yeah.
12     Q.  And you said that happened when you
13 restructured in early 2018?
14     A.  I don't recall the exact timeframe on
15 that.  Sometime in 2018, I believe.
16     Q.  Would it have been --
17     A.  I think it was after when we had the
18 lunch.
19     Q.  It was after she complained that she
20 had too much administrative duties?
21     A.  Uh-huh (positive response).
22     Q.  When she was promoted, were the
23 accounts that -- or clients that she was

Page 118

1  responsible for removed from her?
2     A.  No.
3        MS. BARLOTTA:  Object to form.
4     Q.  So she had the inside broker duties
5  and those accounts that she had when she was
6  executive assistant?
7        MS. BARLOTTA:  Object to form.
8     A.  It's not like it's an immediate.
9  Like when you get moved from an account executive
10 to an inside broker, it's not like a switch is
11 flipped.
12        Like we said before, inside brokers,
13 brokers, all brokers still handle functions
14 within a team and do what's necessary on a
15 particular relationship, whether it be an entire
16 office relationship or whether it be a specific
17 account relationship.  It's something that
18 happens over time.
19     Q.  And I understand you have clients,
20 and so you're going to get something -- like, for
21 example, you said you did certain things when you
22 were on the road, because it's just what the
23 account needed.

Page 119

1        But if you wanted to delegate it, you
2  could have, correct --
3     A.  Sure.
4     Q.  -- to an account executive?
5     A.  Sure.
6     Q.  The account executives are assigned
7  those tasks and ultimately responsible for those
8  tasks, and they can't delegate it to somebody
9  else?
10        MS. BARLOTTA:  Object to form.
11     A.  Sure, correct.
12     Q.  Okay.  And you said it's not
13 immediate.  It's not a switch.  If Kat says it
14 was about two years later that the restructuring
15 occurred after her promotion, do you have any
16 reason to think it was that much time had passed?
17        MS. BARLOTTA:  Object to form.
18     A.  You know, I don't know if there's any
19 specific timeframe.  I mean, you know, we say
20 this all the time in our industry, it's a
21 marathon, not a sprint.  It takes years to
22 develop a career in the insurance industry, much
23 like a legal profession.

Page 120

1        It's relationship based.  It takes
2  time to get the confidence in a client for them
3  to trust you with their business.  It's very --
4  it's a very intensive learning curve from a
5  coverage perspective, because we deal with so
6  many different products.
7     Q.  So would you agree with her it was
8  about two years before the restructuring
9  occurred?
10        MS. BARLOTTA:  Object to form.
11     A.  I don't remember the exact dates.  We
12 restructured things a couple of different times
13 to try to take some of that administrative
14 workload off of her.
15     Q.  Okay.  You mentioned someone named
16 Steele Cadden?
17     A.  Uh-huh (positive response).
18     Q.  Is he related to John Cadden?
19     A.  He is.
20     Q.  And what is their relationship?
21     A.  Father, son.
22     Q.  Okay.  And did Mr. Cadden, the
23 father, have any role in approving Steele

Page 121

1  Cadden's bonuses?
2       MS. BARLOTTA:  Object to form.
3       A.  They were sent to him; but, I mean,
4  no authority, no nothing.  That was my decision.
5       Q.  Okay.  Did the Birmingham office of
6  CRC maintain discrimination complaints?
7       MS. BARLOTTA:  Object to form.
8       A.  I don't know.  That seems more
9  appropriate for HR.
10      Q.  Well, that's why I was asking did
11 Birmingham.  Did Birmingham office CRC, not
12 Truist HR?
13      MS. BARLOTTA:  Object to form.
14      A.  I don't know the answer to that.
15      Q.  Did you maintain any complaints of
16 discrimination?
17      A.  No.
18      Q.  What was the number of employees at
19 CRC between 2017 and 2020 in total?
20      A.  Companywide?
21      Q.  Yeah.
22      A.  I do not know.
23      Q.  How many employees were in human

Page 122

1  resources?
2       A.  I do not know.
3       Q.  How many employees in CRC Birmingham?
4       A.  I don't know.
5       Q.  How many employees in the
6  professional liability department?
7       A.  I'm going to say probably thirty,
8  plus or minus.  I don't know the exact number.
9       Q.  When there was a vacancy in the
10 Birmingham office of CRC, how would people know
11 that opportunity existed?
12      A.  Typically, it was posted on an
13 internal intranet site.
14      Q.  On the intranet?
15      A.  Uh-huh (positive response).  I know
16 they also posted them on LinkedIn as well.
17      Q.  Okay.  You mentioned it was
18 typically.  Was there ever a situation that it
19 was word of mouth?
20      A.  I don't know.
21      Q.  Did you ever hire anybody by word of
22 mouth?
23      A.  No.

Page 123

1       Q.  Were you in control of hiring and
2  firing?
3       A.  For my team, yes.
4       Q.  When Kat came over to your
5  department, how was the offer to come to your
6  department conveyed to her?
7       A.  It was a formal offer.  We had put
8  out a position requisition for an account
9  executive.  Her name was mentioned to me.  I
10 can't remember who mentioned it to me, but at the
11 time Kat was working with -- Jack Elliott was her
12 boss at the time.  He ran our administrative
13 compliance, I guess is the best way to refer to
14 it, group, which is where audit fell.  Kat was in
15 the audit department.
16      We started looking for someone in
17 2014, was trying to find the right person.  Her
18 name came up.  I spoke to Jack in the office
19 about it, which typically happens when there's an
20 internal transfer.  You want to make sure that,
21 you know, the other group feels like you're not
22 poaching their people.
23      Jack said he felt like Kat was good

Page 124

1  for the position and was ready to move out of
2  audit, that she, in Jack's words, had expressed
3  that she was getting tired of all the travel that
4  was required by audit.  And we put the offer
5  letter together through HR, and they presented it
6  to her, and she accepted.
7       Q.  Is there ever a situation where like
8  you would request somebody on your team?
9       MS. BARLOTTA:  Object to form.
10      A.  And what do you mean by request?
11      Q.  Like if there was an employee you
12 felt -- like I know you went to Jack in this
13 case.
14      A.  Uh-huh (positive response).
15      Q.  But her name was already given to
16 you.
17      A.  Uh-huh (positive response).
18      Q.  Is there ever a situation where you
19 just see an employee, you like how they're
20 working, and you just request that person to be
21 on your team?
22      MS. BARLOTTA:  Object to form.
23      A.  We've not really done that, I mean,

Page 125

1  unless we're actively looking and we have a
2  position requisition or we know that we have an
3  open spot that we could bring somebody on for
4  continued growth.
5          I mean, we did it with Amy Ritenour,
6  who's on our team now.  She was in our accounting
7  department, and we just reached out to her to see
8  if she was interested in making a move.
9      Q.   If someone wants to request somebody
10 from your team, would you convey that request to
11 that person?
12         MS. BARLOTTA:  Object to form.
13     A.   If someone came to me?
14     Q.   Uh-huh (positive response), yes.
15     A.   Sure, absolutely.
16     Q.   Okay.  Did Susan Phillips come to you
17 and say she wanted Kat on her team?
18     A.   No.
19     Q.   Did any other senior brokers ask for
20 Kat to come on the team?
21         MS. BARLOTTA:  Object to form.
22     A.   Not that I'm aware of.
23     Q.   Did anybody tell you that either

Page 126

1  Susan Phillips or two senior brokers had asked
2  for Kat on their team?
3      A.   Not that I recall.
4      Q.   Like Rusty Hughes or Mr. Cadden?
5          MS. BARLOTTA:  Object to form.
6      A.   No.
7      Q.   Is there any documentation or like
8  Dashboard information or Workday information that
9  would show when either Susan Phillips or Dave
10 Sloneker needed an associate broker?
11     A.   Not that I'm aware of.
12     Q.   When does a team qualify for an
13 additional associate broker?
14     A.   We got a -- I don't know what the
15 term is.  It's kind of like an algorithm or Excel
16 spreadsheet that when someone thinks they might
17 be interested in hiring a new team member, that
18 document, they basically say, Hey, we want to put
19 out this position requisition form, and we're
20 looking for an account executive or whatever the
21 position is at X, and we're thinking X amount of
22 base salary range.
23         And we send that to leadership.  Then

Page 127

1  they pull that spreadsheet document that I was
2  referring to.  And it basically looks at revenue,
3  number of individuals already on your team, your
4  team's total compensation, your team's travel and
5  entertainment expenses.
6          And there is a percentage, and I
7  don't know what the percentage is, but there is a
8  kind of a red light, green light, yellow light
9  approach that they see.  And if you're green,
10 then that position is approved.
11     Q.   I think you said there was a position
12 requisition form?
13     A.   Uh-huh (positive response).
14     Q.   So you have to fill that out and give
15 it to leadership?
16     A.   Uh-huh (positive response).
17     Q.   Okay.  Do you know where those forms
18 are kept or stored?
19     A.   I do not.
20     Q.   And so if Susan Phillips or Dave
21 Sloneker were looking for an associate broker,
22 those forms should be somewhere at CRC?
23         MS. BARLOTTA:  Object to form.

Page 128

1      A.   I don't know the answer to that.
2      Q.   Okay.  Did you follow that process
3  when you needed an associate broker?
4          MS. BARLOTTA:  Object to form.
5      A.   The position requisition?
6      Q.   Yes.
7      A.   I didn't hire an associate broker.
8      Q.   Is Clay Segrest an associate broker?
9      A.   Oh, you're talking about Clay.  Yes,
10 when Clay was hired, I don't think at that time
11 we even -- that was 2009.  I don't recall a
12 position requisition form.  Clay came to us as a
13 referral.
14     Q.   Did you reach out to anyone else to
15 hire as an associate broker when you hired Clay?
16     A.   I did not.
17     Q.   Did you post a vacancy at that time?
18     A.   I did not.
19     Q.   Is that standard to not post a
20 vacancy?
21         MS. BARLOTTA:  Object to form.
22     A.   I don't know.  At that time it really
23 wasn't a vacancy.  It was a new position.

Page 129

1    Q.   Okay.  Are you -- did you have access
2    to Clay Segrest's application for employment?
3        A.   I do not recall.  I wasn't the team
4    lead, the team broker lead at that time.
5        Q.   You weren't?
6        A.   I was not.
7        Q.   Who was?
8        A.   Betsy Barnett.
9        Q.   Let me show you Plaintiff's Exhibit
10   Number 8.
11           (Whereupon, Plaintiff's Exhibit No. 8
12   was marked for identification and a copy of same
13   is attached hereto.)
14           MS. GILL:  We'll need to redact this
15   before it goes into the transcript.  I'm reading
16   it.  Sorry.
17       Q.   (BY MS. GILL:)  What position did
18   Clay apply for?
19       A.   This says here broker assistant.
20       Q.   So this was before you broke off from
21   Betsy?
22       A.   It is.
23       Q.   But Clay was hired for associate

Page 130

1    broker?
2            MS. BARLOTTA:  Object to form.
3        Q.   At that time?
4        A.   Broker assistant it shows here.
5        Q.   Right.  But, I mean, I'm asking what
6    position he was put into when he was hired.
7            MS. BARLOTTA:  Object to form.
8        A.   Broker assistant.
9        Q.   Okay.  When did he receive a
10   promotion?
11           MS. BARLOTTA:  Object to form.
12       A.   I don't recall.
13       Q.   Would his personnel file reflect when
14   he got his promotion?
15           MS. BARLOTTA:  Object to form.
16       A.   I don't know.
17       Q.   What percent of the time do brokers
18   travel?
19       A.   There's no definitive answer to it.
20   It just depends on their own.  There's no
21   requirement.
22       Q.   Is it different from an associate
23   broker or an inside broker?

Page 131

1        A.   Inside brokers really don't travel
2    that often.  There's no expectation.  They can,
3    they could, but there's no expectation.
4        Q.   On his application he mentions he
5    heard about the company through a family friend.
6    Does he have a friend that worked there that got
7    him the job?
8            MS. BARLOTTA:  Object to form.
9        A.   He does not.
10       Q.   If you'll look at the second page of
11   that document, do you see the offer of
12   employment?
13       A.   I do see that.
14       Q.   Do you see what position he was
15   offered?
16       A.   Yeah, yeah.  Associate broker.
17       Q.   So he got the associate broker off
18   the bat when he came in?
19           MS. BARLOTTA:  Object to form.
20       A.   According to this, yes.
21       Q.   Are the qualifications for an
22   associate broker different than a broker's
23   assistant?

Page 132

1            MS. BARLOTTA:  Object to form.
2        A.   There really are no specific
3    qualifications for an associate broker.  Clay was
4    hired -- when we hired Clay, Clay came in what we
5    referred to back then as a BIT, broker in
6    training.  Clay had zero insurance experience.
7    He was hired in 2009 and started out --
8        Q.   When you say --
9        A.   Go ahead.
10       Q.   Go ahead.
11       A.   No, you go ahead.
12       Q.   When you say a BIT, broker in
13   training, like B-I-T?
14       A.   B-I-T.
15       Q.   Is that initials for something?
16       A.   Just acronym for broker in training.
17       Q.   And are there any qualifications for
18   inside broker?
19       A.   No, not any formal qualifications in
20   terms of training.  It's really -- you know, when
21   someone is hired, it's on-the-job experience.
22   It's time in the trenches.  It's, like I said, a
23   marathon versus a sprint.  Lots of hours spent

Page 133

1  reviewing coverage forms, given different
2  scenarios and circumstances around claims, policy
3  wording.
4       Q.   And the same question for account
5  executive:  Are there any qualifications for
6  that?
7       A.   It's the same.
8       Q.   So would it be fair to say that for
9  all the positions offered on your team, it's
10  training -- on-the-job training?
11       A.   Yeah.
12       MS. BARLOTTA:  Object to form.
13       A.   For the most part.
14       Q.   A minute ago you were talking about
15  different agencies that were assigned to Kat
16  Hendrix.  How did you determine which agencies
17  were assigned to her?
18       A.   I mean, a lot of it was -- you know,
19  when someone new is brought onto a team,
20  typically that person -- you know, we're not
21  going to take existing retailers that a
22  particular person might have been servicing for
23  years and years and years and have personal

Page 134

1  relationships and disrupt that unless there's a
2  need.
3       So, typically, when someone new is
4  hired, that person picks up new clients.  You
5  know, as we go out and visit and see new clients
6  and new retailers start to submit business to us,
7  those are assigned to usually the newest person
8  on the team.
9       Q.   How would you determine that with the
10  executive -- I'm losing a position in my mind --
11  account executive?
12       A.   Same way.
13       Q.   Okay.  So like the different
14  secretarial or administrative tasks that Kat was
15  complaining she was doing, she was doing those
16  because she was newer on the team?
17       MS. BARLOTTA:  Object to form.
18       A.   At that time, she was an account
19  executive, yeah.
20       Q.   But she continued to do those when
21  she became inside broker?
22       MS. BARLOTTA:  Object to form.
23       A.   Some, yes.

Page 135

1       Q.   What other inside brokers performed
2  administrative tasks?
3       A.   I didn't have another inside broker
4  on my team.
5       Q.   Do you know if they did on other
6  teams?
7       A.   Yes.
8       Q.   I mean they were assigned
9  administrative tasks on other teams?
10       A.   Yes.
11       Q.   Okay.  What position is responsible
12  for quoting policies?
13       A.   For sending out the quote?  Account
14  executive.
15       Q.   And what position is responsible to
16  bind policies?
17       A.   To actual issue the binder of
18  insurance, account executives.  But as I've said
19  before, that's something that every single
20  position in the firm in our department does in
21  some capacity.
22       Q.   But you can delegate it to your
23  account executive?

Page 136

1       MS. BARLOTTA:  Object to form.
2       A.   Sure.
3       Q.   Is there a difference in pay between
4  account executive and inside broker?
5       A.   Not necessarily.
6       MS. BARLOTTA:  Object to form.
7       Q.   Are there any agency breakouts
8  showing assignments on other teams?
9       MS. BARLOTTA:  Object to form.
10       A.   Not that I'm aware of.
11       Q.   Would Clay Segrest bind or quote
12  policies?
13       A.   Yes.
14       Q.   Is there a certain procedure or
15  policy that applies to requesting a transfer to a
16  different department?
17       MS. BARLOTTA:  Object to form.
18       A.   Not that I'm aware of.
19       Q.   How are transfers determined?
20       A.   I think the person that's wanting to
21  be transferred has to communicate that to someone
22  and request it.
23       Q.   Do you ever involuntarily transfer

Video Deposition of Corey Daugherty

6/21/2023
35 (137 - 140)

Page 137

1  somebody from a department?
2      MS. BARLOTTA:  Object to form.
3      **A.  Repeat the question, please.**
4      Q.  Do you ever involuntarily transfer
5  someone from the department?
6      MS. BARLOTTA:  Object to form.
7      **A.  I have not.**
8      Q.  For example, if someone is not
9  getting along with somebody, say they don't need
10  to be working with this person, we're going to
11  transfer you to a different department?
12      **A.  I have not.**
13      Q.  Do you have -- my understanding is
14  Kathryn Hendrix requested a transfer.  Do you
15  know why she was not transferred?
16      MS. BARLOTTA:  Object to form.
17      **A.  I was never made aware that she had**
18  **requested a transfer.**
19      Q.  Did you ever discuss transferring
20  Kathryn Hendrix with Mr. Helveston?
21      MS. BARLOTTA:  Object to form.
22      **A.  I did not.**
23      Q.  I'm sorry.  A lot of this is

Page 138

1  repetitive, so I'm going through it so I don't
2  ask you twice.
3      **A.  No problem.**
4      MS. PALMER:  What you really want is
5  for her to just mark out a whole page.
6      MS. GILL:  I'm working on it.
7      THE WITNESS:  Put a big X across all
8  of it.
9      Q.  (BY MS. GILL:)  Did Birmingham office
10  of CRC maintain the postings of positions that
11  were vacant?
12      MS. BARLOTTA:  Object to form.
13      **A.  I've never seen any.  I don't -- I**
14  **couldn't speak to that definitively.  I don't**
15  **know.**
16      Q.  Okay.  We talked about the training
17  and how it was a computer -- computerized
18  training.  Was it simply where you just do a
19  module and then click on it when you're done and
20  then move to the next one and click on it when
21  you're done?
22      MS. BARLOTTA:  Object to form.
23      **A.  Uh-huh (positive response).**

Page 139

1      Q.  How do you know the person viewing
2  the module and the person clicking that it's done
3  is the same person?
4      MS. BARLOTTA:  Object to form.
5      **A.  I don't know the answer to that.**
6      Q.  Is there any in-person training on
7  discrimination?
8      MS. BARLOTTA:  Object to the form.
9      **A.  Not that I'm aware of.**
10      Q.  Are there any disciplinary policies
11  related to administering discipline on people who
12  are complained about?
13      **A.  Not that I'm aware.**
14      MS. BARLOTTA:  Object to form.
15      **A.  Not that I'm aware of.**
16      Q.  Do you know whether Clay Segrest was
17  ever disciplined in any way relating to Kathryn
18  Hendrix's complaint that he was treating her like
19  a secretary?
20      MS. BARLOTTA:  Object to form.
21      **A.  Not that I'm aware of.**
22      Q.  Are you aware of whether Jonathan
23  Morgan was disciplined for misrepresenting his

Page 140

1  heading in the e-mails?
2      MS. BARLOTTA:  Object to form.
3      **A.  Not that I'm aware of.**
4      Q.  Are you aware of whether Clay Segrest
5  was disciplined for omitting Kat Hendrix from his
6  out-of-office notice?
7      MS. BARLOTTA:  Object to form.
8      **A.  Not that I'm aware of.**
9      Q.  Did you receive any training on how
10  or -- whether computerized, written, or anything,
11  on how to respond to complaints of EEOC charges
12  of discrimination?
13      MS. BARLOTTA:  Object to form.
14      **A.  Not that I recall.**
15      Q.  Were you required to assist in the
16  response to Kat Hendrix's EEOC charge?
17      MS. BARLOTTA:  Object to form.
18      **A.  I was not.**
19      Q.  I only have two of these.  I'll let
20  you look at it.  I'm sorry.
21      (Whereupon, Plaintiff's Exhibit No. 9
22  was marked for identification and a copy of same
23  is attached hereto.)

Page 141

1    Q.  Are you familiar with this document?
2    A.  I am.
3    Q.  What is this document?
4    A.  It was my response, I guess, once I
5  was made aware of the EEOC charge.
6    Q.  Okay.
7    A.  I just sat down and put some things
8  together myself so that we would have them.
9    Q.  What was -- do you have a date that
10 you prepared this?  I don't see it.
11   A.  I don't.  I don't know.  I mean,
12 based on that third page -- well, I don't know
13 the answer to that.  I just see where Stefani
14 Petty, November 22nd, 2019, told me that Kat had
15 resigned effective today and filed an EEOC
16 charge.  So that looks like that was the date
17 that I was made aware of the EEOC charge.
18   Q.  Okay.  I see.  Is that Exhibit Number
19 9 all of the notes that you prepared?
20   A.  I don't recall.
21   Q.  If you look at the third page, it
22 looks like there's some typewritten -- there's a
23 typewritten word that says "redacted."  Were

Page 142

1  there additional notes?
2    A.  I don't know.  I don't remember.
3    Q.  Okay.  So --
4        MS. BARLOTTA:  There are additional
5  notes.  We've withheld them as privileged.  As a
6  point of compromise, we produced these because
7  y'all were very interested in them, but the rest
8  of the notes have involved attorney/client
9  conversations, so --
10       MS. GILL:  That's fine.  I just
11 wanted it to be clear on the record.
12   A.  Yeah, my bad.
13   Q.  (BY MS. GILL:)  Okay.  Do you know
14 the plaintiff's -- do you know Kathryn Hendrix's
15 dates of employment?
16   A.  She joined our team July 2014 -- no.
17 Yeah, July 2014, I believe.
18   Q.  Do you remember when she left?
19   A.  July 2019.
20   Q.  Do you know the reason she left?
21   A.  She filed FMLA.
22   Q.  Did -- when she came on your team,
23 did you perform a background check on Kathryn

Page 143

1  Hendrix?
2    A.  I did not personally.
3    Q.  Do you know if Kathryn Hendrix held
4  any other positions at CRC?
5    A.  She did.  We talked about it earlier.
6  She was in our audit department, yeah.
7    Q.  Okay.  So would it be fair to say she
8  was in the audit department, and then she became
9  account executive and then inside broker?
10       MS. BARLOTTA:  Object to form.
11   A.  Yes.
12   Q.  Are you aware of any other positions?
13   A.  None that I'm aware of.
14   Q.  Are you aware of any discipline
15 received by Kat?
16   A.  Not that I'm aware of.
17   Q.  How did you determine Kat's base
18 salary?
19   A.  When we put the position requisition
20 form out, we had a -- we would have had a salary
21 range that would have been approved, and that was
22 what we offered her when we approached her about
23 taking the position, accepting the position.

Page 144

1    Q.  And that's for the account executive?
2    A.  Yes.
3    Q.  Okay.  Did you go through the same
4  process when she became an inside broker?
5    A.  No.  There was no position
6  requisition form necessary at that point.
7    Q.  How did you determine what her salary
8  was going to be at that point?
9    A.  I just bumped it from sixty to
10 sixty-five thousand.
11   Q.  How was Kat Hendrix's bonuses
12 calculated?
13   A.  We've talked about that, but that's a
14 decision that's made by the brokers.  If you look
15 at the bonus document, CRC allocates two percent
16 for bonuses to the entire team, two percent of
17 revenue.  And then it's the broker's discretion
18 on how much he or she wants to come out of their
19 pocket above and beyond that two percent.
20       And the things that are taken into
21 consideration by me personally are tenure at the
22 firm, experience, how long you've been in the
23 insurance production side.

Page 145

1    Q.   And now that you say it, I remember
2  we did talk about that earlier.
3    A.   No problem.
4    Q.   Okay.  What benefits was Kat Hendrix
5  entitled to?
6    A.   That would be a question for HR.
7    Q.   Okay.  Did you -- is Kat Hendrix
8  eligible for rehire?
9    A.   I don't know the answer to that
10  question.  That would be a HR question.
11    Q.   HR?  Okay.  If she is eligible, would
12  you consider her for an associate broker
13  position?
14    A.   I don't know the answer to that.
15    Q.   Okay.  And just so I understand your
16  prior testimony correctly, the inside broker is
17  not required to travel, but they can?
18    A.   Yeah.
19    Q.   And so they're not required to drum
20  up new business or are they?
21    A.   They're not.
22    Q.   Okay.  Do you know whether there's a
23  job description for an account executive?

Page 146

1      MS. BARLOTTA:  Object to form.
2    A.   I've not seen it.  There should be,
3  but I've not seen it.
4    Q.   Is that a question for HR?
5    A.   That would be a question for HR, job
6  description documents.
7    Q.   Does Workday contain the job
8  description?
9    A.   I don't know the answer to that.
10    Q.   Let me show you Plaintiff's Exhibit
11  10.
12      (Whereupon, Plaintiff's Exhibit No.
13  10 was marked for identification and a copy of
14  same is attached hereto.)
15    A.   Okay.
16    Q.   There you go.
17    A.   Thank you.
18    Q.   Have you seen this document?
19    A.   I have.
20    Q.   Were you involved in preparing this
21  document?
22    A.   In 2017?
23    Q.   Yes.

Page 147

1    A.   I was not.
2    Q.   Okay.  Did you give this to Kathryn
3  Hendrix?
4    A.   HR would have given it to her as part
5  of her --
6    Q.   So would questions relating to this
7  agreement be better suited for HR?
8    A.   Probably so, yes.
9    Q.   Do you know if all of your brokers
10  were given an employment agreement?
11    A.   I can't speak definitively for every
12  single broker, but it's a standard document in
13  our industry and in our firm that any
14  production-based role is required to sign a
15  noncompete agreement.  I'm not aware of any
16  broker who has not signed this document.
17    Q.   Okay.  It looks like these are mostly
18  HR anyway.
19      This is Number 11.
20      (Whereupon, Plaintiff's Exhibit No.
21  11 was marked for identification and a copy of
22  same is attached hereto.)
23    A.   Okay.

Page 148

1    Q.   Have you seen this document?
2    A.   I have.
3    Q.   What is this document?
4    A.   This is -- it's a marketing piece
5  that we put together.  Individual teams put these
6  together to send them out to -- when we go and
7  visit clients or talk to clients over the phone,
8  we can e-mail this document to them that shows
9  them what classes of business we specialize in,
10  what classes of business we place, information
11  about our in-house programs, and then contact
12  information for our specific team.
13    Q.   Okay.  And I think you said each of
14  the teams have one of these?
15    A.   I mean, it's something that we used
16  often.  I mean, every team -- this is not
17  something that's required of every team to do.
18  It was something that we put together for our
19  specific team to try and effectively and
20  efficiently market to our clients.
21    Q.   Is it kept in Workday or is it --
22    A.   No.
23    Q.   Just on somebody's computer?

Page 149

1    A.   Yeah.
2    Q.   This is Plaintiff's Exhibit Number
3  12.
4         (Whereupon, Plaintiff's Exhibit No.
5  12 was marked for identification and a copy of
6  same is attached hereto.)
7    A.   Thank you.
8    Q.   I want to direct your attention to
9  the affirmative defenses section, which looks
10 like it's Page 9 of 18.
11   A.   Okay.
12   Q.   I'm going to direct you --
13        MS. BARLOTTA:  He's not designated on
14 this, but you can ask him questions as a fact
15 witness.
16        MS. GILL:  Oh, he's not?  Is there a
17 separate person that's going to be designated?
18        MS. BARLOTTA:  Ms. Petty.
19        MS. GILL:  Ms. Petty?  Okay.
20   Q.   (BY MS. GILL:)  Never mind then on
21 those questions.
22   A.   All right.
23   Q.   Were you responsible for locating

Page 150

1  documents responsive to our requests for
2  production?
3         MS. BARLOTTA:  Object to form.
4    A.   I was not.
5    Q.   Do you know who was?
6    A.   I do not.
7         MS. BARLOTTA:  Object to form.
8    Q.   Is this a question for Ms. Petty?
9         MS. BARLOTTA:  Object to form.
10   Q.   The HR?
11   A.   I would think so.  I wasn't involved
12 in document production.
13   Q.   Let me ask you this:  Did you take
14 any efforts to locate documents responsive to the
15 requests for production?
16        MS. BARLOTTA:  Object to form.
17   A.   I think I went back and searched a
18 couple of e-mails, but that was the extent of it.
19 Nothing else.  And I, of course, produced the --
20 I wrote up the document that we looked at
21 earlier, Exhibit 9 --
22   Q.   The notes?
23   A.   -- I guess.  Yes, Exhibit 9.  That

Page 151

1  was me.  Outside of that, no.
2    Q.   Did you search any mailbox other than
3  Ms. Hendrix's mailbox?
4         MS. BARLOTTA:  Object to form.
5    Q.   When you looked at e-mails?
6         MS. BARLOTTA:  Object to form.
7    A.   I didn't.  I didn't search Kathryn's
8  inbox.
9    Q.   Oh.  Whose e-mails did you search
10 through?
11   A.   My own.
12   Q.   Okay.  Did you perform any other
13 searches for any other e-mails?
14   A.   I did not.
15   Q.   Do you know where Ms. Hendrix's
16 laptop computer is?
17   A.   I do not.
18   Q.   Did you know that she returned it to
19 CRC?
20   A.   I did.
21   Q.   Okay.  But you don't know where it
22 went after it --
23   A.   I do not.

Page 152

1    Q.   Were you aware that Ms. Hendrix had
2  retained an attorney?
3    A.   I was not.
4         MS. BARLOTTA:  Object to form.
5    A.   Clearly at some point I was made
6  aware of it but did not know when.
7    Q.   Well, obviously, a lawsuit has been
8  filed --
9    A.   Yeah.
10   Q.   -- but before that?
11   A.   No.
12   Q.   Before her EEOC charge was filed?
13        MS. BARLOTTA:  Object to form.
14   A.   No.
15   Q.   Did anybody come to you and tell you,
16 like Ms. Petty or anybody, tell you that you
17 needed to preserve evidence?
18        MS. BARLOTTA:  Object to form.
19   A.   We received a preservation notice, I
20 guess once counsel was retained, that we had to
21 sign an affidavit.
22   Q.   Were you aware that Kat Hendrix
23 requested a severance?

Page 153

1        MS. BARLOTTA:  Object to form.
2        A.   Yes.  I don't know at which point,
3    but I remember seeing that document.
4        Q.   And was there an investigation after
5    she requested severance?
6        MS. BARLOTTA:  Object to form.
7        A.   Not that I'm aware of.  I think
8    that's a more appropriate question for HR.
9        Q.   Human resources?
10       A.   Uh-huh (positive response).
11       Q.   Are all salaries the same across the
12   board for associate brokers?
13       A.   They are not.
14       MS. BARLOTTA:  Object to form.
15       Q.   I believe you mentioned there might
16   be a range.  Do you know what that range is for
17   incoming associate brokers?
18       A.   I do not.  It depends on the team.
19       Q.   Is there a range for inside brokers?
20       A.   There is not.
21       Q.   Is there a range for account
22   executives?
23       A.   There is not.

Page 154

1        Q.   Are the bonuses, the semi-annual and
2    annual bonus, are they considered part of the
3    salary?
4        A.   They are not.
5        Q.   I've heard something, either in a
6    document or somewhere, about a contingent bonus.
7    What is that?
8        A.   I don't know what you're referring to
9    there.
10       Q.   Okay.  Is there ever a situation
11   where a bonus could be granted to someone not --
12   separate and distinct from the semi-annual and
13   the annual bonus?
14       A.   Not that I'm aware of.
15       Q.   Are there any other bonuses provided
16   to employees other than the semi-annual and the
17   annual?
18       A.   None that I'm aware of.
19       MS. BARLOTTA:  Object to form.
20       Q.   I guess that's semi-annual.  I don't
21   know why I'm saying semi-annual and annual.
22   Twice a year?
23       A.   Right.  I'm with you.

Page 155

1        Q.   Okay.  What is a supplemental
2    commission?
3        A.   I don't know.
4        Q.   Do you know what an incentive
5    commission is?
6        A.   I do not -- well, I mean, incentive
7    commission, I mean, we as an organization and as
8    a firm have incentives with our insurance
9    companies and retail agencies that we do business
10   with, certain commission agreements with them.
11   But that's with retail clients and insurance
12   companies.
13       Q.   Okay.  So they receive the bonus, the
14   supplemental incentive or you do --
15       MS. BARLOTTA:  Object to the form.
16       Q.   -- from them?
17       MS. BARLOTTA:  Object to form.
18       A.   CRC would get it from insurance
19   companies.
20       Q.   I gotcha.
21       A.   And then we would pass on any similar
22   type of incentive comp or commission to our
23   retail clients.  But that is not done at the

Page 156

1    individual broker team level.
2        Q.   So members of the team don't receive
3    portions --
4        A.   No, absolutely not.
5        Q.   Are there goals or KPIs that are
6    required to be achieved to receive a bonus?
7        A.   No.
8        Q.   And I think you said once the bonuses
9    are set, they're sent to Rusty Hughes, Cadden, or
10   Helveston, but they don't have any discretion or
11   authority to change it?
12       A.   They've never exhibited any authority
13   or veto towards me personally.
14       Q.   Is there training on the products
15   they're selling, the brokers?
16       A.   There's no formal training.  It's,
17   you know, just day-to-day reading policy forms.
18   When I started, you take a policy form home and
19   read it and highlight it and mark it up and over
20   and over and over again.
21       Q.   So it's kind of like what we talked
22   about before, on-the-job training?
23       A.   On-the-job training.  A lot of

Page 157

1  self-motivated on-the-job training.
2      Q.  Who decided to change Kat from
3  account executive to inside broker?
4      A.  I made the decision.
5      Q.  Did you communicate this change in
6  title to other employees of CRC and, if so, how
7  did you do it?
8      A.  Yeah, I would have had to have
9  discussed it with Rusty and probably John, but
10  for sure Rusty.
11      Q.  What about the other members of your
12  team?  Did you discuss it with them?
13      A.  Yeah, after the fact.  I mean, it was
14  not -- it was my decision, but --
15      Q.  Right.
16      A.  -- we relayed that position -- that
17  decision was announced to the entire department.
18      Q.  Was it a verbal announcement or was
19  it an e-mail that went out?
20      A.  No.  I sent out an e-mail.
21      Q.  Was -- when you notified -- when did
22  you notify Kat Hendrix of her change in title?
23      A.  I don't remember the exact date.

Page 158

1      Q.  Was that through an e-mail or was
2  that a verbal conversation?
3      A.  It would have been a verbal
4  conversation if I remember correctly.
5      Q.  Was she provided any kind of list or
6  description of what her new and additional duties
7  would be?
8      A.  Not that I remember at that time, no.
9      Q.  How would she know what her job
10  duties were?
11      A.  I mean, we had talked about it
12  multiple times.  I mean, she had been with us at
13  that point from 2014 to 2017.  I mean, she could
14  have asked any question that she had.  But --
15      Q.  So I guess it's, again, on-the-job
16  training, like as issues arise?
17      A.  Yep.
18      Q.  Who made the decision to hire Brandon
19  Hayes as an associate broker?
20      A.  That would have been Dave Sloneker.
21      Q.  Do you know how Dave Sloneker -- did
22  he post the vacancy or did he find him by word of
23  mouth?

Page 159

1      A.  That was a posted position, both
2  internally; and if I remember correctly, it was
3  also posted on LinkedIn.  And Brandon was --
4  Brandon came across that position through
5  LinkedIn, if I remember correctly.
6      Q.  And I guess he just submitted a
7  resume, and then it just went from there?
8      A.  He knew Dave outside of the office,
9  and from what he's -- from what I remember him
10  telling us, he inquired from Dave that he had
11  seen a position that was open at CRC for an
12  associate broker and asked him if he could give
13  him some guidance on how to inquire about that
14  position and who might be looking to hire.
15          And Dave told him that it was
16  actually him, and Brandon applied for the
17  position.
18      MS. PALMER:  Side note:  I went to
19  law school with Brandon.
20      THE WITNESS:  Small world.
21      MS. GILL:  We've been going about an
22  hour.  Do y'all want to take a little bathroom
23  break?

Page 160

1      MS. BARLOTTA:  Sure.
2      VIDEOGRAPHER:  We'll go off the
3  record at 2:06 p.m.
4      (Whereupon, a brief recess was
5  taken.)
6      VIDEOGRAPHER:  We are back on the
7  record at 2:21 p.m.
8      Q.  (BY MS. GILL:)  Do you know who made
9  the decision to hire Jonathan Morgan?
10      A.  He's on Truitt Taylor's team, so
11  Truitt Taylor would be my answer there, but
12  different team, so I wouldn't have any way of
13  really knowing with certainty.
14      Q.  Do you know who authorized Jonathan
15  Morgan to put associate broker on the website?
16      MS. BARLOTTA:  Object to form.
17      A.  I do not.
18      Q.  Do you know whether Jonathan Morgan
19  was ever instructed to correct the incorrect
20  information?
21      MS. BARLOTTA:  Object to the form.
22      A.  I do not.
23      Q.  Do you know whether he was ever

Page 161

1  disciplined for putting incorrect information on
2  the website?
3        MS. BARLOTTA:  Object to form.
4     A.  I do not.
5     Q.  Has anyone -- well, would this be HR?
6  Has anyone complained to you of unfair treatment
7  by Clay, Corey, Rusty, John, or Ron?
8     A.  No.
9     Q.  Did Sarah Dunston ever work in your
10 department?
11    A.  She did.
12    Q.  When did she work in your department?
13    A.  I don't remember the dates.
14    Q.  Did Kristyn Smith ever work in your
15 department?
16    A.  Yes.
17    Q.  When did she work in your department?
18    A.  I don't know the specific dates.
19    Q.  Do you know whether there were any
20 sexual harassment complaints at CRC?
21    A.  None that --
22       MS. BARLOTTA:  Object to form.
23    A.  None that I'm aware of.

Page 162

1     Q.  Did Lauren Lindberg ever work in your
2  department?
3     A.  Yes.
4     Q.  What were the dates of her working in
5  your department?
6     A.  I don't remember.
7     Q.  Did CRC take any action after
8  receiving the letter from the attorney asking to
9  preserve evidence?
10       MS. BARLOTTA:  Object to form.
11    A.  I don't know the extent of any
12 action, but I know that me personally, I was
13 asked to sign the preservation of documents
14 affidavit, I guess is how you would refer to it,
15 or maybe it was not even an affidavit.  Maybe it
16 was I had to reply to an e-mail just attesting
17 that I would not destroy any documents.
18    Q.  What action, if any, did CRC take
19 after receiving Ms. Hendrix's resignation letter?
20       MS. BARLOTTA:  Object to form.
21    A.  I don't know the answer to that.
22    Q.  Would that be a question for HR?
23       MS. BARLOTTA:  Object to form.

Page 163

1     A.  Yes.
2     Q.  What action did CRC take after
3  receiving the EEOC charge?
4        MS. BARLOTTA:  Object to form.
5     A.  That's a question for HR.
6     Q.  Okay.  What actions did you take
7  after the two lunch meetings or the two meetings
8  with Kat where she complained she was being
9  treated like a secretary?
10       MS. BARLOTTA:  Object to form.
11    A.  We sat down and revisited the -- as
12 we mentioned before, we revisited the agency
13 split and tried to take some of that
14 administrative work off of her that she was
15 complaining about and assigned Tiffany, Andrea,
16 and Yvette some of the agencies that she was
17 handling to do some of those things.
18    Q.  Did Kat ever tell you that she would
19 not be having that conversation with you if she
20 was wearing khakis and a golf shirt?
21       MS. BARLOTTA:  Object to form.
22    A.  No.
23    Q.  Did Rusty ever say to Kat in front of

Page 164

1  you that Susan Dunston said -- I'm sorry -- Sarah
2  Dunston said males are being given more
3  opportunities, and that's why she's leaving?
4        MS. BARLOTTA:  Object to form.
5     A.  Not that I'm aware of.
6     Q.  And did Rusty ever say in front of
7  you to Kat that, you know, Do you feel the same
8  way?  We want to make sure you don't feel that
9  way.
10    A.  Not that I recall.
11    Q.  And did Kat say to Rusty in front of
12 you that, Well, there's an issue there?
13    A.  I don't remember that at all.
14    Q.  Did you ever refer any accounts to
15 Clay Segrest?
16    A.  Refer?
17    Q.  Yes.
18    A.  No.  I mean, there's accounts that
19 I've asked Clay to handle over the years.  He's
20 been on my team.  For whatever reason, Clay
21 specializes in cyber liability and has kind of
22 positioned himself in the professional liability
23 industry now as a cyber liability expert.  So

Page 165

1  oftentimes when we get cyber liability accounts
2  in, I will pass them off to him or, you know,
3  engage with him.
4      Q.   Did you ever refer or pass off
5  accounts to Kat Hendrix?
6      A.   Yeah.
7      Q.   Can you name those accounts?
8      A.   I can't name them by name, but we had
9  an agency in Columbus, Ohio that she handled that
10  was an ambulance business, and she would take
11  those accounts and run with them, market them,
12  place them.
13     Q.   Did you ever take revenue-generating
14  accounts from Kat?
15          MS. BARLOTTA:  Object to form.
16     A.   No.  We reassigned business within
17  the team, but it wasn't a revenue impacting.
18     Q.   Were lower level brokers handed
19  business from brokers on a regular basis?
20          MS. BARLOTTA:  Object to form.
21     A.   What do you mean lower level brokers?
22  What are you referring to?
23     Q.   Associate and inside versus broker.

Page 166

1      A.   Inside brokers, yeah.
2      Q.   Okay.
3      A.   Renewals and new business.
4      Q.   Not just -- it was new business, too?
5          MS. BARLOTTA:  Object to form.
6      A.   Uh-huh (positive response), yes.
7      Q.   I know we talked about your not
8  providing Kat Hendrix a list of her new duties.
9  You just talked about it as it happened on the
10  job.
11         Did you ever discuss what her new
12  duties were going to be with leadership?
13         MS. BARLOTTA:  Object to form.
14     A.   No.  There was no need.
15     Q.   Did any other females on your team
16  make comments to you about the amount of
17  administrative work that Kat was doing?
18     A.   No.
19     Q.   Were brokers assigned to an office?
20     A.   Some, but not all.
21     Q.   How was it determined who got an
22  office and who didn't?
23     A.   The way that I -- the way we talked

Page 167

1  about it internally was, I mean, every team
2  within our department, I don't want to say pods
3  or clusters, but we try -- I tried to keep our
4  team together, because so much of what we do on a
5  day-to-day basis is communicating throughout the
6  day, pre-pandemic, of course.
7          But everybody is in the office,
8  you're communicating, and even though you might
9  not be intimately involved in the exact
10  conversation, you hear the conversation, the
11  dialogue, the market speak.  So we try to keep
12  our teams together.
13         And at the time that Kathryn was with
14  us, I mean, we were busting out of the seams, and
15  we were in the process of remodeling our office
16  space, which we have since done.  It's freed up a
17  lot more offices.  But at the time, it was --
18  there was one office on the completely opposite
19  side of the department that we talked about.
20         And Rusty and I had told Kathryn that
21  once the build-out was done, that she would get
22  an office on the side of the building that we
23  were in.

Page 168

1      Q.   And was anyone else assigned to a
2  cubicle on your team?
3      A.   Yeah.
4      Q.   Who was assigned to a cubicle?
5      A.   Andrea, Yvette, Tiffany.
6      Q.   So all the account executives?
7      A.   All the account executives.  Kathryn
8  sat in a cubicle next to Yvette that was also
9  next to another cubicle that Brandon Hayes sat
10  in.
11     Q.   Where do the new people sit?
12     A.   That we've hired since?
13     Q.   You said you had hired three new
14  people since.  Where do they sit?
15     A.   Cubicles.
16     Q.   But they're all account executives as
17  well?
18     A.   Account executive and broker
19  assistant.
20     Q.   Okay.  The assistant broker didn't
21  get an office once the remodel was done?
22     A.   I don't have an assistant broker.
23     Q.   Oh.  Oh, assistant --

Page 169

1           MS. PALMER:  Broker assistant.
2       Q.   Broker assistant.
3       **A.   No, she's in a cube.**
4       Q.   I can't keep all these positions
5   straight.
6       **A.   She's in a cube.**
7       Q.   How was it determined Tiffany
8   received a better desk or better cubicle than Kat
9   Hendrix?
10          MS. BARLOTTA:  Object to form.
11      **A.   I don't understand the question.  I**
12  **don't understand why --**
13      Q.   Well, from what I understand -- and
14  I'll show you Plaintiff's Exhibit 13.
15          (Whereupon, Plaintiff's Exhibit No.
16  13 was marked for identification and a copy of
17  same is attached hereto.)
18      Q.   Under Kat's desk or a portion of
19  Kat's desk there was a bunch of wiring.  Do you
20  see that?
21      **A.   I do.**
22      Q.   Does that accurately depict Kat's
23  desk?

Page 170

1       **A.   Yeah.**
2       Q.   And, I guess, why was Kat assigned to
3   this desk versus Tiffany, who was newer?
4           MS. BARLOTTA:  Object to form.
5       **A.   It was the closest space to us at the**
6   **time.**
7       Q.   In other teams do inside brokers have
8   an office?
9           MS. BARLOTTA:  Object to form.
10      **A.   Not all at the time.  I mean, Brandon**
11  **Hayes, I just mentioned Brandon Hayes was either**
12  **an inside broker or associate broker, and he sat**
13  **in a cube next to Kat.**
14      Q.   Does he have an office now?
15      **A.   He does now.  But we've since -- as a**
16  **department, we since have two new -- not two new,**
17  **but two other inside brokers, two female inside**
18  **brokers that don't have offices.  They're in a**
19  **cube.**
20      Q.   Was Kat's new position of inside
21  broker ever listed on the website?
22      **A.   I don't know.**
23      Q.   Does CRC Birmingham have HR on-site?

Page 171

1       **A.   They do not.**
2       Q.   Do other offices have HR on-site?
3       **A.   I don't know the answer to that.**
4       Q.   So I need to ask HR?
5       **A.   Yes.**
6       Q.   Okay.  Do you know what happened to
7   any of Ms. Hendrix's personal items and documents
8   contained in her desk after she was employed?
9       **A.   I do not.**
10      Q.   Did Kat Hendrix ever tell you she
11  wanted to be an associate broker?
12      **A.   I remember Kat and I having**
13  **conversations about that and about the travel**
14  **piece of it.  And I always remembered her showing**
15  **interest in an inside broker role.**
16      Q.   What efforts were taken to preserve
17  and recover evidence on your cellphone as it
18  relates to this case and any communications you
19  may have had with Ms. Hendrix?
20          MS. BARLOTTA:  Object to form.
21      **A.   I don't know the answer to that.**
22      Q.   Did you take any efforts to preserve
23  it?

Page 172

1           MS. BARLOTTA:  Object to form.
2       **A.   No.  I didn't delete anything.**
3       Q.   Okay.  That's an effort.
4       **A.   Right.**
5       Q.   Did you take any steps to notify
6   other people in your department to preserve their
7   data on their cellphones?
8           MS. BARLOTTA:  Object to form.
9       **A.   I did not.**
10          MS. GILL:  Can we talk a moment or
11  can we go off the record so that my co-counsel
12  and I can talk a moment?  I think we're almost
13  done.  I just want to make sure we're done.
14          VIDEOGRAPHER:  We'll go off the
15  record at 2:42 p.m.
16          (Whereupon, a brief recess was
17  taken.)
18          VIDEOGRAPHER:  We are back on the
19  record at 2:59.
20      Q.   (BY MS. GILL:)  Does Lauren still
21  work at CRC?
22      **A.   Lauren?**
23      Q.   Lindberg?

Page 173

1    A.  She does not.
2    Q.  And does Brandon Hayes still work
3  there?
4    A.  He does not.
5    Q.  So does he have an office there?  I
6  think we were talking about an office.
7    A.  No.  He sat in a cube next to -- he
8  was a broker, but he sat in a cube next to
9  Kathryn.
10   Q.  Let me show you what I'm marking as
11 Plaintiff's Exhibit 14.
12       (Whereupon, Plaintiff's Exhibit No.
13 14 was marked for identification and a copy of
14 same is attached hereto.)
15   Q.  Did you meet with John Cadden,
16 Stefani Petty, and Rusty?
17   A.  Yeah, we had a call with them.  I
18 mean, we had a call with Stefani, the three of
19 us.
20   Q.  Okay.  So you, Rusty, and John were
21 in one office, and y'all called Stefani Petty?
22   A.  Yes.
23   Q.  And it was about -- was it about

Page 174

1  Kathryn Hendrix?
2    A.  It would have been, yes.
3    Q.  And what did y'all talk about?
4    MS. BARLOTTA:  I'm going to object,
5  because I think that's covered by privilege.
6  Because this was after the EEOC charge was filed,
7  so that would have been at the direction of legal
8  counsel in response to -- in preparing a response
9  to her charge.
10   Q.  Let me ask you this:  Was legal
11 counsel invited to that meeting?
12   MS. BARLOTTA:  If you know.
13   A.  I don't know the answer to that.
14   Q.  Was legal counsel a participant
15 during that meeting?
16   A.  I don't recall.
17   Q.  Do you remember you, Rusty, and John
18 in one room calling Stefani Petty?
19   A.  Yes.
20   Q.  You don't remember any lawyer being
21 involved in that conversation?
22   A.  I do not.
23   MS. BARLOTTA:  Object to form.

Page 175

1    MS. GILL:  I think I get to ask what
2  he talked about during that conversation.
3    MS. BARLOTTA:  Not if it was at the
4  direction of counsel, and it's also covered by
5  the anticipation of litigation privilege, because
6  she's clearly filed her charge at this time.
7       Stefani Petty is going to testify
8  that she was involved in preparing the response
9  to this charge, so this conversation most
10 certainly was going to be at the direction of
11 legal counsel for purposes of responding to the
12 charge.
13   MS. GILL:  Okay.  So on the record,
14 are you instructing him not to answer?
15   MS. BARLOTTA:  Yes.
16   MS. GILL:  Our position on this whole
17 issue is that what happened in that meeting could
18 go towards the affirmative defenses, and that --
19 because their conduct in their investigation come
20 into play, and that work product would not be an
21 issue if you're using it as an affirmative
22 defense.
23   MS. BARLOTTA:  I don't know that

Page 176

1  we're using anything that happened in that
2  conversation as part of an affirmative defense.
3  But, I mean, I just -- I don't think that you get
4  to, you know -- I've never heard of an allowance
5  for once a charge is filed, that -- and it's
6  being handled by legal counsel, which this was by
7  the legal department, that you get to ask the
8  company about what discussions there were about
9  the charge in preparation of the response.  I
10 don't see how that's not privileged.
11   MS. GILL:  I think if the attorney is
12 involved, it's privileged, but I think if you're
13 responding to an EEOC charge and the attorney is
14 not involved --
15   MS. BARLOTTA:  Well, you're talking
16 about attorney/client communication privilege,
17 which is different from anticipation of
18 litigation work product privilege.  So those are
19 two separate privileges.
20   MS. GILL:  I guess our position is
21 that because the attorney is not involved in this
22 meeting, that it would be your burden to show
23 that it is work product privilege and that it is

Page 177

1  your burden to file a protective order on this
2  issue.
3       MS. BARLOTTA: Okay. Well, we can do
4  that.
5       MS. GILL: I guess we would just ask
6  that the --
7       MS. BARLOTTA: He's not designated to
8  talk about the response to the charge anyway. So
9  he's just testifying as a fact witness, and all
10 these questions pertain to his fact deposition
11 testimony.
12      MS. GILL: Well, part of the 30(b)(6)
13 deposition notice talked about affirmative
14 defenses.
15      MS. BARLOTTA: And I already said he
16 wasn't designated on that, and he's not
17 designated on anything pertaining to the response
18 to the EEOC charge.
19      MS. GILL: We would just reserve the
20 right to reopen the deposition based on the
21 outcome of this, and also in the event some of
22 the documents I'm about to ask about are
23 produced, that we can go over those documents as

Page 178

1  well.
2       Q.   (BY MS. GILL:) Did you know why Ms.
3  Hendrix was on FMLA leave?
4       A.   Not specifically. I remember that I
5  was in New York with my family, and I remember
6  this call vividly. I called Kat about something
7  work related, and she was -- we chatted for a
8  brief moment, and then she started crying, and I
9  asked her what was wrong, and she said that, I
10 don't know if you know this, but I have had
11 mental health problems in the past or have dealt
12 with mental health issues in the past, and I have
13 had a breakdown, and my doctor has recommended
14 that I take leave.
15      And my wife and kids were sitting
16 there next to me in LaGuardia Airport, and I
17 said, Kat, this place is secondary and do what
18 you need to do to take care of yourself.
19      Q.   Did she say what caused her
20 breakdown?
21      A.   And we will support you. She did
22 not. We did not get into any of the specifics or
23 details that I recall at that time.

Page 179

1       Q.   I'm showing you what I've marked as
2  Plaintiff's Exhibit -- did you get into why Ms.
3  Hendrix had a breakdown at a later point in time?
4       A.   No.
5       Q.   Okay. I'm going to show you what
6  I've marked as Plaintiff's Exhibit Number 15.
7       (Whereupon, Plaintiff's Exhibit No.
8  15 was marked for identification and a copy of
9  same is attached hereto.)
10      Q.   Did I give that to you? I did not.
11 Sorry.
12      A.   Okay.
13      Q.   Do you know what that document is?
14      A.   Yep.
15      Q.   Can you tell us what that document
16 is?
17      A.   Yeah. It looks like an e-mail from
18 George Bennett, what day was that, August 1st,
19 2018. So George worked at TDC Specialty, which
20 is one of our insurance companies that we do
21 business with, a lot of business with.
22      And they had planned this event down
23 at Lake Martin at Willow Point, and they came up

Page 180

1  with the invitation list, and they sent this
2  e-mail out to, you know, the first group of
3  people or the people that they had that they
4  wanted to invite to this event.
5       Not a decision made by us. It was a
6  client of -- an insurance company that we do
7  business with sent this out.
8       Q.   Okay.
9       A.   And a lot of these people in this
10 e-mail are not even in the Birmingham office.
11 There's California office, there's Colorado
12 office, there's the Nashville office, the New
13 York office.
14      And then I sent Rusty an e-mail that
15 same day forty minutes later saying, Need to be
16 sure Kathryn and Lauren are invited to this.
17      Q.   Okay.
18      A.   Because I felt like they needed to be
19 there as well, even though Lauren was not on my
20 team.
21      Q.   That's what I was going to ask you.
22 Was Lauren on your team?
23      A.   No, she was not.

Page 181

1    Q.   Was Lauren a broker of any type?
2    A.   She was an inside broker.
3    Q.   Lauren was an inside broker?
4    A.   Uh-huh (positive response).
5    Q.   Okay.  And Willow Point, is that a
6    golf course?
7    A.   It is.
8    Q.   Did everybody play golf?
9    A.   I think the people that wanted to or
10   do play golf did.
11   Q.   Do you know whether Ms. Hendrix was
12   given the opportunity to play golf?
13   A.   I do not recall.  I don't know.
14   Q.   Do you recall whether she was
15   assigned to be on a pontoon boat instead of play
16   golf?
17   A.   I don't know.  I didn't plan the
18   event.
19   Q.   Did Lauren become a broker after Kat
20   left?
21   A.   I don't know the answer to that.  I
22   don't remember.  She wasn't on my team, so I
23   don't know the dates.

Page 182

1    Q.   Is it possible that Lauren was not a
2    broker at the time of the golf incident?
3    A.   I don't know.
4    Q.   You said that you did not make the
5    assignments for the golf trip.  Who did?
6    A.   George Bennett or someone within TDC,
7    which is not a CRC company.
8    Q.   Let me show you what I'm marking as
9    Plaintiff's Exhibit 16.
10        (Whereupon, Plaintiff's Exhibit No.
11   16 was marked for identification and a copy of
12   same is attached hereto.)
13   A.   16, yep.
14   Q.   Did George ever work at CRC?
15   A.   Yeah, he did.
16   Q.   And at some point he moved to TDC?
17   A.   Yes.
18   Q.   Okay.  I'm sorry.  I need to give you
19   the exhibit.
20   A.   Thank you.
21   Q.   Have you seen that document?
22   A.   I mean, I have at some point, yeah.
23   It was sent to me.

Page 183

1    Q.   Okay.  It looks like it's from Rusty
2    Hughes?
3    A.   Yeah.
4    Q.   And it's copying George Bennett.  Do
5    you see that?
6    A.   I do.
7    Q.   And so Rusty Hughes is typing out the
8    agenda?
9    A.   No.  The way that I recall this is
10   George sent the agenda to Rusty, and Rusty copied
11   it and sent it to us.  Rusty wouldn't have had
12   any involvement in setting the agenda here.  It
13   was a TDC event.
14   Q.   At the -- do you know if Rusty had
15   any input on CRC assignments?
16   A.   No.
17   Q.   On Page 718?
18   A.   718?
19   Q.   At the bottom, 718.
20   A.   No, he would not have.
21        MS. GILL:  I think we are done.
22        THE WITNESS:  Perfect.
23        MS. GILL:  I do have a housekeeping

Page 184

1    measure to discuss.
2        MS. BARLOTTA:  On the record or off
3    the record?
4        MS. GILL:  We can do it on the
5    record.  There's been a few documents -- oh, do
6    you have any questions for him?  I'm sorry.  I
7    forgot.
8        MS. BARLOTTA:  No, I do not.
9        MS. GILL:  I'm sorry.  There's been
10   some documents that have been identified that we
11   believe are responsive to our requests for
12   production.  One was Ms. Hendrix's Workday file,
13   her full file on Workday, her dashboard in the
14   intranet, documents related to -- on the intranet
15   and on LinkedIn for vacancies, the Excel
16   spreadsheet for new team members that goes to
17   leadership.
18       MS. BARLOTTA:  Can you tell me what
19   requests these are responsive to?
20       MS. GILL:  Do you have our requests
21   for production?
22       MS. PALMER:  I mean, not right off.
23       MS. GILL:  The Workday file and the

Page 185

1 dashboard all are responsive to the request for
2 Kathryn Hendrix's personnel file and for her
3 bonus calculations.
4        MS. BARLOTTA:  I don't know about
5 that, but I don't have -- necessarily have a
6 problem producing it if we can get our hands on
7 it.  I think the full Workday file was produced,
8 wasn't it, Kayla?
9        MS. WUNDERLICH:  I would have to
10 double check.
11        MS. BARLOTTA:  What part of the
12 Workday file do you think you don't have?
13        MS. GILL:  I can tell you what was
14 produced for Clay was significantly much more
15 than what we got for Kathryn, for Kat.
16        The Workday file that was produced
17 for Clay had substantially more information than
18 the Workday file for Ms. Hendrix.
19        MS. BARLOTTA:  Such as?
20        MS. GILL:  Clay's file is CRC-Hendrix
21 4679 through 4731.
22        MS. BARLOTTA:  He was there longer,
23 so, I mean, he might have more -- I mean, a

Page 186

1 bigger file.
2        MS. GILL:  It's 2017 forward.
3        MS. BARLOTTA:  Right, but he started
4 working for CRC in 2009, so you understand he's
5 been there a lot longer.
6        MS. PALMER:  She started working
7 there in 2006, so she's been there longer.
8        MS. BARLOTTA:  But in this
9 department, though.
10        MS. PALMER:  So the information
11 specifically in the Workday file that I do not
12 believe that we have for Kat is all of the stuff
13 on the first few pages that shows a reporting
14 structure.  It shows compensation changes.  It
15 shows like an audit trail of any change made to
16 the file, and unless I'm just completely missing
17 it, we don't have that for her.
18        MS. BARLOTTA:  Okay.  I'll see, but
19 you have her compensation structure and the dates
20 of all of her pay changes.  We have produced
21 that.
22        MS. PALMER:  Yes, you have produced
23 the information, but not in the same format that

Page 187

1 it was maintained by the company.
2        MS. BARLOTTA:  Maybe yes, maybe no.
3        MS. PALMER:  There's -- this file
4 here is completely different.
5        MS. BARLOTTA:  Then that would be
6 duplicative is my response.
7        MS. PALMER:  I would argue that there
8 is additional information included in the audit
9 trail that's relevant to the nature of the
10 lawsuit.
11        MS. BARLOTTA:  Such as?
12        MS. PALMER:  Such as dates that
13 changes were made.
14        MS. BARLOTTA:  And that's relevant to
15 what?
16        MS. PALMER:  Whether she was or
17 wasn't actually promoted.
18        MS. BARLOTTA:  Oh, you're saying
19 she -- it is your contention in this case that
20 she wasn't promoted to inside broker?
21        MS. PALMER:  Our contention is that
22 the terms and conditions that she was subjected
23 to were not equal to males and that part of that

Page 188

1 includes the duties and job responsibilities that
2 she was assigned to do regardless of title.
3        MS. BARLOTTA:  Specifically as to the
4 dates, you're saying that you think that there's
5 a document out there that's going to show that
6 she wasn't actually promoted to inside broker?
7 You're contending she wasn't promoted to inside
8 broker?
9        MS. PALMER:  Yeah, I mean, I'm not
10 going to tell you like our position on the case
11 at this point.  I can tell you that based on what
12 I've seen, what we have for her does not match
13 what we have for other people.  And if it's a
14 uniform system, the information should be there,
15 and we're entitled to look at it.
16        MS. BARLOTTA:  We will see if the
17 information is there.  I don't think that you're
18 entitled to look at it.  I think we have produced
19 what is -- we're supposed to have produced in
20 this case.  You've got her compensation
21 structure.  You've got all the dates that those
22 changes were made.
23        MS. PALMER:  Okay.

Page 189

1    MS. BARLOTTA:  I mean, we produced
2  her personnel file, so that's what we produced,
3  number one.  What you're asking for is additional
4  information.
5    MS. PALMER:  So I think that's part
6  of the hang-up is you're saying you produced her
7  personnel file, but then you guys produced this
8  Workday file for Segrest, which is part of a
9  personnel file.
10    MS. BARLOTTA:  It's not part of a --
11  okay, that's fine.  It's different.
12    MS. PALMER:  It contains personnel
13  information.  It's an HRIS system.  Our request
14  specifies a HRIS --
15    MS. BARLOTTA:  You are making a new
16  request.  We'll see if we can accommodate it.  It
17  is a new request, and we did respond to the
18  request.
19    MS. PALMER:  The request for the
20  personnel file included an in-depth definition
21  that included all information, no matter how
22  maintained, in the HRIS system.
23    MS. BARLOTTA:  I see personnel file

Page 190

1  maintained by BB&T and Truist for plaintiff.
2    MS. PALMER:  There's a definition
3  somewhere.
4    MS. BARLOTTA:  All right.  So you're
5  making a request for the Workday file, and -- to
6  the extent that it hasn't already been produced.
7  And you are making a request, a new request for
8  the dashboard, and that -- what you all produced
9  was a -- what I guess Ms. Hendrix did was like
10  took a screenshot of some sort of a computer
11  screen?
12    MS. PALMER:  Of the dashboard, and we
13  specifically --
14    MS. BARLOTTA:  So we're not going to
15  have like a screenshot of a dashboard, right, at
16  this point in time, I wouldn't think.
17    MS. PALMER:  He testified that he
18  could run a report based on date, and we
19  requested the dashboard specifically.  I think we
20  requested the AIM information as well and was
21  told that that didn't exist.
22    MS. BARLOTTA:  Where is that request?
23    MS. PALMER:  Produce all charts,

Page 191

1  dashboards, or reports evidencing revenues per
2  marketing representative on the accounts in the
3  AIM system from January 2018 to November 2019.
4  It's Request Number 4.
5    MS. BARLOTTA:  That's different than
6  the dashboard.
7    MS. PALMER:  It says dashboard.
8    MS. BARLOTTA:  Yeah, but the
9  dashboard is a different -- you said for that
10  dashboard for the AIM system.  This is not the
11  AIM --
12    MS. PALMER:  Or reports.
13    MS. BARLOTTA:  This is not the AIM
14  system.  That's what he testified to.
15    MS. PALMER:  Comma, or reports
16  evidencing revenues per market representative on
17  accounts in the AIM system.  The market
18  representatives are maintained in the AIM system.
19  The request was for the charts, dashboards, and
20  reports.
21    MS. BARLOTTA:  Okay.  I guess I'm
22  confused by the request, because this request
23  says produce all charts, dashboards, and reports

Page 192

1  evidencing the revenues per marketing
2  representative.  So are you saying that --
3  because -- are you saying she's a marketing
4  representative?  I mean, it doesn't say to
5  produce anything for her.  So I don't know what
6  this is asking.
7    MS. PALMER:  Well, no, because we're
8  -- if her bonuses and department bonuses and team
9  bonuses are all based on all these revenues,
10  that's what we were digging into there was we
11  needed the dashboards to show that information so
12  that we can point to a comparable team to figure
13  out how their bonuses are done.
14    MS. BARLOTTA:  Okay.  But, again,
15  this is requesting for marketing representatives
16  on accounts.  So I don't know who -- we don't
17  have that.  We don't have that job title.
18    MS. PALMER:  Well, no, he testified
19  that there is something in the -- I think it was
20  in AIM listed as marketing representative and
21  that it would depend on who put that information
22  there, because that's why Yvette Talsma, who is
23  not an associate broker or inside broker, was

Page 193

1   listed on that dashboard.
2        MS. BARLOTTA:  What might make sense
3   then is for you all to rephrase this request,
4   because the way it's written now is any and all
5   per marketing representative for over a year
6   worth of data.  It's not limited in any sort of
7   scope.
8        So if you just want that for
9   plaintiff, I mean, can we --
10       MS. PALMER:  No, we don't want it
11  just for her.  We want it for the Birmingham
12  Professional Liability.
13       MS. BARLOTTA:  No, that's not going
14  to happen.
15       MS. GILL:  We have more.
16       MS. BARLOTTA:  I mean, you want -- I
17  mean, think about what this is asking, all
18  reports in the AIM system.  He just told you that
19  was all of their client data.  You want every
20  single report on every single client in the AIM
21  system?
22       MS. PALMER:  No, we're looking for
23  the charts, dashboards, and reports that are like

Page 194

1   those that we showed him the information --
2        MS. BARLOTTA:  That's different.
3   What I'm asking you then is to limit your request
4   to that specifically, for the people that you
5   want it for, because this is not what this
6   request is asking.
7        MS. PALMER:  I guess we have a
8   different understanding of how the system works,
9   because my understanding is --
10       MS. BARLOTTA:  Well, I'm just reading
11  it.  It says, Produce all charts, dashboards, or
12  reports evidencing the revenues per marketing
13  representatives on accounts in the AIM system.  I
14  mean, I don't even know what that means.
15       MS. PALMER:  The accounts are listed
16  in the AIM system.  The AIM system feeds into
17  Connect.  That's where the dashboard is.
18       MS. BARLOTTA:  If you want the
19  Connect report, what I'm saying is ask for that.
20       MS. GILL:  Okay.  We would like the
21  Connect report for all the people in the
22  Birmingham Professional Liability department.
23       MS. BARLOTTA:  Send me a request for

Page 195

1   that.  Send me an RFP for that.
2        MS. GILL:  The Connect report or
3   dashboard report, however you want to
4   characterize it, for all Bham.
5        MS. BARLOTTA:  And why do you think
6   you're entitled to everybody in the entire
7   department?
8        MS. GILL:  Just the Birmingham
9   Professional Liability.
10       MS. BARLOTTA:  Yeah, why do you think
11  you're entitled to everybody in the professional
12  liability department?
13       MS. GILL:  Because he just testified
14  that there's a formula to determine the bonuses
15  for each team, and we're trying to figure out
16  whether she was treated fairly based on --
17       MR. BARLOTTA:  He said everything was
18  done differently.  Every team did their bonuses
19  differently.  What he was talking about is a
20  formula, which we produced.  You have that.  The
21  formula that he was talking about, you have that.
22       MS. GILL:  We saw that.
23       MS. BARLOTTA:  Yeah.  So what he's

Page 196

1   talking about after that, he said -- he testified
2   very clearly --
3        MS. GILL:  She's asking me why do we
4   want the whole --
5        MS. BARLOTTA:  -- clearly multiple
6   times that it was completely discretionary up to
7   the individual team.
8        MS. PALMER:  It was completely
9   discretionary of the individual team that went up
10  to Rusty Hughes and John Cadden for at least some
11  level of review.  And it's been our position from
12  the beginning of this lawsuit that we are not
13  limited to a single team, because it is not
14  uncommon in discrimination cases to have to go
15  outside of your team or outside of your
16  department even to point to the differential
17  treatment.
18       MS. BARLOTTA:  His testimony was
19  clear that there was no input, that it went up to
20  them to see, but they did not have input into it,
21  and no one has ever vetoed it or changed it.
22       MS. PALMER:  He said no one had ever
23  vetoed him.

Page 197

1    MS. BARLOTTA:  Well, then you can
2  make that argument to the judge.
3    MS. GILL:  Some of the documents that
4  you have produced show that they did review it,
5  so --
6    MS. BARLOTTA:  No.
7    MS. GILL:  We'll take it up with the
8  judge.
9    MS. BARLOTTA:  I know the e-mail
10 you're talking about.  That's not what it shows.
11   MS. GILL:  The vacancies on the
12 intranet, that were posted on the intranet that
13 he said --
14   MS. BARLOTTA:  We've produced that
15 already.  You have it.
16   MS. PALMER:  We have a chart that
17 shows -- it's like a -- I don't know, like an
18 Excel spreadsheet or something.
19   MS. BARLOTTA:  Yeah, that's the
20 record of the job posting that we have.
21   MS. PALMER:  He said LinkedIn.
22   MS. BARLOTTA:  Right, and it shows it
23 was posted externally.  I don't have a LinkedIn.

Page 198

1  I don't have a LinkedIn post going back to 2017.
2    MS. PALMER:  So there's no
3  information about the job other than the title.
4    MS. BARLOTTA:  It's -- all is in that
5  spreadsheet that was produced to you, when it was
6  posted, when it was closed, who applied, what
7  their qualifications were, that it was posted
8  internally, that it was posted externally.  It's
9  all there.
10   MS. PALMER:  For those two positions?
11   MS. BARLOTTA:  Yes.
12   MS. GILL:  The Excel spreadsheet for
13 new team members, that goes to leadership?
14   MS. PALMER:  No, that was something
15 he testified about the red light, green light,
16 like number formulas.
17   MS. GILL:  Right.
18   MS. PALMER:  We haven't seen anything
19 like that.
20   MS. BARLOTTA:  Anything else?
21   MS. GILL:  I was just telling you
22 that's something that he testified about that we
23 are requesting.

Page 199

1    MS. BARLOTTA:  And what is that
2  responsive to?
3    MS. PALMER:  There was a request
4  specifically about how the vacancies were -- let
5  me see if I can find it.
6    (Whereupon, a discussion off the
7  record was held.)
8    MS. GILL:  Well, the next thing was
9  position requisition form that's blank.  We would
10 like to see a copy of that, but if you have
11 filled out forms --
12   MS. BARLOTTA:  And that is responsive
13 to what request?
14   MS. GILL:  It has to do with how
15 positions are communicated to people and how they
16 are --
17   MS. BARLOTTA:  Okay.  Where?
18   MS. PALMER:  I'm looking.
19   MS. GILL:  She's looking for it.
20 Hang on.  That's both the Excel spreadsheet and
21 the position requisition form.
22   MS. BARLOTTA:  I think those are the
23 same thing.

Page 200

1    MS. GILL:  The spreadsheet --
2    MS. PALMER:  Produce all postings and
3  job search information, including applications is
4  Number 14.  Sorry.  Including applications,
5  resumes, position inquiries, including internal
6  and external applicants for all positions within
7  the -- and I said EPL, because it is professional
8  liability.
9    MS. BARLOTTA:  That's not what he
10 said, and that's not responsive to -- whatever he
11 testified to doesn't meet the criteria for any of
12 that.  Again, we've produced the postings and job
13 search information, which also shows the
14 applicants as well.
15   MS. PALMER:  I mean, a position
16 requisition form is directly responsive to job
17 postings and job search information.
18   MS. BARLOTTA:  Job requisition is
19 very different from a job posting.  You know
20 that.
21   MS. PALMER:  Yes, but it's not very
22 different than a job search information.
23   MS. BARLOTTA:  Job search -- okay.

Page 201

1  You can argue that to the Court. Job search
2  information is different from a requisition of I
3  need a job. That's what he testified to, that
4  there's a form that says, I want to hire
5  somebody, this is what I want to pay them.
6         Postings and job search information
7  is like, hey -- especially how this is phrased in
8  here, including applications, resumes of people
9  who applied for the jobs.
10        I mean, if y'all want it, just send
11 me a request for it, but we're not going to sit
12 here and tell me that we haven't produced this
13 information that's already responsive to these
14 requests. These are new requests that you're
15 making.
16     MS. GILL: The next thing on the list
17 is e-mails from Kathryn Hendrix and e-mail
18 promoting Kathryn Hendrix. He testified he sent
19 out an e-mail.
20     MS. BARLOTTA: Okay. I think he
21 testified that he told her.
22     MS. GILL: I think we asked how he
23 communicated it to his team. He said he sent out

Page 202

1  an e-mail.
2      MS. BARLOTTA: I'll have to see the
3  transcript. I don't think that that --
4      MS. GILL: That's it.
5      MS. PALMER: There were a couple of
6  times, Rachel, that he said that would be for IT.
7  Are you putting up an IT person or can we expect
8  Stefani Petty for that?
9      MS. BARLOTTA: I think Stefani Petty
10 is going to be able to answer these to the extent
11 that we've agreed that they're going to be
12 testified to. As you know, we have a remaining
13 disagreement of the 30(b)(6).
14     MS. PALMER: Do you stand by our
15 position that it's y'all's burden to file a
16 protective order?
17     MS. BARLOTTA: And we will do that,
18 and I'm happy to do that. As I said, we agreed
19 that we would go forward with the deposition, and
20 anything that was not -- there was still a
21 dispute over or that was not adequately
22 addressed, that we could take that up with the
23 Court at that time.

Page 203

1      MS. GILL: We're done.
2      MS. BARLOTTA: Okay. We need to talk
3  about deposition dates.
4      VIDEOGRAPHER: We're going off the
5  record at 3:33 p.m.
6
7
8
9          FURTHER DEPONENT SAITH NOT
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 204

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5
6       I HEREBY CERTIFY that the above
7  and foregoing transcript was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness.
13      I FURTHER CERTIFY that I am
14 neither of counsel, nor of any relation to the
15 parties to the action, nor am I anywise
16 interested in the result of said cause.
17
18
19 /s/Tanya D. Cornelius
20 TANYA D. CORNELIUS, RPR
21 ACCR #378 Expires 10/1/2023
22 Notary Expires 9/13/26
23

Video Deposition of Corey Daugherty                      6/21/2023
                                                              53

**WORD INDEX**

**< 1 >**
**1**  4:10
  10:18, 19
  85:18
**1:03**  114:10
**10**  4:10, 19
  146:11, 13
**10/1/2023**
  204:21
**10:33**  61:12
**10:47**  61:16
**100**  6:6
**104**  6:6
**106**  4:16
**11**  4:20
  147:19, 21
**11:50**  114:6
**12**  4:21
  149:3, 5
**129**  4:17
**12th**  98:20
**13**  4:22
  169:14, 16
**14**  4:23
  173:11, 13
  200:4
**140**  4:18
**1400**  6:19
**146**  4:19
**147**  4:20
**149**  4:21
**15**  5:3
  179:6, 8
**16**  5:4
  182:9, 11,
  13
**169**  4:22
**173**  4:23

**179**  5:3
**18**  149:10
**182**  5:4
**1996**  11:22
**1st**  11:22
  179:18

**< 2 >**
**2**  2:7  4:11
  7:6  62:15,
  16  80:5
  85:18
  95:12
  106:9
**2:06**  160:3
**2:21**  160:7
**2:21-CV-
0300-MHH**
  1:5  8:4
**2:42**  172:15
**2:59**  172:19
**2000**  12:5
**2006**  186:7
**2008**  12:10
  29:8, 10
**2009**  29:12
  128:11
  132:7
  186:4
**2014**  19:8
  123:17
  142:16, 17
  158:13
**2016**  107:1
**2017**  28:22
  41:14
  46:11
  101:2
  102:10
  121:19
  146:22
  158:13

**186:**2
**198:**1
**2018**  27:5
  58:9, 11
  60:5  66:12
  107:19
  116:20
  117:13, 15
  179:19
  191:3
**2019**  46:11
  58:11
  60:14, 17
  98:20
  107:5
  116:20
  141:14
  142:19
  191:3
**2020**  41:14
  101:2
  102:10
  121:19
**2023**  1:19
  2:9  7:14
**20th**  2:7
  6:19  7:6
**21**  1:19
**21st**  2:8
  7:14
**22nd**
  141:14
**23rd**  6:6
**24th**  66:12

**< 3 >**
**3**  4:12
  71:9, 10
  72:4, 18
**3:33**  203:5
**30(b)(6**
  11:3

**113:**15
**114:**1
**177:**12
**202:**13
**35203**  6:20
  7:7
**35233**  6:7
**35255**  6:12
**378**  204:21

**< 4 >**
**4**  4:13
  79:8, 11
  191:4
**420**  6:19
**4679**
  185:21
**4731**
  185:21
**4979**  85:7,
21
**4980**  85:21

**< 5 >**
**5**  4:14
  80:14, 15,
  19
**5:30**  91:6
**55204**  6:11

**< 6 >**
**6**  4:15
  97:4, 5
**62**  4:11

**< 7 >**
**7**  4:16
  105:23
  106:1
**71**  4:12
**718**  183:17,

**18**, 19
**79**  4:13

**< 8 >**
**8**  4:17
  129:10, 11
**80**  4:14

**< 9 >**
**9**  4:3, 18
  140:21
  141:19
  149:10
  150:21, 23
**9/13/26**
  204:22
**9:32**  1:20
  2:9  7:8, 15
**900**  2:8
  7:7
**97**  4:15

**< A >**
**A**  2:1  6:1,
  5, 9, 10
  9:12, 14, 16,
  17, 21  10:2,
  7, 11, 15, 20,
  22, 23  11:1,
  3, 5, 8, 13,
  16, 19, 22
  12:1, 2, 3, 5,
  6, 7, 12, 17,
  21, 23  13:3,
  6, 9, 11, 13,
  17, 18, 19,
  22  14:1, 5,
  8, 10, 12, 15,
  17, 21, 23
  15:3, 10, 13,
  16, 17, 20,
  22  16:1, 4,

7, 10, 13, 16, 19, 21, 22 17:1, 2, 7, 11, 13, 17, 21 18:1, 3, 6, 13, 22 19:2, 5, 8, 17, 19, 20, 23 20:1, 6, 11, 14, 17, 18 21:2, 6, 7, 11, 18 22:5, 6, 13 23:1, 5, 7, 8, 17, 20 24:7, 16, 18 25:2, 3, 4, 8, 12, 16, 20, 23 26:4, 7, 8, 9, 16, 19, 23 27:3, 8, 10, 11, 12, 13, 15, 17, 19, 21 28:1, 3, 5, 7, 10, 12, 16, 18, 21 29:2, 8, 11, 15, 16, 17, 20 30:2, 7, 9, 12, 18, 21 31:1, 2, 4, 7, 13, 17, 20, 22 32:4, 7, 11, 16, 17, 22 33:6, 8, 11, 13, 15, 20, 23 34:4, 8, 17, 23 35:4, 9, 11, 13, 17, 20 36:1, 17, 18, 21, 22 37:2,

7, 9, 16 38:3, 5, 10, 15, 18, 21 39:3, 6, 9, 13, 15, 19, 21, 23 40:2, 5, 7, 9, 11, 15, 17, 20 41:1, 4, 7, 10, 12, 15, 18, 22 42:2, 9, 12, 14, 16, 19, 22 43:2, 4, 6, 13, 20, 23 44:6, 8, 10, 11, 13, 15, 18 45:1, 5, 8, 11, 14, 16, 23 46:1, 2, 3, 8, 12, 15, 18, 20, 21 47:4, 9, 13, 17, 23 48:1, 4, 6, 10, 11, 12, 13, 15, 18, 20, 23 49:4, 7, 9, 12, 15, 16, 20 50:1, 2, 3, 10, 13, 16, 20 51:1, 4, 8, 9, 12, 15, 18, 20, 23 52:4, 6, 14, 15, 22 53:1, 3, 4, 6, 8, 9, 14, 15, 17 54:1, 16, 18 55:2, 4, 7, 8, 10, 12, 13, 14, 16, 20, 23 56:2,

3, 5, 6, 9, 15, 18, 20, 22 57:2, 6, 11, 13, 17, 20, 21 58:18, 19 59:7, 10, 22 60:6, 8, 10, 16, 19, 21, 22 61:2, 6, 8, 13, 22 62:2, 5, 9, 13, 17, 20, 23 63:4, 6, 10, 12, 17, 19, 23 64:2, 4, 7, 10, 13, 16, 17 65:1, 3, 5, 7, 8, 18, 21, 23 66:1, 4, 8, 10, 12, 15, 19, 23 67:3, 9, 12, 17 68:1, 4, 5, 10, 16, 21, 23 69:2, 4, 6, 7, 14, 17, 23 70:3, 10, 14, 16, 17 71:3, 6, 7, 11 72:6, 10, 13, 14, 15, 16, 23 73:2, 4, 9, 12, 14, 15, 18, 19 74:6, 7, 11, 13, 17, 19, 22 75:2, 4, 7, 14, 18, 19, 21, 23 76:4, 5, 9, 14, 17, 19 77:1, 3, 14, 18, 21

78:5, 9, 13, 14, 15, 17, 18, 22 79:2, 6, 10, 12, 17, 18, 20, 21, 23 80:4, 6, 7, 10, 12, 16, 21, 23 81:3, 5, 12, 15, 19, 21, 22 82:1, 8, 11, 14, 18, 22 83:2, 4, 6, 9, 13, 17, 20, 22 84:2, 9, 13, 14, 15 85:1, 4, 8, 23 86:3, 12, 13, 14, 19, 23 87:4, 7, 9, 16 88:5, 16, 17, 19, 22 89:2, 5, 10, 13, 15, 20, 23 90:4, 5, 6, 8, 11, 16, 18, 21, 23 91:15, 17, 23 92:1, 7, 14, 20 93:5, 9, 11, 12, 14, 17, 19, 22 94:4, 9, 15, 20, 23 95:5, 8, 10, 13, 15, 19, 23 96:7, 13, 16, 20, 21, 22 97:6, 10, 13, 19, 22 98:2, 3, 5, 7, 16, 18, 23 99:4, 6, 9,

12, 14, 15, 17, 22, 23 100:1, 4, 7, 10, 12, 15, 18, 21, 23 101:3, 5, 7, 9, 14 102:2, 3, 11, 15 103:1, 3, 5, 10, 14, 16, 20 104:2, 8, 10, 21 105:6, 9, 13, 14, 15, 18, 21 106:2, 5, 6, 7, 11, 14, 17, 21, 23 107:2, 6, 8, 11, 14, 18 108:3, 5, 17 109:1, 4, 7, 11, 15, 19, 21 110:2, 6, 7, 11, 14, 19, 22 111:1, 3, 5, 8, 12, 14, 18, 20 112:1, 9, 12, 16 113:1, 11, 12, 20 114:4, 7, 12, 14, 18, 21, 23 115:2, 7, 12, 14, 19, 23 116:7, 9, 15, 18, 21 117:14, 17, 21 118:2, 8, 10, 14, 16 119:3, 5, 11, 13, 18, 20, 21, 22, 23

Video Deposition of Corey Daugherty

120:*2, 4, 11,
12, 17, 19,
21* 121:*3, 8,
14, 17, 20,
22* 122:*2, 4,
7, 9, 12, 15,
18, 20, 23*
123:*3, 7, 8*
124:*7, 10,
14, 17, 18,
23* 125:*1, 8,
13, 15, 18,
22* 126:*3, 6,
11, 12, 14,
17* 127:*6, 7,
8, 11, 13, 16,
19* 128:*1, 5,
7, 9, 11, 12,
16, 17, 18,
19, 22, 23*
129:*3, 6, 8,
12, 19, 22*
130:*4, 8, 9,
12, 16, 19*
131:*1, 5, 6,
9, 13, 16, 20,
22* 132:*2, 5,
9, 11, 12, 14,
16, 19, 22,
23* 133:*7,
11, 13, 14,
18, 19, 21*
134:*1, 10,
12, 18, 23*
135:*3, 7, 10,
13, 17*
136:*2, 3, 5,
10, 13, 14,
15, 18, 20*
137:*1, 3, 7,
11, 12, 14,
17, 18, 22,*

*23* 138:*3, 5,
7, 13, 17, 18,
23* 139:*5, 9,
13, 15, 19,
21* 140:*3, 8,
14, 18, 22*
141:*2, 4, 7,
9, 11, 20, 22*
142:*2, 5, 12,
16, 19, 21,
23* 143:*2, 5,
11, 13, 16,
19, 20*
144:*2, 5, 9,
13* 145:*3, 6,
9, 10, 14, 18,
21, 22*
146:*2, 4, 5,
9, 13, 15, 17,
19, 22*
147:*1, 4, 8,
11, 12, 14,
21, 23*
148:*2, 4, 15,
22* 149:*1, 5,
7, 11, 14, 16,
22* 150:*4, 6,
8, 11, 17, 23*
151:*7, 11,
14, 17, 20,
23* 152:*3, 5,
7, 9, 11, 14,
19, 23*
153:*2, 7, 8,
10, 13, 16,
18, 19, 20,
21, 23*
154:*4, 5, 6,
8, 10, 11, 14,
18, 22, 23*
155:*1, 3, 6,
8, 18, 21*

156:*4, 6, 7,
12, 16, 18,
23* 157:*4, 8,
13, 16, 18,
20, 23*
158:*2, 3, 8,
11, 17, 20*
159:*1, 6, 8,
11, 22*
160:*4, 10,
17, 22*
161:*4, 8, 11,
13, 16, 18,
21, 23*
162:*3, 6, 11,
21, 22*
163:*1, 5, 9,
11, 20, 22*
164:*5, 10,
13, 16, 18,
23* 165:*6, 8,
16, 17, 19,
21* 166:*1, 3,
6, 8, 14, 18,
20, 23*
167:*4, 16*
168:*1, 3, 4,
5, 7, 8, 12,
15, 18, 22*
169:*3, 6, 8,
11, 16, 18,
19, 21*
170:*1, 5, 10,
13, 15, 18,
22* 171:*1, 3,
5, 9, 12, 21*
172:*2, 4, 9,
10, 12, 16,
22* 173:*1, 4,
7, 8, 13, 17,
18, 22*
174:*2, 8, 13,*

*14, 16, 19,
22* 176:*5*
177:*1, 9*
178:*4, 7, 13,
21* 179:*3, 4,
8, 12, 14, 17,
21* 180:*5, 9,
18, 23*
181:*1, 2, 4,
5, 7, 9, 13,
15, 17, 19,
21* 182:*1, 3,
6, 7, 11, 13,
15, 17, 20,
22* 183:*3, 6,
9, 13, 16, 18,
20, 23*
184:*5*
185:*5, 23*
186:*5, 13*
188:*5, 13*
189:*8, 10,
14, 15, 17*
190:*2, 5, 7,
9, 10, 15, 18*
191:*9*
192:*3, 12*
193:*5*
194:*7, 23*
195:*14, 19*
196:*13*
197:*16, 17,
23* 198:*1*
199:*3, 6, 10*
200:*15, 19,
22* 201:*2, 3,
4, 11* 202:*5,
12, 15, 20*
204:*1, 11*
**A.M** 1:*20*
2:*10* 7:*8,*

*15* 61:*12,
16* 114:*6*
**abides**
31:*18*
**ability**
10:*13*
**able** 43:*20*
44:*18* 56:*2*
59:*3, 11*
60:*3, 4*
65:*9, 11*
202:*10*
**absolutely**
37:*12*
85:*15*
125:*15*
156:*4*
**accepted**
30:*15*
124:*6*
**accepting**
143:*23*
**access**
49:*2, 6*
57:*18*
59:*18*
60:*15* 73:*8,
21* 74:*8*
129:*1*
**accommoda
te** 189:*16*
**account**
21:*17, 18,
19* 22:*7, 9*
23:*3, 18*
25:*1* 27:*21*
28:*3, 7, 12,
15* 29:*4*
30:*14, 18*
37:*4* 39:*23*
40:*2, 18*
45:*3* 52:*9,*

*21, 23* 53:*4*
54:*7* 55:*12*
56:*21* 62:*7*
67:*11, 16,*
*17* 68:*6, 14*
73:*20* 80:*2*
81:*10*
82:*23* 83:*1,*
*15* 114:*18*
115:*4, 9, 22*
116:*4, 7, 14,*
*16* 118:*9,*
*17, 23*
119:*4, 6*
123:*8*
126:*20*
133:*4*
134:*11, 18*
135:*13, 18,*
*23* 136:*4*
143:*9*
144:*1*
145:*23*
153:*21*
157:*3*
168:*6, 7, 16,*
*18*
accounting
22:*7* 125:*6*
accounts
36:*2* 46:*7*
117:*23*
118:*5*
164:*14, 18*
165:*1, 5, 7,*
*11, 14*
191:*2, 17*
192:*16*
194:*13, 15*
ACCR
204:*21*

accuracy
22:*3*
accurately
169:*22*
achieved
156:*6*
acronym
132:*16*
acting  7:*2*
action
162:*7, 12,*
*18* 163:*2*
204:*15*
actions
163:*6*
actively
125:*1*
actual
17:*23*
29:*14*
135:*17*
add  37:*8*
73:*17*
added
45:*10*
additional
37:*22* 90:*2*
126:*13*
142:*1, 4*
158:*6*
187:*8*
189:*3*
addressed
81:*16*
202:*22*
adds  34:*16*
adequately
202:*21*
adjust
84:*20*
administer
8:*17*

administerin
g 139:*11*
administrati
ve  22:*10,*
*13, 14*
37:*13* 97:*1*
102:*19, 23*
103:*22*
104:*6*
108:*22*
110:*15*
117:*6, 8, 10,*
*20* 120:*13*
123:*12*
134:*14*
135:*2, 9*
163:*14*
166:*17*
advanced
53:*7*
affidavit
152:*21*
162:*14, 15*
affiliation
75:*5*
affirmative
149:*9*
175:*18, 21*
176:*2*
177:*13*
agencies
26:*2*
115:*23*
116:*22*
133:*15, 16*
155:*9*
163:*16*
agency
25:*8, 22*
52:*6* 54:*7*
104:*11*
136:*7*

163:*12*
165:*9*
agenda
183:*8, 10,*
*12*
agent
116:*9*
agents
26:*2, 3*
94:*13*
114:*16, 21*
115:*7*
116:*12*
aggregated
33:*8* 59:*1,*
*16*
ago  60:*10*
110:*12*
133:*14*
agree
83:*15*
120:*7*
AGREED
2:*2, 11, 18*
3:*3* 202:*11,*
*18*
Agreement
4:*19* 147:*7,*
*10, 15*
agreements
155:*10*
ahead
132:*9, 10,*
*11*
AIM  52:*5,*
*12, 14*
54:*11, 18*
55:*5* 67:*1*
190:*20*
191:*3, 10,*
*11, 13, 17,*
*18* 192:*20*

193:*18, 20*
194:*13, 16*
Airport
178:*16*
al  8:*1*
ALABAMA
1:*1*  2:*8*
6:*7, 12, 20*
7:*7, 18* 8:*3*
204:*3*
Alex  17:*3*
algorithm
126:*15*
allocates
144:*15*
allowance
176:*4*
allows
69:*10*
alter  10:*13*
ambulance
165:*10*
amend
44:*1, 7, 9*
48:*1*
amended
75:*9*
amount
33:*6, 8*
58:*5*
126:*21*
166:*16*
Amy  39:*15*
40:*1, 14, 21*
125:*5*
an  15:*3*
18:*14, 16,*
*18*  19:*4, 12*
20:*10, 16,*
*17*  21:*9, 12,*
*16, 18*  22:*6*
23:*22*  25:*3,*

*18, 22  26:1
28:12
29:13
30:14, 16
36:14, 18
37:8, 9, 17,
18, 20  38:7,
15, 17
41:20  43:9
45:9  47:14
51:20, 23
52:9, 21
54:9  55:12,
14  56:10
57:7  59:3,
15  60:8
61:7  62:21
63:21  66:3
67:10  68:6,
14  69:7, 10
70:12  73:5
75:10  79:1,
23  80:2
81:17  82:1,
6, 7  83:13,
15, 17
84:23  85:3,
11, 22  88:1,
22  89:4, 19
90:3  93:2
95:23  97:2
98:14
100:12
102:1, 21
115:22
116:4, 11,
13, 16
118:8, 9, 10,
15  119:4
122:12
123:8, 19
124:11, 19*

*125:2
126:10, 12,
15, 20
127:21
128:3, 7, 8,
15  130:22,
23  131:21
132:3
134:18
141:15
144:4
145:12, 23
147:10
152:2, 21
153:4
155:4, 7
157:19, 20
158:1, 19
159:11, 21
162:15, 16
164:12
165:9, 10
166:19, 21
167:22
168:21, 22
170:8, 12,
14  171:11,
15  172:3
173:5, 6
175:20, 21
176:2, 4, 13
179:17
180:6, 14
181:2, 3
186:15
189:13, 20
192:23
195:1
197:17
201:19
202:1, 7*

**and**  1:*11
2:2, 6, 11,
12, 14, 16,
18, 22, 23
3:3  7:1, 4,
16  8:6, 13,
15, 22  9:4,
14  10:3, 5,
8, 20  11:6,
18, 23  12:6,
10, 12, 19
13:1, 5, 8,
15, 23  14:3,
7, 9, 13, 19
15:6, 8, 13,
15, 21, 23
16:5, 11
17:2, 3, 7,
15, 19  18:4,
18  19:3, 14,
21  20:4, 6,
7, 8, 12, 16,
20  21:4, 5,
6, 13  22:3,
16, 17  23:2
24:8, 9
25:17
26:14, 16
27:4, 9, 16,
20, 22  28:2,
8, 19, 23
29:13
30:16, 18,
22  31:6, 8,
18  32:8
33:3, 7, 15,
21  34:5, 13,
15  35:10
36:3, 9, 19
37:1, 10, 18,
23  38:6, 19,
22  39:4, 15,*

*17  40:1, 8,
14, 15, 18,
22  41:5, 9
42:7  43:13,
15, 22  44:9
45:4, 15, 17
46:5, 6, 10,
11, 13, 19
47:1, 7, 8,
11, 21  48:4,
6, 16, 19, 20
49:5, 10, 13,
17, 18, 22
50:3, 4, 5, 6
51:2, 13, 14
52:14  53:3,
16  54:6, 12,
13, 14, 21,
23  55:19
56:1, 11, 20
57:21  58:8,
12, 20  59:2,
6, 12, 23
60:1, 2, 4, 5,
9, 10, 20
61:18, 19,
20  62:6, 17
63:13, 15
64:20, 21
65:11, 16,
22  66:7, 17,
22  67:3, 10,
12, 15
68:10, 17,
23  69:10,
11, 12, 15,
19  70:1, 4,
7, 8, 10, 19,
21  71:11
72:7, 8, 11,
19  73:7, 19,
20, 21, 23*

*74:7  75:3,
10, 16
76:20, 23
77:4, 15, 23
78:1  79:7,
12, 19  80:8,
16  81:20
82:11, 13
83:15
84:15, 20
85:18, 21
86:1, 7, 8
87:19  88:6,
7  89:8
90:9, 13
91:12, 23
92:4, 7, 9,
10, 16, 21
93:12, 20,
23  94:1, 5
95:12
96:14  97:6,
23  98:3
99:4, 19, 21
100:20, 22
101:17
102:5, 7, 16
103:15
104:11, 12,
14, 22
105:3, 7
106:2, 15,
19, 22
107:1, 3, 4,
20  108:4,
21  109:5,
16, 17, 22,
23  110:11,
16  111:13,
15  112:5, 7
113:14, 18
114:12, 19,*

Video Deposition of Corey Daugherty

6/21/2023

58

*20, 23*
115:*7, 19*
116:*8*
117:*5, 8, 9,*
*12*  118:*5,*
*14, 19, 20*
119:*7, 8, 12*
120:*20, 22*
121:*19*
123:*1*
124:*1, 4, 5,*
*6, 10, 20*
125:*1, 7, 17*
126:*19, 21,*
*23*  127:*2, 4,*
*6, 9, 14, 20*
129:*12*
132:*7, 17*
133:*2, 4, 23*
134:*1, 5, 6*
135:*15*
136:*4, 22*
138:*17, 19,*
*20*  139:*2*
140:*22*
141:*7, 15*
143:*8, 9, 21*
144:*1, 17,*
*19, 20*
145:*1, 15,*
*19*  146:*13*
147:*13, 21*
148:*6, 11,*
*13, 19*
149:*5*
150:*17, 19*
152:*15*
153:*4*
154:*1, 12,*
*16, 21*
155:*7, 9, 11,*
*21*  156:*8,*

*18, 19, 20*
157:*6, 9*
158:*6*
159:*2, 3, 6,*
*7, 9, 12, 14,*
*15, 16*
163:*11, 13,*
*15, 16, 20*
164:*3, 6, 11,*
*21*  165:*10,*
*11, 23*
166:*3, 22*
167:*8, 13,*
*14, 20*
168:*1, 18*
169:*13, 16*
170:*2, 12*
171:*7, 12,*
*13, 14, 17,*
*18*  172:*12*
173:*2, 13,*
*16, 20, 21,*
*23*  174:*3,*
*17*  175:*4,*
*18, 20*
176:*5, 13,*
*23*  177:*9,*
*15, 16, 21*
178:*5, 7, 8,*
*9, 12, 13, 15,*
*16, 17, 21*
179:*8, 22,*
*23*  180:*1, 9,*
*14, 16*
181:*5*
182:*11, 16*
183:*4, 7, 10,*
*11*  184:*15,*
*23*  185:*2*
186:*16, 19*
187:*14, 22,*
*23*  188:*1,*

*13, 15*
189:*17*
190:*1, 5, 7,*
*8, 12, 18, 20*
191:*19, 23*
192:*8, 20*
193:*4, 23*
195:*5, 15*
196:*10, 11,*
*21*  197:*22*
199:*1, 12,*
*15, 20*
200:*2, 6, 7,*
*10, 12, 17*
201:*6, 12,*
*17*  202:*17,*
*18, 19*
204:*7, 8, 10,*
*11*
**and/or**  96:*8*
**Andrea**
27:*4*  28:*4,*
*5*  40:*15, 22*
66:*17*
79:*19*
117:*9*
163:*15*
168:*5*
**announced**
157:*17*
**announcem**
**ent**  157:*18*
**annual**
154:*2, 13,*
*17, 21*
**anomaly**
83:*17*
**answer**
10:*13*
29:*15*
44:*13*
45:*11*  55:*7*

60:*16*  61:*6*
68:*1*  72:*9*
76:*17*  84:*2*
86:*12*
88:*11*  94:*9*
105:*18*
112:*11*
113:*4*
121:*14*
128:*1*
130:*19*
139:*5*
141:*13*
145:*9, 14*
146:*9*
160:*11*
162:*21*
171:*3, 21*
174:*13*
175:*14*
181:*21*
202:*10*
**answered**
34:*13*
**Answers**
4:*12*  11:*6*
71:*14*
204:*8*
**anticipation**
175:*5*
176:*17*
**anybody**
39:*7*  56:*7*
77:*12, 15*
83:*7*  95:*20*
101:*6*
122:*21*
125:*23*
152:*15, 16*
**anybody's**
74:*6*

**anyway**
147:*18*
177:*8*
**anywise**
204:*15*
**app**  69:*7, 9,*
*10*  73:*4, 5,*
*7*  74:*3, 7*
**appears**
66:*12*
106:*15, 17*
**applicants**
200:*6, 14*
**Application**
4:*17*  23:*13*
129:*2*
131:*4*

**applications**
200:*3, 4*
201:*8*
**applied**
159:*16*
198:*6*
201:*9*
**applies**
136:*15*
**apply**
36:*14*
109:*2*
112:*4*
113:*11*
129:*18*
**appointmen**
**ts**  91:*10*
**approach**
127:*9*
**approached**
143:*22*
**appropriate**
121:*9*
153:*8*

Video Deposition of Corey Daugherty

6/21/2023
59

approved
127:10
143:21
approving
120:23
approximate
ly 2:9 12:9
April 11:22
architects
70:1
archived
60:12
argue
187:7
201:1
argument
197:2
asked 67:1
72:6, 18
100:16
102:18
126:1
158:14
159:12
162:13
164:19
178:9
201:22
asking
108:8
112:9, 13
121:10
130:5
162:8
189:3
192:6
193:17
194:3, 6
196:3
asks 37:18

assign
2:23 83:21
114:16
assigned
37:21
115:22
116:11, 13,
16 117:8
119:6
133:15, 17
134:7
135:8
163:15
166:19
168:1, 4
170:2
181:15
188:2
assigning
108:21
assignment
s 82:16, 20
83:8
104:12
136:8
182:5
183:15
assist
140:15
assistant
26:7, 8, 9,
13, 19
37:22
39:19
118:6
129:19
130:4, 8
131:23
168:19, 20,
22, 23
169:1, 2

assistants
45:3 56:21
82:20, 22
83:3
assisted
69:17
associate
19:6, 12, 19,
22 20:4, 10,
12 22:22
37:9 38:7,
17 43:22
45:4 47:14
56:1, 11
81:23 82:6
83:5 84:23
126:10, 13
127:21
128:3, 7, 8,
15 129:23
130:22
131:16, 17,
22 132:3
145:12
153:12, 17
158:19
159:12
160:15
165:23
170:12
171:11
192:23
associates
43:10
assume
10:9 59:17
AssuredPart
ners
116:23
117:6
attach
52:17 85:5

attached
10:21
62:18
71:12
79:13
80:17 97:7
106:3
129:13
140:23
146:14
147:22
149:6
169:17
173:14
179:9
182:12

attachments
24:5
attending
91:2
attention
72:17 96:2
149:8
attesting
162:16
attorney
72:8 152:2
162:8
176:11, 13,
21
attorney/clie
nt 142:8
176:16
attorneys
43:10
audit
123:14, 15
124:2, 4
143:6, 8
186:15
187:8

August
107:4
179:18
authority
121:4
156:11, 12
authorized
160:14
automatic
79:4 80:22
automaticall
y 48:2
57:14
available
31:19 33:9
84:19
aware
16:10
34:23 37:2,
7 38:3
42:10
44:15 45:7,
8 71:6, 7
73:1 75:4,
7, 18 76:4,
9, 14 77:10,
18 83:9
84:22
86:14, 23
88:15, 16
90:2 91:11
96:12
101:9
103:3
125:22
126:11
136:10, 18
137:17
139:9, 13,
15, 21, 22
140:3, 4, 8
141:5, 17

143:*12, 13,
14, 16*
147:*15*
152:*1, 6, 22*
153:*7*
154:*14, 18*
161:*23*
164:*5*

< B >
back  18:*14*
52:*8*  53:*12*
58:*8, 9, 10*
61:*15*  88:*9*
93:*20*
96:*10*
108:*18*
114:*9, 12*
132:*5*
150:*17*
160:*6*
172:*18*
198:*1*

background
142:*23*
bad  142:*12*
BAKER
6:*15*
balances
34:*6*
BANK  1:*11*
8:*13, 15*
76:*5*
banks  76:*1*
Barlotta
6:*17*  8:*12*
9:*3*  13:*18*
18:*9*  20:*5*
22:*12*  30:*6,*
*10, 20*
31:*16*  32:*3,*

*10*  33:*14*
34:*7, 20, 22*
35:*3, 16*
37:*6*  38:*2,*
*9, 20*  49:*19*
50:*19*  51:*7,*
*11*  54:*17*
57:*10*
59:*19, 21*
60:*7*  61:*1,*
*5, 9*  62:*12*
63:*9*  64:*23*
67:*23*
71:*15, 22*
72:*5*  74:*5*
75:*13*
76:*18*
77:*17*
78:*16, 21*
81:*4*  85:*10,*
*14, 19*
86:*11, 18,*
*22*  87:*3, 15*
89:*1*  93:*8*
94:*3, 8, 14,*
*19*  95:*4, 18,*
*22*  96:*15*
98:*22*  99:*8,*
*18*  100:*3, 9*
101:*12, 15,*
*21*  102:*14*
103:*2, 9, 13,*
*19*  104:*1, 7,*
*20*  105:*22*
107:*15, 22*
108:*8, 16,*
*23*  109:*10,*
*14, 18*
110:*1, 18,*
*23*  111:*4, 7,*
*11, 23*
112:*6, 13,*

*21*  113:*1, 5,*
*16, 22*
114:*4*
118:*3, 7*
119:*10, 17*
120:*10*
121:*2, 7, 13*
124:*9, 22*
125:*12, 21*
126:*5*
127:*23*
128:*4, 21*
130:*2, 7, 11,*
*15*  131:*8,*
*19*  132:*1*
133:*12*
134:*17, 22*
136:*1, 6, 9,*
*17*  137:*2, 6,*
*16, 21*
138:*12, 22*
139:*4, 8, 14,*
*20*  140:*2, 7,*
*13, 17*
142:*4*
143:*10*
146:*1*
149:*13, 18*
150:*3, 7, 9,*
*16*  151:*4, 6*
152:*4, 13,*
*18*  153:*1, 6,*
*14*  154:*19*
155:*15, 17*
160:*1, 16,*
*21*  161:*3,*
*22*  162:*10,*
*20, 23*
163:*4, 10,*
*21*  164:*4*
165:*15, 20*
166:*5, 13*

169:*10*
170:*4, 9*
171:*20*
172:*1, 8*
174:*4, 12,*
*23*  175:*3,*
*15, 23*
176:*15*
177:*3, 7, 15*
184:*2, 8, 18*
185:*4, 11,*
*19, 22*
186:*3, 8, 18*
187:*2, 5, 11,*
*14, 18*
188:*3, 16*
189:*1, 10,*
*15, 23*
190:*4, 14,*
*22*  191:*5, 8,*
*13, 21*
192:*14*
193:*2, 13,*
*16*  194:*2,*
*10, 18, 23*
195:*5, 10,*
*17, 23*
196:*5, 18*
197:*1, 6, 9,*
*14, 19, 22*
198:*4, 11,*
*20*  199:*1,*
*12, 17, 22*
200:*9, 18,*
*23*  201:*20*
202:*2, 9, 17*
203:*2*
Barnett
12:*7*  16:*18*
29:*20*  30:*1*
129:*8*

Barrett  2:*7*
7:*6*
base  31:*7*
46:*23*  50:*1*
126:*22*
143:*17*
based
33:*12, 13,*
*15, 18*
66:*21*
96:*21, 23*
98:*23*
102:*20*
120:*1*
141:*12*
177:*20*
188:*11*
190:*18*
192:*9*
195:*16*
basically
53:*17*
68:*17*
69:*10*
91:*21*
126:*18*
127:*2*
basis  24:*1*
165:*19*
167:*5*
bat  131:*18*
Bates  85:*7*
bathroom
159:*22*
BB&T
45:*17*
190:*1*
BEARMAN
6:*15*
becoming
30:*17, 18*

Video Deposition of Corey Daugherty

6/21/2023

61

beginning
7:8  196:12
behalf
7:17  97:21
98:21
believe
13:3  18:17
23:2  28:22
31:7  61:19
77:21
117:7, 15
142:17
153:15
184:11
186:12
benefit
45:19
83:14
benefits
145:4
Bennett
179:18
182:6
183:4
Berkley
70:20
BERKOWIT
Z  6:16
best  38:23
123:13
Betsy  12:7
16:18
29:20, 23
129:8, 21
Betsy's
30:2
better  99:4,
15  147:7
169:8
beyond
144:19

Bham
43:15, 18
88:19
195:4
big  85:8,
13  138:7
bigger
186:1
bind  22:2
135:16
136:11
binder
135:17
binders
22:1, 20
52:19
binding
11:7  26:11
binds
52:18
bio  84:17

Birmingham
2:8  6:7, 12,
20  7:7
14:2, 7, 11
15:5, 12
43:14
44:16  59:8
60:2  76:21
86:8, 16
87:2, 16, 17,
18, 19  88:2,
3, 5, 6, 13,
17  89:8
90:11, 12
117:1
121:5, 11
122:3, 10
138:9
170:23
180:10

193:11
194:22
195:8
Bistro
111:14
BIT  132:5,
12
B-I-T
132:13, 14
blank  199:9
block  77:3,
9, 11, 20
78:20
blocks
76:23
77:16
board
61:23
69:15, 19,
23  70:4, 19
73:22, 23
153:12
boards
69:11  73:8
boat
181:15
bonus
31:18, 21
32:23
33:11, 12
48:13
144:15
154:2, 6, 11,
13  155:13
156:6
185:3
bonuses
31:11, 14
32:9  33:7
34:2  35:6,
19  63:8
121:1

144:11, 16
154:1, 15
156:8
192:8, 9, 13
195:14, 18
book
114:19, 22
115:3
116:18
boss
123:12
bottom
63:14
79:16
97:23
107:7
183:19
bound
58:4
109:13
Box  6:11
brand  25:4
brand-new
36:9
Brandon
83:19
158:18
159:3, 4, 16,
19  168:9
170:10, 11
173:2
break  61:8,
18  114:4
159:23
breakdown
178:13, 20
179:3
breakouts
136:7
Brent  13:6
Brent's
13:9

Brett  14:18,
19
brief  61:13
160:4
172:16
178:8
bring  36:7
125:3
bringing
36:10
broke
129:20
broker
11:16  12:1,
4, 6, 14
16:16
17:15, 23
18:15, 16,
18  19:1, 4,
12, 13, 17,
19, 20, 21,
22, 23  20:1,
4, 10, 12, 16,
17  21:9, 12,
21, 23  23:4,
12  24:8
26:7, 8, 9,
13, 19
27:10, 11,
13  28:18
29:7, 8, 14,
16, 20  30:4,
18, 19, 23
31:3, 17, 22,
23  32:12,
14, 18  33:2,
9, 11, 23
34:6, 14, 19
36:14, 19,
22  37:9, 11,
21  38:7, 15,
17  39:4, 19

40:*3, 11*
43:*22*  44:*8*
46:*20*
47:*15*  49:*1*
54:*4*  55:*14*
56:*2, 10, 11,
21*  57:*16*
58:*14, 18,
20, 21*  64:*3,
6, 7, 12, 13,
19*  65:*23*
66:*3*  67:*7*
68:*10*  70:*3*
77:*7*  79:*21*
80:*1*  81:*22,
23*  82:*2, 6,
7*  83:*3, 11,
14*  84:*23*
85:*3, 22*
88:*18*
91:*19*  92:*7*
93:*14*  97:*2*
98:*9, 14*
99:*23*
102:*21*
103:*7, 18,
22*  104:*6*
108:*21*
114:*21*
116:*4, 11*
117:*4*
118:*4, 10*
126:*10, 13*
127:*21*
128:*3, 7, 8,
15*  129:*4,
19*  130:*1, 4,
8, 23*
131:*16, 17,
22*  132:*3, 5,
12, 16, 18*
134:*21*

135:*3*
136:*4*
143:*9*
144:*4*
145:*12, 16*
147:*12, 16*
156:*1*
157:*3*
158:*19*
159:*12*
160:*15*
165:*23*
168:*18, 20,
22*  169:*1, 2*
170:*12, 21*
171:*11, 15*
173:*8*
181:*1, 2, 3,
19*  182:*2*
187:*20*
188:*6, 8*
192:*23*
**brokerage**
11:*20*
**brokers**
17:*10, 19*
18:*2, 5, 8*
19:*7, 15*
22:*22*
32:*23*
36:*23*  37:*4*
40:*4, 6*
43:*16, 19,
22*  45:*2, 3,
4*  58:*13*
83:*5, 10*
87:*17*
88:*19*  89:*7*
90:*12*
110:*22*
114:*19*
115:*20, 21*

116:*2*
118:*12, 13*
125:*19*
126:*1*
130:*17*
131:*1*
135:*1*
144:*14*
147:*9*
153:*12, 17,
19*  156:*15*
165:*18, 19,
21*  166:*1,
19*  170:*7,
17, 18*
**broker's**
34:*4*  35:*1*
98:*12*
131:*22*
144:*17*
**brought**
54:*14*
133:*19*
**budget**
58:*6*  65:*15*
**building**
167:*22*
**build-out**
167:*21*
**bumped**
144:*9*
**bunch**
169:*19*
**burden**
176:*22*
177:*1*
202:*15*
**business**
20:*20, 21*
21:*12, 14,
21*  23:*20*
24:*15, 21*

25:*2, 4*
36:*10, 16*
37:*1, 23*
40:*23*  41:*6*
53:*20, 21*
59:*13*
65:*14*
67:*12*  68:*5,
7*  69:*18, 21*
70:*21*
73:*16, 17*
77:*7*  82:*13*
91:*9, 13, 17*
92:*5, 9, 19*
93:*4*
104:*13, 14,
15*  114:*20,
22, 23*
115:*3*
116:*10*
117:*4*
120:*3*
134:*6*
145:*20*
148:*9, 10*
155:*9*
165:*10, 16,
19*  166:*3, 4*
179:*21*
180:*7*
**businesses**
91:*21*
**busting**
167:*14*

**< C >**
**Cadden**
13:*22*  15:*1*
35:*8*  39:*15,
20, 21*
40:*21*  60:*3*
101:*10*

102:*7, 10*
109:*17, 23*
111:*17*
112:*5, 17*
120:*16, 18,
22*  126:*4*
156:*9*
173:*15*
196:*10*
**Cadden's**
102:*17*
121:*1*
**calculate**
31:*21*
**calculated**
31:*15*  33:*1*
144:*12*
**calculating**
32:*9*
**calculation**
32:*23*

**calculations**
185:*3*
**CALDWELL**
6:*15*
**California**
77:*5, 7, 8*
180:*11*
**call**  92:*4*
173:*17, 18*
178:*6*
**called**
44:*21*
51:*17*  60:*9,
11*  87:*7*
173:*21*
178:*6*
**calling**
174:*18*
**calls**  37:*18*
99:*10*

Video Deposition of Corey Daugherty

6/21/2023

63

capable
29:5
capacity
11:3  12:8
20:18
21:20  22:3
24:19
29:21  37:8
83:12
135:21
capital
69:13
care  178:18
career
119:22
Carolina
117:2, 3, 11
carrier
25:13
CASE  1:5
7:23  8:3
16:3  38:8
62:11  67:6
72:12  91:7
99:1
124:13
171:18
187:19
188:10, 20
cases
116:15
196:14
casualty
15:6, 8, 13,
23  16:9
64:16, 17
87:19
catalyst
77:4
cause  7:9
204:16

caused
178:19
cellphone
171:17
cellphones
172:7
Central
7:15
CEO  12:20
13:1
certain
77:20
115:23
116:2
118:21
136:14
155:10
certainly
108:10
175:10
certainty
49:21
160:13
certify  7:2
204:6, 13
cetera
91:11
change
22:5  38:5
39:2, 3
44:2, 7, 9
48:8  50:8
51:2  80:11
156:11
157:2, 5, 22
186:15
changed
80:8
196:21
changes
37:16
38:19

186:14, 20
187:13
188:22
changing
80:9

characterize
22:9  24:13
45:22  46:2
195:4
charge
95:7  96:1,
5  100:13
102:2
140:16
141:5, 16,
17  152:12
163:3
174:6, 9
175:6, 9, 12
176:5, 9, 13
177:8, 18
charges
140:11
chart
70:12
197:16
charts
47:7
190:23
191:19, 23
193:23
194:11
chat  42:7,
9  50:12
71:1, 5, 7
72:19
74:14, 21
chatted
178:7

check
142:23
185:10
checked
78:9
checking
55:3
checks
34:5, 18
chose  74:7
circumstanc
es  133:2
Cite  7:18
cities  14:10
city's  14:20
Civil  7:4
claims
133:2
clarify
74:12
101:22
classes
106:13, 19
148:9, 10
Clay  27:4,
7  29:6
40:7, 14
64:20
65:22  66:2
68:9  81:7,
11, 12, 17
94:12, 15
98:16
102:22
110:5
111:3, 15
114:16
128:8, 9, 10,
12, 15
129:2, 18,
23  132:3, 4,
6  136:11

139:16
140:4
161:7
164:15, 19,
20  185:14,
17
Clay's  27:7
80:22
185:20
clean  95:21
clear  66:23
107:23
113:8, 14
142:11
196:19
cleared
52:10
clearing
67:12
Clearly
152:5
175:6
196:2, 5
clears  68:6
click  49:10
50:3, 4, 5
56:5  58:20
65:8, 9, 10,
11  88:6, 7
138:19, 20
clicking
57:8  139:2
client
22:16
24:19, 20
25:1, 3, 4, 6,
11  42:18
46:8  53:22
54:1, 2, 4
73:15
89:20
90:14

Video Deposition of Corey Daugherty

6/21/2023

64

108:*15*
120:*2*
180:*6*
193:*19, 20*
**clients**
22:*4*  23:*9*
24:*14*  26:*3,*
*14*  37:*15*
46:*7, 8*
54:*12*  92:*3,*
*13*  93:*2*
104:*15*
115:*13*
116:*12*
117:*23*
118:*19*
134:*4, 5*
148:*7, 20*
155:*11, 23*
**client's**
54:*5*
**closed**
198:*6*
**closest**
170:*5*
**cloud**
76:*15*
**clusters**
167:*3*
**co-broke**
83:*15*
**co-counsel**
172:*11*
**code**  98:*15,*
*17*
**coded**
98:*3, 7, 13*
**Colorado**
92:*8, 15*
93:*1*
180:*11*

**Columbus**
117:*1*
165:*9*
**come**
50:*18, 22*
55:*21*
60:*13*  81:*8*
96:*2*
100:*19*
123:*5*
125:*16, 20*
144:*18*
152:*15*
175:*19*
**comes**
23:*9*  52:*9*
53:*9, 12*
66:*21*  68:*6,*
*11*
**coming**
59:*13*
68:*18*
89:*20*  90:*6,*
*15, 19*  91:*2*
**Comma**
191:*15*
**commencin**
**g**  2:*9*
**comment**
100:*13*
102:*3*
104:*2*
**comments**
166:*16*
**commercial**
11:*19*
25:*13, 15*

**commission**
155:*2, 5, 7,*
*10, 22*

**Commissio**
**ner**  3:*5*
7:*2*

**commitment**
20:*22*  21:*8*
**communicat**
**e**  42:*20*
70:*9*  71:*2*
72:*22*  73:*2*
91:*12*
92:*17*
136:*21*
157:*5*
**communicat**
**ed**  199:*15*
201:*23*
**communicat**
**ing**  167:*5, 8*
**communicat**
**ion**  73:*3*
91:*3*
176:*16*
**communicat**
**ions**  171:*18*
**comp**  50:*1,*
*6*  155:*22*
**companies**
53:*11*
69:*21*  70:*6,*
*9*  155:*9, 12,*
*19*  179:*20*
**company**
11:*7*  12:*14*
24:*4, 20, 22*
25:*18*  26:*1*
34:*9*  35:*21*
37:*17*  52:*3*
70:*13, 20,*
*23*  90:*14*
93:*6, 10, 13,*
*17, 19, 23*

94:*7, 15, 17*
96:*9*
110:*21*
131:*5*
176:*8*
180:*6*
182:*7*
187:*1*
**company-**
**issued**
94:*20*
**Companywi**
**de**  121:*20*
**comparable**
76:*3*
192:*12*
**compared**
65:*14*
**comparison**
58:*6*
**compensate**
**d**  32:*22*
**compensati**
**on**  45:*20*
46:*23*
49:*22*
127:*4*
186:*14, 19*
188:*20*
**competitive**
92:*1*
**complain**
100:*20*
103:*6*
110:*16, 21*
**complained**
96:*13*
105:*20*
117:*19*
139:*12*
161:*6*
163:*8*

**complaining**
110:*14*
134:*15*
163:*15*
**complaint**
100:*4, 7, 15*
101:*7, 14*
111:*17*
139:*18*
**complaints**
99:*20*
100:*1*
102:*13*
103:*12*
110:*13*
111:*2*
112:*4, 20*
121:*6, 15*
140:*11*
161:*20*
**complete**
48:*4, 6*
96:*9*
**completely**
82:*14*
167:*18*
186:*16*
187:*4*
196:*6, 8*
**compliance**
2:*15*
123:*13*

**components**
117:*10*
**comprised**
17:*18*

**compromise**
142:*6*

Video Deposition of Corey Daugherty

6/21/2023
65

computer
65:8  76:16
105:5, 6
138:17
148:23
151:16
190:10
computer-
aided  204:9
computerize
d  138:17
140:10
conditions
187:22
conduct
175:19
confidence
120:2
confirm
44:18
confused
55:22
191:22
Connect
60:9  63:1,
2, 6  194:17,
19, 21
195:2
consider
108:20
145:12
consideratio
n  144:21
considered
51:9  63:7
154:2
consistent
78:6
constantly
37:14, 16
70:8

contact
70:4, 22
148:11
contain
146:7
contained
48:17  54:8
171:8
contains
95:13
189:12
contending
188:7
content
84:1
108:11
contention
187:19, 21
contents
95:2, 17
context
91:1
contingent
154:6
continued
116:8
125:4
134:20
Continuing
5:1
control
94:1  123:1
conversatio
n  52:16
103:14, 16
158:2, 4
163:19
167:10
174:21
175:2, 9
176:2

conversatio
ns  96:17,
23  102:16
111:9
142:9
171:13
convey
125:10
conveyed
123:6
copied
183:10
copies
71:13
copy  10:20,
22, 23
62:17
71:11
79:12
80:16  97:6
106:2
129:12
140:22
146:13
147:21
149:5
169:16
173:13
179:8
182:11
199:10
copying
183:4
COREY
1:16  2:4
7:8, 20
8:20  9:12
19:9, 10
74:2  97:18
161:7
Corey's
73:22

Cornelius
2:5  7:1, 17
204:19, 20
CORP  1:11
corporate
7:20  11:3
32:11, 14
33:2  52:1
69:7  77:4
112:16
Correct
12:2, 17
14:22
17:11  21:2
44:12
68:21
71:17
92:14
106:16
109:7, 11,
17  119:2,
11  160:19
204:11
correctly
17:14  26:6
31:9  33:11
145:16
158:4
159:2, 5
correlation
75:4
correspond
ence  87:12
counsel
2:4, 20, 22
7:5  8:5
107:21
108:15
152:20
174:8, 11,
14  175:4,

11  176:6
204:14
count
17:14
65:13
country
32:18
58:22

countrywide
87:11
counts
23:23
COUNTY
204:4
couple
32:17  77:2
114:12
120:12
150:18
202:5
course
17:1  19:21
28:8
108:18
150:19
167:6
181:6
COURT
1:1  2:16
7:16, 18
8:2  9:20
113:23
201:1
202:23
cover
21:22
23:17  24:2
53:10
coverage
24:3  26:11
54:10

Video Deposition of Corey Daugherty

6/21/2023
66

120:5
133:1
**covered**
174:5
175:4
**CRC**  1:10
7:21, 23
8:13, 15
9:14  11:4,
15, 18, 21
14:1  15:5
29:18  30:8
31:11
32:19  33:7
51:5, 14
52:4  53:18
57:4  69:6
72:18, 20
75:9  77:22,
23  87:7, 13
88:12  95:1
121:6, 11,
19  122:3,
10  127:22
138:10
143:4
144:15
151:19
155:18
157:6
159:11
161:20
162:7, 18
163:2
170:23
172:21
182:7, 14
183:15
186:4
**CRC-**
**Hendrix**

85:7
185:20
**create**
36:19
37:23
40:23  41:6
69:11, 14,
23  70:4
77:12
86:13
**created**
32:5  42:7
52:1, 3
73:22
76:23
86:16
**creates**
44:5  79:4
84:1
**creating**
37:1  86:10
**creation**
86:21
**criteria**
200:11
**crying**
178:8
**CSR**  2:6
7:1
**cube**  169:3,
6  170:13,
19  173:7, 8
**cubicle**
168:2, 4, 8,
9  169:8
**Cubicles**
168:15
**current**
24:3
**currently**
18:10
26:23

38:16  41:1,
2  109:19
**Curtin**  16:1
**curve**
120:4
**customer**
22:15
115:7
**cyber**
164:21, 23
165:1

**< D >**
**D**  2:5  4:1
7:1  204:19,
20
**Dashboard**
4:11  49:9
51:15, 17,
18  54:23
55:6, 9, 10,
12, 15, 16,
23  56:8, 12,
13  57:1, 3,
5, 8, 9, 13,
21, 23  58:1
59:12
60:11, 19
61:18
62:11, 22
63:2, 7, 10
66:21
68:23  98:9
126:8
184:13
185:1
190:8, 12,
15, 19
191:6, 7, 9,
10  193:1
194:17
195:3

**dashboards**
54:19
191:1, 19,
23  192:11
193:23
194:11
**data**  50:17,
20  60:12
66:20
70:10
172:7
193:6, 19
**date**  7:3,
14  53:21
58:8  63:20
66:8, 9, 11
68:23  69:1
79:23
98:23  99:5,
7  116:21
141:9, 16
157:23
190:18
**dates**
120:11
142:15
161:13, 18
162:4
181:23
186:19
187:12
188:4, 21
203:3
**DAUGHERT**
**Y**  1:16  2:4
7:8, 20
8:20  9:12,
13  10:16
67:7  97:18
101:16
112:7

**Dave**
126:9
127:20
158:20, 21
159:8, 10,
15
**David**
12:23  13:5
14:14, 19
**day**  2:8
23:1  57:23
81:6, 7, 9
167:6
179:18
180:15
**days**  92:23
93:3
**day-to-day**
20:9  38:22
75:15
82:12
156:17
167:5
**deal**  120:5
**dealing**
23:14, 15,
20, 22
**dealings**
36:12
**dealt**
178:11
**December**
98:20
**decided**
38:22
157:2
**decision**
35:5  38:21,
23  121:4
144:14
157:4, 14,
17  158:18

160:*9*
180:*5*
**decisions**
34:*6*
**default**
44:*3*
**defendant**
41:*14*
**Defendants**
1:*12*  6:*14*
**defense**
175:*22*
176:*2*
**defenses**
149:*9*
175:*18*
177:*14*
**definition**
189:*20*
190:*2*
**definitive**
130:*19*
**definitively**
138:*14*
147:*11*
**delegate**
119:*1, 8*
135:*22*
**delete**
172:*2*
**Denver**
64:*18*  93:*1*
**department**
15:*3, 4*
16:*12*  44:*1,
20, 23*  46:*4*
73:*6, 19*
76:*22*  84:*3,
11*  89:*19*
92:*11*
96:*10*
102:*7*

110:*3*
122:*6*
123:*5, 6, 15*
125:*7*
135:*20*
136:*16*
137:*1, 5, 11*
143:*6, 8*
157:*17*
161:*10, 12,
15, 17*
162:*2, 5*
167:*2, 19*
170:*16*
172:*6*
176:*7*
186:*9*
192:*8*
194:*22*
195:*7, 12*
196:*16*
**departments**  15:*5, 11,
16*  16:*9*
71:*5*
**departure**
39:*10*
94:*11*
96:*14*
**depend**
192:*21*
**depending**
34:*11*
90:*13*
114:*23*
**depends**
89:*16*
130:*20*
153:*18*
**depict**
169:*22*

**DEPONENT**
203:*9*
**DEPOSITIO
N**  1:*15*
2:*4, 13, 14*
3:*1, 4*  4:*10*
7:*19*  9:*16*
10:*22*
112:*15*
113:*15, 20*
177:*10, 13,
20*  202:*19*
203:*3*
**depositions**
2:*17*
**description**
145:*23*
146:*6, 8*
158:*6*
**designated**
68:*19*
101:*18*
112:*8, 21*
113:*17*
149:*13, 17*
177:*7, 16,
17*
**desk**  68:*9,
10*  169:*8,
18, 19, 23*
170:*3*
171:*8*
**desktop**
50:*15*
**desktops**
74:*4*
**destroy**
162:*17*
**detailed**
57:*20*
**details**
178:*23*

**determine**
35:*19*
133:*16*
134:*9*
143:*17*
144:*7*
195:*14*
**determined**
136:*19*
166:*21*
169:*7*
**determines**
33:*21*
**develop**
92:*18*
119:*22*
**developing**
36:*9*
**development**  91:*13*
116:*9*
**devoted**
105:*16*
**dialogue**
167:*11*
**difference**
20:*3, 15*
96:*13*
136:*3*
**different**
9:*21*  17:*20,
21*  18:*23*
19:*15*
24:*12*  26:*2*
31:*11*
41:*19*  46:*6*
63:*5*  75:*17*
80:*6*  86:*7,
9*  106:*12*
110:*17*
116:*1*
120:*6, 12*

130:*22*
131:*22*
133:*1, 15*
134:*13*
136:*16*
137:*11*
160:*12*
176:*17*
187:*4*
189:*11*
191:*5, 9*
194:*2, 8*
200:*19, 22*
201:*2*
**differential**
196:*16*
**differently**
34:*11, 15*
96:*19*
195:*18, 19*
**digging**
192:*10*
**dinner**
90:*9, 19*
91:*2*
**dinners**
91:*11*
**direct**
72:*17*
95:*20*
149:*8, 12*
**direction**
21:*21*  23:*3*
39:*1*  174:*7*
175:*4, 10*
**directly**
21:*11*
110:*20*
111:*1*
200:*16*
**disagreement**  202:*13*

Video Deposition of Corey Daugherty

6/21/2023
68

disciplinary
139:10
discipline
139:11
143:14
disciplined
139:17, 23
140:5
161:1
discovered
69:8, 9
discretion
32:9  34:4
35:2
144:17
156:10
discretionar
y  196:6, 9
discriminate
d  102:4
discriminati
on  99:21
100:2, 5, 13
101:19
102:3, 11
104:19
105:11, 20
121:6, 16
139:7
140:12
196:14
discuss
137:19
157:12
166:11
184:1
discussed
157:9
discussion
106:7
113:12
199:6

discussions
176:8
dispute
202:21
disrupt
134:1
distinct
154:12
distributed
34:3
distribution
87:13, 22
DISTRICT
1:1  8:2
Diversity
106:19
107:4
divide
115:3
DIVISION
1:3  8:3
divvies
34:15
divvying
34:19
doctor
178:13
Doctors
70:19
doctor's
48:20
Document
4:20, 21, 23
52:15, 16
53:18
60:22
62:20  63:1
65:4, 7
67:19, 21
76:12
100:1

104:18
106:4, 10,
18  107:23
111:2
126:18
127:1
131:11
141:1, 3
144:15
146:18, 21
147:12, 16
148:1, 3, 8
150:12, 20
153:3
154:6
179:13, 15
182:21
188:5
documentati
on  112:3,
19  126:7
documentin
g  99:20
documents
23:13
26:16  61:4
62:19
108:9
146:6
150:1, 14
162:13, 17
171:7
177:22, 23
184:5, 10,
14  197:3
doing  70:9
97:1
102:18, 20
108:16
115:10
134:15
166:17

DONELSON
6:15
double
88:7
185:10
download
73:7  74:7
drinks  90:9
dropped
67:14
drugs
10:12
drum
24:15
145:19
duly  8:21
Dunston
161:9
164:1, 2
duplicative
187:6
duties
20:4, 9
22:19  37:5,
22  99:23
104:18
116:5, 8
117:20
118:4
158:6, 10
166:8, 12
188:1
duty
116:12

< E >
E  4:1  6:1
204:1
E1  41:20
E3  41:20
E5  41:20

earlier
53:8  65:13
67:1  68:8
74:15
98:10
143:5
145:2
150:21
early  28:21
116:19, 20
117:13
easy  68:11
70:12
Edward
9:12
EEO  105:8,
17  107:13
112:4, 19
EEOC  95:6
96:1
140:11, 16
141:5, 15,
17  152:12
163:3
174:6
176:13
177:18
effect  2:14
effective
141:15
effectively
22:18
148:19
efficiently
22:17
148:20
effort  172:3
efforts
150:14
171:16, 22
eight
18:23

31:*23*  32:*1*
59:*6*  91:*19*
**either**
92:*22*  96:*8*
97:*20*  99:*7*
103:*11, 17*
125:*23*
126:*9*
154:*5*
170:*11*
**elevate**
102:*5*
**eligible**
145:*8, 11*
**Elliott**
123:*11*
**else's**  49:*3*
65:*10*
**E-mail**
4:*13, 14*
5:*3, 4*
37:*18*
41:*13*
42:*22*  43:*3,
5, 9, 14*
44:*17*
72:*19*
75:*15*  78:*1*
79:*15*  80:*6*
81:*13, 17*
87:*12, 22*
88:*1, 22*
89:*4*  93:*2*
148:*8*
157:*19, 20*
158:*1*
162:*16*
179:*17*
180:*2, 10,
14*  197:*9*
201:*17, 19*
202:*1*

**e-mails**
42:*7*  52:*17*
74:*15*  78:*3,
23*  87:*1, 6*
140:*1*
150:*18*
151:*5, 9, 13*
201:*17*
**emphasis**
20:*23*
**employed**
171:*8*
**employee**
23:*23*  45:*9*
46:*6*  49:*14*
50:*7*  54:*13*
84:*19*
87:*10*
95:*23*
96:*11*
100:*12*
101:*4*
104:*22*
109:*2, 9*
124:*11, 19*
**employees**
31:*10*
32:*21*
66:*22*
72:*21*
77:*15*
84:*15*
105:*12*
109:*3, 12*
113:*11*
121:*18, 23*
122:*3, 5*
154:*16*
157:*6*
**employee's**
57:*7*

**employer**
95:*13*
**Employmen
t**  4:*19*
23:*22*
47:*18*  48:*8*
50:*8*  82:*4*
129:*2*
131:*12*
142:*15*
147:*10*
**endorsemen
ts**  22:*2*
**engage**
165:*3*
**engineers**
70:*1*
**enter**
52:*11*
68:*12*
**entering**
52:*11*  67:*5*
**enters**
68:*15*
**entertainme
nt**  127:*5*
**entire**  51:*6*
89:*19*
118:*15*
144:*16*
157:*17*
195:*6*
**entirely**
35:*1*
**entitled**
145:*5*
188:*15, 18*
195:*6, 11*
**environmen
t**  92:*1, 2*
**EPL**  200:*7*

**equal**
187:*23*
**equipment**
96:*10*
**especially**
201:*7*
**Esq**  6:*5,
10, 17, 18*
**et**  8:*1*
91:*11*
**event**
89:*20*  90:*3,
4, 13*
177:*21*
179:*22*
180:*4*
181:*18*
183:*13*
**Everybody**
9:*5*  49:*2,
17*  68:*18*
78:*7*  109:*6*
167:*7*
181:*8*
195:*6, 11*

**everybody's**
74:*3*
**evidence**
3:*2*  152:*17*
162:*9*
171:*17*
**evidencing**
191:*1, 16*
192:*1*
194:*12*
**exact**  13:*9*
29:*16*
32:*16*
110:*7, 10*
117:*14*
120:*11*

122:*8*
157:*23*
167:*9*
**exactly**
52:*23*
95:*10*
97:*14*
104:*8*
116:*21*
**EXAMINATI
ON**  4:*2*
7:*9*  9:*8*
**examined**
8:*21*
**example**
25:*18*
41:*20*  43:*8*
53:*19*
62:*21*
63:*22*
68:*22*  78:*2*
79:*1, 14*
88:*2*  90:*2*
109:*5*
118:*21*
137:*8*
**Excel**
126:*15*
184:*15*
197:*18*
198:*12*
199:*20*
**exceptions**
93:*15*
**Exchange**
75:*10, 12,
15, 20*
**Excluding**
20:*8*
**excuse**
29:*11*
48:*21*

58:*10*
102:*17*
**exec**  67:*11*
**executive**
21:*17, 18*
22:*8, 10*
23:3  27:*21*
28:*3, 7, 13,
15*  29:*4*
30:*14, 18*
37:*5, 21*
39:*23*  40:*2,
19*  55:*12*
68:*6, 14*
80:*3*  82:*20,
22*  115:*22*
116:*5, 7, 14,
17*  118:*6, 9*
119:*4*
123:*9*
126:*20*
133:*5*
134:*10, 11,
19*  135:*14,
23*  136:*4*
143:*9*
144:*1*
145:*23*
157:*3*
168:*18*
**executives**
12:*16*
21:*19*  45:*3*
56:*21*  62:*7*
81:*10*
82:*23*  83:*1*
114:*19*
115:*4, 9*
119:*6*
135:*18*
153:*22*
168:*6, 7, 16*

**EXHIBIT**
4:*8, 9*
10:*17, 19*
62:*15, 16*
63:*14*  64:*2*
71:*9, 10*
72:*3*  79:*11*
80:*5, 14, 15,
18*  85:*11*
97:*4, 5*
105:*23*
106:*1*
129:*9, 11*
140:*21*
141:*18*
146:*10, 12*
147:*20*
149:*2, 4*
150:*21, 23*
169:*14, 15*
173:*11, 12*
179:*2, 6, 7*
182:*9, 10,
19*
**exhibited**
156:*12*
**EXHIBITS**
5:*1*
**exist**
190:*21*
**existed**
122:*11*
**existing**
20:*20, 21*
25:*3*
104:*15*
133:*21*
**exists**  21:*4*
**expand**
88:*7*
**expect**
202:*7*

**expectation**
21:*8*  131:*2,
3*
**expenses**
127:*5*
**experience**
22:*16*  36:*3*
115:*8*
132:*6, 21*
144:*22*
**expert**
164:*23*
**expertise**
83:*13*
**Expires**
204:*21, 22*
**Explain**
32:*13*
**exposure**
23:*19, 21*
24:*1*
**expressed**
30:*16*
110:*8*
124:*2*
**expressing**
110:*9*
**extent**
150:*18*
162:*11*
190:*6*
202:*10*
**external**
200:*6*
**externally**
197:*23*
198:*8*
**extremely**
22:*15*
**eyes**  96:*2,
5*

**< F >**
**F**  204:*1*
**fact**  21:*7*
112:*9, 14*
113:*1, 18,
20*  149:*14*
157:*13*
177:*9, 10*
**factor**
36:*14, 15*
**factors**
115:*1*
**factual**
114:*1*
**fair**  10:*1, 6,
10*  14:*3, 9*
36:*13*
98:*19*
103:*23*
133:*8*
143:*7*
**fairly**
195:*16*
**fall**  28:*21*
**familiar**
16:*2*  31:*11*
41:*21*
45:*13*  69:*3*
106:*4*
141:*1*
**family**
131:*5*
178:*5*
**far**  47:*4*
54:*20*
58:*10*
77:*14*
91:*10*
109:*4*
116:*8*

**Farahany**
2:*7*  7:*6*
**Farm**
25:*10, 12,
18*
**Father**
120:*21, 23*
**Federal**  7:*3*
**fee**  58:*3*
59:*14*
**feeds**
194:*16*
**feel**  164:*7,
8*
**feeling**
96:*23*
**feels**
123:*21*
**fell**  123:*14*
**felt**  29:*5*
38:*23*  81:*7*
96:*18*
102:*19*
123:*23*
124:*12*
180:*18*
**female**
110:*22*
170:*17*
**females**
96:*14*
103:*8, 18*
108:*21*
166:*15*
**figure**
192:*12*
195:*15*
**file**  51:*6, 9,
10*  100:*7*
130:*13*
177:*1*
184:*12, 13,*

Video Deposition of Corey Daugherty

6/21/2023

71

23 185:2, 7, 12, 16, 18, 20 186:1, 11, 16 187:3 189:2, 7, 8, 9, 20, 23 190:5 202:15

filed 8:1 9:15 100:4, 15 141:15 142:21 152:8, 12 174:6 175:6 176:5

files 52:15 76:12

filing 3:4

fill 97:12 127:14

filled 97:21 199:11

FINANCIAL 1:10 8:13, 15

find 65:5 123:17 158:22 199:5

fine 71:23 101:20 142:10 189:11

firing 123:2

firm 11:20 36:10 37:12 43:7, 9 53:12 59:4 66:22 98:12

135:20 144:22 147:13 155:8

first 8:21 11:14 25:18 38:14 63:13 180:2 186:13

fit 84:21

five 12:9 29:21 53:10

flip 11:10 65:16

flipped 118:11

FMLA 48:20 142:21 178:3

focus 104:14

follow 24:8 128:2

following 7:10

follows 8:22

force 2:14

foregoing 7:4 204:7, 10

forgot 184:7

form 2:21 4:15 20:5 22:12 30:6, 10, 20 31:16 32:3,

10 33:14 34:7, 20, 22 35:3, 16 37:6 38:2, 9, 20 48:6 49:19 50:19 51:7, 11 54:17 57:10 59:19, 21 60:7 61:1, 5 62:12 63:9 64:23 67:23 72:5 74:5, 8 75:13 76:18 77:17 78:16, 21 81:4 86:11, 18, 22 87:3, 15, 22 89:1 93:8 94:3, 8, 14, 19 95:4, 18, 22 96:7, 15 97:11, 12, 16 98:22 99:8, 18 100:3, 9 101:12 102:14 103:2, 9, 13, 19 104:1, 7, 20 105:22 108:23 109:10, 14, 18 110:1, 18, 23 111:4, 7, 11, 23 112:6 118:3, 7

119:10, 17 120:10 121:2, 7, 13 124:9, 22 125:12, 21 126:5, 19 127:12, 23 128:4, 12, 21 130:2, 7, 11, 15 131:8, 19 132:1 133:12 134:17, 22 136:1, 6, 9, 17 137:2, 6, 16, 21 138:12, 22 139:4, 8, 14, 20 140:2, 7, 13, 17 143:10, 20 144:6 146:1 150:3, 7, 9, 16 151:4, 6 152:4, 13, 18 153:1, 6, 14 154:19 155:15, 17 156:18 160:16, 21 161:3, 22 162:10, 20, 23 163:4, 10, 21 164:4 165:15, 20 166:5, 13 169:10 170:4, 9 171:20

172:1, 8 174:23 199:9, 21 200:16 201:4

formal 100:4, 7, 15 123:7 132:19 156:16

format 186:23

forms 127:17, 22 133:1 156:17 199:11

formula 31:17, 20 32:2, 6 33:5, 12, 13, 19 195:14, 20, 21

formulas 198:16

forty 32:20 180:15

forum 73:4

forward 39:1 60:17 186:2 202:19

free 104:12

freed 167:16

friend 131:5, 6

front 85:17 163:23 164:6, 11

Video Deposition of Corey Daugherty

6/21/2023
72

full 2:15
184:13
185:7
function
22:7 42:9
71:7 74:10
functions
45:18
82:13
118:13
funds
37:14
FURTHER
2:11, 18
3:3 203:9
204:13

< G >
gears 41:8
gender
96:22
general
22:4 23:20
37:10
38:12, 13
generally
68:13
74:14
89:11
generate
47:7 50:2
53:4
generated
53:2, 21
59:15
generating
21:13
George
179:18, 19
182:6, 14
183:4, 10

getting
30:17
55:22
103:7, 17
124:3
137:9
GILL 4:3
6:9, 10
8:10 9:5, 9,
14 18:11
61:7, 17
71:13, 17,
20 72:2
79:8, 14
85:12, 16,
20 101:20,
23 107:20
108:1, 14,
20 112:10,
11 113:3, 7,
9, 19 114:3,
11 115:18,
21 129:14,
17 138:6, 9
142:10, 13
149:16, 19,
20 159:21
160:8
172:10, 20
175:1, 13,
16 176:11,
20 177:5,
12, 19
178:2
183:21, 23
184:4, 9, 20,
23 185:13,
20 186:2
193:15
194:20
195:2, 8, 13,
22 196:3

197:3, 7, 11
198:12, 17,
21 199:8,
14, 19
200:1
201:16, 22
202:4
203:1
gist 110:12
give 72:14
80:19
82:16, 19
83:7 94:12
127:14
147:2
159:12
179:10
182:18
given 9:16
32:23 37:4
57:23
103:21
104:5
124:15
133:1
147:4, 10
164:2
181:12
204:12
gladly 10:5
go 11:9
12:19 25:9
27:6 33:5
35:20
36:19
41:10 44:9
47:1, 20, 21
48:4, 6
49:17, 22
54:22 55:6
56:13
57:13 58:8

59:11 60:4
61:11
84:15 92:4,
9, 10, 16
100:14, 22
101:1
114:5, 11
132:9, 10,
11 134:5
144:3
146:16
148:6
160:2
172:11, 14
175:18
177:23
196:14
202:19
goals
51:14
156:5
goes 16:5
43:9, 10
48:20 58:9,
10 129:15
184:16
198:13
going 7:13
9:3 10:9,
16 11:9
12:13 21:5
23:21, 23
36:9 41:8
52:2 59:1,
11 61:7
62:14 71:8
81:7 85:6
89:18 90:9
91:4, 5
92:9, 16, 18,
21, 23 93:2
97:11

104:21
108:10
114:11, 15
118:20
122:7
133:21
137:10
138:1
144:8
149:12, 17
159:21
166:12
174:4
175:7, 10
179:5
180:21
188:5, 10
190:14
193:13
198:1
201:11
202:10, 11
203:4
golf
163:20
181:6, 8, 10,
12, 16
182:2, 5
good
123:23
Google
74:21
Gotcha
64:20
155:20
gotten
58:2 93:5
113:23
Gould 17:3
G-o-u-l-d
17:3

Cite, LLC

graduating
12:*6*
granted
154:*11*
Green
39:*13, 18*
41:*5*  127:*8,*
*9*  198:*15*
grounds
2:*23*
group
43:*14*
44:*11*
46:*14*
65:*20*  69:*9*
77:*23*
82:*15*
86:*13*  87:*7*
88:*4, 17, 23*
89:*4, 9*
90:*4, 5, 6,*
*10, 16*  91:*8*
114:*21*
123:*14, 21*
180:*2*
groups
43:*5*  44:*3,*
*9*  45:*7*
86:*7, 9, 10,*
*21*  87:*2, 5,*
*14, 18*
88:*14*  90:*2*
growth
20:*18*  60:*1*
116:*8*
125:*4*
guess
12:*14, 18*
14:*18*
16:*23*
19:*14*
20:*23*  21:*5*

37:*20*  42:*3*
43:*15*
44:*21*  47:*6*
55:*11*  56:*4*
63:*13*  78:*2*
85:*16, 17,*
*20*  99:*4, 19*
116:*19*
123:*13*
141:*4*
150:*23*
152:*20*
154:*20*
158:*15*
159:*6*
162:*14*
170:*2*
176:*20*
177:*5*
190:*9*
191:*21*
194:*7*
guidance
159:*13*
guys   91:*6*
189:*7*

< H >
handbook
104:*22*
109:*2, 9*
handed
165:*18*
handle
116:*1, 2*
118:*13*
164:*19*
handled
36:*1, 2*
81:*9*  165:*9*
176:*6*

handles
22:*8*  26:*13*
handling
58:*15*
117:*4, 5*
163:*17*
hands
185:*6*
Hang
199:*20*
hang-up
189:*6*
happen
83:*18*
91:*18*
193:*14*
happened
38:*1*  44:*14*
117:*12*
166:*9*
171:*6*
175:*17*
176:*1*
happens
25:*20*
67:*11*
118:*18*
123:*19*
happy
202:*18*

Harassment
107:*16*
108:*2, 7, 22*
161:*20*
Hayes
83:*19*
158:*19*
168:*9*
170:*11*
173:*2*

head   17:*7*
42:*5*
heading
140:*1*
health
178:*11, 12*
healthy
92:*1*
hear   89:*14*
167:*10*
heard   92:*8*
131:*5*
154:*5*
176:*4*
held   45:*21*
106:*8*
113:*13*
143:*3*
199:*7*
helpful
108:*12*
helping
20:*20*
Helveston
101:*11*
109:*17, 23*
112:*5, 18*
137:*20*
156:*10*
HENDRIX
1:*7*  6:*22*
7:*23*  8:*9,*
*11*  9:*15*
16:*3, 11, 20*
18:*12, 13*
26:*18*  27:*1,*
*14*  28:*9, 23*
30:*5*  31:*2*
38:*5*  56:*23*
61:*23*  64:*8,*
*21*  78:*12*
79:*18*  81:*1*

114:*17*
133:*16*
137:*14, 20*
140:*5*
143:*1, 3*
145:*4, 7*
147:*3*
152:*1, 22*
157:*22*
165:*5*
166:*8*
169:*9*
171:*10, 19*
174:*1*
178:*3*
179:*3*
181:*11*
185:*18*
190:*9*
201:*17, 18*
Hendrix's
51:*5*  67:*21*
139:*18*
140:*16*
142:*14*
144:*11*
151:*3, 15*
162:*19*
171:*7*
184:*12*
185:*2*
hereto
10:*21*
62:*18*
71:*12*
79:*13*
80:*17*  97:*7*
106:*3*
129:*13*
140:*23*
146:*14*
147:*22*

Video Deposition of Corey Daugherty

6/21/2023
74

149:*6*
169:*17*
173:*14*
179:*9*
182:*12*
**Hey** 91:*4*
92:*7* 93:*2*
126:*18*
201:*7*
**higher-ups**
35:*7*
**highest**
12:*14*
**highlight**
156:*19*
**hire** 19:*5*
48:*2, 3*
84:*6*
122:*21*
128:*7, 15*
158:*18*
159:*14*
160:*9*
201:*4*
**hired**
18:*18*
28:*12* 29:*6,*
*8, 16, 19*
39:*5, 7, 9,*
*12, 17, 18*
45:*10* 82:*1*
84:*7* 85:*3*
86:*2*
128:*10, 15*
129:*23*
130:*6*
132:*4, 7, 21*
134:*4*
168:*12, 13*
**hires** 84:*11*
**hiring**
110:*22*

123:*1*
126:*17*
**History**
4:*16* 24:*5*
106:*16*
**Holland**
6:*23* 7:*16*
**home**
70:*17, 19*
73:*16, 20*
156:*18*
**homes**
69:*17, 22*
73:*23* 74:*2*
**honestly**
82:*1* 97:*14*
**hopefully**
115:*5*
**hour** 61:*8*
106:*22*
107:*10, 11*
108:*4*
159:*22*
**hours**
132:*23*
**housekeepi
ng** 183:*23*
**Houston**
13:*10* 14:*7*
**HR** 51:*1*
99:*10, 16*
100:*6, 14,*
*22* 101:*1, 7,*
*14, 18*
102:*5*
103:*12*
111:*6, 19,*
*20* 121:*9,*
*12* 124:*5*
145:*6, 10,*
*11* 146:*4, 5*
147:*4, 7, 18*

150:*10*
153:*8*
161:*5*
162:*22*
163:*5*
170:*23*
171:*2, 4*
**HRIS**
189:*13, 14,*
*22*
**Hughes**
15:*20*
16:*15* 17:*1*
18:*14* 92:*7*
98:*11*
101:*10*
102:*7, 10*
109:*16, 23*
110:*4*
111:*16, 22*
112:*4, 18*
126:*4*
156:*9*
183:*2, 7*
196:*10*
**human**
45:*23* 46:*2,*
*3* 121:*23*
153:*9*
**hundred**
32:*17*
58:*23* 59:*2*
63:*15*
96:*21*

**< I >**
**I** 2:*1* 4:*1*
7:*1* 9:*14,*
*17* 10:*4*
11:*1, 10, 22*
12:*5, 8, 9,*
*12, 14, 18*

13:*3, 9*
14:*5, 6, 14,*
*18* 16:*5, 17,*
*23* 17:*14*
18:*15, 17,*
*20, 21* 19:*8,*
*14* 20:*23*
21:*5, 16*
22:*14* 23:*2*
24:*8* 25:*17*
26:*1, 5, 12,*
*22* 28:*22*
29:*15, 19,*
*20* 31:*7, 8,*
*23* 32:*7, 16*
34:*8, 13*
35:*17* 36:*6,*
*7, 11* 37:*7,*
*11, 12, 20*
38:*13, 15*
39:*3* 41:*9,*
*18, 19, 22*
42:*3, 4*
43:*8, 14, 16,*
*20, 21* 44:*6,*
*10, 13, 18,*
*21* 45:*11,*
*14* 46:*1, 2*
47:*2, 6, 10,*
*11, 18, 20,*
*21, 23*
48:*23*
49:*20, 21*
51:*8, 12*
52:*2* 54:*21,*
*22* 55:*1, 7,*
*11, 18* 56:*4*
57:*6, 13, 22*
58:*9, 18, 19*
59:*10, 17,*
*22* 60:*11,*
*16* 61:*6, 18*

62:*5, 6, 13*
63:*13, 21*
65:*8, 9, 10,*
*12* 66:*19*
68:*1, 4, 8*
69:*7, 8*
71:*13, 20,*
*22* 72:*6, 7,*
*17* 73:*21*
74:*12, 22*
75:*8, 23*
76:*1, 5, 17*
77:*10, 14,*
*21* 78:*2, 9,*
*10, 13, 17,*
*22* 79:*8*
80:*10, 12,*
*23* 81:*3, 5,*
*15, 17, 19*
82:*1, 2, 3, 8,*
*11* 83:*22*
84:*2, 4, 6,*
*13* 85:*1, 5,*
*6, 9, 14, 16,*
*17, 20* 86:*4,*
*5, 6, 12, 19*
87:*19* 88:*5,*
*8* 89:*2, 5,*
*13, 15, 16*
91:*18* 92:*6,*
*21* 93:*9, 14*
94:*9, 10, 17,*
*23* 95:*5, 8,*
*10, 15, 19,*
*23* 96:*2, 16,*
*20, 22*
97:*13, 14,*
*15* 98:*2, 7,*
*23* 99:*1, 2,*
*4, 9, 12, 14,*
*19, 22*
100:*5, 14,*

Video Deposition of Corey Daugherty

6/21/2023

*16* 101:*21*
102:*2*, *4, 5,*
*16, 17*
103:*5, 10,*
*14* 104:*3, 8,*
*9, 21* 105:*1,*
*9, 13, 14, 18,*
*21* 106:*21*
107:*6, 8, 14,*
*18, 20*
108:*3, 9, 14,*
*17, 18*
109:*1, 4*
110:*7, 8, 10,*
*11, 19*
111:*1, 5, 8,*
*12, 14, 18,*
*20* 112:*1*
113:*7, 8*
114:*15*
115:*18*
116:*19, 20*
117:*7, 14,*
*15, 17*
118:*19*
119:*18, 19*
120:*11*
121:*3, 8, 10,*
*14, 22*
122:*2, 4, 8,*
*15, 20*
123:*9, 13,*
*18* 124:*12,*
*23* 125:*5*
126:*3, 14*
127:*1, 6, 11,*
*19* 128:*1, 7,*
*10, 11, 16,*
*18, 22*
129:*3, 6*
130:*5, 12,*
*16* 131:*13*

132:*22*
133:*18*
135:*3, 8*
136:*20*
137:*7, 12,*
*17, 22*
138:*1, 13,*
*14* 139:*5*
140:*14, 18,*
*19* 141:*2, 4,*
*7, 10, 11, 12,*
*13, 17, 18,*
*20* 142:*2,*
*10, 17*
143:*2*
144:*9*
145:*1, 9, 14,*
*15* 146:*9,*
*19* 147:*1,*
*11* 148:*2,*
*13, 15, 16*
149:*8*
150:*4, 6, 11,*
*17, 19, 20,*
*23* 151:*7,*
*14, 17, 20,*
*23* 152:*3, 5,*
*19* 153:*2, 3,*
*7, 15, 18*
154:*8, 20*
155:*3, 6, 7,*
*20* 156:*8,*
*18* 157:*4, 8,*
*13, 20, 23*
158:*4, 8, 11,*
*12, 13, 15*
159:*2, 5, 6,*
*9, 18*
160:*12, 17,*
*22* 161:*4,*
*13, 18*
162:*6, 11,*

*12, 14, 16,*
*17, 21*
164:*10, 13,*
*18* 165:*2, 8*
166:*7, 23*
167:*1, 2, 3,*
*14, 20*
168:*22*
169:*4, 11,*
*13, 21*
170:*2, 10,*
*11, 22*
171:*3, 4, 9,*
*12, 14, 21*
172:*2, 9, 12,*
*13* 173:*5,*
*17* 174:*5,*
*13, 16, 22*
175:*1, 23*
176:*3, 9, 11,*
*12, 20*
177:*5, 15*
178:*4, 5, 6,*
*8, 9, 10, 12,*
*14, 16, 23*
179:*10*
180:*14, 18,*
*21* 181:*9,*
*13, 17, 21,*
*22* 182:*3,*
*18, 22*
183:*6, 9, 21,*
*23* 184:*6, 8,*
*22* 185:*4, 5,*
*7, 9, 13, 23*
186:*11*
187:*7*
188:*9, 11,*
*17, 18*
189:*1, 5, 23*
190:*9, 16,*
*19* 191:*21*

192:*4, 5, 16,*
*19* 193:*9,*
*16* 194:*7,*
*13, 14*
197:*9, 17,*
*23* 198:*1,*
*21* 199:*5,*
*22* 200:*7,*
*15* 201:*2, 4,*
*5, 10, 20, 22*
202:*3, 9, 18*
204:*1, 6, 13,*
*15*
**idea** 70:*7*
**identificatio**
**n** 10:*20*
62:*17*
71:*11*
79:*12*
80:*16* 97:*6*
106:*2*
129:*12*
140:*22*
146:*13*
147:*21*
149:*5*
169:*16*
173:*13*
179:*8*
182:*11*
**identified**
184:*10*
**identifies**
85:*21*
**identify**
8:*5* 24:*5*
**immediate**
118:*8*
119:*13*

**immediately**
100:*14*

**impacting**
165:*17*
**important**
22:*15*
**inbox**
151:*8*
**incentive**
155:*4, 6, 14,*
*22*
**incentives**
155:*8*
**incident**
182:*2*
**include**
45:*2* 77:*19*
87:*9*
**included**
43:*18*
44:*17*
48:*13*
102:*6*
187:*8*
189:*20, 21*
**includes**
87:*9* 188:*1*
**including**
91:*20*
200:*3, 4, 5*
201:*8*
**Inclusion**
106:*20*
107:*4*
**income**
31:*5* 58:*3*
59:*15*
**incoming**
153:*17*
**Incorporate**
**d** 7:*22* 8:*1*
**incorrect**
160:*19*
161:*1*

Video Deposition of Corey Daugherty

6/21/2023

76

increase
 55:*1*
in-depth
 189:*20*
INDEX  4:*8*
individual
 14:*20*  15:*3*
 16:*16*
 32:*12, 14*
 33:*23*
 34:*10*  36:*4,*
 *5*  44:*8*
 46:*13*  50:*5*
 54:*20*  58:*1,*
 *14*  59:*3*
 64:*6, 7, 11,*
 *13, 19*
 84:*14*
 86:*13*
 98:*14*
 148:*5*
 156:*1*
 196:*7, 9*
individuals
 34:*3*  35:*6*
 46:*22*
 65:*20*
 127:*3*
individual's
 98:*11*
industry
 23:*13*
 69:*16*  77:*6*
 119:*20, 22*
 147:*13*
 164:*23*
information
 21:*15*
 45:*20*  46:*6,*
 *9, 16, 19*
 47:*16, 17*
 48:*9, 17*

49:*3, 6*
 50:*8, 12, 22*
 52:*6*  53:*4,*
 *17, 22, 23*
 54:*1, 2, 3, 6,*
 *8, 12*  55:*5*
 57:*15, 19,*
 *20*  58:*17*
 68:*20*  70:*5,*
 *11, 22*  72:*9*
 73:*10*
 75:*11, 20*
 77:*20*
 84:*11*  89:*6*
 91:*13*  94:*6*
 99:*20*
 126:*8*
 148:*10, 12*
 160:*20*
 161:*1*
 185:*17*
 186:*10, 23*
 187:*8*
 188:*14, 17*
 189:*4, 13,*
 *21*  190:*20*
 192:*11, 21*
 194:*1*
 198:*3*
 200:*3, 13,*
 *17, 22*
 201:*2, 6, 13*
in-house
 148:*11*
initial  71:*15*
initially
 52:*14*
initials
 132:*15*
in-person
 105:*4*
 139:*6*

input
 46:*16*
 47:*15*
 50:*17, 21*
 51:*14*  53:*3*
 66:*21*
 67:*21*
 68:*20*
 183:*15*
 196:*19, 20*
inquire
 159:*13*
inquired
 159:*10*
inquiries
 200:*5*
inside  18:*4,*
 *7, 15, 16, 18*
 19:*4, 17*
 20:*16, 17*
 21:*1, 6, 9,*
 *12*  22:*22*
 28:*18*
 30:*23*  31:*3*
 36:*14, 16,*
 *19, 23*  37:*4,*
 *8, 21*  38:*7,*
 *15*  39:*4*
 43:*22*  45:*3*
 47:*15*
 55:*14*
 56:*10*  66:*3*
 80:*1*  81:*22*
 82:*2, 7*
 85:*3, 22*
 97:*2*
 102:*21*
 103:*22*
 114:*19*
 115:*19, 21*
 116:*2, 4, 11*
 117:*4*

118:*4, 10,*
 *12*  130:*23*
 131:*1*
 132:*18*
 134:*21*
 135:*1, 3*
 136:*4*
 143:*9*
 144:*4*
 145:*16*
 153:*19*
 157:*3*
 165:*23*
 166:*1*
 170:*7, 12,*
 *17, 20*
 171:*15*
 181:*2, 3*
 187:*20*
 188:*6, 7*
 192:*23*
instance
 50:*21*
 64:*16*
 67:*13*
 69:*14*
instruct
 77:*19*
instructed
 160:*19*
instructing
 108:*15*
 175:*14*

INSURANCE
 1:*10*  7:*21,*
 *23*  8:*13*
 11:*19*  24:*4,*
 *20, 22*  25:*8,*
 *10, 14, 15*
 26:*1*  37:*17*
 53:*11*  54:*4,*

7  69:*20*
 70:*3, 5, 9*
 76:*3, 9*
 77:*6, 23*
 90:*14*
 119:*22*
 132:*6*
 135:*18*
 144:*23*
 155:*8, 11,*
 *18*  179:*20*
 180:*6*
insure
 69:*22*
 117:*2*
insured
 54:*3, 9*
intellectual
 69:*12*
intensive
 120:*4*
interact
 83:*11*
interest
 29:*3*  30:*17*
 171:*15*
interested
 125:*8*
 126:*17*
 142:*7*
 204:*16*
internal
 51:*21, 23*
 122:*13*
 123:*20*
 200:*5*
internally
 159:*2*
 167:*1*
 198:*8*

Video Deposition of Corey Daugherty

6/21/2023

77

Interrogatories 4:12 71:14
intimately 167:9
intranet 51:20, 22, 23 54:13, 23 56:8 57:2 60:8 84:14 122:13, 14 184:14 197:12
introduced 45:16
investigation 153:4 175:19
invitation 180:1
invite 90:20 180:4
invited 90:15 174:11 180:16
invoice 22:6
invoices 22:2, 21
involuntarily 136:23 137:4
involved 89:19 108:18 142:8 146:20 150:11

167:9 174:21 175:8 176:12, 14, 21
involvement 82:3, 12 116:10 183:12
iPad 74:7
Ironshore 70:20
issue 52:20 111:10 113:10 135:17 164:12 175:17, 21 177:2
issued 52:17, 18, 19 93:12 96:11
issues 94:6 112:8 114:1 158:16 178:12
issuing 21:23 22:1, 2, 20
items 171:7

< J >
Jack 123:11, 18, 23 124:12
Jack's 124:2

James 17:3 18:16 59:12
January 27:5 191:3
Jason 64:17 98:11
JEFFERSON 204:4
job 20:4 131:7 145:23 146:5, 7 158:9 166:10 188:1 192:17 197:20 198:3 200:3, 12, 16, 17, 18, 19, 22, 23 201:1, 3, 6
jobs 201:9
John 13:22 15:1 60:3 102:7, 10 103:15, 17 120:18 157:9 161:7 173:15, 20 174:17 196:10
joined 27:5 142:16
Jonathan 81:18 82:12 84:22

139:22 160:9, 14, 18
judge 197:2, 8
July 12:5 142:16, 17, 19
JUNE 1:19 2:9 7:14

< K >
Kat 16:6, 11 18:11, 13 93:17 94:21 96:12 102:22 103:6, 21 105:20 110:5 111:10 119:13 123:4, 11, 14, 23 125:17, 20 126:2 133:15 134:14 140:5, 16 141:14 143:15 144:11 145:4, 7 152:22 157:2, 22 163:8, 18, 23 164:7, 11 165:5, 14 166:8, 17 169:8 170:2, 13

171:10, 12 178:6, 17 181:19 185:15 186:12
KATHRYN 1:7 6:22 8:9, 11 9:15 16:3, 20 26:18 27:1, 4, 14 28:8, 23 30:5, 16 31:2 39:3 51:5 56:23 61:23 64:8, 21 65:22 66:14 67:20, 22 78:12 79:18 81:1, 5, 16 84:8 88:22 109:20 114:17 116:16 137:14, 20 139:17 142:14, 23 143:3 147:2 167:13, 20 168:7 173:9 174:1 180:16 185:2, 15 201:17, 18
Kathryn's 39:10 102:17 151:7

Video Deposition of Corey Daugherty

6/21/2023
78

**Kat's** 95:*2,
6* 111:*2*
143:*17*
169:*18, 19,
22* 170:*20*
**Kayla** 6:*18*
8:*14* 185:*8*
**keep** 21:5
167:*3, 11*
169:*4*
**kept**
127:*18*
148:*21*
**khakis**
163:*20*
**kids** 178:*15*
**kind** 11:*9*
29:*17* 41:*9*
46:*19* 48:*8*
50:*11*
52:*22*
70:*12* 73:*9,
16* 85:*8*
86:*6* 90:*17*
126:*15*
127:*8*
156:*21*
158:*5*
164:*21*
**knew** 91:*1*
159:*8*
**know** 9:*18*
10:*4* 13:*9,
11* 14:*5*
19:*8* 23:*20*
29:*15*
31:*23* 32:*5,
8, 16* 35:*17*
41:*16, 19*
43:*8* 44:*6,
13* 45:*11*
46:*1* 47:*11,*

*23* 48:*23*
49:*20, 21*
51:*8, 12, 19*
52:*5* 55:*7*
57:*4* 59:*14*
60:*11, 16*
61:*6, 20*
62:*10*
64:*11*
66:*17, 19*
68:*1, 5*
69:*16*
70:*17* 72:*7*
74:*20, 22*
75:*23* 76:*1,
5, 17* 77:*14*
78:*13*
80:*11* 81:*1,
5, 18* 82:*2,
5* 83:*12*
84:*2* 86:*6,
12, 15, 16*
87:*19* 89:*3*
91:*2, 19, 23*
92:*20*
93:*17* 94:*9,
21, 23* 95:*1,
19* 99:*10,
13, 14*
101:*23*
102:*2*
104:*9*
105:*9, 18,
19* 109:*4*
115:*1*
119:*18, 19*
121:*8, 14,
22* 122:*2, 4,
8, 10, 15, 20*
123:*21*
124:*12*
125:*2*

126:*14*
127:*7, 17*
128:*1, 22*
130:*16*
132:*20*
133:*18, 20*
134:*5*
135:*5*
137:*15*
138:*15*
139:*1, 5, 16*
141:*11, 12*
142:*2, 13,
14, 20*
143:*3*
145:*9, 14,
22* 146:*9*
147:*9*
150:*5*
151:*15, 18,
21* 152:*6*
153:*2, 16*
154:*8, 21*
155:*3, 4*
156:*17*
158:*9, 21*
160:*8, 14,
18, 23*
161:*18, 19*
162:*11, 12,
21* 164:*7*
165:*2*
166:*7*
170:*22*
171:*3, 6, 21*
174:*12, 13*
175:*23*
176:*4*
178:*2, 10*
179:*13*
180:*2*
181:*11, 13,*

*17, 21, 23*
182:*3*
183:*14*
185:*4*
192:*5, 16*
194:*14*
197:*9, 17*
200:*19*
202:*12*
**knowing**
160:*13*
**knowledge**
36:*3* 50:*23*
88:*21* 89:*7,
11* 112:*17*
**knows**
101:*17*
**KPIs** 156:*5*
**Kristyn**
161:*14*

**< L >**
**L** 2:*1*
**LaGuardia**
178:*16*
**laid** 96:*2, 5*
**Lake**
179:*23*
**laptop**
151:*16*
**late** 91:*5*
**Lauren**
39:*13, 18*
40:*13* 41:*5*
162:*1*
172:*20, 22*
180:*16, 19,
22* 181:*1, 3,
19* 182:*1*
**LAW** 6:*4*
159:*19*
**laws** 2:*15*

**lawsuit**
9:*14* 152:*7*
187:*10*
196:*12*
**lawyer**
174:*20*
**lawyers**
70:*1*
**lead** 16:*16*
18:*19*
19:*21* 49:*1*
98:*8* 129:*4*
**leader**
17:*22*
**leadership**
20:*6, 8*
59:*23*
102:*6*
126:*23*
127:*15*
166:*12*
184:*17*
198:*13*
**leading**
2:*21*
**leads**
91:*12, 17*
93:*7*
**Learning**
4:*16*
106:*15*
120:*4*
**leave**
48:*16*
178:*3, 14*
**leaves** 96:*9*
**leaving**
164:*3*
**led** 12:*7*
**Lee** 17:*4*
**left** 39:*12*
42:*18*

44:11  84:8
142:18, 20
181:20
**legal**
119:23
174:7, 10,
14  175:11
176:6, 7
**legislation**
77:5
**Leslie**  6:5
7:22  8:8
**letter**
23:17  24:3
53:10
124:5
162:8, 19
**letters**
21:22
**level**  12:14
32:11, 14
36:4  41:16
156:1
165:18, 21
196:11
**Lewis**
64:17  67:7
98:11
**liability**
11:16  15:7,
9, 10, 19
16:12
23:22
44:20, 22
59:9  76:22
110:3
122:6
164:21, 22,
23  165:1
193:12
194:22

195:9, 12
200:8
**license**
77:8
**light**  127:8
198:15
**limit**  194:3
**limited**
193:6
196:13
**Lindberg**
162:1
172:23
**line**  13:20
23:14  82:6,
10
**lines**  25:13
**LinkedIn**
122:16
159:3, 5
184:15
197:21, 23
198:1
**list**  18:20
41:11  43:9,
14, 19
45:10
49:10
64:14
65:10, 19,
21  69:20
87:13, 22
88:3  98:13
158:5
166:8
180:1
201:16
**listed**
11:12
22:20, 21
64:6, 7, 14
66:16, 18

78:3, 4
79:15
84:23
170:21
192:20
193:1
194:15
**lists**  45:6
65:21  66:2
**listserv**
42:2  88:23
89:4
**listservs**
42:1
**litigation**
96:4  175:5
176:18
**little**  9:21
159:22
**living**
69:16, 17,
20
**LLC**  6:4
**local**  25:10
**locate**
72:15
150:14
**locating**
149:23
**log**  45:18
47:2, 10
**login**  50:14
**long**  11:21
12:3  19:10
61:3
104:10
107:9
115:1
144:22
**longer**
38:6  60:5
89:7

185:22
186:5, 7
**look**  47:1
53:14, 15
54:23  56:8,
11  57:7
58:7, 8, 9
60:3, 4
64:1  66:7
70:18, 21
73:23
106:6, 9
131:10
140:20
141:21
144:14
188:15, 18
**looked**
98:9, 10
150:20
151:5
**looking**
18:20  24:6
123:16
125:1
126:20
127:21
159:14
193:22
199:18, 19
**looks**
23:12
34:11
59:23  60:1
63:15  80:6
85:7
106:22
127:2
141:16, 22
147:17
149:9

179:17
183:1
**losing**
134:10
**loss**  23:13
24:5  37:14
**lot**  12:12
69:18
96:22
115:1
133:18
137:23
156:23
167:17
179:21
180:9
186:5
**Lots**
132:23
**loud**  9:20
**lower**  49:5
165:18, 21
**lunch**
96:18, 20
111:13, 14
114:7
117:18
163:7

**< M >**
**M**  6:18
**mailbox**
151:2, 3
**maintain**
21:4
116:13
121:6, 15
138:10
**maintained**
76:23
187:1
189:22

Video Deposition of Corey Daugherty

6/21/2023

80

190:*1*
191:*18*
**maintaining**
21:*13*
**making**
22:*16*
125:*8*
189:*15*
190:*5, 7*
201:*15*
**males**
96:*14*
103:*7, 17*
164:*2*
187:*23*
**managemen**
**t**  20:*7, 8*
52:*6, 21, 23*
**manager**
15:*16, 18,*
*21, 23*
16:*14*
49:*16*
97:*17*
102:*7*
**Managers**
107:*16*
108:*2*
**manages**
15:*4*
**mandated**
77:*11*
**marathon**
119:*21*
132:*23*
**mark**  86:*5*
138:*5*
156:*19*
**marked**
10:*17, 20*
62:*17*
71:*11*

79:*12*
80:*16*  97:*6*
106:*2*
129:*12*
140:*22*
146:*13*
147:*21*
149:*5*
169:*16*
173:*13*
179:*1, 6, 8*
182:*11*
**market**
20:*20*  23:*6*
24:*8*
148:*20*
165:*11*
167:*11*
191:*16, 17*
**Marketing**
4:*20*  21:*20*
26:*11*  67:*9,*
*10, 15, 18*
69:*12*  84:*3,*
*10*  104:*13*
148:*4*
191:*2*
192:*1, 3, 15,*
*20*  193:*5*
194:*12*
**markets**
23:*3*  24:*10,*
*11, 12*
70:*21*  74:*1*
**marking**
62:*15*  71:*9*
80:*13*
85:*10*  97:*3*
173:*10*
182:*8*

**Martin**
15:*22*
179:*23*
**match**
188:*12*
**matter**
189:*21*
**McClure**
17:*4*
**M-c-c-l-u-r-**
**e**  17:*5*
**McGriff**
117:*3, 10*
**mean**  14:*6*
22:*14*  23:*6*
26:*1*  36:*6*
42:*2*  43:*21*
50:*20*
58:*19*
59:*22*
66:*19*  68:*4*
82:*22*  84:*3*
85:*16*  88:*5*
89:*16*
91:*18*
94:*17*  98:*6*
102:*17*
104:*21*
105:*13, 14*
108:*9*
110:*8*
119:*19*
121:*3*
124:*10, 23*
125:*5*
130:*5*
133:*18*
135:*8*
141:*11*
148:*15, 16*
155:*6, 7*
157:*13*

158:*11, 12,*
*13*  164:*18*
165:*21*
167:*1, 14*
170:*10*
173:*18*
176:*3*
182:*22*
184:*22*
185:*23*
188:*9*
189:*1*
192:*4*
193:*9, 16,*
*17*  194:*14*
200:*15*
201:*10*
**means**
194:*14*
204:*9*
**measure**
184:*1*
**medical/mal**
**practice**
70:*2*
**medication**
10:*12*
**MedPro**
70:*20*
**meet**  36:*15*
91:*5*
173:*15*
200:*11*
**meeting**
104:*10*
111:*14*
174:*11, 15*
175:*17*
176:*22*
**meetings**
91:*11*

111:*13*
163:*7*
**member**
67:*4*  78:*15*
79:*20*
126:*17*
**members**
26:*21*
66:*22*
79:*15*  80:*9*
156:*2*
157:*11*
184:*16*
198:*13*
**memorized**
108:*10*
**men**
108:*21*
110:*17*
**mental**
178:*11, 12*
**mentioned**
16:*17*
27:*16, 22*
61:*19*
65:*12*  68:*8*
75:*10*
112:*2*
120:*15*
122:*17*
123:*9, 10*
153:*15*
163:*12*
170:*11*
**mentions**
131:*4*
**mentoring**
29:*18*
**message**
92:*18*
**messages**
91:*14*

messaging
50:11
73:13
74:10
met 22:17

microphone
115:17
Midway
106:18
million
63:15
mind
25:19
134:10
149:20
mine
100:12
minimum
32:18
minus
122:8
minute
133:14
minutes
180:15
misrepresen
ted 78:19
misrepresen
ting 139:23
missed
14:14
26:22
114:15
missing
186:16
mistakenly
67:13
modify
47:21 51:2

module
138:19
139:2
moment
172:10, 12
178:8
monitor
7:15
Montgomer
y 7:18
month
58:7 63:20
months
77:2
Morgan
81:18
84:22
85:22
139:23
160:9, 15,
18
mouth
122:19, 22
158:23
move
36:22
124:1
125:8
138:20
moved
118:9
182:16
multiple
58:13
158:12
196:5

< N >
N 2:1 4:1
6:1
name 7:16
9:11, 13

14:14
16:23
18:21
23:18 27:7,
18 50:3, 5
56:6 63:15
65:9, 10, 11
67:3, 6, 14,
18 77:22
98:11, 12
123:9, 18
124:15
165:7, 8
named
120:15
Nashville
180:12
nature
187:9
necessarily
116:7
136:5
185:5
necessary
2:19
118:14
144:6
need 24:9
55:1
129:14
134:2
137:9
166:14
171:4
178:18
180:15
182:18
201:3
203:2
needed
60:14
89:19

102:19
118:23
126:10
128:3
152:17
180:18
192:11
needing
30:13
needs 22:4,
5, 17
negotiation
104:13
neither
204:14
network
44:4
never 25:4
35:11, 12,
13 36:15
39:3 73:14
86:14 88:8
90:22
91:16 92:6
94:10 96:2,
5 99:2
137:17
138:13
149:20
156:12
176:4
new 20:20
21:11
24:14 25:2,
4 36:19
37:1, 23
39:7, 9
40:23 41:6
53:20, 21
58:5 64:16,
17 65:13
68:5 69:15

73:15
75:16 84:6,
7, 11 94:12,
13 104:14
116:9
126:17
128:23
133:19
134:3, 4, 5,
6 145:20
158:6
166:3, 4, 8,
11 168:11,
13 170:16,
20 178:5
180:12
184:16
189:15, 17
190:7
198:13
201:14
newer
134:16
170:3
newest
134:7
nineteen
63:16

noncompete
147:15
normal
75:15
North 2:7
6:19 7:7
117:2, 3, 11
NORTHERN
1:1 8:2
Notary 2:6
7:2 204:22
note
159:18

Notes  4:18
52:16
141:19
142:1, 5, 8
150:22
notice  3:4
4:10  10:22
11:10, 12
95:13
114:2
140:6
152:19
177:13
noticed
7:22
notification
47:4
notified
157:21
notify
157:22
172:5
November
141:14
191:3
NUMBER
1:5  4:2, 9
8:3  10:18
17:19
32:17  58:4
59:16
62:15  71:9
72:4, 18
77:8  78:1
80:14  85:7
94:18, 22
97:4
105:23
121:18
122:8
127:3
129:10

141:18
147:19
149:2
179:6
189:3
191:4
198:16
200:4
numbers
33:5  65:14
nursing
69:17, 22
70:17, 19
73:16, 19,
23  74:2

< O >
O  2:1
oath  8:17
Obenauer
12:23
14:15, 16
Object
20:5  22:12
30:6, 10, 20
31:16  32:3,
10  33:14
34:7, 20, 22
35:3, 16
37:6  38:2,
9, 20  49:19
50:19  51:7,
11  54:17
57:10
59:19, 21
60:7  61:1,
5  62:12
63:9  64:23
67:23  72:5
74:5  75:13
76:18
77:17

78:16, 21
81:4  86:11,
18, 22  87:3,
15  89:1
93:8  94:3,
8, 14, 19
95:4, 18, 22
96:15
98:22  99:8,
18  100:3, 9
101:12
102:14
103:2, 9, 13,
19  104:1, 7,
20  105:22
107:20
108:14, 23
109:10, 14,
18  110:1,
18, 23
111:4, 7, 11,
23  112:6
118:3, 7
119:10, 17
120:10
121:2, 7, 13
124:9, 22
125:12, 21
126:5
127:23
128:4, 21
130:2, 7, 11,
15  131:8,
19  132:1
133:12
134:17, 22
136:1, 6, 9,
17  137:2, 6,
16, 21
138:12, 22
139:4, 8, 14,
20  140:2, 7,

13, 17
143:10
146:1
150:3, 7, 9,
16  151:4, 6
152:4, 13,
18  153:1, 6,
14  154:19
155:15, 17
160:16, 21
161:3, 22
162:10, 20,
23  163:4,
10, 21
164:4
165:15, 20
166:5, 13
169:10
170:4, 9
171:20
172:1, 8
174:4, 23
objections
2:20, 23
obviously
66:14  91:3
102:16
152:7
occurred
119:15
120:9
O'Connor
17:2
offer  30:4,
15, 19
123:5, 7
124:4
131:11
offered  3:2
131:15
133:9
143:22

office  13:6,
7, 10, 15
14:1, 7, 11,
20, 21  15:6
25:10  60:2
64:18
74:15  79:4,
6  81:6, 9
87:21, 23
92:2, 3, 23
93:3  102:8
118:16
121:5, 11
122:10
123:18
138:9
159:8
166:19, 22
167:7, 15,
18, 22
168:21
170:8, 14
173:5, 6, 21
180:10, 11,
12, 13
offices  2:6
7:6  14:4, 6,
10  26:2
32:19
87:20, 21
167:17
170:18
171:2
oftentimes
165:1
Oh  14:8
18:13
55:22
56:16
115:18
128:9
149:16

Video Deposition of Corey Daugherty

6/21/2023
83

| | | | | |
|---|---|---|---|---|
| 151:9<br>168:23<br>184:5<br>187:18<br>**Ohio** 117:1<br>165:9<br>**Okay** 9:18<br>10:16 11:2,<br>13, 23 12:3<br>13:1 14:3,<br>13 15:1, 15<br>17:6 18:20<br>19:18<br>20:15<br>24:17 25:9,<br>17, 19, 21<br>26:5, 7<br>27:16 28:6,<br>8 29:6, 13<br>31:2 32:8,<br>13 33:10,<br>18 34:2, 5<br>35:14, 23<br>39:14 40:1,<br>8, 12, 16<br>41:5, 8, 12<br>42:6, 11, 15<br>45:6 46:5,<br>10 47:3, 10<br>49:13, 23<br>51:2, 16<br>52:13, 22<br>53:13<br>54:23 55:5,<br>8, 11 56:1,<br>7, 16, 20<br>62:3, 6, 10,<br>21 63:7, 11,<br>13, 18, 23<br>64:15 65:2,<br>19 66:2, 13<br>67:2 68:2, | 13, 22<br>70:15, 19<br>71:1, 8<br>72:7 74:12<br>75:1, 8, 16<br>76:8, 11, 15<br>79:3, 7<br>80:5 81:11<br>83:16<br>85:14, 19<br>86:1, 4, 6<br>87:8 90:1<br>91:22<br>93:12<br>97:17<br>107:1<br>110:5<br>111:13<br>112:10<br>113:7<br>115:15<br>119:12<br>120:15, 22<br>121:5<br>122:17<br>125:16<br>127:17<br>128:2<br>129:1<br>130:9<br>134:13<br>135:11<br>138:16<br>141:6, 18<br>142:3, 13<br>143:7<br>144:3<br>145:4, 7, 11,<br>15, 22<br>146:15<br>147:2, 17,<br>23 148:13 | 149:11, 19<br>151:12, 21<br>154:10<br>155:1, 13<br>163:6<br>166:2<br>168:20<br>171:6<br>172:3<br>173:20<br>175:13<br>177:3<br>179:5, 12<br>180:8, 17<br>181:5<br>182:18<br>183:1<br>186:18<br>188:23<br>189:11<br>191:21<br>192:14<br>194:20<br>199:17<br>200:23<br>201:20<br>203:2<br>**omitted**<br>78:15 81:2<br>88:22 89:3<br>**omitting**<br>140:5<br>**once** 35:5<br>88:8 91:1<br>94:1 96:3<br>105:13, 14<br>141:4<br>152:20<br>156:8<br>167:21<br>168:21<br>176:5 | **ones** 71:15,<br>16<br>**on-site**<br>170:23<br>171:2<br>**on-the-job**<br>132:21<br>133:10<br>156:22, 23<br>157:1<br>158:15<br>**open**<br>57:22 73:5<br>92:16<br>125:3<br>159:11<br>**opened**<br>73:4<br>**operate**<br>91:20<br>**operating**<br>72:20<br>**operations**<br>13:14<br>38:22<br>**opinion**<br>102:1<br>112:22, 23<br>113:9, 18<br>**opinions**<br>101:17<br>**opportunitie<br>s** 164:3<br>**opportunity**<br>122:11<br>181:12<br>**opposite**<br>167:18<br>**oral** 7:9<br>**order** 80:8<br>177:1<br>202:16 | **organization**<br>57:22<br>58:19<br>59:23<br>87:10<br>91:18<br>155:7<br>**organization<br>s** 42:6<br>**outcome**<br>177:21<br>**Outlook**<br>41:15<br>42:10 44:3<br>75:14, 17,<br>18, 20 86:7<br>**out-of-<br>office**<br>140:6<br>**outside**<br>12:15 36:7,<br>19 113:17<br>114:1<br>151:1<br>159:8<br>196:15<br>**owned** 76:5<br>**ownership**<br>115:5, 6, 10<br>**owns** 21:4<br><br>**< P >**<br>**P** 2:1 6:1<br>**P.C** 6:9, 16<br>**p.m** 114:10<br>160:3, 7<br>172:15<br>203:5<br>**P.O** 6:11<br>**PAGE** 4:2,<br>9 63:13 |

Cite, LLC

Video Deposition of Corey Daugherty

6/21/2023

64:*1*  65:*16*
80:*5*  85:*17*,
*18*  95:*12*
106:*9*
131:*10*
138:*5*
141:*12, 21*
149:*10*
183:*17*

**pages**
108:*11*
186:*13*

**PALMER**
6:*4, 5*  7:*22*
8:*8*  71:*18*
138:*4*
159:*18*
169:*1*
184:*22*
186:*6, 10,
22*  187:*3, 7,
12, 16, 21*
188:*9, 23*
189:*5, 12,
19*  190:*2,
12, 17, 23*
191:*7, 12,
15*  192:*7,
18*  193:*10,
22*  194:*7,
15*  196:*8,
22*  197:*16,
21*  198:*2,
10, 14, 18*
199:*3, 18*
200:*2, 15,
21*  202:*5,
14*

**pandemic**
42:*16*

**paper**
76:*12*

**part**
133:*13*
147:*4*
154:*2*
176:*2*
177:*12*
185:*11*
187:*23*
189:*5, 8, 10*

**participant**
174:*14*

**participate**
72:*2*

**particular**
31:*19*
38:*11*
62:*20*  65:*3*
69:*19*
90:*14*
115:*2, 11,
12*  116:*9*
118:*15*
133:*22*

**parties**  2:*3,
22*  204:*15*

**partnered**
104:*16*

**pass**
155:*21*
165:*2, 4*

**passed**
77:*5*
119:*16*

**PATRICIA**
6:*9, 10*
8:*10*  9:*13*

**Paul**  15:*22*

**pay**  47:*1, 2*
49:*8, 10, 18,
21*  136:*3*
186:*20*
201:*5*

**people**
39:*9, 11*
47:*8, 12*
73:*6*  77:*22*
82:*17*  83:*8*
84:*7*  86:*8*
88:*4*  90:*20*
103:*6*
122:*10*
123:*22*
139:*11*
168:*11, 14*
172:*6*
180:*3, 9*
181:*9*
188:*13*
194:*4, 21*
199:*15*
201:*8*

**people's**
49:*6*  56:*17*

**percent**
33:*6*  96:*21*
130:*17*
144:*15, 16,
19*

**percentage**
127:*6, 7*

**Perfect**
183:*22*

**perform**
142:*23*
151:*12*

**performed**
135:*1*

**period**
33:*16*
63:*19*
102:*15*

**person**
22:*8*  46:*13*
50:*5*  68:*19*

78:*4*  79:*6*
92:*15, 22*
115:*4*
123:*17*
124:*20*
125:*11*
133:*20, 22*
134:*4, 7*
136:*20*
137:*10*
139:*1, 2, 3*
149:*17*
202:*7*

**personal**
25:*13*  93:*6,
18*  94:*18,
22*  133:*23*
171:*7*

**personally**
30:*8*  99:*1*
143:*2*
144:*21*
156:*13*
162:*12*

**personnel**
51:*10*
130:*13*
185:*2*
189:*2, 7, 9,
12, 20, 23*

**perspective**
20:*19*
115:*8*
116:*10*
120:*5*

**pertain**
177:*10*

**pertaining**
177:*17*

**Peter**  16:*1*

**Petty**
141:*14*

149:*18, 19*
150:*8*
152:*16*
173:*16, 21*
174:*18*
175:*7*
202:*8, 9*

**phase**
24:*23*

**Phillips**
125:*16*
126:*1, 9*
127:*20*

**phone**
70:*18*  73:*7*
74:*6*  78:*1*
93:*6, 13, 18,
19*  94:*1, 6,
7, 10, 15, 16,
18, 20*  95:*2,
17, 21*  98:*1,
21*  99:*2, 3*
148:*7*

**phones**
74:*4*  93:*10*
94:*12*

**Photo**  4:*22*

**phrased**
201:*7*

**physician**
70:*2*

**picks**  134:*4*

**picture**
84:*16*

**piece**  25:*2,
3*  67:*12*
68:*5, 7*
148:*4*
171:*14*

**place**
20:*20*
69:*17*  70:*3*

76:*21*
148:*10*
165:*12*
178:*17*
**placed**
54:*10*
**placement**
23:*23*
104:*14*
**Plaintiff**
1:*8*  6:*3*
8:*9, 11*
16:*2*  190:*1*
193:*9*
**plaintiffs**
8:*7*
**PLAINTIFF'
S**  4:*9*
10:*17, 19*
62:*15, 16*
71:*9, 10*
72:*3*  79:*11*
80:*14, 15,
18*  97:*4, 5*
105:*23*
106:*1*
129:*9, 11*
140:*21*
142:*14*
146:*10, 12*
147:*20*
149:*2, 4*
169:*14, 15*
173:*11, 12*
179:*2, 6, 7*
182:*9, 10*
**plan**  41:*16*
181:*17*
**planned**
179:*22*
**plans**  41:*21*

**play**
175:*20*
181:*8, 10,
12, 15*
**please**  8:*5,
17*  9:*10*
112:*12*
137:*3*
**plugged**
33:*19*
**plus**  59:*2*
122:*8*
**poaching**
123:*22*
**pocket**
144:*19*
**pods**  167:*2*
**point**
30:*19, 22*
73:*3*  75:*3*
78:*10, 11*
79:*21*
142:*6*
144:*6, 8*
152:*5*
153:*2*
158:*13*
179:*3, 23*
181:*5*
182:*16, 22*
188:*11*
190:*16*
192:*12*
196:*16*
**policies**
22:*3*  52:*20*
58:*4*  76:*2,
20*  86:*21*
104:*17*
105:*8*
109:*13*
112:*2, 19*

135:*12, 16*
136:*12*
139:*10*
**policy**  22:*6*
37:*17*
60:*23*
65:*13*
75:*19, 22*
76:*6, 10*
133:*2*
136:*15*
156:*17, 18*

**policyholder**
54:*9*

**policyholder'
s**  54:*3*
**pontoon**
181:*15*
**pool**  31:*18*
**portion**
169:*18*
**portions**
156:*3*
**position**
11:*14*
12:*15*  13:*8,
23*  21:*17*
25:*7*  27:*9,
20*  28:*2, 11*
30:*5, 12, 13,
23*  31:*3*
39:*18*
40:*19*
78:*19*
81:*20*
123:*8*
124:*1*
125:*2*
126:*19, 21*
127:*10, 11*

128:*5, 12,
23*  129:*17*
130:*6*
131:*14*
134:*10*
135:*11, 15,
20*  143:*19,
23*  144:*5*
145:*13*
157:*16*
159:*1, 4, 11,
14, 17*
170:*20*
175:*16*
176:*20*
188:*10*
196:*11*
199:*9, 21*
200:*5, 15*
202:*15*
**positioned**
164:*22*
**positions**
20:*16*
43:*21*  55:*8*
103:*18*
133:*9*
138:*10*
143:*4, 12*
169:*4*
198:*10*
199:*15*
200:*6*
**positive**
13:*17*
27:*17*
29:*11*
46:*15*  56:*3*
57:*17*
61:*22*  64:*4*
66:*10*  78:*5*
79:*10*  80:*7*

84:*9*  97:*19*
98:*5*
100:*18*
106:*11*
117:*21*
120:*17*
122:*15*
124:*14, 17*
125:*14*
127:*13, 16*
138:*23*
153:*10*
166:*6*
181:*4*
**possession**
94:*1, 10*
99:*3*
**possible**
35:*14*
111:*21*
182:*1*
**post**  31:*8*
128:*17, 19*
158:*22*
198:*1*
**posted**
122:*12, 16*
159:*1, 3*
197:*12, 23*
198:*6, 7, 8*
**posting**
197:*20*
200:*19*
**postings**
138:*10*
200:*2, 12,
17*  201:*6*
**potential**
24:*14*
**potentially**
25:*11*

Powell
  17:3  18:16
Powell's
  59:12
power
  35:10
practice
  46:14
practices
  23:22
pre  31:8
precisely
  84:5
prefilled
  97:15
premises
  75:11
premium
  36:3
pre-
pandemic
  167:6
preparation
  72:3  176:9
prepare
  82:10
prepared
  21:23
  141:10, 19
preparing
  146:20
  174:8
  175:8
presence
  84:20
PRESENT
  6:22
presented
  124:5
preservatio
n  95:13

152:19
162:13
preserve
  95:2, 17
  152:17
  162:9
  171:16, 22
  172:6
president
  12:19  13:1,
  13  14:1
  102:8
prevented
  36:23
previously
  63:2
primarily
  20:19  43:3
print  68:23
printing
  60:20
prior  3:2
  42:21
  72:11
  77:10
  96:14
  145:16
private
  54:11
  73:13
  74:10
privilege
  174:5
  175:5
  176:16, 18,
23
privileged
  142:5
  176:10, 12
privileges
  176:19

probably
  32:17, 19
  34:10  46:3
  67:14  91:3
  111:12
  112:3
  122:7
  147:8
  157:9
problem
  138:3
  145:3
  185:6
problems
  178:11
Procedure
  7:4  136:14
procedures
  34:21
  76:21
  86:20

proceedings
  7:10
process
  128:2
  144:4
  167:15
processing
  117:9
produce
  33:18
  190:23
  191:23
  192:5
  194:11
  200:2
produced
  21:16  33:4,
  16  51:5
  57:4  58:21
  62:11

94:16
107:15
142:6
150:19
177:23
185:7, 14,
16  186:20,
22  188:18,
19  189:1, 2,
6, 7  190:6,
8  195:20
197:4, 14
198:5
200:12
201:12
producer
  98:4, 8, 13
producing
  20:13
  21:10  47:8
  185:6
product
  23:14  52:7
  70:2
  175:20
  176:18, 23
production
  20:2  36:5,
  6  58:1
  60:1  98:15,
  17  144:23
  150:2, 12,
  15  184:12,
  21
production-
based
  147:14

productivity
  47:7

products
  120:6
  156:14
profession
  119:23
Professiona
l  11:16
  15:7, 9, 10,
  19  16:12
  43:14, 16,
  19  44:16,
  20, 22  59:8
  70:1  76:22
  86:8, 17
  87:2, 17
  88:2, 3, 5, 6,
  13, 18, 19
  89:8  90:12
  110:3
  122:6
  164:22
  193:12
  194:22
  195:9, 11
  200:7
profile
  47:21  48:1
program
  29:18
  41:13
  45:16, 23
  46:2  47:6
  51:19
  67:16
  92:10
programs
  17:8  41:23
  72:19, 20
  148:11
progress
  54:22
  56:12

Video Deposition of Corey Daugherty

6/21/2023

**promoted**
29:*5*
117:*22*
187:*17, 20*
188:*6, 7*
**Promoting**
106:*19*
107:*4*
201:*18*
**promotion**
28:*17, 20*
29:*1* 31:*6*
48:*11*
119:*15*
130:*10, 14*
**promotions**
28:*14*
**property**
15:*6, 8, 13,*
*21* 16:*8*
87:*19*
**proprietary**
52:*4, 7*
**protective**
177:*1*
202:*16*
**provide**
72:*8* 84:*10*
**provided**
7:*3* 33:*7*
105:*20*
154:*15*
158:*5*
**providing**
22:*15*
166:*8*
**Public** 2:*6*
7:*2* 73:*4*
**publication**
84:*18*
**pull** 47:*1*
49:*8, 10*

65:*12*
68:*23*
70:*18*
85:*17*
127:*1*
**pulled** 59:*5*
**pulling**
60:*18* 94:*6*
**pulls** 57:*14,*
*23*
**purposes**
50:*9* 69:*12,*
*13* 175:*11*
**pushed**
104:*23*
**put** 23:*16*
30:*22*
46:*20* 48:*2*
53:*9* 67:*5,*
*13* 68:*2*
70:*4* 84:*12,*
*18* 123:*7*
124:*4*
126:*18*
130:*6*
138:*7*
141:*7*
143:*19*
148:*5, 18*
160:*15*
192:*21*
**putting**
113:*3*
161:*1*
202:*7*

**< Q >**
**Q** 9:*10, 13,*
*18* 10:*3, 8,*
*12, 16, 22*
11:*2, 6, 9,*
*14, 18, 21,*

*23* 12:*3, 12,*
*18, 22* 13:*1,*
*5, 8, 11, 15,*
*20, 23* 14:*3,*
*6, 9, 13, 16,*
*18, 22* 15:*1,*
*8, 11, 15, 18,*
*21, 23* 16:*2,*
*5, 8, 11, 14,*
*17, 20, 23*
17:*6, 9, 12,*
*14, 18, 22*
18:*2, 4, 7,*
*20, 23* 19:*3,*
*6, 14, 18, 22*
20:*3, 8, 12,*
*15, 23* 21:*3,*
*9, 15* 22:*9,*
*19* 23:*2, 6*
24:*13, 17*
25:*6, 9, 15,*
*17, 21* 26:*1,*
*5, 15, 17, 21*
27:*1, 6, 9,*
*11, 13, 16,*
*18, 20, 22*
28:*2, 4, 6, 8,*
*11, 14, 17,*
*19, 23* 29:*6,*
*10, 13, 23*
30:*4, 8, 11,*
*16, 22* 31:*2,*
*5, 10, 14, 20,*
*23* 32:*5, 8,*
*13* 33:*10,*
*18, 21* 34:*2,*
*5, 13, 18, 21*
35:*1, 5, 10,*
*12, 14, 18,*
*23* 36:*13,*
*18, 23* 37:*3,*
*20* 38:*4, 13,*

*17, 19* 39:*2,*
*5, 7, 11, 14,*
*17, 20, 22*
40:*1, 3, 6, 8,*
*10, 12, 16,*
*18, 21* 41:*2,*
*5, 8, 13, 16,*
*19, 23* 42:*3,*
*11, 13, 15,*
*17, 20, 23*
43:*3, 5, 8,*
*18, 21* 44:*5,*
*7, 11, 14, 16,*
*21* 45:*2, 6,*
*9, 13, 15, 22*
46:*5, 10, 13,*
*16, 19* 47:*3,*
*6, 10, 14, 20*
48:*8, 11, 13,*
*16, 19* 49:*1,*
*5, 8, 13, 16,*
*23* 50:*2, 7,*
*11, 14, 17,*
*21* 51:*2, 5,*
*9, 13, 16, 19,*
*22* 52:*2, 5,*
*13, 22* 53:*2,*
*7, 13, 19*
54:*11, 21*
55:*3, 5, 8,*
*11, 14, 18,*
*22* 56:*1, 4,*
*7, 10, 16, 20,*
*23* 57:*4, 7,*
*12, 16, 18*
59:*5, 8, 17,*
*20* 60:*5, 14,*
*17, 20, 22*
61:*3, 17, 23*
62:*3, 6, 10,*
*14, 19, 21*
63:*1, 5, 7,*

*11, 13, 18,*
*21* 64:*1, 5,*
*8, 11, 15, 20*
65:*2, 5, 16,*
*19, 23* 66:*2,*
*7, 11, 13, 16*
67:*2, 20*
68:*2, 13, 17,*
*22* 69:*3, 5*
70:*12, 15*
71:*1, 4, 8*
72:*2, 7, 11,*
*14, 17* 73:*1,*
*11, 13, 15*
74:*3, 9, 12,*
*14, 18, 20*
75:*1, 3, 6, 8,*
*16, 19, 22*
76:*1, 8, 11,*
*15, 20*
77:*12, 15,*
*19* 78:*2, 6,*
*11, 14, 18,*
*23* 79:*3, 7,*
*14, 18, 21*
80:*2, 5, 8,*
*11, 13, 18,*
*22* 81:*1, 11,*
*13, 18, 20,*
*22* 82:*5, 9,*
*16, 19* 83:*1,*
*3, 5, 7, 16,*
*19, 21, 23*
84:*6, 10, 22*
85:*2, 5, 20*
86:*1, 4, 13,*
*16, 20* 87:*1,*
*5, 8, 14*
88:*1, 14, 17,*
*21* 89:*3, 6,*
*11, 14, 22*
90:*1, 6, 9,*

Video Deposition of Corey Daugherty

6/21/2023

16, 19, 22
91:12, 16,
22  92:12,
15  93:5, 10,
12, 17, 20,
23  94:5, 12,
16, 21  95:1,
6, 9, 12, 16,
20  96:5, 12,
17  97:3, 8,
11, 17, 20,
23  98:3, 6,
16, 19  99:4,
7, 10, 13, 15,
19, 23
100:7, 11,
16, 19, 22
101:1, 4, 6,
10, 13, 23
102:9, 12,
22  103:4, 6,
11, 16, 21
104:4, 17
105:3, 7, 13,
16, 19, 23
106:4, 6, 9,
12, 15, 18,
22  107:1, 3,
7, 9, 12
108:1, 4, 6,
20  109:2, 5,
8, 12, 16, 20,
22  110:5,
11, 16, 21
111:2, 6, 9,
13, 16, 19,
21  112:2,
11, 16, 23
113:9, 14
114:11, 15
115:9, 13,
15, 21

116:4, 11,
16  117:12,
16, 19, 22
118:4, 19
119:4, 6, 12
120:7, 15,
18, 20, 22
121:5, 10,
15, 18, 21,
23  122:3, 5,
9, 14, 17, 21
123:1, 4
124:7, 11,
15, 18
125:9, 14,
16, 19, 23
126:4, 7, 12
127:11, 14,
17, 20
128:2, 6, 8,
14, 17, 19
129:1, 5, 7,
9, 17, 20, 23
130:3, 5, 9,
13, 17, 22
131:4, 10,
14, 17, 21
132:8, 10,
12, 15, 17
133:4, 8, 14
134:9, 13,
20  135:1, 5,
8, 11, 15, 22
136:3, 7, 11,
14, 19, 23
137:4, 8, 13,
19, 23
138:9, 16
139:1, 6, 10,
16, 22
140:4, 9, 15,
19  141:1, 3,

6, 9, 18, 21
142:3, 13,
18, 20, 22
143:3, 7, 12,
14, 17
144:1, 3, 7,
11  145:1, 4,
7, 11, 15, 19,
22  146:4, 7,
10, 16, 18,
20, 23
147:2, 6, 9,
17  148:1, 3,
13, 21, 23
149:2, 8, 12,
20, 23
150:5, 8, 10,
13, 22
151:2, 5, 9,
12, 15, 18,
21  152:1, 7,
10, 12, 15,
22  153:4, 9,
11, 15, 19,
21  154:1, 5,
10, 15, 20
155:1, 4, 13,
16, 20
156:2, 5, 8,
14, 21
157:2, 5, 11,
15, 18, 21
158:1, 5, 9,
15, 18, 21
159:6
160:8, 14,
18, 23
161:5, 9, 12,
14, 17, 19
162:1, 4, 7,
18, 22
163:2, 6, 18,

23  164:6,
11, 14, 17
165:4, 7, 13,
18, 23
166:2, 4, 7,
15, 19, 21
168:1, 4, 6,
11, 13, 16,
20, 23
169:2, 4, 7,
13, 18, 22
170:2, 7, 14,
20, 23
171:2, 4, 6,
10, 16, 22
172:3, 5, 20,
23  173:2, 5,
10, 15, 20,
23  174:3,
10, 14, 17,
20  178:2,
19  179:1, 5,
10, 13, 15
180:8, 17,
21  181:1, 3,
5, 8, 11, 14,
19  182:1, 4,
8, 14, 16, 18,
21  183:1, 4,
7, 14, 17, 19
**qualifications** 131:21
132:3, 17,
19  133:5
198:7
**qualify**
126:12
**question**
10:10  22:6
29:16
34:14
37:20

45:12
55:11
68:17  72:1,
15, 18
88:11  99:4,
15  112:12
113:4
133:4
137:3
145:6, 10
146:4, 5
150:8
153:8
158:14
162:22
163:5
169:11
**questions**
2:21, 22
10:4, 14
11:11
12:12  72:6,
9  112:14
114:12
147:6
149:14, 21
177:10
184:6
204:8
**quote**  53:3,
5, 12, 15, 16,
17, 18
135:13
136:11
**quotes**
22:1, 20
52:17
**quoting**
26:10
117:5, 8
135:12

Video Deposition of Corey Daugherty

6/21/2023
89

< R >
R 6:1
204:1
Rachel
6:17 8:12
202:6
raise 31:3
48:11
Raleigh-
Durham
117:3
ran 123:12
range
68:23 69:1
126:22
143:21
153:16, 19,
21
rank 59:4
ranking
58:18, 20
64:3 98:9
rarely
87:11
reach 92:6
128:14
reached
125:7
reaching
24:14, 18,
19
read 9:3,
23 156:19
reading
2:12
129:15
156:17
194:10
ready 9:5
124:1

really 20:3
46:21 48:1,
7 83:10, 11
85:5, 20
91:18
124:23
128:22
131:1
132:2, 20
138:4
160:13
realtime
73:3
reason
79:18
88:21
119:16
142:20
164:20
reassigned
165:16
recall
18:15
78:17, 22
95:10, 15
96:21
103:5, 10
104:3
108:17
110:7, 19
111:1, 12,
14 116:21
117:14
126:3
128:11
129:3
130:12
140:14
141:20
164:10
174:16
178:23

181:13, 14
183:9
receive
28:14, 17
31:2, 11
87:1, 5
88:1 95:6
130:9
140:9
155:13
156:2, 6
received
28:19 54:6
143:15
152:19
169:8
receiving
162:8, 19
163:3
recess
61:13
114:7
160:4
172:16
recommend
ed 178:13
record
7:14 8:6
9:11, 21
61:12, 16
101:16
106:8
107:22
112:7
113:13
114:6, 10
142:11
160:3, 7
172:11, 15,
19 175:13
184:2, 3, 5
197:20

199:7
203:5
recorded
99:11
recover
171:17
red 127:8
198:15
redact
129:14
redacted
141:23
refer 23:17
43:15
52:10
123:13
162:14
164:14, 16
165:4
reference
24:2
references
84:17
referral
92:10
128:13
referred
43:17
132:5
referring
21:6 65:17
67:8 85:21
127:2
154:8
165:22
refers 66:4,
5 69:16
reflect
130:13
regardless
188:2

regular
165:19
rehire
145:8
Reich 17:4
R-e-i-c-h
17:4
Reich's
19:11
related
74:23
75:20
86:21
91:10
101:18
120:18
139:11
178:7
184:14
relates
21:1 35:18
171:18
relating
2:16 76:22
112:3, 19
139:17
147:6
relation
204:14
relationship
83:14
118:15, 16,
17 120:1,
20
relationship
s 20:21
36:1, 7, 10,
20 114:23
116:3
134:1
relayed
157:16

Video Deposition of Corey Daugherty

6/21/2023
90

relevant
  187:*9*, *14*
remaining
  202:*12*
remember
  21:*16*
  28:*19*  31:*5*,
  *9*  62:*3*, *6*
  80:*9*  89:*13*,
  *15*  95:*11*,
  *12*, *23*  96:*1*,
  *22*  97:*14*,
  *15*  104:*8*
  110:*9*, *10*
  111:*5*, *18*,
  *22*  112:*1*
  120:*11*
  123:*10*
  142:*2*, *18*
  145:*1*
  153:*3*
  157:*23*
  158:*4*, *8*
  159:*2*, *5*, *9*
  161:*13*
  162:*6*
  164:*13*
  171:*12*
  174:*17*, *20*
  178:*4*, *5*
  181:*22*
remembere
d  171:*14*
remodel
  168:*21*
remodeling
  167:*15*
removed
  118:*1*
renewal
  25:*2*  26:*13*

renewals
  116:*10*
  166:*3*
reopen
  177:*20*
rep  67:*9*,
  *10*, *15*, *18*
Repeat
  112:*12*
  137:*3*
repetitive
  138:*1*
rephrase
  10:*5*, *8*
  193:*3*
replace
  39:*5*
replies
  79:*4*
reply
  80:*22*
  162:*16*
report
  14:*13*  35:*7*
  50:*2*
  101:*13*
  109:*16*, *22*
  111:*6*
  190:*18*
  193:*20*
  194:*19*, *21*
  195:*2*, *3*
reported
  110:*3*
reporter
  7:*16*  8:*17*
  9:*1*, *20*
  79:*9*
Reporting
  7:*18*
  186:*13*

reports
  13:*7*, *15*
  104:*18*
  191:*1*, *12*,
  *15*, *20*, *23*
  193:*18*, *23*
  194:*12*
represent
  9:*14*
representati
ve  7:*21*
  11:*4*
  112:*16*
  191:*2*, *16*
  192:*2*, *4*, *20*
  193:*5*
representati
ves  191:*18*
  192:*15*
  194:*13*
represents
  63:*20*
  204:*10*
request
  52:*18*
  84:*15*
  95:*14*
  124:*8*, *10*,
  *20*  125:*9*,
  *10*  136:*22*
  185:*1*
  189:*13*, *16*,
  *17*, *18*, *19*
  190:*5*, *7*, *22*
  191:*4*, *19*,
  *22*  193:*3*
  194:*3*, *6*, *23*
  199:*3*, *13*
  201:*11*
requested
  37:*15*
  137:*14*, *18*

152:*23*
153:*5*
190:*19*, *20*
requesting
  37:*14*
  97:*17*
  136:*15*
  192:*15*
  198:*23*
requests
  22:*1*  37:*16*
  150:*1*, *15*
  184:*11*, *19*,
  *20*  201:*14*
required
  22:*23*
  47:*15*  61:*3*
  101:*7*, *11*,
  *13*  102:*22*
  105:*12*
  124:*4*
  140:*15*
  145:*17*, *19*
  147:*14*
  148:*17*
  156:*6*

requirement
  130:*21*
requires
  77:*6*
requisition
  30:*14*
  123:*8*
  125:*2*
  126:*19*
  127:*12*
  128:*5*, *12*
  143:*19*
  144:*6*
  199:*9*, *21*

200:*16*, *18*
201:*2*
reserve
  113:*19*
  177:*19*
resignation
  162:*19*
resigned
  39:*4*
  141:*15*
resource
  73:*12*
resources
  45:*23*  46:*2*,
  *4*  122:*1*
  153:*9*
respective
  2:*3*  15:*5*
  70:*5*
respond
  140:*11*
  189:*17*
responding
  175:*11*
  176:*13*
response
  13:*17*
  27:*17*
  29:*11*
  46:*15*  56:*3*
  57:*17*
  61:*22*  64:*4*
  66:*10*
  72:*21*  75:*9*
  78:*5*  79:*10*
  80:*7*  84:*9*
  97:*19*  98:*5*
  100:*18*
  104:*4*, *9*
  106:*11*
  117:*21*
  120:*17*

122:15
124:14, 17
125:14
127:13, 16
138:23
140:16
141:4
153:10
166:6
174:8
175:8
176:9
177:8, 17
181:4
187:6
**responses**
75:9
**responsibilit
ies**  115:10
188:1
**responsibilit
y**  20:7, 19
21:8  26:10
**responsible**
20:2  21:12
36:4  86:9
115:22
116:5
118:1
119:7
135:11, 15
149:23
**responsive**
150:1, 14
184:11, 19
185:1
199:2, 12
200:10, 16
201:13
**rest**  142:7
**restaurant**
91:6

**restructured**
104:11
116:18
117:13
120:12
**restructurin
g**  119:14
120:8
**result**
204:16
**resume**
159:7
**resumes**
200:5
201:8
**retail**
20:21  22:4
23:9  25:8
54:4  92:7
104:15
116:3
155:9, 11,
23
**retailer**
37:18
115:2
**retailers**
133:21
134:6
**retain**  61:3
**retained**
152:2, 20
**retention**
60:22
75:19, 22
76:1, 6, 10
**retired**
16:19, 22
**returned**
151:18

**revenue**
20:12  21:9
23:21
31:18  33:3,
16  51:14
54:14, 18
55:23  58:5,
14, 21  59:1,
6, 16  60:1
61:20
63:12, 16
65:14
127:2
144:17
165:17
**revenue-
existing**
21:13
**revenue-
generating**
165:13
**revenues**
47:12
191:1, 16
192:1, 9
194:12
**review**
72:11
77:15
196:11
197:4
**reviewing**
22:2  26:11
133:1
**reviews**
23:12  47:5
**revisited**
163:11, 12
**RFP**  195:1
**right**  9:10
24:4  25:20
27:6  40:13

61:11
73:20  74:1
113:19
114:5
123:17
130:5
149:22
154:23
157:15
172:4
177:20
184:22
186:3
190:4, 15
197:22
198:17
**Ritenour**
39:15  40:1,
21  125:5
**R-i-t-e-n-o-
u-r**  39:16
**road**  37:10
118:22
**role**  21:19
22:8  26:12
29:4  30:18
36:22  97:2
102:20
120:23
147:14
171:15
**roles**
93:14
103:8
**roll**  105:10
**rolled**
12:10
**Ron**  161:7
**room**
174:18
**RPR**  2:5
7:1  204:20

**rules**  2:16
7:4  34:21
86:20
109:8
**rumors**
89:14
**run**  17:2
165:11
190:18
**runs**  23:13
**Rusty**
15:20
16:14  17:1
18:14  35:7
60:3  92:6
98:1
101:10
102:6, 9, 16
103:15, 17
109:16, 23
110:4
111:16
112:4
126:4
156:9
157:9, 10
161:7
163:23
164:6, 11
167:20
173:16, 20
174:17
180:14
183:1, 7, 10,
11, 14
196:10
**Rusty's**
92:13

**< S >**
**S**  2:1  6:1

s/Tanya
204:*19*
**SAITH**
203:*9*
**salaries**
153:*11*
**salary**   31:*7*
46:*23*  50:*1,*
*6, 22*
126:*22*
143:*18, 20*
144:*7*
154:*3*
**sales**
51:*14*  55:*1*
57:*21*
58:*19*
59:*22*
**Sanders**
28:*1*  66:*17*
117:*7*
**Sarah**
161:*9*
164:*1*
**sat**  141:*7*
163:*11*
168:*8, 9*
170:*12*
173:*7, 8*
**saw**  98:*10*
108:*11*
195:*22*
**saying**
34:*14*  56:*4*
70:*13*  93:*2*
154:*21*
180:*15*
187:*18*
188:*4*
189:*6*
192:*2, 3*
194:*19*

**says**  63:*1*
64:*2, 3*
72:*21*
97:*17, 23*
98:*3*
119:*13*
129:*19*
141:*23*
191:*7, 23*
194:*11*
201:*4*
**scenarios**
133:*2*
**school**
159:*19*
**scope**
193:*7*
**Scott**   17:*7,*
*9*
**screen**
65:*12*
190:*11*
**screenshot**
65:*3*
190:*10, 15*
**seams**
167:*14*
**search**
151:*2, 7, 9*
200:*3, 13,*
*17, 22, 23*
201:*1, 6*
**searched**
150:*17*
**searches**
151:*13*
**second**
72:*14*
106:*6*
107:*3*
131:*10*

**secondary**
178:*17*
**secretarial**
22:*11, 13*
134:*14*
**secretary**
110:*6*
111:*3*
139:*19*
163:*9*
**section**
149:*9*
**see**   18:*21*
36:*11*
49:*20, 22*
56:*16, 18*
58:*12, 13,*
*16, 20*  59:*1,*
*3, 6, 10, 11,*
*12*  64:*3, 8*
65:*16*  66:*8*
72:*21*
73:*21*
78:*10*
79:*16*
80:*22*
81:*13*
84:*21*
85:*14*  88:*7*
90:*15*
92:*22*   95:*6,*
*9*  98:*1, 2, 4*
106:*20*
107:*5, 13,*
*14, 18*
108:*1, 19*
124:*19*
125:*7*
127:*9*
131:*11, 13,*
*14*  134:*5*
141:*10, 13,*

*18*  169:*20*
176:*10*
183:*5*
186:*18*
188:*16*
189:*16, 23*
196:*20*
199:*5, 10*
202:*2*
**seeing**
93:*1*  95:*11*
97:*15*
153:*3*
**seen**  10:*23*
21:*15*
35:*11, 12,*
*13*  62:*19*
78:*2*  81:*17*
138:*13*
146:*2, 3, 18*
148:*1*
159:*11*
182:*21*
188:*12*
198:*18*
**Segrest**
27:*8*  29:*6*
40:*7*  64:*20*
66:*3*  98:*16*
114:*17*
128:*8*
136:*11*
139:*16*
140:*4*
164:*15*
189:*8*
**Segrest's**
129:*2*
**self-**
**motivated**
157:*1*

**selling**
156:*15*
**semi-**
**annual**
154:*1, 12,*
*16, 20, 21*
**send**   24:*7,*
*10, 21*
53:*10*  93:*2*
126:*23*
148:*6*
194:*23*
195:*1*
201:*10*
**sending**
21:*21*  22:*1*
37:*16*
135:*13*
**sends**
24:*20*
37:*18*
**senior**
11:*16*
69:*16, 20*
125:*19*
126:*1*
**sense**
193:*2*
**sent**  33:*2*
77:*3*  81:*17*
87:*12*
121:*3*
156:*9*
157:*20*
180:*1, 7, 14*
182:*23*
183:*10, 11*
201:*18, 23*
**sentiment**
102:*18*
**separate**
15:*14*

Video Deposition of Corey Daugherty                    6/21/2023
                                                            93

64:*18*
69:*23*
73:*18*
82:*14*
88:*17*  90:*5*
113:*20*
149:*17*
154:*12*
176:*19*
**September**
66:*12*
**Server**
75:*10, 12*
**servers**
76:*12*
**service**
22:*4, 17*
115:*7*
**service-
based**
21:*19*
**SERVICES**
1:*10*  7:*21,
23*  77:*23*
**servicing**
133:*22*
**set**  44:*3*
57:*21, 22*
58:*18*  66:*5,
20*  67:*16*
87:*18*
114:*20*
156:*9*
**setting**
183:*12*
**seven**
17:*15*
91:*19*
**severance**
152:*23*
153:*5*

**sexual**
108:*6*
161:*20*
**Share**  75:*3*
**SharePoint**
75:*6*
**sharing**
73:*9*
**shift**  41:*8*
**shirt**
163:*20*
**show**
10:*17*  47:*7*
54:*6, 19*
56:*6*  59:*15*
62:*14*
67:*18*  71:*8*
78:*23*  79:*7*
80:*13, 18*
85:*6, 8*
108:*9*
126:*9*
129:*9*
146:*10*
169:*14*
173:*10*
176:*22*
179:*5*
182:*8*
188:*5*
192:*11*
197:*4*
**showed**
108:*12*
194:*1*
**showing**
97:*3*  136:*8*
171:*14*
179:*1*
**shown**
29:*2*  67:*17*

**shows**
50:*4, 6*
55:*17*  58:*2,
3, 4, 5*
67:*10, 17*
88:*12*
130:*4*
148:*8*
186:*13, 14,
15*  197:*10,
17, 22*
200:*13*
**side**  24:*4*
96:*4*
144:*23*
159:*18*
167:*19, 22*
**sign**  9:*4*
147:*14*
152:*21*
162:*13*
**signature**
2:*12*  76:*23*
77:*3, 9, 11,
13, 16, 20*
78:*20*  82:*5,
10*  97:*13*
**signed**
147:*16*

**Significantly**
20:*22*
185:*14*
**similar**
14:*11*
87:*18, 22*
110:*9*
155:*21*
**simple**
57:*8*  60:*18*
**simply**
138:*18*

**single**
58:*21*
135:*19*
147:*12*
193:*20*
196:*13*
**sit**  168:*11,
14*  201:*11*
**site**  52:*1*
57:*14*  60:*9*
84:*14*
122:*13*
**sitting**
68:*9, 10*
178:*15*
**situation**
36:*18*
78:*14, 18*
89:*15, 17*
122:*18*
124:*7, 18*
154:*10*
**situations**
37:*3*  83:*12*
90:*17*
**six**  12:*9*
29:*21*
**sixty**  31:*7*
144:*9*
**sixty-five**
31:*8*
144:*10*
**Slack**
42:*23*
74:*21*
**Sloneker**
126:*10*
127:*21*
158:*20, 21*
**Small**
159:*20*

**Smith**
161:*14*

**solicitations**
26:*14*
**somebody**
22:*5*  44:*11*
48:*2, 20*
50:*22*
59:*17*
67:*12*
70:*16*
78:*19*  84:*6*
90:*19*  96:*8*
97:*20*
98:*20*
102:*3*
113:*4*
115:*1*
119:*8*
124:*8*
125:*3, 9*
137:*1, 9*
201:*5*

**somebody's**
148:*23*
**someone's**
93:*6*
**son**  120:*21*
**Sorry**
18:*19*
39:*22*
55:*22*
80:*19*  83:*1*
97:*8, 9*
115:*16, 18*
116:*12*
129:*16*
137:*23*
140:*20*
164:*1*

Video Deposition of Corey Daugherty

6/21/2023

94

179:*11*
182:*18*
184:*6, 9*
200:*4*
**sort**
190:*10*
193:*6*
**source**
73:*5*
**South**  6:*6*
**SOUTHERN**
1:*3*  8:*3*
**space**
167:*16*
170:*5*
**speak**
87:*20*
105:*1*
111:*16, 20*
138:*14*
147:*11*
167:*11*
**specialize**
148:*9*
**specializes**
164:*21*
**Specialty**
179:*19*
**specific**
31:*20*
33:*12, 15*
46:*22*  52:*3*
54:*9*  56:*19*
67:*4*  68:*19*
72:*15*
76:*10, 11*
84:*19*
87:*23*
111:*17*
118:*16*
119:*19*
132:*2*

148:*12, 19*
161:*18*
**Specifically**
35:*18*
81:*15*
89:*10*
103:*10*
105:*1*
178:*4*
186:*11*
188:*3*
190:*13, 19*
194:*4*
199:*4*
**specificity**
44:*19*
**specifics**
178:*22*
**specifies**
189:*14*
**spent**
132:*23*
**split**  163:*13*
**spoke**
123:*18*
**spot**  67:*9,
11*  70:*11*
84:*14*
125:*3*

**spreadsheet**
126:*16*
127:*1*
184:*16*
197:*18*
198:*5, 12*
199:*20*
200:*1*
**sprint**
119:*21*
132:*23*

**staff**  43:*11*
44:*19*
45:*18*
**stand**
202:*14*
**Standard**
7:*15*  76:*4,
10*  128:*19*
147:*12*
**standpoint**
54:*2*
**start**  8:*6*
12:*18*
38:*14*
134:*6*
**started**
11:*22*  12:*5,
10*  69:*11*
123:*16*
132:*7*
156:*18*
178:*8*
186:*3, 6*
**state**  9:*10*
25:*10, 12,
17*  77:*5*
101:*15*
204:*3*
**statements**
55:*19, 21*
**STATES**
1:*1*  32:*20,
21*
**stats**  61:*20*
67:*21*  68:*3*
**Steele**
39:*15, 20,
21*  40:*13,
21*  120:*16,
23*
**S-t-e-e-l-e**
39:*21*

**Stefani**
141:*13*
173:*16, 18,
21*  174:*18*
175:*7*
202:*8, 9*
**stenotype**
204:*8*
**steps**  95:*1,
16*  172:*5*
**sticker**
80:*20*  97:*9*
**STIPULATE
D**  2:*2, 11,
18*  3:*3*
**stipulation**
7:*5*
**stipulations**
9:*2*
**storage**
75:*10*
76:*12*
**store**  46:*5*
47:*12*  69:*9*
74:*18*
**stored**
47:*5*  48:*22*
74:*3*  75:*17*
127:*18*
**storing**
50:*7*
**straight**
169:*5*
**streams**
51:*14*
**Street**  2:*7*
6:*6, 19*  7:*6*
**structure**
12:*13*
14:*11*
34:*12*  38:*6*
41:*10*

45:*19*
114:*13*
186:*14, 19*
188:*21*
**stubs**  47:*1,
2*  49:*9, 11,
18, 21*
**stuff**  41:*9*
186:*12*
**subject**
101:*17*
109:*8*
112:*18*
**subjected**
187:*22*
**submission**
23:*8, 9, 12*
53:*9*  65:*13*
66:*23*  67:*5*
68:*11, 12*
70:*17*
**submissions**  21:*22*
58:*2*  59:*14*
**submit**
74:*7*  84:*15*
134:*6*
**submitted**
159:*6*
**submitting**
72:*12*
**subordinate
s**  17:*19*
49:*5*  68:*3*
**subset**
55:*16*  56:*2,
20*  57:*1, 9*
**substantiall
y**  185:*17*
**sudden**
42:*5*

**Suite** *2:7*
6:*6, 19* 7:*7*
**suited**
147:*7*
**summer**
28:*21*
**supervise**
109:*6*
**supplement**
**al** 71:*16,*
*19, 21, 23*
155:*1, 14*
**support**
21:*19*
43:*11*
178:*21*
**supporting**
20:*18*
**supposed**
78:*7*
188:*19*
**sure** 22:*16*
26:*5* 61:*9,*
*10* 63:*19*
68:*4* 72:*16*
82:*2* 86:*4*
93:*15* 94:*4*
97:*10*
99:*17*
100:*18, 21*
113:*8*
114:*14*
119:*3, 5, 11*
123:*20*
125:*15*
136:*2*
157:*10*
160:*1*
164:*8*
172:*13*
180:*16*

**Susan**
125:*16*
126:*1, 9*
127:*20*
164:*1*
**Sutton**
28:*5* 66:*17*
**S-u-t-t-o-n**
28:*5*
**switch**
89:*8*
118:*10*
119:*13*
**sworn** 8:*21*
**system**
51:*13*
52:*11, 21,*
*23* 58:*9*
66:*5, 19, 20*
188:*14*
189:*13, 22*
191:*3, 10,*
*14, 17, 18*
193:*18, 21*
194:*8, 13,*
*16*
**systems**
60:*10*
74:*16*

**< T >**
**T** 2:*1*
204:*1*
**tab** 52:*15*
56:*5* 64:*2*
65:*5* 67:*15*
**table** 36:*8*
**tabs** 66:*8*
**take** 61:*8*
95:*16*
100:*5*
101:*7, 11*

113:*20, 23*
114:*4*
115:*6, 9*
120:*13*
133:*21*
150:*13*
156:*18*
159:*22*
162:*7, 18*
163:*2, 6, 13*
165:*10, 13*
171:*22*
172:*5*
178:*14, 18*
197:*7*
202:*22*
**taken** 2:*5*
61:*14*
106:*13*
114:*8*
144:*20*
160:*5*
171:*16*
172:*17*
204:*7*
**takes**
115:*4*
119:*21*
120:*1*
**talk** 19:*14*
41:*9* 42:*7*
70:*8* 102:*5,*
*9, 12*
111:*21*
145:*2*
148:*7*
172:*10, 12*
174:*3*
177:*8*
203:*2*
**talked** 29:*3*
104:*9*

138:*16*
143:*5*
144:*13*
156:*21*
158:*11*
166:*7, 9, 23*
167:*19*
175:*2*
177:*13*
**talking**
18:*9, 11*
38:*10, 11,*
*13* 53:*8*
61:*18*
62:*22*
64:*21*
128:*9*
133:*14*
173:*6*
176:*15*
195:*19, 21*
196:*1*
197:*10*
**Talsma**
27:*19*
67:*13* 80:*2*
192:*22*
**T-a-l-s-m-a**
27:*19*
**Talsma's**
67:*14*
**tangent**
41:*10*
**Tanya** 2:*5*
7:*1, 17*
204:*20*
**task** 48:*4*
**tasks**
22:*23*
37:*11*
74:*18*
83:*21*

108:*21, 22*
119:*7, 8*
134:*14*
135:*2, 9*
**tax** 26:*16*
**Taylor**
6:*23* 7:*16*
18:*17, 19*
160:*11*
**Taylor's**
81:*21*
160:*10*
**TDC**
179:*19*
182:*6, 16*
183:*13*
**team** 12:*7,*
*8, 10, 11*
16:*16, 18,*
*21, 23* 17:*1,*
*2, 9, 16, 22,*
*23* 18:*4, 19*
19:*3, 11, 13,*
*20* 20:*2, 7,*
*9, 17, 18*
*21:20* 24:*9*
26:*9, 12, 20,*
*22* 30:*2*
31:*18, 19*
32:*12, 15*
33:*2, 4, 11,*
*21* 34:*3, 8,*
*10, 15, 16*
35:*2, 6, 19,*
*22* 38:*10,*
*14* 39:*7*
40:*3, 4, 10,*
*13* 46:*14,*
*21, 22* 49:*2,*
*18* 50:*4*
53:*14*
54:*21* 56:*8,*

Video Deposition of Corey Daugherty

6/21/2023
96

13, 19  57:1,
9  58:13, 14,
21  59:2, 4
60:18
61:19  64:5,
17, 18, 19,
22  66:22
67:4, 6, 7
68:18  69:1,
11, 13
70:16
73:19, 22
77:19  78:3,
4, 7, 15
79:15, 20
80:9  81:2,
21  82:3, 11,
13, 14, 17,
21  83:13,
15, 19
92:17, 20
98:7, 8, 15
100:1
102:6
104:10, 11
109:3, 5, 6
118:14
123:3
124:8, 21
125:6, 10,
17, 20
126:2, 12,
17  127:3
129:3, 4
133:9, 19
134:8, 16
135:4
142:16, 22
144:16
148:12, 16,
17, 19
153:18

156:1, 2
157:12
160:10, 12
164:20
165:17
166:15
167:1, 4
168:2
180:20, 22
181:22
184:16
192:8, 12
195:15, 18
196:7, 9, 13,
15  198:13
201:23
**teammates**
45:19  47:1
**teams**
17:15, 18
18:2, 7
19:1, 6, 12
32:1, 18
38:6, 11, 13
42:4, 13
45:19
54:20
55:10
56:18
58:17, 23
59:2, 6, 18
73:9  83:7,
11  91:19,
21  92:2, 3
109:12, 22
110:2
114:20
116:2
135:6, 9
136:8
148:5, 14

167:12
170:7
**team's**
33:15
57:14, 19
58:1  127:4
**Tell**  20:15
43:20
108:11
110:5
125:23
152:15, 16
163:18
171:10
179:15
184:18
185:13
188:10, 11
201:12
**telling**
159:10
198:21
**template**
77:3, 11
**ten**  76:2
**Tenure**
35:21
144:21
**term**  73:2
126:15
**terminate**
48:5
**terminated**
96:8
**termination**
48:6  96:7
**terms**  20:6
21:11
31:18
82:12
132:20
187:22

**testified**
8:22
190:17
191:14
192:18
195:13
196:1
198:15, 22
200:11
201:3, 18,
21  202:12
**Testify**
113:2
175:7
**testifying**
107:21
177:9

**TESTIMONY**
1:15
108:15
113:18
145:16
177:11
196:18
204:11
**text**  74:10
90:16, 23
91:3, 8, 14
92:17  93:5
**Thank**
8:16
146:17
149:7
182:20
**Thanks**
74:2
**thereto**  3:2
204:8
**thing**
19:22  85:8
115:19

199:8, 23
201:16
**things**
22:14, 21
35:20
43:11  47:8
48:16
52:20  53:2
55:19
61:20
118:21
120:12
141:7
144:20
163:17
**think**
12:13  16:5,
17  18:14
19:4, 8
34:8, 13
42:4  43:16
46:3  47:10,
18  55:18
58:9  63:21
69:8  71:21,
22  75:8
78:9, 10
82:1  84:6
85:6  88:6,
8  117:17
119:16
127:11
128:10
136:20
148:13
150:11, 17
153:7
156:8
172:12
173:6
174:5
175:1

176:*3, 11,
12*  181:*9*
183:*21*
185:*7, 12*
188:*4, 17,
18*  189:*5*
190:*16, 19*
192:*19*
193:*17*
195:*5, 10*
199:*22*
201:*20, 22*
202:*3, 9*
**thinking**
42:*3*
126:*21*
**thinks**
126:*16*
**third**  64:*1*
141:*12, 21*
**thirty**
24:*12*
32:*20*
53:*11*
122:*7*
**thirty-five**
32:*19, 20*
**thought**
86:*1*
**thousand**
31:*8*
144:*10*
**thousands**
32:*21*
**Three**
15:*13*
24:*11*  39:*9,
11*  41:*19*
75:*2*  84:*7*
92:*23*  93:*3*
168:*13*
173:*18*

**Tiffany**
27:*4, 23*
40:*15, 22*
66:*17*
79:*19*
117:*7*
163:*15*
168:*5*
169:*7*
170:*3*
**time**  2:*23*
3:*1*  7:*14*
12:*7*  16:*20*
18:*15, 17*
19:*5, 9, 13*
26:*20, 23*
27:*1, 3, 13*
29:*17*
30:*13*
33:*17*
37:*22*
38:*23*
45:*18*  47:*2,
10*  48:*16*
53:*18*  57:*3,
5*  63:*19*
67:*11*  68:*5,
14*  77:*1*
79:*22*
83:*10*
87:*11, 12*
90:*23*
96:*22*
102:*8, 15*
105:*2*
109:*20, 21*
113:*21*
114:*6*
116:*19*
118:*18*
119:*16, 20*
120:*2*

123:*11, 12*
128:*10, 17,
22*  129:*4*
130:*3, 17*
132:*22*
134:*18*
158:*8*
167:*13, 17*
170:*6, 10*
175:*6*
178:*23*
179:*3*
182:*2*
190:*16*
202:*23*
**timeframe**
117:*14*
119:*19*
**timeline**
105:*10*
**times**
120:*12*
158:*12*
196:*6*
202:*6*
**timetable**
105:*9*
**tired**  124:*3*
**title**  13:*9*
19:*9, 19*
69:*15*
84:*16*
157:*6, 22*
188:*2*
192:*17*
198:*3*
**titles**  13:*3*
106:*12*
**today**
10:*14*
12:*12*  63:*5,
6*  141:*15*

**told**  89:*7*
103:*12, 21*
113:*5*
141:*14*
159:*15*
167:*20*
190:*21*
193:*18*
201:*21*
**tool**  46:*3*
52:*14*
**top**  12:*18,
19*  42:*5*
**topic**
112:*22*
**topics**
11:*12*
101:*18*
113:*16*
**total**  33:*8*
58:*5, 20*
59:*1, 16*
65:*14*
121:*19*
127:*4*
**touch**
36:*11*
**touched**
86:*6*
**tower**  60:*4*
**town**  89:*21*
90:*7*
**track**
51:*13*
54:*22*
56:*12*
**trail**
186:*15*
187:*9*
**trained**
16:*17*
29:*23*

**training**
12:*6, 8*
29:*9, 17, 20*
30:*4, 19*
104:*23*
105:*3, 4, 7,
11, 16, 19*
107:*12, 16*
108:*18*
132:*6, 13,
16, 20*
133:*10*
138:*16, 18*
139:*6*
140:*9*
156:*14, 16,
22, 23*
157:*1*
158:*16*
**transaction**
24:*23*  52:*8*
**transcribed**
204:*9*
**transcript**
9:*23*
129:*15*
202:*3*
204:*7, 11*
**transcriptio
n**  204:*10*
**transfer**
123:*20*
136:*15, 23*
137:*4, 11,
14, 18*
**transferred**
136:*21*
137:*15*
**transferring**
137:*19*
**transfers**
136:*19*

travel
20:22  21:7
37:5, 23
124:3
127:4
130:18
131:1
145:17
171:13
traveling
36:9  37:1,
10  92:21
93:1, 4
treated
96:19
110:6, 17
163:9
195:16
treating
111:3
139:18
treatment
96:13
161:6
196:17
Tredway
13:6  14:18
Trello  69:3,
5, 6  70:18
71:2, 5, 7
72:22
73:21
74:18, 20,
21  75:3
trenches
132:22
trends  60:2
Trey  17:3
19:11
T-r-e-y  17:4
trial  3:1

trickled
76:6
tried
163:13
167:3
Trigg  17:7,
9
trip  182:5
Trish
115:16
true  49:13
71:4
204:11
TRUIST
1:10, 11
8:13, 15
45:17
104:23
105:4
121:12
190:1
Truitt
18:17, 18
19:4  81:21
160:10, 11
Truitt's
82:14
trust  120:3
try  92:4, 9,
16  95:16
104:12
115:3
120:13
148:19
167:3, 11
trying
50:21
72:15
123:17
195:15
turn  93:20

turned
94:2  95:3
twenty-five
24:12
53:11
twenty-four
63:16
Twice
32:22
105:15
138:2
154:22
two  15:11
18:2  20:16
24:11  33:6
58:23  59:2
63:15
71:13
74:22
103:11
111:12
119:14
120:8
126:1
140:19
144:15, 16,
19  163:7
170:16, 17
176:19
198:10
Tyler  17:2
type  53:16
58:16  73:5
155:22
181:1
types
19:15
112:8, 14
typewritten
141:22, 23
typically
21:23  22:7

23:11  24:7
93:14
122:12, 18
123:19
133:20
134:3
typing
183:7

< U >
U  2:1
U.S  8:1
UAB  12:6
Uh-huh
13:17
27:17
29:11
46:15  56:3
57:17
61:22  64:4
66:10  78:5
79:10  80:7
84:9  97:19
98:5
100:18
106:11
117:21
120:17
122:15
124:14, 17
125:14
127:13, 16
138:23
153:10
166:6
181:4
ultimately
119:7
unable
37:5
uncommon
196:14

understand
10:3, 5, 9
11:2, 6
26:6
110:11
118:19
145:15
169:11, 12,
13  186:4
understandi
ng  11:23
31:10
33:10  38:4
74:9  85:2
137:13
194:8, 9
underwriter
70:23
89:20  90:3
underwriter
s  90:6
underwritin
g  17:8, 12,
15  19:3
91:20
unfair
161:6
uniform
188:14
UNITED  1:1
update
84:20
updated
60:10
upload
48:19, 21
use  32:1
41:23
42:20  50:9
52:7  71:5
74:16, 18
75:6, 12

Video Deposition of Corey Daugherty

89:*7*  90:*11*
91:*14*
94:*17*
**uses**  46:*4*
**usual**  9:*1*
**usually**
134:*7*
**utilize**
41:*17*
42:*12, 13*
**utilized**
35:*15*
72:*20*

**< V >**
**V**  7:*23*
111:*15*
**vacancies**
184:*15*
197:*11*
199:*4*
**vacancy**
122:*9*
128:*17, 20,*
*23*  158:*22*
**vacant**
138:*11*
**Valuing**
106:*19*
107:*3*
**varies**  34:*8*
**various**
33:*5*
**vary**  23:*19*
**verbal**
157:*18*
158:*2, 3*
**verbally**
100:*19*
**verified**
71:*19, 20*

**versus**
89:*17, 23*
132:*23*
165:*23*
170:*3*
**veto**  35:*10*
156:*13*
**vetoed**
196:*21, 23*
**vice-**
**president**
11:*17*
13:*12*
**VIDEO**
1:*15*  7:*19*
**Videograph**
**er**  6:*23*
7:*13*  8:*16*
61:*11, 15*
114:*5, 9*
115:*16*
160:*2, 6*
172:*14, 18*
203:*4*
**videoing**
9:*22*
**view**  19:*20*
**viewing**
139:*1*
**visit**  134:*5*
148:*7*
**vividly**
178:*6*
**volume**
36:*2*
**vs**  1:*9*

**< W >**
**wage**
55:*19, 20*
**waived**
2:*13*  3:*5*

**want**  11:*10*
26:*5*  53:*3*
54:*22*
56:*11*  61:*8*
72:*7*  85:*5*
115:*6*
123:*20*
126:*18*
138:*4*
149:*8*
159:*22*
164:*8*
167:*2*
172:*13*
193:*8, 10,*
*11, 16, 19*
194:*5, 18*
195:*3*
196:*4*
201:*4, 5, 10*
**wanted**
36:*21, 22*
49:*8*  73:*6*
74:*12*  86:*4*
90:*15*  97:*2*
101:*21*
113:*7, 8*
119:*1*
125:*17*
142:*11*
171:*11*
180:*4*
181:*9*
**wanting**
29:*4*
136:*20*
**wants**
144:*18*
**way**  9:*23*
23:*11*
49:*16*  65:*7*
66:*20*

67:*15*
70:*10*  88:*9*
100:*14*
114:*18*
123:*13*
134:*12*
139:*17*
160:*12*
164:*8, 9*
166:*23*
183:*9*
193:*4*
**wearing**
163:*20*
**wears**  13:*3*
**website**
23:*18*
83:*23*  84:*1,*
*12, 16, 20,*
*23*  160:*15*
161:*2*
170:*21*
**Well**  11:*14*
13:*6*  14:*16*
30:*3*  48:*17*
60:*6*  62:*7*
73:*2*  78:*23*
108:*14*
112:*5, 16*
113:*3, 19,*
*22*  116:*3*
121:*10*
122:*16*
141:*12*
152:*7*
155:*6*
161:*5*
164:*12*
168:*17*
169:*13*
176:*15*
177:*3, 12*

178:*1*
180:*19*
190:*20*
192:*7, 18*
194:*10*
197:*1*
199:*8*
200:*14*
**went**  61:*17*
96:*20*
124:*12*
150:*17*
151:*22*
157:*19*
159:*7, 18*
196:*9, 19*
**We're**  7:*17*
9:*3*  23:*14,*
*15, 20, 21*
24:*5*  25:*13*
57:*21, 22*
58:*19*
59:*22*  90:*9*
91:*23*
125:*1*
126:*19, 21*
133:*20*
137:*10*
172:*12, 13*
176:*1*
188:*15, 19*
190:*14*
192:*7*
193:*22*
195:*15*
201:*11*
203:*1, 4*
**we've**  25:*4*
26:*8*  54:*9*
58:*2, 23*
59:*23*  61:*7*
113:*23*

Video Deposition of Corey Daugherty

6/21/2023
100

124:*23*
142:*5*
144:*13*
159:*21*
168:*12*
170:*15*
197:*14*
200:*12*
202:*11*
**whatsoever**
32:*9*
**wholesale**
11:*20*
13:*13*  70:*3*
**wholesaler**
23:*8*
**wholly**
116:*5*
**wide**  34:*9*
**wife**  178:*15*
**Willis**
117:*1, 9*
**Willow**
179:*23*
181:*5*
**wipe**  95:*20*
97:*23*  99:*2*
**wiped**
98:*21*  99:*5*
**wiring**
169:*19*
**withheld**
142:*5*
**witness**
2:*13*  7:*8*
8:*18*  9:*6*
61:*10*
85:*15*
112:*9, 15*
113:*1, 18,*
*20*  138:*7*
149:*15*

159:*20*
177:*9*
183:*22*
204:*12*
**wondering**
47:*11*
**Woodward**
19:*10*

**Woodward's**
19:*9*
**word**
20:*23*
122:*19, 21*
141:*23*
158:*22*
**wording**
133:*3*
**words**
110:*7, 10*
124:*2*
**work**  16:*8,*
*11*  21:*3*
97:*1*
102:*19, 23*
103:*22*
104:*6*
110:*15*
117:*6*
161:*9, 12,*
*14, 17*
162:*1*
163:*14*
166:*17*
172:*21*
173:*2*
175:*20*
176:*18, 23*
178:*7*
182:*14*
**Workday**
45:*13, 15*

46:*9, 10, 17,*
*20*  47:*5, 6,*
*22*  48:*3, 4,*
*6, 17, 21*
49:*3, 6, 12*
50:*9, 12, 14,*
*18*  51:*6, 9*
55:*21*
126:*8*
146:*7*
148:*21*
184:*12, 13,*
*23*  185:*7,*
*12, 16, 18*
186:*11*
189:*8*
190:*5*
**worked**
25:*5*  47:*20*
115:*2*
131:*6*
179:*19*
**workflow**
72:*19*
**working**
36:*15*
54:*21*
123:*11*
124:*20*
137:*10*
138:*6*
162:*4*
186:*4, 6*
**workload**
120:*14*
**Workplace**
107:*16*
108:*1*
**works**
20:*17*
23:*11*  65:*7*
194:*8*

**worksheet**
33:*3*
**worksheets**
33:*1*
**world**
159:*20*
**worth**
193:*6*
**write**  53:*20*
**writes**
73:*16*
**writing**
74:*2*
**written**
104:*17*
140:*10*
193:*4*
**wrong**
178:*9*
**wrote**
150:*20*
**Wunderlich**
6:*18*  8:*14*
185:*9*

**< X >**
**X**  4:*1*
24:*10*  54:*7*
93:*1*
126:*21*
138:*7*

**< Y >**
**Y**  24:*10*
54:*7*  93:*1*
**y'all**  14:*4*
30:*19*
41:*16*
42:*13, 20*
43:*11*  71:*1*
74:*16, 18*
75:*6*  76:*11,*

*20*  91:*14*
95:*16*
142:*7*
159:*22*
173:*21*
174:*3*
201:*10*
**y'all's**
202:*15*
**Yeah**
18:*22*  19:*2*
20:*1*  30:*2*
36:*17, 21*
51:*18, 23*
55:*2, 4*
59:*7, 22*
60:*21*  61:*2*
64:*1*  65:*18*
68:*16*  69:*2,*
*4*  70:*14*
72:*10, 23*
73:*18*
74:*13*
75:*18*
77:*14*  79:*2,*
*20, 23*
80:*21*
82:*11*  83:*1*
86:*3, 5*
87:*4, 16*
88:*11, 19,*
*20*  93:*11*
96:*20*
97:*10*
100:*11, 23*
104:*21*
106:*14, 17,*
*21*  107:*18*
108:*17*
109:*4*
110:*14*
113:*5*

114:*14*
116:*15, 18*
117:*11*
121:*21*
131:*16*
133:*11*
134:*19*
142:*12, 17*
143:*6*
145:*18*
149:*1*
152:*9*
157:*8, 13*
165:*6*
166:*1*
168:*3*
170:*1*
173:*17*
179:*17*
182:*15, 22*
183:*3*
188:*9*
191:*8*
195:*10, 23*
197:*19*
**year**  32:*22*
58:*8*
105:*13, 14,*
*15*  154:*22*
193:*5*
**years**  12:*9*
29:*22*  36:*8*
52:*8*  60:*10*
76:*2*
119:*14, 21*
120:*8*
133:*23*
164:*19*
**yellow**
127:*8*
**Yep**  9:*6*
97:*22*

107:*2*
158:*17*
179:*14*
182:*13*
**York**  64:*16,*
*17*  178:*5*
180:*13*
**Yvette**
27:*4, 16*
40:*15, 22*
65:*22, 23*
67:*13, 14*
80:*2*  117:*5*
163:*16*
168:*5, 8*
192:*22*
**Yvette's**
27:*18*

< Z >
**Z**  24:*10*
54:*7*  93:*1*
**zero**  132:*6*