FILED
2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 5

# Video Deposition of Stefani Petty

## July 13, 2023

## Hendrix v. CRC Insurance Services, Inc., et al.

## 2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    CASE NUMBER: 2:21-CV-0300-MHH
6
7    KATHRYN HENDRIX,
8         Plaintiff,
9         vs.
10   CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL
11   CORP, and TRUIST BANK,
12        Defendants.
13
14
15
16   VIDEO DEPOSITION TESTIMONY OF:
17        STEFANI PETTY
18
19
20        JULY 13, 2023
21        10:03 A.M.
22
23

Page 2

1         S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED by and
3    between the parties through their respective
4    counsel that the video deposition of STEFANI
5    PETTY may be taken before Tanya D. Cornelius,
6    RPR, CSR, and Notary Public, via remote
7    videoconference in Birmingham, Alabama, on the
8    13th day of July, 2023, commencing at
9    approximately 10:03 a.m.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the signature to and the reading of the
12   deposition by the witness is NOT waived, the
13   deposition to have the same force and effect as
14   if full compliance had been had with all laws
15   and rules of Court relating to the taking of
16   depositions.
17        IT IS FURTHER STIPULATED AND AGREED
18   that it shall not be necessary for any
19   objections to be made by counsel to any
20   questions, except as to form or leading
21   questions, and that counsel for the parties may
22   make objections and assign grounds at the time
23   of the trial, or at the time said deposition is

Page 3

1    offered in evidence, or prior thereto.
2         IT IS FURTHER STIPULATED AND AGREED
3    that notice of filing of the deposition by the
4    Commissioner is waived.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1              I N D E X
2    EXAMINATION BY:              PAGE NUMBER
3         MS. GILL               10
4
5         * * * * * * * * * * * * * *
6
7         EXHIBIT INDEX
8    PLAINTIFF'S EXHIBIT NO:          PAGE NUMBER

9    1  Notice of Deposition       12
10   2  Letter            13
11   3  E-mail            22
12   4  Letter            38
13   5  Letter            39
14   6  E-mail            40
15   7  EEOC Charge            48
16   8  (No exhibit marked)
17   9  (No exhibit marked)
18   10 Handbook Excerpt       58
19   11 Handbook Excerpt       63
20   12 (No exhibit marked)
21   13 (No exhibit marked)
22   14 (No exhibit marked)
23   15 E-mail            117

Video Deposition of Stefani Petty

7/13/2023
2 (5 - 8)

Page 5

1   EXHIBITS (Continuing)

2

3

4   16 E-mail                115

5   17 (No exhibit marked)

6   18 (No exhibit marked)

7   19 Document              119

8   20 Answers to Interrogatories    127

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 6

1        A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4      BARRETT & FARAHANY

5      BY:  Patricia A. Gill, Esq.

6      2 20th Street North, Suite 900

7      Birmingham, Alabama  35203

8

9

10     PALMER LAW, LLC

11     BY:  Leslie A. Palmer, Esq.

12     104 23rd Street South, Suite 100

13     Birmingham, Alabama  35233

14

15

16     WILKINSON LAW FIRE, P.C.

17     BY:  Cynthia Forman Wilkinson, Esq.

18     1717 3rd Avenue North, Suite A

19     Birmingham, Alabama  35203

20

21

22

23

Page 7

1   APPEARANCES (Continuing)

2

3   FOR THE DEFENDANTS:

4      BAKER, DONELSON, BEARMAN, CALDWELL

5      & BERKOWITZ, P.C.

6      BY:  Rachel Barlotta, Esq.

7         Kayla M. Wunderlich, Esq.

8      420 North 20th Street, Suite 1400

9      Birmingham, Alabama  35203

10

11   ALSO PRESENT:  Kathryn Hendrix

12         Christina Bailey

13         Ashford Giddens, Videographer

14

15

16

17

18

19

20

21

22

23

Page 8

1        I, Tanya D. Cornelius, RPR, CSR, and

2   Notary Public, acting as Commissioner, certify

3   that on this date, as provided by the Federal

4   Rules of Civil Procedure, and the foregoing

5   stipulation of counsel, there came before me via

6   remote videoconference in Birmingham, Alabama,

7   beginning at 10:03 a.m., STEFANI PETTY, witness

8   in the above cause, for oral examination,

9   whereupon the following proceedings were had:

10

11

12

13

14        VIDEOGRAPHER:  We are now on the

15   record.  The date is July 13th, 2023.  The time

16   is 10:03.  My name is Ashford Giddens, and the

17   court reporter is Tanya Cornelius.  We're here on

18   behalf of Cite Court Reporting of Montgomery,

19   Alabama.

20        This is the video deposition of the

21   corporate representative of CRC Insurance

22   Services, Incorporated, which was noticed by

23   Cynthia Wilkinson, for the case Hendrix V. CRC

Page 9

1   Insurance Services, Incorporated, et al., in the
2   Circuit Court of the Northern District of
3   Alabama, Southern Division, Case Number
4   2:21-CV-0300-MHH.
5           Counsel, please identify yourselves
6   for the record, starting with the plaintiff.
7           MS. GILL:  Hi, I'm Patricia Gill.  I
8   represent the plaintiff, Kathryn Hendrix.
9           MS. PALMER:  Leslie Palmer for the
10  plaintiff, Kathryn Hendrix, and I am going to be
11  operating off of Tricia's audio.
12          MS. BARLOTTA:  Rachel Barlotta for
13  all named defendants.
14          MS. WUNDERLICH:  And Kayla Wunderlich
15  for all named defendants.
16          MS. BAILEY:  I'm Christina Bailey.
17  I'm in-house counsel for the defendants.
18          VIDEOGRAPHER:  Will the court
19  reporter please administer the oath to the
20  witness?
21          STEFANI PETTY,
22      being first duly sworn, was
23      examined and testified as follows:

Page 10

1           THE REPORTER:  Will this be usual
2   stipulations?
3           MS. GILL:  Yes, that's fine.
4           MS. BARLOTTA:  We're going to read
5   and sign.
6
7               EXAMINATION
8   BY MS. GILL:
9       Q.   Ms. Petty, my name is Patricia Gill.
10  I represent Kathryn Hendrix in the lawsuit that
11  she has filed against CRC and Truist Financial
12  Corp. and Truist Bank.  I just have a few
13  questions to ask you today.
14          If you could, please state your name
15  for the record.
16      A.   Stefani Petty.
17      Q.   And, Ms. Petty, have you ever given a
18  deposition before?
19      A.   Yes.
20      Q.   Okay.  I'm still going to go over
21  some ground rules just to make sure we're on the
22  same page.  This is -- obviously, we're being
23  recorded, but it's still an informal proceeding.

Page 11

1   So if you would like to take a break, you're
2   certainly welcome to ask for one.  I would just
3   ask that if there's a question pending, that you
4   answer the question first, and then we take a
5   break; is that fair?
6       A.   Yes.
7       Q.   And if you can for the record, for
8   the court reporter so that they can transcribe
9   your testimony, say out loud yes or no and not an
10  uh-huh (positive response) or huh-uh (negative
11  response), because it's very difficult to read
12  the transcript after that; is that fair?
13      A.   Yes.
14      Q.   Are you on any medication that would
15  alter your ability to answer my questions today?
16      A.   No.
17      Q.   Okay.  Ms. Petty, are you aware that
18  you are here pursuant to -- as a Rule 30(b)(6)
19  corporate representative?
20      A.   Yes.
21      Q.   Okay.  And that you are for CRC
22  Insurances -- Insurance Services, Inc.?
23      A.   Yes.

Page 12

1       Q.   Okay.  And I would like to show you
2   Plaintiff's Exhibit Number 1.  I'm sorry.  The
3   computer is connecting.
4           (Whereupon, Plaintiff's Exhibit No. 1
5   was marked for identification and a copy of same
6   is attached hereto.)
7       Q.   Have you seen this document before?
8       A.   Yes.
9       Q.   Okay.  And if you'll scroll down
10  Exhibit 1.  Have you reviewed the different
11  topics that are suggested for your deposition?
12      A.   Yes.
13      Q.   What did you do to prepare for your
14  deposition today?
15      A.   I discussed with our inside counsel,
16  Christina Bailey, and --
17      Q.   Wait, I'm just going to cut you off
18  right there, and I apologize for interrupting
19  you.  I'm not asking you for attorney/client
20  privileged communications.  So don't tell me the
21  substance of anything you did.  I'm just asking
22  you what you did.  You can --
23      A.   I consulted with our legal counsel.

Video Deposition of Stefani Petty                                    7/13/2023
                                                                    4 (13 - 16)

Page 13

1    Q.   Okay.  Thank you.  Did you review any
2  documents prior to your deposition?
3    A.   Yes.
4    Q.   Okay.  And what documents did you
5  review?
6    A.   This document.
7    Q.   Any other documents reviewed prior to
8  your deposition?
9    A.   Not -- well, I mean, I don't know
10  what you mean by documents.  Can you clarify?  I
11  mean, I would need to --
12    Q.   Policies, e-mails, answers to
13  discovery, anything that has been produced in
14  this case, did you review those records?
15    A.   I did look at e-mails, my e-mails.
16    Q.   Okay.  And did you -- I'm going to --
17  let's see.  Okay.  Sorry about that.  I'm going
18  to show you what I have marked as Plaintiff's
19  Exhibit Number 2.
20        (Whereupon, Plaintiff's Exhibit No. 2
21  was marked for identification and a copy of same
22  is attached hereto.)
23    Q.   Have you seen this document before?

Page 14

1    A.   Yes.
2    Q.   And when did you first see that
3  document?
4    A.   My recollection would be that it was
5  the same day that the letter was -- this letter
6  is dated or it was the day after.
7    Q.   Okay.  Would it be fair to say that
8  the date the letter was received by your office
9  is the day you saw it?
10    A.   Yes.
11        MS. BARLOTTA:  Object to the form.
12    Q.   Okay.  And what did you do when you
13  received this letter?
14    A.   I tried to reach out to Ms. Hendrix.
15    Q.   Okay.  And were you successful in
16  reaching out to her?
17    A.   No.
18    Q.   When you were not successful in
19  reaching her, what did you do?
20    A.   I tried to reach her again.
21    Q.   Okay.  And how many times would you
22  say you tried to reach her?
23    A.   I would -- I don't recall the exact

Page 15

1  number, but I e-mailed her multiple times and
2  made a phone call to her.
3    Q.   Okay.  Do you have copies of those
4  e-mails?
5    A.   Yes.
6    Q.   Have they been produced in this case?
7    A.   Yes, to my knowledge.
8    Q.   And you said you also tried to reach
9  out to her by phone, and were you able to speak
10  with her on the phone?
11    A.   No.
12    Q.   The e-mail address that you e-mailed
13  her on, was that her work e-mail or her home
14  e-mail?
15    A.   Her personal e-mail.
16    Q.   Do you know whether or not Ms.
17  Hendrix was on leave at that time?
18    A.   Yes.
19    Q.   Did you contact anyone else at CRC in
20  her department to investigate the allegations she
21  made in this letter?
22    A.   I spoke to John Cadden, the office
23  president, in regards to her leave and her not

Page 16

1  returning from leave and when --
2    Q.   When did that happen?
3    A.   I don't recall the exact time of
4  that.  It would have been around the time of this
5  letter.
6    Q.   Would it be when she was seeking to
7  extend her leave?
8    A.   It was around the time of this
9  letter.
10    Q.   Okay.  Do you know what date she went
11  on leave?
12    A.   I do not.
13    Q.   Do you know how long she remained on
14  leave after this letter?
15    A.   She did not return from leave.
16    Q.   Okay.  Do you know how long it was --
17  and my understanding is in November, she
18  resigned.  Is that your understanding?
19    A.   Yes.
20    Q.   I'm going to show you what I'm
21  marking as Plaintiff's Exhibit -- I'm sorry.
22  When you spoke with John Cadden, did you speak to
23  him by text message, e-mail, or phone?

Page 17

1   A.  Phone.
2   Q.  And what was said during that
3   conversation?
4       A.  I don't recall the exact specifics,
5   but it was discussing her not returning from
6   leave due to this letter.
7   Q.  Did you discuss the allegations
8   contained in this letter?
9       A.  I did ask John about this.
10  Q.  Okay.  And what specifically did you
11  ask him?
12      A.  I asked him if he had any awareness.
13  Q.  And what was his response?
14      A.  He was not aware.
15  Q.  Did you speak with Mr. Helveston
16  about the allegations that Ms. Hendrix was making
17  in this letter?
18      MS. BARLOTTA:  Object to form.
19      A.  I'm sorry.  I didn't hear that.  Am I
20  supposed to answer that question?
21  Q.  You are.  I asked -- and I can repeat
22  the question.  That's fine.
23      A.  Okay.

Page 18

1   Q.  Did you speak to Mr. Helveston about
2   the allegations Ms. Hendrix made in this letter?
3       MS. BARLOTTA:  Object to form.  And,
4   Stefani, you should not -- since there's not a
5   timeframe on this, I want to make sure that
6   you're not testifying about any conversations you
7   would have had with Mr. Helveston at the
8   direction of legal counsel.
9       MS. GILL:  And I would object to
10  that, because that -- any conversations she had
11  when you weren't present are not attorney/client
12  privileged.
13      MS. BARLOTTA:  It's a different
14  privilege.  We've talked about this before.  It's
15  work product, so --
16      MS. GILL:  Work product relates to
17  documents.  It does not relate to conversations
18  had and it does not protect the facts.
19      MS. BARLOTTA:  I've stated my
20  objection.
21  Q.  (BY MS. GILL:)  So what did you
22  discuss, if anything, with John Helveston about
23  the allegations of this letter?

Page 19

1       MS. BARLOTTA:  Same objections.
2       THE WITNESS:  So am I supposed to
3   answer her question?
4       MS. BARLOTTA:  Not if it involves
5   attorney/client directed communication, no, you
6   should not answer that.
7       THE WITNESS:  Okay.
8       MS. GILL:  And just for the record,
9   you are instructing your client not to testify
10  about a conversation she had with John Helveston
11  when you were not present because it was at your
12  direction?
13      MS. BARLOTTA:  At the direction of
14  in-house counsel, because I believe there may
15  have been conversation after the EEOC charge was
16  filed or perhaps after the lawsuit was filed, and
17  those are protected under anticipation of
18  litigation and attorney work product.
19      MS. GILL:  So it's not protected
20  under work product.  So you're directing her not
21  to answer?
22      MS. BARLOTTA:  If that's what her
23  response would involve.  She can talk about any

Page 20

1   conversations she had like she testified about
2   with Cadden after the receipt of this letter
3   before this move to a legal proceeding in which
4   counsel got involved.
5       MS. GILL:  I'm asking her after this
6   letter, which is simply a letter from Ms. Hendrix
7   where she's making an allegation of differential
8   treatment, what did you discuss with Mr.
9   Helveston?
10      MS. BARLOTTA:  I think she's
11  testified to this already, that any conversation
12  she had with Mr. Helveston would have been after
13  -- would have been after this turned into a legal
14  proceeding, and they're going to be covered under
15  one or more privileges.
16      MS. GILL:  Okay, she didn't testify.
17  You said that.  If she's going to say that --
18      MS. BARLOTTA:  Well, she asked --
19  okay.  That's what she said, I mean, when I asked
20  her if that was what it was, and she said yes, so
21  she's not -- then I said then you can't testify
22  about that.
23      MS. GILL:  She didn't say yes.  She

Video Deposition of Stefani Petty

7/13/2023
6 (21 - 24)

Page 21

1  said can I testify to that to you, and you told
2  her no.  So I am asking her right now.
3      Q.   (BY MS. GILL:)  Any conversations you
4  had with John Helveston, were they at the
5  direction of counsel?
6      A.   So let me clarify who you're speaking
7  about, because are you talking about John Cadden
8  or are you talking about Ron Helveston?
9      Q.   I'm sorry.  Ron Helveston.
10      A.   I did not.
11      Q.   You did not have any conversations
12  with him?
13      A.   Not before the legal matter started,
14  and it was turned over to our legal group.
15      Q.   So you did have conversations with
16  him after the legal matter started?
17      A.   One conversation.
18      MS. GILL:  And my understanding is
19  that you are asserting the work product privilege
20  as a reason to not testify to the contents of
21  that conversation?
22      MS. BARLOTTA:  We are asserting that,
23  those privileges that I've already explained.

Page 22

1      MS. GILL:  I'm asking you are you
2  instructing her not to answer based on that
3  privilege?
4      MS. BARLOTTA:  That is a different
5  question, and yes, we are instructing her not to
6  answer based upon those privileges.
7      MS. GILL:  We will take that up with
8  the Court.  All right.
9      Q.   (BY MS. GILL:)  Let me show you what
10  I've marked as Plaintiff's Exhibit Number 3.
11      (Whereupon, Plaintiff's Exhibit No. 3
12  was marked for identification and a copy of same
13  is attached hereto.)
14      Q.   And just the first question:  Is that
15  your e-mail address at the top where it says it's
16  sent to?
17      A.   Yes.
18      Q.   Okay.  Did you receive this e-mail
19  from Ms. Palmer?
20      A.   Yes, it appears so.
21      Q.   Okay.  And if you can scroll up.
22  Attached to that e-mail was this letter.  Did you
23  receive that?

Page 23

1      A.   Yes.
2      Q.   And in this letter, the second
3  paragraph, this is a duty to maintain, retain,
4  and protect and not destroy all documents.  Do
5  you see that?
6      A.   Yes.
7      Q.   After receiving this letter, did you
8  take any steps to maintain, preserve, retain,
9  protect, and not destroy any and all documents,
10  data, electronic and hard copy, that were related
11  to Ms. Hendrix's claims?
12      A.   Yes.
13      Q.   You did?
14      A.   Yes.
15      Q.   What steps did you take?
16      A.   I was placed under a litigation hold,
17  and I remained compliant with our litigation
18  hold.
19      Q.   What does a litigation hold do?
20      A.   It advises you that you have to
21  maintain all documents and information related to
22  this matter.
23      Q.   Is that just like a flag on anything

Page 24

1  related to Kathryn Hendrix?
2      A.   Yes.
3      Q.   And how is the flag or the hold
4  communicated to employees of BB&T and CRC?
5      A.   It's a corporate e-mail received.
6      Q.   Is that corporate e-mail sent just to
7  you or is it sent to all employees of BB&T and
8  CRC?
9      A.   It's sent to whoever is under the
10  litigation hold.
11      Q.   Do you know who was under the
12  litigation hold in this case?
13      A.   I can't speak to the exact names, but
14  it should be the ones that were involved in the
15  matter.
16      Q.   For example, do you know whether or
17  not Corey Daugherty received the e-mail from
18  corporate litigation hold?
19      A.   My assumption would be yes, but I
20  didn't see that e-mail.
21      Q.   Would it be fair to say you don't
22  know one way or the other?
23      A.   Yes.

Page 25

1   Q.  In this letter, Ms. Hendrix through
2   her attorney asserts additional claims of unfair
3   treatment of women.  What did you do to
4   investigate that?
5   **A.  Upon receipt of this letter, it was**
6   **provided to our legal group.**
7   Q.  Was the first letter that was
8   Plaintiff's Exhibit Number 2 provided to the
9   legal group?
10  **A.  I don't recall what was Item Number**
11  **2.  Was that the letter she originally sent?**
12  **Yes.**
13  Q.  Was that provided to legal at the
14  time it was received?
15  **A.  I don't recall the exact timeframe**
16  **that was sent to legal.**
17  Q.  Could it have been after you received
18  the letter from Palmer Legal Services?
19      MS. BARLOTTA:  Object to form.
20      You can answer, Stefani.  I'm just
21  objecting to the form of the question.
22  Q.  She's just preserving the record.
23  **A.  Okay.**

Page 26

1       MS. BARLOTTA:  If you understand the
2   question, you can answer it.
3   **A.  Can you repeat the question?**
4   Q.  Is it possible it was forwarded at
5   the same time you received the letter from Palmer
6   Legal Services?
7       MS. BARLOTTA:  Object to form.
8   **A.  That is possible, because prior to**
9   **that, it was not a legal matter.**
10  Q.  So prior to Ms. Palmer providing you
11  this letter, it was not a legal matter.  Would it
12  be fair to say that your conversation with Ron
13  Helveston did not occur until after this letter?
14  **A.  Can you repeat the question, please?**
15  Q.  Earlier you testified that you had a
16  conversation with Mr. Helveston at the direction
17  of either in-house counsel or legal counsel, and
18  your attorney objected based on work product and
19  anticipation of litigation.
20      Did that -- would it be fair to say
21  that conversation occurred after you received
22  this letter from Ms. Palmer?
23      MS. BARLOTTA:  Object to form.

Page 27

1       THE WITNESS:  Do I still answer that?
2       MS. BARLOTTA:  You can answer about
3   the timeframe of the question.
4       I also want to clarify, too, we are
5   asserting attorney/client privilege, because if
6   she's acting as a representative of counsel, then
7   that does fall under attorney/client privileged
8   communications.
9       MS. GILL:  And we don't agree with
10  that assessment.  If an attorney is not there
11  advising them legally and is talking about the
12  facts of the case, it is not protected by the
13  privilege, and that goes for work product as
14  well.  But that's okay.  We'll address that with
15  the Court later on.
16  Q.  (BY MS. GILL:)  My question to you
17  is:  You testified earlier that the conversation
18  with Mr. Helveston was at the direction of an
19  attorney.  So would it be fair to say that that
20  conversation occurred after you received this
21  letter from Ms. Palmer?
22  **A.  I'm still not quite sure I understand**
23  **your exact question.**

Page 28

1   Q.  You testified it became a legal
2   matter when you received the letter from Ms.
3   Palmer.  Is that true?
4       MS. BARLOTTA:  Object to the form.
5   She testified she handed it to legal.  I don't
6   think she testified that she classified it one
7   way or the other.
8       MS. GILL:  She did testify to that a
9   minute ago.  I'm just making sure that that is --
10  if she is standing by her prior testimony.
11      MS. BARLOTTA:  No, I think you've
12  misrepresented the testimony.  I talked about it
13  being a legal matter, therefore the privileges
14  became involved.  I don't think she characterized
15  it as one way or the other.
16      MS. GILL:  That's not accurate.  She
17  testified that when she received this letter, it
18  became a legal matter.  So my question to her, to
19  Ms. Petty is, when you received --
20  Q.  (BY MS. GILL:)  Is that true, when
21  you received this letter from the attorney, did
22  the issue suddenly become a legal matter?
23      MS. BARLOTTA:  Object to form, and

Page 29

1  move to strike counsel's testimony.
2      Q.  You can answer the question.
3      A.  I'm sorry.  Can you repeat?  Did you
4  say answer the question or --
5      Q.  Yes.  You can always answer the
6  question when she objects.  She's just preserving
7  the issue for the record.  The only time you
8  don't answer is when she instructs you not to.
9          So my question to you is:  Upon
10 receipt of this letter from Ms. Hendrix's lawyer,
11 Leslie Palmer, did the allegations become a legal
12 matter?
13         MS. BARLOTTA:  Object to form.
14 That's a different question.
15     Q.  You can answer.
16         MS. BARLOTTA:  That calls for a legal
17 conclusion.
18     Q.  You can answer.
19     A.  I sent the letter --
20         THE REPORTER:  I'm sorry.  I didn't
21 hear you.
22     Q.  (BY MS. GILL:)  Ms. Petty, you can
23 answer.

Page 30

1      A.  I sent the letter to our legal group
2  upon receipt.
3      Q.  So at that point, you considered it a
4  legal matter?
5          MS. BARLOTTA:  Object to form.
6      Q.  You can answer.
7          MS. BARLOTTA:  You're asking her --
8  you're just asking her personal opinion.  This is
9  not part of her 30(b)(6) testimony.
10         MS. GILL:  I'm asking her when BB&T
11 or Truist or CRC determined it was a legal matter
12 and they needed to provide this to their
13 attorney.
14         MS. BARLOTTA:  That's outside the
15 scope of the 30(b)(6), so she's testifying as a
16 fact witness at this point, and it will just be
17 based on her personal knowledge.
18         MS. GILL:  She's already testified --
19 I'll move on.  She's already answered it
20 previously, but anyway.
21     Q.  (BY MS. GILL:)  So the conversation
22 with Mr. Helveston, was it after this letter or
23 before this letter?

Page 31

1      A.  It was after this letter.
2      Q.  Thank you.  In your conversation with
3  Mr. Helveston, did you discuss the allegations of
4  Ms. Hendrix?
5          MS. BARLOTTA:  She's already -- we've
6  already instructed her not to answer about the
7  contents of her discussion with Mr. Helveston.
8          MS. GILL:  Okay.
9      Q.  (BY MS. GILL:)  Was your
10 conversation --
11         MS. BARLOTTA:  It was at the
12 direction of counsel.
13         MS. GILL:  I understand, and we're
14 going to take that up with the Court.  I'm asking
15 about the facts, not about what counsel's mental
16 operations or legal strategy or instructions to
17 the client.  I'm not asking any of those things.
18 I'm asking about the facts of the case.
19     Q.  (BY MS. GILL:)  What did you do to
20 investigate the allegations of Ms. Hendrix?
21         MS. BARLOTTA:  You can answer that
22 question.
23     A.  Based on the information that I had,

Page 32

1  I was unable to -- I didn't have enough
2  information based off of what she sent to me, and
3  she did not respond to me, so I never had a
4  conversation with her.
5          We received the legal letter, and it
6  was turned over to legal, and then I assisted our
7  legal group with gathering the information
8  regarding that situation.
9      Q.  Okay.  So the legal group conducted
10 the investigation?
11     A.  I'm not speaking on behalf of the
12 legal group, but my part in it was I did help to
13 gather information to provide to our legal group.
14     Q.  What information did you gather?
15         THE WITNESS:  Do I answer that?
16         MS. BARLOTTA:  You can answer in
17 terms of any documents without -- that you
18 provided to counsel, company records you provided
19 to counsel, to in-house counsel, but you
20 shouldn't be talking about anything that would
21 involve substantive communications with you and
22 counsel, for instance, counsel directed you to do
23 X, Y, and Z, or counsel directed you to gather

Page 33

1   certain things.  Nothing that's going to involve
2   the direction of in-house counsel.
3           MS. GILL:  And we don't agree with
4   that.  If you're going to -- if you're going to
5   rely upon the defense of good faith efforts in,
6   you know, conducting an investigation, you know,
7   those are factual questions, asking her what she
8   did, who she interviewed, what did those
9   witnesses say to her.  I think all of that is
10  relevant, and I think it all comes in, and I
11  think it's not protected by --
12          MS. BARLOTTA:  Well, if I get to ask
13  you who are all the people that you interviewed
14  and what are all the documents you gathered in
15  response to this letter.  I'm not allowed to ask
16  your witness that.  She's going to testify --
17          MS. GILL:  That's different.
18          MS. BARLOTTA:  No, it's not
19  different.  It's exactly the same.
20          MS. GILL:  It is different.  I'm not
21  asking her --
22          MS. BARLOTTA:  And the company has
23  counsel that was responding to legal allegations,

Page 34

1   so if they direct their employees to go gather
2   certain documents and have certain conversations,
3   that's all privileged in the same way it's
4   privileged with respect to what you and your
5   client did in drafting this letter.
6           MS. GILL:  I'm not asking her
7   anything the attorneys said to her.  I'm not
8   asking for the attorney's mental operations.  I'm
9   not asking for documents prepared like charts and
10  things like that in anticipation of litigation.
11  So we do not agree, and we will address this with
12  the Court.
13          MS. BARLOTTA:  Okay.
14          MS. GILL:  Are you instructing her
15  not to answer as to any conversations she had
16  with any witnesses?
17          MS. BARLOTTA:  Yeah, she's not
18  allowed to talk about what she did at the
19  direction of counsel, again, like you're not
20  going to let me ask your client about everything
21  you directed her to do.  So it's the same thing.
22  It's no different.
23          MS. GILL:  I'm not asking her what

Page 35

1   you told her to do, but that's okay.  We'll take
2   it up with the Court.  We'll move on.
3           You certainly would be able to ask if
4   my client talked to John Smith and what was said,
5   and that's all I'm doing.  I'm not asking who
6   directed you to do it.  I'm asking what did you
7   do, which is very different.
8           MS. BARLOTTA:  Well, she --
9       Q.   (BY MS. GILL:)  What did you do --
10          MS. BARLOTTA:  She's already
11  testified that the conversations were at the
12  direction of counsel, so if counsel told her what
13  to ask, then, again, that's all going to be
14  privileged.  Attorney/client and work product
15  privilege.
16          MS. GILL:  We don't agree.
17      Q.   (BY MS. GILL:)  What did you do to
18  investigate --
19          MS. BARLOTTA:  I understand you don't
20  agree, but if you want to keep arguing about it,
21  we can keep arguing about it or we can just move
22  on.
23      Q.   What did --

Page 36

1           MS. GILL:  I'm moving on.
2       Q.   (BY MS. GILL:)  What did you do --
3   what did you actively, actively physically do to
4   investigate the claim?
5           MS. BARLOTTA:  She's already answered
6   that question.
7       Q.   You can answer.
8           MS. BARLOTTA:  Asked and answered.
9   Stefani, you can just testify to what
10  you've already testified to.
11      A.   I've already testified.
12      Q.   And what was that testimony?  I
13  missed it somehow through all the arguing.
14      A.   Upon receipt of the letter, I turned
15  the letter over to our legal group, and then at
16  the direction of our legal group, I assisted in
17  gathering information needed for the
18  investigation.
19          MS. GILL:  And just so the record is
20  clean, you're instructing her not to answer any
21  questions about what information she did receive
22  during the investigation; is that true?
23          MS. BARLOTTA:  Yes, again, because

Page 37

1    it's information obtained --
2         MS. GILL:  All you've got to say is
3    yes.  All you've got to say is yes.
4         MS. BARLOTTA:  No.  I'm going to make
5    my objections and state my responses.  You don't
6    get to limit what I say.
7         So yes, she's been instructed not to
8    answer, because she's already testified that what
9    she did was at the direction of counsel in
10   response to a legal demand from --
11        MS. GILL:  Okay.
12        MS. BARLOTTA:  So attorney/client,
13   work product, and anticipation of litigation
14   privileges all apply.
15        MS. GILL:  Okay.  So you're
16   instructing her not to answer.  Thank you.  We'll
17   move on.
18        We're going to take a break for a
19   second if that's okay.
20        MS. BARLOTTA:  Sure.
21        VIDEOGRAPHER:  We are going off the
22   record.  The time is 10:37.
23        (Whereupon, a brief recess was

Page 38

1    taken.)
2         VIDEOGRAPHER:  We are back on the
3    record.  The time is 10:52.
4         MS. GILL:  She's pulling up what we
5    have marked as Plaintiff's Exhibit Number 4.
6         Are we back on the record?
7         VIDEOGRAPHER:  We are.
8         MS. GILL:  Okay.
9         (Whereupon, Plaintiff's Exhibit No. 4
10   was marked for identification and a copy of same
11   is attached hereto.)
12        Q.   (BY MS. GILL:)  Have you seen this
13   document before, Ms. Petty?
14        A.   Yes, I believe so.
15        Q.   Okay.  And without asking what was
16   said between you and the attorney, Ms. Thomas, is
17   Ms. Thomas who you worked with to assist in the
18   investigation?
19        A.   Yes.
20        Q.   Okay.  And would it be fair to say
21   that the investigation began after receipt of the
22   October 8th, 2019 letter?
23        MS. BARLOTTA:  Object to form.

Page 39

1    A.   Yes.  I mean, if that was the day.  I
2    don't recall the exact date of when we received
3    the letter.
4         Q.   Okay.  So it might have been a day or
5    two after, but whenever the letter came to you,
6    is that when it began?
7         MS. BARLOTTA:  Object to form.
8    A.   When I received the letter, I turned
9    it over to our legal department.
10        Q.   Okay.  And if you'll -- we can go
11   back to Plaintiff's Exhibit Number 3.  If you'll
12   go back to the first page.  It's an e-mail
13   attaching a letter, it says October 10th.  Do you
14   agree with that when you received the letter?
15   A.   Yes, I agree that's when I received
16   this e-mail.
17        Q.   Let me show you what's marked as
18   Plaintiff's Exhibit Number 5.
19        (Whereupon, Plaintiff's Exhibit No. 5
20   was marked for identification and a copy of same
21   is attached hereto.)
22        Q.   Have you seen that letter?
23   A.   I'm -- I'm not sure if I've seen this

Page 40

1    letter.
2         Q.   Okay.  In that letter -- I'm just
3    going to ask you about one thing it says.  It
4    says that CRC is not interested in the severance
5    proposal outlined in your letter.
6         Did CRC consider Ms. Hendrix as being
7    resigned at that point or not?
8         MS. BARLOTTA:  Object to form.
9    A.   I'm not sure I understand your
10   question when you say at that point.
11        Q.   As of November 14th, was Ms. Hendrix
12   still employed by CRC and on leave?
13   A.   Yes.
14        Q.   Okay.  Let me show you what's being
15   marked as Plaintiff's Exhibit Number 6.
16        (Whereupon, Plaintiff's Exhibit No. 6
17   was marked for identification and a copy of same
18   is attached hereto.)
19        Q.   Have you seen this document?  It's an
20   e-mail and attached letter -- (audio
21   interference).
22        THE REPORTER:  I'm sorry, Patricia.
23   Could you repeat that?

Page 41

1    MS. GILL:  It's an e-mail that
2  attaches a letter of resignation and an EEOC
3  charge.  I'm asking her if she saw that.
4    **A.  Is there -- you're asking me if I**
5  **received that, her resignation?**
6    Q.  (BY MS. GILL:)  Yes, ma'am.
7    **A.  Yes.**
8    Q.  Okay.  In her letter about midway
9  through the first paragraph, she says, No one has
10  contacted me or my attorney concerning any
11  investigation, no new policies have been
12  implemented, and the conduct continues.  Do you
13  see that?
14    **A.  Yes.**
15    Q.  Did -- to your understanding, did
16  anyone at CRC or BB&T or Truist contact Ms.
17  Palmer or Ms. Hendrix to conduct the
18  investigation?
19    MS. BARLOTTA:  Object to form.
20    **A.  I reached out to Ms. Hendrix multiple**
21  **times as soon as we received her initial letter.**
22    Q.  Okay.  Did anybody reach out to Ms.
23  Hendrix after you received the October 8th

Page 42

1  letter?
2    **A.  I don't recall --**
3    MS. BARLOTTA:  Object to form.
4    **A.  -- the October 8th.**
5    Q.  I'm sorry.  I guess it was an e-mail
6  October 10th that contained a letter.
7    **A.  And what is your question?**
8    Q.  Did anyone contact either Ms. Palmer
9  or Ms. Hendrix to investigate what her -- the
10  extent of her allegations?
11    MS. BARLOTTA:  Object to the form.
12  Asked and answered.
13    Q.  Was there an answer?  I didn't hear
14  the answer.  I'm sorry.  Can you repeat that?
15    **A.  I reached out to Ms. Hendrix upon**
16  **receipt of her initial letter.**
17    Q.  Yes.  My question -- and my question
18  is:  Did anybody reach out to her after receiving
19  the October 10th e-mail that contained the letter
20  from her attorney?  Did anybody reach out to her
21  or her attorney at that point?
22    MS. BARLOTTA:  You're asking if
23  anyone reached out to her for a second time?

Page 43

1    Q.  After the October 8th -- 10th e-mail,
2  did anybody reach out to her?
3    MS. BARLOTTA:  I think that's --
4  okay.  That's the problem with the question, but
5  it's fine.
6    Do you understand the question,
7  Stefani?
8    THE WITNESS:  I don't.  I'm just
9  trying to make sure I --
10    Q.  (BY MS. GILL:)  Did you or anybody at
11  CRC, BB&T, or Truist contact Ms. Hendrix or her
12  attorney, Leslie Palmer, after receipt of the
13  October 10th letter?
14    MS. BARLOTTA:  Object to form.
15    **A.  I reached out to her initially from**
16  **her first letter.**
17    Q.  I understand --
18    **A.  She did not respond.**
19    Q.  -- you testified --
20    **A.  I can't speak -- can I answer?**
21    Q.  Yeah.  I would like you to answer the
22  question I asked, not if you reached out to her
23  after the September letter, because you've

Page 44

1  already answered that.
2    I'm asking if you or anybody at BB&T,
3  Truist, or CRC reached out to her after the
4  October 10th letter, her or her attorney.
5    MS. BARLOTTA:  Object to form.
6    **A.  I can only speak for myself.  I did**
7  **not reach out to her after the letter from her**
8  **attorney.**
9    Q.  Okay.  Do you have any information or
10  knowledge that anyone at CRC, Truist, or BB&T
11  reached out to Ms. Palmer after receipt of that
12  letter to assist in the investigation?
13    MS. BARLOTTA:  Object to form.
14    THE REPORTER:  I can't hear her.
15    Q.  We can't hear you.
16    **A.  I think we looked at the e-mail.**
17    THE REPORTER:  She's breaking up.
18    MS. GILL:  She's breaking up, yeah.
19    THE WITNESS:  Can you hear me?
20    MS. GILL:  We cannot hear her.
21    THE WITNESS:  Can you hear me now?
22    MS. GILL:  She's frozen.  I think if
23  that was Ms. Petty that said, Can you hear me

Page 45

1    now, we can hear you, but we can't see you moving
2    or anything.
3           THE REPORTER:  Do you want to go off
4    the record?  We lost her.
5           VIDEOGRAPHER:  Do you want to go off
6    the record?
7           MS. GILL:  Yeah, we might as well
8    until she gets back on.
9           VIDEOGRAPHER:  We're going off the
10   record the time is 11:04.
11          (Whereupon, a brief recess was
12   taken.)
13          VIDEOGRAPHER:  We're back on the
14   record.  The time is 11:10 a.m. Central.
15          Q.   (BY MS. GILL:)  Can you hear me, Ms.
16   Petty?  Can you hear me, Ms. Petty?
17          (Whereupon, a discussion off the
18   record was held.)
19          Q.   (BY MS. GILL:)  Before your computer
20   froze and we had to take a little break, we were
21   talking about Plaintiff's Exhibit Number 6, and
22   you mentioned you did receive the resignation
23   letter; is that correct?

Page 46

1           MS. BARLOTTA:  Object to form.
2           A.   I received her --
3           Q.   The resignation letter from Kat?
4           A.   I received her resignation letter,
5    yes.
6           Q.   Did Ms. Hendrix attach her proposed
7    charge of discrimination to the resignation
8    letter?
9           A.   I would need to see the e-mail.  I
10   don't recall.
11          Q.   Okay.  Let me ask you this:  Did you
12   receive the e-mail -- her resignation letter by
13   e-mail or by U.S. mail?
14          A.   I received it by e-mail.
15          Q.   Okay.  But you don't recall if the
16   charge was attached to it or not?
17          A.   I would just want to see the e-mail
18   to review that.
19          Q.   Okay.  You can scroll up.  The e-mail
20   I have is to Ms. Thomas.  So my -- did Ms. -- did
21   Kathryn Hendrix send you her resignation letter?
22          A.   I received notice she was resigning
23   from her --

Page 47

1           Q.   Okay.
2           A.   I would --
3           Q.   I guess my question is:  In this
4    e-mail to legal counsel, Ms. Palmer says, Ms.
5    Hendrix forwarded these documents to Ms. Petty
6    earlier this morning.
7           My question to you is:  Did you
8    receive the resignation letter and the EEOC
9    charge from Ms. Hendrix?
10          A.   I received her resignation notice.  I
11   just don't recall if that was attached to the --
12   (audio interference.)
13          THE REPORTER:  I'm sorry.  You're
14   going to have to speak up.  Attached to the what?
15          THE WITNESS:  E-mail.
16          Q.   (BY MS. GILL:)  Did you see Ms.
17   Hendrix's EEOC charge at that time or did you see
18   it after it was filed?
19          A.   I don't remember the exact date that
20   I saw her EEOC charge.
21          Q.   Okay.  Let me show you Plaintiff's
22   Exhibit Number 7.
23

Page 48

1           (Whereupon, Plaintiff's Exhibit No. 7
2    was marked for identification and a copy of same
3    is attached hereto.)
4           Q.   Have you seen this document before?
5           A.   Yes.
6           Q.   Okay.  And after you received this
7    charge or saw this charge, what did CRC do to
8    investigate?
9           A.   Upon receipt of the letter from her
10   attorney, it was turned over to our legal group.
11          Q.   Okay.  And did you participate in the
12   investigation into the allegations of this
13   charge?
14          A.   I assisted our legal group with
15   gathering information.
16          Q.   Okay.  And what did you do -- what
17   information did you gather?
18          MS. BARLOTTA:  We're not going to --
19   we just already tread on this ground, Trish.  I
20   don't know why you're going back over it.
21          She's not going to answer questions
22   about what legal counsel directed her to do after
23   we got a demand letter from the plaintiff who's

Video Deposition of Stefani Petty

7/13/2023
13 (49 - 52)

Page 49

1 represented by counsel asking for money.
2          This is all anticipation of
3 litigation and protected under attorney/client
4 and attorney work product privileges.
5          MS. GILL:  Are you going to dismiss
6 any Faragher defense?
7          MS. BARLOTTA:  Well, she doesn't have
8 a sexual harassment claim, does she?
9          MS. GILL:  Are you going to dismiss
10 any good faith defense?
11          MS. BARLOTTA:  I think you
12 misunderstand good faith.  It's not the same
13 thing as Faragher.
14          I'm not aware of there being a
15 hostile work environment claim in this case.  If
16 there is, then perhaps we do have a Faragher
17 defense, but it's not going to be based upon what
18 we consider to be privileged information.
19          MS. GILL:  If you'll give me one
20 second.  Are you going to contest punitive
21 damages?
22          MS. BARLOTTA:  Yes.
23          MS. GILL:  Okay.  So -- and just so

Page 50

1 I'm clear, you're going to instruct your witness,
2 the 30(b)(6) corporate representative, not to
3 testify about any facts related to any
4 investigation into the allegations made by
5 Kathryn Hendrix?
6          MS. BARLOTTA:  Well, let me be clear.
7 She has testified already about the efforts that
8 she made in response to the initial letter from
9 Ms. Hendrix to get an understanding of her
10 allegations.
11          After this became a legal matter,
12 after Ms. Hendrix hired counsel, made a demand,
13 obviously we are in anticipation of litigation at
14 that point, if not full-blown litigation.  And
15 her EEOC charge was presented to the company in
16 the same way, coming from her counsel.
17          So anything in response to that is
18 going to be privileged, and she's not going to be
19 allowed to testify about that.
20          MS. GILL:  Okay.  And so you're
21 instructing her not to answer on those issues
22 based on those privileges?
23          MS. BARLOTTA:  Right.  But as she's

Page 51

1 already testified to, which she is going to
2 testify to, is about the efforts that were made
3 in response to Ms. Hendrix's first letter before
4 she retained counsel.
5          MS. GILL:  Okay.
6          MS. BARLOTTA:  And made legal
7 demands.
8          MS. GILL:  Okay.  I think we're going
9 to have to address this issue with the judge to
10 the extent that a human resource witness is
11 having conversations with other witnesses about
12 the allegations and investigating the claims,
13 because we don't believe that's protected under
14 attorney/client privilege, work product, or
15 anticipation -- it's a fact -- we're trying to
16 discover facts, not documents prepared in
17 anticipation of litigation or documents --
18          MS. BARLOTTA:  You can -- and, Trish,
19 you can discover facts, right?  You can talk to
20 -- you can depose Mr. Helveston about what he
21 knows concerning, you know, what happened with
22 Ms. Hendrix's employment and Mr. Daugherty, and
23 all the people who work with Ms. Hendrix who have

Page 52

1 knowledge about her pay, which is her primary
2 claim in this case, and her working environment
3 there.
4          So you've got plenty of witnesses at
5 your disposal to obtain facts without having to
6 subvert the attorney/client and work product
7 privileges.
8          MS. GILL:  But statements that he
9 would have made to HR are --
10          MS. BARLOTTA:  There's no claim in
11 this case about what legal did or did not do.
12 All the information, factual information you need
13 pertaining to your client's claims you can get.
14          But trying to use -- but trying to
15 get at what the in-house counsel did, it's not
16 appropriate.
17          MS. GILL:  I am not trying to get
18 what in-house counsel did.  I'm trying to get
19 what facts were revealed in her investigation.
20 That's the purpose of discovery.
21          MS. BARLOTTA:  Well, I don't get --
22 just like I can't go look in your files, you
23 can't look in ours.  That's how it works.

Page 53

1    MS. GILL:  I'm not asking to look in
2  your file.
3    MS. BARLOTTA:  Well, you are.  And if
4  I were to ask you who you talked to in your
5  investigation of Ms. Hendrix's allegations when
6  she came to you and what you did when you drafted
7  that letter, you would say I'm not entitled to
8  that.  You're not entitled --
9    MS. GILL:  You wouldn't be
10  entitled --
11    MS. BARLOTTA:  Excuse me.  Just --
12  excuse me.  Just like you're not entitled to find
13  out what Truist in-house counsel did and who they
14  directed their employees to talk to so they could
15  respond to the letter.  It's not --
16    MS. GILL:  I wasn't asking who they
17  directed.  I'm asking what she did.  And you
18  would be entitled to ask my client who she spoke
19  with about the case.  Not us, but if she spoke to
20  Mr. Helveston, you would be able to get all that.
21    MS. BARLOTTA:  Ms. Petty has already
22  talked to -- already said who she talked to.  You
23  asked her if she talked to Mr. Helveston, and

Page 54

1  she's testified to that.
2    MS. GILL:  But you would be able to
3  ask what she discussed with Mr. Helveston.
4    MS. BARLOTTA:  Right, because she
5  already testified that that discussion happened
6  at the direction of counsel.
7    MS. GILL:  No, no, no.  I'm saying if
8  my client went and spoke to Mr. Helveston, you
9  would be able to ask her, Did you speak to Mr.
10  Helveston and what was said?  There's no
11  difference here.
12    MS. BARLOTTA:  Yeah, it is different.
13    MS. GILL:  I'm asking --
14    MS. BARLOTTA:  If I asked your
15  client --
16    MS. GILL:  -- discussion past
17  discovery.
18    MS. BARLOTTA:  -- what did you do in
19  response to your attorney's request when you came
20  to their office and they said you wanted them to
21  represent you, and they said, Here's what you
22  need to go get, you would not let me ask -- you
23  would not let me ask her about that, and you

Page 55

1  would instruct her not to testify about that.
2  It's the same thing.
3    Instead of going and asking the
4  witnesses about what they know, what you're
5  trying to do is shortcut, short-circuit this and
6  get into Truist in-house counsel's files.  You
7  can't do that.
8    MS. GILL:  I'm not trying to do that.
9  She's a fact witness.
10    MS. BARLOTTA:  Let's just move on.
11    MS. GILL:  A 30(b)(6) witness.
12    MS. BARLOTTA:  We are wasting time.
13  We're not going to agree.  You're going to have
14  to go get an order from Judge Haikala that we
15  have to reveal to you conversations --
16    MS. GILL:  It's not a process of --
17    MS. BARLOTTA:  -- with in-house
18  counsel in the process of this investigation
19  after Ms. Hendrix retained counsel.
20    MS. GILL:  Well, my understanding of
21  the law is that you have to file for a protective
22  order, and you haven't done that in this case.
23    MS. BARLOTTA:  No, no, I don't.  No.

Page 56

1  You are so far outside the 30(b)(6), you need to
2  be compelled.  There's nothing in the 30(b)(6)
3  that says that we're going to talk about
4  privileged information or what in-house counsel
5  did.
6    MS. GILL:  I'm not asking for
7  privileged information or what in-house counsel
8  did.  I've never asked that question.
9    MS. BARLOTTA:  Well, you're wrong.
10    MS. GILL:  I think we need to call
11  the Court.  If you'll give me a second, I'm going
12  to look up the phone number, and we can call the
13  judge.  I'll be right back.
14    THE REPORTER:  Do you want to go off
15  the record, Trish?
16    MS. GILL:  I think we should stay on
17  the record with the phone call with the judge.
18    MS. BARLOTTA:  We should finish the
19  deposition.  And the judge is going to want to
20  know at the end of it what all we were able to
21  resolve and what we weren't.
22    To stop it at this point when you've
23  already said that we would take this up with the

Video Deposition of Stefani Petty                    7/13/2023
                                                     15 (57 - 60)

Page 57

1  judge and then you keep bringing it up, and then
2  you're trying to interrupt the judge in the
3  middle of the day to get an answer on the spot
4  is, I think, not a wise move.
5       You need to finish the deposition,
6  get your questions answered that you have, and we
7  can take this up with the judge at a later time.
8  But we've got a witness sitting here on the Zoom.
9       MS. GILL:  I think we need to resolve
10 this, because she's from out of town, and if
11 we're going to have to come back --
12      MS. BARLOTTA:  She's virtual.  You
13 can take her deposition again virtually at
14 another time.
15      MS. GILL:  I think we would like to
16 get advice from the judge at this point.  So
17 we're going to call the docket clerk real quick.
18      (Phone call made.)
19      MS. PALMER:  I'm trying to get to
20 Judge Haikala's law chambers, please.  Yes,
21 ma'am, we are in a deposition right now, and
22 we'll need the Court's instruction on an issue in
23 the deposition.

Page 58

1       Hi, this is Attorney Leslie Palmer.
2  I'm calling about Case Number 2:21-CV-300 with
3  Judge Haikala.  We were wondering if we could get
4  Judge Haikala on the phone about a deposition
5  dispute that we're having.  My phone number is
6  (205) 285-3050.  And, again, it's Case Number
7  2:21-CV-00 -- 300.  It is 11:28 on Thursday, July
8  the 13th.  Thank you very much, bye-bye.
9       MS. GILL:  So Leslie has left a
10 message.  Nobody is answering right now, so we'll
11 just keep going, and we will address that when
12 the call comes back.
13      All right.  Is everybody ready?  I
14 think we're still on the record.
15      THE REPORTER:  Yes.
16      VIDEOGRAPHER:  You are still on the
17 record.
18      Q.  (BY MS. GILL:)  Okay.  Let me show
19 you what I've marked as Plaintiff's Exhibit
20 Number 10.
21      (Whereupon, Plaintiff's Exhibit No.
22 10 was marked for identification and a copy of
23 same is attached hereto.)

Page 59

1       MS. GILL:  We're skipping 8 and 9 for
2  the record.
3       MS. PALMER:  Sorry, Tanya, I had them
4  premarked.
5       MS. GILL:  They were premarked.
6  Sorry.
7       THE REPORTER:  It's okay.
8       Q.  (BY MS. GILL:)  Have you seen this
9  document?
10      A.  I'm not exactly sure what this is
11 from.  Is this --
12      Q.  I'll represent to you that CRC
13 provided it to us in discovery as a policy and
14 procedure.
15      A.  Okay.
16      MS. BARLOTTA:  I think it's from the
17 handbook, is it not?
18      MS. GILL:  It is.  I just didn't want
19 to produce all hundred and seventy something
20 pages, so I took an excerpt.
21      Q.  (BY MS. GILL:)  Have you seen this?
22      A.  Yes.
23      Q.  Okay.  And in this policy, it says we

Page 60

1  -- at the top it says -- hang on.  Sorry.  It's
2  at the bottom is where I need to go.
3       The equal opportunity provision of
4  the handbook, it says that BB&T is committed to
5  equal opportunity for all associates and
6  applicants, and they will not discriminate on the
7  basis of color, religion, national origin, and
8  gender.
9       I guess my question to you is:  Is a
10 BB&T policy handbook applicable to CRC as well
11 and their employees?
12      A.  Yes.
13      Q.  And so what did BB&T, Truist, or CRC
14 do to ensure equal opportunity for all employees?
15      MS. BARLOTTA:  Object to form.
16      A.  So can you clarify what you mean by
17 that specifically?
18      Q.  Well, this policy says that BB&T is
19 committed to equal opportunity for all associates
20 and applicants, and that they will not
21 discriminate against applicants or associates on
22 the basis of gender.
23      What did BB&T, CRC, or Truist, or --

Page 61

1   what did they do to ensure that there was no
2   discrimination on the basis of gender?
3        MS. BARLOTTA:  Object to form.
4        A.   So, I mean, we provide training
5   around that.  We provide -- we have policies.  We
6   have the handbook.  I'm still, I guess, just not
7   exactly sure what you mean by that.
8        Q.   And those are the kinds of things I'm
9   looking for.  In terms of the training, what
10  training did you provide to the employees of CRC
11  as it relates to gender discrimination?
12       A.   So all employees receive training
13  around our code of ethics and workplace
14  harassment training.  Those are annual trainings
15  that they take, and --
16       Q.   Okay.
17       A.   -- they have to --
18       Q.   I'm sorry.  I was just saying okay.
19  Did you have more to say?
20       A.   No.
21       Q.   Okay.  Did you train on treating
22  people differently on the basis of gender, not
23  just harassment, but like equal opportunities and

Page 62

1   pay?
2        MS. BARLOTTA:  Object to form.
3        A.   Yes, those things are part of that.
4        Q.   It's contained in the training?
5        A.   Yes, there's discussion.
6        Q.   Did the managers or supervisors have
7   training on making sure females and males are
8   receiving equal pay for like duties?
9        MS. BARLOTTA:  Object to form.
10       A.   The managers all had to take the
11  courses as well, the trainings that were
12  provided.
13       Q.   Was the managers' training the same
14  as the employees' training?
15       MS. BARLOTTA:  Object to form.
16       A.   The courses that were taken annually
17  were distributed to everyone.  There is specific
18  --
19       Q.   Okay.  There is specific what?
20       A.   There is specific courses and
21  trainings that go to managers specifically as
22  well.
23       Q.   Do you know whether documentation

Page 63

1   relating to the manager training has been
2   produced in this case?
3        MS. BARLOTTA:  Object to form.
4        A.   I don't know exactly what's been
5   presented, but, I mean, I've stated that I know
6   we take the annual training courses.
7        Q.   Is anyone messaging you during this
8   testimony?
9        A.   No.
10       Q.   Okay.  Let me show you what's being
11  marked as Plaintiff's 11.
12       (Whereupon, Plaintiff's Exhibit No.
13  11 was marked for identification and a copy of
14  same is attached hereto.)
15       Q.   Have you seen this document before?
16       A.   Can you make it a little bit bigger?
17  Is that possible?
18       Q.   Yeah.
19       A.   Yes.
20       Q.   Is this a different handbook or the
21  same handbook of Plaintiff's Exhibit Number 10?
22       A.   I don't recall if it's the same or
23  different.

Page 64

1        Q.   At the bottom it says 2019.  Would
2   that --
3        A.   I can't tell just by this.  I would
4   have to see the --
5        Q.   Okay.  I'm going to shift some gears
6   a little bit and talk about some other areas of
7   law until we can get a response from the judge on
8   those other issues.
9        Let me ask you this:  Does HR
10  participate in determining the salaries and
11  bonuses for employees?
12       A.   HR does not -- (audio interference).
13       Q.   Okay.  And would that --
14       THE REPORTER:  I'm sorry.  I didn't
15  hear that.
16       THE WITNESS:  And it was just an echo
17  on my end.  Can you hear me?
18       THE REPORTER:  So your answer was:
19  HR does not.  Was that your full answer?
20       A.   HR does not specifically determine
21  the pay, but there are guidelines around that.
22       Q.   (BY MS. GILL:)  And where are those
23  guidelines kept?

Page 65

1       MS. BARLOTTA:  I'm just going to
2  interject.  Mr. Daugherty was designated on all
3  pay issues concerning this case.  So this is --
4  Ms. Petty's deposition is outside of that just
5  based upon personal knowledge, not as 30(b)(6).
6       MS. GILL:  What I was asking her is
7  HR -- if they participated, and she said
8  guidelines were kept.
9       Q.   (BY MS. GILL:)  So let me ask you
10 this:  Does HR keep the guidelines?
11      MS. BARLOTTA:  Object to form.  And,
12 again, this is her testimony.  With respect to
13 all pay issues identified in the 30(b)(6), Mr.
14 Daugherty was designated.
15      Q.   Are you designated -- are you an HR
16 representative at CRC?
17      **A.   Are you asking me now or then or --**
18      Q.   Yeah.  At the time -- well, were you
19 in HR --
20      **A.   Yes, I was at the time.  Yes, I was.**
21      Q.   Are you in HR now?
22      **A.   I work on HR stuff for insurance.**
23      Q.   Okay.  Are you at CRC or Truist or

Page 66

1  BB&T anymore?
2       **A.   I'm at Truist Insurance Holdings.**
3       Q.   Okay.  So does HR maintain those pay
4  guidelines?
5       **A.   So pay with regards to how pay would**
6  **have been determined, that would have been with**
7  **the business, how they determined the pay.**
8            **Guidelines that I think probably I'm**
9  **referring to as far as salary and things like**
10 **that, that was on the bank side, not the**
11 **insurance side.**
12      Q.   Okay.  So the guidelines, was that --
13 are you talking about like a salary range?
14      **A.   It's not the same in the insurance.**
15      Q.   Okay.  So the pay would be completely
16 up to CRC how it's -- the base salary is set and
17 what bonuses are given would be completely up to
18 CRC?
19      **A.   Yes.**
20      Q.   Okay.  And HR had no input
21 whatsoever?
22      MS. BARLOTTA:  Object to form.
23      **A.   Pay is based on the insurance**

Page 67

1  structure.
2       Q.   Right.  I'm just trying to confirm.
3  HR had nothing to do with that?
4       **A.   Right.  Their pay is based off of the**
5  **insurance broker structure.**
6       Q.   Gotcha.  Did BB&T or Truist, whoever
7  it was at the time when Ms. Hendrix was there,
8  did they review annually the pay structures of
9  the insurance brokers?
10      **A.   I'm not sure what you mean by review**
11 **annually.**
12      Q.   Did you -- each year when pay and
13 bonuses were being suggested, were you -- did you
14 review those decisions made by CRC brokers?
15      MS. BARLOTTA:  And, again, this is
16 going to be based upon Ms. Petty's personal
17 knowledge.  Mr. Daugherty was already designated
18 on all pay topics, so you're not going to come
19 back and revisit those topics and try to get
20 different answers from a different corporate
21 representative.
22      MS. GILL:  That's fine.
23      MS. BARLOTTA:  She's testifying about

Page 68

1  these issues from her personal knowledge as a
2  fact witness to the extent that she has personal
3  knowledge of them.
4       MS. GILL:  That's fine.
5       Q.   (BY MS. GILL:)  Did you -- did HR
6  review the pay structure as it relates -- after
7  the CRC insurance brokers created them?
8       MS. BARLOTTA:  Object to form.
9       **A.   I did not.**
10      Q.   Okay.  Do you know if anybody in your
11 department did?
12      **A.   I can't -- I can't answer that.**
13      Q.   Okay.  When you received the letters
14 from Ms. Palmer and the EEOC charge, did CRC take
15 steps to preserve the contents of Ms. Hendrix's
16 computer and cellphone?
17      MS. BARLOTTA:  Object to the form.
18      **A.   Yes.**
19      Q.   What steps did y'all take?
20      **A.   As I explained earlier, I'm under --**
21 **we're under -- I'm under a litigation hold**
22 **related to that.**
23      Q.   Okay.  I mean, did you physically

Page 69

1  confiscate the computer and phone to make sure
2  nobody tampered with it?
3      **A.   I did not.**
4      Q.   Okay.
5      **A.   But --**
6      Q.   So would it be fair to say the only
7  affirmative step taken was to place it on a
8  litigation hold?
9      MS. BARLOTTA:  Object to form.
10     **A.   I'm not sure what you're meaning by**
11  **that.**
12     Q.   Do you or anyone at CRC, Truist, or
13  BB&T take steps to preserve e-mails, documents
14  created by Ms. Hendrix, anything related to this
15  lawsuit that were contained in Ms. Hendrix's
16  computer or cellphone?
17     MS. BARLOTTA:  Object to form again.
18     **A.   We --**
19     MS. BARLOTTA:  Again, Trish, I
20  testified -- e-mailed about this earlier.  The
21  testimony that she's giving in a corporate
22  representative capacity is about the current
23  location of the laptop.

Page 70

1      She's not going to testify about the
2  phone, and if she did, it's based upon her
3  personal knowledge as a fact witness, not as a
4  CRC or corporate representative.
5      MS. GILL:  And that's fine.
6      Q.   (BY MS. GILL:)  Do you know where her
7  computer and cellphone are?
8      **A.   We have -- we do have those.**
9      Q.   You do?  Okay.  Did you conduct a
10  search on her computer or her cellphone to
11  determine if anything was related to the request
12  for production in this case?
13     MS. BARLOTTA:  She's not testifying
14  about that.  Don't answer that question.
15     MS. GILL:  She already said she
16  didn't know, so is there going to be a corporate
17  representative that has information related to
18  this?
19     MS. BARLOTTA:  No.  We only agreed to
20  testify -- was to put somebody up to testify
21  about the location of the laptop.  As I said in
22  my e-mail, she's prepared to testify about that.
23     MS. GILL:  Okay.  Did you file a

Page 71

1  protective order on this issue?
2      MS. BARLOTTA:  We already talked
3  about that, Trish, that we agreed that we would
4  take the depositions, and anything that was
5  unresolved, we would take up with the Court
6  afterwards in order to save time so we could get
7  the case moving given that we have a discovery
8  deadline in about fifteen days --
9      MS. GILL:  I think that --
10     MS. BARLOTTA:  I have the e-mails if
11  you don't remember that.
12     MS. GILL:  We did not waive any
13  requirement to file a protective order, just for
14  the record, but --
15     MS. BARLOTTA:  I'm not saying that.
16  What we agreed about was the timing, that we
17  would not file a protective order on the front
18  end so we could go ahead and get Mr. Daugherty's
19  deposition and Ms. Petty's deposition taken.
20     MS. GILL:  And I know I left the meet
21  and confer.  I don't know if that's what we
22  agreed to or not.
23     MS. BARLOTTA:  I sent an e-mail

Page 72

1  confirming that, and you all said that yes, it
2  was your understanding that we were going to go
3  ahead and proceed with the depositions without
4  waiting for the defendant to file a protective
5  order.
6      MS. GILL:  We're still allowed to ask
7  the questions, though.
8      MS. BARLOTTA:  Well, but I'm telling
9  you --
10     MS. GILL:  If she's going to be
11  excluded, that's another issue.
12     MS. BARLOTTA:  Again, and your
13  30(b)(6) doesn't have anything in there about her
14  phone.  She's prepared to testify, and what we
15  agreed to was that we would put somebody up to
16  testify about the location of the laptop.
17     MS. GILL:  Well, we're not
18  specifically confined --
19     MS. BARLOTTA:  You already know we're
20  not testifying -- again, we think it's an
21  infringement of attorney/client privilege for you
22  all to start asking witnesses about what searches
23  we've done for evidence in the case.

Page 73

1    MS. GILL:  And I don't agree with
2  that as well.  I guess when the judge calls us
3  back, we can address that as well.
4        If I recall at the hearing, Judge
5  Haikala wanted us to take these depositions to
6  determine what -- where the documentation is and
7  how we would revise our discovery requests to get
8  those records.
9        MS. BARLOTTA:  I would love it if we
10 could get to those questions, but that's not what
11 you're asking.  We still don't have an
12 understanding of what documents it is that you
13 think that you need or want that haven't been
14 produced or what they are that are relevant to
15 this case that haven't been turned over or
16 produced.
17       MS. GILL:  I think that we had a
18 five-hour meet and confer that we went through
19 and told you what documents we were requesting.
20       MS. BARLOTTA:  Okay.
21       MS. GILL:  We'll get into those
22 questions about that right now.
23       MS. BARLOTTA:  You're supposed to be

Page 74

1  getting testimony about comparators.
2        MS. GILL:  Can we take a break?  Just
3  one second.  We need to go off the record.
4        VIDEOGRAPHER:  We are off the record.
5  The time is 11:49.
6        (Whereupon, a brief recess was
7  taken.)
8        VIDEOGRAPHER:  We are back on the
9  record.  The time is 12:05.
10       Q.   (BY MS. GILL:)  Ms. Petty, when
11 either Helveston or Mr. Daugherty or Mr. Cadden
12 received an informal verbal complaint of
13 discrimination, are they required to report that
14 to HR?
15       A.   Yes.
16       MS. BARLOTTA:  Object to form.
17       Q.   Do you know if that happened in this
18 case?
19       MS. BARLOTTA:  Object to form.
20       THE WITNESS:  What was the question
21 that she asked?
22       Q.   (BY MS. GILL:)  Do you know if
23 Helveston, Cadden, or Daugherty reported an

Page 75

1  informal verbal complaint of discrimination to HR
2  in this case?
3        MS. BARLOTTA:  Object to form.
4        A.   I was notified by Kathryn's initial
5  letter that she was sent.
6        Q.   Do you know what e-mail program CRC
7  uses?
8        MS. BARLOTTA:  Corey already
9  testified about this.
10       MS. GILL:  Well, I was going to -- he
11 didn't know what level plan, so I was going to
12 ask her what level plan.
13       MS. BARLOTTA:  You can ask her if she
14 knows, but --
15       MS. GILL:  Okay.
16       MS. BARLOTTA:  (Audio interference.)
17       THE REPORTER:  I'm sorry.  I didn't
18 understand, Rachel.  You said what?
19       MS. BARLOTTA:  I said you can ask her
20 of her personal standpoint if she knows, yes.
21       Q.   (BY MS. GILL:)  Do you know -- my
22 understanding is they use Outlook.  Do you know
23 what level plan they use for Outlook?

Page 76

1        A.   I do not know.
2        Q.   Do you know who has control over
3  setting up groups on Outlook?
4        A.   On Outlook, no, I do not know.
5        Q.   Like, I think there was some
6  testimony previously about Birmingham
7  Professional being a group of specific people.
8  Do you know who set that up and who determines
9  who is in those groups?
10       A.   I do not know.
11       Q.   Do you know whether data is
12 maintained on a server or on the cloud?
13       A.   I do not know.
14       Q.   Do you know -- well, does HR do any
15 training on the appropriate use of e-mail?
16       MS. BARLOTTA:  Object to form.
17       A.   I don't exactly know what you mean by
18 that.
19       Q.   Is there any portion of the training
20 that relates to what e-mail can be used for and
21 what it cannot be used for?
22       MS. BARLOTTA:  Object to form.
23       A.   Yes, yes.

Page 77

1    Q.  Okay.  What training do employees
2    receive on that issue?
3        A.  There would be information in the
4    handbook or a policy.  I can't recall right off
5    the top of my head where that was located, but
6    there's just language around proper use.
7    Q.  Okay.
8        A.  Of --
9    Q.  Okay.  So it would be contained in
10   the policies?
11       A.  I'm not sure if it's policy or
12   handbook or --
13   Q.  Okay.  Are e-mails monitored for
14   inappropriate use?
15       MS. BARLOTTA:  Object to form.
16       A.  I can't speak to exactly the
17   monitoring.  We do have monitoring of e-mails,
18   but I can't speak to that.
19   Q.  Are there any policies as it relates
20   to e-mails of sharing non-business-related
21   information through e-mail?
22       MS. BARLOTTA:  Object to form.
23       A.  I'm just going to say the same thing

Page 78

1    I said previously around that.  I mean, I think
2    there is language, but I won't say specifically
3    that it's a policy or where it's located in the
4    handbook, but I think there's language related to
5    proper use.
6    Q.  Okay.  Do you know who has
7    administrative control over the Outlook system at
8    CRC's professional liability department?
9        MS. BARLOTTA:  Object to form.
10       A.  I don't know.
11   Q.  Do you have any information or
12   knowledge as to why one group of brokers would
13   switch which group they use?
14       MS. BARLOTTA:  Object to form.
15       A.  I don't -- I'm not quite sure what
16   you mean.  Use what?
17   Q.  For example, the brokers were using
18   Birmingham Professional at some point in time.
19   Do you have any information or knowledge why they
20   would switch from using that group?
21       MS. BARLOTTA:  Object to form.
22       A.  I'm still not quite sure I understand
23   what you mean by that question.  Who switch and

Page 79

1    use what?
2    Q.  The e-mail list for Birmingham
3    Professional.  Do you know why the people on
4    Birmingham Professional stopped using Birmingham
5    Professional and changed to another listserv?
6        MS. BARLOTTA:  Object to form.
7        A.  I don't know.
8    Q.  Did -- you mentioned there was e-mail
9    monitoring.  Is there cellphone monitoring on
10   company-owned cellphones?
11       A.  I'm not -- I don't know.
12   Q.  Okay.  And did CRC do anything to
13   preserve the contents of company-owned cellphones
14   such as text messages and things like that
15   related to this case?
16       MS. BARLOTTA:  Object to form.
17       A.  I just want to be clear I'm answering
18   what I know.  I mean, we would have litigation
19   hold, and if they were under the litigation hold,
20   they would have the same restrictions that I
21   would have on, you know, maintaining information.
22   Q.  So once a litigation hold is placed
23   on certain matters, is it up to that person, each

Page 80

1    person involved in the litigation hold to uphold
2    the litigation hold?
3        MS. BARLOTTA:  Object to form.
4        A.  If I'm understanding that correctly,
5    each person has to -- if they're under the
6    litigation hold, they're required to follow those
7    instructions.
8    Q.  Is there any way to monitor or check
9    whether or not they complied with the litigation
10   hold?
11       MS. BARLOTTA:  Object to form.
12       A.  I -- I can't answer that.
13   Q.  Do you know who the carrier is for
14   the company-owned phones?
15       A.  I think they have more than one.  I'm
16   not exactly sure which one was being used for
17   that group.
18   Q.  Can you list the different carriers
19   that were being used by CRC?
20       A.  I'm not a hundred percent sure.
21   Q.  So would the answer to that question
22   be I don't know?
23       A.  Yes.

Page 81

1    Q.   Do you have a way to find out that
2  information?
3         MS. BARLOTTA:  Object to form.
4    A.   Are you asking me if I can find out
5  who the carrier was regarding her phone?  Is that
6  what you're asking?
7    Q.   I would say for the employees in the
8  Birmingham professional liability department.
9    A.   Yes.
10   Q.   You could?  Okay.
11   A.   I can ask the question.
12   Q.   Yeah.  And where would you go to ask
13 that question?  Who would you ask?
14   A.   I can ask our operations group.  They
15 managed the phone plans.
16   Q.   Did CRC or BB&T or Truist record
17 calls made to HR?
18   A.   If calling into the 800 line, yes,
19 those calls are recorded.
20   Q.   Do you know how long those are
21 stored?
22   A.   I know there's a policy on retention.
23 I don't know that off the top of my head, but I

Page 82

1  know there was a schedule related to retention.
2    Q.   Okay.  I think I already covered
3  this, and correct me if I have.  Did -- was there
4  a policy or practice applicable to people like
5  Helveston, Daugherty, Hughes, and Cadden for
6  documenting complaints of discrimination?
7         MS. BARLOTTA:  Object to form.
8    A.   So there wasn't a -- like a system
9  they would document that in, but if you're asking
10 me if HR had a system, they did.
11   Q.   Okay.  So I think you testified
12 earlier, and correct me if I'm incorrect, that
13 they would report it to HR, and then HR -- you're
14 saying now HR has a document system to maintain
15 those records?
16   A.   I'm saying there was a system in
17 place that was used at the time.
18   Q.   Okay.
19   A.   But that was only for -- that system
20 was only for certain things, so I don't know.
21   Q.   What things were covered under the
22 system?
23   A.   So, I mean, so the system that was

Page 83

1  used at the time -- and I'm sorry.  This has just
2  been a lot of years ago.
3    Q.   I understand.
4    A.   So, yeah.  The system that was used
5  would have things documented in it that the HR
6  group would have worked on and investigated on
7  the HR side.  So code of ethics related matters.
8    Q.   Does that include complaints of
9  discrimination or differential treatment?
10        MS. BARLOTTA:  Object to form.
11   A.   Yes, if those were investigated on
12 the HR side.
13   Q.   And what if it's a hybrid
14 investigation where HR helps legal, would those
15 documents be maintained in HR or is that at
16 legal?
17        MS. BARLOTTA:  Object to form.
18   A.   As discussed earlier, it was turned
19 over to legal.
20   Q.   Okay.  So those documents -- the
21 documents in this case are not maintained in your
22 HR office?  Is that a true statement?  I'm sorry?
23   A.   Yes, that would be my understanding,

Page 84

1  yes.
2    Q.   Okay.  Is there a written policy on
3  the duty to document reports of discrimination?
4    A.   So when you say a written policy --
5    Q.   For example, if someone like Mr.
6  Helveston, Mr. Cadden, or Mr. Hughes, or even Mr.
7  Daugherty receives a verbal complaint of unfair
8  treatment based on gender, is there a policy or
9  some kind of written guidance that they're to
10 follow, of the steps that they need to follow in
11 order to document that discrimination or do they
12 just simply hand it over to HR and then let HR
13 handle it?
14        MS. BARLOTTA:  Object to form.
15   A.   There is guidance instructing
16 managers, leaders, anyone on reporting concerns.
17   Q.   Okay.  And is that guidance -- has
18 that guidance been produced in this case?
19        MS. BARLOTTA:  Object to form.
20   A.   My assumption would be yes.
21   Q.   Okay.  But you don't know for sure?
22        MS. BARLOTTA:  Object to form.
23   A.   I wasn't the one that turned over the

Page 85

1  information.
2      Q.   Okay.  Do you know who did?
3      A.   I'm assuming our legal group.
4          MS. BARLOTTA:  Object to form.
5          Okay.  Yeah, I was asking who
6  provided it to the lawyer.  Obviously, the lawyer
7  is going to produce the documents in the case,
8  but I was going to say:  Who helped collect those
9  documents for the lawyer?
10     A.   I would have.
11     Q.   Okay.  But you don't -- you didn't --
12 you did or didn't provide guidance or
13 instructions to the manager and leaders when they
14 received a complaint for this case?
15         MS. BARLOTTA:  She -- I think,
16 Stefani, I think her question is assuming that
17 your answer or your answer is assuming that there
18 is a specific written policy telling managers
19 what to do when they get some sort of a
20 complaint.
21         MS. GILL:  It's based on her
22 testimony that there is guidance --
23         MS. BARLOTTA:  She's asking if that

Page 86

1  has been -- if that specific document has been
2  produced.
3          MS. GILL:  Yeah, yeah.  Before I
4  asked that about the document, I asked her, and
5  she said there was guidance and instructions that
6  goes to managers and leaders.  And so I asked if
7  that's been produced in this case.  So that's --
8          MS. BARLOTTA:  There's guidance and
9  policies in the employee handbook about what to
10 do if you see discrimination.  I think you're
11 assuming that her answer means something
12 different than that.  I don't think she's
13 clarified that.
14     Q.   (BY MS. GILL:)  Well, when you said
15 that there was guidance or instructions to
16 managers and leaders about what to do with a
17 report of discrimination, is that a separate
18 document from the employee handbook?
19         MS. BARLOTTA:  Object to form.
20     A.   I can't recall right off.  I turned
21 over the information to our legal group that we
22 would have had that would have been applicable.
23     Q.   I'm asking you is it a separate

Page 87

1  document?  The document that you just testified
2  to, were you talking about a page of the handbook
3  or were you talking about a separate document?
4          MS. BARLOTTA:  She said guidance.
5  She didn't say a document.  You made that
6  assumption.
7          MS. GILL:  She said there's guidance
8  and instructions to managers and leaders, and so
9  -- and then we started talking about documents.
10         MS. BARLOTTA:  Which -- right, and
11 you started asking her because you were assuming
12 that when she was saying instructions and
13 guidance as being a written document.  Maybe it
14 is.  I don't -- I'm saying she just --
15         MS. GILL:  I'm asking her now.
16     Q.   (BY MS. GILL:)  Is it a separate
17 document?
18     A.   I think it was in multiple places.
19     Q.   Can you identify those places?
20     A.   The handbook, and then it's a policy,
21 but I can't -- I can't recall the exact policy
22 off the top of my head.
23     Q.   Do you do any training on this

Page 88

1  guidance and instructions to managers and leaders
2  on what to do to document reports of
3  discrimination?
4          MS. BARLOTTA:  Object to form.
5      A.   We have guidance that's for all
6  teammates on reporting concerns, and we have ways
7  for them to do that, multiple ways for them to
8  report concerns.
9      Q.   My question is:  Did you train people
10 on that guidance or did you just rely on them to
11 refer to the policies and handbook?
12         MS. BARLOTTA:  Object to form.
13     A.   We would educate managers, yes, on
14 those things.
15     Q.   Okay.  Was that an in-person training
16 or a computer training or -- tell me how you
17 would educate them.
18     A.   I mean, I think it's multiple ways.
19 I mean, they do the training courses.  We
20 certainly answer any questions that they have.
21 There's the handbook, and the policies are posted
22 on intranet sites.  There's information directing
23 them to where to go with any questions, any help

Page 89

1  that they need.

2     Q.   Would Mr. Daugherty qualify as a

3  manager?

4     **A.   Yes.**

5     Q.   Okay.  And what -- the same question

6  for Mr. Hughes, Mr. Cadden, and Mr. Helveston,

7  would they qualify as managers?

8     **A.   Yes.**

9     Q.   Was HR aware that Kathryn Hendrix

10  made complaints that her male co-workers,

11  specifically Clay Segrest, was treating her like

12  a secretary and that her workload was preventing

13  her from completing inside broker duties?

14        MS. BARLOTTA:  Object to form.

15  Assumes facts not in evidence.

16     Q.   You can answer.

17     **A.   I'm -- no, I didn't -- she didn't**

18  **tell me that, and I tried to reach out to her to**

19  **get the facts, and I never received a response.**

20     Q.   Did Corey Daugherty tell you Ms.

21  Hendrix had made a complaint that Clay Segrest

22  was treating her like a secretary and that her

23  workload was preventing her from completing

Page 90

1  inside broker duties?

2        MS. BARLOTTA:  Object to form.

3  Assumes facts not in evidence.

4     Q.   You can answer.

5     **A.   No.**

6     Q.   Was HR aware that Kathryn Hendrix

7  raised concerns about lack of female broker

8  hirings and that CRC hadn't hired a female broker

9  in twelve years?

10        MS. BARLOTTA:  Object to form.

11  Assumes facts not in evidence.

12     Q.   You can answer.

13     **A.   I'm going to provide my same answer**

14  **that I provided before.  I tried to reach out to**

15  **her.  The only knowledge I had was her first**

16  **letter that I received and tried to -- made**

17  **multiple attempts to reach out to her with no**

18  **response.**

19     Q.   And I understand that's your -- your

20  testimony is your first receipt of a complaint

21  from her was the letter.

22        My question to you is:  Did anyone,

23  Mr. Daugherty, Mr. Cadden, Mr. Hughes, or Mr.

Page 91

1  Helveston, tell HR that Kathryn Hendrix had

2  raised concerns about lack of female broker hires

3  and that they hadn't hired a female broker in

4  twelve years?

5        MS. BARLOTTA:  Same objection.

6  Assumes facts not in evidence.

7     Q.   You can answer.

8     **A.   So I'm just not quite sure how to**

9  **answer this without talking about conversations**

10  **that were after the legal.**

11     Q.   Okay.  How about this:  Before you

12  received the letter of September -- in September

13  from Kat asking for severance, did anyone, Mr.

14  Helveston, Mr. Daugherty, Mr. Cadden, or Mr.

15  Hughes, tell you that Kathryn Hendrix had

16  complained that there was lack of female broker

17  hirings and that they had not hired a female

18  broker in twelve years?

19        MS. BARLOTTA:  Object to form.

20     **A.   No.**

21     Q.   Okay.  If Ms. Hendrix had raised

22  these concerns to Daugherty, Helveston, Hughes,

23  and Cadden, should those concerns have been

Page 92

1  brought to you before the September letter?

2        MS. BARLOTTA:  Object to form.

3     Q.   You can answer.

4     **A.   Yes.**

5     Q.   Prior to the September letter

6  provided by Ms. Hendrix to you, had you received

7  any complaints -- or not directly to you.  Had

8  anyone notified you of Ms. Hendrix's complaints

9  of differential treatment in job assignments,

10  duties, and compensation?

11        MS. BARLOTTA:  Object to form.

12  Assumes facts not in evidence and asked and

13  answered.

14     Q.   You can answer.

15     **A.   I just want to make sure I**

16  **understand, because you said not to me.  So I'm**

17  **not sure what you meant by --**

18     Q.   I'm not saying -- you said the first

19  time Ms. Hendrix complained to you was the

20  September letter.  I'm asking you did any of her

21  managers, anybody in the Birmingham professional

22  liability department, notify you she had

23  complained to them of unfair treatment prior to

Page 93

1  the September letter that you received?

2      MS. BARLOTTA:  Object to form.

3  Assumes facts not in evidence.

4      Q.   You can answer.

5      **A.   No.**

6      Q.   Excuse me just one second.

7          Would failure to report a complaint

8  of discrimination to HR received by a manager be

9  subject to discipline?

10      MS. BARLOTTA:  Object to form.

11      **A.   So can you say that again?**

12      Q.   Would the failure to report to HR a

13  complaint of discrimination received by a manager

14  be subject to discipline?

15      MS. BARLOTTA:  Object to form.

16      Q.   You can answer.

17      **A.   Yes.  Managers should report if they**

18  **have a concern.**

19      Q.   Does HR maintain job postings and --

20  in their department?

21      **A.   So I'm not sure exactly what your**

22  **question is as far as the -- I mean, that's**

23  **probably a --**

Page 94

1      Q.   What about -- let me rephrase.  My

2  understanding is when there's a position open, a

3  requisition form is created.  Does HR maintain

4  that form?

5      MS. BARLOTTA:  Object to form.

6      **A.   That was outside of the scope of --**

7  **that would have been a recruiting.**

8      Q.   Okay.  So that's not an HR issue?

9  That's a separate department?

10      **A.   No.  That's part of -- that's part of**

11  **HR, but whether they were keeping that specific**

12  **document, I --**

13      Q.   I guess what I'm asking is:  All

14  prior openings for positions would have some

15  documentation associated with it.  Is that

16  documentation kept, and where is it maintained?

17      MS. BARLOTTA:  Object to form.

18      **A.   So yes, there would be documentation.**

19  **What I'm saying I don't want to speak to is where**

20  **-- if that documentation is kept or how that's**

21  **kept.  But there would have been documentation**

22  **for a job requisition to be opened, yes.**

23      Q.   Okay.  And if -- does every open

Page 95

1  position require a job requisition form?

2      MS. BARLOTTA:  Object to form.

3      **A.   From my understanding, yes.**

4      Q.   In this case, Ms. Hendrix was given

5  the position of inside broker.  Was there a job

6  requisition form for her prior to her getting

7  that position?

8      MS. BARLOTTA:  Object to form.

9  Stefani's not designated, and Corey provided all

10  the testimony about how that job -- how she came

11  into that job.  You can ask her what her personal

12  knowledge is about that.

13      Q.   Okay.

14      **A.   So, generally speaking, there would**

15  **be a job requisition on all jobs.  I just can't**

16  **specifically say that I saw documentation or**

17  **would know in her case specifically.**

18      Q.   Okay.  When an employee is given a

19  promotion, are they given a pay raise with the

20  promotion?

21      MS. BARLOTTA:  Object to form.

22      **A.   So it's different in the broker --**

23  **the way the pay is set up for brokers.  It's --**

Page 96

1  **because there is, you know, formulas around how**

2  **brokers are paid, and so, you know, and the**

3  **incentive plan is discretionary.  So to say that**

4  **someone always received, you know, an increase, I**

5  **can't say that.  I don't know.**

6      Q.   How about when you're going from

7  account executive to inside broker or broker?

8  Would there be a pay difference in that change in

9  position?

10      MS. BARLOTTA:  I'm just going to

11  reiterate that she's testifying based upon her

12  personal knowledge here, because Mr. Daugherty

13  was designated on all issues related to pay

14  differences and pay between brokers and account

15  executives and so forth.

16      MS. GILL:  Yeah.  And I'm not

17  necessarily asking about bonuses and things like

18  that.  I'm talking about the base pay and the

19  guidelines that she testified to earlier.  That's

20  all I'm talking about, the base pay.

21      MS. BARLOTTA:  The same thing.

22  Stefani, just testify to what your personal

23  knowledge is, if any, on these issues.

Page 97

```
1        THE WITNESS: Okay.
2        A.  Base pay would -- I mean, it's still
3    different for even support people of a broker, of
4    a book, because they still have to pay for -- to
5    be able to support the pay of anybody as part of
6    that team and that book, so --
7        Q.  (BY MS. GILL:) Okay.  When people
8    change positions, for example, from account
9    executive to inside broker, would it be -- would
10   their job duties change?
11       MS. BARLOTTA:  Object to form.  This
12   is, again, based upon her personal knowledge.
13   Mr. Daugherty testified extensively on these
14   issues and was designated to do such.  So she's
15   being deposed in a fact witness capacity at this
16   point.
17       A.  Those jobs have different job
18   descriptions.
19       Q.  Okay.  And do you -- who sets -- who
20   creates those job descriptions?  Is that created
21   through HR or is that created in the departments?
22       A.  It's a collaboration.
23       Q.  Okay.  So HR does participate in
```

Page 98

```
1    preparing job descriptions?
2        MS. BARLOTTA:  Object to form.
3        Q.  You can answer.
4        A.  In having those set up
5    systematically, like having those set up.  But, I
6    mean, the business is defining what the duties
7    are of those jobs.
8        Q.  Okay.  If someone is transferring
9    from, for example, from the Birmingham
10   professional liability department to another
11   office in another city, would a requisition form
12   need to be prepared?
13       MS. BARLOTTA:  Object to form.
14       A.  Are you -- are you talking about on
15   the same team?  Are you -- you're just saying
16   they're relocating?  I don't --
17       Q.  For example, in this case, Mr.
18   Helveston asked Ms. Hendrix if she wanted to
19   transfer, and she said yes.  Would there be
20   documentation of him effectuating that transfer?
21       MS. BARLOTTA:  Object to the form.
22   Assumes facts not in evidence, and move to strike
23   counsel's testimony.
```

Page 99

```
1        Q.  You can answer.
2        A.  And can you just repeat the question?
3    I'm sorry.
4        Q.  If an employee is going to be
5    transferred to another city into another
6    department, would there be documentation
7    effectuating that transfer?
8        MS. BARLOTTA:  Object to form.
9        Q.  You can answer.
10       A.  To my knowledge, if it's a new job
11   that's been created, there would be, but people
12   relocate and stay a part of the same team, and
13   that may not require a requisition form.
14       Q.  What if it is the same city but
15   different department team?
16       MS. BARLOTTA:  Object to form.
17       Q.  Would there be documentation for
18   that?
19       MS. BARLOTTA:  Same objection.
20       A.  So --
21       Q.  You can answer.
22       A.  If it's part of a different team, a
23   different group, then yes.
```

Page 100

```
1        Q.  Okay.  Do you know if any
2    documentation was prepared in efforts to transfer
3    Ms. Hendrix to another team?
4        MS. BARLOTTA:  Object to form.
5    Assumes that that, in fact, happened.
6        Q.  Well, that's what I'm asking.  Did it
7    happen?
8        MS. BARLOTTA:  Your question assumes
9    that that request was made or somehow relayed or
10   communicated.  So there's several assumptions in
11   your question.
12       Q.  You can answer.
13       MS. BARLOTTA:  And you're asking her
14   to respond to a hypothetical.  Object to form.
15       Q.  You can answer.
16       A.  Okay.  I've already forgot the
17   question.  What --
18       Q.  If the transfer was to be in the same
19   city but different team -- I've already asked
20   that.  Hang on.
21       Were there any documents in this case
22   relating to a transfer for Kathryn Hendrix?
23       MS. BARLOTTA:  Object to form.
```

Page 101

1    A.   She transferred from the audit
2  department to broker.  I mean, that's a broad
3  question.
4    Q.   I -- well, I was trying to make it
5  more general so that -- my understanding is that
6  Mr. Helveston told Ms. Hendrix if he relayed her
7  complaints to the men, she couldn't work there
8  anymore, and he asked her if she wanted to
9  transfer, and she says yes.
10       So my question is:  Is there any
11 documentation or evidence that a transfer was in
12 the works for Ms. Hendrix?
13       MS. BARLOTTA:  Object to form, and
14 move to strike counsel's testimony.
15    Q.   You can answer.
16    A.   Okay.  So I can't -- the requisition
17 form is something that was done -- I mean, the
18 business would bill that out and complete that
19 and submit that.  I don't know.
20    Q.   Okay.  So you don't know if there's
21 anything there?
22    A.   I did not -- no.  I wouldn't have
23 been a part of that.

Page 102

1    Q.   Was Clay Segrest ever disciplined for
2  differential treatment of Ms. Hendrix?
3        MS. BARLOTTA:  Object to form.
4  Assumes facts not in evidence.
5    Q.   You can answer.
6    A.   No, not that I'm aware of.
7    Q.   Was Jonathan Morgan ever disciplined
8  for misrepresenting his title on e-mails?
9        MS. BARLOTTA:  Object to form.
10 Assumes facts not in evidence.
11    A.   Not that I'm aware of.
12    Q.   Does CRC or BB&T, or Truist have any
13 -- I don't know what to call it -- any annual
14 oversight to determine the effectiveness of the
15 defendants' anti-discrimination policies?
16       MS. BARLOTTA:  Object to form.
17    A.   I'm not sure I understand your
18 question.
19    Q.   Does CRC, BB&T, or Truist, do they
20 review the policies and whether they are being
21 effective on anti-discrimination?
22       MS. BARLOTTA:  Object to form.
23    Q.   You can answer.

Page 103

1    A.   All policies are reviewed and are on
2  a timeline to be reviewed.
3    Q.   Okay.  Do you know how often?
4    A.   There's probably a schedule, but I
5  don't know that off the top of my head, no.
6    Q.   Okay.
7        MS. GILL:  Can we take a quick break?
8  I need to use the restroom, and I think
9  co-counsel wanted to confer with me about
10 something real quick.
11       MS. BARLOTTA:  Okay.
12       MS. GILL:  Thank you.
13       VIDEOGRAPHER:  We are off the record.
14 The time is 12:52.
15       (Whereupon, a brief recess was
16 taken.)
17       VIDEOGRAPHER:  We are back on the
18 record.  The time is 1:06.
19    Q.   (BY MS. GILL:)  Thank you for letting
20 me take a break.
21       Before we went on the break, we were
22 talking about whether or not HR reviews the
23 policies to determine if they are effective.

Page 104

1        So my question now is:  Do they
2  review the policies to see if it relates to the
3  promotion or advancement of females and equal
4  advancement of females?
5        MS. BARLOTTA:  Object to form.
6    A.   So I'm still not quite sure what
7  specifically you're asking in that.  I mean, the
8  policies are reviewed.
9    Q.   Did you determine -- when they are
10 reviewed, do you -- does CRC or BB&T or Truist
11 review them for their effectiveness as it relates
12 to equal opportunities for women?
13       MS. BARLOTTA:  Object to form.
14    A.   Yes.
15    Q.   And are there any analysis or reports
16 or documents collected and maintained at CRC
17 relating to the review of the effectiveness of
18 the policies?
19       MS. BARLOTTA:  Object to form.
20    A.   CRC would not have any of that
21 information.
22    Q.   Okay.  So it would be maintained by
23 BB&T or Truist?

Page 105

1    A.  Yes.
2    Q.  What would I need to ask for -- what
3    would that be called for us to ask for in
4    discovery?
5         MS. BARLOTTA:  Object to form.
6    A.  So I'm not exactly sure what you're
7    asking for, and, I mean, we have governance
8    groups and different areas that own different
9    policies.  So I don't know exactly how to answer
10   that as far as where that stuff is housed.
11   That's not my job in HR.
12   Q.  Okay.  I didn't know -- like
13   oftentimes when people are reviewing policies or
14   collecting information to determine the
15   effectiveness or something, they create a report,
16   like a final report.  I didn't know if there's
17   anything like that in this case and what it would
18   be called.
19        MS. BARLOTTA:  Object to form.
20   A.  I'm not aware.
21   Q.  Is there a compensation analyst that
22   would review the compensation of the Birmingham
23   professional liability department?

Page 106

1    A.  So, again, I'm going to kind of
2    revert back to the same thing I said before.  Pay
3    structure and how that's handled for insurance is
4    different.  So I don't know what you're asking if
5    --
6    Q.  So from what I understand is like,
7    for example, I know that Truist has posted a
8    position for a compensation analyst as it relates
9    to mortgage -- was it mortgage loan -- mortgage
10   brokers.  So is there a similar position for
11   insurance brokers?
12        MS. BARLOTTA:  Object to form.
13   A.  So there's compensation people that
14   are aligned to support insurance, but that
15   doesn't change what I said as far as -- the pay
16   structure is what it is for insurance and for the
17   broker population.  That's not something that an
18   analyst is determining.
19   Q.  Okay.  But there's nobody reviewing
20   -- there's no oversight on how it's done?
21        MS. BARLOTTA:  Object to form.
22   A.  So, again, that's -- the way the pay
23   structure is for that group is -- I mean, it's a

Page 107

1    formula.  It's set up the way it is for teams and
2    brokers and, you know, they have to fit into
3    that.
4         So if there were issues with them
5    not, then I'm sure, you know, someone would work
6    with them on that.  But the business is involved
7    in all of that.
8    Q.  How would you learn that it's not in
9    compliance with that formula?
10        MS. BARLOTTA:  Object to form.
11   A.  So, I mean, if the -- you know, they
12   have their own accounting groups as well that are
13   supporting them that would know if the --
14   Q.  Okay.  And so whoever would -- you
15   said there would be people that would check on
16   that.  The people would be in the insurance
17   division as well as the accountants are in the
18   insurance division.
19        MS. BARLOTTA:  Object to form.
20   Q.  Or department.
21        MS. BARLOTTA:  Object to form.
22   A.  I'm not sure what you're saying I
23   said people check on.  What --

Page 108

1    Q.  I guess what I'm asking is: BB&T,
2    CRC, Truist, they don't -- they don't go in and
3    review the formula to determine if there's
4    discrimination practices occurring?
5         MS. BARLOTTA:  Object to form.
6    A.  I said if it doesn't work or it
7    doesn't fit, then they have a whole accounting
8    group that would set the --
9    Q.  But that accounting group is at CRC,
10   not BB&T or Truist?
11   A.  There's an accounting group they
12   support, specifically CRC.
13   Q.  And so BB&T or Truist has no
14   oversight on whether or not equal opportunities
15   and compensation are being offered to women?
16        MS. BARLOTTA:  Object to form.
17   A.  So Truist does have a compensation
18   department with analysts and, you know, all kinds
19   of positions in it, and they do have oversight to
20   certain things, but that doesn't change that
21   there is a structure for how the pay works for
22   brokers.
23        And if they were trying to do

Page 109

1   something that didn't fit within that, I wouldn't
2   -- like I said, the accounting group would know
3   that, and I'm sure there is something that the
4   comp group -- but I don't know what you're really
5   trying to ask me.
6       Q.   Who does payroll?
7       A.   The payroll department.
8       Q.   Right.  Is it CRC or is it BB&T or
9   Truist?
10      A.   It's -- it was BB&T at the time.
11      Q.   And just so I'm clear, you keep
12  talking about the structure is, you know, there's
13  a formula, and that team gets -- it falls within
14  that formula, but within the team it's
15  discretionary; is that correct?
16      MS. BARLOTTA:  Yeah, and these
17  questions were all asked to Corey.  He was
18  designated on this topic, so, you know, she's
19  just going to be testifying about her personal
20  opinion on these things.
21      Q.   Well, I'm just making sure that BB&T
22  and Truist don't -- they don't set the salaries
23  and they don't -- as long as it's within that

Page 110

1   formula, they don't do anything to change what's
2   happening within a team; is that correct?
3       MS. BARLOTTA:  Again, this was
4   covered with Mr. Daugherty.  He was the one who
5   was designated to talk about how pay is set up
6   for the brokers.  He testified extensively on
7   this.
8       MS. GILL:  And I'm just asking her
9   what her knowledge as an HR person is.
10      Q.   (BY MS. GILL:)  You can answer.
11      A.   Okay.  What specifically do you want
12  me to answer on that?
13      Q.   I just want to make sure I'm clear
14  that so long as the pay of a team is within that
15  struct -- that formula that you mentioned for
16  that team, HR, BB&T, Truist, they don't do
17  anything to change that.
18      MS. BARLOTTA:  Object to form.
19      A.   No.
20      Q.   Where are noncompete agreements
21  created?
22      MS. BARLOTTA:  Object to form.
23      A.   So when you mean created, you're

Page 111

1   saying who creates those?
2       Q.   Yes.
3       A.   There's a legal person that helps
4   with that.
5       Q.   Are they maintained in the human
6   resources department?
7       A.   They are, yes, they're maintained,
8   yes.
9       Q.   Do you know whether Lauren Lindberg
10  had a noncompete agreement?
11      A.   I don't know who that is off the top
12  of my head.
13      Q.   Okay.  Are noncompetes part of the
14  hiring package when someone is hired for a broker
15  position?
16      A.   When you say part of the package --
17      Q.   When somebody gets hired on, do they
18  have to sign a noncompete to come to work as a
19  broker?
20      A.   So brokers would have an employment
21  agreement.
22      Q.   Okay.  And does that employment
23  agreement contain a noncompete?

Page 112

1       MS. BARLOTTA:  Object to form.
2       A.   So as far as the language in the
3   employment agreements, that can -- that can tend
4   to vary depending on how old an employment
5   agreement is versus how new an employment
6   agreement is.
7       Q.   So they're not uniform throughout?
8       MS. BARLOTTA:  Object to form.
9       A.   No, because we've acquired many
10  companies that --
11      Q.   As an employee of CRC, what benefits
12  was Ms. Hendrix entitled to?
13      A.   She would have been entitled to the
14  same benefits as all employees.
15      Q.   And what are those benefits?
16      A.   So, I mean, I couldn't sit here and
17  list off all of the benefits, but it would have
18  been whatever benefits were available at that
19  time.
20      I mean, are you referring to like
21  medical, dental, vision?  Are you referring to
22  like welfare benefits?
23      Q.   Sure.  Any of those things, medical,

Page 113

1  dental, disability, 401(k), or whatever.  What
2  was she entitled to?
3      A.   She would have been entitled to the
4  same benefits as all teammates, full-time
5  teammates.
6      Q.   Okay.  And what are those benefits?
7      A.   We have welfare benefits, which is
8  going to include your medical, dental, vision.
9  We have 401(k) plans, life insurance, disability.
10  I mean, I don't -- I can't sit here and tell you
11  every single benefit.
12     Q.   Did CRC -- does CRC match in the
13  401(k) plan?
14     A.   They do.
15     Q.   What is the matching percentage?
16     A.   They match fifty percent up to the
17  contribution limit.
18     Q.   Do you know whether Kathryn Hendrix
19  is eligible for rehire?
20     A.   She is in the system eligible for
21  rehire.
22     Q.   So is -- does that mean she possibly
23  is not eligible for rehire?

Page 114

1          MS. BARLOTTA:  Object to form.
2      A.   If -- if we could have gained
3  information that would potentially make her not
4  eligible for rehire, but she's in the system
5  today as eligible for rehire.
6      Q.   What kind of information would make
7  her not eligible?
8      A.   So if, I mean, someone violates a
9  code of ethics.  So any kind of criminal activity
10  or just anything that's code of ethics violation,
11  they could be deemed ineligible for rehire.
12     Q.   Would a team member or employee who
13  engaged in unlawful discrimination be eligible
14  for rehire?
15     A.   If it was substantiated that they had
16  violated our code of ethics, they would not be
17  eligible for rehire.
18     Q.   Does paying your teammates an unequal
19  amount of bonuses or pay based on gender a
20  violation of your code of ethics?
21          MS. BARLOTTA:  Object to form.
22     A.   No.  The incentive plan on the
23  insurance side is discretionary.

Page 115

1      Q.   So it's okay to engage in gender
2  discrimination as it relates to pay?  That's not
3  a violation of your code of ethics?
4          MS. BARLOTTA:  Object to form.
5      A.   That is -- that's not what I said.
6      Q.   Okay.  Well, that's what I was
7  asking.  Is gender discrimination in pay a
8  violation of your code of ethics?
9      A.   It would be, but -- it would be.  I
10  was just saying that the pay on the insurance
11  side in their incentive plan is discretionary.
12     Q.   Okay.  Did human resources have any
13  involvement in processing Ms. Hendrix's
14  termination paperwork?
15          MS. BARLOTTA:  Object to form.
16     A.   As far as processing?
17     Q.   Did you prepare the termination form?
18     A.   No, I did not.
19     Q.   Okay.  I'm going to show you
20  Plaintiff's Exhibit 16.  I think it's going to
21  take her a second to pull it up, because she got
22  disconnected.
23          (Whereupon, Plaintiff's Exhibit No.

Page 116

1  16 was marked for identification and a copy of
2  same is attached hereto.)
3      Q.   Have you seen this document before?
4      A.   I have seen -- I don't know if I've
5  specifically seen this one filled out with this
6  information, but I have seen this form, yes.
7      Q.   Okay.  So you have not seen this
8  particular form for Ms. Hendrix?
9      A.   I can't say that I specifically saw
10  this one for her, but I have seen this form.
11     Q.   Is this document provided to HR upon
12  termination of an employee?
13     A.   This is -- this form is not used for
14  that.
15     Q.   What is this form used for?
16     A.   This form is used for the business
17  side to deactivate access with their systems and
18  things.
19     Q.   Okay.  So this does not go to human
20  resources?
21     A.   This is an internal CRC form.
22     Q.   At the bottom, do you know who filled
23  out this particular form?

Page 117

1   A.   I don't know who filled out this
2   form.
3   Q.   Okay.  I'm going to show you
4   Plaintiff's Exhibit 15.
5        (Whereupon, Plaintiff's Exhibit No.
6   15 was marked for identification and a copy of
7   same is attached hereto.)
8   Q.   Have you seen this document?
9   A.   Yes, that's my e-mail.
10  Q.   And who is this e-mail to?
11  A.   Corey.
12  Q.   Okay.  And it looks like Mr. Cadden
13  and Mr. Hughes were copied on that as well?
14  A.   Yes.
15  Q.   What was the purpose of this e-mail?
16  A.   This was to provide them instructions
17  on processing her termination in our Workday
18  system.
19  Q.   And would Plaintiff's Exhibit 16 that
20  I just showed you be part of that processing of
21  her termination?
22  A.   It is -- this form right here is an
23  internal form for CRC.  It is not part of the

Page 118

1   Workday termination process.  This goes to IT.
2   You see at the top, it says e-mail to HelpDesk @
3   CRC.
4   Q.   Okay.  I see that.  So it also says
5   IAS @ BB&T.  Who is that?
6   A.   That's -- it's the IT stuff to
7   deactivate access.  That's what it is.
8   Q.   At the bottom it instructs whoever is
9   receiving this to wipe the cellphone as of
10  December 12th.  Do you see that?
11  A.   Okay.  Yes, I see that.
12  Q.   Do you know whether that was done?
13  A.   I do not know.
14  Q.   Okay.  Okay.  Sorry.  Does Mr. Hughes
15  report to HR?
16  A.   What do you mean by does he report to
17  HR?
18  Q.   I guess what I'm asking is:  Is he
19  lateral to HR or what's his position?
20  A.   So Rusty is a manager in the CRC
21  business.  He's not part of HR at all.
22  Q.   Okay.  Would he be subject to the
23  policies or the practices to report complaints of

Page 119

1   discrimination to HR as well?
2   A.   Yes.
3   Q.   I'm going to show you Plaintiff's
4   Exhibit 19.  Okay.
5        (Whereupon, Plaintiff's Exhibit No.
6   19 was marked for identification and a copy of
7   same is attached hereto.)
8        (Whereupon, a discussion off the
9   record was held.)
10  Q.   (BY MS. GILL:)  Just a second.  In
11  your -- in CRC's answer, it mentions that the
12  plaintiff has failed or refused to mitigate
13  damages.  What facts do you have to support that
14  defense?
15       MS. BARLOTTA:  Trish, we've talked
16  about this.  This is one of the subjects that
17  we've gone back and forth on.  We're not going to
18  have a witness testify about legal terms and
19  things of that nature.  You can ask -- you're
20  better off to ask for this stuff in an
21  interrogatory of some sort, but the witness is
22  not going to sit here and testify about legal
23  conclusions.

Page 120

1        MS. GILL:  I'm not asking her to
2   testify about a legal conclusion.  I'm asking her
3   what facts does she have to support the
4   defendants' position that Ms. Hendrix has not
5   mitigated her damages.
6        MS. BARLOTTA:  Well, mitigation is a
7   legal term.
8        MS. GILL:  Okay.
9   Q.   (BY MS. GILL:)  Are you aware of any
10  positions that -- inside broker positions
11  available or broker positions available in the
12  community?
13       MS. BARLOTTA:  Object to the form.
14  A.   Are you asking about today?
15  Q.   From the time that Ms. Hendrix left
16  until now.
17  A.   I mean, there's -- I would assume
18  there's been positions available.  I haven't
19  specifically went out there and looked those up.
20  Q.   Okay.  So you don't have any specific
21  knowledge of a specific position?
22  A.   Off the top of my head, no.
23  Q.   That's fine.

Page 121

1    A.   I'm just a little confused by that
2  question.
3       Q.   What facts do you have that CRC or
4  BB&T made a good faith effort to comply with
5  federal and state laws as it relates to equal
6  compensation and opportunities for Ms. Hendrix?
7       MS. BARLOTTA:  The same objections as
8  I had before, Trish.  There's a specific --
9       MS. GILL:  I'm just asking her the
10 facts, like what facts is she aware of -- what
11 efforts --
12      MS. BARLOTTA:  If you have an
13 explanation about what good faith means, what
14 that means under the law as it relates to Title
15 VII.  I mean, that's a specific legal term, and
16 you're asking her to --
17      Q.   (BY MS. GILL:)  Okay.  Let me
18 rephrase my question.  What efforts did CRC
19 take -- or BB&T take to ensure Kathryn Hendrix
20 received equal pay and equal opportunities?
21      MS. BARLOTTA:  Asked and answered.
22      Q.   You can answer.
23      A.   So, I mean, based on the information

Page 122

1  we had at the time of her initial complaint in
2  September, her initial letter that she sent to
3  the legal group, based off of that letter, that's
4  the first knowledge that I had of the situation.
5       I made multiple attempts to reach
6  her.  So we did what we were trying to do to find
7  out facts to be able to start an investigation on
8  the HR side.  We were unable to do that.
9       Q.   Okay.  Did you speak to her managers?
10      MS. BARLOTTA:  Object to form.  Asked
11 and answered.
12      Q.   You can answer.
13      MS. BARLOTTA:  She already testified
14 she talked to John Cadden.  We're going over the
15 same testimony.
16      Q.   Did you review her pay?
17      MS. BARLOTTA:  Object to form.  When?
18      Q.   When she complained, did you review
19 her pay to see if it was fair?
20      MS. BARLOTTA:  There is no allegation
21 in her letter about pay.
22      Q.   Did you review her pay?
23      THE WITNESS:  Did she -- did she say

Page 123

1  something?
2       Q.   Did you review her pay?
3       MS. BARLOTTA:  Did you review her pay
4  when she first sent that letter to benefits I
5  think is what she's asking you.
6       A.   Okay.  No.  I tried to reach out to
7  her to find out what her concerns were so I could
8  investigate.
9       Q.   Okay.  When you saw the allegations
10 of the letter, or Ms. Palmer's letter or the EEOC
11 charge, did you review the hiring practices of
12 brokers and compare to see how many females were
13 placed in the broker position in the last few
14 years?
15      MS. BARLOTTA:  Object to form.
16 You're asking if she personally did that.
17      MS. GILL:  Yes.
18      THE WITNESS:  Do I answer that?
19      Q.   (BY MS. GILL:)  Yes.
20      MS. BARLOTTA:  You can answer if you
21 personally did that, but that information was
22 provided in our EEOC statement.
23      A.   My answer to that is what I testified

Page 124

1  to earlier is that I made multiple attempts to
2  reach out to her.  I was unable to do that.
3       As soon as we received the legal
4  letter, I turned it over to legal, and then
5  worked with them at that point forward.
6       Q.   Did you review the inside broker
7  positions, you or CRC or BB&T or Truist, review
8  the inside -- the broker positions to determine
9  how many females were hired as a broker in the
10 past few years?
11      A.   So I think that falls under once it
12 became a legal matter.
13      Q.   Did you do that yourself?  Did you
14 review to see if any females were hired as
15 brokers in the past few years?
16      A.   If I was asked to do that, I would
17 have done that.
18      Q.   Okay.  Did you -- but you can't tell
19 me what you did or did not do?
20      A.   I can't remember specifically.
21      Q.   Okay.  And do you know if CRC or BB&T
22 reviewed the past hiring processes to determine
23 how many females were hired as brokers?

Page 125

1     A.   Are you asking that related to this?
2     Q.   I'm asking -- yes.
3     A.   If we were asked to do that, we would
4  have done that. I can't speak for what all was
5  done in this, because it -- I was doing what I
6  was asked to do at the direction of legal.
7     Q.   Okay. As you're sitting here today,
8  do you know how many women and how many men were
9  put in the broker -- are in the broker positions?
10     A.   No, I don't know that off the top of
11  my head.
12     MS. BARLOTTA: She's not designated
13  to testify about that. Mr. Daugherty testified
14  about all of the people within the new hire
15  positions in the professional liability
16  department.
17     Q.   You can answer. Do you know, if you
18  know?
19     MS. BARLOTTA: From your personal
20  knowledge.
21     A.   I do not personally know that
22  information off the top of my head.
23     Q.   And my understanding is as of today

Page 126

1  Ms. Hendrix is still listed as eligible for
2  rehire; is that correct?
3     MS. BARLOTTA: Object to form. Asked
4  and answered.
5     Q.   You can answer.
6     A.   As of today, to my knowledge, she's
7  in the system as rehire eligible.
8     Q.   Okay. And just to make sure I'm
9  clear and correct, in order for her to become
10  ineligible for rehire, the company would learn of
11  some conduct, like a violation of the code of
12  ethics or something that would make her
13  uneligible; is that correct?
14     MS. BARLOTTA: Object to form. Asked
15  and answered.
16     Q.   You can answer.
17     A.   Yes.
18     Q.   And so as of today, because she's
19  still eligible for rehire, is it safe to say that
20  CRC or BB&T or Truist does not have a reason to
21  render her ineligible for rehire as of today?
22     MS. BARLOTTA: Object to form.
23     A.   I would not say that -- I don't know

Page 127

1  if there's information that we've gained that
2  would cause us to make that determination or not
3  at this point.
4     Q.   Okay. But my understanding is if CRC
5  or BB&T or Truist learns of information that
6  would make her ineligible for rehire, then her
7  status would change to ineligible for rehire; is
8  that correct?
9     MS. BARLOTTA: Object to form.
10     A.   Yes.
11     THE WITNESS: Sorry.
12     Q.   (BY MS. GILL:) I'm going to show you
13  Plaintiff's Exhibit 20 and just ask you if you've
14  seen this document before.
15     (Whereupon, Plaintiff's Exhibit No.
16  20 was marked for identification and a copy of
17  same is attached hereto.)
18     A.   Yes.
19     MS. BARLOTTA: Trish -- Stefani, I
20  don't know if you have seen this document before,
21  so just make sure of that before you respond.
22     Mr. Daugherty was designated to
23  testify about these responses, because he's the

Page 128

1  one who signed them. So anything she testifies
2  about is going to be from her personal knowledge.
3     MS. GILL: That's fine. She's
4  already answered the question, but that's fine.
5     Q.   (BY MS. GILL:) Did you --
6     A.   I was --
7     MS. BARLOTTA: Hey, Stefani, make
8  sure that when she shows you a document, that you
9  flip through all of it before you start answering
10  questions instead of just flashing the first
11  page.
12     THE WITNESS: Okay. Okay.
13     Q.   (BY MS. GILL:) Did you -- I'm going
14  to ask my assistant counsel to scroll through it
15  and let you look through it. So you can tell her
16  to slow down if you need to.
17     A.   I mean, it's actually small. I can't
18  really -- I mean, I can't see that.
19     Q.   Let's see if we can make it bigger.
20     A.   Okay. I'm not sure that I have seen
21  this. I first thought this was just the original
22  part of the information that came in earlier or
23  if this was something that was provided later,

Page 129

1   I'm not sure if I've seen this.
2       Q.   Okay.  It's questions that we issued
3   to the defendant.  And so my question to you is:
4   Did you assist in preparing these answers?
5           MS. BARLOTTA:  And she may have
6   provided information, but she may not have been
7   aware that she was providing information
8   specifically in response to these questions.
9           MS. GILL:  That's fine.
10      Q.   (BY MS. GILL)  If you know.  Do you
11  know if you helped with this?
12      A.   I honestly don't know.  I honestly
13  don't know.
14      Q.   Okay.  Do you remember us requesting
15  documents from the defendant, from CRC and BB&T?
16          MS. BARLOTTA:  Object to form.
17      Q.   You can answer.
18      A.   So are you asking me if stuff was
19  requested from me directly?
20      Q.   Well, we sent out a request for
21  production of documents.  Did you assist in
22  compiling those documents in response to those
23  requests?

Page 130

1           MS. BARLOTTA:  If you know, Stefani.
2       A.   Yeah, so I did assist with gathering
3   information I was instructed to help with.
4       Q.   Do you remember what documents you
5   gathered?
6       A.   I don't remember all of the
7   information.
8       Q.   Do you remember some of the
9   information?
10      A.   That would have been like the
11  handbook and the policies and then information
12  that I gathered from John and the group.  But I
13  can't remember specifically every single thing
14  that I provided.
15      Q.   When you said information gathered
16  from John and the group, are you talking about
17  documentation or are you talking about
18  statements?
19          MS. BARLOTTA:  Objection.  I think
20  she's -- she's -- Stefani, I think you're --
21  she's talking about -- specifically, she's asking
22  about requests for production of documents.
23  That's something that's happened in the lawsuit

Page 131

1   that were served on counsel, and I think you're
2   testifying about prior to when the lawsuit was
3   filed.
4           MS. GILL:  She just testified that
5   she produced information gathered from John and
6   the group.  So I'm just asking her what that
7   information was, was it witness statements or --
8           MS. BARLOTTA:  Trish, your questions
9   were about what she gathered in response to
10  requests for production of documents, and that's
11  what I'm trying to clarify.  That's not what she
12  said.
13          MS. GILL:  But I've changed my
14  questioning since to cater to her answer.  And so
15  I'm just trying to ask her was that witness
16  statements or was it documents.
17      A.   So I guess I'm just a little bit
18  confused on when we're talking about
19  specifically.  But when I said John and the
20  group, it would have been the conversation that I
21  had with John and Rusty and Corey.
22          MS. BARLOTTA:  At the direction of
23  legal counsel; is that what you're talking about,

Page 132

1   and Truist in-house counsel?
2           THE WITNESS:  Yes.
3       Q.   (BY MS. GILL:)  And that's the issue
4   that we're taking up with the judge, that
5   conversation?
6       A.   Uh-huh (positive response).
7       Q.   Okay.  Any other conversations or
8   documentation that you gathered that's not
9   subject to our reserved issue that we're going to
10  address with the judge?
11      A.   If I'm understanding correctly, I
12  would have provided anything that legal would
13  have asked me to provide.
14      Q.   Did you personally search your
15  mailbox for e-mails responsive to discovery?
16          MS. BARLOTTA:  Object to form.  You
17  need to explain what discovery is.  I mean, I
18  don't -- she doesn't --
19      Q.   In response to that request for
20  production, did you personally search your own
21  e-mail for anything that was responsive to those
22  requests that we made?
23          MS. BARLOTTA:  I don't know that she

Page 133

1  testified that she saw the request for
2  production.
3      Q.   Okay.  Did you search your e-mail for
4  any e-mails to produce in this case?
5      A.   If I would have been asked to do that
6  by legal, I would have.  I don't remember if I
7  was asked at the time.
8      Q.   Okay.  I'm going through my outline.
9  It looks like I've asked a lot of these
10 questions, so if you'll give me a second.
11         Has anyone else other than Ms.
12 Hendrix complained of unfair treatment by Clay
13 Segrest, Corey Daugherty, Rusty Hughes, or John
14 Cadden, or Ron Helveston?
15     A.   No.
16     Q.   Are you -- did you receive a
17 complaint from Sarah Dunston complaining of
18 unfair treatment in a male-dominated environment?
19     A.   No.
20     Q.   Did you receive a complaint from
21 Kristyn Smith that she did not get a bonus and
22 that she relied on that bonus?
23         MS. BARLOTTA:  Object to form.

Page 134

1      A.   No, not that I'm aware of.
2      Q.   Have you received any sexual
3  harassment complaints against CRC?
4          MS. BARLOTTA:  No, we're not going to
5  testify to that.
6          MS. GILL:  Are you instructing the
7  witness not to answer?
8          MS. BARLOTTA:  Yeah.  Without
9  limiting it to this particular department where
10 the plaintiff worked and to the decisionmaker,
11 she can testify certainly about that.  But a
12 companywide ask, it's outside the bounds of Rule
13 26.
14         MS. GILL:  It's our position that it
15 goes towards defenses.  And I guess that's
16 something else on the list that we will take up
17 with the Court.
18     Q.   (BY MS. GILL:)  Are you familiar with
19 Lauren Lindberg's complaints of anti-gay comments
20 being made to her in an e-mail?
21         MS. BARLOTTA:  Object to form.
22 Assumes facts not in evidence.
23     Q.   You can answer.

Page 135

1      A.   No, I'm not aware.
2      Q.   Just a second.  I'm looking over my
3  notes.  I'm getting very close to being finished,
4  well, except for the reserved issues.
5          Do you have any information or
6  knowledge relating to how -- am I on mute?
7          Do you have any information or
8  knowledge as to how CRC requested updates to the
9  website?
10     A.   So they would have an internal
11 department that managed their website.  I'm not
12 familiar with exactly what that process is, no.
13     Q.   Okay.  So that has nothing to do with
14 HR?
15     A.   No.
16     Q.   And I guess what I'm asking, like if
17 a new person is hired or somebody is promoted and
18 the website needs to reflect that change, my
19 understanding of what you're telling me now is
20 that would be up to the departments -- the person
21 in that department to update it, not -- and that
22 department would be in CRC, not the HR?
23     A.   Correct.  I'm telling you that HR is

Page 136

1  not involved in that.  I don't know what that
2  exact process is.
3      Q.   Does CRC have an HR department
4  on-site?
5      A.   No.
6      Q.   And I mean in the Birmingham office.
7  I apologize.  I should have clarified that.  In
8  Birmingham, is there an HR department?
9      A.   No.
10     Q.   Do other offices have their own HR
11 on-site?
12     A.   So HR for insurance is a function
13 that's provided by Truist in support of
14 insurance.  But we're not sitting in those
15 individual offices.
16     Q.   Okay.  Is there a liaison in
17 different offices other than Birmingham?
18     A.   So are you asking about --
19 specifically about HR -- Truist HR employees
20 sitting in?
21     Q.   An HR manager or other -- yes, a
22 Truist or CRC person, HR manager sitting in other
23 offices other than Birmingham, like a point of

Page 137

1  contact?
2      A.  So, okay.  So that may be a different
3  question when you say point of contact.
4      Q.  Okay.
5      A.  What do you mean by that?
6      Q.  Let's ask both questions then.  Is
7  there a point of contact in each of the
8  individual offices other than Birmingham?
9      A.  So a point of contact could be
10 somebody that is -- you know, somebody that's
11 been deemed as somebody that can help with
12 certain functions.  That does not mean they're an
13 HR representative.
14     The HR structure is how I described
15 that before.  They're not sitting in the
16 individual offices.
17     Q.  Is there a person in HR at the other
18 locations?
19     A.  So no, not in the individual offices,
20 not a Truist HR person, no.
21     Q.  When Kathryn Hendrix left CRC, what
22 happened to the items contained in her desk and
23 documents contained in her desk?

Page 138

1      A.  So I don't know specifically what
2  happened to items in her desk.  She would have --
3  she turned in her equipment, her company
4  equipment.
5      Q.  Okay.  So you don't know who cleaned
6  out the papers and things in her actual cubicle?
7      MS. BARLOTTA:  Object to form.
8      A.  I don't have awareness to that.
9      MS. GILL:  If you will give me a
10 second to confer with co-counsel, I think I'm
11 through with my outline, if that's okay.  If we
12 can take a short break.  Thank you.
13     VIDEOGRAPHER:  We are off the record.
14 The time is 2:05.
15     (Whereupon, a brief recess was
16 taken.)
17     VIDEOGRAPHER:  We are back on the
18 record.  The time is 2:22.
19     MS. GILL:  At this time I have
20 finished my outline, but we do reserve the right
21 to re-depose this witness as it relates to the
22 facts unearthed in the investigation, because
23 that information relates to several defenses and

Page 139

1  towards pretext, and that includes the searches
2  done.  We also reserve the right to question
3  about sexual harassment complaints in other
4  departments.
5      And we've put a call into the judge,
6  and I understand that Rachel is objecting to that
7  based on the attorney/client privilege, the work
8  product privilege, and the anticipation of
9  litigation privileges, but we put a call into the
10 client -- into the judge, and are requesting her
11 assistance.
12     And I guess once we work that out, we
13 can just reserve the right to reopen the
14 deposition based on what the judge rules on those
15 issues or tells us what to do.
16     MS. BARLOTTA:  Okay.
17     MS. GILL:  And that's all.
18     MS. BARLOTTA:  Okay, great.
19     VIDEOGRAPHER:  This concludes our
20 deposition.  The time is 2:23.
21     THE REPORTER:  Do you need a copy?
22     MS. BARLOTTA:  Yes, we do.
23     THE REPORTER:  And send the read and

Page 140

1  sign to you?
2      MS. BARLOTTA:  Yes, please.
3      THE REPORTER:  Okay.  Thanks.
4
5
6      FURTHER DEPONENT SAITH NOT

Page 141

```
1          C E R T I F I C A T E
2
3   STATE OF ALABAMA  )
4   JEFFERSON COUNTY  )
5
6         I HEREBY CERTIFY that the above
7   and foregoing transcript was taken down by me in
8   stenotype, and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness.
13        I FURTHER CERTIFY that I am
14  neither of counsel, nor of any relation to the
15  parties to the action, nor am I anywise
16  interested in the result of said cause.
17
18        [signature]
19        /s/Tanya D. Cornelius
20        TANYA D. CORNELIUS, RPR
21        ACCR #378 Expires 10/1/2023
22        Notary Expires 9/13/26
23
```

Cite, LLC

**WORD INDEX**

**< 1 >**
**1**  4:9  12:2, 4, 10
**1:06**  103:18
**10**  4:3, 18  58:20, 22  63:21
**10/1/2023**  141:21
**10:03**  1:21  2:9  8:7, 16
**10:37**  37:22
**10:52**  38:3
**100**  6:12
**104**  6:12
**10th**  39:13  42:6, 19  43:1, 13  44:4
**11**  4:19  63:11, 13
**11:04**  45:10
**11:10**  45:14
**11:28**  58:7
**11:49**  74:5
**115**  5:4
**117**  4:23
**119**  5:7
**12**  4:9, 20
**12:05**  74:9
**12:52**  103:14
**127**  5:8
**12th**  118:10
**13**  1:20  4:10, 21
**13th**  2:8  8:15  58:8

**14**  4:22
**1400**  7:8
**14th**  40:11
**15**  4:23  117:4, 6
**16**  5:4  115:20  116:1  117:19
**17**  5:5
**1717**  6:18
**18**  5:6
**19**  5:7  119:4, 6

**< 2 >**
**2**  4:10  6:6  13:19, 20  25:8, 11
**2:05**  138:14
**2:21-CV-00**  58:7
**2:21-CV-0300-MHH**  1:5  9:4
**2:21-CV-300**  58:2
**2:22**  138:18
**2:23**  139:20
**20**  5:8  127:13, 16
**2019**  38:22  64:1
**2023**  1:20  2:8  8:15
**205**  58:6
**20th**  6:6  7:8
**22**  4:11
**23rd**  6:12
**26**  134:13

**285-3050**  58:6

**< 3 >**
**3**  4:11  22:10, 11  39:11
**30(b)(6**  11:18  30:9, 15  50:2  55:11  56:1, 2  65:5, 13  72:13
**300**  58:7
**35203**  6:7, 19  7:9
**35233**  6:13
**378**  141:21
**38**  4:12
**39**  4:13
**3rd**  6:18

**< 4 >**
**4**  4:12  38:5, 9
**40**  4:14
**401(k**  113:1, 9, 13
**420**  7:8
**48**  4:15

**< 5 >**
**5**  4:13  39:18, 19
**58**  4:18

**< 6 >**
**6**  4:14  40:15, 16  45:21
**63**  4:19

**< 7 >**
**7**  4:15  47:22  48:1

**< 8 >**
**8**  4:16  59:1
**800**  81:18
**8th**  38:22  41:23  42:4  43:1

**< 9 >**
**9**  4:17  59:1
**9/13/26**  141:22
**900**  6:6

**< A >**
**A**  2:1  6:1, 5, 11, 18  10:12, 16, 17, 19  11:1, 3, 4, 6, 13, 16, 18, 20, 23  12:5, 8, 12, 15, 23  13:3, 6, 9, 15, 21  14:1, 4, 10, 14, 17, 20, 23  15:2, 5, 7, 11, 15, 18, 22  16:3, 8, 12, 15, 19  17:1, 4, 9, 12, 14, 19, 23  18:4, 13  19:10  20:3, 6, 13  21:6, 10, 13, 17,

**20**  22:4, 12, 17, 20  23:1, 3, 6, 12, 14, 16, 19, 20, 23  24:2, 5, 9, 13, 19, 23  25:5, 10, 15, 23  26:3, 8, 9, 11, 14, 15  27:6, 22  28:1, 8, 13, 18, 22  29:3, 11, 14, 16, 19  30:1, 3, 11, 15  31:1, 23  32:3, 11  36:11, 14  37:10, 18, 23  38:10, 14, 19  39:1, 4, 8, 13, 15, 20, 23  40:9, 13, 17  41:2, 4, 7, 14, 20  42:2, 4, 6, 7, 15, 23  43:15, 18, 20  44:6, 16  45:11, 17, 20  46:2, 4, 9, 14, 17, 22  47:2, 10, 19  48:2, 5, 9, 14, 23  49:8, 14, 16  50:11, 12  51:10, 15  55:9, 11, 16, 21  56:11  57:4, 7, 8, 21  58:4, 9, 22  59:10,

Video Deposition of Stefani Petty                                  7/13/2023

13, 15, 22
60:9, 12, 16
61:4, 12, 17,
20  62:3, 5,
10, 16, 20
63:4, 9, 13,
16, 19, 20,
22  64:3, 6,
7, 12, 20
65:17, 20,
22  66:2, 5,
13, 14, 19,
23  67:4, 10,
20  68:1, 9,
12, 18, 20,
21  69:3, 5,
7, 10, 18, 21
70:3, 8, 9,
16, 23  71:7,
13, 17  72:4
73:17  74:2,
6, 15  75:4
76:1, 4, 7,
10, 12, 13,
17, 23  77:3,
4, 8, 11, 16,
23  78:3, 10,
15, 22  79:7,
11, 17, 22
80:4, 12, 15,
20, 23  81:1,
4, 9, 11, 14,
18, 22  82:1,
4, 8, 10, 14,
16, 19, 23
83:2, 4, 11,
13, 18, 22,
23  84:2, 4,
7, 8, 15, 20,
23  85:3, 10,
14, 18, 19
86:16, 17,

20, 23  87:2,
3, 5, 13, 16,
18, 20  88:5,
13, 16, 18
89:2, 4, 8,
12, 17, 19,
21, 22  90:5,
8, 13, 20
91:3, 8, 17,
20  92:4, 15
93:5, 7, 8,
11, 12, 13,
17, 18, 21,
23  94:2, 6,
7, 9, 10, 18,
22  95:1, 3,
5, 14, 15, 18,
19, 22  96:8
97:2, 3, 4,
15, 17, 22
98:4, 11, 14
99:2, 10, 12,
13, 20, 22
100:14, 16,
22  101:1, 2,
11, 16, 22,
23  102:6,
11, 17
103:1, 2, 4,
7, 15, 20
104:6, 14,
20  105:1, 6,
15, 16, 20,
21  106:1, 7,
8, 10, 13, 22,
23  107:11,
22  108:6, 7,
11, 17, 21
109:7, 10,
13  110:2,
11, 14, 19,
23  111:3, 7,

10, 11, 14,
16, 18, 20,
23  112:2, 9,
13, 16
113:3, 7, 14,
16, 20
114:2, 8, 12,
15, 19, 22
115:3, 5, 7,
9, 16, 18, 21
116:1, 4, 9,
13, 16, 21
117:1, 6, 9,
11, 14, 16,
22  118:6,
11, 13, 16,
20  119:2, 6,
8, 10, 18
120:2, 6, 14,
17, 21, 22
121:1, 4, 8,
15, 23
123:6, 23
124:9, 11,
12, 16, 20
125:1, 3, 10,
21  126:6,
11, 17, 20,
23  127:10,
16, 18
128:6, 8, 17,
20  129:12,
18, 20
130:2, 6, 10
131:17
132:6, 11
133:5, 9, 10,
15, 16, 18,
19, 20, 21
134:1, 11
135:1, 2, 10,
15, 17, 23

136:5, 9, 12,
16, 18, 21,
23  137:2, 5,
7, 9, 17, 19,
20  138:1, 8,
9, 12, 15
139:5, 9, 21
141:1, 11
**A.M**  1:21
2:9  8:7
45:14
**ability**
11:15
**able**  15:9
35:3  53:20
54:2, 9
56:20  97:5
122:7
**access**
116:17
118:7
**account**
96:7, 14
97:8

**accountants**
107:17
**accounting**
107:12
108:7, 9, 11
109:2
**ACCR**
141:21
**accurate**
28:16
**acquired**
112:9
**acting**  8:2
27:6
**action**
141:15

**actively**
36:3
**activity**
114:9
**actual**
138:6
**additional**
25:2
**address**
15:12
22:15
27:14
34:11  51:9
58:11  73:3
132:10
**administer**
9:19
**administrati**
**ve**  78:7
**advanceme**
**nt**  104:3, 4
**advice**
57:16
**advises**
23:20
**advising**
27:11
**affirmative**
69:7
**ago**  28:9
83:2
**agree**  27:9
33:3  34:11
35:16, 20
39:14, 15
55:13  73:1
**AGREED**
2:2, 10, 17
3:2  70:19
71:3, 16, 22
72:15

Video Deposition of Stefani Petty

**agreement**
111:*10, 21,*
*23* 112:*5, 6*
**agreements**
110:*20*
112:*3*
**ahead**
71:*18* 72:*3*
**al** 9:*1*
**ALABAMA**
1:*1* 2:*7*
6:*7, 13, 19*
7:*9* 8:*6, 19*
9:*3* 141:*3*
**aligned**
106:*14*
**allegation**
20:*7*
122:*20*
**allegations**
15:*20* 17:*7,*
*16* 18:*2, 23*
29:*11* 31:*3,*
*20* 33:*23*
42:*10*
48:*12* 50:*4,*
*10* 51:*12*
53:*5* 123:*9*
**allowed**
33:*15*
34:*18*
50:*19* 72:*6*
**alter** 11:*15*
**amount**
114:*19*
**an** 10:*23*
11:*9* 20:*7*
27:*10, 18*
33:*6* 39:*12*
40:*19* 41:*1,*
*2* 42:*5, 13*
50:*9* 55:*14*

57:*3, 22*
59:*20*
64:*16*
65:*15*
71:*23*
72:*20*
73:*11*
74:*12, 23*
88:*15* 94:*8*
95:*18* 96:*4*
99:*4*
106:*17*
108:*11*
110:*9*
111:*20*
112:*4, 5, 11*
114:*18*
116:*12, 21*
117:*22*
119:*20*
121:*12*
122:*7*
134:*20*
135:*10*
136:*3, 8, 21*
137:*12*
**analysis**
104:*15*
**analyst**
105:*21*
106:*8, 18*
**analysts**
108:*18*
**and** 1:*11*
2:*2, 6, 10,*
*11, 13, 15,*
*17, 21, 22*
3:*2* 8:*1, 4,*
*16* 9:*10, 14,*
*23* 10:*5, 11,*
*12, 17* 11:*4,*
*7, 9, 21*

12:*1, 5, 9,*
*16, 18* 13:*4,*
*16, 21* 14:*2,*
*12, 15, 21*
15:*1, 8, 9,*
*23* 16:*1, 17*
17:*2, 10, 13,*
*21* 18:*3, 9,*
*18* 19:*8, 16,*
*18* 20:*14,*
*20* 21:*1, 14,*
*18* 22:*5, 12,*
*14, 21* 23:*2,*
*4, 9, 10, 17,*
*21* 24:*3, 4,*
*7* 26:*17, 18*
27:*9, 11, 13*
28:*23*
30:*12, 16*
31:*13* 32:*2,*
*5, 6, 21, 23*
33:*3, 10, 14,*
*22* 34:*2, 4,*
*9, 11* 35:*4,*
*5, 14* 36:*8,*
*12, 15, 19*
37:*5, 13*
38:*10, 15,*
*16, 20*
39:*10, 20*
40:*12, 17,*
*20* 41:*2, 12*
42:*7, 12, 17*
45:*20, 21*
47:*8* 48:*2,*
*6, 11, 16*
49:*3, 4, 23*
50:*14, 18,*
*20* 51:*6, 12,*
*18, 22* 52:*2,*
*6* 53:*3, 6,*
*13, 17, 23*

54:*8, 10, 20,*
*21, 23* 55:*3,*
*5, 22* 56:*12,*
*19, 21* 57:*1,*
*6, 10, 21*
58:*6, 11, 22*
59:*1, 13, 19,*
*23* 60:*5, 6,*
*7, 11, 13, 20*
61:*8, 13, 15,*
*23* 62:*7, 20*
63:*13* 64:*6,*
*10, 13, 16,*
*22* 65:*7, 11*
66:*9, 16, 20*
67:*12, 15,*
*19* 68:*14,*
*16* 69:*1*
70:*2, 5, 7*
71:*4, 18, 19,*
*20, 21* 72:*1,*
*3, 12, 14*
73:*1, 6, 18,*
*19* 76:*8, 20*
78:*23* 79:*5,*
*12, 14, 19*
81:*12* 82:*3,*
*5, 12, 13*
83:*1, 6, 13*
84:*12, 17*
85:*13* 86:*4,*
*5, 6, 8, 16*
87:*8, 9, 10,*
*12, 20* 88:*1,*
*6, 11, 21*
89:*5, 6, 12,*
*18, 19, 22*
90:*8, 16, 19*
91:*3, 17, 23*
92:*10, 12*
93:*19*
94:*16, 23*

95:*9* 96:*2,*
*14, 15, 16,*
*17, 18* 97:*6,*
*14, 19*
98:*19, 22*
99:*2, 12*
100:*13*
101:*8, 9, 13,*
*18, 19*
102:*20*
103:*1, 8*
104:*3, 15,*
*16* 105:*7, 8,*
*17* 106:*3,*
*16* 107:*1, 2,*
*14* 108:*2,*
*13, 15, 18,*
*19, 23*
109:*3, 11,*
*13, 16, 22,*
*23* 110:*8*
111:*22*
112:*15, 16*
113:*6, 10*
116:*1, 17*
117:*6, 10,*
*12, 13, 19*
119:*6, 17,*
*18, 22*
120:*19*
121:*5, 6, 15,*
*20, 21*
122:*11*
123:*12*
124:*4, 21*
125:*8, 23*
126:*4, 8, 9,*
*15, 18*
127:*13, 16*
128:*15*
129:*3, 5, 15*
130:*11, 12,*

16  131:1, 5,
10, 14, 19,
21  132:1, 3
133:21
134:10, 15
135:16, 17,
21  136:6
137:22
138:6, 23
139:1, 5, 6,
8, 10, 12, 17,
23  141:7, 8,
10, 11
**annual**
61:14  63:6
102:13
**annually**
62:16  67:8,
11
**answer**
11:4, 15
17:20  19:3,
6, 21  22:2,
6  25:20
26:2  27:1,
2  29:2, 4, 5,
8, 15, 18, 23
30:6  31:6,
21  32:15,
16  34:15
36:7, 20
37:8, 16
42:13, 14
43:20, 21
48:21
50:21  57:3
64:18, 19
68:12
70:14
80:12, 21
85:17
86:11

88:20
89:16  90:4,
12, 13  91:7,
9  92:3, 14
93:4, 16
98:3  99:1,
9, 21
100:12, 15
101:15
102:5, 23
105:9
110:10, 12
119:11
121:22
122:12
123:18, 20,
23  125:17
126:5, 16
129:17
131:14
134:7, 23
**answered**
30:19  36:5,
8  42:12
44:1  57:6
92:13
121:21
122:11
126:4, 15
128:4
**answering**
58:10
79:17
128:9
**Answers**
5:8  13:12
67:20
129:4
141:8
**anticipation**
19:17
26:19

34:10
37:13  49:2
50:13
51:15, 17
139:8
**anti-
discriminati
on**  102:15,
21
**anti-gay**
134:19
**anybody**
41:22
42:18, 20
43:2, 10
44:2  68:10
92:21  97:5
**anymore**
66:1  101:8
**anyway**
30:20
**anywise**
141:15
**apologize**
12:18
136:7
**APPEARAN
CES**  7:1
**appears**
22:20
**applicable**
60:10  82:4
86:22
**applicants**
60:6, 20, 21
**apply**  37:14
**appropriate**
52:16
76:15
**approximate
ly**  2:9

**areas**  64:6
105:8
**arguing**
35:20, 21
36:13
**Ashford**
7:13  8:16
**asked**
17:12, 21
20:18, 19
36:8  42:12
43:22
53:23
54:14  56:8
74:21  86:4,
6  92:12
98:18
100:19
101:8
109:17
121:21
122:10
124:16
125:3, 6
126:3, 14
132:13
133:5, 7, 9
**asking**
12:19, 21
20:5  21:2
22:1  30:7,
8, 10  31:14,
17, 18  33:7,
21  34:6, 8,
9, 23  35:5,
6  38:15
41:3, 4
42:22  44:2
49:1  53:1,
16, 17
54:13  55:3
56:6  65:6,

17  72:22
73:11  81:4,
6  82:9
85:5, 23
86:23
87:11, 15
91:13
92:20
94:13
96:17
100:6, 13
104:7
105:7
106:4
108:1
110:8
115:7
118:18
120:1, 2, 14
121:9, 16
123:5, 16
125:1, 2
129:18
130:21
131:6
135:16
136:18
**asserting**
21:19, 22
27:5
**asserts**
25:2

**assessment**
27:10
**assign**  2:22
**assignment
s**  92:9
**assist**
38:17
44:12

129:*4*, *21*
130:*2*
**assistance**
139:*11*
**assistant**
128:*14*
**assisted**
32:*6*  36:*16*
48:*14*
**associated**
94:*15*
**associates**
60:*5*, *19*, *21*
**assume**
120:*17*
**Assumes**
89:*15*  90:*3*,
*11*  91:*6*
92:*12*  93:*3*
98:*22*
100:*5*, *8*
102:*4*, *10*
134:*22*
**assuming**
85:*3*, *16*, *17*
86:*11*
87:*11*
**assumption**
24:*19*
84:*20*  87:*6*
**assumptions**  100:*10*
**attach**  46:*6*
**attached**
12:*6*  13:*22*
22:*13*, *22*
38:*11*
39:*21*
40:*18*, *20*
46:*16*
47:*11*, *14*
48:*3*  58:*23*

63:*14*
116:*2*
117:*7*
119:*7*
127:*17*
**attaches**
41:*2*
**attaching**
39:*13*
**attempts**
90:*17*
122:*5*
124:*1*
**attorney**
19:*18*  25:*2*
26:*18*
27:*10*, *19*
28:*21*
30:*13*
38:*16*
41:*10*
42:*20*, *21*
43:*12*  44:*4*,
*8*  48:*10*
49:*4*  58:*1*
**attorney/client**  12:*19*
18:*11*  19:*5*
27:*5*, *7*
35:*14*
37:*12*  49:*3*
51:*14*  52:*6*
72:*21*
139:*7*
**attorneys**
34:*7*
**attorney's**
34:*8*  54:*19*
**audio**  9:*11*
40:*20*
47:*12*

64:*12*
75:*16*
**audit**  101:*1*
**available**
112:*18*
120:*11*, *18*
**Avenue**
6:*18*
**aware**
11:*17*
17:*14*
49:*14*  89:*9*
90:*6*  102:*6*,
*11*  105:*20*
120:*9*
121:*10*
129:*7*
134:*1*
135:*1*
**awareness**
17:*12*
138:*8*

**< B >**
**back**  38:*2*,
*6*  39:*11*, *12*
45:*8*, *13*
48:*20*
56:*13*
57:*11*
58:*12*
67:*19*  73:*3*
74:*8*
103:*17*
106:*2*
119:*17*
138:*17*
**Bailey**
7:*12*  9:*16*
12:*16*
**BAKER**  7:*4*

**BANK**  1:*11*
10:*12*
66:*10*
**Barlotta**
7:*6*  9:*12*
10:*4*  14:*11*
17:*18*  18:*3*,
*13*, *19*  19:*1*,
*4*, *13*, *22*
20:*10*, *18*
21:*22*  22:*4*
25:*19*  26:*1*,
*7*, *23*  27:*2*
28:*4*, *11*, *23*
29:*13*, *16*
30:*5*, *7*, *14*
31:*5*, *11*, *21*
32:*16*
33:*12*, *18*,
*22*  34:*13*,
*17*  35:*8*, *10*,
*19*  36:*5*, *8*,
*23*  37:*4*, *12*,
*20*  38:*23*
39:*7*  40:*8*
41:*19*  42:*3*,
*11*, *22*  43:*3*,
*14*  44:*5*, *13*
46:*1*  48:*18*
49:*7*, *11*, *22*
50:*6*, *23*
51:*6*, *18*
52:*10*, *21*
53:*3*, *11*, *21*
54:*4*, *12*, *14*,
*18*  55:*10*,
*12*, *17*, *23*
56:*9*, *18*
57:*12*
59:*16*
60:*15*  61:*3*
62:*2*, *9*, *15*

63:*3*  65:*1*,
*11*  66:*22*
67:*15*, *23*
68:*8*, *17*
69:*9*, *17*, *19*
70:*13*, *19*
71:*2*, *10*, *15*,
*23*  72:*8*, *12*,
*19*  73:*9*, *20*,
*23*  74:*16*,
*19*  75:*3*, *8*,
*13*, *16*, *19*
76:*16*, *22*
77:*15*, *22*
78:*9*, *14*, *21*
79:*6*, *16*
80:*3*, *11*
81:*3*  82:*7*
83:*10*, *17*
84:*14*, *19*,
*22*  85:*4*, *15*,
*23*  86:*8*, *19*
87:*4*, *10*
88:*4*, *12*
89:*14*  90:*2*,
*10*  91:*5*, *19*
92:*2*, *11*
93:*2*, *10*, *15*
94:*5*, *17*
95:*2*, *8*, *21*
96:*10*, *21*
97:*11*  98:*2*,
*13*, *21*  99:*8*,
*16*, *19*
100:*4*, *8*, *13*,
*23*  101:*13*
102:*3*, *9*, *16*,
*22*  103:*11*
104:*5*, *13*,
*19*  105:*5*,
*19*  106:*12*,
*21*  107:*10*,

Video Deposition of Stefani Petty

7/13/2023

43

*19, 21*
108:*5, 16*
109:*16*
110:*3, 18,
22*  112:*1, 8*
114:*1, 21*
115:*4, 15*
119:*15*
120:*6, 13*
121:*7, 12,
21*  122:*10,
13, 17, 20*
123:*3, 15,
20*  125:*12,
19*  126:*3,
14, 22*
127:*9, 19*
128:*7*
129:*5, 16*
130:*1, 19*
131:*8, 22*
132:*16, 23*
133:*23*
134:*4, 8, 21*
138:*7*
139:*16, 18,
22*  140:*2*
**BARRETT**
6:*4*
**base**  66:*16*
96:*18, 20*
97:*2*
**based**  22:*2,
6*  26:*18*
30:*17*
31:*23*  32:*2*
49:*17*
50:*22*  65:*5*
66:*23*  67:*4,
16*  70:*2*
84:*8*  85:*21*
96:*11*

97:*12*
114:*19*
121:*23*
122:*3*
139:*7, 14*
**basis**  60:*7,
22*  61:*2, 22*
**BB&T**  24:*4,
7*  30:*10*
41:*16*
43:*11*  44:*2,
10*  60:*4, 10,
13, 18, 23*
66:*1*  67:*6*
69:*13*
81:*16*
102:*12, 19*
104:*10, 23*
108:*1, 10,
13*  109:*8,
10, 21*
110:*16*
118:*5*
121:*4, 19*
124:*7, 21*
126:*20*
127:*5*
129:*15*
**BEARMAN**
7:*4*
**began**
38:*21*  39:*6*
**beginning**
8:*7*
**behalf**
8:*18*  32:*11*
**believe**
19:*14*
38:*14*
51:*13*
**benefit**
113:*11*

**benefits**
112:*11, 14,
15, 17, 18,
22*  113:*4, 6,
7*  123:*4*
**BERKOWIT
Z**  7:*5*
**better**
119:*20*
**bigger**
63:*16*
128:*19*
**bill**  101:*18*

**Birmingham**
2:*7*  6:*7, 13,
19*  7:*9*  8:*6*
76:*6*  78:*18*
79:*2, 4*
81:*8*  92:*21*
98:*9*
105:*22*
136:*6, 8, 17,
23*  137:*8*
**bit**  63:*16*
64:*6*
131:*17*
**bonus**
133:*21, 22*
**bonuses**
64:*11*
66:*17*
67:*13*
96:*17*
114:*19*
**book**  97:*4,
6*
**bottom**
60:*2*  64:*1*
116:*22*
118:*8*

**bounds**
134:*12*
**break**  11:*1,
5*  37:*18*
45:*20*  74:*2*
103:*7, 20,
21*  138:*12*
**breaking**
44:*17, 18*
**brief**  37:*23*
45:*11*  74:*6*
103:*15*
138:*15*
**bringing**
57:*1*
**broad**
101:*2*
**broker**
67:*5*  89:*13*
90:*1, 7, 8*
91:*2, 3, 16,
18*  95:*5, 22*
96:*7*  97:*3,
9*  101:*2*
106:*17*
111:*14, 19*
120:*10, 11*
123:*13*
124:*6, 8, 9*
125:*9*
**brokers**
67:*9, 14*
68:*7*  78:*12,
17*  95:*23*
96:*2, 14*
106:*10, 11*
107:*2*
108:*22*
110:*6*
111:*20*
123:*12*
124:*15, 23*

**brought**
92:*1*
**business**
66:*7*  98:*6*
101:*18*
107:*6*
116:*16*
118:*21*
**bye-bye**
58:*8*

**< C >**
**Cadden**
15:*22*
16:*22*  20:*2*
21:*7*  74:*11,
23*  82:*5*
84:*6*  89:*6*
90:*23*
91:*14, 23*
117:*12*
122:*14*
133:*14*
**CALDWELL**
7:*4*
**call**  15:*2*
56:*10, 12,
17*  57:*17,
18*  58:*12*
102:*13*
139:*5, 9*
**called**
105:*3, 18*
**calling**
58:*2*  81:*18*
**calls**  29:*16*
73:*2*  81:*17,
19*
**capacity**
69:*22*
97:*15*

Video Deposition of Stefani Petty

7/13/2023
44

carrier
80:13  81:5
carriers
80:18
CASE  1:5
8:23  9:3
13:14  15:6
24:12
27:12
31:18
49:15  52:2,
11  53:19
55:22  58:2,
6  63:2
65:3  70:12
71:7  72:23
73:15
74:18  75:2
79:15
83:21
84:18  85:7,
14  86:7
95:4, 17
98:17
100:21
105:17
133:4
cater
131:14
cause  8:8
127:2
141:16
cellphone
68:16
69:16  70:7,
10  79:9
118:9
cellphones
79:10, 13
Central
45:14

certain
33:1  34:2
79:23
82:20
108:20
137:12
certainly
11:2  35:3
88:20
134:11
certify  8:2
141:6, 13
chambers
57:20
change
96:8  97:8,
10  106:15
108:20
110:1, 17
127:7
135:18
changed
79:5
131:13
characterize
d  28:14
Charge
4:15  19:15
41:3  46:7,
16  47:9, 17,
20  48:7, 13
50:15
68:14
123:11
charts  34:9
check  80:8
107:15, 23
Christina
7:12  9:16
12:16
Circuit  9:2
Cite  8:18

city  98:11
99:5, 14
100:19
Civil  8:4
claim  36:4
49:8, 15
52:2, 10
claims
23:11  25:2
51:12
52:13
clarified
86:13
136:7
clarify
13:10  21:6
27:4  60:16
131:11
classified
28:6
Clay  89:11,
21  102:1
133:12
clean  36:20
cleaned
138:5
clear  50:1,
6  79:17
109:11
110:13
126:9
clerk  57:17
client  19:9
31:17  34:5,
20  35:4
53:18  54:8,
15  139:10
client's
52:13
close  135:3
cloud
76:12

co-counsel
103:9
138:10
code  61:13
83:7  114:9,
10, 16, 20
115:3, 8
126:11
collaboratio
n  97:22
collect  85:8
collected
104:16
collecting
105:14
color  60:7
come
57:11
67:18
111:18
comes
33:10
58:12
coming
50:16
commencin
g  2:8
comments
134:19
Commissio
ner  3:4
8:2
committed
60:4, 19
communicat
ed  24:4
100:10
communicat
ion  19:5
communicat
ions  12:20
27:8  32:21

community
120:12
comp
109:4
companies
112:10
company
32:18
33:22
50:15
126:10
138:3
company-
owned
79:10, 13
80:14
companywi
de  134:12
comparator
s  74:1
compare
123:12
compelled
56:2
compensati
on  92:10
105:21, 22
106:8, 13
108:15, 17
121:6
compiling
129:22
complained
91:16
92:19, 23
122:18
133:12

complaining
133:17
complaint
74:12  75:1

84:*7*  85:*14*, *20*  89:*21*
90:*20*  93:*7*, *13*  122:*1*
133:*17*, *20*
**complaints**
82:*6*  83:*8*
89:*10*  92:*7*, *8*  101:*7*
118:*23*
134:*3*, *19*
139:*3*
**complete**
101:*18*
**completely**
66:*15*, *17*
**completing**
89:*13*, *23*
**compliance**
2:*14*  107:*9*
**compliant**
23:*17*
**complied**
80:*9*
**comply**
121:*4*
**computer**
12:*3*  45:*19*
68:*16*  69:*1*, *16*  70:*7*, *10*
88:*16*
**computer-aided**  141:*9*
**concern**
93:*18*
**concerning**
41:*10*
51:*21*  65:*3*
**concerns**
84:*16*  88:*6*, *8*  90:*7*

91:*2*, *22*, *23*
123:*7*
**concludes**
139:*19*
**conclusion**
29:*17*
120:*2*

**conclusions**
119:*23*
**conduct**
41:*12*, *17*
70:*9*
126:*11*
**conducted**
32:*9*
**conducting**
33:*6*
**confer**
71:*21*
73:*18*
103:*9*
138:*10*
**confined**
72:*18*
**confirm**
67:*2*
**confirming**
72:*1*
**confiscate**
69:*1*
**confused**
121:*1*
131:*18*
**connecting**
12:*3*
**consider**
40:*6*  49:*18*
**considered**
30:*3*
**consulted**
12:*23*

**contact**
15:*19*
41:*16*  42:*8*
43:*11*
137:*1*, *3*, *7*, *9*
**contacted**
41:*10*
**contain**
111:*23*
**contained**
17:*8*  42:*6*, *19*  62:*4*
69:*15*  77:*9*
137:*22*, *23*
**contents**
21:*20*  31:*7*
68:*15*
79:*13*
**contest**
49:*20*
**continues**
41:*12*
**Continuing**
5:*1*  7:*1*

**contribution**
113:*17*
**control**
76:*2*  78:*7*
**conversation**  17:*3*
19:*10*, *15*
20:*11*
21:*17*, *21*
26:*12*, *16*, *21*  27:*17*, *20*  30:*21*
31:*2*, *10*
32:*4*
131:*20*
132:*5*

**conversations**  18:*6*, *10*, *17*  20:*1*
21:*3*, *11*, *15*
34:*2*, *15*
35:*11*
51:*11*
55:*15*  91:*9*
132:*7*
**copied**
117:*13*
**copies**  15:*3*
**copy**  12:*5*
13:*21*
22:*12*
23:*10*
38:*10*
39:*20*
40:*17*  48:*2*
58:*22*
63:*13*
116:*1*
117:*6*
119:*6*
127:*16*
139:*21*
**Corey**
24:*17*  75:*8*
89:*20*  95:*9*
109:*17*
117:*11*
131:*21*
133:*13*
**Cornelius**
2:*5*  8:*1*, *17*
141:*19*, *20*
**CORP**  1:*11*
10:*12*
**corporate**
8:*21*  11:*19*
24:*5*, *6*, *18*
50:*2*  67:*20*

69:*21*  70:*4*, *16*
**correct**
45:*23*  82:*3*, *12*  109:*15*
110:*2*
126:*2*, *9*, *13*
127:*8*
135:*23*
141:*11*
**correctly**
80:*4*
132:*11*
**counsel**
2:*4*, *19*, *21*
8:*5*  9:*5*, *17*
12:*15*, *23*
18:*8*  19:*14*
20:*4*  21:*5*
26:*17*  27:*6*
31:*12*
32:*18*, *19*, *22*, *23*  33:*2*, *23*  34:*19*
35:*12*  37:*9*
47:*4*  48:*22*
49:*1*  50:*12*, *16*  51:*4*
52:*15*, *18*
53:*13*  54:*6*
55:*18*, *19*
56:*4*, *7*
128:*14*
131:*1*, *23*
132:*1*
141:*14*
**counsel's**
29:*1*  31:*15*
55:*6*  98:*23*
101:*14*
**COUNTY**
141:*4*

courses 62:11, 16, 20  63:6 88:19
COURT 1:1  2:15 8:17, 18 9:2, 18 11:8  22:8 27:15 31:14 34:12  35:2 56:11  71:5 134:17
Court's 57:22
covered 20:14  82:2, 21  110:4
co-workers 89:10
CRC 1:10 8:21, 23 10:11 11:21 15:19  24:4, 8  30:11 40:4, 6, 12 41:16 43:11  44:3, 10  48:7 59:12 60:10, 13, 23  61:10 65:16, 23 66:16, 18 67:14  68:7, 14  69:12 70:4  75:6 79:12 80:19 81:16  90:8

102:12, 19 104:10, 16, 20  108:2, 9, 12  109:8 112:11 113:12 116:21 117:23 118:3, 20 121:3, 18 124:7, 21 126:20 127:4 129:15 134:3 135:8, 22 136:3, 22 137:21
CRC's 78:8 119:11
create 105:15
created 68:7  69:14 94:3  97:20, 21  99:11 110:21, 23
creates 97:20 111:1
criminal 114:9
CSR 2:6 8:1
cubicle 138:6
current 69:22
cut 12:17
Cynthia

6:17  8:23

< D >
D 2:5  4:1 8:1  141:19, 20
damages 49:21 119:13 120:5
data 23:10 76:11
date 8:3, 15  14:8 16:10  39:2 47:19
dated 14:6
Daugherty 24:17 51:22  65:2, 14  67:17 74:11, 23 82:5  84:7 89:2, 20 90:23 91:14, 22 96:12 97:13 110:4 125:13 127:22 133:13

Daugherty's 71:18
day 2:8 14:5, 6, 9 39:1, 4 57:3
days 71:8

deactivate 116:17 118:7
deadline 71:8
December 118:10
decisionma ker 134:10
decisions 67:14
deemed 114:11 137:11
defendant 72:4  129:3, 15
Defendants 1:12  7:3 9:13, 15, 17 102:15 120:4
defense 33:5  49:6, 10, 17 119:14
defenses 134:15 138:23
defining 98:6
demand 37:10 48:23 50:12
demands 51:7
dental 112:21 113:1, 8
department 15:20  39:9

68:11  78:8 81:8  92:22 93:20  94:9 98:10  99:6, 15  101:2 105:23 107:20 108:18 109:7 111:6 125:16 134:9 135:11, 21, 22  136:3, 8
department s 97:21 135:20 139:4
depending 112:4
DEPONENT 140:6
depose 51:20
deposed 97:15
DEPOSITIO N 1:16 2:4, 12, 13, 23  3:3  4:9 8:20  10:18 12:11, 14 13:2, 8 56:19  57:5, 13, 21, 23 58:4  65:4 71:19 139:14, 20
depositions 2:16  71:4 72:3  73:5

described 137:*14*

descriptions 97:*18, 20* 98:*1*

designated 65:*2, 14, 15* 67:*17* 95:*9* 96:*13* 97:*14* 109:*18* 110:*5* 125:*12* 127:*22*

desk 137:*22, 23* 138:*2*

destroy 23:*4, 9*

determination 127:*2*

determine 64:*20* 70:*11* 73:*6* 102:*14* 103:*23* 104:*9* 105:*14* 108:*3* 124:*8, 22*

determined 30:*11* 66:*6, 7*

determines 76:*8*

determining 64:*10* 106:*18*

difference 54:*11* 96:*8*

differences 96:*14*

different 12:*10* 18:*13* 22:*4* 29:*14* 33:*17, 19, 20* 34:*22* 35:*7* 54:*12* 63:*20, 23* 67:*20* 80:*18* 86:*12* 95:*22* 97:*3, 17* 99:*15, 22, 23* 100:*19* 105:*8* 106:*4* 136:*17* 137:*2*

differential 20:*7* 83:*9* 92:*9* 102:*2*

differently 61:*22*

difficult 11:*11*

direct 34:*1*

directed 19:*5* 32:*22, 23* 34:*21* 35:*6* 48:*22* 53:*14, 17*

directing 19:*20* 88:*22*

direction 18:*8* 19:*12, 13* 21:*5* 26:*16* 27:*18*

31:*12* 33:*2* 34:*19* 35:*12* 36:*16* 37:*9* 54:*6* 125:*6* 131:*22*

directly 92:*7* 129:*19*

disability 113:*1, 9*

discipline 93:*9, 14*

disciplined 102:*1, 7*

disconnected 115:*22*

discover 51:*16, 19*

discovery 13:*13* 52:*20* 54:*17* 59:*13* 71:*7* 73:*7* 105:*4* 132:*15, 17*

discretionary 96:*3* 109:*15* 114:*23* 115:*11*

discriminate 60:*6, 21*

discrimination 46:*7* 61:*2, 11* 74:*13* 75:*1* 82:*6* 83:*9* 84:*3, 11* 86:*10, 17* 88:*3* 93:*8,*

13 108:*4* 114:*13* 115:*2, 7* 119:*1*

discuss 17:*7* 18:*22* 20:*8* 31:*3*

discussed 12:*15* 54:*3* 83:*18*

discussing 17:*5*

discussion 31:*7* 45:*17* 54:*5, 16* 62:*5* 119:*8*

dismiss 49:*5, 9*

disposal 52:*5*

dispute 58:*5*

distributed 62:*17*

DISTRICT 1:*1* 9:*2*

DIVISION 1:*3* 9:*3* 107:*17, 18*

docket 57:*17*

Document 5:*7* 12:*7* 13:*6, 23* 14:*3* 38:*13* 40:*19* 48:*4* 59:*9* 63:*15* 82:*9, 14* 84:*3, 11* 86:*1, 4, 18* 87:*1, 3, 5, 13, 17* 88:*2*

94:*12* 116:*3, 11* 117:*8* 127:*14, 20* 128:*8*

documentation 62:*23* 73:*6* 94:*15, 16, 18, 20, 21* 95:*16* 98:*20* 99:*6, 17* 100:*2* 101:*11* 130:*17* 132:*8*

documented 83:*5*

documenting 82:*6*

documents 13:*2, 4, 7, 10* 18:*17* 23:*4, 9, 21* 32:*17* 33:*14* 34:*2, 9* 47:*5* 51:*16, 17* 69:*13* 73:*12, 19* 83:*15, 20, 21* 85:*7, 9* 87:*9* 100:*21* 104:*16* 129:*15, 21, 22* 130:*4, 22* 131:*10, 16* 137:*23*

doing 35:*5* 125:*5*

Video Deposition of Stefani Petty

**DONELSON**
7:4
**drafted**
53:6
**drafting**
34:5
**due** 17:6
**duly** 9:22
**Dunston**
133:17
**duties**
62:8 89:13
90:1 92:10
97:10 98:6
**duty** 23:3
84:3

**< E >**
**E** 4:1 6:1
141:1
**Earlier**
26:15
27:17 47:6
68:20
69:20
82:12
83:18
96:19
124:1
128:22
**echo** 64:16
**educate**
88:13, 17
**EEOC** 4:15
19:15 41:2
47:8, 17, 20
50:15
68:14
123:10, 22
**effect** 2:13

**effective**
102:21
103:23
**effectiveness** 102:14
104:11, 17
105:15
**effectuating**
98:20 99:7
**effort** 121:4
**efforts**
33:5 50:7
51:2 100:2
121:11, 18
**either**
26:17 42:8
74:11
**electronic**
23:10
**eligible**
113:19, 20,
23 114:4, 5,
7, 13, 17
126:1, 7, 19
**E-mail**
4:11, 14, 23
5:4 15:12,
13, 14, 15
16:23
22:15, 18,
22 24:5, 6,
17, 20
39:12, 16
40:20 41:1
42:5, 19
43:1 44:16
46:9, 12, 13,
14, 17, 19
47:4, 15
70:22
71:23 75:6
76:15, 20

77:21 79:2,
8 117:9, 10,
15 118:2
132:21
133:3
134:20
**e-mailed**
15:1, 12
69:20
**e-mails**
13:12, 15
15:4 69:13
71:10
77:13, 17,
20 102:8
132:15
133:4
**employed**
40:12
**employee**
86:9, 18
95:18 99:4
112:11
114:12
116:12
**employees**
24:4, 7
34:1 53:14
60:11, 14
61:10, 12
62:14
64:11 77:1
81:7
112:14
136:19

**employment**
51:22
111:20, 22
112:3, 4, 5
**engage**
115:1

**engaged**
114:13
**ensure**
60:14 61:1
121:19
**entitled**
53:7, 8, 10,
12, 18
112:12, 13
113:2, 3
**environment** 49:15
52:2
133:18
**equal** 60:3,
5, 14, 19
61:23 62:8
104:3, 12
108:14
121:5, 20
**equipment**
138:3, 4
**Esq** 6:5,
11, 17 7:6,
7
**et** 9:1
**ethics**
61:13 83:7
114:9, 10,
16, 20
115:3, 8
126:12
**everybody**
58:13
**evidence**
3:1 72:23
89:15 90:3,
11 91:6
92:12 93:3
98:22
101:11

102:4, 10
134:22
**exact**
14:23 16:3
17:4 24:13
25:15
27:23 39:2
47:19
87:21
136:2
**exactly**
33:19
59:10 61:7
63:4 76:17
77:16
80:16
93:21
105:6, 9
135:12
**EXAMINATION** 4:2
8:8 10:7
**examined**
9:23
**example**
24:16
78:17 84:5
97:8 98:9,
17 106:7
**Excerpt**
4:18, 19
59:20
**excluded**
72:11
**Excuse**
53:11, 12
93:6
**executive**
96:7 97:9
**executives**
96:15

Video Deposition of Stefani Petty

7/13/2023
49

EXHIBIT
4:7, 8, 16,
17, 20, 21,
22  5:5, 6
12:2, 4, 10
13:19, 20
16:21
22:10, 11
25:8  38:5,
9  39:11, 18,
19  40:15,
16  45:21
47:22  48:1
58:19, 21
63:12, 21
115:20, 23
117:4, 5, 19
119:4, 5
127:13, 15
EXHIBITS
5:1
Expires
141:21, 22
explain
132:17
explained
21:23
68:20
explanation
121:13
extend
16:7
extensively
97:13
110:6
extent
42:10
51:10  68:2

< F >
F  141:1

fact  30:16
51:15  55:9
68:2  70:3
97:15
100:5
facts  18:18
27:12
31:15, 18
50:3  51:16,
19  52:5, 19
89:15, 19
90:3, 11
91:6  92:12
93:3  98:22
102:4, 10
119:13
120:3
121:3, 10
122:7
134:22
138:22
factual
33:7  52:12
failed
119:12
failure
93:7, 12
fair  11:5,
12  14:7
24:21
26:12, 20
27:19
38:20  69:6
122:19
faith  33:5
49:10, 12
121:4, 13
fall  27:7
falls
109:13
124:11

familiar
134:18
135:12
far  56:1
66:9  93:22
105:10
106:15
112:2
115:16
Faragher
49:6, 13, 16
FARAHANY
6:4
Federal
8:3  121:5
female
90:7, 8
91:2, 3, 16,
17
females
62:7  104:3,
4  123:12
124:9, 14,
23
fifteen  71:8
fifty  113:16
file  53:2
55:21
70:23
71:13, 17
72:4
filed  10:11
19:16
47:18
131:3
files  52:22
55:6
filing  3:3
filled  116:5,
22  117:1
final  105:16

FINANCIAL
1:10  10:11
find  53:12
81:1, 4
122:6
123:7
fine  10:3
17:22  43:5
67:22  68:4
70:5
120:23
128:3, 4
129:9
finish
56:18  57:5
finished
135:3
138:20
FIRE  6:16
first  9:22
11:4  14:2
22:14  25:7
39:12  41:9
43:16  51:3
90:15, 20
92:18
122:4
123:4
128:10, 21
fit  107:2
108:7
109:1
five-hour
73:18
flag  23:23
24:3
flashing
128:10
flip  128:9
follow  80:6
84:10

following
8:9
follows
9:23
force  2:13
foregoing
8:4  141:7,
10
forgot
100:16
form  2:20
14:11
17:18  18:3
25:19, 21
26:7, 23
28:4, 23
29:13  30:5
38:23  39:7
40:8  41:19
42:3, 11
43:14  44:5,
13  46:1
60:15  61:3
62:2, 9, 15
63:3  65:11
66:22  68:8,
17  69:9, 17
74:16, 19
75:3  76:16,
22  77:15,
22  78:9, 14,
21  79:6, 16
80:3, 11
81:3  82:7
83:10, 17
84:14, 19,
22  85:4
86:19  88:4,
12  89:14
90:2, 10
91:19  92:2,
11  93:2, 10,

Video Deposition of Stefani Petty

7/13/2023

15  94:3, 4,
5, 17  95:1,
2, 6, 8, 21
97:11  98:2,
11, 13, 21
99:8, 13, 16
100:4, 14,
23  101:13,
17  102:3, 9,
16, 22
104:5, 13,
19  105:5,
19  106:12,
21  107:10,
19, 21
108:5, 16
110:18, 22
112:1, 8
114:1, 21
115:4, 15,
17  116:6, 8,
10, 13, 15,
16, 21, 23
117:2, 22,
23  120:13
122:10, 17
123:15
126:3, 14,
22  127:9
129:16
132:16
133:23
134:21
138:7
**Forman**
6:17
**formula**
107:1, 9
108:3
109:13, 14
110:1, 15

**formulas**
96:1
**forth**  96:15
119:17
**forward**
124:5
**forwarded**
26:4  47:5
**front**  71:17
**froze**  45:20
**frozen**
44:22
**full**  2:14
64:19
**full-blown**
50:14
**full-time**
113:4
**function**
136:12
**functions**
137:12
**FURTHER**
2:10, 17
3:2  140:6
141:13

**< G >**
**gained**
114:2
127:1
**gather**
32:13, 14,
23  34:1
48:17
**gathered**
33:14
130:5, 12,
15  131:5, 9
132:8
**gathering**
32:7  36:17

48:15
130:2
**gears**  64:5
**gender**
60:8, 22
61:2, 11, 22
84:8
114:19
115:1, 7
**general**
101:5
**generally**
95:14
**getting**
74:1  95:6
135:3
**Giddens**
7:13  8:16
**GILL**  4:3
6:5  9:7
10:3, 8, 9
18:9, 16, 21
19:8, 19
20:5, 16, 23
21:3, 18
22:1, 7, 9
27:9, 16
28:8, 16, 20
29:22
30:10, 18,
21  31:8, 9,
13, 19  33:3,
17, 20  34:6,
14, 23  35:9,
16, 17  36:1,
2, 19  37:2,
11, 15  38:4,
8, 12  41:1,
6  43:10
44:18, 20,
22  45:7, 15,
19  47:16

49:5, 9, 19,
23  50:20
51:5, 8
52:8, 17
53:1, 9, 16
54:2, 7, 13,
16  55:8, 11,
16, 20  56:6,
10, 16  57:9,
15  58:9, 18
59:1, 5, 8,
18, 21
64:22  65:6,
9  67:22
68:4, 5
70:5, 6, 15,
23  71:9, 12,
20  72:6, 10,
17  73:1, 17,
21  74:2, 10,
22  75:10,
15, 21
85:21  86:3,
14  87:7, 15,
16  96:16
97:7  103:7,
12, 19
110:8, 10
119:10
120:1, 8, 9
121:9, 17
123:17, 19
127:12
128:3, 5, 13
129:9, 10
131:4, 13
132:3
134:6, 14,
18  138:9,
19  139:17
**give**  49:19
56:11

133:10
138:9
**given**
10:17
66:17  71:7
95:4, 18, 19
141:12
**giving**
69:21
**go**  10:20
34:1  39:10,
12  45:3, 5
52:22
54:22
55:14
56:14  60:2
62:21
71:18  72:2
74:3  81:12
88:23
108:2
116:19
**goes**  27:13
86:6  118:1
134:15
**going**  9:10
10:4, 20
12:17
13:16, 17
16:20
20:14, 17
31:14  33:1,
4, 16  34:20
35:13  37:4,
18, 21  40:3
45:9  47:14
48:18, 20,
21  49:5, 9,
17, 20  50:1,
18  51:1, 8
55:3, 13
56:3, 11, 19

57:11, 17
58:11  64:5
65:1  67:16,
18  70:1, 16
72:2, 10
75:10, 11
77:23  85:7,
8  90:13
96:6, 10
99:4  106:1
109:19
113:8
115:19, 20
117:3
119:3, 17,
22  122:14
127:12
128:2, 13
132:9
133:8
134:4
**good**  33:5
49:10, 12
121:4, 13
**Gotcha**
67:6
**governance**
105:7
**great**
139:18
**ground**
10:21
48:19
**grounds**
2:22
**group**
21:14  25:6,
9  30:1
32:7, 9, 12,
13  36:15,
16  48:10,
14  76:7

78:12, 13,
20  80:17
81:14  83:6
85:3  86:21
99:23
106:23
108:8, 9, 11
109:2, 4
122:3
130:12, 16
131:6, 20
**groups**
76:3, 9
105:8
107:12
**guess**  42:5
47:3  60:9
61:6  73:2
94:13
108:1
118:18
131:17
134:15
135:16
139:12
**guidance**
84:9, 15, 17,
18  85:12,
22  86:5, 8,
15  87:4, 7,
13  88:1, 5,
10
**guidelines**
64:21, 23
65:8, 10
66:4, 8, 12
96:19


**< H >**
**Haikala**
55:14  58:3,
4  73:5

**Haikala's**
57:20
**hand**  84:12
**Handbook**
4:18, 19
59:17  60:4,
10  61:6
63:20, 21
77:4, 12
78:4  86:9,
18  87:2, 20
88:11, 21
130:11
**handed**
28:5
**handle**
84:13
**handled**
106:3
**hang**  60:1
100:20
**happen**
16:2  100:7
**happened**
51:21  54:5
74:17
100:5
130:23
137:22
138:2
**happening**
110:2
**harassment**
49:8  61:14,
23  134:3
139:3
**hard**  23:10
**head**  77:5
81:23
87:22
103:5
111:12

120:22
125:11, 22
**hear**  17:19
29:21
42:13
44:14, 15,
19, 20, 21,
23  45:1, 15,
16  64:15,
17
**hearing**
73:4
**held**  45:18
119:9
**help**  32:12
88:23
130:3
137:11
**HelpDesk**
118:2
**helped**
85:8
129:11
**helps**
83:14
111:3
**Helveston**
17:15  18:1,
7, 22  19:10
20:9, 12
21:4, 8, 9
26:13, 16
27:18
30:22  31:3,
7  51:20
53:20, 23
54:3, 8, 10
74:11, 23
82:5  84:6
89:6  91:1,
14, 22
98:18

101:6
133:14
**HENDRIX**
1:7  7:11
8:23  9:8,
10  10:10
14:14
15:17
17:16  18:2
20:6  24:1
25:1  31:4,
20  40:6, 11
41:17, 20,
23  42:9, 15
43:11  46:6,
21  47:5, 9
50:5, 9, 12
51:23
55:19  67:7
69:14  89:9,
21  90:6
91:1, 15, 21
92:6, 19
95:4  98:18
100:3, 22
101:6, 12
102:2
112:12
113:18
116:8
120:4, 15
121:6, 19
126:1
133:12
137:21
**Hendrix's**
23:11
29:10
47:17  51:3,
22  53:5
68:15

Video Deposition of Stefani Petty

7/13/2023

52

69:*15*  92:*8*
115:*13*
**hereto**
12:*6*  13:*22*
22:*13*
38:*11*
39:*21*
40:*18*  48:*3*
58:*23*
63:*14*
116:*2*
117:*7*
119:*7*
127:*17*
**Hey**  128:*7*
**Hi**  9:*7*
58:*1*
**hire**  125:*14*
**hired**
50:*12*  90:*8*
91:*3, 17*
111:*14, 17*
124:*9, 14,*
*23*  135:*17*
**hires**  91:*2*
**hiring**
111:*14*
123:*11*
124:*22*
**hirings**
90:*8*  91:*17*
**hold**  23:*16,*
*18, 19*  24:*3,*
*10, 12, 18*
68:*21*  69:*8*
79:*19, 22*
80:*1, 2, 6,*
*10*
**Holdings**
66:*2*
**home**
15:*13*

**honestly**
129:*12*
**hostile**
49:*15*
**housed**
105:*10*
**HR**  52:*9*
64:*9, 12, 19,*
*20*  65:*7, 10,*
*15, 19, 21,*
*22*  66:*3, 20*
67:*3*  68:*5*
74:*14*  75:*1*
76:*14*
81:*17*
82:*10, 13,*
*14*  83:*5, 7,*
*12, 14, 15,*
*22*  84:*12*
89:*9*  90:*6*
91:*1*  93:*8,*
*12, 19*  94:*3,*
*8, 11*  97:*21,*
*23*  103:*22*
105:*11*
110:*9, 16*
116:*11*
118:*15, 17,*
*19, 21*
119:*3*
122:*8*
135:*14, 22,*
*23*  136:*3, 8,*
*10, 12, 19,*
*21, 22*
137:*13, 14,*
*17, 20*
**Hughes**
82:*5*  84:*6*
89:*6*  90:*23*
91:*15, 22*
117:*13*

118:*14*
133:*13*
**huh-uh**
11:*10*
**human**
51:*10*
111:*5*
115:*12*
116:*19*
**hundred**
59:*19*
80:*20*
**hybrid**
83:*13*

**hypothetical**
100:*14*

**< I >**
**I**  2:*1*  4:*1*
8:*1*  9:*7, 10*
10:*10, 12*
11:*2*  12:*1,*
*15, 18, 23*
13:*9, 10, 11,*
*15, 18*
14:*14, 20,*
*23*  15:*1, 22*
16:*3, 12*
17:*4, 9, 12,*
*19, 21*  18:*5,*
*9*  19:*2, 14*
20:*10, 19,*
*21*  21:*1, 2,*
*10*  23:*16,*
*17*  24:*13,*
*19*  25:*10,*
*15*  27:*1, 4,*
*22*  28:*5, 11,*
*12, 14*
29:*19, 20*
30:*1*  31:*13,*

*23*  32:*1, 3,*
*6, 12, 15*
33:*9, 10, 12*
35:*19*
36:*12, 14,*
*16*  37:*6*
38:*14*  39:*1,*
*8, 15*  40:*9*
41:*4, 20*
42:*2, 5, 13,*
*15*  43:*3, 8,*
*9, 15, 17, 20,*
*21, 22*  44:*6,*
*14, 16, 22*
46:*2, 4, 9,*
*14, 17, 20,*
*22*  47:*2, 3,*
*10, 19, 20*
48:*14, 19*
49:*11*  51:*8*
52:*17, 21,*
*22*  53:*4, 16*
54:*14*
55:*23*
56:*10, 16*
57:*4, 9, 15*
58:*13*  59:*3,*
*16, 18, 20*
60:*2, 9*
61:*4, 6, 18*
63:*4, 5, 22*
64:*3, 14*
65:*6, 20, 22*
66:*8*  68:*9,*
*12, 20, 23*
69:*3, 19*
70:*21*  71:*9,*
*10, 20, 21,*
*23*  73:*1, 2,*
*4, 9, 17*
75:*4, 10, 11,*
*17, 19*  76:*1,*

*4, 5, 10, 13,*
*17*  77:*4, 16,*
*18*  78:*1, 2,*
*4, 10, 15, 22*
79:*7, 11, 17,*
*18, 20*
80:*12, 15,*
*22*  81:*4, 7,*
*11, 14, 22,*
*23*  82:*2, 3,*
*11, 20, 23*
83:*3*  84:*23*
85:*5, 8, 10,*
*15, 16*  86:*3,*
*4, 6, 10, 12,*
*20*  87:*14,*
*18, 21*
88:*18, 19*
89:*17, 18,*
*19*  90:*14,*
*15, 16, 19*
92:*15*
93:*22*
94:*12, 13,*
*19*  95:*15,*
*16*  96:*4, 5*
97:*2*  98:*5,*
*16*  101:*2, 4,*
*16, 17, 19,*
*22*  102:*13,*
*17*  103:*4, 8*
104:*7*
105:*2, 7, 9,*
*12, 16*
106:*2, 4, 6,*
*7, 15, 23*
107:*11, 22*
108:*1, 6*
109:*1, 2, 4*
110:*13*
111:*11*
112:*16, 20*

113:*10*
114:*8*
115:*5, 6, 9,
18, 20*
116:*4, 6, 9,
10* 117:*1,
20* 118:*4,
11, 13, 18*
120:*17, 18*
121:*8, 15,
23* 122:*4, 5*
123:*4, 6, 7,
18, 23*
124:*1, 2, 4,
11, 16, 20*
125:*4, 5, 10,
21* 126:*23*
127:*19*
128:*6, 17,
18, 20, 21*
129:*12*
130:*2, 3, 6,
12, 14, 19,
20* 131:*1,
17, 19, 20*
132:*11, 17,
23* 133:*5, 6*
134:*15*
135:*6, 16*
136:*1, 6, 7*
137:*14*
138:*1, 8, 10,
19* 139:*6,
12* 141:*1, 6,
13, 15*
**IAS** 118:*5*
**identificatio
n** 12:*5*
13:*21*
22:*12*
38:*10*
39:*20*

40:*17* 48:*2*
58:*22*
63:*13*
116:*1*
117:*6*
119:*6*
127:*16*
**identified**
65:*13*
**identify**
9:*5* 87:*19*
**implemente
d** 41:*12*
**inappropriat
e** 77:*14*
**incentive**
96:*3*
114:*22*
115:*11*
**include**
83:*8* 113:*8*
**includes**
139:*1*
**Incorporate
d** 8:*22* 9:*1*
**incorrect**
82:*12*
**increase**
96:*4*
**INDEX** 4:*7*
**individual**
136:*15*
137:*8, 16,
19*
**ineligible**
114:*11*
126:*10, 21*
127:*6, 7*
**informal**
10:*23*
74:*12* 75:*1*

**information**
23:*21*
31:*23* 32:*2,
7, 13, 14*
36:*17, 21*
37:*1* 44:*9*
48:*15, 17*
49:*18*
52:*12* 56:*4,
7* 70:*17*
77:*3, 21*
78:*11, 19*
79:*21* 81:*2*
85:*1* 86:*21*
88:*22*
104:*21*
105:*14*
114:*3, 6*
116:*6*
121:*23*
123:*21*
125:*22*
127:*1, 5*
128:*22*
129:*6, 7*
130:*3, 7, 9,
11, 15*
131:*5, 7*
135:*5, 7*
138:*23*
**infringemen
t** 72:*21*
**in-house**
9:*17* 19:*14*
26:*17*
32:*19* 33:*2*
52:*15, 18*
53:*13* 55:*6,
17* 56:*4, 7*
132:*1*
**initial**
41:*21*

42:*16* 50:*8*
75:*4* 122:*1,
2*
**initially**
43:*15*
**in-person**
88:*15*
**input** 66:*20*
**inside**
12:*15*
89:*13* 90:*1*
95:*5* 96:*7*
97:*9*
120:*10*
124:*6, 8*
**instance**
32:*22*
**instruct**
50:*1* 55:*1*
**instructed**
31:*6* 37:*7*
130:*3*
**instructing**
19:*9* 22:*2,
5* 34:*14*
36:*20*
37:*16*
50:*21*
84:*15*
134:*6*
**instruction**
57:*22*

**instructions**
31:*16* 80:*7*
85:*13* 86:*5,
15* 87:*8, 12*
88:*1*
117:*16*
**instructs**
29:*8* 118:*8*

**INSURANCE**
1:*10* 8:*21*
9:*1* 11:*22*
65:*22* 66:*2,
11, 14, 23*
67:*5, 9*
68:*7* 106:*3,
11, 14, 16*
107:*16, 18*
113:*9*
114:*23*
115:*10*
136:*12, 14*
**Insurances**
11:*22*
**interested**
40:*4*
141:*16*

**interference**
40:*21*
47:*12*
64:*12*
75:*16*
**interject**
65:*2*
**internal**
116:*21*
117:*23*
135:*10*
**Interrogatori
es** 5:*8*
**interrogator
y** 119:*21*
**interrupt**
57:*2*
**interrupting**
12:*18*
**interviewed**
33:*8, 13*

intranet 88:22
investigate 15:20  25:4
31:20
35:18  36:4
42:9  48:8
123:8

investigated 83:6, 11
investigatin g 51:12
investigatio n 32:10
33:6  36:18,
22  38:18,
21  41:11,
18  44:12
48:12  50:4
52:19  53:5
55:18
83:14
122:7
138:22
involve 19:23
32:21  33:1
involved 20:4  24:14
28:14  80:1
107:6
136:1

involvement 115:13
involves 19:4
issue 28:22  29:7
51:9  57:22
71:1  72:11

77:2  94:8
132:3, 9
issued 129:2
issues 50:21  64:8
65:3, 13
68:1  96:13,
23  97:14
107:4
135:4
139:15
Item  25:10
items 137:22
138:2

< J >
JEFFERSO N 141:4
job  92:9
93:19
94:22  95:1,
5, 10, 11, 15
97:10, 17,
20  98:1
99:10
105:11
jobs  95:15
97:17  98:7
John 15:22
16:22  17:9
18:22
19:10  21:4,
7  35:4
122:14
130:12, 16
131:5, 19,
21  133:13
Jonathan 102:7

judge  51:9
55:14
56:13, 17,
19  57:1, 2,
7, 16, 20
58:3, 4
64:7  73:2,
4  132:4, 10
139:5, 10,
14
JULY  1:20
2:8  8:15
58:7

< K >
Kat  46:3
91:13
KATHRYN
1:7  7:11
9:8, 10
10:10  24:1
46:21  50:5
89:9  90:6
91:1, 15
100:22
113:18
121:19
137:21
Kathryn's 75:4
Kayla  7:7
9:14
keep  35:20,
21  57:1
58:11
65:10
109:11
keeping 94:11
kept  64:23
65:8  94:16,
20, 21

kind  84:9
106:1
114:6, 9
kinds  61:8
108:18
know  13:9
15:16
16:10, 13,
16  24:11,
16, 22  33:6
48:20
51:21  55:4
56:20
62:23  63:4,
5  68:10
70:6, 16
71:20, 21
72:19
74:17, 22
75:6, 11, 21,
22  76:1, 2,
4, 8, 10, 11,
13, 14, 17
78:6, 10
79:3, 7, 11,
18, 21
80:13, 22
81:20, 22,
23  82:1, 20
84:21  85:2
95:17  96:1,
2, 4, 5
100:1
101:19, 20
102:13
103:3, 5
105:9, 12,
16  106:4, 7
107:2, 5, 11,
13  108:18
109:2, 4, 12,
18  111:9,

11  113:18
116:4, 22
117:1
118:12, 13
124:21
125:8, 10,
17, 18, 21
126:23
127:20
129:10, 11,
12, 13
130:1
132:23
136:1
137:10
138:1, 5
knowledge 15:7  30:17
44:10  52:1
65:5  67:17
68:1, 3
70:3  78:12,
19  90:15
95:12
96:12, 23
97:12
99:10
110:9
120:21
122:4
125:20
126:6
128:2
135:6, 8
knows 51:21
75:14, 20
Kristyn 133:21

< L >
L  2:1

Video Deposition of Stefani Petty

7/13/2023

55

**lack** 90:*7* 91:2, *16*
**language** 77:*6* 78:2, *4* 112:2
**laptop** 69:*23* 70:*21* 72:*16*
**lateral** 118:*19*
**Lauren** 111:*9* 134:*19*
**LAW** 6:*10*, *16* 55:*21* 57:*20* 64:*7* 121:*14*
**laws** 2:*14* 121:*5*
**lawsuit** 10:*10* 19:*16* 69:*15* 130:*23* 131:2
**lawyer** 29:*10* 85:6, *9*
**leaders** 84:*16* 85:*13* 86:6, *16* 87:*8* 88:*1*
**leading** 2:*20*
**learn** 107:*8* 126:*10*
**learns** 127:*5*

**leave** 15:*17*, *23* 16:*1, 7, 11, 14, 15* 17:*6* 40:*12*
**left** 58:*9* 71:*20* 120:*15* 137:*21*
**legal** 12:*23* 18:*8* 20:*3, 13* 21:*13, 14, 16* 25:6, *9, 13, 16, 18* 26:6, *9, 11, 17* 28:*1, 5, 13, 18, 22* 29:*11, 16* 30:*1, 4, 11* 31:*16* 32:*5, 6, 7, 9, 12, 13* 33:*23* 36:*15, 16* 37:*10* 39:*9* 47:*4* 48:*10, 14, 22* 50:*11* 51:*6* 52:*11* 83:*14, 16, 19* 85:*3* 86:*21* 91:*10* 111:*3* 119:*18, 22* 120:*2, 7* 121:*15* 122:*3* 124:*3, 4, 12* 125:*6* 131:*23* 132:*12* 133:*6*

**legally** 27:*11*
**Leslie** 6:*11* 9:*9* 29:*11* 43:*12* 58:*1, 9*
**Letter** 4:*10, 12, 13* 14:*5, 8, 13* 15:*21* 16:*5, 9, 14* 17:*6, 8, 17* 18:*2, 23* 20:*2, 6* 22:*22* 23:*2, 7* 25:*1, 5, 7, 11, 18* 26:*5, 11, 13, 22* 27:*21* 28:*2, 17, 21* 29:*10, 19* 30:*1, 22, 23* 31:*1* 32:*5* 33:*15* 34:*5* 36:*14, 15* 38:*22* 39:*3, 5, 8, 13, 14, 22* 40:*1, 2, 5, 20* 41:*2, 8, 21* 42:*1, 6, 16, 19* 43:*13, 16, 23* 44:*4, 7, 12* 45:*23* 46:*3, 4, 8, 12, 21* 47:*8* 48:*9, 23* 50:*8* 51:*3* 53:*7, 15* 75:*5* 90:*16, 21* 91:*12* 92:*1, 5, 20* 93:*1* 122:*2,*

*3, 21* 123:*4, 10* 124:*4*
**letters** 68:*13*
**letting** 103:*19*
**level** 75:*11, 12, 23*
**liability** 78:*8* 81:*8* 92:*22* 98:*10* 105:*23* 125:*15*
**liaison** 136:*16*
**life** 113:*9*
**limit** 37:*6* 113:*17*
**limiting** 134:*9*
**Lindberg** 111:*9*
**Lindberg's** 134:*19*
**line** 81:*18*
**list** 79:*2* 80:*18* 112:*17* 134:*16*
**listed** 126:*1*
**listserv** 79:*5*
**litigation** 19:*18* 23:*16, 17, 19* 24:*10, 12, 18* 26:*19* 34:*10* 37:*13* 49:*3* 50:*13, 14*

**51**:*17* 68:*21* 69:*8* 79:*18, 19, 22* 80:*1, 2, 6, 9* 139:*9*
**little** 45:*20* 63:*16* 64:*6* 121:*1* 131:*17*
**LLC** 6:*10*
**loan** 106:*9*
**located** 77:*5* 78:*3*
**location** 69:*23* 70:*21* 72:*16*
**locations** 137:*18*
**long** 16:*13, 16* 81:*20* 109:*23* 110:*14*
**look** 13:*15* 52:*22, 23* 53:*1* 56:*12* 128:*15*
**looked** 44:*16* 120:*19*
**looking** 61:*9* 135:*2*
**looks** 117:*12* 133:*9*
**lost** 45:*4* 133:*9*
**lot** 83:*2*
**loud** 11:*9*
**love** 73:*9*

< M >
M  7:7
ma'am
 41:6  57:21
mail  46:13
mailbox
 132:15
maintain
 23:3, 8, 21
 66:3  82:14
 93:19  94:3
maintained
 76:12
 83:15, 21
 94:16
 104:16, 22
 111:5, 7
maintaining
 79:21
making
 17:16  20:7
 28:9  62:7
 109:21
male  89:10
male-
dominated
 133:18
males  62:7
managed
 81:15
 135:11
manager
 63:1  85:13
 89:3  93:8,
 13  118:20
 136:21, 22
managers
 62:6, 10, 13,
 21  84:16
 85:18  86:6,
 16  87:8
 88:1, 13

89:7  92:21
93:17
122:9
marked
 4:16, 17, 20,
 21, 22  5:5,
 6  12:5
 13:18, 21
 22:10, 12
 38:5, 10
 39:17, 20
 40:15, 17
 48:2  58:19,
 22  63:11,
 13  116:1
 117:6
 119:6
 127:16
marking
 16:21
match
 113:12, 16
matching
 113:15
matter
 21:13, 16
 23:22
 24:15  26:9,
 11  28:2, 13,
 18, 22
 29:12  30:4,
 11  50:11
 124:12
matters
 79:23  83:7
mean  13:9,
 10, 11
 20:19  39:1
 60:16  61:4,
 7  63:5
 67:10
 68:23

76:17  78:1,
16, 23
79:18
82:23
88:18, 19
93:22  97:2
98:6  101:2,
17  104:7
105:7
106:23
107:11
110:23
112:16, 20
113:10, 22
114:8
118:16
120:17
121:15, 23
128:17, 18
132:17
136:6
137:5, 12
meaning
69:10
means
86:11
121:13, 14
141:9
meant
92:17
medical
112:21, 23
113:8
medication
11:14
meet  71:20
73:18
member
114:12
men  101:7
125:8

mental
31:15  34:8
mentioned
45:22  79:8
110:15
mentions
119:11
message
16:23
58:10
messages
79:14
messaging
63:7
middle
57:3
midway
41:8
minute
28:9
misrepresen
ted  28:12
misrepresen
ting  102:8
missed
36:13
misundersta
nd  49:12
mitigate
119:12
mitigated
120:5
mitigation
120:6
money
49:1
monitor
80:8
monitored
77:13
monitoring
77:17  79:9

Montgomer
y  8:18
Morgan
102:7
morning
47:6
mortgage
106:9
move  20:3
29:1  30:19
35:2, 21
37:17
55:10  57:4
98:22
101:14
moving
36:1  45:1
71:7
multiple
15:1  41:20
87:18  88:7,
18  90:17
122:5
124:1
mute  135:6

< N >
N  2:1  4:1
6:1
name  8:16
10:9, 14
named
9:13, 15
names
24:13
national
60:7
nature
119:19
necessarily
96:17

Video Deposition of Stefani Petty                    7/13/2023
57

**necessary**
2:*18*
**need** 13:*11*
46:*9* 52:*12*
54:*22* 56:*1,*
*10* 57:*5, 9,*
*22* 60:*2*
73:*13* 74:*3*
84:*10* 89:*1*
98:*12*
103:*8*
105:*2*
128:*16*
132:*17*
139:*21*
**needed**
30:*12*
36:*17*
**needs**
135:*18*
**negative**
11:*10*
**neither**
141:*14*
**never** 32:*3*
56:*8* 89:*19*
**new** 41:*11*
99:*10*
112:*5*
125:*14*
135:*17*
**non-**
**business-**
**related**
77:*20*

**noncompete**
110:*20*
111:*10, 18,*
*23*
**noncompete**
**s** 111:*13*

**North** 6:*6,*
*18* 7:*8*
**NORTHERN**
1:*1* 9:*2*
**Notary** 2:*6*
8:*2* 141:*22*
**notes**
135:*3*
**notice** 3:*3*
4:*9* 46:*22*
47:*10*
**noticed**
8:*22*
**notified**
75:*4* 92:*8*
**notify**
92:*22*
**November**
16:*17*
40:*11*
**NUMBER**
1:*5* 4:*2, 8*
9:*3* 12:*2*
13:*19* 15:*1*
22:*10* 25:*8,*
*10* 38:*5*
39:*11, 18*
40:*15*
45:*21*
47:*22*
56:*12* 58:*2,*
*5, 6, 20*
63:*21*

**< O >**
**O** 2:*1*
**oath** 9:*19*
**Object**
14:*11*
17:*18* 18:*3,*
*9* 25:*19*
26:*7, 23*

28:*4, 23*
29:*13* 30:*5*
38:*23* 39:*7*
40:*8* 41:*19*
42:*3, 11*
43:*14* 44:*5,*
*13* 46:*1*
60:*15* 61:*3*
62:*2, 9, 15*
63:*3* 65:*11*
66:*22* 68:*8,*
*17* 69:*9, 17*
74:*16, 19*
75:*3* 76:*16,*
*22* 77:*15,*
*22* 78:*9, 14,*
*21* 79:*6, 16*
80:*3, 11*
81:*3* 82:*7*
83:*10, 17*
84:*14, 19,*
*22* 85:*4*
86:*19* 88:*4,*
*12* 89:*14*
90:*2, 10*
91:*19* 92:*2,*
*11* 93:*2, 10,*
*15* 94:*5, 17*
95:*2, 8, 21*
97:*11* 98:*2,*
*13, 21* 99:*8,*
*16* 100:*4,*
*14, 23*
101:*13*
102:*3, 9, 16,*
*22* 104:*5,*
*13, 19*
105:*5, 19*
106:*12, 21*
107:*10, 19,*
*21* 108:*5,*
*16* 110:*18,*

*22* 112:*1, 8*
114:*1, 21*
115:*4, 15*
120:*13*
122:*10, 17*
123:*15*
126:*3, 14,*
*22* 127:*9*
129:*16*
132:*16*
133:*23*
134:*21*
138:*7*
**objected**
26:*18*
**objecting**
25:*21*
139:*6*
**objection**
18:*20* 91:*5*
99:*19*
130:*19*
**objections**
2:*19, 22*
19:*1* 37:*5*
121:*7*
**objects**
29:*6*
**obtain** 52:*5*
**obtained**
37:*1*
**obviously**
10:*22*
50:*13* 85:*6*
**occur**
26:*13*
**occurred**
26:*21*
27:*20*
**occurring**
108:*4*

**October**
38:*22*
39:*13*
41:*23* 42:*4,*
*6, 19* 43:*1,*
*13* 44:*4*
**offered** 3:*1*
108:*15*
**office** 14:*8*
15:*22*
54:*20*
83:*22*
98:*11*
136:*6*
**offices**
136:*10, 15,*
*17, 23*
137:*8, 16,*
*19*
**oftentimes**
105:*13*
**Okay**
10:*20*
11:*17, 21*
12:*1, 9*
13:*1, 4, 16,*
*17* 14:*7, 12,*
*15, 21* 15:*3*
16:*10, 16*
17:*10, 23*
19:*7* 20:*16,*
*19* 22:*18,*
*21* 25:*23*
27:*14* 31:*8*
32:*9* 34:*13*
35:*1* 37:*11,*
*15, 19* 38:*8,*
*15, 20* 39:*4,*
*10* 40:*2, 14*
41:*8, 22*
43:*4* 44:*9*
46:*11, 15,*

*19* 47:*1, 21*
48:*6, 11, 16*
49:*23*
50:*20* 51:*5,*
*8* 58:*18*
59:*7, 15, 23*
61:*16, 18,*
*21* 62:*19*
63:*10* 64:*5,*
*13* 65:*23*
66:*3, 12, 15,*
*20* 68:*10,*
*13, 23* 69:*4*
70:*9, 23*
73:*20*
75:*15* 77:*1,*
*7, 9, 13*
78:*6* 79:*12*
81:*10* 82:*2,*
*11, 18*
83:*20* 84:*2,*
*17, 21* 85:*2,*
*5, 11* 87:*19*
88:*15* 89:*5*
91:*11, 21*
94:*8, 23*
95:*13, 18*
97:*1, 7, 19,*
*23* 98:*8*
100:*1, 16*
101:*16, 20*
103:*3, 6, 11*
104:*22*
105:*12*
106:*19*
107:*14*
110:*11*
111:*13, 22*
113:*6*
115:*1, 6, 12,*
*19* 116:*7,*
*19* 117:*3,*

*12* 118:*4,*
*11, 14, 22*
119:*4*
120:*8, 20*
121:*17*
122:*9*
123:*6, 9*
124:*18, 21*
125:*7*
126:*8*
127:*4*
128:*12, 20*
129:*2, 14*
132:*7*
133:*3, 8*
135:*13*
136:*16*
137:*2, 4*
138:*5, 11*
139:*16, 18*
140:*3*
**old** 112:*4*
**once** 79:*22*
124:*11*
139:*12*
**ones** 24:*14*
**on-site**
136:*4, 11*
**open** 94:*2,*
*23*
**opened**
94:*22*
**openings**
94:*14*
**operating**
9:*11*
**operations**
31:*16* 34:*8*
81:*14*
**opinion**
30:*8*
109:*20*

**opportunities** 61:*23*
104:*12*
108:*14*
121:*6, 20*
**opportunity**
60:*3, 5, 14,*
*19*
**oral** 8:*8*
**order**
55:*14, 22*
71:*1, 6, 13,*
*17* 72:*5*
84:*11*
126:*9*
**origin** 60:*7*
**original**
128:*21*
**originally**
25:*11*
**outline**
133:*8*
138:*11, 20*
**outlined**
40:*5*
**Outlook**
75:*22, 23*
76:*3, 4*
78:*7*
**outside**
30:*14* 56:*1*
65:*4* 94:*6*
134:*12*
**oversight**
102:*14*
106:*20*
108:*14, 19*

**< P >**
**P** 2:*1* 6:*1*
**P.C** 6:*16*
7:*5*

**package**
111:*14, 16*
**PAGE** 4:*2,*
*8* 10:*22*
39:*12* 87:*2*
128:*11*
**pages**
59:*20*
**paid** 96:*2*
**PALMER**
6:*10, 11*
9:*9* 22:*19*
25:*18* 26:*5,*
*10, 22*
27:*21* 28:*3*
29:*11*
41:*17* 42:*8*
43:*12*
44:*11* 47:*4*
57:*19* 58:*1*
59:*3* 68:*14*
**Palmer's**
123:*10*
**papers**
138:*6*
**paperwork**
115:*14*
**paragraph**
23:*3* 41:*9*
**part** 30:*9*
32:*12* 62:*3*
94:*10* 97:*5*
99:*12, 22*
101:*23*
111:*13, 16*
117:*20, 23*
118:*21*
128:*22*
**participate**
48:*11*
64:*10*
97:*23*

**participated**
65:*7*
**particular**
116:*8, 23*
134:*9*
**parties** 2:*3,*
*21* 141:*15*
**Patricia**
6:*5* 9:*7*
10:*9* 40:*22*
**pay** 52:*1*
62:*1, 8*
64:*21* 65:*3,*
*13* 66:*3, 5,*
*7, 15, 23*
67:*4, 8, 12,*
*18* 68:*6*
95:*19, 23*
96:*8, 13, 14,*
*18, 20* 97:*2,*
*4, 5* 106:*2,*
*15, 22*
108:*21*
110:*5, 14*
114:*19*
115:*2, 7, 10*
121:*20*
122:*16, 19,*
*21, 22*
123:*2, 3*
**paying**
114:*18*
**payroll**
109:*6, 7*
**pending**
11:*3*
**people**
33:*13*
51:*23*
61:*22* 76:*7*
79:*3* 82:*4*
88:*9* 97:*3,*

*7* 99:*11*
105:*13*
106:*13*
107:*15, 16,
23* 125:*14*
**percent**
80:*20*
113:*16*
**percentage**
113:*15*
**person**
79:*23* 80:*1,
5* 110:*9*
111:*3*
135:*17, 20*
136:*22*
137:*17, 20*
**personal**
15:*15* 30:*8,
17* 65:*5*
67:*16* 68:*1,
2* 70:*3*
75:*20*
95:*11*
96:*12, 22*
97:*12*
109:*19*
125:*19*
128:*2*
**personally**
123:*16, 21*
125:*21*
132:*14, 20*
**pertaining**
52:*13*
**PETTY**
1:*17* 2:*5*
8:*7* 9:*21*
10:*9, 16, 17*
11:*17*
28:*19*
29:*22*

38:*13*
44:*23*
45:*16* 47:*5*
53:*21*
74:*10*
**Petty's**
65:*4* 67:*16*
71:*19*
**phone**
15:*2, 9, 10*
16:*23* 17:*1*
56:*12, 17*
57:*18* 58:*4,
5* 69:*1*
70:*2* 72:*14*
81:*5, 15*
**phones**
80:*14*
**physically**
36:*3* 68:*23*
**place** 69:*7*
82:*17*
**placed**
23:*16*
79:*22*
123:*13*
**places**
87:*18, 19*
**Plaintiff**
1:*8* 6:*3*
9:*6, 8, 10*
48:*23*
119:*12*
134:*10*
**PLAINTIFF'
S** 4:*8* 12:*2,
4* 13:*18, 20*
16:*21*
22:*10, 11*
25:*8* 38:*5,
9* 39:*11, 18,
19* 40:*15,*

*16* 45:*21*
47:*21* 48:*1*
58:*19, 21*
63:*11, 12,
21* 115:*20,
23* 117:*4, 5,
19* 119:*3, 5*
127:*13, 15*
**plan** 75:*11,
12, 23* 96:*3*
113:*13*
114:*22*
115:*11*
**plans**
81:*15*
113:*9*
**please** 9:*5,
19* 10:*14*
26:*14*
57:*20*
140:*2*
**plenty** 52:*4*
**point** 30:*3,
16* 40:*7, 10*
42:*21*
50:*14*
56:*22*
57:*16*
78:*18*
97:*16*
124:*5*
127:*3*
136:*23*
137:*3, 7, 9*
**Policies**
13:*12*
41:*11* 61:*5*
77:*10, 19*
86:*9* 88:*11,
21* 102:*15,
20* 103:*1,
23* 104:*2, 8,*

*18* 105:*9,
13* 118:*23*
130:*11*
**policy**
59:*13, 23*
60:*10, 18*
77:*4, 11*
78:*3* 81:*22*
82:*4* 84:*2,
4, 8* 85:*18*
87:*20, 21*
**population**
106:*17*
**portion**
76:*19*
**position**
94:*2* 95:*1,
5, 7* 96:*9*
106:*8, 10*
111:*15*
118:*19*
120:*4, 21*
123:*13*
134:*14*
**positions**
94:*14* 97:*8*
108:*19*
120:*10, 11,
18* 124:*7, 8*
125:*9, 15*
**positive**
11:*10*
132:*6*
**possible**
26:*4, 8*
63:*17*
**possibly**
113:*22*
**posted**
88:*21*
106:*7*

**postings**
93:*19*
**potentially**
114:*3*
**practice**
82:*4*
**practices**
108:*4*
118:*23*
123:*11*
**premarked**
59:*4, 5*
**prepare**
12:*13*
115:*17*
**prepared**
34:*9* 51:*16*
70:*22*
72:*14*
98:*12*
100:*2*
**preparing**
98:*1* 129:*4*
**PRESENT**
7:*11* 18:*11*
19:*11*
**presented**
50:*14* 63:*5*
**preserve**
23:*8* 68:*15*
69:*13*
79:*13*
**preserving**
25:*22* 29:*6*
**president**
15:*23*
**pretext**
139:*1*
**preventing**
89:*12, 23*

previously
30:*20*  76:*6*
78:*1*
primary
52:*1*
prior   3:*1*
13:*2, 7*
26:*8, 10*
28:*10*  92:*5,*
*23*  94:*14*
95:*6*  131:*2*
privilege
18:*14*
21:*19*  22:*3*
27:*5, 13*
35:*15*
51:*14*
72:*21*
139:*7, 8*
privileged
12:*20*
18:*12*  27:*7*
34:*3, 4*
35:*14*
49:*18*
50:*18*  56:*4,*
*7*
privileges
20:*15*
21:*23*  22:*6*
28:*13*
37:*14*  49:*4*
50:*22*  52:*7*
139:*9*
probably
66:*8*  93:*23*
103:*4*
problem
43:*4*
Procedure
8:*4*  59:*14*

proceed
72:*3*
proceeding
10:*23*  20:*3,*
*14*

proceedings
8:*9*
process
55:*16, 18*
118:*1*
135:*12*
136:*2*
processes
124:*22*
processing
115:*13, 16*
117:*17, 20*
produce
59:*19*  85:*7*
133:*4*
produced
13:*13*  15:*6*
63:*2*  73:*14,*
*16*  84:*18*
86:*2, 7*
131:*5*
product
18:*15, 16*
19:*18, 20*
21:*19*
26:*18*
27:*13*
35:*14*
37:*13*  49:*4*
51:*14*  52:*6*
139:*8*
production
70:*12*
129:*21*
130:*22*
131:*10*

132:*20*
133:*2*
Professiona
l   76:*7*
78:*8, 18*
79:*3, 4, 5*
81:*8*  92:*21*
98:*10*
105:*23*
125:*15*
program
75:*6*
promoted
135:*17*
promotion
95:*19, 20*
104:*3*
proper
77:*6*  78:*5*
proposal
40:*5*
proposed
46:*6*
protect
18:*18*  23:*4,*
*9*
protected
19:*17, 19*
27:*12*
33:*11*  49:*3*
51:*13*
protective
55:*21*  71:*1,*
*13, 17*  72:*4*
provide
30:*12*
32:*13*  61:*4,*
*5, 10*  85:*12*
90:*13*
117:*16*
132:*13*

provided
8:*3*  25:*6, 8,*
*13*  32:*18*
59:*13*
62:*12*  85:*6*
90:*14*  92:*6*
95:*9*
116:*11*
123:*22*
128:*23*
129:*6*
130:*14*
132:*12*
136:*13*
providing
26:*10*
129:*7*
provision
60:*3*
Public   2:*6*
8:*2*
pull   115:*21*
pulling
38:*4*
punitive
49:*20*
purpose
52:*20*
117:*15*
pursuant
11:*18*
put   70:*20*
72:*15*
125:*9*
139:*5, 9*

< Q >
Q   10:*9, 17,*
*20*  11:*7, 14,*
*17, 21*  12:*1,*
*7, 9, 13, 17*
13:*1, 4, 7,*

12, 16, 23
14:*2, 7, 12,*
*15, 18, 21*
15:*3, 6, 8,*
*12, 16, 19*
16:*2, 6, 10,*
*13, 16, 20*
17:*2, 7, 10,*
*13, 15, 21*
18:*1, 21*
21:*3, 9, 11,*
*15*  22:*9, 14,*
*18, 21*  23:*2,*
*7, 13, 15, 19,*
*23*  24:*3, 6,*
*11, 16, 21*
25:*1, 7, 13,*
*17, 22*  26:*4,*
*10, 15*
27:*16*  28:*1,*
*20*  29:*2, 5,*
*15, 18, 22*
30:*3, 6, 21*
31:*2, 9, 19*
32:*9, 14*
35:*9, 17, 23*
36:*2, 7, 12*
38:*12, 15,*
*20*  39:*4, 10,*
*17, 22*  40:*2,*
*11, 14, 19*
41:*6, 8, 15,*
*22*  42:*5, 8,*
*13, 17*  43:*1,*
*10, 17, 19,*
*21*  44:*9, 15*
45:*15, 19*
46:*3, 6, 11,*
*15, 19*  47:*1,*
*3, 16, 21*
48:*4, 6, 11,*
*16*  58:*18*

Video Deposition of Stefani Petty

7/13/2023

61

59:*8, 12, 21,
23* 60:*13*,
*18* 61:*8, 16,
18, 21* 62:*4,
6, 13, 19, 23*
63:*7, 10, 15,
18, 20* 64:*1,
5, 13, 22*
65:*9, 15, 18,
21, 23* 66:*3,
12, 15, 20*
67:*2, 6, 12*
68:*5, 10, 13,
19, 23* 69:*4,
6, 12* 70:*6,
9* 74:*10, 17,
22* 75:6, 21
76:*2, 5, 11,
14, 19* 77:*1,
7, 9, 13, 19*
78:*6, 11, 17*
79:*2, 8, 12,
22* 80:*8, 13,
18, 21* 81:*1,
7, 10, 12, 16,
20* 82:*2, 11,
18, 21* 83:*3,
8, 13, 20*
84:*2, 5, 17,
21* 85:*2, 5,
11* 86:*14,
23* 87:*16,
19, 23* 88:*9,
15* 89:*2, 5,
9, 16, 20*
90:*4, 6, 12,
19* 91:*7, 11,
21* 92:*3, 5,
14, 18* 93:*4,
6, 12, 16, 19*
94:*1, 8, 13,
23* 95:*4, 13,*

*18* 96:*6*
97:*7, 19, 23*
98:*3, 8, 17*
99:*1, 4, 9,
14, 17, 21*
100:*1, 6, 12,
15, 18*
101:*4, 15,
20* 102:*1, 5,
7, 12, 19, 23*
103:*3, 6, 19*
104:*9, 15,
22* 105:*2,
12, 21*
106:*6, 19*
107:*8, 14,
20* 108:*1, 9,
13* 109:*6, 8,
11, 21*
110:*10, 13,
20* 111:*2, 5,
9, 13, 17, 22*
112:*7, 11,
15, 23*
113:*6, 12,
15, 18, 22*
114:*6, 12,
18* 115:*1, 6,
12, 17, 19*
116:*3, 7, 11,
15, 19, 22*
117:*3, 8, 10,
12, 15, 19*
118:*4, 8, 12,
14, 18, 22*
119:*3, 10*
120:*9, 15,
20, 23*
121:*3, 17,
22* 122:*9,
12, 16, 18,
22* 123:*2, 9,*

*19* 124:*6,
13, 18, 21*
125:*2, 7, 17,
23* 126:*5, 8,
16, 18*
127:*4, 12*
128:*5, 13,
19* 129:*2,
10, 14, 17,
20* 130:*4, 8,
15* 132:*3, 7,
14, 19*
133:*3, 8, 16,
20* 134:*2,
18, 23*
135:*2, 13,
16* 136:*3, 6,
10, 16, 21*
137:*4, 6, 17,
21* 138:*5*
**qualify**
89:*2, 7*
**question**
11:*3, 4*
17:*20, 22*
19:*3* 22:*5,
14* 25:21
26:*2, 3, 14*
27:*3, 16, 23*
28:18 29:*2,
4, 6, 9, 14*
31:22 36:*6*
40:*10* 42:*7,
17* 43:*4, 6,
22* 47:*3, 7*
56:*8* 60:*9*
70:*14*
74:*20*
78:*23*
80:*21*
81:*11, 13*
85:*16* 88:*9*

89:*5* 90:*22*
93:*22* 99:*2*
100:*8, 11,
17* 101:*3,
10* 102:*18*
104:*1*
121:*2, 18*
128:*4*
129:*3*
137:*3*
139:*2*
**questioning**
131:*14*
**questions**
2:*20, 21*
10:*13*
11:*15* 33:*7*
36:*21*
48:*21* 57:*6*
72:*7* 73:*10,
22* 88:*20,
23* 109:*17*
128:*10*
129:*2, 8*
131:*8*
133:*10*
137:*6*
141:*8*
**quick**
57:*17*
103:*7, 10*
**quite**
27:*22*
78:*15, 22*
91:*8* 104:*6*

**< R >**
**R** 6:*1*
141:*1*
**Rachel** 7:*6*
9:*12* 75:*18*

139:*6*
**raise** 95:*19*
**raised**
90:*7* 91:*2,
21*
**range**
66:*13*
**reach**
14:*14, 20,
22* 15:*8*
41:*22*
42:*18, 20*
43:*2* 44:*7*
89:*18*
90:*14, 17*
122:*5*
123:*6*
124:*2*
**reached**
41:*20*
42:*15, 23*
43:*15, 22*
44:*3, 11*
**reaching**
14:*16, 19*
**read** 10:*4*
11:*11*
139:*23*
**reading**
2:*11*
**ready**
58:*13*
**real** 57:*17*
103:*10*
**really**
109:*4*
128:*18*
**reason**
21:*20*
126:*20*
**recall**
14:*23* 16:*3*

Video Deposition of Stefani Petty

7/13/2023

62

17:*4*  25:*10*,
*15*  39:*2*
42:*2*  46:*10*,
*15*  47:*11*
63:*22*  73:*4*
77:*4*  86:*20*
87:*21*
**receipt**
20:*2*  25:*5*
29:*10*  30:*2*
36:*14*
38:*21*
42:*16*
43:*12*
44:*11*  48:*9*
90:*20*
**receive**
22:*18*, *23*
36:*21*
45:*22*
46:*12*  47:*8*
61:*12*  77:*2*
133:*16*, *20*
**received**
14:*8*, *13*
24:*5*, *17*
25:*14*, *17*
26:*5*, *21*
27:*20*  28:*2*,
*17*, *19*, *21*
32:*5*  39:*2*,
*8*, *14*, *15*
41:*5*, *21*, *23*
46:*2*, *4*, *14*,
*22*  47:*10*
48:*6*  68:*13*
74:*12*
85:*14*
89:*19*
90:*16*
91:*12*  92:*6*
93:*1*, *8*, *13*

96:*4*
121:*20*
124:*3*
134:*2*
**receives**
84:*7*
**receiving**
23:*7*  42:*18*
62:*8*  118:*9*
**recess**
37:*23*
45:*11*  74:*6*
103:*15*
138:*15*
**recollection**
14:*4*
**record**
8:*15*  9:*6*
10:*15*  11:*7*
19:*8*  25:*22*
29:*7*  36:*19*
37:*22*  38:*3*,
*6*  45:*4*, *6*,
*10*, *14*, *18*
56:*15*, *17*
58:*14*, *17*
59:*2*  71:*14*
74:*3*, *4*, *9*
81:*16*
103:*13*, *18*
119:*9*
138:*13*, *18*
**recorded**
10:*23*
81:*19*
**records**
13:*14*
32:*18*  73:*8*
82:*15*
**recruiting**
94:*7*

**re-depose**
138:*21*
**refer**  88:*11*
**referring**
66:*9*
112:*20*, *21*
**reflect**
135:*18*
**refused**
119:*12*
**regarding**
32:*8*  81:*5*
**regards**
15:*23*  66:*5*
**rehire**
113:*19*, *21*,
*23*  114:*4*, *5*,
*11*, *14*, *17*
126:*2*, *7*, *10*,
*19*, *21*
127:*6*, *7*
**reiterate**
96:*11*
**relate**
18:*17*
**related**
23:*10*, *21*
24:*1*  50:*3*
68:*22*
69:*14*
70:*11*, *17*
78:*4*  79:*15*
82:*1*  83:*7*
96:*13*
125:*1*
**relates**
18:*16*
61:*11*  68:*6*
76:*20*
77:*19*
104:*2*, *11*
106:*8*

115:*2*
121:*5*, *14*
138:*21*, *23*
**relating**
2:*15*  63:*1*
100:*22*
104:*17*
135:*6*
**relation**
141:*14*
**relayed**
100:*9*
101:*6*
**relevant**
33:*10*
73:*14*
**relied**
133:*22*
**religion**
60:*7*
**relocate**
99:*12*
**relocating**
98:*16*
**rely**  33:*5*
88:*10*
**remained**
16:*13*
23:*17*
**remember**
47:*19*
71:*11*
124:*20*
129:*14*
130:*4*, *6*, *8*,
*13*  133:*6*
**remote**  2:*6*
8:*6*
**render**
126:*21*
**reopen**
139:*13*

**repeat**
17:*21*  26:*3*,
*14*  29:*3*
40:*23*
42:*14*  99:*2*
**rephrase**
94:*1*
121:*18*
**report**
74:*13*
82:*13*
86:*17*  88:*8*
93:*7*, *12*, *17*
105:*15*, *16*
118:*15*, *16*,
*23*
**reported**
74:*23*
**reporter**
8:*17*  9:*19*
10:*1*  11:*8*
29:*20*
40:*22*
44:*14*, *17*
45:*3*  47:*13*
56:*14*
58:*15*  59:*7*
64:*14*, *18*
75:*17*
139:*21*, *23*
140:*3*
**Reporting**
8:*18*  84:*16*
88:*6*
**reports**
84:*3*  88:*2*
104:*15*
**represent**
9:*8*  10:*10*
54:*21*
59:*12*

Video Deposition of Stefani Petty

7/13/2023

63

representati
ve  8:21
11:19  27:6
50:2  65:16
67:21
69:22  70:4,
17  137:13

represented
49:1

represents
141:10

request
54:19
70:11
100:9
129:20
132:19
133:1

requested
129:19
135:8

requesting
73:19
129:14
139:10

requests
73:7
129:23
130:22
131:10
132:22

require
95:1  99:13

required
74:13  80:6

requirement
71:13

requisition
94:3, 22
95:1, 6, 15

98:11
99:13
101:16

reserve
138:20
139:2, 13

reserved
132:9
135:4

resignation
41:2, 5
45:22  46:3,
4, 7, 12, 21
47:8, 10

resigned
16:18  40:7

resigning
46:22

resolve
56:21  57:9

resource
51:10

resources
111:6
115:12
116:20

respect
34:4  65:12

respective
2:3

respond
32:3  43:18
53:15
100:14
127:21

responding
33:23

response
11:10, 11
17:13
19:23
33:15

37:10  50:8,
17  51:3
54:19  64:7
89:19
90:18
129:8, 22
131:9
132:6, 19

responses
37:5
127:23

responsive
132:15, 21

restrictions
79:20

restroom
103:8

result
141:16

retain  23:3,
8

retained
51:4  55:19

retention
81:22  82:1

return
16:15

returning
16:1  17:5

reveal
55:15

revealed
52:19

revert
106:2

review
13:1, 5, 14
46:18  67:8,
10, 14  68:6
102:20
104:2, 11,
17  105:22

108:3
122:16, 18,
22  123:2, 3,
11  124:6, 7,
14

reviewed
12:10  13:7
103:1, 2
104:8, 10
124:22

reviewing
105:13
106:19

reviews
103:22

revise  73:7

revisit
67:19

right  12:18
21:2  22:8
50:23
51:19  54:4
56:13
57:21
58:10, 13
67:2, 4
73:22  77:4
86:20
87:10
109:8
117:22
138:20
139:2, 13

Ron  21:8,
9  26:12
133:14

RPR  2:6
8:1  141:20

Rule  11:18
134:12

rules  2:15
8:4  10:21
139:14

Rusty
118:20
131:21
133:13

< S >
S  2:1  6:1

s/Tanya
141:19

safe  126:19

SAITH
140:6

salaries
64:10
109:22

salary  66:9,
13, 16

Sarah
133:17

save  71:6

saw  14:9
41:3  47:20
48:7  95:16
116:9
123:9
133:1

saying
54:7  61:18
71:15
82:14, 16
87:12, 14
92:18
94:19
98:15
107:22
111:1
115:10

says  22:15
39:13  40:3,

Video Deposition of Stefani Petty

7/13/2023

64

*4* 41:*9*
47:*4*  56:*3*
59:*23*  60:*1,*
*4, 18*  64:*1*
118:*2, 4*
**schedule**
82:*1*  103:*4*
**scope**
30:*15*  94:*6*
**scroll**  12:*9*
22:*21*
46:*19*
128:*14*
**search**
70:*10*
132:*14, 20*
133:*3*
**searches**
72:*22*
139:*1*
**second**
23:*2*  37:*19*
42:*23*
49:*20*
56:*11*  74:*3*
93:*6*
115:*21*
119:*10*
133:*10*
135:*2*
138:*10*
**secretary**
89:*12, 22*
**see**  13:*17*
14:*2*  23:*5*
24:*20*
41:*13*  45:*1*
46:*9, 17*
47:*16, 17*
64:*4*  86:*10*
104:*2*
118:*2, 4, 10,*

*11*  122:*19*
123:*12*
124:*14*
128:*18, 19*
**seeking**
16:*6*
**seen**  12:*7*
13:*23*
38:*12*
39:*22, 23*
40:*19*  48:*4*
59:*8, 21*
63:*15*
116:*3, 4, 5,*
*6, 7, 10*
117:*8*
127:*14, 20*
128:*20*
129:*1*
**Segrest**
89:*11, 21*
102:*1*
133:*13*
**send**  46:*21*
139:*23*
**sent**  22:*16*
24:*6, 7, 9*
25:*11, 16*
29:*19*  30:*1*
32:*2*  71:*23*
75:*5*  122:*2*
123:*4*
129:*20*
**separate**
86:*17, 23*
87:*3, 16*
94:*9*
**September**
43:*23*
91:*12*  92:*1,*
*5, 20*  93:*1*
122:*2*

**served**
131:*1*
**server**
76:*12*
**SERVICES**
1:*10*  8:*22*
9:*1*  11:*22*
25:*18*  26:*6*
**set**  66:*16*
76:*8*  95:*23*
98:*4, 5*
107:*1*
108:*8*
109:*22*
110:*5*
**sets**  97:*19*
**setting**
76:*3*
**seventy**
59:*19*
**severance**
40:*4*  91:*13*
**sexual**
49:*8*  134:*2*
139:*3*
**sharing**
77:*20*
**shift**  64:*5*
**short**
138:*12*
**short-
circuit**  55:*5*
**shortcut**
55:*5*
**show**  12:*1*
13:*18*
16:*20*  22:*9*
39:*17*
40:*14*
47:*21*
58:*18*
63:*10*

115:*19*
117:*3*
119:*3*
127:*12*
**showed**
117:*20*
**shows**
128:*8*
**side**  66:*10,*
*11*  83:*7, 12*
114:*23*
115:*11*
116:*17*
122:*8*
**sign**  10:*5*
111:*18*
140:*1*
**signature**
2:*11*
**signed**
128:*1*
**similar**
106:*10*
**simply**
20:*6*  84:*12*
**single**
113:*11*
130:*13*
**sit**  112:*16*
113:*10*
119:*22*
**sites**  88:*22*
**sitting**
57:*8*  125:*7*
136:*14, 20,*
*22*  137:*15*
**situation**
32:*8*  122:*4*
**skipping**
59:*1*
**slow**
128:*16*

**small**
128:*17*
**Smith**  35:*4*
133:*21*
**somebody**
70:*20*
72:*15*
111:*17*
135:*17*
137:*10, 11*
**soon**
41:*21*
124:*3*
**sorry**  12:*2*
13:*17*
16:*21*
17:*19*  21:*9*
29:*3, 20*
40:*22*  42:*5,*
*14*  47:*13*
59:*3, 6*
60:*1*  61:*18*
64:*14*
75:*17*  83:*1,*
*22*  99:*3*
118:*14*
127:*11*
**sort**  85:*19*
119:*21*
**South**  6:*12*
**SOUTHERN**
1:*3*  9:*3*
**speak**  15:*9*
16:*22*
17:*15*  18:*1*
24:*13*
43:*20*  44:*6*
47:*14*  54:*9*
77:*16, 18*
94:*19*
122:*9*
125:*4*

speaking
21:6  32:11
95:14
specific
62:17, 19,
20  76:7
85:18  86:1
94:11
120:20, 21
121:8, 15
specifically
17:10
60:17
62:21
64:20
72:18  78:2
89:11
95:16, 17
104:7
108:12
110:11
116:5, 9
120:19
124:20
129:8
130:13, 21
131:19
136:19
138:1
specifics
17:4
spoke
15:22
16:22
53:18, 19
54:8
spot  57:3
standing
28:10
standpoint
75:20

start  72:22
122:7
128:9
started
21:13, 16
87:9, 11
starting  9:6
state  10:14
37:5  121:5
141:3
stated
18:19  63:5
statement
83:22
123:22
statements
52:8
130:18
131:7, 16
STATES
1:1
status
127:7
stay  56:16
99:12
STEFANI
1:17  2:4
8:7  9:21
10:16  18:4
25:20  36:9
43:7  85:16
96:22
127:19
128:7
130:1, 20
Stefani's
95:9
stenotype
141:8
step  69:7
steps  23:8,
15  68:15,

19  69:13
84:10
STIPULATE
D  2:2, 10,
17  3:2
stipulation
8:5
stipulations
10:2
stop  56:22
stopped
79:4
stored
81:21
strategy
31:16
Street  6:6,
12  7:8
strike  29:1
98:22
101:14
struct
110:15
structure
67:1, 5
68:6  106:3,
16, 23
108:21
109:12
137:14
structures
67:8
stuff  65:22
105:10
118:6
119:20
129:18
subject
93:9, 14
118:22
132:9

subjects
119:16
submit
101:19
substance
12:21
substantiate
d  114:15
substantive
32:21
subvert
52:6
successful
14:15, 18
suddenly
28:22
suggested
12:11
67:13
Suite  6:6,
12, 18  7:8
supervisors
62:6
support
97:3, 5
106:14
108:12
119:13
120:3
136:13
supporting
107:13
supposed
17:20  19:2
73:23
sure  10:21
18:5  27:22
28:9  37:20
39:23  40:9
43:9  59:10
61:7  62:7
67:10  69:1,

10  77:11
78:15, 22
80:16, 20
84:21  91:8
92:15, 17
93:21
102:17
104:6
105:6
107:5, 22
109:3, 21
110:13
112:23
126:8
127:21
128:8, 20
129:1
switch
78:13, 20,
23
sworn  9:22
system
78:7  82:8,
10, 14, 16,
19, 22, 23
83:4
113:20
114:4
117:18
126:7
systematica
lly  98:5
systems
116:17

< T >
T  2:1
141:1
take  11:1,
4  22:7
23:8, 15
31:14  35:1

Video Deposition of Stefani Petty

7/13/2023

66

37:*18*
45:*20*
56:*23*  57:*7,
13*  61:*15*
62:*10*  63:*6*
68:*14, 19*
69:*13*  71:*4,
5*  73:*5*
74:*2*  103:*7,
20*  115:*21*
121:*19*
134:*16*
138:*12*
**taken**  2:*5*
38:*1*  45:*12*
62:*16*  69:*7*
71:*19*  74:*7*
103:*16*
138:*16*
141:*7*
**talk**  19:*23*
34:*18*
51:*19*
53:*14*  56:*3*
64:*6*  110:*5*
**talked**
18:*14*
28:*12*  35:*4*
53:*4, 22, 23*
71:*2*
119:*15*
122:*14*
**talking**
21:*7, 8*
27:*11*
32:*20*
45:*21*
66:*13*  87:*2,
3, 9*  91:*9*
96:*18, 20*
98:*14*
103:*22*

109:*12*
130:*16, 17,
21*  131:*18,
23*
**tampered**
69:*2*
**Tanya**  2:*5*
8:*1, 17*
59:*3*
141:*20*
**team**  97:*6*
98:*15*
99:*12, 15,
22*  100:*3,
19*  109:*13,
14*  110:*2,
14, 16*
114:*12*
**teammates**
88:*6*  113:*4,
5*  114:*18*
**teams**
107:*1*
**tell**  12:*20*
64:*3*  88:*16*
89:*18, 20*
91:*1, 15*
113:*10*
124:*18*
128:*15*
**telling**
72:*8*  85:*18*
135:*19, 23*
**tells**  139:*15*
**tend**  112:*3*
**term**  120:*7*
121:*15*
**termination**
115:*14, 17*
116:*12*
117:*17, 21*
118:*1*

**terms**
32:*17*  61:*9*
119:*18*
**testified**
9:*23*  20:*1,
11*  26:*15*
27:*17*  28:*1,
5, 6, 17*
30:*18*
35:*11*
36:*10, 11*
37:*8*  43:*19*
50:*7*  51:*1*
54:*1, 5*
69:*20*  75:*9*
82:*11*  87:*1*
96:*19*
97:*13*
110:*6*
122:*13*
123:*23*
125:*13*
131:*4*
133:*1*
**testifies**
128:*1*
**testify**
19:*9*  20:*16,
21*  21:*1, 20*
28:*8*  33:*16*
36:*9*  50:*3,
19*  51:*2*
55:*1*  70:*1,
20, 22*
72:*14, 16*
96:*22*
119:*18, 22*
120:*2*
125:*13*
127:*23*
134:*5, 11*

**testifying**
18:*6*  30:*15*
67:*23*
70:*13*
72:*20*
96:*11*
109:*19*
131:*2*

**TESTIMONY**
1:*16*  11:*9*
28:*10, 12*
29:*1*  30:*9*
36:*12*  63:*8*
65:*12*
69:*21*  74:*1*
76:*6*  85:*22*
90:*20*
95:*10*
98:*23*
101:*14*
122:*15*
141:*11*
**text**  16:*23*
79:*14*
**Thank**
13:*1*  31:*2*
37:*16*  58:*8*
103:*12, 19*
138:*12*
**Thanks**
140:*3*
**thereto**  3:*1*
141:*8*
**thing**
34:*21*  40:*3*
49:*13*  55:*2*
77:*23*
96:*21*
106:*2*
130:*13*

**things**
31:*17*  33:*1*
34:*10*  61:*8*
62:*3*  66:*9*
79:*14*
82:*20, 21*
83:*5*  88:*14*
96:*17*
108:*20*
109:*20*
112:*23*
116:*18*
119:*19*
138:*6*
**think**
20:*10*  28:*6,
11, 14*  33:*9,
10, 11*  43:*3*
44:*16, 22*
49:*11*  51:*8*
56:*10, 16*
57:*4, 9, 15*
58:*14*
59:*16*  66:*8*
71:*9*  72:*20*
73:*13, 17*
76:*5*  78:*1,
4*  80:*15*
82:*2, 11*
85:*15, 16*
86:*10, 12*
87:*18*
88:*18*
103:*8*
115:*20*
123:*5*
124:*11*
130:*19, 20*
131:*1*
138:*10*

**Thomas**
38:*16*, *17*
46:*20*
**thought**
128:*21*
**Thursday**
58:*7*
**time**  2:*22*,
*23*  8:*15*
15:*17*  16:*3*,
*4*, *8*  25:*14*
26:*5*  29:*7*
37:*22*  38:*3*
42:*23*
45:*10*, *14*
47:*17*
55:*12*  57:*7*,
*14*  65:*18*,
*20*  67:*7*
71:*6*  74:*5*,
*9*  78:*18*
82:*17*  83:*1*
92:*19*
103:*14*, *18*
109:*10*
112:*19*
120:*15*
122:*1*
133:*7*
138:*14*, *18*,
*19*  139:*20*
**timeframe**
18:*5*  25:*15*
27:*3*
**timeline**
103:*2*
**times**
14:*21*  15:*1*
41:*21*
**timing**
71:*16*

**title**  102:*8*
121:*14*
**today**
10:*13*
11:*15*
12:*14*
114:*5*
120:*14*
125:*7*, *23*
126:*6*, *18*,
*21*
**told**  21:*1*
35:*1*, *12*
73:*19*
101:*6*
**top**  22:*15*
60:*1*  77:*5*
81:*23*
87:*22*
103:*5*
111:*11*
118:*2*
120:*22*
125:*10*, *22*
**topic**
109:*18*
**topics**
12:*11*
67:*18*, *19*
**town**  57:*10*
**train**  61:*21*
88:*9*
**training**
61:*4*, *9*, *10*,
*12*, *14*  62:*4*,
*7*, *13*, *14*
63:*1*, *6*
76:*15*, *19*
77:*1*  87:*23*
88:*15*, *16*,
*19*

**trainings**
61:*14*
62:*11*, *21*
**transcribe**
11:*8*
**transcribed**
141:*9*
**transcript**
11:*12*
141:*7*, *11*
**transcriptio
n**  141:*10*
**transfer**
98:*19*, *20*
99:*7*  100:*2*,
*18*, *22*
101:*9*, *11*
**transferred**
99:*5*  101:*1*
**transferring**
98:*8*
**tread**  48:*19*
**treating**
61:*21*
89:*11*, *22*
**treatment**
20:*8*  25:*3*
83:*9*  84:*8*
92:*9*, *23*
102:*2*
133:*12*, *18*
**trial**  2:*23*
**Tricia's**
9:*11*
**tried**  14:*14*,
*20*, *22*  15:*8*
89:*18*
90:*14*, *16*
123:*6*
**Trish**
48:*19*
51:*18*

56:*15*
69:*19*  71:*3*
119:*15*
121:*8*
127:*19*
131:*8*
**true**  28:*3*,
*20*  36:*22*
83:*22*
141:*11*
**TRUIST**
1:*10*, *11*
10:*11*, *12*
30:*11*
41:*16*
43:*11*  44:*3*,
*10*  53:*13*
55:*6*  60:*13*,
*23*  65:*23*
66:*2*  67:*6*
69:*12*
81:*16*
102:*12*, *19*
104:*10*, *23*
106:*7*
108:*2*, *10*,
*13*, *17*
109:*9*, *22*
110:*16*
124:*7*
126:*20*
127:*5*
132:*1*
136:*13*, *19*,
*22*  137:*20*
**try**  67:*19*
**trying**  43:*9*
51:*15*
52:*14*, *17*,
*18*  55:*5*, *8*
57:*2*, *19*
67:*2*  101:*4*

108:*23*
109:*5*
122:*6*
131:*11*, *15*
**turned**
20:*13*
21:*14*  32:*6*
36:*14*  39:*8*
48:*10*
73:*15*
83:*18*
84:*23*
86:*20*
124:*4*
138:*3*
**twelve**
90:*9*  91:*4*,
*18*
**two**  39:*5*

**< U >**
**U**  2:*1*
**U.S**  46:*13*
**uh-huh**
11:*10*
132:*6*
**unable**
32:*1*  122:*8*
124:*2*
**understand**
26:*1*  27:*22*
31:*13*
35:*19*  40:*9*
43:*6*, *17*
75:*18*
78:*22*  83:*3*
90:*19*
92:*16*
102:*17*
106:*6*
139:*6*

Video Deposition of Stefani Petty

7/13/2023
68

understanding 16:17, 18 21:18 41:15 50:9 55:20 72:2 73:12 75:22 80:4 83:23 94:2 95:3 101:5 125:23 127:4 132:11 135:19
unearthed 138:22
uneligible 126:13
unequal 114:18
unfair 25:2 84:7 92:23 133:12, 18
uniform 112:7
UNITED 1:1
unlawful 114:13
unresolved 71:5
update 135:21
updates 135:8
uphold 80:1
use 52:14 75:22, 23 76:15 77:6, 14 78:5, 13, 16 79:1 103:8

uses 75:7
usual 10:1

< V >
V 8:23
vary 112:4
verbal 74:12 75:1 84:7
versus 112:5
VIDEO 1:16 2:4 8:20
videoconference 2:7 8:6
Videographer 7:13 8:14 9:18 37:21 38:2, 7 45:5, 9, 13 58:16 74:4, 8 103:13, 17 138:13, 17 139:19
VII 121:15
violated 114:16
violates 114:8
violation 114:10, 20 115:3, 8 126:11
virtual 57:12
virtually 57:13

vision 112:21 113:8
vs 1:9

< W >
Wait 12:17
waiting 72:4
waive 71:12
waived 2:12 3:4
want 18:5 27:4 35:20 45:3, 5 46:17 56:14, 19 59:18 73:13 79:17 92:15 94:19 110:11, 13
wanted 54:20 73:5 98:18 101:8 103:9
wasting 55:12
way 24:22 28:7, 15 34:3 50:16 80:8 81:1 95:23 106:22 107:1
ways 88:6, 7, 18

website 135:9, 11, 18
welcome 11:2
welfare 112:22 113:7
well 13:9 20:18 27:14 33:12 35:8 45:7 49:7 50:6 52:21 53:3 55:20 56:9 60:10, 18 62:11, 22 65:18 72:8, 17 73:2, 3 75:10 76:14 86:14 100:6 101:4 107:12, 17 109:21 115:6 117:13 119:1 120:6 129:20 135:4
went 16:10 54:8 73:18 103:21 120:19
We're 8:17 10:4, 21, 22 31:13 37:18 45:9, 13 48:18

51:8, 15 55:13 56:3 57:11, 17 58:5, 14 59:1 68:21 72:6, 17, 19 119:17 122:14 131:18 132:4, 9 134:4 136:14
We've 18:14 31:5 57:8 72:23 112:9 119:15, 17 127:1 139:5
whatsoever 66:21

WILKINSON 6:16, 17 8:23
wipe 118:9
wise 57:4
witness 2:12 8:7 9:20 19:2, 7 27:1 30:16 32:15 33:16 43:8 44:19, 21 47:15 50:1 51:10 55:9, 11 57:8 64:16 68:2 70:3 74:20 97:1, 15 119:18, 21

122:*23*
123:*18*
127:*11*
128:*12*
131:*7, 15*
132:*2*
134:*7*
138:*21*
141:*12*
**witnesses**
33:*9*  34:*16*
51:*11*  52:*4*
55:*4*  72:22
**women**
25:*3*
104:*12*
108:*15*
125:*8*
**wondering**
58:*3*
**work**  15:*13*
18:*15, 16*
19:*18, 20*
21:*19*
26:*18*
27:*13*
35:*14*
37:*13*  49:*4,*
*15*  51:*14,*
*23*  52:*6*
65:*22*
101:*7*
107:*5*
108:*6*
111:*18*
139:*7, 12*
**Workday**
117:*17*
118:*1*
**worked**
38:*17*  83:6

124:*5*
134:*10*
**working**
52:*2*
**workload**
89:*12, 23*
**workplace**
61:*13*
**works**
52:*23*
101:*12*
108:*21*
**written**
84:2, *4*, *9*
85:*18*
87:*13*
**wrong**  56:*9*
**Wunderlich**
7:*7*  9:*14*

**< X >**
**X**  4:*1*
32:*23*

**< Y >**
**Y**  32:*23*
**y'all**  68:*19*
**Yeah**
34:*17*
43:*21*
44:*18*  45:*7*
54:*12*
63:*18*
65:*18*
81:*12*  83:*4*
85:5  86:*3*
96:*16*
109:*16*
130:*2*
134:*8*
**year**  67:*12*

**years**  83:*2*
90:*9*  91:*4,*
*18*  123:*14*
124:*10, 15*

**< Z >**
**Z**  32:*23*
**Zoom**  57:*8*