FILED

2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 6

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5

6

7      CIVIL ACTION NO.:  2:21-cv-00300-MHH

8

9      KATHRYN HENDRIX,

10            Plaintiff,

11

12      v.

13

14      CRC INSURANCE SERVICES, INC., TRUIST

15      FINANCIAL CORP., AND TRUIST BANK,

16            Defendants.

17

18

19      VIDEOTAPED DEPOSITION TESTIMONY OF:

20               KATHRYN HENDRIX

21               July 18, 2023

22

23   Job No. CS5999253

Page 2

1  S T I P U L A T I O N S
2      IT IS STIPULATED AND AGREED
3  by and between the parties through their
4  respective counsel that the deposition of
5  KATHRYN HENDRIX may be taken before Lane
6  C. Butler, a Court Reporter and Notary
7  Public for the State at Large, at the law
8  offices of Baker, Donelson, Bearman,
9  Caldwell & Berkowitz, 1901 Sixth Avenue
10  North, Suite 2600, Birmingham, Alabama,
11  on the 18th day of July, 2023, commencing
12  at approximately 9:10 a.m. Central.
13      IT IS FURTHER STIPULATED
14  AND AGREED that it shall not be necessary
15  for any objections to be made by counsel
16  to any questions except as to form or
17  leading questions and that counsel for
18  the parties may make objections and
19  assign grounds at the time of trial or at
20  the time said deposition is offered in
21  evidence, or prior thereto.
22      In accordance with the Federal
23  Rules of Civil Procedure, I, Lane C.

Page 3

1  Butler, am hereby delivering to Rachel
2  Barlotta, Esq., the original transcript
3  of the oral testimony taken the 18th day
4  of July, 2023.
5      Please be advised that this is
6  the same and not retained by the Court
7  Reporter, nor filed with the Court.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4
5  Leslie A. Palmer, Esq.
6  PALMER LAW
7  104 23rd Street South, Suite 100
8  Birmingham, Alabama  35233
9  leslie@palmerlegalservices.com
10
11  Cynthia F. Wilkinson, Esq.
12  WILKINSON LAW FIRM
13  1717 Third Avenue North, Suite A
14  Birmingham, Alabama  35203
15  cwilkinson@wilkinsonfirm.net
16
17  Patricia A. Gill, Esq. (via Teams)
18  PATRICIA A. GILL, P.C.
19  Post Office Box 55204
20  Birmingham, Alabama  35255
21  patriciagill@yahoo.com
22
23

Page 5

1  FOR THE DEFENDANTS:
2
3  Rachel V. Barlotta, Esq.
4  Kayla Wunderlich, Esq.
5  BAKER, DONELSON, BEARMAN, CALDWELL &
6  BERKOWITZ
7  1901 Sixth Avenue North, Suite 2600
8  Birmingham, Alabama  35203
9  rbarlotta@bakerdonelson.com
10  kwunderlich@bakerdonelson.com
11
12
13  ALSO PRESENT:
14
15  Christina Bailey, Esq. (via Zoom)
16  Corey Daugherty
17  Karen Kelley, videographer
18
19
20
21
22
23

2 (Pages 2 - 5)

Page 6

1        I N D E X

2

3   EXAMINATION BY:      PAGE NO.

4   Ms. Barlotta       12

5

6

7

8

9      E X H I B I T S

10

11  FOR THE DEFENDANT:

12  Ex 1  Performance Assessment and   56

13      Career Management Plan,

14      Bates CRC/Hendrix 004806

15  Ex 2  Performance Assessment and   62

16      Career Management Plan,

17      Bates CRC/Hendrix 004781

18  Ex 3  Performance Assessment and   68

19      Career Management Plan,

20      Bates CRC/Hendrix 004755

21  Ex 4  Psychiatry Associates   72

22      records, Bates Hendrix

23      001121 (under seal)

Page 7

1  Ex 5  Reviewed Documents List,   112

2      Bates CRC/Hendrix 000042

3  Ex 6  Policies & Procedures,   113

4      Bates CRC/Hendrix 000443

5  Ex 7  Policies & Procedures,   117

6      Bates CRC/Hendrix 000298

7  Ex 8  Job Description, Bates   138

8      CRC/Hendrix 000204

9  Ex 9  Employment Agreement, Bates   149

10     CRC/Hendrix 000108

11  Ex 10  2017 Annual Review, Bates   151

12     CRC/Hendrix 000027

13  Ex 11  Email, Bates CRC/Hendrix   160

14     004754

15  Ex 12  2018 Annual Review, Bates   161

16     CRC/Hendrix 000022

17  Ex 13  Photographs   212

18  Ex 14  Cadden, text message   250

19  Ex 15  Correspondence, Bates   254

20     CRC/Hendrix 000133

21  Ex 16  Email, Bates CRC/Hendrix   256

22     000597

23

Page 8

1  Ex 17  Email chain, Bates   266

2     CRC/Hendrix 000135

3  Ex 18  Email, Bates Hendrix 000245   269

4  Ex 19  Correspondence, November   272

5     22, 2019

6  Ex 20  Charge of Discrimination   277

7  Ex 21  Lindberg text messages   289

8  Ex 22  Brown text messages   317

9  Ex 23  Companies Spreadsheet,   328

10     Bates CRC/Hendrix 004735

11     (under seal)

12  Ex 24  Email, Bates CRC/Hendrix   340

13     000732

14  Ex 25  Email chain, Bates   341

15     CRC/Hendrix 000918

16  Ex 26  Email, Bates CRC/Hendrix   342

17     000889

18  Ex 27  Email chain, Bates   343

19     CRC/Hendrix 000738

20  Ex 28  Email chain, Bates   344

21     CRC/Hendrix 001184

22  Ex 29  Email chain, Bates   346

23     CRC/Hendrix 000650

Page 9

1  Ex 30  Email chain, Bates   347

2     CRC/Hendrix 000697

3  Ex 31  Email, Bates CRC/Hendrix   348

4     000131

5  Ex 32  Email chain, Bates   350

6     CRC/Hendrix 001234

7  Ex 33  Email chain, Bates   351

8     CRC/Hendrix 000906

9  Ex 34  Email chain, Bates   352

10     CRC/Hendrix 001368

11  Ex 35  Email chain, Bates   352

12     CRC/Hendrix 000698

13  Ex 36  Email chain, Bates   354

14     CRC/Hendrix 000661

15  Ex 37  Email chain, Bates   355

16     CRC/Hendrix 000984

17

18  NOTE:  Pages 73 through 79 of the

19  deposition transcript were placed under

20  seal.

21

22

23

1      I, Lane C. Butler, a Court
2   Reporter and Notary Public, State of
3   Alabama at Large, acting as Notary,
4   certify that on this date, pursuant to
5   the Federal Rules of Civil Procedure and
6   the foregoing stipulation of counsel,
7   there came before me at the law offices
8   of Baker, Donelson, Bearman, Caldwell &
9   Berkowitz, 1901 Sixth Avenue North, Suite
10  2600, Birmingham, Alabama, commencing at
11  approximately 9:10 a.m., on the 18th day
12  of July, 2023, KATHRYN HENDRIX, witness
13  in the above cause, for oral examination,
14  whereupon the following proceedings were
15  had:
16
17      THE VIDEOGRAPHER:  Good morning.
18  We're going on the record at 9:10 a.m. on
19  July 18, 2023.  This is Media Unit 1 in
20  the videorecorded deposition of Kathryn
21  Hendrix in the matter of Kathryn Hendrix
22  v. CRC Insurance Services, Inc.; Truist
23  Financial Corp.; and Truist Bank, filed

1   in the United States District Court for
2   the Northern District of Alabama,
3   Southern Division, Case No.
4   2:21-cv-00300.  This deposition is being
5   held at 1901 Sixth Avenue North,
6   Birmingham, Alabama.
7       My name is Karen Kelley.  I'm
8   the videographer.  The court reporter is
9   Lane Butler, both with Veritext.
10      If counsel could please
11  introduce yourself, after which the court
12  reporter will swear in the witness.
13
14      MS. BARLOTTA:  Rachel Barlotta,
15  counsel for defendants.
16      MS. WUNDERLICH:  Kayla
17  Wunderlich, counsel for defendants.
18      MS. PALMER:  Leslie Palmer,
19  counsel for plaintiff, Kat Hendrix.
20      MS. WILKINSON:  Cynthia
21  Wilkinson, counsel for the plaintiff, Kat
22  Hendrix.
23

1      KATHRYN HENDRIX,
2       being first duly sworn,
3    was examined and testified as follows:
4
5       THE COURT REPORTER:  Thank you.
6       And, attorneys, usual
7   stipulations?
8       MS. PALMER:  We'll read and
9   sign.
10      MS. BARLOTTA:  I also just
11  wanted to state for the record, I expect
12  Christina Bailey to be joining via
13  Microsoft Teams.  That's why that camera
14  is set up.  She's in-house counsel for
15  Truist.
16
17  EXAMINATION BY MS. BARLOTTA:
18     Q.  All right.  Good morning, Ms.
19  Hendrix.
20     A.  Good morning.
21     Q.  We've met before.  Again, my
22  name is Rachel Barlotta.  I am
23  representing CRC and Truist in the

1   lawsuit that you filed.  I'm going to be
2   asking you some questions today about the
3   claims that you've made against those
4   parties.  And you had the benefit of
5   sitting through Mr. Daugherty's and Ms.
6   Stefani Petty's deposition; correct?
7      A.  Correct.
8      Q.  So you were able to observe
9   those depositions and kind of see how
10  they worked.  Is that right?
11     A.  Yes.
12     Q.  Okay.  And then because of that,
13  I'm not going to spend a lot of time
14  going through the ground rules of the
15  depositions, but I do want to talk to you
16  about two points before we get into the
17  substance of the case.
18     A.  Okay.
19     Q.  And one of those is that the
20  court reporter just put you under oath.
21  Do you know what that means?
22     A.  I do.
23     Q.  Okay.  What does that mean?

Page 14

1    A.  To tell the truth.
2    Q.  Okay.  And you understand you
3  have to tell the truth today in the
4  deposition just like you would in front
5  of a judge and jury?
6    A.  Yes.
7    Q.  And you understand that there
8  can be civil or criminal penalties if you
9  don't tell the truth in the deposition?
10    A.  Yes.
11    Q.  The other thing I want to let
12  you know about is that we are in the
13  discovery process in this case, and part
14  of that is taking depositions.  And that
15  is so we can get -- both sides can get an
16  understanding of the other parties'
17  positions and the evidence that they're
18  going to use to support their claims and
19  defenses.  So absent unusual
20  circumstances, the parties are only
21  allowed to take a deposition one time.
22    A.  Okay.
23    Q.  Which means today is the only

Page 15

1  day that Truist and CRC, through their
2  lawyer, me, gets to ask you questions
3  about your claims.  So for that reason,
4  I'm going to ask that when you answer a
5  question, that you would do so and be as
6  accurate and complete as possible.  Can
7  you do that?
8    A.  I can.
9    Q.  If you do not understand a
10  question that I ask, will you please let
11  me know that?
12    A.  Yes.
13    Q.  If you answer the question, I'm
14  going to assume that you understood it.
15  Is that fair?
16    A.  Yes.
17    Q.  How long have you known that you
18  were going to have to give a deposition
19  in this case?
20    A.  Since it was filed.
21    Q.  And what --
22    A.  I assume.
23    Q.  And what have you done to

Page 16

1  prepare for that deposition?
2    A.  I met with my attorneys, and I
3  reviewed the documents that you guys have
4  provided and that I have provided y'all.
5    Q.  How long did you meet with your
6  attorneys?
7    A.  A couple of hours.
8    Q.  Other than your counsel, have
9  you talked to anyone today about the fact
10  that you were going to be giving a
11  deposition?
12    A.  My family knows.
13    Q.  Anyone other than your family?
14    A.  I do have some friends that
15  know.
16    Q.  And who are they?
17    A.  My best friend, Sami Strange,
18  knows.  I'm sorry, I'm very nervous, so.
19    Q.  That's fine.  Take your time.
20    A.  Okay.  Jean Muller.
21    Q.  Any other friends you've spoke
22  to --
23    A.  Sarah Sullivan.  And my friend

Page 17

1  Morgan Amos.  And I didn't talk about the
2  case.  They just -- I just told them I
3  was having a deposition today.
4    Q.  Are any of those individuals you
5  just named, did they -- any of them ever
6  work for CRC or BB&T?
7    A.  Jean did.
8    Q.  What was her role?
9    A.  She started in the internal
10  audit department, and she was a corporate
11  trainer.  She retired in 2015-ish, I
12  think.
13    Q.  Since you left your employment
14  with CRC in November of 2019, have you
15  communicated with any current or former
16  CRC employees about your allegations in
17  this case?
18    A.  In Birmingham?
19    Q.  Any.  Any.
20    A.  Not details of the case.
21    Q.  Okay.  Who have you spoken to
22  about the case?  And I'm talking -- the
23  time frame I'm talking about is since you

5 (Pages 14 - 17)

Page 18

1 left your employment through today.
2 A. I have a good friend that works
3 in the Dallas office. He's aware.
4 Q. You said in the Dallas office?
5 A. Uh-huh.
6 Q. Okay. Is that a yes?
7 A. Yes.
8 Q. And what is his name?
9 A. Kenneth Kelly.
10 Q. Okay. Are you okay? Do you
11 need to take a break?
12 A. No.
13 Q. Okay. Well, I should have let
14 you -- well, I didn't let you know that
15 because I maybe assumed that you knew
16 that. But if at any point in time today
17 you need to take a break, just let me
18 know.
19 A. Okay.
20 Q. Okay?
21 Okay. Any -- any other current
22 or former CRC employees that you've
23 talked to about your claims in this case

Page 19

1 since you left your employment?
2 A. Lauren Lindberg.
3 Q. Okay. Anybody else?
4 A. I can't recall anybody else
5 right now.
6 Q. When is the last time you spoke
7 with Ms. Lindberg?
8 A. I --
9 Q. Or communicated. I should say
10 that. I mean, -- "communicated" meaning
11 phone, text, e-mail.
12 A. I think it was maybe March or
13 April 2020, I think.
14 Q. Okay.
15 A. We gave you guys the text, and
16 that was the last communication.
17 Q. Okay. And your communications
18 with Kenneth Kelly, how -- have those
19 been texts? Snapchat? How have those
20 been with him?
21 A. Me, Ken, and Jean were close
22 while Ken worked in the -- the training
23 department, too, so we have Zooms about

Page 20

1 once a month just to keep up with each
2 other.
3 Q. And what did you talk to with
4 them about this case?
5 A. That I had filed a suit.
6 Q. Anything else?
7 A. They were familiar with the
8 issues I was having while working there
9 because we were friends then too.
10 Q. And what were those issues?
11 A. The discrimination that was
12 happening to the women in the department
13 and it being ignored.
14 Q. And have you asked either of
15 them to be a witness in the case?
16 A. No.
17 Q. Do you expect them to be
18 witnesses in the case?
19 A. No.
20 Q. All right. Where did you go to
21 -- where did you go to college?
22 A. Birmingham-Southern.
23 Q. What was your major?

Page 21

1 A. Accounting.
2 Q. Did you have any scholarships
3 there?
4 A. Very small. I don't remember
5 the name of it.
6 Q. Was it an academic scholarship?
7 A. I think maybe. I really can't
8 remember.
9 Q. Were you accepted to any other
10 schools other than Birmingham-Southern?
11 A. I think Auburn and Alabama.
12 Q. Were you offered scholarships
13 there?
14 A. No.
15 Q. How were your grades in college?
16 A. I graduated with a 3.2.
17 Q. And what was your first job out
18 of college?
19 A. Staff accountant at Dixon
20 Hughes.
21 Q. How did you get that job?
22 A. I participated in an internship
23 program that Birmingham-Southern did.

6 (Pages 18 - 21)

Page 22

1    Q.   What did you do as a staff
2    accountant?
3    A.   A lot of different things.  I
4    did some audit, tax, internal audit.
5    Q.   And when you say you did audit,
6    what does that mean?
7    A.   We would audit financial
8    statements.  In internal audits, we would
9    audit internal controls.
10   Q.   And for somebody who's not an
11   accountant, how would you explain that?
12   A.   What an auditor does?
13   Q.   Yes.
14   A.   I don't know.  We would go
15   through different financial statements
16   and perform -- you know, do what the
17   program, the audit program was asking us
18   to check.
19   Q.   What were you looking for?
20   A.   It's been so long and I have not
21   done those type of audits, so I really
22   couldn't --
23   Q.   Who trained you to do that job?

Page 23

1    A.   My managers there were Laura
2    Ray.  I can't remember the other lady's
3    name.  Scott Berte was a partner.  Tim
4    York was a partner.
5    Q.   How long was your training?
6    A.   I did my internship with them
7    from January through the middle of March,
8    and that was a lot of training.
9    Q.   When you were a staff
10   accountant, did you work independently?
11   A.   Some.
12   Q.   Did you have to analyze
13   information and data?
14   A.   I was learning about that.
15   Q.   Okay.  So, would you describe
16   your job as more of just the -- you just
17   used a program and it was a data
18   entry-type position, more so?
19   A.   Yeah.  I also had to do client
20   visits and communicate with the clients.
21   Q.   And what would -- what would you
22   do on a client visit?
23   A.   We would do the audits on site.

Page 24

1    We did a lot of car dealerships, so we
2    would need access to their documents if
3    they were paperless.
4    Q.   Did you have to sell accounting
5    services to anybody?
6    A.   (Witness shakes head.)
7    THE COURT REPORTER:  No?
8    THE WITNESS:  No.
9    THE COURT REPORTER:  Thank you.
10   Q.   Did you enjoy that job?
11   A.   I did.
12   Q.   Why did you leave it?
13   A.   I didn't want to pursue the CPA
14   role.
15   Q.   Why is that?
16   A.   Because there was a lot of
17   opportunity at the time in compliance and
18   internal audit.
19   Q.   And what do you mean by
20   opportunity in compliance and audit?
21   A.   Sarbanes-Oxley was passed in
22   2002, so a lot of new programs were being
23   developed.

Page 25

1    Q.   Was it just something about the
2    auditing work that attracted you, or was
3    it financially more lucrative?
4    A.   It was more -- the internal
5    audit was more about policies and
6    procedures and not financial audits.
7    Q.   So less number-crunching?
8    A.   Uh-huh.
9    Q.   Is that a yes?
10   A.   Yes.
11   Q.   And that's what appealed to you
12   about it?
13   A.   I enjoyed that.
14   Q.   Who was your supervisor at Dixon
15   Hughes?
16   A.   I can't remember who was my
17   direct supervisor or if the partners were
18   the supervisors.
19   Q.   Do you remember who you reported
20   to or who gave you assignments?
21   A.   Laura Ray did.
22   Q.   Anybody else other than Ms. Ray?
23   A.   Yeah.  I cannot remember her

7 (Pages 22 - 25)

Page 26

1   name.  She was another manager there.
2      Q.  How did your employment there
3   end?
4      A.  I resigned.
5      Q.  Why?
6      A.  To go work at CRC.
7      Q.  Were you asked to leave?
8      A.  No.
9      Q.  Did you ever receive any bad
10  performance evaluations?
11     A.  No.
12     Q.  Any disciplinary actions when
13  you were there?
14     A.  No.  I was told I could come
15  back.
16     Q.  Did you feel like you were
17  treated fairly there?
18     A.  Yeah.
19     Q.  And did you think that women
20  were treated fairly there?
21     A.  I do.
22     Q.  How did you come to work at CRC?
23     A.  I was familiar with the company

Page 27

1   and --
2      Q.  How so?
3      A.  My best friend growing up's dad
4   worked there.
5      Q.  Who is that?
6      A.  Randy McClendon.
7      Q.  And who was his dad?
8      A.  Well, Kimberly was my friend.
9   Randy.
10     Q.  Oh, I'm sorry.  Oh, Kimberly
11  McClendon was your friend?
12     A.  Uh-huh.
13     Q.  Is that a yes?
14     A.  Yes.
15     Q.  And her father was Randy
16  McClendon?
17     A.  Yes.
18     Q.  And what was Mr. McClendon's
19  role at CRC?
20     A.  He was a senior broker.
21     Q.  In which department?
22     A.  Casualty.
23     Q.  And how did you know the

Page 28

1   McClendons?  How did you come to know
2   them?
3      A.  We lived down the street from
4   them when I was little.
5      Q.  Okay.  So you were familiar with
6   CRC.  What about that prompted you to
7   seek employment there?
8      A.  They were hiring an internal
9   auditor.
10     Q.  How did you find that out?
11     A.  It was on their website, I
12  think.
13     Q.  On the CRC website?
14     A.  Yeah.  I think so.
15     Q.  What prompted you to go look at
16  the website?
17     A.  I had kind of started looking
18  around at different places because I had
19  decided not to pursue the CPA.
20     Q.  Were you going to be required to
21  get a CPA if you continued to work at
22  Dixon Hughes?
23     A.  I think it was a requirement.  I

Page 29

1   can't remember.
2      Q.  Where else did you look at
3   working other than CRC?
4      A.  Nowhere, I don't think.
5      Q.  How did you apply for that job
6   or indic- -- or let CRC know that you
7   were interested?
8      A.  I called Randy and told him that
9   I saw the job posting and asked him if he
10  could give me a name to send my resumé
11  to.
12     Q.  Did he do that?
13     A.  Yes.
14     Q.  Who was that person?
15     A.  Melody Banks.
16     Q.  What was Ms. Banks' role?
17     A.  She was, I believe, the director
18  of the human resources department.  I'm
19  not positive about her exact title.
20     Q.  What was the next thing that
21  happened after you sent your resumé?
22     A.  I think that Jack called me.  He
23  was the audit manager.

8 (Pages 26 - 29)

1    Q.   And what is -- what is Jack's
2  last name?
3    A.   Elliott.
4    Q.   And his role was what?
5    A.   He was the director of the audit
6  department.  He started it.  He was the
7  first hire.
8         MS. PALMER:  Raise your mic up.
9         THE WITNESS:  Sorry.
10   Q.   Okay.  And after Mr. Elliott
11  called you, what's the next thing that
12  happened?
13   A.   It might not have been in this
14  order, but I had an interview with the
15  CFO.
16   Q.   Who was at the time?
17   A.   Kristi Jeffers, and Melody, I
18  believe, came to that.  And then I
19  interviewed with Charlie Wood, the COO,
20  and -- I forget what her title was and I
21  forget her name at the moment.
22   Q.   Okay.
23   A.   She ended up taking Kristi

1  Jeffers' spot, though, when Kristi left.
2    Q.   Okay.  So she became -- whoever
3  this person was became the CFO at some
4  point?
5    A.   Uh-huh.
6    Q.   Is that a yes?
7    A.   Yes.
8    Q.   Other than Mr. McClendon, did
9  you know anybody else who worked at CRC
10  at the time that you interviewed for the
11  job?
12   A.   Yes.
13   Q.   Who was that?
14   A.   I knew Tom Curtin, the founder,
15  the CEO.  I knew Ron Helveston.  I
16  knew -- there are several people from
17  Vestavia where I went to high school.
18  Joe LaRocca.
19   Q.   Is that L-A-R-O-C-C-A?
20   A.   Uh-huh.  I'm trying to think who
21  else I knew.  I can't recall anybody at
22  the moment.
23   Q.   That's fine.  If you think of

1  them later, let me know.
2    A.   Okay.
3    Q.   How did you know Tom Curtin?
4    A.   Through the McClendons.
5    Q.   What had been your interaction
6  up -- with him up to that point before
7  you started working at CRC?
8    A.   Family events.  We all had lake
9  houses close to each other.
10   Q.   Where was -- what lake was that?
11   A.   Lake Martin.
12   Q.   Okay.  I mean, were you on a
13  first name basis with him?
14   A.   Mr. Curtin?
15   Q.   Yes.
16   A.   I called him Mr. Curtin.
17   Q.   Okay.  But did he know -- I
18  mean, did he know you?
19   A.   Yes.  Yes.
20   Q.   Did he have children your age or
21  around your age?
22   A.   Will.
23   Q.   Did Will work at CRC?

1    A.   I don't think he ever worked
2  there.  He could have at some point but
3  not while --
4    Q.   How did you know Mr. Helveston?
5    A.   Through the McClendons.
6    Q.   Was he also one of -- have a --
7  did he also have a lake house on Lake
8  Martin near you all?
9    A.   He did.  But I didn't -- I don't
10  think we hung out with them at the lake,
11  not that I can remember, really.
12   Q.   And your interaction with Mr.
13  Helveston prior to coming to CRC was --
14  what was the nature of that?
15   A.   Family friends.
16   Q.   Just at social gatherings with
17  other people?
18   A.   Yeah.  Mainly, my parents were
19  good friends with him.
20   Q.   And your parents were good
21  friends with Mr. Helveston?
22   A.   With the Helvestons.
23   Q.   How did they become friends?

9 (Pages 30 - 33)

Page 34

1    A.   Through the McClendons.
2    Q.   What was Mr. Helveston's title
3  at the time that you were working -- you
4  started working for CRC?
5    A.   Oh.  There were changes that
6  were happening.  He became president.  I
7  think he was co-president for a minute.
8  But president.
9    Q.   Well, at the time you had -- you
10 came to CRC, was he in some sort of
11 executive type role?
12   A.   Yes.  I believe so.  He was
13 still a broker too.  I believe he was
14 doing executive.
15   Q.   What about Mr. LaRocca?
16   A.   I just knew of him.
17   Q.   Okay.  What was his job?
18   A.   He was a casualty broker, and he
19 worked under Randy.  His -- I graduated
20 with his little sister.
21   Q.   Did you talk with any of these
22 folks about what their experience was
23 like working at CRC before you went to

Page 35

1  work there?
2    A.   No.
3    Q.   Did you date Mr. Helveston's son
4  at some point?
5    A.   I did.
6    Q.   What was his name?
7    A.   Blake.
8    Q.   What was the time frame of that
9  relationship?
10   A.   We actually dated when we were
11 kids.
12   Q.   High school?
13   A.   I think middle school.
14   Q.   Or younger than that?
15   A.   Middle school maybe.
16   Q.   Okay.
17   A.   And then again 2006 through
18 2008-ish, I believe.
19   Q.   So right around the time you
20 started working at CRC?
21   A.   Right.
22   Q.   Did Mr. -- either Ron or Blake
23 Helveston encourage you to apply at CRC?

Page 36

1    A.   No.  They weren't involved at
2  all.
3    Q.   Well, did you tell them, "Hey,
4  by the way, I'm going to go work for
5  this" --
6    A.   After I was hired.
7    Q.   So it's your testimony that you
8  didn't tell your boyfriend at the time
9  that you were going to go work at CRC?
10   A.   He wasn't my boyfriend at the
11 time.
12   Q.   I'm sorry, I thought you said he
13 was in 2006.
14   A.   Correct.  I started working at
15 CRC, and my mom mentioned to Ms.
16 Helveston that I was headed to Denver on
17 an audit.  And she said that Blake was
18 living out there and I should give him a
19 call, and I did.
20   Q.   Did you reach out to Mr.
21 McClendon and tell him that you were
22 applying to CRC?
23   A.   Yeah.  He gave me Melody's

Page 37

1  contact to send my resumé.
2    Q.   Do you know if your parents
3  spoke to the Helvestons about the fact
4  that you had applied to work at CRC?
5    A.   I don't believe they did because
6  I remember Ms. Helveston making the
7  comment that she was surprised that I
8  hadn't let her know that I was
9  interviewing.
10   Q.   When did she make that comment?
11   A.   At some point after I was hired.
12   Q.   All right.  So tell me about
13 your job in the audit department.  What
14 did you do?
15   A.   I worked in there for seven and
16 a half, close to eight years.  We would
17 perform audits, annual audits of the
18 production teams, their files, the AIM
19 system.  We audited accounting, taxes,
20 licensing, SecureDesk.
21   Q.   When you say you did the audits
22 for the production team, what does that
23 -- what does that mean?

10 (Pages 34 - 37)

1    A.   We would check that the required
2  documents were in their policy file and
3  that they had followed the procedures
4  that -- corporate procedures.
5    Q.   And who was the production team?
6    A.   What do you mean?  We audited
7  all of the production teams.
8    Q.   Yeah.  What is a production
9  team, though, for -- for CRC?
10    A.   A broker team.
11    Q.   And can you explain the concept
12  of a broker team?
13    A.   The concept?
14    Q.   Yeah.  What --
15    A.   The structure?
16    Q.   The structure.
17    A.   There's a senior broker who
18  would be the coded broker in the system.
19  And the teams varied based on the size of
20  the book of business.
21    Q.   And when you say they were a
22  "coded broker," what does that mean?
23    A.   They had a code that recorded

1  their revenue in the system under their
2  name.
3    Q.   That was a CRC code?
4    A.   It was in AIM, yeah, the -- the
5  agency management system.
6    Q.   And when you say it recorded
7  their revenue, what do you mean by that?
8    A.   The accounting.  This is --
9  that's where you put in the premium, the
10  commission, which then was captured in
11  the system --
12    Q.   Okay.  So --
13    A.   -- under their revenue.
14    Q.   I'm sorry.  So, is the revenue
15  the commission?
16    A.   And fees.
17    Q.   Okay.  And what is the
18  commission from?
19    A.   Each policy.
20    Q.   So each policy that CRC sells
21  results in a commission?
22    A.   There could be a case where --
23    Q.   -- it does not?

1    A.   I believe that some they could
2  fee and not commission.
3    Q.   Okay.  What's the difference
4  between a fee and a commission?
5    A.   One is a percentage of the
6  premium, and the other is a set amount.
7    Q.   All right.  So for each policy
8  that CRC sells, there -- that would
9  result in either a commission or a fee or
10  sometimes both.  Is that right?
11    A.   I think so.
12    Q.   Okay.  And that commission
13  gets -- and/or fee gets recorded in AIM.
14  Is that right?
15    A.   Uh-huh.
16    Q.   Is that a yes?
17    A.   Yes.
18    Q.   Okay.  And then that is tied --
19  is it your testimony that then that --
20  that fee or commission is tied to a coded
21  broker in AIM?
22    A.   What do you mean "tied to"?
23    Q.   Well, I was asking you about

1  what a coded broker meant, and you said
2  that it was the broker had a code that
3  recorded revenue in AIM.  And so then I
4  asked you what the revenue was, and we
5  got to commissions.  So I'm trying to get
6  an understanding from you about how that
7  revenue relates back to the broker code.
8    A.   How the revenue relates back to
9  the broker code?
10    Q.   Yes.
11    A.   I'm not sure I understand.
12    Q.   Okay.  Well, maybe you can
13  explain it to me this way.  If a broker
14  has a code that records revenue in AIM,
15  what does that mean?
16    A.   There's -- the senior broker is
17  the coded broker, so that's who is the
18  team name.  I was on Team Daugherty.
19    Q.   So for -- for Team Daugherty, he
20  would have been the coded broker for that
21  team?
22    A.   For that, yes.  There was a spot
23  for -- called marketing rep where --

11 (Pages 38 - 41)

Page 42

1  whoever marketed the business.
2     Q.  And when you say "there was a
3  spot," you mean a spot in AIM?
4     A.  Yeah.
5     Q.  So it would be accurate to say
6  there was a spot in AIM for revenue and a
7  spot in AIM for marketing representative?
8     A.  Uh-huh.
9     Q.  Is that a yes?
10    A.  Yes.
11    Q.  Okay.  And --
12    A.  And also a CISR, I believe is
13  what it's called in the system, and the
14  account executive or broker assistant
15  would be logged.
16    Q.  Okay.  Okay.  Was there anybody
17  other than a broker who would be recorded
18  in AIM under that revenue tab or column?
19    A.  So you coded them by the
20  submissions.
21    Q.  Okay.
22    A.  So by the policies.
23    Q.  Okay.

Page 43

1     A.   So each policy would have a
2  broker, a marketing rep, and a CISR
3  account executive that you would list --
4  log in the system when you set up the
5  commission or the -- or the submission of
6  the renewal.
7     Q.  Okay.  So for each policy, there
8  would be -- that's entered into AIM,
9  there's going to be a spot for a broker?
10  Is that right?
11    A.  The -- yeah.  The team name, the
12  lead broker.
13    Q.  The lead broker.  And then
14  there's a spot for the customer service
15  representative?
16    A.  Uh-huh.
17    Q.  Is that a yes?
18    A.  Yes.  Sorry.
19    Q.  And then you also said a
20  marketing representative?
21    A.  Yes.
22    Q.  Did you have a broker code?
23    A.  I had a marketing rep ID and

Page 44

1  CISR ID log once I was promoted --
2     Q.  Okay.
3     A.  -- to inside broker.
4     Q.  Okay.
5        THE COURT REPORTER:  To inside?
6        THE WITNESS:  Broker.
7        THE COURT REPORTER:  Thank you.
8     Q.  So after you became an inside
9  broker, you had a marketing rep ID and a
10  CI- -- CISR ID?
11    A.  Yeah.  I always had the CISR ID.
12  That's where the account executive is
13  listed.
14    Q.  What's the significance of
15  having a marketing rep ID?
16    A.  It also captures revenue.
17    Q.  What do you -- what would you
18  need -- what was your understanding of
19  what you needed to do to have a broker
20  code that would record the revenue?
21    A.  There were premi- -- minimum --
22  minimum revenue requirements.
23    Q.  And what were those?

Page 45

1     A.  I don't know.
2     Q.  Do you know if it was like over
3  100,000 or 200,000 or 300,000?
4     A.  I would -- if I had to guess, I
5  would say a lead broker would need to be
6  750 to a million.
7     Q.  To have a lead broker code,
8  you'd would need to have 750 to a million
9  dollars in revenue?
10    A.  And be --
11    Q.  Is that right?
12    A.  I don't know.  That's --
13    Q.  That's what you think?
14    A.  That's what I would guess.
15    Q.  Okay.  That's what you would
16  guess?
17    A.  Yeah.
18    Q.  All right.
19    A.  And you would have to be
20  promoted into the role through management
21  or hired into it.
22    Q.  And just so that our terminology
23  is clear on the record, Ms. Hendrix, is a

12 (Pages 42 - 45)

1  lead broker or a senior broker the same
2  thing, or are those two different things?
3      A.  It could -- it could be two
4  different things just because of how some
5  teams are set up, but it usually is the
6  senior broker.  Some teams are -- some
7  are teams, and so it would have an actual
8  team name.
9      Q.  Were there brokers who had
10  revenue codes for the AIM system that
11  were not lead brokers?
12      A.  No.  Well, there were no senior
13  brokers.  Is that --
14      Q.  No.  I'm just asking -- you said
15  that the -- I think we -- I was asking
16  what you would need to do to get a code,
17  and you said, well, to be a lead broker,
18  you'd need 750,000 to -- you thought that
19  you would need 750,000 to a million
20  dollars in revenue.  But you said lead
21  broker, so I was just wondering if there
22  was another threshold --
23      A.  I don't know.

1      Q.  -- for an associate broker, for
2  example, to have a code.
3      A.  I do know at one time there --
4  oh, not to have a code.  I don't think
5  that there was a requirement, not that I
6  was aware of.
7      Q.  Okay.  All right.  So we were
8  talking about the -- your job as -- in
9  the audit department, and you said you
10  would audit the AIM system.  So, what
11  were you auditing in that system?
12      A.  Each of the policy files.
13      Q.  Anything else?
14      A.  In AIM?
15      Q.  Yes.
16      A.  I mean, I don't think there
17  would be anything else.
18      Q.  Okay.  And you say the policy
19  file would be -- or whatever policies
20  that CRC sold, you were making sure that
21  the appropriate information was in the
22  system for that policy?
23      A.  Uh-huh.

1      Q.  Is that right?  Is that
2  accurate?
3      A.  Yes.
4      Q.  And what kind of things were you
5  looking for?
6      A.  In AIM or in the policy file?
7  It could be different.
8      Q.  Okay.  Explain that to me.
9      A.  Some offices have paper files.
10  Actually, Birmingham professional was the
11  only one that was allowed to keep
12  everything in AIM and use it as a
13  paperless file.  So we would -- it was
14  the same stuff, so I would just audit the
15  policy file from where it should have
16  started to where it's ending, which
17  starts with usually the application.  We
18  would check the quote.  We would make
19  sure there was a request to bind from the
20  agent, a request to bind to the carrier,
21  a binder --
22      Q.  And in lay terms, you know, if a
23  judge ends up reading this transcript who

1  has no knowledge about the insurance
2  industry, what is a request to bind?
3      A.  It is an order for the business.
4      Q.  It's a request from the client
5  to say, "Yes, we want this policy"?
6      A.  Correct.
7      Q.  Okay.
8      A.  And then we also would have to
9  send one to the carrier.
10      Q.  The insurance carrier who was
11  going to insure that particular client?
12      A.  Correct.  And then they would
13  send the binder.
14      Q.  And what is a binder?
15      A.  It lists the limits, effective
16  date, terms and conditions of what's
17  going to -- what the policy -- what's in
18  the policy.
19      Q.  What do you do with the binder?
20      A.  What do you mean, what do you do
21  with it?
22      Q.  Well, I mean, what would -- what
23  would somebody on a broker chain do with

1   a binder who were looking to see if it
2   was there?  I mean, what is the -- is it
3   something that gets uploaded?  Is it
4   something that gets put in a file?  Is it
5   something that has to be typed up or
6   prepared?
7      A.   It could be several ways.  We
8   would look for the binder from the
9   carrier, and then teams would have an
10  option to either put a cover letter on
11  that binder and send it to the in- -- to
12  the agent or retype the binder in the AIM
13  system and send it to the agent.
14     Q.   With respect to an -- the
15  request to bind, what has to happen on
16  the broker's side with that?
17     A.   The request to bind from the
18  agent or to the carrier?
19     Q.   Both.
20     A.   You would have to have the
21  request to bind before you could bind the
22  policy in AIM, which is where you
23  invoiced it.

1      Q.   Okay.  But from just a nuts and
2   bolts perspective, if you're on a broker
3   team and the call that comes in from the
4   client says, "Yes, we want this policy,"
5   they're making the order, then what
6   happens?
7      A.   If they -- a verbal request to
8   bind?
9      Q.   Well, if it's different, then we
10  can talk about it.  Let's start with
11  verbal.
12     A.   Yeah.  You had to have written
13  confirmation within 24 hours to bind.
14     Q.   Could that be done by e-mail?
15     A.   It could.
16     Q.   If you got the request in an
17  e-mail, then what would you do, or some
18  other form in writing?
19     A.   You would put it in the file.  I
20  guess you're asking me as -- what the
21  broker team does.
22     Q.   Yes.
23     A.   Okay.  You would put it in the

1   file and then -- can you repeat the
2   question?
3      Q.   Yeah.  I was asking from a nuts
4   and bolts perspective what -- what the
5   broker team does if -- with a request to
6   bind.  Like, what do they have to do with
7   it?
8      A.   Put it in the file.
9      Q.   Just put it in the file?
10     A.   Yeah.
11     Q.   And for Birmingham, you said
12  they did all electronic files?
13     A.   Birmingham professional.
14     Q.   Birmingham professional?
15     A.   Uh-huh.
16     Q.   So that would -- would that mean
17  uploading it to AIM?
18     A.   Uh-huh.
19     Q.   Is that a yes?
20     A.   Yes.  Sorry.  We switched to
21  ImageRight while I was there, and so we
22  stopped keeping it in AIM and would print
23  it to ImageRight, which was a paperless

1   system.
2      Q.   You mentioned that part of the
3   -- going back to the auditing, something
4   about SecureDesk.  What is that?
5      A.   It was required by the bank,
6   BB&T.  And we would check all the desks
7   to make sure no confidential information
8   was left out; any shred was not left at
9   the desk, it was taken to the shred box;
10  no passwords were kept out.  Laptops had
11  to be locked to the desk.
12     Q.   So when you were working in the
13  audit department, what was your official
14  title?
15     A.   It changed --
16     Q.   Okay.
17     A.   -- several times.
18     Q.   Okay.  What was your first one?
19     A.   Internal auditor, I believe.
20     Q.   And then what was the next
21  title?
22     A.   Well, they went through a phase
23  where we had to change from auditor to

Page 54

1  reviewer as our title.  So internal
2  reviewer.
3    Q.  Did your job duties change at
4  all?
5    A.  No.  It was just the title
6  because that's what BB&T had told us to
7  do.
8    Q.  And then any other titles you
9  had?
10    A.  Senior auditor.
11    Q.  When did you get senior auditor
12  title?
13    A.  I would have to -- I would have
14  to go look, but it was --
15    Q.  Just your best estimate that
16  you --
17    A.  Okay.  2012-ish.
18    Q.  Was that a promotion?
19    A.  It was.
20    Q.  Did you supervise anybody as a
21  senior auditor?
22    A.  No.
23    Q.  All right.  What did you do on a

Page 55

1  day-to-day basis, first as an internal
2  auditor, or internal reviewer?
3    A.  It would be different every --
4  most days and every week because we would
5  travel to the locations.  So some days
6  I'd spend traveling, flying, getting a
7  car, getting to the hotel.  Some days --
8  and then I'd set up in the office that I
9  was at and pull the policy files that we
10  were auditing and perform the audit.
11    Q.  Did you work independently?
12    A.  I did.
13    Q.  Did you feel like you did that
14  job well?
15    A.  I do.
16    Q.  Did you feel like you had
17  appropriate training to know how to do
18  the job?
19    A.  Yeah.  I was the second hire, so
20  I worked with Jack to kind of figure out
21  the program.  But I want to say I
22  traveled with Jack for about a year
23  performing the audits before I went on my

Page 56

1  own.
2    Q.  Okay.
3      MS. WILKINSON:  Rachel, when you
4  get a minute, can we take a break?  I
5  don't want to interrupt you.
6      MS. BARLOTTA:  We can take a
7  break now.  It's fine.
8      THE VIDEOGRAPHER:  We're going
9  off the record at 10:02.
10      (Break taken.)
11      THE VIDEOGRAPHER:  We're going
12  back on the record at 10:10.
13    Q.  (By Ms. Barlotta) I'm showing
14  you what I've marked as Defendant's
15  Exhibit 1.
16      MS. BARLOTTA:  Oh, thank you.
17    Q.  As I understand, it's a
18  performance evaluation that we produced
19  in this case that you received in 2010.
20  And if you would look with me at page --
21  the second page of Defendant's Exhibit 1,
22  is that your signature?
23  (Defendant's Exhibit 1 was marked for

Page 57

1  identification and is attached.)
2    A.  Looks like it.
3    Q.  Okay.  And if you'd look with me
4  on page 4, is that also your signature?
5    A.  Looks like it.
6    Q.  And would it be correct that Mr.
7  Jack Elliott was the one who did your
8  performance evaluations in 2010?
9    A.  Uh-huh.  Yes.
10    Q.  On page 6, there is management
11  comments about strengths, your strengths
12  and then your areas for improvement.  And
13  one of the things he listed was looking
14  for leadership opportunities within the
15  department.  And do you recall what you
16  discussed with him about looking for
17  leadership opportunities?
18    A.  I guess it was about becoming a
19  senior auditor, I believe.
20    Q.  In the summary, he states:  "I
21  would like 2010 to be the year that your
22  leadership opportunities within the
23  department are found.  There are great

15 (Pages 54 - 57)

Page 58

1  opportunities to be found within the
2  audit department.  The safe and easy path
3  will not be the best course in 2010.
4  Consider searching for ways to complete
5  the additional responsibilities you have
6  been given in a timely manner."
7     Did you -- other than becoming a
8  senior auditor, do you know what he was
9  talking about with respect to there --
10  that there were great opportunities to be
11  found within the audit department?
12     A.  I don't recall.
13     Q.  Okay.  Did you tell -- did you
14  tell Mr. Elliott that you wanted
15  leadership opportunities within the
16  department?
17     A.  I could have.  I was always
18  looking to advance in my career.
19     Q.  You could have.  You don't
20  recall whether you did or not?
21     A.  I don't recall if I brought it
22  to him or he brought it to me.
23     Q.  And did you feel like Mr.

Page 59

1  Elliott was working to advance your
2  career?
3     A.  He was.
4     Q.  It says, "Obtaining your CIC
5  designation should be at the very top of
6  priorities."  What is that?
7     A.  It is Certified Insurance
8  Counselors certification.
9     Q.  Did you obtain that?
10     A.  I did.
11     Q.  When did you obtain that?
12     A.  I think maybe around 2012.
13     Q.  What was involved in obtaining
14  that?
15     A.  It was a five-part course in
16  three days, and you had to pass it -- all
17  five -- a test for all five parts to get
18  the certification.
19     Q.  Did CRC pay for that --
20     A.  They did.
21     Q.  -- certification?
22     The comments also represent --
23  or excuse me, not represent, mention a

Page 60

1  bonus.  What kind of bonuses did you
2  receive when you were in the audit
3  department?
4     A.  If I can remember correct, they
5  ranged from maybe 1,000 to maybe 6,000.
6  They were biannual.
7     Q.  Okay.  And do you know what they
8  were based upon?
9     A.  They were at my manager's
10  discretion, so.
11     Q.  Okay.  Was it tied -- were they
12  tied to any specific metrics or numbers
13  or goals or anything --
14     A.  Not in the audit --
15     Q.  -- that you recall?
16     A.  -- department.  We weren't a
17  production team.
18     Q.  And when you worked in the audit
19  department, did you have to sell
20  anything?
21     A.  No.
22     Q.  Did you have to -- did you call
23  on clients?

Page 61

1     A.  No.
2     Q.  Did you make presentations of
3  any sort?
4     A.  I did for the locations
5  regarding policies and procedures.
6     Q.  Tell me about that.  What did
7  you -- how often did you do that?
8     A.  When CRC acquired Crump, we went
9  to all of their offices and went over
10  CRC's policies and procedures, kind of
11  introduced them to the audit process.
12     Q.  So, was that a one-time thing?
13     A.  Yes.  And then we acquired Swett
14  in --
15     Q.  How do you spell Swett?
16     A.  S-W-E-T-T, I think.
17     Q.  Okay.  And so you would go to
18  the Swett offices and explain to them
19  what the CRC policies were?
20     A.  I believe we did it for Swett.
21  I remember doing it for Crump.
22     Q.  Was that something you and Mr.
23  Elliott did together, or did you do it by

16 (Pages 58 - 61)

Page 62

1  yourself?
2      A.  I did some by myself, some
3  together.
4      Q.  How many did you do by yourself?
5      A.  I cannot remember.
6      Q.  Let me show you what I've marked
7  as Defendant's Exhibit 2.  All right.  So
8  I'm showing you what's been marked as
9  Defendant's Exhibit 2, which I will tell
10  you has been produced by the defendants
11  in this case from your personnel records.
12  And the last document we looked at had a
13  written signature on it.  This evaluation
14  appears to have an electronic signature.
15  So, do you recall that you would receive
16  evaluations and sign off on them
17  electronically?
18  (Defendant's Exhibit 2 was marked for
19  identification and is attached.)
20      A.  Yes.
21      Q.  Okay.  And again I'd like to
22  direct your attention to page 6, the
23  management comments.

Page 63

1      A.  Comments.
2      Q.  You see that Mr. Elliott has
3  listed your strengths as learning more
4  about the insurance side and knowing
5  computer systems and being comfortable
6  using them.  Would you agree that those
7  were strengths that you had?
8      A.  Yeah.
9      Q.  Okay.  And the areas for
10  improvement, he asked -- or he noted for
11  you to communicate more with your manager
12  and begin to take leadership roles in the
13  department.  Do you see that?
14      A.  I do.
15      Q.  And do you recall Mr. Elliott
16  encouraging you to take leadership roles
17  in the department?
18      A.  Yes.
19      Q.  Okay.  In his summary, he says
20  that he's seen great improvements in your
21  audit but also in you and that you were
22  close to finishing the CICs.  And is that
23  -- is that consistent with your testimony

Page 64

1  before that you thought that you
2  completed that in 2012?
3      A.  This is from 2012?  Yeah.
4      Q.  Well, it just says I will -- so
5  the date you signed it was on --
6  electronically signed, it was January
7  4th, 2012.
8      A.  And you want to know if I got
9  the CIC in 2012?
10      Q.  Right.  Because he says in here
11  that you were close to getting those.
12  You were -- you hadn't finished them, but
13  you were close to completing them.  And I
14  thought your testimony earlier was that
15  you did that sometime in 2012?
16      A.  I believe it was 2012.
17      Q.  Do you know why it was that he
18  wanted you to get that designation?
19      A.  He had always said so that I
20  could have more opportunity at CRC.
21      Q.  Did you know what he meant by
22  that when he said more opportunity?
23      A.  I don't know.  No.  Maybe on the

Page 65

1  sales side, production, if I wanted to
2  make that leap.
3      Q.  Had you talked with him about
4  making that change?
5      A.  That had always been something
6  that I wanted to do down the line.
7      Q.  And when did that be- -- when
8  did that become something that you wanted
9  to do, like you wanted to get into
10  selling insurance?
11      A.  Well, I wanted to get to the
12  production side.  Maybe after year two or
13  three in audit.
14      Q.  And why -- why did that come
15  about?  What made you want to go to the
16  production side after you had been in
17  audit for two or three years?
18      A.  There was a lot of opportunity
19  over there.
20      Q.  And what does that mean, "a lot
21  of opportunity over there"?
22      A.  To make more money, I guess.
23  Audit was not a production position.

17 (Pages 62 - 65)

Page 66

1    Q.   Meaning audit did not produce
2  revenue.
3    A.   Correct.
4    Q.   Right?
5        And had you -- was that part of
6  -- was that any part of your audit
7  procedures, that you would look at
8  commissions and bonuses?
9    A.   We never looked at bonuses.  We
10  would check the commissions --
11    Q.   Okay.
12    A.   -- on the policies.
13    Q.   Did you have any idea what
14  people were making over in production in
15  terms of a salary or bonus?
16    A.   No.
17    Q.   Okay.  You just had a -- you
18  just had this thought that you -- that
19  there would be more money, that you would
20  make more money on that side?
21    A.   I mean, people that I knew that
22  worked on that side had a lot of money.
23    Q.   Well, that's what I --

Page 67

1    A.   Made a lot of money.
2    Q.   I'm just trying to get at did
3  somebody say, "Hey, you know, you should
4  come over here because we make a lot of
5  money and this is my salary."  I mean,
6  what -- that's what I'm trying to get at.
7    A.   Oh, no.  I had several people
8  come to me while I was an auditor and ask
9  if I had considered coming to the sales
10  side because I didn't have a personality
11  of an auditor.
12    Q.   And what does that mean, you
13  didn't have the personality of an
14  auditor?
15    A.   I was personable.
16    Q.   Who were the people who asked
17  you?
18    A.   I can't recall.
19    Q.   Were they peop- -- where they
20  people in Birmingham or other offices?
21    A.   I want to say other offices.  It
22  could have happened in Birmingham.
23    Q.   But back to the money question,

Page 68

1  did you have any inkling of how much
2  money people were making on the
3  production side at the time you were
4  working in audit -- auditing?
5    A.   No.  Not that I can recall.
6    Q.   I'm showing you what I've marked
7  as Defendant's Exhibit 3.  Defendant's
8  Exhibit 3, I submit to you, is another
9  performance evaluation that was produced
10  by the defendants in this case from your
11  personnel records.  And it's reflecting,
12  on page 2, an electronic signature of
13  March 1st, 2013.  Do you see that?
14  (Defendant's Exhibit 3 was marked for
15  identification and is attached.)
16    A.   I do.
17    Q.   Okay.  Do you have any reason to
18  dispute that you didn't electronically --
19  that you electronically signed this?
20    A.   No.  I don't dispute it.
21    Q.   Okay.  I want to look at again
22  page 6 under the "Manager's Summary"
23  where it says:  "We will reset duties in

Page 69

1  2014.  I appreciate your long term work
2  in the department."
3        Do you know what was going to
4  change about your duties in 2014?
5    A.   I think that it was starting to
6  do more of the reviews of the audit
7  reports that he was currently doing.
8    Q.   Had you asked for a change of
9  duties?
10    A.   I can't remember if I
11  specifically asked or if he encouraged.
12    Q.   What about your duties do you
13  think you might have encouraged him or
14  asked him to change?
15    A.   I -- I don't know.  I can't
16  recall.
17    Q.   Okay.  So you had mentioned, I
18  believe -- and if I'm wrong, you can
19  correct me, but that you had wanted to
20  make a move to the production side
21  because you thought you could make more
22  money.  Is that right?
23    A.   Yeah.

18 (Pages 66 - 69)

Page 70

1    Q.   Any other reasons?
2    A.   It seemed like a fun culture to
3  work in.  It's very different from the
4  audit.
5    Q.   Okay.  And what about it seemed
6  fun?
7    A.   The -- I guess it was more of
8  what wasn't fun in audit than what was
9  fun in the -- on the brokerage side.
10   Q.   Well, you can describe that.
11  What was not fun about audit?
12   A.   Oh, we had to remain
13  independent, so there was a while where
14  we had a rule we weren't allowed to eat
15  with people, couldn't give the impression
16  that we were favorable towards teams.  So
17  I wasn't really able to get to know the
18  people as much.
19   Q.   Anything else you didn't like
20  about the audit side?
21   A.   Jack could be difficult to work
22  for.
23   Q.   How so?

Page 71

1    A.   He managed by what mood he was
2  in, it seemed.
3    Q.   What does that mean?
4    A.   There were times he would I
5  guess lash out and to -- what I mean is
6  just send an e-mail.
7    Q.   Send an e-mail like that was
8  critical?
9    A.   Right.  And he would do it to
10  the whole department.  And he also -- it
11  was a remote job.  I worked from home.
12  And he had decided that he wanted it to
13  be an in-office job when we were in town.
14  And so that was a big change for me and
15  the rest of -- some people were then
16  required to drive two hours to offices.
17  And I didn't have a place to sit either.
18  He just would find me an empty cube for
19  the day.
20   Q.   And what office were you driving
21  in to?
22   A.   Birmingham.
23   Q.   How far was that from where you

Page 72

1  lived at the time?
2    A.   A mile maybe.
3    Q.   I'm showing you what I've marked
4  as Defendant's Exhibit 4.  These are
5  records that your attorney produced to us
6  in this case.
7  (Defendant's Exhibit 4 was marked for
8  identification and placed under seal.)
9        MS. PALMER:  Rachel, I just want
10  to note for the record -- I know you came
11  into this case a little bit late -- we
12  have a protective order about any mention
13  of this information or these exhibits
14  requiring a filing under seal.
15       MS. BARLOTTA:  Okay.  So we can
16  place -- are you asking to place this
17  part of her deposition under seal?
18       MS. PALMER:  Yes.
19       MS. BARLOTTA:  Okay.
20  (NOTE:  Pages 73 through 77 were placed
21        under seal.)
22             *
23             *

Page 78

1    Q.   (By Ms. Barlotta) Okay.  So, how
2  did that come about?  Like, how did you
3  come to work on the production side in
4  the professional liability department in
5  CRC's Birmingham office?
6    A.   I had actually been on an audit
7  in Houston and had talked to Brent
8  Tredway, who was the president of that
9  location, about coming to the production
10  side and wanted his opinion, if he
11  thought that it would be a good move for
12  me.  He said it was.  So I was talking --
13  but he said that I would need to talk to
14  Jack before he could consider anything.
15  And when I went to Jack, Corey apparently
16  had come to him about me coming on his
17  team because he was needing somebody.
18   Q.   Had you known Corey -- I mean,
19  when you say Corey, you mean Corey
20  Daugherty?
21   A.   Yeah, Corey.
22   Q.   Had you met him before?
23   A.   I had met him.  I didn't know

19 (Pages 70, 71, 72, 78)

1  him.  I believe I had met him.  I was
2  making it a point to introduce myself to
3  the brokers once I had decided that I
4  wanted to go to the production side.
5      Q.  And you said you thought that
6  Mr. Daugherty had come to Mr. Elliott and
7  asked about you moving over to the
8  production side?
9      A.  Uh-huh.
10     Q.  Is that right?
11     A.  I believe that's what happened.
12     Q.  So, did you, at any point when
13 you were working at audit, go to any
14 brokers in the Birmingham CRC office and
15 say, "Hey, I want to come work over here
16 for you guys"?
17     A.  No.
18     Q.  So, how did you learn about that
19 Mr. -- and I'm sorry, I think you might
20 have said this.  But did you say that Mr.
21 Elliott came to you and told you that Mr.
22 Daugherty was interested in hiring you?
23     A.  I actually went to him to talk

1  to him about possibly working in Houston
2  on a production team.
3      Q.  Okay.
4      A.  And I said, "I want to get your
5  thoughts on me moving over to
6  production."  And he said, "Did somebody
7  talk to you?"  Because apparently, Corey
8  had just talked to him, but I didn't know
9  about that at the moment.
10     Q.  Well, is that what he said, that
11 Corey had come -- Mr. Daugherty had come
12 to him?
13     A.  He said somebody had come to
14 him.  I'm not sure if he told me who it
15 was at that time.
16     Q.  Okay.  And then what else
17 happened in that conversation?
18     A.  I mean, I believe he said that
19 he thought I was ready and would make a
20 good fit and would support the move.
21     Q.  Okay.  So, what did you do?
22 What was the next thing you did after
23 that discussion?

1      A.  I can't remember exactly.  I
2  know in the next couple of weeks, Corey
3  called or e-mailed.  I went down and sat
4  in his office and talked to him.  I was
5  also talking to Brent Tredway, discussing
6  the opportunities that were available at
7  each place.
8      Q.  And Brent Tredway was in Texas?
9      A.  Uh-huh.  Houston.
10     Q.  Houston?  Did you get an offer
11 to come work in the Houston office?
12     A.  Not an official or written
13 offer, but he did want me to come on a
14 team there, if I remember right.
15     Q.  Okay.  And so, did -- so, did
16 you have two offers, one from Birmingham
17 and one from Houston?
18     A.  Uh-huh.
19     Q.  Is that a yes?
20     A.  Yes.  I believe.  That's how I
21 viewed it.
22     Q.  Okay.  Did you submit an
23 application or resumé of any sort to work

1  in the Birmingham office or the Houston
2  office?
3      A.  I don't believe so.
4      Q.  It was all just verbal
5  discussions?
6      A.  I think so.
7      Q.  Was there ever an interview with
8  either the Houston office or the
9  Birmingham office?
10     A.  Informal, maybe, a discussion at
11 the office.  And then on the phone with
12 Brent.
13     Q.  Okay.  Who was part of the
14 informal discussion?
15     A.  I believe it was just me and
16 Brent and just me and Corey.
17     Q.  Did you have any understanding
18 of what position you were being
19 considered for?
20     A.  Yes.
21     Q.  What was that?
22     A.  Both were account executive
23 positions at the time.  I made it pretty

20 (Pages 79 - 82)

Page 83

1  clear, though, that I was looking to move
2  into a brokerage role and looking to be
3  trained by a broker.
4    Q.  How did you make that clear?
5    A.  I remember Corey said -- was
6  talking about his team, and he said,
7  "Andrea's been here 20 years, Yvette's
8  been here 25 years."  And I remember
9  saying that that was awesome, but I
10  wasn't looking for somewhere that I was
11  going to be sitting in the same seat 20
12  years from now.  I was looking to learn
13  and to grow.
14    Q.  And is that the same thing that
15  you -- discussion -- did you have that
16  same discussion with Mr. Tredway in
17  Houston?
18    A.  Right.
19    Q.  And what was Mr. Tredway's
20  response?
21    A.  The team he -- I believe from
22  what I remember is the team he was going
23  to put me on had just moved someone into

Page 84

1  the inside broker position, and so he
2  couldn't guarantee that that position, I
3  guess, would be available on that team
4  anytime soon.  Corey had told me that
5  there was opportunity to learn, to grow,
6  and become a broker.
7    Q.  Okay.  Anything more specific
8  than that, other than there's opportunity
9  to learn and grow and become a broker?
10  Meaning, did he give you any sort of
11  timeline saying, oh, yeah, if you come
12  here and work X number of years, then you
13  can be a -- you can be a broker?
14    A.  No.  Not that I recall.
15    Q.  Did he tell you whether or not
16  there were any other broker roles open on
17  his team at the time?
18    A.  No.
19    Q.  Did you talk to anybody else who
20  worked in the -- other than Mr.
21  Daugherty, did you talk to anybody else
22  who worked in the Birmingham CRC office
23  about moving to an account executive

Page 85

1  position before you accepted that offer?
2    A.  Like on somebody else's team?
3    Q.  Yes.
4    A.  Not that I remember.
5    Q.  Did you call -- I'm just asking,
6  did you call anybody up to say:  "Hey,
7  what's it like to work here?  What's it
8  like to work on" -- "What's it like to
9  work with Mr. Daugherty?"  Did you try to
10  get any sort of inside --
11    A.  Randy McClendon, maybe.  I can't
12  remember if I talked to him.  He said he
13  was a great guy.  Everybody I talked to
14  said he was a great guy and good to work
15  for.
16    Q.  So, what drove you to accept
17  Birmingham instead of the Houston offer?
18    A.  The potential opportunity that I
19  saw in the department.
20    Q.  And what do you mean by that?
21    A.  Corey was a very successful and
22  -- I mean, considered an expert as a
23  professional liability broker.  And he

Page 86

1  was very young for where he was at, I
2  believe.  His team was growing.  And I
3  had watched teams grow, and I knew he
4  would need an inside broker at some
5  point.
6    Q.  And what led you to believe that
7  he would need an inside broker?
8    A.  I had spent the past eight years
9  auditing all of the teams, and that was
10  -- as you grew, you -- that helped you
11  grow, to have somebody be your inside
12  broker and market the business so you can
13  be producing and bringing in more.
14    Q.  Do all teams have inside
15  brokers?
16    A.  No.
17    Q.  Do you know why some teams do
18  and some teams don't?
19    A.  I think it's the -- up to the
20  broker.
21    Q.  Did you want to stay in
22  Birmingham, or was that at all a driver
23  for you accepting the Birmingham

21 (Pages 83 - 86)

Page 87

1  position?
2      A.  I'm sure it was part of it.  My
3  family lives here.
4      Q.  In your initial discussions with
5  Mr. Daugherty about the position, did you
6  all talk about what you would be doing as
7  an account executive?
8      A.  I can't remember if we
9  specifically talked about it.  I was
10  familiar with what the role did from
11  auditing the policies and procedures.
12      Q.  And what did that role do?
13      A.  They maintained, or helped keep
14  the relationship with the agent; were in
15  charge of creating the policy files,
16  making sure the stuff was in there; and
17  creating quotes, all the different
18  documents that were required to be typed
19  and done in AIM.
20      Q.  So helped maintain the
21  relationship.  They made sure the
22  appropriate documents got -- they were
23  responsible for creating the policy files

Page 88

1  and making sure the appropriate
2  documentation got into the files.  They
3  also created quotes.  Anything else?
4      A.  They would do the binders.  They
5  would --
6      Q.  And that's the binders we've
7  already talked about.  Is that right?
8      A.  Yeah.  They would issue the
9  policies.
10      Q.  What's involved with issuing a
11  policy?
12      A.  Checking it to make sure the
13  coverages and everything matches the
14  binder and sending it to the agent.
15      Q.  How long does that take?
16      A.  It depends on the policy file.
17      Q.  Average time?  Just your best
18  estimate.
19      A.  I mean, --
20      Q.  From your -- your specific --
21  you know, doing that.
22      A.  I mean, a property policy would
23  take maybe five minutes.  Some would take

Page 89

1  two to check the effective dates, the
2  limits, the endorsements.
3      Q.  So between two to five minutes?
4      A.  Rough estimate.
5      Q.  Rough estimate.
6      A.  Uh-huh.
7      Q.  What was involved in creating
8  quotes?
9      A.  Our team did the limited quote.
10  So it was a memo that we would attach to
11  the carrier's quote, so you had to put --
12  input a lot less than you would on the
13  full AIM quote where you had to retype
14  all of the information.
15      Q.  So essentially, you had like a
16  standard form that you would attach to
17  whatever the insurance -- the quote
18  document that you received from the
19  insurance carrier?
20      A.  Uh-huh.  And then you would --
21      Q.  Is that a yes?
22      A.  Yes.  Sorry.
23      Q.  And then you would?

Page 90

1      A.  There were things you had to do
2  on a carrier quote before sending to the
3  agent, like whiting out the commission.
4      Q.  Whiting out, why would you do
5  that?
6      A.  Because you didn't necessarily
7  want the agent to see your commission.
8      Q.  Okay.
9      A.  We would tell them if they
10  asked.  We split the commissions with the
11  agent, so what they saw wouldn't be what
12  they got.
13      Q.  Who pays the commission?
14      A.  The carrier.
15      Q.  But I understand from Mr.
16  Daugherty's testimony that on -- at least
17  on the Birmingham professional liability
18  side, the broker teams really considered
19  the agents to be more so of your target
20  clients.
21      A.  Right.  Yeah.  We don't work
22  directly with insurers.
23      Q.  How long does it take to create

22 (Pages 87 - 90)

1 a quote?  On average.
2    A.  It could be five minutes.
3    Q.  Okay.  What about doing the
4 binders, how long would that take?
5    A.  Maybe two to three because you
6 input the information at the quote stage.
7    Q.  Were account executives also
8 responsible for renewals?
9    A.  Yeah.
10    Q.  What is involved in a renewal?
11    A.  Sending out a solicitation, or
12 the renewal letter, I guess, with the
13 application when it was coming up for
14 renewal.  I think we tried to do it two
15 to three months before the effective
16 date.
17    Q.  Anything else you would have to
18 do other than send out a letter?  I mean,
19 would you call people and say, "Hey, your
20 policy is about to expire," or call the
21 agent and say, "Hey, this policy is about
22 to expire"?
23    A.  Yeah, it could.

1    Q.  Yeah.
2    A.  Usually, you just sent the
3 application, and then once you got the
4 application back from the agent, you
5 would send it to the carrier and any
6 additional information you had about the
7 account.  And then the carrier would send
8 you the quote back.
9    Q.  And you said -- one of the
10 things you mentioned was maintaining or
11 helping to keep relationships with the
12 agents.  What did that involve as an
13 account executive?
14    A.  Well, you were responsible for
15 the accounts of the agent and making sure
16 that they got the application, and you
17 were their point of contact, usually, on
18 renewals.
19    Q.  All right.  Anything else you
20 did as an account executive?
21    A.  We also marketed business.
22    Q.  And how did you do that?
23    A.  Would look at the submissions

1 and figure out what markets might --
2    Q.  I'm sorry, what was that, the
3 first thing you said about --
4    A.  Look at the submissions.
5    Q.  Look at the submissions.
6    A.  Follow up for any outstanding
7 information.
8    Q.  What is a submission?
9    A.  Usually, it's the application,
10 and it could be loss runs, whatever the
11 carrier requires in order to quote the
12 coverage.
13    Q.  What is a loss run?
14    A.  It recor- -- it is a history of
15 the losses on policy accounts.
16    Q.  Was there a program that you
17 would draw that information from?  How
18 would you get a --
19    A.  You had to get it from the
20 carriers.
21    Q.  How did you do that?
22    A.  Some had loss run e-mail
23 addresses.  Some you would have to

1 e-mail.  Some you could pull off of their
2 websites directly.
3    Q.  So for -- for the marketing
4 business aspect, you would look at a
5 submission, which would be an application
6 from -- right?  And this would be a
7 business?  Since y'all did professional
8 liability, would it --
9    A.  Right.  We'd get it from the
10 agent, but --
11    Q.  Oh, you get it from the agent.
12 But the application actually had been
13 filled out by some company seeking a
14 policy --
15    A.  Yeah.
16    Q.  -- of some sort?
17    A.  Yes.
18    Q.  And -- and you said you would
19 follow up to see if there was any
20 outstanding information needed for the
21 application.
22    A.  Uh-huh.  Yeah.
23    Q.  Is that right?

23 (Pages 91 - 94)

1    A.   And then we would -- sometimes
2   for new business, we would create a
3   submission letter, kind of doing a quick
4   picture of what the exposures were and
5   what coverages they were looking for and
6   what attachments were included.
7    Q.   Okay.  And then you would send
8   that to carriers, various carriers --
9    A.   Uh-huh.  The underwriters.
10    Q.   -- to see how -- like a quote
11   for what they would insure that
12   particular entity for?
13    A.   Uh-huh.
14    Q.   Is that right?
15    A.   Yeah.
16    Q.   Would you do like a blast e-mail
17   out?
18    A.   No.
19    Q.   Is that how you would do it?
20         How would you do it?
21    A.   I would send individual e-mails
22   to each of the underwriters.  Some you
23   might call to see if it was something

1   that would fit with them.  But you still
2   would send the submission if you wanted
3   it quoted.
4    Q.   All right.  Anything else you
5   did to market business as an account
6   executive?
7    A.   To market business as an account
8   executive?  I think that was the
9   marketing aspect of it, I think.
10    Q.   Okay.  Anything you -- any other
11   duties in general that you had as an
12   account executive when you worked on Mr.
13   Daugherty's team?
14    A.   I prepared the renewal lists
15   every month and sent them out to the
16   teams -- to our team, which was what
17   policies were coming up, who the agent
18   was, and who the assigned account
19   exec.
20    Q.   Was that something that you
21   created yourself, or had somebody been
22   doing that prior to you?
23    A.   Yvette did it before I did.

1    Q.   Anything else?
2    A.   For Clay, a lot of times I would
3   get marketing material from the marketing
4   department printed when I was his account
5   executive or worked on his accounts.  I
6   did that for Corey some too.
7    Q.   And who would you get those
8   marketing materials from?
9    A.   The marketing department.  Or
10   sometime -- you -- the dashboard, you
11   were able to create some graphs and stuff
12   and -- but we'd have to send it to the
13   marketing to get color prints.
14    Q.   Was there a specific person that
15   you would typically reach out to in
16   marketing?
17    A.   I think Colin Peterson was who I
18   worked with a lot.
19    Q.   Do you know where -- where Colin
20   was -- well, let me ask you this.  Was
21   the marketing department in Birmingham,
22   or was it somewhere else?
23    A.   It was in Birmingham.

1    Q.   Okay.
2    A.   I don't -- there could be people
3   in other offices, but --
4    Q.   Okay.
5    A.   -- I only remember in
6   Birmingham.
7    Q.   And when you said "for Clay,"
8   you're talking about Clay Segrest?
9    A.   Correct.
10    Q.   All right.  Anything else that
11   you did as an account executive?
12    A.   I would help respond to our
13   internal audits, any issues that would
14   come up for our team.
15    Q.   Anything else?
16    A.   Not that I can think of right
17   now.
18    Q.   Who trained you on your account
19   executive job duties?
20    A.   I had taken the AIM training
21   class that was provided by CRC trainers
22   two or three times throughout my course,
23   maybe, in audit.  And then I took it

1  again when I started on Corey's team.  So
2  that was kind of to learn the system and
3  what was required to be in the files.
4  And I knew that stuff.  And then I sat
5  with Andrea and Yvette and -- I guess it
6  was just the two of them that really.
7    Q.  Two of them that trained you?
8    A.  Yeah.
9    Q.  Okay.  And for the record, it's
10  -- that is Andrea Sutton?
11    A.  Uh-huh.
12    Q.  And Yvette Talsma?
13    A.  Uh-huh.
14    Q.  Is that a yes?
15    A.  Yes.  Sorry.
16    Q.  Before you accepted the account
17  executive position, had you had any
18  discussions with Mr. Daugherty about what
19  your compensation would be?
20    A.  I don't think that I did.
21    Q.  Okay.  So, was that part of a
22  verbal offer that was made to you?  So
23  for example, did he call you up and say:

1  "Hey, I want you on our team.  We're
2  going to pay you X"?
3    A.  I think it was an -- I think I
4  did get an offer, official offer letter.
5    Q.  Okay.
6    A.  And it was just the same salary
7  I was making in audit.  The bonuses in
8  audit I knew I felt were kind of -- I
9  wasn't going to get a lot more than that.
10  And so I knew that opportunity was over
11  there.
12    Q.  You mean you weren't -- you knew
13  in audit your bonuses weren't going to be
14  higher than what they were, that $1,000
15  to $6,000 range?
16    A.  I -- I assumed, yeah.
17    Q.  You assumed that that was going
18  to be the amount of bonus that you would
19  make on the production side, or did you
20  think it was going to be more?
21    A.  More.  Yeah.
22    Q.  Okay.
23    A.  I thought it would be more.

1    Q.  But you don't recall Mr.
2  Daugherty telling you any specifics about
3  the type or range of bonus that you would
4  get?
5    A.  No.  Just that I -- I didn't get
6  one the first go-around because of when I
7  joined his team.  And so I didn't get one
8  from audit either since I had left there,
9  so I knew that I was going in taking a
10  pay cut.
11    Q.  Did you all have any discussions
12  before you came in to that role about how
13  -- about whether or not you would be
14  entitled to a bonus?
15    A.  I don't believe so.
16    Q.  Okay.  So when you were given
17  your offer letter, you don't recall it
18  saying anything about that you would get
19  a bonus -- anything other than your base
20  salary?
21    A.  Right.  Correct.  Not that I can
22  recall.
23    Q.  Okay.  And did you try to

1  negotiate for a higher salary?
2    A.  No.
3    Q.  Why not?
4    A.  I really was excited about doing
5  the job, and I felt like I was going to
6  be good at it.  And people that were
7  successful on the production side seemed
8  to be pretty successful.
9    Q.  So you felt like it was worth
10  the pay cut in the short term because you
11  saw people being successful on that side
12  in the long run?
13    A.  Yeah.  Or --
14    Q.  And again, so when you say
15  "successful," you're talking about how
16  much money they earned?
17    A.  Yeah, I -- I believe so.  And at
18  the time, I was aiming for the broker
19  role and thinking that would be when it
20  came if I could get to that point.  But I
21  knew I -- there were things that I still
22  needed to learn about the brokerage side.
23    Q.  Okay.  But you didn't have any

25 (Pages 99 - 102)

1   understanding at the time you accepted
2   the account executive role about what, if
3   any, bonuses people were earning on the
4   production side?
5       A.   I don't recall having that
6   conversation.
7       Q.   What else -- what else did you
8   think you needed to learn when you came
9   in to the professional liability
10  department?
11      A.   As the relation -- what
12  relationships were there, who had the
13  relationships, coverages, the markets.
14      Q.   And when you say coverages, what
15  do you mean by that?
16      A.   Professional lines had several
17  different coverages that they wrote, and
18  professional is very different than
19  property and casualty.
20      Q.   And what were some of the
21  coverages that professional wrote?
22      A.   Professional liability, errors
23  and omissions, employment practices,

1   miscellaneous, you know, medical,
2   miscellaneous medical.
3       THE COURT REPORTER:  I'm sorry,
4   what medical?
5       THE WITNESS:  Miscellaneous
6   medical.
7       A.   And they wrote a lot of senior
8   living accounts that were the
9   professional and general liability.  It
10  would come together on one policy.
11      Q.   And so when you say you had to
12  learn coverages, is what you mean by that
13  that you had to -- you had to learn what
14  these policies covered, the types of
15  claims and the types of incidents that
16  they would cover so that you would know
17  how to place coverage?
18      A.   Yeah.  Yes.  And along with what
19  market wrote what business.
20      Q.   Explain that to me, what you
21  mean by, "what market wrote what
22  business."
23      A.   So markets would be, a lot of

1   times, specific to lines of coverage.  So
2   like OneBeacon wrote -- I believe they
3   were just medical at one time.  They
4   might have expanded and did some other.
5   Then like TDC, strictly medical
6   facilities.
7       Q.   Yeah.
8       A.   So it was very specialized.
9       Q.   Is TDC a carrier, underwriter?
10      A.   Uh-huh.
11      Q.   Is that a yes?
12      A.   Yes.  Sorry.
13      Q.   So you would need to know, when
14  an application came in for a certain kind
15  of coverage, which carrier wrote it so
16  you would know who to go to to get a
17  quote?
18      A.   Uh-huh.
19      Q.   Is that right?
20      A.   Yeah.
21      Q.   If I got any part of that wrong,
22  you correct me.  Okay?
23      A.   Yeah.

1       Q.   Okay.  Is there anything else
2   about the -- knowing the markets?
3       A.   The relationships with the
4   carriers or with the underwriters.
5       Q.   Okay.
6       A.   That's -- it was --
7       Q.   Why was that important?
8       A.   It was a relationship business,
9   is what everybody said.
10      Q.   Do you agree with that?
11      A.   I do.
12      Q.   So, what relationships did you
13  learn about when you first joined the
14  team?
15      A.   When I first joined the team?
16      Q.   Yes.
17      A.   I was more working with the
18  agents at that time while I'm -- with
19  Clay's, some of Corey's.
20      Q.   Who were Clay's agents?
21      A.   I would have to -- I mean, I
22  remember Lockton New York was a big one
23  he was working on.  He had inherited a

Page 107

1 lot of accounts from Corey.
2    Q.   What accounts do you think that
3 he inherited from Corey?
4    A.   What accounts?  I would have to
5 look at the lists --
6    Q.   Okay.
7    A.   -- to remember the names of
8 them.
9    Q.   Okay.  What about Lockton?
10    A.   I just -- it was a big carrier
11 that Clay was working on.
12    Q.   Okay.  You don't know if that's
13 an account he inherited from Corey?
14    A.   No, it was not.
15    Q.   That was an account he brought
16 in?
17    A.   Yeah.  I can't remember how he
18 met the guy.
19    Q.   What about New York?
20    A.   Lockton New York.  Sorry.
21    Q.   Oh, that's correct.  Thank you.
22       All right.  Any other of Clay's
23 agents that you think you were working --

Page 108

1 you said Lockton New York.  Did you say
2 that you couldn't remember any more or
3 that there were others?
4    A.   There were others.
5    Q.   You just don't know as you sit
6 here right now who they were?
7    A.   Right.  I couldn't name them
8 all.
9    Q.   Okay.  Can you name any of them?
10    A.   J. Smith Lanier in -- I can't
11 remember where they were located.  He had
12 an agent or two in Colorado, I believe,
13 and I think he inherited those from Corey
14 because Corey had -- couldn't work on
15 other Colorado accounts, I believe,
16 because of --
17    Q.   What --
18    A.   Because of the -- he had a big
19 agent that he worked with there.  I think
20 I remember that correct.
21    Q.   Is that information that
22 somebody told you?
23    A.   I believe Corey told me.

Page 109

1    Q.   Okay.
2    A.   Maybe Clay.  Morton was the
3 Colorado agent.
4    Q.   Okay.
5       THE COURT REPORTER:  Morton?
6       THE WITNESS:  Morton.
7    Q.   Was Morton Corey's or was it
8 Clay's?
9    A.   Corey's.
10    Q.   Okay.  Okay.  Any other of
11 Clay's accounts that you recall that you
12 worked on as an account executive?
13    A.   I can't think of any right now.
14    Q.   Okay.  J. Smith Lanier, do you
15 know, was that his account, or do you --
16 or is it your contention he inherited
17 that from Mr. Daugherty?
18    A.   I am not sure.
19    Q.   When you were an account
20 executive, who -- who did you report to?
21    A.   Corey.
22    Q.   Mr. Daugherty?
23    A.   Yes.

Page 110

1    Q.   I'm going to -- my understanding
2 is that there is two Coreys --
3    A.   Okay.
4    Q.   -- that worked at --
5    A.   Woodward.
6    Q.   Okay.
7    A.   Yeah.
8    Q.   So I just want to make sure that
9 we get the -- that we keep our Coreys
10 straight.
11    A.   Okay.  Okay.
12       MS. PALMER:  We've been going an
13 hour.  Are you okay?  Do you want to take
14 a break?
15       MS. WILKINSON:  I could use one.
16 I just didn't want to interrupt you if
17 you're shifting gears.
18       MS. BARLOTTA:  Yeah, we are
19 shifting gears.  I think it's a good time
20 to take a break.  That's fine.
21       MS. WILKINSON:  That would be
22 wonderful.  Thank you.
23       THE VIDEOGRAPHER:  We're going

27 (Pages 107 - 110)

Page 111

1 off the record at 11:11.
2 (Break taken.)
3 THE VIDEOGRAPHER: We're going
4 back on the record at 11:28.
5 MS. BARLOTTA: While we're back
6 on the record, Leslie, we had not ended
7 specifically the part that was going to
8 be under seal, so I just wanted to make
9 sure that we had a way to go back.
10 Because, I mean, obviously, we've had a
11 long -- a lot of testimony that would not
12 qualify for being under seal, so if we
13 could just agree that that portion end
14 when we stopped discussing Plaintiff's --
15 Defendant's Exhibit 4.
16 MS. PALMER: Exhibit 4?
17 MS. BARLOTTA: Correct.
18 Q. (By Ms. Barlotta) Okay. I'm
19 showing you what I've marked as
20 Defendant's Exhibit 5. These are
21 documents that the defendants produced in
22 this case as part of your personnel
23 records. And it's my understanding that

Page 112

1 this is an electronic summary of your
2 acknowledgments of various handbooks and
3 policies while you were employed with CRC
4 after CRC became associated with BB&T.
5 So I want to ask you, do you
6 recall that from time to time you would
7 be asked to sign an electronic
8 acknowledgment for policies that BB&T
9 had?
10 (Defendant's Exhibit 5 was marked for
11 identification and is attached.)
12 A. Yes.
13 Q. And do you have -- with respect
14 to this document, do you have any reason
15 to dispute where if it says signed by
16 Kathryn Hendrix and on the date, that you
17 did not electronically sign for these
18 policies on the dates and times
19 indicated?
20 A. I don't have any reason to
21 dispute it.
22 Q. Okay. I'm going to show you
23 what I'm marking as Defendant's Exhibit

Page 113

1 6, which I'll submit to you is a portion
2 of the BB&T associates handbook for 2018.
3 And according to Defendant's Exhibit 5,
4 page 8, you acknowledged this -- receipt
5 of this handbook on February 9th, 2018.
6 Do you see that?
7 (Defendant's Exhibit 6 was marked for
8 identification and is attached.)
9 A. I do.
10 Q. Okay. And on the signature
11 statement provide -- on page 8 -- that "I
12 acknowledge that the 2018 Excellence
13 Associate Handbook and information about
14 BB&T's benefits are available through the
15 BB&T benefits website at bbtbenefits.com.
16 I understand that I am responsible for
17 reading and abiding by the policies and
18 procedures contained in the handbook."
19 And do you agree that you signed
20 that acknowledgment?
21 A. Looks like I did.
22 Q. Going back to Defendant's
23 Exhibit 6, I specifically want to direct

Page 114

1 your attention to the last page of that
2 exhibit, which is Bates-labeled 453, with
3 respect to reporting incidents of
4 harassment and discrimination.
5 Did you -- when you -- what I --
6 what I want to ask you is, first of all,
7 did you -- when you signed for the
8 employee handbook, did you take time to
9 look at it and review it in 2018?
10 A. I couldn't be positive if I did.
11 Q. Okay. At any point in time, did
12 you go and review the BB&T policy on
13 reporting incidents of harassment and
14 discrimination?
15 A. I recall looking at the policy.
16 I don't know when it would have been or
17 what handbook, what year.
18 Q. Okay. When did you look at the
19 policy?
20 MS. PALMER: Object to form.
21 A. I --
22 Q. Well, let me ask you this. Was
23 it after you started working for -- on

28 (Pages 111 - 114)

Page 115

1    the production side?
2      A.  Yeah, I'm sure.
3      Q.  Okay.
4      A.  I probably reviewed some when I
5    was on the audit side too.
6      Q.  Okay.  Did you know where to
7    find BB&T policies?
8      A.  I did.
9      Q.  Were those available to you on
10   the company intranet?
11     A.  Yes.
12     Q.  Did you understand that
13   employees could report concerns about
14   discrimination to supervisors, managers,
15   associates?
16     A.  Yes.
17     Q.  No.  I'm sorry.  Strike that.
18   That's not what I meant to say.
19       Did you understand that reports
20   of discrimination could be made to the
21   associate's supervisor, to the department
22   manager, the associate relations manager,
23   or the corporate associate relations

Page 116

1    manager?
2      A.  Yes.
3      Q.  And who did you understand to be
4    the department manager when you were
5    working for the professional liability
6    department?
7      A.  Rusty Hughes.
8      Q.  Who was the regional associate
9    relations manager?
10     A.  Stefani Petty, I think.
11       THE COURT REPORTER:  I'm sorry,
12   say the name again.
13       THE WITNESS:  Stefani Petty.
14     A.  I don't know if -- maybe Stefani
15   Petty.  Or she might have been the
16   corporate.  Yeah.  No.  I think she was
17   the regional.  I can't remember.
18     Q.  Thanks.  So you knew who Ms.
19   Petty was before this lawsuit?
20     A.  I did.
21     Q.  Okay.  I'm going to show you
22   what I've marked as Defendant's Exhibit
23   7, which is the 2019 handbook.  And do

Page 117

1    you agree that according to Defendant's
2    Exhibit 5, that you acknowledged the
3    receipt of this handbook on February 1st,
4    2019?
5    (Defendant's Exhibit 7 was marked for
6    identification and is attached.)
7      A.  Looks like it.
8      Q.  So you had the opportunity to
9    review that handbook.  Is that correct?
10       (Witness reviews document.)
11     A.  Yes.
12     Q.  Okay.  Including the policies
13   that BB- -- BB&T had for reporting
14   incidents of discrimination and
15   harassment?
16     A.  Which --
17     Q.  I mean, you had -- that's what
18   I'm asking.  So you had the opportunity
19   to review the handbook including the
20   policies set forth in Defendant's Exhibit
21   7 for reporting incidents of harassment
22   and discrimination?
23     A.  I believe so.

Page 118

1      Q.  Okay.  How did it come that --
2    how did it come to be that you moved to
3    the position of inside broker?
4      A.  I was promoted by Corey.
5      Q.  How did that promotion come
6    about?
7      A.  The way I recall, we went to
8    lunch, me, Corey, and Clay, and discussed
9    several things that were kind of
10   repetitive of what we had -- we had
11   already discussed about me learning more
12   about the sales.  And I feel like I
13   remember them starting to prepare to
14   leave because I thought -- I thought I
15   was there for a promotion.  I thought he
16   was going to tell me about it then
17   because we had been talking about me
18   moving in that direction.  And when he
19   didn't, I mentioned that the Birmingham
20   corporate office hadn't hired a woman
21   broker at the time in I thought was 12
22   years and it was a problem, and I
23   couldn't believe that BB&T was allowing

29 (Pages 115 - 118)

Page 119

1  it to happen.
2     Q.   Okay.  When you said -- what did
3  you -- that first part you said, that you
4  -- that you talked about things that were
5  repetitive such as learning more about
6  sales, what is --
7     A.   There were several times he
8  would tell me that he was going to get me
9  more involved.  I would go on more sales
10  calls, more marketing meetings, so -- and
11  move towards learning about the broker
12  role.
13     Q.   Okay.  And was that something
14  you felt like you needed more -- to learn
15  more about?
16     A.   Yes.  But I also needed the
17  promotion.  I thought at the time it
18  would relieve me of the account executive
19  duties that I was handling.
20     Q.   Why did you want to be relieved
21  of those duties?
22     A.   To learn -- to give me time to
23  learn about the sales.

Page 120

1     Q.   Okay.  Why did you think that
2  you would be relieved of account
3  executive duties?
4     A.   Because I was being promoted to
5  a different position, and our team was
6  hiring a new account executive.  I
7  assumed at the time that she would be the
8  account executive on mine and the
9  accounts Clay and I worked mainly because
10  Clay did not have the revenue to support
11  an account executive just for him.  I
12  didn't really have a reason to think that
13  it wouldn't change.
14     Q.   Well, I mean, did you know any
15  other inside brokers in the PL department
16  at that time?
17     A.   I knew Cathy Reeves.  But I was
18  familiar with the position from my audit
19  experience.
20     Q.   Okay.  Well, what I'm trying to
21  get at, though, is, did somebody tell you
22  that when you become an inside broker,
23  that you no longer have to do

Page 121

1  administrative duties, all you have to
2  focus on is learning how to be a broker?
3     A.   No.  But there weren't any other
4  brokers besides Cathy Reeves that had
5  that responsibility on them.
6     Q.   What do you mean?  Have what
7  responsibility?
8     A.   Account executive duties.  And I
9  knew -- I had been told up until that
10  point that a broker is a broker.
11     Q.   When you became an inside
12  broker, were you still expecting to
13  receive a base salary?
14     A.   Yes.
15     Q.   And in your mind, if you were
16  being relieved of account executive
17  duties, what would you be being
18  compensated for when you became an inside
19  broker before you were producing any sort
20  of revenue on your own?
21     A.   I was thinking Corey would use
22  me as his inside broker to market his
23  business and place accounts.  I kind of

Page 122

1  assumed Clay would, too, at the --
2  initially.
3     Q.   Were you not -- were you not
4  already doing that as an account
5  executive?  When you say market business,
6  because you -- you did mention before,
7  that was one of the things that you did
8  as an account executive.
9     A.   Right.  Yeah.  Yeah.
10     Q.   Okay.
11     A.   I kind of assumed that that role
12  would move to me off of Andrea and
13  Yvette, too, and I would take that off of
14  them, but they continued to do their own
15  marketing.
16     Q.   Okay.  And that was an
17  assumption you made, that those duties
18  would be removed from you?
19     A.   An educated assumption based off
20  of my history in audit, and I was --
21     Q.   Okay.  Well, let's talk about
22  that.  What -- what else -- I mean, who
23  else specifically did you learn from in

Page 123

1  audit that once they became an inside
2  broker, they no longer had account
3  executive duties other than marketing
4  business?
5      A.  I didn't learn that from
6  anybody.  I just was familiar with who I
7  would go to when certain items were not
8  in the file or I had questions about
9  certain procedures.  I would never go to
10  an inside broker and ask him where the
11  app was.  Or they weren't typing the
12  quotes.  It's --
13      Q.  And who are you thinking of?
14  Anybody specifically?
15      A.  I mean, there were 500 broker
16  teams, so they could all be -- they could
17  be set up differently.  I don't remember
18  any specific.
19      Q.  Okay.  But it would be fair to
20  say that no one, no inside broker that
21  you had any sort of interactions with
22  while you were in audit ever said to you,
23  "Oh, once you're an inside broker, you

Page 124

1  don't have to do anything except market
2  business"?
3      A.  No.
4      Q.  That was an assumption you made
5  because when you were auditing files, you
6  would see -- you didn't see the inside
7  brokers' names on certain things like
8  quotes or policy binders?
9      A.  There was a distinction between
10  broker and non-broker roles, so.
11      Q.  Okay.  But I'm just trying to
12  figure out what led you to believe that
13  when you became an inside broker, you
14  wouldn't have to do other account
15  executive duties other than marketing
16  business.  And I think you said that that
17  was an understanding that you had got
18  from auditing files and from looking at
19  the files.  And if I'm wrong, you tell me
20  I'm wrong.  I just want to make sure that
21  I understand where you reached that
22  conclusion.  Or what that conclusion was
23  based upon.

Page 125

1      A.  I could have offered a lot more
2  value to Corey as an inside broker.  I
3  assumed getting a promotion, it would
4  also include a change of responsibilities
5  and duties.  I knew I would always have
6  to do some administrative things, but
7  it's the difference between it being your
8  responsibility and having somebody else
9  that you could send it to.
10      Q.  Okay.  I just -- and I -- and
11  thank you for that.  But I think my
12  question is a little bit different.  I
13  think I'm trying to understand why --
14  what it was about your experience at CRC
15  up to that point that led you to conclude
16  that once you became an inside broker,
17  you would not be doing account executive
18  things, you would mainly just be
19  marketing business.
20      A.  They were different positions.
21      Q.  Anything other than the fact
22  that they were -- that the positions had
23  different names on them?

Page 126

1      A.  I mean, the job descriptions, I
2  believe, were different.
3      Q.  Okay.  Did you look at the job
4  description --
5      A.  I can't remember.
6      Q.  -- before you accepted the
7  inside broker job?
8      A.  I can't remember.
9      Q.  Did you ask Corey to -- to
10  become an inside broker specifically?
11      A.  Yes, I think.  But I think he
12  asked which I was interested in,
13  associate or inside.  And being an inside
14  broker for Corey was a great opportunity.
15      Q.  So you told him you were
16  interested in the inside broker role?
17      A.  Right.
18      Q.  Why did you say that versus the
19  associate broker role?
20      A.  Because I saw the opportunity
21  that was in front of me was -- being
22  Corey's inside broker was a great
23  opportunity.  Being an associate broker,

31 (Pages 123 - 126)

Page 127

1 it would have been harder, and I also --
2 mainly because -- I'm really not sure.
3   Q.  Okay.  What about being an
4 associate broker would have been harder
5 than being an inside broker?
6   A.  The associate broker is supposed
7 to build their book and bring in all of
8 the business that they work on.
9   Q.  Okay.  And -- and an assoc- --
10 an inside broker is not expected to build
11 their book?
12   A.  Correct.  That was my
13 understanding.
14   Q.  You just work on the business
15 that the lead broker brings in, as an
16 inside broker?
17   A.  Yeah.  I mean, I could have the
18 opportunities to solicit other business
19 from agents, but the --
20   Q.  You weren't expected to?
21   A.  That was my understanding that I
22 -- when I got the position.  And then it
23 was -- started being described different

Page 128

1 once I was in it.
2   Q.  Okay.  And then once you were in
3 it, what did you -- how -- what do you
4 mean by that?
5   A.  Corey had sent me an e-mail
6 about getting on the road and bringing
7 new business in from agents.  When Rusty
8 told the department that I was now an
9 inside broker, he said, "And so she will
10 be building her own book of business
11 now."  And that caught me off guard, so I
12 said, "I'll be helping Corey grow his."
13   Q.  Okay.  I want to go back to
14 something you said just to make sure I
15 understood what you meant by it.  You
16 said you saw being an inside broker with
17 Mr. Daugherty as being a great
18 opportunity.  What was the great
19 opportunity that you saw?
20   A.  He was a young broker and very
21 good at what he did.
22   Q.  Well, was the opportunity to
23 learn from him?  Was the opportunity that

Page 129

1 he had a lot of -- he would have a lot of
2 money like because he was making a lot of
3 commissions?  What was the opportunity?
4   A.  That he was growing fast, and I
5 knew that he could grow faster if he
6 would utilize an inside broker on his
7 team.  I felt that he would.
8   Q.  Okay.  What was the opportunity
9 for you, though, in working with Mr.
10 Daugherty --
11   A.  So --
12   Q.  -- as an inside broker?  When
13 you said you wanted to be an inside
14 broker, I asked you -- let -- let me just
15 take a step back because I may have lost
16 you, so let me go back.
17       You said -- when I asked you why
18 inside versus out- -- associate broker,
19 you said, "Well, I saw" -- "I thought
20 being an inside broker with Mr. Daugherty
21 would be a great opportunity."  So that's
22 what I'm trying to get at.  What was --
23 what specifically was the opportunity

Page 130

1 that you saw for yourself in that?
2   A.  Corey was still doing things
3 that he, as the lead broker, shouldn't be
4 wasting and spending his time on, and I
5 knew that if he was freed up -- I mean, I
6 told him at one point that we were a $3
7 million team, but he -- I was confused
8 why he wasn't a $5 million team and --
9 because I had worked with all the teams
10 and seen them grow.  And he was one of
11 the best at what he did.
12   Q.  Okay.  And so, was that the
13 opportunity, you wanted to learn from the
14 best?  What was the --
15   A.  Right.  So when I was promoted
16 to -- it came with the marketing ID code
17 too, so I could now somewhat record
18 revenue in the system under me.
19   Q.  And why was that important?
20   A.  I believe that I thought that
21 would be what I would be bonused off of.
22   Q.  Were you -- to your
23 understanding, was there any coding in

Page 131

1  the -- and when you say "system," you
2  mean the AIM system.
3  A.  Correct.
4  Q.  Is that right?
5  Was there any coding in the AIM
6  system when you were an account executive
7  that was tied to your -- the bonuses that
8  you received, to your understanding?
9  A.  I didn't know if they were
10  directly tied.
11  Q.  What specifically in the system?
12  A.  Well, I would be marked as a
13  CISR, so you would be able to see what --
14  how much revenue I was working on.
15  Q.  Okay.  When you said that it
16  caught you off guard that Rusty -- you
17  mean Rusty Hughes --
18  A.  Yes.
19  Q.  -- is that right -- had made the
20  comment that you would be building your
21  own book of business, was that -- you
22  were not interested in doing that at
23  that -- at that point in time?

Page 132

1  A.  No.  I was surprised he was --
2  didn't know what the role of an inside
3  broker was.
4  Q.  That Rusty didn't know what the
5  role of an inside broker was?
6  A.  Uh-huh.  That I understood it
7  as.
8  Q.  Did you ask anyone any questions
9  about that when he made that comment?
10  A.  No.
11  Q.  Did you go back to --
12  A.  I said working on Corey's --
13  growing Corey's book of business.
14  Q.  Okay.  Did you go back to Mr.
15  Daugherty and say, "Mr. Hughes made this
16  comment, and I just want to make sure
17  that I'm not responsible for bringing in
18  my own clients at this point"?
19  A.  I don't recall doing that.
20  Q.  Did you ever have any
21  discussions -- I think you mentioned that
22  Mr. Daugherty sent you an e-mail about
23  being on the road?

Page 133

1  A.  Right.  The opportunity was
2  always there to bring in new business if
3  the time wasn't.
4  Q.  Well, when he -- when Mr.
5  Daugherty suggested to you that you go on
6  the road or -- or -- did you tell him you
7  weren't interested in doing that?  Like
8  you -- you didn't want to have to try to
9  bring in business, you wanted to just
10  work on his accounts?
11  A.  I don't believe so.
12  Q.  Okay.  Is -- is that how you
13  felt at that time?
14  A.  I started to get confused around
15  then and --
16  Q.  And I'm -- the time frame I'm
17  talking about is right when you first
18  became an inside broker.
19  A.  Right.
20  Q.  Okay.  Is that --
21  A.  Because I thought I was being
22  promoted to an inside broker.
23  Q.  I just wanted to be sure we were

Page 134

1  on the same page about the time frame.
2  So -- all right.  So I just want to make
3  sure, you thought you -- you were going
4  to be an inside broker.  Your
5  understanding of inside broker was that
6  you were not going to be expected to
7  build your own book of business; right?
8  A.  Right.
9  Q.  You thought that you would be
10  doing -- mainly just marketing Corey's
11  business.  Is that right?
12  A.  Yeah.
13  Q.  And not any other account
14  executive duties?
15  A.  Right.
16  Q.  And you were expecting to make
17  more money in the inside broker role as
18  well?
19  A.  Well, because I was expecting
20  the inside broker business from Andrea
21  and Yvette's agents to start coming to
22  me, too.  And I went to Corey about that
23  one time, and he told me that Andrea

33 (Pages 131 - 134)

Page 135

1  liked to market her own accounts.  And so
2  this -- I was starting to realize that
3  the opportunity might not be there like I
4  thought it was.
5      Q.  So, would it be fair to say that
6  you thought that the opportunity was that
7  you were going to help Corey get more
8  business and that you would get credit
9  for that business?
10     A.  Well, I just would help him grow
11  his book.  There could be different ways
12  to do that.  I felt like there could.
13  The -- one of the first -- oh, I'm sorry.
14  One of the first things was him -- us
15  working on the small business accounts.
16     Q.  Okay.  Well, were you expecting
17  your compensation to increase as an
18  inside broker?
19     A.  I would have thought my bonus
20  would have increased.
21     Q.  Did you expect to work more or
22  longer hours as an inside broker than you
23  were as an account executive?

Page 136

1      A.  Uh-huh.
2      Q.  Is that a yes?
3      A.  Yes.  I'm sorry.
4      Q.  And you would only be -- the
5  only thing you would be doing would be
6  the marketing for -- to your
7  understanding or what your expectation
8  was, I guess?
9      A.  Uh-huh.  I mean, yeah, and the
10  more business he could bring in because
11  if I could take some of the marketing off
12  of his plate.
13     Q.  And the marketing that you're --
14  I just want to be clear because marketing
15  means, I think, a different thing in
16  this -- this context than it does in the
17  normal -- normal vernacular.
18     A.  It does.
19     Q.  But marketing in this case means
20  that -- getting the applications in from
21  an agent and going out and trying to get
22  a carrier to -- to quote it?
23     A.  Yeah.  I -- what I thought at

Page 137

1  the time, it was more focused on the
2  carrier/broker/market relationship, and
3  the account executive maintains the
4  relationship with the agent.
5      Q.  Okay.  So maybe a better way to
6  go about this would just be to tell me,
7  as an inside broker, what specific duties
8  did you think you would be doing on the
9  marketing?
10     A.  The whole marketing process.  So
11  either -- like when a new submission came
12  in, somebody would send it to me, and I
13  could create -- get -- get it logged,
14  create the cover sheet, get it to
15  markets.
16     Q.  Okay.  All right.  I'm showing
17  you what I've marked as Defendant's
18  Exhibit 8.  This is a document that's
19  been produced by the defendants in this
20  case, which is the BB&T job title for
21  inside broker.  Is this the job
22  description you were referring to earlier
23  in your testimony?

Page 138

1  (Defendant's Exhibit 8 was marked for
2  identification and is attached.)
3      A.  I couldn't say.
4      Q.  Okay.  Did you -- but you, at
5  some point when you were working at CRC,
6  thought you saw an inside broker written
7  job description?
8      A.  Well, when I looked at them, I
9  started noticing that they kind of were
10  encompassing all of the jobs on all of
11  the job descriptions.
12     Q.  Is that -- so, is that a yes,
13  you looked at it at some point in time?
14     A.  I believe I did.
15     Q.  Okay.
16     A.  I don't know that it was this
17  one.
18     Q.  Okay.  On the "Essential Duties
19  and Responsibilities," is there anything
20  listed here that you disagree that you
21  did as an inside broker?
22        (Witness reviews document.)
23     A.  No.  I don't disagree.

34 (Pages 135 - 138)

Page 139

1    Q.  Okay.
2    A.  I don't think.
3    Q.  Okay.  So let's go back to this
4  conversation that you had with -- the
5  lunch conversation.  When was -- when
6  roughly -- I don't expect you to come up
7  with a day or month, but when roughly was
8  this conversation at lunch that you had
9  with Mr. Segrest and Mr. Daugherty?
10   A.  August 2017.
11   Q.  Okay.  And you said you went
12  there because you -- you were at the
13  lunch thinking that you were going to be
14  promoted to inside broker.  Is that
15  right?
16   A.  I was thinking that.
17   Q.  Why did you think that?
18       MS. PALMER:  Object to the form.
19   You can answer.
20       THE WITNESS:  Okay.
21   A.  We had discussed me moving more
22  into a broker role.
23   Q.  But what about -- specifically

Page 140

1  about that lunch made you think that
2  that -- I mean, that this was the day
3  that this was going to happen?
4    A.  I cannot remember.  I can't
5  remember.
6    Q.  Okay.  So after you made this
7  comment about that there had not been a
8  female broker hired, are you saying that
9  they then turned -- Mr. Daugherty then
10  turned around and said, "Oh, well you can
11  become an inside broker"?
12   A.  The way that I recall is he
13  said, "When we get back to the office,
14  I'll get with Rusty and see what we need
15  to get going."  Oh, because I -- I think
16  I asked like at some point if I was going
17  to be promoted or when would I be
18  promoted.
19   Q.  And that --
20   A.  That's how I recall it.
21   Q.  And during the lunch, you did?
22   A.  Yes.  Yeah.
23   Q.  Okay.

Page 141

1    A.  Because I started on the team in
2  July 2014, so I was three years in and
3  still an account executive.
4    Q.  Okay.  So after this lunch --
5  well, actually, let me go to this, the
6  comment you made about the -- about --
7  you said that there had been no female
8  broker hired.
9    A.  Uh-huh.  I believe at that
10  lunch, Corey had brought up too that he
11  had heard that I and maybe the women were
12  concerned that women weren't getting the
13  same opportunities as the men.
14   Q.  You said you believe he said
15  that?
16   A.  Yeah.  I kept a journal and had
17  that noted when I reread it.
18   Q.  And -- okay.  But I was asking
19  you about your comment when you said
20  about the -- nobody being hired -- no
21  women being hired as brokers.
22   A.  Right.
23   Q.  Do you know of any women who

Page 142

1  applied to be brokers during that time
2  frame that you were at CRC?
3    A.  At CRC?
4    Q.  Before this lunch, before you
5  made this comment.
6    A.  Oh.  I'm not sure.
7    Q.  So you don't know if anyone --
8  any women had applied for a broker
9  position in the last number of years, how
10  ever long it was, before you had this
11  lunch?
12   A.  Correct.  But I knew there were
13  many qualified women within the
14  department that could have been inside
15  brokers.
16   Q.  Okay.  Did any of those women
17  tell you that they had applied to become
18  an inside broker at the time of this
19  lunch?
20   A.  No.  I don't remember if they --
21  if they did.
22   Q.  Who were the other female
23  brokers?

35 (Pages 139 - 142)

Page 143

1    A.  In the department?
2    Q.  Uh-huh.  At that time.
3    A.  Cathy Reeves and Susan Phillips.
4    Q.  Susan Phillips?
5    A.  Uh-huh.
6    Q.  Was Betsy there when you worked
7  there?
8    A.  I had worked with her when I was
9  on the audit, when I was in audit, but
10  she had retired when I got there.
11    Q.  Do you know her last name?
12    A.  Barnette.
13    Q.  Barnette.  And the -- I think
14  you said Cathy Reeves was an inside
15  broker.  Is that right?
16    A.  Correct.
17    Q.  And Susan Phillips was a lead
18  broker; correct?
19    A.  I believe senior broker, yes.
20  She wasn't -- I don't believe -- I guess
21  she was when I came in their department.
22  Their team got combined at some point.
23    Q.  And what had been Ms. Barnette's

Page 144

1  role?
2    A.  She started the department, the
3  professional liability department at CRC.
4    Q.  Do you know who Corey first
5  worked for when he came to the
6  professional liability department at CRC?
7    A.  I believe Betsy.
8    Q.  So you said that at the end of
9  this lunch conversation, that Mr.
10  Daugherty had said that he would get back
11  to the office and get something started?
12    A.  The paperwork.
13    Q.  Okay.  And then what's the next
14  thing that happened in your transition to
15  an inside broker position?
16    A.  I had to sign an employment
17  agreement with a noncompete.  I remember
18  Corey saying that that was one of the
19  only problems with being promoted to
20  broker would be that I have to sign a
21  noncompete.  I don't think it would have
22  been considered a problem for any of the
23  men.

Page 145

1    Q.  Do you know whether or not Mr.
2  Daugherty had a noncompete agreement?
3    A.  Not the same one, I believe.  I
4  think he said he had signed -- his was
5  the original when he became a broker.
6  And then Corey, Rusty, and Clay, one at a
7  time on different occasions, asked me if
8  I was getting it reviewed by an attorney.
9  And I was not until the three of them
10  asked me that, and I felt that maybe I
11  should.
12    Q.  So they encouraged you to have
13  the agreement looked at by an attorney?
14    A.  I wouldn't say encouraged.
15    Q.  But they were the one who --
16  they were the ones who first put the idea
17  in your head that --
18    A.  Yeah.  It said it on there, I
19  think, that you can have it reviewed by
20  an attorney.
21    Q.  That you can have it reviewed.
22    A.  You can.
23    Q.  Right?

Page 146

1    A.  Yes.
2    Q.  And they asked you if you were
3  going to get it reviewed by an attorney.
4  Is that right?
5    A.  I believe so, yes.
6    Q.  Do you -- have you ever seen
7  Clay's noncompete agreement?  Clay
8  Segrest.
9    A.  No.
10    Q.  You don't know what the terms
11  are of it?
12    A.  I don't.
13    Q.  Okay.  Which male employee do
14  you think -- you said it wouldn't be --
15  it wouldn't be a problem for a man.  What
16  did you mean by that?
17    A.  Corey Woodward transferred from
18  property.  I imagine it was just
19  something he needed to do, probably not
20  considered a problem.  I didn't
21  understand why it would be a problem.  I
22  was looking at it as an opportunity with
23  CRC.

Page 147

Q. Okay. Well, I guess maybe I'm confused by the testimony. You -- you said that Corey told you that was the only problem with becoming a broker was that you would be subject to a noncompete agreement. Is that right?
A. I feel like I -- yeah. I think that I remember it like that.
Q. Okay. All right. And when you --
A. And he wasn't saying it -- it was just in passing.
Q. Okay.
A. It wasn't a --
Q. And you said that you didn't think it would be a problem for a man. And I took that to mean that you thought men didn't have to sign noncompete agreements. Is that not what you were trying to say?
A. No.
Q. Okay. What did you mean by it wouldn't have been a problem for a man?

Page 148

A. I don't think Corey would have seen it as a problem for a man.
Q. Why? Why do you say that?
A. Because it just was part of becoming a broker. I mean,.
Q. Okay. Well, I -- I guess what I -- I've been trying to figure out what about that --
A. I thought it was --
Q. -- what about that comment you took to mean -- to have anything to do with gender.
A. I felt like it was to deter me from wanting --
Q. Okay.
A. -- the broker.
Q. That was just a feeling that you had?
A. Yes.
Q. All right. So you signed the noncompete agreement. And then what happened?
A. And then --

Page 149

Q. Actually, while we're talking about that, let me go ahead and mark that as an exhibit. I'm showing you what has been marked as Defendant's Exhibit 9.
(Defendant's Exhibit 9 was marked for identification and is attached.)
(Witness reviews document.)
Q. Okay. And on page 10 of this document, is that your signature?
A. Looks like it.
Q. Okay. And it looks like Jack Elliott signed this.
A. He had been promoted.
Q. Okay. All right. I don't -- I'm not asking you anything you talked about with any lawyer, but did you have an attorney review this before you signed it?
A. I did.
Q. Who was that lawyer?
A. John Saxon.
Q. Did you make any edits to the agreement before you signed it?

Page 150

A. I don't believe I did.
Q. Did you talk with Mr. Daugherty about what your compensation was going to look like when you became an inside broker?
A. No, not at the time.
Q. Did you negotiate your pay in that position?
A. Not at the time.
Q. Did you at any time --
A. No.
Q. -- after becoming an inside broker?
A. No.
Q. Okay. I'm showing you what I've marked as Defendant's Exhibit 10, okay, which I'll submit to you is a copy of your performance evaluation for 2017. And if I look at page 3 of the exhibit, which is Bates-labeled 29 --
A. Okay.
Q. -- under the comments at the bottom of the page, it says that,

Page 151

1  "Effective 1/1/2018 Kathryn moved into an
2  Inside Broker role on our team and has
3  been working diligently to learn more
4  about the sales process and assist in new
5  business production and retention of
6  existing clients and book."
7      Do you feel like that's an
8  accurate statement?
9  (Defendant's Exhibit 10 was marked for
10  identification and is attached.)
11      A.  It is.  But I was thinking it
12  meant to market business, I believe, at
13  this time.  Or this might have been after
14  he had already assigned -- did he -- no.
15  I don't think he had given the new
16  assignment yet.
17      (Witness reviews document.)
18      A.  "Has an assigned group of retail
19  relationships."  So those were the
20  accounts that I was responsible for being
21  an account executive that were assigned
22  to me.
23      Q.  Okay.  So that -- is it the

Page 152

1  second sentence that you're not sure
2  about, "She now has an assigned group of
3  retail relationships in addition to
4  helping me with new business placements
5  for existing clients"?
6      A.  Yeah.
7      Q.  And you're not sure about it
8  because of the timing?
9      A.  Right.  And I thought that when
10  I was assigned, it would be as an inside
11  broker, not reassigned different agents
12  to do the account executive work on.
13      Q.  Okay.  When you -- so this
14  assignment of group retail relationships,
15  is that what you're saying, you did not
16  think that that was going to be part of
17  your job as an inside broker?  Is that
18  the part -- the part you're talking
19  about?
20      A.  I guess I misunderstood what
21  "assigned" meant, what role I was going
22  to be assigned, what part of the.
23      Q.  Okay.  Well, after -- when did

Page 153

1  you -- when did you realize that there
2  was a difference between your
3  expectations and the reality of what your
4  job was going to look like as an inside
5  broker?
6      A.  We had a group meeting, and he
7  handed out the new agency splits, and my
8  list was longer than it had been.  So I
9  was looking at more administrative work
10  than before.  And Andrea even commented
11  on it.
12      Q.  Okay.  And what -- when was that
13  meeting, roughly?
14      A.  I think it was -- it was January
15  or February 2018.  It was after Tiffany
16  had joined the team.
17      Q.  So you had been -- but you had
18  been an inside broker at that point for
19  -- well, no.  I guess this says effective
20  January 1st, 2018.  So you were not an
21  inside broker in 2017?
22      A.  I thought I was promoted -- I
23  thought it was November.

Page 154

1      Q.  So end of 2017, beginning of
2  2018?
3      A.  Correct.
4      Q.  Okay.  And there was -- there
5  was a meeting in January or February of
6  2018 after Tiff- -- Tiffany Sanders had
7  been hired.
8      A.  Right.
9      Q.  Is that right?
10      And -- and at that meeting, Mr.
11  Daugherty provided a new list of the
12  accounts.  And you -- it's your testimony
13  that that -- your list had more than you
14  had had as an account executive?
15      A.  I believe it did.
16      Q.  Okay.  And did you have any
17  conversations with Mr. Daugherty at that
18  point to say, "Hey, this is not what
19  I" -- "I didn't think the inside broker
20  job was going to be like this"?
21      A.  Andrea asked the question
22  immediately, "Why does she have more
23  accounts now?"

38 (Pages 151 - 154)

Page 155

1    Q.  Did you have any discussions
2   with Mr. Daugherty at that point to say
3   that -- you know, to tell him that this
4   was not what you were expecting?
5    A.  No.  Because I trusted him and
6   thought he must have seen and known
7   something that maybe I had been unaware
8   of.
9    Q.  And the comment on the next page
10  says, "Continued" -- opportunities for
11  growth, "Continued focus around coverage
12  and products in the marketplace.
13  Potential RPLU designation."
14       Do you know what that is?
15   A.  I do.
16   Q.  What is that?
17   A.  I can't remember what the R
18  stands for, but it's Professional
19  Liability Underwriter.
20   Q.  Was that anything you ever
21  pursued?
22   A.  I had started to pursue it.  I
23  was exempt from one or two parts because

Page 156

1   of classes I took in college.  There was
2   -- I don't know.  I think it was an
3   11-part test maybe.  It was a big
4   undertaking.
5    Q.  Okay.  Did you ever take any
6   courses to -- to obtain that designation?
7       MS. PALMER:  Object to the form.
8    A.  I don't think I started in any
9   of the courses, but we -- the department
10  had copies of the books.  I think I had
11  started looking at the books.
12   Q.  Okay.  Did you have any
13  discussions with Cathy Reeves prior to
14  becoming an inside broker about what her
15  job looked like or what her duties were?
16   A.  I'm sure I did.
17   Q.  Okay.  You don't recall anything
18  specifically, though, that she told you
19  about the job?
20   A.  Her job had changed when I --
21  because her -- George Bennett, she worked
22  -- she was his inside broker, and he left
23  and gave his book to Tyler.  So she then

Page 157

1   now is working for Tyler.  And --
2    Q.  And was Tyler on George
3   Bennett's team?
4    A.  No.  He was on Rusty's team.  So
5   it transferred the revenue.
6    Q.  Who else was on Mr. Bennett's
7   team?
8    A.  Denisa Lovoy, she went to
9   Rusty's team at well.  Lee McClure might
10  have been on there.
11       THE COURT REPORTER:  What was
12  the name?
13       THE WITNESS:  Lee McClure.
14   A.  I can't remember if he was on
15  George's team at that time.
16   Q.  Okay.  So you said her job had
17  changed because she had changed the team
18  that she was working on?
19   A.  The broker that she was working
20  for and the team, yeah.  But they were --
21  a lot of -- I mean, they -- she had
22  worked on the account.  She had helped
23  grow the book of business with George.

Page 158

1    Q.  Well, I'm just wondering if at
2   any point in time before you told Mr.
3   Daugherty that you were interested in the
4   inside broker position if you went to her
5   and said:  "Hey, what do you do as an
6   inside broker?  I'm thinking about moving
7   into that position."
8    A.  I'm sure I had a conversation
9   with her, but I can't recall what it was.
10   Q.  What did she tell you?
11       MS. PALMER:  Object to the form.
12   A.  I really can't remember.
13   Q.  Okay.  Well, I mean, you don't
14  remember her saying:  "Oh, once you
15  become an inside broker, you don't have
16  administrative duties anymore.  You only
17  have to market business"?
18   A.  No.  And I knew I would have
19  some administrative duties, just not be
20  assigned a full 'nother --
21   Q.  And how many administrative
22  duties were you expecting to have?
23   A.  I didn't have an expectation,

39 (Pages 155 - 158)

Page 159

1 really.
2       MS. BARLOTTA:  All right.  It's
3 12:00 -- almost 12:30.  Do y'all want to
4 break for lunch?
5       MS. WILKINSON:  Whatever you
6 want to do.
7       MS. BARLOTTA:  Well, I can -- we
8 can keep going.  I mean, I don't -- I
9 mean, we -- I will -- I mean, I do want
10 to break for lunch at some point.  I
11 mean, she -- this one has to, you know,
12 eat, so.
13       MS. WILKINSON:  Let's go ahead
14 and go because I need to get up and move
15 around --
16       MS. BARLOTTA:  Okay.
17       MS. WILKINSON:  -- a little bit.
18       MS. BARLOTTA:  All right.
19       MS. WILKINSON:  That would be
20 good.  How long do you want to break for?
21       THE VIDEOGRAPHER:  We're going
22 off the record at 12:25.
23          (Break taken.)

Page 160

1       THE VIDEOGRAPHER:  We're going
2 back on the record at 1:19.
3       Q.   (By Ms. Barlotta) I'll show you
4 what I've marked as Defendant's Exhibit
5 11, which is a little bit out of our
6 chronological order that we've been
7 trying to follow, but I wanted to get
8 this date on the record.  So I'll
9 represent to you, Ms. Hendrix, this is an
10 e-mail that was produced by the
11 defendants dated May 3rd -- 30th, 2014,
12 from Darren Masier.  Do you know who that
13 person is?
14 (Defendant's Exhibit 11 was marked for
15 identification and is attached.)
16       A.   I don't.
17       Q.   It -- but the e-mail states:
18 "Kathryn Hendrix will be transferring
19 from Jack Elliott's team to Corey
20 Daugherty's team in Birmingham, AL as an
21 Account Executive.  She will be starting
22 on July 21, 2014."
23          Is that consistent with your

Page 161

1 recollection as to when you started
2 working in the professional liability
3 department on the production side?
4       A.   I believe so.
5       Q.   I'm showing you what I've marked
6 as Defendant's Exhibit 12.  This is a
7 performance -- a 2018 performance review
8 that we -- the defendants produced in
9 this case as part of your personnel
10 records.  Do you recall receiving
11 performance evaluations from Mr.
12 Daugherty?
13 (Defendant's Exhibit 12 was marked for
14 identification and is attached.)
15       A.   Yeah.  They would be in Workday.
16       Q.   And would you pull them up and
17 review them and electronically sign them?
18       A.   I believe so.
19       Q.   I want to look with you at page
20 3 of Defendant's Exhibit 12 on the 2018
21 goals where it says, "Kat has continued
22 to develop in her role as Inside Broker
23 and is starting to actively get more

Page 162

1 involved in the" -- I believe that's a
2 typo, but it's supposed to be "in the
3 brokering and negotiation of new business
4 and renewals."  Do you agree with that
5 statement?
6       A.   Yeah.  Yeah.
7       Q.   Okay.  And, "Will lean on her
8 heavily in 2019 in this role to help
9 drive year over year growth."
10          Did you understand he was going
11 to rely on you in 2019 to help drive
12 year-over-year growth?
13       A.   That's what I understood.
14       Q.   Okay.  And he said you were
15 "extremely organized and her computer" --
16 and your computer skills were
17 exceptional.  Would you agree with that?
18       A.   Yes.
19       Q.   Okay.  You had referenced fairly
20 early in the deposition that you had --
21 believe that you had been discriminated
22 against when working at CRC.  How do you
23 feel like you were discriminated against?

40 (Pages 159 - 162)

Page 163

1    A.   Just not treated the same as the
2    men.
3    Q.   In what ways were you not
4    treated the same?
5    A.   I would be left off of some
6    dinners.  I was being required account
7    executive duties that none of the other
8    male brokers were.
9    Q.   Anything else?
10   A.   Opportunities, I didn't get as
11   many opportunities.
12   Q.   Opportunities for what?
13   A.   Referral business.  And Corey
14   kept using Clay to send some referrals
15   to.
16   Q.   Anything else?
17   A.   I was left out of some carrier
18   events.
19   Q.   Okay.  Anything else?
20   A.   Not that I can think of right
21   now.
22   Q.   Okay.  Well, is there anything
23   that would help you recall any other ways

Page 164

1    in which you were discriminated against?
2    A.   I think the massive amount of
3    administrative work was the big thing
4    that I was feeling.  Most of the other
5    women were, too.  I wasn't the only one
6    that was having a problem.
7    Q.   Okay.
8    A.   And since we specialize in
9    employment practice liability, I started
10   to realize -- I learned what gender bias
11   was and unconscious bias.  And so I was
12   able to see those differences.  Like we
13   went on one trip where Cor- -- so Corey,
14   Clay -- and I mean, I wouldn't have gone,
15   I'm -- I don't -- I don't know if I would
16   have.  But they all didn't stay with the
17   rest of the group on a trip.  They went
18   back to Corey's lake house or Rusty's
19   lake house to spend the night as a group.
20   Q.   Did you ever have women stay --
21   that you work with stay over at your
22   house?
23   A.   I did.  I think Mandy stayed

Page 165

1    over there one time when she didn't want
2    to drive home.  It wasn't hosted by
3    underwriters.
4    Q.   Did you invite other women to
5    stay --
6    A.   Yeah.
7    Q.   -- stay at home?
8    A.   I was friends with -- not stay,
9    but --
10   Q.   Stay overnight if you had a late
11   night and they didn't want to drive home
12   because they had been drinking?
13   A.   I think Mandy just did that one
14   time.  I can't remember another time.
15   Q.   Did you ever invite any men to
16   stay over at your house?
17   A.   No.  Christy Smith stayed over
18   one night.
19   Q.   Was there any reason that you
20   didn't make that invitation to any of the
21   men that you worked with, that if they
22   needed a place to stay, that they could
23   stay at your house?

Page 166

1    A.   They were married men, most of
2    them were, ma'am.
3    Q.   And the men who stayed at the
4    lake house, were they married?
5    A.   I'm not sure.
6    Q.   All right.  What dinners do you
7    contend that you were excluded from?
8    A.   I think there was ones I didn't
9    know about because I would have been
10   excluded.  It's -- at first, it happened
11   more often when I became -- when I first
12   became an inside broker.  Then me and
13   some other women started bringing it to
14   their attention that we were being left
15   out when -- and so they started inviting
16   all women to all events once I was
17   promoted into a broker position and
18   included.  So I felt that that was --
19   Q.   When did that happen, that you
20   started getting invited to all the
21   events?  Roughly.  I'm not looking for a
22   specific date.
23   A.   Maybe in 2018.  I'm -- I'm not

41 (Pages 163 - 166)

Page 167

1    sure.
2       Q.   Okay.  And whose attention did
3    you bring that issue to?
4       A.   I am -- I know I talked to Clay
5    about it.  I think we maybe had a
6    conversation around Tyler about it.
7    Because Tyler made the comment that he
8    believes in equity, so he tries to send
9    all the e-mails to everybody.
10      Q.   So you're not -- what role was
11   Tyler in at the time of this
12   conversation?
13      A.   Associate broker.
14      Q.   And was Clay also an associate
15   broker at the time you talked to him
16   about this?
17      A.   Yes.
18      Q.   Anybody else that you recall
19   bringing it to their attention that you
20   thought that women had been excluded from
21   dinners?
22      A.   I'm not sure.
23      Q.   What was the purpose of the

Page 168

1    dinners?
2       A.   Most of them were with
3    underwriters, to develop relationships
4    with the carriers.
5       Q.   So, would it be CRC was hosting
6    the dinner or the underwriter was hosting
7    the dinner?
8       A.   The underwriter, most of the
9    time.
10      Q.   Meaning not CRC was hosting the
11   dinner?
12      A.   Right.
13      Q.   And the underwriters would be in
14   charge of who got invited, would they
15   not?
16      A.   Right, so.
17      Q.   All right.  You said you were
18   being required to do account executive --
19   account -- account executive duties that
20   male brokers were not expected to do.
21   Who -- were there any other male inside
22   brokers during the time period that you
23   worked there?

Page 169

1       A.   When Jonathan Morgan was hired
2    as an inside broker.
3       Q.   Do you have any knowledge about
4    what he did on a day-to-day basis?
5       A.   No.
6       Q.   No?
7       A.   He had -- he was new when he --
8    I had left.  We weren't there that long
9    together.
10      Q.   Okay.  But I just want to make
11   sure, you -- you don't know what he did
12   on a day-to-day basis in terms of
13   performing account executive duties or
14   not?
15      A.   I remember having one
16   conversation with him where he sent
17   something to Danielle to send to the
18   agent and Danielle sent it back to him --
19   she was the account executive on the
20   team -- to do.
21      Q.   She said:  "I'm not doing it.
22   You do it yourself"?
23      A.   I think so.

Page 170

1       THE COURT REPORTER:  I'm sorry?
2       THE WITNESS:  I think so.
3       Q.   And did you get that information
4    from him or from Danielle?
5       A.   I think from him.
6       Q.   Okay.
7       A.   She worked out of Mississippi.
8       Q.   Okay.  So as far as you know, he
9    did not have an account executive doing
10   any duties for him?
11      A.   I -- yeah, I don't know.
12      Q.   Okay.  What other -- which other
13   male brokers did you have firsthand
14   knowledge about what they were doing on a
15   day-to-day basis?
16      A.   I would say I had more knowledge
17   of things they weren't having to do.
18      Q.   And how did you get that
19   knowledge?
20      A.   Because I talked to the other
21   women about it.
22      Q.   And which men are you talking
23   about specifically?

42 (Pages 167 - 170)

Page 171

1    A.  Clay would be an example, Tyler.
2    Q.  Do you know how long Mr. Segrest
3  had been in the professional liability
4  department?
5    A.  2009 maybe.
6    Q.  And what about Tyler?  And let
7  -- strike that.
8        What is Tyler's full name?
9    A.  O'Connor, Tyler O'Connor.
10    Q.  How long had he been with the
11  professional liability department?
12    A.  Maybe a little longer than Clay.
13  I'm not positive.
14    Q.  Okay.  So, did I understand your
15  testimony to be that you talked with
16  women who worked with Mr. Segrest and Mr.
17  O'Connor who told you that they were not
18  doing account executive duties?
19    A.  I was Clay's account executive
20  for the first, what, three years, so I
21  was very aware that he was not going to
22  type a quote.  And then Cathy Reeves was
23  starting to get more put on her from

Page 172

1  Tyler that was account executive.  She --
2  I think she had been to Rusty about
3  Denisa, that she wasn't helping her with
4  the accounts.  But I don't think she
5  received any help, so.
6    Q.  Okay.
7    A.  She was waiting for retirement.
8    Q.  When you say the first -- you
9  were Clay's account executive for the
10  first three -- three years, are you
11  talking about the time period when
12  your -- you had the account executive job
13  title?
14    A.  Right.
15    Q.  Okay.
16    A.  Yeah.  So that's how I knew he
17  wasn't doing account executive duties.
18    Q.  Okay.  So, is your testimony
19  that he would never do a quote or a loss
20  run?
21    A.  He might do a loss run every
22  once in a while, but for the most part,
23  no.  He was very distinct about what was

Page 173

1  my job and what was his.
2    Q.  Did he do binders?
3    A.  No.  Only if he had to, maybe.
4  Not a lot.  I mean, it would be if he was
5  in a -- there wasn't another account
6  executive there to do it for him.
7    Q.  Okay.  Did you have an objection
8  to -- when you were an account executive,
9  did you have an objection to doing that
10  work for him?
11    A.  Not all of the work, but he used
12  me as his secretary as well, so, doing
13  his printing.
14    Q.  What kind of printing?
15    A.  The marketing stuff.
16    Q.  Oh.  How often did you do that?
17    A.  Not -- I mean, it wasn't a daily
18  or even weekly thing.  If he was going to
19  visit an agent.
20    Q.  Okay.  What else did you do that
21  you considered to be secretarial?  What
22  else did you do for Mr. Segrest that you
23  considered to be secretarial?

Page 174

1    A.  He would send me e-mails from
2  his desk to attach in the computer system
3  that he was sitting in front of.
4    Q.  And that bothered you that he
5  asked you to do that?
6    A.  Yeah.  At that -- it got to the
7  point that, yeah, I went to Corey about
8  it and told him.
9    Q.  Did Mr. Daugherty ever ask you
10  to do that?
11    A.  Yes.
12    Q.  Did it bother you when he asked
13  you to do it?
14    A.  No.
15    Q.  Anything else secretarial-wise
16  that you felt like you had to do for Mr.
17  Segrest?
18    A.  I can't think of anything right
19  now.
20    Q.  So when you went to Mr.
21  Daugherty and said that you were bothered
22  by Mr. Segrest sending you these e-mails
23  and asking you to attach them in the

Page 175

1    computer system, what was his response to
2    you?
3        A.  I remember him saying, "Well, I
4    know that he's appreciative of you doing
5    those things while he's on the road."
6    And I said:  "He's not on the road.  He
7    is sitting at his desk in there and
8    sending them to me."
9            And I think I -- the time period
10   I went to Corey was once I had received
11   my promotion, but they hadn't hired a new
12   account executive to do Clay's work, so I
13   was still doing it all and -- while they
14   were waiting for a new account executive
15   to start and take on his workload.
16       Q.  Okay.
17       A.  And my workload.
18       Q.  All right.  But -- okay.  Back
19   to my question.  After you -- after you
20   said that to Mr. Daugherty, did he -- you
21   said, "No, he's in his office," and he
22   said:  "Well, that's too bad.  You need
23   to keep doing it"?  Or did he say, "No,

Page 176

1    you don't have to worry about that"?
2        A.  No.  He told me I needed to keep
3    doing it until we had somebody hired for
4    Clay.
5        Q.  Did you have a problem with that
6    plan?
7        A.  I was discouraged, I believe,
8    because I think at the time they hadn't
9    even found anybody to hire yet.
10       Q.  How long did it take to do this
11   attach -- this attachment to the system?
12       A.  It didn't -- it wasn't a long
13   process, but it was things would pile up
14   and -- for different files and.
15           I think I was the -- I know I
16   was the second, maybe third account
17   executive that went to Corey about Clay,
18   and Yvette had said she wouldn't do his
19   account executive work anymore early on.
20       Q.  And you know that because they
21   -- they told you that?
22       A.  Yes.
23       Q.  The other female account

Page 177

1    executives told you that they had made
2    complaints that they didn't want to do --
3        A.  Well, Yvette just she were --
4    she went to Corey and said, "I'm not
5    going to work with Clay anymore."
6        Q.  And what did she say happened as
7    a result of that?
8        A.  She wasn't working with Clay
9    anymore.
10       Q.  Did she tell you why she didn't
11   want to work with Clay?
12       A.  He speaks down to people.  It's
13   -- it's condescending, a little.
14       Q.  Is that why you didn't like
15   doing his work?
16       A.  Some.
17       Q.  Okay.  Any other reasons?
18       A.  He wasn't doing anything.
19       Q.  And what do you mean, he wasn't
20   doing anything?
21       A.  He didn't have anything to work
22   on.  He wasn't out bringing new business
23   in.

Page 178

1        Q.  Well, did you sit in his office
2    all day and look -- I mean, observe what
3    he was doing?
4        A.  No.
5        Q.  Okay.  Did you -- he -- is your
6    testimony he never traveled?
7        A.  He traveled occasionally, I
8    mean,.  Not as much as I thought
9    inside -- I mean, associate brokers did
10   travel.
11       Q.  How much did you think an
12   associate broker should travel?
13       A.  They could travel as much as
14   they wanted, I believe, so.  By not
15   traveling, you weren't out seeking new
16   business.
17       Q.  Well, so, did you have an idea
18   in your mind about how often an associate
19   broker should travel?  Is that once a
20   week?  A couple of times a month?
21       A.  However much they chose to
22   travel.
23       Q.  So it varied.  Would you --

44 (Pages 175 - 178)

Page 179

1  would that be fair to say?  It varied --
2    A.  Yeah.
3    Q.  -- by the person how much they
4  traveled?
5    A.  Uh-huh.
6    Q.  Is that a yes?
7    A.  Yes.  Sorry.
8    Q.  Associate brokers also make
9  phone calls to people?
10   A.  They do.
11   Q.  All right.  So, what -- what --
12 so Tyler O'Connor, you said that he
13 didn't have to do -- I think he was the
14 other person you just identified that you
15 said did not have to do the
16 administrative duties.
17   A.  Uh-huh.
18   Q.  Is that right?
19   A.  Correct.
20   Q.  And you learned that information
21 by talking to Cathy Reeves?
22   A.  I believe so.  And Brandi, I
23 think, had said that.

Page 180

1    Q.  Do you know how often Tyler --
2  Mr. O'Connor traveled?
3    A.  I don't.
4    Q.  Okay.  And was it your
5  interpretation that Ms. Reeves was
6  complaining to you about having to do Mr.
7  O'Connor's work?
8    A.  Some.
9    Q.  What do you mean by "some"?
10   A.  I mean, I guess -- yeah, I guess
11 complaining.  Some of it was about that,
12 and then some of it was the book that was
13 transferred to him were a lot of her
14 agents.  And how the system was set up,
15 she couldn't log herself in as the
16 revenue anymore because Tyler was the
17 associate broker on Rusty's.
18   Q.  Okay.  Do you know whether or
19 not she ever tried to rectify that
20 situation by talking to Rusty or anybody
21 else?
22   A.  I believe she talked to Rusty.
23 I'm not positive it was about that.  I

Page 181

1  know she did go to him some -- about some
2  things.  I'm not --
3    Q.  Did she tell you whether or not
4  that issue ever got resolved?
5    A.  It didn't while I was there.
6    Q.  Is Ms. Reeves still working
7  there, or do you know?
8    A.  I think she's retired.
9    Q.  Is Mr. O'Connor still there, as
10 far as you know?
11   A.  As far as I know.
12   Q.  Do you know when Ms. Reeves
13 retired?
14   A.  No.
15   Q.  Okay.  Any other male CRC
16 brokers that you contend did not have to
17 do account executive duties?  We talked
18 about Mr. Segrest, and we've talked about
19 Mr. O'Connor.
20   A.  I don't believe any of them --
21 some of them did do some of the work, but
22 I don't think any of them were assigned
23 to do the work.  I think they all had

Page 182

1  account executives that were assigned.
2  Or Amber had told me that Alex would
3  sometimes type his quotes.
4    Q.  Well, when you became an inside
5  broker, were you expecting to have an
6  account executive assigned to you?
7    A.  No.  I thought they'd be
8  assigned to the agent.
9    Q.  Would it ever be accurate to say
10 that the number of account executives
11 that a team had would depend upon that
12 lead broker's book of business?
13   A.  Yes.
14   Q.  Because you have to have enough
15 revenue to support a salary for an
16 account executive; right?
17   A.  Right.  A salary and I think the
18 overhead.  I think that you had to have
19 more than.
20   Q.  So there would be some teams
21 that might have two or three account
22 executives and maybe a team that might
23 only have one?

45 (Pages 179 - 182)

Page 183

1    A.   Could be.  I don't know if there
2  were -- I can't think of any with just
3  one.
4    Q.   Okay.  Tell me -- well, let's do
5  it this way.  Tell me the biggest team
6  when you were there at CRC and the
7  smallest team.
8    A.   I think Rusty's team was the
9  biggest team, I think.  So Rusty --
10     MS. PALMER:  I'm sorry, Rachel,
11  are we talking about in Birmingham
12  professional liability?
13     MS. BARLOTTA:  Yeah.  I'm sorry.
14     THE WITNESS:  Okay.
15     MS. BARLOTTA:  Yeah.  And when
16  -- I said during the time that she was
17  in -- at CRC in the professional
18  liability department, the -- biggest
19  team and the smallest team in terms of
20  head count and structure.
21    A.   Susan and Dave maybe had more.
22  They were a combined broker team.
23    Q.   Okay.  And do you know roughly

Page 184

1  how many people were on their team,
2  combined broker team?
3    A.   I think it was seven: Susan,
4  Dave, Lauren, Brandon, Vandalyn, and
5  Rhonda.  Six.
6    Q.   Okay.
7    A.   And McClure.  Seven.
8    Q.   Okay.
9    A.   Did I say McClure?
10    Q.   No, you didn't.  So that would
11  be seven all together?
12    A.   Uh-huh.
13    Q.   And then who was the smallest
14  team?
15    A.   Trey Reich maybe.
16    Q.   Okay.
17    A.   He -- yeah.  He had one account
18  executive and an associate broker.
19    Q.   Who was that associate broker?
20    A.   Corey Woodward.
21    Q.   You were friends with Corey
22  Woodward, weren't you?
23    A.   I was.  We're neighbors.

Page 185

1    Q.   I mean, did he tell you that he
2  did account executive duties?
3    A.   He was trying to start a small
4  business program within professional, and
5  so yeah, I think he did do some.
6    Q.   On the Susan-Dave team that you
7  were talking about, the seven people, the
8  -- how many account executives did they
9  have?
10    A.   Lauren was when she was hired,
11  and Rhonda, and then Vandalyn was a
12  broker assistant.
13    Q.   Okay.  McClure was -- Lee
14  McClure, he was a broker or was he an
15  associate broker?
16    A.   I think his title was broker,
17  but he wasn't the coded broker for their
18  team at the time while I was there.
19    Q.   And then Brandon Hays would have
20  been an associate broker?
21    A.   Correct.
22    Q.   Okay.  One of the other ways
23  that you said you felt discriminated

Page 186

1  against was that you didn't have as many
2  opportunities for referral business, and
3  then you said that Mr. Daugherty kept
4  using Mr. Segrest to send referrals.
5  What did you -- what are you talking
6  about there?
7    A.   There were times where he -- a
8  new business account would come in, and
9  he would give it to Clay.
10    Q.   What accounts are you thinking
11  of?
12    A.   I wouldn't be able to tell you.
13    Q.   Do you know if any of those
14  accounts materialized into a policy or a
15  commission?
16    A.   I am not sure.
17    Q.   What carrier events were you
18  left out of?  If that's different than
19  the dinners.  I know we talked about the
20  dinners, but if that's something
21  different.  I had that listed in my
22  notes.
23    A.   There was a MedPro event.

46 (Pages 183 - 186)

1    Q.   And when was that?
2    A.   2018 sometime, I believe, down
3  in Sylacauga, I think.  Lauren came to me
4  one day and said that the marketing guy
5  there had invited us -- or no.  The -- an
6  underwriter that she worked with invited
7  us.  And I was excited.  And --
8    Q.   Why were you excited about that?
9    A.   Because I thought I was invited.
10    Q.   But like why did you want to go
11  to this event?
12    A.   MedPro was a big carrier.  We
13  had a big relationship with them.  They
14  were a good partner to get to know.  And
15  then later, I found out that we had not
16  been invited, but we could come, but we
17  would need to get our own hotel rooms.
18  They had the lodge.
19    Q.   And MedPro was in charge of the
20  invite; correct?
21    A.   Right.
22    Q.   And did CRC pay for you to have
23  a room at the lodge?

1    A.   Yes.  I think Lee McClure paid
2  for our rooms.  He was, I believe, at the
3  time, their top broker, so.
4    Q.   And when you say he paid for it,
5  are you saying he paid for it out of his
6  pocket --
7    A.   No.
8    Q.   -- or he paid for it like as an
9  expense account?
10    A.   Expense.
11    Q.   Did you have an expense account
12  as an inside broker?
13    A.   I did.
14    Q.   How much -- do you know how much
15  it was?
16    A.   Well, I had a card.
17    Q.   Okay.
18    A.   I had it from audit, so I
19  just --
20    Q.   Did you -- were you aware of any
21  certain amount, a limit that you could or
22  could not put on that card?
23    A.   One time, I -- I know it was

1  audited, but I didn't know what the limit
2  was.  But one time, I accidentally put
3  everybody's room on my card, and I got a
4  call.
5    Q.   Okay.
6    A.   And so I told her to look at the
7  next one that was reversed under it.
8    Q.   But in terms of -- you didn't
9  have like a set -- like you could only
10  spend $5,000 a year in trying to go out
11  and get new business?
12    A.   I was never given any kind of
13  amount.
14    Q.   Okay.  All right.  Any other
15  carrier events that you felt like you had
16  been excluded from?
17    A.   Not that I can think of.  I was
18  excluded from the first -- from the
19  broker retreat the first year I was a
20  broker.
21    Q.   When was that?
22    A.   Maybe in February 2018.
23    Q.   And then you went to the one in

1  2019?
2    A.   Yes.  I wasn't on the initial
3  list.
4    Q.   And you had just become an
5  inside broker in what year?
6    A.   2017.
7    Q.   The end of 2017 --
8    A.   Right.
9    Q.   -- or beginning of 2018?
10    A.   Right.  But I knew that the --
11  well, what usually happened was the
12  first-year brokers always went.  Brandon
13  Hays went.
14    Q.   You said Brandon Hays went in
15  2018?  Is that what you're saying?
16    A.   I believe he did.
17    Q.   Was Brandon Hays a -- was a
18  associate broker?
19    A.   Uh-huh.
20    Q.   Is that yes?
21    A.   Yes.
22    Q.   After you -- I know we had
23  discussed earlier about when you went to

Page 191

1  Mr. Daugherty about being promoted, you
2  told him that you wanted to be an inside
3  broker versus an associate broker.
4  Correct?
5     A.  I believe I did at that time.
6     Q.  Yeah.  At any point in time
7  did you come -- after that did you come
8  back to him and say, "Actually, I want to
9  be an associate broker"?
10    A.  No.  But at the same lunch, I
11 mentioned that Susan had told to me she
12 had come -- went to Rusty about me
13 becoming her associate broker and was
14 told no, they had other plans for me.
15    Q.  And the lunch you're mentioning
16 is the lunch you already testified to
17 that you had with Mr. Segrest and Mr.
18 Daugherty?  Is it that lunch you're
19 talking about?
20    A.  I believe it was.
21    Q.  And now you're saying at that
22 lunch, you told Mr. -- this is the lunch
23 you thought you were going to be promoted

Page 192

1  to inside broker.  Is that right?
2     A.  Yeah.
3     Q.  Okay.  I just want to make sure
4  we're on the same page.
5        At that lunch, it's your
6  testimony that you think that you had
7  mentioned to them that Ms. Phillips had
8  come to Rusty Hughes and said that she
9  wanted you to come to her team as an
10 associate broker?
11    A.  That's what I remember.
12    Q.  Why did you say that?  I mean,
13 why did that get brought up in this
14 conversation?
15    A.  With Corey?
16    Q.  And Clay.
17    A.  Because I was wondering if he
18 was going to give me a promotion.
19    Q.  Okay.
20    A.  So I realized when he wasn't,
21 there weren't plans for me.  But I had
22 heard of an opportunity that had been
23 presented that wasn't presented to me.

Page 193

1     Q.  And how did you hear about that
2  opportunity?
3     A.  Susan told me.
4     Q.  And when did she tell you about
5  that?
6     A.  I want to say it was like 2016.
7     Q.  Okay.  What did you say when she
8  said that to you?  What did -- did you
9  tell -- in 2016, did you say:  "I --
10 "I'd" -- "Yeah, I would like" -- "like to
11 come work for you, Susan.  I want to be
12 on your team"?
13    A.  Well, she -- they had put Lauren
14 Lindberg on her team at that point, so.
15    Q.  In 2016, they had?
16    A.  I think it -- I think it -- I
17 think that's how it worked, that that was
18 the timeline.  I would have to
19 double-check, but I think that was it.
20    Q.  But Lauren Lindberg started out
21 as an account executive, didn't she?
22    A.  She did.  That wasn't what she
23 was told -- she was initially told what

Page 194

1  she was going to be doing.
2     Q.  Wait, you're saying that Lauren
3  Lindberg thought that she was -- she was
4  going to be -- that she was -- that she
5  was applying for and was going to be an
6  associate broker and she came there and
7  started her first day on the job and
8  figured out she -- "No, you're an account
9  executive"?
10    A.  Lauren Lindberg was in the
11 property department, and she worked for a
12 broker who would regularly make comments
13 about gay people, and she was gay.  One
14 of the comments was, "All gay people are
15 going to hell."  So she went to John
16 Cadden and said that she was not -- she
17 needed to resign, she couldn't work there
18 anymore.  And John said that there was an
19 opportunity in professional for her, a
20 broker opportunity, and if she could just
21 sit tight for a couple of weeks, he could
22 get it worked out for her.
23       And then when she moved down --

48 (Pages 191 - 194)

Page 195

1  because it was supposed to be to work for
2  Susan -- they said that Susan wasn't
3  retiring yet, so she would be working as
4  Lee's account executive.
5      Q.  So, what was -- you're saying
6  that Lauren Lindberg was in a broker
7  position in the property department?
8      A.  Account executive.
9      Q.  She was an account executive?
10     A.  Uh-huh.
11     Q.  Okay.  So it was a lateral move
12 for her from account executive in
13 property to come over to Susan Phillips'
14 team?
15     A.  I believe at the time she
16 thought she was going to be working with
17 Susan as an associate broker, as her
18 associate broker.
19     Q.  Okay.  And this is information
20 you got from Lauren Lindberg?
21     A.  Uh-huh.
22     Q.  Is that a yes?
23     A.  Yes.  Sorry.

Page 196

1      Q.  Okay.  So back to this
2  discussion with Susan Phillips that you
3  think happened in 2016, my question to
4  you was, did -- when she told you, "Hey,
5  I went to Rusty and said I want you to
6  come to my team," did you say to her,
7  "Yeah, I mean, I want to come to your
8  team"?
9      A.  No.
10     Q.  Why not?
11     A.  At the time, I was thinking I
12 was going to be moving into a broker role
13 on Corey's team.
14     Q.  Okay.  Did you ever come back to
15 her and say, "Hey, Susan, if that
16 opportunity comes along again, I would
17 really like to be a broker on your team"?
18     A.  No.
19     Q.  Anything along those lines where
20 you suggested to her that you were
21 interested in making a move to her team?
22     A.  No.
23     Q.  Okay.  So that -- we were

Page 197

1  talking about that discussion because you
2  said that you told Mr. Segrest and Mr.
3  Daugherty about this comment that Ms.
4  Phillips had made to you at this lunch
5  where you thought that you were going to
6  be promoted to an inside broker.  So --
7  and that was in relation to my question
8  to you -- that was in response to my
9  question to you as to whether or not you
10 had ever gone back to Corey Daugherty at
11 any time and said, "I think I want to be
12 an associate broker instead of an inside
13 broker."
14     A.  No.
15     Q.  Did that ever happen?
16     A.  No.
17     Q.  Okay.  Did you ever go to any of
18 the other brokers within the professional
19 liability department and express an
20 interest in becoming an associate broker?
21     A.  I don't believe I did.
22     Q.  Did you ever go to any other --
23 of the other brokers in the department

Page 198

1  and express an interest in moving teams?
2      A.  No.  I had that conversation
3  with Mr. Helveston.
4      Q.  Okay.  We're going to come back
5  to that.
6          All right.  Are there any male
7  employees at CRC who you contend did the
8  same job as you but made more money?
9      A.  All the male brokers, I believe,
10 made more than me.  And maybe we had the
11 same opportunities to go out, but I was
12 also responsible for a lot of account
13 executive duties.  But I don't -- I don't
14 know what -- I know I've been given Tyler
15 and Clay, Jonathan Morgan.
16     Q.  You mean you've seen the pay
17 that -- their pay that's been produced in
18 this lawsuit.
19     A.  Uh-huh.
20     Q.  Is that right?
21     A.  Yes.
22     Q.  Okay.  Is it your contention in
23 this case that you should have made the

49 (Pages 195 - 198)

Page 199

1   same amount of money as Clay Segrest?
2      A.   I don't know necessarily the
3   same, but I do believe he was getting
4   revenue he wasn't earning.
5      Q.   Okay.  But you agree he was
6   earning revenue on account -- on some
7   accounts that were his own?
8      A.   Sure.  Yeah.
9      Q.   Did you bring any new accounts
10  in to CRC professional liability
11  department when you were there either as
12  an account executive or inside broker?
13     A.   One, maybe two.
14     Q.   And what were those?
15     A.   One was from Cory Fox.  He used
16  to work at CRC.
17     Q.   Any other one?
18     A.   Not that I can think of right
19  now.
20     Q.   Okay.  Do you recall the amount
21  of the commission on the -- the Fox piece
22  of business?
23     A.   I think it was like an $80,000

Page 200

1   policy, so I would assume maybe $8,000.
2   10 percent was the norm.
3      Q.   And was that after the agent
4   split or before?  The 10 percent.
5      A.   That would be after.  That would
6   be what CRC got.
7      Q.   CRC would clear?
8      A.   Uh-huh.
9      Q.   Okay.  Did you see that -- in
10  the records that you reviewed that
11  Jonathan Morgan made less money than you?
12     A.   Yes.  He -- his bonuses were
13  bigger than mine started.
14     Q.   And what do you recall your
15  bonuses starting at?
16     A.   I think 5,000 was my first two.
17     Q.   Was that as an account executive
18  or an inside broker?
19     A.   Account executive.
20     Q.   Okay.  As an inside broker, were
21  your bonuses bigger than Mr. Morgan's?
22     A.   Yes.  He just had started.
23     Q.   Do you contend you should have

Page 201

1   been paid the same as Mr. O'Connor?
2      A.   Not for what was being assigned
3   me.
4      Q.   And what do you mean by that?
5      A.   That Tyler was paid a lot of
6   money for a book that -- he did produce
7   business, but he inherited it from
8   George.  So that revenue just went direct
9   from George to him.
10     Q.   And you didn't work with George?
11     A.   No.  George left right when I
12  got there.
13     Q.   Did you ever discuss with
14  Brandon Hays what he made?
15     A.   I did not.
16     Q.   Okay.  And he at one point sat
17  -- his office was next to your --
18     A.   Cubicle.
19     Q.   His cubicle was next to your
20  cubicle.  Is that right?
21     A.   Yeah.
22     Q.   Did y'all ever chat about
23  bonuses and what he was making?

Page 202

1      A.   No.  I remember one time -- when
2   he got his first bonus, him being excited
3   about it.
4      Q.   But he didn't tell you how much
5   it was?
6      A.   No.  But I knew he hadn't
7   written a policy, nor was he doing any
8   account executive.
9      Q.   Well, if his testimony in this
10  case was that his first bonus was less
11  than 5,000, would you have any reason to
12  dispute that?
13        MS. PALMER:  Object to the form.
14     A.   I don't think so.  He didn't get
15  one the first time, I believe.
16     Q.   Okay.  Did you have an
17  understanding that the associate broker's
18  bonus was based upon the revenue that
19  they brought in?
20     A.   What I understood?
21     Q.   Yes.
22     A.   Uh-huh.
23     Q.   Is that a yes?

50 (Pages 199 - 202)

1    A.   Yes.
2    Q.   Okay.
3    A.   Sorry.
4    Q.   And you might have testified to
5  this, so I'm sorry if I'm making you
6  repeat yourself.  But did you say what
7  team Mr. Morgan work on -- worked on?
8    A.   Truitt Taylor's team.
9    Q.   Were you aware that Mr. Taylor's
10  team was looking to hire an associate
11  broker?
12    A.   Maybe it was his second or third
13  he'd been through.  He went through a lot
14  of employees.
15    Q.   Okay.
16    A.   I would not have wanted to work
17  for him.
18    Q.   Okay.  What about when Mr. Hays
19  was hired, were you aware that Dave
20  Sloneker and Susan Phillips were looking
21  for an associate broker?
22    A.   I was.
23    Q.   Did you express an interest in

1  taking that position?
2    A.   No.  Because I was told that I
3  was going to be Corey's inside broker at
4  that time, I believe.
5    Q.   Okay.  Did you ever ask anyone
6  at CRC if you could be added to the
7  website?
8    A.   Not that I can recall.
9    Q.   Did you want to be on the
10  website?
11    A.   If brokers were -- yeah.  It
12  would have benefitted me to be on the
13  website.
14    Q.   How so?
15    A.   When people look up CRC looking
16  for a broker --
17    Q.   Okay.
18    A.   -- my name would have been
19  there.
20    Q.   Was there a reason you didn't
21  ask if you wanted to be on it?
22    A.   No.
23    Q.   Do you know of anybody who got

1  -- got a client because somebody saw them
2  on the website?
3    A.   I am not sure.  I'm sure it
4  happened.
5    Q.   How are you sure it happened?
6    A.   Well, I would -- I would bet
7  that it happened, but I wouldn't be able
8  to --
9    Q.   That would be an assumption?
10    A.   Correct.
11    Q.   I mean, -- I mean, you -- you
12  saw how Mr. Daugherty worked to develop
13  client relationships; right?
14    A.   I did.  Corey helped Betsy
15  develop a lot of the relation- -- or some
16  of the relationships for his book.
17    Q.   How did he go about developing
18  clients?
19    A.   Developing, growing the book of
20  business?
21    Q.   Yeah.  Getting relationships
22  with agencies so you all could quote
23  policies and --

1    A.   He --
2    Q.   -- find coverage.
3    A.   New agencies, I feel like,
4  usually came to him through referrals.
5    Q.   From other clients that were
6  happy with the services that he had
7  provided?
8    A.   Or other brokers, property and
9  casualty brokers.
10    Q.   And anything else that you saw
11  him do to grow his book of business?
12    A.   He just knew the coverages.  He
13  was an expert in the coverages he was
14  working on.
15    Q.   Did he travel and visit people?
16    A.   He did.
17    Q.   How often was he on the road?
18    A.   I'm not sure.
19    Q.   Okay.  Well, I mean, you worked
20  with him for several years.  Do you have
21  an estimate of how often he would --
22    A.   Well, sometimes he would be on a
23  carrier trip.  Sometimes he'd be at the

51 (Pages 203 - 206)

Page 207

1    lake.  So it wasn't necessarily on an
2    agency visit if he wasn't at the office.
3    Maybe a couple -- three or four times a
4    year, I feel like maybe he would.
5        Q.   Visit an agent?
6        A.   And do a couple at a time, I
7    think --
8        Q.   Okay.
9        A.   -- maybe, in areas.
10       Q.   Okay.  And you went on -- you
11   went with him on some of those trips,
12   didn't you?
13       A.   I did.
14       Q.   Did you ask to go on those
15   trips, or did he -- did he bring that
16   opportunity to you?
17       A.   The specific opportunities, he
18   brought to me.  I believe I communicated
19   to him that I'd like to be included on
20   more sales calls.
21       Q.   Did you enjoy traveling with him
22   to see --
23       A.   Yes.

Page 208

1        Q.   -- business associates?
2        A.   Yeah.
3        Q.   Okay.  How often did you look at
4    the website for CRC?
5        A.   I don't know.  The brokers?
6        Q.   Yes.
7        A.   I wouldn't be able to tell you.
8        Q.   Okay.  Well, I'm just saying,
9    were you trying to keep tabs of when
10   people were on there and when they
11   weren't?
12       A.   No.  But my -- I have an audit
13   background, so there was no rhyme or
14   reason, and so I didn't understand why --
15   why some people were excluded, some
16   people were added the day that they were
17   hired.
18       Q.   Who do you think was added the
19   day that they were hired?
20       A.   Jonathan Morgan maybe, I think.
21       Q.   Did you ever go ask him and say,
22   "Hey, how did you get on the website so
23   fast?"

Page 209

1        A.   I didn't.
2        Q.   Why not?
3        A.   I'm not sure.
4        Q.   Because you knew the marketing
5    department was there on the site;
6    correct?
7        A.   Correct.
8        Q.   Were you aware that there was a
9    form on the intranet that you could fill
10   out if you wanted to --
11           MS. PALMER:  Object to the form.
12       Q.   -- put a bio on the -- on the
13   website or you wanted to make changes to
14   a bio?
15       A.   I wasn't.
16           THE COURT REPORTER:  I'm sorry?
17           THE WITNESS:  I wasn't.
18       Q.   Did you ever go looking for
19   that?
20       A.   Not that I can remember.
21       Q.   Did anyone at CRC tell you what
22   your signature block on your e-mails had
23   to look like?

Page 210

1        A.   They sent out a standard one at
2    some point, a --
3        Q.   Who is "they"?
4        A.   -- a template.  Or it was
5    available on the intranet maybe.
6        Q.   Who -- who is "they"?
7        A.   Who would have?  I can't
8    remember who was in charge of creating
9    them.
10       Q.   Okay.  Did you have any concerns
11   about listing your job title as inside
12   broker on your signature block?
13       A.   No.
14       Q.   Did you want to list your title
15   as associate broker or broker instead of
16   inside broker?
17       A.   No.
18       Q.   When you first came to work on
19   the professional liability side as an
20   account executive, where was your
21   workspace?
22       A.   A cubicle over by Andrea's on
23   our team.

52 (Pages 207 - 210)

Page 211

1    Q.  Did you have that same space the
2  whole time?
3    A.  No.
4    Q.  When did it change?
5    A.  When they hired Tiffany for
6  Clay, so I moved so Clay could have her
7  closer.
8    Q.  So that would have been in 2018?
9    A.  I believe so.
10   Q.  Did you have any objections to
11 moving your -- your cubicle?
12   A.  At first, it was set up to where
13 the wires were where my feet would go.
14 And I remember showing it to Corey, and
15 he said, "Do you think it would bother
16 you?"  I said yes.
17      So I went to Brandi because
18 that's who they told me to go to to talk
19 about getting it reversed so that I could
20 have my feet on the other side.  And she
21 said that they had tried in the past, but
22 they would have to get BB&T's approval
23 and made it sound like it wasn't going to

Page 212

1  happen.  But I said: "Okay.  Who do I
2  need to go to to get BB&T's approval?"
3  So we ended up getting it, and they
4  reversed it.
5    Q.  Who's Brandi?
6    A.  Brandi worked for Rusty.
7    Q.  Do you know her last name?
8    A.  Is it Russell?
9    Q.  Okay.
10   A.  I believe.
11   Q.  Did -- did she have some sort of
12 like an office manager-type role?
13   A.  No.  But she did some of that
14 stuff for Rusty because he was the
15 manager of the department.
16   Q.  Okay.  Okay.  I'm showing you
17 what I'll mark as Defendant's Exhibit 13.
18 And I believe these are photos that we --
19 that your attorneys produced to us.
20      Do these photos reflect your
21 office space at CRC as of the time that
22 you left your employment there in 2019?
23 (Defendant's Exhibit 13 was marked for

Page 213

1  identification and is attached.)
2    A.  Same day -- yeah, I was still
3  sitting there.  Yes.
4    Q.  Is that yes?  Okay.
5      Was -- so, was this after the
6  wires were moved?
7    A.  Yes.
8    Q.  Okay.  So if I'm looking at the
9  first page -- no.  Excuse me.  I'm
10 looking at the second page.
11   A.  The wires weren't moved.  The
12 desk was moved.
13   Q.  The desk was moved.  Okay.  But
14 it was your -- is your testimony that
15 when you initially were assigned this --
16 this cubicle where we -- where I see that
17 blue in the picture in the bottom
18 right-hand corner, that was where your
19 feet would have gone?
20   A.  Yes.
21   Q.  Okay.  And then you went to --
22 you showed that to Mr. Daugherty.
23   A.  Uh-huh.

Page 214

1    Q.  Is that right?
2    A.  Yes.
3    Q.  And he said that they would try
4  to -- try to get it changed?
5    A.  Yes.
6    Q.  And did he go to Ms. Russell or
7  did you go to Ms. Russell?
8    A.  I believe I did.
9    Q.  And then she said BB&T would
10 have to get it approved?
11   A.  Yes.  So she sent me to Cindy
12 Scott.
13   Q.  Okay.  And who's Cindy Scott?
14   A.  Cindy had been with CRC for
15 years.  I'm not sure what her title was.
16   Q.  Okay.
17   A.  She didn't work for a producer
18 team.
19   Q.  Okay.  And did she approve
20 having the wires moved?
21   A.  She --
22      MS. PALMER:  Object to form.
23   A.  -- said the same thing Brandi

53 (Pages 211 - 214)

1  did, that we would have to contact BB&T
2  in order to have it moved.  And so I
3  asked her to please go on and do that.
4      Q.  Okay.  Did she -- well, I don't
5  know.  Do you know if she did that or
6  not?
7      A.  She did.
8      Q.  Okay.  Do you know when you took
9  these pictures?
10     A.  I see my calendar says November.
11  I am not positive the date, but it would
12  -- I would have it in my picture.
13     Q.  Okay.  Okay.  You had referenced
14  in your testimony earlier that -- a
15  conversation with Mr. Helveston, and I
16  said we were going to come back to that,
17  so that was -- I want to come back to
18  that now.
19     A.  Okay.
20     Q.  Tell me about that conversation.
21  How did it come -- first of all, how did
22  it come about?
23     A.  Ms. Helveston was with my mom

1  somewhere, and she asked how I was liking
2  it and if I was doing well.  And my mom
3  said, "It's horrible."  And she said,
4  "Why?"  She said, "The good old boys
5  aren't letting her have the opportunities
6  that they have."  She said she would get
7  Bubba to reach out to me, Mr. Helveston.
8  So he called me to schedule a breakfast,
9  and then we went to that breakfast.
10     Q.  Okay.  So just to recap, you had
11  made a complaint to your mother about
12  your work environment.  Your mother, in
13  some social setting with Ms. Helveston,
14  relays that you are unhappy with your
15  work environment, that you're calling it
16  a good old boys club.  Ms. Helveston says
17  she's going to let her husband know and
18  he'll reach out to you.  And then Mr.
19  Helveston reached out to you and set up a
20  breakfast meeting.
21     A.  Yes.
22     Q.  Is that right?
23     A.  Yes.

1      Q.  Okay.
2      A.  That's how I remember it.
3      Q.  Okay.  How -- did he call you?
4      A.  Yes, on my desk phone, I
5  believe.
6      Q.  And tell me about that initial
7  conversation that you had with him.
8      A.  On the phone?
9      Q.  Yes.  On the desk phone, yes.
10     A.  Okay.  I think he said:  "I hear
11  you're having some issues.  Do you want
12  to grab breakfast so we can talk about
13  it?"  And I said yes.
14         MS. PALMER:  Rachel, would this
15  be a good time to take a quick break?
16         MS. BARLOTTA:  Oh, yeah.  That's
17  fine.  Sure.
18         THE VIDEOGRAPHER:  We're going
19  off the record at 2:29.
20         (Break taken.)
21         THE VIDEOGRAPHER:  We're going
22  back on the record at 2:48.
23     Q.  (By Ms. Barlotta) All right.

1  Before we took a break, we were about to
2  talk about -- or we were -- were talking
3  about, excuse me, the conversation that
4  you had with Mr. Helveston.  And we had
5  talked about that he had reached out to
6  you by phone at work and had scheduled a
7  meeting with you, a breakfast meeting
8  with you.  Is that right?
9      A.  Right.  I had told my mom it was
10  okay for her to let Ms. Helveston know I
11  was having issues.  I had asked her
12  before that to not because I was trying
13  to figure a way out.
14     Q.  Okay.
15     A.  To handle it.
16     Q.  Okay.  What would be the reason
17  that you wouldn't have reached out to Mr.
18  Helveston directly yourself instead of
19  relying on your mom?
20     A.  I was still wanting to be a
21  broker.  So I think I thought it was
22  better if he called me to set it up as
23  opposed to me calling him.

Page 219

1    Q.  But you knew how to get ahold of
2  him if you needed to; correct?
3    A.  I could have figured it out, I'm
4  sure.
5    Q.  When you say you were still
6  wanting to be a broker, at this point in
7  time you were an inside broker.  Is that
8  correct?
9    A.  I had the title.
10    Q.  And in what way do you contend
11  that you were not an inside broker as of
12  the time you had a conversation with Mr.
13  Helveston?
14    A.  Why I felt that way?
15    Q.  Sure.  You can phrase it that
16  way.
17    A.  Little things were happening.
18  One of the agencies that he had assigned
19  me to, I had gone to him -- he finally
20  reassigned Yvette to be the account
21  executive.
22    Q.  And is "he" Mr. Daugherty?
23    A.  I'm sorry.  Yes, Mr. Daugherty.

Page 220

1    Q.  Okay.  Go ahead.
2    A.  Now, it was my understanding
3  that a broker could market the business
4  and send it to the account executive to
5  get to the agent.  She was forwarding me
6  stuff to send -- of the agents quotes to
7  send out.  And I went to Corey and asked
8  if I understood correctly that she should
9  be doing the quotes.  He said I did, yes,
10  that's what he wanted.  And I told him I
11  thought it needed to come from him, and
12  he said he really wanted me to work it
13  out between us, me and Yvette.
14    Q.  Okay.  Okay.  So -- okay.  And I
15  just want to make sure I'm understanding
16  your testimony, so if I get something
17  wrong, please correct me.
18    A.  Okay.
19    Q.  But you said that -- when I
20  asked you about why it was you felt like
21  you were not a broker, inside broker, and
22  just had the title of inside broker, you
23  said little things were happening, that

Page 221

1  it was -- would be Yvette Talsma who
2  has -- was sending you quotes to handle?
3    A.  I believe, and binders maybe.
4    Q.  And binders to handle.  And that
5  when you complained to Mr. Daugherty
6  about that issue, he said you should work
7  it out with her?
8    A.  Well, I clarified if that's what
9  it was supposed to be.  He said yes, and
10  then he said he would like me to work --
11  us to work it out.
12    Q.  He clarified that you -- as an
13  inside broker, she should be doing that
14  for you, you should not be doing that for
15  her?
16    A.  Yes.  If I needed her to do it.
17    Q.  Okay.  So I just -- again, I
18  want to make sure the record is clear.
19  I'm not -- I'm not -- I'm not sure that
20  it was there.
21    If he, Mr. Daugherty, said that
22  if you wanted to give her quotes or
23  binders, that it was appropriate for you

Page 222

1  to do so as an inside broker?
2    A.  Correct.
3    Q.  To give that work to Ms. Talsma
4  as an account executive?
5    A.  Correct.
6    Q.  Okay.
7    A.  She was assigned to that agency.
8    Q.  And -- but he would not -- he
9  wanted you to tell her that.  He -- he
10  was declining to go to her and explain
11  that that's how it should work?
12    A.  That's what I interpreted from
13  our conversation.
14    Q.  When he said, "I want you to
15  work it out with her"?
16    A.  I think I said, "Okay."  It was
17  -- this was around the time where I was
18  starting to have the realization that I
19  was not going to be given or had not been
20  given --
21    Q.  Did you go back to Ms. Talsma
22  and say, "Hey, I talked to Corey
23  Daugherty and he said that really, the

55 (Pages 219 - 222)

1  way this works now that I'm an inside
2  broker is that I can give this stuff to
3  you and he" -- "you know, he's asked me
4  to" -- "for us to come up with, you know,
5  a plan for you to do that?"  Did you --
6  did you do that?
7      A.  I don't think so.
8      Q.  Why not?
9      A.  Yvette was the veteran on the
10  team.
11      Q.  She had been there a long time.
12  She had been in the professional
13  liability department a long time.  Is
14  that right?
15      A.  That's right.
16      Q.  So over 20 years?
17      A.  Maybe over 30 now.
18      Q.  Okay.  But at the time that this
19  occurred -- and this would have been in
20  2019.  Is that right?
21      A.  Yes.  I believe so.
22      Q.  Okay.  Do you think that she had
23  been there at least 20 years at that

1  time?
2      A.  Yes.
3      Q.  Okay.  All right.  Anything else
4  that, as of the time that you had this
5  discussion with Mr. Helveston, you felt
6  like you were not -- you were an inside
7  broker in title only?
8      A.  Mississippi school districts, I
9  had worked on those schools since I
10  started with Corey.  They were with
11  Fisher Bottrell.  I had collected a lot
12  of data over the years on those accounts.
13  And one of the things he did to free me
14  up was to move the Mississippi schools to
15  Clay as opposed to letting Tiffany do the
16  account executive work for me, so it
17  moved the revenue with it, too.
18      Q.  When was that?
19      A.  I don't know the exact date.
20      Q.  Was it when Tiffany was hired?
21      A.  No.
22      Q.  Do you have an approximate date
23  on when that happened?

1      A.  They were July renewals, I
2  think.  I believe it was in maybe late
3  2018, early 2019.  I can't remember
4  exactly.  They also had a broker chat on
5  their iPhones.
6      Q.  What was the -- how do you
7  spell -- you said Bottrell?  How do you
8  spell that?
9      A.  I think it's B-O-T-T-R-E-L-L.
10  Fisher Bottrell.  F-I-S-C-H-E-R [sic], I
11  think.
12      Q.  Sorry, B-O what?
13      A.  T-T-R-E-L-L.
14      Q.  Okay.  Okay.  Okay.  So yes, the
15  -- you were -- you said there was a group
16  chat?
17      A.  Uh-huh.
18      Q.  I think --
19      A.  Well --
20      Q.  I think I may have interrupted
21  you. I'm sorry.  So, what was your
22  response about that?
23      A.  We went to San Diego PLUS, me,

1  Brandon, Danielle, and Amber.  And
2  Brandon took a picture of me, Danielle,
3  and Amber.  And he said:  "That's such a
4  cute picture.  Do you care if I send it
5  to the broker group?"
6      I said, "What broker group?"
7  And his face kind of got red.  And I
8  said, "The all-male broker group chat?"
9      There was another time that
10  Corey Woodward mentioned something to me
11  that he thought I knew and then said,
12  "I'm sorry, it was on the broker chat."
13  I don't believe Susan was on it, or
14  Cathy, though.
15      Q.  Okay.  So the reason that you
16  think that there was this male chat group
17  is because when Brandon Hays took a
18  picture of you and said he sent it to the
19  group chat, or the broker chat, that you
20  asked him what chat he was talking about
21  because you weren't part of it?
22      A.  Right.
23      Q.  Did you ever actually see any

Page 227

1  messages exchanged on this --
2  A.  I didn't see them, huh-uh.
3  Q.  Do you know if it was a text
4  message group or a Snapchat group or a --
5  A.  I believe it was a text message
6  group.
7  Q.  And why do you believe that?
8  A.  Well, I do think that I did see
9  -- Corey Woodward showed me a picture one
10  time when I had asked him about it.  And
11  he said, for the most part, they didn't
12  talk about carriers and stuff, but.  I
13  said, "But that is discussed on there?"
14  And then he showed a picture that Corey
15  had sent him that -- had sent the group
16  that was --
17  Q.  A picture of what?
18  A.  I think a turkey.
19  Q.  A picture that who had sent the
20  group?
21  A.  Corey Daugherty.  So it was -- I
22  believe it was kind of a -- just a --
23  immature boys, and that's what he --

Page 228

1  Corey was trying to communicate to me was
2  it's nothing except sometimes, Corey
3  Woodward.
4  Q.  Okay.  And when did you -- when
5  did you have this conversation with Mr.
6  Woodward?
7  A.  I can't remember the exact date.
8  Q.  Your best estimate as you sit
9  here today?
10  A.  Early 2019.
11  Q.  Okay.  All right.  So anything
12  else that you -- led you to feel like you
13  were not a broker, inside broker?
14  A.  I was doing a lot of the same
15  jobs as all the other women.  One of the
16  things, I was being held up.  I feel like
17  one of the agents was not sending me
18  business as fast because she knew she had
19  to wait on me to get it processed and do
20  that whole part too.  I was picking up on
21  that she wasn't getting -- that agency
22  wasn't getting the attention that they
23  needed or the service.

Page 229

1  Q.  Okay.  And how did you get that
2  information?
3  A.  I feel like -- it wasn't a --
4  she didn't directly say it to me.  It was
5  -- I feel like it was implied somehow.
6  Q.  What was the name of this
7  person?
8  A.  I think it is Sarah Polling and
9  DeVenne.  And then I started to run into
10  the same issue with Willis Chicago.  We
11  had the big account, the Somerby senior
12  living.  And so it was a lot of policies,
13  and so -- to market them and quote, and I
14  wasn't able to spend any time marketing.
15  But there weren't any other brokers that
16  didn't have somebody to send the quote to
17  when they needed to get it out, so I was
18  having to decide between a new business
19  account that I could be working on or
20  typing all the quotes and binders.
21         There were still times that
22  Corey would bring quotes to my desk to
23  type up when Andrea and Yvette were

Page 230

1  there.
2  Q.  Okay.  And you were typing
3  binders and quotes for Mr. Daugherty?
4  A.  Correct.
5  Q.  Okay.  Okay.  Back to your
6  conversation with Mr. Helveston, tell me
7  about that breakfast meeting.
8  A.  He said, "What's the issue?"
9  And I said:  "It's a discrimination.  The
10  men are not allowing the women the same
11  opportunities as the men."
12  Q.  Okay.  Anything else you said?
13  A.  He kind of took a sigh of
14  relief, I felt, and he said, "Phew, I
15  thought it was going to be one of those
16  Me Too things," and didn't seem as
17  worried.  I told him that it kind of was
18  one of those Me Too things, just not with
19  a sexual harassment component.  I wanted
20  to be included, I wanted to be a part,
21  and be given the same opportunities.
22  Q.  And I want to make sure that
23  I've got your right testimony.  I don't

Page 231

1  want to retread ground. But have you
2  told me about all the opportunities that
3  you felt like you were not given?
4     A.  I -- my bonuses weren't going
5  up. They -- they were, in small
6  increments, but the same increments that
7  they were when I was an account
8  executive.
9        When -- in 2018, Corey -- we had
10  our biggest year yet. That was the first
11  year that I was an inside broker for the
12  whole year. That was the year we moved
13  the small accounts so that it could open
14  the team up to be able to work on larger
15  accounts. Corey won professional
16  liability broker of the year for 2018.
17  And then my first bonus in 2019, that
18  should have related to 2018. I believe
19  it was the same as the previous one, and
20  that communicated to me that nothing had
21  changed.
22     Q.  Okay. So you thought that
23  because you were an inside broker that

Page 232

1  that would automatically translate to a
2  bigger bonus, or should have
3  automatically translated to a bigger
4  bonus?
5     A.  Yeah.
6     Q.  Okay.
7     A.  I mean, and the team --
8     Q.  Did you not understand that it
9  was tied to revenue that you brought in?
10     A.  I did. But he had to budget for
11  Clay's new account executive, her bonus
12  and salary. And Clay, he wasn't building
13  up his book of business at the time. It
14  wasn't growing.
15     Q.  Okay. Other than that -- in
16  2018 and other -- other than that one
17  account that you mentioned to me, any
18  other revenue that you brought in?
19     A.  Not that I can -- I helped Corey
20  bring in revenue.
21     Q.  Did you understand the account
22  executives' bonuses were tied to the size
23  of accounts -- the size of the accounts

Page 233

1  that they were working on --
2     A.  I had --
3     Q.  -- or responsible for?
4     A.  -- assumed that that's probably
5  how.
6     Q.  Did -- in 2018, didn't Ms.
7  Talsma and Ms. Sutton have more accounts
8  than you?
9     A.  They were account executives.
10  Yes.
11     Q.  Okay.
12     A.  I believe that they did.
13     Q.  Were there accounts that you
14  helped Corey bring in in 2018 that you
15  somehow feel like you were not given
16  credit for?
17     A.  I guess all of the new business
18  that I helped him work on. I was -- it
19  seemed like I was being paid the same as
20  when I was an account executive.
21     Q.  Well, you had the ability to
22  look up that information in AIM, did you
23  not?

Page 234

1     A.  Yes. Yes, and in Dashboard.
2     Q.  Okay. Was there any time that
3  you looked up in AIM or Dashboard that
4  you saw that there was an account that
5  you should have been the marketing rep on
6  that was not assigned to you?
7     A.  I did not market -- I did not
8  mark the accounts that I only acted as an
9  account executive on. I put that as
10  Corey -- under Corey still because my job
11  as an inside broker, as I understood it,
12  was to work on new business, and I
13  thought that that number was supposed to
14  reflect the new business that I worked
15  on. So to get my full number, you'd have
16  to add account executive, the two
17  columns.
18     Q.  But you would agree that your
19  bonus was directly tied to how much Corey
20  brought in.
21     A.  Yes.
22     Q.  Is that correct?
23     A.  Yes.

Page 235

1    Q.  And the different teams had -- I
2  think you alluded to this before with the
3  different size teams.  But different
4  teams within the professional liability
5  department had different sizes of books
6  of business?
7    A.  Yes.
8    Q.  And there were some that were
9  bigger than Corey's?
10    A.  Rusty and maybe Truitt.
11    Q.  And there were some that were
12  smaller than Corey's.
13    A.  Uh-huh.
14    Q.  Is that right?
15    A.  Yes.
16    Q.  But for whoever the account
17  executives and brokers on those lead
18  broker teams were, their bonuses would
19  have been tied to how much that team
20  brought in.  Is that right?
21    A.  I'm not sure.
22    Q.  Okay.  So back to your
23  conversation with Mr. Helveston, you said

Page 236

1  that -- that you were not being allowed
2  the same opportunities.  Did you tell him
3  -- I just asked you what those
4  opportunities were.  But did you tell him
5  what the opportunities were?
6    A.  I can't remember if I
7  specifically -- I know I mentioned the
8  carrier trips.  And he had the same reply
9  that they did, that the carriers are who
10  invite them.  I thought Corey would want
11  me to get to know his carriers and help
12  me facilitate those relationships.
13    Q.  Okay.  And is your -- your
14  contention that he did not do that?
15    A.  He did on some, I think.
16    Q.  Which ones?
17    A.  TDC, he had -- they sent out an
18  invite for their event, and he followed
19  up to tell them to add Lauren and I.  He
20  either -- there were some accounts, I
21  wouldn't be able to name them, where he
22  did introduce me in a -- to an
23  underwriter that I'd be -- or an agent --

Page 237

1  running with the account.
2    Q.  Can you think of any of those?
3    A.  No, I can't.
4    Q.  Okay.  All right.  Anything else
5  that was discussed in the breakfast
6  meeting with Mr. Helveston?
7    A.  He -- his response -- well, he
8  then said, "What do you want to do?"  I
9  said I -- he said, "What do you want me
10  to do," which caught me off guard.  I was
11  expecting the answer to be:  "Not on my
12  watch.  I'll handle it."  So he said --
13    Q.  You weren't expecting him to ask
14  you what you thought would be a good
15  resolution to the situation?
16    A.  Well, he had also said that he
17  wouldn't be able -- he couldn't talk to
18  them because I wouldn't be able to go
19  work back with the same group of guys
20  once I'd made the complaint.  So I was
21  having to realize at that time that I
22  wasn't going to get any help.
23    Q.  When was this discussion?

Page 238

1    A.  It was late June 2019.
2       He then asked if I would want to
3  transfer teams.  I said I would at that
4  point.  And I felt that that would come
5  with a recommendation from him.  If he
6  put me on a team, that would have helped
7  me, I believe.
8    Q.  Okay.  How did the meeting end?
9    A.  He said he would think about --
10  he was going to think about it and he'll
11  come up with a plan and he would get back
12  to me.
13    Q.  And what specifically were you
14  expecting him to do as a result of that
15  meeting?
16    A.  I think a big part of it was I
17  never expected he'd be there without
18  informing HR that he was meeting with
19  someone about a complaint since we sold
20  employment practice liability insurance.
21  I -- I just --
22    Q.  Okay.  Did you -- you didn't
23  tell him, though, prior to that meeting

59 (Pages 235 - 238)

Page 239

1    what your complaint was going to be about
2    though, did you?
3        A.   My mom had told Ms. Helveston.
4        Q.   And you don't know what Ms.
5    Helveston told him?
6        A.   No, I don't.
7        Q.   But my question again was, what
8    did you -- what were you expecting him to
9    do?
10       A.   Fix it.
11       Q.   And what -- and what would he do
12   to fix it?
13       A.   I'm not sure there.  I --
14       Q.   Well, if the situation had been
15   fixed, what did that -- what would --
16   what did that mean in your mind, to have
17   had it fixed?
18       A.   I don't know what that looked
19   like.  That's why I was asking him for
20   help.  I let him know that other women
21   were having issues and had made
22   complaints to Rusty, and Rusty always
23   told them to go work it out with their

Page 240

1    broker.
2        Q.   And that was information you
3    heard from other women?
4        A.   Yes.  And saw it happen, them go
5    in his office and come out without help.
6        Q.   Okay.  Who -- who did you see go
7    into his office and come out without
8    help?
9        A.   Lauren.  I think Vandalyn,
10   because her broker told her she had to
11   have her RPLU to be promoted to account
12   executive, which none of us had.  I know
13   that Mandy Pender did.  She asked for --
14   if she could transfer off of Truitt's
15   team because of the hostile work
16   environment that she was experiencing,
17   and he said no.
18       Q.   Okay.  And this was information
19   you got from Mandy?
20       A.   Uh-huh.
21            MS. PALMER:  Is that a yes?
22       A.   Yes.  So --
23       Q.   And what did Lauren tell you

Page 241

1    about what she said, what she -- what she
2    allegedly complained to Rusty about?
3        A.   I think Lauren com- -- more than
4    once complained to him that she couldn't
5    market because she -- Lee was letting her
6    market a lot of his business.  The plan
7    was for her to be promoted to inside
8    broker.  And --
9        Q.   Okay.  And again, this was the
10   information that you got from Lauren?
11       A.   Correct.
12       Q.   You were not present for any
13   discussions that Lauren and Rusty had?
14       A.   Correct.
15       Q.   You were not present for any
16   discussions that Vandalyn had with Rusty?
17       A.   Correct.  I had a conversation
18   with Rusty when he brought up Sarah
19   Dunston, and I guess Sarah Dunston -- I
20   don't know if she had already told me --
21   yeah, I guess she had already told me
22   that she gave Rusty an earful to make
23   sure that he understood that women were

Page 242

1    having a problem.  And so he said, "Now,
2    Sarah Dunston told me that the women out
3    there think that they're not getting" --
4    or, "there's a problem."  And I said that
5    I agreed and I was glad that he was
6    aware.
7        Q.   Anything -- anything other than
8    he said that women were having a problem?
9        A.   Not that I remember.
10       Q.   Okay.  When was this
11   conversation?
12       A.   It was around the time that I
13   was being pro- -- I believe it was around
14   the time I was being promoted, because
15   Corey and I sat in his office and drank a
16   beer with him.
17       Q.   So we're talking late 2017,
18   early 2018?
19       A.   I believe so.
20       Q.   All right.  All right.  Is there
21   any other managerial employees that you
22   contend that you complained to about
23   discrimination at CRC or BB&T?

Page 243

1    A.   That I complained to?
2    Q.   Yes.
3    A.   I had conversations with some
4  brokers in management positions about it.
5  I wouldn't say I took a complaint -- I
6  couldn't take a complaint to them.
7    Q.   What do you mean, you couldn't
8  take a complaint to them?
9    A.   You had -- you went through your
10 line of -- that he -- they had no
11 management over me, so we were -- it was
12 more of a conversation, just.
13   Q.   What do you mean, there was no
14 management over you?
15   A.   So like Trey Reich was -- had
16 his own broker team.
17   Q.   Okay.
18   A.   So --
19   Q.   So I just don't understand why
20 that means you couldn't take your
21 complaint to --
22   A.   I mean, I could com- --
23   Q.   -- anyone there.

Page 244

1    A.   Well, I could take my complaint
2  to Corey or Rusty but not -- other teams
3  managed themselves.  The broker managed
4  them.
5    Q.   Okay.  But did you have any
6  complaints with any of the other teams?
7  Wasn't your complaint with Mr. Daugherty?
8    A.   Oh, I'm sorry.  It wasn't -- it
9  was in general of just maybe the culture,
10 that it was -- and Trey had mentioned
11 that they had a lunch with Betsy at
12 Gianmarco, and she asked about
13 opportunities not being given to women.
14   Q.   Okay.  And Betsy was in charge
15 for some period of time.  Is that not
16 right?
17   A.   Yeah.  Betsy trained all of
18 them.  She started the professional
19 liability department.
20   Q.   So this conversation that Trey
21 was telling you about, was it -- was he
22 saying that this conversation was after
23 Betsy was no longer with CRC?

Page 245

1    A.   I believe so.  That's what I
2  remember.
3    Q.   Okay.  Okay.  And this was
4  something that Trey brought up to you?
5    A.   Yes.
6    Q.   Okay.  I was asking you about
7  anybody you complained to in a management
8  position at BB&T or CR- -- or CRC about
9  discrimination other, obviously, than the
10 conversation you had with Mr. Helveston.
11   A.   Right.
12   Q.   Anybody else?
13      MS. PALMER:  I'm sorry, Rachel,
14 are we just talking about from the
15 Helveston forward or --
16   Q.   Well, I know you -- you -- well,
17 obviously, you have letters that your
18 attorneys sent and -- and -- and the
19 leave period.  But let's -- yeah, let's
20 just focus on the time period from when
21 you were -- began working at CRC through
22 when you had this conversation with Mr.
23 Helveston.

Page 246

1       Anybody else that you brought
2  any concerns of discrimination to that
3  was in a management position?
4    A.   I had talked to Corey about it
5  in the past.
6    Q.   When did you talk to Corey about
7  it?
8    A.   That day at the lunch.
9    Q.   Okay.
10   A.   I went back to him about Clay,
11 let him know he was treating me like his
12 secretary.
13   Q.   Okay.  And then after you had
14 that conversation with Mr. Daugherty,
15 then you were no longer doing Mr.
16 Segrest's secretarial work.  Is that
17 right?
18   A.   I was until they got an account
19 executive to take it over.
20   Q.   So Ms. Sanders?
21   A.   Yes.
22   Q.   Yeah.  Okay.  All right.  Any
23 other conversations that you had with Mr.

61 (Pages 243 - 246)

Page 247

1  Daugherty in which you raised concerns
2  about discrimination?
3     A.  I can't recall right now.
4     Q.  Okay.  All right.  So then after
5  you have this breakfast meeting with Mr.
6  Helveston in late June of 2019, did you
7  have any further discussions with him?
8     A.  No.  I went back to the office
9  and waited to hear from him.  I ran into
10 him three or four times within the next
11 couple of weeks, and he never even
12 mentioned that he was working on it or
13 acknowledged that I -- we had talked
14 about it.
15    Q.  Did you ask him about it?  Did
16 you say, "Hey, have you thought any more
17 about what we talked about?"
18    A.  I didn't.
19    Q.  Why not?
20    A.  He had said he would take care
21 of it.  He was president of the company.
22 I was figuring he was taking care of it
23 and I would hear from him.

Page 248

1     Q.  Okay.  And then you were
2  continuing to perform your job duties?
3     A.  At that time, to the best of my
4  ability.  I had -- had started to realize
5  that I had given up my career, kind of,
6  there, or made it a lot more difficult
7  and that he -- four or five weeks went by
8  and I still hadn't heard from him, and I
9  just had the realization that I wasn't
10 going to get help.  And I went on medical
11 leave for the next month, and I still
12 never heard from him.  And then my mom
13 was having a trip or a breakfast with Ms.
14 Helveston, and she asked how I was doing,
15 and my mom told her I was out on medical
16 leave.
17    Q.  Okay.  Anything else?
18    A.  I got a text from John Cadden
19 the next day or two saying that he had
20 talked to Ron and he wanted to talk to me
21 to see how we could work it out or fix it
22 in a way that I was comfortable with.
23    Q.  Okay.  Then what happened?

Page 249

1     A.  I had believed Corey.  I had
2  believed Rusty.  I had believed Mr.
3  Helveston.  So I was having a hard time
4  believing John Cadden would --
5     Q.  Meaning you --
6     A.  -- change it.
7     Q.  Meaning you didn't respond to
8  him?
9     A.  Correct.
10    Q.  Okay.  And what were you doing
11 while you -- well, let me ask you this.
12 I'll show you what I've marked as
13 Defendant's Exhibit 14.
14        I understand your counsel just
15 produced a text message that you have of
16 this same text message that we -- I think
17 we got either yesterday or today.  But
18 this is a text message that -- one
19 version.  We produced two versions of
20 this text message in this case from Mr.
21 Cadden.  And they -- I am showing the
22 date on here as being August 28th, 2019,
23 at 1:29 p.m.

Page 250

1  (Defendant's Exhibit 14 was marked for
2  identification and is attached.)
3     A.  I don't argue that.
4        THE COURT REPORTER:  I'm sorry?
5        THE WITNESS:  I don't argue
6  that.
7     Q.  All right.  During this period
8  of time while you were on leave, what
9  were you doing?
10    A.  I stayed at my parents' house
11 and -- I'm not sure.  I don't know.
12    Q.  Okay.  Were you -- did you --
13 had you started looking for another job?
14    A.  While I was on leave?
15    Q.  Yeah.
16    A.  No.
17    Q.  Why not?
18    A.  Why wasn't I looking for another
19 job?
20    Q.  Yes.
21    A.  I still had one.
22    Q.  Okay.  Well, I guess I'm trying
23 to figure out what had been going on in

62 (Pages 247 - 250)

Page 251

1  your mind if you had been out on leave,
2  you said you were waiting for Mr.
3  Helveston to do something, you get -- you
4  get a -- John Cadden reaches out to you,
5  you don't respond, and you said you were
6  concerned about this -- the statement
7  that Mr. Helveston made that you wouldn't
8  be able to go back and work there, so it
9  seems like kind of a logical thing that
10  you might do would be to start looking
11  for a job elsewhere.
12      Did you not think that, or did
13  you -- you thought that you were going to
14  be coming back to CRC at that point in
15  time?
16    A.  I was not sure.  I was on
17  medical leave for -- put on it by my
18  psychiatrist and.
19    Q.  Okay.  Were you waiting for
20  somebody else to reach out to you other
21  than Mr. Cadden?
22    A.  When I went on medical leave, I
23  thought that BB&T would reach out

Page 252

1  because, again, I was assuming that the
2  complaint had been brought to them.
3    Q.  Did it ever occur to you to
4  reach out to anyone within the HR
5  department at BB&T?
6    A.  It -- I thought about it.  But
7  the -- the way it was set up, we were
8  told often that your salaries are from
9  BB&T and your bonuses are from your
10  broker, and so it made it difficult to go
11  to corporate and report someone who had
12  pure discretion over my bonus.
13    Q.  Okay.  So, would it be fair to
14  say that you did not go to corporate
15  because you were afraid that that would
16  negatively impact your bonus?
17      MS. PALMER:  Object to the form.
18    A.  I think my career.
19    Q.  Okay.  And your bonus?  Or are
20  you changing your testimony?
21      MS. PALMER:  Object to form.
22    Q.  You just said, if I understood
23  your testimony correctly, that you -- it

Page 253

1  was hard for you to go to corporate
2  because you understood that BB&T had
3  control over your salary but CRC had
4  control over your bonus.
5    A.  Correct.
6    Q.  So what I was trying to say is,
7  is what you meant by that that you were
8  afraid that if you went to BB&T, then
9  that CRC would retaliate against you by
10  not giving you a high bonus or as good of
11  a bonus?
12    A.  I thought it could be a
13  possibility.
14    Q.  Did you know of that happening
15  to anybody?
16    A.  Not for going to HR.  I know
17  Andrea lost her bonus one year when she
18  came to Corey's team.
19    Q.  And she told you that?
20    A.  Uh-huh.
21    Q.  Is that a -- is that a yes?
22    A.  Yes.
23    Q.  And did she tell you why she

Page 254

1  thought she had lost her bonus?
2    A.  They had lost some big accounts.
3    Q.  Did she say that she lost it
4  because she made any sort of complaints?
5    A.  No.
6    Q.  Okay.  I don't -- I just want
7  you to understand when I ask these
8  questions, I'm not -- I'm not asking you
9  anything that you might have talked with
10  with any attorney.  Okay?  But at the
11  time that Mr. Cadden reached out to you
12  in that text message that we looked at in
13  late August, had you consulted with any
14  attorneys concerning any sort of
15  discrimination concerns that you had with
16  CRC/BB&T?
17    A.  No.
18    Q.  Okay.  I'm showing you what I
19  marked as Defendant's Exhibit 15.  Is
20  Defendant's Exhibit 15 a letter that you
21  drafted and sent to BB&T corporate?
22  (Defendant's Exhibit 15 was marked for
23  identification and is attached.)

63 (Pages 251 - 254)

Page 255

1    A.  Yes.
2    Q.  Is that a yes?  Okay.  And the
3  date of this letter is September 2nd,
4  2019; correct?
5    A.  Yes.
6    Q.  Okay.  And it was at this time
7  you had decided that you wanted to leave
8  your employment with CRC?
9      MS. PALMER:  Object to form.
10    A.  I had accepted it, I think.  I'm
11  not exactly sure when I decided it.
12    Q.  Okay.  But what is your -- what
13  is your understanding of the severance?
14    A.  To -- payment in exchange for a
15  noncompete -- I mean, a nondisclosure was
16  the idea I was thinking, or a payment to
17  leave the company, to part ways.
18    Q.  Okay.  And that's what you were
19  requesting in this letter; correct?
20    A.  Correct.
21    Q.  And you say in this -- this
22  letter, "After dedicating five years of
23  life" -- "my life to this department,

Page 256

1  it's finally become clear to me that CRC
2  Birmingham Professional Liability is not
3  a place" -- "is not a place for me."  Is
4  that right?
5    A.  Yes.
6    Q.  I'm showing you what I've marked
7  as Defendant's Exhibit 16.  And is
8  Defendant's Exhibit 16 an e-mail that
9  Stefani Petty sent to you on September
10  3rd, 2019?
11  (Defendant's Exhibit 16 was marked for
12  identification and is attached.)
13    (Witness reviews document.)
14    A.  Oh, did you ask me a question?
15    Q.  Yes.
16    A.  I'm sorry.
17    Q.  Is this Defendant's Exhibit 16 a
18  letter -- I mean, excuse me -- an e-mail
19  that Ms. Petty sent to you on September
20  3rd, 2019?
21    A.  It looks like it is.
22    Q.  Okay.  And it's at
23  kathryn.hendrix@gmail.com.  Is that your

Page 257

1  personal e-mail account?
2    A.  Yes.
3    Q.  Did you respond to this e-mail?
4    A.  I did not, I don't think.
5    Q.  Why not?
6    A.  I knew that if she were invest-
7  -- take -- if she took my complaint,
8  which I gave her enough, that I assumed
9  it would have -- she would have gone to
10  Rusty and Mr. Helveston, who I had
11  assumed had the complaint that I had made
12  to Mr. Helveston and that an
13  investigation could be done without me.
14    Q.  Does it make sense to you that
15  the HR department would want to talk to
16  the actual person who was making a
17  complaint?
18    A.  It does.  I was out on medical
19  leave, and so I.
20    Q.  Do you -- are you -- were you
21  unable to talk on the phone while you
22  were on medical leave?
23    A.  I could talk on the phone, but I

Page 258

1  was experiencing extreme anxiety, panic
2  attacks around CRC.
3    Q.  Okay.  Were you talking to other
4  people on the phone at this time?
5    A.  I'm sure I was.
6    Q.  And you were talking to people
7  about your work situation, weren't you?
8    A.  I'm sure I had conversations.
9    Q.  Why didn't you respond via
10  e-mail if you didn't want to talk to her
11  on the phone?
12    A.  I don't remember an exact
13  reason.
14    Q.  Or why didn't you say:  "I don't
15  feel really well enough to talk to you.
16  Can we talk again, maybe can we connect
17  in a couple of weeks when maybe I'll feel
18  better?"
19    A.  At this point, I was going -- I
20  knew that part of it would be, "Who have
21  you told or complained to?"  So I was
22  going to have to report Ron Helveston to
23  BB&T, and I couldn't go to work back at

64 (Pages 255 - 258)

Page 259

1    CRC after reporting Ron.  I didn't feel
2    like I could.
3        Q.  Okay.  But no one told you that?
4        A.  I was familiar with the culture
5    there.  I knew how things worked.
6        Q.  Well, do you know anybody who
7    made a complaint against Mr. Helveston?
8        A.  I had heard of someone that had
9    in the past before I was there.
10       Q.  Who -- who was this person?
11       A.  I believe it was an HR director
12   or HR person.
13       Q.  And who did you get this
14   information from?
15       A.  I think Christy Smith told me.
16       Q.  And what did she tell you about
17   this complaint?
18       A.  The person from HR was -- I
19   don't know if she was let go or she left,
20   but yeah, she wasn't there after that.
21   But that's just -- I wasn't there.
22       Q.  All right.  And Christy wasn't
23   there, either?

Page 260

1        A.  Christy?  She might have been
2    there.  She worked there twice at CRC, so
3    I'm not sure if she worked there in
4    the --
5        Q.  I'm saying, did she tell you she
6    was present for any complaints that this
7    other unidentified HR person made?
8        A.  No.
9        Q.  And you don't know if that
10   person quit or if they were fired or what
11   happened?
12       A.  Correct.
13       Q.  Okay.  Mr. Helveston was a close
14   family friend; correct?
15       A.  Correct.
16       Q.  And you -- and you felt like he,
17   despite that he was a close family friend
18   and someone that you had been close with
19   for years, would still retaliate against
20   you?
21       A.  After he didn't help me with my
22   complaint, I wasn't sure.
23       Q.  Okay.  And to be fair, you don't

Page 261

1    know what he did after you spoke with him
2    about your complaint, do you?
3        A.  I don't.  But I -- HR would have
4    reached out to me, I believe, if he had.
5        Q.  Okay.  Because you're assuming
6    that -- that he should have gone to HR
7    and that would have been helping you?
8        A.  He should have gone to HR
9    because he was the president of the
10   company and a woman was coming to him
11   with a discrimination complaint.
12       Q.  Okay.  So if -- is that what you
13   wanted him to do?  You just wanted him to
14   go to HR?
15       A.  I didn't know what I wanted him
16   to do, but I assumed that the president
17   of CRC would have taken my complaint and.
18       Q.  But when HR finally contacts
19   you, you won't talk to them; correct?
20       A.  I, at that point, would have to
21   tell them that I had already reported it
22   to Mr. Helveston.
23       Q.  And you felt like that was going

Page 262

1    to get Mr. Helveston in trouble?
2        A.  At the time, it should, I would
3    -- I mean, I would think that --
4        Q.  Okay.  What -- what -- what I'm
5    trying to get at is your -- was the
6    concern that you didn't want to get a
7    close family friend in trouble, or was
8    your concern that -- that, you know, he
9    was -- this was somehow going to -- to --
10   to bring retaliation upon you if you told
11   HR about Mr. Helveston?  That's -- I'm --
12   I'm -- I'm lost in there.
13       A.  I think there was a lot that I
14   was concerned about.  I was --
15       Q.  But with respect to Mr.
16   Helveston, you said you didn't want to
17   talk to HR because you knew that you were
18   going to have to tell HR that you had
19   previously reported this to Mr.
20   Helveston, and from your perspective, you
21   don't think that he had done anything.
22   So what I'm trying to figure out is --
23       A.  He hadn't --

65 (Pages 259 - 262)

1    Q.  -- why that -- why that was a
2  concern for you.  Was it a concern
3  because you didn't want to get this close
4  family friend of yours in trouble with
5  BB&T or because you didn't want Mr.
6  Helveston to find out that he had -- you
7  had made this complaint, and therefore,
8  that you -- something bad would happen
9  with your job?
10    A.  I -- I really am not sure.  This
11  -- I -- my complaint was about the whole
12  professional department.  So at this
13  point, the complaint to BB&T would be
14  from me about all of those men, all the
15  men in my department and Mr. Helveston.
16    Q.  Okay.  So, is that -- so, is
17  that the reason you didn't want to talk
18  to Ms. Petty from HR was because you
19  didn't want to have to talk about all of
20  the men in the department?
21    MS. PALMER:  Object to form.
22    A.  I was not in a good state of
23  mind during this time.  I was having

1  trouble making sense of a lot of things,
2  which is part of the reason my doctor put
3  me on medical leave.
4    Q.  So, is the answer you don't know
5  why you didn't reach back out to Ms.
6  Petty?
7    MS. PALMER:  Object to form.
8    A.  I realized that Mr. Helveston
9  had not taken my complaint, so all of
10  those things were my concern.
11    Q.  What "all of those things"?
12    A.  Well, now I would have to report
13  Mr. Helveston along with the department.
14    Q.  Okay.  What was the -- I mean,
15  but -- okay.  Why wouldn't you want to
16  talk to HR about the department?  That
17  was what you were complaining about.
18    What I'm struggling to
19  understand, Ms. Hendrix, is that you go
20  to Mr. Helveston and you say there's
21  discrimination occurring.  You wanted him
22  to do something.  And you said one of the
23  things you wanted him to do was to go to

1  HR.
2    A.  Uh-huh.
3    Q.  But then HR comes to you, and
4  you don't talk to them.  And you say,
5  "Well, I don't want to talk to them
6  because I don't want to have to talk
7  about the department."  So that's where
8  I'm getting confused.  Can you help me
9  with that?
10    A.  I really am not -- I mean,
11  again, I wasn't in a good state of mind.
12  I can't remember what my thought
13  reasonings and processes were, which is
14  why I was on medical leave.
15    Q.  Okay.  Let's look at Defendant's
16  Exhibit 17.
17    MS. PALMER:  Rachel, we've been
18  going another hour.  Would this be a good
19  stopping point?
20    MS. BARLOTTA:  No, not right
21  now.
22    Q.  All right.  I'm showing you
23  what's just been marked as Defendant's

1  Exhibit 17.  Do you recall that Ms. Petty
2  sent you another e-mail on September 6,
3  2019, following up again to see if she
4  could assist you with concerns that you'd
5  raised in your letter provided to
6  benefits administration?
7  (Defendant's Exhibit 17 was marked for
8  identification and is attached.)
9    A.  Yes.
10    Q.  Okay.  And did you respond to
11  this e-mail?
12    A.  I don't believe so.
13    Q.  Why not?
14    (Witness reviews document.)
15    A.  I think I felt confident that
16  there wasn't going to be an investigation
17  at this point.
18    Q.  You felt confident there wasn't
19  going to be an investigation.  And what
20  was that -- what was that confident
21  feeling based upon?
22    A.  Ron had not taken the complaint
23  to BB&T.

66 (Pages 263 - 266)

Page 267

1    Q.  To your knowledge?
2    A.  So my mom had texted Ms.
3  Helveston and -- after Cadden reached out
4  and said that I had decided I wanted to
5  request severance and I could send it to
6  Mr. Helveston, and he said send it to
7  BB&T.
8    Q.  And this was a conversation that
9  your mother had?
10    A.  Uh-huh.
11    Q.  Or you said -- or would it be
12  text messages?
13    A.  I -- a message or a text
14  message, I believe.
15    Q.  And your mom told you this?  Or
16  did you -- have you seen these text
17  messages?
18    A.  I haven't seen them.  She was
19  communicating for me.  I was not in a
20  good state of mind to communicate with
21  anybody.
22    Q.  Okay.  So -- okay.  Again, so --
23  just so I'm clear, you said that you felt

Page 268

1  confident there was not going to be an
2  investigation because your mother had
3  reached out to the Helvestons about
4  getting severance, and they -- the
5  response she got back was that you should
6  go to BB&T about that?
7    A.  Right.  I couldn't send it to
8  him.  I needed to send it to BB&T.
9    Q.  Okay.  And what about that made
10  you feel like there wasn't going to be an
11  investigation?
12    A.  Thinking -- thinking procedures
13  were being followed, if he hadn't taken
14  the complaint to HR and she was --
15    Q.  Okay.  But -- but you took your
16  complaint to the benefits department;
17  right?
18    A.  After taking it --
19    Q.  Yeah.
20    A.  -- to Helves- -- I mean,
21  before take -- yeah, after taking it to
22  Helveston.
23    Q.  And when they reached out to you

Page 269

1  to do an investigation, you did not talk
2  to them; correct?
3    A.  Correct.
4    Q.  Okay.  Were you asking your
5  mother to communicate with the
6  Helvestons, or was she just doing that?
7    A.  Maybe a little bit of both.  I
8  -- again, I was -- this time period is
9  pretty fuzzy for me.
10    Q.  Okay.  I'm showing you what I've
11  marked as Defendant's Exhibit 18.  And
12  these are e-mails that we -- your
13  attorneys produced.
14  (Defendant's Exhibit 18 was marked for
15  identification and is attached.)
16    A.  Looks like it.
17    Q.  Okay.  So the first e-mail of
18  this exhibit, this is the -- this e-mail
19  that was sent to Kristina Kelley, this
20  had the -- your -- that letter that we've
21  already looked attached to it where it
22  says, "Kristina, Please see attached"?
23    A.  I think so.

Page 270

1    Q.  Okay.  Did you send anything
2  else that you know of?  Any other
3  attachments?  And just for the record,
4  Defendant's Exhibit 15 has the same date
5  on it of September 2nd, 2019.
6    MS. PALMER:  I'm sorry.  Kat, if
7  you'll turn the page.
8    You said first page.
9    MS. BARLOTTA:  Oh.  I mean, --
10    MS. PALMER:  The e-mails --
11    MS. BARLOTTA:  Yeah, right.
12    MS. PALMER:  -- read backwards.
13    MS. BARLOTTA:  Okay.  Okay.
14    MS. PALMER:  So the bottom there
15  would be your e-mail on page --
16    Q.  (By Ms. Barlotta) So the page
17  Bates-labeled 246 was an e-mail from you
18  to Kristina Kelley dated September 2nd
19  2019.  And it says: "Kristina, Please
20  see attached.  My personal e-mail address
21  is k██████ -- I think ████████ is
22  misspelled --
23    A.  Yeah.

67 (Pages 267 - 270)

Page 271

1    Q.   -- "@gmail.com."  My question
2  was, the -- do you agree that you
3  attached the letter that we looked at,
4  which was Defendant's Exhibit 15?
5    A.   I don't have any reason to
6  dispute that.
7    Q.   Okay.  And Ms. Kristina responds
8  the very next morning to you; correct?
9    A.   Correct.
10    Q.   September 3rd, 2019, at 8:48
11  a.m.?
12    A.   Uh-huh.
13    Q.   Is that a yes?
14    A.   Yes.
15    Q.   And she says:  Thank you for
16  reaching out.  I wanted to let you know
17  that I forwarded your letter to Regional
18  Associates Relations Manager Stefani
19  Petty for review.  Stefani is the HR
20  contact for your area who will be working
21  with you to address your concerns
22  regarding your work environment."
23      Is that correct?

Page 272

1    A.   Looks like it.
2    Q.   And she gave you her phone
3  number and her e-mail address; correct?
4    A.   Correct.
5      MS. PALMER:  Rachel, before we
6  do another exhibit, can we --
7      MS. BARLOTTA:  Yes.  All right.
8  That's fine.
9      THE VIDEOGRAPHER:  We're going
10  off the record at 3:56.
11      (Break taken.)
12      THE VIDEOGRAPHER:  We're going
13  back on the record at 4:08.
14    Q.   (By Ms. Barlotta) All right.
15  I'm showing you what I've marked
16  Defendant's Exhibit 19.  Is this a letter
17  that you sent to Stefani Petty on
18  November 22nd, 2019, resigning your
19  employment?
20  (Defendant's Exhibit 19 was marked for
21  identification and is attached.)
22    A.   Yes.
23    Q.   And you had retained counsel at

Page 273

1  this time?
2    A.   Yes.
3    Q.   The first paragraph, the middle
4  of the paragraph, says, "No one has
5  contacted me or my attorney concerning
6  any investigation."
7    A.   Correct.
8    Q.   You didn't -- you didn't
9  consider Ms. Petty reaching out to you to
10  be contacting you to attempt to conduct
11  an investigation?
12    A.   She had -- after I sent her my
13  complaint, she -- I knew that she had --
14  the information was available if she was
15  going to do an investigation.
16    Q.   But you knew that it would make
17  sense for her to talk directly with you
18  about what your concerns were because the
19  only information she would have had was
20  in the letter that you sent to the
21  benefits department?
22      MS. PALMER:  Object to the form.
23    A.   I had taken my complaint to Mr.

Page 274

1  Helveston, and I.
2    Q.   And is it your testimony that
3  you, in that conversation with Mr.
4  Helveston, you told him every single one
5  of your concerns about the -- your work
6  environment there at CRC?
7    A.   No.  But I knew that if they did
8  an investigation, they would talk to the
9  other women -- or I would assume they
10  would talk to the other women -- in the
11  department.
12    Q.   But you did not provide any
13  names of people that they should talk to?
14    A.   John Cadden was aware.  I didn't
15  -- no, I did not provide any names.
16    Q.   Did you have contact with anyone
17  at either BB&T or CRC -- well, let me
18  start the question this way.  Other than
19  the e-mails that we've looked at with the
20  benefits department and with Ms. Petty,
21  did you have contact with any other
22  person at BB&T and CRC between the time
23  that you went out on medical leave and

Page 275

1  when you sent this letter on November
2  22nd, 2019?
3      A.  I can't recall.  I -- I could --
4      Q.  But you didn't have any
5  discussions with anybody about your job,
6  like what it was -- the status of it or
7  whether you were going to come back to
8  work or not?
9      A.  I had communicated extending my
10  leave at different points.
11      Q.  Okay.  Anybody in the office,
12  the CRC office that you spoke to about
13  any plans to come back to work?
14      A.  I don't think so.
15      Q.  All right.  You say that -- in
16  this letter that "BB&T has left me with
17  no other option other than to resign my
18  position and find subsequent employment."
19          At this time, were you looking
20  for subsequent employment?
21      A.  It was my intention to.
22      Q.  But you were not actually doing
23  it at that time?

Page 276

1      A.  I don't believe so.
2      Q.  When did you start looking for
3  subsequent employment, if you did?
4      A.  I was trying to figure out
5  different things that I could do.
6  QuickBooks is what I thought I would be
7  able to do, but I'm still -- I still am
8  and was then experiencing PTSD whenever I
9  went to try to work on my resumé or --
10  because my whole career was at CRC.  So
11  starting over was a hard thing for me
12  because my career was pretty important to
13  me.
14          MS. BARLOTTA:  Could you give me
15  a new sheet?
16          THE COURT REPORTER:  Yeah.
17  We're still on that one.
18          MS. BARLOTTA:  Hold on.  Wait.
19      Q.  (By Ms. Barlotta) All right.
20  I'm showing you what I marked as
21  Defendant's Exhibit 20.  Is this the EEOC
22  charge of discrimination that you have
23  filed against CRC?

Page 277

1  (Defendant's Exhibit 20 was marked for
2  identification and is attached.)
3      A.  It looks like it.
4      Q.  And you signed this.  Is that
5  your signature on the second page?
6      A.  It looks like -- it looks like
7  it.
8      Q.  And you had counsel at the time
9  that you filed this charge of
10  discrimination; correct?
11      A.  Correct.
12      Q.  I want to ask you about your
13  allegation on the first -- in the
14  first -- middle of the first paragraph
15  that says that, "I asked repeatedly to be
16  placed on an e-mail listserv that the
17  males used to communicate leads."
18          What e-mail listserv are you
19  talking about?
20      A.  Birmingham professional brokers.
21      Q.  And what -- you said, "In late
22  2017 or early 2018, I was finally added."
23  So, is that when you became an inside

Page 278

1  broker?
2      A.  Yes.
3      Q.  What leads were communicated on
4  that listserv?
5      A.  I wouldn't know.
6      Q.  Well, after you were added,
7  what --
8      A.  It was used to communicate with
9  the brokers in the department.  And then
10  once I was added, it started to create
11  issues because other women wanted to be
12  added that were in the account executive
13  position, and so Cor- -- Rusty told the
14  department that we would now be using
15  "professional all."
16      Q.  And did "professional all"
17  include account executives?
18      A.  Yes.
19      Q.  Are you aware of any leads that
20  you were excluded from on this listserv?
21      A.  No.
22      Q.  Okay.  Do you know of any leads
23  on this listserv that materialized into

69 (Pages 275 - 278)

Page 279

1 business for any particular broker?
2    A.  I wouldn't know.
3    Q.  Okay.  Isn't it true that the
4 broker teams are somewhat competitive
5 with each other in the professional
6 liability department?
7    A.  They are.
8    Q.  Okay.  I mean, you're trying to
9 earn more money than the next team.
10 Isn't that right?
11    A.  Yes.
12    Q.  Okay.  So if you had a good tip
13 on a lead, you wouldn't share that with
14 your -- another team, would you?
15    A.  They shared more than -- they
16 communicated through it.  Dinners, that's
17 how they were planned most of the time
18 prior.  Underwriter visits.
19    Q.  Okay.  But I'm asking you about
20 leads, though.  Is that -- is that what
21 you meant in this charge?  Did you mean
22 something different than that when you
23 said it was used to communicate leads?

Page 280

1    A.  I mean, maybe not specifically.
2    Q.  Okay.  So you maybe didn't mean
3 to -- "leads," to use the word "leads" in
4 this charge?  You meant to just
5 communicate business events, that it was
6 used to communicate business events or?
7    A.  Carrier events, coverages, I
8 mean,.
9    Q.  Okay.
10    A.  It -- I didn't understand why,
11 once I got added, they stopped using it.
12    Q.  Okay.  Did anybody tell you why?
13    A.  I don't know if I was assuming
14 or if they said, so that they could be
15 fair to the department.
16    Q.  Okay.  Well, after you were
17 added, is it your contention that you
18 were continuing to be excluded from
19 communication about these business
20 events?
21    A.  There would be times that I was.
22    Q.  And have you already told me
23 about those times, or is that something

Page 281

1 we haven't talked about today?
2    A.  I wouldn't know which specific
3 ones they were.
4    Q.  Okay.  Anything that comes to
5 mind as you sit here today?
6    A.  What's the question?
7    Q.  Yeah.  Anything that you were --
8 I said after that you were added to this
9 listserv that you said that all the women
10 got added to, was there anything after
11 that that you can --
12    A.  They weren't added.  We switched
13 which one we used.
14    Q.  Okay.  After a new one was
15 created that included all the -- all the
16 women?
17    A.  It was already -- it already
18 existed, but.  So communication was sent
19 department-wide to "professional all,"
20 and then brokers would also communicate
21 on the broker e-mail about different
22 broker things.
23    Q.  Okay.  And it's your contention

Page 282

1 that once you were added to the broker
2 e-mail that there was an instruction from
3 Mr. Hughes that they should use
4 "Birmingham professional all" and not the
5 broker e-mail?
6    A.  Correct.
7    Q.  To talk about business events?
8    A.  And dinners.
9    Q.  Okay.
10    A.  It was -- I was confused what
11 would happen, why -- why were they
12 communicating the broker communication to
13 the whole department now.
14    Q.  Okay.
15    A.  And --
16    Q.  All right.  You were confused by
17 it.  But did you ever ask anybody, get an
18 explanation?
19    A.  I mean, no.
20    Q.  Okay.  The second page of your
21 charge, in the middle of the page is a
22 paragraph that says, "I've been told on
23 at" -- "told of at least two

70 (Pages 279 - 282)

Page 283

1  opportunities (2016 and 2018) where
2  higher level brokers have 'asked' for me
3  to be moved into their team as an
4  associate broker which would have given
5  me the opportunity to move up."
6      We talked about, I believe, the
7  2016. You said that that was a
8  conversation that Ms. Phillips had told
9  you about. Is that what you were
10 referring to in this charge?
11     A. Yes.
12     Q. Okay. What was the 2018
13 opportunity?
14     A. Susan also told me that Dave
15 Sloneker had asked, when he was looking
16 for an associate broker, about me coming
17 on their team. She said that it went all
18 the way to John and that he said no.
19     Q. And did you -- and at that time
20 in 2018, did you want to move to Dave
21 Sloneker's team as an associate broker?
22     A. No. At the time, I still was
23 under the impression I was going to be

Page 284

1  able to be an inside broker and those
2  opportunities.
3      Q. Okay. After you became an
4  inside broker, did you travel more with
5  Mr. Daugherty?
6      A. Maybe a trip or two.
7      Q. Had you traveled with him when
8  you were an account executive?
9      A. I think we went to North
10 Carolina when I was an account executive.
11 I can't remember if I had been promoted
12 at that point.
13     Q. Did you plan any trips to visit
14 any prospective clients when you were an
15 inside broker?
16     A. I had drinks with a local Willis
17 agent, Tracy Nelms.
18     Q. Anything other than that that
19 you --
20     A. I had --
21     Q. -- planned yourself?
22     A. -- drinks with a girl from
23 Cobbs, Allen & Hall at which James Powell

Page 285

1  showed up, too, because he -- had heard
2  that I was having lunch with an agent at
3  an agency he worked for. It was very
4  embarrassing. I had gotten it
5  approved --
6      Q. So you think he was showing up
7  there to protect his turf, so to speak --
8      A. That is --
9      Q. -- with that agency?
10     A. Yes. That's -- you -- rule of
11 thumb was you don't go into an agency
12 that somebody's already in.
13     Q. Did you know he was already in
14 it?
15     A. I did. And so I had gone to
16 Rusty and Corey to ask them, and they
17 both told me that it was fine. And Rusty
18 told me that hometown agencies can be
19 accessed by more than one broker.
20     Q. Okay. All right. So Cobbs,
21 Allen & Hall and Tracy Nelms. Anybody
22 else?
23     A. Not that I can think of right

Page 286

1  now.
2      Q. Did you ever talk to Tiffany
3  about taking her to go visit -- call on
4  Willis?
5      A. No, I don't think so.
6      Q. Or any other client?
7      A. Tiffany was the account
8  executive on Willis, but other than that,
9  she worked for Clay. I had approached
10 him at one point to see just with the
11 idea of if he would travel, that I would
12 -- could be his inside broker too and
13 help him while he was on the road, but I
14 would need Tiffany's help in that case.
15 And by the time I got home, which was a
16 mile or two away, he had written me an
17 e-mail that was pretty condescending that
18 he had thought about it and he didn't
19 want anything -- he didn't want to make
20 any changes, so.
21     Q. Okay. Who wrote that e-mail to
22 you?
23     A. Clay.

71 (Pages 283 - 286)

Page 287

1    Q.  Okay.  I want to come back to
2  that e-mail in just a minute, but I want
3  to ask you this first.  One of your
4  claims in this case, Ms. Hendrix, is that
5  you were retaliated against, meaning
6  that, as I understand it, that you -- you
7  contend that you were -- CRC did
8  something negative to you because you
9  made a complaint of discrimination.  Can
10  you tell me what that might be?
11    A.  They didn't investigate the
12  claim.
13    Q.  The -- they didn't invest- --
14  investigate the claim that you made to
15  Mr. Helveston?
16    A.  Or Ms. Petty.
17    Q.  Anything else?
18    A.  After -- I was curious if my
19  bonuses would have continued to go up if
20  I would have remained an account
21  executive and not tried to pursue the
22  broker role, so.  I don't know.
23    Q.  Okay.  So, are -- is it your

Page 288

1  contention in the case that your bonuses
2  were lower because you asked to move to
3  an inside broker role?
4    A.  No.  That was just a thought.  I
5  was curious.
6    Q.  Okay.  Okay.  All right.  I am
7  showing you what I've marked or what I'm
8  going to mark as Exhibit 21.  And before
9  I do that, I want to ask you, was it --
10  was it important to you that there
11  were -- that there were other female
12  brokers at CRC?
13    A.  What do you mean, was it
14  important to me?
15    Q.  Well, I think one -- your
16  testimony earlier was that you had made a
17  comment to Mr. Daugherty that you thought
18  it was problematic that there had not
19  been any female brokers hired.
20    A.  I still think it's kind of
21  problematic.
22    Q.  Okay.  So that's what I'm trying
23  to get at.  You wanted -- you thought it

Page 289

1  was important to have more female
2  brokers?
3    A.  Yeah.
4    Q.  I'm showing you what I've marked
5  as Defendant's Exhibit 21, which are
6  documents we received from your attorney.
7  And this particular group of documents
8  are, I understand, text messages that you
9  exchanged with Lauren Lindberg.  And for
10  the record, these go from Hendrix Bates
11  label 00700 through 817.
12       All right.  And I know you
13  testified that it's not appropriate to --
14  you said that it was -- you were aware
15  from EPL that your work with EPL
16  coverages that Me Too lawsuits were an
17  issue and that sex discrimination
18  lawsuits were an issue.  Is that right?
19  (Defendant's Exhibit 21 was marked for
20  identification and is attached.)
21    A.  Yeah.
22    Q.  Okay.  Well, were you also aware
23  that it's against the law to discriminate

Page 290

1  based on age?
2    A.  Yeah.
3    Q.  If you would, look with me at
4  the page Bates-labeled 742.  And just so
5  the record is clear, the text -- text
6  message boxes in gray would be Ms.
7  Lindberg's texts and your text messages
8  would be the ones in blue.
9    A.  Looks like it.
10    Q.  Okay.  And her response to --
11  looking at the text message dated
12  September 19th, '18, is -- not her
13  response.  Her text message to you says,
14  "I think I'm going to send things other
15  than policies to Brandon tomorrow to see
16  what happens."
17       Your --
18    A.  Where are you?
19    Q.  Page Bates-labeled 742.
20    A.  Oh, okay.  Sorry.
21    Q.  The blue box, your text message
22  back to her, says: "Hell yeah.  But I
23  think we need to go to Amwins Approach

72 (Pages 287 - 290)

Page 291

1  Brandon like you were throwing him a bone
2  because you can see that Dave is not
3  helping him out at all...and you are done
4  waiting on these old motherfuckers to get
5  out of the way so y'all can start making
6  a bunch of" -- emoji, money happy face.
7  "It will be worth your time to train
8  him."
9      And am I correct that the old
10  MF'er that you were talking about was
11  Dave Sloneker in this text message?
12      (Witness reviews document.)
13  A.  Okay.
14      (Witness reviews document.)
15  Q.  Is that correct?
16  A.  I guess so.
17  Q.  If you would look at a few pages
18  over at page Bates 747, starting with
19  Ms. Lindberg's text to you at the top of
20  the page, she says:  "So, I am going to
21  continue to until we have that someone.
22  Even tho I want to pack my shit and say F
23  you Susan and leave sometimes...Being in

Page 292

1  the middle sucks - blame is always
2  pointed at you when things go wrong and
3  your value gets questioned.  All I'm
4  trying to do is help keep this ship
5  sailing in the right direction until
6  Susan and Dave F'ing retire and Lee and I
7  get to run the shit.  But I really do see
8  where you are coming from.  I can't say I
9  wouldn't do the same thing in your case."
10      And your response to her is:  "I
11  totally did not mean that to sound bitchy
12  but it totally did.  Sorry!  These are
13  your prime years in life and career so
14  Susan and Dave need to get the fuck out
15  already.  I know you got this.  You are
16  already succeeding and just getting
17  started.  #teamlindberg."
18      Was that your advice to her?
19  A.  Lee McClure was making the money
20  for that team, and so it had to do with
21  that too, that -- it wasn't part of
22  getting out of the way.  It was so that
23  they could be paid the full commissions

Page 293

1  or revenue that they were earning for
2  their team, I believe.  Lauren and I were
3  really struggling to figure out a way.
4  Q.  And they needed to get out of
5  the way during the prime years of her
6  career.  Is that right?
7  A.  Well, she transferred down there
8  with the -- at some -- or she was told
9  that Susan was on her way to retire, and
10  Susan kept pushing it off, pushing it
11  off.  And then Susan, for some reason,
12  wouldn't work with her to be her
13  associate broker.  Brandon brought it to
14  my attention, asked if I thought it was
15  because she was gay.  And I said I
16  didn't, but I might now.  It's not
17  something that I had thought about.
18  Q.  So you were okay with Susan
19  leaving?
20  A.  I was -- I'm not sure if I -- I
21  mean, I would have been okay.  I was okay
22  that she stayed.
23  Q.  Well, let's talk about that.

Page 294

1  Let's look at Bates -- your -- these text
2  messages Bates-labeled 781.
3  A.  Yeah.
4  Q.  Okay.  At the bottom of the
5  page, you say, "She would not be able to
6  make it through the whole day without
7  alcohol."
8      That "she" you're talking about
9  is Ms. Susan Phillips; correct?
10  A.  I was a little concerned about
11  her.
12  Q.  And Lauren Lindberg's response:
13  "I know...I could tell that's all she was
14  thinking about in our meeting."
15      And your response to Ms.
16  Lindberg was:  "She knows that they
17  cannot push her out of the spot.  So you
18  got to push her out."  Correct?
19  A.  That's what it says.
20  Q.  Okay.  So you were then advising
21  Ms. Lindberg that she needed to push out
22  the only female broker, senior broker at
23  CRC?

73 (Pages 291 - 294)

1    A.  Because she was being paid Lee
2  and Lauren's revenue.  Her book of
3  business -- I think hers and Dave's
4  couldn't support their team.  I wasn't in
5  a management position either.
6    Q.  What does that have to do with
7  anything?
8    A.  Just Susan was.
9    Q.  I'm sorry?
10    A.  Susan was.
11    Q.  Let's look at page 706, the text
12  messages at the bottom of this page where
13  she's asking you -- Ms. Lindberg is
14  asking you, "What was the thing I needed
15  to google?  The type of suit."
16    You respond -- responded,
17  "Gender bias/failure to promote."
18    What was that in connection
19  with?
20    A.  We were selling employment
21  practice liability policies.  The -- the
22  more I learned about them, I hadn't
23  realized what a big risk it was for

1  companies.  And I think that we had got
2  in a conversation about it, so I told her
3  to Google it.
4    Q.  Well, were you suggesting her to
5  bring that lawsuit to -- that type of
6  lawsuit?
7    A.  No.
8    Q.  Okay.  Let's look at 779.  The
9  picture at the top of the page that you
10  texted to Ms. Lindberg is John Saxon's
11  business card.  Is that right?
12    A.  It is.
13    Q.  Okay.  And your next text to her
14  underneath that says, "early retirement."
15  What did you mean by that?
16    A.  I think maybe I was trying to
17  lighten the moment of -- we were -- as we
18  were realiz- -- I was realizing that I
19  wasn't going to have a career at CRC.
20    Q.  Well, were you suggesting that
21  you could sue CRC and get enough money to
22  retire early?
23    A.  I don't think so.  I think it

1  was just a EPL-type joke.  She needed to
2  talk to somebody.  I -- it -- the women
3  had been complaining.  It was known that
4  the women thought that there weren't
5  opportunities for them.  And we were a
6  professional liability department.
7    Q.  But my question was specifically
8  about the early retirement comment and
9  what you meant by that.
10    A.  I'm not sure.
11    Q.  If you would look with me at
12  page 711.  And your text message to her
13  dated February 21st, '18, says:  "You
14  know, I bet Brandon would like to help
15  you quote, bind and submit things to
16  market.  He seems pretty eager to learn
17  but doesn't have anyone training him.
18  You could kind of make him your bitch."
19    A.  It was a joke.
20    Q.  Would -- do you think it would
21  be appropriate if the male brokers in the
22  office were texting each other about
23  making you their bitch?

1    MS. PALMER:  Object to form.
2    A.  Would it be appropriate?
3    Q.  Yes.
4    A.  I don't know.
5    Q.  Would you find that to be
6  discriminatory if male employees were
7  texting each other about making you their
8  bitch?
9    MS. PALMER:  Object to form.
10    A.  I don't think I was saying it
11  because he was a man.
12    Q.  Okay.  But that's different from
13  my question.  I mean, --
14    A.  Can you repeat the question?
15    Q.  If men were saying that about
16  you, would you find that to be
17  discriminatory?  If they were talking
18  about giving you work to make them your
19  bitch.
20    A.  Yeah, I guess so.  We had.
21    Q.  Look at, with me, 755.  So your
22  text message to her on 11/30/2018 at 5:44
23  says:  "We let them do it.  We have to

74 (Pages 295 - 298)

Page 299

1  stop letting them.  You need to forward
2  quotes and binders to Lee and CC Susan
3  'Lee, quote attached.  Please let Susan
4  know who y'all need to get to handle.'
5  It's hard being an asshole at first but
6  you get used to it real quick."
7      Is -- is that how you handled
8  your coworkers' relationships where
9  you -- do you feel like that you were --
10  you got used to being an asshole?
11      A.  No.
12      Q.  She responds to you and says:
13  Yea you're right.  What sucks is that's
14  not what the agreed to help me with in
15  their meeting.  They only agreed to do
16  post-binding tasks, which they barely do
17  that."
18      And then you respond:  "Put it
19  on Lee.  Make him man the fuck up.  He is
20  such a vagina."  Is that what you wrote
21  to her?
22      A.  Looks like it.
23      Q.  Okay.  Would you find it

Page 300

1  problematic if men in the office were
2  referring to you as a vagina?
3      A.  Probably.
4      Q.  Are you aware of anyone in the
5  office referring to you as a bitch or a
6  vagina?
7      A.  No.
8      Q.  All right.  Let's look at 758.
9  On 758, as I understand it, you're
10  exchanging some text messages about
11  Lauren Lindberg over -- over her getting
12  an office.
13      (Witness reviews document.)
14      Q.  Is that correct?
15      A.  What?
16      Q.  That you are texting with her
17  about her being assigned an office in
18  these text messages on --
19      A.  Looks like it.
20      Q.  Okay.  At your text to her on
21  December 11th, 2018, at 1:21 p.m., you
22  say that:  "Rusty flat out lied to my
23  face about it.  I still can't stomach

Page 301

1  looking at that ugly ass motherfucker."
2      Ms. Hendrix, would that bother
3  you if the men in the office were calling
4  you names like ugly ass MF'er?
5      A.  Probably.
6      Q.  At the time you were sending
7  these text messages, this was on a phone
8  that was given to you by CRC; correct?
9      A.  Correct.
10      Q.  And your account was paid for by
11  CRC; correct?
12      A.  Correct.
13      Q.  And you were sending these
14  messages during business hours; correct?
15      A.  Looks like it.
16      Q.  All right.  Let's look at page
17  746.  And I want to ask you about your
18  text in the middle of the page dated
19  October 16, 2018, that was sent at 11:16
20  p.m. in the evening to her where you say:
21  "When Clay and Corey were dragging their
22  feet on hiring a new AE I started
23  dropping the ball on non-important but

Page 302

1  really annoying things...things like loss
2  run requests.  I'd hold out until the
3  agent felt the need to copy one of
4  them...so they had to make the decisions
5  of Forwarding me the request or just
6  requesting the" -- excuse my language --
7  "fucking loss runs.  So that's what I
8  mean, when I say drop the ball, if you're
9  dropping it on purpose you can make sure
10  important shit gets done."
11      Is that -- first of all, is that
12  accurate in terms of what you were doing?
13      A.  For Clay.
14      Q.  So you were intentionally not
15  doing Clay's work so they would hire an
16  account executive?
17      A.  They were already hiring an
18  account executive.
19      Q.  But you said they were dragging
20  their feet on it?
21      A.  Right.  I had received my
22  promotion in August.
23      Q.  You go on to say:  "At the very

1 least you and Lee should be sharing the
2 responsibility of being available if that
3 is the case with your large accounts.  If
4 you guys lose those big accounts, your
5 pay would not take a big hit.  Their pay
6 would take a very big hit."
7     What did you mean by that?
8     A.  We didn't have big bonuses to
9 hit.  I just meant that Lee's book is his
10 responsibility, and she had gone to him
11 many times for help, and we were trying
12 to figure out a way.
13     Q.  Let's look at 741.  And
14 specifically, I want to direct your
15 attention to the screenshot at the top of
16 the page entitled "Daugherty Agent
17 Breakout."  What is that?
18     A.  I created that to try to show
19 Corey that as an inside broker, I was
20 still handling more than Clay and his
21 account executive.  And I felt that that
22 communicated to him some because I guess
23 I got some accounts moved off of me as an

1 account executive.
2     Q.  Right.  So you said below that
3 in a text message, "I have gotten some
4 stuff shifted off of me (you're F'ing
5 welcome Woodward)."
6     What did you mean by that?
7     A.  He was working the small
8 business accounts.  And so I -- that's
9 what I approached Corey with was us not
10 working on accounts less than -- I can't
11 remember the amount -- that was standard
12 in every other office.  I had never seen
13 a $3 million broker working on $1,000
14 accounts.  And so I approached Corey to
15 see if he would be interested because I
16 think it -- there was -- it added up to
17 not a lot of revenue but a good amount of
18 policies.
19     Q.  But you said -- you go on to
20 say:  "I'm having to do a piss poor job
21 of servicing those but it's working and
22 he slowly moving them to Andrea, Yvette
23 or Woodward.  You should make something

1 like this to share with Susan and Rusty
2 and Lee."
3     So as of September 19, 2018, is
4 it correct that Mr. Daugherty was moving
5 administrative work away from you and to
6 Andrea, Yvette, and Woodward?
7     A.  Yeah.  Over a year after I had
8 been told I was going to be promoted.
9     Q.  And the text message below that
10 says:  "I still think Corey really
11 understands the difference in an inside
12 broker and an associate broker...it's
13 possible he thinks women are called
14 inside brokers and males are called
15 associate brokers."
16     What did you mean by that?
17     A.  I think what it says.  Clay, as
18 an associate broker, was supposed to be
19 bringing in new business and.
20     Q.  Okay.  And we've already
21 established that Mr. Segrest brought in
22 more business than you did; correct?
23     MS. PALMER:  Object to form.

1     A.  He inherited a lot more.
2     Q.  Okay.  And I -- and think I'd
3 asked you earlier what accounts he
4 inherited.  Do you have any others that
5 you could -- I think you said there were
6 some in Denver.  Any others that you
7 contend that he inherited?
8     A.  I wouldn't be able to name them.
9     Q.  Okay.  Well, if you don't know
10 what they are, then how do you know he
11 inherited them?
12     A.  I was on his team for three
13 years.  So Corey had -- a lot of the book
14 in professional was all Betsy's, and when
15 she retired, I believe that's how they
16 were shifted, some of the accounts that
17 they worked on under Betsy.
18     Q.  So Betsy gave them her accounts.
19 Is that what you're saying?
20     A.  Corey.  And then Corey would
21 have shifted them to Clay.
22     Q.  And that was before you were
23 working with him; correct?

76 (Pages 303 - 306)

Page 307

1    A.  Some.  He -- I don't know if he
2 had done it at this time, but Bottrell
3 ended up moving from me.  I just.
4    Q.  But you wanted that one moved,
5 didn't you?
6    A.  I would have preferred to stay
7 the broker on the account and just let
8 Tiffany be the account executive.
9    Q.  So you wanted to be the broker
10 and get the revenue, you just didn't want
11 to have to do the work on it?
12       MS. PALMER:  Object to form.
13    A.  I wanted to be a broker.
14    Q.  On the account specifically.
15 But you didn't want to have to do the
16 administrative work on it.  Is that
17 right?
18    A.  Like the other brokers.
19    Q.  All right.  Let's look at 771.
20 There is a text message that says, "I
21 believe James is wanting to hire her."
22       I don't know who "her" is.  Do
23 you?

Page 308

1    A.  Maybe Mandy.
2    Q.  Okay.
3    A.  To switch from Truitt's team.
4    Q.  Well, look at the text message
5 before that.  It's redacted.  Do you know
6 why that's redacted?
7    A.  Under advice of counsel, I plead
8 the Fifth.
9    Q.  Okay.  And there's a lot of
10 redactions in these text messages.  If I
11 ask you about them, is your response
12 going to be the same every time?
13    A.  Under advice of counsel, I plead
14 the Fifth.
15    Q.  Okay.  Are you aware of any
16 criminal investigation that's focused on
17 you at this time?
18    A.  No.
19    Q.  Okay.  Are you aware of any
20 criminal investigation that concerns you
21 that has happened either during or since
22 you've left your employment with CRC?
23    A.  What -- can you repeat that?

Page 309

1    Q.  Yeah.  Has there ever been, that
2 you're aware of, any criminal
3 investigation of you at any time during
4 your employment at CRC or since you've
5 left?
6    A.  Not that I'm aware of.
7    Q.  Has any law enforcement agency
8 asked you for any sort of testimony in
9 any proceeding?
10    A.  Not that I'm aware of.
11    Q.  Have you been asked by law
12 enforcement to produce any sort of
13 documents?
14    A.  Not that I'm aware of.
15    Q.  Do you have any reason to
16 believe that you are going to come under
17 criminal investigation any time in the
18 near future?
19    A.  Not that I'm aware of.
20    Q.  At the time you sent these text
21 messages, this was on a phone that was
22 owned by CRC; correct?
23    A.  Correct.  Correct.

Page 310

1    Q.  Okay.  This text message, the
2 one that's redacted, is -- looks --
3 appears to be, on page 770, a -- Ms.
4 Lindberg's text message, not yours.  Is
5 that right?
6    A.  I really can't tell.
7    Q.  Okay.  Well, you see that your
8 blue -- the blue text messages that are
9 you are on the right side of the page,
10 and the gray text messages that are hers
11 are on the left side of the page.  Would
12 you agree with that?
13    A.  Yeah.
14    Q.  Okay.  And this black box at the
15 bottom of 770 is on the right -- on
16 the -- more on the left-hand side of the
17 page.
18    A.  Looks like it.
19    Q.  Okay.  So, are you pleading the
20 Fifth in relationship to something that
21 Ms. Lindberg said to you?
22    A.  Under advice of counsel, I plead
23 the Fifth.

77 (Pages 307 - 310)

Page 311

1    Q.  All right.  Let's look at the --
2  back to the text message that we talked
3  about on 771.  It says:  "I believe James
4  is wanting to hire her and Rusty will
5  have to let her go teach his team because
6  he knows how Truitt has treated her.
7  James asked me once a long time ago if I
8  wanted to come work for him.  Probably
9  wasn't being serious but I totally think
10  he would be the one in that department to
11  do that."
12      When was that?
13    A.  When was what?
14    Q.  That James asked you to come
15  work for him.
16    A.  It wasn't a formal ask.  It was
17  either when he was hiring Sarah Dunston's
18  replacement or Brooke, who worked for him
19  before.  I asked him what the position
20  was, I believe, because he was looking
21  for an account executive.
22    Q.  Okay.  And for the record, do
23  you know James' last name?

Page 312

1    A.  Powell.
2    Q.  And was he a senior broker?
3    A.  He was.
4    Q.  Okay.  All right.  Let's look at
5  page 802 -- no, 785.  The middle of the
6  page.  I want to ask you about this text
7  that you sent to Ms. Lindberg on March
8  20th, 2019.  You say:  "Friendly
9  reminder... you are allowed to go out and
10  find your own agent/accounts right now.
11  On nights Kelly has to work, You could
12  cruise LinkedIn and find some social
13  service/healthcare women and message
14  them."
15      MS. PALMER:  I'm sorry, Rachel,
16  what page are you on?
17      MS. BARLOTTA:  785.
18      MS. PALMER:  I was on 802.
19    Q.  And you write this dialogue
20  where Lee would say, "what are you
21  working on?"  You would say, "a new biz
22  submission from a retailer I connected
23  with on linked in."  And then there's a

Page 313

1  poop emoji and then a dancing emoji.
2      What I want to ask you about
3  that text message is, you were advising
4  Ms. Lindberg that she could go out and
5  pursue her own business, correct, as --
6    A.  I wasn't advising her.
7    Q.  -- as an inside broker?
8    A.  She was an account executive.
9    Q.  Okay.  In 20- -- in March of
10  2019, she was still an account executive?
11    A.  She was an account executive the
12  whole time I worked there.
13    Q.  Okay.  Are you aware that at
14  some point she became an inside broker?
15    A.  Yes.  After my complaint, she
16  was promoted to inside broker.
17    Q.  Is it your contention that she
18  got promoted because you complained?
19    A.  She said she wasn't informed
20  that she was getting the promotion and
21  she was not required to sign the
22  noncompete that I had had reviewed by an
23  attorney.  So I didn't know, but I felt

Page 314

1  that maybe.
2    Q.  You felt that maybe she got
3  promoted because you made a complaint?
4    A.  This isn't -- well, this is --
5  this is before then.
6    Q.  Yeah.
7    A.  So she was --
8    Q.  I understand.
9    A.  -- an account executive.
10    Q.  Yeah.  Okay.  I understand that.
11  That's your testimony.  I was just asking
12  you about the second part of that
13  testimony where you said that she got
14  promoted to inside broker after you made
15  a complaint.  And I was trying to
16  clarify, is that your -- is that your --
17  are you asserting that in this case, that
18  the reason that Ms. Lindberg got promoted
19  was because you complained?
20    A.  No.  She was going to be
21  promoted anyway.
22    Q.  Okay.
23    A.  But they had been telling her

78 (Pages 311 - 314)

Page 315

1  that for years, I believe.
2      Q.  This friendly reminder that you
3  sent her about cruising LinkedIn and
4  finding potential clients, was that
5  something that you did?
6      A.  No.  I don't think so.
7      Q.  Why not?
8      A.  When was this?
9      (Witness reviews document.)
10     A.  Why wasn't I --
11     Q.  Well, I mean, you -- you were
12  suggesting that for her, that she could
13  go out and get her own business.  I'm
14  just saying, why did you not follow that
15  suggestion for yourself?
16     A.  I don't know.
17     Q.  Okay.  All right.  Let's look at
18  802.  Well, actually, let's go by -- look
19  at 803, 803.  There's a series of text
20  messages that start on October 15th,
21  2019, with Ms. Lindberg and continue on
22  through page Bates-labeled Hendrix 804
23  about you all meeting.  And am I correct

Page 316

1  that you end up deciding to meet her at
2  The Cheesecake Factory?
3      A.  I believe so.
4      Q.  And this was while you were out
5  on medical leave; correct?
6      A.  Yes.
7      Q.  So you felt well enough to be
8  able to meet her at The Cheesecake
9  Factory and -- is that right?
10     A.  Yes.
11     Q.  Okay.  And did you talk about
12  things involving CRC in that meeting?
13     A.  I'm sure we did.
14     Q.  Did you talk about your
15  complaint, that you had hired an
16  attorney?
17     A.  I can't remember.  I know I told
18  her at some point.
19     MS. PALMER:  Would this be a
20  good time to take the last break of the
21  day?
22     MS. BARLOTTA:  Sure.
23     THE VIDEOGRAPHER:  We're going

Page 317

1  off the record at 5:10.
2      (Break taken.)
3      THE VIDEOGRAPHER:  We're going
4  back on the record at 5:22.
5      Q.  (By Ms. Barlotta) Okay.  Ms.
6  Hendrix, I'm showing you what I've marked
7  as Defendant's Exhibit 22, which are text
8  messages that we received that you
9  produced in this case.  And I understand
10 these are text messages with Sarah Brown.
11 Can you tell me who Sarah Brown is?
12 (Defendant's Exhibit 22 was marked for
13 identification and is attached.)
14     A.  She was an in-house underwriter.
15     Q.  Who worked at CRC?
16     A.  Yes.
17     Q.  I want to direct your attention
18 to 881.  And you're telling her on
19 February 4th, 2018 -- the text message
20 box towards the top of the page that's
21 time-stamped 9:42 p.m. says: "Or ask
22 Scott if he can help you or do you need
23 to talk to Rusty?  Every single person

Page 318

1  you work with would back you up in saying
2  'I am overqualified to be an underwriter
3  assistant' So say it loud and say it
4  often."
5      And she says:  "Im going to tell
6  Scott at the review to see what he says.
7  I wish we had another person on our team
8  to do just administrative work."
9      This Scott who you're talking
10 about, is that Scott Trigg?
11     A.  Yes.
12     Q.  And was he the head underwriter?
13     A.  I guess.
14     Q.  Or do you know what his job
15 title was?
16     A.  He was an underwriter, program
17 manager maybe.
18     Q.  And you go on to tell her:  "I
19 might say 'I'm ready to be an
20 underwriter.  How do we make that
21 happen?'"
22     And she responds:  "I always
23 plan to go in there guns blazing, but end

Page 319

1  up chickening out every time.  I get so
2  nervous."
3         You respond, "I do too.  But I
4  asked and look what happened."
5         What did you mean by that?
6     A.   My promotion, I think.
7     Q.   Your promotion to inside broker?
8     A.   I'm -- I'm assuming yes.
9     Q.   Okay.
10    A.   And Sarah was already doing the
11 underwriting at this point.
12    Q.   Okay.  Let's look at 9- -- well,
13 no.  Let's look at 908 first.  The bottom
14 text, I wanted to ask you about the very
15 bottom of this page that's time --
16 date-stamped March 17, 2018.
17        "I'm going to ask Corey this
18 week if he thinks we could either move
19 bottrell research triangle to Andrea.
20 Because I cannot be the AE on two of our
21 largest agencies and be trying to broker
22 business."
23        Was that the account you had

Page 320

1  mentioned earlier in your deposition
2  testimony involving the schools?
3     A.   That was moved to Clay and
4  Tiffany?  Yeah.  I think so.
5     Q.   Okay.
6     A.   Yeah, it is.
7     Q.   And did you ask Corey to move
8  that to Andrea?
9     A.   I don't know if I ever ended up
10 asking or -- I feel like Andrea
11 volunteered to him that she would take
12 Research Triangle to help me out.  I
13 think that that's how it happened.
14 Because she saw that I was trying.
15    Q.   All right.  Let's look at 927.
16 Well, let -- before I ask -- before I
17 move to that page, is that when they were
18 moved?  Around the time that it -- that
19 it was moved, was it March of 2018?
20    A.   I am not sure.
21    Q.   Okay.  Do you have any reason to
22 think they wouldn't have been moved
23 around that time?

Page 321

1     A.   I am not positive that it was --
2     Q.   Okay.
3     A.   -- because I'm not sure I asked
4  Corey or --
5     Q.   Well, when do you recall them
6  being moved?
7     A.   Research Triangle?
8     Q.   Or Bottrell.
9     A.   I really am not sure.  I
10 couldn't say.
11    Q.   Okay.  So you don't know if it
12 was 2017, 2018?
13    A.   Well, it would've had to have
14 been after 2018.  I mean, after this day;
15 right?
16    Q.   I would assume so, but you tell
17 me.
18    A.   I mean, --
19    Q.   Because you said you weren't
20 sure about the date, so.
21    A.   It would be after that.
22    Q.   But you don't know whether it
23 was 2018 or early 2019?

Page 322

1     A.   (Witness shakes head.)
2     Q.   Is that a no?
3     A.   No.
4     Q.   Okay.  All right.  I want to
5  talk to you about 926, a text message
6  dated May 4th, 2018, where you say: "You
7  will die when I tell you about Clay and I
8  talking...like holy balls.  As I left
9  last night, I thought we were having a
10 casual conversation to which he followed
11 up with a very formal email later that
12 night about how he did not want to
13 overwhelm Tiffany therefore nothing about
14 the agent split was going to be changing
15 right now.  I responded being as polite
16 as I could and said I was sorry for the
17 confusion but I was not asking him...bc
18 it is a question for Corey."
19        Is that an accurate depiction of
20 your conversation with Mr. Segrest about
21 giving work to Tiffany, shifting work
22 from you to Tiffany?
23    A.   The Bottrell?  I -- or that --

Page 323

1 the conversation that we had -- I don't
2 know what accounts, but I believe that
3 that it was around the time where I was
4 trying to have the conversation with him
5 to see if it could be a possibility to be
6 an inside broker for him as well, but I
7 wouldn't be able to do that -- so that he
8 could be on the road more bringing in
9 business.
10   Q.   Okay.  But again, is this
11 accurate that he -- when he said that he
12 didn't want to change things with
13 Tiffany, you said that it's not asking
14 you, this is a question for Corey?
15   A.   I guess I did.
16   Q.   Okay.  Then it goes on to say --
17 you go on to say -- she asked you if he
18 included Corey on the e-mail.  You say,
19 "He might have bcc'ed him but not sure."
20 And you said, "It reminded me where my
21 confidence has been for the past 4
22 years."
23     She says:  "Good for you

Page 324

1 responding like that.  Like my mouth just
2 dropped open when I read that.  He's so
3 jealous of you and the fact you are
4 rocking it.  And hell, Tiffany isn't
5 overwhelmed or at least I don't think she
6 is.  She is eager to do and help in
7 anyway."
8     And your response on the next
9 page is:  "Oh, I know.  I asked her first
10 bc I knew she was the one it would
11 affect.  He would just get the revenues.
12 Super jealous.  The email almost made me
13 feel bad for him but instead I'm
14 going" -- "I think I'm going to let it
15 motivate me to crush him.  If this Willis
16 deal actually is an opportunity I'm going
17 to have a closed-door meeting with Rusty
18 and Corey and tell time both I do not
19 want Clay nor Tyler working on this deal
20 because they will ruin it.  They are the
21 very definition of why retailers like
22 Willis do not work with wholesalers...
23 entitled little bitches putting on a

Page 325

1 facade that they are adding value to a
2 transaction but in reality doing zero
3 work."
4     What did you mean by that he was
5 "super jealous"?
6   A.   I am not sure at the time what I
7 was referring to.
8   Q.   And so as of May 4th of 2018,
9 you were motivated to crush Clay Segrest.
10 Is that right?
11   A.   Sarah and I were good friends.
12 I'm not sure that would have been my
13 intention to her.  I was just expressing
14 some anger or frustration about him.
15   Q.   But you do refer to Mr. Segrest
16 and Mr. O'Connor as "entitled little
17 bitches"; correct?
18   A.   It looks like it.
19   Q.   All right.  Let's look at 946.
20 I want to ask you about your screenshot
21 of an e-mail that Mr. Daugherty sent you
22 about lunch on -- a screenshot, anyway,
23 was sent to Sarah Brown on August 2nd,

Page 326

1 2018.  And I know the print on that is
2 small.  But as I read it, it looks like
3 Mr. Daugherty sent you an e-mail that
4 says:  "Does next Thursday the 9th work
5 to grab lunch?  I thought this week was
6 going to be good but I forgot Holly had
7 me" -- doing something and a -- "meeting
8 on Thursday and I have" -- something --
9 "on Friday.  If so I am dropping it in
10 the calendar now."
11     And then you write under that,
12 "Motherfucker."  What was upsetting to
13 you about -- well, let me ask you.
14 You're referring to Mr. Daugherty as
15 MF'er; right?
16   A.   Or the situation.  I think he
17 was postponing a lunch.
18   Q.   What about that was upsetting to
19 you that he was postponing the lunch to
20 the 9th?
21   A.   Maybe he had postponed it
22 before.  I don't know.  Or I was ready to
23 talk to him that day.  I don't know.

81 (Pages 323 - 326)

Page 327

1    Q.   Do you know what you wanted to
2   talk to him about in August of 2018?
3    A.   I believe that that's when I
4   gave him some charts -- I think that
5   that's when -- to illustrate the
6   breakdown of the team.  It could have
7   been also around Woodward.  I'm not
8   positive.  But I was there to tell him
9   that I didn't think anything about my job
10  had changed since our lunch a year ago.
11   Q.   And this was after Tiffany
12  Sanders had been hired.  Is that right?
13   A.   Yes.
14   Q.   Okay.  And this is after you had
15  a large number of policies shifted away
16  from you to Ms. Sanders; correct?
17   A.   I had more put on me.
18   Q.   I thought you said initially.
19  But if I recall that policy count, you
20  had the least amount that we looked at
21  earlier.  Do we need to go back and look
22  at that again?
23   A.   Yeah.

Page 328

1    Q.   Okay.  Let's do it this way.
2   I'm showing you what I've marked as
3   Defendant's Exhibit 23.  It's a
4   compilation of spreadsheets we produced.
5   And specifically, if we look at page
6   Bates-labeled 4739 --
7   (Defendant's Exhibit 23 was marked for
8   identification and placed under seal.)
9    A.   I am not there.
10   Q.   It's at the top.
11   A.   Oh, sorry.  I got it.
12   Q.   And I don't know the date on
13  this, so if you have any idea about the
14  date, let me know that.  But this was --
15  was this something that you created, this
16  policy count?  Is that your testimony?
17   A.   I would have pulled the numbers
18  out of AIM.  I think there's a folder on
19  the laptop that has a lot of -- several
20  of these graphs because I was at some
21  point just trying to see where I stood.
22   Q.   Okay.  But it looks like, if we
23  look at this, we do the per- -- policy

Page 329

1   count by percentage for Mr. Daugherty's
2   team, you had 19 percent and Tiffany had
3   17 percent; correct?
4    A.   Correct.  And I was an inside
5   broker, and she was an account executive.
6   So that was Tiffany's and Clay's.  That
7   represents all of -- both their numbers.
8    Q.   And so after you became an
9   inside broker, were you expecting your
10  policy count to go to zero?
11   A.   Maybe not zero, but I did not
12  expect to get more than I had before.
13   Q.   And if you had 158 before you --
14  at the time you were an inside broker,
15  how much did you have when you were --
16  how many accounts do you think you had
17  when you were an account executive?
18   A.   Well, I worked on Corey's and
19  Clay's, so all those 140 would have been
20  ones I worked on, I guess.
21   Q.   That got transferred to Tiffany?
22   A.   Well -- right.
23   Q.   So, is it your testimony that

Page 330

1   after those 140 policies were transferred
2   to Tiffany, that you -- you just did not
3   have time to broker business?
4    A.   158 were put on me.  So --
5    Q.   Well, is that more?  I mean, I'm
6   confused.  I thought you said that
7   the hundred -- you had more than that as
8   an account executive and they got moved
9   to Tiffany.
10   A.   Well, I worked on Clay and
11  Corey's stuff, and Tiffany was hired just
12  to work on Clay's stuff, so.  I might
13  have had additional accounts.
14   Q.   And after Tiffany was hired, you
15  were not working on Clay's stuff anymore?
16   A.   Correct.
17   Q.   Okay.  So those 158 policies
18  were just for Mr. Daugherty.  Is that
19  right?
20   A.   I -- I don't know.
21   Q.   Okay.
22   A.   I'm not sure.
23   Q.   Okay.  I guess I'm trying to

82 (Pages 327 - 330)

Page 331

1  figure out how it was that you're --
2  you're contending that your policy --
3  after Ms. Sanders was hired that your
4  policy count went up.  Maybe you're not
5  contending that.  I just want to make
6  sure.
7      A.  Can you repeat that?
8      Q.  Yeah.  Are you -- is it -- are
9  you saying that even after Tiffany was
10  hired, that your policy count went up?
11  Or did it go down after she was hired?
12      A.  I -- it went up.  And this I'm
13  not sure is from then.  There was --
14  Corey gave us -- he had printed out all
15  the agents with the revenues, the policy
16  counts, and -- with the new splits on
17  them.  So this was -- this isn't that.
18  This is something I created.
19      Q.  Okay.  I'm talking, though,
20  about this specific exhibit that we're
21  looking at right now and this policy
22  count which you said you created.  I
23  understand we don't have a date on it,

Page 332

1  but we have -- we know it was sometime
2  after Ms. Sanders was hired.  We can
3  agree on that; right?
4      A.  Right.
5      Q.  Okay.  So you said -- you keep
6  saying that you -- your policy count went
7  up after Tiffany was hired, and I'm
8  trying to figure out how that was
9  possible.  I mean, --
10      A.  Some were shifted off of Andrea
11  and Yvette as well and -- and put on
12  mine.
13      Q.  Okay.  So when you were an
14  account executive, Andrea and Yvette had
15  over 200 and you had fewer than 150
16  policies when you were an account
17  executive?
18      A.  It looks like it.
19      Q.  No, you don't -- no, not "it
20  looks like it."  You tell me what --
21  that's your -- because I don't know how
22  many policies you had when you were an
23  account executive.  That's what I'm

Page 333

1  trying to figure out.
2      A.  On this sheet, at that time, I
3  guess I did.
4      Q.  Well, at this time, you were an
5  inside broker; correct?
6      A.  Correct.
7      Q.  Okay.  So --
8          MS. PALMER:  Object to the form.
9      Q.  So -- well, after Tiffany was
10  hired, you were an inside broker; right?
11      A.  Correct.
12      Q.  Okay.  So again, if, after
13  Tiffany is hired, you have -- she has 140
14  policies, some of those policies that you
15  were working on for Clay went to her;
16  correct?  Excuse me.  Not policies,
17  accounts that went -- went to her;
18  correct?
19      A.  Yes.
20      Q.  That would mean that your
21  accounts decreased.
22      A.  There were some shifted, I
23  believe, off of Andrea and Yvette too, so

Page 334

1  we would need the spreadsheet that Corey
2  created and presented to the team in
3  order --
4      Q.  What spreadsheet are you
5  thinking of?
6      A.  He created an agency -- the new
7  agency split, the new retailer split --
8      Q.  Okay.
9      A.  -- that -- the meeting we had in
10  January, I think.
11      Q.  Okay.
12      A.  I haven't seen it within the --
13          MS. BARLOTTA:  Kayla, can you
14  put your hands on that?
15          MS. WUNDERLICH:  I haven't seen
16  it.
17          MS. BARLOTTA:  We don't have it?
18  Okay.
19      Q.  And when was that?
20      A.  I believe it was January 2018.
21      Q.  Okay.
22      A.  And Andrea made the comment when
23  he handed it to us, why does Kat have

83 (Pages 331 - 334)

Page 335

1  more accounts now than she.
2    Q.  Okay.  And that was -- you said
3  that was -- and did it change after that?
4  Did your accounts go down or up after
5  that meeting?
6    A.  I don't remember.  I don't think
7  they did.  That's the one where I'm left
8  suggesting that Corey knew something I
9  didn't.
10    Q.  Okay.  All right.  Can you go
11  back to your text messages with Ms. --
12    A.  Brown or Lindberg?
13    Q.  -- Lindberg, which is
14  Defendant's Exhibit 21.  741 of that
15  document.  And we looked at these text
16  messages earlier, and I thought I
17  understood what you were saying, but your
18  recent testimony has me confused now.
19    So you've texted Ms. Lindberg
20  with a screenshot of the breakout that we
21  just looked at in Defendant's Exhibit 23,
22  and you said to her, "I've got some stuff
23  shifted off of me," which I understood to

Page 336

1  mean that you had less stuff because it
2  had been shifted off of you.  Is that
3  accurate?
4    A.  I'm not sure if that's what that
5  graph reflects or if that is the graph
6  before I had stuff shifted off of me.
7    Q.  What do you mean, the graph
8  before you had stuff shifted off of you?
9    A.  Did I present this to him and
10  then, in turn, it was shifted off, so
11  this would reflect prior to.
12    Q.  Okay.  Does that make sense to
13  you that you would have sent this
14  screenshot to her with a text message
15  immediately following it saying, "I've
16  gotten some stuff shifted off of me"?
17    A.  Yes.  Like this would be the
18  document that I presented to Corey to
19  show what the teams were working on.  I
20  wish I had put Tiffany and Clay on the
21  same line so it was -- it would represent
22  better what -- there's two of them --
23    Q.  Okay.

Page 337

1    A.  -- and one of me.
2    Q.  So you're saying with this --
3  what you could have meant by this is that
4  you sent this to Corey to say, "Look, I
5  have 158 policies and that's too many,"
6  and then after that, you got stuff
7  shifted of you?
8    A.  I had been a broker over a year,
9  trying to get work -- or administrative
10  stuff shifted off of me.
11    Q.  Well, that's what I'm saying.
12  Is that what you were saying to her, that
13  you sent -- you presented this, this
14  screenshot of this, or you presented this
15  particular chart to Mr. Daugherty saying,
16  "Look, I've got 19 percent of the
17  accounts," and then in response to that,
18  he shifted stuff off of you?
19    A.  I -- I don't know if this is all
20  I provided him because I mentioned Corey
21  Woodward, and I know there were other
22  graphs.
23    Q.  Okay.  That's fine.  At some

Page 338

1  point, Ms. Hendrix, can we agree that you
2  presented some documentation -- according
3  to this text message, you presented some
4  documentation to Ms. Daugherty -- I mean,
5  Mr. Daugherty, and in response to that,
6  he shifted work off of you?
7    A.  (Witness nods head.)  I --
8    Q.  Is that a yes?
9    A.  Yes.
10    Q.  Okay.  Back to your text
11  messages with Ms. Brown, can you look
12  with me at 984.  I want to ask you about
13  these text messages at the top of the
14  page where you said, on the 15th, "How
15  long are they going to let" -- excuse me.
16  Sarah said to you:  "How long are they
17  going to let Susan do that?  You can't
18  come in for 1 hour a week and still have
19  an office.  You should get one and him
20  get the other."
21    And you responded:  "As long as
22  she wants...old women are untouchable in
23  today's Corp world."

84 (Pages 335 - 338)

1      What did you mean by that?
2      A.   We sold employment practice
3   liability, so I guess I believed that
4   older women were a liability.  I'm not
5   sure.
6      Q.   So, does that mean -- would it
7   be your testimony then that the only
8   women who were discriminated against at
9   CRC would be younger women?
10     A.   No.
11     Q.   Well, do you think Ms. Phillips
12  was discriminated against?
13     A.   She was throughout her whole
14  career, she said.  Her advice was -- or
15  she said I wasn't going to change it.
16     Q.   And you told Ms. Brown that she
17  was untouchable; correct?
18     A.   Looks like it.
19     Q.   All right.
20     A.   Ms. Brown was an EPLI
21  underwriter too.
22     Q.   Okay.  I'm showing you what I've
23  marked as Defendant's Exhibit 24.  It's

1   an e-mail dated January 3rd, 20- -- 2018,
2   from Clay Segrest to Corey Daugherty and
3   which you are copied, it says, as -- as
4   is -- the other account executives, where
5   he says, "Is everybody good for 4:00
6   meeting tomorrow afternoon with drinks to
7   follow?"
8   (Defendant's Exhibit 24 was marked for
9   identification and is attached.)
10     A.   A team meeting.
11     Q.   A team meeting?  How often did
12  you have team meetings?
13     A.   Is Tiffany on this?  No.  So she
14  wasn't there yet.
15          We -- not a whole lot.  We tried
16  to meet regularly for a little while, and
17  it kind of fell off.  But whole team
18  meetings, I'm not sure.  One or two a
19  year, maybe.  Kind of a guess.
20     Q.   Okay.  Showing you what I've
21  marked as Defendant's Exhibit 25.  This
22  is an e-mail from Lee McClure to multiple
23  CRC employees including you about Hiscox?

1   Is that right?
2   (Defendant's Exhibit 25 was marked for
3   identification and is attached.)
4      A.   Yes.
5      Q.   And Hiscox was an
6   underwriter/carrier.
7      A.   Uh-huh.
8      Q.   Is that right?
9      A.   Yes.
10     Q.   And he sends an e-mail out
11  saying that he has dinner reservations at
12  6:30 for those interested.  Is that
13  right?
14     A.   Yes.
15     Q.   Okay.  So this was a dinner
16  invite you were included on in January of
17  2018?
18     A.   All the other women except for
19  Susan and Cathy are account executives
20  too, so.
21     Q.   Okay.
22     A.   But yes.  I'm not sure if I
23  went.  I can't remember.

1      Q.   All right.  Let me show you
2   what's been marked as Defendant's Exhibit
3   26, which is an e-mail that we produced
4   between Rusty Hughes and Corey Daugherty
5   about TDC in which Mr. Daugherty tells
6   Mr. Hughes that:  "Yvette says she was in
7   for a drink and Kat is planning on drinks
8   and dinner.  Not sure about the others
9   but will let you know."
10          So, do you agree that you were
11  invited to a drinks and dinner with TDC
12  in February of 2018?
13  (Defendant's Exhibit 26 was marked for
14  identification and is attached.)
15     A.   I wouldn't dispute it.
16     Q.   And TDC was what?
17     A.   An underwriter, medical
18  liability.
19          (Witness reviews document.)
20     A.   That's where George Bennett went
21  to work --
22     Q.   Okay.
23     A.   -- after he left CRC.

85 (Pages 339 - 342)

Page 343

1    Q.   Showing you now what I marked as
2    Defendant's Exhibit 27.  It's an e-mail
3    from Corey Daugherty dated March 8, 2018,
4    to it looks like it appears several
5    MedPro employees and then you as well.
6    And you say, "Go ahead and" -- he says,
7    "Go ahead and pencil us in for 5:00
8    Tuesday afternoon for drinks with the
9    Insured and the retailer."
10   (Defendant's Exhibit 27 was marked for
11   identification and is attached.)
12   A.   Yeah.
13   Q.   So based upon this e-mail, would
14   you agree that you were included on a
15   business event of drinks with MedPro?
16   A.   This might be when the agent was
17   there, too.
18   (Witness reviews document.)
19   Q.   Is that a yes?
20   A.   Yes.  I was included on the
21   e-mail.
22   Q.   Well, did you go?  Did you
23   recall meeting with MedPro folks with Mr.

Page 344

1    Daugherty?
2    A.   Yes.  It was in Chicago.
3    Q.   Was that the PLUS meeting in
4    Chicago?
5    A.   I think -- I think that it was
6    during PLUS.  PLUS medical, maybe.
7    Q.   Yeah.  And so I'm going to show
8    you --
9    A.   Andrea was the account executive
10   on the account.
11   Q.   -- show you what I've marked as
12   Defendant's Exhibit 28 --
13   A.   Okay.
14   Q.   -- which is an e-mail chain
15   between you and Mr. Daugherty about PLUS
16   Chicago from March 2018.  And the bottom
17   of this e-mail shows a whole itinerary
18   that you and Mr. Daugherty had to meet
19   with various clients, or prospective
20   clients, I suppose.
21   (Defendant's Exhibit 27 was marked for
22   identification and is attached.)
23   A.   And underwriters.

Page 345

1    Q.   And underwriters.  Is that -- is
2    that correct?
3    A.   Yes.
4    Q.   And did you attend all these
5    events with Mr. Daugherty?
6    A.   I did.  I believe so.
7    Q.   Did any of the other account
8    executives go on this trip?
9    A.   I was an inside broker, but no.
10   And it was Andrea's -- she was the
11   account executive, and I didn't work on
12   the account.
13   Q.   Okay.  Did you tell Mr.
14   Daugherty you didn't go if you weren't
15   working on the account?
16   A.   No.  I was pleased, happy to be
17   invited.
18   Q.   Okay.  I'm showing you what I've
19   marked as Defendant's Exhibit 29.  It's
20   an e-mail -- starts with an e-mail chain
21   that begins with an e-mail from Corey
22   Daugherty dated April 4th, 2018, to the
23   brokers in the office including you.  Is

Page 346

1    that correct?
2    (Defendant's Exhibit 29 was marked for
3    identification and is attached.)
4    (Witness reviews document.)
5    A.   Ross Robertson was a account
6    executive.  Christy Smith was an
7    underwriter.
8    Q.   Okay.
9    A.   So --
10   Q.   But he's talking about inviting
11   all of you to drinks and dinner with
12   American Empire.  Is that right?
13   A.   Uh-huh.
14   Q.   Is that correct?
15   A.   Yes.
16   Q.   And he says, "They are going to
17   be a key relationship for us as the
18   senior living marketplace continues to
19   firm."
20        So you would agree he was
21   including you on a meeting with somebody
22   he considered to be a key relationship
23   for CRC.  Is that right?

86 (Pages 343 - 346)

Page 347

1    A.  On this meeting.
2       MS. PALMER: I don't think you
3    meant to give me that, Rachel.
4       MS. BARLOTTA: Oh. Did I
5    already give you one or did I not give
6    you one?
7       MS. PALMER: That's the one we
8    just did; right? 29.
9       MS. BARLOTTA: It is.
10      Q.  (By Ms. Barlotta) All right.
11   I'm showing you what I've marked as
12   Defendant's Exhibit 30. It's an e-mail
13   from Brandon Hays to Tay -- to Trey Reich
14   in which you and several other people at
15   CRC are copied on regarding Bresnahan.
16   Do you know how to pronounce that?
17   (Defendant's Exhibit 30 was marked for
18   identification and is attached.)
19      A.  I don't.
20      Q.  Okay. Do you know what that --
21   who that was?
22      A.  I think he was an underwriter.
23      Q.  Did you go to that event?

Page 348

1    A.  I can't remember.
2    Q.  But you were invited to it?
3    A.  Yes. I was one of the select
4    people that Brandon, it looks like, chose
5    to send this one to instead of using the
6    e-mail address that was there.
7    Q.  All right. I'm showing you what
8    I've marked as Defendant's Exhibit 31.
9    This is an e-mail from Mr. Daugherty to
10   you dated July 13th, 2018, regarding a
11   meeting in Denver. Do you recall that
12   you took a business trip with him to
13   Denver in July of 2018?
14   (Defendant's Exhibit 31 was marked for
15   identification and is attached.)
16      A.  It was professional liability
17   departments of -- so yes.
18      Q.  Okay.
19      A.  I think that's what -- yeah.
20      Q.  When he says, "My goal between
21   now and Thanksgiving is to be on the road
22   as often as possible and I want you to
23   know you have my full support to do the

Page 349

1    same," did you get on the road after
2    you -- he sent you this e-mail?
3    A.  I don't believe I did. I was
4    kind of.
5    Q.  You were kind of what?
6    A.  I think at this time I still had
7    my -- the full account executive load,
8    which might have hindered my travel.
9    Q.  I'm sorry, you had full account
10   executive load which what?
11      A.  Might have hindered my travel.
12   That was one of the things holding me
13   back from trying to grow.
14      Q.  At that point in time, did you
15   have a laptop computer?
16      A.  I don't know. I had one at some
17   point.
18      Q.  And you don't recall when you
19   got it?
20      A.  I don't.
21      Q.  All right. I'm showing you what
22   I've marked as Defendant's Exhibit 32.
23   It starts -- the first page of this

Page 350

1    exhibit starts with an e-mail exchange
2    between Rusty and Corey Daugherty and
3    George Bennett about a CRC/TDCSU Fall
4    Summit at Willow Point. But it
5    originates with an invitation on the
6    second page from George Bennett at TDC to
7    it appears multiple CRC employees
8    throughout the country and not just from
9    the Birmingham office. Is that accurate?
10   (Defendant's Exhibit 32 was marked for
11   identification and is attached.)
12      A.  I think it -- yeah. I think it
13   was all the Birmingham and then some
14   professional from different offices.
15      Q.  Okay. But you were not on the
16   initial invite to this from TDC?
17      A.  It doesn't look like I was.
18      Q.  Okay. Do you have any reason to
19   dispute that Corey Daugherty specifically
20   reached out to George and asked to
21   include you and Lauren?
22      A.  Huh-uh. I don't dispute that.
23      Q.  Did you end up attending this

Page 351

1  event?
2      A.  I did.
3      Q.  I'm showing you what I've marked
4  as Defendant's Exhibit 33.  And it
5  appears to be an e-mail exchange from
6  Kimberly Towles with McGriff with you and
7  Corey -- I mean, with -- and Corey
8  Daugherty on which you are copied.
9  (Defendant's Exhibit 33 was marked for
10  identification and is attached.)
11      MS. PALMER:  Sorry, Rachel, did
12  you have one for me?
13      MS. BARLOTTA:  Oh, I'm sorry.
14  Yes, I do.
15      Q.  Did you recall that you made a
16  visit with Mr. Daugherty to call on Kim
17  Towles?
18      A.  Yes.
19      Q.  And that would have been in the
20  fall of 2018; correct?
21      A.  It looks like it.
22      Q.  Okay.  All right.  I'm showing
23  you what I've marked as Defendant's

Page 352

1  Exhibit 34, which is an e-mail exchange
2  between you and Mr. Daugherty but with
3  the thing concerning -- or the subject
4  line is "Somerby Imperial Plaza."  But
5  what I wanted to ask you about was this
6  top part where Mr. Daugherty asked you
7  how the MedPro dinner was last night.
8  So, do you recall that you attended a
9  MedPro dinner in September of 2018?
10  (Defendant's Exhibit 34 was marked for
11  identification and is attached.)
12      A.  I think so.  It was at
13  Woolworth, maybe.
14      Q.  All right.  I'm showing you what
15  I marked as Defendant's Exhibit 35.  It's
16  an e-mail exchange between you and Mr.
17  Daugherty dated September 18th, 2018.  In
18  your e-mail to him on the first page of
19  this exhibit, you mention having drinks
20  with Tracy.  And I think you may have
21  alluded to that in your testimony earlier
22  today, that you had scheduled drinks with
23  Tracy Nelms.  Is that right?

Page 353

1  (Defendant's Exhibit 35 was marked for
2  identification and is attached.)
3      A.  Yeah.
4      Q.  Is that the Tracy you're talking
5  about here?
6      A.  Yes.
7      Q.  And where did Tracy work?
8      A.  She -- I guess she was -- yeah,
9  she was at Willis.  She left Willis at
10  some point.
11      Q.  So you had -- you did have time
12  to go have drinks with Ms. Nelms.
13      A.  In Birmingham, I did.
14      Q.  Is that correct?  Okay.
15      I'm showing you what I've marked
16  as Defendant's Exhibit 36.  This is an
17  e-mail exchange dated October -- well,
18  it's got a couple of dates.  But it
19  starts on September 12th, actually, and
20  goes on through October 12th, 2018,
21  between Matt DeVenne and Corey Daugherty,
22  and you're cc'ed on this.  Did you --
23  were you involved in this meeting where

Page 354

1  you were going to fly to see --
2      A.  Yes.
3      Q.  -- Mr. DeVenne?
4  (Defendant's Exhibit 36 was marked for
5  identification and is attached.)
6      A.  I think DeVenne.  Yeah.
7      Q.  Oh, I'm sorry.  Thank you.
8  DeVenne.  And he was -- was he an agent?
9      A.  He was.
10      Q.  Was there some issue at the
11  Willow Point -- a CRC/TDC issue --
12  retreat where you did not want to be
13  assigned to go on the boat, you wanted to
14  play golf instead?
15      A.  No.
16      Q.  Okay.  All right.  I'm showing
17  you what I've marked as Defendant's
18  Exhibit 37, which is an e-mail from Rusty
19  Hughes dated January 18th, 2019, to it
20  looks like several brokers inside the
21  office including you where he's telling
22  you to mark your calendars for a dinner
23  with RSUI and that Austin was initiating

88 (Pages 351 - 354)

Page 355

1  the dinner.
2      THE COURT REPORTER:  Initiating
3  what?
4      MS. BARLOTTA:  Initiating the
5  dinner.
6  (Defendant's Exhibit 37 was marked for
7  identification and is attached.)
8    A.  And then he was saying who to
9  include.  I went to high school with
10  Austin, just a year.
11    Q.  Okay.  But this was a dinner
12  event that you got invited to.  Is that
13  right?
14    A.  Yes.  I was -- I had attended
15  their broker seminar, RSUI's.
16      MS. PALMER:  Rachel, that's
17  time.  We're at seven.
18      MS. BARLOTTA:  I don't -- I
19  don't -- I don't know.  Is that accurate
20  or not?
21      THE VIDEOGRAPHER:  We're at
22  seven hours.
23      MS. BARLOTTA:  Okay.  Okay.  Can

Page 356

1  I get in about like three more questions,
2  four more questions?  Well, actually, can
3  I confer with her and then I'll wrap up?
4  Because I had -- I was not aware that
5  that was time.  I thought I had about
6  another 20 minutes.
7      THE VIDEOGRAPHER:  We're going
8  off the record at 6:13.
9      (Break taken.)
10      THE VIDEOGRAPHER:  We're going
11  back on the record at 6:16.
12      MS. PALMER:  Rachel, before you
13  ask that, I -- you've had seven hours.
14  Politely, I'm going to have to request
15  that we stop.  The rules are clear.  And
16  you've had seven hours to ask about the
17  merits of the case.
18      MS. BARLOTTA:  Okay.  I -- all
19  right.  I mean, I don't know.  It was
20  just one question.  So I mean, I don't --
21      MS. PALMER:  It's always just
22  one question.  And respectfully, I don't
23  think that -- that we would be allowed to

Page 357

1  do it.  But, you know, at this point,
2  we've been through the merits of the
3  case.  She answered your questions I
4  think pretty swiftly and honestly.  And
5  we have the rules for a reason, and we're
6  going to end it at seven hours.
7      MS. BARLOTTA:  Well, I'm going
8  to ask her the question.  You can
9  instruct her not to answer.
10    Q.  (By Ms. Barlotta) Ms. Hendrix,
11  have you done anything to -- have you
12  applied for any broker positions since
13  you left CRC?
14      MS. PALMER:  Don't answer the
15  question.  We are done.  It is seven
16  hours.
17      MS. BARLOTTA:  Okay.
18      THE VIDEOGRAPHER:  Okay.  This
19  concludes the deposition of Kathryn
20  Hendrix.  We're going off the record at
21  6:17.
22          END OF DEPOSITION
23      (6:17 p.m. Central)

Page 358

1          C E R T I F I C A T E
2  STATE OF ALABAMA    )
3  COUNTY OF JEFFERSON )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that the
7  content herein was produced in transcript
8  form by computer aid under my
9  supervision, and that the foregoing
10  represents, to the best of my ability, a
11  true and correct transcript of the
12  proceedings occurring on said date at
13  said time.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of said
18  case.
19
20  LANE C. BUTLER, RPR, CRR, CCR
21  CCR# 418 -- Expires 9/30/23
22  Commissioner, State of Alabama
23  My Commission Expires: 2/11/25

89 (Pages 355 - 358)

Page 359

1  Cynthia Wilkinson, Esq.

2  cwilkinson@wilkinsonfirm.net

3       July 28, 2023

4  RE: Hendrix, Kathryn v. CRC Insurance Services, Inc., Et Al.

5  7/18/2023, Kathryn Hendrix (#5999253)

6   The above-referenced transcript is available for

7  review.

8   Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12   The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  erratas-cs@veritext.com

16

17  Return completed errata within 30 days from

18  receipt of testimony.

19   If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22       Yours,

23       Veritext Legal Solutions

24

25

Page 361

1  Hendrix, Kathryn v. CRC Insurance Services, Inc., Et Al.

2  Kathryn Hendrix (#5999253)

3       ACKNOWLEDGEMENT OF DEPONENT

4   I, Kathryn Hendrix, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Kathryn Hendrix           Date

13  *If notary is required

14       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20____.

16

17

18       _____

19  NOTARY PUBLIC

20

21

22

23

24

25

Page 360

1  Hendrix, Kathryn v. CRC Insurance Services, Inc., Et Al.

2  Kathryn Hendrix (#5999253)

3       E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  Kathryn Hendrix           Date

25

Veritext Legal Solutions

800-567-8658                                          973-410-4098

[& - 2012]                                        Page 1

| & |
|---|
| **&**   2:9 5:5 7:3,5 |
| 10:8 284:23 |
| 285:21 |

| **0** |
|---|
| **000022**   7:16 |
| **000027**   7:12 |
| **000042**   7:2 |
| **000108**   7:10 |
| **000131**   9:4 |
| **000133**   7:20 |
| **000135**   8:2 |
| **000204**   7:8 |
| **000245**   8:3 |
| **000298**   7:6 |
| **000443**   7:4 |
| **000597**   7:22 |
| **000650**   8:23 |
| **000661**   9:14 |
| **000697**   9:2 |
| **000698**   9:12 |
| **000732**   8:13 |
| **000738**   8:19 |
| **000889**   8:17 |
| **000906**   9:8 |
| **000918**   8:15 |
| **000984**   9:16 |
| **001121**   6:23 |
| **001184**   8:21 |
| **001234**   9:6 |
| **001368**   9:10 |
| **00300**   1:7 11:4 |
| **004735**   8:10 |
| **004754**   7:14 |

**004755**   6:20
**004781**   6:17
**004806**   6:14
**00700**   289:11

| **1** |
|---|
| **1**   6:12 10:19 |
| 56:15,21,23 |
| 338:18 |
| **1,000**   60:5 |
| 100:14 304:13 |
| **1/1/2018**   151:1 |
| **10**   7:11 149:8 |
| 150:16 151:9 |
| 200:2,4 |
| **100**   4:7 |
| **100,000**   45:3 |
| **104**   4:7 |
| **10:02**   56:9 |
| **10:10**   56:12 |
| **11**   7:13 156:3 |
| 160:5,14 |
| **11/30/2018** |
| 298:22 |
| **112**   7:1 |
| **113**   7:3 |
| **117**   7:5 |
| **11:11**   111:1 |
| **11:28**   111:4 |
| **11th**   300:21 |
| **12**   6:4 7:15 |
| 118:21 161:6 |
| 161:13,20 |
| **12:00**   159:3 |
| **12:25**   159:22 |

**12:30**   159:3
**12th**   353:19,20
**13**   7:17 212:17
212:23
**138**   7:7
**13th**   348:10
**14**   7:18 249:13
250:1
**140**   329:19
330:1 333:13
**149**   7:9
**15**   7:19 254:19
254:20,22
270:4 271:4
**150**   332:15
**151**   7:11
**158**   329:13
330:4,17 337:5
**15th**   315:20
338:14
**16**   7:21 256:7,8
256:11,17
301:19
**160**   7:13
**161**   7:15
**17**   8:1 265:16
266:1,7 319:16
329:3
**1717**   4:13
**18**   1:21 8:3
10:19 269:11
269:14 290:12
297:13
**18362**   358:19

**18th**   2:11 3:3
10:11 352:17
354:19
**19**   8:4 272:16
272:20 305:3
329:2 337:16
**1901**   2:9 5:7
10:9 11:5
**19th**   290:12
**1:19**   160:2
**1:21**   300:21
**1:29**   249:23
**1st**   68:13 117:3
153:20

| **2** |
|---|
| **2**   6:15 62:7,9 |
| 62:18 68:12 |
| **2/11/25**   358:23 |
| **20**   8:6 83:7,11 |
| 223:16,23 |
| 276:21 277:1 |
| 313:9 340:1 |
| 356:6 361:15 |
| **200**   332:15 |
| **200,000**   45:3 |
| **2002**   24:22 |
| **2006**   35:17 |
| 36:13 |
| **2008**   35:18 |
| **2009**   171:5 |
| **2010**   56:19 |
| 57:8,21 58:3 |
| **2012**   54:17 |
| 59:12 64:2,3,7 |
| 64:9,15,16 |

**2013**  68:13
**2014**  69:1,4
  141:2 160:11
  160:22
**2015**  17:11
**2016**  193:6,9,15
  196:3 283:1,7
**2017**  7:11
  139:10 150:18
  153:21 154:1
  190:6,7 242:17
  277:22 321:12
**2018**  7:15
  113:2,5,12
  114:9 153:15
  153:20 154:2,6
  161:7,20
  166:23 187:2
  189:22 190:9
  190:15 211:8
  225:3 231:9,16
  231:18 232:16
  233:6,14
  242:18 277:22
  283:1,12,20
  300:21 301:19
  305:3 317:19
  319:16 320:19
  321:12,14,23
  322:6 325:8
  326:1 327:2
  334:20 340:1
  341:17 342:12
  343:3 344:16
  345:22 348:10

348:13 351:20
  352:9,17
  353:20
**2019**  8:5 17:14
  116:23 117:4
  162:8,11 190:1
  212:22 223:20
  225:3 228:10
  231:17 238:1
  247:6 249:22
  255:4 256:10
  256:20 266:3
  270:5,19
  271:10 272:18
  275:2 312:8
  313:10 315:21
  321:23 354:19
**2020**  19:13
**2023**  1:21 2:11
  3:4 10:12,19
  359:3
**20th**  312:8
**21**  8:7 160:22
  288:8 289:5,19
  335:14
**212**  7:17
**21st**  297:13
**22**  8:5,8 317:7
  317:12
**22nd**  272:18
  275:2
**23**  8:9 328:3,7
  335:21
**23rd**  4:7

**24**  8:12 51:13
  339:23 340:8
**246**  270:17
**25**  8:14 83:8
  340:21 341:2
**250**  7:18
**254**  7:19
**256**  7:21
**26**  8:16 342:3
  342:13
**2600**  2:10 5:7
  10:10
**266**  8:1
**269**  8:3
**27**  8:18 343:2
  343:10 344:21
**272**  8:4
**277**  8:6
**28**  8:20 344:12
  359:3
**289**  8:7
**28th**  249:22
**29**  8:22 150:20
  345:19 346:2
  347:8
**2:21**  1:7 11:4
**2:29**  217:19
**2:48**  217:22
**2nd**  255:3
  270:5,18
  325:23

| **3** |
|---|

**3**  6:18 68:7,8
  68:14 130:6
  150:19 161:20

304:13
**3.2.**  21:16
**30**  9:1 223:17
  347:12,17
  359:17
**300,000**  45:3
**30th**  160:11
**31**  9:3 348:8,14
**317**  8:8
**32**  9:5 349:22
  350:10
**328**  8:9
**33**  9:7 351:4,9
**34**  9:9 352:1,10
**340**  8:12
**341**  8:14
**342**  8:16
**343**  8:18
**344**  8:20
**346**  8:22
**347**  9:1
**348**  9:3
**35**  9:11 352:15
  353:1
**350**  9:5
**351**  9:7
**352**  9:9,11
**35203**  4:14 5:8
**35233**  4:8
**35255**  4:20
**354**  9:13
**355**  9:15
**36**  9:13 353:16
  354:4

**[37 - account]**

**37**  9:15 354:18 355:6
**3:56**  272:10
**3rd**  160:11 256:10,20 271:10 340:1

**4**

**4**  6:21 57:4 72:4,7 111:15 111:16 323:21
**418**  358:21
**453**  114:2
**4739**  328:6
**4:08**  272:13
**4th**  64:7 317:19 322:6 325:8 345:22

**5**

**5**  7:1 111:20 112:10 113:3 117:2 130:8
**5,000**  189:10 200:16 202:11
**500**  123:15
**55204**  4:19
**56**  6:12
**5999253**  359:5 360:2 361:2
**5:10**  317:1
**5:22**  317:4

**6**

**6**  7:3 57:10 62:22 68:22 113:1,7,23

266:2
**6,000**  60:5 100:15
**62**  6:15
**68**  6:18
**6:13**  356:8
**6:16**  356:11
**6:17**  357:21,23
**6:30**  341:12

**7**

**7**  7:5 116:23 117:5,21
**7/18/2023**  359:5
**706**  295:11
**711**  297:12
**72**  6:21
**73**  9:18 72:20
**741**  303:13 335:14
**742**  290:4,19
**746**  301:17
**747**  291:18
**750**  45:6,8
**750,000**  46:18 46:19
**755**  298:21
**758**  300:8,9
**77**  72:20
**770**  310:3,15
**771**  307:19 311:3
**779**  296:8
**781**  294:2

**785**  312:5,17
**79**  9:18

**8**

**8**  7:7 113:4,11 137:18 138:1 343:3
**8,000**  200:1
**80,000**  199:23
**802**  312:5,18 315:18
**803**  315:19,19
**804**  315:22
**817**  289:11
**881**  317:18

**9**

**9**  7:9 149:4,5 319:12
**9/30/23**  358:21
**908**  319:13
**926**  322:5
**927**  320:15
**946**  325:19
**984**  338:12
**9:10**  2:12 10:11 10:18
**9:42**  317:21
**9th**  113:5 326:4 326:20

**a**

**a.m.**  2:12 10:11 10:18 271:11
**abiding**  113:17
**ability**  233:21 248:4 358:10

**able**  13:8 70:17 97:11 131:13 164:12 186:12 205:7 208:7 229:14 231:14 236:21 237:17 237:18 251:8 276:7 284:1 294:5 306:8 316:8 323:7
**above**  10:13 358:4 359:6 361:7
**absent**  14:19
**academic**  21:6
**accept**  85:16
**accepted**  21:9 85:1 99:16 103:1 126:6 255:10
**accepting**  86:23
**access**  24:2
**accessed**  285:19
**accidentally**  189:2
**accordance**  2:22
**account**  42:14 43:3 44:12 82:22 84:23 87:7 91:7 92:7 92:13,20 96:5 96:7,12,18

97:4 98:11,18
99:16 103:2
107:13,15
109:12,15,19
119:18 120:2,6
120:8,11 121:8
121:16 122:4,8
123:2 124:14
125:17 131:6
134:13 135:23
137:3 141:3
151:21 152:12
154:14 157:22
160:21 163:6
168:18,19,19
169:13,19
170:9 171:18
171:19 172:1,9
172:12,17
173:5,8 175:12
175:14 176:16
176:19,23
181:17 182:1,6
182:10,16,21
184:17 185:2,8
186:8 188:9,11
193:21 194:8
195:4,8,9,12
198:12 199:6
199:12 200:17
200:19 202:8
210:20 219:20
220:4 222:4
224:16 229:11
229:19 231:7

232:11,17,21
233:9,20 234:4
234:9,16
235:16 237:1
240:11 246:18
257:1 278:12
278:17 284:8
284:10 286:7
287:20 301:10
302:16,18
303:21 304:1
307:7,8,14
311:21 313:8
313:10,11
314:9 319:23
329:5,17 330:8
332:14,16,23
340:4 341:19
344:9,10 345:7
345:11,12,15
346:5 349:7,9

**accountant**
21:19 22:2,11
23:10

**accounting**
21:1 24:4
37:19 39:8

**accounts** 92:15
93:15 97:5
104:8 107:1,2
107:4 108:15
109:11 120:9
121:23 133:10
135:1,15
151:20 154:12

154:23 172:4
186:10,14
199:7,9 224:12
231:13,15
232:23,23
233:7,13 234:8
236:20 254:2
303:3,4,23
304:8,10,14
306:3,16,18
312:10 323:2
329:16 330:13
333:17,21
335:1,4 337:17

**accuracy** 359:9

**accurate** 15:6
42:5 48:2
151:8 182:9
302:12 322:19
323:11 336:3
350:9 355:19

**acknowledge**
113:12

**acknowledged**
113:4 117:2
247:13

**acknowledge...**
361:3

**acknowledg...**
112:8 113:20
359:12

**acknowledg...**
112:2

**acquired** 61:8
61:13

**acted** 234:8

**acting** 10:3

**action** 1:7
358:16

**actions** 26:12

**actively** 161:23

**actual** 46:7
257:16

**actually** 35:10
48:10 78:6
79:23 94:12
141:5 149:1
191:8 226:23
275:22 315:18
324:16 353:19
356:2

**add** 234:16
236:19

**added** 204:6
208:16,18
277:22 278:6
278:10,12
280:11,17
281:8,10,12
282:1 304:16

**adding** 325:1

**addition** 152:3

**additional** 58:5
92:6 330:13

**additions** 361:6

**address** 270:20
271:21 272:3
348:6

**addresses**
93:23

**administration**
266:6
**administrative**
121:1 125:6
153:9 158:16
158:19,21
164:3 179:16
305:5 307:16
318:8 337:9
**advance** 58:18
59:1
**advice** 292:18
308:7,13
310:22 339:14
**advised** 3:5
**advising**
294:20 313:3,6
**ae** 301:22
319:20
**affect** 324:11
**afraid** 252:15
253:8
**afternoon**
340:6 343:8
**age** 32:20,21
290:1
**agencies**
205:22 206:3
219:18 285:18
319:21
**agency** 39:5
153:7 207:2
222:7 228:21
285:3,9,11
309:7 334:6,7

**agent** 48:20
50:12,13,18
87:14 88:14
90:3,7,11
91:21 92:4,15
94:10,11 96:17
108:12,19
109:3 136:21
137:4 169:18
173:19 182:8
200:3 207:5
220:5 236:23
284:17 285:2
302:3 303:16
312:10 322:14
343:16 354:8
**agents** 90:19
92:12 106:18
106:20 107:23
127:19 128:7
134:21 152:11
180:14 220:6
228:17 331:15
**ago** 311:7
327:10
**agree** 63:6
106:10 111:13
113:19 117:1
162:4,17 199:5
234:18 271:2
310:12 332:3
338:1 342:10
343:14 346:20
**agreed** 2:2,14
242:5 299:14

299:15
**agreement** 7:9
144:17 145:2
145:13 146:7
147:6 148:21
149:23
**agreements**
147:19
**ahead** 149:2
159:13 220:1
343:6,7
**ahold** 219:1
**aid** 358:8
**aim** 37:18 39:4
40:13,21 41:3
41:14 42:3,6,7
42:18 43:8
46:10 47:10,14
48:6,12 50:12
50:22 52:17,22
87:19 89:13
98:20 131:2,5
233:22 234:3
328:18
**aiming** 102:18
**al** 160:20 359:4
360:1 361:1
**alabama** 1:2
2:10 4:8,14,20
5:8 10:3,10
11:2,6 21:11
358:2,22
**alcohol** 294:7
**alex** 182:2

**allegation**
277:13
**allegations**
17:16
**allegedly** 241:2
**allen** 284:23
285:21
**allotted** 359:20
**allowed** 14:21
48:11 70:14
236:1 312:9
356:23
**allowing**
118:23 230:10
**alluded** 235:2
352:21
**amber** 182:2
226:1,3
**american**
346:12
**amos** 17:1
**amount** 40:6
100:18 164:2
188:21 189:13
199:1,20
304:11,17
327:20
**amwins** 290:23
**analyze** 23:12
**andrea** 99:5,10
122:12 134:20
134:23 153:10
154:21 229:23
253:17 304:22
305:6 319:19

320:8,10
332:10,14
333:23 334:22
344:9
**andrea's** 83:7
210:22 345:10
**anger** 325:14
**annoying** 302:1
**annual** 7:11,15
37:17
**answer** 15:4,13
139:19 237:11
264:4 357:9,14
**answered**
357:3
**anxiety** 258:1
**anybody** 19:3,4
24:5 25:22
31:9,21 42:16
54:20 84:19,21
85:6 123:6,14
167:18 176:9
180:20 204:23
245:7,12 246:1
253:15 259:6
267:21 275:5
275:11 280:12
282:17 285:21
**anymore**
158:16 176:19
177:5,9 180:16
194:18 330:15
**anytime** 84:4
**anyway** 314:21
324:7 325:22

**anywise** 358:17
**app** 123:11
**apparently**
78:15 80:7
**appealed** 25:11
**appears** 62:14
310:3 343:4
350:7 351:5
**appended**
361:7
**applicable**
359:8
**application**
48:17 81:23
91:13 92:3,4
92:16 93:9
94:5,12,21
105:14
**applications**
136:20
**applied** 37:4
142:1,8,17
357:12
**apply** 29:5
35:23
**applying** 36:22
194:5
**appreciate** 69:1
**appreciative**
175:4
**approach**
290:23
**approached**
286:9 304:9,14

**appropriate**
47:21 55:17
87:22 88:1
221:23 289:13
297:21 298:2
**approval**
211:22 212:2
**approve** 214:19
**approved**
214:10 285:5
**approximate**
224:22
**approximately**
2:12 10:11
**april** 19:13
345:22
**area** 271:20
**areas** 57:12
63:9 207:9
**argue** 250:3,5
**asked** 20:14
26:7 29:9 41:4
63:10 67:16
69:8,11,14
79:7 90:10
112:7 126:12
129:14,17
140:16 145:7
145:10 146:2
154:21 174:5
174:12 215:3
216:1 218:11
220:7,20 223:3
226:20 227:10
236:3 238:2

240:13 244:12
248:14 277:15
283:2,15 288:2
293:14 306:3
309:8,11 311:7
311:14,19
319:4 321:3
323:17 324:9
350:20 352:6
**asking** 13:2
22:17 40:23
46:14,15 51:20
52:3 72:16
85:5 117:18
141:18 149:15
174:23 239:19
245:6 254:8
269:4 279:19
295:13,14
314:11 320:10
322:17 323:13
**aspect** 94:4
96:9
**ass** 301:1,4
**asserting**
314:17
**assessment**
6:12,15,18
**asshole** 299:5
299:10
**assign** 2:19
**assigned** 96:18
151:14,18,21
152:2,10,21,22
158:20 181:22

182:1,6,8
201:2 213:15
219:18 222:7
234:6 300:17
354:13
**assignment**
 151:16 152:14
**assignments**
 25:20
**assist** 151:4
 266:4
**assistant** 42:14
 185:12 318:3
**assoc** 127:9
**associate** 47:1
 113:13 115:22
 115:23 116:8
 126:13,19,23
 127:4,6 129:18
 167:13,14
 178:9,12,18
 179:8 180:17
 184:18,19
 185:15,20
 190:18 191:3,9
 191:13 192:10
 194:6 195:17
 195:18 197:12
 197:20 202:17
 203:10,21
 210:15 283:4
 283:16,21
 293:13 305:12
 305:15,18

**associate's**
 115:21
**associated**
 112:4
**associates** 6:21
 113:2 115:15
 208:1 271:18
**assume** 15:14
 15:22 200:1
 274:9 321:16
**assumed** 18:15
 100:16,17
 120:7 122:1,11
 125:3 233:4
 257:8,11
 261:16
**assuming** 252:1
 261:5 280:13
 319:8
**assumption**
 122:17,19
 124:4 205:9
**attach** 89:10,16
 174:2,23
 176:11
**attached** 57:1
 62:19 68:15
 112:11 113:8
 117:6 138:2
 149:6 151:10
 160:15 161:14
 213:1 250:2
 254:23 256:12
 266:8 269:15
 269:21,22

270:20 271:3
272:21 277:2
289:20 299:3
317:13 340:9
341:3 342:14
343:11 344:22
346:3 347:18
348:15 350:11
351:10 352:11
353:2 354:5
355:7 359:11
**attachment**
 176:11
**attachments**
 95:6 270:3
**attacks** 258:2
**attempt** 273:10
**attend** 345:4
**attended** 352:8
 355:14
**attending**
 350:23
**attention** 62:22
 114:1 166:14
 167:2,19
 228:22 293:14
 303:15 317:17
**attorney** 72:5
 145:8,13,20
 146:3 149:17
 254:10 273:5
 289:6 313:23
 316:16 359:13
**attorneys** 12:6
 16:2,6 212:19

245:18 254:14
269:13
**attracted** 25:2
**auburn** 21:11
**audit** 17:10
 22:4,4,5,7,9,17
 24:18,20 25:5
 29:23 30:5
 36:17 37:13
 47:9,10 48:14
 53:13 55:10
 58:2,11 60:2
 60:14,18 61:11
 63:21 65:13,17
 65:23 66:1,6
 68:4 69:6 70:4
 70:8,11,20
 78:6 79:13
 98:23 100:7,8
 100:13 101:8
 115:5 120:18
 122:20 123:1
 123:22 143:9,9
 188:18 208:12
**audited** 37:19
 38:6 189:1
**auditing** 25:2
 47:11 53:3
 55:10 68:4
 86:9 87:11
 124:5,18
**auditor** 22:12
 28:9 53:19,23
 54:10,11,21
 55:2 57:19

58:8 67:8,11
67:14
**audits** 22:8,21
23:23 25:6
37:17,17,21
55:23 98:13
**august** 139:10
249:22 254:13
302:22 325:23
327:2
**austin** 354:23
355:10
**automatically**
232:1,3
**available** 81:6
84:3 113:14
115:9 210:5
273:14 303:2
359:6
**avenue** 2:9 4:13
5:7 10:9 11:5
**average** 88:17
91:1
**aware** 18:3
47:6 171:21
188:20 203:9
203:19 209:8
242:6 274:14
278:19 289:14
289:22 300:4
308:15,19
309:2,6,10,14
309:19 313:13
356:4

**awesome** 83:9

**b**

**b** 6:9 225:9,12
**back** 26:15
41:7,8 53:3
56:12 67:23
92:4,8 111:4,5
111:9 113:22
128:13 129:15
129:16 132:11
132:14 139:3
140:13 144:10
160:2 164:18
169:18 175:18
191:8 196:1,14
197:10 198:4
215:16,17
217:22 222:21
230:5 235:22
237:19 238:11
246:10 247:8
251:8,14
258:23 264:5
268:5 272:13
275:7,13 287:1
290:22 311:2
317:4 318:1
327:21 335:11
338:10 349:13
356:11
**background**
208:13
**backwards**
270:12

**bad** 26:9
175:22 263:8
324:13
**bailey** 5:15
12:12
**baker** 2:8 5:5
10:8
**bakerdonelso...**
5:9,10
**ball** 301:23
302:8
**balls** 322:8
**bank** 1:15
10:23 53:5
**banks** 29:15,16
**barely** 299:16
**barlotta** 3:2 5:3
6:4 11:14,14
12:10,17,22
56:6,13,16
72:15,19 78:1
110:18 111:5
111:17,18
159:2,7,16,18
160:3 183:13
183:15 217:16
217:23 265:20
270:9,11,13,16
272:7,14
276:14,18,19
312:17 316:22
317:5 334:13
334:17 347:4,9
347:10 351:13
355:4,18,23

356:18 357:7
357:10,17
**barnette**
143:12,13
**barnette's**
143:23
**base** 101:19
121:13
**based** 38:19
60:8 122:19
124:23 202:18
266:21 290:1
343:13
**basis** 32:13
55:1 169:4,12
170:15
**bates** 6:14,17
6:20,22 7:2,4,6
7:7,9,11,13,15
7:19,21 8:1,3
8:10,12,14,16
8:18,20,22 9:1
9:3,5,7,9,11,13
9:15 114:2
150:20 270:17
289:10 290:4
290:19 291:18
294:1,2 315:22
328:6
**bb** 117:13
**bb&t** 17:6 53:6
54:6 112:4,8
113:2,15
114:12 115:7
117:13 118:23

| | | | |
|---|---|---|---|
| 137:20 214:9 | 69:18 79:1,11 | 267:14 276:1 | **betsy** 143:6 |
| 215:1 242:23 | 80:18 81:20 | 283:6 293:2 | 144:7 205:14 |
| 245:8 251:23 | 82:3,15 83:21 | 306:15 307:21 | 244:11,14,17 |
| 252:5,9 253:2 | 86:2,6 101:15 | 309:16 311:3 | 244:23 306:17 |
| 253:8 254:16 | 102:17 105:2 | 311:20 315:1 | 306:18 |
| 254:21 258:23 | 108:12,15,23 | 316:3 323:2 | **betsy's** 306:14 |
| 263:5,13 | 117:23 118:23 | 327:3 333:23 | **better** 137:5 |
| 266:23 267:7 | 124:12 126:2 | 334:20 345:6 | 218:22 258:18 |
| 268:6,8 274:17 | 130:20 133:11 | 349:3 | 336:22 |
| 274:22 275:16 | 138:14 141:9 | **believed** 249:1 | **biannual** 60:6 |
| **bb&t's** 113:14 | 141:14 143:19 | 249:2,2 339:3 | **bias** 164:10,11 |
| 211:22 212:2 | 143:20 144:7 | **believes** 167:8 | 295:17 |
| **bbtbenefits.c...** | 145:3 146:5 | **believing** 249:4 | **big** 71:14 |
| 113:15 | 150:1 151:12 | **benefit** 13:4 | 106:22 107:10 |
| **bc** 322:17 | 154:15 161:4 | **benefits** 113:14 | 108:18 156:3 |
| 324:10 | 161:18 162:1 | 113:15 266:6 | 164:3 187:12 |
| **bcc'ed** 323:19 | 162:21 176:7 | 268:16 273:21 | 187:13 229:11 |
| **bearman** 2:8 | 178:14 179:22 | 274:20 | 238:16 254:2 |
| 5:5 10:8 | 180:22 181:20 | **benefitted** | 295:23 303:4,5 |
| **becoming** | 187:2 188:2 | 204:12 | 303:6,8 |
| 57:18 58:7 | 190:16 191:5 | **bennett** 156:21 | **bigger** 200:13 |
| 147:4 148:5 | 191:20 195:15 | 342:20 350:3,6 | 200:21 232:2,3 |
| 150:12 156:14 | 197:21 198:9 | **bennett's** 157:3 | 235:9 |
| 191:13 197:20 | 199:3 202:15 | 157:6 | **biggest** 183:5,9 |
| **beer** 242:16 | 204:4 207:18 | **berkowitz** 2:9 | 183:18 231:10 |
| **began** 245:21 | 211:9 212:10 | 5:6 10:9 | **bind** 48:19,20 |
| **beginning** | 212:18 214:8 | **berte** 23:3 | 49:2 50:15,17 |
| 154:1 190:9 | 217:5 221:3 | **best** 16:17 27:3 | 50:21,21 51:8 |
| **begins** 345:21 | 223:21 225:2 | 54:15 58:3 | 51:13 52:6 |
| **believe** 29:17 | 226:13 227:5,7 | 88:17 130:11 | 297:15 |
| 30:18 34:12,13 | 227:22 231:18 | 130:14 228:8 | **binder** 48:21 |
| 35:18 37:5 | 233:12 238:7 | 248:3 358:10 | 49:13,14,19 |
| 40:1 42:12 | 242:13,19 | **bet** 205:6 | 50:1,8,11,12 |
| 53:19 57:19 | 245:1 259:11 | 297:14 | 88:14 |
| 61:20 64:16 | 261:4 266:12 | | |

**[binders - bring]** Page 10

**binders** 88:4,6
91:4 124:8
173:2 221:3,4
221:23 229:20
230:3 299:2
**binding** 299:16
**bio** 209:12,14
**birmingham**
2:10 4:8,14,20
5:8 10:10 11:6
17:18 20:22
21:10,23 48:10
52:11,13,14
67:20,22 71:22
78:5 79:14
81:16 82:1,9
84:22 85:17
86:22,23 90:17
97:21,23 98:6
118:19 160:20
183:11 256:2
277:20 282:4
350:9,13
353:13
**bit** 72:11
125:12 159:17
160:5 269:7
**bitch** 297:18,23
298:8,19 300:5
**bitches** 324:23
325:17
**bitchy** 292:11
**biz** 312:21
**black** 310:14

**blake** 35:7,22
36:17
**blame** 292:1
**blast** 95:16
**blazing** 318:23
**block** 209:22
210:12
**blue** 213:17
290:8,21 310:8
310:8
**boat** 354:13
**bolts** 51:2 52:4
**bone** 291:1
**bonus** 60:1
66:15 100:18
101:3,14,19
135:19 202:2
202:10,18
231:17 232:2,4
232:11 234:19
252:12,16,19
253:4,10,11,17
254:1
**bonused**
130:21
**bonuses** 60:1
66:8,9 100:7
100:13 103:3
131:7 200:12
200:15,21
201:23 231:4
232:22 235:18
252:9 287:19
288:1 303:8

**book** 38:20
127:7,11
128:10 131:21
132:13 134:7
135:11 151:6
156:23 157:23
180:12 182:12
201:6 205:16
205:19 206:11
232:13 295:2
303:9 306:13
**books** 156:10
156:11 235:5
**bother** 174:12
211:15 301:2
**bothered** 174:4
174:21
**bottom** 150:23
213:17 270:14
294:4 295:12
310:15 319:13
319:15 344:16
**bottrell** 224:11
225:7,10 307:2
319:19 321:8
322:23
**box** 4:19 53:9
290:21 310:14
317:20
**boxes** 290:6
**boyfriend** 36:8
36:10
**boys** 216:4,16
227:23

**brandi** 179:22
211:17 212:5,6
214:23
**brandon** 184:4
185:19 190:12
190:14,17
201:14 226:1,2
226:17 290:15
291:1 293:13
297:14 347:13
348:4
**break** 18:11,17
56:4,7,10
110:14,20
111:2 159:4,10
159:20,23
217:15,20
218:1 272:11
316:20 317:2
356:9
**breakdown**
327:6
**breakfast**
216:8,9,20
217:12 218:7
230:7 237:5
247:5 248:13
**breakout**
303:17 335:20
**brent** 78:7 81:5
81:8 82:12,16
**bresnahan**
347:15
**bring** 127:7
133:2,9 136:10

| | | | |
|---|---|---|---|
| 167:3 199:9 | 126:19,22,23 | 189:19,20 | 304:13 305:12 |
| 207:15 229:22 | 127:4,5,6,10,15 | 190:5,18 191:3 | 305:12,18 |
| 232:20 233:14 | 127:16 128:9 | 191:3,9,13 | 307:7,9,13 |
| 262:10 296:5 | 128:16,20 | 192:1,10 194:6 | 312:2 313:7,14 |
| **bringing** 86:13 | 129:6,12,14,18 | 194:12,20 | 313:16 314:14 |
| 128:6 132:17 | 129:20 130:3 | 195:6,17,18 | 319:7,21 323:6 |
| 166:13 167:19 | 132:3,5 133:18 | 196:12,17 | 329:5,9,14 |
| 177:22 305:19 | 133:22 134:4,5 | 197:6,12,13,20 | 330:3 333:5,10 |
| 323:8 | 134:17,20 | 199:12 200:18 | 337:8 345:9 |
| **brings** 127:15 | 135:18,22 | 200:20 203:11 | 355:15 357:12 |
| **broker** 27:20 | 137:2,7,21 | 203:21 204:3 | **broker's** 50:16 |
| 34:13,18 38:10 | 138:6,21 | 204:16 210:12 | 182:12 202:17 |
| 38:12,17,18,22 | 139:14,22 | 210:15,15,16 | **brokerage** 70:9 |
| 40:21 41:1,2,7 | 140:8,11 141:8 | 218:21 219:6,7 | 83:2 102:22 |
| 41:9,13,16,17 | 142:8,18 | 219:11 220:3 | **brokering** |
| 41:20 42:14,17 | 143:15,18,19 | 220:21,21,22 | 162:3 |
| 43:2,9,12,13,22 | 144:15,20 | 221:13 222:1 | **brokers** 46:9 |
| 44:3,6,9,19 | 145:5 147:4 | 223:2 224:7 | 46:11,13 79:3 |
| 45:5,7 46:1,1,6 | 148:5,16 150:5 | 225:4 226:5,6 | 79:14 86:15 |
| 46:17,21 47:1 | 150:13 151:2 | 226:8,12,19 | 120:15 121:4 |
| 49:23 51:2,21 | 152:11,17 | 228:13,13 | 124:7 141:21 |
| 52:5 83:3 84:1 | 153:5,18,21 | 231:11,16,23 | 142:1,15,23 |
| 84:6,9,13,16 | 154:19 156:14 | 234:11 235:18 | 163:8 168:20 |
| 85:23 86:4,7 | 156:22 157:19 | 240:1,10 241:8 | 168:22 170:13 |
| 86:12,20 90:18 | 158:4,6,15 | 243:16 244:3 | 178:9 179:8 |
| 102:18 118:3 | 161:22 166:12 | 252:10 278:1 | 181:16 190:12 |
| 118:21 119:11 | 166:17 167:13 | 279:1,4 281:21 | 197:18,23 |
| 120:22 121:2 | 167:15 169:2 | 281:22 282:1,5 | 198:9 204:11 |
| 121:10,10,12 | 178:12,19 | 282:12 283:4 | 206:8,9 208:5 |
| 121:19,22 | 180:17 182:5 | 283:16,21 | 229:15 235:17 |
| 123:2,10,15,20 | 183:22 184:2 | 284:1,4,15 | 243:4 277:20 |
| 123:23 124:10 | 184:18,19 | 285:19 286:12 | 278:9 281:20 |
| 124:10,13 | 185:12,14,15 | 287:22 288:3 | 283:2 288:12 |
| 125:2,16 126:7 | 185:16,17,20 | 293:13 294:22 | 288:19 289:2 |
| 126:10,14,16 | 188:3,12 | 294:22 303:19 | 297:21 305:14 |

305:15 307:18
345:23 354:20
**brooke** 311:18
**brought** 58:21
58:22 107:15
141:10 192:13
202:19 207:18
232:9,18
234:20 235:20
241:18 245:4
246:1 252:2
293:13 305:21
**brown** 8:8
317:10,11
325:23 335:12
338:11 339:16
339:20
**bubba** 216:7
**budget** 232:10
**build** 127:7,10
134:7
**building**
128:10 131:20
232:12
**bunch** 291:6
**business** 38:20
42:1 49:3
86:12 92:21
94:4,7 95:2
96:5,7 104:19
104:22 106:8
121:23 122:5
123:4 124:2,16
125:19 127:8
127:14,18

128:7,10
131:21 132:13
133:2,9 134:7
134:11,20
135:8,9,15
136:10 151:5
151:12 152:4
157:23 158:17
162:3 163:13
177:22 178:16
182:12 185:4
186:2,8 189:11
199:22 201:7
205:20 206:11
208:1 220:3
228:18 229:18
232:13 233:17
234:12,14
235:6 241:6
279:1 280:5,6
280:19 282:7
295:3 296:11
301:14 304:8
305:19,22
313:5 315:13
319:22 323:9
330:3 343:15
348:12
**butler** 2:6 3:1
10:1 11:9
358:20

**c**

**c** 2:6,23 4:1
10:1 31:19,19
225:10 358:1,1

358:20
**cadden** 7:18
194:16 248:18
249:4,21 251:4
251:21 254:11
267:3 274:14
**caldwell** 2:9
5:5 10:8
**calendar**
215:10 326:10
**calendars**
354:22
**call** 36:19 51:3
60:22 85:5,6
91:19,20 95:23
99:23 189:4
217:3 286:3
351:16
**called** 29:8,22
30:11 32:16
41:23 42:13
81:3 216:8
218:22 305:13
305:14
**calling** 216:15
218:23 301:3
**calls** 119:10
179:9 207:20
**camera** 12:13
**captured** 39:10
**captures** 44:16
**car** 24:1 55:7
**card** 188:16,22
189:3 296:11

**care** 226:4
247:20,22
**career** 6:13,16
6:19 58:18
59:2 248:5
252:18 276:10
276:12 292:13
293:6 296:19
339:14
**carolina** 284:10
**carrier** 48:20
49:9,10 50:9
50:18 89:19
90:2,14 92:5,7
93:11 105:9,15
107:10 136:22
137:2 163:17
186:17 187:12
189:15 206:23
236:8 280:7
341:6
**carrier's** 89:11
**carriers** 93:20
95:8,8 106:4
168:4 227:12
236:9,11
**case** 11:3 13:17
14:13 15:19
17:2,17,20,22
18:23 20:4,15
20:18 39:22
56:19 62:11
68:10 72:6,11
111:22 136:19
137:20 161:9

198:23 202:10
249:20 286:14
287:4 288:1
292:9 303:3
314:17 317:9
356:17 357:3
358:18
**casual** 322:10
**casualty** 27:22
34:18 103:19
206:9
**cathy** 120:17
121:4 143:3,14
156:13 171:22
179:21 226:14
341:19
**caught** 128:11
131:16 237:10
**cause** 10:13
**cc** 299:2
**cc'ed** 353:22
**ccr** 358:20,21
**central** 2:12
357:23
**ceo** 31:15
**certain** 105:14
123:7,9 124:7
188:21
**certification**
59:8,18,21
**certified** 59:7
**certify** 10:4
358:4,14
**cfo** 30:15 31:3

**chain** 8:1,14,18
8:20,22 9:1,5,7
9:9,11,13,15
49:23 344:14
345:20
**change** 53:23
54:3 65:4 69:4
69:8,14 71:14
120:13 125:4
211:4 249:6
323:12 335:3
339:15 360:4,7
360:10,13,16
360:19
**changed** 53:15
156:20 157:17
157:17 214:4
231:21 327:10
**changes** 34:5
209:13 286:20
359:10 361:6
**changing**
252:20 322:14
**charge** 8:6
87:15 168:14
187:19 210:8
244:14 276:22
277:9 279:21
280:4 282:21
283:10
**charlie** 30:19
**chart** 337:15
**charts** 327:4
**chat** 201:22
225:4,16 226:8

226:12,16,19
226:19,20
**check** 22:18
38:1 48:18
53:6 66:10
89:1 193:19
**checking** 88:12
**cheesecake**
316:2,8
**chicago** 229:10
344:2,4,16
**chickening**
319:1
**children** 32:20
**chose** 178:21
348:4
**christina** 5:15
12:12
**christy** 165:17
259:15,22
260:1 346:6
**chronological**
160:6
**ci** 44:10
**cic** 59:4 64:9
**cics** 63:22
**cindy** 214:11
214:13,14
**circumstances**
14:20
**cisr** 42:12 43:2
44:1,10,11
131:13
**civil** 1:7 2:23
10:5 14:8

**claim** 287:12
287:14
**claims** 13:3
14:18 15:3
18:23 104:15
287:4
**clarified** 221:8
221:12
**clarify** 314:16
**class** 98:21
**classes** 156:1
**clay** 97:2 98:7,8
107:11 109:2
118:8 120:9,10
122:1 145:6
146:7 163:14
164:14 167:4
167:14 171:1
171:12 176:4
176:17 177:5,8
177:11 186:9
192:16 198:15
199:1 211:6,6
224:15 232:12
246:10 286:9
286:23 301:21
302:13 303:20
305:17 306:21
320:3 322:7
324:19 325:9
330:10 333:15
336:20 340:2
**clay's** 106:19
106:20 107:22
109:8,11 146:7

171:19 172:9
175:12 232:11
302:15 329:6
329:19 330:12
330:15
**clear** 45:23
83:1,4 136:14
200:7 221:18
256:1 267:23
290:5 356:15
**client** 23:19,22
49:4,11 51:4
205:1,13 286:6
**clients** 23:20
60:23 90:20
132:18 151:6
152:5 205:18
206:5 284:14
315:4 344:19
344:20
**close** 19:21
32:9 37:16
63:22 64:11,13
260:13,17,18
262:7 263:3
**closed** 324:17
**closer** 211:7
**club** 216:16
**cobbs** 284:23
285:20
**code** 38:23 39:3
41:2,7,9,14
43:22 44:20
45:7 46:16
47:2,4 130:16

**coded** 38:18,22
40:20 41:1,17
41:20 42:19
185:17
**codes** 46:10
**coding** 130:23
131:5
**colin** 97:17,19
**collected**
224:11
**college** 20:21
21:15,18 156:1
**color** 97:13
**colorado**
108:12,15
109:3
**column** 42:18
**columns**
234:17
**com** 241:3
243:22
**combined**
143:22 183:22
184:2
**come** 26:14,22
28:1 65:14
67:4,8 78:2,3
78:16 79:6,15
80:11,11,13
81:11,13 84:11
98:14 104:10
118:1,2,5
139:6 186:8
187:16 191:7,7
191:12 192:8,9

193:11 195:13
196:6,7,14
198:4 215:16
215:17,21,22
220:11 223:4
238:4,11 240:5
240:7 275:7,13
287:1 309:16
311:8,14
338:18
**comes** 51:3
196:16 265:3
281:4
**comfortable**
63:5 248:22
**coming** 33:13
67:9 78:9,16
91:13 96:17
134:21 251:14
261:10 283:16
292:8
**commencing**
2:11 10:10
**comment** 37:7
37:10 131:20
132:9,16 140:7
141:6,19 142:5
148:10 155:9
167:7 197:3
288:17 297:8
334:22
**commented**
153:10
**comments**
57:11 59:22

62:23 63:1
150:22 194:12
194:14
**commission**
39:10,15,18,21
40:2,4,9,12,20
43:5 90:3,7,13
186:15 199:21
358:23
**commissioner**
358:22
**commissions**
41:5 66:8,10
90:10 129:3
292:23
**communicate**
23:20 63:11
228:1 267:20
269:5 277:17
278:8 279:23
280:5,6 281:20
**communicated**
17:15 19:9,10
207:18 231:20
275:9 278:3
279:16 303:22
**communicating**
267:19 282:12
**communication**
19:16 280:19
281:18 282:12
**communicati...**
19:17
**companies** 8:9
296:1

**company**  26:23
  94:13 115:10
  247:21 255:17
  261:10
**compensated**
  121:18
**compensation**
  99:19 135:17
  150:3
**competitive**
  279:4
**compilation**
  328:4
**complained**
  221:5 241:2,4
  242:22 243:1
  245:7 258:21
  313:18 314:19
**complaining**
  180:6,11
  264:17 297:3
**complaint**
  216:11 237:20
  238:19 239:1
  243:5,6,8,21
  244:1,7 252:2
  257:7,11,17
  259:7,17
  260:22 261:2
  261:11,17
  263:7,11,13
  264:9 266:22
  268:14,16
  273:13,23
  287:9 313:15

314:3,15
  316:15
**complaints**
  177:2 239:22
  244:6 254:4
  260:6
**complete**  15:6
  58:4 361:8
**completed**  64:2
  359:17
**completing**
  64:13
**compliance**
  24:17,20
**component**
  230:19
**computer**  63:5
  162:15,16
  174:2 175:1
  349:15 358:8
**concept**  38:11
  38:13
**concern**  262:6
  262:8 263:2,2
  264:10
**concerned**
  141:12 251:6
  262:14 294:10
**concerning**
  254:14 273:5
  352:3
**concerns**
  115:13 210:10
  246:2 247:1
  254:15 266:4

271:21 273:18
  274:5 308:20
**conclude**
  125:15
**concludes**
  357:19
**conclusion**
  124:22,22
**condescending**
  177:13 286:17
**conditions**
  49:16
**conduct**  273:10
**confer**  356:3
**confidence**
  323:21
**confident**
  266:15,18,20
  268:1
**confidential**
  53:7
**confirmation**
  51:13
**confused**  130:7
  133:14 147:2
  265:8 282:10
  282:16 330:6
  335:18
**confusion**
  322:17
**connect**  258:16
**connected**
  312:22
**connection**
  295:18

**consider**  58:4
  78:14 273:9
**considered**
  67:9 82:19
  85:22 90:18
  144:22 146:20
  173:21,23
  346:22
**consistent**
  63:23 160:23
**consulted**
  254:13
**contact**  37:1
  92:17 215:1
  271:20 274:16
  274:21
**contacted**
  273:5
**contacting**
  273:10
**contacts**  261:18
**contained**
  113:18
**contend**  166:7
  181:16 198:7
  200:23 219:10
  242:22 287:7
  306:7
**contending**
  331:2,5
**content**  358:7
**contention**
  109:16 198:22
  236:14 280:17
  281:23 288:1

**[contention - correct]**   Page 16

313:17
**context**  136:16
**continue**
291:21 315:21
**continued**
28:21 122:14
155:10,11
161:21 287:19
**continues**
346:18
**continuing**
248:2 280:18
**control**  253:3,4
**controls**  22:9
**conversation**
80:17 103:6
139:4,5,8
144:9 158:8
167:6,12
169:16 192:14
198:2 215:15
215:20 217:7
218:3 219:12
222:13 228:5
230:6 235:23
241:17 242:11
243:12 244:20
244:22 245:10
245:22 246:14
267:8 274:3
283:8 296:2
322:10,20
323:1,4
**conversations**
154:17 243:3

246:23 258:8
**coo**  30:19
**copied**  340:3
347:15 351:8
**copies**  156:10
359:14
**copy**  150:17
302:3
**cor**  164:13
278:13
**corey**  5:16
78:15,18,19,19
78:21 80:7,11
81:2 82:16
83:5 84:4
85:21 97:6
107:1,3,13
108:13,14,23
109:21 118:4,8
121:21 125:2
126:9,14 128:5
128:12 130:2
134:22 135:7
141:10 144:4
144:18 145:6
146:17 147:3
148:1 160:19
163:13 164:13
174:7 175:10
176:17 177:4
184:20,21
192:15 197:10
205:14 211:14
220:7 222:22
224:10 226:10

227:9,14,21
228:1,2 229:22
231:9,15
232:19 233:14
234:10,10,19
236:10 242:15
244:2 246:4,6
249:1 285:16
301:21 303:19
304:9,14
305:10 306:13
306:20,20
319:17 320:7
321:4 322:18
323:14,18
324:18 331:14
334:1 335:8
336:18 337:4
337:20 340:2
342:4 343:3
345:21 350:2
350:19 351:7,7
353:21
**corey's**  99:1
106:19 109:7,9
126:22 132:12
132:13 134:10
164:18 196:13
204:3 235:9,12
253:18 329:18
330:11
**coreys**  110:2,9
**corner**  213:18
**corp**  1:15 10:23
338:23

**corporate**
17:10 38:4
115:23 116:16
118:20 252:11
252:14 253:1
254:21
**correct**  13:6,7
36:14 49:6,12
57:6 60:4 66:3
69:19 98:9
101:21 105:22
107:21 108:20
111:17 117:9
127:12 131:3
142:12 143:16
143:18 154:3
179:19 185:21
187:20 191:4
205:10 209:6,7
219:2,8 220:17
222:2,5 230:4
234:22 241:11
241:14,17
249:9 253:5
255:4,19,20
260:12,14,15
261:19 269:2,3
271:8,9,23
272:3,4 273:7
277:10,11
282:6 291:9,15
294:9,18
300:14 301:8,9
301:11,12,14
305:4,22

**[correct - creating]**

306:23 309:22
309:23,23
313:5 315:23
316:5 325:17
327:16 329:3,4
330:16 333:5,6
333:11,16,18
339:17 345:2
346:1,14
351:20 353:14
358:11 361:8
**corrections**
361:6
**correctly** 220:8
252:23
**corresponden...**
7:19 8:4
**cory** 199:15
**counsel** 2:4,15
2:17 10:6
11:10,15,17,19
11:21 12:14
16:8 249:14
272:23 277:8
308:7,13
310:22 358:15
359:14
**counselors** 59:8
**count** 183:20
327:19 328:16
329:1,10 331:4
331:10,22
332:6
**country** 350:8

**counts** 331:16
**county** 358:3
**couple** 16:7
81:2 178:20
194:21 207:3,6
247:11 258:17
353:18
**course** 58:3
59:15 98:22
**courses** 156:6,9
**court** 1:1 2:6
3:6,7 10:1 11:1
11:8,11 12:5
13:20 24:7,9
44:5,7 104:3
109:5 116:11
157:11 170:1
209:16 250:4
276:16 355:2
**cover** 50:10
104:16 137:14
**coverage** 93:12
104:17 105:1
105:15 155:11
206:2
**coverages**
88:13 95:5
103:13,14,17
103:21 104:12
206:12,13
280:7 289:16
**covered** 104:14
**coworkers**
299:8

**cpa** 24:13
28:19,21
**cr** 245:8
**crc** 1:14 6:14
6:17,20 7:2,4,6
7:8,10,12,13,16
7:20,21 8:2,10
8:12,15,16,19
8:21,23 9:2,3,6
9:8,10,12,14,16
10:22 12:23
15:1 17:6,14
17:16 18:22
26:6,22 27:19
28:6,13 29:3,6
31:9 32:7,23
33:13 34:4,10
34:23 35:20,23
36:9,15,22
37:4 38:9 39:3
39:20 40:8
47:20 59:19
61:8,19 64:20
79:14 84:22
98:21 112:3,4
125:14 138:5
142:2,3 144:3
144:6 146:23
162:22 168:5
168:10 181:15
183:6,17
187:22 198:7
199:10,16
200:6,7 204:6
204:15 208:4

209:21 212:21
214:14 242:23
244:23 245:8
245:21 251:14
253:3,9 254:16
255:8 256:1
258:2 259:1
260:2 261:17
274:6,17,22
275:12 276:10
276:23 287:7
288:12 294:23
296:19,21
301:8,11
308:22 309:4
309:22 316:12
317:15 339:9
340:23 342:23
346:23 347:15
350:3,7 354:11
357:13 359:4
360:1 361:1
**crc's** 61:10 78:5
**create** 90:23
95:2 97:11
137:13,14
278:10
**created** 88:3
96:21 281:15
303:18 328:15
331:18,22
334:2,6
**creating** 87:15
87:17,23 89:7
210:8

**credit** 135:8
233:16
**criminal** 14:8
308:16,20
309:2,17
**critical** 71:8
**crr** 358:20
**cruise** 312:12
**cruising** 315:3
**crump** 61:8,21
**crunching** 25:7
**crush** 324:15
325:9
**cs** 359:15
**cs5999253** 1:23
**cube** 71:18
**cubicle** 201:18
201:19,20
210:22 211:11
213:16
**culture** 70:2
244:9 259:4
**curious** 287:18
288:5
**current** 17:15
18:21
**currently** 69:7
**curtin** 31:14
32:3,14,16
**customer** 43:14
**cut** 101:10
102:10
**cute** 226:4
**cv** 1:7 11:4

**cwilkinson**
4:15 359:2
**cynthia** 4:11
11:20 359:1

**d**

**d** 6:1
**dad** 27:3,7
**daily** 173:17
**dallas** 18:3,4
**dancing** 313:1
**danielle** 169:17
169:18 170:4
226:1,2
**darren** 160:12
**dashboard**
97:10 234:1,3
**data** 23:13,17
224:12
**date** 10:4 35:3
49:16 64:5
91:16 112:16
160:8 166:22
215:11 224:19
224:22 228:7
249:22 255:3
270:4 319:16
321:20 328:12
328:14 331:23
358:12 360:24
361:12
**dated** 35:10
160:11 270:18
290:11 297:13
301:18 322:6
340:1 343:3

345:22 348:10
352:17 353:17
354:19
**dates** 89:1
112:18 353:18
**daugherty** 5:16
41:18,19 78:20
79:6,22 80:11
84:21 85:9
87:5 99:18
101:2 109:17
109:22 128:17
129:10,20
132:15,22
133:5 139:9
140:9 144:10
145:2 150:2
154:11,17
155:2 158:3
161:12 174:9
174:21 175:20
186:3 191:1,18
197:3,10
205:12 213:22
219:22,23
221:5,21
222:23 227:21
230:3 244:7
246:14 247:1
284:5 288:17
303:16 305:4
325:21 326:3
326:14 330:18
337:15 338:4,5
340:2 342:4,5

343:3 344:1,15
344:18 345:5
345:14,22
348:9 350:2,19
351:8,16 352:2
352:6,17
353:21
**daugherty's**
13:5 90:16
96:13 160:20
329:1
**dave** 183:21
184:4 185:6
203:19 283:14
283:20 291:2
291:11 292:6
292:14
**dave's** 295:3
**day** 2:11 3:3
10:11 15:1
55:1,1 71:19
139:7 140:2
169:4,4,12,12
170:15,15
178:2 187:4
194:7 208:16
208:19 213:2
246:8 248:19
294:6 316:21
321:14 326:23
361:15
**days** 55:4,5,7
59:16 359:17
**deal** 324:16,19

**dealerships**
24:1
**december**
300:21
**decide** 229:18
**decided** 28:19
71:12 79:3
255:7,11 267:4
**deciding** 316:1
**decisions** 302:4
**declare** 361:4
**declining**
222:10
**decreased**
333:21
**dedicating**
255:22
**deemed** 361:6
**defendant** 6:11
**defendant's**
56:14,21,23
62:7,9,18 68:7
68:7,14 72:4,7
111:15,20
112:10,23
113:3,7,22
116:22 117:1,5
117:20 137:17
138:1 149:4,5
150:16 151:9
160:4,14 161:6
161:13,20
212:17,23
249:13 250:1
254:19,20,22

256:7,8,11,17
265:15,23
266:7 269:11
269:14 270:4
271:4 272:16
272:20 276:21
277:1 289:5,19
317:7,12 328:3
328:7 335:14
335:21 339:23
340:8,21 341:2
342:2,13 343:2
343:10 344:12
344:21 345:19
346:2 347:12
347:17 348:8
348:14 349:22
350:10 351:4,9
351:23 352:10
352:15 353:1
353:16 354:4
354:17 355:6
**defendants**
1:16 5:1 11:15
11:17 62:10
68:10 111:21
137:19 160:11
161:8
**defenses** 14:19
**definition**
324:21
**delivering** 3:1
**denisa** 157:8
172:3

**denver** 36:16
306:6 348:11
348:13
**department**
17:10 19:23
20:12 27:21
29:18 30:6
37:13 47:9
53:13 57:15,23
58:2,11,16
60:3,16,19
63:13,17 69:2
71:10 78:4
85:19 97:4,9
97:21 103:10
115:21 116:4,6
120:15 128:8
142:14 143:1
143:21 144:2,3
144:6 156:9
161:3 171:4,11
183:18 194:11
195:7 197:19
197:23 199:11
209:5 212:15
223:13 235:5
244:19 252:5
255:23 257:15
263:12,15,20
264:13,16
265:7 268:16
273:21 274:11
274:20 278:9
278:14 279:6
280:15 281:19

282:13 297:6
311:10
**departments**
348:17
**depend** 182:11
**depends** 88:16
**depiction**
322:19
**deponent**
359:13 361:3
**deposing**
359:13
**deposition** 1:19
2:4,20 9:19
10:20 11:4
13:6 14:4,9,21
15:18 16:1,11
17:3 72:17
162:20 320:1
357:19,22
**depositions**
13:9,15 14:14
**describe** 23:15
70:10
**described**
127:23
**description** 7:7
126:4 137:22
138:7
**descriptions**
126:1 138:11
**designation**
59:5 64:18
155:13 156:6

**desk** 53:9,11
  174:2 175:7
  213:12,13
  217:4,9 229:22
**desks** 53:6
**despite** 260:17
**details** 17:20
**deter** 148:13
**develop** 161:22
  168:3 205:12
  205:15
**developed**
  24:23
**developing**
  205:17,19
**devenne** 229:9
  353:21 354:3,6
  354:8
**dialogue**
  312:19
**die** 322:7
**diego** 225:23
**difference** 40:3
  125:7 153:2
  305:11
**differences**
  164:12
**different** 22:3
  22:15 28:18
  46:2,4 48:7
  51:9 55:3 70:3
  87:17 103:17
  103:18 120:5
  125:12,20,23
  126:2 127:23

  135:11 136:15
  145:7 152:11
  176:14 186:18
  186:21 235:1,3
  235:3,5 275:10
  276:5 279:22
  281:21 298:12
  350:14
**differently**
  123:17
**difficult** 70:21
  248:6 252:10
**diligently** 151:3
**dinner** 168:6,7
  168:11 341:11
  341:15 342:8
  342:11 346:11
  352:7,9 354:22
  355:1,5,11
**dinners** 163:6
  166:6 167:21
  168:1 186:19
  186:20 279:16
  282:8
**direct** 25:17
  62:22 113:23
  201:8 303:14
  317:17
**direction**
  118:18 292:5
**directly** 90:22
  94:2 131:10
  218:18 229:4
  234:19 273:17

**director** 29:17
  30:5 259:11
**disagree**
  138:20,23
**disciplinary**
  26:12
**discouraged**
  176:7
**discovery**
  14:13
**discretion**
  60:10 252:12
**discriminate**
  289:23
**discriminated**
  162:21,23
  164:1 185:23
  339:8,12
**discrimination**
  8:6 20:11
  114:4,14
  115:14,20
  117:14,22
  230:9 242:23
  245:9 246:2
  247:2 254:15
  261:11 264:21
  276:22 277:10
  287:9 289:17
**discriminatory**
  298:6,17
**discuss** 201:13
**discussed** 57:16
  118:8,11
  139:21 190:23

  227:13 237:5
**discussing** 81:5
  111:14
**discussion**
  80:23 82:10,14
  83:15,16 196:2
  197:1 224:5
  237:23
**discussions**
  82:5 87:4
  99:18 101:11
  132:21 155:1
  156:13 241:13
  241:16 247:7
  275:5
**dispute** 68:18
  68:20 112:15
  112:21 202:12
  271:6 342:15
  350:19,22
**distinct** 172:23
**distinction**
  124:9
**district** 1:1,2
  11:1,2
**districts** 224:8
**division** 1:3
  11:3
**dixon** 21:19
  25:14 28:22
**doctor** 264:2
**document**
  62:12 89:18
  112:14 117:10
  137:18 138:22

149:7,9 151:17
256:13 266:14
291:12,14
300:13 315:9
335:15 336:18
342:19 343:18
346:4
**documentation**
88:2 338:2,4
**documents** 7:1
16:3 24:2 38:2
87:18,22
111:21 289:6,7
309:13
**doing** 34:14
61:21 69:7
87:6 88:21
91:3 95:3
96:22 102:4
122:4 125:17
130:2 131:22
132:19 133:7
134:10 136:5
137:8 169:21
170:9,14
171:18 172:17
173:9,12 175:4
175:13,23
176:3 177:15
177:18,20
178:3 194:1
202:7 216:2
220:9 221:13
221:14 228:14
246:15 248:14

249:10 250:9
269:6 275:22
302:12,15
319:10 325:2
326:7
**dollars** 45:9
46:20
**donelson** 2:8
5:5 10:8
**door** 324:17
**double** 193:19
**drafted** 254:21
**dragging**
301:21 302:19
**drank** 242:15
**draw** 93:17
**drink** 342:7
**drinking**
165:12
**drinks** 284:16
284:22 340:6
342:7,11 343:8
343:15 346:11
352:19,22
353:12
**drive** 71:16
162:9,11 165:2
165:11
**driver** 86:22
**driving** 71:20
**drop** 302:8
**dropped** 324:2
**dropping**
301:23 302:9
326:9

**drove** 85:16
**duly** 12:2
**dunston** 241:19
241:19 242:2
**dunston's**
311:17
**duties** 54:3
68:23 69:4,9
69:12 96:11
98:19 119:19
119:21 120:3
121:1,8,17
122:17 123:3
124:15 125:5
134:14 137:7
138:18 156:15
158:16,19,22
163:7 168:19
169:13 170:10
171:18 172:17
179:16 181:17
185:2 198:13
248:2

**e**

**e** 4:1,1 6:1,9
19:11 51:14,17
61:16 71:6,7
81:3 93:22
94:1 95:16,21
128:5 132:22
160:10,17
167:9 174:1,22
209:22 225:9
225:10,13
256:8,18 257:1

257:3 258:10
266:2,11
269:12,17,18
270:10,15,17
270:20 272:3
274:19 277:16
277:18 281:21
282:2,5 286:17
286:21 287:2
323:18 325:21
326:3 340:1,22
341:10 342:3
343:2,13,21
344:14,17
345:20,20,21
347:12 348:6,9
349:2 350:1
351:5 352:1,16
352:18 353:17
354:18 358:1,1
360:3,3,3
**eager** 297:16
324:6
**earful** 241:22
**earlier** 64:14
137:22 190:23
215:14 288:16
306:3 320:1
327:21 335:16
352:21
**early** 162:20
176:19 225:3
228:10 242:18
277:22 296:14
296:22 297:8

321:23
**earn** 279:9
**earned** 102:16
**earning** 103:3
199:4,6 293:1
**easy** 58:2
**eat** 70:14
159:12
**edits** 149:22
**educated**
122:19
**eeoc** 276:21
**effective** 49:15
89:1 91:15
151:1 153:19
**eight** 37:16
86:8
**either** 20:14
35:22 40:9
50:10 71:17
82:8 101:8
137:11 199:11
236:20 249:17
259:23 274:17
295:5 308:21
311:17 319:18
**electronic**
52:12 62:14
68:12 112:1,7
**electronically**
62:17 64:6
68:18,19
112:17 161:17
**elliott** 30:3,10
57:7 58:14

59:1 61:23
63:2,15 79:6
79:21 149:12
**elliott's** 160:19
**else's** 85:2
**email** 7:13,21
8:1,3,12,14,16
8:18,20,22 9:1
9:3,5,7,9,11,13
9:15 322:11
324:12
**embarrassing**
285:4
**emoji** 291:6
313:1,1
**empire** 346:12
**employed**
112:3
**employee** 114:8
146:13
**employees**
17:16 18:22
115:13 198:7
203:14 242:21
298:6 340:23
343:5 350:7
**employment**
7:9 17:13 18:1
19:1 26:2 28:7
103:23 144:16
164:9 212:22
238:20 255:8
272:19 275:18
275:20 276:3
295:20 308:22

309:4 339:2
**empty** 71:18
**encompassing**
138:10
**encourage**
35:23
**encouraged**
69:11,13
145:12,14
**encouraging**
63:16
**ended** 30:23
111:6 212:3
307:3 320:9
**endorsements**
89:2
**ends** 48:23
**enforcement**
309:7,12
**enjoy** 24:10
207:21
**enjoyed** 25:13
**entered** 43:8
**entitled** 101:14
303:16 324:23
325:16
**entity** 95:12
**entry** 23:18
**environment**
216:12,15
240:16 271:22
274:6
**epl** 289:15,15
297:1

**epli** 339:20
**equity** 167:8
**errata** 359:11
359:13,17
**erratas** 359:15
**errors** 103:22
**esq** 3:2 4:5,11
4:17 5:3,4,15
359:1
**essential**
138:18
**essentially**
89:15
**established**
305:21
**estimate** 54:15
88:18 89:4,5
206:21 228:8
**et** 359:4 360:1
361:1
**evaluation**
56:18 62:13
68:9 150:18
**evaluations**
26:10 57:8
62:16 161:11
**evening** 301:20
**event** 186:23
187:11 236:18
343:15 347:23
351:1 355:12
**events** 32:8
163:18 166:16
166:21 186:17
189:15 280:5,6

280:7,20 282:7
345:5
**everybody**
85:13 106:9
167:9 340:5
**everybody's**
189:3
**evidence** 2:21
14:17
**ex** 6:12,15,18
6:21 7:1,3,5,7,9
7:11,13,15,17
7:18,19,21 8:1
8:3,4,6,7,8,9,12
8:14,16,18,20
8:22 9:1,3,5,7,9
9:11,13,15
**exact** 29:19
224:19 228:7
258:12
**exactly** 81:1
225:4 255:11
**examination**
6:3 10:13
12:17
**examined** 12:3
**example** 47:2
99:23 171:1
**excellence**
113:12
**except** 2:16
124:1 228:2
341:18
**exceptional**
162:17

**exchange**
255:14 350:1
351:5 352:1,16
353:17
**exchanged**
227:1 289:9
**exchanging**
300:10
**excited** 102:4
187:7,8 202:2
**excluded** 166:7
166:10 167:20
189:16,18
208:15 278:20
280:18
**excuse** 59:23
213:9 218:3
256:18 302:6
333:16 338:15
**exec** 96:19
**executive** 34:11
34:14 42:14
43:3 44:12
82:22 84:23
87:7 92:13,20
96:6,8,12 97:5
98:11,19 99:17
103:2 109:12
109:20 119:18
120:3,6,8,11
121:8,16 122:5
122:8 123:3
124:15 125:17
131:6 134:14
135:23 137:3

141:3 151:21
152:12 154:14
160:21 163:7
168:18,19
169:13,19
170:9 171:18
171:19 172:1,9
172:12,17
173:6,8 175:12
175:14 176:17
176:19 181:17
182:6,16
184:18 185:2
193:21 194:9
195:4,8,9,12
198:13 199:12
200:17,19
202:8 210:20
219:21 220:4
222:4 224:16
231:8 232:11
233:20 234:9
234:16 240:12
246:19 278:12
284:8,10 286:8
287:21 302:16
302:18 303:21
304:1 307:8
311:21 313:8
313:10,11
314:9 329:5,17
330:8 332:14
332:17,23
344:9 345:11
346:6 349:7,10

**executives** 91:7
177:1 182:1,10
182:22 185:8
232:22 233:9
235:17 278:17
340:4 341:19
345:8
**exempt** 155:23
**exhibit** 56:15
56:21,23 62:7
62:9,18 68:7,8
68:14 72:4,7
111:15,16,20
112:10,23
113:3,7,23
114:2 116:22
117:2,5,20
137:18 138:1
149:3,4,5
150:16,19
151:9 160:4,14
161:6,13,20
212:17,23
249:13 250:1
254:19,20,22
256:7,8,11,17
265:16 266:1,7
269:11,14,18
270:4 271:4
272:6,16,20
276:21 277:1
288:8 289:5,19
317:7,12 328:3
328:7 331:20
335:14,21

**[exhibit - felt]** Page 24

339:23 340:8
340:21 341:2
342:2,13 343:2
343:10 344:12
344:21 345:19
346:2 347:12
347:17 348:8
348:14 349:22
350:1,10 351:4
351:9 352:1,10
352:15,19
353:1,16 354:4
354:18 355:6
**exhibits** 72:13
**existed** 281:18
**existing** 151:6
152:5
**expanded**
105:4
**expect** 12:11
20:17 135:21
139:6 329:12
**expectation**
136:7 158:23
**expectations**
153:3
**expected**
127:10,20
134:6 168:20
238:17
**expecting**
121:12 134:16
134:19 135:16
155:4 158:22
182:5 237:11

237:13 238:14
239:8 329:9
**expense** 188:9
188:10,11
**experience**
34:22 120:19
125:14
**experiencing**
240:16 258:1
276:8
**expert** 85:22
206:13
**expire** 91:20,22
**expires** 358:21
358:23
**explain** 22:11
38:11 41:13
48:8 61:18
104:20 222:10
**explanation**
282:18
**exposures** 95:4
**express** 197:19
198:1 203:23
**expressing**
325:13
**extending**
275:9
**extreme** 258:1
**extremely**
162:15

**f**

**f** 4:11 225:10
291:22 358:1

**f'ing** 292:6
304:4
**facade** 325:1
**face** 226:7
291:6 300:23
**facilitate**
236:12
**facilities** 105:6
**fact** 16:9 37:3
125:21 324:3
**factory** 316:2,9
**fails** 359:19
**failure** 295:17
**fair** 15:15
123:19 135:5
179:1 252:13
260:23 280:15
**fairly** 26:17,20
162:19
**fall** 350:3
351:20
**familiar** 20:7
26:23 28:5
87:10 120:18
123:6 259:4
**family** 16:12,13
32:8 33:15
87:3 260:14,17
262:7 263:4
**far** 71:23 170:8
181:10,11
**fast** 129:4
208:23 228:18
**faster** 129:5

**father** 27:15
**favorable**
70:16
**february** 113:5
117:3 153:15
154:5 189:22
297:13 317:19
342:12
**federal** 2:22
10:5
**fee** 40:2,4,9,13
40:20
**feel** 26:16 55:13
55:16 58:23
118:12 147:7
151:7 162:23
206:3 207:4
228:12,16
229:3,5 233:15
258:15,17
259:1 268:10
299:9 320:10
324:13
**feeling** 148:17
164:4 266:21
**fees** 39:16
**feet** 211:13,20
213:19 301:22
302:20
**fell** 340:17
**felt** 100:8 102:5
102:9 119:14
129:7 133:13
135:12 145:10
148:13 166:18

174:16 185:23
189:15 219:14
220:20 224:5
230:14 231:3
238:4 260:16
261:23 266:15
266:18 267:23
302:3 303:21
313:23 314:2
316:7
**female**  140:8
141:7 142:22
176:23 288:11
288:19 289:1
294:22
**fewer**  332:15
**fifth**  308:8,14
310:20,23
**figure**  55:20
93:1 124:12
148:7 218:13
250:23 262:22
276:4 293:3
303:12 331:1
332:8 333:1
**figured**  194:8
219:3
**figuring**  247:22
**file**  38:2 47:19
48:6,13,15
50:4 51:19
52:1,8,9 88:16
123:8
**filed**  3:7 10:23
13:1 15:20

20:5 276:23
277:9
**files**  37:18
47:12 48:9
52:12 55:9
87:15,23 88:2
99:3 124:5,18
124:19 176:14
**filing**  72:14
**fill**  209:9
**filled**  94:13
**finally**  219:19
256:1 261:18
277:22
**financial**  1:15
10:23 22:7,15
25:6
**financially**  25:3
**find**  28:10
71:18 115:7
206:2 263:6
275:18 298:5
298:16 299:23
312:10,12
**finding**  315:4
**fine**  16:19
31:23 56:7
110:20 217:17
272:8 285:17
337:23
**finished**  64:12
**finishing**  63:22
**fired**  260:10
**firm**  4:12
346:19

**first**  12:2 21:17
30:7 32:13
53:18 55:1
93:3 101:6
106:13,15
114:6 119:3
133:17 135:13
135:14 144:4
145:16 166:10
166:11 171:20
172:8,10
189:18,19
190:12 194:7
200:16 202:2
202:10,15
210:18 211:12
213:9 215:21
231:10,17
269:17 270:8
273:3 277:13
277:14,14
287:3 299:5
302:11 319:13
324:9 349:23
352:18
**firsthand**
170:13
**fisher**  224:11
225:10
**fit**  80:20 96:1
**five**  59:15,17
59:17 88:23
89:3 91:2
248:7 255:22

**fix**  239:10,12
248:21
**fixed**  239:15,17
**flat**  300:22
**fly**  354:1
**flying**  55:6
**focus**  121:2
155:11 245:20
**focused**  137:1
308:16
**folder**  328:18
**folks**  34:22
343:23
**follow**  93:6
94:19 160:7
315:14 340:7
**followed**  38:3
236:18 268:13
322:10
**following**  10:14
266:3 336:15
**follows**  12:3
**foregoing**  10:6
358:5,9 361:5
**forget**  30:20,21
**forgot**  326:6
**form**  2:16
51:18 89:16
114:20 139:18
156:7 158:11
202:13 209:9
209:11 214:22
252:17,21
255:9 263:21
264:7 273:22

298:1,9 305:23
307:12 333:8
358:8
**formal**  311:16
322:11
**former**  17:15
18:22
**forth**  117:20
**forward**  245:15
299:1
**forwarded**
271:17
**forwarding**
220:5 302:5
**found**  57:23
58:1,11 176:9
187:15
**founder**  31:14
**four**  207:3
247:10 248:7
356:2
**fox**  199:15,21
**frame**  17:23
35:8 133:16
134:1 142:2
**free**  224:13
**freed**  130:5
**friday**  326:9
**friend**  16:17,23
18:2 27:3,8,11
260:14,17
262:7 263:4
**friendly**  312:8
315:2

**friends**  16:14
16:21 20:9
33:15,19,21,23
165:8 184:21
325:11
**front**  14:4
126:21 174:3
**frustration**
325:14
**fuck**  292:14
299:19
**fucking**  302:7
**full**  89:13
158:20 171:8
234:15 292:23
348:23 349:7,9
**fun**  70:2,6,8,9
70:11
**further**  2:13
247:7 358:14
**future**  309:18
**fuzzy**  269:9

**g**

**gatherings**
33:16
**gay**  194:13,13
194:14 293:15
**gears**  110:17,19
**gender**  148:12
164:10 295:17
**general**  96:11
104:9 244:9
**george**  156:21
157:2,23 201:8
201:9,10,11

342:20 350:3,6
350:20
**george's**  157:15
**getting**  55:6,7
64:11 125:3
128:6 136:20
141:12 145:8
166:20 199:3
205:21 211:19
212:3 228:21
228:22 242:3
265:8 268:4
292:16,22
300:11 313:20
**gianmarco**
244:12
**gill**  4:17,18
**girl**  284:22
**give**  15:18
29:10 36:18
70:15 84:10
119:22 186:9
192:18 221:22
222:3 223:2
276:14 347:3,5
347:5
**given**  58:6
101:16 151:15
189:12 198:14
222:19,20
230:21 231:3
233:15 244:13
248:5 283:4
301:8 361:9

**giving**  16:10
253:10 298:18
322:21
**glad**  242:5
**gmail.com.**
256:23 271:1
**go**  20:20,21
22:14 26:6
28:15 36:4,9
54:14 61:17
65:15 79:4,13
101:6 105:16
111:9 114:12
119:9 123:7,9
128:13 129:16
132:11,14
133:5 137:6
139:3 141:5
149:2 159:13
159:14 181:1
187:10 189:10
197:17,22
198:11 205:17
207:14 208:21
209:18 211:13
211:18 212:2
214:6,7 215:3
220:1 222:10
222:21 237:18
239:23 240:4,6
251:8 252:10
252:14 253:1
258:23 259:19
261:14 264:19
264:23 268:6

285:11 286:3
287:19 289:10
290:23 292:2
302:23 304:19
311:5 312:9
313:4 315:13
315:18 318:18
318:23 323:17
327:21 329:10
331:11 335:4
335:10 343:6,7
343:22 345:8
345:14 347:23
353:12 354:13
**goal** 348:20
**goals** 60:13
161:21
**goes** 323:16
353:20
**going** 10:18
13:1,13,14
14:18 15:4,14
15:18 16:10
28:20 36:4,9
43:9 49:11,17
53:3 56:8,11
69:3 83:11,22
100:2,9,13,17
100:20 101:9
102:5 110:1,12
110:23 111:3,7
112:22 113:22
116:21 118:16
119:8 134:3,6
135:7 136:21

139:13 140:3
140:15,16
146:3 150:3
152:16,21
153:4 154:20
159:8,21 160:1
162:10 171:21
173:18 177:5
191:23 192:18
194:1,4,5,15
195:16 196:12
197:5 198:4
204:3 211:23
215:16 216:17
217:18,21
222:19 230:15
231:4 237:22
238:10 239:1
248:10 250:23
251:13 253:16
258:19,22
261:23 262:9
262:18 265:18
266:16,19
268:1,10 272:9
272:12 273:15
275:7 283:23
288:8 290:14
291:20 296:19
305:8 308:12
309:16 314:20
316:23 317:3
318:5 319:17
322:14 324:14
324:14,16

326:6 338:15
338:17 339:15
344:7 346:16
354:1 356:7,10
356:14 357:6,7
357:20
**golf** 354:14
**good** 10:17
12:18,20 18:2
33:19,20 78:11
80:20 85:14
102:6 110:19
128:21 159:20
187:14 216:4
216:16 217:15
237:14 253:10
263:22 265:11
265:18 267:20
279:12 304:17
316:20 323:23
325:11 326:6
340:5
**google** 295:15
296:3
**gotten** 285:4
304:3 336:16
**grab** 217:12
326:5
**grades** 21:15
**graduated**
21:16 34:19
**graph** 336:5,5
336:7
**graphs** 97:11
328:20 337:22

**gray** 290:6
310:10
**great** 57:23
58:10 63:20
85:13,14
126:14,22
128:17,18
129:21
**grew** 86:10
**ground** 13:14
231:1
**grounds** 2:19
**group** 151:18
152:2,14 153:6
164:17,19
225:15 226:5,6
226:8,16,19
227:4,4,6,15,20
237:19 289:7
**grow** 83:13
84:5,9 86:3,11
128:12 129:5
130:10 135:10
157:23 206:11
349:13
**growing** 27:3
86:2 129:4
132:13 205:19
232:14
**growth** 155:11
162:9,12
**guarantee** 84:2
**guard** 128:11
131:16 237:10

**guess** 45:4,14
45:16 51:20
57:18 65:22
70:7 71:5 84:3
91:12 99:5
136:8 143:20
147:1 148:6
152:20 153:19
180:10,10
233:17 241:19
241:21 250:22
291:16 298:20
303:22 318:13
323:15 329:20
330:23 333:3
339:3 340:19
353:8
**guns** 318:23
**guy** 85:13,14
107:18 187:4
**guys** 16:3 19:15
79:16 237:19
303:4

**h**

**h** 6:9 225:10
360:3
**half** 37:16
**hall** 284:23
285:21
**hand** 213:18
310:16
**handbook**
113:2,5,13,18
114:8,17
116:23 117:3,9

117:19
**handbooks**
112:2
**handed** 153:7
334:23
**handle** 218:15
221:2,4 237:12
299:4
**handled** 299:7
**handling**
119:19 303:20
**hands** 334:14
**happen** 50:15
119:1 140:3
166:19 197:15
212:1 240:4
263:8 282:11
318:21
**happened**
29:21 30:12
67:22 79:11
80:17 144:14
148:22 166:10
177:6 190:11
196:3 205:4,5
205:7 224:23
248:23 260:11
308:21 319:4
320:13
**happening**
20:12 34:6
219:17 220:23
253:14
**happens** 51:6
290:16

**happy** 206:6
291:6 345:16
**harassment**
114:4,13
117:15,21
230:19
**hard** 249:3
253:1 276:11
299:5
**harder** 127:1,4
**hays** 185:19
190:13,14,17
201:14 203:18
226:17 347:13
**he'll** 216:18
238:10
**head** 24:6
145:17 183:20
318:12 322:1
338:7
**headed** 36:16
**healthcare**
312:13
**hear** 193:1
217:10 247:9
247:23
**heard** 141:11
192:22 240:3
248:8,12 259:8
285:1
**heavily** 162:8
**held** 11:5
228:16
**hell** 194:15
290:22 324:4

**help** 98:12
135:7,10 162:8
162:11 163:23
172:5 236:11
237:22 239:20
240:5,8 248:10
260:21 265:8
286:13,14
292:4 297:14
299:14 303:11
317:22 320:12
324:6
**helped** 86:10
87:13,20
157:22 205:14
232:19 233:14
233:18 238:6
**helping** 92:11
128:12 152:4
172:3 261:7
291:3
**helves** 268:20
**helveston** 31:15
33:4,13,21
35:23 36:16
37:6 198:3
215:15,23
216:7,13,16,19
218:4,10,18
219:13 224:5
230:6 235:23
237:6 239:3,5
245:10,15,23
247:6 248:14
249:3 251:3,7

257:10,12
258:22 259:7
260:13 261:22
262:1,11,16,20
263:6,15 264:8
264:13,20
267:3,6 268:22
274:1,4 287:15
**helveston's**
34:2 35:3
**helvestons**
33:22 37:3
268:3 269:6
**hendrix** 1:9,20
2:5 6:14,17,20
6:22 7:2,4,6,8
7:10,12,13,16
7:20,21 8:2,3
8:10,12,15,16
8:19,21,23 9:2
9:3,6,8,10,12
9:14,16 10:12
10:21,21 11:19
11:22 12:1,19
45:23 112:16
160:9,18
264:19 270:21
287:4 289:10
301:2 315:22
317:6 338:1
357:10,20
359:4,5 360:1
360:2,24 361:1
361:2,4,12

**hereto** 361:7
**hey** 36:3 67:3
79:15 85:6
91:19,21 100:1
154:18 158:5
196:4,15
208:22 222:22
247:16
**high** 31:17
35:12 253:10
355:9
**higher** 100:14
102:1 283:2
**hindered** 349:8
349:11
**hire** 30:7 55:19
176:9 203:10
302:15 307:21
311:4
**hired** 36:6
37:11 45:21
118:20 140:8
141:8,20,21
154:7 169:1
175:11 176:3
185:10 203:19
208:17,19
211:5 224:20
288:19 316:15
327:12 330:11
330:14 331:3
331:10,11
332:2,7 333:10
333:13

**hiring** 28:8
79:22 120:6
301:22 302:17
311:17
**hiscox** 340:23
341:5
**history** 93:14
122:20
**hit** 303:5,6,9
**hold** 276:18
302:2
**holding** 349:12
**holly** 326:6
**holy** 322:8
**home** 71:11
165:2,7,11
286:15
**hometown**
285:18
**honestly** 357:4
**horrible** 216:3
**hosted** 165:2
**hostile** 240:15
**hosting** 168:5,6
168:10
**hotel** 55:7
187:17
**hour** 110:13
265:18 338:18
**hours** 16:7
51:13 71:16
135:22 301:14
355:22 356:13
356:16 357:6
357:16

**house** 12:14
33:7 164:18,19
164:22 165:16
165:23 166:4
250:10 317:14
**houses** 32:9
**houston** 78:7
80:1 81:9,10
81:11,17 82:1
82:8 83:17
85:17
**hr** 238:18
252:4 253:16
257:15 259:11
259:12,18
260:7 261:3,6
261:8,14,18
262:11,17,18
263:18 264:16
265:1,3 268:14
271:19
**hughes** 21:20
25:15 28:22
116:7 131:17
132:15 192:8
282:3 342:4,6
354:19
**huh** 18:5 25:8
27:12 31:5,20
40:15 42:8
43:16 47:23
52:15,18 57:9
79:9 81:9,18
89:6,20 94:22
95:9,13 99:11

**[huh - inside]** Page 30

99:13 105:10
105:18 132:6
136:1,9 141:9
143:2,5 179:5
179:17 184:12
190:19 195:10
195:21 198:19
200:8 202:22
213:23 225:17
227:2 235:13
240:20 253:20
265:2 267:10
271:12 341:7
346:13 350:22
**human** 29:18
**hundred** 330:7
**hung** 33:10
**husband**
216:17

**i**

**idea** 66:13
145:16 178:17
255:16 286:11
328:13
**identification**
57:1 62:19
68:15 72:8
112:11 113:8
117:6 138:2
149:6 151:10
160:15 161:14
213:1 250:2
254:23 256:12
266:8 269:15
272:21 277:2

289:20 317:13
328:8 340:9
341:3 342:14
343:11 344:22
346:3 347:18
348:15 350:11
351:10 352:11
353:2 354:5
355:7
**identified**
179:14
**ignored** 20:13
**illustrate** 327:5
**imageright**
52:21,23
**imagine** 146:18
**immature**
227:23
**immediately**
154:22 336:15
**impact** 252:16
**imperial** 352:4
**implied** 229:5
**important**
106:7 130:19
276:12 288:10
288:14 289:1
301:23 302:10
**impression**
70:15 283:23
**improvement**
57:12 63:10
**improvements**
63:20

**incidents**
104:15 114:3
114:13 117:14
117:21
**include** 125:4
278:17 350:21
355:9
**included** 95:6
166:18 207:19
230:20 281:15
323:18 341:16
343:14,20
**including**
117:12,19
340:23 345:23
346:21 354:21
**increase** 135:17
**increased**
135:20
**increments**
231:6,6
**independent**
70:13
**independently**
23:10 55:11
**indic** 29:6
**indicated**
112:19
**individual**
95:21
**individuals**
17:4
**industry** 49:2
**informal** 82:10
82:14

**information**
23:13 47:21
53:7 72:13
89:14 91:6
92:6 93:7,17
94:20 108:21
113:13 170:3
179:20 195:19
229:2 233:22
240:2,18
241:10 259:14
273:14,19
**informed**
313:19
**informing**
238:18
**inherited**
106:23 107:3
107:13 108:13
109:16 201:7
306:1,4,7,11
**initial** 87:4
190:2 217:6
350:16
**initially** 122:2
193:23 213:15
327:18
**initiating**
354:23 355:2,4
**inkling** 68:1
**input** 89:12
91:6
**inside** 44:3,5,8
84:1 85:10
86:4,7,11,14

118:3 120:15
120:22 121:11
121:18,22
123:1,10,20,23
124:6,13 125:2
125:16 126:7
126:10,13,13
126:16,22
127:5,10,16
128:9,16 129:6
129:12,13,18
129:20 132:2,5
133:18,22
134:4,5,17,20
135:18,22
137:7,21 138:6
138:21 139:14
140:11 142:14
142:18 143:14
144:15 150:4
150:12 151:2
152:10,17
153:4,18,21
154:19 156:14
156:22 158:4,6
158:15 161:22
166:12 168:21
169:2 178:9
182:4 188:12
190:5 191:2
192:1 197:6,12
199:12 200:18
200:20 204:3
210:11,16
219:7,11

220:21,22
221:13 222:1
223:1 224:6
228:13 231:11
231:23 234:11
241:7 277:23
284:1,4,15
286:12 288:3
303:19 305:11
305:14 313:7
313:14,16
314:14 319:7
323:6 329:4,9
329:14 333:5
333:10 345:9
354:20
**instruct** 357:9
**instruction**
282:2
**insurance** 1:14
10:22 49:1,10
59:7 63:4
65:10 89:17,19
238:20 359:4
360:1 361:1
**insure** 49:11
95:11
**insured** 343:9
**insurers** 90:22
**intention**
275:21 325:13
**intentionally**
302:14
**interaction**
32:5 33:12

**interactions**
123:21
**interest** 197:20
198:1 203:23
**interested** 29:7
79:22 126:12
126:16 131:22
133:7 158:3
196:21 304:15
341:12 358:17
**internal** 17:9
22:4,8,9 24:18
25:4 28:8
53:19 54:1
55:1,2 98:13
**internship**
21:22 23:6
**interpretation**
180:5
**interpreted**
222:12
**interrupt** 56:5
110:16
**interrupted**
225:20
**interview** 30:14
82:7
**interviewed**
30:19 31:10
**interviewing**
37:9
**intranet** 115:10
209:9 210:5
**introduce**
11:11 79:2

236:22
**introduced**
61:11
**invest** 257:6
287:13
**investigate**
287:11,14
**investigation**
257:13 266:16
266:19 268:2
268:11 269:1
273:6,11,15
274:8 308:16
308:20 309:3
309:17
**invitation**
165:20 350:5
**invite** 165:4,15
187:20 236:10
236:18 341:16
350:16
**invited** 166:20
168:14 187:5,6
187:9,16
342:11 345:17
348:2 355:12
**inviting** 166:15
346:10
**invoiced** 50:23
**involve** 92:12
**involved** 36:1
59:13 88:10
89:7 91:10
119:9 162:1
353:23

**involving**
316:12 320:2
**iphones** 225:5
**ish** 17:11 35:18
54:17
**issue** 88:8
167:3 181:4
221:6 229:10
230:8 289:17
289:18 354:10
354:11
**issues** 20:8,10
98:13 217:11
218:11 239:21
278:11
**issuing** 88:10
**items** 123:7
**itinerary**
344:17

**j**

**j** 108:10 109:14
**jack** 29:22
55:20,22 57:7
70:21 78:14,15
149:11 160:19
**jack's** 30:1
**james** 284:23
307:21 311:3,7
311:14,23
**january** 23:7
64:6 153:14,20
154:5 334:10
334:20 340:1
341:16 354:19

**jealous** 324:3
324:12 325:5
**jean** 16:20 17:7
19:21
**jeffers** 30:17
31:1
**jefferson** 358:3
**job** 1:23 7:7
21:17,21 22:23
23:16 24:10
29:5,9 31:11
34:17 37:13
47:8 54:3
55:14,18 71:11
71:13 98:19
102:5 126:1,3
126:7 137:20
137:21 138:7
138:11 152:17
153:4 154:20
156:15,19,20
157:16 172:12
173:1 194:7
198:8 210:11
234:10 248:2
250:13,19
251:11 263:9
275:5 304:20
318:14 327:9
**jobs** 138:10
228:15
**joe** 31:18
**john** 149:21
194:15,18
248:18 249:4

251:4 274:14
283:18 296:10
**joined** 101:7
106:13,15
153:16
**joining** 12:12
**joke** 297:1,19
**jonathan** 169:1
198:15 200:11
208:20
**journal** 141:16
**judge** 14:5
48:23
**july** 1:21 2:11
3:4 10:12,19
141:2 160:22
225:1 348:10
348:13 359:3
**june** 238:1
247:6
**jury** 14:5

**k**

**karen** 5:17 11:7
**kat** 11:19,21
161:21 270:6
334:23 342:7
**kathryn** 1:9,20
2:5 10:12,20
10:21 12:1
112:16 151:1
160:18 270:21
357:19 359:4,5
360:1,2,24
361:1,2,4,12

**kathryn.hend...**
256:23
**kayla** 5:4 11:16
334:13
**keep** 20:1 48:11
87:13 92:11
110:9 159:8
175:23 176:2
208:9 292:4
332:5
**keeping** 52:22
**kelley** 5:17 11:7
269:19 270:18
**kelly** 18:9
19:18 312:11
**ken** 19:21,22
**kenneth** 18:9
19:18
**kept** 53:10
141:16 163:14
186:3 293:10
**key** 346:17,22
**kids** 35:11
**kim** 351:16
**kimberly** 27:8
27:10 351:6
**kin** 358:15
**kind** 13:9 28:17
48:4 55:20
60:1 61:10
95:3 99:2
100:8 105:14
118:9 121:23
122:11 138:9
173:14 189:12

226:7 227:22
230:13,17
248:5 251:9
288:20 297:18
340:17,19
349:4,5
**knew**  18:15
31:14,15,16,21
34:16 66:21
86:3 99:4
100:8,10,12
101:9 102:21
116:18 120:17
121:9 125:5
129:5 130:5
142:12 158:18
172:16 190:10
202:6 206:12
209:4 219:1
226:11 228:18
257:6 258:20
259:5 262:17
273:13,16
274:7 324:10
335:8
**know**  13:21
14:12 15:11
16:15 18:14,18
22:14,16 27:23
28:1 29:6 31:9
32:1,3,17,18
33:4 37:2,8
45:1,2,12
46:23 47:3
48:22 55:17

58:8 60:7 64:8
64:17,21,23
67:3 69:3,15
70:17 72:10
78:23 80:8
81:2 86:17
88:21 97:19
104:1,16
105:13,16
107:12 108:5
109:15 114:16
115:6 116:14
120:14 131:9
132:2,4 138:16
141:23 142:7
143:11 144:4
145:1 146:10
155:3,14 156:2
159:11 160:12
164:15 166:9
167:4 169:11
170:8,11 171:2
175:4 176:15
176:20 180:1
180:18 181:1,7
181:10,11,12
183:1,23
186:13,19
187:14 188:14
188:23 189:1
190:22 198:14
198:14 199:2
204:23 208:5
212:7 215:5,5
215:8 216:17

218:10 223:3,4
224:19 227:3
236:7,11 239:4
239:18,20
240:12 241:20
245:16 246:11
250:11 253:14
253:16 259:6
259:19 260:9
261:1,15 262:8
264:4 270:2
271:16 278:5
278:22 279:2
280:13 281:2
285:13 287:22
289:12 292:15
294:13 297:14
298:4 299:4
306:9,10 307:1
307:22 308:5
311:23 313:23
315:16 316:17
318:14 320:9
321:11,22
323:2 324:9
326:1,22,23
327:1 328:12
328:14 330:20
332:1,21
337:19,21
342:9 347:16
347:20 348:23
349:16 355:19
356:19 357:1

**knowing**  63:4
106:2
**knowledge**
49:1 169:3
170:14,16,19
267:1
**known**  15:17
78:18 155:6
297:3
**knows**  16:12,18
294:16 311:6
**kristi**  30:17,23
31:1
**kristina**  269:19
269:22 270:18
270:19 271:7
**kwunderlich**
5:10

**l**

**l**  2:1 31:19
225:9,9,13,13
**label**  289:11
**labeled**  114:2
150:20 270:17
290:4,19 294:2
315:22 328:6
**lady's**  23:2
**lake**  32:8,10,11
33:7,7,10
164:18,19
166:4 207:1
**lane**  2:5,23
10:1 11:9
358:20

| | | | |
|---|---|---|---|
| **language** 302:6 | 309:7,11 | **learned** 164:10 | 259:19 275:16 |
| **lanier** 108:10 | **lawsuit** 13:1 | 179:20 295:22 | 308:22 309:5 |
| 109:14 | 116:19 198:18 | **learning** 23:14 | 310:11,16 |
| **laptop** 328:19 | 296:5,6 | 63:3 118:11 | 322:8 335:7 |
| 349:15 | **lawsuits** 289:16 | 119:5,11 121:2 | 342:23 353:9 |
| **laptops** 53:10 | 289:18 | **leave** 24:12 | 357:13 |
| **large** 2:7 10:3 | **lawyer** 15:2 | 26:7 118:14 | **legal** 359:23 |
| 303:3 327:15 | 149:16,20 | 245:19 248:11 | **leslie** 4:5,9 |
| **larger** 231:14 | **lay** 48:22 | 248:16 250:8 | 11:18 111:6 |
| **largest** 319:21 | **lead** 43:12,13 | 250:14 251:1 | **letter** 50:10 |
| **larocca** 31:18 | 45:5,7 46:1,11 | 251:17,22 | 91:12,18 95:3 |
| 34:15 | 46:17,20 | 255:7,17 | 100:4 101:17 |
| **lash** 71:5 | 127:15 130:3 | 257:19,22 | 254:20 255:3 |
| **late** 72:11 | 143:17 182:12 | 264:3 265:14 | 255:19,22 |
| 165:10 225:2 | 235:17 279:13 | 274:23 275:10 | 256:18 266:5 |
| 238:1 242:17 | **leadership** | 291:23 316:5 | 269:20 271:3 |
| 247:6 254:13 | 57:14,17,22 | **leaving** 293:19 | 271:17 272:16 |
| 277:21 | 58:15 63:12,16 | **led** 86:6 124:12 | 273:20 275:1 |
| **lateral** 195:11 | **leading** 2:17 | 125:15 228:12 | 275:16 |
| **laura** 23:1 | **leads** 277:17 | **lee** 157:9,13 | **letters** 245:17 |
| 25:21 | 278:3,19,22 | 185:13 188:1 | **letting** 216:5 |
| **lauren** 19:2 | 279:20,23 | 241:5 292:6,19 | 224:15 241:5 |
| 184:4 185:10 | 280:3,3 | 295:1 299:2,3 | 299:1 |
| 187:3 193:13 | **lean** 162:7 | 299:19 303:1 | **level** 283:2 |
| 193:20 194:2 | **leap** 65:2 | 305:2 312:20 | **liability** 78:4 |
| 194:10 195:6 | **learn** 79:18 | 340:22 | 85:23 90:17 |
| 195:20 236:19 | 83:12 84:5,9 | **lee's** 195:4 | 94:8 103:9,22 |
| 240:9,23 241:3 | 99:2 102:22 | 303:9 | 104:9 116:5 |
| 241:10,13 | 103:8 104:12 | **left** 17:13 18:1 | 144:3,6 155:19 |
| 289:9 293:2 | 104:13 106:13 | 19:1 31:1 53:8 | 161:2 164:9 |
| 294:12 300:11 | 119:14,22,23 | 53:8 101:8 | 171:3,11 |
| 350:21 | 122:23 123:5 | 156:22 163:5 | 183:12,18 |
| **lauren's** 295:2 | 128:23 130:13 | 163:17 166:14 | 197:19 199:10 |
| **law** 2:7 4:6,12 | 151:3 297:16 | 169:8 186:18 | 210:19 223:13 |
| 10:7 289:23 | | 201:11 212:22 | 231:16 235:4 |

238:20 244:19
256:2 279:6
295:21 297:6
339:3,4 342:18
348:16
**licensing** 37:20
**lied** 300:22
**life** 255:23,23
292:13
**lighten** 296:17
**liked** 135:1
**liking** 216:1
**limit** 188:21
189:1
**limited** 89:9
**limits** 49:15
89:2
**lindberg** 8:7
19:2,7 193:14
193:20 194:3
194:10 195:6
195:20 289:9
294:16,21
295:13 296:10
300:11 310:21
312:7 313:4
314:18 315:21
335:12,13,19
**lindberg's**
290:7 291:19
294:12 310:4
**line** 65:6
243:10 336:21
352:4 360:4,7
360:10,13,16

360:19
**lines** 103:16
105:1 196:19
**linked** 312:23
**linkedin** 312:12
315:3
**list** 7:1 43:3
153:8 154:11
154:13 190:3
210:14
**listed** 44:13
57:13 63:3
138:20 186:21
**listing** 210:11
**lists** 49:15
96:14 107:5
**listserv** 277:16
277:18 278:4
278:20,23
281:9
**little** 28:4 34:20
72:11 125:12
159:17 160:5
171:12 177:13
219:17 220:23
269:7 294:10
324:23 325:16
340:16
**lived** 28:3 72:1
**lives** 87:3
**living** 36:18
104:8 229:12
346:18
**load** 349:7,10

**local** 284:16
**located** 108:11
**location** 78:9
**locations** 55:5
61:4
**locked** 53:11
**lockton** 106:22
107:9,20 108:1
**lodge** 187:18
187:23
**log** 43:4 44:1
180:15
**logged** 42:15
137:13
**logical** 251:9
**long** 15:17 16:5
22:20 23:5
69:1 88:15
90:23 91:4
102:12 111:11
142:10 159:20
169:8 171:2,10
176:10,12
223:11,13
311:7 338:15
338:16,21
**longer** 120:23
123:2 135:22
153:8 171:12
244:23 246:15
**look** 28:15 29:2
50:8 54:14
56:20 57:3
66:7 68:21
92:23 93:4,5

94:4 107:5
114:9,18 126:3
150:4,19 153:4
161:19 178:2
189:6 204:15
208:3 209:23
233:22 265:15
290:3 291:17
294:1 295:11
296:8 297:11
298:21 300:8
301:16 303:13
307:19 308:4
311:1 312:4
315:17,18
319:4,12,13
320:15 325:19
327:21 328:5
328:23 337:4
337:16 338:11
350:17
**looked** 62:12
66:9 138:8,13
145:13 156:15
234:3 239:18
254:12 269:21
271:3 274:19
327:20 335:15
335:21
**looking** 22:19
28:17 48:5
50:1 57:13,16
58:18 83:1,2
83:10,12 95:5
114:15 124:18

146:22 153:9
156:11 166:21
203:10,20
204:15 209:18
213:8,10
250:13,18
251:10 275:19
276:2 283:15
290:11 301:1
311:20 331:21
**looks**  57:2,5
113:21 117:7
149:10,11
256:21 269:16
272:1 277:3,6
277:6 290:9
299:22 300:19
301:15 310:2
310:18 325:18
326:2 328:22
332:18,20
339:18 343:4
348:4 351:21
354:20
**lose**  303:4
**loss**  93:10,13
93:22 172:19
172:21 302:1,7
**losses**  93:15
**lost**  129:15
253:17 254:1,2
254:3 262:12
**lot**  13:13 22:3
23:8 24:1,16
24:22 65:18,20

66:22 67:1,4
89:12 97:2,18
100:9 104:7,23
107:1 111:11
125:1 129:1,1
129:2 157:21
173:4 180:13
198:12 201:5
203:13 205:15
224:11 228:14
229:12 241:6
248:6 262:13
264:1 304:17
306:1,13 308:9
328:19 340:15
**loud**  318:3
**lovoy**  157:8
**lower**  288:2
**lucrative**  25:3
**lunch**  118:8
139:5,8,13
140:1,21 141:4
141:10 142:4
142:11,19
144:9 159:4,10
191:10,15,16
191:18,22,22
192:5 197:4
244:11 246:8
285:2 325:22
326:5,17,19
327:10

## m

**ma'am**  166:2
**made**  2:15 13:3
65:15 67:1
82:23 87:21
99:22 115:20
122:17 124:4
131:19 132:9
132:15 140:1,6
141:6 142:5
167:7 177:1
197:4 198:8,10
198:23 200:11
201:14 211:23
216:11 237:20
239:21 248:6
251:7 252:10
254:4 257:11
259:7 260:7
263:7 268:9
287:9,14
288:16 314:3
314:14 324:12
334:22 351:15
361:5
**mail**  19:11
51:14,17 71:6
71:7 93:22
94:1 95:16
128:5 132:22
160:10,17
256:8,18 257:1
257:3 258:10
266:2,11
269:17,18

270:15,17,20
272:3 277:16
277:18 281:21
282:2,5 286:17
286:21 287:2
323:18 325:21
326:3 340:1,22
341:10 342:3
343:2,13,21
344:14,17
345:20,20,21
347:12 348:6,9
349:2 350:1
351:5 352:1,16
352:18 353:17
354:18
**mailed**  81:3
**mails**  95:21
167:9 174:1,22
209:22 269:12
270:10 274:19
**maintain**  87:20
**maintained**
87:13
**maintaining**
92:10
**maintains**
137:3
**major**  20:23
**make**  2:18
37:10 48:18
53:7 61:2 65:2
65:22 66:20
67:4 69:20,21
80:19 83:4

**[make - marking]**                                    Page 37

| | | | |
|---|---|---|---|
| 88:12 100:19 | **man**   146:15 | **mark**   149:2 | 354:17 355:6 |
| 110:8 111:8 | 147:16,23 | 212:17 234:8 | **market**   86:12 |
| 124:20 128:14 | 148:2 298:11 | 288:8 354:22 | 96:5,7 104:19 |
| 132:16 134:2 | 299:19 | **marked**   56:14 | 104:21 121:22 |
| 134:16 149:22 | **managed**   71:1 | 56:23 62:6,8 | 122:5 124:1 |
| 165:20 169:10 | 244:3,3 | 62:18 68:6,14 | 135:1 137:2 |
| 179:8 192:3 | **management** | 72:3,7 111:19 | 151:12 158:17 |
| 194:12 209:13 | 6:13,16,19 | 112:10 113:7 | 220:3 229:13 |
| 220:15 221:18 | 39:5 45:20 | 116:22 117:5 | 234:7 241:5,6 |
| 230:22 241:22 | 57:10 62:23 | 131:12 137:17 | 297:16 |
| 257:14 273:16 | 243:4,11,14 | 138:1 149:4,5 | **marketed**   42:1 |
| 286:19 294:6 | 245:7 246:3 | 150:16 151:9 | 92:21 |
| 297:18 298:18 | 295:5 | 160:4,14 161:5 | **marketing** |
| 299:19 302:4,9 | **manager**   26:1 | 161:13 212:23 | 41:23 42:7 |
| 304:23 318:20 | 29:23 63:11 | 249:12 250:1 | 43:2,20,23 |
| 331:5 336:12 | 115:22,22 | 254:19,22 | 44:9,15 94:3 |
| **making**   37:6 | 116:1,4,9 | 256:6,11 | 96:9 97:3,3,8,9 |
| 47:20 51:5 | 212:12,15 | 265:23 266:7 | 97:13,16,21 |
| 65:4 66:14 | 271:18 318:17 | 269:11,14 | 119:10 122:15 |
| 68:2 79:2 | **manager's**   60:9 | 272:15,20 | 123:3 124:15 |
| 87:16 88:1 | 68:22 | 276:20 277:1 | 125:19 130:16 |
| 92:15 100:7 | **managerial** | 288:7 289:4,19 | 134:10 136:6 |
| 129:2 196:21 | 242:21 | 317:6,12 328:2 | 136:11,13,14 |
| 201:23 203:5 | **managers**   23:1 | 328:7 339:23 | 136:19 137:9 |
| 257:16 264:1 | 115:14 | 340:8,21 341:2 | 137:10 173:15 |
| 291:5 292:19 | **mandy**   164:23 | 342:2,13 343:1 | 187:4 209:4 |
| 297:23 298:7 | 165:13 240:13 | 343:10 344:11 | 229:14 234:5 |
| **male**   146:13 | 240:19 308:1 | 344:21 345:19 | **marketplace** |
| 163:8 168:20 | **manner**   58:6 | 346:2 347:11 | 155:12 346:18 |
| 168:21 170:13 | **march**   19:12 | 347:17 348:8 | **markets**   93:1 |
| 181:15 198:6,9 | 23:7 68:13 | 348:14 349:22 | 103:13 104:23 |
| 226:8,16 | 312:7 313:9 | 350:10 351:3,9 | 106:2 137:15 |
| 297:21 298:6 | 319:16 320:19 | 351:23 352:10 | **marking** |
| **males**   277:17 | 343:3 344:16 | 352:15 353:1 | 112:23 |
| 305:14 | | 353:15 354:4 | |

**[married - men]**                                                                 Page 38

| | | | |
|---|---|---|---|
| **married**  166:1 | 50:2 52:16 | 282:19 288:13 | 316:5 342:17 |
| 166:4 | 65:20 66:21 | 292:11 293:21 | 344:6 |
| **martin**  32:11 | 67:5,12 71:3,5 | 296:15 298:13 | **medpro**  186:23 |
| 33:8 | 78:18,19 80:18 | 302:8 303:7 | 187:12,19 |
| **masier**  160:12 | 85:20,22 88:19 | 304:6 305:16 | 343:5,15,23 |
| **massive**  164:2 | 88:22 91:18 | 315:11 319:5 | 352:7,9 |
| **matches**  88:13 | 100:12 103:15 | 321:14,18 | **meet**  16:5 |
| **material**  97:3 | 104:12,21 | 325:4 330:5 | 316:1,8 340:16 |
| **materialized** | 106:21 111:10 | 332:9 333:20 | 344:18 |
| 186:14 278:23 | 117:17 120:14 | 336:1,7 338:4 | **meeting**  153:6 |
| **materials**  97:8 | 121:6 122:22 | 339:1,6 351:7 | 153:13 154:5 |
| **matt**  353:21 | 123:15 126:1 | 356:19,20 | 154:10 216:20 |
| **matter**  10:21 | 127:17 128:4 | **meaning**  19:10 | 218:7,7 230:7 |
| **mcclendon** | 130:5 131:2,17 | 66:1 84:10 | 237:6 238:8,15 |
| 27:6,11,16 | 136:9 140:2 | 168:10 249:5,7 | 238:18,23 |
| 31:8 36:21 | 146:16 147:17 | 287:5 | 247:5 294:14 |
| 85:11 | 147:22 148:5 | **means**  13:21 | 299:15 315:23 |
| **mcclendon's** | 148:11 157:21 | 14:23 136:15 | 316:12 324:17 |
| 27:18 | 158:13 159:8,9 | 136:19 243:20 | 326:7 334:9 |
| **mcclendons** | 159:9,11 | 358:6 | 335:5 340:6,10 |
| 28:1 32:4 33:5 | 164:14 173:4 | **meant**  41:1 | 340:11 343:23 |
| 34:1 | 173:17 177:19 | 64:21 115:18 | 344:3 346:21 |
| **mcclure**  157:9 | 178:2,8,9 | 128:15 151:12 | 347:1 348:11 |
| 157:13 184:7,9 | 180:9,10 185:1 | 152:21 253:7 | 353:23 |
| 185:13,14 | 192:12 196:7 | 279:21 280:4 | **meetings** |
| 188:1 292:19 | 198:16 201:4 | 297:9 303:9 | 119:10 340:12 |
| 340:22 | 205:11,11 | 337:3 347:3 | 340:18 |
| **mcgriff**  351:6 | 206:19 232:7 | **media**  10:19 | **melody**  29:15 |
| **mean**  13:23 | 239:16 243:7 | **medical**  104:1 | 30:17 |
| 19:10 22:6 | 243:13,22 | 104:2,4,6 | **melody's**  36:23 |
| 24:19 32:12,18 | 255:15 256:18 | 105:3,5 248:10 | **memo**  89:10 |
| 37:23 38:6,22 | 262:3 264:14 | 248:15 251:17 | **men**  141:13 |
| 39:7 40:22 | 265:10 268:20 | 251:22 257:18 | 144:23 147:18 |
| 41:15 42:3 | 270:9 279:8,21 | 257:22 264:3 | 163:2 165:15 |
| 47:16 49:20,22 | 280:1,2,8 | 265:14 274:23 | 165:21 166:1,3 |

170:22 230:10
230:11 263:14
263:15,20
298:15 300:1
301:3
**mention**  59:23
72:12 122:6
352:19
**mentioned**
36:15 53:2
69:17 92:10
118:19 132:21
191:11 192:7
226:10 232:17
236:7 244:10
247:12 320:1
337:20
**mentioning**
191:15
**merits**  356:17
357:2
**message**  7:18
227:4,5 249:15
249:16,18,20
254:12 267:13
267:14 290:6
290:11,13,21
291:11 297:12
298:22 304:3
305:9 307:20
308:4 310:1,4
311:2 312:13
313:3 317:19
322:5 336:14
338:3

**messages**  8:7,8
227:1 267:12
267:17 289:8
290:7 294:2
295:12 300:10
300:18 301:7
301:14 308:10
309:21 310:8
310:10 315:20
317:8,10
335:11,16
338:11,13
**met**  12:21 16:2
78:22,23 79:1
107:18
**metrics**  60:12
**mf'er**  291:10
301:4 326:15
**mhh**  1:7
**mic**  30:8
**microsoft**
12:13
**middle**  23:7
35:13,15 273:3
277:14 282:21
292:1 301:18
312:5
**mile**  72:2
286:16
**million**  45:6,8
46:19 130:7,8
304:13
**mind**  121:15
178:18 239:16
251:1 263:23

265:11 267:20
281:5
**mine**  120:8
200:13 332:12
**minimum**
44:21,22
**minute**  34:7
56:4 287:2
**minutes**  88:23
89:3 91:2
356:6
**miscellaneous**
104:1,2,5
**mississippi**
170:7 224:8,14
**misspelled**
270:22
**misunderstood**
152:20
**mom**  36:15
215:23 216:2
218:9,19 239:3
248:12,15
267:2,15
**moment**  30:21
31:22 80:9
296:17
**money**  65:22
66:19,20,22
67:1,5,23 68:2
69:22 102:16
129:2 134:17
198:8 199:1
200:11 201:6
279:9 291:6

292:19 296:21
**month**  20:1
96:15 139:7
178:20 248:11
**months**  91:15
**mood**  71:1
**morgan**  17:1
169:1 198:15
200:11 203:7
208:20
**morgan's**
200:21
**morning**  10:17
12:18,20 271:8
**morton**  109:2,5
109:6,7
**mother**  216:11
216:12 267:9
268:2 269:5
**motherfucker**
301:1 326:12
**motherfuckers**
291:4
**motivate**
324:15
**motivated**
325:9
**mouth**  324:1
**move**  69:20
78:11 80:20
83:1 119:11
122:12 159:14
195:11 196:21
224:14 283:5
283:20 288:2

319:18 320:7
320:17
**moved** 83:23
118:2 151:1
194:23 211:6
213:6,11,12,13
214:20 215:2
224:17 231:12
283:3 303:23
307:4 320:3,18
320:19,22
321:6 330:8
**moving** 79:7
80:5 84:23
118:18 139:21
158:6 196:12
198:1 211:11
304:22 305:4
307:3
**muller** 16:20
**multiple**
340:22 350:7

**n**

**n** 2:1 4:1 6:1
**name** 11:7
12:22 18:8
21:5 23:3 26:1
29:10 30:2,21
32:13 35:6
39:2 41:18
43:11 46:8
108:7,9 116:12
143:11 157:12
171:8 204:18
212:7 229:6

236:21 306:8
311:23
**named** 17:5
**names** 107:7
124:7 125:23
274:13,15
301:4
**nature** 33:14
**near** 33:8
309:18
**necessarily**
90:6 199:2
207:1
**necessary** 2:14
361:6
**need** 18:11,17
24:2 44:18
45:5,8 46:16
46:18,19 78:13
86:4,7 105:13
140:14 159:14
175:22 187:17
212:2 286:14
290:23 292:14
299:1,4 302:3
317:22 327:21
334:1
**needed** 44:19
94:20 102:22
103:8 119:14
119:16 146:19
165:22 176:2
194:17 219:2
220:11 221:16
228:23 229:17

268:8 293:4
294:21 295:14
297:1
**needing** 78:17
**negative** 287:8
**negatively**
252:16
**negotiate** 102:1
150:7
**negotiation**
162:3
**neighbors**
184:23
**neither** 358:15
**nelms** 284:17
285:21 352:23
353:12
**nervous** 16:18
319:2
**never** 66:9
123:9 172:19
178:6 189:12
238:17 247:11
248:12 304:12
**new** 24:22 95:2
106:22 107:19
107:20 108:1
120:6 128:7
133:2 137:11
151:4,15 152:4
153:7 154:11
162:3 169:7
175:11,14
177:22 178:15
186:8 189:11

199:9 206:3
229:18 232:11
233:17 234:12
234:14 276:15
281:14 301:22
305:19 312:21
331:16 334:6,7
**night** 164:19
165:11,18
322:9,12 352:7
**nights** 312:11
**nods** 338:7
**non** 124:10
301:23
**noncompete**
144:17,21
145:2 146:7
147:5,18
148:21 255:15
313:22
**nondisclosure**
255:15
**norm** 200:2
**normal** 136:17
136:17
**north** 2:10 4:13
5:7 10:9 11:5
284:9
**northern** 1:2
11:2
**notary** 2:6 10:2
10:3 361:13,19
**note** 9:18 72:10
72:20 359:10

**noted**  63:10
  141:17 361:7
**notes**  186:22
**nother**  158:20
**noticing**  138:9
**november**  8:4
  17:14 153:23
  215:10 272:18
  275:1
**number**  25:7
  84:12 142:9
  182:10 234:13
  234:15 272:3
  327:15
**numbers**  60:12
  328:17 329:7
**nuts**  51:1 52:3

**o**

**o**  2:1 31:19
  225:9,12
**o'connor**  171:9
  171:9,17
  179:12 180:2
  181:9,19 201:1
  325:16
**o'connor's**
  180:7
**oath**  13:20
**object**  114:20
  139:18 156:7
  158:11 202:13
  209:11 214:22
  252:17,21
  255:9 263:21
  264:7 273:22

298:1,9 305:23
  307:12 333:8
**objection**  173:7
  173:9
**objections**  2:15
  2:18 211:10
**observe**  13:8
  178:2
**obtain**  59:9,11
  156:6
**obtaining**  59:4
  59:13
**obviously**
  111:10 245:9
  245:17
**occasionally**
  178:7
**occasions**  145:7
**occur**  252:3
**occurred**
  223:19
**occurring**
  264:21 358:12
**october**  301:19
  315:20 353:17
  353:20
**offer**  81:10,13
  85:1,17 99:22
  100:4,4 101:17
**offered**  2:20
  21:12 125:1
**offers**  81:16
**office**  4:19 18:3
  18:4 55:8
  71:13,20 78:5

79:14 81:4,11
  82:1,2,8,9,11
  84:22 118:20
  140:13 144:11
  175:21 178:1
  201:17 207:2
  212:12,21
  240:5,7 242:15
  247:8 275:11
  275:12 297:22
  300:1,5,12,17
  301:3 304:12
  338:19 345:23
  350:9 354:21
**offices**  2:8 10:7
  48:9 61:9,18
  67:20,21 71:16
  98:3 350:14
**official**  53:13
  81:12 100:4
**oh**  27:10,10
  34:5 47:4
  56:16 67:7
  70:12 84:11
  94:11 107:21
  123:23 135:13
  140:10,15
  142:6 158:14
  173:16 217:16
  244:8 256:14
  270:9 290:20
  324:9 328:11
  347:4 351:13
  354:7

**okay**  13:12,18
  13:23 14:2,22
  16:20 17:21
  18:6,10,10,13
  18:19,20,21
  19:3,14,17
  23:15 28:5
  30:10,22 31:2
  32:2,12,17
  34:17 35:16
  39:12,17 40:3
  40:12,18 41:12
  42:11,16,16,21
  42:23 43:7
  44:2,4 45:15
  47:7,18 48:8
  49:7 51:1,23
  53:16,18 54:17
  56:2 57:3
  58:13 60:7,11
  61:17 62:21
  63:9,19 66:11
  66:17 68:17,21
  69:17 70:5
  72:15,19 78:1
  80:3,16,21
  81:15,22 82:13
  84:7 90:8 91:3
  95:7 96:10
  98:1,4 99:9,21
  100:5,22
  101:16,23
  102:23 105:22
  106:1,5 107:6
  107:9,12 108:9

**[okay - okay]**                                                                 Page 42

| | | | |
|---|---|---|---|
| 109:1,4,10,10 | 164:7 167:2 | 220:18 221:17 | 270:1,13,13 |
| 109:14 110:3,6 | 169:10 170:6,8 | 222:6,16 | 271:7 275:11 |
| 110:11,11,13 | 170:12 171:14 | 223:18,22 | 278:22 279:3,8 |
| 111:18 112:22 | 172:6,15,18 | 224:3 225:14 | 279:12,19 |
| 113:10 114:11 | 173:7,20 | 225:14,14 | 280:2,9,12,16 |
| 114:18 115:3,6 | 175:16,18 | 226:15 228:4 | 281:4,14,23 |
| 116:21 117:12 | 177:17 178:5 | 228:11 229:1 | 282:9,14,20 |
| 118:1 119:2,13 | 180:4,18 | 230:2,5,5,12 | 283:12 284:3 |
| 120:1,20 | 181:15 183:4 | 231:22 232:6 | 285:20 286:21 |
| 122:10,16,21 | 183:14,23 | 232:15 233:11 | 287:1,23 288:6 |
| 123:19 124:11 | 184:6,8,16 | 234:2 235:22 | 288:6,22 |
| 125:10 126:3 | 185:13,22 | 236:13 237:4 | 289:22 290:10 |
| 127:3,9 128:2 | 188:17 189:5 | 238:8,22 240:6 | 290:20 291:13 |
| 128:13 129:8 | 189:14 192:3 | 240:18 241:9 | 293:18,21,21 |
| 130:12 131:15 | 192:19 193:7 | 242:10 243:17 | 294:4,20 296:8 |
| 132:14 133:12 | 195:11,19 | 244:5,14 245:3 | 296:13 298:12 |
| 133:20 135:16 | 196:1,14,23 | 245:3,6 246:9 | 299:23 300:20 |
| 137:5,16 138:4 | 197:17 198:4 | 246:13,22 | 305:20 306:2,9 |
| 138:15,18 | 198:22 199:5 | 247:4 248:1,17 | 308:2,9,15,19 |
| 139:1,3,11,20 | 199:20 200:9 | 248:23 249:10 | 310:1,7,14,19 |
| 140:6,23 141:4 | 200:20 201:16 | 250:12,22 | 311:22 312:4 |
| 141:18 142:16 | 202:16 203:2 | 251:19 252:13 | 313:9,13 |
| 144:13 146:13 | 203:15,18 | 252:19 254:6 | 314:10,22 |
| 147:1,9,13,22 | 204:5,17 | 254:10,18 | 315:17 316:11 |
| 148:6,15 149:8 | 206:19 207:8 | 255:2,6,12,18 | 317:5 319:9,12 |
| 149:11,14 | 207:10 208:3,8 | 256:22 258:3 | 320:5,21 321:2 |
| 150:15,16,21 | 210:10 212:1,9 | 259:3 260:13 | 321:11 322:4 |
| 151:23 152:13 | 212:16,16 | 260:23 261:5 | 323:10,16 |
| 152:23 153:12 | 213:4,8,13,21 | 261:12 262:4 | 327:14 328:1 |
| 154:4,16 156:5 | 214:13,16,19 | 263:16 264:14 | 328:22 330:17 |
| 156:12,17 | 215:4,8,13,13 | 264:15 265:15 | 330:21,23 |
| 157:16 158:13 | 215:19 216:10 | 266:10 267:22 | 331:19 332:5 |
| 159:16 162:7 | 217:1,3,10 | 267:22 268:9 | 332:13 333:7 |
| 162:14,19 | 218:10,14,16 | 268:15 269:4 | 333:12 334:8 |
| 163:19,22 | 220:1,14,14,14 | 269:10,17 | 334:11,18,21 |

**[okay - page]**                                                        Page 43

335:2,10
336:12,23
337:23 338:10
339:22 340:20
341:15,21
342:22 344:13
345:13,18
346:8 347:20
348:18 350:15
350:18 351:22
353:14 354:16
355:11,23,23
356:18 357:17
357:18
**old**  216:4,16
291:4,9 338:22
**older**  339:4
**omissions**
103:23
**once**  20:1 44:1
79:3 92:3
123:1,23
125:16 128:1,2
158:14 166:16
172:22 175:10
178:19 237:20
241:4 278:10
280:11 282:1
311:7
**onebeacon**
105:2
**ones**  145:16
166:8 236:16
281:3 290:8
329:20

**open**  84:16
231:13 324:2
**opinion**  78:10
**opportunities**
57:14,17,22
58:1,10,15
81:6 127:18
141:13 155:10
163:10,11,12
186:2 198:11
207:17 216:5
230:11,21
231:2 236:2,4
236:5 244:13
283:1 284:2
297:5
**opportunity**
24:17,20 64:20
64:22 65:18,21
84:5,8 85:18
100:10 117:8
117:18 126:14
126:20,23
128:18,19,22
128:23 129:3,8
129:21,23
130:13 133:1
135:3,6 146:22
192:22 193:2
194:19,20
196:16 207:16
283:5,13
324:16
**opposed**  218:23
224:15

**option**  50:10
275:17
**oral**  3:3 10:13
**order**  30:14
49:3 51:5
72:12 93:11
160:6 215:2
334:3
**organized**
162:15
**original**  3:2
145:5
**originates**
350:5
**outstanding**
93:6 94:20
**overhead**
182:18
**overnight**
165:10
**overqualified**
318:2
**overwhelm**
322:13
**overwhelmed**
324:5
**own**  56:1
121:20 122:14
128:10 131:21
132:18 134:7
135:1 187:17
199:7 243:16
312:10 313:5
315:13

**owned**  309:22
**oxley**  24:21

**p**

**p**  2:1 4:1,1
**p.c.**  4:18
**p.m.**  249:23
300:21 301:20
317:21 357:23
**pack**  291:22
**page**  6:3 56:20
56:21 57:4,10
62:22 68:12,22
113:4,11 114:1
134:1 149:8
150:19,23
155:9 161:19
192:4 213:9,10
270:7,8,15,16
277:5 282:20
282:21 290:4
290:19 291:18
291:20 294:5
295:11,12
296:9 297:12
301:16,18
303:16 310:3,9
310:11,17
312:5,6,16
315:22 317:20
319:15 320:17
324:9 328:5
338:14 349:23
350:6 352:18
360:4,7,10,13
360:16,19

**pages** 9:18
72:20 291:17
**paid** 188:1,4,5
188:8 201:1,5
233:19 292:23
295:1 301:10
**palmer** 4:5,6
11:18,18 12:8
30:8 72:9,18
110:12 111:16
114:20 139:18
156:7 158:11
183:10 202:13
209:11 214:22
217:14 240:21
245:13 252:17
252:21 255:9
263:21 264:7
265:17 270:6
270:10,12,14
272:5 273:22
298:1,9 305:23
307:12 312:15
312:18 316:19
333:8 347:2,7
351:11 355:16
356:12,21
357:14
**palmerlegals...**
4:9
**panic** 258:1
**paper** 48:9
**paperless** 24:3
48:13 52:23

**paperwork**
144:12
**paragraph**
273:3,4 277:14
282:22
**parents** 33:18
33:20 37:2
250:10
**part** 14:13 53:2
59:15 66:5,6
72:17 82:13
87:2 99:21
105:21 111:7
111:22 119:3
148:4 152:16
152:18,18,22
156:3 161:9
172:22 226:21
227:11 228:20
230:20 238:16
255:17 258:20
264:2 292:21
314:12 352:6
**participated**
21:22
**particular**
49:11 95:12
279:1 289:7
337:15
**parties** 2:3,18
13:4 14:16,20
358:16
**partner** 23:3,4
187:14

**partners** 25:17
**parts** 59:17
155:23
**pass** 59:16
**passed** 24:21
**passing** 147:12
**passwords**
53:10
**past** 86:8
211:21 246:5
259:9 323:21
**path** 58:2
**patricia** 4:17
4:18
**patriciagill**
4:21
**pay** 59:19
100:2 101:10
102:10 150:7
187:22 198:16
198:17 303:5,5
**payment**
255:14,16
**pays** 90:13
**penalties** 14:8
**pencil** 343:7
**pender** 240:13
**peop** 67:19
**people** 31:16
33:17 66:14,21
67:7,16,20
68:2 70:15,18
71:15 91:19
98:2 102:6,11
103:3 177:12

179:9 184:1
185:7 194:13
194:14 204:15
206:15 208:10
208:15,16
258:4,6 274:13
347:14 348:4
**percent** 200:2,4
329:2,3 337:16
**percentage**
40:5 329:1
**perform** 22:16
37:17 55:10
248:2
**performance**
6:12,15,18
26:10 56:18
57:8 68:9
150:18 161:7,7
161:11
**performing**
55:23 169:13
**period** 168:22
172:11 175:9
244:15 245:19
245:20 250:7
269:8
**person** 29:14
31:3 97:14
160:13 179:3
179:14 229:7
257:16 259:10
259:12,18
260:7,10
274:22 317:23

318:7
**personable**
67:15
**personal**   257:1
270:20
**personality**
67:10,13
**personnel**
62:11 68:11
111:22 161:9
**perspective**
51:2 52:4
262:20
**peterson**   97:17
**petty**   116:10,13
116:15,19
256:9,19
263:18 264:6
266:1 271:19
272:17 273:9
274:20 287:16
**petty's**   13:6
**phase**   53:22
**phew**   230:14
**phillips**   143:3,4
143:17 192:7
195:13 196:2
197:4 203:20
283:8 294:9
339:11
**phone**   19:11
82:11 179:9
217:4,8,9
218:6 257:21
257:23 258:4

258:11 272:2
301:7 309:21
**photographs**
7:17
**photos**   212:18
212:20
**phrase**   219:15
**picking**   228:20
**picture**   95:4
213:17 215:12
226:2,4,18
227:9,14,17,19
296:9
**pictures**   215:9
**piece**   199:21
**pile**   176:13
**piss**   304:20
**pl**   120:15
**place**   71:17
72:16,16 81:7
104:17 121:23
165:22 256:3,3
**placed**   9:19
72:8,20 277:16
328:8
**placements**
152:4
**places**   28:18
**plaintiff**   1:10
4:3 11:19,21
**plaintiff's**
111:14
**plan**   6:13,16,19
176:6 223:5
238:11 241:6

284:13 318:23
**planned**   279:17
284:21
**planning**   342:7
**plans**   191:14
192:21 275:13
**plate**   136:12
**play**   354:14
**plaza**   352:4
**plead**   308:7,13
310:22
**pleading**
310:19
**please**   3:5
11:10 15:10
215:3 220:17
269:22 270:19
299:3
**pleased**   345:16
**plus**   225:23
344:3,6,6,15
**pocket**   188:6
**point**   18:16
31:4 32:6 33:2
35:4 37:11
79:2,12 86:5
92:17 102:20
114:11 121:10
125:15 130:6
131:23 132:18
138:5,13
140:16 143:22
153:18 154:18
155:2 158:2
159:10 174:7

191:6 193:14
201:16 210:2
219:6 238:4
251:14 258:19
261:20 263:13
265:19 266:17
284:12 286:10
313:14 316:18
319:11 328:21
338:1 349:14
349:17 350:4
353:10 354:11
357:1
**pointed**   292:2
**points**   13:16
275:10
**policies**   7:3,5
25:5 42:22
47:19 61:5,10
61:19 66:12
87:11 88:9
96:17 104:14
112:3,8,18
113:17 115:7
117:12,20
205:23 229:12
290:15 295:21
304:18 327:15
330:1,17
332:16,22
333:14,14,16
337:5
**policy**   38:2
39:19,20 40:7
43:1,7 47:12

47:18,22 48:6
48:15 49:5,17
49:18 50:22
51:4 55:9
87:15,23 88:11
88:16,22 91:20
91:21 93:15
94:14 104:10
114:12,15,19
124:8 186:14
200:1 202:7
327:19 328:16
328:23 329:10
331:2,4,10,15
331:21 332:6
**polite**  322:15
**politely**  356:14
**polling**  229:8
**poop**  313:1
**poor**  304:20
**portion**  111:13
113:1
**position**  23:18
65:23 82:18
84:1,2 85:1
87:1,5 99:17
118:3 120:5,18
127:22 142:9
144:15 150:8
158:4,7 166:17
195:7 204:1
245:8 246:3
275:18 278:13
295:5 311:19

**positions**  14:17
82:23 125:20
125:22 243:4
357:12
**positive**  29:19
114:10 171:13
180:23 215:11
321:1 327:8
**possibility**
253:13 323:5
**possible**  15:6
305:13 332:9
348:22
**possibly**  80:1
**post**  4:19
299:16
**posting**  29:9
**postponed**
326:21
**postponing**
326:17,19
**potential**  85:18
155:13 315:4
**powell**  284:23
312:1
**practice**  164:9
238:20 295:21
339:2
**practices**
103:23
**preferred**
307:6
**premi**  44:21
**premium**  39:9
40:6

**prepare**  16:1
118:13
**prepared**  50:6
96:14
**present**  5:13
241:12,15
260:6 336:9
**presentations**
61:2
**presented**
192:23,23
334:2 336:18
337:13,14
338:2,3
**president**  34:6
34:7,8 78:8
247:21 261:9
261:16
**pretty**  82:23
102:8 269:9
276:12 286:17
297:16 357:4
**previous**
231:19
**previously**
262:19
**prime**  292:13
293:5
**print**  52:22
326:1
**printed**  97:4
331:14
**printing**  173:13
173:14

**prints**  97:13
**prior**  2:21
33:13 96:22
156:13 238:23
279:18 336:11
**priorities**  59:6
**pro**  242:13
**probably**  115:4
146:19 233:4
300:3 301:5
311:8
**problem**
118:22 144:22
146:15,20,21
147:4,16,23
148:2 164:6
176:5 242:1,4
242:8
**problematic**
288:18,21
300:1
**problems**
144:19
**procedure**  2:23
10:5
**procedures**  7:3
7:5 25:6 38:3,4
61:5,10 66:7
87:11 113:18
123:9 268:12
**proceeding**
309:9 358:5
**proceedings**
10:14 358:12

**[process - putting]**

| | | | |
|---|---|---|---|
| **process** 14:13 | **professional** | 153:22 166:17 | **psychiatry** 6:21 |
| 61:11 137:10 | 48:10 52:13,14 | 191:1,23 197:6 | **ptsd** 276:8 |
| 151:4 176:13 | 78:4 85:23 | 240:11 241:7 | **public** 2:7 10:2 |
| **processed** | 90:17 94:7 | 242:14 284:11 | 361:19 |
| 228:19 | 103:9,16,18,21 | 305:8 313:16 | **pull** 55:9 94:1 |
| **processes** | 103:22 104:9 | 313:18 314:3 | 161:16 |
| 265:13 | 116:5 144:3,6 | 314:14,18,21 | **pulled** 328:17 |
| **produce** 66:1 | 155:18 161:2 | **promotion** | **pure** 252:12 |
| 201:6 309:12 | 171:3,11 | 54:18 118:5,15 | **purpose** 167:23 |
| **produced** | 183:12,17 | 119:17 125:3 | 302:9 |
| 56:18 62:10 | 185:4 194:19 | 175:11 192:18 | **pursuant** 10:4 |
| 68:9 72:5 | 197:18 199:10 | 302:22 313:20 | **pursue** 24:13 |
| 111:21 137:19 | 210:19 223:12 | 319:6,7 | 28:19 155:22 |
| 160:10 161:8 | 231:15 235:4 | **prompted** 28:6 | 287:21 313:5 |
| 198:17 212:19 | 244:18 256:2 | 28:15 | **pursued** 155:21 |
| 249:15,19 | 263:12 277:20 | **pronounce** | **push** 294:17,18 |
| 269:13 317:9 | 278:15,16 | 347:16 | 294:21 |
| 328:4 342:3 | 279:5 281:19 | **property** 88:22 | **pushing** 293:10 |
| 358:7 | 282:4 297:6 | 103:19 146:18 | 293:10 |
| **producer** | 306:14 348:16 | 194:11 195:7 | **put** 13:20 39:9 |
| 214:17 | 350:14 | 195:13 206:8 | 50:4,10 51:19 |
| **producing** | **program** 21:23 | **prospective** | 51:23 52:8,9 |
| 86:13 121:19 | 22:17,17 23:17 | 284:14 344:19 | 83:23 89:11 |
| **production** | 55:21 93:16 | **protect** 285:7 | 145:16 171:23 |
| 37:18,22 38:5 | 185:4 318:16 | **protective** | 188:22 189:2 |
| 38:7,8 60:17 | **programs** | 72:12 | 193:13 209:12 |
| 65:1,12,16,23 | 24:22 | **provide** 113:11 | 234:9 238:6 |
| 66:14 68:3 | **promote** | 274:12,15 | 251:17 264:2 |
| 69:20 78:3,9 | 295:17 | **provided** 16:4 | 299:18 327:17 |
| 79:4,8 80:2,6 | **promoted** 44:1 | 16:4 98:21 | 330:4 332:11 |
| 100:19 102:7 | 45:20 118:4 | 154:11 206:7 | 334:14 336:20 |
| 103:4 115:1 | 120:4 130:15 | 266:5 337:20 | **putting** 324:23 |
| 151:5 161:3 | 133:22 139:14 | **psychiatrist** | |
| **products** | 140:17,18 | 251:18 | |
| 155:12 | 144:19 149:13 | | |

**q**

**qualified**
142:13
**qualify**  111:12
**question**  15:5
15:10,13 52:2
67:23 125:12
154:21 175:19
196:3 197:7,9
239:7 256:14
271:1 274:18
281:6 297:7
298:13,14
322:18 323:14
356:20,22
357:8,15
**questioned**
292:3
**questions**  2:16
2:17 13:2 15:2
123:8 132:8
254:8 356:1,2
357:3
**quick**  95:3
217:15 299:6
**quickbooks**
276:6
**quit**  260:10
**quote**  48:18
89:9,11,13,17
90:2 91:1,6
92:8 93:11
95:10 105:17
136:22 171:22
172:19 205:22

229:13,16
297:15 299:3
**quoted**  96:3
**quotes**  87:17
88:3 89:8
123:12 124:8
182:3 220:6,9
221:2,22
229:20,22
230:3 299:2

**r**

**r**  4:1 31:19
155:17 225:9
225:10,13
358:1 360:3,3
**rachel**  3:1 5:3
11:14 12:22
56:3 72:9
183:10 217:14
245:13 265:17
272:5 312:15
347:3 351:11
355:16 356:12
**raise**  30:8
**raised**  247:1
266:5
**ran**  247:9
**randy**  27:6,9
27:15 29:8
34:19 85:11
**range**  100:15
101:3
**ranged**  60:5
**ray**  23:2 25:21
25:22

**rbarlotta**  5:9
**reach**  36:20
97:15 216:7,18
251:20,23
252:4 264:5
**reached**  124:21
216:19 218:5
218:17 254:11
261:4 267:3
268:3,23
350:20
**reaches**  251:4
**reaching**
271:16 273:9
**read**  12:8
270:12 324:2
326:2 359:9
361:5
**reading**  48:23
113:17
**ready**  80:19
318:19 326:22
**real**  299:6
**reality**  153:3
325:2
**realiz**  296:18
**realization**
222:18 248:9
**realize**  135:2
153:1 164:10
237:21 248:4
**realized**  192:20
264:8 295:23
**realizing**
296:18

**really**  21:7
22:21 33:11
70:17 90:18
99:6 102:4
120:12 127:2
158:12 159:1
196:17 220:12
222:23 258:15
263:10 265:10
292:7 293:3
302:1 305:10
310:6 321:9
**reason**  15:3
68:17 112:14
112:20 120:12
165:19 202:11
204:20 208:14
218:16 226:15
258:13 263:17
264:2 271:5
293:11 309:15
314:18 320:21
350:18 357:5
359:11 360:6,9
360:12,15,18
360:21
**reasonings**
265:13
**reasons**  70:1
177:17
**reassigned**
152:11 219:20
**recall**  19:4
31:21 57:15
58:12,20,21

60:15 62:15
63:15 67:18
68:5 69:16
84:14 101:1,17
101:22 103:5
109:11 112:6
114:15 118:7
132:19 140:12
140:20 156:17
158:9 161:10
163:23 167:18
199:20 200:14
204:8 247:3
266:1 275:3
321:5 327:19
343:23 348:11
349:18 351:15
352:8
**recap** 216:10
**receipt** 113:4
117:3 359:18
**receive** 26:9
60:2 62:15
121:13
**received** 56:19
89:18 131:8
172:5 175:10
289:6 302:21
317:8
**receiving**
161:10
**recent** 335:18
**recollection**
161:1

**recommendat...**
238:5
**recor** 93:14
**record** 10:18
12:11 44:20
45:23 56:9,12
72:10 99:9
111:1,4,6
130:17 159:22
160:2,8 217:19
217:22 221:18
270:3 272:10
272:13 289:10
290:5 311:22
317:1,4 356:8
356:11 357:20
**recorded** 38:23
39:6 40:13
41:3 42:17
**records** 6:22
41:14 62:11
68:11 72:5
111:23 161:10
200:10
**rectify** 180:19
**red** 226:7
**redacted** 308:5
308:6 310:2
**redactions**
308:10
**reeves** 120:17
121:4 143:3,14
156:13 171:22
179:21 180:5
181:6,12

**refer** 325:15
**referenced**
162:19 215:13
359:6
**referral** 163:13
186:2
**referrals**
163:14 186:4
206:4
**referring**
137:22 283:10
300:2,5 325:7
326:14
**reflect** 212:20
234:14 336:11
**reflecting**
68:11
**reflects** 336:5
**regarding** 61:5
271:22 347:15
348:10
**regional** 116:8
116:17 271:17
**regularly**
194:12 340:16
**reich** 184:15
243:15 347:13
**related** 231:18
**relates** 41:7,8
**relation** 103:11
197:7 205:15
**relations**
115:22,23
116:9 271:18

**relationship**
35:9 87:14,21
106:8 137:2,4
187:13 310:20
346:17,22
**relationships**
92:11 103:12
103:13 106:3
106:12 151:19
152:3,14 168:3
205:13,16,21
236:12 299:8
**relays** 216:14
**relief** 230:14
**relieve** 119:18
**relieved** 119:20
120:2 121:16
**rely** 162:11
**relying** 218:19
**remain** 70:12
**remained**
287:20
**remember** 21:4
21:8 23:2
25:16,19,23
29:1 33:11
37:6 60:4
61:21 62:5
69:10 81:1,14
83:5,8,22 85:4
85:12 87:8
98:5 106:22
107:7,17 108:2
108:11,20
116:17 118:13

123:17 126:5,8
140:4,5 142:20
144:17 147:8
155:17 157:14
158:12,14
165:14 169:15
175:3 192:11
202:1 209:20
210:8 211:14
217:2 225:3
228:7 236:6
242:9 245:2
258:12 265:12
284:11 304:11
316:17 335:6
341:23 348:1
**reminded**
323:20
**reminder**   312:9
315:2
**remote**   71:11
**removed**
122:18
**renewal**   43:6
91:10,12,14
96:14
**renewals**   91:8
92:18 162:4
225:1
**rep**   41:23 43:2
43:23 44:9,15
234:5
**repeat**   52:1
203:6 298:14
308:23 331:7

**repeatedly**
277:15
**repetitive**
118:10 119:5
**replacement**
311:18
**reply**   236:8
**report**   109:20
115:13 252:11
258:22 264:12
**reported**   25:19
261:21 262:19
**reporter**   2:6
3:7 10:2 11:8
11:12 12:5
13:20 24:7,9
44:5,7 104:3
109:5 116:11
157:11 170:1
209:16 250:4
276:16 355:2
**reporting**
114:3,13
117:13,21
259:1
**reports**   69:7
115:19
**represent**
59:22,23 160:9
336:21
**representative**
42:7 43:15,20
**representing**
12:23

**represents**
329:7 358:10
**request**   48:19
48:20 49:2,4
50:15,17,21
51:7,16 52:5
267:5 302:5
356:14
**requesting**
255:19 302:6
**requests**   302:2
**required**   28:20
38:1 53:5
71:16 87:18
99:3 163:6
168:18 313:21
361:13
**requirement**
28:23 47:5
**requirements**
44:22
**requires**   93:11
**requiring**
72:14
**reread**   141:17
**research**
319:19 320:12
321:7
**reservations**
341:11
**reset**   68:23
**resign**   194:17
275:17
**resigned**   26:4

**resigning**
272:18
**resolution**
237:15
**resolved**   181:4
**resources**
29:18
**respect**   50:14
58:9 112:13
114:3 262:15
**respectfully**
356:22
**respective**   2:4
**respond**   98:12
249:7 251:5
257:3 258:9
266:10 295:16
299:18 319:3
**responded**
295:16 322:15
338:21
**responding**
324:1
**responds**   271:7
299:12 318:22
**response**   83:20
175:1 197:8
225:22 237:7
268:5 290:10
290:13 292:10
294:12,15
308:11 324:8
337:17 338:5
**responsibilities**
58:5 125:4

138:19
**responsibility**
  121:5,7 125:8
  303:2,10
**responsible**
  87:23 91:8
  92:14 113:16
  132:17 151:20
  198:12 233:3
**rest**  71:15
  164:17
**result**  40:9
  177:7 238:14
  358:17
**results**  39:21
**resumé**  29:10
  29:21 37:1
  81:23 276:9
**retail**  151:18
  152:3,14
**retailer**  312:22
  334:7 343:9
**retailers**
  324:21
**retained**  3:6
  272:23
**retaliate**  253:9
  260:19
**retaliated**
  287:5
**retaliation**
  262:10
**retention**  151:5
**retire**  292:6
  293:9 296:22

**retired**  17:11
  143:10 181:8
  181:13 306:15
**retirement**
  172:7 296:14
  297:8
**retiring**  195:3
**retread**  231:1
**retreat**  189:19
  354:12
**return**  359:13
  359:17
**retype**  50:12
  89:13
**revenue**  39:1,7
  39:13,14 41:3
  41:4,7,8,14
  42:6,18 44:16
  44:20,22 45:9
  46:10,20 66:2
  120:10 121:20
  130:18 131:14
  157:5 180:16
  182:15 199:4,6
  201:8 202:18
  224:17 232:9
  232:18,20
  293:1 295:2
  304:17 307:10
**revenues**
  324:11 331:15
**reversed**  189:7
  211:19 212:4
**review**  7:11,15
  114:9,12 117:9

117:19 149:17
  161:7,17
  271:19 318:6
  359:7
**reviewed**  7:1
  16:3 115:4
  145:8,19,21
  146:3 200:10
  313:22
**reviewer**  54:1,2
  55:2
**reviews**  69:6
  117:10 138:22
  149:7 151:17
  256:13 266:14
  291:12,14
  300:13 315:9
  342:19 343:18
  346:4
**rhonda**  184:5
  185:11
**rhyme**  208:13
**right**  12:18
  13:10 19:5
  20:20 35:19,21
  37:12 40:7,10
  40:14 43:10
  45:11,18 47:7
  48:1 54:23
  62:7 64:10
  66:4 69:22
  71:9 79:10
  81:14 83:18
  88:7 90:21
  92:19 94:6,9

94:23 95:14
  96:4 98:10,16
  101:21 105:19
  107:22 108:6,7
  109:13 122:9
  126:17 130:15
  131:4,19 133:1
  133:17,19
  134:2,7,8,11,15
  137:16 139:15
  141:22 143:15
  145:23 146:4
  147:6,9 148:20
  149:14 152:9
  154:8,9 159:2
  159:18 163:20
  166:6 168:12
  168:16,17
  172:14 174:18
  175:18 179:11
  179:18 182:16
  182:17 187:21
  189:14 190:8
  190:10 192:1
  198:6,20
  199:18 201:11
  201:20 205:13
  213:18 214:1
  216:22 217:23
  218:8,9 223:14
  223:15,20
  224:3 226:22
  228:11 230:23
  235:14,20
  237:4 242:20

242:20 244:16
245:11 246:17
246:22 247:3,4
250:7 256:4
259:22 265:20
265:22 268:7
268:17 270:11
272:7,14
275:15 276:19
279:10 282:16
285:20,23
288:6 289:12
289:18 292:5
293:6 296:11
299:13 300:8
301:16 302:21
304:2 307:17
307:19 310:5,9
310:15 311:1
312:4,10
315:17 316:9
320:15 321:15
322:4,15
325:10,19
326:15 327:12
329:22 330:19
331:21 332:3,4
333:10 335:10
339:19 341:1,8
341:13 342:1
346:12,23
347:8,10 348:7
349:21 351:22
352:14,23
354:16 355:13

356:19
**risk** 295:23
**road** 128:6
132:23 133:6
175:5,6 206:17
286:13 323:8
348:21 349:1
**robertson**
346:5
**rocking** 324:4
**role** 17:8 24:14
27:19 29:16
30:4 34:11
45:20 83:2
87:10,12
101:12 102:19
103:2 119:12
122:11 126:16
126:19 132:2,5
134:17 139:22
144:1 151:2
152:21 161:22
162:8 167:10
196:12 212:12
287:22 288:3
**roles** 63:12,16
84:16 124:10
**ron** 31:15
35:22 248:20
258:22 259:1
266:22
**room** 187:23
189:3
**rooms** 187:17
188:2

**ross** 346:5
**rough** 89:4,5
**roughly** 139:6
139:7 153:13
166:21 183:23
**rplu** 155:13
240:11
**rpr** 358:20
**rsui** 354:23
**rsui's** 355:15
**ruin** 324:20
**rule** 70:14
285:10
**rules** 2:23 10:5
13:14 356:15
357:5
**run** 93:13,22
102:12 172:20
172:21 229:9
292:7 302:2
**running** 237:1
**runs** 93:10
302:7
**russell** 212:8
214:6,7
**rusty** 116:7
128:7 131:16
131:17 132:4
140:14 145:6
172:2 180:20
180:22 183:9
191:12 192:8
196:5 212:6,14
235:10 239:22
239:22 241:2

241:13,16,18
241:22 244:2
249:2 257:10
278:13 285:16
285:17 300:22
305:1 311:4
317:23 324:17
342:4 350:2
354:18
**rusty's** 157:4,9
164:18 180:17
183:8

**s**

**s** 2:1,1 4:1 6:9
61:16 225:10
360:3
**safe** 58:2
**sailing** 292:5
**salaries** 252:8
**salary** 66:15
67:5 100:6
101:20 102:1
121:13 182:15
182:17 232:12
253:3
**sales** 65:1 67:9
118:12 119:6,9
119:23 151:4
207:20
**sami** 16:17
**san** 225:23
**sanders** 154:6
246:20 327:12
327:16 331:3
332:2

**sarah** 16:23
229:8 241:18
241:19 242:2
311:17 317:10
317:11 319:10
325:11,23
338:16
**sarbanes** 24:21
**sat** 81:3 99:4
201:16 242:15
**saw** 29:9 85:19
90:11 102:11
126:20 128:16
128:19 129:19
130:1 138:6
205:1,12
206:10 234:4
240:4 320:14
**saxon** 149:21
**saxon's** 296:10
**saying** 83:9
84:11 101:18
140:8 144:18
147:11 152:15
158:14 175:3
188:5 190:15
191:21 194:2
195:5 208:8
244:22 248:19
260:5 298:10
298:15 306:19
315:14 318:1
331:9 332:6
335:17 336:15
337:2,11,12,15

341:11 355:8
**says** 51:4 59:4
63:19 64:4,10
68:23 112:15
150:23 153:19
155:10 161:21
215:10 216:16
269:22 270:19
271:15 273:4
277:15 282:22
290:13,22
291:20 294:19
296:14 297:13
298:23 299:12
305:10,17
307:20 311:3
317:21 318:5,6
323:23 326:4
340:3,5 342:6
343:6 346:16
348:20
**schedule** 216:8
**scheduled**
218:6 352:22
**scholarship**
21:6
**scholarships**
21:2,12
**school** 31:17
35:12,13,15
224:8 355:9
**schools** 21:10
224:9,14 320:2
**scott** 23:3
214:12,13

317:22 318:6,9
318:10
**screenshot**
303:15 325:20
325:22 335:20
336:14 337:14
**seal** 6:23 8:11
9:20 72:8,14
72:17,21 111:8
111:12 328:8
**searching** 58:4
**seat** 83:11
**second** 55:19
56:21 152:1
176:16 203:12
213:10 277:5
282:20 314:12
350:6
**secretarial**
173:21,23
174:15 246:16
**secretary**
173:12 246:12
**securedesk**
37:20 53:4
**see** 13:9 50:1
63:2,13 68:13
90:7 94:19
95:10,23 113:6
124:6,6 131:13
140:14 164:12
200:9 207:22
213:16 215:10
226:23 227:2,8
240:6 248:21

266:3 269:22
270:20 286:10
290:15 291:2
292:7 304:15
310:7 318:6
323:5 328:21
354:1
**seek** 28:7
**seeking** 94:13
178:15
**seem** 230:16
**seemed** 70:2,5
71:2 102:7
233:19
**seems** 251:9
297:16
**seen** 63:20
130:10 146:6
148:2 155:6
198:16 267:16
267:18 304:12
334:12,15
**segrest** 98:8
139:9 146:8
171:2,16
173:22 174:17
174:22 181:18
186:4 191:17
197:2 199:1
305:21 322:20
325:9,15 340:2
**segrest's**
246:16
**select** 348:3

**sell**  24:4 60:19
**selling**  65:10
  295:20
**sells**  39:20 40:8
**seminar**  355:15
**send**  29:10 37:1
  49:9,13 50:11
  50:13 71:6,7
  91:18 92:5,7
  95:7,21 96:2
  97:12 125:9
  137:12 163:14
  167:8 169:17
  174:1 186:4
  220:4,6,7
  226:4 229:16
  267:5,6 268:7
  268:8 270:1
  290:14 348:5
**sending**  88:14
  90:2 91:11
  174:22 175:8
  221:2 228:17
  301:6,13
**sends**  341:10
**senior**  27:20
  38:17 41:16
  46:1,6,12
  54:10,11,21
  57:19 58:8
  104:7 143:19
  229:11 294:22
  312:2 346:18
**sense**  257:14
  264:1 273:17

336:12
**sent**  29:21 92:2
  96:15 128:5
  132:22 169:16
  169:18 210:1
  214:11 226:18
  227:15,15,19
  236:17 245:18
  254:21 256:9
  256:19 266:2
  269:19 272:17
  273:12,20
  275:1 281:18
  301:19 309:20
  312:7 315:3
  325:21,23
  326:3 336:13
  337:4,13 349:2
  359:14
**sentence**  152:1
**september**
  255:3 256:9,19
  266:2 270:5,18
  271:10 290:12
  305:3 352:9,17
  353:19
**series**  315:19
**serious**  311:9
**service**  43:14
  228:23 312:13
**services**  1:14
  10:22 24:5
  206:6 359:4
  360:1 361:1

**servicing**
  304:21
**set**  12:14 40:6
  43:4 46:5 55:8
  117:20 123:17
  180:14 189:9
  211:12 216:19
  218:22 252:7
**setting**  216:13
**seven**  37:15
  184:3,7,11
  185:7 355:17
  355:22 356:13
  356:16 357:6
  357:15
**several**  31:16
  50:7 53:17
  67:7 103:16
  118:9 119:7
  206:20 328:19
  343:4 347:14
  354:20
**severance**
  255:13 267:5
  268:4
**sex**  289:17
**sexual**  230:19
**shakes**  24:6
  322:1
**share**  279:13
  305:1
**shared**  279:15
**sharing**  303:1
**sheet**  137:14
  276:15 333:2

359:11
**shifted**  304:4
  306:16,21
  327:15 332:10
  333:22 335:23
  336:2,6,8,10,16
  337:7,10,18
  338:6
**shifting**  110:17
  110:19 322:21
**ship**  292:4
**shit**  291:22
  292:7 302:10
**short**  102:10
**show**  62:6
  112:22 116:21
  160:3 249:12
  303:18 336:19
  342:1 344:7,11
**showed**  213:22
  227:9,14 285:1
**showing**  56:13
  62:8 68:6 72:3
  111:19 137:16
  149:3 150:15
  161:5 211:14
  212:16 249:21
  254:18 256:6
  265:22 269:10
  272:15 276:20
  285:6 288:7
  289:4 317:6
  328:2 339:22
  340:20 343:1
  345:18 347:11

**[showing - sound]**                                                    Page 55

348:7 349:21
351:3,22
352:14 353:15
354:16
**shows**  344:17
**shred**  53:8,9
**sic**  225:10
**side**  50:16 63:4
65:1,12,16
66:20,22 67:10
68:3 69:20
70:9,20 78:3
78:10 79:4,8
90:18 100:19
102:7,11,22
103:4 115:1,5
161:3 210:19
211:20 310:9
310:11,16
**sides**  14:15
**sigh**  230:13
**sign**  12:9 62:16
112:7,17
144:16,20
147:18 161:17
313:21 359:12
**signature**  56:22
57:4 62:13,14
68:12 113:10
149:9 209:22
210:12 277:5
358:19
**signed**  64:5,6
68:19 112:15
113:19 114:7

145:4 148:20
149:12,17,23
277:4 359:20
**significance**
44:14
**single**  274:4
317:23
**sister**  34:20
**sit**  71:17 108:5
178:1 194:21
228:8 281:5
**site**  23:23 209:5
**sitting**  13:5
83:11 174:3
175:7 213:3
**situation**
180:20 237:15
239:14 258:7
326:16
**six**  184:5
**sixth**  2:9 5:7
10:9 11:5
**size**  38:19
232:22,23
235:3
**sizes**  235:5
**skills**  162:16
**sloneker**
203:20 283:15
291:11
**sloneker's**
283:21
**slowly**  304:22
**small**  21:4
135:15 185:3

231:5,13 304:7
326:2
**smaller**  235:12
**smallest**  183:7
183:19 184:13
**smith**  108:10
109:14 165:17
259:15 346:6
**snapchat**  19:19
227:4
**social**  33:16
216:13 312:12
**sold**  47:20
238:19 339:2
**solicit**  127:18
**solicitation**
91:11
**solutions**
359:23
**somebody**
22:10 49:23
67:3 78:17
80:6,13 85:2
86:11 96:21
108:22 120:21
125:8 137:12
176:3 205:1
229:16 251:20
297:2 346:21
**somebody's**
285:12
**somerby**
229:11 352:4
**somewhat**
130:17 279:4

**son**  35:3
**soon**  84:4
**sorry**  16:18
27:10 30:9
36:12 39:14
43:18 52:20
79:19 89:22
93:2 99:15
104:3 105:12
107:20 115:17
116:11 135:13
136:3 170:1
179:7 183:10
183:13 195:23
203:3,5 209:16
219:23 225:12
225:21 226:12
244:8 245:13
250:4 256:16
270:6 290:20
292:12 295:9
312:15 322:16
328:11 349:9
351:11,13
354:7
**sort**  34:10 61:3
81:23 84:10
85:10 94:16
121:19 123:21
212:11 254:4
254:14 309:8
309:12
**sound**  211:23
292:11

**[south - street]** Page 56

south  4:7
southern  1:3
  11:3 20:22
  21:10,23
space  211:1
  212:21
speak  285:7
speaks  177:12
specialize
  164:8
specialized
  105:8
specific  60:12
  84:7 88:20
  97:14 105:1
  123:18 137:7
  166:22 207:17
  281:2 331:20
specifically
  69:11 87:9
  111:7 113:23
  122:23 123:14
  126:10 129:23
  131:11 139:23
  156:18 170:23
  236:7 238:13
  280:1 297:7
  303:14 307:14
  328:5 350:19
specifics  101:2
spell  61:15
  225:7,8
spend  13:13
  55:6 164:19
  189:10 229:14

spending  130:4
spent  86:8
split  90:10
  200:4 322:14
  334:7,7
splits  153:7
  331:16
spoke  16:21
  19:6 37:3
  261:1 275:12
spoken  17:21
spot  31:1 41:22
  42:3,3,6,7 43:9
  43:14 294:17
spreadsheet
  8:9 334:1,4
spreadsheets
  328:4
staff  21:19 22:1
  23:9
stage  91:6
stamped
  317:21 319:16
standard  89:16
  210:1 304:11
stands  155:18
start  51:10
  134:21 175:15
  185:3 251:10
  274:18 276:2
  291:5 315:20
started  17:9
  28:17 30:6
  32:7 34:4
  35:20 36:14

48:16 99:1
114:23 127:23
133:14 138:9
141:1 144:2,11
155:22 156:8
156:11 161:1
164:9 166:13
166:15,20
193:20 194:7
200:13,22
224:10 229:9
244:18 248:4
250:13 278:10
292:17 301:22
starting  69:5
  118:13 135:2
  160:21 161:23
  171:23 200:15
  222:18 276:11
  291:18
starts  48:17
  345:20 349:23
  350:1 353:19
state  2:7 10:2
  12:11 263:22
  265:11 267:20
  358:2,22
statement
  113:11 151:8
  162:5 251:6
statements
  22:8,15
states  1:1 11:1
  57:20 160:17

status  275:6
stay  86:21
  164:16,20,21
  165:5,7,8,10,16
  165:22,23
  307:6
stayed  164:23
  165:17 166:3
  250:10 293:22
stefani  13:6
  116:10,13,14
  256:9 271:18
  271:19 272:17
stenographic
  358:6
step  129:15
stipulated  2:2
  2:13
stipulation
  10:6
stipulations
  12:7
stomach
  300:23
stood  328:21
stop  299:1
  356:15
stopped  52:22
  111:14 280:11
stopping
  265:19
straight  110:10
strange  16:17
street  4:7 28:3

**strengths**  57:11
  57:11 63:3,7
**strictly**  105:5
**strike**  115:17
  171:7
**structure**  38:15
  38:16 183:20
**struggling**
  264:18 293:3
**stuff**  48:14
  87:16 97:11
  99:4 173:15
  212:14 220:6
  223:2 227:12
  304:4 330:11
  330:12,15
  335:22 336:1,6
  336:8,16 337:6
  337:10,18
**subject**  147:5
  352:3
**submission**
  43:5 93:8 94:5
  95:3 96:2
  137:11 312:22
**submissions**
  42:20 92:23
  93:4,5
**submit**  68:8
  81:22 113:1
  150:17 297:15
**subscribed**
  361:14
**subsequent**
  275:18,20

276:3
**substance**
  13:17
**succeeding**
  292:16
**successful**
  85:21 102:7,8
  102:11,15
**sucks**  292:1
  299:13
**sue**  296:21
**suggested**
  133:5 196:20
**suggesting**
  296:4,20
  315:12 335:8
**suggestion**
  315:15
**suit**  20:5
  295:15
**suite**  2:10 4:7
  4:13 5:7 10:9
**sullivan**  16:23
**summary**  57:20
  63:19 68:22
  112:1
**summit**  350:4
**super**  324:12
  325:5
**supervise**  54:20
**supervision**
  358:9
**supervisor**
  25:14,17
  115:21

**supervisors**
  25:18 115:14
**support**  14:18
  80:20 120:10
  182:15 295:4
  348:23
**suppose**  344:20
**supposed**  127:6
  162:2 195:1
  221:9 234:13
  305:18
**sure**  41:11
  47:20 48:19
  53:7 80:14
  87:2,16,21
  88:1,12 92:15
  109:18 110:8
  111:9 115:2
  124:20 127:2
  128:14 132:16
  133:23 134:3
  142:6 152:1,7
  156:16 158:8
  166:5 167:1,22
  169:11 186:16
  192:3 199:8
  205:3,3,5
  206:18 209:3
  214:15 217:17
  219:4,15
  220:15 221:18
  221:19 230:22
  235:21 239:13
  241:23 250:11
  251:16 255:11

258:5,8 260:3
  260:22 263:10
  293:20 297:10
  302:9 316:13
  316:22 320:20
  321:3,9,20
  323:19 325:6
  325:12 330:22
  331:6,13 336:4
  339:5 340:18
  341:22 342:8
**surprised**  37:7
  132:1
**susan**  143:3,4
  143:17 183:21
  184:3 185:6
  191:11 193:3
  193:11 195:2,2
  195:13,17
  196:2,15
  203:20 226:13
  283:14 291:23
  292:6,14 293:9
  293:10,11,18
  294:9 295:8,10
  299:2,3 305:1
  338:17 341:19
**sutton**  99:10
  233:7
**swear**  11:12
**swett**  61:13,15
  61:18,20
**swiftly**  357:4
**switch**  308:3

switched  52:20
  281:12
sworn  12:2
  361:14
sylacauga
  187:3
system  37:19
  38:18 39:1,5
  39:11 42:13
  43:4 46:10
  47:10,11,22
  50:13 53:1
  99:2 130:18
  131:1,2,6,11
  174:2 175:1
  176:11 180:14
systems  63:5

**t**

t  2:1,1 6:9
  61:16,16 225:9
  225:9,13,13
  358:1,1 360:3
  360:3
tab  42:18
tabs  208:9
take  14:21
  16:19 18:11,17
  56:4,6 63:12
  63:16 88:15,23
  88:23 90:23
  91:4 110:13,20
  114:8 122:13
  129:15 136:11
  156:5 175:15
  176:10 217:15

243:6,8,20
244:1 246:19
247:20 257:7
268:21 303:5,6
316:20 320:11
taken  2:5 3:3
  53:9 56:10
  98:20 111:2
  159:23 217:20
  261:17 264:9
  266:22 268:13
  272:11 273:23
  317:2 356:9
  358:5
talk  13:15 17:1
  20:3 34:21
  51:10 78:13
  79:23 80:7
  84:19,21 87:6
  122:21 150:2
  211:18 217:12
  218:2 227:12
  237:17 246:6
  248:20 257:15
  257:21,23
  258:10,15,16
  261:19 262:17
  263:17,19
  264:16 265:4,5
  265:6 269:1
  273:17 274:8
  274:10,13
  282:7 286:2
  293:23 297:2
  316:11,14

317:23 322:5
326:23 327:2
talked  16:9
  18:23 65:3
  78:7 80:8 81:4
  85:12,13 87:9
  88:7 119:4
  149:15 167:4
  167:15 170:20
  171:15 180:22
  181:17,18
  186:19 218:5
  222:22 246:4
  247:13,17
  248:20 254:9
  281:1 283:6
  311:2
talking  17:22
  17:23 47:8
  58:9 78:12
  81:5 83:6 98:8
  102:15 118:17
  133:17 149:1
  152:18 170:22
  172:11 179:21
  180:20 183:11
  185:7 186:5
  191:19 197:1
  218:2 226:20
  242:17 245:14
  258:3,6 277:19
  291:10 294:8
  298:17 318:9
  322:8 331:19
  346:10 353:4

talsma  99:12
  221:1 222:3,21
  233:7
target  90:19
tasks  299:16
tax  22:4
taxes  37:19
tay  347:13
taylor's  203:8,9
tdc  105:5,9
  236:17 342:5
  342:11,16
  350:6,16
  354:11
tdcsu  350:3
teach  311:5
team  37:22
  38:5,9,10,12
  41:18,18,19,21
  43:11 46:8
  51:3,21 52:5
  60:17 78:17
  80:2 81:14
  83:6,21,22
  84:3,17 85:2
  86:2 89:9
  96:13,16 98:14
  99:1 100:1
  101:7 106:14
  106:15 120:5
  129:7 130:7,8
  141:1 143:22
  151:2 153:16
  157:3,4,7,9,15
  157:17,20

**[team - thank]**                                                                          Page 59

160:19,20
169:20 182:11
182:22 183:5,7
183:8,9,19,19
183:22 184:1,2
184:14 185:6
185:18 192:9
193:12,14
195:14 196:6,8
196:13,17,21
203:7,8,10
210:23 214:18
223:10 231:14
232:7 235:19
238:6 240:15
243:16 253:18
279:9,14 283:3
283:17,21
292:20 293:2
295:4 306:12
308:3 311:5
318:7 327:6
329:2 334:2
340:10,11,12
340:17
**teamlindberg**
292:17
**teams**   4:17
12:13 37:18
38:7,19 46:5,6
46:7 50:9
70:16 86:3,9
86:14,17,18
90:18 96:16
123:16 130:9

182:20 198:1
235:1,3,4,18
238:3 244:2,6
279:4 336:19
**tell**   14:1,3,9
36:3,8,21
37:12 58:13,14
61:6 62:9
84:15 90:9
118:16 119:8
120:21 124:19
133:6 137:6
142:17 155:3
158:10 177:10
181:3 183:4,5
185:1 186:12
193:4,9 202:4
208:7 209:21
215:20 217:6
222:9 230:6
236:2,4,19
238:23 240:23
253:23 259:16
260:5 261:21
262:18 280:12
287:10 294:13
310:6 317:11
318:5,18
321:16 322:7
324:18 327:8
332:20 345:13
**telling**   101:2
244:21 314:23
317:18 354:21

**tells**   342:5
**template**   210:4
**term**   69:1
102:10
**terminology**
45:22
**terms**   48:22
49:16 66:15
146:10 169:12
183:19 189:8
302:12
**test**   59:17
156:3
**testified**   12:3
191:16 203:4
289:13
**testimony**   1:19
3:3 36:7 40:19
63:23 64:14
90:16 111:11
137:23 147:2
154:12 171:15
172:18 178:6
192:6 202:9
213:14 215:14
220:16 230:23
252:20,23
274:2 288:16
309:8 314:11
314:13 320:2
328:16 329:23
335:18 339:7
352:21 359:9
359:18 361:8

**texas**   81:8
**text**   7:18 8:7,8
19:11,15 227:3
227:5 248:18
249:15,16,18
249:20 254:12
267:12,13,16
289:8 290:5,5
290:7,11,13,21
291:11,19
294:1 295:11
296:13 297:12
298:22 300:10
300:18,20
301:7,18 304:3
305:9 307:20
308:4,10
309:20 310:1,4
310:8,10 311:2
312:6 313:3
315:19 317:7
317:10,19
319:14 322:5
335:11,15
336:14 338:3
338:10,13
**texted**   267:2
296:10 335:19
**texting**   297:22
298:7 300:16
**texts**   19:19
290:7
**thank**   12:5 24:9
44:7 56:16
107:21 110:22

| | | | |
|---|---|---|---|
| 125:11 271:15 | **think**   17:12 | 166:8 167:5 | 286:5 288:15 |
| 354:7 | 19:12,13 21:7 | 169:23 170:2,5 | 288:20 290:14 |
| **thanks**   116:18 | 21:11 26:19 | 172:2,4 174:18 | 290:23 295:3 |
| **thanksgiving** | 28:12,14,23 | 175:9 176:8,15 | 296:1,16,23,23 |
| 348:21 | 29:4,22 31:20 | 178:11 179:13 | 297:20 298:10 |
| **thereto**   2:21 | 31:23 33:1,10 | 179:23 181:8 | 304:16 305:10 |
| **thing**   14:11 | 34:7 35:13 | 181:22,23 | 305:17 306:2,5 |
| 29:20 30:11 | 40:11 45:13 | 182:17,18 | 311:9 315:6 |
| 46:2 61:12 | 46:15 47:4,16 | 183:2,8,9 | 319:6 320:4,13 |
| 80:22 83:14 | 59:12 61:16 | 184:3 185:5,16 | 320:22 324:5 |
| 93:3 136:5,15 | 69:5,13 79:19 | 187:3 188:1 | 324:14 326:16 |
| 144:14 164:3 | 82:6 86:19 | 189:17 192:6 | 327:4,9 328:18 |
| 173:18 214:23 | 91:14 96:8,9 | 193:16,16,17 | 329:16 334:10 |
| 251:9 276:11 | 97:17 98:16 | 193:19 196:3 | 335:6 339:11 |
| 292:9 295:14 | 99:20 100:3,3 | 197:11 199:18 | 344:5,5 347:2 |
| 352:3 | 100:20 103:8 | 199:23 200:16 | 347:22 348:19 |
| **things**   22:3 | 107:2,23 | 202:14 207:7 | 349:6 350:12 |
| 46:2,4 48:4 | 108:13,19 | 208:18,20 | 350:12 352:12 |
| 57:13 90:1 | 109:13 110:19 | 211:15 217:10 | 352:20 354:6 |
| 92:10 102:21 | 116:10,16 | 218:21 222:16 | 356:23 357:4 |
| 118:9 119:4 | 120:1,12 | 223:7,22 225:2 | **thinking** |
| 122:7 124:7 | 124:16 125:11 | 225:9,11,18,20 | 102:19 121:21 |
| 125:6,18 130:2 | 125:13 126:11 | 226:16 227:8 | 123:13 139:13 |
| 135:14 170:17 | 126:11 132:21 | 227:18 229:8 | 139:16 151:11 |
| 175:5 176:13 | 136:15 137:8 | 235:2 236:15 | 158:6 186:10 |
| 181:2 219:17 | 139:2,17 140:1 | 237:2 238:9,10 | 196:11 255:16 |
| 220:23 224:13 | 140:15 143:13 | 238:16 240:9 | 268:12,12 |
| 228:16 230:16 | 144:21 145:4 | 241:3 242:3 | 294:14 334:5 |
| 230:18 259:5 | 145:19 146:14 | 249:16 251:12 | **thinks**   305:13 |
| 264:1,10,11,23 | 147:7,16 148:1 | 252:18 255:10 | 319:18 |
| 276:5 281:22 | 151:15 152:16 | 257:4 259:15 | **third**   4:13 |
| 290:14 292:2 | 153:14 154:19 | 262:3,13,21 | 176:16 203:12 |
| 297:15 302:1,1 | 156:2,8,10 | 266:15 269:23 | **tho**   291:22 |
| 316:12 323:12 | 163:20 164:2 | 270:21 275:14 | **thought**   36:12 |
| 349:12 | 164:23 165:13 | 284:9 285:6,23 | 46:18 64:1,14 |

**[thought - time]**

66:18 69:21
78:11 79:5
80:19 100:23
118:14,14,15
118:21 119:17
129:19 130:20
133:21 134:3,9
135:4,6,19
136:23 138:6
147:17 148:9
152:9 153:22
153:23 155:6
167:20 178:8
182:7 187:9
191:23 194:3
195:16 197:5
218:21 220:11
226:11 230:15
231:22 234:13
236:10 237:14
247:16 251:13
251:23 252:6
253:12 254:1
265:12 276:6
286:18 288:4
288:17,23
293:14,17
297:4 322:9
326:5 327:18
330:6 335:16
356:5
**thoughts** 80:5
**three** 59:16
65:13,17 91:5
91:15 98:22

141:2 145:9
171:20 172:10
172:10 182:21
207:3 247:10
306:12 356:1
**threshold**
46:22
**throwing** 291:1
**thumb** 285:11
**thursday** 326:4
326:8
**tied** 40:18,20
40:22 60:11,12
131:7,10 232:9
232:22 234:19
235:19
**tiff** 154:6
**tiffany** 153:15
154:6 211:5
224:15,20
286:2,7 307:8
320:4 322:13
322:21,22
323:13 324:4
327:11 329:2
329:21 330:2,9
330:11,14
331:9 332:7
333:9,13
336:20 340:13
**tiffany's** 286:14
329:6
**tight** 194:21
**tim** 23:3

**time** 2:19,20
13:13 14:21
16:19 17:23
18:16 19:6
24:17 30:16
31:10 34:3,9
35:8,19 36:8
36:11 47:3
61:12 68:3
72:1 80:15
82:23 84:17
88:17 102:18
103:1 105:3
106:18 110:19
112:6,6 114:8
114:11 118:21
119:17,22
120:7,16 130:4
131:23 133:3
133:13,16
134:1,23 137:1
138:13 142:1
142:18 143:2
145:7 150:6,9
150:10 151:13
157:15 158:2
165:1,14,14
167:11,15
168:9,22
172:11 175:9
176:8 183:16
185:18 188:3
188:23 189:2
191:5,6 195:15
196:11 197:11

202:1,15 204:4
207:6 211:2
212:21 217:15
219:7,12
222:17 223:11
223:13,18
224:1,4 226:9
227:10 229:14
232:13 234:2
237:21 242:12
242:14 244:15
245:20 248:3
249:3 250:8
251:15 254:11
255:6 258:4
262:2 263:23
269:8 273:1
274:22 275:19
275:23 277:8
279:17 283:19
283:22 286:15
291:7 301:6
307:2 308:12
308:17 309:3
309:17,20
311:7 313:12
316:20 317:21
319:1,15
320:18,23
323:3 324:18
325:6 329:14
330:3 333:2,4
349:6,14
353:11 355:17
356:5 358:13

359:19

**timeframe**
359:8

**timeline**  84:11
193:18

**timely**  58:6

**times**  53:17
71:4 97:2
98:22 105:1
112:18 119:7
178:20 186:7
207:3 229:21
247:10 280:21
280:23 303:11

**timing**  152:8

**tip**  279:12

**title**  29:19
30:20 34:2
53:14,21 54:1
54:5,12 137:20
172:13 185:16
210:11,14
214:15 219:9
220:22 224:7
318:15

**titles**  54:8

**today**  13:2 14:3
14:23 16:9
17:3 18:1,16
228:9 249:17
281:1,5 352:22

**today's**  338:23

**together**  61:23
62:3 104:10
169:9 184:11

**told**  17:2 26:14
29:8 54:6
79:21 80:14
84:4 108:22,23
121:9 126:15
128:8 130:6
134:23 147:3
156:18 158:2
171:17 174:8
176:2,21 177:1
182:2 189:6
191:2,11,14,22
193:3,23,23
196:4 197:2
204:2 211:18
218:9 220:10
230:17 231:2
239:3,5,23
240:10 241:20
241:21 242:2
248:15 252:8
253:19 258:21
259:3,15
262:10 267:15
274:4 278:13
280:22 282:22
282:23 283:8
283:14 285:17
285:18 293:8
296:2 305:8
316:17 339:16

**tom**  31:14 32:3

**tomorrow**
290:15 340:6

**took**  98:23
147:17 148:11
156:1 215:8
218:1 226:2,17
230:13 243:5
257:7 268:15
348:12

**top**  59:5 188:3
291:19 296:9
303:15 317:20
328:10 338:13
352:6

**totally**  292:11
292:12 311:9

**towards**  70:16
119:11 317:20

**towles**  351:6,17

**town**  71:13

**tracy**  284:17
285:21 352:20
352:23 353:4,7

**train**  291:7

**trained**  22:23
83:3 98:18
99:7 244:17

**trainer**  17:11

**trainers**  98:21

**training**  19:22
23:5,8 55:17
98:20 297:17

**transaction**
325:2

**transcript**  3:2
9:19 48:23
358:7,11 359:6

359:20 361:5,8

**transfer**  238:3
240:14

**transferred**
146:17 157:5
180:13 293:7
329:21 330:1

**transferring**
160:18

**transition**
144:14

**translate**  232:1

**translated**
232:3

**travel**  55:5
178:10,12,13
178:19,22
206:15 284:4
286:11 349:8
349:11

**traveled**  55:22
178:6,7 179:4
180:2 284:7

**traveling**  55:6
178:15 207:21

**treated**  26:17
26:20 163:1,4
311:6

**treating**  246:11

**tredway**  78:8
81:5,8 83:16

**tredway's**
83:19

**trey**  184:15
243:15 244:10

244:20 245:4
347:13
**trial** 2:19
**triangle** 319:19
320:12 321:7
**tried** 91:14
180:19 211:21
287:21 340:15
**tries** 167:8
**trigg** 318:10
**trip** 164:13,17
206:23 248:13
284:6 345:8
348:12
**trips** 207:11,15
236:8 284:13
**trouble** 262:1,7
263:4 264:1
**true** 279:3
358:11 361:8
**truist** 1:14,15
10:22,23 12:15
12:23 15:1
**truitt** 203:8
235:10 311:6
**truitt's** 240:14
308:3
**trusted** 155:5
**truth** 14:1,3,9
**try** 85:9 101:23
133:8 214:3,4
276:9 303:18
**trying** 31:20
41:5 67:2,6
120:20 124:11

125:13 129:22
136:21 147:20
148:7 160:7
185:3 189:10
208:9 218:12
228:1 250:22
253:6 262:5,22
276:4 279:8
288:22 292:4
296:16 303:11
314:15 319:21
320:14 323:4
328:21 330:23
332:8 333:1
337:9 349:13
**tuesday** 343:8
**turf** 285:7
**turkey** 227:18
**turn** 270:7
336:10
**turned** 140:9
140:10
**twice** 260:2
**two** 13:16 46:2
46:3 65:12,17
71:16 81:16
89:1,3 91:5,14
98:22 99:6,7
108:12 110:2
155:23 182:21
199:13 200:16
234:16 248:19
249:19 282:23
284:6 286:16
319:20 336:22

340:18
**tyler** 156:23
157:1,2 167:6
167:7,11 171:1
171:6,9 172:1
179:12 180:1
180:16 198:14
201:5 324:19
**tyler's** 171:8
**type** 22:21
23:18 34:11
101:3 171:22
182:3 212:12
229:23 295:15
296:5 297:1
**typed** 50:5
87:18
**types** 104:14,15
**typically** 97:15
**typing** 123:11
229:20 230:2
**typo** 162:2

**u**

**u** 2:1
**ugly** 301:1,4
**uh** 18:5 25:8
27:12 31:5,20
40:15 42:8
43:16 47:23
52:15,18 57:9
79:9 81:9,18
89:6,20 94:22
95:9,13 99:11
99:13 105:10
105:18 132:6

136:1,9 141:9
143:2,5 179:5
179:17 184:12
190:19 195:10
195:21 198:19
200:8 202:22
213:23 225:17
227:2 235:13
240:20 253:20
265:2 267:10
271:12 341:7
346:13 350:22
**unable** 257:21
**unaware** 155:7
**unconscious**
164:11
**under** 6:23
8:11 9:19
13:20 34:19
39:1,13 42:18
68:22 72:8,14
72:17,21 111:8
111:12 130:18
150:22 189:7
234:10 283:23
306:17 308:7
308:13 309:16
310:22 326:11
328:8 358:8
**underneath**
296:14
**understand**
14:2,7 15:9
41:11 56:17
90:15 113:16

115:12,19
116:3 124:21
125:13 146:21
162:10 171:14
208:14 232:8
232:21 243:19
249:14 254:7
264:19 280:10
287:6 289:8
300:9 314:8,10
317:9 331:23
**understanding**
14:16 41:6
44:18 82:17
103:1 110:1
111:23 124:17
127:13,21
130:23 131:8
134:5 136:7
202:17 220:2
220:15 255:13
**understands**
305:11
**understood**
15:14 128:15
132:6 162:13
202:20 220:8
234:11 241:23
252:22 253:2
335:17,23
**undertaking**
156:4
**underwriter**
105:9 155:19
168:6,8 187:6

236:23 279:18
317:14 318:2
318:12,16,20
339:21 341:6
342:17 346:7
347:22
**underwriters**
95:9,22 106:4
165:3 168:3,13
344:23 345:1
**underwriting**
319:11
**unhappy**
216:14
**unidentified**
260:7
**unit**  10:19
**united**  1:1 11:1
**untouchable**
338:22 339:17
**unusual**  14:19
**up's**  27:3
**uploaded**  50:3
**uploading**
52:17
**upsetting**
326:12,18
**use**  14:18 48:12
110:15 121:21
280:3 282:3
**used**  23:17
173:11 199:15
277:17 278:8
279:23 280:6
281:13 299:6

299:10 359:20
**using**  63:6
163:14 186:4
278:14 280:11
348:5
**usual**  12:6
**usually**  46:5
48:17 92:2,17
93:9 190:11
206:4
**utilize**  129:6

| **v** |

**v**  1:12 5:3
10:22 359:4
360:1 361:1
**vagina**  299:20
300:2,6
**value**  125:2
292:3 325:1
**vandalyn**  184:4
185:11 240:9
241:16
**varied**  38:19
178:23 179:1
**various**  95:8
112:2 344:19
**verbal**  51:7,11
82:4 99:22
**verify**  359:9
**veritext**  11:9
359:14,23
**veritext.com**
359:15
**vernacular**
136:17

**version**  249:19
**versions**  249:19
**versus**  126:18
129:18 191:3
**vestavia**  31:17
**veteran**  223:9
**videographer**
5:17 10:17
11:8 56:8,11
110:23 111:3
159:21 160:1
217:18,21
272:9,12
316:23 317:3
355:21 356:7
356:10 357:18
**videorecorded**
10:20
**videotaped**
1:19
**viewed**  81:21
**visit**  23:22
173:19 206:15
207:2,5 284:13
286:3 351:16
**visits**  23:20
279:18
**volunteered**
320:11

| **w** |

**w**  61:16
**wait**  194:2
228:19 276:18
**waited**  247:9

**[waiting - went]** Page 65

| | | | |
|---|---|---|---|
| **waiting** 172:7 | 263:17,19 | 311:8 319:14 | 205:2 208:4,22 |
| 175:14 251:2 | 264:15 265:5,6 | 327:1 352:5 | 209:13 |
| 251:19 291:4 | 277:12 283:20 | 354:13 | **websites** 94:2 |
| **want** 13:15 | 286:19,19 | **wanting** 148:14 | **week** 55:4 |
| 14:11 24:13 | 287:1,2 288:9 | 218:20 219:6 | 178:20 319:18 |
| 49:5 51:4 | 291:22 301:17 | 307:21 311:4 | 326:5 338:18 |
| 55:21 56:5 | 303:14 307:10 | **wants** 338:22 | **weekly** 173:18 |
| 64:8 65:15 | 307:15 312:6 | **wasting** 130:4 | **weeks** 81:2 |
| 67:21 68:21 | 313:2 317:17 | **watch** 237:12 | 194:21 247:11 |
| 72:9 79:15 | 322:4,12 | **watched** 86:3 | 248:7 258:17 |
| 80:4 81:13 | 323:12 324:19 | **way** 36:4 41:13 | **welcome** 304:5 |
| 86:21 90:7 | 325:20 331:5 | 111:9 118:7 | **went** 31:17 |
| 100:1 110:8,13 | 338:12 348:22 | 137:5 140:12 | 34:23 53:22 |
| 110:16 112:5 | 354:12 | 183:5 218:13 | 55:23 61:8,9 |
| 113:23 114:6 | **wanted** 12:11 | 219:10,14,16 | 78:15 79:23 |
| 119:20 124:20 | 58:14 64:18 | 223:1 248:22 | 81:3 118:7 |
| 128:13 132:16 | 65:1,6,8,9,11 | 252:7 274:18 | 134:22 139:11 |
| 133:8 134:2 | 69:19 71:12 | 283:18 291:5 | 157:8 158:4 |
| 136:14 159:3,6 | 78:10 79:4 | 292:22 293:3,5 | 164:13,17 |
| 159:9,20 | 96:2 111:8 | 293:9 303:12 | 174:7,20 |
| 161:19 165:1 | 129:13 130:13 | 328:1 | 175:10 176:17 |
| 165:11 169:10 | 133:9,23 160:7 | **ways** 50:7 58:4 | 177:4 189:23 |
| 177:2,11 | 178:14 191:2 | 135:11 163:3 | 190:12,13,14 |
| 187:10 191:8 | 192:9 203:16 | 163:23 185:22 | 190:23 191:12 |
| 192:3 193:6,11 | 204:21 209:10 | 255:17 | 194:15 196:5 |
| 196:5,7 197:11 | 209:13 220:10 | **we've** 12:21 | 201:8 203:13 |
| 204:9 210:14 | 220:12 221:22 | 88:6 110:12 | 207:10,11 |
| 215:17 217:11 | 222:9 230:19 | 111:10 160:6 | 211:17 213:21 |
| 220:15 221:18 | 230:20 248:20 | 181:18 265:17 | 216:9 220:7 |
| 222:14 230:22 | 255:7 261:13 | 269:20 274:19 | 225:23 243:9 |
| 231:1 236:10 | 261:13,15 | 305:20 357:2 | 246:10 247:8 |
| 237:8,9 238:2 | 264:21,23 | **website** 28:11 | 248:7,10 |
| 254:6 257:15 | 267:4 271:16 | 28:13,16 | 251:22 253:8 |
| 258:10 262:6 | 278:11 288:23 | 113:15 204:7 | 274:23 276:9 |
| 262:16 263:3,5 | 307:4,9,13 | 204:10,13 | 283:17 284:9 |

| | | | |
|---|---|---|---|
| 331:4,10,12 | 151:17 157:13 | 192:17 | 216:12,15 |
| 332:6 333:15 | 170:2 183:14 | **wood** 30:19 | 218:6 220:12 |
| 333:17,17 | 209:17 250:5 | **woodward** | 221:6,10,11 |
| 341:23 342:20 | 256:13 266:14 | 110:5 146:17 | 222:3,11,15 |
| 355:9 | 291:12,14 | 184:20,22 | 224:16 231:14 |
| **whiting** 90:3,4 | 300:13 315:9 | 226:10 227:9 | 233:18 234:12 |
| **wholesalers** | 322:1 338:7 | 228:3,6 304:5 | 237:19 239:23 |
| 324:22 | 342:19 343:18 | 304:23 305:6 | 240:15 246:16 |
| **wide** 281:19 | 346:4 359:8,10 | 327:7 337:21 | 248:21 251:8 |
| **wilkinson** 4:11 | 359:12,19 | **woolworth** | 258:7,23 |
| 4:12 11:20,21 | **witnesses** 20:18 | 352:13 | 271:22 274:5 |
| 56:3 110:15,21 | **woman** 118:20 | **word** 280:3 | 275:8,13 276:9 |
| 159:5,13,17,19 | 261:10 | **work** 17:6 | 289:15 293:12 |
| 359:1 | **women** 20:12 | 23:10 25:2 | 298:18 302:15 |
| **wilkinsonfir...** | 26:19 141:11 | 26:6,22 28:21 | 305:5 307:11 |
| 4:15 359:2 | 141:12,21,23 | 32:23 35:1 | 307:16 311:8 |
| **willis** 229:10 | 142:8,13,16 | 36:4,9 37:4 | 311:15 312:11 |
| 284:16 286:4,8 | 164:5,20 165:4 | 55:11 69:1 | 318:1,8 322:21 |
| 324:15,22 | 166:13,16 | 70:3,21 78:3 | 322:21 324:22 |
| 353:9,9 | 167:20 170:21 | 79:15 81:11,23 | 325:3 326:4 |
| **willow** 350:4 | 171:16 228:15 | 84:12 85:7,8,9 | 330:12 337:9 |
| 354:11 | 230:10 239:20 | 85:14 90:21 | 338:6 342:21 |
| **wires** 211:13 | 240:3 241:23 | 108:14 127:8 | 345:11 353:7 |
| 213:6,11 | 242:2,8 244:13 | 127:14 133:10 | **workday** |
| 214:20 | 274:9,10 | 135:21 152:12 | 161:15 |
| **wise** 174:15 | 278:11 281:9 | 153:9 164:3,21 | **worked** 13:10 |
| **wish** 318:7 | 281:16 297:2,4 | 173:10,11 | 19:22 27:4 |
| 336:20 | 305:13 312:13 | 175:12 176:19 | 31:9 33:1 |
| **witness** 10:12 | 338:22 339:4,8 | 177:5,11,15,21 | 34:19 37:15 |
| 11:12 20:15 | 339:9 341:18 | 180:7 181:21 | 55:20 60:18 |
| 24:6,8 30:9 | **won** 231:15 | 181:23 193:11 | 66:22 71:11 |
| 44:6 104:5 | **wonderful** | 194:17 195:1 | 84:20,22 96:12 |
| 109:6 116:13 | 110:22 | 199:16 201:10 | 97:5,18 108:19 |
| 117:10 138:22 | **wondering** | 203:7,16 | 109:12 110:4 |
| 139:20 149:7 | 46:21 158:1 | 210:18 214:17 | 120:9 130:9 |

143:6,8 144:5
156:21 157:22
165:21 168:23
170:7 171:16
187:6 193:17
194:11,22
203:7 205:12
206:19 212:6
224:9 234:14
259:5 260:2,3
285:3 286:9
306:17 311:18
313:12 317:15
329:18,20
330:10
**working** 20:8
29:3 32:7 34:3
34:4,23 35:20
36:14 53:12
59:1 68:4
79:13 80:1
106:17,23
107:11,23
114:23 116:5
129:9 131:14
132:12 135:15
138:5 151:3
157:1,18,19
161:2 162:22
177:8 181:6
195:3,16
206:14 229:19
233:1 245:21
247:12 271:20
304:7,10,13,21

306:23 312:21
324:19 330:15
333:15 336:19
345:15
**workload**
175:15,17
**works** 18:2
223:1
**workspace**
210:21
**world** 338:23
**worried** 230:17
**worry** 176:1
**worth** 102:9
291:7
**would've**
321:13
**wrap** 356:3
**write** 312:19
326:11
**writing** 51:18
**written** 51:12
62:13 81:12
138:6 202:7
286:16
**wrong** 69:18
105:21 124:19
124:20 220:17
292:2
**wrote** 103:17
103:21 104:7
104:19,21
105:2,15
286:21 299:20

**wunderlich** 5:4
11:16,17
334:15

| x |
|---|

**x** 6:1,9 84:12
100:2

| y |
|---|

**y'all** 16:4 94:7
159:3 201:22
291:5 299:4
**yahoo.com**
4:21
**yea** 299:13
**yeah** 23:19
25:23 26:18
28:14 33:18
36:23 38:8,14
39:4 42:4
43:11 44:11
45:17 51:12
52:3,10 55:19
63:8 64:3
69:23 78:21
84:11 88:8
90:21 91:9,23
92:1 94:15,22
95:15 99:8
100:16,21
102:13,17
104:18 105:7
105:20,23
107:17 110:7
110:18 115:2
116:16 122:9,9

127:17 134:12
136:9,23
140:22 141:16
145:18 147:7
152:6 157:20
161:15 162:6,6
165:6 170:11
172:16 174:6,7
179:2 180:10
183:13,15
184:17 185:5
191:6 192:2
193:10 196:7
199:8 201:21
204:11 205:21
208:2 213:2
217:16 232:5
241:21 244:17
245:19 246:22
250:15 259:20
268:19,21
270:11,23
276:16 281:7
289:3,21 290:2
290:22 294:3
298:20 305:7
309:1 310:13
314:6,10 320:4
320:6 327:23
331:8 343:12
344:7 348:19
350:12 353:3,8
354:6
**year** 55:22
57:21 65:12

114:17 162:9,9
162:12,12
189:10,19
190:5,12 207:4
231:10,11,12
231:12,16
253:17 305:7
327:10 337:8
340:19 355:10
**years**   37:16
65:17 83:7,8
83:12 84:12
86:8 118:22
141:2 142:9
171:20 172:10
206:20 214:15
223:16,23
224:12 255:22
260:19 292:13
293:5 306:13
315:1 323:22
**yesterday**
249:17
**york**   23:4
106:22 107:19
107:20 108:1
**young**   86:1
128:20
**younger**   35:14
339:9
**yvette**   96:23
99:5,12 122:13
176:18 177:3
219:20 220:13
221:1 223:9

229:23 304:22
305:6 332:11
332:14 333:23
342:6
**yvette's**   83:7
134:21

**z**

**zero**   325:2
329:10,11
**zoom**   5:15
**zooms**   19:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.