# EXHIBIT 7

# Video Deposition of Ron Helveston

January 17, 2024

Hendrix v. CRC Insurance Services, Inc., et al.

2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF ALABAMA

3         SOUTHERN DIVISION

4

5    CASE NUMBER: 2:21-CV-0300-MHH

6

7    KATHRYN HENDRIX,

8         Plaintiff,

9         vs.

10   CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL

11   CORP., and TRUIST BANK,

12        Defendants.

13

14

15   VIDEO DEPOSITION TESTIMONY OF:

16        RON HELVESTON

17

18

19        JANUARY 17, 2024

20        1:36 P.M.

21

22

23

**Page 2**

1         S T I P U L A T I O N

2         IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel that the video deposition of RON

5    HELVESTON may be taken before Tanya D.

6    Cornelius, RPR, CSR, and Notary Public, at the

7    offices of Wilkinson Law Firm, P.C., 1717 3rd

8    Avenue North, Suite A, Birmingham, Alabama, on

9    the 17th day of January, 2024, commencing at

10   approximately 1:36 p.m.

11        IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is NOT waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws

16   and rules of Court relating to the taking of

17   depositions.

18        IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any

20   objections to be made by counsel to any

21   questions, except as to form or leading

22   questions, and that counsel for the parties may

23   make objections and assign grounds at the time

**Page 3**

1    of the trial, or at the time said deposition is

2    offered in evidence, or prior thereto.

3         IT IS FURTHER STIPULATED AND AGREED

4    that notice of filing of the deposition by the

5    Commissioner is waived.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1              I N D E X

2    EXAMINATION BY:              PAGE NUMBER

3         MS. PALMER              8

4

5

6         * * * * * * * * * * * * * *

7

8              EXHIBIT INDEX

9    PLAINTIFF'S EXHIBIT NO:       PAGE NUMBER

10   21   Notice of Deposition     31

11   22   Job Listing         94

12   23   Bonus Worksheet          107

13

14

15

16

17

18

19

20

21

22

23

Page 5

1        A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:

4      PALMER LAW, LLC

5      BY:  Leslie A. Palmer, Esq.

6      104 23rd Street South, Suite 100

7      Birmingham, Alabama  35233

8

9      WILKINSON LAW FIRM, P.C.

10     BY:  Cynthia Forman Wilkinson, Esq.

11     1717 3rd Avenue North, Suite A

12     Birmingham, Alabama 35203

13

14

15  FOR THE DEFENDANTS:

16     BAKER, DONELSON, BEARMAN, CALDWELL

17        & BERKOWITZ, P.C.

18     BY:  Rachel Barlotta, Esq.

19     420 North 20th Street, Suite 1400

20     Birmingham, Alabama  35203

21

22  ALSO PRESENT:  Kat Hendrix

23         William Byrd, Videographer

Page 6

1          I, Tanya D. Cornelius, RPR, CSR, and

2  Notary Public, acting as Commissioner, certify

3  that on this date, as provided by the Federal

4  Rules of Civil Procedure, and the foregoing

5  stipulation of counsel, there came before me at

6  the offices of Wilkinson Law Firm, P.C., 1717 3rd

7  Avenue North, Suite A, Birmingham, Alabama,

8  beginning at 1:36 p.m., RON HELVESTON, witness in

9  the above cause, for oral examination, whereupon

10 the following proceedings were had:

11

12

13          VIDEOGRAPHER:  We are on the record.

14 It is January 17th, 2024 at 1:36 p.m.  My name is

15 William Byrd, and the court reporter is Tanya

16 Cornelius.  We're here on behalf of Cite Court

17 Reporting of Montgomery, Alabama.

18          This is the video deposition of Ron

19 Helveston, which was noticed by Cynthia

20 Wilkinson, for case Hendrix V. CRC Insurance

21 Services, Inc., et al., in the United States

22 District Court for the Northern District of

23 Alabama, Southern Division, Case Number

Page 7

1  2:21-CV-0300-MHH.

2          Counsel, please identify yourselves

3  for the record, starting with the plaintiff.

4          MS. PALMER:  Leslie Palmer for the

5  plaintiff, Kathryn Hendrix.

6          MS. WILKINSON:  Cynthia Wilkinson for

7  the plaintiff, Kathryn Hendrix.

8          MS. BARLOTTA:  Rachel Barlotta for

9  defendant, CRC Insurance and Truist.

10         VIDEOGRAPHER:  Will the court

11 reporter please administer the oath to the

12 witness?

13

14             RON HELVESTON,

15          being first duly sworn, was

16        examined and testified as follows:

17

18

19         THE REPORTER:  Will this be usual

20 stipulations?

21         MS. BARLOTTA:  We're going to read

22 and sign.  Thank you.

23

Page 8

1               EXAMINATION

2  BY MS. PALMER:

3     Q.  Good afternoon, Mr. Helveston.  My

4  name is Leslie Palmer, and I represent Kathryn

5  Hendrix in her lawsuit against CRC and Truist.

6  When we speak of Truist, we're speaking of Truist

7  Financial and Truist Bank together as they've

8  both been named in this lawsuit.

9          Cynthia Wilkinson, you met her when

10 you came in, she's also representing Ms. Hendrix,

11 and we have you here today to take your

12 deposition to get an understanding of your

13 position with CRC and any facts that you may have

14 related to the case.

15         Is there any reason that you wouldn't

16 be able to give a thorough, truthful deposition

17 today?

18     A.  No.

19     Q.  Okay.  Have you given depositions

20 before?

21     A.  I have.

22     Q.  Okay.  Related to employment or

23 personal?

Page 9

1    A.  They're employment.
2    Q.  Employment cases?  Is that in your
3  role with CRC?
4    A.  Yes.
5    Q.  How many depositions would you say
6  you have given in the past?
7    A.  Two.
8    Q.  Two?  And do you remember anything
9  about those particular depositions?
10   A.  Yes.  One, one of our former
11 employees raided our company and took over a
12 hundred plus employees to -- and we all got
13 deposed on that.
14   Q.  Would that be like a competition type
15 lawsuit?
16   A.  Yes.  Well, it would be, you know,
17 taking our employees, so raiding our company.
18   Q.  And that was with CRC Insurance?
19   A.  Yeah.
20   Q.  When was that?
21   A.  Oh, god.  That was probably six or
22 seven years ago.  I'm guessing on that.  It could
23 have been longer.

Page 10

1    Q.  Was that before CRC became affiliated
2  with BB&T or Truist?
3    A.  No, after.
4    Q.  And would it have been during the
5  BB&T era --
6    A.  Yes.
7    Q.  -- or the Truist era?
8    A.  BB&T era.
9    Q.  And you said two depositions?
10   A.  Yes.
11   Q.  Were both related to that particular
12 instance?
13   A.  No.
14   Q.  Okay.  What was the other one?
15   A.  The other one was an employee in our
16 New York office.
17   Q.  And what was that related to?
18   A.  Oh, god.  He had several things.  I
19 think the thrust of it was age discrimination.
20   Q.  Okay.  And you said the New York
21 office.  What would have been the purpose of your
22 deposition in that case?
23        MS. BARLOTTA:  Object to the form.

Page 11

1    A.  I was on some of the e-mail trails.
2    Q.  On the e-mails?
3    A.  Yes.
4    Q.  When you gave the deposition for the
5  company raid, what was your position with CRC?
6    A.  I was the CEO.
7    Q.  And when you gave the deposition for
8  the New York office, what was your --
9    A.  I was the CEO.
10   Q.  How long were you the CEO for CRC?
11   A.  You know what, I don't know those
12 dates, to be honest with you.  Driving over here,
13 I knew you were going to ask me that.  But I --
14 six or seven years, but, again, that would be a
15 guess.
16   Q.  What was your position before that?
17   A.  I was president.
18   Q.  President.  So let's start kind of
19 from -- are you employed there now?
20   A.  No.
21   Q.  Okay.  When did you leave CRC?
22   A.  I retired on 12/31/20.
23   Q.  Covid was enough for you, huh?

Page 12

1    A.  Yes.  Thirty-six years.
2    Q.  Thirty-six years.  That's a long
3  haul.
4        Okay.  And so roughly six, seven
5  years, somewhere around there before 2020, you
6  would have been the CEO?
7    A.  Yes.
8    Q.  Okay.  And then before you were the
9  CEO, you were president.  Do you know roughly how
10 many years you were president?
11   A.  No, because really the guy that left
12 and took our employees and I were co-president.
13 So I was co-president and then president and then
14 CEO.  And I cannot give you those dates.  I'm
15 sorry.
16   Q.  Was it more or less than ten years?
17   A.  All together, it was more than ten
18 years.
19   Q.  The co-president and president?
20   A.  Oh, no, that was only like two or
21 three years, because he left, and then I became
22 president for a little while, and then I became
23 CEO.  It all kind of ran together, to be honest.

Page 13

```
 1    Q.   Yeah, like a ball rolling down the
 2  hill?
 3    A.   Yes.
 4    Q.   Did you work for CRC before you were
 5  co-president?
 6    A.   Oh, yes.
 7    Q.   What was your position then?
 8    A.   I was a broker.
 9    Q.   A broker.  How long were you a
10  broker, roughly?
11    A.   I was a broker at least twenty-five
12  years.  And when I was president, I was still a
13  broker.
14    Q.   Okay.
15    A.   And when I was co-president, I was
16  still a broker.
17    Q.   Is John Cadden the president now?
18    A.   John Cadden is the president of the
19  Birmingham office.
20    Q.   Okay.  And you made a distinction
21  there.  Does that mean you were the president
22  over all the offices?
23    A.   Yes.
```

Page 14

```
 1    Q.   Okay.  And that was the whole time
 2  you were co-president and president?
 3    A.   Yes.
 4    Q.   How many offices would that involve?
 5    A.   Close to -- somewhere around fifteen.
 6  And I need to make a distinction.  I was
 7  president and CEO of CRC -- the brokerage
 8  division of CRC Insurance Services.  There's also
 9  an underwriting division and a programs division.
10    Q.   Okay.  Are all of those divisions of
11  a larger company?
12    A.   Well, they are BB&T Holdings.  The
13  name has changed since Truist got involved in it,
14  but that's -- it was all under that same
15  insurance umbrella.
16    Q.   Okay.  And you were the president of
17  a particular division nationwide?
18    A.   Right.  I was president of the
19  brokerage division.
20    Q.   What type of broker were you?
21    A.   I was a casualty broker.
22    Q.   What do casualty brokers do?
23    A.   That's liability.
```

Page 15

```
 1    Q.   General liability?
 2    A.   Slip and falls.
 3    Q.   Okay.
 4    A.   You know, things that good lawyers
 5  would sue for.
 6    Q.   If I don't sue for those things, does
 7  that make me not a good lawyer?
 8         Okay.  So how did -- when you were a
 9  casualty broker, were you here in the Birmingham
10  office?
11    A.   Yes.
12    Q.   How was your team structured?
13    A.   I was the lead broker, then I had an
14  associate broker, and I had two underwriting
15  assistants.
16    Q.   And that's what they were called,
17  underwriting assistants?
18    A.   Yes.  Technical assistants,
19  underwriting assistants.
20    Q.   Okay.  I've seen technical assistant.
21         Can you tell me at the time that you
22  were acting as a broker in the casualty
23  department what the job duties would be for a
```

Page 16

```
 1  lead broker?  Like what would you do day in and
 2  day out?
 3    A.   You know, when you have a team that
 4  small and you write a lot of business, we do a
 5  little bit of everything.  I brokered accounts.
 6  I sent out submissions.  I actually sent out the
 7  binders.  I did everything.  Whatever it took, we
 8  did.
 9         My main goal was to go out, bring
10  business in, and try to write it and service
11  agents, visit companies.
12    Q.   Did that require a lot of travel?
13    A.   Not as much, no.  Maybe once a month.
14    Q.   Okay.  What about long hours?  Was
15  it --
16    A.   Oh, yeah, a lot of long hours.
17    Q.   What about the associate broker?
18  What would your associate broker do?
19    A.   Well, he would -- he learned -- it
20  took him -- the thing about insurance, each one
21  of the divisions, property, casualty, and
22  professional, are different, but the casualty
23  broker, you have a two- or three-year learning
```

Page 17

1  curve.  And so for two or three years, he was
2  learning the business.  And an associate broker
3  wants to be a broker.
4      Q.   Okay.
5      A.   So they're in there learning from you
6  in order to become a broker, to get their own
7  book of business and be a broker.
8      Q.   Okay.  So we heard some stuff in an
9  earlier deposition about an internship program
10 that CRC used to have.  Are you familiar with
11 that?
12     A.   Yes.
13     Q.   Would an associate broker be similar
14 to like when they did the internships?
15     A.   No.
16         MS. BARLOTTA:  Object to the form.
17     Q.   No?  Okay.  Would the associate
18 broker do everything that you were doing?
19     A.   Yes.
20     Q.   Just kind of under your tutelage?
21     A.   Yes.
22     Q.   And then what about your technical
23 assistants or your underwriter assistants?  What

Page 18

1  were they doing?
2      A.   They were processing paper and just
3  keeping all -- there's a tremendous amount of
4  paperwork and flow, and you have to be very
5  current, and they were just constantly keeping
6  up.
7      Q.   Okay.  Did they ever do the binders
8  and submissions?
9      A.   Oh, yes.
10     Q.   So what would be the big difference
11 between your underwriter or technical assistant
12 and an associate broker?
13         MS. BARLOTTA:  Object to the form.
14     Q.   You can answer.
15         MS. BARLOTTA:  You can answer the
16 question.  She's asking for your team
17 specifically.
18     A.   Yeah, on my team, on my team, the
19 associate broker was required to -- was expected
20 to learn all the agents, go out and visit them
21 and bring business in.  And the technical
22 assistants were to process the paper part of
23 that.

Page 19

1      Q.   Okay.  So how much travel would be
2  required for your associate broker?
3      A.   Very little at first, and then when I
4  would go, I would bring them in order to
5  introduce them to all my agents, and they would
6  learn the company.  So we'd go to Atlanta and let
7  them learn the underwriters.
8      Q.   Would they eventually take those from
9  you or would they --
10         MS. BARLOTTA:  Object to the form.
11     A.   When I had them, we bumped up -- when
12 I gave up my book, he took it.
13     Q.   Okay.  Who was your associate broker?
14     A.   Andrew Baker.
15     Q.   Andrew Baker.  Is he still there now?
16     A.   Yes.
17         MS. BARLOTTA:  I was sorority sisters
18 with his wife, Kerri.
19         THE WITNESS:  Oh, really, Kerri?
20         MS. BARLOTTA:  Yes.
21         MS. PALMER:  It's a small world.
22     Q.   (BY MS. PALMER:)  Did you ever have
23 an associate -- I'm sorry -- an inside broker

Page 20

1  when you were a broker?
2      A.   No.
3      Q.   No inside broker?  Do you have an
4  understanding in your role as president and CEO
5  as what an inside broker would do?
6          MS. BARLOTTA:  Object to form.
7      A.   You have to understand that every
8  team functioned a little bit different.  So what
9  I say an inside broker might do might -- it
10 depends on the number of people and how much
11 business you have.  So I can't really say that.
12         I mean, inside broker, a lot of times
13 they processed a lot of paper and did those kind
14 of things.  Most inside brokers did not want to
15 become brokers.  They just wanted to deal with
16 companies and agents and work accounts.
17         But every team could utilize the
18 people on their team the best -- you know, in
19 order to write the most business.
20     Q.   Okay.  You said that most people that
21 were inside brokers didn't want to be brokers.
22 Why is that?
23         MS. BARLOTTA:  Object to the form.

Page 21

1    Q.   Or why do you believe?

2         MS. BARLOTTA: Object to the form.

3    A.   Because they would have made them
4    associate brokers. We -- if you wanted to become
5    a broker, we'll give you an avenue to become a
6    broker. And most all of the associate brokers
7    let us know that they wanted to be brokers. And
8    so we brought them outside the office and let
9    them do all the things that a broker would do to
10   build up a book.

11        And then one day when they had enough
12   people, they would come to us and say, It's time
13   for me to become a broker, and we'd look at them
14   and say yes or no, if you've got to do a little
15   more, but that's how we did it.

16   Q.   But in order to do that, would they
17   need to be an associate broker first?

18        MS. BARLOTTA: Object to the form.

19   A.   Not necessarily.

20   Q.   How would they do that if they
21   weren't an associate broker?

22   A.   Well, some of them -- well, you know,
23   I'm not sure I quite understood -- you have to

Page 22

1    understand, there's no set way to get there. I
2    mean, so you could have been a -- we could have
3    hired you as somebody from an insurance company
4    that knew a lot, and you'd slide right into it,
5    you know.

6         We hired people that didn't have a
7    lot of -- as much talent but were able to be
8    brokers. So it really -- it just kind of
9    depends. I mean, there's no set rule.

10   Q.   Okay.

11   A.   It's more about how much volume you
12   can bring in. Can you support yourself.

13   Q.   Okay. There are job descriptions,
14   though, right?

15   A.   Yes.

16   Q.   And how do you go about making sure
17   that titles match job descriptions?

18        MS. BARLOTTA: Object to form.

19   A.   You know, that -- those were -- we
20   didn't do that really, to be honest with you.

21   Q.   Okay.

22   A.   Because we gave you as much authority
23   as you wanted. I mean, like I say, on a small

Page 23

1    team, on a team with four or five people,
2    everybody had to do everything. So there wasn't
3    I only do this or I only do that. We all did
4    everything.

5    Q.   Okay.

6    A.   And that's how most of those teams
7    are.

8    Q.   And as the CEO, so I want to shift to
9    a specific time period of like '17 -- 2017, '18,
10   '19, you were the CEO then, right?

11   A.   Yes.

12   Q.   Okay. So as the CEO in '17, '18,
13   '19, what oversight did you have over how those
14   teams managed their employees?

15        MS. BARLOTTA: Object to the form.

16   A.   You know what, that was done by
17   the -- the office presidents had that oversight.

18   Q.   Okay.

19   A.   And then the office presidents would
20   go to the regional directors, and the regional
21   directors would come to me. So they had a lot of
22   -- they had a couple of layers before they got to
23   me. So, quite frankly, I didn't have a lot of

Page 24

1    oversight over that.

2    Q.   Okay. Did you have any oversight as
3    the CEO in that time period over hiring of
4    brokers?

5         MS. BARLOTTA: Object to form.

6    A.   Sometimes yes, and most times no. If
7    they came to us, if the office president came to
8    us and made a pitch that they wanted to hire this
9    broker, if it made sense, we let them do it, I
10   mean, and it comes out of their P&L. So if they
11   want to take a chance on somebody, we let them do
12   it.

13   Q.   Okay. How involved would you be in
14   the hiring process?

15        MS. BARLOTTA: Object to form.

16   A.   Not very much to be -- because,
17   remember, I'm over all of the offices. So every
18   time they want to hire somebody, I don't go out
19   there and talk -- sometimes I do, but not very
20   often. They have the -- they do the whole
21   procedure.

22   Q.   Okay. So when you were the CEO, you
23   were still over all the offices?

Page 25

1    A.   Yes.

2    Q.   Okay.  Was there -- do you recall

3  interviewing anybody for broker positions between

4  -- during the time that you were a CEO?

5        MS. BARLOTTA:  Object to form.

6    A.   I'm sure I did.  I'm sure I was in

7  the office, and the office president or the

8  regional director would say, Hey, we're thinking

9  about hiring this person, talk to them.  I'm sure

10  I did that.

11    Q.   Okay.

12    A.   I don't know any specific names or

13  anything.

14    Q.   What would be the purpose of you

15  talking to them if you --

16        MS. BARLOTTA:  Object to form.

17    A.   Just another set of eyes on them.

18    Q.   What types of things would you as the

19  CEO and a past broker look for in hiring?

20        MS. BARLOTTA:  Object to form.

21    A.   Well, you know, their personality,

22  their drive, you know, what they're looking for,

23  where they want to go.

Page 26

1    Q.   Okay.  You're familiar with Kat

2  Hendrix, right?

3    A.   With what?

4    Q.   Kathryn Hendrix?

5    A.   Oh, yeah, of course.

6    Q.   And you knew Kathryn before she

7  started working for CRC?

8    A.   Yes.

9    Q.   So were you involved at all in

10  Kathryn's hiring process?

11    A.   No.

12    Q.   Did you even know that she was

13  applying?

14    A.   No.

15    Q.   So are you aware that at some point

16  she transitioned from her previous role into a

17  role in the proper -- I'm sorry -- in the

18  professional liability department?

19    A.   Yes.

20    Q.   Okay.  And whose team did you become

21  aware that she worked under?

22    A.   Corey Daugherty.

23    Q.   Did you have anything to do with her

Page 27

1  transfer into that role?

2    A.   No.

3    Q.   Did you speak to her before her

4  transfer about any aspiration that she had?

5    A.   No.

6    Q.   Did anybody before -- let's say

7  before 2019, did anybody express any complaints

8  to you about Kathryn Hendrix?

9    A.   No.

10    Q.   And her job performance?

11    A.   No.

12    Q.   Do you remember interviewing Brandon

13  Hayes?

14    A.   Oh, that name sounds familiar, but I

15  do not remember that.

16    Q.   He's a lawyer, came to work there as

17  an associate broker.  Does that ring any bells?

18    A.   You know, I remember the fact that he

19  was a lawyer, but that's about all I remember.

20    Q.   Okay.  Do you remember if he had any

21  previous insurance experience?

22    A.   I don't remember.  I don't remember

23  him, so I wouldn't remember that.

Page 28

1    Q.   Yeah.

2        Okay.  So you said earlier that when

3  you were a broker, you were involved in a lot of

4  paperwork yourself.

5    A.   Yes.

6    Q.   Did that require a lot of computer

7  use?

8    A.   Yes.

9    Q.   Thank God for computers sometimes.

10    A.   I couldn't do it without computers.

11    Q.   Did you regularly communicate via

12  e-mail on the computers?

13        MS. BARLOTTA:  Object to the form.

14    A.   Yes.

15    Q.   And your communications, would that

16  be companywide?  Like if you had an issue that

17  you needed to talk to, say, John Cadden about,

18  would you walk down the hall and talk to him or

19  would you shoot him an e-mail?

20        MS. BARLOTTA:  Object to form.

21    A.   It depends.

22    Q.   There were times that you did both?

23    A.   Yes.

Page 29

1    Q.   Okay.  Did you ever have an occasion
2  to text message him?
3       MS. BARLOTTA:  Object to form.
4    A.   Yes.
5    Q.   Okay.  Did you have a company phone?
6    A.   Yes.
7    Q.   Do you still have a company phone?
8    A.   No.
9    Q.   When did you give up your company
10  phone?
11    A.   On 12/31/20.
12    Q.   Gladly, right?
13       Did you have a company phone the
14  whole time?
15    A.   No.  I was with the company
16  thirty-six years.  They didn't provide phones way
17  back when.  I was employee number nine.
18    Q.   You didn't have one of those cool car
19  phones with the curly cord?
20       When you did finally get a company
21  phone, was it always provided by the company?
22       MS. BARLOTTA:  Object to form.
23    A.   Yes.

Page 30

1    Q.   It was a company-owned?
2    A.   Yes.
3    Q.   Were there any particular rules that
4  went along with the use of that phone?
5       MS. BARLOTTA:  Object to form.
6    A.   Well, some phones were not company.
7  Not every broker had a company phone.  It was
8  your choice.
9    Q.   Okay.
10    A.   So they could -- I could have had my
11  own thing and they just put it on my expense
12  account.  So you can do it either way.  I had a
13  personal phone -- I mean I had a company phone.
14    Q.   Okay.  Is there a way that we would
15  be able to determine -- like how would that
16  expense account look if it had a phone on it?
17       MS. BARLOTTA:  Object to form.
18    A.   You know what, I don't know.  I
19  didn't see those expense accounts.
20    Q.   Let me go ahead and mark this one
21  before I forget.
22       MS. PALMER:  And, Rachel, we're going
23  to start with 21, because I believe that's where

Page 31

1  we left off.
2       (Whereupon, Plaintiff's Exhibit No.
3  21 was marked for identification and a copy of
4  same is attached hereto.)
5    Q.   (BY MS. PALMER:)  Do you recognize
6  Plaintiff's Exhibit 21 that I've just given you?
7    A.   Yes.
8    Q.   This is a notice -- I'll represent to
9  you that this is a notice to take your deposition
10  in this case, and it says re-notice because we've
11  had some trouble with scheduling.
12       If you'll flip to me -- you'll hear
13  me do that a million times.  Flip for me to the
14  second page, and it asks for some documents to be
15  brought to the deposition.
16       What documents did you use to prepare
17  for your deposition today?
18    A.   I didn't use any documents.
19    Q.   Okay.  What did you do to prepare for
20  your deposition today?
21    A.   I just kind of thought about, as best
22  I could, what happened four to five years ago.
23    Q.   Okay.  And don't tell me what you

Page 32

1  talked about, but did you meet with Ms. Barlotta
2  to prepare?
3    A.   Yes.
4    Q.   How long did you meet with her?
5    A.   Two hours maybe.
6    Q.   Number two on the document here asks
7  for any text messages, e-mails, or other
8  documents discussing Kathryn Hendrix, including
9  her employment, medical leave, or complaints.
10       Do you have possession of any text
11  messages related to Kathryn Hendrix?
12    A.   I do not.
13    Q.   Do you have possession of any e-mails
14  related to Kathryn Hendrix?
15    A.   I do not.
16    Q.   Do you have possession of any other
17  documents related to Kathryn Hendrix?
18    A.   I do not.
19    Q.   What searches did you do to confirm
20  that you don't have any of these things that were
21  requested?
22    A.   I would not -- in the deposition, I
23  was not -- I've been retired three years, so I

Page 33

1  didn't have the ability to do any searches.
2      Q.   So from 2019 to the date of your
3  retirement at the end of 2020, did you do any
4  searches for those documents at that time?
5      MS. BARLOTTA:  Object to the form.
6      A.   I actually tried to look on my phone
7  to see if I had texted her to go to lunch or not,
8  and I could not find anything on my phone.
9      Q.   How did you look on your phone?
10     A.   I just went --
11     Q.   Kind of scrolled?
12     A.   Yeah.
13     Q.   You didn't type in any particular
14 search term?
15     A.   I did that, too.
16     Q.   Okay.  Do you remember what you would
17 have typed in?
18     A.   I would have typed in her name.
19     Q.   Name?  What about e-mail, did you do
20 that same kind of search in your e-mail?
21     A.   At one time, yes.  To my knowledge, I
22 didn't have any e-mails to Kathryn.
23     Q.   Okay.  What about to anyone

Page 34

1  concerning Kathryn?
2      A.   Not that I can remember.
3      Q.   Okay.  Did you -- let's see.  I make
4  these outlines, and then I hop all over the place
5  and get all confused.
6          Okay.  Let's go back to the
7  corporation.  So you referenced earlier that at
8  some point, BB&T became involved with CRC.
9      A.   Yes.
10     Q.   How did that happen?
11     A.   They purchased CRC.
12     Q.   Okay.  Were you involved in that
13 process at all?
14     A.   As an owner, I was involved in that
15 process.
16     Q.   Okay.  So you were an owner of CRC
17 Services, Inc.?
18     A.   Yes.
19     Q.   So in order to purchase CRC -- in
20 order to purchase CRC, BB&T would have had to
21 purchase it from you; is that right?
22     A.   Yes.
23     Q.   What -- do you recall who you sold

Page 35

1  CRC to, the actual entity?
2      A.   Well, we sold it to BB&T Insurance.
3  BB&T, Bank Branch --
4      Q.   Branch Banking & Trust?
5      A.   Yeah, that's it.
6      Q.   And before that happened, before that
7  sale, you were in the Birmingham office, correct?
8      A.   Yes.
9      Q.   Did you have a human resources
10 department?
11     A.   Yes.
12     Q.   Who would have been in charge of the
13 human resources department?
14     A.   We had a couple of them.  I think the
15 last one would have been Melody Banks.
16     Q.   Okay.  And when you sold the company
17 to BB&T, what happened to the human resources
18 department?
19     A.   They carried it over -- we all got
20 five-year contracts, so they carried over also.
21     Q.   Okay.  So Melody stayed on with the
22 company for five years?
23     A.   No.  She left early.

Page 36

1      Q.   Okay.  Did the human resources
2  department in the Birmingham office exist for
3  five years after the purchase?
4      MS. BARLOTTA:  Object to form.
5      A.   Yes, I think it did.  I'm not a
6  hundred percent sure.  At some point, BB&T came
7  in and took over the human resources department.
8      Q.   Okay.  And whenever that point was,
9  once they did that, would BB&T house a person in
10 the Birmingham office of CRC?
11     MS. BARLOTTA:  Object to form.
12     A.   They may have had a person in there
13 just to kind of do the paperwork, but they didn't
14 really have -- the person we contacted was a lady
15 named Stefani Petty, and she was -- I think she
16 was in the Carolinas.
17     Q.   Did CRC or BB&T provide any training
18 to the Birmingham employees --
19     MS. BARLOTTA:  Object to form.
20     Q.   -- after the purchase related to any
21 changes that may occur in human resources?
22     MS. BARLOTTA:  Object to form.
23     A.   We -- BB&T instituted a deal where we

Page 37

1    took -- every employee had to take online
2    classes, and there were probably five a year, and
3    there was -- it was about banking.  It was about
4    insurance.  It was about all the human resources
5    things, and it was -- I probably -- I think
6    everybody -- it was mandatory that everybody in
7    the company take those classes.
8        Q.   Okay.  Did you take those classes?
9        A.   Oh, yes.
10       Q.   Specifically talking about the human
11   resources classes, would those be that kind of
12   click-through training?
13       A.   Yes.  You would have to read the --
14   you would read about it, and then they would give
15   you scenarios, and you would try to answer yay or
16   nay or if you're -- trying to see if you
17   understood it.
18       Q.   And were any of those trainings or
19   scenarios related to dealing with employee
20   complaints?
21       A.   Yes.
22       Q.   Okay.  Did you take specific training
23   about dealing with employee complaints?

Page 38

1        MS. BARLOTTA:  Object to form.
2        A.   I -- yes.
3        Q.   What do you recall about how to deal
4    with an employee complaint?
5        MS. BARLOTTA:  Object to form.
6        A.   Well, it -- you know, it would just
7    depend on what the complaint was, and then we
8    would -- you would have to get both sides of the
9    story.  You couldn't just believe the employee.
10   You would have to do some research on it.
11       Q.   Okay.  What type of research?
12       A.   Well, you have to go to the --
13   whatever the problem was, you would have to look
14   at the side of it to see where -- if it made
15   sense, or you would have to get the parties
16   together.  You would have to do some research and
17   try to find out all the facts.
18       Q.   Okay.  And are you familiar with the
19   metaphor, You don't put the fox in charge of the
20   hen house?
21       MS. BARLOTTA:  Object to form.
22       Q.   Does that sound familiar?
23       A.   Yeah.

Page 39

1        Q.   And do you understand that to mean
2    that somebody that may be involved in a situation
3    shouldn't be the one looking into it?
4        MS. BARLOTTA:  Object to form.
5        A.   Yes.
6        Q.   Okay.  Do you agree that that's best
7    practices in employment?
8        MS. BARLOTTA:  Object to form.
9        A.   I -- yes.
10       Q.   So if somebody is making a
11   complaint -- say if I make a complaint about
12   Cynthia over here, Cynthia shouldn't be the one
13   investigating my complaint, right?
14       A.   Right.
15       MS. BARLOTTA:  Object to form.
16       Q.   Was that practice followed as far as
17   you understood at CRC and Truist?
18       MS. BARLOTTA:  Object to form.
19       A.   You know, I wasn't involved in most
20   of that, so I don't know.
21       Q.   Okay.  What would be your specific
22   role if you received an employee complaint?
23       MS. BARLOTTA:  Object to form.

Page 40

1        A.   It depends on what type of complaint
2    it was.
3        Q.   Okay.  If you received a complaint of
4    discrimination.
5        A.   I would call Stefani Petty.
6        Q.   And ask Stefani Petty what to do?
7        A.   Yes, or I'd say, Stefani, you take
8    this over.
9        Q.   Okay.  And would you turn the
10   employee over to Stefani as well?
11       MS. BARLOTTA:  Object to form.
12       Q.   That had complained?
13       A.   I would -- Stefani would contact the
14   employee, obviously.
15       Q.   Do you recall ever speaking with
16   Kathryn Hendrix about her ambitions in the
17   company?
18       A.   No.
19       Q.   Did Kathryn ever talk to you about
20   wanting to be a producer?
21       A.   Not to my knowledge.
22       Q.   I want to talk about some specific
23   people just to kind of get an understanding here.

Page 41

1      John Cadden you said is the current
2   president of the Birmingham --
3      A.   Yes.
4      Q.   Is he the president of the Birmingham
5   office total, like the -- all three divisions?
6      A.   No.
7      Q.   Okay.  What division is he president
8   over?
9      A.   The brokerage division.
10     Q.   Okay.  But that would include
11  property, casualty --
12     A.   Yes.
13     Q.   -- and professional?
14     A.   Professional.
15     Q.   Okay.  And Rusty Hughes, who is Rusty
16  Hughes?
17     A.   Rusty Hughes runs the professional
18  department in Birmingham.
19     Q.   So he would be like the second down
20  from John as related to professional?
21     A.   Yes.
22     Q.   Professional in Birmingham.  Is there
23  a person who is over the professional nationwide

Page 42

1   or is it office specific?
2      A.   Office specific.
3      Q.   Okay.  How long have you known Rusty
4   Hughes?
5      A.   Oh, god.  Rusty is -- twenty years
6   probably.  There again, that's a guess.
7      Q.   Has he been a broker with CRC that
8   whole time?
9      A.   Associate broker, training, yeah,
10  went through the whole process, yes.
11     Q.   Okay.  So associate broker, and/or
12  broker in training, and broker?
13     A.   Yes.
14     Q.   He was not ever an inside broker?
15     A.   I do not think so.
16     Q.   Okay.  And not ever an account
17  executive?
18     A.   I don't think so.
19          MS. BARLOTTA:  Object to form.
20     Q.   What about Corey Daugherty?
21     A.   Okay.
22     Q.   Is he a broker?
23     A.   Yes.

Page 43

1      Q.   How long have you known Corey
2   Daugherty?
3      A.   Gosh, Corey started in the mailroom,
4   the file room.
5      Q.   How did he move up, if you're aware,
6   from the file room?
7      A.   He started helping Betsy Barnett, and
8   she got to know Corey, liked him, and talked him
9   into coming into her department.
10     Q.   Okay.  So then he would have kind of
11  moved into an associate broker role?
12     A.   Yes, broker in training and moving up
13  just like Rusty.
14     Q.   What about Clay Segrest.  Are you
15  familiar with Clay?
16     A.   Yeah, Clay.  I don't know that --
17  Clay was -- when I was CEO, I knew Corey and
18  Rusty a lot better.  Clay, when Clay was involved
19  in it, I was not controlling that office, and so
20  I don't -- I know Clay, but I don't know much
21  history about him.
22     Q.   Okay.  Do you know Steele Cadden?
23     A.   Yes.

Page 44

1      Q.   Is Steele Cadden John Cadden's son?
2      A.   Yes.
3      Q.   And is Steele Cadden now working for
4   CRC?
5      A.   I do not know.
6      Q.   Blake Helveston?
7      A.   Yes.
8      Q.   Is he your son?
9      A.   Yes.
10     Q.   And is he working for CRC?
11     A.   Yes.
12     Q.   What is his position?
13     A.   He is a -- oh, I hate to tell you.
14  I'm pretty sure he's an inside broker.
15     Q.   In what department?
16     A.   He's a casualty.
17     Q.   Who is he working under?
18     A.   He's working under -- oh, god, I'm
19  going brain dead on my own son.  Oh, gosh.  I'll
20  think of it in a minute.  He's a casualty broker.
21  I can see him, but I can't think of his name.
22  I'm sorry.
23     Q.   I hate when I do that.  It always

Page 45

1  leaves my mouth.
2       Did you have anything to do with
3  Blake's hiring?
4       A.  Yes.
5       Q.  How would that have worked?
6       A.  I was retiring.  We had a rule that
7  -- we had a rule that you couldn't hire your
8  children, you know, in the same -- especially in
9  the same office.  You really didn't want to hire
10 them at all.  And so I went to my boss, Dave
11 Obenauer, and said, I'm retiring, and after I
12 retire, can you hire Blake, and he said yes.
13      Q.  And Obenauer -- I know I'm saying
14 that wrong.
15      A.  You're actually pretty good.
16      Q.  He's in Texas; is that right?
17      A.  No.  He's actually in North Carolina;
18 Ashville, North Carolina.
19      Q.  Okay.  What is his position?
20      A.  He was my boss, and he was -- well,
21 since I left, he's gotten more -- but he was over
22 -- he was in BB&T Insurance, and he was over like
23 all of the divisions, you know, underwriting,

Page 46

1  programs, and brokerage.  He's since gotten a
2  couple of promotions.  So I don't know exactly
3  what his title is now.
4       Q.  So he wasn't specifically CRC.  He
5  was part of that selling to CRC?
6       A.  Yes.
7       Q.  Okay.  Or selling CRC.  I misspoke.
8       The rule about no hiring the kids, is
9  that like a written policy?
10      A.  I think -- no, I think it was an
11 unwritten policy.
12      Q.  Okay.
13      A.  It's since been done away with.
14      Q.  Okay.  Do they have requirements now
15 since they did away with it?  Do they have
16 requirements to make sure that there's not any
17 kind of nepotism going on?
18      MS. BARLOTTA:  Object to form.
19      A.  Well, that rule was laxed sometime
20 near the time that I was leaving, so I think it's
21 complete -- I don't know how it is now.  When I
22 was the CEO, you couldn't do it.  Now, but now I
23 think they're saying, Hey, they want to let them

Page 47

1  hire their children.
2       Q.  Okay.  What about when you were the
3  CEO?  What about inner office relationships?  Was
4  there any kind of rule about that?
5       A.  If you had an inner office
6  relationship, you needed to notify HR.
7       Q.  Okay.  What would be the purpose of
8  having an employee notify HR?
9       MS. BARLOTTA:  Object to form.
10      A.  That's just -- they just set the
11 rule.  I guess so -- you know, you would see them
12 in the office together, I guess.  I don't know,
13 to be honest.
14      Q.  When you were the owner of CRC, did
15 you have a similar rule?
16      A.  I'm not sure we did, to be honest
17 with you.
18      Q.  Okay.  Are you familiar with Christy
19 Smith?
20      A.  I'm sorry?
21      Q.  Christy Smith?
22      A.  Yes.

Page 48

1       Q.  Okay.  How do you know Christy Smith?
2       A.  Oh, I'm sorry.  No.  Christy Sauder.
3  I don't know Christy Smith.  I may, but that's
4  not ringing a bell like Christy Sauder was.
5       Q.  Who's Christy Sauder?
6       A.  She was in our claims department.
7       Q.  And what was her role?
8       A.  She was the head of Birmingham
9  claims.  She was actually the head of all claims
10 for the company.
11      Q.  What about Karissa Keyes?  Does that
12 name sound familiar?
13      A.  No.
14      Q.  Lauren Lindberg?
15      A.  No.
16      Q.  Jonathan Morgan?
17      A.  No.
18      Q.  Andrea Sutton?
19      A.  No.
20      Q.  Yvette Talsma?
21      A.  No.
22      Q.  Or Sarah Dunston?
23      A.  Sarah Dunston sounds familiar.  The

Page 49

1  name sounds familiar, but I can't connect the
2  dots on that one.
3      Q.  So as far as you can remember, those
4  folks that you're saying don't sound familiar,
5  you didn't have any dealings with them?
6      A.  I had no dealings with them, because
7  I don't know who they are.
8      Q.  Okay.  I want to take you to June of
9  2019.  You were still the CEO at that point,
10 right?
11     A.  Yes.
12     Q.  And in June of 2019, did you have a
13 meeting with Kathryn Hendrix?
14     A.  Yes.
15     Q.  Okay.  Where would that meeting take
16 place?
17     A.  At a place called First Watch in
18 Vestavia.
19     Q.  Do you remember when that was?
20     A.  You're telling me June, and I'm going
21 to agree with you.
22     Q.  Okay.  You don't remember the
23 specific day?

Page 50

1      A.  No.
2      Q.  Do you have any kind of calendar
3  entries or anything that would document that?
4      A.  No, no.
5      Q.  How did you come to have that meeting
6  at First Watch with Kat?
7      A.  My wife is a member of a birthday
8  club that Kathryn's mother, Laura, is a member
9  of.  And they were at Lake Martin.  I think they
10 were actually on a boat, and my wife called me
11 and said that I'm sitting here with Laura
12 Hendrix, and she's telling me that Kathryn is
13 unhappy at work.  Can you please call her.  And I
14 said yes.
15     Q.  Okay.  So did you call Kathryn?
16     A.  Yeah.  I'm assuming I called her and
17 not text or e-mailed her.  I'm assuming that.
18 But I don't know a hundred percent how we
19 connected up.
20     Q.  Did your wife tell you what she meant
21 by Kathryn was unhappy at work?
22     A.  No.
23     Q.  How soon after learning this did you

Page 51

1  call Kat?
2      A.  I was either traveling or I did it
3  right away.  I did it as soon as I could do it.
4      Q.  Within a week?
5      A.  Oh, yes.
6      Q.  And you set up this meeting at First
7  Watch?
8      A.  Yes.
9      Q.  Okay.  Was that like a breakfast
10 meeting or a lunch meeting?
11     A.  Breakfast.
12     Q.  What did you eat?  I'm kidding.
13         Tell me what you can remember.  Like
14 just be back at that breakfast and tell me what
15 you can remember.
16         MS. BARLOTTA:  Object to form.
17     A.  Okay.  First off, when we sat down,
18 my first question to her was:  Is there anything
19 sexual going on?
20     Q.  Why would you jump to that?
21     A.  Because if there was -- if anything
22 in that neighborhood going on, I would have
23 immediately had to say, Hey, I've got call

Page 52

1  Stefani Petty, because that is, you know, not
2  something that I can deal with.
3      Q.  Okay.  All right.
4      A.  And her answer was no.
5      Q.  All right.  And I assume the
6  conversation continued from there?
7      A.  It did.
8      Q.  How so?
9      A.  Okay.  Then I asked her what were the
10 issues.
11     Q.  What do you remember her telling you?
12     A.  Okay.  I remember her having five
13 issues.
14     Q.  Okay.
15     A.  One:  She wasn't -- she didn't feel
16 like she was properly trained in order to be able
17 to do the job.
18     Q.  Okay.
19     A.  Number two:  She didn't feel like she
20 had been assigned enough agents.
21     Q.  Okay.
22     A.  Number three:  She didn't feel like
23 she was getting invited to some of the lunches or

Page 53

1  dinners.

2      Q.  Okay.

3      A.  Number four:  There was a guy that

4  did underwriting, and I'll think of his name in a

5  minute, but she didn't feel like he liked her.

6          And, oh, god, there's one more, too.

7  Oh, there was a -- she said in the professional

8  department, and I never really understood whether

9  it was e-mail or text or what it is, but she told

10 me that there were e-mails or texts -- there was

11 communication going on in the professional

12 department, and she wasn't included, and she felt

13 like she was being left out.

14     Q.  Okay.  Did you --

15     A.  Scott Trigg is the guy's name.

16 Sorry.  I got -- it comes in there slowly

17 sometimes.

18     Q.  Did you ask her about the specifics

19 of each of these categories?

20     A.  I'm sure we talked about it.

21     Q.  Did you talk specifically about any

22 of these five particular complaints being related

23 to her being a female?

Page 54

1          MS. BARLOTTA:  Object to form.

2      A.  No.

3      Q.  If Kat were to say that -- do you

4  remember -- do you remember speaking with Kat and

5  saying, Oh, good.  I thought this was one of

6  those MeToo things?

7          MS. BARLOTTA:  Object to form.

8      A.  No.

9      Q.  If Kat says that she specifically

10 told you this was gender related and it was a

11 problem at CRC, would you dispute that?

12     A.  I would.

13         MS. BARLOTTA:  Object to form.

14     Q.  And would you agree with me that

15 that's a pretty big thing to disagree about?

16         MS. BARLOTTA:  Object to form.

17     A.  Yes.

18     Q.  Why do you think Kat felt like she

19 had these issues?

20         MS. BARLOTTA:  Object to form.

21     A.  Well, now, I'm assuming, but as of --

22 look, she didn't -- she didn't feel like she was

23 -- she had enough knowledge and had enough

Page 55

1  experience and had been taught in order to be a

2  broker.  So when you're doing that, everything

3  else gets magnified, number one.

4          Number two:  If you're not getting

5  invited to lunches and dinners -- when company

6  people come over, they pay, so they get to invite

7  who they want to invite.  And so if -- sometimes

8  they don't want to take the whole department,

9  because they have an expense account just like

10 everybody else does.  And so they invite the

11 people they want or the people they're getting

12 business from.  That has nothing to do with

13 gender.

14         Scott Trigg, the underwriter that she

15 felt didn't like her, Scott had a line slip,

16 maybe he had two, but he was responsible for

17 those line slips.  And if -- so he was an

18 underwriter.

19         All underwriters are grouchy.  I had

20 a love-hate relationship with half of my

21 underwriters.  So the fact that he didn't like

22 her could have been -- you know, I didn't like

23 half my underwriters.

Page 56

1      Q.  What about not being included in the

2  communications?

3          MS. BARLOTTA:  Object to form.

4      A.  Well, there's so many different

5  communications.  I mean, there's all brokers;

6  there's all casualty brokers; there's all

7  property brokers; there's all brokers in

8  Birmingham, all brokers in the Southeast, all

9  brokers in Louisiana.

10         There's so many different ones, and a

11 lot of times brokers talk to brokers.  They don't

12 talk to their inside people.  I mean, that's -- I

13 didn't think that was any big deal.

14     Q.  Okay.  Did -- when you were the owner

15 or president, so your whole tenure at CRC, did

16 you hire any females as brokers?

17         MS. BARLOTTA:  Object to form.

18     A.  I'm sure we did, yes, because we have

19 female brokers.

20     Q.  You specifically.

21     A.  Oh, yeah, no.  I mean, we hired --

22 yeah, we hired one out of Louisiana.  God, she

23 still works in Birmingham in the property

Page 57

1  department, and I'll think of her name in a
2  minute.
3      Q.   And you hired her?
4         MS. BARLOTTA:  Object to form.
5      A.   Well, I was involved in hiring her.
6  Skip Cooper actually hired her.
7      Q.   Is that the only one that you can
8  remember?
9         MS. BARLOTTA:  Object to form.
10     A.   Yes.
11     Q.   Okay.  And that's in your whole
12 tenure as best you can remember?
13     A.   Remember, I was involved in the -- we
14 had a -- even during my tenure, we had offices
15 that did their own hiring.  So I didn't know
16 everybody that was hired.
17     Q.   Okay.  Who would have been
18 responsible for training Kathryn?
19        MS. BARLOTTA:  Object to form.
20     A.   Corey.
21     Q.   Corey?
22     A.   Yes.
23     Q.   And would that have been in both of

Page 58

1  her roles on this team?
2         MS. BARLOTTA:  Object to form.
3      A.   I'm not sure what roles.
4      Q.   Okay.  So do you understand that when
5  she transitioned from audit, she was an account
6  executive?  Is that knowledge that you have?
7      A.   No.
8      Q.   So you don't know what positions
9  Kathryn Hendrix held at CRC?
10     A.   I had thought she had an inside
11 broker position -- I mean, yeah, inside.  But
12 there again, I'm the CEO.  I don't know what
13 position most people have.  I mean, within a
14 team, I don't know everybody's position.
15     Q.   Okay.  If she is an inside broker and
16 she's raising a concern to you that she doesn't
17 have enough agents, would that be concerning?
18        MS. BARLOTTA:  Object to form.
19     A.   No.  What -- brokers have the
20 eighty/twenty rule.  They get eighty percent of
21 their business from twenty percent of their
22 agents, so they have a whole other list of
23 agents.  And most brokers would be more than

Page 59

1  happy to give you any that you want out of that
2  eighty list.  So that would not be concerning at
3  all.  There should have been plenty.
4      Q.   Okay.  And I guess that's what I'm
5  saying is if there should have been plenty, but
6  she wasn't getting them, does that kind of raise
7  an eyebrow?
8         MS. BARLOTTA:  Object to the form.
9  Assumes facts not in evidence.
10     A.   No.  She could have asked for more.
11     Q.   Who would be responsible for
12 determining who came to -- who was invited to the
13 lunches and dinners?
14        MS. BARLOTTA:  Object to form.
15     A.   The underwriters.
16     Q.   The underwriters, which are your
17 clients?
18     A.   Yeah, the ones that are paying.
19     Q.   Did they have a point of contact that
20 they would reach out to set that stuff up?
21     A.   No, I don't think so.  They -- no.
22     Q.   Who would be responsible for
23 assigning the agents --

Page 60

1         MS. BARLOTTA:  Object to the form.
2      Q.   -- to their team?
3         MS. BARLOTTA:  Object to the form.
4      A.   To their team, that means -- some
5  agents dealt with four or five teams.  The
6  customer gets to pick who they want to deal with.
7      Q.   Okay.  Would the broker in charge of
8  the customer be the one to assign to the folks
9  under him, Hey, you manage this account?
10        MS. BARLOTTA:  Object to form.
11     A.   That should be.  I assume that, but I
12 don't know that on each -- each team is run a
13 little different.
14     Q.   When Kat told you that she felt like
15 she wasn't getting enough agents, did you ask her
16 if she had asked for more?
17     A.   No.
18     Q.   Did -- what did you do -- what
19 resolution did you come to, if any, at the --
20     A.   Okay.  Yeah, I told her, I said,
21 Let's go back to the office.  I'll get Rusty,
22 Corey, Cadden, you and I, we'll sit in a room,
23 and we'll just hash it all out.

Page 61

1    Q.   And you specifically said Rusty,
2  Corey, and Cadden?
3    A.   Yes.
4    Q.   And why those three folks?
5    A.   Well, because, you know, Corey was
6  her -- the broker.  Rusty ran the department.
7  John ran the office.  All three of them, you have
8  to include all three of them in the --
9    Q.   Did you say anything to Kat along the
10 lines of, If I tell them about your complaint,
11 you won't be able to go back to work there?
12   A.   No, I never said that.
13   Q.   Did you ask Kat if she was interested
14 in a transfer?
15   A.   No, I didn't.  What I did tell her is
16 that if this -- if she couldn't resolve the
17 situation, that we could look at transferring
18 her.
19   Q.   And what did Kathryn say about going
20 back to the office and hashing it out?
21   A.   She said she didn't want to do that,
22 that she wanted to handle it.
23   Q.   How did you tell her to handle it, if

Page 62

1  you did?
2      MS. BARLOTTA:  Object to form.
3    A.   I told her to talk to Corey, and if
4  after talking to Corey she still wasn't
5  satisfied, to get back to me.
6    Q.   Okay.  And if Kat's recollection of
7  this whole conversation is different than yours,
8  would you dispute her version?
9      MS. BARLOTTA:  Object to form.
10   A.   Yes.
11   Q.   And that is a pretty big difference
12 in stories, right?
13     MS. BARLOTTA:  Object to form.
14   A.   Yeah.
15   Q.   Did you take any notes during the
16 meeting with her?
17   A.   No.
18   Q.   When you got back to the office, did
19 you e-mail anybody?
20   A.   No.
21   Q.   Did you call anybody?
22   A.   Not right away.  I saw John Cadden in
23 the hall maybe three or four days later, and I

Page 63

1  told him that we had had breakfast, and she had
2  had some concerns, and that she was going to talk
3  to Corey.  And John said, Well, do I need to do
4  anything?  And I said, Well, let's wait and let
5  her talk to Corey; and if she gets back to me,
6  I'm going to get back to you.
7    Q.   Okay.  And did you share with John
8  Cadden what her concerns were?
9    A.   No, I did not.
10   Q.   You just said, I had lunch with
11 Kathryn, and she had some concerns?
12   A.   Breakfast with Kathryn.
13   Q.   Yeah.  Did you eventually tell John
14 Cadden -- what did you do after speaking with
15 John in the hallway, if anything, as related to
16 Kathryn's plans?
17   A.   Nothing.
18   Q.   Did you ever tell John Cadden to
19 reach out to her?
20   A.   After I found out she was gone, I
21 asked John Cadden to reach out to her.
22   Q.   How did you find out she was gone?
23   A.   It's a guess, but I think my

Page 64

1  assistant, Amy Elliott, told me.
2    Q.   Do you remember what she said?
3    A.   She said that Kathryn Hendrix is not
4  coming in the office -- did you hear Kathryn
5  Hendrix is not coming in the office anymore,
6  something to that effect.  That's not a quote.
7    Q.   And when you got that message from
8  Amy, you reached out to John?
9    A.   Yes.
10   Q.   And what did you tell John to do?
11   A.   I said, John, Kathryn is not coming
12 in the office.  You need to call her and find out
13 what's going on.
14   Q.   Did he do that?
15   A.   Yes.  I called him a couple of days
16 later, and he said, Ron, I've called her three
17 times, and she won't call me back.
18   Q.   Does John Cadden have a company
19 phone?
20   A.   Yes.
21   Q.   Did you try to call Kat at any time
22 after that meeting?
23   A.   No.

Page 65

1    Q.   Did you e-mail her at any time after
2  that meeting?
3    A.   No.
4    Q.   Did you e-mail John Cadden about Kat?
5    A.   No.
6    Q.   Why not?
7         MS. BARLOTTA:  Object to form.
8    A.   I mean, I told him to -- you're
9  talking about after the meeting or after he tried
10 to call her?
11        MS. BARLOTTA:  Are you asking him why
12 he didn't send an e-mail instead of calling or
13 are you asking why he didn't send an e-mail after
14 they had a phone conversation?
15   A.   I'm not following you.
16   Q.   When you went to John and asked him
17 to call her and he said he had and she hadn't
18 answered, at any point during that time, did you
19 e-mail him?
20   A.   No.
21   Q.   Why did you not send him any e-mails?
22        MS. BARLOTTA:  Object to form.
23   A.   Well, because at that point I told

Page 66

1  him I was going to call Stefani Petty, and I
2  called Stefani Petty.
3    Q.   When did you call Stefani Petty?
4    A.   Right after John said, I've called
5  her, and she hasn't called me back.
6    Q.   Did you talk to Stefani?
7    A.   It took a while.  She's always hard
8  to get on the phone, but eventually, yes, I did
9  talk to Stefani.
10   Q.   Do you recall how long after you had
11 spoken to John about calling her?
12   A.   I probably called her the same day.
13 It may have been -- it may have taken me a day to
14 get in touch with her.
15   Q.   But maybe a day, not weeks?
16   A.   No, no, no.  It was right away, right
17 away.
18   Q.   What did you and Stefani talk about?
19   A.   I just told her that Kat had some
20 issues, and she wasn't coming in the office, and
21 she needed to call her.
22   Q.   And you called her?  You didn't
23 e-mail her?

Page 67

1    A.   No, I called her.
2    Q.   Why didn't you e-mail her?
3         MS. BARLOTTA:  Object to form.
4    A.   Because I always called her.
5    Q.   You never e-mailed Stefani Petty?
6         MS. BARLOTTA:  Object to form.
7    A.   Well, I may have e-mailed Stefani
8  Petty, but I didn't do it in that particular
9  case.
10   Q.   Is there any reason you didn't do it
11 in that particular case?
12   A.   Well, I just thought it was quicker
13 to pick up the phone and call her.
14   Q.   But she didn't pick up the phone?
15        MS. BARLOTTA:  Object to form.
16 Mischaracterization.
17   A.   She didn't pick up the phone?
18   Q.   Right.  When you called her, she
19 didn't pick up the phone?
20   A.   I don't think so.  I always had
21 trouble getting her, so I assume she didn't, but
22 she may have.  Quite frankly, I don't remember.
23   Q.   If you have trouble getting somebody,

Page 68

1  wouldn't it make sense to e-mail them?
2         MS. BARLOTTA:  Object to form.
3    A.   Maybe to you.  I would keep calling
4  them.  We do our business on the phone.
5    Q.   Did you ever talk to Corey Daugherty
6  about Kathryn Hendrix's complaints?
7    A.   No.
8    Q.   Why?
9         MS. BARLOTTA:  Object to form.
10   A.   Because she was going to talk to him
11 about it, and I was waiting for that response.
12   Q.   And then when you found out she
13 hadn't -- that she wasn't coming in, did you talk
14 to Corey Daugherty at that point?
15   A.   I talked to John and Corey.  And
16 Corey told me he had an e-mail that gave her a
17 whole bunch of agents.  That's all he said about
18 it.
19   Q.   We've been going right at an hour.
20 Do you want to take a break?
21   A.   No.  I'm fine.
22   Q.   You're good?
23        I'm sorry.  Who said that they had an

Page 69

1  e-mail giving her a bunch of agents, John or
2  Corey?
3      A.  Corey.
4      Q.  Okay.  When did you talk to Corey
5  about Kat?
6      A.  You know, days after, days after she
7  had left.  But it wasn't long after she left,
8  because once I talked to Stefani Petty, then I
9  was not supposed to get involved.  They wanted a
10  -- one person getting involved in it.  So after
11  that, I let her handle it.
12      Q.  So when you talked to John and said,
13  She's not coming into work anymore, you need to
14  call and find out what's happening, is that the
15  same time you talked to Corey?  Was that like a
16  joint conversation?
17      A.  No, it wasn't -- no, it wasn't a
18  joint.
19      Q.  When you talked to Stefani Petty,
20  when you called Stefani after you found out Kat
21  was not coming into work and you talked to her,
22  tell me everything you said to Stefani Petty.
23      A.  I don't remember exactly what I said.

Page 70

1  But what I said was Kathryn wasn't coming --
2  Kathryn Hendrix works in the professional
3  department, and she's not coming in the office.
4  She's got some issues.  Call her.
5      Q.  Did you tell her about the lunch you
6  guys had or, I'm sorry, the breakfast?
7      A.  No.
8      Q.  Why not?
9      A.  Because I -- I was still under the
10  impression that she had talked to Corey.  And I
11  didn't know that these two were related, because
12  I didn't remember when we had our breakfast and
13  when she left.  I didn't remember the time in
14  between that.
15      Q.  Is it fair to say that it would be
16  pretty important for Ms. Petty to have a full
17  bank of knowledge going in to speaking with Ms.
18  Hendrix?
19          MS. BARLOTTA:  Object to form.
20      A.  You know, at that point, I didn't
21  know what her -- Kathryn's issues were, because
22  she had -- I had never heard from her, so I
23  assumed her and Corey worked everything out.  I

Page 71

1  didn't know what this was.  So I didn't want to
2  say something that I couldn't back up.
3          So I had -- I really had no idea.  It
4  could have been related to this or it could have
5  been something else.  So Stefani is a big girl.
6  She can figure out on her own.
7      Q.  And when -- you talked to Corey
8  Daugherty before you talked to Ms. Petty, right?
9      A.  You know what, I don't remember the
10  time sequence on that.
11      Q.  Okay.  When you talked to Corey
12  Daugherty, did you ask him if he knew what was
13  going on?
14          MS. BARLOTTA:  Object to form.
15      A.  No, I did not, but apparently he knew
16  something, because he said he had given her a
17  whole list of agents.
18      Q.  Okay.  And when Corey made that
19  statement about giving her agents, did that lead
20  you to believe that this was related to her
21  complaints she had made to you?
22          MS. BARLOTTA:  Object to form.
23      A.  No, but it led me to believe that

Page 72

1  Kathryn and Corey had talked.
2      Q.  When you spoke to Corey, tell me
3  everything you can remember that you said to
4  Corey.
5          MS. BARLOTTA:  And if you've already
6  said it, you can just say you've already
7  testified to what that is.
8      Q.  You can answer.
9      A.  I don't remember, to be honest.  The
10  only thing that stuck out on me is he said he had
11  an e-mail that gave her a bunch of agents.
12  That's all I remember.
13      Q.  Okay.  Do you remember if you called
14  him into your office?
15      A.  No, I did not call him into my
16  office.
17      Q.  Did you go to his office?
18      A.  I did not go to his office.
19      Q.  So would this have maybe been just
20  like a casual meeting in the hall?
21      A.  No.
22          MS. BARLOTTA:  Object to form.
23      A.  This was on the phone.

Page 73

1    Q.   So you would have called him?  Would
2  you have called from your cellphone?
3    A.   No.  Probably my office phone.
4    Q.   The office phone?  But you did not
5  e-mail him?
6    A.   No.
7    Q.   Did you ask him for a copy of the
8  e-mail?
9    A.   No.
10    Q.   Why not?
11    MS. BARLOTTA:  Object to form.
12    A.   Well, I had turned it over to -- it
13  was getting turned over to Stefani Petty, and I
14  didn't need to see that list or that e-mail.
15    Q.   When you talked to Stefani Petty to
16  turn it over, you didn't tell her about the
17  e-mail either, did you?
18    MS. BARLOTTA:  Object to form.
19    A.   No.
20    Q.   Do you know who was part of the
21  communications that Kat was complaining about
22  being excluded from?
23    MS. BARLOTTA:  Object to form.  Asked

Page 74

1  and answered.
2    A.   No.
3    Q.   Did you ask her?
4    A.   I assumed it was the brokers.
5    Q.   Why would you assume that?
6    A.   Well, because the brokers have their
7  -- you know, the brokers have their
8  communication, and I would have thought that
9  would be the only one that would bother her if
10  she wasn't included in what the brokers were
11  saying.
12    I don't think she would be concerned
13  about what the technical assistants were saying,
14  but I don't know that.
15    Q.   And you said something earlier about
16  the broker communications and departments,
17  divisions, I don't want to put words in your
18  mouth, but are there e-mail groups that the
19  company uses?
20    MS. BARLOTTA:  Object to form.
21    A.   Well, there's probably fifty
22  different ways for them to do it.  You can do all
23  casualty brokers, all professional brokers, all

Page 75

1  brokers in Birmingham, all brokers in -- all
2  professional brokers in California.  You know,
3  you can do that any way you want to.
4    Q.   Right.  But you wouldn't have to go
5  in and like type everybody's name, right?
6  There's a list that lists -- like if you go into
7  some database, you can say all brokers
8  Birmingham, and it would autopopulate who that
9  goes to, right?
10    MS. BARLOTTA:  Object to form.
11    A.   Yes, but you actually -- I think we
12  had somebody in IT that would set that up, too.
13  If you went to them and said, Hey, I want a group
14  of ten people, they would set that up and call it
15  something so you could go in there and find it.
16  And so it would stop you from having to do the
17  ten people that you wanted on the e-mail all the
18  time.
19    Q.   So as far as you know in your
20  position as the owner or president, CEO,
21  somewhere there's a database that has groups of
22  people?
23    MS. BARLOTTA:  Object to form.

Page 76

1    A.   Yeah, there should be when you type
2  in an e-mail, yeah.  Just like any -- you would
3  have in your -- on your computer.
4    Q.   And if we needed to get that list or
5  a list like that, who would we speak to to get
6  that?
7    MS. BARLOTTA:  Object to form.
8    A.   I don't know.  Like I say, I've been
9  gone over three years.  Everything has changed
10  since I left.
11    Q.   When you were there, would it have
12  been just someone in the IT department?
13    A.   Yes.
14    Q.   Okay.  When you were a broker --
15  okay.  When you became the CEO, you're no longer
16  a broker; is that right?
17    A.   I think I was a broker for -- it was
18  either president or CEO.  I was a broker when I
19  was president.  I think when I became CEO, I
20  actually gave up my book.  Somewhere in between
21  there.
22    I think even when I was a
23  co-president, I still had the book for a while.

Page 77

1    Q.   Okay.  I am going to show you what
2  has been previously marked as Plaintiff's Exhibit
3  2, and I know it's a little bit strange we're
4  hopping all over the place in these numbers, but
5  this has been used already.
6         The Plaintiff's Exhibit 2, I'll
7  represent to you, is like screenshots from CRC's
8  computers.  Does this look familiar at all to
9  you?
10   **A.   Yes.**
11   Q.   Okay.  What -- can you tell me what
12 you understand this to be?
13   **A.   Well, it's a little hard to read, but**
14 **it looks like it's the broker production, revenue**
15 **production.**
16   Q.   Okay.  And this is something that's
17 tracked companywide through CRC?
18   MS. BARLOTTA: Object to form.
19   **A.   Yeah.  There's more than one office**
20 **on here, yes.**
21   Q.   Okay.  And when you par down -- so
22 the blue lines here have a number at the end of
23 them.  Is that like a year-to-date revenue?

Page 78

1    MS. BARLOTTA: Object to form.
2    **A.   You know, I can't -- I can't see the**
3  **numbers.  I'm assuming it could be revenue.  It**
4  **could be premium.**
5    Q.   Okay.  Flip to Page 2 for me, please,
6  sir.  You see at the top there, it's got some
7  kind of bubbles filled in, and revenue and
8  year-to-date are filled in, right?
9    MS. BARLOTTA: Object to form.
10   **A.   Yes.**
11   Q.   Okay.  So if you clicked those
12 bubbles, would what populates underneath it be
13 the revenue?
14   MS. BARLOTTA: Object to form.  If
15 you know.
16   **A.   Well, the revenue would have been --**
17 **would have popped -- oh, this is -- was this**
18 **premium?  No, this is revenue.  So revenue should**
19 **be sticking out on the side.**
20   Q.   Okay.  And that's because you can
21 narrow that search based on those bubbles on the
22 top?
23   MS. BARLOTTA: Object to form.

Page 79

1    **A.   You know, I would assume you could.**
2    Q.   Okay.  Is that something that you had
3  access to as the CEO?
4    MS. BARLOTTA: Object to form.
5    **A.   Oh, yeah.  If you could do it, I**
6  **should have had access to it.  Maybe even if I**
7  **didn't know how to do it, somebody could have**
8  **showed me how to do it.**
9    Q.   Do you recall ever going in and
10 looking at these numbers or looking at this
11 dashboard?
12   **A.   I'm constantly looking at team**
13 **revenue numbers.**
14   Q.   Okay.  And when we're talking about
15 specifically Birmingham, can you do the same type
16 of report for just the Birmingham office?
17   **A.   Yes.**
18   MS. BARLOTTA: Object to form.
19   Q.   And can you do the same type of
20 report for particular departments in the
21 Birmingham office?
22   MS. BARLOTTA: Object to form.
23   **A.   Like casualty, property,**

Page 80

1  professional?
2    Q.   Right.
3    **A.   Yes.**
4    Q.   So if I just wanted to look at
5  professional liability, could I get this same
6  type of report for professional liability?
7    **A.   You could when I worked there.**
8    Q.   Okay.  Are these -- and I'm not
9  saying these are the correct numbers.  I'm just
10 wondering if these are the revenue numbers, are
11 these the type of numbers that would go into --
12 are these the numbers that would go into the
13 bonus calculations?
14   MS. BARLOTTA: Object to form.
15   **A.   If those are the correct numbers,**
16 **yes.**
17   Q.   Okay.  And when I say bonus
18 calculations, do you agree with me that there is
19 a bonus formula that CRC uses?
20   MS. BARLOTTA: Object to form.
21   **A.   Oh, yes.**
22   Q.   And that formula revolves around the
23 revenue that a broker brings in, right?

Page 81

1    MS. BARLOTTA: Object to form.
2    **A.  Correct.**
3    Q.   So what is your understanding of how
4    that bonus structure works?
5        MS. BARLOTTA: Object to form. For
6    the time period of when he was president?
7        MS. PALMER: Yes.
8    Q.   (BY MS. PALMER:) When you were the
9    -- let's talk about when you were the CEO.
10       MS. BARLOTTA: Or president?
11   Q.  Let's just say 2017 forward.
12   **A.  Okay.**
13   Q.   So from that time period, what was
14   your understanding as to how the bonus
15   calculations worked?
16       MS. BARLOTTA: For every department?
17       MS. PALMER: Generally, yes.
18   **A.  The brokers had a formula. It**
19   **started with twenty-five percent, and then it --**
20   **and it went up to forty percent.**
21   Q.   (BY MS. PALMER:) Okay. How -- what
22   is -- I've lost it again. The twenty-five
23   percent, where does that number come from?

Page 82

1    **A.  That's just been the number. I think**
2    **it's passed down from brokers to brokers. That's**
3    **just always been the number.**
4    Q.   Okay. So twenty-five to forty
5    percent. What -- twenty-five to forty percent of
6    what?
7    **A.  Your revenue.**
8    Q.   Tell me like I'm a Golden Retriever
9    as one of my favorite lawyers says.
10   **A.  Okay. Twenty-five -- okay. And let**
11   **me make this clear. Forty percent -- you get**
12   **paid on your full revenue up to thirty-seven and**
13   **a half percent. The forty percent, you only got**
14   **that part of anything above four million.**
15       **So if you wrote three million nine**
16   **hundred and ninety-nine, you would get**
17   **thirty-seven and a half percent of the whole**
18   **thing. But if you wrote over four million, the**
19   **part over four million, you would only get --**
20   **that would be the only part that you would add**
21   **the forty percent to.**
22       **Does that make sense to you?**
23   Q.  Yes. So you're looking at the

Page 83

1    revenue number. And a broker can get a bonus
2    anywhere from twenty-five percent to thirty-seven
3    and a half percent unless it's four million or
4    more, and then on the amount over four million,
5    they could get up to forty?
6    **A.  Yes. But -- okay. But the bonus --**
7    **when we say bonus, it takes into consideration**
8    **your salary. So, I mean, if you -- if your**
9    **salary was a hundred thousand and your bonus was**
10   **a hundred and ten, you would only get ten.**
11       **Do you see what I'm saying? It took**
12   **into consideration your salary.**
13   Q.   So it takes into consideration the
14   broker's salary?
15   **A.  The broker's salary.**
16   Q.   What about the other employees on the
17   broker's team? Who pays their salary?
18   **A.  The brokers -- no, not their salary.**
19   **The company pays the salary. The broker pays the**
20   **bonus.**
21   Q.   So the broker pays their own salary,
22   but CRC pays everybody else's salary?
23       MS. BARLOTTA: Object to form.

Page 84

1    **A.  In most of the cases.**
2        MS. BARLOTTA: Object to the form.
3    Q.   Okay. How do you determine or how
4    does -- in your experience, how would a broker
5    determine -- how would a broker know if their
6    bonus was twenty-five, thirty, thirty-five?
7    **A.  Because they have a sheet. They**
8    **know.**
9    Q.   What does the sheet look like?
10   **A.  The sheet tells them twenty-five**
11   **percent up to maybe -- and I'm guessing here,**
12   **because I haven't seen those in a while.**
13   **Twenty-five percent up to a certain, maybe half a**
14   **million, and then twenty-five, and then**
15   **twenty-seven and a half and thirty, thirty-five,**
16   **you know, depending -- there's revenue bands in**
17   **there, and if you're in that band, then you get**
18   **that percentage.**
19   Q.   Okay. So like a -- it's sort of like
20   a chart?
21   **A.  Yes.**
22   Q.   Okay. And that's set companywide?
23   **A.  There were a few exceptions, but**

Page 85

1   ninety-nine percent of the brokers had that.
2       Q.   Do you know where that chart or scale
3   was maintained?
4           MS. BARLOTTA:  Object to form.
5       A.   I'm -- you know, I think a lot of
6   people had a copy of that.
7       Q.   Okay.  Just a paper copy?
8       A.   Yes.
9       Q.   Do you recall ever having to go into
10  the computer and get a copy of that?
11          MS. BARLOTTA:  Object to form.
12      A.   I couldn't find it on the computer.
13      Q.   Okay.  I can't find things on my
14  computer half the time, so -- okay.
15          So the main bonus number that goes to
16  the broker is based on revenues off of that chart
17  for certain amounts?
18      A.   Minus their salary.
19      Q.   What happens from there?
20      A.   Okay.  Now, I'm not sure what you're
21  asking me.
22      Q.   Okay.  So CRC pays bonuses to team
23  members, right, in addition to their salary?

Page 86

1       A.   Yes.
2       Q.   Okay.  So how is it determined what a
3   team member's bonus would be?
4       A.   Okay.  So the company gave you, and I
5   think the number was two and a half percent of
6   your revenue.  So whatever your revenue is, they
7   multiply that times two and a half percent, and
8   that would be for team members.
9           But that was never enough.  So
10  brokers had to pay the people out of their -- out
11  of his -- out of his bonus pool, he had -- in
12  ninety percent of the cases, that's how it
13  worked.
14      Q.   Was there -- what is the formula for
15  determining what a team member gets out of the
16  bonus pool?
17          MS. BARLOTTA:  Object to form.
18      A.   Well, there's no formula for that.  I
19  mean, the -- if you're an associate broker and
20  you brought in X amount of premium, say you went
21  out and you got agents, they sent you business,
22  and you bound it, then you would get a -- then
23  most of the guys cut deals with their associate

Page 87

1   brokers that, I'll give you a percentage of
2   everything you bring in, which gives them the
3   incentive to go out and do it, so, and that
4   percentage generally is around twenty-five
5   percent.
6       Q.   So most of the time in your
7   experience, a broker would get a percentage of
8   the revenue they brought in?
9           MS. BARLOTTA:  Object to form.
10      Q.   If they were responsible for the
11  account?
12      A.   The associate broker.  Is that what
13  you're saying?
14      Q.   I'm just saying broker.  So where I'm
15  getting confused is it seems like there's -- on
16  these teams, there's not a real clear delineation
17  between the roles.  So would you --
18          MS. BARLOTTA:  Object.
19      A.   Well, there's a big delineation.  If
20  you're bringing in revenue and binders, that's a
21  big difference than just pushing paper.
22      Q.   And is it your understanding that an
23  inside broker could bring in revenue and binders?

Page 88

1           MS. BARLOTTA:  Object to form.
2       A.   It depends on -- yeah, some do, and
3   some don't.
4       Q.   And could an account executive bring
5   in --
6       A.   No.
7       Q.   So if an inside broker is bringing in
8   revenue, would the same deal apply to them?
9       A.   Each broker set their own deal.  So
10  that depends on the broker and the inside -- or
11  the broker will cut those deals with -- the
12  company gave them two and a half percent to give
13  to the thing, and anything over that would be a
14  deal between the lead broker, the associate
15  broker, inside broker, the underwriting
16  assistant, all the team members, in addition to
17  the two and a half percent.
18      Q.   Who monitors those payments?
19      A.   Those --
20          MS. BARLOTTA:  Object to form.
21      A.   They don't get monitored unless
22  there's a complaint, and in my mind, there's very
23  few complaints.

Page 89

1    Q.   Okay.  And if there was a complaint,
2    who would monitor it?
3         MS. BARLOTTA:  Object to form.
4         A.   Well, it's really -- if it was
5    caught, it would be our accounting people.  Our
6    accounting people would occasionally call us and
7    say, We just got the bonus calculations, and
8    something doesn't look right.
9              And so a lot of times she would call
10   the -- either the president of that office or the
11   broker and say, Man, this doesn't look right.
12   Are you sure this is what you want to do or am I
13   missing something here or --
14        Q.   Are you familiar with the audits that
15   CRC would go through?
16        MS. BARLOTTA:  Object to form.
17        A.   Boy, we went through a lot of audits.
18   I don't know which ones you're talking about.
19        Q.   CRC had an internal audit department,
20   right?
21        A.   Yes.
22        Q.   And the role of that department would
23   be to go around and audit certain areas of the

Page 90

1    company for checks and balances, right?
2         MS. BARLOTTA:  Object to form.
3         A.   Yes.
4         Q.   All right.  Did audit ever audit
5    payroll?
6         A.   Now, that, I don't know.
7         Q.   Did they ever audit these bonuses?
8         A.   No.  I would say they didn't do that.
9         Q.   Do you know why?
10        MS. BARLOTTA:  Object to form.
11        A.   Well, I just think that that was
12   proprietary information that they didn't --
13   probably wouldn't want the audit team to see.
14   That would be like giving everybody's personal
15   information out.
16        Q.   And as far as you're aware, this is
17   an unwritten rule as far as paying your teams,
18   right?
19        MS. BARLOTTA:  Object to form.
20        A.   Yes.
21        Q.   And there's no set structure?
22        A.   No set structure.
23        Q.   No set factors that you look at?

Page 91

1         A.   No set factors.
2         Q.   Okay.  Is it fair to say that that
3    could open the door for a whole lot of sway back
4    and forth?
5         MS. BARLOTTA:  Object to form.
6         A.   I didn't see a -- I don't know what
7    you mean by sway back and forth.
8         Q.   Did -- were bonus numbers talked
9    about regularly?
10        A.   No.  The company did not encourage
11   people to talk about bonus numbers.  Your
12   compensation is supposed to be private, like it
13   is with everything.  Nobody really talks about
14   their compensation, and that's the way they felt
15   about it.
16        Q.   Why?
17        A.   They just didn't want them talking
18   about it.  I don't know the rule.  I mean, it's
19   your business what you make.  It's not anybody
20   else's business.
21        Q.   Right.  So can you see why if there's
22   not a set structure and nobody talks about it,
23   there's not really anybody checking to make sure

Page 92

1    discrimination is not happening?
2         MS. BARLOTTA:  Object to form.
3    Argumentative.
4         A.   I mean, I don't know how
5    discrimination could happen in that.  I mean,
6    it's a -- I mean, the company gave you -- the
7    company gave them two and a half percent.  So
8    they could give that to the people.
9              I mean, it -- we just never had any
10   complaints about discrimination in bonus
11   calculations.
12        Q.   But is it --
13        A.   The broker -- okay.  But before the
14   broker turned in the sheet, he sat down with
15   everybody on his team generally and said, Here's
16   what -- you know, here's what I'm thinking about
17   for you or, you know -- and they have a
18   conversation about it.  And if there was any
19   problems, seems like to me they would come out
20   there, Hey, you're not -- sure, everybody
21   thought, you're not paying me enough.  I mean,
22   enough is never enough, but --
23        Q.   So it's your understanding that they

Page 93

1  would address this with the individual team
2  members?
3      **A.  Oh, yeah.**
4      Q.   Okay.  Can you -- would you agree
5  with me that it would be really hard to know if
6  you were being discriminated against if you
7  didn't know what other people were getting?
8      MS. BARLOTTA:  Object to form.
9  Speculative and calls for opinion.
10     **A.  Well, every team is different and**
11  **every -- if you have ten people, you've got less**
12  **bonus to go around.  And some teams were really**
13  **lean.  There were a lot of business with three or**
14  **four other people, and some people had eight or**
15  **ten people on their team.**
16     **So even if you worked as hard as this**
17  **person, if you had more team members, there**
18  **wasn't as much to go around.  So there's a lot of**
19  **different factors involved in that.**
20     **You can't -- I mean, here's the pot,**
21  **I mean, and it's plus the two and a half percent.**
22  **It has to go somewhere.  I mean, there's no other**
23  **place to get money from.**

Page 94

1      Q.   Right.  But there's not a set scoring
2  or anything related to the factors?
3      MS. BARLOTTA:  Object to form.
4      **A.  No.  The -- they had salary ranges,**
5  **but they didn't -- when it came to the bonus, it**
6  **was all discretionary.**
7      Q.   Okay.  I'm going to show you what I'm
8  going to mark as -- you know what, I didn't put
9  the sticker on it -- Plaintiff's Exhibit 22.
10     (Whereupon, Plaintiff's Exhibit No.
11  22 was marked for identification and a copy of
12  same is attached hereto.)
13     Q.   And Plaintiff's Exhibit 22 I pulled
14  off the Truist website.  Have you ever seen a
15  document like this before?
16     **A.  No.**
17     MS. BARLOTTA:  This is something you
18  haven't produced yet?  It's not Bates or
19  anything.
20     MS. PALMER:  Right, it's on the
21  Truist website.  I got it yesterday.
22     MS. BARLOTTA:  Well, if you're going
23  to rely on it, you're still supposed to produce

Page 95

1  it or identify it.
2      Q.   (BY MS. PALMER:)  Have you seen a
3  document like this before?
4      **A.  No.**
5      Q.   Do you -- when you were the CEO of --
6      MS. BARLOTTA:  We object about asking
7  any questions about a document that's just been
8  produced and about which he doesn't know since
9  you just pulled it off the website, and he hasn't
10  worked for the company in four years.
11     MS. PALMER:  I'm laying a foundation,
12  and we agreed to usual stipulations.  So your
13  objection should be to the form.
14     MS. BARLOTTA:  No, I can tell you
15  what's wrong with your question so you can fix
16  it.  That's the purpose.
17     Q.   (BY MS. PALMER:)  So when you were
18  the CEO of Truist, let's -- or of CRC, let's
19  focus again on 2017 to your retirement, did you
20  have any occasion to go to the website?
21     **A.  No.**
22     Q.   Okay.  Did you ever --
23     MS. BARLOTTA:  This says it comes

Page 96

1  from the Department of Labor website, not Truist.
2  www.DOL.gov.
3      Q.   Did you ever receive forms --
4      MS. BARLOTTA:  No, no, no, let's get
5  that clear on the record.  You just represented
6  to the witness --
7      MS. WILKINSON:  Rachel, let her ask
8  her questions.
9      MS. PALMER:  Let me handle this.
10     MS. BARLOTTA:  No.  She just
11  represented to the witness that this came from
12  Truist's website, so she needs to correct that on
13  the record.
14     MS. PALMER:  Except it's not a lie,
15  so we'll handle this.
16
17     Q.   (BY MS. PALMER:)  I'll pull up for you
18  here, Mr. Helveston, the CRC website where I got
19  that document.
20     MS. BARLOTTA:  If you had just
21  produced it in advance of the deposition like
22  you're supposed to --
23     **A.  You got this from the CRC website?**

Page 97

1    MS. BARLOTTA: -- we probably
2  wouldn't have any problems.
3    Q.   (BY MS. PALMER:)  I'm sorry?
4    A.   The CRC website?
5    Q.   Yes, sir, the CRC website.  So --
6      MS. BARLOTTA:  This applies to
7  government contractors.  I mean, I don't -- is
8  there any allegation in this case that Kathryn
9  Hendrix worked as a government contractor?
10     MS. PALMER:  I'm just asking if he
11 has familiarity with this form.
12     MS. WILKINSON:  Rachel, do not
13 highjack --
14     MS. BARLOTTA:  No --
15     MS. WILKINSON:  Let me finish.  Don't
16 interrupt.  Don't interrupt.
17     MS. BARLOTTA:  You just interpreted
18 me, Cynthia.
19     MS. WILKINSON:  I did not.
20     MS. BARLOTTA:  I was not done with
21 what I was saying, but go ahead.
22     MS. WILKINSON:  Do not highjack this
23 deposition.

Page 98

1  And, Mr. Helveston, I'm so sorry.
2  We're trying not to waste your time.
3      MS. BARLOTTA:  No, no, no, no.  You
4  are not going to suck up to my witness.
5      MS. WILKINSON:  And I believe the
6  question on the table is just simply have you
7  ever seen this.  And if you have not, the answer
8  is no, and that's perfectly okay.  My
9  understanding, this was also posted in the break
10 room in a common area, though, at work.
11     MS. BARLOTTA:  I have a couple of
12 problems with what's going on here with the
13 plaintiff counsels' antics today.  Number one,
14 they're producing a document in the middle of a
15 deposition representing to the witness that it is
16 from the CRC website.  It doesn't appear to be on
17 the face of it.
18     I've asked them to clarify where this
19 came from.  They have gotten upset with me for
20 asking them to clarify what this document is,
21 which they haven't produced about which they want
22 to question my witness.
23     MS. WILKINSON:  Do we have a way to

Page 99

1  also record Rachel in the deposition as well as
2  the witness?  Can we?
3      VIDEOGRAPHER:  She's being recorded.
4      MS. WILKINSON:  To video record her.
5  That's okay.  Don't worry about it.  We'll set it
6  up for all the rest of them that way.
7      VIDEOGRAPHER:  We can if you'd like.
8      MS. WILKINSON:  We are not upset that
9  you have called us out on anything.  Leslie is at
10 this point pulling up the CRC website to show
11 that that is where she got it.  I don't know why
12 this is all of a sudden such a big deal.
13     MS. BARLOTTA:  Cynthia, it would be a
14 very big deal if I pulled out a document in a
15 witness' deposition, particularly your client's,
16 that she had never seen and started asking her
17 questions about it.  You would be stopping the
18 deposition and saying, We're going to go look at
19 this, we're going to talk about it, you're not
20 going to ask my witness questions about it.
21     I'm not doing anything that is
22 improper or inappropriate.  I'm happy for you to
23 take this up with the judge.  She would say the

Page 100

1  same thing.
2      MS. WILKINSON:  Rachel, she's not
3  asked this witness one question about this
4  document.
5      MS. BARLOTTA:  She was trying to
6  until I --
7      MS. WILKINSON:  Please don't
8  interrupt me.  Do not interrupt me again.  You
9  have a habit in every deposition I have ever been
10 in with you, even in court, of interrupting
11 people, and we're not going to do that today or
12 in any other deposition in this case.
13     MS. BARLOTTA:  Let me --
14     MS. WILKINSON:  Hang on.  Let me
15 finish.
16     MS. BARLOTTA:  Let know when you're
17 finished, and then I will, because I thought you
18 were.
19     MS. WILKINSON:  We're going to
20 respect each other, and you knew I wasn't
21 finished, because I was in mid word.  The only
22 thing that has been said is if he's seen it.  If
23 he hasn't seen it, that's -- period, that's it.

Page 101

1  I mean, there's no reason to get this upset about
2  this and waste his time in this deposition.
3      MS. BARLOTTA: If you would -- the
4  only people who are wasting time -- oh, I'm
5  sorry. Are you done?
6      MS. WILKINSON: Go ahead.
7      MS. BARLOTTA: Okay. We wouldn't be
8  wasting time if you had produced this like in
9  advance of the deposition like you are supposed
10 to do. And the fact that you didn't do it timely
11 and you're upset now and you're going to tell me
12 that I am wasting time is a little bit of
13 gaslighting, and I think you know that, Cynthia.
14     MS. WILKINSON: It's not gaslighting.
15 And if she just discovered this today, then it's
16 perfectly okay to ask a witness, and we can
17 produce it. It happens frequently --
18     MS. BARLOTTA: No --
19     MS. WILKINSON: -- in fact, you've
20 done it. I'll go back and pull all the
21 depositions that you've done it.
22     MS. BARLOTTA: The proper thing to do
23 is to say, Hey, before the deposition, we just

Page 102

1  found this document. We want to ask the witness
2  about it. Do you have any objections to that?
3  Do you want to talk with them about it
4  beforehand?
5      MS. WILKINSON: Go ahead, Leslie, and
6  show him.
7      Q.  (BY MS. PALMER:) Mr. Helveston, I am
8  placing in front of you my laptop, and it is open
9  to a website. Do you see that?
10     A.  I do.
11     Q.  And what is the address of that
12 website?
13     A.  It looks like a CRC address.
14     Q.  And does that website appear to you
15 to be a job listing for CRC?
16     MS. BARLOTTA: Object to form.
17     A.  Yes.
18     Q.  Okay. I'm going to scroll for you,
19 because this one is a little bit tricky. I'm
20 just going to take this off so I can see, too.
21     Well, Rachel is going to scroll for
22 you.
23     And do you see there on the bottom of

Page 103

1  that job posting a link that appears to link out
2  to a document? Let me point you right here to
3  this hyperlink (indicating) --
4      MS. BARLOTTA: Would you verify?
5      Q.  -- while it's scrolling by.
6      MS. PALMER: No. Does it not say Pay
7  Transparency -- excuse my --
8      MS. BARLOTTA: This takes us to the
9  Department of Labor website, correct?
10     MS. PALMER: It does, correct.
11     MS. BARLOTTA: Thank you.
12     Q.  (BY MS. PALMER:) Do you agree with
13 me that the link of the document was on the CRC
14 website?
15     A.  It appears to be.
16     Q.  And that's related to a job posting
17 for CRC?
18     A.  Yes.
19     Q.  And then the link that Ms. Barlotta
20 clicked, does that take you to a screen that
21 appears to be the document that I've handed you
22 in Plaintiff's Exhibit 22?
23     A.  Yes.

Page 104

1      Q.  Thank you. And Plaintiff's Exhibit
2  22 is called a Pay Transparency Notice. Do you
3  agree with me about that?
4      A.  Yes.
5      Q.  Okay. Have you ever seen a pay
6  transparency notice?
7      A.  No.
8      Q.  Do you frequent the break rooms at
9  CRC -- or I'm sorry. When you were at CRC, did
10 you go to the break rooms?
11     A.  Of course.
12     Q.  Okay. And, you know, in the break
13 rooms, were there notices hanging up like from
14 the Department of Labor, from the EEOC?
15     A.  Yes.
16     Q.  Did you ever look at those?
17     A.  Sometimes.
18     Q.  Do you recall seeing a pay
19 transparency notice there?
20     A.  I do not.
21     Q.  Do you understand why it would be
22 important to have transparency in pay?
23     MS. BARLOTTA: Object to form.

Page 105

1    A.   Well, we need to clarify something,
2  okay?  So the pay, everybody knew what the ranges
3  -- there were ranges on the pay, but the bonuses
4  are nondiscretionary, and so that's different.
5       If the team didn't write anything,
6  you wouldn't get any bonus.  And so that -- I can
7  see where this is talking about your pay, but not
8  your bonus.
9    Q.   Okay.
10   A.   A bonus is above and beyond your pay,
11 depending on what kind of year you had.  And it
12 was discretionary, and it was at the will -- CRC
13 could have not paid you any bonus except to
14 fulfill the contracts that they have written with
15 the people.
16   Q.   Okay.
17   A.   So this -- to me, this -- you know,
18 they tried to keep everybody in certain pay
19 scales.  If you were a broker assistant, they had
20 pay ranges and all that kind of stuff.
21      But bonus was completely different.
22 That was -- they've always said in everything
23 that that was discretionary and not guaranteed.

Page 106

1    Q.   Okay.  Did -- are you familiar with
2  what the pay scales would be for each position?
3       MS. BARLOTTA:  Object to form.
4    A.   No.
5    Q.   Would it surprise you to learn that
6  some employees were paid significantly less
7  salary?
8       MS. BARLOTTA:  Object to form.
9    A.   Yeah, that would surprise me.
10   Q.   Was there a general culture at CRC
11 about just not talking about the money?
12      MS. BARLOTTA:  Object to form.
13   A.   I didn't -- I don't think people
14 talked about it.  I don't know if there was a
15 culture for that.
16   Q.   Did the brokers talk about their
17 revenues?
18   A.   Oh, yeah.  They bragged about their
19 revenue.
20   Q.   Okay.  The -- are you familiar with
21 the bonus worksheet that would fill out -- that
22 they would fill out?
23   A.   You mean -- okay.  So I'm a little --

Page 107

1  the term "worksheet" is a little loose.
2    Q.   Yeah.  Let me show you this, and I'm
3  not going to mark it as an exhibit, but I'll --
4       MS. WILKINSON:  I would go ahead and
5  mark it if you show it to him.
6       MS. PALMER:  Okay.  We may have used
7  it before, but I'll just mark it as a new one.
8  It's 4995 through 4998.  It's the bonus numbers.
9       MS. WILKINSON:  I don't see it.  Go
10 ahead and mark it again.
11      MS. PALMER:  I'm going to mark this
12 as Plaintiff's Exhibit 23.
13      (Whereupon, Plaintiff's Exhibit No.
14 23 was marked for identification and a copy of
15 same is attached hereto.)
16   Q.   (BY MS. PALMER:)  And I'm going to go
17 ahead and apologize to you about the type on
18 this.  This is how it came to me.
19   A.   That's okay.  That's okay.
20   Q.   And I have a hard time reading it as
21 well.  So Plaintiff's Exhibit 23 is Bates
22 labeled -- and when I say Bates label, I'm
23 talking about the number there on the bottom

Page 108

1  right, and it's CRC-Hendrix 4995 through 4998.
2  Do you see those numbers?
3    A.   I'm -- oh, at the very bottom?
4    Q.   Yeah, the very bottom.
5    A.   I do see that number now.
6    Q.   Okay.  So Page 2 of that, if you'll
7  flip for me, which is the 4996, it's the tiniest
8  little chart, but it appears to be like
9  calculations of the bonus pool for twelve months
10 ending December 31st, 2018 for Daugherty.  Can
11 you see that at all?
12   A.   You know what, I need a magnifying
13 glass.  Even with my glasses, I can't see that.
14   Q.   I understand that.  I understand
15 that.  Just this general like structure here with
16 this kind of Excel spreadsheet with the columns,
17 does that look familiar at all to you?
18   A.   The first page looks familiar, but
19 the second -- I mean, I'm sorry.  I just -- I
20 can't.
21   Q.   Yeah, it's tiny.  And I tried to
22 print it and blow it up, and I couldn't, because
23 of the way it was sent to us.

Page 109

1  So the first sheet, you said that
2  looks familiar.  Why does that look familiar to
3  you?
4       MS. BARLOTTA:  Object to form.
5       A.  Because -- let me look at it real
6  quick.  This is the kind of sheets that would --
7  the broker would turn in.  The brokers would turn
8  them in to the office president, and the office
9  president would compile a big list and turn them
10 in to the accounting.  And they did that twice a
11 year when bonus was calculated.
12      Q.  Why would the president turn the
13 sheets into accounting?
14      A.  Well, the president of each office is
15 required to collect these.  That's part of his
16 job to make sure that they get all the bonus
17 sheets in.  My job was to make sure that
18 everybody got their bonus sheets in.  Now, I
19 didn't see them.
20      Q.  Okay.
21      A.  I didn't go every one of them.  I
22 didn't see them, but I had the -- I needed to
23 make sure, because we were under a time

Page 110

1  constraint to make sure that everybody got paid.
2  And if these sheets weren't in, they wouldn't be
3  able to pay the bonuses on time.
4       So if we weren't getting them, the
5  accounting people were calling John Cadden or
6  whoever the office was and said, You better get
7  these bonus numbers in if you want your people to
8  get a bonus.
9       Q.  Okay.
10      A.  So that's why.  And John was
11 responsible for Birmingham to collect all those
12 from everybody, every broker in the Birmingham
13 office.
14      Q.  But the bonuses are discretionary,
15 right?
16      A.  Yes.
17      Q.  So was there ever an instance where
18 they would not turn a form in?
19      MS. BARLOTTA:  Object to form.
20      A.  Not -- if they didn't turn a form in,
21 they didn't get a bonus.
22      Q.  Would they ever put zeros on the
23 bonus number column?

Page 111

1       A.  You know, I never saw a zero, but
2  there may have been a case where somebody went to
3  the broker and said, Man, if you'll give me more
4  in January -- you know, there's two bonus times,
5  and somebody may go to them and say, Man, I need
6  more in January, and I won't get any bonus in
7  whenever -- the other time.  We pay them twice a
8  year.  I mean, that could have happened.
9       Q.  Yeah.
10      A.  But it would be very unlikely that
11 there would be a zero unless there was some
12 circumstances.  Because, like I said, if nothing
13 else, you would get -- the twelve and a half
14 percent would be spread out.  And that was spread
15 out by, you know, the office president and them
16 just to make sure that everybody got something.
17      Q.  Okay.  Would there be any reason for
18 the office president to review this form?
19      MS. BARLOTTA:  Object to form.
20      A.  The office president?
21      Q.  Yeah, because they all go to the
22 president.
23      A.  Well, I mean, you know, some of them

Page 112

1  did.  Some of them probably didn't.
2       Q.  Okay.  What's the purpose of giving a
3  bonus?
4       MS. BARLOTTA:  Object to form.
5       A.  Well, it's an incentive for getting
6  these people to produce more business.  And they
7  don't give a bonus.  They earn a bonus.
8       Q.  But there's not any metrics that
9  define how you would earn a bonus?
10      MS. BARLOTTA:  Object to form.
11      A.  Yeah, there is for the team, but not
12 for the individual.
13      Q.  Right.  So how would an individual on
14 a team know what they needed to do to get a
15 higher bonus?
16      MS. BARLOTTA:  Object to form.
17      A.  I guess they would work with their
18 broker.
19      Q.  Are you familiar with some of the
20 other companies that are affiliated with CRC?
21      MS. BARLOTTA:  Object to form.
22      A.  Vaguely.
23      Q.  Yeah, if I give you some names, can

Page 113

1  you tell me if this rings a bell, TAPCO?

2      A.  Yes.

3      Q.  What is TAPCO?

4      A.  TAPCO is a -- they're an MGA.  They

5  have programs, and they fill those programs.  So

6  they're -- they're basically underwriters.

7      Q.  Okay.  And are they affiliated with

8  CRC or do they just do business with CRC?

9      A.  No, no.  They're affiliated with CRC.

10 CRC -- now, BB&T bought TAPCO and made them part

11 of the group.

12     Q.  Okay.  What about BenefitMall?

13     A.  I don't know that one.

14     Q.  Crump?

15     A.  Crump, yeah.  Crump was bought and

16 merged into CRC Brokerage.

17     Q.  Okay.  Ethos?

18     A.  Yes, Ethos was bought, and it's a --

19 at least it was a separate company that wrote

20 some off-the-wall kind of stuff.

21     Q.  Starwind?

22     A.  I'm sorry?

23     Q.  Starwind?

Page 114

1      A.  I don't know that one.

2      Q.  Trinity?  I'm getting into some

3  you're not familiar with.  Handley?

4      A.  Handley was -- yeah, Handley, gosh, I

5  want to say it was like life insurance.  It was a

6  specialty item, but there again, it was bought by

7  BB&T and kind of put in the insurance family.  So

8  it was under the umbrella, but we had no -- you

9  know, like I say, some of them I don't even know.

10     Q.  Okay.  Do you have any understanding

11 of how many companies were under the umbrella?

12     A.  No, because they were buying

13 companies all the time.  And that's another

14 thing.  See, when you buy a company, they all

15 have different payroll structures, too.  We

16 bought Crump, and we bought Swett, and it was --

17 they were constantly trying -- BB&T was

18 constantly trying to get everybody on the same

19 pay scales.  They were all different.

20         Now, the broker formulas were real

21 close, but salaries and all of that, the company

22 was constantly trying to, you know, making

23 changes and to make sure that they were getting

Page 115

1  those as close as possible.  And those were huge

2  companies that we purchased.

3      Q.  Did you see Ms. Hendrix's letter

4  requesting severance?

5      A.  I did not.

6      Q.  How -- when you were the CEO -- I

7  keep wanting to say COO.  That's why I'm being

8  slow about it.  But the CEO.  So let's go back

9  '17 to '19 again, or '17 to your retirement.  How

10 were job postings for the Birmingham office made?

11         MS. BARLOTTA:  Object to form.

12     A.  You know, those were done by somebody

13 else.  I'm assuming they did them like however

14 you do those job postings.  I really didn't know.

15     Q.  Are you aware of whether there was an

16 internal site where they could be listed?

17     A.  You know, I think -- I don't know

18 where it was, but I think there was an internal

19 site.  So sometimes they encouraged -- you know,

20 they would rather you stay with the family, so to

21 speak.  But I did not know.

22     Q.  Did you ever see any e-mails about,

23 you know, Hey, we've got this position opening up

Page 116

1  that kind of went office-wide?

2          MS. BARLOTTA:  Object to form.

3      A.  You know, I don't think so.

4      Q.  Do you know what a gender gap --

5  gender bonus gap is?

6          MS. BARLOTTA:  Object to form.

7      A.  No.

8      Q.  Do you know who Kimberly Moore-Wright

9  is?

10     A.  Kimberly who?

11     Q.  Kimberly Moore-Wright?

12     A.  No.

13     Q.  Do you have any dealings with any of

14 the executive leadership at Truist Financial?

15     A.  Truist Financial?

16     Q.  Yes.

17     A.  You're talking about the bank?

18     Q.  So when you were the CEO of CRC, did

19 you deal with any of what they call the executive

20 leadership team of Truist Financial Corporation?

21     A.  Yes.

22     Q.  Okay.  And in those dealings, you

23 don't recall dealing with Kimberly Moore-Wright?

Page 117

1    A.   I do not.

2    Q.   Okay.

3    A.   I'm thinking -- I'm assuming we're

4   talking about the same -- I mean, see, there

5   again, it was BB&T, and then they rolled some

6   into Truist.  So it's a little confusing as to

7   who you're talking.

8    Q.   Right.

9    A.   I mean, being who we were, we -- the

10  people that -- like Dave Obenauer and John Howard

11  and all of those people in the BB&T part of it we

12  had dealings with, but I don't know if they were

13  the Truist Financial people.

14   Q.   Or not?

15   A.   That's a vague term to me.

16   Q.   Right.

17   A.   To be honest, we didn't -- I knew a

18  lot more about BB&T than I knew about Truist,

19  because Truist was the combination of -- we

20  didn't know the SunTrust people really, and when

21  they combined, that kind of removed us a little

22  more from that feeling.

23   Q.   Okay.  And so you were removed as the

Page 118

1   -- you were removed from the connection there,

2   and you were the CEO of CRC, right?

3        MS. BARLOTTA:  Object to form.

4    A.   Right.  Well, yeah, I still had my

5   same connection, you know, but when they combined

6   those companies, we lost some of the contacts.

7    Q.   Right.  And would you agree with me

8   that the folks under you who aren't as high up

9   maybe also could get confused about --

10       MS. BARLOTTA:  Object to the form.

11   Q.   -- that relationship?

12       MS. BARLOTTA:  Object to the form.

13   A.   No, I don't think -- they didn't deal

14  with them anyway, so I don't think they should

15  have been -- would have been concerned about

16  that.

17       I mean, I actually dealt with them,

18  so, but I wouldn't think my associate broker or

19  any -- they could probably care less.  I mean,

20  show me what I need to write and how much you're

21  going to pay me.  That's what they --

22   Q.   What if they needed to make

23  complaints?

Page 119

1        MS. BARLOTTA:  Object to form.

2    A.   I'm sorry?

3    Q.   What about if an employee needed to

4   make a complaint?

5        MS. BARLOTTA:  Object to form.

6    A.   Well, there's a BB&T 800 hotline you

7   can always call to make a complaint, and they'll

8   be on top of you in two seconds.

9    Q.   Do you know where that hotline goes,

10  like who runs it?

11       MS. BARLOTTA:  Object to form.

12   A.   It goes to some -- it goes to HR,

13  because if you called them and it was somebody in

14  our region, Stefani Petty would be calling.

15   Q.   Okay.

16       MS. PALMER:  Can we take a break and

17  then --

18       VIDEOGRAPHER:  We are going off the

19  record.  It is 3:19 p.m. Central Standard Time.

20       (Whereupon, a brief recess was

21  taken.)

22       VIDEOGRAPHER:  We are back on the

23  record.  It is 3:27.

Page 120

1    Q.   (BY MS. PALMER:)  All right.  Mr.

2   Helveston, we have just taken a little break, and

3   I'm going to do my best to get you out of here.

4   So I'm just going to try to wrap up a little bit,

5   but I think that's every lawyer's famous last

6   words.

7        First off, I should have asked you

8   this early on:  In your tenure with CRC, your

9   whole tenure, did anyone ever make any

10  discrimination complaints about you?

11   A.   No.

12   Q.   Did anyone make any harassment

13  complaints about you?

14   A.   Not that I know of.

15   Q.   So no one from HR or otherwise ever

16  communicated with you about an employee's

17  complaints with you?

18   A.   With me?

19   Q.   Yes.

20   A.   Not that I know of.

21   Q.   Okay.  What about other complaints of

22  discrimination or harassment?

23   A.   About anybody?

Page 121

1    Q.   About anybody, yes, sir.

2    A.   Not that come to mind.  I'm not

3  saying it didn't happen in thirty-six years, but

4  none that really come to mind.

5    Q.   Okay.  So as the owner, then

6  president, then CEO of CRC, was it your duty to

7  make sure that no discrimination was occurring?

8        MS. BARLOTTA:  Object to form.

9    A.   That should have been everybody's

10  duty.

11    Q.   Okay.  What steps did you personally

12  take to ensure that you were running the ship

13  that way?

14        MS. BARLOTTA:  Object to form.

15    A.   You know, our HR department did that,

16  and BB&T did it when we took all the classes and

17  all that.  Me personally, I didn't do it.  I

18  mean, that's kind of a hard question to answer.

19    Q.   So per the policy at CRC, what did

20  you understand discrimination to mean?

21        MS. BARLOTTA:  Object to form.

22    A.   What did I understand?

23    Q.   Yes, sir.

Page 122

1    A.   You're talking about what kind of

2  discrimination -- I mean, any time, you know,

3  sex, race, religion, you know, just, you know, I

4  guess if you're taking advantage of -- you know,

5  somebody is getting left out of the crowd

6  intentionally or something like that, I mean.

7  I'm not sure I can define it.  It's kind of like

8  you know what it is, but I can't really define

9  it.

10    Q.   That famous supreme court case, I

11  can't describe it, but I'll know it when I see

12  it?

13    A.   Exactly.

14    Q.   If an employee were to say to you,

15  It's an equality issue, would you understand that

16  to be discrimination?

17        MS. BARLOTTA:  Object to form.

18    A.   It's an -- well, nobody -- all these

19  brokers are different, and so equality from

20  there, equality -- when you're a producer and

21  you're out producing, quality is a different

22  thing, because two people are sitting side by

23  side, and one is making, you know, two hundred

Page 123

1  thousand, and one is making eight hundred

2  thousand, and yet they're coming in every day and

3  doing the same thing.  Now, is that equality?

4  Did he get more agents than I had or did he steal

5  my agents?

6        There's just so many things involved

7  in that, that it's really hard to put a finger on

8  it, what equality is in that.

9    Q.   In, let's say, the last fifteen years

10  of your employment with CRC, how many female

11  brokers were in the Birmingham office?

12        MS. BARLOTTA:  Object to form.

13    A.   Well, Betsy -- Betsy Barnett ran the

14  professional department before Rusty did.

15    Q.   I just heard she passed away as well.

16  I'm sorry about that.

17    A.   Yeah, she did, unfortunately.  But

18  Betsy was -- she was there in the last fifteen

19  years, well respected.  Everybody loved -- as a

20  matter of fact, she trained Corey and that whole

21  group.

22        Melissa Raspino in our property

23  department, very good broker; Susan Phillips in

Page 124

1  the professional department; Martha Hosey in the

2  casualty department; Sherry Curtis in the

3  casualty department.  I don't think there were

4  any other.  I'm not a hundred percent sure of

5  that.

6    Q.   Do you know if Susan Phillips is

7  still there?

8    A.   She's -- I saw her not too long ago,

9  and she's -- as a matter of fact, she invited me

10  to her retirement party.  It either just happened

11  or it's coming up.  So she's pretty soon to --

12  she either pretty soon just left or pretty soon

13  leaving.

14    Q.   Okay.  Were you involved in a meeting

15  with Betsy Barnett, some sort of unofficial lunch

16  meeting, where she made statements about being

17  concerned about the number of female brokers?

18        MS. BARLOTTA:  Object to form.

19    A.   You know, Betsy has been gone for ten

20  years probably.  I would not remember that.

21    Q.   Okay.  What steps did you take as the

22  CEO and president to ensure that no one

23  retaliated against anyone?

Page 125

1    MS. BARLOTTA:  Object to form.

2    A.   Oh, gosh, BB&T had all kinds of
3  non-retaliation.  That was -- you saw that all
4  the time.  And we made -- I mean, I don't know
5  that anybody -- in the brokerage end, I don't
6  really know how anybody would retaliate against
7  another one.

8        The brokerage teams are almost like
9  independent contractors.  Like when I had my team
10  and my four or five people on my team, we came
11  in, and we did everything -- we could relate to
12  other people or we didn't have to relate to other
13  people.

14        But there wasn't any -- there wasn't
15  any ability to -- the only retaliation may be if
16  some other team stole my agent or tried to -- you
17  know, you had kind of agents that you worked
18  with.  Although you didn't have agencies, you had
19  agents within the agencies.

20        So maybe if somebody tried to steal
21  somebody's agents or -- that may be a problem,
22  but I don't know where retaliation would come in,
23  to be honest with you.

Page 126

1    Q.   What about employment retaliation,
2  like if an employee complains -- if a team member
3  complains about their broker and then their
4  broker controls their bonus?

5    MS. BARLOTTA:  Object to form.

6    Q.   Could you see room for retaliation in
7  that area?

8    MS. BARLOTTA:  You're asking him just
9  in theory, hypothetical?

10   Q.   You can answer.

11   A.   Yeah, no, I mean, like I say --

12   MS. BARLOTTA:  Object to form.

13   A.   -- that could be.  That could happen.

14   Q.   Did you as the owner, president, CEO,
15  do anything to ensure that didn't happen?

16   MS. BARLOTTA:  If you're asking him
17  if he can ensure -- if he ensured -- that he
18  would stop a hypothetical situation from
19  happening?  Is that the question?

20   Q.   You can answer the question.

21   MS. BARLOTTA:  Object to the form.  I
22  don't -- I'm confused.

23   A.   First, you would have to know if they

Page 127

1  had a problem, and then you -- that's just
2  impossible really to figure out, because you'd
3  have to know one to know the other; and if you
4  didn't know one, you couldn't know the other.

5    Q.   And how would you learn if they had a
6  problem?

7    MS. BARLOTTA:  Again, you're talking
8  about hypothetical.  He's not an expert witness.
9  You're just asking him hypothetical --

10   A.   I --

11   MS. PALMER:  Hold on.  You're asking
12  him hypothetical opinion questions, which are
13  irrelevant and improper, and they're not
14  admissible.

15   Q.   You can answer, Mr. Helveston.

16   MS. BARLOTTA:  Object to the form
17  again.  She's asking you to speculate about a
18  situation that never happened.  She's in theory
19  asking you.

20   A.   I mean, after all this, I've even
21  forgotten the question.

22   Q.   How would you know -- you made a
23  statement that in order to stop retaliation, you

Page 128

1  would have to know that it had happened.  So how
2  would you know that it had happened?  Like what
3  would be an employee's expectation to report
4  that?

5    A.   Well, keep in mind --

6    MS. BARLOTTA:  Wait, wait.  No, no.
7  She's asking you to testify about another
8  employee's expectation, so object to the form.
9  If you can answer what another employee would
10  expect.

11   A.   No, I can't answer what another
12  employee --

13   Q.   What would you expect from another
14  employee?

15   MS. BARLOTTA:  Same problem.  Same
16  objection.  You're asking him to -- what he would
17  expect about a nonspecified, unidentified
18  employee, what that person would -- he would
19  think that they would expect.

20   MS. PALMER:  I'm following a trail of
21  questioning related to a form of discrimination
22  that he identified.

23   MS. BARLOTTA:  No, you're asking him

Page 129

1  hypotheticals about a situation that doesn't
2  exist and asking him to comment about what an
3  unidentified hypothetical employee -- what he
4  would think an unidentified hypothetical employee
5  would or would not do in a particular situation.
6         MS. PALMER:  I'm asking about his
7  role as the president, owner, and CEO of the
8  company as related to discrimination and
9  retaliation.
10        MS. BARLOTTA:  Right.  If you want to
11 put it in those terms about whether --
12        MS. PALMER:  Rachel, we are under the
13 usual stipulations.  You can object to the form;
14 and if Mr. Helveston can answer the question, he
15 can answer the question.
16        MS. BARLOTTA:  Leslie, I've given you
17 a lot of leeway on the hypotheticals today.  It's
18 been pretty much an hour of those.
19        MS. PALMER:  Can you point me to a
20 rule that says I cannot ask hypotheticals?
21        MS. BARLOTTA:  Yeah.  He's not an
22 expert witness.  Hypothetical scenarios are
23 proper for expert witnesses.  He's strictly here

Page 130

1  testifying about his personal knowledge, not
2  speculating about a situation that has or has not
3  happened.  And you're not even giving him any
4  parameters around it.
5         MS. PALMER:  I'm asking him about his
6  personal knowledge related to his position as the
7  president, CEO, and owner of CRC.
8         MS. BARLOTTA:  Yeah, an appropriate
9  question would be:  Did an employee come to you
10 and complain about this?  If that happened, what
11 would you do?
12        I don't know what this if this
13 happened and this happened and this -- he's
14 struggling here because your questions are bad,
15 and you should not be asking a lay witness
16 hypothetical questions, like a twenty-minute
17 diatribe of them.
18        MS. PALMER:  It wouldn't be a
19 twenty-minute diatribe if you would let him
20 answer.
21     Q.   (BY MS. PALMER:)  I apologize about
22 that, Mr. Helveston.  We can move on --
23        MS. BARLOTTA:  You don't need to

Page 131

1  apologize to the witness.  I'm his counsel.  You
2  don't need to --
3     Q.   -- if Ms. Barlotta will let you
4  answer.
5         MS. BARLOTTA:  Please stop
6  apologizing to my witness.  I'm his attorney.
7  Okay.  You don't need to apologize for me.
8         MS. PALMER:  This is his deposition,
9  not yours.
10    Q.   (BY MS. PALMER:)  What did you do as
11 the president, CEO, or owner of CRC to protect
12 your employees from discrimination?
13        MS. BARLOTTA:  Object to the form.
14 He's already answered that question.
15    A.   We have procedures that, you know, if
16 they had a problem, there's HR there.  And as the
17 president or CEO, ninety percent of the time, the
18 employees didn't come to me.  They would come to
19 like an office manager or their team members.
20 They -- before it got to me, it would go through
21 two or three other people.
22    Q.   Right.  So in that ten percent of the
23 time that it -- that they came directly to you,

Page 132

1  let's talk specifically about --
2     A.   No, I'm not even sure -- I'm not sure
3  anybody -- remember, even Kathryn didn't come to
4  me.  I came to her.  So there's not many times --
5  I can't think of a time when somebody would come
6  to me that hadn't been to somebody else first.
7         They just -- it just didn't happen,
8  especially -- ninety percent of the offices were
9  out of state.  In Birmingham, they would go to
10 John Cadden.
11    Q.   So during that breakfast meeting with
12 Kathryn, what would she have needed to say to
13 make you aware that she was experiencing
14 discrimination?
15        MS. BARLOTTA:  Object to form.
16    A.   She would have -- number one, all she
17 had to do really was say, I don't want to talk to
18 John, and I need your help.  You know, I'm
19 getting discriminated against, and I need your
20 help, you know.  That's all she would have had to
21 say is that -- and she would have said, I don't
22 need to talk -- you want me to talk to Corey.  I
23 don't need to talk to Corey.  I'm getting

Page 133

1  discriminated against, and I need your help, and
2  I would have gone back and called Stefani Petty.
3      Kathryn and I are friends. I've
4  known her family for thirty years. There was no
5  reason for me not to help her.
6      Q.  Right. The -- you testified earlier
7  about assuming that one of the communications
8  that she was left out of was brokers. Do you
9  recall that testimony?
10     A.  I'm sorry. Say that again.
11     Q.  You testified earlier about the
12  communications that Kat complained about being
13  left out of. You said you assumed it was a
14  broker communication. Do you remember saying
15  that?
16     MS. BARLOTTA: Object to form.
17     A.  Well, I also remember saying that I
18  didn't really -- I didn't really understand what
19  that was involved, but it makes sense that
20  there's so many different e-mail groups, that you
21  could -- and a lot of them -- if I'm sitting on a
22  team and my broker is getting a lot of e-mails
23  and I'm not getting them, maybe I'm feeling like

Page 134

1  I'm not getting them.
2      Q.  Yeah.
3      A.  But if you're not getting them, to
4  me, you just go to your broker and say, Hey,
5  look, I'm really trying to learn here, and you
6  guys are probably talking about some really good
7  stuff that I can learn. Can you get me into --
8  can you add me to this group? I mean, why in the
9  world wouldn't anybody do that?
10     Q.  When you were having trouble
11  understanding what she was talking about, did you
12  ask her specifically who were these
13  communications between?
14     MS. BARLOTTA: Object to form.
15     A.  Well, I think she told me who it was.
16  It was between the brokers in the professional
17  department.
18     Q.  Okay. Did you ask her to see any of
19  the communications?
20     A.  No.
21     Q.  The bonus sheet that you talked about
22  earlier, that kind of the range that shows --
23     A.  This one (indicating)?

Page 135

1      Q.  The one we talked about that led us
2  to that exhibit, the twenty-five.
3      A.  Twenty-five, oh, yeah.
4      Q.  The twenty-five to -- yeah, that with
5  the revenues, do you still have your copy of
6  that?
7      A.  No.
8      Q.  What happened to the documents in
9  your office when you left?
10     MS. BARLOTTA: Object to form.
11     A.  I have no idea.
12     Q.  Did you clean out your desk?
13     A.  I cleaned out my personal stuff. I
14  didn't take a bonus sheet with me.
15     Q.  Did you instruct anything to be
16  shredded?
17     A.  That was already -- yeah, I already
18  took care of that.
19     Q.  Do you know who is in your office
20  now?
21     A.  Yeah. Zach Mather is in my office, a
22  broker.
23     Q.  Did you turn over your -- any of your

Page 136

1  stuff to Zach specifically?
2      A.  No. Zach didn't -- well, I mean, he
3  may have gotten the computer that was in there,
4  but he got the -- he could have gotten the
5  painting on the wall or something, you know.
6      The offices were redone by the --
7  when we were out for Covid, the offices were
8  redone. So when they were finished being redone,
9  I was done.
10     So when I left and the time Zach
11  moved in the office was completely different. It
12  was completely remodeled, so there wasn't
13  anything in there.
14     Q.  Did you ask Kat why she believed she
15  was being treated differently?
16     MS. BARLOTTA: Object to form.
17  Assumes facts not in evidence.
18     A.  Yeah, I didn't get that she was being
19  treated differently. I just -- she had these
20  issues, but to me, those were normal broker
21  issues that a lot of people have, but if you --
22  you know, that you could work out with your
23  broker. So I didn't get that she was being

Page 137

1   treated -- not being treated equal.

2      Q.   Okay.  And I can't remember, did you

3   say that you took notes during your meeting with

4   her?

5      A.   I'm sorry?

6      Q.   Did you say that you took notes

7   during your meeting with her?

8      A.   No, I did not take notes.

9      Q.   When you got back to the office, did

10  you jot anything down?

11     A.   No, I did not.

12     Q.   But you vividly remember the five

13  points that she set out?

14     A.   Yeah, because -- being a broker,

15  those are the things that resonated with me.

16  Yes, I remember those.

17     Q.   When she pointed out those five

18  issues, did you ask her why she felt like those

19  five issues were occurring?

20         MS. BARLOTTA:  Object to form.

21     A.   I mean, I don't remember that part of

22  the conversation.  Quite frankly, I understood a

23  lot of it because I've been a broker.  I've had

Page 138

1   situations where I felt like I didn't know all of

2   the -- I didn't have enough training.  I didn't

3   know the forms.  You know, there's been

4   underwriters that didn't like me.  So a lot of

5   those things I could relate to.

6      Q.   Okay.  What did you do in those

7   situations when it was occurring to you?

8      A.   Well, just, hey, look, you've got to

9   deal with the brokers anyway.  You've just got to

10  pony up.  If you need a quote from them, you've

11  got to learn to deal with them.

12     Q.   Why do you think there aren't many

13  women brokers in Birmingham?

14         MS. BARLOTTA:  Object to form.

15     A.   You know what, I don't know.  I guess

16  we -- when they hire -- we hire -- we bring in

17  interns, and we hire from there, and they just

18  hire the people.

19         I don't think -- I don't think

20  there's any, you know, any reason or any master

21  plan not to hire women brokers.  The largest

22  broker in our company was a woman.

23     Q.   Have you noticed -- when you were

Page 139

1   there before 2020, did you notice a trend of the

2   women being in account executive and inside

3   broker roles?

4          MS. BARLOTTA:  Object to form.

5      A.   Well, not really.  Some of them were

6   because they didn't want to travel.

7      Q.   Okay.  Who's Justin McFadden?

8      A.   That's Andrew Baker's inside broker.

9      Q.   Okay.  So was he Andrew Baker's

10  inside broker when Andrew Baker was your

11  associate broker?

12     A.   No, no.

13     Q.   So that would have been after you

14  became the CEO and left your book?

15     A.   Yeah.  Andrew took over my book, and

16  a while later, he hired Justin McFadden.

17     Q.   And is that how it works with brokers

18  is you always hand your book down to somebody

19  when you leave?

20         MS. BARLOTTA:  Object to form.

21     A.   There's different ways to do it.

22     Q.   But it's all about the connections

23  you have, right?

Page 140

1      A.   Right.  Because you can't hand it

2   over -- if the agents don't want to deal with

3   you, it doesn't matter whether you hand them

4   over, they'll leave.

5      Q.   Right.  It's like lawyers.  If you

6   leave a firm, you tell the client, but they can

7   stay or they can go.

8      A.   Exactly.  It's all about

9   relationships.

10         MS. PALMER:  All right.  I am done

11  with you, sir.  Thank you so much.

12         THE WITNESS:  All right.  Thank you.

13         VIDEOGRAPHER:  This concludes our

14  deposition.  It is 3:46 p.m. Central Standard

15  Time.

16

17

18

19         FURTHER DEPONENT SAITH NOT

20

21

22

23

Page 141

1         C E R T I F I C A T E

2

3    STATE OF ALABAMA )

4    JEFFERSON COUNTY )

5

6         I HEREBY CERTIFY that the above

7    and foregoing transcript was taken down by me in

8    stenotype, and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the testimony

12   given by said witness.

13        I FURTHER CERTIFY that I am

14   neither of counsel, nor of any relation to the

15   parties to the action, nor am I anywise

16   interested in the result of said cause.

17

18   *[signature]*

19        /s/Tanya D. Cornelius

20        TANYA D. CORNELIUS, RPR

21        ACCR #378 Expires 10/1/2024

22        Notary Expires 9/13/26

23

Please return the signature page, correction sheet, and transcript within 30 days.  The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

 Tanya Cornelius
Certified Court Reporter

WITNESS SIGNATURE PAGE


In Re:  Read and sign of Video Deposition of Ron Helveston


I, _____, hereby certify that I have read the

foregoing transcript of my deposition and it is a true and correct transcript of the

testimony given by me at the time and place stated with the corrections, if any, and the

reasons therefore noted on a separate sheet of paper and attached hereto.




                                    _____
                                    Video Deposition of Ron Helveston



SWORN TO AND SUBSCRIBED before me this _____ day of _____,
202____.



                                    _____
                                    NOTARY PUBLIC



                        MY COMMISSION EXPIRES:

                                    _____

Video Deposition of Ron Helveston

Errata Sheet

Page Number          Line Number                    Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORD INDEX**

**< 1 >**
**1:36**  1:20
2:10  6:8, 14
**10/1/2024** 141:21
**100**  5:6
**104**  5:6
**107**  4:12
**12/31/20** 11:22 29:11
**1400**  5:19
**17**  1:19 23:9, 12 115:9
**1717**  2:7 5:11  6:6
**17th**  2:9 6:14
**18**  23:9, 12
**19**  23:10, 13  115:9

**< 2 >**
**2**  77:3, 6 78:5  108:6
**2:21-CV-0300-MHH** 1:5  7:1
**2017**  23:9 81:11 95:19
**2018** 108:10
**2019**  27:7 33:2  49:9, 12

**2020**  12:5 33:3  139:1
**2024**  1:19 2:9  6:14
**20th**  5:19
**21**  4:10 30:23  31:3, 6
**22**  4:11 94:9, 11, 13 103:22 104:2
**23**  4:12 107:12, 14, 21
**23rd**  5:6

**< 3 >**
**3:19**  119:19
**3:27**  119:23
**3:46**  140:14
**31**  4:10
**31st**  108:10
**35203**  5:12, 20
**35233**  5:7
**378**  141:21
**3rd**  2:7 5:11  6:6

**< 4 >**
**420**  5:19 108:1
**4995**  107:8 108:1
**4996**  108:7
**4998**  107:8 108:1

**< 8 >**
**8**  4:3
**800**  119:6

**< 9 >**
**9/13/26** 141:22
**94**  4:11

**< A >**
**A**  2:1, 8 5:1, 5, 11 6:7  8:16, 18, 21  9:1, 4, 7, 10, 11, 14, 16, 19, 21  10:3, 6, 8, 10, 13, 15, 18  11:1, 3, 6, 9, 11, 14, 17, 20, 22 12:1, 2, 7, 11, 17, 20, 22  13:1, 3, 6, 8, 9, 11, 12, 15, 16, 18, 20, 23 14:3, 5, 6, 9, 11, 12, 17, 18, 21, 23 15:2, 4, 7, 8, 11, 13, 18, 22, 23  16:3, 4, 12, 13, 16, 19, 23  17:3, 5, 6, 7, 12, 15, 19, 21 18:2, 3, 9, 18  19:3, 11, 14, 16, 21 20:1, 2, 7, 8, 12, 13  21:3, 5, 9, 10, 13, 14, 19, 22 22:2, 4, 6,

11, 15, 19, 22, 23  23:1, 6, 9, 11, 16, 19, 21, 22, 23  24:6, 8, 11, 16  25:1, 4, 6, 12, 17, 19, 21  26:3, 5, 8, 11, 14, 16, 19, 22 27:2, 5, 9, 11, 14, 16, 18, 19, 22 28:3, 5, 6, 8, 10, 14, 21, 23  29:4, 5, 6, 7, 8, 11, 13, 15, 20, 23  30:1, 2, 6, 7, 10, 12, 13, 14, 16, 18  31:3, 7, 8, 9, 13, 18, 21  32:3, 5, 12, 15, 18, 22  33:6, 10, 12, 15, 18, 21  34:2, 9, 11, 14, 18, 22  35:2, 5, 8, 9, 11, 14, 19, 23  36:5, 9, 12, 14, 23 37:2, 9, 13, 21  38:2, 6, 12, 23  39:2, 5, 9, 10, 11, 14, 19  40:1, 3, 5, 7, 13, 18, 20, 21 41:3, 6, 9, 12, 14, 17,

21, 23  42:2, 5, 6, 7, 9, 13, 15, 18, 21, 22, 23  43:3, 7, 12, 16, 18, 23  44:2, 5, 7, 9, 11, 13, 16, 18, 20 45:4, 6, 7, 15, 17, 20 46:1, 6, 9, 10, 13, 19 47:5, 10, 15, 17, 21, 23 48:2, 4, 6, 8, 13, 15, 17, 19, 21, 23 49:6, 11, 12, 14, 17, 20 50:1, 4, 7, 8, 10, 16, 18, 22  51:2, 4, 5, 8, 9, 10, 11, 17, 21 52:4, 7, 9, 12, 15, 19, 22  53:3, 4, 7, 15, 20, 23 54:2, 8, 10, 12, 15, 17, 21  55:1, 15, 20  56:4, 10, 18, 21  57:1, 5, 10, 13, 14, 20, 22  58:3, 7, 10, 13, 16, 19, 22 59:10, 15, 18, 19, 21 60:4, 11, 12, 17, 20, 22 61:3, 5, 12,

*14, 15, 21*
*62:3, 10, 11,*
*14, 17, 20,*
*22  63:9, 12,*
*17, 20, 23*
*64:3, 6, 9,*
*11, 15, 18,*
*20, 23  65:3,*
*5, 8, 14, 15,*
*20, 23  66:4,*
*7, 12, 13, 15,*
*16, 19  67:1,*
*4, 7, 12, 17,*
*20  68:3, 7,*
*10, 15, 16,*
*20, 21  69:1,*
*3, 6, 9, 15,*
*17, 23  70:7,*
*9, 16, 20*
*71:5, 9, 15,*
*16, 23  72:9,*
*11, 15, 18,*
*20, 21, 23*
*73:3, 6, 7, 9,*
*12, 19  74:2,*
*4, 6, 21*
*75:6, 11, 13,*
*21  76:1, 5,*
*8, 13, 14, 16,*
*17, 18, 22,*
*23  77:3, 10,*
*13, 19, 22,*
*23  78:2, 10,*
*16  79:1, 5,*
*12, 17, 23*
*80:3, 7, 15,*
*19, 21, 23*
*81:2, 12, 18*
*82:1, 7, 8,*
*10, 13, 17*
*83:1, 3, 6, 9,*
*10, 15, 18*

*84:1, 4, 5, 7,*
*10, 12, 13,*
*15, 19, 20,*
*21, 23  85:5,*
*6, 7, 8, 10,*
*12, 18, 20*
*86:1, 2, 4, 5,*
*7, 15, 18, 22*
*87:1, 7, 12,*
*16, 19, 20*
*88:2, 6, 9,*
*12, 13, 17,*
*19, 21, 22*
*89:1, 4, 9,*
*17, 21  90:3,*
*6, 8, 11, 20,*
*22  91:1, 3,*
*6, 10, 17, 22*
*92:4, 6, 7,*
*13, 17  93:3,*
*10, 13, 18,*
*21  94:1, 4,*
*11, 14, 16*
*95:2, 4, 7,*
*11, 21*
*96:14, 23*
*97:4, 9*
*98:10, 11,*
*14, 23*
*99:12, 13,*
*14  100:9*
*101:12, 16*
*102:9, 10,*
*13, 15, 17,*
*19  103:1, 2,*
*15, 16, 18,*
*20, 23*
*104:2, 4, 5,*
*7, 11, 15, 17,*
*18, 20*
*105:1, 10,*
*17, 19*

*106:4, 9, 10,*
*13, 14, 18,*
*23  107:1, 7,*
*14, 19, 20*
*108:3, 5, 12,*
*18  109:5, 9,*
*10, 14, 21,*
*23  110:8,*
*10, 16, 18,*
*20, 21*
*111:1, 2, 7,*
*10, 11, 13,*
*20, 23*
*112:2, 5, 7,*
*9, 11, 14, 17,*
*22  113:1, 2,*
*4, 9, 13, 15,*
*18, 19, 22*
*114:1, 4, 5,*
*12, 14*
*115:5, 12,*
*17  116:3, 4,*
*7, 10, 12, 15,*
*17, 21*
*117:1, 3, 6,*
*9, 15, 17, 21*
*118:4, 13*
*119:2, 4, 6,*
*7, 12, 16, 20*
*120:2, 4, 11,*
*14, 18, 20,*
*23  121:2, 9,*
*15, 18, 22*
*122:1, 13,*
*18, 20, 21*
*123:7, 13,*
*17, 19*
*124:4, 8, 9,*
*14, 19*
*125:2, 21*
*126:2, 11,*
*13, 18, 23*

*127:1, 5, 10,*
*17, 20, 22*
*128:5, 11,*
*17, 20, 21*
*129:1, 5, 17,*
*19  130:2,*
*15, 16, 18*
*131:15, 16*
*132:2, 5, 16*
*133:10, 13,*
*17, 21, 22*
*134:3, 15,*
*20, 23*
*135:3, 7, 11,*
*13, 14, 17,*
*21  136:2,*
*18, 21*
*137:5, 8, 11,*
*14, 21, 22,*
*23  138:4, 8,*
*10, 15, 22*
*139:1, 5, 8,*
*12, 15, 16,*
*21  140:1, 6,*
*8  141:1, 11*
**ability**  33:1
125:15
**able**  8:16
22:7  30:15
52:16
61:11
110:3
**access**
79:3, 6
**account**
30:12, 16
42:16  55:9
58:5  60:9
87:11  88:4
139:2
**accounting**
89:5, 6

109:10, 13
110:5
**accounts**
16:5  20:16
30:19
**ACCR**
141:21
**acting**  6:2
15:22
**action**
141:15
**actual**  35:1
**add**  82:20
134:8
**addition**
85:23
88:16
**address**
93:1
102:11, 13
**administer**
7:11
**admissible**
127:14
**advance**
96:21
101:9
**advantage**
122:4
**affiliated**
10:1
112:20
113:7, 9
**afternoon**
8:3
**age**  10:19
**agencies**
125:18, 19
**agent**
125:16
**agents**
16:11

18:*20*  19:*5*
20:*16*
52:*20*
58:*17, 22,*
*23*  59:*23*
60:*5, 15*
68:*17*  69:*1*
71:*17, 19*
72:*11*
86:*21*
123:*4, 5*
125:*17, 19,*
*21*  140:*2*
**ago**  9:*22*
31:*22*
124:*8*
**agree**  39:*6*
49:*21*
54:*14*
80:*18*  93:*4*
103:*12*
104:*3*
118:*7*
**AGREED**
2:*2, 11, 18*
3:*3*  95:*12*
**ahead**
30:*20*
97:*21*
101:*6*
102:*5*
107:*4, 10,*
*17*
**al**  6:*21*
**ALABAMA**
1:*1*  2:*8*
5:*7, 12, 20*
6:*7, 17, 23*
141:*3*
**allegation**
97:*8*

**ambitions**
40:*16*
**amount**
18:*3*  83:*4*
86:*20*
**amounts**
85:*17*
**Amy**  64:*1,*
*8*
**an**  8:*12*
10:*15*  14:*9*
15:*13*  17:*2,*
*8, 9, 13*
18:*12*
19:*23*  20:*3,*
*5, 9*  21:*5,*
*17, 21*  22:*3*
27:*17*
28:*16, 19*
29:*1*  34:*14,*
*16*  38:*4*
39:*22*
40:*23*
42:*14, 16*
43:*11*
44:*14*
46:*10*  47:*5,*
*8*  55:*9, 17*
58:*5, 10, 15*
59:*7*  65:*12,*
*13*  68:*16,*
*19, 23*
72:*11*  76:*2*
86:*19*
87:*22*  88:*4,*
*7*  89:*19*
90:*17*
107:*3*
110:*17*
112:*5, 13*
113:*4*
115:*15, 18*

119:*3*
120:*16*
122:*14, 15,*
*18*  126:*2*
127:*8*
128:*3*
129:*2, 4, 18,*
*21*  130:*8, 9*
131:*19*
**and**  1:*11*
2:*2, 6, 11,*
*12, 14, 16,*
*18, 22, 23*
3:*3*  6:*1, 4,*
*15*  7:*9, 16,*
*22*  8:*4, 5, 7,*
*11, 13*  9:*8,*
*11, 12, 18*
10:*4, 9, 17,*
*20*  11:*7*
12:*4, 8, 12,*
*13, 14, 19,*
*21, 22*
13:*12, 15,*
*20*  14:*1, 2,*
*6, 7, 9, 16*
15:*2, 14, 16*
16:*1, 4, 10,*
*21*  17:*1, 2,*
*7, 22*  18:*2,*
*4, 5, 8, 12,*
*20, 21*  19:*3,*
*5, 6*  20:*4,*
*10, 13, 16*
21:*6, 7, 8,*
*11, 12, 13,*
*14*  22:*4, 16*
23:*6, 8, 19,*
*20*  24:*6, 8,*
*10, 19*  25:*7,*
*19*  26:*6, 20*
27:*10*

28:*15, 18*
30:*11, 20,*
*22*  31:*3, 10,*
*14, 23*  33:*8*
34:*4, 5*
35:*6, 16*
36:*7, 8, 15*
37:*2, 5, 14,*
*15, 18*  38:*7,*
*16, 18*  39:*1,*
*17*  40:*6, 9*
41:*13, 15*
42:*12, 16*
43:*7, 8, 12,*
*17, 19*  44:*3,*
*10*  45:*10,*
*11, 12, 13,*
*20, 22*  46:*1*
48:*7*  49:*12,*
*20*  50:*9, 10,*
*11, 12, 13,*
*16*  51:*6, 14*
52:*4, 5*
53:*4, 6, 8,*
*12*  54:*4, 10,*
*14, 23*  55:*1,*
*5, 7, 10, 17*
56:*10*  57:*1,*
*3, 11, 23*
58:*15, 23*
59:*4, 13*
60:*22, 23*
61:*1, 2, 4,*
*19, 20*  62:*3,*
*6, 11, 23*
63:*1, 2, 3, 4,*
*5, 7, 11*
64:*7, 10, 12,*
*16, 17*
65:*16, 17*
66:*1, 5, 18,*
*20, 22*

67:*13*
68:*11, 12,*
*15*  69:*12,*
*14, 21*  70:*3,*
*10, 12, 23*
71:*7, 18*
72:*1, 5*
73:*13*  74:*1,*
*8, 15, 16*
75:*5, 8, 13,*
*14, 15, 16*
76:*4*  77:*3,*
*16, 21*  78:*7,*
*20*  79:*9, 14,*
*19*  80:*8, 17,*
*22*  81:*19,*
*20*  82:*10,*
*12, 16, 17*
83:*1, 3, 4, 9,*
*10*  84:*11,*
*14, 15, 17,*
*22*  85:*10*
86:*4, 5, 7,*
*19, 21, 22*
87:*3, 20, 22,*
*23*  88:*2, 4,*
*10, 12, 13,*
*17, 22*  89:*1,*
*6, 7, 9, 11,*
*22, 23*  90:*1,*
*16, 21*  91:*4,*
*7, 14, 22*
92:*7, 15, 17,*
*18*  93:*9, 10,*
*12, 14, 21*
94:*11, 13*
95:*8, 9, 12*
98:*1, 5, 7, 8*
99:*16, 18*
100:*11, 17,*
*20*  101:*2,*
*10, 11, 13,*

15, 16, 20
102:5, 8, 11, 14, 23
103:16, 19
104:1, 12
105:4, 6, 10, 11, 12, 20, 23  107:2, 4, 10, 14, 16, 17, 20, 22
108:1, 21, 22  109:8, 9, 10  110:2, 6, 10  111:3, 5, 6, 13, 14, 15
112:6
113:5, 7, 10, 15, 18
114:7, 13, 16, 21, 23
115:1
116:22
117:5, 10, 11, 20, 23
118:2, 7, 20
119:7, 13, 16  120:2
121:16
122:19, 20, 23  123:1, 2, 20  124:9, 22  125:4, 10, 11
126:3
127:1, 3, 5, 13  129:2, 7, 8, 14  130:3, 7, 10, 13, 15
131:16
132:18, 19, 21  133:1, 2, 3, 21, 22, 23

134:4, 5
136:10
137:2
138:17
139:2, 14, 15, 17
141:7, 8, 10, 11
**and/or**
42:11
**Andrea**
48:18
**Andrew**
19:14, 15
139:8, 9, 10, 15
**answer**
18:14, 15
37:15  52:4
72:8  98:7
121:18
126:10, 20
127:15
128:9, 11
129:14, 15
130:20
131:4
**answered**
65:18  74:1
131:14
**answers**
141:8
**antics**
98:13
**anybody**
25:3  27:6, 7  62:19, 21
91:19, 23
120:23
121:1
125:5, 6

132:3
134:9
**anymore**
64:5  69:13
**anyway**
118:14
138:9
**anywise**
141:15
**apologize**
107:17
130:21
131:1, 7
**apologizing**
131:6
**apparently**
71:15
**appear**
98:16
102:14
**appears**
103:1, 15, 21  108:8
**applies**
97:6
**apply**  88:8
**applying**
26:13
**appropriate**
130:8
**approximately**  2:10
**area**  98:10
126:7
**areas**  89:23
**Argumentative**  92:3
**Ashville**
45:18
**asked**  52:9
59:10
60:16

63:21
65:16
73:23
98:18
100:3
120:7
**asking**
18:16
65:11, 13
85:21  95:6
97:10
98:20
99:16
126:8, 16
127:9, 11, 17, 19
128:7, 16, 23  129:2, 6
130:5, 15
**asks**  31:14
32:6
**aspiration**
27:4
**assign**
2:23  60:8
**assigned**
52:20
**assigning**
59:23
**assistant**
15:20
18:11  64:1
88:16
105:19
**assistants**
15:15, 17, 18, 19
17:23
18:22
74:13
**associate**
15:14

16:17, 18
17:2, 13, 17
18:12, 19
19:2, 13, 23
21:4, 6, 17, 21  27:17
42:9, 11
43:11
86:19, 23
87:12
88:14
118:18
139:11
**assume**
52:5  60:11
67:21  74:5
79:1
**assumed**
70:23  74:4
133:13
**Assumes**
59:9
136:17
**assuming**
50:16, 17
54:21  78:3
115:13
117:3
133:7
**Atlanta**
19:6
**attached**
31:4  94:12
107:15
**attorney**
131:6
**audit**  58:5
89:19, 23
90:4, 7, 13
**audits**
89:14, 17

authority
  22:22
autopopulat
e  75:8
Avenue
  2:8  5:11
  6:7  21:5
aware
  26:15, 21
  43:5  90:16
  115:15
  132:13

< B >
back  29:17
  34:6  51:14
  60:21
  61:11, 20
  62:5, 18
  63:5, 6
  64:17  66:5
  71:2  91:3,
  7  101:20
  115:8
  119:22
  133:2
  137:9
bad  130:14
BAKER
  5:16  19:14,
  15  139:10
Baker's
  139:8, 9
balances
  90:1
ball  13:1
band  84:17
bands
  84:16
BANK  1:11
  8:7  35:3

70:17
116:17
Banking
  35:4  37:3
Banks
  35:15
Barlotta
  5:18  7:8,
  21  10:23
  17:16
  18:13, 15
  19:10, 17,
  20  20:6, 23
  21:2, 18
  22:18
  23:15  24:5,
  15  25:5, 16,
  20  28:13,
  20  29:3, 22
  30:5, 17
  32:1  33:5
  36:4, 11, 19,
  22  38:1, 5,
  21  39:4, 8,
  15, 18, 23
  40:11
  42:19
  46:18  47:9,
  16  51:16
  54:1, 7, 13,
  16, 20  56:3,
  17  57:4, 9,
  19  58:2, 18
  59:8, 14
  60:1, 3, 10
  62:2, 9, 13
  65:7, 11, 22
  67:3, 6, 15
  68:2, 9
  70:19
  71:14, 22
  72:5, 22

73:11, 18,
  23  74:20
  75:10, 23
  76:7  77:18
  78:1, 9, 14,
  23  79:4, 18,
  22  80:14,
  20  81:1, 5,
  10, 16
  83:23  84:2
  85:4, 11
  86:17  87:9,
  18  88:1, 20
  89:3, 16
  90:2, 10, 19
  91:5  92:2
  93:8  94:3,
  17, 22  95:6,
  14, 23  96:4,
  10, 20  97:1,
  6, 14, 17, 20
  98:3, 11
  99:13
  100:5, 13,
  16  101:3, 7,
  18, 22
  102:16
  103:4, 8, 11,
  19  104:23
  106:3, 8, 12
  109:4
  110:19
  111:19
  112:4, 10,
  16, 21
  115:11
  116:2, 6
  118:3, 10,
  12  119:1, 5,
  11  121:8,
  14, 21
  122:17

123:12
124:18
125:1
126:5, 8, 12,
  16, 21
127:7, 16
128:6, 15,
  23  129:10,
  16, 21
130:8, 23
131:3, 5, 13
132:15
133:16
134:14
135:10
136:16
137:20
138:14
139:4, 20
Barnett
  43:7
  123:13
  124:15
based
  78:21
  85:16
basically
  113:6
Bates
  94:18
  107:21, 22
BB&T  10:2,
  5, 8  14:12
  34:8, 20
  35:2, 3, 17
  36:6, 9, 17,
  23  45:22
  113:10
  114:7, 17
  117:5, 11,
  18  119:6

121:16
125:2
BEARMAN
  5:16
beginning
  6:8
behalf  6:16
believe
  21:1  30:23
  38:9  71:20,
  23  98:5
believed
  136:14
bell  48:4
  113:1
bells  27:17
BenefitMall
  113:12
BERKOWIT
Z  5:17
best  20:18
  31:21  39:6
  57:12
  120:3
Betsy  43:7
  123:13, 18
  124:15, 19
better
  43:18
  110:6
beyond
  105:10
big  18:10
  54:15
  56:13
  62:11  71:5
  87:19, 21
  99:12, 14
  109:9
binders
  16:7  18:7
  87:20, 23

Video Deposition of Ron Helveston

1/17/2024

**Birmingham**
 2:*8*  5:*7, 12,*
 *20*  6:*7*
 13:*19*  15:*9*
 35:*7*  36:*2,*
 *10, 18*  41:*2,*
 *4, 18, 22*
 48:*8*  56:*8,*
 *23*  75:*1, 8*
 79:*15, 16,*
 *21*  110:*11,*
 *12*  115:*10*
 123:*11*
 132:*9*
 138:*13*
**birthday**
 50:*7*
**bit**  16:*5*
 20:*8*  77:*3*
 101:*12*
 102:*19*
 120:*4*
**Blake**  44:*6*
 45:*12*
**Blake's**
 45:*3*
**blow**
 108:*22*
**blue**  77:*22*
**boat**  50:*10*
**Bonus**
 4:*12*  80:*13,*
 *17, 19*  81:*4,*
 *14*  83:*1, 6,*
 *7, 9, 20*
 84:*6*  85:*15*
 86:*3, 11, 16*
 89:*7*  91:*8,*
 *11*  92:*10*
 93:*12*  94:*5*
 105:*6, 8, 10,*

 *13, 21*
 106:*21*
 107:*8*
 108:*9*
 109:*11, 16,*
 *18*  110:*7, 8,*
 *21, 23*
 111:*4, 6*
 112:*3, 7, 9,*
 *15*  116:*5*
 126:*4*
 134:*21*
 135:*14*
**bonuses**
 85:*22*  90:*7*
 105:*3*
 110:*3, 14*
**book**  17:*7*
 19:*12*
 21:*10*
 76:*20, 23*
 139:*14, 15,*
 *18*
**boss**  45:*10,*
 *20*
**bother**  74:*9*
**bottom**
 102:*23*
 107:*23*
 108:*3, 4*
**bought**
 113:*10, 15,*
 *18*  114:*6,*
 *16*
**bound**
 86:*22*
**Boy**  89:*17*
**bragged**
 106:*18*
**brain**  44:*19*
**Branch**
 35:*3, 4*

**Brandon**
 27:*12*
**break**
 68:*20*  98:*9*
 104:*8, 10,*
 *12*  119:*16*
 120:*2*
**breakfast**
 51:*9, 11, 14*
 63:*1, 12*
 70:*6, 12*
 132:*11*
**brief**
 119:*20*
**bring**  16:*9*
 18:*21*  19:*4*
 22:*12*  87:*2,*
 *23*  88:*4*
 138:*16*
**bringing**
 87:*20*  88:*7*
**brings**
 80:*23*
**broker**
 13:*8, 9, 10,*
 *11, 13, 16*
 14:*20, 21*
 15:*9, 13, 14,*
 *22*  16:*1, 17,*
 *18, 23*  17:*2,*
 *3, 6, 7, 13,*
 *18*  18:*12,*
 *19*  19:*2, 13,*
 *23*  20:*1, 3,*
 *5, 9, 12*
 21:*5, 6, 9,*
 *13, 17, 21*
 24:*9*  25:*3,*
 *19*  27:*17*
 28:*3*  30:*7*
 42:*7, 9, 11,*
 *12, 14, 22*

 43:*11, 12*
 44:*14, 20*
 55:*2*  58:*11,*
 *15*  60:*7*
 61:*6*  74:*16*
 76:*14, 16,*
 *17, 18*
 77:*14*
 80:*23*  83:*1,*
 *19, 21*  84:*4,*
 *5*  85:*16*
 86:*19*  87:*7,*
 *12, 14, 23*
 88:*7, 9, 10,*
 *11, 14, 15*
 89:*11*
 92:*13, 14*
 105:*19*
 109:*7*
 110:*12*
 111:*3*
 112:*18*
 114:*20*
 118:*18*
 123:*23*
 126:*3, 4*
 133:*14, 22*
 134:*4*
 135:*22*
 136:*20, 23*
 137:*14, 23*
 138:*22*
 139:*3, 8, 10,*
 *11*
**brokerage**
 14:*7, 19*
 41:*9*  46:*1*
 113:*16*
 125:*5, 8*
**brokered**
 16:*5*

**brokers**
 14:*22*
 20:*14, 15,*
 *21*  21:*4, 6,*
 *7*  22:*8*
 24:*4*  56:*5,*
 *6, 7, 8, 9, 11,*
 *16, 19*
 58:*19, 23*
 74:*4, 6, 7,*
 *10, 23*  75:*1,*
 *2, 7*  81:*18*
 82:*2*  83:*18*
 85:*1*  86:*10*
 87:*1*
 106:*16*
 109:*7*
 122:*19*
 123:*11*
 124:*17*
 133:*8*
 134:*16*
 138:*9, 13,*
 *21*  139:*17*
**broker's**
 83:*14, 15,*
 *17*
**brought**
 21:*8*  31:*15*
 86:*20*  87:*8*
**bubbles**
 78:*7, 12, 21*
**build**  21:*10*
**bumped**
 19:*11*
**bunch**
 68:*17*  69:*1*
 72:*11*
**business**
 16:*4, 10*
 17:*2, 7*
 18:*21*

20:*11, 19*
55:*12*
58:*21* 68:*4*
86:*21*
91:*19, 20*
93:*13*
112:*6*
113:*8*
**buy** 114:*14*
**buying**
114:*12*
**Byrd** 5:*23*
6:*15*

**< C >**
**Cadden**
13:*17, 18*
28:*17* 41:*1*
43:*22* 44:*1,*
*3* 60:*22*
61:*2* 62:*22*
63:*8, 14, 18,*
*21* 64:*18*
65:*4* 110:*5*
132:*10*
**Cadden's**
44:*1*
**calculated**
109:*11*

**calculations**
80:*13, 18*
81:*15* 89:*7*
92:*11*
108:*9*
**CALDWELL**
5:*16*
**calendar**
50:*2*
**California**
75:*2*

**call** 40:*5*
50:*13, 15*
51:*1, 23*
62:*21*
64:*12, 17,*
*21* 65:*10,*
*17* 66:*1, 3,*
*21* 67:*13*
69:*14* 70:*4*
72:*15*
75:*14* 89:*6,*
*9* 116:*19*
119:*7*
**called**
15:*16*
49:*17*
50:*10, 16*
64:*15, 16*
66:*2, 4, 5,*
*12, 22* 67:*1,*
*4, 18* 69:*20*
72:*13* 73:*1,*
*2* 99:*9*
104:*2*
119:*13*
133:*2*
**calling**
65:*12*
66:*11* 68:*3*
110:*5*
119:*14*
**calls** 93:*9*
**car** 29:*18*
**care**
118:*19*
135:*18*
**Carolina**
45:*17, 18*
**Carolinas**
36:*16*
**carried**
35:*19, 20*

**CASE** 1:*5*
6:*20, 23*
8:*14* 10:*22*
31:*10* 67:*9,*
*11* 97:*8*
100:*12*
111:*2*
122:*10*
**cases** 9:*2*
84:*1* 86:*12*
**casual**
72:*20*
**casualty**
14:*21, 22*
15:*9, 22*
16:*21, 22*
41:*11*
44:*16, 20*
56:*6* 74:*23*
79:*23*
124:*2, 3*
**categories**
53:*19*
**caught**
89:*5*
**cause** 6:*9*
141:*16*
**cellphone**
73:*2*
**Central**
119:*19*
140:*14*
**CEO** 11:*6,*
*9, 10* 12:*6,*
*9, 14, 23*
14:*7* 20:*4*
23:*8, 10, 12*
24:*3, 22*
25:*4, 19*
43:*17*
46:*22* 47:*3*
49:*9* 58:*12*

75:*20*
76:*15, 18,*
*19* 79:*3*
81:*9* 95:*5,*
*18* 115:*6, 8*
116:*18*
118:*2*
121:*6*
124:*22*
126:*14*
129:*7*
130:*7*
131:*11, 17*
139:*14*
**certain**
84:*13*
85:*17*
89:*23*
105:*18*
**certify** 6:*2*
141:*6, 13*
**chance**
24:*11*
**changed**
14:*13* 76:*9*
**changes**
36:*21*
114:*23*
**charge**
35:*12*
38:*19* 60:*7*
**chart**
84:*20* 85:*2,*
*16* 108:*8*
**checking**
91:*23*
**checks**
90:*1*
**children**
45:*8* 47:*1*
**choice** 30:*8*

**Christy**
47:*19, 22*
48:*1, 2, 3, 4,*
*5*
**circumstanc**
**es** 111:*12*
**Cite** 6:*16*
**Civil** 6:*4*
**claims**
48:*6, 9*
**clarify**
98:*18, 20*
105:*1*
**classes**
37:*2, 7, 8,*
*11* 121:*16*
**Clay** 43:*14,*
*15, 16, 17,*
*18, 20*
**clean**
135:*12*
**cleaned**
135:*13*
**clear** 82:*11*
87:*16* 96:*5*
**clicked**
78:*11*
103:*20*
**click-**
**through**
37:*12*
**client** 140:*6*
**clients**
59:*17*
**client's**
99:*15*
**Close** 14:*5*
114:*21*
115:*1*
**club** 50:*8*

collect
109:*15*
110:*11*
column
110:*23*
columns
108:*16*

combination
117:*19*
combined
*117:21*
*118:5*
come
21:*12*
23:*21*  50:*5*
55:*6*  60:*19*
81:*23*
92:*19*
121:*2, 4*
125:*22*
130:*9*
131:*18*
132:*3, 5*
comes
24:*10*
53:*16*
95:*23*
coming
43:*9*  64:*4,*
*5, 11*  66:*20*
68:*13*
69:*13, 21*
70:*1, 3*
123:*2*
124:*11*
commencin
g  *2:9*
comment
129:*2*

Commissio
ner   3:*5*
6:*2*
common
98:*10*
communicat
e   28:*11*
communicat
ed   120:*16*
communicat
ion   53:*11*
74:*8*
133:*14*
communicat
ions   28:*15*
56:*2, 5*
73:*21*
74:*16*
133:*7, 12*
134:*13, 19*
companies
16:*11*
20:*16*
112:*20*
114:*11, 13*
115:*2*
118:*6*
company
9:*11, 17*
11:*5*  14:*11*
19:*6*  22:*3*
29:*5, 7, 9,*
*13, 15, 20,*
*21*  30:*6, 7,*
*13*  35:*16,*
*22*  37:*7*
40:*17*
48:*10*  55:*5*
64:*18*
74:*19*
83:*19*  86:*4*
88:*12*  90:*1*

91:*10*  92:*6,*
*7*  95:*10*
113:*19*
114:*14, 21*
129:*8*
138:*22*
company-
owned   30:*1*
companywi
de   28:*16*
77:*17*
84:*22*
compensati
on   91:*12,*
*14*
competition
9:*14*
compile
109:*9*
complain
130:*10*
complained
40:*12*
133:*12*

complaining
73:*21*
complains
126:*2, 3*
complaint
38:*4, 7*
39:*11, 13,*
*22*  40:*1, 3*
61:*10*
88:*22*  89:*1*
119:*4, 7*
complaints
27:*7*  32:*9*
37:*20, 23*
53:*22*  68:*6*
71:*21*
88:*23*

92:*10*
118:*23*
120:*10, 13,*
*17, 21*
complete
46:*21*
completely
105:*21*
136:*11, 12*
compliance
2:*15*
computer
28:*6*  76:*3*
85:*10, 12,*
*14*  136:*3*
computer-
aided   141:*9*
computers
28:*9, 10, 12*
77:*8*
concern
58:*16*
concerned
74:*12*
118:*15*
124:*17*
concerning
34:*1*  58:*17*
59:*2*
concerns
63:*2, 8, 11*
concludes
140:*13*
confirm
32:*19*
confused
34:*5*  87:*15*
118:*9*
126:*22*
confusing
117:*6*

connect
49:*1*
connected
50:*19*
connection
118:*1, 5*

connections
139:*22*
consideratio
n   83:*7, 12,*
*13*
constantly
18:*5*  79:*12*
114:*17, 18,*
*22*
constraint
110:*1*
contact
40:*13*
59:*19*
contacted
36:*14*
contacts
118:*6*
continued
52:*6*
contractor
97:*9*
contractors
97:*7*  125:*9*
contracts
35:*20*
105:*14*
controlling
43:*19*
controls
126:*4*
conversatio
n   52:*6*
62:*7*  65:*14*
69:*16*

Video Deposition of Ron Helveston

1/17/2024

49

92:*18*
137:*22*
**COO**   115:*7*
**cool**   29:*18*
**Cooper**
57:*6*
**co-**
**president**
12:*12, 13,*
*19*   13:*5, 15*
14:*2*   76:*23*
**copy**   31:*3*
73:*7*   85:*6,*
*7, 10*   94:*11*
107:*14*
135:*5*
**cord**   29:*19*
**Corey**
26:*22*
42:*20*   43:*1,*
*3, 8, 17*
57:*20, 21*
60:*22*   61:*2,*
*5*   62:*3, 4*
63:*3, 5*
68:*5, 14, 15,*
*16*   69:*2, 3,*
*4, 15*   70:*10,*
*23*   71:*7, 11,*
*18*   72:*1, 2,*
*4*   123:*20*
132:*22, 23*
**Cornelius**
2:*6*   6:*1, 16*
141:*19, 20*
**CORP**   1:*11*
**corporation**
34:*7*
116:*20*
**correct**
35:*7*   80:*9,*
*15*   81:*2*

96:*12*
103:*9, 10*
141:*11*
**counsel**
2:*4, 20, 22*
6:*5*   7:*2*
131:*1*
141:*14*
**counsels**
98:*13*
**COUNTY**
141:*4*
**couple**
23:*22*
35:*14*   46:*2*
64:*15*
98:*11*
**course**
26:*5*
104:*11*
**COURT**
1:*1*   2:*16*
6:*15, 16, 22*
7:*10*
100:*10*
122:*10*
**Covid**
11:*23*
136:*7*
**CRC**   1:*10*
6:*20*   7:*9*
8:*5, 13*   9:*3,*
*18*   10:*1*
11:*5, 10, 21*
13:*4*   14:*7,*
*8*   17:*10*
26:*7*   34:*8,*
*11, 16, 19,*
*20*   35:*1*
36:*10, 17*
39:*17*   42:*7*
44:*4, 10*

46:*4, 5, 7*
47:*14*
54:*11*
56:*15*   58:*9*
77:*17*
80:*19*
83:*22*
85:*22*
89:*15, 19*
95:*18*
96:*18, 23*
97:*4, 5*
98:*16*
99:*10*
102:*13, 15*
103:*13, 17*
104:*9*
105:*12*
106:*10*
112:*20*
113:*8, 9, 10,*
*16*   116:*18*
118:*2*
120:*8*
121:*6, 19*
123:*10*
130:*7*
131:*11*
**CRC-**
**Hendrix**
108:*1*
**CRC's**   77:*7*
**crowd**
122:*5*
**Crump**
113:*14, 15*
114:*16*
**CSR**   2:*6*
6:*1*
**culture**
106:*10, 15*
**curly**   29:*19*

**current**
18:*5*   41:*1*
**Curtis**
124:*2*
**curve**   17:*1*
**customer**
60:*6, 8*
**cut**   86:*23*
88:*11*
**Cynthia**
5:*10*   6:*19*
7:*6*   8:*9*
39:*12*
97:*18*
99:*13*
101:*13*

**< D >**
**D**   2:*5*   4:*1*
6:*1*   141:*19,*
*20*
**dashboard**
79:*11*
**database**
75:*7, 21*
**date**   6:*3*
33:*2*
**dates**
11:*12*
12:*14*
**Daugherty**
26:*22*
42:*20*   43:*2*
68:*5, 14*
71:*8, 12*
108:*10*
**Dave**
45:*10*
117:*10*
**day**   2:*9*
16:*1, 2*
21:*11*

49:*23*
66:*12, 13,*
*15*   123:*2*
**days**   62:*23*
64:*15*   69:*6*
**dead**   44:*19*
**deal**   20:*15*
36:*23*   38:*3*
52:*2*   56:*13*
60:*6*   88:*8,*
*9, 14*   99:*12,*
*14*   116:*19*
118:*13*
138:*9, 11*
140:*2*
**dealing**
37:*19, 23*
116:*23*
**dealings**
49:*5, 6*
116:*13, 22*
117:*12*
**deals**
86:*23*
88:*11*
**dealt**   60:*5*
118:*17*
**December**
108:*10*
**defendant**
7:*9*
**Defendants**
1:*12*   5:*15*
**define**
112:*9*
122:*7, 8*
**delineation**
87:*16, 19*
**department**
15:*23*
26:*18*
35:*10, 13,*

*18*  36:*2, 7*
41:*18*  43:*9*
44:*15*  48:*6*
53:*8, 12*
55:*8*  57:*1*
61:*6*  70:*3*
76:*12*
81:*16*
89:*19, 22*
96:*1*  103:*9*
104:*14*
121:*15*
123:*14, 23*
124:*1, 2, 3*
134:*17*
**department
s**  74:*16*
79:*20*
**depend**
38:*7*
**depending**
84:*16*
105:*11*
**depends**
20:*10*  22:*9*
28:*21*  40:*1*
88:*2, 10*
**DEPONENT**
140:*19*
**deposed**
9:*13*
**DEPOSITIO
N**  1:*15*
2:*4, 13, 14*
3:*1, 4*  4:*10*
6:*18*  8:*12,
16*  10:*22*
11:*4, 7*
17:*9*  31:*9,
15, 17, 20*
32:*22*
96:*21*

97:*23*
98:*15*  99:*1,
15, 18*
100:*9, 12*
101:*2, 9, 23*
131:*8*
140:*14*
**depositions**
2:*17*  8:*19*
9:*5, 9*  10:*9*
101:*21*
**describe**
122:*11*

**descriptions**
22:*13, 17*
**desk**
135:*12*
**determine**
30:*15*  84:*3,
5*
**determined**
86:*2*

**determining**
59:*12*
86:*15*
**diatribe**
130:*17, 19*
**difference**
18:*10*
62:*11*
87:*21*
**different**
16:*22*  20:*8*
56:*4, 10*
60:*13*  62:*7*
74:*22*
93:*10, 19*
105:*4, 21*
114:*15, 19*
122:*19, 21*

133:*20*
136:*11*
139:*21*
**differently**
136:*15, 19*
**dinners**
53:*1*  55:*5*
59:*13*
**directly**
131:*23*
**director**
25:*8*
**directors**
23:*20, 21*
**disagree**
54:*15*
**discovered**
101:*15*
**discretionar
y**  94:*6*
105:*12, 23*
110:*14*
**discriminate
d**  93:*6*
132:*19*
133:*1*
**discriminati
on**  10:*19*
40:*4*  92:*1,
5, 10*
120:*10, 22*
121:*7, 20*
122:*2, 16*
128:*21*
129:*8*
131:*12*
132:*14*
**discussing**
32:*8*
**dispute**
54:*11*  62:*8*

**distinction**
13:*20*  14:*6*
**DISTRICT**
1:*1*  6:*22*
**DIVISION**
1:*3*  6:*23*
14:*8, 9, 17,
19*  41:*7, 9*
**divisions**
14:*10*
16:*21*  41:*5*
45:*23*
74:*17*
**document**
32:*6*  50:*3*
94:*15*  95:*3,
7*  96:*19*
98:*14, 20*
99:*14*
100:*4*
102:*1*
103:*2, 13,
21*
**documents**
31:*14, 16,
18*  32:*8, 17*
33:*4*  135:*8*
**doing**
17:*18*  18:*1*
55:*2*  99:*21*
123:*3*
**DONELSON**
5:*16*
**door**  91:*3*
**dots**  49:*2*
**drive**  25:*22*
**Driving**
11:*12*
**duly**  7:*15*
**Dunston**
48:*22, 23*

**duties**
15:*23*
**duty**  121:*6,
10*

**< E >**
**E**  4:*1*  5:*1*
141:*1*
**earlier**
17:*9*  28:*2*
34:*7*  74:*15*
133:*6, 11*
134:*22*
**early**  35:*23*
120:*8*
**earn**  112:*7,
9*
**eat**  51:*12*
**EEOC**
104:*14*
**effect**  2:*14*
64:*6*
**eight**
93:*14*
123:*1*
**eighty**
58:*20*  59:*2*
**eighty/twent
y**  58:*20*
**either**
30:*12*  51:*2*
73:*17*
76:*18*
89:*10*
124:*10, 12*
**Elliott**  64:*1*
**else's**
83:*22*
91:*20*
**e-mail**  11:*1*
28:*12, 19*
33:*19, 20*

53:9 62:19
65:1, 4, 12,
13, 19
66:23 67:2
68:1, 16
69:1 72:11
73:5, 8, 14,
17 74:18
75:17 76:2
133:20
**e-mailed**
50:17 67:5,
7
**e-mails**
11:2 32:7,
13 33:22
53:10
65:21
115:22
133:22
**employed**
11:19
**employee**
10:15
29:17 37:1,
19, 23 38:4,
9 39:22
40:10, 14
47:8 119:3
122:14
126:2
128:9, 12,
14, 18
129:3, 4
130:9
**employees**
9:11, 12, 17
12:12
23:14
36:18
83:16

106:6
131:12, 18
**employee's**
120:16
128:3, 8

**employment**
8:22 9:1, 2
32:9 39:7
123:10
126:1
**encourage**
91:10
**encouraged**
115:19
**ensure**
121:12
124:22
126:15, 17
**ensured**
126:17
**entity** 35:1
**entries**
50:3
**equal** 137:1
**equality**
122:15, 19,
20 123:3, 8
**era** 10:5, 7,
8
**especially**
45:8 132:8
**Esq** 5:5,
10, 18
**et** 6:21
**Ethos**
113:17, 18
**eventually**
19:8 63:13
66:8
**everybody**
23:2 37:6

55:10
57:16
83:22
92:15, 20
105:2, 18
109:18
110:1, 12
111:16
114:18
123:19

**everybody's**
58:14 75:5
90:14
121:9
**evidence**
3:2 59:9
136:17
**exactly**
46:2 69:23
122:13
140:8
**EXAMINATI
ON** 4:2
6:9 8:1
**examined**
7:16
**Excel**
108:16
**exceptions**
84:23
**excluded**
73:22
**excuse**
103:7
**executive**
42:17 58:6
88:4
116:14, 19
139:2
**EXHIBIT**
4:8, 9 31:2,

6 77:2, 6
94:9, 10, 13
103:22
104:1
107:3, 12,
13, 21
135:2
**exist** 36:2
129:2
**expect**
128:10, 13,
17, 19
**expectation**
128:3, 8
**expected**
18:19
**expense**
30:11, 16,
19 55:9
**experience**
27:21 55:1
84:4 87:7
**experiencin
g** 132:13
**expert**
127:8
129:22, 23
**Expires**
141:21, 22
**express**
27:7
**eyebrow**
59:7
**eyes** 25:17

**< F >**
**F** 141:1
**face** 98:17
**fact** 27:18
55:21
101:10, 19

123:20
124:9
**factors**
90:23 91:1
93:19 94:2
**facts** 8:13
38:17 59:9
136:17
**fair** 70:15
91:2
**falls** 15:2
**familiar**
17:10 26:1
27:14
38:18, 22
43:15
47:19
48:12, 23
49:1, 4
77:8 89:14
106:1, 20
108:17, 18
109:2
112:19
114:3
**familiarity**
97:11
**family**
114:7
115:20
133:4
**famous**
120:5
122:10
**far** 39:16
49:3 75:19
90:16, 17
**favorite**
82:9
**Federal** 6:3

**feel** 52:*15,
19, 22* 53:*5*
54:*22*
**feeling**
117:*22*
133:*23*
**felt** 53:*12*
54:*18*
55:*15*
60:*14*
91:*14*
137:*18*
138:*1*
**female**
53:*23*
56:*19*
123:*10*
124:*17*
**females**
56:*16*
**fifteen**
14:*5* 123:*9,
18*
**fifty** 74:*21*
**figure** 71:*6*
127:*2*
**file** 43:*4, 6*
**filing** 3:*4*
**fill** 106:*21,
22* 113:*5*
**filled** 78:*7,
8*
**finally**
29:*20*
**FINANCIAL**
1:*10* 8:*7*
116:*14, 15,
20* 117:*13*
**find** 33:*8*
38:*17*
63:*22*
64:*12*

69:*14*
75:*15*
85:*12, 13*
**fine** 68:*21*
**finger**
123:*7*
**finish**
97:*15*
100:*15*
**finished**
100:*17, 21*
136:*8*
**Firm** 2:*7*
5:*9* 6:*6*
140:*6*
**first** 7:*15*
19:*3* 21:*17*
49:*17* 50:*6*
51:*6, 17, 18*
108:*18*
109:*1*
120:*7*
126:*23*
132:*6*
**five** 23:*1*
31:*22*
35:*22* 36:*3*
37:*2* 52:*12*
53:*22* 60:*5*
125:*10*
137:*12, 17,
19*
**five-year**
35:*20*
**fix** 95:*15*
**flip** 31:*12,
13* 78:*5*
108:*7*
**flow** 18:*4*
**focus**
95:*19*

**folks** 49:*4*
60:*8* 61:*4*
118:*8*
**followed**
39:*16*
**following**
6:*10* 65:*15*
128:*20*
**follows**
7:*16*
**force** 2:*14*
**foregoing**
6:*4* 141:*7,
10*
**forget**
30:*21*
**forgotten**
127:*21*
**form** 2:*21*
10:*23*
17:*16*
18:*13*
19:*10* 20:*6,
23* 21:*2, 18*
22:*18*
23:*15* 24:*5,
15* 25:*5, 16,
20* 28:*13,
20* 29:*3, 22*
30:*5, 17*
33:*5* 36:*4,
11, 19, 22*
38:*1, 5, 21*
39:*4, 8, 15,
18, 23*
40:*11*
42:*19*
46:*18* 47:*9,
16* 51:*16*
54:*1, 7, 13,
16, 20* 56:*3,
17* 57:*4, 9,*

*19* 58:*2, 18*
59:*8, 14*
60:*1, 3, 10*
62:*2, 9, 13*
65:*7, 22*
67:*3, 6, 15*
68:*2, 9*
70:*19*
71:*14, 22*
72:*22*
73:*11, 18,
23* 74:*20*
75:*10, 23*
76:*7* 77:*18*
78:*1, 9, 14,
23* 79:*4, 18,
22* 80:*14,
20* 81:*1, 5*
83:*23* 84:*2*
85:*4, 11*
86:*17* 87:*9*
88:*1, 20*
89:*3, 16*
90:*2, 10, 19*
91:*5* 92:*2*
93:*8* 94:*3*
95:*13*
97:*11*
102:*16*
104:*23*
106:*3, 8, 12*
109:*4*
110:*18, 19,
20* 111:*18,
19* 112:*4,
10, 16, 21*
115:*11*
116:*2, 6*
118:*3, 10,
12* 119:*1, 5,
11* 121:*8,
14, 21*

122:*17*
123:*12*
124:*18*
125:*1*
126:*5, 12,
21* 127:*16*
128:*8, 21*
129:*13*
131:*13*
132:*15*
133:*16*
134:*14*
135:*10*
136:*16*
137:*20*
138:*14*
139:*4, 20*
**Forman**
5:*10*
**former** 9:*10*
**forms** 96:*3*
138:*3*
**formula**
80:*19, 22*
81:*18*
86:*14, 18*
**formulas**
114:*20*
**forth** 91:*4,
7*
**forty** 81:*20*
82:*4, 5, 11,
13, 21* 83:*5*
**forward**
81:*11*
**found**
63:*20*
68:*12*
69:*20*
102:*1*
**foundation**
95:*11*

four  23:1
31:22  53:3
60:5  62:23
82:14, 18,
19  83:3, 4
93:14
95:10
125:10
fox  38:19
frankly
23:23
67:22
137:22
frequent
104:8
frequently
101:17
friends
133:3
front  102:8
fulfill
105:14
full  2:15
70:16
82:12
functioned
20:8
FURTHER
2:11, 18
3:3  140:19
141:13

< G >
gap  116:4,
5
gaslighting
101:13, 14
gender
54:10
55:13
116:4, 5

General
15:1
106:10
108:15
Generally
81:17  87:4
92:15
getting
52:23  55:4,
11  59:6
60:15
67:21, 23
69:10
73:13
87:15  93:7
110:4
112:5
114:2, 23
122:5
132:19, 23
133:22, 23
134:1, 3
girl  71:5
give  8:16
12:14  21:5
29:9  37:14
59:1  87:1
88:12  92:8
111:3
112:7, 23
given  8:19
9:6  31:6
71:16
129:16
141:12
gives  87:2
giving
69:1  71:19
90:14
112:2
130:3

Gladly
29:12
glass
108:13
glasses
108:13
go  16:9
18:20  19:4,
6  22:16
23:20
24:18
25:23
30:20  33:7
34:6  38:12
60:21
61:11
72:17, 18
75:4, 6, 15
80:11, 12
85:9  87:3
89:15, 23
93:12, 18,
22  95:20
97:21
99:18
101:6, 20
102:5
104:10
107:4, 9, 16
109:21
111:5, 21
115:8
131:20
132:9
134:4
140:7
goal  16:9
god  9:21
10:18  28:9
42:5  44:18
53:6  56:22

goes  75:9
85:15
119:9, 12
going  7:21
11:13
30:22
44:19
46:17
49:20
51:19, 22
53:11
61:19  63:2,
6  64:13
66:1  68:10,
19  70:17
71:13  77:1
79:9  94:7,
8, 22  98:4,
12  99:18,
19, 20
100:11, 19
101:11
102:18, 20,
21  107:3,
11, 16
118:21
119:18
120:3, 4
Golden
82:8
Good  8:3
15:4, 7
45:15  54:5
68:22
123:23
134:6
Gosh  43:3
44:19
114:4
125:2
gotten
45:21  46:1

98:19
136:3, 4

government
97:7, 9
grouchy
55:19
grounds
2:23
group
75:13
113:11
123:21
134:8
groups
74:18
75:21
133:20
guaranteed
105:23
guess
11:15  42:6
47:11, 12
59:4  63:23
112:17
122:4
138:15
guessing
9:22  84:11
guy  12:11
53:3
guys  70:6
86:23
134:6
guy's  53:15

< H >
habit  100:9
half  55:20,
23  82:13,
17  83:3
84:13, 15

85:14  86:5,
7  88:12, 17
92:7  93:21
111:13
**hall**  28:18
62:23
72:20
**hallway**
63:15
**hand**
139:18
140:1, 3
**handed**
103:21
**handle**
61:22, 23
69:11  96:9,
15
**Handley**
114:3, 4
**Hang**
100:14
**hanging**
104:13
**happen**
34:10  92:5
121:3
126:13, 15
132:7
**happened**
31:22  35:6,
17  111:8
124:10
127:18
128:1, 2
130:3, 10,
13  135:8
**happening**
69:14  92:1
126:19

**happens**
85:19
101:17
**happy**
59:1  99:22
**harassment**
120:12, 22
**hard**  66:7
77:13  93:5,
16  107:20
121:18
123:7
**hash**  60:23
**hashing**
61:20
**hate**  44:13,
23
**haul**  12:3
**Hayes**
27:13
**head**  48:8,
9
**hear**  31:12
64:4
**heard**  17:8
70:22
123:15
**held**  58:9
**help**
132:18, 20
133:1, 5
**helping**
43:7
**HELVESTO
N**  1:16
2:5  6:8, 19
7:14  8:3
44:6  96:18
98:1  102:7
120:2
127:15

129:14
130:22
**hen**  38:20
**HENDRIX**
1:7  5:22
6:20  7:5, 7
8:5, 10
26:2, 4
27:8  32:8,
11, 14, 17
40:16
49:13
50:12  58:9
64:3, 5
70:2, 18
97:9
**Hendrix's**
68:6  115:3
**hereto**
31:4  94:12
107:15
**Hey**  25:8
46:23
51:23  60:9
75:13
92:20
101:23
115:23
134:4
138:8
**high**  118:8
**higher**
112:15
**highjack**
97:13, 22
**hill**  13:2
**hire**  24:8,
18  45:7, 9,
12  47:1
56:16
138:16, 17,
18, 21

**hired**  22:3,
6  56:21, 22
57:3, 6, 16
139:16
**hiring**  24:3,
14  25:9, 19
26:10  45:3
46:8  57:5,
15
**history**
43:21
**Hold**
127:11
**Holdings**
14:12
**honest**
11:12
12:23
22:20
47:13, 17
72:9
117:17
125:23
**hop**  34:4
**hopping**
77:4
**Hosey**
124:1
**hotline**
119:6, 9
**hour**  68:19
129:18
**hours**
16:14, 16
32:5
**house**
36:9  38:20
**Howard**
117:10
**HR**  47:6, 8
119:12
120:15

121:15
131:16
**huge**  115:1
**Hughes**
41:15, 16,
17  42:4
**huh**  11:23
**human**
35:9, 13, 17
36:1, 7, 21
37:4, 10
**hundred**
9:12  36:6
50:18
82:16  83:9,
10  122:23
123:1
124:4
**hyperlink**
103:3


**hypothetical**
126:9, 18
127:8, 9, 12
129:3, 4, 22
130:16
**hypothetical
s**  129:1, 17,
20

**< I >**
**I**  2:1  4:1
6:1  8:4, 21
10:18  11:1,
6, 9, 11, 13,
17, 22
12:12, 13,
14, 21, 22
13:8, 11, 12,
15  14:6, 18,
21  15:6, 13,
14  16:5, 6,

7  19:*3, 4,*
*11, 12, 17*
*20:9, 11, 12*
*21:23  22:1,*
*9, 23  23:3,*
*8, 23  24:9,*
*18, 19  25:6,*
*10, 12*
*27:14, 18,*
*19, 22, 23*
*28:10*
*29:15, 17*
*30:10, 12,*
*13, 18, 21,*
*23  31:18,*
*21, 22*
*32:12, 15,*
*18, 22, 23*
*33:6, 7, 8,*
*10, 15, 18,*
*21  34:2, 3,*
*4, 14  35:14*
*36:5, 15*
*37:5  38:2*
*39:9, 11, 19,*
*20  40:5, 13,*
*22  42:15,*
*18  43:16,*
*17, 19, 20*
*44:5, 13, 21,*
*23  45:6, 10,*
*11, 13, 21*
*46:2, 7, 10,*
*20, 21, 22*
*47:11, 12*
*48:3  49:1,*
*6, 7, 8  50:9,*
*13, 16, 18*
*51:2, 3, 22*
*52:2, 5, 9,*
*12  53:8, 16*
*54:5, 12*

*55:19, 22*
*56:5, 12, 21*
*57:5, 13, 15*
*58:10, 11,*
*12, 13, 14*
*59:4, 21*
*60:11, 20,*
*22  61:10,*
*12, 15  62:3,*
*22, 23  63:3,*
*4, 9, 10, 20,*
*23  64:11,*
*15  65:8, 23*
*66:1, 8, 12,*
*19  67:1, 4,*
*7, 8, 12, 20,*
*21, 22  68:3,*
*11, 15  69:8,*
*11, 23  70:1,*
*9, 10, 12, 13,*
*20, 22, 23*
*71:1, 2, 3, 9,*
*15  72:9, 12,*
*15, 18*
*73:12, 13*
*74:4, 8, 12,*
*14, 17*
*75:11, 13*
*76:8, 10, 17,*
*18, 19, 22,*
*23  77:1, 3*
*78:2  79:1,*
*5, 6  80:4, 5,*
*7, 17  82:1*
*83:8  84:12*
*85:5, 12, 13*
*86:4, 18*
*89:12, 18*
*90:6, 8, 11*
*91:6, 18*
*92:4, 5, 6, 9,*
*21  93:20,*

*21, 22  94:8,*
*13, 21*
*95:14*
*96:18  97:7,*
*19, 20, 21*
*98:5, 11*
*99:11, 14*
*100:6, 9, 17,*
*20, 21*
*101:1, 12,*
*13  102:7,*
*10, 20*
*104:20*
*105:6*
*106:13, 14*
*107:4, 9, 20,*
*22  108:5,*
*12, 13, 14,*
*19, 21, 22*
*109:18, 21,*
*22  111:1, 5,*
*6, 8, 12, 23*
*112:17, 23*
*113:13*
*114:1, 4, 9*
*115:5, 6, 14,*
*17, 18, 21*
*116:3*
*117:1, 4, 9,*
*12, 17, 18*
*118:4, 13,*
*14, 17, 18,*
*19, 20*
*120:5, 7, 14,*
*20  121:17,*
*22  122:2, 3,*
*6, 7, 8, 10,*
*11  123:4,*
*15  124:3, 8,*
*20  125:4, 5,*
*9, 22*
*126:11, 21*

*127:10, 20*
*128:11*
*129:20*
*130:12, 21*
*132:4, 5, 17,*
*18, 19, 21,*
*22  133:1, 2,*
*3, 17, 18*
*134:7, 8, 15*
*135:11, 13,*
*17  136:2, 9,*
*10, 18, 19,*
*23  137:2, 8,*
*11, 16, 21,*
*22  138:1, 2,*
*5, 15, 19*
*140:10*
*141:1, 6, 13,*
*15*
**idea**  *71:3*
*135:11*
**identificatio
n**  *31:3*
*94:11*
*107:14*
**identified**
*128:22*
**identify**
*7:2  95:1*

**immediately**
*51:23*
**important**
*70:16*
*104:22*
**impossible**
*127:2*
**impression**
*70:10*
**improper**
*99:22*
*127:13*

**inappropriat
e** *99:22*
**incentive**
*87:3  112:5*
**include**
*41:10  61:8*
**included**
*53:12  56:1*
*74:10*
**including**
*32:8*

**independent**
*125:9*
**INDEX**  *4:8*
**indicating**
*103:3*
*134:23*
**individual**
*93:1*
*112:12, 13*
**information**
*90:12, 15*
**inner**  *47:3,*
*5*
**inside**
*19:23  20:3,*
*5, 9, 12, 14,*
*21  42:14*
*44:14*
*56:12*
*58:10, 11,*
*15  87:23*
*88:7, 10, 15*
*139:2, 8, 10*
**instance**
*10:12*
*110:17*
**instituted**
*36:23*
**instruct**
*135:15*

**INSURANCE**
1:*10*  6:*20*
7:*9*  9:*18*
14:*8, 15*
16:*20*  22:*3*
27:*21*  35:*2*
37:*4*  45:*22*
114:*5, 7*

**intentionally**
122:*6*
**interested**
61:*13*
141:*16*
**internal**
89:*19*
115:*16, 18*
**interns**
138:*17*
**internship**
17:*9*
**internships**
17:*14*
**interpreted**
97:*17*
**interrupt**
97:*16*
100:*8*
**interrupting**
100:*10*

**interviewing**
25:*3*  27:*12*
**introduce**
19:*5*
**investigatin**
**g**  39:*13*
**invite**  55:*6,*
*7, 10*
**invited**
52:*23*  55:*5*

59:*12*
124:*9*
**involve**
14:*4*
**involved**
14:*13*
24:*13*  26:*9*
28:*3*  34:*8,*
*12, 14*  39:*2,*
*19*  43:*18*
57:*5, 13*
69:*9, 10*
93:*19*
123:*6*
124:*14*
133:*19*
**irrelevant**
127:*13*
**issue**
28:*16*
122:*15*
**issues**
52:*10, 13*
54:*19*
66:*20*  70:*4,*
*21*  136:*20,*
*21*  137:*18,*
*19*
**item**  114:*6*

**< J >**
**JANUARY**
1:*19*  2:*9*
6:*14*  111:*4,*
*6*
**JEFFERSO**
**N**  141:*4*
**Job**  4:*11*
15:*23*
22:*13, 17*
27:*10*
52:*17*

102:*15*
103:*1, 16*
109:*16, 17*
115:*10, 14*
**John**
13:*17, 18*
28:*17*  41:*1,*
*20*  44:*1*
61:*7*  62:*22*
63:*3, 7, 13,*
*15, 18, 21*
64:*8, 10, 11,*
*18*  65:*4, 16*
66:*4, 11*
68:*15*  69:*1,*
*12*  110:*5,*
*10*  117:*10*
132:*10, 18*
**joint**  69:*16,*
*18*
**Jonathan**
48:*16*
**jot**  137:*10*
**judge**
99:*23*
**jump**  51:*20*
**June**  49:*8,*
*12, 20*
**Justin**
139:*7, 16*

**< K >**
**Karissa**
48:*11*
**Kat**  5:*22*
26:*1*  50:*6*
51:*1*  54:*3,*
*4, 9, 18*
60:*14*  61:*9,*
*13*  64:*21*
65:*4*  66:*19*
69:*5, 20*

73:*21*
133:*12*
136:*14*
**KATHRYN**
1:*7*  7:*5, 7*
8:*4*  26:*4, 6*
27:*8*  32:*8,*
*11, 14, 17*
33:*22*  34:*1*
40:*16, 19*
49:*13*
50:*12, 15,*
*21*  57:*18*
58:*9*  61:*19*
63:*11, 12*
64:*3, 4, 11*
68:*6*  70:*1,*
*2*  72:*1*
97:*8*  132:*3,*
*12*  133:*3*
**Kathryn's**
26:*10*  50:*8*
63:*16*
70:*21*
**Kat's**  62:*6*
**keep**  68:*3*
105:*18*
115:*7*
128:*5*
**keeping**
18:*3, 5*
**Kerri**  19:*18,*
*19*
**Keyes**
48:*11*
**kidding**
51:*12*
**kids**  46:*8*
**Kimberly**
116:*8, 10,*
*11, 23*

**kind**  11:*18*
12:*23*
17:*20*
20:*13*  22:*8*
31:*21*
33:*11, 20*
36:*13*
37:*11*
40:*23*
43:*10*
46:*17*  47:*4*
50:*2*  59:*6*
78:*7*
105:*11, 20*
108:*16*
109:*6*
113:*20*
114:*7*
116:*1*
117:*21*
121:*18*
122:*1, 7*
125:*17*
134:*22*
**kinds**  125:*2*
**knew**
11:*13*  22:*4*
26:*6*  43:*17*
71:*12, 15*
100:*20*
105:*2*
117:*17, 18*
**know**  9:*16*
11:*11*  12:*9*
15:*4*  16:*3*
20:*18*  21:*7,*
*22*  22:*5, 19*
23:*16*
25:*12, 21,*
*22*  26:*12*
27:*18*
30:*18*  38:*6*

39:*19, 20*
43:*8, 16, 20,*
*22*  44:*5*
45:*8, 13, 23*
46:*2, 21*
47:*11, 12*
48:*1, 3*
49:*7*  50:*18*
52:*1*  55:*22*
57:*15*  58:*8,*
*12, 14*
60:*12*  61:*5*
69:*6*  70:*11,*
*20, 21*  71:*1,*
*9*  73:*20*
74:*7, 14*
75:*2, 19*
76:*8*  77:*3*
78:*2, 15*
79:*1, 7*
84:*5, 8, 16*
85:*2, 5*
89:*18*  90:*6,*
*9*  91:*6, 18*
92:*4, 16, 17*
93:*5, 7*
94:*8*  95:*8*
99:*11*
100:*16*
101:*13*
104:*12*
105:*17*
106:*14*
108:*12*
111:*1, 4, 15,*
*23*  112:*14*
113:*13*
114:*1, 9, 22*
115:*12, 14,*
*17, 19, 21,*
*23*  116:*3, 4,*
*8*  117:*12,*

*20*  118:*5*
119:*9*
120:*14, 20*
121:*15*
122:*2, 3, 4,*
*8, 11, 23*
124:*6, 19*
125:*4, 6, 17,*
*22*  126:*23*
127:*3, 4, 22*
128:*1, 2*
130:*12*
131:*15*
132:*18, 20*
135:*19*
136:*5, 22*
138:*1, 3, 15,*
*20*
**knowledge**
33:*21*
40:*21*
54:*23*  58:*6*
70:*17*
130:*1, 6*
**known**
42:*3*  43:*1*
133:*4*

**< L >**
**L**  2:*1*
**label**
107:*22*
**labeled**
107:*22*
**Labor**  96:*1*
103:*9*
104:*14*
**lady**  36:*14*
**Lake**  50:*9*
**laptop**
102:*8*

**larger**
14:*11*
**largest**
138:*21*
**Laura**  50:*8,*
*11*
**Lauren**
48:*14*
**Law**  2:*7*
5:*4, 9*  6:*6*
**laws**  2:*15*
**lawsuit**  8:*5,*
*8*  9:*15*
**lawyer**
15:*7*  27:*16,*
*19*
**lawyers**
15:*4*  82:*9*
140:*5*
**lawyer's**
120:*5*
**laxed**  46:*19*
**lay**  130:*15*
**layers**
23:*22*
**laying**
95:*11*
**lead**  15:*13*
16:*1*  71:*19*
88:*14*
**leadership**
116:*14, 20*
**leading**
2:*21*
**lean**  93:*13*
**learn**
18:*20*  19:*6,*
*7*  106:*5*
127:*5*
134:*5, 7*
138:*11*

**learned**
16:*19*
**learning**
16:*23*  17:*2,*
*5*  50:*23*
**leave**
11:*21*  32:*9*
139:*19*
140:*4, 6*
**leaves**  45:*1*
**leaving**
46:*20*
124:*13*
**led**  71:*23*
135:*1*
**leeway**
129:*17*
**left**  12:*11,*
*21*  31:*1*
35:*23*
45:*21*
53:*13*  69:*7*
70:*13*
76:*10*
122:*5*
124:*12*
133:*8, 13*
135:*9*
136:*10*
139:*14*
**Leslie**  5:*5*
7:*4*  8:*4*
99:*9*  102:*5*
129:*16*
**letter**  115:*3*
**liability**
14:*23*  15:*1*
26:*18*  80:*5,*
*6*
**lie**  96:*14*
**life**  114:*5*

**liked**  43:*8*
53:*5*
**Lindberg**
48:*14*
**line**  55:*15,*
*17*
**lines**  61:*10*
77:*22*
**link**  103:*1,*
*13, 19*
**list**  58:*22*
59:*2*  71:*17*
73:*14*  75:*6*
76:*4, 5*
109:*9*
**listed**
115:*16*
**Listing**
4:*11*
102:*15*
**lists**  75:*6*
**little**  12:*22*
16:*5*  19:*3*
20:*8*  21:*14*
60:*13*  77:*3,*
*13*  101:*12*
102:*19*
106:*23*
107:*1*
108:*8*
117:*6, 21*
120:*2, 4*
**LLC**  5:*4*
**long**  11:*10*
12:*2*  13:*9*
16:*14, 16*
32:*4*  42:*3*
43:*1*  66:*10*
69:*7*  124:*8*
**longer**
9:*23*  76:*15*

Video Deposition of Ron Helveston

1/17/2024

58

look 21:13
25:19
30:16 33:6,
9 38:13
54:22
61:17 77:8
80:4 84:9
89:8, 11
90:23
99:18
104:16
108:17
109:2, 5
134:5
138:8
looking
25:22 39:3
79:10, 12
82:23
looks
77:14
102:13
108:18
109:2
loose 107:1
lost 81:22
118:6
lot 16:4, 12,
16 20:12,
13 22:4, 7
23:21, 23
28:3, 6
43:18
56:11 85:5
89:9, 17
91:3 93:13,
18 117:18
129:17
133:21, 22
136:21
137:23
138:4

Louisiana
56:9, 22
loved
123:19
love-hate
55:20
lunch 33:7
51:10
63:10 70:5
124:15
lunches
52:23 55:5
59:13

< M >
magnified
55:3
magnifying
108:12
mailroom
43:3
main 16:9
85:15
maintained
85:3
making
22:16
39:10
114:22
122:23
123:1
Man 89:11
111:3, 5
manage
60:9
managed
23:14
manager
131:19
mandatory
37:6

mark
30:20 94:8
107:3, 5, 7,
10, 11
marked
31:3 77:2
94:11
107:14
Martha
124:1
Martin 50:9
master
138:20
match
22:17
Mather
135:21
matter
123:20
124:9
140:3
McFadden
139:7, 16
mean
13:21
20:12 22:2,
9, 23 24:10
30:13 39:1
56:5, 12, 21
58:11, 13
65:8 83:8
86:19 91:7,
18 92:4, 5,
6, 9, 21
93:20, 21,
22 97:7
101:1
106:23
108:19
111:8, 23
117:4, 9
118:17, 19

121:18, 20
122:2, 6
125:4
126:11
127:20
134:8
136:2
137:21
means
60:4 141:9
meant
50:20
medical
32:9
meet 32:1,
4
meeting
49:13, 15
50:5 51:6,
10 62:16
64:22 65:2,
9 72:20
124:14, 16
132:11
137:3, 7
Melissa
123:22
Melody
35:15, 21
member
50:7, 8
86:15
126:2
members
85:23 86:8
88:16 93:2,
17 131:19
member's
86:3
merged
113:16

message
29:2 64:7
messages
32:7, 11
met 8:9
metaphor
38:19
MeToo
54:6
metrics
112:8
MGA 113:4
mid 100:21
middle
98:14
million
31:13
82:14, 15,
18, 19 83:3,
4 84:14
mind
88:22
121:2, 4
128:5
Minus
85:18
minute
44:20 53:5
57:2
Mischaracte
rization
67:16
missing
89:13
misspoke
46:7
money
93:23
106:11
monitor
89:2

Video Deposition of Ron Helveston

1/17/2024

monitored 88:21

monitors 88:18

Montgomery 6:17

month 16:13

months 108:9

Moore-Wright 116:8, 11, 23

Morgan 48:16

mother 50:8

mouth 45:1 74:18

move 43:5 130:22

moved 43:11 136:11

moving 43:12

multiply 86:7

< N >

N 2:1 4:1 5:1

name 6:14 8:4 14:13 27:14 33:18, 19 44:21 48:12 49:1 53:4, 15 57:1 75:5

named 8:8 36:15

names 25:12 112:23

narrow 78:21

nationwide 14:17 41:23

nay 37:16

near 46:20

necessarily 21:19

necessary 2:19

need 14:6 21:17 63:3 64:12 69:13 73:14 105:1 108:12 111:5 118:20 130:23 131:2, 7 132:18, 19, 22, 23 133:1 138:10

needed 28:17 47:6 66:21 76:4 109:22 112:14 118:22 119:3 132:12

needs 96:12

neighborhood 51:22

neither 141:14

nepotism 46:17

never 53:8 61:12 67:5 70:22 86:9 92:9, 22 99:16 111:1 127:18

New 10:16, 20 11:8 107:7

nine 29:17 82:15

ninety 86:12 131:17 132:8

ninety-nine 82:16 85:1

nondiscretionary 105:4

non-retaliation 125:3

nonspecified 128:17

normal 136:20

North 2:8 5:11, 19 6:7 45:17, 18

NORTHERN 1:1 6:22

Notary 2:6 6:2 141:22

notes 62:15 137:3, 6, 8

notice 3:4 4:10 31:8, 9 104:2, 6, 19 139:1

noticed 6:19 138:23

notices 104:13

notify 47:6, 8

NUMBER 1:5 4:2, 9 6:23 20:10 29:17 32:6 52:19, 22 53:3 55:3, 4 77:22 81:23 82:1, 3 83:1 85:15 86:5 98:13 107:23 108:5 110:23 124:17 132:16

numbers 77:4 78:3 79:10, 13 80:9, 10, 11, 12, 15 91:8, 11 107:8 108:2 110:7

< O >

O 2:1

oath 7:11

Obenauer 45:11, 13 117:10

Object 10:23 17:16 18:13 19:10 20:6, 23 21:2, 18 22:18 23:15 24:5, 15 25:5, 16, 20 28:13, 20 29:3, 22 30:5, 17 33:5 36:4, 11, 19, 22 38:1, 5, 21 39:4, 8, 15, 18, 23 40:11 42:19 46:18 47:9, 16 51:16 54:1, 7, 13, 16, 20 56:3, 17 57:4, 9, 19 58:2, 18 59:8, 14 60:1, 3, 10 62:2, 9, 13 65:7, 22 67:3, 6, 15 68:2, 9 70:19 71:14, 22 72:22 73:11, 18, 23 74:20 75:10, 23 76:7 77:18 78:1, 9, 14,

Video Deposition of Ron Helveston

1/17/2024

23  79:4, 18,
22  80:14,
20  81:1, 5
83:23  84:2
85:4, 11
86:17  87:9,
18  88:1, 20
89:3, 16
90:2, 10, 19
91:5  92:2
93:8  94:3
95:6
102:16
104:23
106:3, 8, 12
109:4
110:19
111:19
112:4, 10,
16, 21
115:11
116:2, 6
118:3, 10,
12  119:1, 5,
11  121:8,
14, 21
122:17
123:12
124:18
125:1
126:5, 12,
21  127:16
128:8
129:13
131:13
132:15
133:16
134:14
135:10
136:16
137:20

138:14
139:4, 20
**objection**
95:13
128:16
**objections**
2:20, 23
102:2
**obviously**
40:14
**occasion**
29:1  95:20
**occasionall**
**y**  89:6
**occur**
36:21
**occurring**
121:7
137:19
138:7
**offered**  3:2
**office**
10:16, 21
11:8  13:19
15:10  21:8
23:17, 19
24:7  25:7
35:7  36:2,
10  41:5
42:1, 2
43:19  45:9
47:3, 5, 12
60:21  61:7,
20  62:18
64:4, 5, 12
66:20  70:3
72:14, 16,
17, 18  73:3,
4  77:19
79:16, 21
89:10
109:8, 14

110:6, 13
111:15, 18,
20  115:10
123:11
131:19
135:9, 19,
21  136:11
137:9
**offices**  2:7
6:6  13:22
14:4  24:17,
23  57:14
132:8
136:6, 7
**office-wide**
116:1
**off-the-wall**
113:20
**Oh**  9:21
10:18
12:20  13:6
16:16  18:9
19:19  26:5
27:14  37:9
42:5  44:13,
18, 19  48:2
51:5  53:6,
7  54:5
56:21
78:17  79:5
80:21  93:3
101:4
106:18
108:3
125:2
135:3
**Okay**  8:19,
22  10:14,
20  11:21
12:4, 8
13:14, 20
14:1, 10, 16

15:3, 8, 20
16:14  17:4,
8, 17  18:7
19:1, 13
20:20
22:10, 13,
21  23:5, 12,
18  24:2, 13,
22  25:2, 11
26:1, 20
27:20  28:2
29:1, 5
30:9, 14
31:19, 23
33:16, 23
34:3, 6, 12,
16  35:16,
21  36:1, 8
37:8, 22
38:11, 18
39:6, 21
40:3, 9
41:7, 10, 15
42:3, 11, 16,
21  43:10,
22  45:19
46:7, 12, 14
47:2, 7, 19
48:1  49:8,
15, 22
50:15  51:9,
17  52:3, 9,
12, 14, 18,
21  53:2, 14
56:14
57:11, 17
58:4, 15
59:4  60:7,
20  62:6
63:7  69:4
71:11, 18
72:13

76:14, 15
77:1, 11, 16,
21  78:5, 11,
20  79:2, 14
80:8, 17
81:12, 21
82:4, 10
83:6  84:3,
19, 22  85:7,
13, 14, 20,
22  86:2, 4
89:1  91:2
92:13  93:4
94:7  95:22
98:8  99:5
101:7, 16
102:18
104:5, 12
105:2, 9, 16
106:1, 20,
23  107:6,
19  108:6
109:20
110:9
111:17
112:2
113:7, 12,
17  114:10
116:22
117:2, 23
119:15
120:21
121:5, 11
124:14, 21
131:7
134:18
137:2
138:6
139:7, 9
**once**  16:13
36:9  69:8

Video Deposition of Ron Helveston

1/17/2024

61

ones  56:10
59:18
89:18
online  37:1
open  91:3
102:8
opening
115:23
opinion
93:9
127:12
oral  6:9
order  17:6
19:4  20:19
21:16
34:19, 20
52:16  55:1
127:23
outlines
34:4
outside
21:8
oversight
23:13, 17
24:1, 2
owner
34:14, 16
47:14
56:14
75:20
121:5
126:14
129:7
130:7
131:11

< P >
P  2:1  5:1
P&L  24:10
P.C  2:7
5:9, 17  6:6

P.M  1:20
2:10  6:8,
14  119:19
140:14
PAGE  4:2,
9  31:14
78:5  108:6,
18
paid  82:12
105:13
106:6
110:1
painting
136:5
PALMER
4:3  5:4, 5
7:4  8:2, 4
19:21, 22
30:22  31:5
81:7, 8, 17,
21  94:20
95:2, 11, 17
96:9, 14, 17
97:3, 10
102:7
103:6, 10,
12  107:6,
11, 16
119:16
120:1
127:11
128:20
129:6, 12,
19  130:5,
18, 21
131:8, 10
140:10
paper  18:2,
22  20:13
85:7  87:21

paperwork
18:4  28:4
36:13
par  77:21
parameters
130:4
part  18:22
46:5  73:20
82:14, 19,
20  109:15
113:10
117:11
137:21
particular
9:9  10:11
14:17  30:3
33:13
53:22  67:8,
11  79:20
129:5
particularly
99:15
parties  2:3,
22  38:15
141:15
party
124:10
passed
82:2
123:15
pay  55:6
86:10
103:6
104:2, 5, 18,
22  105:2, 3,
7, 10, 18, 20
106:2
110:3
111:7
114:19
118:21

paying
59:18
90:17
92:21
payments
88:18
payroll
90:5
114:15
pays  83:17,
19, 21, 22
85:22
people
20:10, 18,
20  21:12
22:6  23:1
40:23  55:6,
11  56:12
58:13
75:14, 17,
22  85:6
86:10  89:5,
6  91:11
92:8  93:7,
11, 14, 15
100:11
101:4
105:15
106:13
110:5, 7
112:6
117:10, 11,
13, 20
122:22
125:10, 12,
13  131:21
136:21
138:18
percent
36:6  50:18
58:20, 21
81:19, 20,

23  82:5, 11,
13, 17, 21
83:2, 3
84:11, 13
85:1  86:5,
7, 12  87:5
88:12, 17
92:7  93:21
111:14
124:4
131:17, 22
132:8
percentage
84:18  87:1,
4, 7
perfectly
98:8
101:16
performanc
e  27:10
period
23:9  24:3
81:6, 13
100:23
person
25:9  36:9,
12, 14
41:23
69:10
93:17
128:18
personal
8:23  30:13
90:14
130:1, 6
135:13
personality
25:21
personally
121:11, 17
Petty
36:15  40:5,

*6* 52:*1*
66:*1, 2, 3*
67:*5, 8*
69:*8, 19, 22*
70:*16* 71:*8*
73:*13, 15*
119:*14*
133:*2*
**Phillips**
123:*23*
124:*6*
**phone**
29:*5, 7, 10,*
*13, 21* 30:*4,*
*7, 13, 16*
33:*6, 8, 9*
64:*19*
65:*14* 66:*8*
67:*13, 14,*
*17, 19* 68:*4*
72:*23* 73:*3,*
*4*
**phones**
29:*16, 19*
30:*6*
**pick** 60:*6*
67:*13, 14,*
*17, 19*
**pitch** 24:*8*
**place** 34:*4*
49:*16, 17*
77:*4* 93:*23*
**placing**
102:*8*
**Plaintiff**
1:*8* 5:*3*
7:*3, 5, 7*
98:*13*
**PLAINTIFF'
S** 4:*9* 31:*2,*
*6* 77:*2, 6*
94:*9, 10, 13*

103:*22*
104:*1*
107:*12, 13,*
*21*
**plan** 138:*21*
**plans** 63:*16*
**please** 7:*2,*
*11* 50:*13*
78:*5* 100:*7*
131:*5*
**plenty**
59:*3, 5*
**plus** 9:*12*
93:*21*
**point**
26:*15* 34:*8*
36:*6, 8*
49:*9* 59:*19*
65:*18, 23*
68:*14*
70:*20*
99:*10*
103:*2*
129:*19*
**pointed**
137:*17*
**points**
137:*13*
**policy** 46:*9,*
*11* 121:*19*
**pony**
138:*10*
**pool** 86:*11,*
*16* 108:*9*
**popped**
78:*17*
**populates**
78:*12*
**position**
8:*13* 11:*5,*
*16* 13:*7*
44:*12*

45:*19*
58:*11, 13,*
*14* 75:*20*
106:*2*
115:*23*
130:*6*
**positions**
25:*3* 58:*8*
**possession**
32:*10, 13,*
*16*
**possible**
115:*1*
**posted**
98:*9*
**posting**
103:*1, 16*
**postings**
115:*10, 14*
**pot** 93:*20*
**practice**
39:*16*
**practices**
39:*7*
**premium**
78:*4, 18*
86:*20*
**prepare**
31:*16, 19*
32:*2*
**PRESENT**
5:*22*
**president**
11:*17, 18*
12:*9, 10, 13,*
*19, 22*
13:*12, 17,*
*18, 21* 14:*2,*
*7, 16, 18*
20:*4* 24:*7*
25:*7* 41:*2,*
*4, 7* 56:*15*

75:*20*
76:*18, 19*
81:*6, 10*
89:*10*
109:*8, 9, 12,*
*14* 111:*15,*
*18, 20, 22*
121:*6*
124:*22*
126:*14*
129:*7*
130:*7*
131:*11, 17*
**presidents**
23:*17, 19*
**pretty**
44:*14*
45:*15*
54:*15*
62:*11*
70:*16*
124:*11, 12*
129:*18*
**previous**
26:*16*
27:*21*
**previously**
77:*2*
**print**
108:*22*
**prior** 3:*2*
**private**
91:*12*
**probably**
9:*21* 37:*2,*
*5* 42:*6*
66:*12* 73:*3*
74:*21*
90:*13* 97:*1*
112:*1*
118:*19*

124:*20*
134:*6*
**problem**
38:*13*
54:*11*
125:*21*
127:*1, 6*
128:*15*
131:*16*
**problems**
92:*19* 97:*2*
98:*12*
**Procedure**
6:*4* 24:*21*
**procedures**
131:*15*

**proceedings**
6:*10*
**process**
18:*22*
24:*14*
26:*10*
34:*13, 15*
42:*10*
**processed**
20:*13*
**processing**
18:*2*
**produce**
94:*23*
101:*17*
112:*6*
**produced**
94:*18* 95:*8*
96:*21*
98:*21*
101:*8*
**producer**
40:*20*
122:*20*

producing
98:14
122:21
production
77:14, 15
professional
16:22
26:18
41:13, 14,
17, 20, 22,
23  53:7, 11
70:2  74:23
75:2  80:1,
5, 6  123:14
124:1
134:16
program
17:9
programs
14:9  46:1
113:5
promotions
46:2
proper
26:17
101:22
129:23
properly
52:16
property
16:21
41:11  56:7,
23  79:23
123:22
proprietary
90:12
protect
131:11
provide
29:16
36:17

provided
6:3  29:21
Public  2:6
6:2
pull  96:17
101:20
pulled
94:13  95:9
99:14
pulling
99:10
purchase
34:19, 20,
21  36:3, 20
purchased
34:11
115:2
purpose
10:21
25:14  47:7
95:16
112:2
pushing
87:21
put  30:11
38:19
74:17  94:8
110:22
114:7
123:7
129:11

< Q >
Q  8:3, 19,
22  9:2, 5, 8,
14, 18, 20
10:1, 4, 7, 9,
11, 14, 17,
20  11:2, 4,
7, 10, 16, 18,
21, 23  12:2,
8, 16, 19

13:1, 4, 7, 9,
14, 17, 20
14:1, 4, 10,
16, 20, 22
15:1, 3, 6,
12, 16, 20
16:12, 14,
17  17:4, 8,
13, 17, 20,
22  18:7, 10,
14  19:1, 8,
13, 15, 22
20:3, 20
21:1, 16, 20
22:10, 13,
16, 21  23:5,
8, 12, 18
24:2, 13, 22
25:2, 11, 14,
18  26:1, 4,
6, 9, 12, 15,
20, 23  27:3,
6, 10, 12, 16,
20  28:1, 6,
9, 11, 15, 22
29:1, 5, 7, 9,
12, 18  30:1,
3, 9, 14, 20
31:5, 8, 19,
23  32:4, 6,
13, 16, 19
33:2, 9, 11,
13, 16, 19,
23  34:3, 10,
12, 16, 19,
23  35:4, 6,
9, 12, 16, 21
36:1, 8, 17,
20  37:8, 10,
18, 22  38:3,
11, 18, 22
39:1, 6, 10,

16, 21  40:3,
6, 9, 12, 15,
19, 22  41:4,
7, 10, 13, 15,
19, 22  42:3,
7, 11, 14, 16,
20, 22  43:1,
5, 10, 14, 22
44:1, 3, 6, 8,
10, 12, 15,
17, 23  45:5,
13, 16, 19
46:4, 7, 12,
14  47:2, 7,
14, 19, 22
48:1, 5, 7,
11, 14, 16,
18, 20, 22
49:3, 8, 12,
15, 19, 22
50:2, 5, 15,
20, 23  51:4,
6, 9, 12, 20
52:3, 5, 8,
11, 14, 18,
21  53:2, 14,
18, 21  54:3,
9, 14, 18
56:1, 14, 20
57:3, 7, 11,
17, 21, 23
58:4, 8, 15
59:4, 11, 16,
19, 22  60:2,
7, 14, 18
61:1, 4, 9,
13, 19, 23
62:6, 11, 15,
18, 21  63:7,
10, 13, 18,
22  64:2, 7,
10, 14, 18,

21  65:1, 4,
6, 16, 21
66:3, 6, 10,
15, 18, 22
67:2, 5, 10,
14, 18, 23
68:5, 8, 12,
19, 22  69:4,
12, 19  70:5,
8, 15  71:7,
11, 18  72:2,
8, 13, 17, 19
73:1, 4, 7,
10, 15, 20
74:3, 5, 15
75:4, 19
76:4, 11, 14
77:1, 11, 16,
21  78:5, 11,
20  79:2, 9,
14, 19  80:2,
4, 8, 17, 22
81:3, 8, 11,
13, 21  82:4,
8, 23  83:13,
16, 21  84:3,
9, 19, 22
85:2, 7, 9,
13, 19, 22
86:2, 14
87:6, 10, 14,
22  88:4, 7,
18  89:1, 14,
19, 22  90:4,
7, 9, 16, 21,
23  91:2, 8,
16, 21
92:12, 23
93:4  94:1,
7, 13  95:2,
5, 17, 22
96:3, 17

Video Deposition of Ron Helveston

1/17/2024

64

97:3, 5
102:7, 11, 14, 18
103:5, 12, 16, 19
104:1, 5, 8, 12, 16, 18, 21 105:9, 16 106:1, 5, 10, 16, 20
107:2, 16, 20 108:4, 6, 14, 21
109:12, 20
110:9, 14, 17, 22
111:9, 17, 21 112:2, 8, 13, 19, 23
113:3, 7, 12, 14, 17, 21, 23 114:2, 10 115:3, 6, 15, 22
116:4, 8, 11, 13, 16, 18, 22 117:2, 8, 14, 16, 23
118:7, 11, 22 119:3, 9, 15 120:1, 12, 15, 19, 21 121:1, 5, 11, 19, 23
122:10, 14
123:9, 15
124:6, 14, 21 126:1, 6, 10, 14, 20
127:5, 15, 22 128:13
130:21

131:3, 10, 22 132:11
133:6, 11
134:2, 10, 18, 21
135:1, 4, 8, 12, 15, 19, 23 136:14
137:2, 6, 9, 12, 17
138:6, 12, 23 139:7, 9, 13, 17, 22
140:5
**quality**
122:21
**question**
18:16
51:18
95:15 98:6, 22 100:3
121:18
126:19, 20
127:21
129:14, 15
130:9
131:14
**questioning**
128:21
**questions**
2:21, 22
95:7 96:8
99:17, 20
127:12
130:14, 16
141:8
**quick** 109:6
**quicker**
67:12
**quite**
21:23
23:23

67:22
137:22
**quote** 64:6
138:10

**< R >**
**R** 5:1
141:1
**race** 122:3
**Rachel**
5:18 7:8
30:22 96:7
97:12 99:1
100:2
102:21
129:12
**raid** 11:5
**raided** 9:11
**raiding**
9:17
**raise** 59:6
**raising**
58:16
**ran** 12:23
61:6, 7
123:13
**range**
134:22
**ranges**
94:4 105:2, 3, 20
**Raspino**
123:22
**reach**
59:20
63:19, 21
**reached**
64:8
**read** 7:21
37:13, 14
77:13

**reading**
2:12
107:20
**real** 87:16
109:5
114:20
**really**
12:11
19:19
20:11 22:8, 20 36:14
45:9 53:8
71:3 89:4
91:13, 23
93:5, 12
115:14
117:20
121:4
122:8
123:7
125:6
127:2
132:17
133:18
134:5, 6
139:5
**reason**
8:15 67:10
101:1
111:17
133:5
138:20
**recall** 25:2
34:23 38:3
40:15
66:10 79:9
85:9
104:18
116:23
133:9
**receive**
96:3

**received**
39:22 40:3
**recess**
119:20
**recognize**
31:5
**recollection**
62:6
**record**
6:13 7:3
96:5, 13
99:1, 4
119:19, 23
**recorded**
99:3
**redone**
136:6, 8
**referenced**
34:7
**region**
119:14
**regional**
23:20 25:8
**regularly**
28:11 91:9
**relate**
125:11, 12
138:5
**related**
8:14, 22
10:11, 17
32:11, 14, 17 36:20
37:19
41:20
53:22
54:10
63:15
70:11 71:4, 20 94:2
103:16
128:21

Video Deposition of Ron Helveston

1/17/2024

129:*8*
130:*6*
**relating**
  2:*16*
**relation**
  141:*14*
**relationship**
  47:*6*  55:*20*
  118:*11*
**relationship
s**  47:*3*
  140:*9*
**religion**
  122:*3*
**rely**  94:*23*
**remember**
  9:*8*  24:*17*
  27:*12*, *15*,
  *18*, *19*, *20*,
  *22*, *23*
  33:*16*  34:*2*
  49:*3*, *19*, *22*
  51:*13*, *15*
  52:*11*, *12*
  54:*4*  57:*8*,
  *12*, *13*  64:*2*
  67:*22*
  69:*23*
  70:*12*, *13*
  71:*9*  72:*3*,
  *9*, *12*, *13*
  124:*20*
  132:*3*
  133:*14*, *17*
  137:*2*, *12*,
  *16*, *21*
**remodeled**
  136:*12*
**removed**
  117:*21*, *23*
  118:*1*

**re-notice**
  31:*10*
**report**
  79:*16*, *20*
  80:*6*  128:*3*
**reporter**
  6:*15*  7:*11*,
  *19*
**Reporting**
  6:*17*
**represent**
  8:*4*  31:*8*
  77:*7*

**represented**
  96:*5*, *11*
**representin
g**  8:*10*
  98:*15*
**represents**
  141:*10*
**requested**
  32:*21*
**requesting**
  115:*4*
**require**
  16:*12*  28:*6*
**required**
  18:*19*  19:*2*
  109:*15*
**requirement
s**  46:*14*, *16*
**research**
  38:*10*, *11*,
  16
**resolution**
  60:*19*
**resolve**
  61:*16*
**resonated**
  137:*15*

**resources**
  35:*9*, *13*, *17*
  36:*1*, *7*, *21*
  37:*4*, *11*
**respect**
  100:*20*
**respected**
  123:*19*
**respective**
  2:*3*
**response**
  68:*11*
**responsible**
  55:*16*
  57:*18*
  59:*11*, *22*
  87:*10*
  110:*11*
**rest**  99:*6*
**result**
  141:*16*
**retaliate**
  125:*6*
**retaliated**
  124:*23*
**retaliation**
  125:*15*, *22*
  126:*1*, *6*
  127:*23*
  129:*9*
**retire**  45:*12*
**retired**
  11:*22*
  32:*23*
**retirement**
  33:*3*  95:*19*
  115:*9*
  124:*10*
**retiring**
  45:*6*, *11*
**Retriever**
  82:*8*

**revenue**
  77:*14*, *23*
  78:*3*, *7*, *13*,
  16, 18
  79:*13*
  80:*10*, *23*
  82:*7*, *12*
  83:*1*  84:*16*
  86:*6*  87:*8*,
  20, 23  88:*8*
  106:*19*
**revenues**
  85:*16*
  106:*17*
  135:*5*
**review**
  111:*18*
**revolves**
  80:*22*
**Right**
  14:*18*  22:*4*,
  14  23:*10*
  26:*2*  29:*12*
  34:*21*
  39:*13*, *14*
  45:*16*
  49:*10*  51:*3*
  52:*3*, *5*
  62:*12*, *22*
  66:*4*, *16*
  67:*18*
  68:*19*  71:*8*
  75:*4*, *5*, *9*
  76:*16*  78:*8*
  80:*2*, *23*
  85:*23*  89:*8*,
  11, 20  90:*1*,
  4, 18  91:*21*
  94:*1*, *20*
  103:*2*
  108:*1*
  110:*15*

112:*13*
117:*8*, *16*
118:*2*, *4*, *7*
120:*1*
129:*10*
131:*22*
133:*6*
139:*23*
140:*1*, *5*, *10*,
  12
**ring**  27:*17*
**ringing**
  48:*4*
**rings**  113:*1*
**role**  9:*3*
  20:*4*  26:*16*,
  17  27:*1*
  39:*22*
  43:*11*  48:*7*
  89:*22*
  129:*7*
**roles**  58:*1*,
  3  87:*17*
  139:*3*
**rolled**
  117:*5*
**rolling**  13:*1*
**RON**  1:*16*
  2:*4*  6:*8*, *18*
  7:*14*  64:*16*
**room**  43:*4*,
  6  60:*22*
  98:*10*
  126:*6*
**rooms**
  104:*8*, *10*,
  13
**roughly**
  12:*4*, *9*
  13:*10*
**RPR**  2:*6*
  6:*1*  141:*20*

rule  22:9
45:6, 7
46:8, 19
47:4, 11, 15
58:20
90:17
91:18
129:20
rules  2:16
6:4  30:3
run  60:12
running
121:12
runs  41:17
119:10
Rusty
41:15, 17
42:3, 5
43:13, 18
60:21  61:1,
6  123:14

< S >
S  2:1  5:1
s/Tanya
141:19
SAITH
140:19
salaries
114:21
salary  83:8,
9, 12, 14, 15,
17, 18, 19,
21, 22
85:18, 23
94:4  106:7
sale  35:7
Sarah
48:22, 23
sat  51:17
92:14

satisfied
62:5
Sauder
48:2, 4, 5
saw  62:22
111:1
124:8
125:3
saying
45:13
46:23  49:4
54:5  59:5
74:11, 13
80:9  83:11
87:13, 14
97:21
99:18
121:3
133:14, 17
says  31:10
54:9  82:9
95:23
129:20
scale  85:2
scales
105:19
106:2
114:19
scenarios
37:15, 19
129:22
scheduling
31:11
scoring
94:1
Scott
53:15
55:14, 15
screen
103:20

screenshots
77:7
scroll
102:18, 21
scrolled
33:11
scrolling
103:5
search
33:14, 20
78:21
searches
32:19  33:1,
4
second
31:14
41:19
108:19
seconds
119:8
see  30:19
33:7  34:3
37:16
38:14
44:21
47:11
73:14  78:2,
6  83:11
90:13  91:6,
21  102:9,
20, 23
105:7
107:9
108:2, 5, 11,
13  109:19,
22  114:14
115:3, 22
117:4
122:11
126:6
134:18

seeing
104:18
seen  15:20
84:12
94:14  95:2
98:7  99:16
100:22, 23
104:5
Segrest
43:14
selling
46:5, 7
send  65:12,
13, 21
sense  24:9
38:15  68:1
82:22
133:19
sent  16:6
86:21
108:23
separate
113:19
sequence
71:10
service
16:10
SERVICES
1:10  6:21
14:8  34:17
set  22:1, 9
25:17
47:10  51:6
59:20
75:12, 14
84:22  88:9
90:21, 22,
23  91:1, 22
94:1  99:5
137:13
seven  9:22
11:14  12:4

severance
115:4
sex  122:3
sexual
51:19
share  63:7
sheet  84:7,
9, 10  92:14
109:1
134:21
135:14
sheets
109:6, 13,
17, 18
110:2
Sherry
124:2
shift  23:8
ship  121:12
shoot
28:19
show  77:1
94:7  99:10
102:6
107:2, 5
118:20
showed
79:8
shows
134:22
shredded
135:16
side  38:14
78:19
122:22, 23
sides  38:8
sign  7:22
signature
2:12

significantly
106:6

similar
17:13
47:15
simply  98:6
sir  78:6
97:5  121:1,
23  140:11
sisters
19:17
sit  60:22
site  115:16,
19
sitting
50:11
122:22
133:21
situation
39:2  61:17
126:18
127:18
129:1, 5
130:2
situations
138:1, 7
six  9:21
11:14  12:4
Skip  57:6
slide  22:4
Slip  15:2
55:15
slips  55:17
slow  115:8
slowly
53:16
small  16:4
19:21
22:23
Smith
47:20, 22
48:1, 3
sold  34:23
35:2, 16

somebody
22:3  24:11,
18  39:2, 10
67:23
75:12  79:7
111:2, 5
115:12
119:13
122:5
125:20
132:5, 6
139:18

somebody's
125:21
son  44:1, 8,
19
soon
50:23  51:3
124:11, 12
sorority
19:17
sorry
12:15
19:23
26:17
44:22
47:21  48:2
53:16
68:23  70:6
97:3  98:1
101:5
104:9
108:19
113:22
119:2
123:16
133:10
137:5
sort  84:19
124:15

sound
38:22
48:12  49:4
sounds
27:14
48:23  49:1
South  5:6
Southeast
56:8
SOUTHERN
1:3  6:23
speak  8:6
27:3  76:5
115:21
speaking
8:6  40:15
54:4  63:14
70:17
specialty
114:6
specific
23:9  25:12
37:22
39:21
40:22  42:1,
2  49:23
specifically
18:17
37:10  46:4
53:21  54:9
56:20  61:1
79:15
132:1
134:12
136:1
specifics
53:18
speculate
127:17
speculating
130:2

Speculative
93:9
spoke  72:2
spoken
66:11
spread
111:14

spreadsheet
108:16
Standard
119:19
140:14
start  11:18
30:23
started
26:7  43:3,
7  81:19
99:16
starting  7:3
Starwind
113:21, 23
state  132:9
141:3
statement
71:19
127:23
statements
124:16
STATES
1:1  6:21
stay
115:20
140:7
stayed
35:21
steal  123:4
125:20
Steele
43:22  44:1,
3

Stefani
36:15  40:5,
6, 7, 10, 13
52:1  66:1,
2, 3, 6, 9, 18
67:5, 7
69:8, 19, 20,
22  71:5
73:13, 15
119:14
133:2
stenotype
141:8
steps
121:11
124:21
sticker
94:9
sticking
78:19
STIPULATE
D  2:2, 11,
18  3:3
stipulation
6:5
stipulations
7:20  95:12
129:13
stole
125:16
stop  75:16
126:18
127:23
131:5
stopping
99:17
stories
62:12
story  38:9
strange
77:3

Street  5:*6*,
*19*
strictly
129:*23*
structure
81:*4*  90:*21*,
*22*  91:*22*
108:*15*
structured
15:*12*
structures
114:*15*
struggling
130:*14*
stuck  72:*10*
stuff  17:*8*
59:*20*
105:*20*
113:*20*
134:*7*
135:*13*
136:*1*
submission
s  16:*6*
18:*8*
suck  98:*4*
sudden
99:*12*
sue  15:*5*, *6*
Suite  2:*8*
5:*6*, *11*, *19*
6:*7*
SunTrust
117:*20*
support
22:*12*
supposed
69:*9*  91:*12*
94:*23*
96:*22*
101:*9*

supreme
122:*10*
sure  21:*23*
22:*16*  25:*6*,
*9*  36:*6*
44:*14*
46:*16*
47:*17*
53:*20*
56:*18*  58:*3*
85:*20*
89:*12*
91:*23*
92:*20*
109:*16, 17*,
*23*  110:*1*
111:*16*
114:*23*
121:*7*
122:*7*
124:*4*
132:*2*
surprise
106:*5*, *9*
Susan
123:*23*
124:*6*
Sutton
48:*18*
sway  91:*3*,
*7*
Swett
114:*16*
sworn  7:*15*

< T >
T  2:*1*
141:*1*
table  98:*6*
take  8:*11*
19:*8*  24:*11*
31:*9*  37:*1*,

*7*, *8*, *22*
40:*7*  49:*8*,
*15*  55:*8*
62:*15*
68:*20*
99:*23*
102:*20*
103:*20*
119:*16*
121:*12*
124:*21*
135:*14*
137:*8*
taken  2:*5*
66:*13*
119:*21*
120:*2*
141:*7*
takes  83:*7*,
*13*  103:*8*
talent  22:*7*
talk  24:*19*
25:*9*  28:*17*,
*18*  40:*19*,
*22*  53:*21*
56:*11, 12*
62:*3*  63:*2*,
*5*  66:*6, 9*,
*18*  68:*5, 10*,
*13*  69:*4*
81:*9*  91:*11*
99:*19*
102:*3*
106:*16*
132:*1, 17*,
*22, 23*
talked  32:*1*
43:*8*  53:*20*
68:*15*  69:*8*,
*12, 15, 19*,
*21*  70:*10*
71:*7, 8, 11*

72:*1*  73:*15*
91:*8*
106:*14*
134:*21*
135:*1*
talking
25:*15*
37:*10*  62:*4*
65:*9*  79:*14*
89:*18*
91:*17*
105:*7*
106:*11*
107:*23*
116:*17*
117:*4, 7*
122:*1*
127:*7*
134:*6, 11*
talks  91:*13*,
*22*
Talsma
48:*20*
Tanya  2:*5*
6:*1, 15*
141:*20*
TAPCO
113:*1, 3, 4*,
*10*
taught  55:*1*
team  15:*12*
16:*3*  18:*16*,
*18*  20:*8, 17*,
*18*  23:*1*
26:*20*  58:*1*,
*14*  60:*2, 4*,
*12*  79:*12*
83:*17*
85:*22*  86:*3*,
*8, 15*  88:*16*
90:*13*
92:*15*  93:*1*,

*10, 15, 17*
105:*5*
112:*11, 14*
116:*20*
125:*9, 10*,
*16*  126:*2*
131:*19*
133:*22*
teams  23:*6*,
*14*  60:*5*
87:*16*
90:*17*
93:*12*
125:*8*
Technical
15:*18, 20*
17:*22*
18:*11, 21*
74:*13*
tell  15:*21*
31:*23*
44:*13*
50:*20*
51:*13, 14*
61:*10, 15*,
*23*  63:*13*,
*18*  64:*10*
69:*22*  70:*5*
72:*2*  73:*16*
77:*11*  82:*8*
95:*14*
101:*11*
113:*1*
140:*6*
telling
49:*20*
50:*12*
52:*11*
tells  84:*10*
ten  12:*16*,
*17*  75:*14*,
*17*  83:*10*

93:*11, 15*
124:*19*
131:*22*
**tenure**
56:*15*
57:*12, 14*
120:*8, 9*
**term**  33:*14*
107:*1*
117:*15*
**terms**
129:*11*
**testified**
*7:16  72:7*
133:*6, 11*
**testify**
128:*7*
**testifying**
130:*1*

**TESTIMONY**
1:*15*  133:*9*
141:*11*
**Texas**
45:*16*
**text**  29:*2*
32:*7, 10*
50:*17*  53:*9*
**texted**  33:*7*
**texts**  53:*10*
**Thank**
*7:22  28:9*
103:*11*
104:*1*
140:*11, 12*
**theory**
126:*9*
127:*18*
**thereto**  3:*2*
141:*8*
**thing**
16:*20*

30:*11*
54:*15*
72:*10*
82:*18*
88:*13*
100:*1, 22*
101:*22*
114:*14*
122:*22*
123:*3*
**things**
10:*18*  15:*4,*
*6*  20:*14*
21:*9*  25:*18*
32:*20*  37:*5*
54:*6*  85:*13*
123:*6*
137:*15*
138:*5*
**think**
10:*19*
35:*14*  36:*5,*
*15*  37:*5*
42:*15, 18*
44:*20, 21*
46:*10, 20,*
*23*  50:*9*
53:*4*  54:*18*
56:*13*  57:*1*
59:*21*
63:*23*
67:*20*
74:*12*
75:*11*
76:*17, 19,*
*22*  82:*1*
85:*5*  86:*5*
90:*11*
101:*13*
106:*13*
115:*17, 18*
116:*3*

118:*13, 14,*
*18*  120:*5*
124:*3*
128:*19*
129:*4*
132:*5*
134:*15*
138:*12, 19*
**thinking**
25:*8*  92:*16*
117:*3*
**thirty**  84:*6,*
*15*  133:*4*
**thirty-five**
84:*6, 15*
**thirty-seven**
82:*12, 17*
83:*2*
**Thirty-six**
12:*1, 2*
29:*16*
121:*3*
**thorough**
8:*16*
**thought**
31:*21*  54:*5*
58:*10*
67:*12*  74:*8*
92:*21*
100:*17*
**thousand**
83:*9*  123:*1,*
*2*
**three**
12:*21*  17:*1*
32:*23*  41:*5*
52:*22*  61:*4,*
*7, 8*  62:*23*
64:*16*  76:*9*
82:*15*
93:*13*
131:*21*

**three-year**
16:*23*
**thrust**
10:*19*
**time**  2:*23*
3:*1*  14:*1*
15:*21*
21:*12*  23:*9*
24:*3, 18*
25:*4*  29:*14*
33:*4, 21*
42:*8*  46:*20*
64:*21*  65:*1,*
*18*  69:*15*
70:*13*
71:*10*
75:*18*  81:*6,*
*13*  85:*14*
87:*6*  98:*2*
101:*2, 4, 8,*
*12*  107:*20*
109:*23*
110:*3*
111:*7*
114:*13*
119:*19*
122:*2*
125:*4*
131:*17, 23*
132:*5*
136:*10*
140:*15*
**timely**
101:*10*
**times**
20:*12*  24:*6*
28:*22*
31:*13*
56:*11*
64:*17*  86:*7*
89:*9*  111:*4*
132:*4*

**tiniest**
108:*7*
**tiny**  108:*21*
**title**  46:*3*
**titles**  22:*17*
**today**  8:*11,*
*17*  31:*17,*
*20*  98:*13*
100:*11*
101:*15*
129:*17*
**told**  53:*9*
54:*10*
60:*14, 20*
62:*3*  63:*1*
64:*1*  65:*8,*
*23*  66:*19*
68:*16*
134:*15*
**top**  78:*6,*
*22*  119:*8*
**total**  41:*5*
**touch**
66:*14*
**tracked**
77:*17*
**trail**  128:*20*
**trails**  11:*1*
**trained**
52:*16*
123:*20*
**training**
36:*17*
37:*12, 22*
42:*9, 12*
43:*12*
57:*18*
138:*2*
**trainings**
37:*18*
**transcribed**
141:*9*

Video Deposition of Ron Helveston

1/17/2024

70

transcript
141:*7, 11*
transcriptio
n  141:*10*
transfer
27:*1, 4*
61:*14*
transferring
61:*17*

transitioned
26:*16*  58:*5*
Transparen
cy  103:*7*
104:*2, 6, 19,
22*
travel
16:*12*  19:*1*
139:*6*
traveling
51:*2*
treated
136:*15, 19*
137:*1*

tremendous
18:*3*
trend  139:*1*
trial  3:*1*
tricky
102:*19*
tried  33:*6*
65:*9*
105:*18*
108:*21*
125:*16, 20*
Trigg
53:*15*
55:*14*
Trinity
114:*2*

trouble
31:*11*
67:*21, 23*
134:*10*
true  141:*11*
TRUIST
1:*10, 11*
7:*9*  8:*5, 6,
7*  10:*2, 7*
14:*13*
39:*17*
94:*14, 21*
95:*18*  96:*1*
116:*14, 15,
20*  117:*6,
13, 18, 19*
Truist's
96:*12*
Trust  35:*4*
truthful
8:*16*
try  16:*10*
37:*15*
38:*17*
64:*21*
120:*4*
trying
37:*16*  98:*2*
100:*5*
114:*17, 18,
22*  134:*5*
turn  40:*9*
73:*16*
109:*7, 9, 12*
110:*18, 20*
135:*23*
turned
73:*12, 13*
92:*14*
tutelage
17:*20*

twelve
108:*9*
111:*13*
twenty
42:*5*  58:*21*
twenty-five
13:*11*
81:*19, 22*
82:*4, 5, 10*
83:*2*  84:*6,
10, 13, 14*
87:*4*  135:*2,
3, 4*
twenty-
minute
130:*16, 19*
twenty-
seven
84:*15*
twice
109:*10*
111:*7*
Two  9:*7, 8*
10:*9*  12:*20*
15:*14*
16:*23*  17:*1*
32:*5, 6*
52:*19*  55:*4,
16*  70:*11*
86:*5, 7*
88:*12, 17*
92:*7*  93:*21*
111:*4*
119:*8*
122:*22, 23*
131:*21*
type  9:*14*
14:*20*
33:*13*
38:*11*  40:*1*
75:*5*  76:*1*
79:*15, 19*

80:*6, 11*
107:*17*
typed
33:*17, 18*
types  25:*18*

**< U >**
U  2:*1*
umbrella
14:*15*
114:*8, 11*
underneath
78:*12*
understand
20:*7*  22:*1*
39:*1*  58:*4*
77:*12*
104:*21*
108:*14*
121:*20, 22*
122:*15*
133:*18*
understandi
ng  8:*12*
20:*4*  40:*23*
81:*3, 14*
87:*22*
92:*23*  98:*9*
114:*10*
134:*11*
understood
21:*23*
37:*17*
39:*17*  53:*8*
137:*22*
underwriter
17:*23*
18:*11*
55:*14, 18*
underwriter
s  19:*7*
55:*19, 21,*

23  59:*15,
16*  113:*6*
138:*4*
underwritin
g  14:*9*
15:*14, 17,
19*  45:*23*
53:*4*  88:*15*
unfortunatel
y  123:*17*
unhappy
50:*13, 21*
unidentified
128:*17*
129:*3, 4*
UNITED
1:*1*  6:*21*
unofficial
124:*15*
unwritten
46:*11*
90:*17*
upset
98:*19*  99:*8*
101:*1, 11*
use  28:*7*
30:*4*  31:*16,
18*
uses  74:*19*
80:*19*
usual  7:*19*
95:*12*
129:*13*
utilize
20:*17*

**< V >**
V  6:*20*
vague
117:*15*
Vaguely
112:*22*

Video Deposition of Ron Helveston

1/17/2024

71

verify
  103:4
version
  62:8
Vestavia
  49:18
VIDEO
  1:15  2:4
  6:18  99:4
Videograph
  er  5:23
  6:13  7:10
  99:3, 7
  119:18, 22
  140:13
visit  16:11
  18:20
vividly
  137:12
volume
  22:11
vs  1:9

< W >
wait  63:4
  128:6
waiting
  68:11
waived
  2:13  3:5
walk  28:18
wall  136:5
want  20:14,
  21  23:8
  24:11, 18
  25:23
  40:22  45:9
  46:23  49:8
  55:7, 8, 11
  59:1  60:6
  61:21
  68:20  71:1

74:17  75:3,
  13  89:12
90:13
91:17
98:21
102:1, 3
110:7
114:5
129:10
132:17, 22
139:6
140:2
wanted
  20:15  21:4,
  7  22:23
  24:8  61:22
  69:9  75:17
  80:4
wanting
  40:20
  115:7
wants  17:3
waste  98:2
  101:2
wasting
  101:4, 8, 12
Watch
  49:17  50:6
  51:7
way  22:1
  29:16
  30:12, 14
  75:3  91:14
  98:23  99:6
  108:23
  121:13
ways
  74:22
  139:21
website
  94:14, 21
  95:9, 20

96:1, 12, 18,
  23  97:4, 5
98:16
99:10
102:9, 12,
  14  103:9,
  14
week  51:4
weeks
  66:15
Well  9:16
  14:12
  16:19
  21:22
  25:21  30:6
  35:2  38:6,
  12  40:10
  45:20
  46:19
  54:21  56:4
  57:5  61:5
  63:3, 4
  65:23  67:7,
  12  73:12
  74:6, 21
  77:13
  78:16
  86:18
  87:19  89:4
  90:11
  93:10
  94:22  99:1
  102:21
  105:1
  107:21
  109:14
  111:23
  112:5
  118:4
  119:6
  122:18
  123:13, 15,

19  128:5
133:17
134:15
136:2
138:8
139:5
went  30:4
  33:10
  42:10
  45:10
  65:16
  75:13
  81:20
  86:20
  89:17
  111:2
  116:1
We're  6:16
  7:21  8:6
  25:8  30:22
  77:3  79:14
  98:2  99:18,
  19  100:11,
  19  117:3
we've
  31:10
  68:19
  115:23
wife  19:18
  50:7, 10, 20
Wilkinson
  2:7  5:9, 10
  6:6, 20  7:6
  8:9  96:7
  97:12, 15,
  19, 22  98:5,
  23  99:4, 8
  100:2, 7, 14,
  19  101:6,
  14, 19
  102:5
  107:4, 9

William
  5:23  6:15
witness
  2:13  6:8
  7:12  19:19
  96:6, 11
  98:4, 15, 22
  99:2, 15, 20
  100:3
  101:16
  102:1
  127:8
  129:22
  130:15
  131:1, 6
  140:12
  141:12
witnesses
  129:23
woman
  138:22
women
  138:13, 21
  139:2
wondering
  80:10
word
  100:21
words
  74:17
  120:6
work  13:4
  20:16
  27:16
  50:13, 21
  61:11
  69:13, 21
  98:10
  112:17
  136:22
worked
  26:21  45:5

70:23  80:7
81:15
86:13
93:16
95:10  97:9
125:17
working
26:7  44:3,
10, 17, 18
works
56:23  70:2
81:4
139:17
Worksheet
4:12
106:21
107:1
world
19:21
134:9
worry  99:5
wrap  120:4
write  16:4,
10  20:19
105:5
118:20
written
46:9
105:14
wrong
45:14
95:15
wrote
82:15, 18
113:19
www.DOL.g
ov  96:2

< X >
X  4:1
86:20

< Y >
yay  37:15
Yeah  9:19
13:1  16:16
18:18  26:5
28:1  33:12
35:5  38:23
42:9  43:16
50:16
56:21, 22
58:11
59:18
60:20
62:14
63:13  76:1,
2  77:19
79:5  88:2
93:3  106:9,
18  107:2
108:4, 21
111:9, 21
112:11, 23
113:15
114:4
118:4
123:17
126:11
129:21
130:8
134:2
135:3, 4, 17,
21  136:18
137:14
139:15
year  37:2
105:11
109:11
111:8
years  9:22
11:14  12:1,
2, 5, 10, 16,

18, 21
13:12  17:1
29:16
31:22
32:23
35:22  36:3
42:5  76:9
95:10
121:3
123:9, 19
124:20
133:4
year-to-
date  77:23
78:8
yesterday
94:21
York  10:16,
20  11:8
Yvette
48:20

< Z >
Zach
135:21
136:1, 2, 10
zero  111:1,
11
zeros
110:22