FILED

2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 9

# Video Deposition of Clay Segrest

## January 31, 2024

## Hendrix v. CRC Insurance Services, Inc., et al.

## 2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ALABAMA
3        SOUTHERN DIVISION
4
5    CASE NUMBER: 2:21-CV-0300-MHH
6
7    KATHRYN HENDRIX,
8        Plaintiff,
9        vs.
10   CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL
11   CORP., and TRUIST BANK,
12       Defendants.
13
14
15       VIDEO DEPOSITION TESTIMONY OF:
16           CLAY SEGREST
17
18
19       JANUARY 31, 2024
20       9:04 A.M.
21
22
23

Page 2

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3    between the parties through their respective
4    counsel that the video deposition of CLAY
5    SEGREST may be taken before Tanya D. Cornelius,
6    RPR, CSR, and Notary Public, at the offices of
7    Wilkinson Law Firm, P.C., 1717 3rd Avenue North,
8    Suite A, Birmingham, Alabama, on the 31st day of
9    January, 2024, commencing at approximately 9:04
10   a.m.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is NOT waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws
16   and rules of Court relating to the taking of
17   depositions.
18       IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any
20   objections to be made by counsel to any
21   questions, except as to form or leading
22   questions, and that counsel for the parties may
23   make objections and assign grounds at the time

Page 3

1    of the trial, or at the time said deposition is
2    offered in evidence, or prior thereto.
3        IT IS FURTHER STIPULATED AND AGREED
4    that notice of filing of the deposition by the
5    Commissioner is waived.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1        I N D E X
2    EXAMINATION BY:           PAGE NUMBER
3        MS. PALMER            9
4
5        * * * * * * * * * * * * * *
6
7        EXHIBIT INDEX
8    PLAINTIFF'S EXHIBIT NO:      PAGE NUMBER

9    41  Notice of Deposition        11
10   42  Workday file                37
11   43  E-mail                      67
12   44  E-mail                      90
13   45  E-mail                      97
14   46  E-mail                      110
15   47  E-mail                      112
16   48  E-mail                      115
17   49  E-mail                      117
18   50  E-mail                      119
19   51  E-mail                      168
20   52  E-mail                      183
21   53  E-mail                      187
22   54  E-mail                      191
23   55  Text messages               196

Page 5

EXHIBITS (Continuing)

56  E-mail                    200
57  Text messages              203

Page 6

A P P E A R A N C E S

FOR THE PLAINTIFF:
  PALMER LAW, LLC
  BY:  Leslie A. Palmer, Esq.
  104 23rd Street South, Suite 100
  Birmingham, Alabama  35233

  WILKINSON LAW FIRM, P.C.
  BY:  Cynthia Forman Wilkinson, Esq.
  1717 3rd Avenue North, Suite A
  Birmingham, Alabama 35203

FOR THE DEFENDANTS:
  BAKER, DONELSON, BEARMAN, CALDWELL
      & BERKOWITZ, P.C.
  BY:  Rachel Barlotta, Esq.
  420 North 20th Street, Suite 1400
  Birmingham, Alabama  35203

ALSO PRESENT:  William Byrd, Videographer
      Kat Hendrix

Page 7

I, Tanya D. Cornelius, RPR, CSR, and
Notary Public, acting as Commissioner, certify
that on this date, as provided by the Federal
Rules of Civil Procedure, and the foregoing
stipulation of counsel, there came before me at
the offices of Wilkinson Law Firm, P.C., 1717
3rd Avenue North, Suite A, Birmingham, Alabama,
beginning at 9:04 a.m., CLAY SEGREST, witness in
the above cause, for oral examination, whereupon
the following proceedings were had:

VIDEOGRAPHER:  We are on the record.
It is January 31st, 2024 at 9:04 a.m. Central
Standard Time.  My name is William Byrd, and the
court reporter is Tanya Cornelius.  We're here on
behalf of Cite Court Reporting of Montgomery,
Alabama.
        This is the video deposition of Clay
Segrest, which was noticed by Cynthia Wilkinson,
for case Hendrix V. CRC Insurance Services, Inc.,
et al., in the United States District Court for
the Northern District of Alabama, Southern

Page 8

Division, Case Number 2:21-CV-0300-MHH.
        Counsel, please identify yourselves
for the record, starting with the plaintiff.
        MS. PALMER:  Leslie Palmer for
plaintiff, Kathryn Hendrix.
        MS. WILKINSON:  Cynthia Wilkinson for
the plaintiff, Kathryn Hendrix.
        MS. BARLOTTA:  Rachel Barlotta for
CRC Insurance and Truist.
        VIDEOGRAPHER:  Will the court
reporter please administer the oath to the
witness.

        CLAY SEGREST,
          being first duly sworn, was
          examined and testified as follows:

        THE REPORTER:  Will this be usual
stipulations?
        MS. BARLOTTA:  We're going to read
and sign.  Thank you.

Page 9

1        EXAMINATION
2   BY MS. PALMER:
3        Q.   All right.  Good morning, Mr.
4   Segrest.  My name is Leslie Palmer, and I
5   represent Kathryn Hendrix along with Cynthia
6   Wilkinson and Attorney Patricia Gill in her
7   lawsuit against CRC and Truist.
8            We haven't met before, but we're
9   going to spend a few hours together today going
10  over everything just kind of to determine what
11  you know about Kathryn's case, if anything, and
12  to get you to kind of explain to us some of the
13  documents that we've received from CRC and how
14  CRC works.
15           So is it okay if I call you Clay?
16       A.   You can call me whatever you like.
17       Q.   This is going to be fun.
18           Okay.  I'm Leslie, you know, if you
19  have any need to call my name.
20       A.   Clay is fine.
21       Q.   Okay.  Perfect.  And have you ever
22  given a deposition before?
23       A.   No.

Page 10

1        Q.   Okay.  So let me tell you a little
2   bit about the ground rules here.  It's a little
3   awkward, because it can feel like you and I are
4   just having a conversation, but as you can see,
5   we have a court reporter, and we have a
6   videographer.  So we need to make sure to get
7   audible answers instead of head nods.  We need
8   like clear yeses and noes.  Do you understand
9   that?
10       A.   I do.
11       Q.   So if I ask you is that a yes or is
12  that a no, I'm not being rude.  I'm just trying
13  to make sure we get the clear record.
14       A.   10-4.
15       Q.   If anything -- if I ask a question
16  that you don't understand, feel free to ask me to
17  rephrase it, to ask it again, or to clarify,
18  okay?
19       A.   Okay.
20       Q.   And if you answer a question, is it
21  safe to say that you understand the question that
22  I'm asking?
23           MS. BARLOTTA:  Object to form.

Page 11

1        A.   Yes.
2        Q.   All right.  First off, is there any
3   reason that you wouldn't be able to give a clear
4   and thorough deposition today?
5            MS. BARLOTTA:  Object to form.
6        Q.   Any medications or anything like that
7   that you've taken?
8        A.   No.
9        Q.   Let me show you what I am going to
10  mark as Plaintiff's Exhibit 41.  And you're going
11  to be the keeper of all documents with yellow
12  labels.
13           (Whereupon, Plaintiff's Exhibit No.
14  41 was marked for identification and a copy of
15  same is attached hereto.)
16       Q.   Have you seen Plaintiff's Exhibit 41
17  before?
18       A.   I don't believe so, no.
19       Q.   Okay.  So this is a notice to take
20  your deposition today at this location.
21           If you'll flip for me to the second
22  page, it asks you to bring a couple of documents,
23  and I know you haven't seen this before, but did

Page 12

1   you bring any documents that you used to prepare
2   for your deposition today?
3        A.   No.
4        Q.   Okay.  What did you do to prepare for
5   your deposition today?
6        A.   Prayed.
7        Q.   Did you review any documents?
8        A.   I did.
9        Q.   Okay.  What documents did you review?
10       A.   I reviewed several documents.
11       Q.   Can you be a little more specific?
12       A.   With Rachel, but they were a lot of
13  e-mails, a lot of text messages.  There were a
14  couple of documents in regards to base pay of
15  employees, and that's the extent of it.
16       Q.   Okay.  Do you remember anything
17  specific about the e-mails that you reviewed,
18  like who they were to or from?
19       A.   Sure.
20       Q.   What do you remember about the --
21       A.   To or from, there were e-mails to
22  Corey Daugherty, from Corey Daugherty, to Kathryn
23  from me, from Kathryn to me.  I mean, there were

Page 13

1   lots of e-mails.
2       Q.   Okay.  And so the e-mails that you
3   reviewed, were you a recipient or a sender on all
4   of them?
5       A.   Yes, I think so.
6       Q.   Okay.
7       A.   I don't remember not being included
8   on the ones that I reviewed.
9       Q.   Right.  Right.  And was the -- were
10  all the e-mails general business related e-mails?
11      A.   Yes.
12      Q.   Okay.  Would that be related to
13  issuing policies to your insureds?
14          MS. BARLOTTA:  Object to form.
15      A.   I don't know if one of them was
16  specific to a policy issuance.
17      Q.   Okay.  Do you recall any e-mails
18  standing out to you as being staff-related versus
19  business-related?
20          MS. BARLOTTA:  Object to form.
21      Q.   Do you understand what I'm --
22      A.   I do not know what that means.
23      Q.   So, you know, in the normal course of

Page 14

1   business, I'll receive and send e-mails to my
2   clients about a case; but if I have an employee
3   that has a concern and we discuss that in e-mail,
4   that's different, right?  That's an employee
5   issue versus a business issue.  Do you understand
6   the distinction?
7           MS. BARLOTTA:  Object to form.
8       A.   I do understand the difference in
9   what you're saying.
10      Q.   Okay.  And does anything stand out to
11  you from the e-mails you reviewed as something
12  that I would have categorized based on my example
13  as employee-related?
14      A.   Yes.
15      Q.   Okay.  Can you tell me about those
16  e-mails?
17          MS. BARLOTTA:  Object to form.
18      Q.   Just what you remember.  And we may
19  get into some of them today.  So if it's --
20      A.   Yeah, I mean, so there were lots of
21  e-mails, and some of the e-mails had to do with
22  team strategy, employees, colleagues, teammates,
23  and then there were others that had to do with

Page 15

1   either delivering what we're supposed to deliver
2   to our retail agents, our clients, and/or
3   communication with underwriters, the carriers.
4   So all that stuff.
5       Q.   Okay.  Thank you.  That clarifies
6   that for me.  And some of these questions are
7   just going to be because I don't have an
8   understanding of all the documents, and so I'm
9   hoping you can clarify that for me, okay?
10      A.   Sure.
11      Q.   Number 2 on Plaintiff's Exhibit 41 is
12  any text messages or e-mails or other documents
13  related to Kathryn Hendrix, including her
14  employment, medical leave, or complaints.
15          Do you recall if any of the e-mails
16  or text messages you reviewed in preparation for
17  this deposition were specifically related to
18  Kathryn Hendrix and her employment?
19      A.   Yes.
20      Q.   Okay.  Do you recall the substance of
21  those e-mails or text messages?
22      A.   Yes.
23      Q.   Okay.  What can you tell me about the

Page 16

1   substance of those e-mails or text messages?
2       A.   That is an incredibly broad question.
3       Q.   Okay.
4       A.   But I saw lots -- I read lots of text
5   messages.
6       Q.   Okay.  Text messages --
7       A.   And e-mails, but --
8       Q.   Text messages between you and
9   Kathryn?
10      A.   I did go back and review text
11  messages between Kathryn and me.
12      Q.   Okay.  And when you say you went back
13  and reviewed those, were those paper text
14  messages like this or were those on your
15  cellphone?
16      A.   They were on my cellphone.
17      Q.   Okay.  And do you have a company
18  cellphone?
19      A.   I do.
20      Q.   When did you go back and review those
21  text messages?
22          MS. BARLOTTA:  Object to form.
23      A.   Last week.

Page 17

1    Q.   Okay.  So last week you reviewed your
2    company phone for text messages between you and
3    Kathryn?
4    A.   Yes.
5    Q.   Okay.  Before last week, had anyone
6    asked you to review your phone for text messages
7    between you and Kathryn?
8    A.   No.
9    Q.   Have you provided a copy of your
10   complete text message string between you and
11   Kathryn to counsel in this case?
12        MS. BARLOTTA:  The text message
13   string is the same as what you produced.  What we
14   produced is the one that Kathryn didn't produce.
15   A.   So I was going to say yes, but I
16   wouldn't call it complete, I don't think.
17   Q.   Okay.  Why wouldn't you call it
18   complete?
19   A.   It was just the most recent.
20   Q.   Okay.  So you have --
21   A.   Like when was the last one, and
22   here's the last one.
23   Q.   So you have on your phone text

Page 18

1    messages that predate the most current one?
2    A.   I do.
3    Q.   Okay.  And do you have text messages
4    on your phone that mention or discuss Kathryn
5    from November of 2000 -- I'm sorry -- from June
6    of 2019 forward?
7        MS. BARLOTTA:  Object to form.
8    Q.   Do you understand what I'm asking?
9    A.   Yes.  Can you say it one more time?
10   Q.   Yeah.  So not text messages with
11   Kathryn, but other text messages between you and
12   other individuals that discuss or relate to
13   Kathryn from June of 2019 through today.
14        MS. BARLOTTA:  Object to form.
15   A.   I can't -- I can't say that for sure.
16   I have not gone back to look or search.
17   Q.   Okay.  Thank you.
18   A.   I have no idea.
19   Q.   That is fair.  That is fair.  I am a
20   tech hoarder, so I have literally every text
21   message I've ever received, and it causes a real
22   problem when I change phones.  So I understand
23   that.

Page 19

1        Okay.  So you're employed by CRC,
2    correct?
3    A.   Yes.
4    Q.   Okay.  Who is your -- let's back up.
5    How did you come to be employed by CRC?
6    A.   Betsy Barnett, who was the president
7    of CRC in 2009 at the time, interviewed me twice,
8    introduced me to Corey Daugherty.  He interviewed
9    me a couple of times and offered me a position.
10   Q.   Had you applied to work for CRC or
11   did Betsy just reach out to you cold call?
12   A.   I reached out to Betsy.
13   Q.   Okay.  How did you know Betsy to
14   reach out to?
15   A.   Lehr, Middlebrooks & Vreeland is the
16   choice of counsel for one of the EPL programs
17   that CRC -- one of the products that they can
18   offer clients, and the Middlebrooks in that name,
19   I've known him my whole life.
20        And so when I got out of grad school,
21   I was interviewing with different banks and real
22   estate companies and was talking to him and
23   respected him and said, Hey, do you have any

Page 20

1    thoughts?  He said, Yes, you need to meet Betsy
2    Barnett at CRC, and so he introduced me in that
3    way.
4    Q.   I love David.
5    A.   Me, too.
6    Q.   Yeah.  I've had cases against him,
7    and they are formidable opponents.
8    A.   Yes.
9    Q.   Whitney over there at his office that
10   works with him is just fantastic.
11        So when did you go to work for CRC?
12   A.   August 2009.
13   Q.   And what was your position?
14   A.   Associate broker.
15   Q.   Okay.  And so we've heard some
16   testimony throughout this case on different
17   positions within CRC.  Can you tell me, do you
18   know what an account executive is at CRC?
19   A.   Heard of them.
20   Q.   What can you tell me about an account
21   executive position?  Like what would you define
22   that position as?
23   A.   Account executive -- we have, let's

Page 21

1  see, four account executives on our team, and
2  they all help our team bind business.
3      Q.   What do you mean help bind business?
4      A.   We all do whatever it takes to get
5  business on the books.
6      Q.   So I have nothing to do with
7  insurance.
8      A.   Right.
9      Q.   So what does it mean to bind
10  business?  Like when you say whatever it takes --
11      A.   Yeah.
12      Q.   -- what does that look like in daily
13  action?
14      A.   So we have retail agents that need
15  help with access to different insurance products.
16      Q.   Okay.
17      A.   Commercial insurance.  Specifically,
18  professional liability, which includes all kind
19  of different things.  And so we try to help them
20  obtain various options and try to get the best
21  coverage and/or the best price, whatever the
22  client is looking for.
23      Q.   Okay.  So you have -- your client is

Page 22

1  the retailer.
2      A.   That's right.
3      Q.   And you work with your client to find
4  them coverage.
5      A.   Yes.
6      Q.   And how do you get paid for that?
7  Does the retailer pay you or does the coverage
8  binder pay you?
9      A.   The insurance carrier.
10      Q.   Okay.  How do they -- how do
11  insurance carriers pay for a service like that?
12      A.   It's commission based, and it's a
13  percentage of the premium.
14      Q.   Is it -- is there a kind of set
15  standard for what that premium commission would
16  be or does it vary based on --
17          MS. BARLOTTA:  Object to the form.
18      A.   It varies, anywhere between -- it
19  just varies.  It can be anywhere between ten and
20  twenty typically, but there could be exceptions
21  there.  It could be five percent.  It depends on
22  the program.
23      Q.   Right.  Are there instances where it

Page 23

1  can be over twenty percent?
2          MS. BARLOTTA:  Object to the form.
3      Q.   In your experience, are there
4  instances where it can be over twenty percent?
5          MS. BARLOTTA:  Object to the form.
6      A.   That's rare.  It would be barely.
7      Q.   Is the client -- who is the agent,
8  right?
9      A.   Well, the agent calls the insured
10  their client.
11      Q.   Right.  But you don't have any direct
12  contact with the insured, do you?
13      A.   Yes.
14      Q.   Okay.  So would the insured and the
15  agent be your client?
16      A.   Yes.
17      Q.   Okay.  So are the insured or the
18  agent aware of the commission that CRC is
19  receiving from the carrier?
20          MS. BARLOTTA:  Object to form.
21      A.   Sometimes.
22      Q.   Okay.
23      A.   We disclose that when requested by

Page 24

1  the retailer.
2      Q.   Okay.  So back to the question.
3      A.   And we only have direct contact with
4  the insured if the retailer invites us to the
5  table.
6      Q.   Right.  That makes sense.
7      A.   We don't call the insured directly
8  without that facilitation.
9      Q.   Right.  Okay.  So what is an account
10  executive's role in this relationship to find the
11  coverage for the agent?
12          MS. BARLOTTA:  Object to the form.
13      A.   That varies, but, I guess, most
14  simply put, the broker or associate broker will
15  try to bring in the piece of business and then
16  work in tandem and in partnership with the
17  account executive to submit to market, negotiate
18  terms, and then present the proposal and/or
19  proposals to the retailer.
20      Q.   Okay.  So the -- and that's exactly
21  what I was wondering.  So the taking the coverage
22  that the insured is looking for and putting it
23  out there to see who will offer what, that's what

Page 25

1  the account executive does.
2         MS. BARLOTTA:  Object to form.
3    Q.   Is that right?
4         MS. BARLOTTA:  Object to form.
5    A.   That is what an account executive --
6  that's one of the many things that they can do.
7    Q.   Right, right, right.  And the account
8  executive also negotiates the terms of those
9  policies, and the terms would be like the
10 commission percentage, right?
11        MS. BARLOTTA:  Object to form.
12   A.   I mean, terms is -- it could be the
13 whole entire policy for them.
14   Q.   But is one of the things that the
15 account executive does is negotiate the
16 commission deal?
17   A.   Could be.
18   Q.   Okay.  You say it could be.  Does
19 that mean that is also something that the broker
20 could do?
21   A.   Yes.
22   Q.   Okay.  What about a broker assistant?
23 Do you -- are you familiar with a broker

Page 26

1  assistant position?
2    A.   Yes.
3    Q.   Okay.  What is a broker assistant?
4    A.   Every team is a little bit different.
5  I mean, I can tell you what our broker assistant
6  does.
7    Q.   Yes.  That would be perfect.  Thank
8  you.
9         MS. BARLOTTA:  What your broker
10 assistant does now?
11        THE WITNESS:  Correct, right now.
12 Probably currently at this moment.
13   Q.   (BY MS. PALMER:)  Okay.
14   A.   Chris solicits renewals, meaning
15 they -- ninety days out from the renewal, they
16 will send a blank application and say, Hey, your
17 renewal is coming up.  We need you to complete
18 this application.
19        Send some other submission documents,
20 and then they'll follow up sixty days out, follow
21 up thirty days out just to make sure that we're
22 sort of out in front of that process.
23        Then when it comes in, as far as

Page 27

1  renewals, many renewals, depending on how
2  complicated the risk is, account executive will
3  take it from the next phase to marketing either
4  with the incumbent or other carriers, and then
5  the broker assistant comes back in at the end to
6  file taxes.  Sometimes policy issuance.
7    Q.   Okay.  And as I understand it, not
8  every team has a broker assistant, right?
9         MS. BARLOTTA:  Object to form.
10   A.   I don't know that.
11   Q.   Okay.  Has -- are you on Team
12 Daugherty?
13   A.   I am.
14   Q.   Okay.  Has Team Daugherty always had
15 a broker assistant?
16   A.   No.
17   Q.   Okay.
18   A.   I'm on Team Daugherty.
19   Q.   Daugherty, okay.  You know he didn't
20 correct me the whole time we were in his
21 deposition?
22   A.   He wouldn't.
23   Q.   Now I feel bad.

Page 28

1    A.   That's not his style.
2    Q.   Daugherty.  Daugherty.  Okay.
3    A.   Corey Daugherty.
4    Q.   Daugherty.  I will get it.
5    A.   You can say whatever you want.  It
6  doesn't matter to me.
7    Q.   Okay.  And so do you recall when your
8  team first got a broker assistant?
9    A.   I do.
10   Q.   Like a rough window?
11   A.   Yeah, that's tough.  I want to say
12 it's probably been probably three years.
13   Q.   Okay.  And I'm going to ask for
14 clarification here, because post-Covid, all my
15 years run together.
16   A.   Yeah, me, too, yeah.
17   Q.   So are we talking -- we're now
18 somehow in 2024.  So are we talking like 2021,
19 2020, pre-Covid, post-Covid?
20   A.   Probably 2021.
21   Q.   Okay.  And who is the -- is the
22 broker assistant that your team received in '20
23 -- roughly 2021 the same broker assistant that

Page 29

1  you have today?
2      A.  Yes.
3      Q.  Okay.  And who is that?
4      A.  Lauren Green.
5      Q.  And is Lauren female?
6      A.  As far as I know.
7      Q.  Okay.  And before Lauren joined the
8  team in roughly 2021, who did the renewal
9  solicits for your team?
10     A.  That was split up between account
11 executives.
12     Q.  Okay.
13     A.  I can clarify a little bit further
14 with the solicitation.  So the closer it gets to
15 the renewal, the more likely it would be for a
16 broker to kind of step in and make a phone call
17 and say, Hey, we're getting pretty close.  So
18 that's part of the solicitation process.
19     Q.  Okay.  And would I be correct in
20 saying that the broker would do that because
21 that's like you're needing to keep that business,
22 so you go out and make that client connection?
23     A.  Yeah.  Sometimes the relationship was

Page 30

1  built based on the broker's relationship with the
2  retailer.
3      Q.  Okay.  Is it getting good at the
4  bottom?
5      A.  It's really good.
6      Q.  Let us know if you need another one.
7          What -- okay.  So the broker is
8  making the client contacts.  The account
9  executives are doing the marketing and binding
10 all of that information.  Does the broker do that
11 stuff as well?
12     A.  Oh, yeah.
13     Q.  The binding and the marketing?
14     A.  Yes.
15     Q.  What about an inside broker?  Can you
16 tell me -- when -- does your team currently have
17 an inside broker?
18     A.  No.
19     Q.  And did your team at one point
20 between 2015 to now have an inside broker?
21     A.  Yes.
22     Q.  Okay.  And who was that?
23     A.  Kathryn.

Page 31

1      Q.  Okay.  Can you tell me what is your
2  understanding about the job duties of an inside
3  broker?
4      A.  So less of those solicitations,
5  right, and tax filing.  But, you know, again, at
6  the time, we didn't have a broker assistant.  So
7  I would say that some of those responsibilities
8  would still be account executive related.
9          And inside broker, the intention
10 would be to elevate that person to a little bit
11 more of a negotiation from a coverage
12 perspective, a pricing perspective with the
13 carriers.
14     Q.  Would that be what you referenced
15 earlier about negotiating the terms?
16     A.  Yes.
17     Q.  Okay.  So if account executives are
18 negotiating the terms, what is the -- like, I
19 guess, what's the difference as an inside broker?
20     A.  The difference is if you don't have
21 the two different categories, then whoever on the
22 team has to get it done.
23     Q.  Okay.  And if you have the two

Page 32

1  different categories, then is there a shift in
2  the duties?
3          MS. BARLOTTA:  Object to form.
4      A.  Could be.
5      Q.  Okay.  Okay.  So renewals imply
6  existing business, right?
7      A.  That's correct.
8      Q.  Okay.  And so in my understanding of
9  just like general sales lingo, inside sales
10 individuals generally work with existing
11 business, right?  Like do you have any knowledge
12 of just general sales?
13         MS. BARLOTTA:  Object to form.
14     A.  Inside what?
15     Q.  Just inside sales?
16         MS. BARLOTTA:  Object to form.
17     A.  I don't know what inside sales means.
18     Q.  Okay.  Not with CRC.  Just kind of
19 just a general --
20     A.  Okay.  Well, are you telling me that
21 inside sales has to do with renewals?  Because I
22 believe you.
23     Q.  Okay.  That's not exactly what I was

Page 33

1  saying, but that was where I was going.  So I
2  guess that's what I'm trying to figure out is
3  would the inside broker be focused more on those
4  renewal businesses because they're existing
5  businesses?
6        MS. BARLOTTA:  Object to form.
7     Q.   Does that make sense?  I know I'm
8  probably talking in circles.
9     A.   Yeah, it just -- that would just
10  vary.  It just doesn't matter, I mean --
11    Q.   Okay.  That's fair.
12         All right.  I'm going to show you
13  what was previously marked for Mr. Daugherty.
14  Yeah?  Is that right?
15    A.   Now we're talking.
16    Q.   So in his deposition as Plaintiff's
17  Exhibit 8.  Do you recognize Plaintiff's Exhibit
18  8?
19    A.   Yes.
20    Q.   Okay.  And is this a copy of your
21  application with CRC?
22    A.   That's what it says.
23    Q.   Okay.

Page 34

1     A.   Wow.
2        MS. PALMER:  Rachel, I don't have you
3  one.
4     A.   This was way back.
5        MS. BARLOTTA:  Yeah, fifteen years
6  ago.
7     Q.   Plaintiff's Exhibit 8 is your
8  application from 2009, right?
9     A.   Yeah, August 3rd, 2009.  That's
10  right.
11    Q.   And, obviously, I don't expect you to
12  remember sitting down and filling this out.
13    A.   I'm impressed that I got August 2009
14  right, though.
15    Q.   So is this your handwriting on Page
16  1?
17    A.   Yes.  Pretty neat handwriting.
18    Q.   What is the position that you applied
19  for in 2009 with CRC?
20    A.   Broker assistant.
21    Q.   Okay.  But you were not hired as a
22  broker assistant, right?
23    A.   I was hired, as I recall, I thought

Page 35

1  an associate broker, but at the time also, I can
2  add to that, Betsy would call it a BID, a broker
3  in training, but that terminology was getting
4  phased out.  They were shifting.
5     Q.   And if you'll flip for me to the
6  second page, the second and third page, is that
7  your offer letter from CRC?
8     A.   Yes.  You see that position?
9     Q.   Yeah.  So that says associate broker?
10    A.   That's different.  Okay.
11    Q.   And that's exactly what I was going
12  for.
13    A.   Okay.
14    Q.   So that's -- so you, in fact, I
15  wanted to clarify, were hired as the associate
16  broker, which is what the offer letter says.
17    A.   That's right.  That makes me feel
18  better.  I was like -- I couldn't remember why I
19  would have written that.
20    Q.   Yeah, yeah.
21         All right.  Do you travel in your
22  position as a broker?
23    A.   Yes.

Page 36

1     Q.   Okay.  And you are a -- you're a
2  broker now, not an associate broker, right?
3     A.   Professional liability broker.
4     Q.   Okay.  And did you travel in your
5  position as a associate broker -- an associate
6  broker?
7     A.   Yes.
8     Q.   I see here on your application, it
9  says you were willing to travel thirty percent of
10  the time.  Is that --
11    A.   I mean, that sounds great.
12    Q.   Right.  Well, that's what I'm asking:
13  Do you travel more or less than that?
14    A.   I --
15    Q.   Or does it vary?
16    A.   It varies.  It comes and goes in
17  waves.  I mean, yeah.  Some months I'm traveling
18  three times to different cities.  Some months I'm
19  traveling once.  I can't give you a percentage.
20    Q.   And when you're traveling, what do
21  you do when you're traveling for CRC?
22    A.   There's many different things.  I
23  travel to visit retail agents and/or their

Page 37

1   insureds to try to get new business, nurture
2   relationships for existing business.  There are
3   proposals that we are requested to attend with
4   the insureds to explain coverages or to, you
5   know, just display the different options that are
6   available.
7          But then we also travel to
8   conferences to make sure that we're up to speed.
9   I have my finger on the pulse with whether it be
10  the Professional Liability Underwriting Society
11  or WSIA, different conferences where our carriers
12  are there, our attorneys are there that we have
13  relationships with.  And sometimes we travel to
14  the carrier offices, the insurance companies.
15         That could be to negotiate a specific
16  insured or it could be for an overall meeting
17  about the relationship.
18     Q.   Okay.  I'm going to show you what has
19  been marked as Plaintiff's Exhibit 42.
20         (Whereupon, Plaintiff's Exhibit No.
21  42 was marked for identification and a copy of
22  same is attached hereto.)
23     Q.   And Plaintiff's Exhibit 42 is a

Page 38

1   printout of your Workday file with CRC.  Are you
2   familiar with Workday?
3      A.   I am.
4      Q.   Okay.  And is Workday how CRC
5   maintains its like personnel records?
6          MS. BARLOTTA:  Object to form.
7      A.   Some of them.
8      Q.   Okay.  The date on this report up on
9   the top right-hand corner is 8/11 of '22.  Has
10  anything about your employment, your position --
11  let me ask:  Has anything about your employment,
12  including your position, title, or salary changed
13  since August 11 of 2022?
14         MS. BARLOTTA:  Object to form.
15     A.   I don't know.
16     Q.   Okay.  And at the top here just under
17  your name, it says broker.  So as of August 11,
18  2022, you were a full-time -- like a full broker,
19  right?
20         MS. BARLOTTA:  Object to form.
21     A.   Okay.
22     Q.   Is that -- I mean, do you agree with
23  me that that's --

Page 39

1      A.   Yes.
2      Q.   Do you recall --
3      A.   That was my understanding.
4      Q.   Okay.  Do you recall when you moved
5   from an assistant broker to an -- I'm sorry --
6   from an associate broker to a broker?
7          MS. BARLOTTA:  Object to form.
8      A.   No.
9      Q.   Flip to the second page there for me.
10     A.   Okay.
11     Q.   So at the -- under teammate history,
12  which is that first little bold thing down, it
13  says promotion -- I'm sorry, Rachel -- June 23rd
14  2021 --
15     A.   Nice.
16     Q.   -- broker.  Does that seem accurate?
17     A.   Must be.
18     Q.   Do you have any reason to believe
19  that it's not accurate?
20         MS. BARLOTTA:  Object to form.
21     A.   I do not.
22     Q.   Okay.  And then the next two boxes
23  down, Compensation History.  So base pay

Page 40

1   proposed, it says this is like a seventy-eight
2   percent change.
3      A.   Okay.
4      Q.   And that's March 16th of 2021.  Does
5   that sound right to you?
6          MS. BARLOTTA:  Object to form.
7      A.   Yes.
8      Q.   Okay.  And what were you making
9   before this base pay was increased in March of
10  2021?
11     A.   I think fifty-six.
12     Q.   Okay.
13     A.   Forty-two for a couple of years, and
14  then it bumped up barely, and then fifty-six for
15  like, I don't know, ten years or something.
16     Q.   Okay.  So the third page -- and I'm
17  going to call some numbers out to you.  If you'll
18  look on the bottom right corner, there's these
19  little bitty numbers, and we can identify those
20  pages so that we know we're looking at the same
21  one.
22     A.   Yep.  Uh-huh (positive response).
23     Q.   And it's 4681.  It says hire date

Page 41

1  10/1/2013.  Is 10/1/2013 when CRC became part of
2  BB&T?  Do you know?
3          MS. BARLOTTA:  Object to form.
4      A.  That does sound about right.
5      Q.  Okay.  Because you didn't have a
6  break in your employment?
7      A.  Right, yeah, right.  That would be
8  the only explanation, I guess.
9      Q.  Okay.  And when you started in 2009,
10  I know you interviewed with Betsy and Corey.
11     A.  That is correct.
12     Q.  Were you both on Betsy's team in
13  2009?
14     A.  No.
15     Q.  Okay.  Did you immediately go to Team
16  Daugherty?
17     A.  Correct.
18     Q.  Okay.  Do you know when Corey, I
19  guess, created Team Daugherty?
20     A.  I think -- I don't know.  Maybe a
21  year before I joined his team.
22     Q.  Okay.
23     A.  It could have been shorter than that.

Page 42

1      Q.  So you never worked under Betsy as
2  part of her team, correct?
3      A.  Correct.
4          MS. BARLOTTA:  Object to form.
5      A.  But I guess I worked for Corey, and
6  Corey worked for Betsy.  So I'm -- but yeah, they
7  were separate teams, and Corey had rolled off on
8  his own team.
9      Q.  And so was Betsy -- at the time that
10  you joined Team Daugherty, was Betsy today's
11  version of Rusty Hughes?
12     A.  Yes.
13     Q.  Okay.
14     A.  The president of the professional
15  liability department in the Birmingham office.
16     Q.  Okay.  Flip for me to the next page,
17  which is 4682.  And I just want to ask if you
18  know a couple of these things.
19          The second line down under Worker
20  History, it says lateral move July 2nd, 2022.  Do
21  you know what that lateral move would be?
22     A.  I do not know what that means.
23     Q.  Okay.  And then three down from that,

Page 43

1  we've got a compensation change March of 2022;
2  but if you go all the way to the last column, it
3  says canceled.  Do you know why there would have
4  been a compensation change canceled in March of
5  2022?
6          MS. BARLOTTA:  Object to form.
7      A.  I have no idea.  What was the date
8  that you -- wasn't it March that you said the
9  base changed?
10     Q.  That you --
11     A.  So I don't know what -- I don't know
12  what 3/1 cancellation is.
13     Q.  So 3/16 --
14     A.  I'm unfamiliar with that.
15     Q.  3/16/2021 is when the base change
16  was.
17     A.  Okay.
18     Q.  So you don't know what this canceled
19  compensation change could have been?
20     A.  I do not know.
21     Q.  Okay.  Have you at any point since
22  March of 2021 requested an increase in your base
23  salary?

Page 44

1      A.  No.
2      Q.  Flip for me to Page 4685, which is a
3  few pages back.
4      A.  Okay.
5      Q.  On the bottom there, it says time off
6  and leave request.  Is Workday how you would
7  manage and put in like requests for time off or
8  is there another method to do that?
9          MS. BARLOTTA:  Object to form.
10     A.  I don't manage that on Workday.  I
11  used to.
12     Q.  Okay.
13     A.  I think.
14     Q.  Do you have to request time off and
15  vacation or is that something that you don't have
16  a particular set amount of?
17     A.  I request that with Corey, with Corey
18  Daugherty.
19     Q.  This report that we've received,
20  which is Plaintiff's Exhibit 42, doesn't appear
21  to have a time off request since 11 of '17.
22     A.  Okay.  Nice.
23     Q.  I know.  So have you taken time off

Page 45

1   since 11 of '17?

2       A.   Yes.

3       Q.   Okay.  And you do that by going

4   directly through Corey, right?

5       A.   Correct.

6       Q.   Okay.  So flip for me a couple more

7   pages, 4686, so one page.  Just on the bottom

8   there we've got -- it's the start of like pay

9   change history.  And so we see that one increase

10  that we've already talked about from March of

11  2021.

12      A.   Okay.

13      Q.   Ad hoc compensation change.  And then

14  if you'll flip to the next page, it's got two

15  more compensation histories listed there.  So 4/1

16  of '15 --

17      A.   I told you.

18      Q.   You've got a good memory.  4/1 of '15

19  we've got a merit compensation change, and then

20  10/1 of '13 we've got a hire compensation.

21      A.   Okay.

22      Q.   So the hire compensation, that's

23  where you were starting at least as far as this

Page 46

1   report starts, whenever that date was, right?

2       A.   Yeah.

3            MS. BARLOTTA:  Object to form.

4       A.   I don't know.

5       Q.   And the merit raise that you received

6   in 2015, it was a ten thousand dollar raise.

7   What do you recall is the basis for that merit

8   raise?

9            MS. BARLOTTA:  Object to form.

10      A.   I don't recall.

11      Q.   Okay.  Did you request a raise?

12      A.   No.

13      Q.   Okay.  Are you aware of when Kat

14  Hendrix joined Team Daugherty?

15      A.   I don't remember the exact date.  I

16  want to say 2016 or '17.

17      Q.   Okay.  You don't recall her joining

18  Team Daugherty in 2015?

19           MS. BARLOTTA:  Object to form.

20      A.   2015.  That sounds good.

21      Q.   Okay.  And I just want to be clear.

22  This report that we're looking at that's

23  Plaintiff's Exhibit 42 with the compensation,

Page 47

1   this does not reflect any bonus compensation,

2   right?

3       A.   Right.

4       Q.   Is there anything in the Workday

5   system that you're aware of that would reflect

6   bonus compensation?

7            MS. BARLOTTA:  Object to form.

8       A.   I don't know that.  I believe so.

9       Q.   Okay.  When you receive -- I'm sorry.

10  Do you receive a W-2 from CRC?

11      A.   Yes.

12      Q.   Okay.  And when you receive the W-2,

13  is it representative of your base and your bonus

14  or are there two separate forms you receive?

15           MS. BARLOTTA:  Object to form.

16      A.   One form representative of all of it.

17      Q.   Okay.  Flip for me to -- let me ask

18  you this:  In 2017 -- no.  In 2018, do you recall

19  Team Daugherty hiring Tiffany Sanders?

20      A.   Yes.

21      Q.   Okay.  And was Tiffany hired to be

22  your account executive?  And by you, I mean like

23  specifically Clay Segrest's account executive?

Page 48

1       A.   Tiffany was hired to be an account

2   executive largely working with me.

3       Q.   Okay.  And when you say largely

4   working with you, does that mean largely as --

5       A.   I would say the majority of her time

6   would be spent working with me on accounts that I

7   brought into the business.

8       Q.   And before Team Daugherty hired

9   Tiffany, who handled the majority of your -- your

10  accounts, Clay Segrest's accounts?

11      A.   Kathryn Hendrix, Andrea Sutton.

12      Q.   Okay.  Had you had any more account

13  executives assigned to your -- the majority of

14  your accounts?

15           MS. BARLOTTA:  Object to form.

16      A.   No.  I worked with Yvette Talsma --

17  well, do you mean at the time of 2018?

18      Q.   No.  So thank you for clarifying

19  that.  Let's back up to 2013.

20      A.   Yeah, okay.  That sounds good.  So it

21  was just Corey, Yvette, and me, all three of us

22  working together.

23      Q.   Okay.  And --

Page 49

1    A.   So -- and Yvette was account
2  executive at the time.  So a hundred percent of
3  my work that involved any account executive was
4  Yvette.
5    Q.   Okay.  And then at some point, Andrea
6  Sutton came on?
7    A.   Correct.
8    Q.   And then at some point, Kathryn
9  Hendrix?
10   A.   Andrea.
11   Q.   Andrea.  I do that every time.
12   A.   I do, too.
13   Q.   Kat has corrected me a hundred times
14  on that.
15        So other than let's say pre-2020 --
16   A.   Yep.
17   Q.   -- other than Yvette, Andrea,
18  Kathryn, and Tiffany, did you work with any
19  account executives?
20   A.   No.
21   Q.   Okay.  Flip for me to Page 4700.
22  It's going to be kind of towards the back, and
23  it's going to turn the paper this way

Page 50

1  (indicating).  And I want to point you to the
2  second block down, Risk Behaviors.  It says:
3  Demonstrates understanding of risk management
4  responsibilities for current job position.  Do
5  you see that?
6    A.   Yes.
7    Q.   Okay.  What is risk management
8  responsibilities for current job position?
9        MS. BARLOTTA:  Object to form.
10   A.   I don't know.  I need some more
11  context here.
12   Q.   Okay.  As an associate broker --
13   A.   Okay.
14   Q.   -- because this was 2014.
15   A.   Okay.  All right.  If it's referring
16  to job responsibilities as an associate broker
17  and needing to understand risk management
18  responsibilities, I mean, our entire products
19  what we sell is risk transfer.
20   Q.   Okay.
21   A.   So we -- this is just saying -- seems
22  like it's saying that you need to have a basic
23  understanding on the products that you're selling

Page 51

1  in risk management.
2    Q.   Okay.  That makes sense.  Flip for me
3  to 4716.
4    A.   Okay.
5    Q.   Do you see that that is your 2018
6  annual review?
7    A.   That's what it says.
8    Q.   Okay.  Do you sit down with Corey to
9  do annual and biannual reviews of your
10  employment?
11   A.   Yes.
12   Q.   Okay.  Have you ever seen a form like
13  this?  Like do you have to sign off on this?
14   A.   It doesn't show up in this format.
15   Q.   Okay.
16   A.   But in Workday we -- yes.  But I
17  don't know if this is the exact Workday format,
18  because it looks a little different.
19   Q.   Okay.  And flip for me three pages --
20  two pages back to 4718.  On the bottom there,
21  comments on overall performance and potential,
22  the last sentence, he says that you continued to
23  develop key relationships throughout 2018, which

Page 52

1  I think will pay dividends in 2019.
2        The paying dividends, is that like
3  your revenue?
4        MS. BARLOTTA:  Object to form.
5    Q.   Is that what's being referenced
6  there?
7    A.   I doubt that.  I think he's using
8  that as -- that's a metaphor, but, I mean,
9  ultimately, hopefully, that would influence that,
10  but --
11   Q.   Okay.  So metaphor meaning like just
12  be beneficial to the team?
13   A.   Correct.
14   Q.   Okay.  And then the next page,
15  Comment:  Continued strategy to try and move away
16  from small business.  What did you and Corey
17  discuss about moving away from small business?
18   A.   Over the years, we have intentionally
19  tried to focus our time on increasing our teams'
20  average premium.  So if our average premium is
21  twenty thousand dollars overall, we're
22  intentionally trying to target larger business,
23  more complex business to increase that average.

Page 53

1    That's what that's referring to.

2         Q.   Okay.  And so what would happen to

3    the small businesses that are existing clients?

4         MS. BARLOTTA:  Object to form.

5         A.   Well, we're aggregators in the sense

6    that I could have a retail agent who we have

7    fifty accounts at five thousand dollars, but the

8    -- to clarify, the goal here would be to be

9    asking those agents, Hey, do you -- let's target

10   some larger business together.  So we're going to

11   service the small business and the large

12   business, but the intention is to grow.

13        Q.   Right.  And I guess that's what I'm

14   asking is --

15        A.   And the best way to grow is to write

16   more business and larger-sized accounts from a

17   premium perspective.

18        Q.   Okay.  And as you're growing and

19   focusing on the larger accounts, who on the team

20   begins to focus on the smaller accounts?  Like

21   does that -- do you shift that to somebody else?

22        MS. BARLOTTA:  Object to form.

23        A.   Could, yeah.  And so I would say that

Page 54

1    account executives might take on more

2    responsibility for managing the small business

3    renewals.

4         Q.   Okay.  Who's Corey Woodward?

5         A.   A colleague.

6         Q.   He's employed at CRC?

7         A.   Yes.

8         Q.   Okay.  Was there a time where some of

9    the Team Daugherty business would shift over to

10   Corey Woodward?

11        MS. BARLOTTA:  Object to form.

12        A.   Yes.

13        Q.   Okay.  Explain that to me.

14        A.   Well, Woodward expressed a desire, a

15   willingness to take on some of the smaller

16   premium accounts.  And so that was a good

17   opportunity for us to focus on some larger

18   business and say -- the threshold, I don't

19   remember what we came up with.  It could have

20   been five thousand to seventy-five hundred, ten

21   thousand depending on the retailer.

22        But let's call it five thousand

23   dollars and less.  We would oftentimes say, Hey,

Page 55

1    Woodward, you can run with these.  You can manage

2    these, and that would be completely off of our

3    book.

4         But it wasn't a hard and fast rule,

5    because it depended on the relationship with the

6    retailer.

7         Q.   Right.  Because the client gets to

8    choose who their person is, right?

9         A.   Yes.

10        Q.   Okay.  So if Corey Woodward begins

11   running the accounts, does that revenue count

12   towards Team Daugherty?

13        A.   No.

14        Q.   Okay.  Who then gets credit for that

15   revenue?

16        A.   Corey Woodward.

17        Q.   Okay.  Does Corey have his own --

18   Corey Woodward have his own team?

19        A.   No.  Trey Reich.

20        Q.   So was -- by transferring these

21   accounts, these small accounts to Corey Woodward,

22   was Team Daugherty giving up the revenue to --

23        A.   Yes, we were foregoing the revenue

Page 56

1    altogether.

2         Q.   Okay.

3         A.   Hang on a minute.  Hang on a minute.

4    That's not true.

5         Q.   Okay.

6         A.   So the year -- I think the agreement

7    that Corey Woodward had proposed and came up with

8    was that we -- his team, meaning Trey Reich's

9    team, and our team, Corey Daugherty's team, would

10   split the revenue year one, and then I think if I

11   recall correctly, there was like a step factor

12   into the next year, and it would be

13   three-quarters, two-thirds, one-third, and then

14   he would keep it.

15        Q.   Okay.

16        A.   So it was sort of a gradual

17   transition.

18        Q.   And then --

19        A.   Eventually, we'd forego that revenue

20   altogether, but --

21        Q.   Do you recall what year your team

22   started transferring some of the smaller cases to

23   Corey Woodward?

Page 57

1          MS. BARLOTTA:  Object to form.
2     Q.   I said cases.  Clients.
3     **A.   No, I mean, it was probably 2017 or**
4  **'18, but I can't say that for sure.**
5     Q.   Do you recall it being a time when
6  Kat Hendrix was working as inside broker?
7          MS. BARLOTTA:  Object to form.
8     **A.   Yes.  I think that's right.**
9     Q.   So --
10    **A.   Hang on a minute.  I don't know if it**
11 **was inside broker or when she was an account**
12 **executive.  I can't say that.**
13    Q.   Okay.
14    **A.   For sure.**
15    Q.   So the system -- the computer system
16 that you guys used to track your revenue, is that
17 called AIM?
18         MS. BARLOTTA:  Object to form.
19    Q.   And when we were -- let's focus on a
20 specific time period of '17 to '19.
21    **A.   You can use AIM to help track your**
22 **revenue.**
23    Q.   Okay.  Is -- what else would you use

Page 58

1  if not AIM?  I'm just trying to --
2     **A.   It depends on the year.**
3     Q.   Okay.  So in 2017 through '19.
4     **A.   Spreadsheet.**
5     Q.   So like an Excel spreadsheet?
6     **A.   Yep.**
7     Q.   We heard a little testimony about
8  like three columns.  Does that sound familiar,
9  like the first column being the broker, the
10 second column being the marketer, and the third
11 column being the manager?  Does that sound
12 familiar to you at all?
13         MS. BARLOTTA:  Object to form.
14    **A.   It sounds like you're referring to**
15 **AIM.**
16    Q.   Okay.  Is that --
17    **A.   But those are not the correct words,**
18 **but yeah.**
19    Q.   So tell me what the correct words
20 are, like if I'm looking at the AIM system.
21    **A.   There's like six different ones and**
22 **so, but -- there's like an account manager,**
23 **there's a CSR, which we don't even use that**

Page 59

1  terminology, because AIM is just a program that
2  doesn't -- that terminology doesn't necessarily
3  apply to our positions.
4     Q.   Right.
5     **A.   But that's how we record it and put**
6  **it in the system.**
7     Q.   Okay.  And so what all categories are
8  in AIM that you guys use?
9     **A.   There's four columns.**
10    Q.   Okay.
11    **A.   There's Team Daugherty, and then the**
12 **rest -- and then there's the broker, Corey**
13 **Daugherty, and then these other two could be**
14 **anybody on the team.  It could be Corey.  It**
15 **could be an account executive.  It could be an**
16 **associate broker.  It could be an assistant, a**
17 **broker assistant.  You can do that however you**
18 **want.**
19    Q.   Okay.  And what is the purpose of
20 these categories within AIM?
21         MS. BARLOTTA:  Object to form.
22    **A.   I think it helps us organize the**
23 **renewals and who's sort of providing -- who's**

Page 60

1  servicing those accounts.
2     Q.   Okay.  So like a -- like client
3  management?
4     **A.   Sure.**
5     Q.   Okay.  Does -- do these four columns
6  assist in determining who's responsible for what
7  revenue?
8     **A.   It could be.**
9     Q.   Okay.  What other method would there
10 be to determine who was responsible for what
11 revenue?
12         MS. BARLOTTA:  Object to form.
13    **A.   If you bring in the -- the revenue**
14 **responsibility is to the broker.**
15    Q.   Okay.
16    **A.   And the broker that is responsible**
17 **for bringing in that business is responsible for**
18 **that revenue associated with that business.**
19    Q.   Okay.  Would that include inside
20 brokers, like if an inside broker works new --
21 works existing business to create increased
22 business, does the inside broker get credit for
23 that revenue?

Page 61

1          MS. BARLOTTA: Object to form.
2      A.   It could.
3      Q.   Okay.
4      A.   Yeah, if an inside broker brings in
5   new business, then you can code it a different
6   way to help you organize where that revenue came
7   from.
8      Q.   Okay.  How would -- what's the coding
9   that you're referencing?
10     A.   Well, depending on the columns, like
11  you can just allocate it saying, you know,
12  so-and-so is in this column, and that would be --
13  you could say -- within your team could mean to
14  say, okay, well, that -- we know that that means
15  that that person went and visited that agency and
16  brought in new business, and it would just be a
17  note within the team to help organize that.
18     Q.   Okay.  And that would be like an
19  Excel spreadsheet, right?
20         MS. BARLOTTA: Object to form.
21     A.   Yeah, it could be.
22     Q.   Okay.  Is that something that Team
23  Daugherty did between 2017 and 2020?

Page 62

1          MS. BARLOTTA: Object to form.
2      Q.   The tracking specifically like that?
3      A.   I had a spreadsheet that I tracked my
4   business with.
5      Q.   Okay.  Where is that spreadsheet?  Is
6   that something that you keep on like your
7   computer or on a server?
8          MS. BARLOTTA: Object to the form.
9      A.   That's right.
10     Q.   Have you been asked to provide that
11  spreadsheet in this lawsuit?
12         MS. BARLOTTA: Object to form.
13     A.   No.
14     Q.   The spreadsheet that you utilize,
15  does it have a column dedicated to anyone other
16  than Corey and you?
17         MS. BARLOTTA: Object to form.
18     A.   No.  That spreadsheet is not an
19  official spreadsheet.
20     Q.   Okay.
21     A.   Those are personal notes of mine.  So
22  the revenue that CRC keeps up with is a different
23  system that I don't control, if that makes sense.

Page 63

1      Q.   Yeah.  Did -- when Kat was working on
2   Team Daugherty, do you recall there being a team
3   spreadsheet that would show policy counts,
4   revenues, and who was assigned to what?
5          MS. BARLOTTA: Object to form.
6      A.   Yes.
7      Q.   Okay.  Is that spreadsheet something
8   that was circulated regularly?
9      A.   Now, hang on a minute.  We've got to
10  clarify that.
11     Q.   Okay.
12     A.   So there's a spreadsheet that would
13  show every single account for every month, and it
14  would show the premium of every account for every
15  month.  But that spreadsheet did not show the
16  revenue for each account.
17         You would have -- you could easily
18  calculate that, though, by you go into each
19  account and say here's how much percentage the
20  carrier is paying us on this account, and so
21  that's -- to clarify.
22     Q.   So that doesn't track the revenue,
23  but it tracked policy counts and the other

Page 64

1   information?
2          MS. BARLOTTA: Object to form.
3      A.   And premium, that's right.
4      Q.   Is that spreadsheet that we're
5   talking about, the team spreadsheet --
6      A.   Yes.
7      Q.   -- something that was circulated
8   regularly throughout the department?
9          MS. BARLOTTA: Object to form.
10     A.   Just our team.
11     Q.   Okay.  And that's what I meant.
12  Thank you for correcting me.  Through your team.
13  Are you aware of where that spreadsheet was
14  maintained?
15         MS. BARLOTTA: Object to form.
16     A.   Yes.
17     Q.   Where was that spreadsheet
18  maintained?
19         MS. BARLOTTA: Object to form.
20     A.   You could -- you could print that out
21  of AIM electronically or save it.  So AIM, that
22  same computer system.
23     Q.   So it was like a report that it would

Page 65

1  print?

2      A.   Right.  And we would do it on a

3  monthly basis.  You could track all our team's

4  accounts on a monthly basis.

5      Q.   And whose responsibility was it to

6  make that report monthly?

7      MS. BARLOTTA:  Object to form.

8      A.   So that has shifted over the years to

9  many different people on the team.

10     Q.   Okay.  Do you recall Kat being one of

11  the responsible people for --

12     A.   I do, yeah.

13     Q.   And when Kat made those reports, is

14  -- how did she circulate that report to the team?

15     MS. BARLOTTA:  Object to form.

16     A.   Electronic mail.

17     Q.   So she would attach it to an e-mail

18  and send it out to the team?

19     A.   That's right.

20     Q.   Have you been asked to search your

21  e-mails for anything related to this lawsuit?

22     MS. BARLOTTA:  Object to form.

23     A.   No.

Page 66

1      Q.   We have been going right at an hour.

2  Do you want to -- do you need a break?

3      A.   That would be awesome.

4      Q.   Yeah, yeah.  Let him read us off the

5  record, and we can get you a refill.

6      VIDEOGRAPHER:  We are taking a break.

7  The time is 10:06.

8      (Whereupon, a brief recess was

9  taken.)

10     VIDEOGRAPHER:  We are back on the

11  record.  It is 10:19.

12     Q.   (BY MS. PALMER:)  All right.  Corey,

13  we took a little break -- Clay.  I've done that

14  thirty thousand times throughout this.

15     A.   I already said you can call me

16  whatever you like.

17     Q.   We took a little break.  Is there

18  anything you need to change about your testimony

19  up to this point?

20     A.   No.

21     Q.   Let me show you what I'm marking as

22  Plaintiff's Exhibit 43.

23     A.   Can I close this?

Page 67

1      Q.   You can.

2      (Whereupon, Plaintiff's Exhibit No.

3  43 was marked for identification and a copy of

4  same is attached hereto.)

5      Q.   And these next several exhibits are

6  just going to be e-mails, because I want to kind

7  of get your understanding and explanation of

8  what's going on in these e-mails.

9      A.   Okay.

10     Q.   So Plaintiff's Exhibit 43, this is an

11  e-mail, it looks like from you, in November of

12  2017.  Do you see that?

13     A.   Uh-huh (positive response).  Uh-huh

14  (positive response).

15     Q.   And we've got it to Kat and Corey,

16  and it says, Binder for Professional, and then

17  names a company there.  Kat, here's the binder.

18  Please release to Teresa and Troy.  Great work on

19  keeping this one this year.  We really needed to

20  retain this renewal.

21     Did I read that right?

22     A.   Yeah.

23     Q.   Okay.  So what is -- like how does

Page 68

1  this work with the binder coming to you to give

2  to Kat to give to the agent?  Is that the order?

3      MS. BARLOTTA:  Object to form.

4      A.   That's what happened, yeah.

5      Q.   Okay.  So the binder is the actual

6  like insurance coverage, like the policy, right?

7      A.   There's a binder, and then there's a

8  policy.  The binder is a summary of it.

9      Q.   So like a declaration sheet?

10     A.   Kind of.  So the binder is

11  confirmation that coverage is bound.  They will

12  issue the policy after the binder.  But the

13  binder is just saying this is officially -- this

14  coverage is officially bound so that you know

15  coverage is in place.

16     Q.   Okay.  And so then you take the

17  binder and forward it to Kat to --

18     A.   Sometimes.

19     Q.   Right.  To send it on to the agents,

20  right?

21     A.   Sometimes.

22     Q.   Okay.  The great work on keeping this

23  one this year, what did you mean by that, keeping

Page 69

1  this one?
2      A.  I'm saying that she did some good
3  work in helping retain this renewal.
4      Q.  Okay.  So was she in direct contact
5  with the agent on this particular matter?
6      A.  Yes.
7      Q.  Okay.
8      A.  Because -- yeah.  This great work on
9  keeping this renewal, that means nice job.
10     Q.  Right, right.  I guess I'm focusing
11 more on --
12     A.  Good work.
13     Q.  -- keeping the renewal.  What was her
14 role versus your role in keeping the renewal?
15         MS. BARLOTTA:  Object to form.
16     A.  They were not in opposition.  There's
17 not a versus.
18     Q.  Okay.  So is this just kind of like
19 we all worked great as a team?
20     A.  Great job.  You did good work.  Corey
21 did good work.  I did good work.  But right here,
22 you did great.
23     Q.  Okay.  Did Kat receive any revenue

Page 70

1  credit for this particular renewal?
2          MS. BARLOTTA:  Object to form.
3      A.  So all of the accounts that Kathryn
4  worked on, Corey Daugherty took into
5  consideration at bonus time.  So I don't know how
6  much of this particular account her pay was
7  associated to that.  Is that what you're asking
8  about?
9      Q.  Yes, yes.  Absolutely.
10     A.  Are you asking about revenue on this
11 particular account?
12     Q.  Right.  So I'm kind of using this one
13 as an example.  So if she's working on this
14 account with you and keeping the account to get
15 the renewal, that's revenue coming into CRC --
16     A.  That's correct.
17     Q.  -- right?  So does she get some set
18 benefit associated with that revenue?  Like how
19 -- so your agents are tracked to your revenue,
20 right?  You said you keep a spreadsheet.
21     A.  Correct.
22     Q.  So does Kat have something similar
23 where she can get credit for the revenue she

Page 71

1  works on?
2          MS. BARLOTTA:  Object to form.
3      A.  She could, but this agent is in
4  Denver, I believe, and that happens to be one of
5  my agents and one of my accounts.  So the revenue
6  would be technically tied to my agent production
7  revenue.
8      Q.  Okay.
9      A.  But, you know, she certainly plays a
10 role in keeping this account, like I said in the
11 e-mail.
12     Q.  Okay.  And that's what I was asking.
13 So this account would have been linked to your
14 revenue --
15     A.  That's correct.
16     Q.  -- numbers?
17         Okay.  When it says release to Teresa
18 and Troy, is release like an industry term or do
19 you just mean like send it to them?
20     A.  I just mean send it to them.
21     Q.  Okay.  So she would just -- is there
22 anything --
23     A.  Issue the binder and invoice.  Take

Page 72

1  this carrier binder, process it in our system,
2  invoice it, and send it to the retailer.
3      Q.  Okay.  What would have to be done to
4  process it in the system?
5      A.  There's a button in AIM that says
6  bind.  You press that button, and it generates a
7  document.
8      Q.  Okay.
9      A.  That gives an outline of this
10 account, premium, taxes that are associated to
11 it.
12     Q.  Okay.  And we'll get to one of those.
13 But is that the letter that has the CRC
14 letterhead on it?
15     A.  It sounds like you know.
16     Q.  Okay.  Yeah, I'm just trying to put
17 all the pieces together.
18     A.  Yeah, that's right.
19     Q.  What about the invoice?  Is that
20 something that's created through AIM as well?
21     A.  Correct.
22     Q.  Okay.  Is -- who has -- so who's the
23 client here?  Teresa and Troy, are they

Page 73

1  Professional Bureau of Collections?  Is that
2  them?
3     A.  No.
4     Q.  Okay.  Who are --
5     A.  Buckner is the name of the retail
6  agency.
7     Q.  Okay.
8     A.  They have since changed names.
9     Q.  Okay.  So since Kat left in 2019, is
10  Buckner, now with the new name, still one of your
11  agents?
12    A.  Yes.
13    Q.  Okay.  And who does the binding --
14  not the binding, but who releases the binder and
15  the invoice now on Buckner?
16      MS. BARLOTTA:  Object to form.
17    A.  It could be one of three people.
18    Q.  Okay.
19    A.  Because we have various accounts with
20  Buckner.
21    Q.  Okay.  Who are those three people?
22    A.  Clay Segrest, that's me, Tiffany
23  Sanders, and Steele Cadden, any of those three

Page 74

1  people.
2     Q.  And how --
3     A.  It could be Amy Ritenour.  It could
4  be four people.  Depends on who's in the office,
5  who's traveling.
6     Q.  Okay.  Who is Amy Ritenour?
7     A.  She's a lady on our team.
8     Q.  What's her position?
9     A.  Account executive.
10    Q.  Okay.  And Steele Cadden?
11    A.  Account executive.
12    Q.  Okay.  When -- do you know when Amy
13  was hired?
14    A.  One year ago.  It could be fourteen
15  months.  I don't know.
16    Q.  And what about Steele?  Do you know
17  when he was hired?
18    A.  Approximately two.
19    Q.  Okay.  So your team now has Corey,
20  Clay, Andrea, Yvette -- Andrea -- Tiffany,
21  Steele, Amy, and Lauren, the broker assistant.
22    A.  That's right.
23    Q.  Is that right?  Okay.  So one, two,

Page 75

1  three, four account -- no.  Five account
2  executives, two brokers?
3     A.  That's right, yes.
4     Q.  How would you determine now -- you
5  said it could be any of these four people.  How
6  would you determine who would release the binder
7  on the account?
8     A.  Most likely, if it's a renewal, then
9  it's probably going to be Tiffany Sanders.  If
10  it's a new business account, it's probably going
11  to be Steele Cadden.
12    Q.  Okay.  And what's the difference,
13  like why does Tiffany do renewals and Steele does
14  new business?
15    A.  Well, for this particular agency,
16  we're trying to grow in there, and Steele is, you
17  know, just learning and evolving and practicing
18  on taking a new piece of business and trying to
19  get that on the books and marketing it for the
20  first time, because sometimes it's a little bit
21  different process than servicing a renewal.  So
22  taking a new piece of business can sometimes be a
23  little bit more involved.

Page 76

1     So with this agency, he's taking on
2  more responsibility with that new business
3  process.
4     Q.  Okay.  And so because this agency is
5  an existing client of yours, but they're giving
6  new business, is that something that if you had
7  an inside broker, that would be something an
8  inside broker would do?
9        MS. BARLOTTA:  Object to form.
10    A.  For the new business coming in?
11    Q.  Yes.
12    A.  Could be.  And -- yeah, it probably
13  -- yeah, sure.
14    Q.  Okay.  Is Steele Cadden in the launch
15  program?
16    A.  Yes.
17    Q.  Okay.  When did he join the launch
18  program?
19    A.  It's been a few months, but I want to
20  say maybe two or three, maybe four.
21    Q.  Okay.  So he had only been there a
22  year, year and a half maybe --
23      MS. BARLOTTA:  Object to form.

Page 77

1    Q.   -- when he joined?

2    A.   Yeah.

3    Q.   Okay.  Do you know how Steele became

4    part of the launch program?

5    A.   I do.

6    Q.   How -- can you tell me how that

7    happened?

8    A.   He interviewed for it with the

9    committee, and they vote on whether or not to let

10   them into the launch program.

11   Q.   Okay.

12   A.   Or invite them into the program.

13   Q.   Is the committee in Birmingham or is

14   the committee companywide?

15   A.   It's companywide.

16   Q.   Okay.  How did he get the interview

17   with the committee?  Like is that something he

18   had to request?  Did he have to apply?  Was he

19   recommended?

20   A.   You have to apply.

21   Q.   How are employees at CRC told that

22   they can apply for this launch program?

23       MS. BARLOTTA:  Object to form.

Page 78

1    Q.   I guess, how -- are you aware of how

2    Steele came to understand this was an

3    opportunity?

4        MS. BARLOTTA:  Object to form.

5    A.   So I think that Steele became

6    familiar with it because of colleagues and other

7    people he knew that went through the program.

8    And then, you know, you have to have a sponsor

9    and then apply.

10   Q.   Who is Steele's sponsor?

11   A.   He has two sponsors, Corey Daugherty

12   and me.

13   Q.   Okay.  Is it standard to sponsor

14   individuals on your own team?  Like is that a

15   requirement?

16       MS. BARLOTTA:  Object to form.

17   A.   I don't know.

18   Q.   Okay.  Did you talk to Steele about

19   this opportunity before he asked you to sponsor

20   him -- let me ask you this:  Did Steele ask you

21   to sponsor him?

22       MS. BARLOTTA:  Object to form.

23   A.   No.

Page 79

1    Q.   Okay.  So how did you come to sponsor

2    Steele?

3    A.   Steele showed interest in the launch

4    program.  I offered to sponsor him.

5    Q.   Okay.  What do you recall about him

6    showing interest in the program?

7        MS. BARLOTTA:  Object to form.

8    A.   I have a couple of colleagues, and we

9    were just talking, the three of us, Corey

10   Daugherty, Steele, and I, about different

11   opportunities.  That one came up, and I

12   personally didn't know too much about it other

13   than it could be a good growth opportunity to

14   learn about the company, and so that's how.

15   Q.   Did you have a conversation with any

16   of the other members on your team about whether

17   they would be interested in the launch program?

18       MS. BARLOTTA:  Object to form.

19   A.   No.

20   Q.   Why not?

21       MS. BARLOTTA:  Object to form.

22   A.   Because the launch program, the

23   intention is to learn more about a production

Page 80

1    role in the future, and so to evolve your career

2    into a production role as a producer, broker, in

3    other words.

4    Q.   Okay.  Have you talked to any of the

5    other members on your team about if they have any

6    aspiration to become a producing member of the

7    team?

8    A.   Yes.

9    Q.   Okay.  Who have you spoken to about

10   that?

11   A.   Tiffany Sanders, Amy Ritenour, Yvette

12   Talsma, Andrea Sutton.

13   Q.   Okay.  What was the conversation that

14   you recall with Tiffany Sanders?

15   A.   Not much, very brief.  She expressed

16   that she did not want to become a broker or be a

17   broker in a production role.

18   Q.   Did you ask Tiffany or did she come

19   to you?

20   A.   That's just in conversation.

21   Q.   Did she say why?

22   A.   One of the reasons that I recall is

23   travel and not really having a desire to be on

Page 81

1  the road very much.

2      Q.   Okay.  Have you had any talks with

3  Tiffany about being an inside broker?

4          MS. BARLOTTA:  Object to form.

5      A.   No.

6      Q.   When you spoke with Tiffany in

7  conversation about her desires with regard to

8  broker production, who brought it up, you or

9  Tiffany?

10         MS. BARLOTTA:  Object to form.  Asked

11 and answered.

12     A.   I don't recall.  Like I said, it was

13 just in conversation.  We've had multiple

14 conversations about it.  And so it just kind of

15 comes up.  It probably came up from both of us in

16 different scenarios.

17     Q.   Okay.  Amy Ritenour, what have you

18 talked to Amy Ritenour about with regard to being

19 a broker in production?

20     A.   In her biannual review, in the last

21 one, we talked to her about her progress since

22 she joined the team and that we saw some

23 potential in her and that -- asked her come to us

Page 82

1  and talk to us about how she wanted her career to

2  evolve, because we told her we could see her in a

3  production role if that was something that she,

4  you know, desired sometime down the road.

5      Q.   And what was Amy's response to that?

6      A.   Not much, just kind of a thank you

7  and noted.  And so I don't know what to make of

8  that.

9      Q.   Did your discussion with Amy mention

10 whether that future role would include inside

11 broker or associate broker?

12     A.   No.  We just talked about a

13 production path in the future.

14     Q.   Okay.  Did you talk about travel

15 expectations?

16     A.   No, we didn't really get into those

17 details.

18     Q.   What about Yvette Talsma?  What

19 conversation do you recall related to Yvette

20 Talsma's production desires?

21     A.   Really, that was -- would be more

22 involved with Corey Daugherty.  I happened to be

23 present.  It just wasn't a one-on-one

Page 83

1  conversation between Yvette and me.

2      Q.   Okay.  What do you recall about the

3  conversation?

4          MS. BARLOTTA:  Object to form.

5      A.   Corey was just saying to Yvette and

6  to Andrea together and separately.  I've heard

7  him more than once say, you know, that if you

8  ever want to be in a production type of role, if

9  you come to us, those opportunities are open to

10 you.

11     Q.   What about Lauren?  Have you ever had

12 a conversation with Lauren?  I think she's the

13 newest member of the team -- no.  Amy is the

14 newest member.  So Lauren is the broker

15 assistant.  Have you had a conversation with

16 Lauren about her future with CRC?

17     A.   Yes.

18     Q.   Tell me about that conversation.

19     A.   At her biannual review, asking her

20 how she feels about her experience so far, if

21 she's happy where she is, does she like what

22 she's doing.  That's how that conversation went.

23     Q.   Okay.  And what was her response?

Page 84

1      A.   She seemed to be very pleased and

2  happy with her role on our team.

3      Q.   Did you specifically mention an

4  opportunity for an inside broker spot?

5          MS. BARLOTTA:  Object to form.

6      A.   No.

7      Q.   Did you specifically mention anything

8  about eventually becoming an associate broker?

9          MS. BARLOTTA:  Object to form.

10     A.   Not specifically.  It was more

11 open-ended.

12     Q.   Yeah.  Did you say anything or hear

13 anything during that conversation about any

14 possibility of linking her to production?

15         MS. BARLOTTA:  Object to form.

16     Q.   In the future?

17     A.   Everybody is linked to production.

18     Q.   Okay.  And so what I mean by that is

19 what we were talking about earlier about being a

20 producer.  So thank you for clarifying.

21     A.   No.  With her, it was more of an

22 open-ended, how do you feel, how's your

23 experience?  Do you like what you're doing?  Tell

Page 85

1  us if you have any issues.
2      Q.   Do you -- so that -- I think you
3  mentioned a couple of times that this was during
4  a biannual review.  Do you do the biannual
5  reviews for the entire team?
6      A.   Do I?
7      Q.   Yes.  Do you participate in the
8  biannual reviews?
9      A.   Not for every member.
10     Q.   Whose biannual reviews do you
11  participate in?
12     A.   Tiffany, Steele, Amy, Lauren.
13     Q.   Okay.  And why those specific
14  individuals?  Like how did that come to be your
15  role?
16     A.   Well, to be clear, when I do that,
17  it's Corey and me.
18     Q.   Right.
19     A.   And those people.
20     Q.   Okay.
21     A.   I'm invited by Corey Daugherty to be
22  involved in those conversations.
23     Q.   Are you invited by Corey to be a part

Page 86

1  of the biannual reviews with Andrea or Yvette?
2      A.   No.
3      Q.   Have you asked him why?
4      A.   No.
5      Q.   Have you ever come to learn that --
6  let me ask you this:  Do Andrea or Yvette -- do
7  Andrea or Yvette still work on any of your
8  agents?
9          MS. BARLOTTA:  Object to form.
10     A.   It's rare.
11     Q.   Okay.
12     A.   It's very rare.
13     Q.   Have you ever heard or become aware
14  that they didn't want to work on your agents?
15     A.   No.
16     Q.   Okay.  Has anyone ever talked to you
17  about --
18     A.   I'd like to know that, though.
19     Q.   Has anyone ever talked to you about
20  how you communicate with staff?
21         MS. BARLOTTA:  Object to form.
22     Q.   I guess, let me ask you this:  Have
23  you ever been counseled or guided on improving

Page 87

1  communication with staff?
2      A.   No.
3          MS. BARLOTTA:  Object to form.
4      Q.   Have you ever heard that anyone --
5      A.   We talk about communicating with
6  staff all the time and colleagues all the time.
7      Q.   Right, right.
8      A.   And when I say we, I mean everybody.
9      Q.   Have you ever received any guidance
10  on whether some of the staff feels like you might
11  talk down to them some?
12         MS. BARLOTTA:  Object to form.
13     A.   No.
14     Q.   Okay.  Do you know if there's a
15  written policy for the launch program?
16     A.   I don't know what that means.
17     Q.   Like a how to -- like a how to get in
18  the program?
19     A.   I don't know if it's written.  I
20  haven't seen it written.
21     Q.   Okay.
22     A.   I was told about that process that I
23  mentioned to you.

Page 88

1      Q.   Okay.  But you haven't seen it in any
2  document about the --
3      A.   I haven't seen it in writing about
4  the application process, the sponsorship, that
5  kind of thing.
6      Q.   Okay.  How did you have to sponsor
7  Steele?  Did you have to like write an e-mail or
8  a letter, make a phone call?
9      A.   Okay.  There is a document where you
10  say, Hey, I'm sponsoring this person, but there's
11  not much to it.  But then you tell why you
12  think -- you know, here's why I think this person
13  would be a good candidate for the launch program.
14     Q.   Okay.  So kind of like a reference
15  form?
16     A.   Yeah.
17     Q.   Okay.
18     A.   I don't remember much about it.  I
19  just remember writing something about this is --
20  I would like to nominate Steele Cadden.  Here's
21  why.
22     Q.   Okay.
23     A.   It was pretty brief.

Page 89

1    Q.  Was that form something that Steele
2  provided you or is it something that you just
3  accessed on the computer?
4    **A.  I don't remember.  I don't know where**
5  **that form came from.**
6    Q.  Okay.  And are you aware that Ross
7  Robertson is also in the launch program?
8    **A.  I am aware of that.**
9    Q.  Okay.  What was Ross' position before
10 he joined the launch program, if you know?
11   MS. BARLOTTA:  Object to form.
12   **A.  Ross is on a different team, so I --**
13 **I believe he was an account executive.**
14   Q.  Okay.  Did you have anything to do
15 with sponsoring Ross?
16   **A.  No.**
17   Q.  Do you know who did?
18   **A.  I mean, I'm -- I think Rusty Hughes,**
19 **because he's on their team, but maybe Tyler**
20 **O'Connor.  That's speculation.**
21   Q.  This Plaintiff's Exhibit 43, the
22 Buckner agency?
23   **A.  Yeah.**

Page 90

1    Q.  How did Buckner become one of your
2  agencies?
3    **A.  I flew to Colorado to see them.**
4    Q.  Okay.  Did you cold call them or like
5  how did you know Buckner was out there?
6    **A.  My colleague, Dan Dunnavant, was a**
7  **casualty broker.  He said, Let's go try to drum**
8  **up some business.  And so we went to Colorado and**
9  **went to see Buckner as well, among four or five**
10 **other agencies.**
11   Q.  Is Dan Dunnavant a CRC casualty
12 broker?
13   **A.  He is.**
14   Q.  Okay.  I'm going to show you
15 Plaintiff's Exhibit 44.
16   And if you get to where you need
17 another break, you just tell me, okay?
18   (Whereupon, Plaintiff's Exhibit No.
19 44 was marked for identification and a copy of
20 same is attached hereto.)
21   Q.  So this is another e-mail,
22 Plaintiff's Exhibit 44, from you to Kat and
23 Corey, and it looks like it's similar, talking

Page 91

1  about retailers.
2    The e-mail from you is:  Well done
3  getting twenty percent on this, Kat.  Is the
4  twenty percent the commission that we talked
5  about that the --
6    **A.  Yeah.**
7    Q.  That the carrier pays?
8    **A.  That's right.**
9    Q.  Okay.  So it was -- on this account,
10 it was Kat's responsibility to negotiate CRC's
11 revenue on this account?
12   MS. BARLOTTA:  Object to form.
13   **A.  No.**
14   Q.  Okay.  Where did I go wrong there?
15   MS. BARLOTTA:  Object to form.
16   Q.  Is the --
17   **A.  She wasn't assigned, I don't think, a**
18 **responsibility for the commission, but it does**
19 **look like, if you go to this next page, that they**
20 **were likely paying us less than twenty percent,**
21 **and Kathryn either at our -- my suggestion,**
22 **Corey's suggestion, or at her own accord and**
23 **within her own, you know, authority said, Hey,**

Page 92

1  **can you bump this up to twenty percent, and the**
2  **carrier agreed.**
3    **So I don't know if that was Corey**
4  **suggesting that or Kathryn just said this is an**
5  **opportunity for us to get some more commission.**
6  **I don't know where that came from.**
7    Q.  Okay.  But that twenty percent, is
8  that twenty percent commission what we're talking
9  about when we say CRC's revenue?
10   MS. BARLOTTA:  Object to form.
11   **A.  Yes.**
12   Q.  Like -- okay.  And who is the agency
13 on this account, if you know?
14   **A.  I do know.  Underwood Anderson.**
15   Q.  And is that one of your agencies?
16   **A.  Yes.**
17   Q.  How did you get that agency in your
18 --
19   **A.  I drove down to the Gulf of Mexico to**
20 **their office and asked them to send me business.**
21   Q.  Okay.  Did you cold call them?
22   **A.  Yes.**
23   Q.  How did you come to know that they

Page 93

1   existed?

2   **A.   Dan Dunnavant.**

3   Q.   Okay.  Casualty again?

4   **A.   Yeah.  Dan had worked with them**

5   **before.  He got a professional liability**

6   **submission.  He knew that our team could work on**

7   **that.**

8   Q.   Okay.  Are there any agencies in your

9   book, so your agents, that were at one time

10  Corey's agents?

11       MS. BARLOTTA:  Object to form.

12  Q.   Corey Daugherty's agents?

13  **A.   Okay.  Let's see.  Yes.**

14  Q.   Okay.  Is there -- can you give me a

15  rough number?

16  **A.   No, but I can give you an example.**

17  Q.   Okay.  Sure.

18  **A.   Corey Daugherty writes a lot of PL,**

19  **GL, and healthcare.  Sometimes he tries -- we as**

20  **a team try to cross-sell.  If we see an**

21  **opportunity to cross-sell with network security**

22  **and privacy or cyber liability, sometimes I will**

23  **take the lead on that and try to pursue that**

Page 94

1   **opportunity with an existing agent of Corey's.**

2   **If successful, that success could be allocated to**

3   **my revenue.**

4   Q.   And that would be the success for the

5   whole policy, not just the network security

6   privacy?

7        MS. BARLOTTA:  Object to form.

8   **A.   No, that would just be for that piece**

9   **of business, that coverage line that I bound.**

10  Q.   Okay.

11  **A.   Or that the team bound but that I was**

12  **taking lead with presenting the proposals.**

13  Q.   And because you take the lead, I

14  know -- I think we've heard that you kind of

15  specialize in -- is that right, you specialize in

16  the cyber security insurance?

17  **A.   That is one of the areas that I focus**

18  **on.**

19  Q.   Okay.  But you also sell the

20  professional liability, general liability, kind

21  of --

22  **A.   You know, PL, fiduciary crime, PL,**

23  **GL, and healthcare, cyber.**

Page 95

1   Q.   Okay.  Is there anybody else at CRC

2   Birmingham that focuses in the cyber insurance?

3        MS. BARLOTTA:  Object to form.

4   **A.   Yes.**

5   Q.   Who is that?

6   **A.   Do you want me to list them?**

7   Q.   Oh, no.  Is there more than one?

8   **A.   Yes.**

9   Q.   I didn't -- I guess what I'm trying

10  to figure out is like does everybody have their

11  own little niche that they're in?

12       MS. BARLOTTA:  Object to form.

13  **A.   There are different focuses on**

14  **different teams, but many of the teams' focuses**

15  **overlap.**

16  Q.   Okay.  Is Fisher Bottrell one of your

17  agents?  Did I say that right?

18       MS. BARLOTTA:  Object to form.

19  Q.   Bottrell, Fisher Bottrell?

20  **A.   Fisher Brown Bottrell is one of Team**

21  **Daugherty's clients.**

22  Q.   And because it's a Team Daugherty

23  client, did -- are you aware of whether Corey

Page 96

1   mined that business?

2   **A.   What does mined mean?**

3   Q.   Like Corey was the first person to

4   get Fisher -- to get business from Fisher for

5   your team?

6   **A.   Betsy Barnett is the first person to**

7   **get business from Bottrell, as far as I know,**

8   **from a professional liability perspective.  And I**

9   **would imagine she's the first person in history**

10  **in professional liability at CRC, because she**

11  **started the department in 1993.**

12  Q.   And when -- you were still there when

13  Betsy was there, so was there a point in time

14  that you're aware of that Fisher moved from Betsy

15  to Corey?

16  **A.   You're going to have to say that**

17  **again or rephrase it or something.**

18  Q.   So before Betsy retired --

19  **A.   Yes.**

20  Q.   -- was Fisher already one of Corey's

21  agents?

22  **A.   Yes.**

23  Q.   Okay.  I'm going to show you

Page 97

1    Plaintiff's Exhibit 45.

2         (Whereupon, Plaintiff's Exhibit No.

3    45 was marked for identification and a copy of

4    same is attached hereto.)

5         A.   But it was still one of Betsy's

6    agents as well.  So she wrote business with

7    Bottrell.  Corey wrote business with Bottrell.

8         Q.   Okay.  Would they compete writing

9    business for the same agent?

10        A.   No.  Betsy was -- no.  They just had

11   different relationships within that agency.  So

12   she introduced Corey to some people, but he

13   nurtured some new relationships.  They had some

14   new folks.  He wrote some business with them.

15   She wrote some business with them.  But she

16   introduced him to that agency as far as I recall.

17        Q.   Plaintiff's Exhibit 45.  So this

18   e-mail you're telling Kat to let Jonathan know we

19   are filing the taxes.  If you look further down,

20   Jonathan has e-mailed you, and then you're

21   forwarding that to Kat, right?

22        A.   Yes.

23        Q.   Okay.  So is it standard for you to

Page 98

1    forward these types of e-mails -- I'm sorry.

2    2015 to '19, was it standard for you to forward

3    these types of e-mails to Kat to handle?

4         MS. BARLOTTA:  Object to form.

5         A.   I mean, yes.  But that depends on the

6    agency.  It depends on the insured.  And that's a

7    long period of time that you just said.  So did

8    you say '15 to '19?

9         Q.   Okay.  Yeah, well, let's just look at

10   '17.  So this e-mail is November of 2017.

11        A.   Okay.

12        Q.   So in 2017, was it pretty standard

13   for you to forward these types of e-mails to Kat

14   to handle?

15        MS. BARLOTTA:  Object to form.

16        A.   Sure.

17        Q.   Okay.  And what would it take to

18   notify the agent that you're filing -- that CRC

19   is filing the taxes?

20        MS. BARLOTTA:  Object to form.

21        A.   Well, that depends.  He could just be

22   asking a question, who's filing the taxes, or he

23   could also be -- because if you look at his

Page 99

1    e-mail, he says, We're missing surplus lines

2    agent information that accompanies the binder to

3    reflect that CRC is filing taxes.  So he may be

4    asking for like we need some proof that CRC is

5    filing the taxes, and that could also be on the

6    quote or the binder, and we didn't check the box

7    that shows CRC is filing the taxes.

8         So he just needs some comfort there.

9    So probably he wants the quote or the binder to

10   check that box, and he may be asking for some

11   more surplus lines information, but he doesn't

12   need that surplus lines information.

13        Q.   Okay.  So this would require Kat to

14   go in and do the --

15        A.   Either redo the binder or the quote,

16   whichever -- I guess the binder in this, and put

17   a check next to the -- who's filing the taxes.

18        Q.   Okay.

19        A.   There's a little box on the quote.

20   And so Jonathan Ting may be just being particular

21   saying, I really just need it for my file showing

22   that CRC is filing the taxes.

23        Q.   Okay.  Do you do binders, like you

Page 100

1    personally?

2         A.   Yes.

3         Q.   Okay.  How many binders do you do in

4    a month?

5         A.   I have no idea.

6         MS. BARLOTTA:  Object to form.

7         Q.   More than fifty, less than fifty?

8         MS. BARLOTTA:  Object to form.

9         A.   Less than fifty.

10        Q.   Okay.  Do you have any idea how many

11   binders Tiffany Sanders does in a month?

12        A.   No.  I mean, I'd have to run the

13   list, and we'd have to talk about each account.

14   I would have to remember who issued the binder.

15   I issue the binder sometimes.  But for the most

16   part, she issues binders.  Probably seventy-five

17   percent compared to my twenty-five percent.

18        Q.   Okay.  And that's just Tiffany.  Does

19   Steele or Amy -- do Steele or Amy issue binders?

20        A.   They do.

21        Q.   Do they --

22        A.   Everybody issues binders except for

23   Lauren Green.

Page 101

1    Q.   Okay.  So -- but this seventy-five
2   percent, is that like all of them together or
3   Tiffany?
4        A.   It's probably -- that's probably
5   equal between all of them.
6        Q.   Okay.  And then the -- flip for me to
7   the third page there.  It's 5916 on the bottom.
8        A.   Okay.
9        Q.   Is this that document we were talking
10  about earlier that is made through AIM?
11       A.   Yes.
12       Q.   Okay.
13       A.   This is a document that's made
14  through AIM.
15       Q.   Okay.  What information would AIM
16  like autofill into this document, like when you
17  click the bind button?
18       A.   Well, a lot of it, except -- when you
19  click the bind, most of this is going to come up,
20  except all of the information was at some point
21  entered manually by our team.
22       Q.   Okay.  And who has to enter the
23  information manually?

Page 102

1        A.   Nobody in particular.  But when you
2   clear a risk, it could be carried over as a
3   renewal.  But if it's a new piece of business,
4   you've got to literally type in the named insured
5   and their address.
6        Q.   Does Amy Ritenour -- does Amy
7   Ritenour have a number of agencies specifically
8   assigned to her to manage?
9        A.   Yes.
10       Q.   Do you know how many agencies roughly
11  that would be?
12       A.   I don't.  I can guess, but that's
13  probably not what you're looking for.
14       Q.   How many agents -- how many agencies
15  do you have roughly that are on your books?
16            MS. BARLOTTA:  Object to form.
17       A.   Between twenty-five and thirty.
18       Q.   Twenty-five and thirty agencies that
19  you manage or that you -- they're like your
20  clients?
21       A.   Yeah.  Some of them are one account,
22  though, I mean, so it's kind of all across the
23  board.

Page 103

1        Q.   Right.  So some of them would have
2   multiple policies?
3        A.   That's right.
4        Q.   Do you know --
5        A.   The top five agencies are about
6   eighty percent of my book.
7        Q.   Okay.  Do you know how many policies
8   you have in your book?
9        A.   Gosh.
10       Q.   Roughly?
11       A.   Yeah.  Close to three hundred.
12       Q.   Okay.  And of the twenty-five to
13  thirty agencies, is Tiffany responsible for
14  the -- managing the majority of them?
15       A.   Yes.
16       Q.   Okay.  Would you have any guess as to
17  the percentage -- well, any idea as to the
18  percentage, whether it --
19       A.   Close to seventy-five.
20       Q.   Seventy-five.  Okay.  So then that
21  other twenty-five percent --
22       A.   Uh-huh (positive response).
23       Q.   -- is that Amy?

Page 104

1        A.   Yeah.
2        Q.   Okay.
3        A.   Yeah.  I'm going to have to lower it
4   to seventy percent, and then the other thirty
5   percent is Amy and then Steele.
6        Q.   Okay.  Do they -- so do Amy and
7   Steele tag team them or do they --
8        A.   They do.  They do.  And right now,
9   you know, Steele is involved with a lot of new
10  business on Tiffany's -- some of Tiffany's agents
11  and some of Amy's.
12       Q.   Okay.  So if Steele is involved in a
13  lot of new business, is he spending the same
14  amount of time managing the existing policies as
15  Amy and Tiffany?
16            MS. BARLOTTA:  Object to form.
17       A.   Does he spend the same amount of his
18  time on renewal as new business?  Is that the
19  question?
20       Q.   Does he have the same amount of
21  responsibility for managing an account as Tiffany
22  and Amy?
23       A.   For managing an account?

Page 105

1    Q.   So let me back that up a little bit.
2    So Steele is in the process of learning how to be
3    a producer, right?
4    **A.   That is one of the many things that**
5    **he's doing.**
6    Q.   Right.  And as part of that, the goal
7    would be eventually for him to become a broker,
8    correct?
9        MS. BARLOTTA:  Object to form.
10   **A.   Yes.  He's expressed that desire, and**
11   **he's taking steps to move in that direction.**
12   Q.   Okay.  Does anyone other than Steele
13   manage accounts that Steele has brought in?  So
14   these new businesses that you're talking about,
15   does anyone other than Steele manage those?  Like
16   does Tiffany issue any of Steele's binders?
17       MS. BARLOTTA:  Object to form.
18   **A.   No.**
19   Q.   Okay.  Does Amy issue binders or
20   invoices for Steele?
21   **A.   Sometimes.**
22   Q.   Okay.  Does Steele issue binders or
23   invoices for Amy?

Page 106

1    **A.   Sometimes, but those are -- when they**
2    **partner on deals because there's an agency that**
3    **they're both working with.  You know, so they**
4    **might jump in and out of the same account.**
5    Q.   Okay.  What about --
6    **A.   And do different tasks, but it's on**
7    **the same insured.**
8    Q.   Okay.  What about that new business
9    that Steele is working on?  Who's issuing the
10   binders and the invoices on that new business?
11   **A.   Most --**
12       MS. BARLOTTA:  Object to form.
13   **A.   -- of the time it's Steele.**
14   Q.   So he's kind of handling it from --
15   **A.   Start to finish.**
16   Q.   -- tadpole to frog?
17   **A.   That's right.**
18   Q.   And that's part of that learning the
19   process?
20   **A.   Absolutely.**
21   Q.   Okay.  The document in front of you,
22   which is Plaintiff's ==Exhibit 45==, the very last
23   page has a -- like a premium breakdown.  Is that

Page 107

1    what that is, the numbers up top?
2    **A.   Yeah, the line that says premium, the**
3    **number next to it, that's the premium.**
4    Q.   Okay.  And so then they've got all
5    these fees added in, and then the commission is
6    ten percent.  So is that the commission that CRC
7    would get?
8    **A.   No.**
9    Q.   Okay.  What is that ten percent
10   commission?
11   **A.   To the retailer.**
12   Q.   Retailer.  Okay.  So CRC's
13   commission --
14   **A.   Gets the remaining whatever is left**
15   **from the carrier's total commission.**
16   Q.   Okay.  So just to give me an example,
17   that one that you were talking about earlier that
18   was a twenty percent commission, that's the total
19   commission is twenty percent?
20   **A.   That's right.**
21   Q.   Okay.  And if that were this same
22   one, I know it's not --
23   **A.   Yeah.**

Page 108

1    Q.   -- but just for example, so the
2    retailer would get ten percent of that --
3    **A.   Yeah, twenty minus ten is ten.**
4    Q.   Right.  So the retailer would get ten
5    percent, and then CRC would get ten percent?
6    **A.   That's right.**
7    Q.   Okay.  How are the renewals set up in
8    y'all's system?  Like how do you learn that a
9    renewal -- it's time for a renewal?
10   **A.   You run that monthly report out of**
11   **AIM.**
12   Q.   Okay.  Somebody has to input the
13   information into AIM, though, right?
14   **A.   Yes.**
15   Q.   And who is usually responsible for
16   that?
17   **A.   Okay.  So for a new piece of**
18   **business, anybody can be responsible for that.**
19   Q.   Okay.
20   **A.   Most of the time an account executive**
21   **will enter that new piece of business**
22   **information.  But currently, every team member**
23   **does that on occasion.**

Page 109

1    The renewal list is run by Lauren
2 Green, and she doesn't have to input any of that
3 information, because it just -- it's in there
4 from the previous year.  So if she's running a
5 renewal, she doesn't have to technically type
6 that information in.
7    Q.   So she can just go in and run a
8 report?
9    A.   That's right.
10    Q.   Okay.  And then she services the
11 renewals?
12    A.   No.
13    Q.   Okay.  Who services the renewals?
14    A.   She sends the solicitation, and
15 everybody services the renewals as needed.
16    Q.   Okay.  So the solicitation is the,
17 Hey, your --
18    A.   -- your renewal is coming up.
19    Q.   Okay.  And then the servicing would
20 be if they have questions, if they need to change
21 things, things like that?
22    A.   Servicing is everything.
23    Q.   Okay.  Let me show you Plaintiff's

Page 110

1 Exhibit 46.
2         (Whereupon, Plaintiff's Exhibit No.
3 46 was marked for identification and a copy of
4 same is attached hereto.)
5    Q.   Okay.  So from Kat to Corey.  So
6 you're not on this.  Is this -- this is Fisher
7 Bottrell.  I just want to ask you -- I know
8 you're not on this e-mail.  But see where Corey
9 is telling her the second string down:  Nice work
10 rounding it out with the cyber?
11    A.   Uh-huh (positive response).
12    Q.   Does that mean that Kat sold this
13 agency on a cyber policy?
14         MS. BARLOTTA:  Object to form.
15    A.   I can't tell.
16    Q.   Okay.  Okay.  How would we be able to
17 tell that?
18         MS. BARLOTTA:  Object to form.
19    A.   You can't based on this information.
20    Q.   Okay.  Is there somewhere that
21 information like that would be housed?
22         MS. BARLOTTA:  Object to form.
23    A.   I mean, you could look back through

Page 111

1 correspondence.
2    Q.   Okay.
3    A.   But do you want me to tell you how I
4 would know?
5    Q.   Yeah.
6    A.   I would go to Corey and Kathryn and
7 say, Hey, how did the cyber come up?  Who first
8 brought it up?  How did we sell it to them?
9 Let's try to do that more often as a team, but I
10 wouldn't know that without them telling me how it
11 went down.
12    Q.   Right.  Okay.  And the same two on
13 the premium increases, is -- how do existing
14 agents go about getting a premium increase?  Like
15 is that something you guys have to sell them on?
16         MS. BARLOTTA:  Object to form.
17    A.   It looks like it was a D&O renewal or
18 they -- it could have been a new piece of
19 business, but the D&O was originally quoted, and
20 then they added EPL to that.  And the EPL -- the
21 premium allocated to the EPL portion of that
22 policy was six thousand dollars.
23    Q.   Okay.  I had read that completely

Page 112

1 wrong.  Thank you.
2         (Whereupon, Plaintiff's Exhibit No.
3 47 was marked for identification and a copy of
4 same is attached hereto.)
5    Q.   Let me show you Plaintiff's Exhibit
6 47.  So this is another string of e-mails that
7 appears to be a renewal.
8    A.   Okay.
9    Q.   From Kat.  So I want to look at the
10 second page, which is that CRC letterhead.
11    A.   Yes.
12    Q.   Again, this is what would come out of
13 AIM, right, the information in this letterhead?
14         MS. BARLOTTA:  Object to form.
15    A.   Yeah.
16    Q.   So if you look at Option 1 and Option
17 2, neither of those list a commission as part of
18 the coverage.  But then down on the bottom it's
19 got the ten percent commission.  So is this is --
20 again, this is the ten percent that goes to the
21 agency?
22    A.   That's right.
23    Q.   Okay.  And so this is one of those

Page 113

1  instances where the agency isn't aware or like
2  hasn't been disclosed what y'all -- what CRC's
3  commission is, right?
4          MS. BARLOTTA:  Object to form.
5      A.  I can't tell.
6      Q.  Okay.
7      A.  You can't tell that from this
8  document, if that's your question.
9      Q.  Okay.  Yeah.  Yeah, I was thinking
10 that the -- they would like add up.  Like you
11 guys would get the twenty percent from the
12 carrier, and then like a ten percent from the
13 agent.
14     A.  No.
15     Q.  So I'm glad we cleared that up.  I
16 clearly have zero understanding of insurance.
17         The next page, this has your like
18 typed signature on it with a slash KH, because
19 Kat prepared this.
20     A.  Yeah.
21     Q.  Are -- is that standard at CRC, like
22 does the slash with the two preparers --
23     A.  Some teams do it like that.

Page 114

1          MS. BARLOTTA:  Object to form.
2      Q.  Does Tiffany do that on your stuff
3  that she renews for you?
4      A.  She does.
5      Q.  Does Amy do that?
6      A.  She does.
7      Q.  And does Steele do that?
8      A.  He does.
9      Q.  And does Lauren do that?
10     A.  Lauren doesn't release quotes.
11     Q.  Okay.  That's right.  She just does
12 the renewals.
13         So how would we go about finding if
14 there are these quote renewals that don't have an
15 assistant name on them, like it's just Clay
16 Segrest, not slash somebody?
17         MS. BARLOTTA:  Object to form.
18     Q.  Like is there a way we could search
19 for that?
20         MS. BARLOTTA:  Object to form.
21     A.  I am not aware of a report that you
22 can run that would tell you which quotes don't
23 have initials after my name.

Page 115

1      Q.  Okay.  Does the AIM system track or
2  are you aware of a report that shows who accesses
3  that information?  So like you said you have to
4  go in and click bind.  Are you aware if there's
5  any kind of audit trail or report to show who's
6  binding what?
7          MS. BARLOTTA:  Object to form.
8      A.  You can go in the account and see
9  which user pressed the bind button.
10     Q.  Okay.  Okay.  I'm going to show you
11 Plaintiff's 48.  Sorry.  You didn't know we were
12 killing trees over here today.  I promise I'm
13 going to skip as many as I can.
14         (Whereupon, Plaintiff's Exhibit No.
15 48 was marked for identification and a copy of
16 same is attached hereto.)
17     Q.  Okay.  So Plaintiff's 48, this is
18 another one of those type of e-mails we've been
19 talking about.  And what I'm real curious about
20 on this one is the second page, it says
21 Disclosure of Premium, and then it says XX
22 (REDACTED) dollars.  What -- is that -- see, it's
23 in the little box kind of towards the bottom of

Page 116

1  the --
2      A.  Yeah.
3      Q.  So is that XX (REDACTED) dollars,
4  that's like the whole premium?
5          MS. BARLOTTA:  Object to form.
6      A.  That's just for the terrorism
7  coverage.
8      Q.  Okay.  Is it common for --
9          MS. BARLOTTA:  Any part of the
10 testimony that relates to prices or she's going
11 to read something into the record about a premium
12 or the cost or anything like that needs to be
13 placed under seal.
14     Q.  Is there -- the next page, the
15 quotation, is that for a separate policy?  Like
16 is the terrorism policy in addition to another
17 policy or are you just binding terrorism
18 coverage?
19     A.  It's -- the TRIA is part of this
20 policy, but --
21         THE REPORTER:  Say that again.
22     A.  The TRIA -- the terrorism coverage is
23 part of this policy.  So you can see that line

Page 117

1   item. The annual premium is XX -- XXXX
2   (REDACTED) dollars plus XX (REDACTED) dollars for
3   terrorism.
4       Q.   Okay. I see that.
5       A.   With a total of XXXX (REDACTED)
6   dollars.
7       Q.   Okay. So that -- this is more than
8   just that. The terrorism coverage is another
9   type of coverage as well. Okay. That makes
10  sense.
11          (Whereupon, Plaintiff's Exhibit No.
12  49 was marked for identification and a copy of
13  same is attached hereto.)
14      Q.   49, Plaintiff's Exhibit 49, this is
15  an e-mail where -- read that for me and tell me
16  is this one of those small accounts we were
17  talking about earlier in the morning where it was
18  getting transferred over to Corey Woodward?
19      A.   Okay. Yeah. That's what Kathryn is
20  suggesting here.
21      Q.   Okay. So is that -- is this 2000 --
22  January 17th, 2018, is that -- does that line up
23  with when some of y'all's smaller accounts were

Page 118

1   getting transferred over to Corey Woodward?
2          MS. BARLOTTA: Object to form.
3       A.   It has to be based on this e-mail.
4       Q.   Okay. And so --
5       A.   Must be.
6       Q.   Would Corey Woodward come to you and
7   ask for accounts or would your -- would Team
8   Daugherty do kind of this and look at here's how
9   this policy is shaking out, maybe we should
10  transfer that?
11          MS. BARLOTTA: Object to form.
12      A.   Yes, both of those are true.
13      Q.   Both of those. Okay. Are you aware
14  of whether this particular account in this e-mail
15  was transferred over to Corey Woodward?
16      A.   I am not aware. I -- I would assume
17  that it did get transferred to Corey.
18      Q.   Okay. Does Corey Woodward only do
19  smaller accounts that preexisted with CRC?
20          MS. BARLOTTA: Object to form.
21      Q.   Or does he have --
22      A.   I don't think so.
23      Q.   Okay. So he is building like his own

Page 119

1   book as well?
2       A.   That's right.
3       Q.   Okay. Let me show you Plaintiff's
4   50.
5          (Whereupon, Plaintiff's Exhibit No.
6   50 was marked for identification and a copy of
7   same is attached hereto.)
8       Q.   Okay. So January 26, 2018, this
9   e-mail appears to be when Tiffany Sanders is
10  coming on board. So you are the author of the
11  top e-mail, right?
12      A.   Uh-huh (positive response).
13      Q.   And so you are setting up Tiffany's
14  schedule --
15      A.   Uh-huh (positive response).
16      Q.   -- for the week?
17      A.   Yes.
18      Q.   So were you wholly responsible for
19  Tiffany? Like were you -- was Tiffany hired with
20  the understanding that you would be her direct
21  report?
22          MS. BARLOTTA: Object to form.
23      A.   Tiffany reports and always has

Page 120

1   reported directly to me and to Corey.
2       Q.   Okay. So like the co -- I think we
3   heard from Corey that you guys are co-team
4   leaders. So you are co-supervisors over Tiffany?
5       A.   The second part of that question is
6   correct.
7       Q.   Okay.
8       A.   The first part, Corey is technically
9   the team lead. I am also a broker and the other
10  broker on the team.
11      Q.   Okay. And so what does Corey do as a
12  team lead that you don't do as the broker?
13      A.   He hired me. I was unable to do
14  that.
15      Q.   Do you have any input on bonuses that
16  are paid out?
17      A.   I do.
18      Q.   When did you start gaining input?
19  When did you -- when did you start giving input
20  on bonuses that were paid out to the team?
21      A.   I don't know when that was.
22      Q.   Was it before 2015?
23          MS. BARLOTTA: Object to form.

Page 121

1    A.  I don't know that.  I don't think so.
2  I don't know.
3    Q.   Okay.  Was it before Tiffany Sanders
4  started working there?
5        MS. BARLOTTA:  Object to form.
6    Q.   On your team?
7    A.  Yes.
8    Q.   Okay.  How would you go about giving
9  Corey Daugherty input on what bonuses are paid
10 out to team members?
11   A.  Corey would suggest some thoughts
12 that he had and just ask if I had anything to
13 add, any input related to that.
14   Q.   Were those conversations ever in
15 e-mail?
16       MS. BARLOTTA:  Object to form.
17   A.  No.
18   Q.   Were they always verbal?
19   A.  Yes.
20   Q.   Did you ever take notes?
21       MS. BARLOTTA:  Object to form.
22   A.  Hmph, yes.
23   Q.   Okay.  Where -- what would you do

Page 122

1  with those notes that you took related to the
2  bonus compilations?
3        MS. BARLOTTA:  Object to form.
4    A.  Put them in the shredder.
5    Q.   Did Corey ever take notes?
6        MS. BARLOTTA:  Object to form.
7    A.  I have no idea.
8    Q.   Okay.  What types of things would you
9  discuss with relation to how to calculate the
10 team members' bonuses?
11       MS. BARLOTTA:  Object to form.
12   A.  I'm sorry.  Did you say what types?
13   Q.   Yeah, what types of things would you
14 -- like what factors would you discuss?
15       MS. BARLOTTA:  Object to form.
16   A.  What factors would we discuss?  Job
17 performance, that's it.
18   Q.   Okay.  Did you discuss bonuses with
19 team members before they were paid?
20       MS. BARLOTTA:  Object to form.
21   A.  Yes, sometimes.
22   Q.   Okay.  What would cause it to be
23 sometimes?  Like were there only certain

Page 123

1  instances you would discuss it?
2        MS. BARLOTTA:  Object to form.
3    A.  No -- well, sometimes the timing, it
4  may like show up in the system or in their
5  account at about the same time we're having the
6  conversation.  Sometimes it's before.
7    Q.   And the conversations that you had
8  with regard to the bonuses with team members,
9  would you provide the team members any guidance
10 as to how they could increase their bonuses?
11       MS. BARLOTTA:  Object to form.
12   A.  Yes.
13   Q.   Okay.  Do you recall having any of
14 those conversations with Kat Hendrix?
15   A.  Yes.
16   Q.   Okay.  What did you discuss with Kat
17 Hendrix?
18   A.  If the team writes more business, our
19 bonuses should increase, more business being
20 revenue, not necessarily number of accounts.
21   Q.   Right.  So was the team writing more
22 business in any way related to Kathryn's work
23 performance?

Page 124

1    A.  Yes.
2    Q.   Okay.  Explain that to me.
3    A.  Well, so -- and the bonuses aren't
4  quite that simple.  It's not just revenue.  So
5  the bonuses, all areas of work performance and
6  job performance are considered in the bonuses.
7        So even if revenues were flat, for
8  example, account executive's bonus could still
9  possibly go up.  Again, that's based on just all
10 analysis of job performance.
11   Q.   Okay.  Was there -- did you have any
12 issue with Kathryn's job performance as it
13 related to bonuses?
14       MS. BARLOTTA:  Object to form.
15   A.  No.
16   Q.   Is there anything Kathryn could have
17 done better in her job performance to increase
18 her bonus?
19       MS. BARLOTTA:  Object to form.
20   A.  Yes.
21   Q.   And what is that?
22   A.  Everyone can improve on their job all
23 the time.

Page 125

1  Q.  And are you referencing just selling
2  more business?
3      MS. BARLOTTA:  Object to form.
4  A.  Every aspect of the job.
5  Q.  Okay.  Did you have input on Yvette
6  Talsma's bonuses?
7  A.  No.
8  Q.  Did you have input on Andrea Sutton's
9  bonuses?  Yeah, Andrea Sutton?
10  A.  Probably, probably.
11  Q.  Are you --
12  A.  I can't say that for sure.
13  Q.  Do you have a recollection of
14  Andrea's bonuses -- let me ask you this:  Did you
15  see the bonus sheet for the whole team?
16  A.  No.
17  Q.  Okay.  Do you have a recollection of
18  Andrea's bonuses being significantly more than
19  Kathryn's?
20      MS. BARLOTTA:  Object to form.
21  A.  No, because I don't know -- I mean, I
22  don't know Andrea's exact bonuses, so I can't say
23  that one way or the other.

Page 126

1  Q.  Did you ever have any discussions
2  with Kat about her bonuses?
3  A.  Yes.
4  Q.  What can you tell me about those
5  discussions?
6      MS. BARLOTTA:  Object to form.
7  A.  Corey and I would talk to her about
8  job performance, how things were going at those
9  biannual reviews, and he would tell her what her
10  bonus allocation was going to be.
11  Q.  Okay.  Did you ever tell her
12  specifically how it was calculated?
13  A.  No.
14  Q.  Did you have input on your bonus?
15  A.  No.
16  Q.  Who determined your bonus?
17  A.  Corey Daugherty.
18  Q.  Okay.  And were you aware that the
19  size of your bonus directly affected the amount
20  of funds left in the pool for everyone else --
21      MS. BARLOTTA:  Object to form.
22  Q.  -- on the team?
23      MS. BARLOTTA:  Object to form.

Page 127

1  A.  Say that again.
2  Q.  So as I understand it, there is a
3  bonus pool per team, correct?
4  A.  That's right.
5  Q.  And so everyone's bonus comes out of
6  that pool.  So did you understand that the size
7  of your bonus would have an effect on how much
8  was left in the pool to provide to the rest of
9  the team?
10      MS. BARLOTTA:  Object to form.
11  A.  I am aware that if there is a bonus
12  pool and all employees on the team and team
13  members get paid out of that pool, that every
14  number that each teammate is allocated would
15  impact what is left in the remainder of the pool.
16  Q.  Okay.  Did you give any thought to if
17  you could provide larger bonuses for the team if
18  --
19  A.  Yes.
20  Q.  Tell me about that.
21  A.  Yes.  So when you asked me do I have
22  any input over my bonus, my initial answer was
23  no.  I have to clarify that, because there were

Page 128

1  conversations between Corey and me where we would
2  discuss whether -- if I -- if we needed to lower
3  mine to increase somebody else's.
4      So we would start at a baseline, and
5  I offered a couple of times, Hey, let's talk
6  about adjusting that.  And so -- but that was
7  only within a range, because I didn't have power
8  in that --
9  Q.  Did you ever --
10  A.  -- a lot of influence in that.
11  Q.  Did you ever offer to lower yours to
12  increase Kathryn's?
13  A.  Yes.
14  Q.  Okay.  When was that?
15  A.  Don't know.  More than --
16  Q.  Do you know if yours was lowered to
17  increase Kathryn's?
18  A.  I can't remember if -- I can't
19  remember, because, like you're saying, you're
20  talking about a pool.  And it's a lot of moving
21  parts.
22  Q.  Yeah.
23  A.  And maybe that had an impact.  Maybe

Page 129

1  -- but ultimately -- I can't say that.

2      Q.   As I understand it, a broker's

3  salary, so Corey Daugherty's salary, comes out of

4  the revenue pool; is that correct?

5          MS. BARLOTTA:  Object to form.

6      A.   I can't answer that either.

7      Q.   Okay.  When you became a broker, not

8  an associate broker, but a broker, are your

9  bonuses still under Team Daugherty?

10     A.   Yes.

11     Q.   Okay.  Do you have anything to do

12 with that bonus calculation sheet that says this

13 is the percent of revenue, this is what we paid

14 midyear?  Have you filled out any of those

15 sheets?

16     A.   No.

17     Q.   Let me see if I can find one so we

18 can talk about it.

19     Do -- to become a broker, do you have

20 to have a particular amount of revenue?  Like to

21 not -- to no longer be an associate broker, to be

22 a broker, do you have to have --

23     A.   I'm not aware of a threshold.

Page 130

1      Q.   Okay.  Do you recall at what point in

2  your employment with CRC that you passed five

3  hundred thousand in revenue?

4      A.   It's been a minute.  I can't say the

5  exact year.

6      Q.   Okay.  If Kathryn says that you had

7  not passed five hundred thousand when she was

8  still employed there in 2019, would you have any

9  reason to dispute that?

10         MS. BARLOTTA:  Object to form.

11     A.   Yes.

12     Q.   Okay.  And how would you --

13     A.   I don't have a reason to dispute

14 whether it was higher or lower than that.  I just

15 have a reason as to why she would know.

16     Q.   Okay.  Is that not information that's

17 maintained in the AIM system?

18         MS. BARLOTTA:  Object to form.

19     A.   Not in AIM.

20     Q.   Okay.  How is it maintained?  Is that

21 just that personal spreadsheet that you were

22 talking about?

23     A.   Well, yeah.  But that's not an

Page 131

1  official spreadsheet.  CRC keeps track of all the

2  numbers, clearly.

3      Q.   Okay.  I want to show you what was

4  previously marked as Plaintiff's Exhibit 23, and

5  it's tee-niny little writing, but that's what we

6  have.  So the second page of that exhibit --

7      A.   Uh-huh (positive response).

8      Q.   -- is the -- like the bonus chart I

9  was talking about.  Have you ever seen anything

10 like that before?

11     A.   I have not seen this document.

12     Q.   Okay.  So you don't currently have

13 any input in completing a bonus chart similar to

14 that?

15     A.   No.

16     Q.   Okay.  And you don't know -- I

17 believe one of those columns is Corey Daugherty's

18 salary that comes off the revenue.  You don't

19 have any knowledge whether your salary comes off

20 of the team revenue?

21         MS. BARLOTTA:  Object to form.

22     A.   I do not know that.  Are you talking

23 about this broker base right here (indicating)?

Page 132

1      Q.   Yeah, the broker base.

2      A.   I don't know.

3      Q.   Who is Mandy Pender?

4      A.   A colleague.

5      Q.   Like what's her position?

6      A.   I don't know.  I think she's an

7  account executive.

8      Q.   But she's not on Team Daugherty,

9  right?

10     A.   No.

11     Q.   In Plaintiff's Exhibit 50 that we had

12 earlier --

13     A.   Yes.

14     Q.   -- in the schedule for Tiffany, you

15 had her spending a day with Mandy Pender.  Why

16 would Tiffany need to spend a day with Mandy

17 Pender?

18     A.   She was hired for a similar role, but

19 she and Mandy used to work together.  So I

20 thought that their knowledge would transfer over

21 well.  And so I thought it would be a good idea.

22 I knew that they were previous colleagues.

23     Q.   Okay.  And then down on the week

Page 133

1  three, like the last day with her:  Sit with me
2  to discuss 2018 goals and team objectives.  Do
3  you see that?
4     A.  Yes.
5     Q.  Did you have that discussion with her
6  at the end of that week?
7     A.  Yeah.
8     Q.  And during that discussion, did you
9  speak with her at all about Kathryn's role as an
10 inside broker on the team?
11    A.  I don't know.  Probably.
12    Q.  So you don't have any recollection of
13 --
14    A.  No.
15       MS. BARLOTTA:  Object to form.
16    Q.  Did you take any notes during that
17 meeting?
18    A.  I'm sure I did.
19    Q.  Okay.  Do you have those notes?
20    A.  No, I'm sure I don't.
21    Q.  Do you know if Tiffany took notes
22 during that meeting?
23    A.  I'm sure she did.

Page 134

1     Q.  But you don't know if she has those
2  notes?
3     A.  I would have no way of knowing that.
4     Q.  Why don't we take a little break just
5  to get you a refill and a breather.
6        VIDEOGRAPHER:  All right.  We are
7  going off the record.  The time is 11:41.
8        (Whereupon, a brief recess was
9  taken.)
10       VIDEOGRAPHER:  We are back on the
11 record.  It is 11:54.
12    Q.  (BY MR. PALMER:)  We are back on the
13 record after a short break.  Is there anything
14 you need to change about your testimony so far?
15    A.  No.
16    Q.  And I may have already asked you
17 this, but I'm just cleaning up my notes here.
18 How many times did you offer to lower your bonus
19 to increase Kathryn's bonus?
20       MS. BARLOTTA:  Object to form.
21    A.  I don't know.
22    Q.  Okay.  Would you recall any
23 particular years that you did that?

Page 135

1     A.  No.
2     Q.  Okay.  How is your bonus calculated?
3        MS. BARLOTTA:  Currently, at present?
4     Q.  When -- so 2015 to '19, how was your
5  bonus calculated?
6        MS. BARLOTTA:  Object to form.
7     A.  It starts with based on production,
8  revenue allocation, but Corey has also mentioned
9  to me that he takes more things into
10 consideration.  I can't define those on his
11 behalf.
12    Q.  Okay.  And when you say it starts
13 with revenue, is that your revenue or the team's
14 revenue?
15       MS. BARLOTTA:  Object to form.
16    A.  Mine.
17    Q.  Okay.  So would Corey then be aware
18 of your specific revenue?
19    A.  Yes.
20    Q.  Okay.  The bonus sheet that I showed
21 you, which was Plaintiff's Exhibit -- way -- that
22 one, yeah, way back there, which is --
23    A.  23.

Page 136

1     Q.  -- Plaintiff's Exhibit 23, have you
2  ever seen those worksheets before?
3        MS. BARLOTTA:  Object to form.
4     A.  Yes.
5     Q.  Okay.  Did you have anything to do
6  with filling out those worksheets?
7     A.  No.  I've only seen this one time.
8     Q.  Okay.  When did you see that?
9     A.  Last week, last week.
10    Q.  Do the numbers represented in
11 Plaintiff's Exhibit 23 represent what you
12 understood the bonuses for team members to be?
13       MS. BARLOTTA:  Object to form.
14    A.  What -- I'm sorry?
15    Q.  That's okay.  Let me ask it this way.
16    A.  Sorry.
17    Q.  So when -- you had discussions with
18 Corey about the team's bonuses, correct?
19    A.  Some of the team members.
20    Q.  Okay.  And so do the bonuses on that
21 document reflect what you understood you and
22 Corey would agree the team members needed to be
23 paid?

Page 137

1          MS. BARLOTTA:  Object to form.
2      A.   The team members that we discussed,
3  yes, but I'm confused about -- I'm confused
4  about --
5      Q.   Which one?
6      A.   February 2019.
7      Q.   Okay.  What's confusing about
8  February of 2019?
9      A.   You've got to clarify the handwritten
10  stuff.
11      Q.   Okay.  So as far as -- are you saying
12  that you're not sure why it's handwritten?
13      A.   They're not -- they're not all lined
14  up right, I guess.
15      Q.   Okay.  Meaning they're not in a line
16  with the one next to them?
17      A.   Yeah.  Hang on a second.  Okay.  Got
18  it.
19      Q.   Okay.
20      A.   I'm ready.
21      Q.   I'm just asking is there any --
22      A.   Yeah, this is what I understood the
23  bonuses to be.

Page 138

1      Q.   Okay.  So as you knew it while
2  Kathryn was working there, you understood her
3  bonuses to be --
4      A.   That's right.
5      Q.   -- significantly less than Andrea --
6          MS. BARLOTTA:  Object to form.
7      A.   Except --
8          MS. BARLOTTA:  Object to the form.
9  So you're talking over each other a little bit.
10  So you need to let her finish her question and
11  then give me a chance to object and then you
12  start your response.
13          THE WITNESS:  Yes, ma'am.
14          MS. BARLOTTA:  Why don't you restart?
15  I don't know where we were on that.
16      Q.   (BY MS. PALMER:)  So the numbers
17  represented in Plaintiff's Exhibit 23, you said
18  that those were what you understood the team
19  member bonuses to be; is that right?
20          MS. BARLOTTA:  Object to form.
21      A.   Some of the team members.
22      Q.   Okay.  Explain that to me.
23      A.   Like I said earlier, I did not know

Page 139

1  the exact numbers of Andrea and Yvette.
2      Q.   Okay.  If you had known the numbers
3  of Andrea and Yvette, would that have caused you
4  to push for more for the other team members?
5          MS. BARLOTTA:  Object to form.
6      A.   Probably not.
7      Q.   Do you think that Kathryn did just as
8  much work as Andrea and Yvette?
9          MS. BARLOTTA:  Object to form.
10      A.   I can't say that.
11      Q.   Do you think Kathryn was just as
12  vital a team member as Andrea and Yvette?
13          MS. BARLOTTA:  Object to form.
14      A.   No.
15      Q.   Okay.  Why do you say that?
16      A.   Experience, tenure.
17      Q.   But Andrea and Yvette are not inside
18  brokers, right?
19          MS. BARLOTTA:  Object to form.
20      A.   Right.
21      Q.   And so inside broker should be
22  directly linked to the team's revenue, right?
23          MS. BARLOTTA:  Object to form.

Page 140

1      A.   Possibly.
2      Q.   So -- but the purpose of a broker is
3  to drive revenue, right?
4          MS. BARLOTTA:  Object to form.
5      A.   Well, yes, but it --
6      Q.   And does that matter if it's an
7  inside broker, an associate broker, or a broker?
8      A.   It all matters.
9      Q.   Okay.
10      A.   But each team operates a little
11  different.  So I -- inside broker was new to our
12  team as well.  We had never had one before.
13      Q.   Okay.  But Kathryn wasn't new to the
14  team, right?
15      A.   No.  She had been there since 2015,
16  like you said.  '14, '15?  I can't remember.
17      Q.   Yeah, somewhere around there.  I was
18  thinking she had told me I was wrong earlier.
19          So when you had the meeting with
20  Corey about bonuses, you said you may have taken
21  notes, and you would have shredded them; is that
22  right?
23          MS. BARLOTTA:  Object to form.

Page 141

1    A.   Yeah.  Yes.

2    Q.   Did you often shred notes?

3    A.   No, that was just me writing down

4    stuff at the time and then --

5    Q.   What types of things would you write

6    down?

7    A.   Like --

8        MS. BARLOTTA:  Object to form.

9    A.   -- what my bonus was and what it was

10   compared to six months prior.

11   Q.   Okay.  Would you take down any notes

12   related to the work performance of the team that

13   you discussed?

14       MS. BARLOTTA:  Object to form.

15   A.   Let me clarify.  When you said notes

16   for bonuses, did I ever take any notes during

17   bonuses, the bonus time discussions, right,

18   that's just for conversation purposes between

19   Corey and me to compare how that bonus is

20   compared to the year prior.  That's the type of

21   notes that I would take.  And then I would shred

22   that, because it's irrelevant after that

23   conversation.

Page 142

1    Q.   Okay.  And so are you talking about

2    just as it related to your bonus or would you

3    take notes related to the other team members?

4        MS. BARLOTTA:  Object to form.

5    A.   I can't say that I wrote down notes

6    for other team members as far as specific

7    numbers.

8    Q.   Who did you tell that you would

9    decrease your bonus to increase Kathryn's bonus?

10       MS. BARLOTTA:  Object to form.

11   A.   I don't really -- yeah, let me

12   clarify something.  I don't know that -- Corey

13   Daugherty and I are the only two people that talk

14   about bonuses, about my bonus or anybody else on

15   the team's bonus.

16       And Corey would tell me what he's

17   thinking with the bonuses, and I would more or

18   less agree and then would just say, offer, Hey,

19   does it matter if I go up or down impacting other

20   people, and the response more or less is, Hey,

21   I've taken all that.  So I would just leave that

22   alone at that point.

23   Q.   Did you ever have a discussion with

Page 143

1    Kat about her desires to do more for CRC?

2    A.   Yes.

3        MS. BARLOTTA:  Object to the form.

4    Q.   And tell me about those discussions.

5        MS. BARLOTTA:  Object to form.

6    Q.   Let me ask it this way:  Did Kathryn

7    ever tell you she wanted to make more money?

8        MS. BARLOTTA:  Object to form.

9    A.   I can't say it was put that way.

10   Q.   Okay.  How was it put?

11   A.   She expressed a desire to grow and

12   evolve her career, take on some more

13   responsibility, a desire to -- to be an inside

14   broker, but I can't say that she said, Hey, I

15   just want to make more money, you know.  I think

16   we both probably assumed that was part of it.

17   Q.   Did you understand the desire to have

18   career growth as the desire to also increase her

19   revenue?

20       MS. BARLOTTA:  Object to form.

21   A.   Yes.  We had discussions about her

22   career growth in terms of, you know, she wanted

23   to go get -- go out and get business, have

Page 144

1    clients of her own, bring in clients.  All that

2    was a possibility and part of the conversations.

3    Q.   Right.  And to do that -- would doing

4    that lead to an increase in her bonus?

5        MS. BARLOTTA:  Object to form.

6    A.   If she went out and got business and

7    brought business in that increased the revenue

8    for the team, would that impact her bonus?

9    Q.   Yes.

10   A.   Yes.

11   Q.   What other conversations did you have

12   with Kathryn about wanting -- her wanting to do

13   more for CRC?

14       MS. BARLOTTA:  Object to form.

15   A.   Yeah, you're going to have to be more

16   specific.

17   Q.   Yeah.

18   A.   Kathryn and I worked together, and so

19   we talked about work, and so --

20   Q.   Right.  So did Kathryn ever tell you

21   that she felt like she was just doing secretarial

22   duties and that she wanted to do more broker

23   duties?

Page 145

1        MS. BARLOTTA: Object to form.
2    **A.   I don't know that she used the term**
3    **secretarial duties, because I don't know what**
4    **that means on a production team.**
5        Q.   Okay.  So did she ever tell you that
6    she wanted to do more broker duties?
7    **A.   Yes.**
8        Q.   Okay.  And in what context did she
9    tell you that?
10   **A.   She expressed desire to do that, and**
11   **so then we talked about it, and we also talked**
12   **with Corey Daugherty about it and kind of agreed**
13   **that that sounds good.  Let's try to -- let's**
14   **take on that path of growth and see where it**
15   **leads us.**
16       Q.   Okay.  And do you recall Kathryn ever
17   telling you that she was having difficulty with
18   that because she was managing so many accounts?
19       MS. BARLOTTA: Object to form.
20       Q.   The same way that an account
21   executive would?
22       MS. BARLOTTA: Object to form.
23   **A.   Yes.**

Page 146

1        Q.   Okay.  And how many times do you
2    recall Kathryn having that conversation with you?
3    **A.   I don't know the answer to that.**
4        Q.   Did you provide Kathryn any direction
5    about how to handle the number of accounts she
6    was managing as an account executive and also
7    grow her broker duties?
8        MS. BARLOTTA: Object to form.
9    **A.   Gosh, that is a really broad**
10   **question.  What's the question?**
11       Q.   Let's back up.  Let's talk about
12   Steele.  So Steele came onto your team as an
13   account executive, right?
14   **A.   Yes.**
15       Q.   And so Steele had a number of
16   accounts that he was responsible for managing the
17   way that an account executive would manage them,
18   right?
19       MS. BARLOTTA: Object to form.
20   **A.   Yes.**
21       Q.   Okay.  So when Steele was placed into
22   the launch program and started drumming up new
23   business, were any of those accounts that he was

Page 147

1    already managing moved off of him onto another
2    account executive?
3        MS. BARLOTTA: Object to form.
4    **A.   No.**
5        Q.   Was anyone else brought in to assist
6    or was anyone else assigned co-responsibilities
7    on any of Steele's accounts to free him up some
8    to allow him to drum up the new business?
9        MS. BARLOTTA: Object to form.
10   **A.   Not for that purpose, no.**
11       Q.   Okay.  For what purpose?
12   **A.   So Amy came on about a year ago, and**
13   **she and Steele co-work on some agency accounts.**
14       Q.   Do you recall --
15   **A.   So some of the new business that**
16   **comes in, they might both work on that account.**
17       Q.   Do you recall Kathryn ever telling
18   you that CRC had not hired a female broker in a
19   large number of years?
20       MS. BARLOTTA: Object to form.
21   **A.   A large number of years?  Sorry.**
22       Q.   Thirteen years?  Does that sound
23   familiar?

Page 148

1        MS. BARLOTTA: Object to form.
2    **A.   I don't know a specific date.  I do**
3    **recall her mentioning female brokers.**
4        Q.   Okay.  And do you recall going to
5    lunch with her at V. Richards to talk about her
6    path -- I'm sorry, V Bistro, Bistro V?
7        MS. BARLOTTA: Object to form.
8    **A.   Yes.**
9        Q.   During that conversation at Bistro V,
10   is that when Kathryn said that CRC has not hired
11   a woman broker in over twelve years?
12       MS. BARLOTTA: Object to form.
13   **A.   I don't remember if she said a**
14   **specific number of years.**
15       Q.   Okay.  But you recall the subject
16   being brought up?
17   **A.   I do.**
18       Q.   Okay.  And what was your response to
19   Kathryn about her concern?
20       MS. BARLOTTA: Object to form.
21   **A.   I recall Kathryn expressing to Corey**
22   **Daugherty and me that there was a lack of or not**
23   **enough female broker representation at CRC.**

Page 149

1    Q.   Okay.  And what was your response to
2  that concern that she raised?
3        MS. BARLOTTA:  Object to form.
4    A.   I'm not sure I had a definitive
5  response.
6    Q.   So that means you didn't -- you don't
7  recall saying anything to her about it?
8        MS. BARLOTTA:  Object to form.
9    A.   I might have said, Okay, that -- I
10  don't know.
11    Q.   Do you recall if you discussed that
12  with Corey Daugherty after Kat was no longer
13  present?
14        MS. BARLOTTA:  Object to form.
15    A.   Which part, the fact that there were
16  no --
17    Q.   Yes, Kathryn's concern about the lack
18  of female brokers.
19        MS. BARLOTTA:  Object to form.
20    A.   Yes, we talked about it.
21    Q.   Okay.  Tell me how you talked about
22  that.
23        MS. BARLOTTA:  Object to form.

Page 150

1    A.   We said Kathryn -- more or less
2  repeated what she said to each other, Kathryn
3  thinks that there's not enough female brokers at
4  CRC.  It was more of just, I guess, regurgitating
5  the conversation.
6    Q.   Did either of you discuss whether you
7  should address that issue with Kathryn?
8        MS. BARLOTTA:  Object to form.
9    A.   No.
10    Q.   Did either of you --
11    A.   We were sitting there at the lunch
12  talking about it, the three of us, when she
13  brought that up.
14    Q.   Right.  And so my question, and we
15  may have gotten twisted around a little bit --
16    A.   Okay.
17    Q.   -- was:  Did the two of you, you and
18  Corey, discuss her concern without her present?
19        MS. BARLOTTA:  Object to form.
20    A.   I mean, not to anything of substance
21  other than acknowledging that this conversation
22  took place, here's what was said.
23    Q.   Okay.  Did either of you address

Page 151

1  Kathryn's concern or point out Kathryn's concern
2  to Rusty Hughes?
3        MS. BARLOTTA:  Object to form.
4    A.   I don't know.
5    Q.   Okay.  Do you recall having a
6  conversation with Rusty Hughes about the amount
7  of female brokers at CRC Birmingham?
8        MS. BARLOTTA:  Object to form.
9    A.   No.
10    Q.   Do you recall having a conversation
11  with John Cadden about the amount of female
12  brokers at CRC Birmingham?
13    A.   No, but can you tell me why -- based
14  on that conversation?
15    Q.   Yeah.
16    A.   As a result of that conversation or
17  just in general?
18    Q.   Right, or at all.  So let's do both.
19  So as a result of Kat raising that concern
20  directly with you and Corey --
21    A.   Okay.  We need to clarify something
22  then, because concern is an interesting word.  I
23  mean, it seems to me like it was an observation.

Page 152

1  It was a statement.  It was an opinion by
2  Kathryn, Here's what I think.  I think there are
3  -- there are not enough female brokers at CRC.
4    Q.   Do you recall her --
5    A.   So I can't call that a concern or a
6  claim or more or less an observation.  I mean,
7  categorize that however you -- I'm not sure how
8  to categorize that.
9    Q.   Do you recall her specifically
10  saying, I can't believe BB&T is letting this
11  happen?
12        MS. BARLOTTA:  Object to form.
13    A.   I can't quote her on that.
14    Q.   Okay.  Does that sound familiar at
15  all?
16        MS. BARLOTTA:  Object to form.
17    A.   I can't say that she said that
18  verbatim.  That sounds like it's related to her
19  comment about there's not enough brokers that are
20  women.
21    Q.   And you sell -- like one of the lines
22  of insurance that you sell is EPL coverage,
23  right?

Page 153

1   A.   Yes.

2   Q.   Okay.  And as a seller of EPL

3   coverage, it's your duty to understand the

4   coverage that you're selling, right?

5        MS. BARLOTTA:  Object to form.

6   A.   Yes.

7   Q.   Yeah.  So do you receive training in

8   what constitutes a complaint of discrimination?

9        MS. BARLOTTA:  Object to form.

10  A.   BB&T, now Truist, has some employee

11  training, you know, webinar things that we have

12  to go through as far as that goes.

13  Q.   But beyond that, as a seller --

14  A.   As a seller.

15  Q.   -- of EPL insurance --

16  A.   Okay.

17  Q.   -- do you have an understanding of

18  what would trigger a possible EPL claim?

19  A.   Yes.

20       MS. BARLOTTA:  Object to form.

21  Q.   And is it your understanding that

22  that would include a complaint of discrimination,

23  depending on the policy?

Page 154

1        MS. BARLOTTA:  Object to form.

2   A.   Yes.

3   Q.   Okay.  And if an employee points out

4   that they believe that females are being treated

5   different than males, is that -- could that be a

6   trigger for an EPL policy?

7        MS. BARLOTTA:  Object to form.

8   Q.   Depending on the policy?

9        MS. BARLOTTA:  Object to form.

10  A.   Being treated differently in what

11  way?

12  Q.   Not being hired --

13  A.   Unfairly?

14  Q.   Not being hired as brokers.

15       MS. BARLOTTA:  Object to form.

16  A.   If someone claimed that that were

17  happening based on their gender, that's possible,

18  depending on the triggers of the policy.

19  Q.   Isn't that exactly what Kat was

20  relaying to you?

21       MS. BARLOTTA:  Object to form.

22  A.   The way I recall the conversation is

23  that Kathryn made a statement that she did not

Page 155

1   think there were enough female brokers at CRC.

2   So I can't say that that's a complaint.

3        I mean, she might not like that or

4   whatever, but it's just an observation as far as

5   we took it.

6   Q.   Okay.  So if Kathryn's version of

7   that conversation is CRC Birmingham has not hired

8   a woman broker in over twelve years, and I can't

9   believe BB&T is allowing this to happen, does

10  that put it more in a complaint category?

11       MS. BARLOTTA:  Complaint for what

12  purposes?  Are we still on EPL policies and

13  whether the --

14  Q.   On Kathryn's statement being a

15  complaint of differential treatment for gender.

16       MS. BARLOTTA:  But on -- for purposes

17  of -- are you talking about for purposes of him

18  making a complaint --

19       MS. PALMER:  His understanding.

20       MS. BARLOTTA:  The start of the line

21  of inquiry started on EPL.

22       MS. PALMER:  Right.  I'm talking

23  about his understanding.

Page 156

1        MS. BARLOTTA:  His understanding as

2   it relates to what would trigger someone --

3   trigger coverage under the policy?

4        MS. PALMER:  No, just his

5   understanding as he was a part of the

6   conversation.

7   A.   Okay.  So that's a good thought,

8   because --

9        MS. BARLOTTA:  I thought we were

10  talking about the coverage.

11  A.   The coverage under the policy, that

12  completely depends on the policy language and

13  what constitutes a trigger of a coverage and

14  knowledge of a claim and all that kind of stuff.

15  Q.   (BY MS. PALMER:)  Right.

16  A.   And I don't -- I have not read CRC's

17  employment practices liability insurance policy,

18  if they have one.

19  Q.   Right.  And I'm not asking you about

20  the specific policy.  I guess it's more of as a

21  seller of those policies, you understand that any

22  number of things, depending on the policy, one

23  through a hundred, could be covered, could

Page 157

1  trigger a policy coverage, depending on the
2  policy?
3      A.   Yeah.  Discrimination is included as
4  a wrongful act under an EPL policy.  Whether or
5  not Kathryn's comments would trigger a claim
6  under that policy, I mean, that's impossible to
7  answer, because the policies just vary in terms
8  of knowledge of a claim, what constitutes -- does
9  a claim have to be in writing, can it be verbal,
10  who has knowledge of a claim.  Could it be any
11  employer or does it have to be, you know, upper
12  management have knowledge of that claim.
13          And, again, most of the EPL policies
14  say it has to be like a written demand.  So just
15  an observation or a statement, however strongly
16  stated, I don't think we could call that a -- we
17  can't categorize that as a complaint.
18      Q.   For purposes of a particular EPL
19  policy?
20      A.   Yeah.
21      Q.   Okay.
22      A.   Sure.
23      Q.   So going back to you guys had this

Page 158

1  lunch at Bistro V.
2      A.   Yes.
3      Q.   Kathryn says what she says.  Did that
4  change the tone of the conversation?  Like what
5  did you guys talk about after that?
6          MS. BARLOTTA:  Object to form.
7      Q.   Let me ask this:  Was that the same
8  conversation where Kathryn presented a -- like a
9  breakdown of agencies to show how much account
10  executive work she was doing?
11          MS. BARLOTTA:  Object to form.
12      A.   No.
13      Q.   Do you know what I'm talking about
14  when I say the breakdown of agencies?
15      A.   Uh-huh (positive response), yes.
16      Q.   And do you remember Kathryn saying,
17  you know, I'm handling this many agencies, and
18  that's just as much as the other account
19  executives, but I'm not an account executive?
20          MS. BARLOTTA:  Object to form.
21      A.   I don't know that it was put that
22  way, but, I mean, we had conversations about
23  agency breakdowns and agency splits.

Page 159

1      Q.   And in those --
2      A.   Often.
3      Q.   Right.  And in those conversations,
4  do you recall Kathryn specifically referencing
5  that she had too much to manage to focus on
6  inside broker duties?
7      A.   Yes, she did say that.
8      Q.   Okay.  After your lunch at Bistro
9  V -- well, first, was the lunch at Bistro V the
10  first time you remember -- V Bistro?
11      A.   Bistro V, yeah, I know what you're
12  talking about.
13      Q.   Was that the first time that you
14  recall Kathryn pointing out the number of female
15  brokers at CRC?
16      A.   No.
17          MS. BARLOTTA:  Object to form.
18      Q.   When is the first time you recall her
19  pointing that out?
20          MS. BARLOTTA:  Object to form.
21      A.   Don't know.
22      Q.   So she did it more than once?
23          MS. BARLOTTA:  Object to form.

Page 160

1      A.   Yes.
2      Q.   Would -- did you follow up on her
3  concern at all?  Like did you ask her, What do
4  you mean by this?
5          MS. BARLOTTA:  Object to form.
6      A.   Yes.
7      Q.   Okay.  And what did she say?
8      A.   I don't remember.
9      Q.   Okay.  Did you talk about --
10      A.   I think it's more of like, Hey, there
11  is not enough female brokers.  Okay.  And then
12  she said that again or -- I mean, I don't know
13  that there's anything more to be said than that.
14  I do remember her expressing that.
15      Q.   After she expressed that, is that
16  when she became an inside broker?
17          MS. BARLOTTA:  Object to form.
18      A.   After -- she became an inside broker
19  after she expressed that, but that's not why she
20  became an inside broker.
21      Q.   Okay.  Why did she become an inside
22  broker?
23      A.   She became an inside broker because

Page 161

1  of her expressing her desire to grow and elevate
2  herself in her career, and capabilities that she
3  had shown and potential that she had shown.
4        We don't promote people based on
5  gender or her statement about there shouldn't be
6  -- there should be more female brokers.  That
7  would be discrimination to promote her based on
8  her gender.
9        Q.   So the move from an AE to an inside
10 broker is a promotion?
11       A.   It -- I guess depending on what team
12 you're on, it could be considered that.  The
13 intent in our situation was to encourage and
14 create a path.  An avenue that she expressed she
15 wanted to take was moving toward more
16 responsibility and broker type roles as an inside
17 broker.
18       Q.   Did you ever ask her if she wanted to
19 be an associate broker?
20       MS. BARLOTTA:  Object to form.
21       A.   I don't know that I asked her that
22 specifically, but we had conversations, and she
23 did not express the desire to be on the road to

Page 162

1  create her own book of business.
2        Q.   What would that desire -- like what
3  would it require for her to say?
4        A.   Hey, I want to be on the road.  I
5  want to go out and get my own business.
6        Q.   Okay.  Would it surprise you to learn
7  that there is an e-mail where Corey Daugherty is
8  telling her to be on the road?
9        MS. BARLOTTA:  Object to form.
10       A.   No, it would not surprise me.
11       Q.   Okay.  Why would that not surprise
12 you?
13       A.   Because I think that Corey -- it
14 would not surprise me for Corey to tell Kathryn
15 that she has full support and freedom and
16 encouragement to go get business if that's what
17 she would like to do.
18       Q.   Okay.  Did Kathryn ever say she
19 didn't want to be on the road?
20       MS. BARLOTTA:  Object to form.
21       Q.   To you?
22       A.   Gosh.  I don't think so.
23       Q.   Is that something that was just

Page 163

1  assumed?
2        MS. BARLOTTA:  Object to form.
3        A.   Okay.  So I think that when Kathryn
4  moved to inside broker, it was my understanding
5  that this was a progression in her career, and
6  that could continue to develop even more so in a
7  production role or not.  But it's just opening up
8  avenues to more and more of a production-type
9  role if she so desired.
10       So I think it was sort of open-ended
11 in terms of I don't know exactly where she wanted
12 it to go.  We just knew she expressed the desire
13 to grow and to become -- to progress her career.
14       Q.   Okay.  And so when you told her or
15 Corey told her that she had the full support to
16 grow --
17       A.   Uh-huh (positive response).
18       Q.   -- what is that support?  What does
19 that look like?
20       MS. BARLOTTA:  Object to form.
21       A.   Well, I think what I was referring to
22 with Corey was just saying that you can go travel
23 and get business.  Like we're not -- he wasn't

Page 164

1  going to restrict her.  Like if she said, I want
2  to go see this agency, he wasn't going to say,
3  No, you can't do that or -- that's what I mean,
4  just sort of autonomy and free rein to go create
5  that business.
6        Q.   So if she were out creating that
7  business, who would be managing the number of
8  accounts that she had the account executive
9  duties for?
10       MS. BARLOTTA:  Object to form.
11       A.   Andrea and Yvette.
12       Q.   And how --
13       A.   While she would be on the road.
14       Q.   So was that expressed to her, was
15 that expressed to Kat that if she went on the
16 road, her agencies would be at least temporarily
17 reassigned to Andrea and Yvette?
18       MS. BARLOTTA:  Object to form.
19       A.   A lot of people on our team travel,
20 including Kathryn, whether it be at a conference
21 or an agency visit.  And while you're out of the
22 office, other team members will step in and
23 service the account on your behalf in your

Page 165

1  absence.
2        Now, for me personally, that happens
3  both ways.  Team members will help me while I'm
4  on the road, on an airplane, and then when I
5  land, I get on a laptop.
6        So maybe rephrase your question or
7  ask me again, and I'll try better -- I'll try to
8  do better.
9     Q.   I guess I'm just trying to figure out
10  if Kathryn's job duties are substantially -- let
11  me ask it this way:  After Kathryn became an
12  inside broker, was there a substantial change to
13  her job duties?
14        MS. BARLOTTA:  Object to form.
15     A.   There were substantial changes.
16     Q.   Okay.  Explain those.
17     A.   The changes that I know of and are
18  aware of is that Kathryn and I gradually shifted
19  agencies to -- well, we hired Tiffany Sanders
20  around that same time or shortly thereafter.  I'm
21  not exactly sure.
22        And so we shifted a lot of agencies
23  gradually and progressively to Tiffany, and then

Page 166

1  I worked with Kathryn progressively less as time
2  went on, and she was working more with Andrea and
3  Yvette as far as I know.
4     Q.   Okay.  How slow was this progression?
5     A.   You mean how fast?
6     Q.   Sure.  How fast?
7     A.   It was gradual.  So as certain
8  renewals and certain agencies would come up,
9  Tiffany came on board, and she would just take on
10  more responsibility as Tiffany's progress and
11  experience progressed.
12     Q.   Was Tiffany a -- when you hired
13  Tiffany to Team Daugherty, was she new to the
14  insurance business?
15     A.   No.
16     Q.   Okay.  What had she done before?
17     A.   She was with a carrier called
18  ProAssurance.
19     Q.   Okay.
20     A.   An insurance carrier.
21     Q.   So she would have been familiar then
22  with the forms?
23     A.   Some coverages.  So she did mostly

Page 167

1  healthcare.  She didn't have a lot of experience
2  with cyber or D&O or EPL.
3     Q.   When Tiffany was added to the team
4  and some of those agents were reassigned to her,
5  did you work with Corey Daugherty to figure out
6  what agents that would be like to figure out how
7  that split would shake out?
8        MS. BARLOTTA:  Object to form.
9     A.   Yes.
10     Q.   I guess who made the decision to
11  reassign particular agencies?
12     A.   Corey, me, Kathryn, and Tiffany.
13        MS. BARLOTTA:  Can we break just a
14  minute here?  I think we've noticed John for
15  1:00, so how much longer do you think you're
16  going to be with him so I can maybe tell him that
17  he doesn't need to be down here sitting around
18  for hours?
19        MS. PALMER:  Maybe an hour.
20        VIDEOGRAPHER:  We are going off the
21  record.  The time is 12:32.
22        (Whereupon, a brief recess was
23  taken.)

Page 168

1        VIDEOGRAPHER:  We are back on the
2  record.  It is 12:33.
3     Q.   (BY MS. PALMER:)  Did you ever talk
4  to HR about Kathryn Hendrix?
5     A.   No.
6     Q.   How did you determine as renewals
7  came across which ones would be reassigned to
8  Tiffany?
9     A.   Tiffany's learning curve, her
10  workload.  Those are a couple of the categories I
11  would consider.
12     Q.   Let me show you Plaintiff's Exhibit
13  51.
14        (Whereupon, Plaintiff's Exhibit No.
15  51 was marked for identification and a copy of
16  same is attached hereto.)
17     Q.   Take a minute and read over that
18  e-mail for me, please, and I've got a few
19  questions for you.
20     A.   Do you want me to read all this?
21     Q.   Yeah, I think it's just the two
22  pages.
23     A.   (Witness complies.)  Okay.

Page 169

1    Q.   So first I want to ask you, this
2  e-mail is dated May 4, 2018.
3    A.   Uh-huh (positive response).
4    Q.   Would you agree with me that Kathryn
5  had been an inside broker for about seven months
6  at that time?
7    A.   You've got to tell me when she became
8  an inside broker.
9    Q.   Like November of '17.  Does that
10 sound right?
11       MS. BARLOTTA:  Object to form.
12   A.   Okay.  That sounds about right.
13   Q.   So roughly she had been a broker for
14 over half a year.
15       MS. BARLOTTA:  Object to form.
16   Q.   Is that right?  Would you agree with
17 me that by May of 2018, she had been a broker
18 for -- an inside broker for at least six months?
19       MS. BARLOTTA:  Object to form.
20   A.   I can't say that.
21       MS. BARLOTTA:  She's --
22   A.   But I can't say that.
23   Q.   That's okay.  Let's put it in this

Page 170

1  context.
2    A.   Because I don't know.
3        MS. BARLOTTA:  Her paperwork says
4  something different, Leslie.
5    Q.   When did you hire Tiffany Sanders?
6    A.   January 2018.
7    Q.   Okay.  And when you hired Tiffany
8  Sanders, was Kathryn Hendrix an inside broker?
9        MS. BARLOTTA:  Object to form.
10   A.   I don't know that either, but if you
11 --
12   Q.   Okay.  That's fine.
13   A.   But I guess if you know when she
14 became an inside broker.
15       MS. BARLOTTA:  Well, she's going
16 based upon what Kathryn Hendrix's testimony is,
17 and so I don't -- that's what Kathryn says.
18 Their documents, I think, may have a different --
19       MS. PALMER:  We have documents with
20 multiple dates.
21       MS. BARLOTTA:  I'm just saying she is
22 presenting that to you as an undisputed fact.
23 It's not an undisputed issue in the case.

Page 171

1    A.   Okay.  That's why I don't know.
2        MS. BARLOTTA:  So unless you have
3  personal knowledge of when it was, then the
4  answer is I don't know.
5    A.   I don't know.
6    Q.   (BY MS. PALMER:)  That's fine.  If
7  Kathryn Hendrix signed her noncompete in November
8  of 2017, is November of 2017 when she would have
9  been an inside broker?
10       MS. BARLOTTA:  Object to form.
11   Q.   Or do you have any knowledge of that?
12   A.   I have no idea.
13   Q.   Okay.  So this -- did you provide
14 this e-mail?
15   A.   Which one?
16   Q.   That we're talking about, <mark>Exhibit 51</mark>.
17   A.   The e-mail from Kathryn, I did not
18 provide.  The e-mail from me to Kathryn, I did.
19   Q.   Okay.  And by provide, I mean --
20   A.   Type and write.
21   Q.   -- not type, but like produce in this
22 lawsuit?
23   A.   No.

Page 172

1    Q.   Okay.  Do you know who did?
2    A.   No.
3    Q.   Okay.  So you have not searched your
4  e-mails?
5    A.   No.
6    Q.   Okay.
7    A.   Sorry.  I thought you meant authored
8  the e-mail.
9    Q.   Yeah.  That's why we clarified it.
10       Okay.  So this is an e-mail where you
11 guys are talking.  Are you guys talking about
12 like plans for the team moving forward?
13   A.   Clearly.
14   Q.   Okay.  And so the first e-mail is
15 from you, May 3rd.
16   A.   Yes.
17   Q.   Because it goes backwards.  We've had
18 a little back and forth about Kat, Kathryn.  Is
19 there any particular -- like did you call her Kat
20 or Kathryn or both?
21   A.   What?
22   Q.   I call her both, so --
23   A.   Yeah.

Page 173

1    Q.   I just didn't know, because I've seen
2  some e-mails where you called her Kat, and then
3  this one called her Kathryn.  So I didn't know if
4  it was because this was supposed to be like a
5  more professional --
6    A.   I called her Kathryn and Kat.
7    Q.   Okay.
8    A.   And interchangeably.
9    Q.   Okay.
10    A.   Sorry.  That's an interesting
11  question.  She went by both.
12    Q.   The longer it is, the more confusing
13  I get.
14    A.   Okay.
15    Q.   So your second sentence there, I
16  guess technically third sentence in the middle of
17  your paragraph says:  We certainly want to make
18  sure we appropriately nurture retail
19  relationships, old and new.
20    A.   Yes.
21    Q.   Okay.  And so as Kathryn is an inside
22  broker, would it be her job to be nurturing the
23  old relationships or both old and new?

Page 174

1        MS. BARLOTTA:  Object to form.
2    A.   Both.
3    Q.   Okay.  And then you said you want to
4  keep Tiffany focused on the right things.  She
5  was brought on board to support my agents.  Did
6  Tiffany have any of Corey's agents?
7    A.   I don't think so at the time of that
8  e-mail, but that -- she gradually did and does.
9    Q.   Okay.  And before Tiffany came on
10  board to support your agents, who was supporting
11  your agents?
12    A.   Kathryn and Andrea.
13    Q.   Okay.  Do you have any idea of the
14  breakdown of that, like if they were fifty/fifty
15  or --
16    A.   I don't, but that was gradual in the
17  same way that this gradual shift from Kathryn to
18  Tiffany -- similar in a way, because before
19  Kathryn came on, it was Yvette and Andrea, mainly
20  Andrea, and then kind of shifted to Kathryn.  And
21  then when we bring on Tiffany, it shifts to
22  Tiffany.  Similar approach.
23    Q.   Okay.  And as Tiffany came on and

Page 175

1  things shifted to Tiffany, did any of your agents
2  remain with Kathryn?
3        MS. BARLOTTA:  Object to form.
4    Q.   Like was she still managing some of
5  your agencies?
6    A.   Yes, yeah.  Like I was saying, it was
7  a gradual -- so yes, yes.
8    Q.   Okay.  So in let's say 2000 -- summer
9  of 2019, was Kathryn still managing some of your
10  agents?
11    A.   I can't say for certain.  I mean,
12  probably a little bit, but the first half of that
13  year was continually gradual transition.
14    Q.   Okay.  The second page there, your
15  last -- second to the last sentence of the first
16  paragraph, you're talking about the new business
17  flow, and then you name a few agencies.
18        Are those agencies new agencies or
19  was it a new business flow from existing
20  agencies?
21        MS. BARLOTTA:  Object to form.
22    A.   Sorry.  Point me to the sentence.
23    Q.   That's okay.  So the first paragraph,

Page 176

1  second to the last sentence.
2    A.   Oh, yeah.  Okay.
3    Q.   So we're talking about --
4    A.   Yep.
5    Q.   -- Lanier, Towne --
6    A.   Yeah.
7    Q.   You're talking about a new business
8  flow, and I'm just wondering if those are --
9    A.   (Witness reading documents.)  Okay.
10  So J. Smith Lanier, Towne, Post.  It says
11  Dougherty Minneapolis, but that's supposed to say
12  Lockton.
13        THE REPORTER:  Say that again.  I'm
14  sorry.
15        MS. PALMER:  Dougherty --
16    A.   Clearly that -- yeah, that --
17        MS. PALMER:  Dougherty Minneapolis.
18    A.   Lockton, yeah.  So Assured Colorado,
19  we only had a couple of accounts that were new,
20  previous twelve months.  So that one is supposed
21  to be really focused on new business.  J. Smith
22  Lanier, we had some accounts in Huntsville, but I
23  wanted to grow that.  Same thing with Towne.

Page 177

1    All of them had some existing
2 business, but those were some growth
3 opportunities for some new business as well.
4    Q.   And that's exactly what I was looking
5 for.  So those were existing agencies with growth
6 opportunity, right?
7    A.   Yes.
8    Q.   And growth opportunity with existing
9 agents is what an inside broker is for, right?
10    MS. BARLOTTA:  Object to form.
11    A.   I mean, it could be.
12    Q.   Okay.  Your last -- second to the
13 last sentence on the last paragraph says:  We
14 could put our heads together to approach and
15 seize this opportunity.
16    You're talking about Willis, I think.
17 Did you guys do that?  Did you put your heads
18 together to figure out a plan to approach Willis?
19    A.   Yeah, we talked about Willis.
20    Q.   Was Willis a new agency or new
21 business from an existing agency?
22    A.   I would say a new business from an
23 existing agency, but there were only a couple of

Page 178

1 accounts that were on the books, and
2 Willis-Chicago was kind of a target that would be
3 nice to kind of go after.
4    Q.   Okay.
5    A.   And try to get some more business,
6 because we knew that they wrote some big
7 business.
8    Q.   Yeah.
9    A.   Corey had a couple of big accounts,
10 and we're like, Let's get some more.
11    Q.   So who -- what was the plan you came
12 up with to get more business from Willis-Chicago?
13    MS. BARLOTTA:  Object to form.
14    Q.   I guess let me ask it this way:  What
15 responsibility, if any, did Kathryn have as
16 related to Willis-Chicago?
17    MS. BARLOTTA:  Object to form.
18    A.   Willis-Chicago, I believe, was one
19 that, again, Corey had some accounts with them,
20 but we knew there was a lot more there.  Kathryn
21 had worked on some of those accounts and, I
22 think, gotten to know them a little bit and
23 just -- we just wanted to try to get more.

Page 179

1    But that was not necessarily my
2 responsibility, you know, so I think Corey and
3 Kathryn really, for the most part, kind of took
4 that on.  So I don't know what they ended up
5 coming up with.
6    Q.   Okay.  And in this e-mail, you're
7 talking about making decisions which related to
8 the business flow.  Is this something you
9 discussed with Corey Daugherty?
10    A.   Yes.
11    Q.   Okay.  And when you discussed that
12 with Corey Daugherty, did you let him know that
13 Kathryn had specific concerns related to the flow
14 or ideas related to the flow?
15    MS. BARLOTTA:  Object to form.
16    A.   Yes.  So -- and all that aligns with
17 what I was saying with the gradual shift.
18    Q.   Okay.
19    A.   And so Corey Daugherty was aware of
20 that and aware of the intention and the plans to
21 move that business and responsibilities to
22 Tiffany.
23    Q.   Was there -- was there a goal to

Page 180

1 achieve that move, this gradual --
2    A.   A deadline?
3    Q.   Not a deadline, but a goal.
4    A.   I don't know the difference.
5    Q.   Okay.  So as Tiffany is taking on
6 more, taking things off of Kathryn --
7    A.   Uh-huh (positive response).
8    Q.   -- is there some date in mind where
9 Kathryn will be operating as an inside broker
10 with no specific assigned accounts to manage?
11    MS. BARLOTTA:  Object to form.
12    A.   No.  I had not set a deadline in
13 terms of a date, but I was consciously and
14 intentionally and deliberately shifting those
15 responsibilities from Kathryn to Tiffany.
16    Q.   Okay.  Did you ever discuss with
17 Kathryn that it was a work in progress, but it
18 would take time?
19    MS. BARLOTTA:  Object to form.
20    A.   This e-mail clearly says that.
21    Q.   Okay.  So this is how you would
22 communicate to --
23    A.   No, I'm not saying this is the extent

Page 181

1   of it.
2        Q.   Right.
3        A.   But it says that.
4        Q.   Okay.
5        A.   I mean, you know, focus on the right
6   things at the right time, and in just three
7   months, she's doing this.  We've got new business
8   coming.  I mean, so you've got to tell me if I'm
9   missing something in the e-mail.
10       Q.   No, I was just wondering if there was
11  like a specific conversation where you said,
12  Look, we're really working on it, you know, give
13  us time.
14       A.   Yeah.  Yes, those conversations
15  happened.
16       Q.   Like regularly?
17       A.   I wouldn't -- I don't know how to
18  define that.
19       Q.   Okay.
20       A.   At least once, and then, I guess,
21  this e-mail more or less supports it.  But yes,
22  Kathryn and I talked about that.
23       Q.   So the at least once that you recall,

Page 182

1   was it before this e-mail and this e-mail is
2   memorializing that or was there another
3   conversation?
4        MS. BARLOTTA:  Object to form.
5        A.   I can't -- I mean, I can't say that.
6   I'm just saying that this e-mail reflects what I
7   am saying right now.  I don't know the timing of
8   that and if conversations were before or after or
9   during or both.
10       Q.   Did you provide her any advice at
11  this time about how to grow her individual --
12  like her personal growth?
13       MS. BARLOTTA:  Object to form.
14       A.   I mean, the only way to grow a book
15  is to go visit agents, and I'm sure we discussed
16  that.
17       Q.   Does anything stand out to you like
18  that you remember?
19       A.   No.
20       Q.   Would you have taken any notes?
21       A.   No.
22       Q.   Lawyers like to ask about notes.
23       A.   Yeah.  A conversation like that,

Page 183

1   that's more or less just strategizing with a
2   colleague, and I was not taking notes on that.
3        Q.   Who has Willis or who took over
4   Willis in 2018 as an account executive?
5        MS. BARLOTTA:  Object to form.
6        A.   I don't know.  Tiffany works with
7   them now.
8        Q.   Okay.  And you're not sure of when
9   she would have taken over as the AE?
10       A.   I don't know the exact timing of that
11  transition.
12       Q.   Who gets the revenue credited to them
13  for Willis-Chicago?
14       A.   Corey Daugherty.
15       Q.   Okay.  Is that part of -- like do you
16  receive any credit for that as part of like your
17  bonus calculation?
18       MS. BARLOTTA:  Object to form.
19       Q.   Do you do work on Willis?
20       MS. BARLOTTA:  Object to form.
21       A.   I do not.
22       Q.   Plaintiff's Exhibit 52.
23       (Whereupon, Plaintiff's Exhibit No.

Page 184

1   52 was marked for identification and a copy of
2   same is attached hereto.)
3        Q.   So I just want to ask about
4   Plaintiff's Exhibit 52.  Let me know when you've
5   had a chance to look over it.
6        A.   (Witness complies.)  All right.
7        Q.   Okay.  So my question about
8   Plaintiff's Exhibit 52 is:  Kathryn says it looks
9   like Trey's team cleared the submission.
10       A.   Uh-huh (positive response).
11       Q.   Is that Trey McClure -- Trey Reich?
12  Lee McClure.
13       A.   Probably not.
14       Q.   Okay.  Do you have any idea who
15  Trey --
16       A.   Trey Nelson.
17       Q.   Nelson.  Okay.  Who is Trey Nelson?
18       A.   He's a property broker.
19       Q.   Okay.  So clearly the submission in
20  AIM, is this -- like is this a submission that
21  was submitted to two different teams at CRC?
22       A.   Yeah, it looks like this accord app
23  was sent to me, but I was just double checking

Page 185

1  with Kat about -- because we just renewed the
2  cyber, but this is for an RSUI 10/1 renewal, and
3  it made me think that it was for property, and we
4  don't control -- our team does not control a
5  property placement, but Trey Nelson's team does
6  for that Mississippi school system.
7      Q.  Okay.  So you were just assigning to
8  Kat to check out and see if this is the property
9  issue?
10         MS. BARLOTTA:  Object to form.
11     Q.  Is that what's happening here?
12         MS. BARLOTTA:  Object to form.
13     A.  Yeah, so we just renewed a March
14  cyber account on Madison County schools, and I
15  think -- it looks like I was just making sure
16  that didn't -- this accord app didn't have
17  anything to do with that.
18         And I noticed that Trey Nelson had
19  entered something for this account for property,
20  and it probably needed to go to them, but I just
21  didn't want to miss anything, because I knew we
22  had recently renewed the cyber.
23     Q.  Was Madison County schools eventually

Page 186

1  moved off of Kathryn?
2         MS. BARLOTTA:  Object to form.
3      A.  Yes.  Madison County schools is part
4  of the Mississippi school system, and most of
5  those are effective July 1, and Tiffany -- the
6  management of the Mississippi schools were
7  shifted to Tiffany.
8      Q.  Is -- was Madison County schools one
9  of the accounts that was identified as a
10  potential growth option -- growth opportunity?
11  I'm sorry.
12         MS. BARLOTTA:  Object to form.
13     A.  From the previous e-mails we talked
14  about?
15     Q.  No, just in general.  Do you recall
16  Madison County being one that --
17     A.  Not really.  I mean, we had written
18  the D&O and the EPL, the educators' E&O for many
19  years on Madison County.  We did sell them some
20  cyber.  They were one of the few schools that
21  purchased the cyber, but beyond the cyber and the
22  D&O and EPL, there really wasn't a growth
23  opportunity for that particular account.

Page 187

1      Q.  Okay.  What is the PLUS committee?
2      A.  Professional Liability Underwriting
3  Society.
4      Q.  Are you -- first, are you a member of
5  the society?
6      A.  I'm a member of PLUS.
7      Q.  Okay.  Are you a member of the
8  committee?
9      A.  No.
10     Q.  Okay.  Were you ever a member of the
11  committee?
12     A.  Yes.
13     Q.  Plaintiff's Exhibit --
14     A.  Southeast chapter steering committee.
15     Q.  Plaintiff's Exhibit 53.
16     A.  Uh-huh (positive response).
17         (Whereupon, Plaintiff's Exhibit No.
18  53 was marked for identification and a copy of
19  same is attached hereto.)
20     Q.  Okay.  So this is like a group for
21  professional liability underwriters.  Is that
22  what PLUS is?
23     A.  That's right.  Well, that's the name

Page 188

1  of it.  But it's brokers, agents, attorneys,
2  underwriters.
3      Q.  Okay.  How long were you on the
4  Southeast steering committee?
5      A.  I believe three years.
6      Q.  And what was your role as a member of
7  the Southeast steering committee?
8      A.  I was a -- I was just a member first,
9  and then I was secretary, and then I can't
10  remember what my last year role was.
11     Q.  How much time --
12     A.  I could have been the vice chair to
13  Sam Stern.  He was the chair at the time, but I
14  rolled off.
15     Q.  How much time would it have taken --
16  how much time would you have to dedicate to being
17  on the Southeast steering committee?
18     A.  Would one have to or how much time
19  did I?
20     Q.  Both.
21     A.  You could kind of be involved as much
22  as you see fit.  I helped host some events that
23  obviously took up a lot more time for a two- or

Page 189

1   three-month period and then kind of took a
2   breather.
3       Q.   Why did you roll off the committee?
4       A.   I think that I felt good about my
5   experience on there and had gotten to meet some
6   people and decided it was a decent time to roll
7   off.  However, we did not want to give up that
8   seat on the committee.
9       Q.   Okay.  And so who made --
10      A.   We as CRC Birmingham.
11      Q.   Right.  So who made the decision to
12  put Kathryn in as the CRC seat?
13      A.   I suggested that Kathryn would be a
14  good candidate.
15      Q.   Did you discuss it with Kathryn
16  before making the suggestion?
17      A.   Yes.
18      Q.   And do you recall anything about
19  discussing it with her, like what you guys talked
20  about specifically?
21      A.   No.
22      Q.   Who did you make the suggestion to?
23      A.   Corey and Rusty.

Page 190

1       Q.   Okay.  And so the bottom e-mail there
2   February 2nd when it says, We miss you on the
3   calls, is that because you're no longer on the
4   committee at that point?
5       A.   That's right.
6       Q.   What was your understanding of
7   Kathryn's role on the committee?  Like do you
8   understand whether she was just a member or if
9   she had a --
10      A.   I don't remember her title that year.
11      Q.   Okay.
12      A.   My first year I didn't have a
13  specific title.  I don't know if she did or not,
14  a specific role on the board or the committee.
15      Q.   Okay.  And then do you know -- so
16  they're coming to you to get sponsors.
17      A.   Yes.
18      Q.   So why are you still on here to get
19  the sponsors if you're no longer on the
20  committee?
21           MS. BARLOTTA:  Object to form.
22      A.   I knew Sam, and also, you know, I
23  knew the underwriters really well at Dual, and so

Page 191

1   I was trying to -- see where I say re-up?  I
2   wanted Dual to commit again to a donation.
3       Q.   Okay.  Did you talk with Kat at all
4   about her experience on the committee?
5       A.   Yes.
6       Q.   Okay.  What did you guys talk about?
7       A.   I would ask her how it's going, and
8   she would say good or not or it's fine, it's
9   good.  And then I think she helped host an event
10  as well, in a similar way that I did when I was
11  on the committee.
12      Q.   Did she ever express that she was
13  unhappy?  You said good or not.  Is there a time
14  where she ever said it was not good?
15      A.   At the end of the first year, she
16  said that she wanted to roll off.
17      Q.   Okay.  Did she say why she wanted to
18  roll off?
19      A.   I don't recall specific reasons why.
20      Q.   Do you recall asking her why?
21           MS. BARLOTTA:  Object to form.
22      A.   I don't recall.
23           (Whereupon, Plaintiff's Exhibit No.

Page 192

1   54 was marked for identification and a copy of
2   same is attached hereto.)
3       Q.   Okay.  So Plaintiff's Exhibit 54 that
4   I just gave you, the top e-mail from Kathryn to
5   Rusty and Corey and you, she's expressing that
6   she's appreciative of the opportunity, but
7   specifically with this part, I am on a
8   subcommittee for the Southeast women's leadership
9   event that is planned in January 2019 in Atlanta.
10      A.   Okay.
11      Q.   And then she goes on to talk about it
12  being the first women's leadership event for this
13  chapter.
14           Did you have any discussion with Kat
15  about that specific 2019 event other than what's
16  contained in this e-mail?
17      A.   I don't recall the details.  I know
18  that she was involved with helping organize that
19  event.
20      Q.   Okay.  Did you ask if there was
21  anything that the office could do to help out or
22  was it just kind of an, oh, Kat's working on that
23  thing today?  I'm trying to figure out what's the

Page 193

1  context of how you would have been talking about
2  the event.
3          MS. BARLOTTA:  Object to form.
4      A.  I don't know.  I don't know.
5      Q.  Okay.
6      A.  I mean, I do know that there were
7  some other CRC folks that attended the event.
8      Q.  Do you know who those folks were?
9      A.  I don't know all of them.  I know
10  Andrea went.  I just remember that because she
11  came back with something from that, like a flyer
12  or something.
13      Q.  So look for me the -- I've got my
14  documents mixed up.
15          Go back to Plaintiff's 54 -- or I
16  guess we're on Plaintiff's 54.  The second page
17  there is your e-mail.
18      A.  Yeah.  This is all the stuff I just
19  said.
20      Q.  Yeah.  So you're talking about her
21  being able to pass the torch after she reviews
22  her experience?
23      A.  Uh-huh (positive response).

Page 194

1      Q.  Is there any particular reason that
2  you would have thought she wanted -- might want
3  to do that early on, like --
4      A.  Sorry.  Hang on a second.  Where's
5  the pass the torch?
6      Q.  The second -- the third paragraph --
7  little paragraph down just before your signature.
8      A.  I'm on the wrong page.  Tell me --
9      Q.  That's okay.  It's Page 6217.
10      A.  Okay.  At the end of this PLUS year?
11      Q.  Yes.
12      A.  Okay.  Oh, yeah, okay.
13      Q.  Is there any particular reason that
14  in February of 2018 you would have been thinking
15  about her wanting to pass the torch?  I guess
16  what I'm asking is --
17      A.  Yeah, she told me she wanted to roll
18  off.
19      Q.  And how long had she been on at that
20  point?
21      A.  And so in this e-mail to Rusty, I was
22  saying she may want to continue in the
23  organization or she may want to pass the torch.

Page 195

1  So I was introducing to Rusty she might be
2  considering her options.
3      Q.  Okay.  And that's what I was
4  wondering, was that was because she had already
5  kind of expressed it to you?
6      A.  She did mention that to me, that she
7  was considering rolling off.
8      Q.  Okay.  Do you recall what you told
9  her in response?
10      A.  No.  But we talked about who -- you
11  know, let's not give up this seat, let's offer it
12  to somebody else within CRC Birmingham and stay
13  involved as a department.
14      Q.  And should Kathryn's participation in
15  this committee have been considered in her bonus
16  calculations?
17          MS. BARLOTTA:  Object to form.
18      A.  Sure.
19      Q.  Do you know if it was?
20          MS. BARLOTTA:  Object to form.
21      A.  Yes.  I know that Corey considered
22  this among other things.
23      Q.  How do you know that?

Page 196

1      A.  Because Corey told me that he takes
2  everybody's performance and involvement into
3  consideration when considering bonuses, and I
4  think he thought it was a good thing that she was
5  involved in this.  It's a great exposure and a
6  good opportunity to meet underwriters and
7  attorneys and retailers.
8      Q.  Let me show you Plaintiff's Exhibit
9  55.
10          (Whereupon, Plaintiff's Exhibit No.
11  55 was marked for identification and a copy of
12  same is attached hereto.)
13      Q.  And this is some text messages.  And
14  at the top there, it's got some names:  Corey
15  Daugherty, Clay Segrest, Yvette Talsma, and
16  Andrea Sutton, and Tiffany Sanders.
17      A.  Uh-huh (positive response).
18      Q.  And then these messages came, I'll
19  represent to you, from Kathryn's iPad.  Is this
20  -- is this text message group representative of
21  the Team Daugherty in 2018 and '19?
22      A.  Yes.
23          MS. BARLOTTA:  Object to form.

Page 197

1    Q.   Is it -- was it common for the team
2  to communicate with each other via text message?
3        MS. BARLOTTA:  Object to form.
4        **A.   Yes.  I don't know how common, but we**
5  **did that for certain things, clearly.**
6        Q.   Okay.  And Kathryn's employment ended
7  in 2019.  Has the team continued to communicate
8  via text message since 2019?
9        MS. BARLOTTA:  Object to form.
10       **A.   We communicate via text message on**
11 **occasion as a team.**
12       Q.   Okay.  And you testified earlier that
13 you have a CRC company phone, right?
14       MS. BARLOTTA:  Object to form.
15       **A.   Yes.**
16       Q.   Do you know anyone else on the team
17 that has a CRC company phone?
18       MS. BARLOTTA:  Object to form.
19       **A.   Yes.**
20       Q.   Who?
21       **A.   Corey Daugherty.**
22       Q.   Okay.  Do any of the account
23 executives currently on the team have company

Page 198

1  phones?
2        MS. BARLOTTA:  Object to form.
3        **A.   I don't know.**
4        Q.   Okay.  Have you searched your text
5  messages to see if you have communicated with
6  anyone about Kathryn after November -- I'm
7  sorry -- after July of 2019?
8        MS. BARLOTTA:  Object to form.
9        **A.   No.**
10       Q.   Have you been asked to search your
11 text messages to see if you had any
12 communications about Kathryn since July of 2019?
13       MS. BARLOTTA:  Object to form.
14       **A.   No.**
15       Q.   There's some discussion in this text
16 about bell ringing.  What is bell ringing?  Like
17 Page 2 talks about the happiest bell ringer ever
18 from Tiffany Sanders, and then the next page,
19 there's actually a bell there.  So tell me about
20 that.
21       **A.   Yeah, it's just a new piece of**
22 **business that was bound, and the team was**
23 **celebrating.**

Page 199

1        Q.   So I've read through these texts, and
2  it appears like maybe you guys have a competition
3  throughout the office?
4        MS. BARLOTTA:  Object to form.
5        **A.   If you bind a sizable new piece of**
6  **business as team, your team rings a bell.  It's**
7  **just a fun thing I -- I mean, I guess you would**
8  **call it a competition, but --**
9        Q.   Yeah, it looked fun.  Is there a --
10 like a particular amount that warrants bell
11 ringing?
12       **A.   One hundred thousand dollars in**
13 **premium.**
14       Q.   Okay.  There are -- look for me on
15 Page 588.  It's on the bottom there.  It's Page 8
16 of 11.  There are a couple of little YouTube
17 clips, one from Corey Daugherty four down, and
18 then second from the bottom is one from you.  Do
19 you have any idea what those YouTube clips may
20 be?
21       **A.   No.**
22       Q.   Okay.  Would you still have this text
23 message?

Page 200

1        MS. BARLOTTA:  Object to form.
2        **A.   I don't know.**
3        Q.   Okay.
4        **A.   I mean --**
5        MS. PALMER:  I think this one is
6  already in, but I'm going to do it again, because
7  I can't find it.
8        (Whereupon, Plaintiff's Exhibit No.
9  56 was marked for identification and a copy of
10 same is attached hereto.)
11       Q.   (BY MS. PALMER:)  Plaintiff's Exhibit
12 56, does this -- does this appear to be like an
13 e-mail from you, an auto reply, like you were out
14 of the office?
15       **A.   Yes.**
16       Q.   Okay.  And you list your team members
17 to contact if they need assistance.
18       **A.   Uh-huh (positive response).**
19       Q.   And I see we're talking about April
20 of 2019.  So I see --
21       **A.   Yeah.**
22       Q.   -- Tiffany Sanders, Andrea Sutton,
23 Yvette Talsma, and Corey Daugherty, right?

Page 201

1    A.   Yes.

2    Q.   Why is Kathryn Hendrix not listed as

3  a Daugherty team member in April of 2019?

4    A.   Well, the out of office gives

5  instructions to whoever sent me an e-mail to go

6  to these other team members.  I put them in this

7  order, because I wanted them to first go to

8  Tiffany.  I didn't include Kathryn because we're

9  shifting my agents' responsibilities to Tiffany.

10   Q.   Right.  But you have Yvette Talsma on

11 here, right?

12   A.   Yeah.

13   Q.   And Yvette doesn't have any of your

14 agents, right?

15   A.   Yvette and I worked together

16 sometimes.

17   Q.   And you have Corey on here, right?

18   A.   Yes.

19   Q.   And Corey is a broker, not an account

20 executive.

21   A.   Corey is my boss, yes.

22   Q.   Right.  So I guess I just don't

23 understand like what was the -- was it your

Page 202

1  thought process that Kathryn shouldn't be

2  included in this because --

3    A.   Yeah, because we were actively moving

4  those responsibilities over to Tiffany, and

5  Kathryn had expressed that she had, you know, too

6  many of those responsibilities.  And so this is

7  a -- clearly an intention to continue moving in

8  that direction.

9        Because if I'm out of the office and

10 I'm on the road and I put Kathryn's name on here

11 and somebody comes to me and requests some task

12 to be done, I didn't want them to then put that

13 on Kathryn to do that task.

14   Q.   Okay.  Your last sentence there

15 before you list the name says:  We have a great

16 team ready to help.

17   A.   Indeed we do.

18   Q.   So can you see that not including

19 Kathryn on here may make her feel like you didn't

20 consider her part of the team?

21        MS. BARLOTTA:  Object to form.

22   A.   No.  You can't make that assumption

23 based on that sentence.

Page 203

1    Q.   Did you ever talk to Kathryn about --

2    A.   Because I didn't say:  We have a

3  great team ready to help, and here are all of the

4  members.

5    Q.   Right.  So did you ever talk to

6  Kathryn about whether she felt like she was part

7  of the team?

8        MS. BARLOTTA:  Object to form.

9    A.   You're going to have to rephrase

10 that, please.

11   Q.   That's okay.  No, that's okay.  We'll

12 just move on.

13   A.   I don't know that -- I don't think

14 that we had that conversation.

15   Q.   Okay.  Plaintiff's Exhibit 57.

16       (Whereupon, Plaintiff's Exhibit No.

17 57 was marked for identification and a copy of

18 same is attached hereto.)

19   A.   Okay.

20   Q.   Is this the text message that you

21 were referencing earlier when you said that you

22 produced or that you -- did you say you saw a

23 text or that you gave a text?  I'm sorry.

Page 204

1    A.   This I did provide.

2    Q.   Okay.  When did you provide this

3  text?

4    A.   Last week.

5    Q.   And I want to look -- the bottom

6  there, August 5, 2019, the column to the right,

7  that's you, correct?

8    A.   Yes.

9    Q.   Thinking about you, Kathryn.

10   A.   Uh-huh (positive response).

11   Q.   And then a little while later the

12 same day:  Thanks, Clay, I appreciate it.  Why

13 were you thinking about Kathryn on August 5th,

14 2019?

15   A.   Kathryn and I hadn't spoken, I think,

16 for maybe a few days or so around that time,

17 because Corey had informed me that she was not

18 doing well and that she needed to take a break

19 from work, and so I was just checking in on her.

20       I didn't really know how to handle it

21 other than just wanted her to know that I was

22 thinking about her.

23   Q.   What do you recall about being told

Page 205

1  she wasn't doing well and needed a break from
2  work?
3      A.   That's it.
4      Q.   Okay.
5      A.   That she was going to take a leave.
6  I didn't really know any other details about it.
7      Q.   Okay.  Did you discuss this -- her
8  leave any further with Corey after August of
9  2019?
10     A.   No.  We just said that -- he just
11 told me that she's on leave.
12     Q.   And when Kathryn didn't come back in
13 November of 2019, did you discuss the end of her
14 employment with Corey?
15     A.   Yes.
16     Q.   What did you discuss about the end of
17 her employment?
18     A.   He said she quit.
19     Q.   Like just out of the blue said she
20 quit or was there a conversation around it?  Like
21 can you give me the context?
22         MS. BARLOTTA:  Object to form.
23     A.   That's it.

Page 206

1      Q.   Did you ask why?
2      A.   Don't know.  I have no idea if I
3  asked why.  I think I said, Wow, yowza.
4      Q.   You knew Kathryn before CRC, right?
5      A.   Yes.
6      Q.   Okay.  Did you guys go to college
7  together?
8      A.   Yes.
9      Q.   And you live just a couple of houses
10 down from her parents, right?
11     A.   I'm not exactly sure where her
12 parents live, but it's in the same neighborhood.
13     Q.   In the area.
14         When you found out that she quit, as
15 Corey said it, did you reach out to her and find
16 out why from her?
17     A.   No.
18     Q.   Why?
19         MS. BARLOTTA:  Object to form.
20     A.   I'm not sure that I felt like that
21 was appropriate.  I don't know why I didn't reach
22 out to her other than -- I didn't see that
23 necessary.

Page 207

1      Q.   Did you work with Sarah Dunston at
2  all?
3      A.   Do I work with her?
4      Q.   Did you work with Sarah Dunston
5  like --
6      A.   No.  She was on a different team.
7      Q.   Did you hear anything about Sarah
8  Dunston after she left her employment with CRC?
9      A.   No.  I knew she went to work for a --
10 I think a bank in England, and that's the last I
11 had heard about.
12     Q.   Okay.  When you moved from an
13 associate broker to a broker, what changed?
14         MS. BARLOTTA:  Object to form.
15     Q.   I guess I'm trying to figure out what
16 is the difference between an associate broker and
17 a broker?
18         MS. BARLOTTA:  Object to form.
19     A.   There was no difference in my mind.
20 I was responsible for going to get new business.
21     Q.   Okay.  And so we've already talked
22 about this.  I think the bonus pool is per team
23 not per broker, right?

Page 208

1         MS. BARLOTTA:  Object to form.
2      A.   That's right.
3      Q.   And you have no knowledge of if your
4  salary comes out of the bonus pool?
5      A.   I don't know that.
6      Q.   Do you have more of a say over how
7  the bonuses are paid now that you're a broker?
8      A.   I can't answer that.
9      Q.   Do you do any -- I want to talk about
10 when you were an associate broker, 2018.  Did you
11 do any binding, invoicing, or quoting for another
12 broker?
13     A.   Yes.
14     Q.   Who?
15     A.   Corey Daugherty.
16     Q.   Do you know how much on average you
17 would bind, quote, or invoice for Corey as a
18 broker?
19     A.   No, I did that quite often for the
20 first several years I was on his team.
21     Q.   After the team developed and you got
22 more than your first account executive, did you
23 continue to do that or was that duty passed on to

Page 209

1  the account executives?
2       MS. BARLOTTA:  Object to the form.
3       **A.   I still do that.**
4       Q.   You still do that?
5       **A.   On occasion.  But like I said**
6  **earlier, a majority of that is with Tiffany, Amy,**
7  **Steele.  We all bind and invoice.**
8       MS. PALMER:  Okay.  If we can have
9  just a minute to chat, I may be done.
10      VIDEOGRAPHER:  All right.  I'll take
11 us off the record.  The time is 1:19.
12      (Whereupon, a brief recess was
13 taken.)
14      MS. BARLOTTA:  So for the purpose of
15 the deposition today, the plaintiff introduced
16 some exhibits which have information which CRC
17 considers to be proprietary related to their
18 customers and policy numbers and amounts of
19 policies and so forth.
20      And so the parties have agreed that
21 instead of placing those amounts -- I mean those
22 exhibits under seal and also sealing the
23 testimony, that we will agree to redact that

Page 210

1  information before filing anything in the public
2  record.
3       MS. WILKINSON:  And if the court
4  reporter has any questions, she can contact any
5  of us, Rachel, and let us know, but we'll just
6  redact that to make it easier for everybody.
7       VIDEOGRAPHER:  We are back from a
8  break.  It is 1:27.
9       Q.   (BY MS. PALMER:)  Okay.  Clay, we are
10 back from our break.  Do you need to change
11 anything about your testimony?
12      **A.   No.**
13      Q.   Okay.  Just a couple of little
14 cleanup questions, and that's always our famous
15 last words, but do you have a company iPad?
16      **A.   I do.**
17      Q.   Have you searched the company iPad
18 for any documents related to Kathryn Hendrix or
19 her claims in this lawsuit?
20      **A.   No.**
21      Q.   Do you have a company laptop?
22      **A.   Yes.**
23      Q.   Have you searched your company laptop

Page 211

1  for any documents related to Kathryn Hendrix or
2  this lawsuit?
3       **A.   No.**
4       MS. PALMER:  That's all I have.
5       MS. BARLOTTA:  Okay.  You're done.
6       VIDEOGRAPHER:  This concludes our
7  deposition.  The time is 1:28.
8
9
10
11      FURTHER DEPONENT SAITH NOT
12
13
14
15
16
17
18
19
20
21
22
23

Page 212

1            C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5
6       I HEREBY CERTIFY that the above
7  and foregoing transcript was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness.
13      I FURTHER CERTIFY that I am
14 neither of counsel, nor of any relation to the
15 parties to the action, nor am I anywise
16 interested in the result of said cause.
17
18      *Tanya Corne*
19      /s/Tanya D. Cornelius
20      TANYA D. CORNELIUS, RPR
21      ACCR #378 Expires 10/1/2024
22      Notary Expires 9/13/26
23

Please return the signature page, correction sheet, and transcript within 30 days.  The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

 Tanya Cornelius
Certified Court Reporter

WITNESS SIGNATURE PAGE

In Re:  Read and sign of Video Deposition of Clay Segrest

I, _____, hereby certify that I have read the

foregoing transcript of my deposition and it is a true and correct transcript of the

testimony given by me at the time and place stated with the corrections, if any, and the

reasons therefore noted on a separate sheet of paper and attached hereto.

_____
Video Deposition of Clay Segrest

SWORN TO AND SUBSCRIBED before me this _____ day of _____,
202____.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

Video Deposition of Clay Segrest

## Errata Sheet

Page Number          Line Number                          Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORD INDEX**

**< 1 >**
**1** 34:*16*
112:*16*
186:*5*
**1:00** 167:*15*
**1:19** 209:*11*
**1:27** 210:*8*
**1:28** 211:*7*
**10/1** 45:*20*
185:*2*
**10/1/2013**
41:*1*
**10/1/2024**
212:*21*
**10:06** 66:*7*
**10:19** 66:*11*
**100** 6:*6*
**104** 6:*6*
**10-4** 10:*14*
**11** 4:*9*
38:*13, 17*
44:*21* 45:*1*
199:*16*
**11:41** 134:*7*
**11:54**
134:*11*
**110** 4:*14*
**112** 4:*15*
**115** 4:*16*
**117** 4:*17*
**119** 4:*18*
**12:32**
167:*21*
**12:33** 168:*2*
**13** 45:*20*
**14** 140:*16*
**1400** 6:*19*

**15** 45:*16,*
*18* 98:*8*
140:*16*
**168** 4:*19*
**16th** 40:*4*
**17** 44:*21*
45:*1* 46:*16*
57:*20*
98:*10*
169:*9*
**1717** 2:*7*
6:*11* 7:*6*
**17th** 117:*22*
**18** 57:*4*
**183** 4:*20*
**187** 4:*21*
**19** 57:*20*
58:*3* 98:*2,*
*8* 135:*4*
196:*21*
**191** 4:*22*
**196** 4:*23*
**1993** 96:*11*

**< 2 >**
**2** 15:*11*
112:*17*
198:*17*
**2:21-CV-**
**0300-MHH**
1:*5* 8:*1*
**20** 28:*22*
**200** 5:*3*
**2000** 18:*5*
117:*21*
175:*8*
**2009** 19:*7*
20:*12* 34:*8,*
*9, 13, 19*
41:*9, 13*
**2013** 48:*19*
**2014** 50:*14*

**2015** 30:*20*
46:*6, 18, 20*
98:*2*
120:*22*
135:*4*
140:*15*
**2016** 46:*16*
**2017** 47:*18*
57:*3* 58:*3*
61:*23*
67:*12*
98:*10, 12*
171:*8*
**2018** 47:*18*
48:*17* 51:*5,*
*23* 117:*22*
119:*8*
133:*2*
169:*2, 17*
170:*6*
183:*4*
194:*14*
196:*21*
208:*10*
**2019** 18:*6,*
*13* 52:*1*
73:*9* 130:*8*
137:*6, 8*
175:*9*
192:*9, 15*
197:*7, 8*
198:*7, 12*
200:*20*
201:*3*
204:*6, 14*
205:*9, 13*
**2020** 28:*19*
61:*23*
**2021** 28:*18,*
*20, 23* 29:*8*
39:*14* 40:*4,*

**10** 43:*22*
45:*11*
**2022** 38:*13,*
*18* 42:*20*
43:*1, 5*
**2024** 1:*19*
2:*9* 7:*14*
28:*18*
**203** 5:*4*
**20th** 6:*19*
**22** 38:*9*
**23** 131:*4*
135:*23*
136:*1, 11*
138:*17*
**23rd** 6:*6*
39:*13*
**26** 119:*8*
**2nd** 42:*20*
190:*2*

**< 3 >**
**3/1** 43:*12*
**3/16** 43:*13*
**3/16/2021**
43:*15*
**31** 1:*19*
**31st** 2:*8*
7:*14*
**35203** 6:*12,*
*20*
**35233** 6:*7*
**37** 4:*10*
**378** 212:*21*
**3rd** 2:*7*
6:*11* 7:*7*
34:*9*
172:*15*

**< 4 >**
**4** 169:*2*

**4/1** 45:*15,*
*18*
**41** 4:*9*
11:*10, 14,*
*16* 15:*11*
**42** 4:*10*
37:*19, 21,*
*23* 44:*20*
46:*23*
**420** 6:*19*
**43** 4:*11*
66:*22* 67:*3,*
*10* 89:*21*
**44** 4:*12*
90:*15, 19,*
*22*
**45** 4:*13*
97:*1, 3, 17*
106:*22*
**46** 4:*14*
110:*1, 3*
**4681** 40:*23*
**4682** 42:*17*
**4685** 44:*2*
**4686** 45:*7*
**47** 4:*15*
112:*3, 6*
**4700** 49:*21*
**4716** 51:*3*
**4718** 51:*20*
**48** 4:*16*
115:*11, 15,*
*17*
**49** 4:*17*
117:*12, 14*

**< 5 >**
**5** 204:*6*
**50** 4:*18*
119:*4, 6*
132:*11*

**51**  4:*19*
168:*13, 15*
171:*16*
**52**  4:*20*
183:*22*
184:*1, 4, 8*
**53**  4:*21*
187:*15, 18*
**54**  4:*22*
192:*1, 3*
193:*15, 16*
**55**  4:*23*
196:*9, 11*
**56**  5:*3*
200:*9, 12*
**57**  5:*4*
203:*15, 17*
**588**  199:*15*
**5916**  101:*7*
**5th**  204:*13*

**< 6 >**
**6217**  194:*9*
**67**  4:*11*

**< 8 >**
**8**  33:*17, 18*
34:*7*
199:*15*
**8/11**  38:*9*

**< 9 >**
**9**  4:*3*
**9/13/26**
212:*22*
**9:04**  1:*20*
2:*9*  7:*8, 14*
**90**  4:*12*
**97**  4:*13*

**< A >**

**A**  2:*1, 8*
6:*1, 5, 11*
7:*7*  9:*9, 16,*
*20, 22, 23*
*10:1, 2, 4, 5,*
*10, 11, 12,*
*14, 15, 19,*
*20*  11:*1, 3,*
*8, 14, 18, 19,*
*22*  12:*3, 6,*
*8, 10, 11, 12,*
*13, 19, 21*
*13:3, 5, 7,*
*11, 15, 16,*
*22*  14:*2, 3,*
*5, 8, 14, 20*
*15:10, 19,*
*22*  16:*2, 4,*
*7, 10, 16, 17,*
*19, 23*  17:*4,*
*8, 9, 15, 19,*
*21*  18:*2, 9,*
*15, 18, 19,*
*21*  19:*3, 6,*
*9, 12, 15*
*20:5, 8, 12,*
*14, 19, 23*
*21:4, 8, 11,*
*14, 17*  22:*2,*
*5, 9, 11, 12,*
*14, 18*  23:*6,*
*9, 13, 16, 21,*
*23*  24:*3, 7,*
*13*  25:*5, 12,*
*17, 21, 22,*
*23*  26:*2, 3,*
*4, 14, 16*
*27:8, 10, 13,*
*15, 16, 18,*
*22*  28:*1, 3,*
*5, 8, 9, 10,*
*11, 16, 20*

*29:2, 4, 6,*
*10, 13, 15,*
*16, 23*  30:*5,*
*12, 14, 18,*
*21, 23*  31:*4,*
*6, 10, 11, 12,*
*16, 20*  32:*1,*
*4, 7, 14, 17,*
*19, 20*  33:*9,*
*15, 19, 20,*
*22*  34:*1, 4,*
*9, 13, 17, 20,*
*21, 23*  35:*2,*
*8, 10, 13, 17,*
*22, 23*  36:*1,*
*3, 5, 7, 11,*
*14, 16, 19,*
*22*  37:*15,*
*21, 23*  38:*3,*
*7, 15, 18, 21*
*39:1, 3, 6, 8,*
*10, 15, 17,*
*21*  40:*1, 3,*
*7, 11, 13, 22*
*41:4, 5, 7,*
*11, 14, 17,*
*20, 23*  42:*3,*
*5, 12, 14, 18,*
*22*  43:*1, 4,*
*7, 11, 14, 17,*
*20*  44:*1, 2,*
*4, 10, 13, 16,*
*17, 21, 22*
*45:2, 5, 6,*
*12, 17, 18,*
*19, 20, 21*
*46:2, 4, 6,*
*10, 11, 12,*
*15, 20*  47:*3,*
*8, 10, 11, 16,*
*20*  48:*1, 5,*
*11, 16, 20*

*49:1, 2, 7,*
*10, 12, 13,*
*16, 20*  50:*6,*
*10, 13, 15,*
*21, 22*  51:*4,*
*7, 11, 12, 14,*
*16, 18*  52:*7,*
*8, 13, 18*
*53:5, 6, 15,*
*16, 23*  54:*5,*
*7, 8, 12, 14,*
*16*  55:*4, 9,*
*13, 16, 19,*
*23*  56:*3, 6,*
*11, 16, 19*
*57:3, 5, 8,*
*10, 14, 19,*
*21*  58:*2, 4,*
*6, 7, 14, 17,*
*21, 23*  59:*1,*
*5, 9, 11, 16,*
*22*  60:*2, 4,*
*8, 13, 16*
*61:2, 4, 5,*
*10, 16, 21*
*62:3, 7, 9,*
*13, 15, 18,*
*21, 22*  63:*2,*
*6, 9, 12*
*64:3, 6, 10,*
*16, 20, 23*
*65:2, 4, 8,*
*12, 16, 19,*
*23*  66:*2, 3,*
*5, 6, 8, 13,*
*15, 17, 20,*
*23*  67:*3, 9,*
*13, 17, 22*
*68:4, 7, 8, 9,*
*10, 18, 21*
*69:2, 6, 8,*
*12, 16, 17,*

*19, 20*  70:*3,*
*10, 16, 20,*
*21*  71:*3, 9,*
*15, 20, 23*
*72:5, 6, 9,*
*15, 18, 21*
*73:3, 5, 8,*
*12, 17, 19,*
*22*  74:*3, 7,*
*9, 11, 14, 18,*
*22*  75:*3, 8,*
*10, 15, 18,*
*20, 21, 22*
*76:10, 12,*
*16, 19, 21,*
*22*  77:*2, 5,*
*8, 12, 15, 20*
*78:5, 8, 11,*
*14, 17, 23*
*79:3, 8, 13,*
*15, 19, 22,*
*23*  80:*2, 6,*
*8, 11, 15, 16,*
*17, 20, 22,*
*23*  81:*5, 12,*
*19, 20*  82:*2,*
*6, 12, 16, 21,*
*23*  83:*5, 8,*
*12, 15, 17,*
*19*  84:*1, 6,*
*10, 17, 19,*
*21*  85:*3, 4,*
*6, 9, 12, 16,*
*19, 21, 23*
*86:2, 4, 10,*
*12, 15, 18*
*87:2, 5, 8,*
*13, 14, 16,*
*17, 19, 22*
*88:3, 8, 9,*
*13, 14, 16,*
*18, 23*  89:*4,*

Video Deposition of Clay Segrest

1/31/2024

8, 12, 16, 18, 23  90:3, 6, 11, 13, 19  91:6, 8, 13, 17  92:11, 14, 16, 19, 22  93:2, 4, 5, 13, 14, 16, 18, 20  94:8, 11, 17, 22  95:4, 6, 8, 13, 20, 22  96:2, 6, 8, 13, 16, 19, 22  97:3, 5, 10, 22  98:5, 6, 11, 16, 21, 22  99:15, 17, 19  100:2, 4, 5, 9, 11, 12, 20, 22  101:4, 8, 11, 13, 18  102:1, 2, 3, 7, 9, 12, 17, 21  103:3, 5, 9, 11, 15, 19, 22  104:1, 3, 8, 9, 12, 17, 23  105:1, 3, 4, 7, 10, 18, 21  106:1, 6, 11, 13, 15, 17, 20, 23  107:2, 8, 11, 14, 18, 20, 23  108:3, 6, 8, 9, 10, 14, 17, 20  109:4, 7, 9, 12, 14, 18, 22  110:3,

11, 13, 15, 19, 23  111:3, 6, 9, 14, 17, 18  112:3, 7, 8, 11, 15, 17, 22  113:5, 7, 12, 14, 18, 20, 23  114:4, 6, 8, 10, 18, 21  115:2, 8, 15  116:2, 6, 11, 15, 19, 22  117:5, 12, 19  118:3, 5, 12, 16, 22  119:2, 6, 12, 15, 17, 23  120:5, 8, 9, 11, 13, 17, 21  121:1, 7, 11, 17, 19, 22  122:4, 7, 12, 16, 21  123:3, 12, 15, 18  124:1, 3, 15, 20, 22  125:4, 7, 10, 12, 13, 16, 17, 21  126:3, 7, 13, 15, 17  127:1, 2, 4, 11, 19, 21  128:4, 5, 7, 10, 13, 15, 18, 20, 23  129:2, 6, 7, 8, 10, 16, 19, 20, 22, 23

130:4, 11, 13, 15, 19, 23  131:7, 11, 13, 15, 22  132:2, 4, 6, 10, 13, 15, 16, 18, 21  133:4, 7, 11, 14, 18, 20, 23  134:3, 4, 5, 8, 13, 15, 21  135:1, 7, 16, 19, 23  136:4, 7, 9, 14, 16, 19  137:2, 6, 9, 13, 15, 17, 20, 22  138:4, 7, 9, 11, 21, 23  139:6, 10, 12, 14, 16, 20  140:1, 2, 5, 7, 8, 10, 15  141:1, 3, 7, 9, 15  142:5, 11, 23  143:2, 9, 11, 13, 21  144:2, 6, 10, 15, 18  145:2, 4, 7, 10, 23  146:3, 9, 14, 15, 20  147:4, 10, 12, 15, 18, 21  148:2, 8, 11, 13, 17, 21, 22  149:4, 9, 15, 20  150:1, 9,

11, 15, 16, 20  151:4, 5, 9, 10, 13, 16, 19, 21  152:1, 5, 13, 17  153:1, 2, 6, 8, 10, 13, 14, 16, 18, 19, 22  154:2, 5, 10, 13, 16, 22, 23  155:2, 8, 10, 14, 18  156:5, 7, 11, 13, 14, 16, 20, 23  157:1, 3, 4, 5, 8, 9, 10, 14, 15, 16, 17, 18, 20, 22  158:2, 8, 12, 15, 21  159:2, 7, 11, 16, 21  160:1, 6, 8, 10, 18, 23  161:10, 11, 14, 21  162:4, 10, 13, 22  163:3, 5, 6, 8, 17, 21  164:11, 13, 19, 20  165:5, 12, 15, 17, 22  166:5, 7, 12, 15, 17, 20, 23  167:1, 9, 12, 13, 22  168:5, 9, 10, 15, 17, 18,

20, 23  169:3, 7, 12, 13, 14, 17, 20, 22  170:2, 6, 10, 13, 18  171:1, 5, 12, 15, 17, 20, 23  172:2, 5, 7, 13, 16, 18, 21, 23  173:4, 6, 8, 10, 14, 20  174:2, 7, 12, 16, 18  175:6, 7, 11, 12, 17, 19, 22  176:2, 4, 6, 7, 9, 16, 18, 19  177:7, 11, 18, 19, 20, 22, 23  178:2, 5, 9, 18, 20, 22  179:10, 16, 19, 23  180:2, 3, 4, 7, 12, 13, 17, 20, 23  181:3, 5, 11, 14, 17, 20  182:5, 14, 19, 21, 23  183:1, 6, 10, 14, 21  184:1, 5, 6, 10, 13, 16, 18, 20, 22  185:4, 13  186:3, 9, 13, 17, 22

Video Deposition of Clay Segrest

1/31/2024

61

187:2, *4, 6,
7, 9, 10, 12,
14, 16, 18,
20, 23
188:*5, 6, 8,
12, 18, 21,
23* 189:*1, 4,
6, 10, 13, 17,
21, 23*
190:*5, 8, 9,
10, 12, 14,
17, 22*
191:*2, 5, 7,
10, 13, 15,
19, 22*
192:*1, 7, 10,
17* 193:*4, 6,
9, 11, 18, 23*
194:*4, 8, 10,
12, 17, 21*
195:*6, 10,
13, 18, 21*
196:*1, 4, 5,
11, 17, 22*
197:*4, 10,
11, 13, 15,
17, 19, 21*
198:*3, 9, 14,
19, 21*
199:*2, 5, 6,
7, 8, 9, 10,
12, 16, 21*
200:*2, 4, 9,
15, 18, 21*
201:*1, 3, 4,
12, 15, 18,
19, 21*
202:*3, 7, 15,
17, 22*
203:*2, 9, 13,
17, 19, 22,
23* 204:*1, 4,

*8, 10, 11, 15,
16, 18*
205:*1, 3, 5,
10, 15, 18,
20, 23*
206:*2, 5, 8,
9, 11, 17, 20*
207:*3, 6, 9,
10, 13, 17,
19* 208:*2, 5,
6, 7, 8, 13,
15, 17, 19*
209:*3, 5, 6,
9, 12* 210:*7,
12, 13, 15,
16, 20, 21,
22* 211:*3*
212:*1, 11*
**A.M**  1:*20*
2:*10*  7:*8,
14*
**able**  11:*3*
110:*16*
193:*21*
**absence**
165:*1*
**Absolutely**
70:*9*
106:*20*
**access**
21:*15*
**accessed**
89:*3*
**accesses**
115:*2*
**accompanie
s**  99:*2*
**accord**
91:*22*
184:*22*
185:*16*

**account**
20:*18, 20,
23*  21:*1*
24:*9, 17*
25:*1, 5, 7,
15*  27:*2*
29:*10*  30:*8*
31:*8, 17*
47:*22, 23*
48:*1, 12*
49:*1, 3, 19*
54:*1*  57:*11*
58:*22*
59:*15*
63:*13, 14,
16, 19, 20*
70:*6, 11, 14*
71:*10, 13*
72:*10*  74:*9,
11*  75:*1, 7,
10*  89:*13*
91:*9, 11*
92:*13*
100:*13*
102:*21*
104:*21, 23*
106:*4*
108:*20*
115:*18*
118:*14*
123:*5*
124:*8*
132:*7*
145:*20*
146:*6, 13,
17*  147:*2,
16*  158:*9,
18, 19*
164:*8, 23*
183:*4*
185:*14, 19*
186:*23*

197:*22*
201:*19*
208:*22*
209:*1*
**accounts**
48:*6, 10, 14*
53:*7, 16, 19,
20*  54:*16*
55:*11, 21*
60:*1*  65:*4*
70:*3*  71:*5*
73:*19*
105:*13*
117:*16, 23*
118:*7, 19*
123:*20*
145:*18*
146:*5, 16,
23*  147:*7,
13*  164:*8*
176:*19, 22*
178:*1, 9, 19,
21*  180:*10*
186:*9*
**ACCR**
212:*21*
**accurate**
39:*16, 19*
**achieve**
180:*1*
**acknowledg
ing**  150:*21*
**act**  157:*4*
**acting**  7:*2*
**action**
21:*13*
212:*15*
**actively**
202:*3*
**actual**  68:*5*
**Ad**  45:*13*

**add**  35:*2*
113:*10*
121:*13*
**added**
107:*5*
111:*20*
167:*3*
**addition**
116:*16*
**address**
102:*5*
150:*7, 23*
**adjusting**
128:*6*
**administer**
8:*11*
**advice**
182:*10*
**AE**  161:*9*
183:*9*
**agencies**
90:*2, 10*
92:*15*  93:*8*
102:*7, 10,
14, 18*
103:*5, 13*
158:*9, 14,
17*  164:*16*
165:*19, 22*
166:*8*
167:*11*
175:*5, 17,
18, 20*
177:*5*
**agency**
61:*15*  73:*6*
75:*15*  76:*1,
4*  89:*22*
92:*12, 17*
97:*11, 16*
98:*6*  106:*2*
110:*13*

Video Deposition of Clay Segrest

1/31/2024

62

112:21
113:1
147:13
158:23
164:2, 21
177:20, 21,
23
**agent** 23:7,
9, 15, 18
24:11 53:6
68:2 69:5
71:3, 6
94:1 97:9
98:18 99:2
113:13
**agents**
15:2 21:14
36:23 53:9
68:19
70:19 71:5
73:11 86:8,
14 93:9, 10,
12 95:17
96:21 97:6
102:14
104:10
111:14
167:4, 6
174:5, 6, 10,
11 175:1,
10 177:9
182:15
188:1
201:9, 14

**aggregators**
53:5
**ago** 34:6
74:14
147:12
**agree**
38:22

136:22
142:18
169:4, 16
209:23
**AGREED**
2:2, 11, 18
3:3 92:2
145:12
209:20
**agreement**
56:6
**AIM** 57:17,
21 58:1, 15,
20 59:1, 8,
20 64:21
72:5, 20
101:10, 14,
15 108:11,
13 112:13
115:1
130:17, 19
184:20
**airplane**
165:4
**al** 7:22
**ALABAMA**
1:1 2:8
6:7, 12, 20
7:7, 18, 23
212:3
**aligns**
179:16
**allocate**
61:11
**allocated**
94:2
111:21
127:14
**allocation**
126:10
135:8
**allow** 147:8

**allowing**
155:9
**altogether**
56:1, 20
**amount**
44:16
104:14, 17,
20 126:19
129:20
151:6, 11
199:10
**amounts**
209:18, 21
**Amy** 74:3,
6, 12, 21
80:11
81:17, 18
82:9 83:13
85:12
100:19
102:6
103:23
104:5, 6, 15,
22 105:19,
23 114:5
147:12
209:6
**Amy's**
82:5
104:11
**an** 14:2, 4
15:7 16:2
20:18, 20
24:9 25:5
30:15, 17,
20 31:2, 19
35:1 36:2,
5 37:16
39:5, 6
43:22 48:1
50:12, 16
57:11 58:5,

22 59:15,
16 60:20
61:4, 18
62:18
65:17 66:1
67:10
70:13
71:18 72:9
76:5, 7
78:2 81:3
84:3, 4, 8,
21 88:7
89:13 92:4
93:16, 20
94:1
104:21, 23
106:2
107:16
108:20
114:14
117:15
127:7
128:23
129:8, 21
130:23
132:6
133:9
140:6, 7
143:13
144:4
145:20
146:6, 12,
17 151:22,
23 152:1, 6
153:17
154:3, 6
155:4
157:4, 15
158:19
160:16, 18,
20, 21, 23
161:9, 14,

16, 19
162:7
164:21
165:4, 11
166:20
167:19
169:5, 8, 18
170:8, 14,
22, 23
171:9
172:10
173:10, 21
177:9, 21,
22 180:9
183:4
185:2
191:9
192:22
200:12, 13
201:5, 19
202:7
207:12, 16
208:10
**analysis**
124:10
**and** 1:11
2:2, 6, 11,
12, 14, 16,
18, 22, 23
3:3 7:1, 4,
15 8:9, 16,
22 9:4, 6, 7,
11, 13, 21
10:3, 5, 8,
20 11:4, 10,
14, 23
12:15 13:2,
9 14:1, 3,
10, 18, 21,
23 15:6, 8,
18 16:7, 8,
10, 11, 12,

Video Deposition of Clay Segrest                    1/31/2024
                                                          63

13, 17, 20
17:2, 7, 10,
21  18:3, 11,
21  19:9, 18,
20, 21, 22,
23  20:2, 7,
13, 15  21:1,
19, 20  22:3,
6, 12, 19
23:14  24:3,
15, 16, 18,
20, 22  25:7,
9  26:16, 20
27:4, 7
28:7, 13, 21
29:3, 5, 7,
16, 17, 19,
22  30:9, 13,
19, 22  31:5,
9, 23  32:8
33:20
34:11, 12
35:5, 6, 11
36:1, 4, 16,
20  37:13,
21, 23  38:4,
16  39:22
40:4, 8, 13,
14, 16, 19,
23  41:9, 10
42:5, 7, 9,
17, 23  44:6,
7, 14  45:3,
9, 13, 19
46:5, 21
47:12, 13,
21, 22  48:3,
8, 21, 23
49:1, 5, 8,
18, 22  50:1,
17  51:9, 19,
21  52:14,

15, 16  53:2,
11, 13, 15,
16, 18, 23
54:16, 18,
23  55:2, 4
56:7, 9, 10,
12, 13, 18
57:19
58:10, 21
59:5, 7, 11,
12, 13, 19,
23  60:16
61:12, 15,
16, 18, 23
62:16  63:4,
13, 19, 20,
23  64:3, 11
65:2, 5, 13,
18  66:5
67:3, 5, 7,
15, 16, 18
68:7, 16, 17
70:14  71:4,
5, 12, 18, 23
72:2, 6, 12,
23  73:13,
14, 23  74:2,
10, 16, 21
75:12, 13,
16, 17, 18,
19  76:4, 12,
22  77:9
78:6, 8, 9,
12  79:8, 10,
11, 14  80:1,
23  81:11,
14, 22, 23
82:1, 5, 7
83:1, 5, 6,
23  84:1, 18
85:13, 17,
19  87:6, 8

89:6  90:8,
16, 19, 22,
23  91:21,
22  92:1, 12,
15, 20
93:19, 22,
23  94:4, 13,
23  95:22
96:8, 12
97:3, 20
98:6, 17
99:5, 6, 10,
14, 16, 20
100:13, 18
101:6, 22
102:5, 17,
18  103:12
104:4, 5, 6,
8, 11, 15, 22
105:6, 10
106:4, 6, 10,
18  107:4, 5,
21  108:5,
15  109:2, 7,
10, 14, 19
110:3
111:6, 12,
19, 20
112:3, 16,
23  113:12
114:7, 9
115:4, 8, 15,
19, 21
117:12, 15
118:4, 6, 8
119:6, 13,
23  120:1, 9,
11  121:12
123:7
124:3, 5, 21
125:1
126:7, 9, 18

127:5, 12
128:1, 4, 6,
20, 23
130:12
131:4, 16
132:19, 21,
23  133:2, 8
134:5, 16
135:12
136:20, 21
138:10, 11
139:1, 3, 8,
12, 17, 21
140:6, 21
141:4, 9, 19,
21  142:1,
13, 16, 17,
18, 20
143:4, 11,
23  144:2, 3,
6, 18, 19, 22
145:8, 10,
11, 12, 14,
16  146:1, 6,
15, 22
147:12, 13
148:4, 18,
22  149:1
150:14, 17
151:20
152:21
153:2, 21
154:3
155:8, 12
156:12, 13,
14, 16, 19
157:13
158:16, 17,
23  159:1, 3
160:7, 11
161:1, 2, 3,
13, 16, 22

162:5, 15
163:5, 8, 13,
14, 23
164:4, 11,
12, 17, 21,
22  165:4, 7,
17, 18, 22,
23  166:2, 8,
9, 10  167:4,
12  168:15,
17, 18
170:7, 17
171:19, 20
172:14, 18
173:2, 6, 8,
19, 21, 23
174:3, 8, 9,
12, 19, 20,
23  175:17
176:8
177:4, 8, 14
178:1, 5, 10,
21, 22
179:2, 6, 11,
16, 19, 20,
21  180:13,
14  181:6,
20, 22
182:1, 8, 15
183:2, 8
184:1
185:2, 3, 8,
14, 18, 20
186:4, 5, 18,
21, 22
187:18
188:6, 9
189:1, 5, 6,
9, 18, 23
190:1, 15,
22, 23
191:7, 9

192:*1, 5, 11*
194:*19, 21*
195:*3, 12,*
*14*  196:*2, 3,*
*5, 6, 7, 11,*
*13, 15, 16,*
*18, 21*
197:*6, 12*
198:*18, 22*
199:*1, 17*
200:*9, 16,*
*19, 23*
201:*13, 15,*
*17, 19*
202:*4, 6, 9,*
*10, 11*
203:*3, 17*
204:*5, 11,*
*15, 18, 19*
205:*1, 12*
206:*9, 15*
207:*10, 16,*
*21*  208:*3,*
*21*  209:*7,*
*18, 19, 20,*
*22*  210:*3, 5,*
*14*  212:*7, 8,*
*10, 11*
**and/or**
*15:2  21:21*
*24:18*
*36:23*
**Anderson**
*92:14*
**Andrea**
*48:11  49:5,*
*10, 11, 17*
*74:20*
*80:12  83:6*
*86:1, 6, 7*
*125:8, 9*
*138:5*

139:*1, 3, 8,*
*12, 17*
*164:11, 17*
*166:2*
*174:12, 19,*
*20*  193:*10*
*196:16*
*200:22*
**Andrea's**
*125:14, 18,*
*22*
**annual**
*51:6, 9*
*117:1*
**answer**
*10:20*
*127:22*
*129:6*
*146:3*
*157:7*
*171:4*
*208:8*
**answered**
*81:11*
**answers**
*10:7  212:8*
**anybody**
*59:14  95:1*
*108:18*
*142:14*
**anywise**
*212:15*
**app**  *184:22*
*185:16*
**appear**
*44:20*
*200:12*
**appears**
*112:7*
*119:9*
*199:2*

**application**
*26:16, 18*
*33:21  34:8*
*36:8  88:4*
**applied**
*19:10*
*34:18*
**apply**  *59:3*
*77:18, 20,*
*22  78:9*
**appreciate**
*204:12*

**appreciative**
*192:6*
**approach**
*174:22*
*177:14, 18*
**appropriate**
*206:21*
**appropriatel**
**y**  *173:18*
**approximate**
**ly**  *2:9*
*74:18*
**April**
*200:19*
*201:3*
**area**  *206:13*
**areas**
*94:17*
*124:5*
**asked**  *17:6*
*62:10*
*65:20*
*78:19*
*81:10, 23*
*86:3  92:20*
*127:21*
*134:16*
*161:21*

198:*10*
206:*3*
**asking**
*10:22  18:8*
*36:12  53:9,*
*14  70:7, 10*
*71:12*
*83:19*
*98:22  99:4,*
*10  137:21*
*156:19*
*191:20*
*194:16*
**asks**  *11:22*
**aspect**
*125:4*
**aspiration**
*80:6*
**assign**  *2:23*
**assigned**
*48:13  63:4*
*91:17*
*102:8*
*147:6*
*180:10*
**assigning**
*185:7*
**assist**  *60:6*
*147:5*
**assistance**
*200:17*
**assistant**
*25:22  26:1,*
*3, 5, 10*
*27:5, 8, 15*
*28:8, 22, 23*
*31:6  34:20,*
*22  39:5*
*59:16, 17*
*74:21*
*83:15*
*114:15*

**Associate**
*20:14*
*24:14  35:1,*
*9, 15  36:2,*
*5  39:6*
*50:12, 16*
*59:16*
*82:11  84:8*
*129:8, 21*
*140:7*
*161:19*
*207:13, 16*
*208:10*
**associated**
*60:18  70:7,*
*18  72:10*
**assume**
*118:16*
**assumed**
*143:16*
*163:1*
**assumption**
*202:22*
**Assured**
*176:18*
**Atlanta**
*192:9*
**attach**
*65:17*
**attached**
*11:15*
*37:22  67:4*
*90:20  97:4*
*110:4*
*112:4*
*115:16*
*117:13*
*119:7*
*168:16*
*184:2*
*187:19*
*192:2*

196:*12*
200:*10*
203:*18*
**attend**  37:*3*
**attended**
193:*7*
**Attorney**
9:*6*
**attorneys**
37:*12*
188:*1*
196:*7*
**audible**
10:*7*
**audit**  115:*5*
**August**
20:*12*  34:*9,*
*13*  38:*13,*
*17*  204:*6,*
*13*  205:*8*
**author**
119:*10*
**authored**
172:*7*
**authority**
91:*23*
**auto**
200:*13*
**autofill**
101:*16*
**autonomy**
164:*4*
**available**
37:*6*
**Avenue**
2:*7*  6:*11*
7:*7*  161:*14*
**avenues**
163:*8*
**average**
52:*20, 23*
208:*16*

**aware**
23:*18*
46:*13*  47:*5*
64:*13*  78:*1*
86:*13*  89:*6,*
*8*  95:*23*
96:*14*
113:*1*
114:*21*
115:*2, 4*
118:*13, 16*
126:*18*
127:*11*
129:*23*
135:*17*
165:*18*
179:*19, 20*
**awesome**
66:*3*
**awkward**
10:*3*

**< B >**
**back**  16:*10,*
*12, 20*
18:*16*  19:*4*
24:*2*  27:*5*
34:*4*  44:*3*
48:*19*
49:*22*
51:*20*
66:*10*
105:*1*
110:*23*
134:*10, 12*
135:*22*
146:*11*
157:*23*
168:*1*
172:*18*
193:*11, 15*

205:*12*
210:*7, 10*
**backwards**
172:*17*
**bad**  27:*23*
**BAKER**
6:*16*
**BANK**  1:*11*
207:*10*
**banks**
19:*21*
**barely**
23:*6*  40:*14*
**Barlotta**
6:*18*  8:*8,*
*21*  10:*23*
11:*5*  13:*14,*
*20*  14:*7, 17*
16:*22*
17:*12*  18:*7,*
*14*  22:*17*
23:*2, 5, 20*
24:*12*  25:*2,*
*4, 11*  26:*9*
27:*9*  32:*3,*
*13, 16*  33:*6*
34:*5*  38:*6,*
*14, 20*  39:*7,*
*20*  40:*6*
41:*3*  42:*4*
43:*6*  44:*9*
46:*3, 9, 19*
47:*7, 15*
48:*15*  50:*9*
52:*4*  53:*4,*
*22*  54:*11*
57:*1, 7, 18*
58:*13*
59:*21*
60:*12*  61:*1,*
*20*  62:*1, 8,*
*12, 17*  63:*5*

64:*2, 9, 15,*
*19*  65:*7, 15,*
*22*  68:*3*
69:*15*  70:*2*
71:*2*  73:*16*
76:*9, 23*
77:*23*  78:*4,*
*16, 22*  79:*7,*
*18, 21*  81:*4,*
*10*  83:*4*
84:*5, 9, 15*
86:*9, 21*
87:*3, 12*
89:*11*
91:*12, 15*
92:*10*
93:*11*  94:*7*
95:*3, 12, 18*
98:*4, 15, 20*
100:*6, 8*
102:*16*
104:*16*
105:*9, 17*
106:*12*
110:*14, 18,*
*22*  111:*16*
112:*14*
113:*4*
114:*1, 17,*
*20*  115:*7*
116:*5, 9*
118:*2, 11,*
*20*  119:*22*
120:*23*
121:*5, 16,*
*21*  122:*3, 6,*
*11, 15, 20*
123:*2, 11*
124:*14, 19*
125:*3, 20*
126:*6, 21,*
*23*  127:*10*

129:*5*
130:*10, 18*
131:*21*
133:*15*
134:*20*
135:*3, 6, 15*
136:*3, 13*
137:*1*
138:*6, 8, 14,*
*20*  139:*5, 9,*
*13, 19, 23*
140:*4, 23*
141:*8, 14*
142:*4, 10*
143:*3, 5, 8,*
*20*  144:*5,*
*14*  145:*1,*
*19, 22*
146:*8, 19*
147:*3, 9, 20*
148:*1, 7, 12,*
*20*  149:*3, 8,*
*14, 19, 23*
150:*8, 19*
151:*3, 8*
152:*12, 16*
153:*5, 9, 20*
154:*1, 7, 9,*
*15, 21*
155:*11, 16,*
*20*  156:*1, 9*
158:*6, 11,*
*20*  159:*17,*
*20, 23*
160:*5, 17*
161:*20*
162:*9, 20*
163:*2, 20*
164:*10, 18*
165:*14*
167:*8, 13*
169:*11, 15,*

*19, 21*
170:*3, 9, 15,*
*21* 171:*2,*
*10* 174:*1*
175:*3, 21*
177:*10*
178:*13, 17*
179:*15*
180:*11, 19*
182:*4, 13*
183:*5, 18,*
*20* 185:*10,*
*12* 186:*2,*
*12* 190:*21*
191:*21*
193:*3*
195:*17, 20*
196:*23*
197:*3, 9, 14,*
*18* 198:*2, 8,*
*13* 199:*4*
200:*1*
202:*21*
203:*8*
205:*22*
206:*19*
207:*14, 18*
208:*1*
209:*2, 14*
211:*5*
**Barnett**
19:*6* 20:*2*
96:*6*
**base** 12:*14*
39:*23* 40:*9*
43:*9, 15, 22*
47:*13*
131:*23*
132:*1*
**based**
14:*12*
22:*12, 16*

30:*1*
110:*19*
118:*3*
124:*9*
135:*7*
151:*13*
154:*17*
161:*4, 7*
170:*16*
202:*23*
**baseline**
128:*4*
**basic** 50:*22*
**basis** 46:*7*
65:*3, 4*
**BB&T** 41:*2*
152:*10*
153:*10*
155:*9*
**BEARMAN**
6:*16*
**becoming**
84:*8*
**beginning**
7:*8*
**begins**
53:*20*
55:*10*
**behalf**
7:*17*
135:*11*
164:*23*
**Behaviors**
50:*2*
**believe**
11:*18*
32:*22*
39:*18* 47:*8*
71:*4* 89:*13*
131:*17*
152:*10*
154:*4*

155:*9*
178:*18*
188:*5*
**bell** 198:*16,*
*17, 19*
199:*6, 10*
**beneficial**
52:*12*
**benefit**
70:*18*
**BERKOWIT
Z** 6:*17*
**best** 21:*20,*
*21* 53:*15*
**Betsey**
19:*12*
**Betsy** 19:*6,*
*11, 13* 20:*1*
35:*2* 41:*10*
42:*1, 6, 9,*
*10* 96:*6, 13,*
*14, 18*
97:*10*
**Betsy's**
41:*12* 97:*5*
**better**
35:*18*
124:*17*
165:*7, 8*
**beyond**
153:*13*
186:*21*
**biannual**
51:*9* 81:*20*
83:*19* 85:*4,*
*8, 10* 86:*1*
126:*9*
**BID** 35:*2*
**big** 178:*6, 9*
**bind** 21:*2,*
*3, 9* 72:*6*
101:*17, 19*

115:*4, 9*
199:*5*
208:*17*
209:*7*
**binder**
22:*8* 67:*16,*
*17* 68:*1, 5,*
*7, 8, 10, 12,*
*13, 17*
71:*23* 72:*1*
73:*14* 75:*6*
99:*2, 6, 9,*
*15, 16*
100:*14, 15*
**binders**
99:*23*
100:*3, 11,*
*16, 19, 22*
105:*16, 19,*
*22* 106:*10*
**binding**
30:*9, 13*
73:*13, 14*
115:*6*
116:*17*
208:*11*

**Birmingham**
2:*8* 6:*7, 12,*
*20* 7:*7*
42:*15*
77:*13* 95:*2*
151:*7, 12*
155:*7*
189:*10*
195:*12*
**Bistro**
148:*6, 9*
158:*1*
159:*8, 9, 10,*
*11*

**bit** 10:*2*
26:*4* 29:*13*
31:*10*
75:*20, 23*
105:*1*
138:*9*
150:*15*
175:*12*
178:*22*
**bitty** 40:*19*
**blank** 26:*16*
**block** 50:*2*
**blue** 205:*19*
**board**
102:*23*
119:*10*
166:*9*
174:*5, 10*
190:*14*
**bold** 39:*12*
**bonus**
47:*1, 6, 13*
70:*5* 122:*2*
124:*8, 18*
125:*15*
126:*10, 14,*
*16, 19*
127:*3, 5, 7,*
*11, 22*
129:*12*
131:*8, 13*
134:*18, 19*
135:*2, 5, 20*
141:*9, 17,*
*19* 142:*2, 9,*
*14, 15*
144:*4, 8*
183:*17*
195:*15*
207:*22*
208:*4*

Video Deposition of Clay Segrest

1/31/2024

**bonuses**
120:*15, 20*
121:*9*
122:*10, 18*
123:*8, 10,*
*19*  124:*3, 5,*
*6, 13*  125:*6,*
*9, 14, 18, 22*
126:*2*
127:*17*
129:*9*
136:*12, 18,*
*20*  137:*23*
138:*3, 19*
140:*20*
141:*16, 17*
142:*14, 17*
196:*3*
208:*7*
**book**  55:*3*
93:*9*  103:*6,*
*8*  119:*1*
162:*1*
182:*14*
**books**
21:*5*  75:*19*
102:*15*
178:*1*
**boss**
201:*21*
**bottom**
30:*4*  40:*18*
44:*5*  45:*7*
51:*20*
101:*7*
112:*18*
115:*23*
190:*1*
199:*15, 18*
204:*5*
**Bottrell**
95:*16, 19,*

*20*  96:*7*
97:*7*  110:*7*
**bound**
68:*11, 14*
94:*9, 11*
198:*22*
**box**  99:*6,*
*10, 19*
115:*23*
**boxes**
39:*22*
**break**  41:*6*
66:*2, 6, 13,*
*17*  90:*17*
134:*4, 13*
167:*13*
204:*18*
205:*1*
210:*8, 10*
**breakdown**
106:*23*
158:*9, 14*
174:*14*
**breakdowns**
158:*23*
**breather**
134:*5*
189:*2*
**brief**  66:*8*
80:*15*
88:*23*
134:*8*
167:*22*
209:*12*
**bring**
11:*22*  12:*1*
24:*15*
60:*13*
144:*1*
174:*21*

**bringing**
60:*17*
**brings**  61:*4*
**broad**  16:*2*
146:*9*
**broker**
20:*14*
24:*14*
25:*19, 22,*
*23*  26:*3, 5,*
*9*  27:*5, 8,*
*15*  28:*8, 22,*
*23*  29:*16,*
*20*  30:*7, 10,*
*15, 17, 20*
31:*3, 6, 9,*
*19*  33:*3*
34:*20, 22*
35:*1, 2, 9,*
*16, 22*  36:*2,*
*3, 5, 6*
38:*17, 18*
39:*5, 6, 16*
50:*12, 16*
57:*6, 11*
58:*9*  59:*12,*
*16, 17*
60:*14, 16,*
*20, 22*  61:*4*
74:*21*  76:*7,*
*8*  80:*2, 16,*
*17*  81:*3, 8,*
*19*  82:*11*
83:*14*  84:*4,*
*8*  90:*7, 12*
105:*7*
120:*9, 10,*
*12*  129:*7, 8,*
*19, 21, 22*
131:*23*
132:*1*
133:*10*

139:*21*
140:*2, 7, 11*
143:*14*
144:*22*
145:*6*
146:*7*
147:*18*
148:*11, 23*
155:*8*
159:*6*
160:*16, 18,*
*20, 22, 23*
161:*10, 16,*
*17, 19*
163:*4*
165:*12*
169:*5, 8, 13,*
*17, 18*
170:*8, 14*
171:*9*
173:*22*
177:*9*
180:*9*
184:*18*
201:*19*
207:*13, 16,*
*17, 23*
208:*7, 10,*
*12, 18*
**brokers**
60:*20*  75:*2*
139:*18*
148:*3*
149:*18*
150:*3*
151:*7, 12*
152:*3, 19*
154:*14*
155:*1*
159:*15*
160:*11*

161:*6*
188:*1*
**broker's**
30:*1*  129:*2*
**brought**
48:*7*  61:*16*
81:*8*
105:*13*
111:*8*
144:*7*
147:*5*
148:*16*
150:*13*
174:*5*
**Brown**
95:*20*
**Buckner**
73:*5, 10, 15,*
*20*  89:*22*
90:*1, 5, 9*
**building**
118:*23*
**built**  30:*1*
**bump**  92:*1*
**bumped**
40:*14*
**Bureau**
73:*1*
**business**
13:*10*  14:*1,*
*5*  21:*2, 3, 5,*
*10*  24:*15*
29:*21*  32:*6,*
*11*  37:*1, 2*
48:*7*  52:*16,*
*17, 22, 23*
53:*10, 11,*
*12, 16*  54:*2,*
*9, 18*  60:*17,*
*18, 21, 22*
61:*5, 16*
62:*4*  75:*10,*

*14, 18, 22*
76:*2, 6, 10*
90:*8*  92:*20*
94:*9*  96:*1,*
*4, 7*  97:*6, 7,*
*9, 14, 15*
102:*3*
104:*10, 13,*
*18*  106:*8,*
*10*  108:*18,*
*21*  111:*19*
123:*18, 19,*
*22*  125:*2*
143:*23*
144:*6, 7*
146:*23*
147:*8, 15*
162:*1, 5, 16*
163:*23*
164:*5, 7*
166:*14*
175:*16, 19*
176:*7, 21*
177:*2, 3, 21,*
*22*  178:*5, 7,*
*12*  179:*8,*
*21*  181:*7*
198:*22*
199:*6*
207:*20*
**businesses**
33:*4, 5*
53:*3*
105:*14*
**business-
related**
13:*19*
**button**
72:*5, 6*
101:*17*
115:*9*

**Byrd**  6:*22*
7:*15*

**< C >**
**Cadden**
73:*23*
74:*10*
75:*11*
76:*14*
88:*20*
151:*11*
**calculate**
63:*18*
122:*9*
**calculated**
126:*12*
135:*2, 5*
**calculation**
129:*12*
183:*17*

**calculations**
195:*16*
**CALDWELL**
6:*16*
**call**  9:*15,*
*16, 19*
17:*16, 17*
19:*11*  24:*7*
29:*16*  35:*2*
40:*17*
54:*22*
66:*15*  88:*8*
90:*4*  92:*21*
152:*5*
157:*16*
172:*19, 22*
199:*8*
**called**
57:*17*
166:*17*
173:*2, 3, 6*

**calls**  23:*9*
190:*3*
**canceled**
43:*3, 4, 18*

**cancellation**
43:*12*
**candidate**
88:*13*
189:*14*
**capabilities**
161:*2*
**career**
80:*1*  82:*1*
143:*12, 18,*
*22*  161:*2*
163:*5, 13*
**carried**
102:*2*
**carrier**
22:*9*  23:*19*
37:*14*
63:*20*  72:*1*
91:*7*  92:*2*
113:*12*
166:*17, 20*
**carriers**
15:*3*  22:*11*
27:*4*  31:*13*
37:*11*
**carrier's**
107:*15*
**CASE**  1:*5*
7:*21*  8:*1*
9:*11*  14:*2*
17:*11*
20:*16*
170:*23*
**cases**  20:*6*
56:*22*  57:*2*

**casualty**
90:*7, 11*
93:*3*
**categories**
31:*21*  32:*1*
59:*7, 20*
168:*10*
**categorize**
152:*7, 8*
157:*17*
**categorized**
14:*12*
**category**
155:*10*
**cause**  7:*9*
122:*22*
212:*16*
**caused**
139:*3*
**causes**
18:*21*
**celebrating**
198:*23*
**cellphone**
16:*15, 16,*
*18*
**Central**
7:*14*
**certain**
122:*23*
166:*7, 8*
175:*11*
197:*5*
**certainly**
71:*9*
173:*17*
**certify**  7:*2*
212:*6, 13*
**chair**
188:*12, 13*

**chance**
138:*11*
184:*5*
**change**
18:*22*  40:*2*
43:*1, 4, 15,*
*19*  45:*9, 13,*
*19*  66:*18*
109:*20*
134:*14*
158:*4*
165:*12*
210:*10*
**changed**
38:*12*  43:*9*
73:*8*
207:*13*
**changes**
165:*15, 17*
**chapter**
187:*14*
192:*13*
**chart**
131:*8, 13*
**chat**  209:*9*
**check**  99:*6,*
*10, 17*
185:*8*
**checking**
184:*23*
204:*19*
**choice**
19:*16*
**choose**
55:*8*
**Chris**  26:*14*
**circles**  33:*8*
**circulate**
65:*14*
**circulated**
63:*8*  64:*7*

Cite 7:17
cities 36:18
Civil 7:4
claim
152:6
153:18
156:14
157:5, 8, 9,
10, 12
claimed
154:16
claims
210:19
clarification
28:14
clarified
172:9
clarifies
15:5
clarify
10:17 15:9
29:13
35:15 53:8
63:10, 21
127:23
137:9
141:15
142:12
151:21
clarifying
48:18
84:20
CLAY 1:16
2:4 7:8, 19
8:14 9:15,
20 47:23
48:10
66:13
73:22
74:20
114:15
196:15

204:12
210:9
cleaning
134:17
cleanup
210:14
clear 10:8,
13 11:3
46:21
85:16
102:2
cleared
113:15
184:9
clearly
113:16
131:2
172:13
176:16
180:20
184:19
197:5
202:7
click
101:17, 19
115:4
client
21:22, 23
22:3 23:7,
10, 15
29:22 30:8
55:7 60:2
72:23 76:5
95:23
clients
14:2 15:2
19:18 53:3
57:2 95:21
102:20
144:1
clips
199:17, 19

close
29:17
66:23
103:11, 19
closer
29:14
code 61:5
coding
61:8
cold 19:11
90:4 92:21
colleague
54:5 90:6
132:4
183:2
colleagues
14:22 78:6
79:8 87:6
132:22
Collections
73:1
college
206:6
Colorado
90:3, 8
176:18
column
43:2 58:9,
10, 11
61:12
62:15
204:6
columns
58:8 59:9
60:5 61:10
131:17
come 19:5
79:1 80:18
81:23 83:9
85:14 86:5
92:23
101:19

111:7
112:12
118:6
166:8
205:12
comes
26:23 27:5
36:16
81:15
127:5
129:3
131:18, 19
147:16
202:11
208:4
comfort
99:8
coming
26:17 68:1
70:15
76:10
109:18
119:10
179:5
181:8
190:16
commencin
g 2:9
Comment
52:15
152:19
comments
51:21
157:5

Commercial
21:17

commission
22:12, 15
23:18
25:10, 16

91:4, 18
92:5, 8
107:5, 6, 10,
13, 15, 18,
19 112:17,
19 113:3
Commissio
ner 3:5
7:2
commit
191:2
committee
77:9, 13, 14,
17 187:1, 8,
11, 14
188:4, 7, 17
189:3, 8
190:4, 7, 14,
20 191:4,
11 195:15
common
116:8
197:1, 4
communicat
e 86:20
180:22
197:2, 7, 10
communicat
ed 198:5
communicat
ing 87:5
communicat
ion 15:3
87:1
communicat
ions 198:12
companies
19:22
37:14
company
16:17 17:2
67:17

Video Deposition of Clay Segrest

1/31/2024

70

79:14
197:13, 17,
23  210:15,
17, 21, 23
companywi
de  77:14,
15
compare
141:19
compared
100:17
141:10, 20
Compensati
on  39:23
43:1, 4, 19
45:13, 15,
19, 20, 22
46:23  47:1,
6
compete
97:8
competition
199:2, 8
compilation
s  122:2
complaint
153:8, 22
155:2, 10,
11, 15, 18
157:17
complaints
15:14
complete
17:10, 16,
18  26:17
completely
55:2
111:23
156:12
completing
131:13

complex
52:23
compliance
2:15

complicated
27:2
complies
168:23
184:6
computer
57:15  62:7
64:22  89:3
computer-
aided  212:9
concern
14:3
148:19
149:2, 17
150:18
151:1, 19,
22  152:5
160:3
concerns
179:13
concludes
211:6
conference
164:20

conferences
37:8, 11
confirmatio
n  68:11
confused
137:3
confusing
137:7
173:12
connection
29:22

consciously
180:13
consider
168:11
202:20
consideratio
n 70:5
135:10
196:3
considered
124:6
161:12
195:15, 21
considering
195:2, 7
196:3
considers
209:17
constitutes
153:8
156:13
157:8
contact
23:12  24:3
69:4
200:17
210:4
contacts
30:8
contained
192:16
context
50:11
145:8
170:1
193:1
205:21
continually
175:13
continue
163:6

194:22
202:7
208:23
continued
51:22
52:15
197:7
Continuing
5:1
control
62:23
185:4
conversatio
n  10:4
79:15
80:13, 20
81:7, 13
82:19  83:1,
3, 12, 15, 18,
22  84:13
123:6
141:18, 23
146:2
148:9
150:5, 21
151:6, 10,
14, 16
154:22
155:7
156:6
158:4, 8
181:11
182:3, 23
203:14
205:20
conversatio
ns  81:14
85:22
121:14
123:7, 14
128:1
144:2, 11

158:22
159:3
161:22
181:14
182:8
copy  11:14
17:9  33:20
37:21  67:3
90:19  97:3
110:3
112:3
115:15
117:12
119:6
168:15
184:1
187:18
192:1
196:11
200:9
203:17
co-
responsibilit
ies  147:6
Corey
12:22  19:8
28:3  41:10,
18  42:5, 6,
7  44:17
45:4  48:21
51:8  52:16
54:4, 10
55:10, 16,
17, 18, 21
56:7, 9, 23
59:12, 14
62:16
66:12
67:15
69:20  70:4
74:19
78:11  79:9

82:22  83:5
85:17, 21,
23  90:23
92:3  93:12,
18  95:23
96:3, 15
97:7, 12
110:5, 8
111:6
117:18
118:1, 6, 15,
17, 18
120:1, 3, 8,
11  121:9,
11  122:5
126:7, 17
128:1
129:3
131:17
135:8, 17
136:18, 22
140:20
141:19
142:12, 16
145:12
148:21
149:12
150:18
151:20
162:7, 13,
14  163:15,
22  167:5,
12  178:9,
19  179:2, 9,
12, 19
183:14
189:23
192:5
195:21
196:1, 14
197:21
199:17

200:23
201:17, 19,
21  204:17
205:8, 14
206:15
208:15, 17
**Corey's**
91:22
93:10  94:1
96:20
174:6
**Cornelius**
2:5  7:1, 16
212:19, 20
**corner**
38:9  40:18
**CORP**  1:11
**correct**
19:2  26:11
27:20
29:19  32:7
41:11, 17
42:2, 3
45:5  49:7
52:13
58:17, 19
70:16, 21
71:15
72:21
105:8
120:6
127:3
129:4
136:18
204:7
212:11
**corrected**
49:13
**correcting**
64:12
**correctly**
56:11

**correspond
ence**  111:1
**cost**  116:12
**co-
supervisors**
120:4
**co-team**
120:3
**counsel**
2:4, 20, 22
7:5  8:2
17:11
19:16
212:14
**counseled**
86:23
**count**
55:11
**counts**
63:3, 23
**County**
185:14, 23
186:3, 8, 16,
19  212:4
**couple**
11:22
12:14  19:9
40:13
42:18  45:6
79:8  85:3
128:5
168:10
176:19
177:23
178:9
199:16
206:9
210:13
**course**
13:23
**COURT**
1:1  2:16

7:16, 17, 22
8:10  10:5
210:3
**coverage**
21:21  22:4,
7  24:11, 21
31:11  68:6,
11, 14, 15
94:9
112:18
116:7, 18,
22  117:8, 9
152:22
153:3, 4
156:3, 10,
11, 13
157:1
**coverages**
37:4
166:23
**covered**
156:23
**co-work**
147:13
**CRC**  1:10
7:21  8:9
9:7, 13, 14
19:1, 5, 7,
10, 17  20:2,
11, 17, 18
23:18
32:18
33:21
34:19  35:7
36:21  38:1,
4  41:1
47:10  54:6
62:22
70:15
72:13
77:21
83:16

90:11  95:1
96:10
98:18  99:3,
4, 7, 22
107:6
108:5
112:10
113:21
118:19
130:2
131:1
143:1
144:13
147:18
148:10, 23
150:4
151:7, 12
152:3
155:1, 7
159:15
184:21
189:10, 12
193:7
195:12
197:13, 17
206:4
207:8
209:16
**CRC's**
91:10  92:9
107:12
113:2
156:16
**create**
60:21
161:14
162:1
164:4
**created**
41:19
72:20

creating
164:6
credit
55:14
60:22  70:1,
23  183:16
credited
183:12
crime
94:22
cross-sell
93:20, 21
CSR  2:6
7:1  58:23
curious
115:19
current
18:1  50:4,
8
currently
26:12
30:16
108:22
131:12
135:3
197:23
curve
168:9
customers
209:18
cyber
93:22
94:16, 23
95:2
110:10, 13
111:7
167:2
185:2, 14,
22  186:20,
21

Cynthia
6:10  7:20
8:6  9:5

< D >
D  2:5  4:1
7:1  212:19,
20
D&O
111:17, 19
167:2
186:18, 22
daily  21:12
Dan  90:6,
11  93:2, 4
date  7:3
38:8  40:23
43:7  46:1,
15  148:2
180:8, 13
dated
169:2
dates
170:20
Daugherty
12:22  19:8
27:12, 14,
18, 19  28:2,
3, 4  33:13
41:16, 19
42:10
44:18
46:14, 18
47:19  48:8
54:9  55:12,
22  59:11,
13  61:23
63:2  70:4
78:11
79:10
82:22
85:21

93:18
95:22
118:8
121:9
126:17
129:9
132:8
142:13
145:12
148:22
149:12
162:7
166:13
167:5
179:9, 12,
19  183:14
196:15, 21
197:21
199:17
200:23
201:3
208:15

Daugherty's
56:9  93:12
95:21
129:3
131:17
David  20:4
day  2:8
132:15, 16
133:1
204:12
days  26:15,
20, 21
204:16
deadline
180:2, 3, 12
deal  25:16
deals  106:2
decent
189:6

decided
189:6
decision
167:10
189:11
decisions
179:7
declaration
68:9
decrease
142:9
dedicate
188:16
dedicated
62:15
Defendants
1:12  6:15
define
20:21
135:10
181:18
definitive
149:4
deliberately
180:14
deliver
15:1
delivering
15:1
demand
157:14
Demonstrat
es  50:3
Denver
71:4
department
42:15  64:8
96:11
195:13
depended
55:5

depending
27:1  54:21
61:10
153:23
154:8, 18
156:22
157:1
161:11
depends
22:21  58:2
74:4  98:5,
6, 21
156:12
DEPONENT
211:11
DEPOSITIO
N  1:15
2:4, 13, 14
3:1, 4  4:9
7:19  9:22
11:4, 20
12:2, 5
15:17
27:21
33:16
209:15
211:7
depositions
2:17
desire
54:14
80:23
105:10
143:11, 13,
17, 18
145:10
161:1, 23
162:2
163:12
desired
82:4  163:9

Video Deposition of Clay Segrest

1/31/2024

73

desires
81:*7*  82:*20*
143:*1*
details
82:*17*
192:*17*
205:*6*
determine
9:*10*  60:*10*
75:*4, 6*
168:*6*
determined
126:*16*

determining
60:*6*
develop
51:*23*
163:*6*
developed
208:*21*
difference
14:*8*  31:*19,
20*  75:*12*
180:*4*
207:*16, 19*
different
14:*4*  19:*21*
20:*16*
21:*15, 19*
26:*4*  31:*21*
32:*1*  35:*10*
36:*18, 22*
37:*5, 11*
51:*18*
58:*21*  61:*5*
62:*22*  65:*9*
75:*21*
79:*10*
81:*16*
89:*12*
95:*13, 14*

97:*11*
106:*6*
140:*11*
154:*5*
170:*4, 18*
184:*21*
207:*6*
differential
155:*15*
differently
154:*10*
difficulty
145:*17*
direct
23:*11*  24:*3*
69:*4*
119:*20*
direction
105:*11*
146:*4*
202:*8*
directly
24:*7*  45:*4*
120:*1*
126:*19*
139:*22*
151:*20*
disclose
23:*23*
disclosed
113:*2*
Disclosure
115:*21*
discriminati
on  153:*8,
22*  157:*3*
161:*7*
discuss
14:*3*  18:*4,
12*  52:*17*
122:*9, 14,
16, 18*

123:*1, 16*
128:*2*
133:*2*
150:*6, 18*
180:*16*
189:*15*
205:*7, 13,
16*
discussed
137:*2*
141:*13*
149:*11*
179:*9, 11*
182:*15*
discussing
189:*19*
discussion
82:*9*  133:*5,
8*  142:*23*
192:*14*
198:*15*

discussions
126:*1, 5*
136:*17*
141:*17*
143:*4, 21*
display
37:*5*
dispute
130:*9, 13*
distinction
14:*6*
DISTRICT
1:*1*  7:*22,
23*
dividends
52:*1, 2*
DIVISION
1:*3*  8:*1*
document
72:*7*  88:*2,

9*  101:*9, 13,
16*  106:*21*
113:*8*
131:*11*
136:*21*
documents
9:*13*  11:*11,
22*  12:*1, 7,
9, 10, 14*
15:*8, 12*
26:*19*
170:*18, 19*
176:*9*
193:*14*
210:*18*
211:*1*
doing  30:*9*
83:*22*
84:*23*
105:*5*
144:*3, 21*
158:*10*
181:*7*
204:*18*
205:*1*
dollar  46:*6*
dollars
52:*21*  53:*7*
54:*23*
111:*22*
115:*22*
116:*3*
117:*2, 6*
199:*12*
donation
191:*2*
DONELSON
6:*16*
double
184:*23*
doubt  52:*7*

Dougherty
176:*11, 15,
17*
drive  140:*3*
drove
92:*19*
drum  90:*7*
147:*8*
drumming
146:*22*
Dual
190:*23*
191:*2*
duly  8:*15*
Dunnavant
90:*6, 11*
93:*2*
Dunston
207:*1, 4, 8*
duties
31:*2*  32:*2*
144:*22, 23*
145:*3, 6*
146:*7*
159:*6*
164:*9*
165:*10, 13*
duty  153:*3*
208:*23*

< E >
E  4:*1*  6:*1*
212:*1*
E&O
186:*18*
earlier
31:*15*
84:*19*
101:*10*
107:*17*
117:*17*
132:*12*

Video Deposition of Clay Segrest                          1/31/2024

138:*23*
140:*18*
197:*12*
203:*21*
209:*6*
**early**  194:*3*
**easier**
210:*6*
**easily**
63:*17*
**educators**
186:*18*
**effect**  2:*14*
127:*7*
**effective**
186:*5*
**eighty**
103:*6*
**either**  15:*1*
27:*3*  91:*21*
99:*15*
129:*6*
150:*6, 10,*
*23*  170:*10*
**Electronic**
65:*16*
**electronicall**
**y**  64:*21*
**elevate**
31:*10*
161:*1*
**else's**
128:*3*
**E-mail**
4:*11, 12, 13,*
*14, 15, 16,*
*17, 18, 19,*
*20, 21, 22*
5:*3*  14:*3*
65:*17*
67:*11*
71:*11*  88:*7*

90:*21*  91:*2*
97:*18*
98:*10*  99:*1*
110:*8*
117:*15*
118:*3, 14*
119:*9, 11*
121:*15*
162:*7*
168:*18*
169:*2*
171:*14, 17,*
*18*  172:*8,*
*10, 14*
174:*8*
179:*6*
180:*20*
181:*9, 21*
182:*1, 6*
190:*1*
192:*4, 16*
193:*17*
194:*21*
200:*13*
201:*5*
**e-mailed**
97:*20*
**e-mails**
12:*13, 17,*
*21*  13:*1, 2,*
*10, 17*  14:*1,*
*11, 16, 21*
15:*12, 15,*
*21*  16:*1, 7*
65:*21*  67:*6,*
*8*  98:*1, 3,*
*13*  112:*6*
115:*18*
172:*4*
173:*2*
186:*13*

**employed**
19:*1, 5*
54:*6*  130:*8*
**employee**
14:*2, 4*
153:*10*
154:*3*
**employee-**
**related**
14:*13*
**employees**
12:*15*
14:*22*
77:*21*
127:*12*
**employer**
157:*11*

**employment**
15:*14, 18*
38:*10, 11*
41:*6*  51:*10*
130:*2*
156:*17*
197:*6*
205:*14, 17*
207:*8*
**encourage**
161:*13*
**encouragem**
**ent**  162:*16*
**ended**
179:*4*
197:*6*
**England**
207:*10*
**enter**
101:*22*
108:*21*
**entered**
101:*21*
185:*19*

**entire**
25:*13*
50:*18*  85:*5*
**EPL**  19:*16*
111:*20, 21*
152:*22*
153:*2, 15,*
*18*  154:*6*
155:*12, 21*
157:*4, 13,*
*18*  167:*2*
186:*18, 22*
**equal**  101:*5*
**Esq**  6:*5,*
*10, 18*
**estate**
19:*22*
**et**  7:*22*
**event**
191:*9*
192:*9, 12,*
*15, 19*
193:*2, 7*
**events**
188:*22*
**Eventually**
56:*19*  84:*8*
105:*7*
185:*23*
**Everybody**
84:*17*  87:*8*
95:*10*
100:*22*
109:*15*
210:*6*

**everybody's**
196:*2*
**everyone's**
127:*5*
**evidence**
3:*2*

**evolve**
80:*1*  82:*2*
143:*12*
**evolving**
75:*17*
**exact**
46:*15*
51:*17*
125:*22*
130:*5*
139:*1*
183:*10*
**exactly**
24:*20*
32:*23*
35:*11*
154:*19*
163:*11*
165:*21*
177:*4*
206:*11*
**EXAMINATI**
**ON**  4:*2*
7:*9*  9:*1*
**examined**
8:*16*
**example**
14:*12*
70:*13*
93:*16*
107:*16*
108:*1*
124:*8*
**Excel**  58:*5*
61:*19*
**exceptions**
22:*20*
**executive**
20:*18, 21,*
*23*  24:*17*
25:*1, 5, 8,*
*15*  27:*2*

Video Deposition of Clay Segrest

1/31/2024
75

31:8 47:22,
23 48:2
49:2, 3
57:12
59:15 74:9,
11 89:13
108:20
132:7
145:21
146:6, 13,
17 147:2
158:10, 19
164:8
183:4
201:20
208:22
**executives**
21:1 29:11
30:9 31:17
48:13
49:19 54:1
75:2
158:19
197:23
209:1
**executive's**
24:10
124:8
**EXHIBIT**
4:7, 8
11:10, 13,
16 15:11
33:17 34:7
37:19, 20,
23 44:20
46:23
66:22 67:2,
10 89:21
90:15, 18,
22 97:1, 2,
17 106:22
110:1, 2

112:2, 5
115:14
117:11, 14
119:5
131:4, 6
132:11
135:21
136:1, 11
138:17
168:12, 14
171:16
183:22, 23
184:4, 8
187:13, 15,
17 191:23
192:3
196:8, 10
200:8, 11
203:15, 16
**EXHIBITS**
5:1 67:5
209:16, 22
**existed**
93:1
**existing**
32:6, 10
33:4 37:2
53:3 60:21
76:5 94:1
104:14
111:13
175:19
177:1, 5, 8,
21, 23
**expect**
34:11
**expectation
s** 82:15
**experience**
23:3 83:20
84:23
139:16

166:11
167:1
189:5
191:4
193:22
**Expires**
212:21, 22
**explain**
9:12 37:4
54:13
124:2
138:22
165:16
**explanation**
41:8 67:7
**exposure**
196:5
**express**
161:23
191:12
**expressed**
54:14
80:15
105:10
143:11
145:10
160:15, 19
161:14
163:12
164:14, 15
195:5
202:5
**expressing**
148:21
160:14
161:1
192:5
**extent**
12:15
180:23

**< F >**
F 212:1
**facilitation**
24:8
**fact** 35:14
149:15
170:22
**factor**
56:11
**factors**
122:14, 16
**fair** 18:19
33:11
**familiar**
25:23 38:2
58:8, 12
78:6
147:23
152:14
166:21
**famous**
210:14
**fantastic**
20:10
**far** 26:23
29:6 45:23
83:20 96:7
97:16
134:14
137:11
142:6
153:12
155:4
166:3
**fast** 55:4
166:5, 6
**February**
137:6, 8
190:2
194:14
**Federal** 7:3

**feel** 10:3,
16 27:23
35:17
84:22
202:19
**feels** 83:20
87:10
**fees** 107:5
**felt** 144:21
189:4
203:6
206:20
**female**
29:5
147:18
148:3, 23
149:18
150:3
151:7, 11
152:3
155:1
159:14
160:11
161:6
**females**
154:4
**fiduciary**
94:22
**fifteen** 34:5
**fifty** 53:7
100:7, 9
**fifty/fifty**
174:14
**fifty-six**
40:11, 14
**figure** 33:2
95:10
165:9
167:5, 6
177:18
192:23
207:15

Video Deposition of Clay Segrest

1/31/2024

**file** 4:10
27:6 38:1
99:21
**filing** 3:4
31:5 97:19
98:18, 19,
22 99:3, 5,
7, 17, 22
210:1
**filled**
129:14
**filling**
34:12
136:6
**FINANCIAL**
1:10
**find** 22:3
24:10
129:17
200:7
206:15
**finding**
114:13
**fine** 9:20
170:12
171:6
191:8
**finger** 37:9
**finish**
106:15
138:10
**Firm** 2:7
6:9 7:6
**first** 8:15
11:2 28:8
39:12 58:9
75:20 96:3,
6, 9 111:7
120:8
159:9, 10,
13, 18
169:1

172:14
175:12, 15,
23 187:4
188:8
190:12
191:15
192:12
201:7
208:20, 22
**Fisher**
95:16, 19,
20 96:4, 14,
20 110:6
**fit** 188:22
**five** 22:21
53:7 54:20,
22 75:1
90:9 103:5
130:2, 7
**flat** 124:7
**flew** 90:3
**flip** 11:21
35:5 39:9
42:16 44:2
45:6, 14
47:17
49:21 51:2,
19 101:6
**flow**
175:17, 19
176:8
179:8, 13,
14
**flyer**
193:11
**focus**
52:19
53:20
54:17
57:19
94:17

159:5
181:5
**focused**
33:3 174:4
176:21
**focuses**
95:2, 13, 14
**focusing**
53:19
69:10
**folks** 97:14
193:7, 8
**follow**
26:20
160:2
**following**
7:10
**follows**
8:16
**force** 2:14
**forego**
56:19
**foregoing**
7:4 55:23
212:7, 10
**form** 2:21
10:23 11:5
13:14, 20
14:7, 17
16:22 18:7,
14 22:17
23:2, 5, 20
24:12 25:2,
4, 11 27:9
32:3, 13, 16
33:6 38:6,
14, 20 39:7,
20 40:6
41:3 42:4
43:6 44:9
46:3, 9, 19
47:7, 15, 16

48:15 50:9
51:12 52:4
53:4, 22
54:11 57:1,
7, 18 58:13
59:21
60:12 61:1,
20 62:1, 8,
12, 17 63:5
64:2, 9, 15,
19 65:7, 15,
22 68:3
69:15 70:2
71:2 73:16
76:9, 23
77:23 78:4,
16, 22 79:7,
18, 21 81:4,
10 83:4
84:5, 9, 15
86:9, 21
87:3, 12
88:15 89:1,
5, 11 91:12,
15 92:10
93:11 94:7
95:3, 12, 18
98:4, 15, 20
100:6, 8
102:16
104:16
105:9, 17
106:12
110:14, 18,
22 111:16
112:14
113:4
114:1, 17,
20 115:7
116:5
118:2, 11,
20 119:22

120:23
121:5, 16,
21 122:3, 6,
11, 15, 20
123:2, 11
124:14, 19
125:3, 20
126:6, 21,
23 127:10
129:5
130:10, 18
131:21
133:15
134:20
135:6, 15
136:3, 13
137:1
138:6, 8, 20
139:5, 9, 13,
19, 23
140:4, 23
141:8, 14
142:4, 10
143:3, 5, 8,
20 144:5,
14 145:1,
19, 22
146:8, 19
147:3, 9, 20
148:1, 7, 12,
20 149:3, 8,
14, 19, 23
150:8, 19
151:3, 8
152:12, 16
153:5, 9, 20
154:1, 7, 9,
15, 21
158:6, 11,
20 159:17,
20, 23
160:5, 17

Cite, LLC

161:*20*
162:*9, 20*
163:*2, 20*
164:*10, 18*
165:*14*
167:*8*
169:*11, 15, 19*  170:*9*
171:*10*
174:*1*
175:*3, 21*
177:*10*
178:*13, 17*
179:*15*
180:*11, 19*
182:*4, 13*
183:*5, 18, 20*  185:*10, 12*  186:*2, 12*  190:*21*
191:*21*
193:*3*
195:*17, 20*
196:*23*
197:*3, 9, 14, 18*  198:*2, 8, 13*  199:*4*
200:*1*
202:*21*
203:*8*
205:*22*
206:*19*
207:*14, 18*
208:*1*
209:*2*
**Forman**
6:*10*
**format**
51:*14, 17*
**formidable**
20:*7*

**forms**
47:*14*
166:*22*
**forth**
172:*18*
209:*19*
**Forty-two**
40:*13*
**forward**
18:*6*  68:*17*
98:*1, 2, 13*
172:*12*
**forwarding**
97:*21*
**found**
206:*14*
**four**  21:*1*
59:*9*  60:*5*
74:*4*  75:*1, 5*  76:*20*
90:*9*
199:*17*
**fourteen**
74:*14*
**free**  10:*16*
147:*7*
164:*4*
**freedom**
162:*15*
**frog**  106:*16*
**front**  26:*22*
106:*21*
**full**  2:*15*
38:*18*
162:*15*
163:*15*
**full-time**
38:*18*
**fun**  9:*17*
199:*7, 9*
**funds**
126:*20*

**FURTHER**
2:*11, 18*
3:*3*  29:*13*
97:*19*
205:*8*
211:*11*
212:*13*
**future**  80:*1*
82:*10, 13*
83:*16*
84:*16*

**< G >**
**gaining**
120:*18*
**gender**
154:*17*
155:*15*
161:*5, 8*
**general**
13:*10*  32:*9, 12, 19*
94:*20*
151:*17*
186:*15*
**generally**
32:*10*
**generates**
72:*6*
**getting**
29:*17*  30:*3*
35:*3*  91:*3*
111:*14*
117:*18*
118:*1*
**Gill**  9:*6*
**give**  11:*3*
36:*19*  68:*1, 2*  93:*14, 16*
107:*16*
127:*16*
138:*11*

181:*12*
189:*7*
195:*11*
205:*21*
**given**  9:*22*
212:*12*
**gives**  72:*9*
201:*4*
**giving**
55:*22*  76:*5*
120:*19*
121:*8*
**GL**  93:*19*
94:*23*
**glad**  113:*15*
**go**  16:*10, 20*  20:*11*
29:*22*
41:*15*  43:*2*
63:*18*  90:*7*
91:*14, 19*
99:*14*
109:*7*
111:*6, 14*
114:*13*
115:*4, 8*
121:*8*
124:*9*
142:*19*
143:*23*
153:*12*
162:*5, 16*
163:*12, 22*
164:*2, 4*
178:*3*
182:*15*
185:*20*
193:*15*
201:*5, 7*
206:*6*
**goal**  53:*8*
105:*6*

179:*23*
180:*3*
**goals**  133:*2*
**goes**  36:*16*
112:*20*
153:*12*
172:*17*
192:*11*
**going**  8:*21*
9:*9, 17*
11:*9, 10*
15:*7*  17:*15*
28:*13*  33:*1, 12*  35:*11*
37:*18*
40:*17*  45:*3*
49:*22, 23*
53:*10*  66:*1*
67:*6, 8*
75:*9, 10*
90:*14*
96:*16, 23*
101:*19*
104:*3*
115:*10, 13*
116:*10*
126:*8, 10*
134:*7*
144:*15*
148:*4*
157:*23*
164:*1, 2*
167:*16, 20*
170:*15*
191:*7*
200:*6*
203:*9*
205:*5*
207:*20*
**Good**  9:*3*
30:*3, 5*
45:*18*

Video Deposition of Clay Segrest

1/31/2024

78

46:*20*
48:*20*
54:*16*  69:*2,*
*12, 20, 21*
79:*13*
88:*13*
132:*21*
145:*13*
156:*7*
189:*4, 14*
191:*8, 9, 13,*
*14*  196:*4, 6*
**Gosh**
103:*9*
146:*9*
162:*22*
**gotten**
150:*15*
178:*22*
189:*5*
**grad**  19:*20*
**gradual**
56:*16*
166:*7*
174:*16, 17*
175:*7, 13*
179:*17*
180:*1*
**gradually**
165:*18, 23*
174:*8*
**great**
36:*11*
67:*18*
68:*22*  69:*8,*
*19, 20, 22*
196:*5*
202:*15*
203:*3*
**Green**  29:*4*
100:*23*
109:*2*

**ground**
10:*2*
**grounds**
2:*23*
**group**
187:*20*
196:*20*
**grow**
53:*12, 15*
75:*16*
143:*11*
146:*7*
161:*1*
163:*13, 16*
176:*23*
182:*11, 14*
**growing**
53:*18*
**growth**
79:*13*
143:*18, 22*
145:*14*
177:*2, 5, 8*
182:*12*
186:*10, 22*
**guess**
24:*13*
31:*19*  33:*2*
41:*8, 19*
42:*5*  53:*13*
69:*10*  78:*1*
86:*22*  95:*9*
99:*16*
102:*12*
103:*16*
137:*14*
150:*4*
156:*20*
161:*11*
165:*9*
167:*10*
170:*13*

173:*16*
178:*14*
181:*20*
193:*16*
194:*15*
199:*7*
201:*22*
207:*15*
**guidance**
87:*9*  123:*9*
**guided**
86:*23*
**Gulf**  92:*19*
**guys**  57:*16*
59:*8*
111:*15*
113:*11*
120:*3*
157:*23*
158:*5*
172:*11*
177:*17*
189:*19*
191:*6*
199:*2*
206:*6*

**< H >**
**half**  76:*22*
169:*14*
175:*12*
**handle**
98:*3, 14*
146:*5*
204:*20*
**handled**
48:*9*
**handling**
106:*14*
158:*17*
**handwriting**
34:*15, 17*

**handwritten**
137:*9, 12*
**Hang**  56:*3*
57:*10*  63:*9*
137:*17*
194:*4*
**happen**
53:*2*
152:*11*
155:*9*
**happened**
68:*4*  77:*7*
82:*22*
181:*15*
**happening**
154:*17*
185:*11*
**happens**
71:*4*  165:*2*
**happiest**
198:*17*
**happy**
83:*21*  84:*2*
**hard**  55:*4*
**head**  10:*7*
**heads**
177:*14, 17*
**healthcare**
93:*19*
94:*23*
167:*1*
**hear**  84:*12*
207:*7*
**heard**
20:*15, 19*
58:*7*  83:*6*
86:*13*  87:*4*
94:*14*
120:*3*
207:*11*
**help**  21:*2,*
*3, 15, 19*

57:*21*  61:*6,*
*17*  165:*3*
192:*21*
202:*16*
203:*3*
**helped**
188:*22*
191:*9*
**helping**
69:*3*
192:*18*
**helps**  59:*22*
**HENDRIX**
1:*7*  6:*23*
7:*21*  8:*5, 7*
9:*5*  15:*13,*
*18*  46:*14*
48:*11*  49:*9*
57:*6*
123:*14, 17*
168:*4*
170:*8*
171:*7*
201:*2*
210:*18*
211:*1*
**Hendrix's**
170:*16*
**hereto**
11:*15*
37:*22*  67:*4*
90:*20*  97:*4*
110:*4*
112:*4*
115:*16*
117:*13*
119:*7*
168:*16*
184:*2*
187:*19*
192:*2*
196:*12*

Video Deposition of Clay Segrest

1/31/2024

200:*10*
203:*18*
**Hey**  19:*23*
26:*16*
29:*17*  53:*9*
54:*23*
88:*10*
91:*23*
109:*17*
111:*7*
128:*5*
142:*18, 20*
143:*14*
160:*10*
162:*4*
**higher**
130:*14*
**hire**  40:*23*
45:*20, 22*
170:*5*
**hired**
34:*21, 23*
35:*15*
47:*21*  48:*1,*
*8*  74:*13, 17*
119:*19*
120:*13*
132:*18*
147:*18*
148:*10*
154:*12, 14*
155:*7*
165:*19*
166:*12*
170:*7*
**hiring**
47:*19*
**histories**
45:*15*
**history**
39:*11, 23*

42:*20*  45:*9*
96:*9*
**Hmph**
121:*22*
**hoarder**
18:*20*
**hoc**  45:*13*
**hopefully**
52:*9*
**hoping**
15:*9*
**host**
188:*22*
191:*9*
**hour**  66:*1*
167:*19*
**hours**  9:*9*
167:*18*
**housed**
110:*21*
**houses**
206:*9*
**how's**
84:*22*
**HR**  168:*4*
**Hughes**
42:*11*
89:*18*
151:*2, 6*
**hundred**
49:*2, 13*
54:*20*
103:*11*
130:*3, 7*
156:*23*
199:*12*
**Huntsville**
176:*22*

**< I >**
**I**  2:*1*  4:*1*
*7:1*  9:*4, 15*

10:*3, 10, 11,*
*15*  11:*9, 18,*
*23*  12:*8, 10,*
*23*  13:*5, 7,*
*8, 15, 22*
14:*2, 8, 12,*
*20*  15:*7*
16:*4, 10, 19*
17:*15, 16*
18:*2, 15, 16,*
*18, 19, 20,*
*22*  19:*12,*
*20, 21*  20:*4*
*21:6*  24:*13,*
*21*  25:*12*
26:*5*  27:*7,*
*10, 13, 23*
28:*4, 9, 11*
29:*6, 13, 19*
31:*7, 18*
32:*17, 21,*
*23*  33:*1, 7,*
*10*  34:*2, 11,*
*13, 23*  35:*1,*
*11, 14, 18*
36:*8, 11, 14,*
*17, 19, 22*
37:*9*  38:*3,*
*15, 22*
39:*21*
40:*11, 15*
41:*8, 10, 18,*
*20, 21*  42:*5,*
*17, 22*  43:*7,*
*11, 20*
44:*10, 13,*
*17, 23*
45:*17*  46:*4,*
*10, 15, 21*
47:*8, 22*
48:*5, 6, 16*
49:*11, 12*

50:*1, 10, 18*
51:*16*  52:*1,*
*7, 8*  53:*6,*
*13, 23*
54:*18*  56:*6,*
*10*  57:*2, 3,*
*4, 8, 10, 12*
59:*22*  62:*3,*
*23*  64:*11*
65:*12*
66:*15, 23*
67:*6, 21*
69:*10, 21*
70:*5*  71:*4,*
*10, 12, 20*
74:*15*
76:*19*  77:*5*
78:*1, 5, 17*
79:*4, 8, 10,*
*11*  80:*22*
81:*12*  82:*7,*
*22*  83:*12*
84:*18*  85:*2,*
*6, 16*  86:*22*
87:*8, 16, 19,*
*22*  88:*3, 12,*
*18, 20*  89:*4,*
*8, 12, 13, 18*
90:*3*  91:*14,*
*17*  92:*3, 6,*
*14, 19*
93:*16, 22*
94:*9, 11, 13,*
*14, 17*  95:*9,*
*17*  96:*7, 8*
97:*16*  98:*5*
99:*16, 21*
100:*5, 12,*
*14, 15*
102:*12, 22*
107:*22*
110:*7, 15,*

23  111:*3, 6,*
*9, 23*  112:*9*
113:*5, 9, 15*
114:*21*
115:*12, 13*
117:*4*
118:*16, 22*
120:*2, 9, 13,*
*17, 21*
121:*1, 2, 12*
122:*7*
125:*12, 21,*
*22*  126:*7*
127:*2, 11,*
*21, 23*
128:*2, 5, 7,*
*18*  129:*1, 2,*
*6, 17*  130:*4,*
*13, 14*
131:*3, 8, 11,*
*16, 22*
132:*2, 6, 19,*
*21, 22*
133:*11, 18,*
*20*  134:*3,*
*16, 21*
135:*10, 20*
137:*14, 22*
138:*15, 23*
139:*10*
140:*11, 16,*
*17, 18*
141:*16, 21*
142:*5, 11,*
*12, 13, 17,*
*19, 21*
143:*9, 14,*
*15*  144:*18*
145:*2, 3*
146:*3*
148:*2, 13,*
*17, 21*

Video Deposition of Clay Segrest

149:*4, 9*
150:*4, 20*
151:*4, 22*
152:*2, 5, 6,*
*10, 13, 17*
154:*22*
155:*2, 3, 8*
156:*9, 16,*
*20* 157:*6,*
*16* 158:*14,*
*21, 22*
159:*11*
160:*8, 10,*
*12, 14*
161:*11, 21*
162:*4, 13,*
*22* 163:*3,*
*10, 11, 21*
164:*1, 3*
165:*4, 5, 9,*
*17, 18*
166:*1, 3*
167:*10, 14,*
*16* 168:*10,*
*21* 169:*1,*
*20, 22*
170:*2, 10,*
*13, 17, 18*
171:*1, 4, 5,*
*12, 17, 18,*
*19* 172:*7,*
*22* 173:*1, 3,*
*6, 13, 15*
174:*7, 16*
175:*6, 11*
176:*22*
177:*4, 11,*
*16, 22*
178:*14, 18,*
*21* 179:*2, 4,*
*17* 180:*4,*
*12, 13*

181:*5, 8, 10,*
*17, 20, 22*
182:*5, 6, 7,*
*14* 183:*2, 6,*
*10, 21*
184:*3, 23*
185:*14, 15,*
*18, 20, 21*
186:*17*
188:*5, 8, 9,*
*12, 13, 19,*
*22* 189:*4,*
*13* 190:*10,*
*12, 13, 22*
191:*1, 7, 9,*
*10, 19, 22*
192:*4, 7, 17*
193:*4, 6, 9,*
*10, 15, 18*
194:*15, 21*
195:*1, 3, 21*
196:*3*
197:*4*
198:*3*
199:*7*
200:*2, 4, 5,*
*7, 19, 20*
201:*6, 7, 8,*
*15, 22*
202:*10, 12*
203:*2, 13*
204:*1, 5, 12,*
*15, 19, 20,*
*21* 205:*6*
206:*2, 3, 20,*
*21, 22*
207:*3, 9, 10,*
*15, 20, 22*
208:*5, 8, 9,*
*19, 20*
209:*3, 5, 9,*
*21* 210:*16*

211:*4*
212:*1, 6, 13,*
*15*
**idea** 18:*18*
43:*7* 100:*5,*
*10* 103:*17*
122:*7*
132:*21*
171:*12*
174:*13*
184:*14*
199:*19*
206:*2*
**ideas**
179:*14*
**identificatio
n** 11:*14*
37:*21* 67:*3*
90:*19* 97:*3*
110:*3*
112:*3*
115:*15*
117:*12*
119:*6*
168:*15*
184:*1*
187:*18*
192:*1*
196:*11*
200:*9*
203:*17*
**identified**
186:*9*
**identify**
8:*2* 40:*19*
**imagine**
96:*9*

**immediately**
41:*15*
**impact**
127:*15*

128:*23*
144:*8*
**impacting**
142:*19*
**imply** 32:*5*
**impossible**
157:*6*
**impressed**
34:*13*
**improve**
124:*22*
**improving**
86:*23*
**include**
60:*19*
82:*10*
153:*22*
201:*8*
**included**
13:*7* 157:*3*
202:*2*
**includes**
21:*18*
**including**
15:*13*
38:*12*
164:*20*
202:*18*
**increase**
43:*22* 45:*9*
52:*23*
111:*14*
123:*10, 19*
124:*17*
128:*3, 12,*
*17* 134:*19*
142:*9*
143:*18*
144:*4*
**increased**
40:*9* 60:*21*
144:*7*

**increases**
111:*13*
**increasing**
52:*19*
**incredibly**
16:*2*
**incumbent**
27:*4*
**INDEX** 4:*7*
**indicating**
50:*1*
131:*23*
**individual**
182:*11*
**individuals**
18:*12*
32:*10*
78:*14*
85:*14*
**industry**
71:*18*
**influence**
52:*9*
128:*10*
**information**
30:*10* 64:*1*
99:*2, 11, 12*
101:*15, 20,*
*23* 108:*13,*
*22* 109:*3, 6*
110:*19, 21*
112:*13*
115:*3*
130:*16*
209:*16*
210:*1*
**informed**
204:*17*
**initial**
127:*22*
**initials**
114:*23*

input
108:12
109:2
120:15, 18,
19  121:9,
13  125:5, 8
126:14
127:22
131:13
inquiry
155:21
inside
30:15, 17,
20  31:2, 9,
19  32:9, 14,
15, 17, 21
33:3  57:6,
11  60:19,
20, 22  61:4
76:7, 8
81:3  82:10
84:4
133:10
139:17, 21
140:7, 11
143:13
159:6
160:16, 18,
20, 21, 23
161:9, 16
163:4
165:12
169:5, 8, 18
170:8, 14
171:9
173:21
177:9
180:9
instances
22:23  23:4
113:1
123:1

instructions
201:5

INSURANCE
1:10  7:21
8:9  21:7,
15, 17  22:9,
11  37:14
68:6  94:16
95:2
113:16
152:22
153:15
156:17
166:14, 20
insured
23:9, 12, 14,
17  24:4, 7,
22  37:16
98:6  102:4
106:7
insureds
13:13  37:1,
4
intent
161:13
intention
31:9  53:12
79:23
179:20
202:7

intentionally
52:18, 22
180:14
interchange
ably  173:8
interest
79:3, 6

interested
79:17
212:16
interesting
151:22
173:10
interview
77:16
interviewed
19:7, 8
41:10  77:8

interviewing
19:21
introduced
19:8  20:2
97:12, 16
209:15
introducing
195:1
invite  77:12
invited
85:21, 23
invites  24:4
invoice
71:23  72:2,
19  73:15
208:17
209:7
invoices
105:20, 23
106:10
invoicing
208:11
involved
49:3  75:23
82:22
85:22
104:9, 12
188:21
192:18

195:13
196:5

involvement
196:2
iPad
196:19
210:15, 17
irrelevant
141:22
issuance
13:16  27:6
issue  14:5
68:12
71:23
100:15, 19
105:16, 19,
22  124:12
150:7
170:23
185:9
issued
100:14
issues
85:1
100:16, 22
issuing
13:13
106:9
item  117:1
its  38:5

< J >
J  176:10,
21
JANUARY
1:19  2:9
7:14
117:22
119:8
170:6
192:9

JEFFERSO
N  212:4
job  31:2
50:4, 8, 16
69:9, 20
122:16
124:6, 10,
12, 17, 22
125:4
126:8
165:10, 13
173:22
John
151:11
167:14
join  76:17
joined
29:7  41:21
42:10
46:14  77:1
81:22
89:10
joining
46:17
Jonathan
97:18, 20
99:20
July  42:20
186:5
198:7, 12
jump  106:4
June  18:5,
13  39:13

< K >
Kat  6:23
46:13
49:13  57:6
63:1  65:10,
13  67:15,
17  68:2, 17
69:23

70:22 73:9
90:22 91:3
97:18, 21
98:3, 13
99:13
110:5, 12
112:9
113:19
123:14, 16
126:2
143:1
149:12
151:19
154:19
164:15
172:18, 19
173:2, 6
185:1, 8
191:3
192:14
**KATHRYN**
1:7 8:5, 7
9:5 12:22,
23 15:13,
18 16:9, 11
17:3, 7, 11,
14 18:4, 11,
13 30:23
48:11 49:8,
18 70:3
91:21 92:4
111:6
117:19
124:16
130:6
138:2
139:7, 11
140:13
143:6
144:12, 18,
20 145:16
146:2, 4

147:17
148:10, 19,
21 150:1, 2,
7 152:2
154:23
158:3, 8, 16
159:4, 14
162:14, 18
163:3
164:20
165:11, 18
166:1
167:12
168:4
169:4
170:8, 16,
17 171:7,
17, 18
172:18, 20
173:3, 6, 21
174:12, 17,
19, 20
175:2, 9
178:15, 20
179:3, 13
180:6, 9, 15,
17 181:22
184:8
186:1
189:12, 13,
15 192:4
198:6, 12
201:2, 8
202:1, 5, 13,
19 203:1, 6
204:9, 13,
15 205:12
206:4
210:18
211:1
**Kathryn's**
9:11

123:22
124:12
125:19
128:12, 17
133:9
134:19
142:9
149:17
151:1
155:6, 14
157:5
165:10
190:7
195:14
196:19
197:6
202:10
**Kat's**
91:10
192:22
**keep** 29:21
56:14 62:6
70:20
174:4
**keeper**
11:11
**keeping**
67:19
68:22, 23
69:9, 13, 14
70:14
71:10
**keeps**
62:22
131:1
**key** 51:23
**KH** 113:18
**killing**
115:12
**kind** 9:10,
12 21:18
22:14

29:16
32:18
49:22 67:6
68:10
69:18
70:12
81:14 82:6
88:5, 14
94:14, 20
102:22
106:14
115:5, 23
118:8
145:12
156:14
174:20
178:2, 3
179:3
188:21
189:1
192:22
195:5
**knew** 78:7
93:6
132:22
138:1
163:12
178:6, 20
185:21
190:22, 23
206:4
207:9
**know** 9:11,
18 11:23
13:15, 22,
23 19:13
20:18
27:10, 19
29:6 30:6
31:5 32:17
33:7 37:5
38:15

40:15, 20
41:2, 10, 18,
20 42:18,
21, 22 43:3,
11, 18, 20
44:23 46:4
47:8 50:10
51:17
57:10
61:11, 14
68:14 70:5
71:9 72:15
74:12, 15,
16 75:17
77:3 78:8,
17 79:12
82:4, 7
83:7 86:18
87:14, 16,
19 88:12
89:4, 10, 17
90:5 91:23
92:3, 6, 13,
14, 23
94:14, 22
96:7 97:18
102:10
103:4, 7
104:9
106:3
107:22
110:7
111:4, 10
115:11
120:21
121:1, 2
125:21, 22
128:15, 16
130:15
131:16, 22
132:2, 6
133:11, 21

Video Deposition of Clay Segrest

134:*1, 21*
138:*15, 23*
142:*12*
143:*15, 22*
145:*2, 3*
146:*3*
148:*2*
149:*10*
151:*4*
153:*11*
157:*11*
158:*13, 17, 21*  159:*11, 21*  160:*12*
161:*21*
163:*11*
165:*17*
166:*3*
170:*2, 10, 13*  171:*1, 4, 5*  172:*1*
173:*1, 3*
178:*22*
179:*2, 4, 12*
180:*4*
181:*5, 12, 17*  182:*7*
183:*6, 10*
184:*4*
190:*13, 15, 22*  192:*17*
193:*4, 6, 8, 9*  195:*11, 19, 21, 23*
197:*4, 16*
198:*3*
200:*2*
202:*5*
203:*13*
204:*20, 21*
205:*6*
206:*2, 21*

208:*5, 16*
210:*5*
**knowing**
134:*3*
**knowledge**
32:*11*
131:*19*
132:*20*
156:*14*
157:*8, 10, 12*  171:*3, 11*  208:*3*
**known**
19:*19*
139:*2*

**< L >**
**L**  2:*1*
**labels**
11:*12*
**lack**
148:*22*
149:*17*
**lady**  74:*7*
**land**  165:*5*
**language**
156:*12*
**Lanier**
176:*5, 10, 22*
**laptop**
165:*5*
210:*21, 23*
**large**
53:*11*
147:*19, 21*
**largely**
48:*2, 3, 4*
**larger**
52:*22*
53:*10, 19*

54:*17*
127:*17*
**larger-sized**
53:*16*
**lateral**
42:*20, 21*
**launch**
76:*14, 17*
77:*4, 10, 22*
79:*3, 17, 22*
87:*15*
88:*13*  89:*7, 10*  146:*22*
**Lauren**
29:*4, 5, 7*
74:*21*
83:*11, 12, 14, 16*
85:*12*
100:*23*
109:*1*
114:*9, 10*
**Law**  2:*7*
6:*4, 9*  7:*6*
**laws**  2:*15*
**lawsuit**  9:*7*
62:*11*
65:*21*
171:*22*
210:*19*
211:*2*
**Lawyers**
182:*22*
**lead**  93:*23*
94:*12, 13*
120:*9, 12*
144:*4*
**leaders**
120:*4*
**leadership**
192:*8, 12*

**leading**
2:*21*
**leads**
145:*15*
**learn**
79:*14, 23*
86:*5*  108:*8*
162:*6*
**learning**
75:*17*
105:*2*
106:*18*
168:*9*
**leave**
15:*14*  44:*6*
142:*21*
205:*5, 8, 11*
**Lee**  184:*12*
**left**  73:*9*
107:*14*
126:*20*
127:*8, 15*
207:*8*
**Lehr**  19:*15*
**Leslie**  6:*5*
8:*4*  9:*4, 18*
170:*4*
**letter**  35:*7, 16*  72:*13*
88:*8*
**letterhead**
72:*14*
112:*10, 13*
**letting**
152:*10*
**liability**
21:*18*  36:*3*
37:*10*
42:*15*  93:*5, 22*  94:*20*
96:*8, 10*

156:*17*
187:*2, 21*
**life**  19:*19*
**line**  42:*19*
94:*9*  107:*2*
116:*23*
117:*22*
137:*15*
155:*20*
**lined**
137:*13*
**lines**  99:*1, 11, 12*
152:*21*
**lingo**  32:*9*
**linked**
71:*13*
84:*17*
139:*22*
**linking**
84:*14*
**list**  95:*6*
100:*13*
109:*1*
112:*17*
200:*16*
202:*15*
**listed**
45:*15*
201:*2*
**literally**
18:*20*
102:*4*
**little**  10:*1, 2*  12:*11*
26:*4*  29:*13*
31:*10*
39:*12*
40:*19*
51:*18*  58:*7*
66:*13, 17*
75:*20, 23*

Video Deposition of Clay Segrest

1/31/2024

84

95:*11*
99:*19*
105:*1*
115:*23*
131:*5*
134:*4*
138:*9*
140:*10*
150:*15*
172:*18*
175:*12*
178:*22*
194:*7*
199:*16*
204:*11*
210:*13*
**live** 206:*9, 12*
**LLC** 6:*4*
**location** 11:*20*
**Lockton** 176:*12, 18*
**long** 98:*7* 188:*3* 194:*19*
**longer** 129:*21* 149:*12* 167:*15* 173:*12* 190:*3, 19*
**look** 18:*16* 21:*12* 40:*18* 91:*19* 97:*19* 98:*9, 23* 110:*23* 112:*9, 16* 118:*8* 163:*19* 181:*12*

184:*5*
193:*13*
199:*14*
204:*5*
**looked** 199:*9*
**looking** 21:*22* 24:*22* 40:*20* 46:*22* 58:*20* 102:*13* 177:*4*
**looks** 51:*18* 67:*11* 90:*23* 111:*17* 184:*8, 22* 185:*15*
**lot** 12:*12, 13* 93:*18* 101:*18* 104:*9, 13* 128:*10, 20* 164:*19* 165:*22* 167:*1* 178:*20* 188:*23*
**lots** 13:*1* 14:*20* 16:*4*
**love** 20:*4*
**lower** 104:*3* 128:*2, 11* 130:*14* 134:*18*
**lowered** 128:*16*

lunch 148:*5* 150:*11* 158:*1* 159:*8, 9*

< M >
**ma'am** 138:*13*
**Madison** 185:*14, 23* 186:*3, 8, 16, 19*
**mail** 65:*16*
**maintained** 64:*14, 18* 130:*17, 20*
**maintains** 38:*5*
**majority** 48:*5, 9, 13* 103:*14* 209:*6*
**making** 30:*8* 40:*8* 155:*18* 179:*7* 185:*15* 189:*16*
**males** 154:*5*
**manage** 44:*7, 10* 55:*1* 102:*8, 19* 105:*13, 15* 146:*17* 159:*5* 180:*10*
**managemen t** 50:*3, 7, 17* 51:*1* 60:*3*

157:*12*
186:*6*
**manager** 58:*11, 22*
**managing** 54:*2* 103:*14* 104:*14, 21, 23* 145:*18* 146:*6, 16* 147:*1* 164:*7* 175:*4, 9*
**Mandy** 132:*3, 15, 16, 19*
**manually** 101:*21, 23*
**March** 40:*4, 9* 43:*1, 4, 8, 22* 45:*10* 185:*13*
**mark** 11:*10*
**marked** 11:*14* 33:*13* 37:*19, 21* 67:*3* 90:*19* 97:*3* 110:*3* 112:*3* 115:*15* 117:*12* 119:*6* 131:*4* 168:*15* 184:*1* 187:*18* 192:*1* 196:*11* 200:*9* 203:*17*

**market** 24:*17*
**marketer** 58:*10*
**marketing** 27:*3* 30:*9, 13* 75:*19*
**marking** 66:*21*
**matter** 28:*6* 33:*10* 69:*5* 140:*6* 142:*19*
**matters** 140:*8*
**McClure** 184:*11, 12*
**mean** 12:*23* 14:*20* 21:*3, 9* 25:*12, 19* 26:*5* 33:*10* 36:*11, 17* 38:*22* 47:*22* 48:*4, 17* 50:*18* 52:*8* 57:*3* 61:*13* 68:*23* 71:*19, 20* 84:*18* 87:*8* 89:*18* 96:*2* 98:*5* 100:*12* 102:*22* 110:*12, 23* 125:*21* 150:*20* 151:*23* 152:*6* 155:*3* 157:*6*

158:22
160:4, 12
164:3
166:5
171:19
175:11
177:11
181:5, 8
182:5, 14
186:17
193:6
199:7
200:4
209:21
**meaning**
26:14
52:11   56:8
137:15
**means**
13:22
32:17
42:22
61:14   69:9
87:16
145:4
149:6
212:9
**meant**
64:11
172:7
**medical**
15:14

**medications**
11:6
**meet**   20:1
189:5
196:6
**meeting**
37:16
133:17, 22
140:19

**member**
80:6   83:13,
14   85:9
108:22
138:19
139:12
187:4, 6, 7,
10   188:6, 8
190:8
201:3
**members**
79:16   80:5
121:10
122:10, 19
123:8, 9
127:13
136:12, 19,
22   137:2
138:21
139:4
142:3, 6
164:22
165:3
200:16
201:6
203:4
**memorializi
ng** 182:2
**memory**
45:18
**mention**
18:4   82:9
84:3, 7
195:6
**mentioned**
85:3   87:23
135:8
**mentioning**
148:3
**merit**
45:19   46:5,
7

**message**
17:10, 12
18:21
196:20
197:2, 8, 10
199:23
203:20
**messages**
4:23   5:4
12:13
15:12, 16,
21   16:1, 5,
6, 8, 11, 14,
21   17:2, 6
18:1, 3, 10,
11   196:13,
18   198:5,
11
**met**   9:8
**metaphor**
52:8, 11
**method**
44:8   60:9
**Mexico**
92:19
**middle**
173:16
**Middlebrook
s**   19:15, 18
**midyear**
129:14
**mind**
180:8
207:19
**mine**   62:21
128:3
135:16
**mined**
96:1, 2

**Minneapolis**
176:11, 17

**minus**
108:3
**minute**
56:3   57:10
63:9   130:4
167:14
168:17
209:9
**missing**
99:1   181:9
**Mississippi**
185:6
186:4, 6
**mixed**
193:14
**moment**
26:12
**money**
143:7, 15
**Montgomer
y**   7:17
**month**
63:13, 15
100:4, 11
**monthly**
65:3, 4, 6
108:10
**months**
36:17, 18
74:15
76:19
141:10
169:5, 18
176:20
181:7
**morning**
9:3   117:17
**move**
42:20, 21
52:15
105:11
161:9

179:21
180:1
203:12
**moved**
39:4   96:14
147:1
163:4
186:1
207:12
**moving**
52:17
128:20
161:15
172:12
202:3, 7
**multiple**
81:13
103:2
170:20

**< N >**
**N**   2:1   4:1
6:1
**name**   7:15
9:4, 19
19:18
38:17   73:5,
10   114:15,
23   175:17
187:23
202:10, 15
**named**
102:4
**names**
67:17   73:8
196:14
**neat**   34:17
**necessarily**
59:2
123:20
179:1

Video Deposition of Clay Segrest

1/31/2024

necessary
2:*19*
206:*23*
**need**  9:*19*
10:*6, 7*
20:*1*  21:*14*
26:*17*  30:*6*
50:*10, 22*
66:*2, 18*
90:*16*  99:*4,*
*12, 21*
109:*20*
132:*16*
134:*14*
138:*10*
151:*21*
167:*17*
200:*17*
210:*10*
**needed**
67:*19*
109:*15*
128:*2*
136:*22*
185:*20*
204:*18*
205:*1*
**needing**
29:*21*
50:*17*
**needs**  99:*8*
116:*12*
**negotiate**
24:*17*
25:*15*
37:*15*
91:*10*
**negotiates**
25:*8*
**negotiating**
31:*15, 18*

negotiation
31:*11*
**neighborho
od**  206:*12*
**neither**
112:*17*
212:*14*
**Nelson**
184:*16, 17*
185:*18*
**Nelson's**
185:*5*
**network**
93:*21*  94:*5*
**never**  42:*1*
140:*12*
**new**  37:*1*
60:*20*  61:*5,*
*16*  73:*10*
75:*10, 14,*
*18, 22*  76:*2,*
*6, 10*  97:*13,*
*14*  102:*3*
104:*9, 13,*
*18*  105:*14*
106:*8, 10*
108:*17, 21*
111:*18*
140:*11, 13*
146:*22*
147:*8, 15*
166:*13*
173:*19, 23*
175:*16, 18,*
*19*  176:*7,*
*19, 21*
177:*3, 20,*
*22*  181:*7*
198:*21*
199:*5*
207:*20*

newest
83:*13, 14*
**Nice**  39:*15*
44:*22*  69:*9*
110:*9*
178:*3*
**niche**  95:*11*
**ninety**
26:*15*
**nods**  10:*7*
**noes**  10:*8*
**nominate**
88:*20*

**noncompete**
171:*7*
**normal**
13:*23*
**North**  2:*7*
6:*11, 19*
7:*7*
**NORTHERN**
1:*1*  7:*23*
**Notary**  2:*6*
7:*2*  212:*22*
**note**  61:*17*
**noted**  82:*7*
**notes**
62:*21*
121:*20*
122:*1, 5*
133:*16, 19,*
*21*  134:*2,*
*17*  140:*21*
141:*2, 11,*
*15, 16, 21*
142:*3, 5*
182:*20, 22*
183:*2*
**notice**  3:*4*
4:*9*  11:*19*

noticed
7:*20*
167:*14*
185:*18*
**notify**
98:*18*
**November**
18:*5*  67:*11*
98:*10*
169:*9*
171:*7, 8*
198:*6*
205:*13*
**NUMBER**
1:*5*  4:*2, 8*
8:*1*  15:*11*
93:*15*
102:*7*
107:*3*
123:*20*
127:*14*
146:*5, 15*
147:*19, 21*
148:*14*
156:*22*
159:*14*
164:*7*
**numbers**
40:*17, 19*
71:*16*
107:*1*
131:*2*
136:*10*
138:*16*
139:*1, 2*
142:*7*
209:*18*
**nurture**
37:*1*
173:*18*
**nurtured**
97:*13*

nurturing
173:*22*


**< O >**
**O**  2:*1*
**oath**  8:*11*
**Object**
10:*23*  11:*5*
13:*14, 20*
14:*7, 17*
16:*22*  18:*7,*
*14*  22:*17*
23:*2, 5, 20*
24:*12*  25:*2,*
*4, 11*  27:*9*
32:*3, 13, 16*
33:*6*  38:*6,*
*14, 20*  39:*7,*
*20*  40:*6*
41:*3*  42:*4*
43:*6*  44:*9*
46:*3, 9, 19*
47:*7, 15*
48:*15*  50:*9*
52:*4*  53:*4,*
*22*  54:*11*
57:*1, 7, 18*
58:*13*
59:*21*
60:*12*  61:*1,*
*20*  62:*1, 8,*
*12, 17*  63:*5*
64:*2, 9, 15,*
*19*  65:*7, 15,*
*22*  68:*3*
69:*15*  70:*2*
71:*2*  73:*16*
76:*9, 23*
77:*23*  78:*4,*
*16, 22*  79:*7,*
*18, 21*  81:*4,*
*10*  83:*4*

Video Deposition of Clay Segrest

84:5, 9, 15
86:9, 21
87:3, 12
89:11
91:12, 15
92:10
93:11  94:7
95:3, 12, 18
98:4, 15, 20
100:6, 8
102:16
104:16
105:9, 17
106:12
110:14, 18,
22  111:16
112:14
113:4
114:1, 17,
20  115:7
116:5
118:2, 11,
20  119:22
120:23
121:5, 16,
21  122:3, 6,
11, 15, 20
123:2, 11
124:14, 19
125:3, 20
126:6, 21,
23  127:10
129:5
130:10, 18
131:21
133:15
134:20
135:6, 15
136:3, 13
137:1
138:6, 8, 11,
20  139:5, 9,

13, 19, 23
140:4, 23
141:8, 14
142:4, 10
143:3, 5, 8,
20  144:5,
14  145:1,
19, 22
146:8, 19
147:3, 9, 20
148:1, 7, 12,
20  149:3, 8,
14, 19, 23
150:8, 19
151:3, 8
152:12, 16
153:5, 9, 20
154:1, 7, 9,
15, 21
158:6, 11,
20  159:17,
20, 23
160:5, 17
161:20
162:9, 20
163:2, 20
164:10, 18
165:14
167:8
169:11, 15,
19  170:9
171:10
174:1
175:3, 21
177:10
178:13, 17
179:15
180:11, 19
182:4, 13
183:5, 18,
20  185:10,
12  186:2,

12  190:21
191:21
193:3
195:17, 20
196:23
197:3, 9, 14,
18  198:2, 8,
13  199:4
200:1
202:21
203:8
205:22
206:19
207:14, 18
208:1
209:2
objections
2:20, 23
objectives
133:2
observation
151:23
152:6
155:4
157:15
obtain
21:20
obviously
34:11
188:23
occasion
108:23
197:11
209:5
O'Connor
89:20
offer  19:18
24:23  35:7,
16  128:11
134:18
142:18
195:11

offered  3:2
19:9  79:4
128:5
office  20:9
42:15  74:4
92:20
164:22
192:21
199:3
200:14
201:4
202:9
offices  2:6
7:6  37:14
official
62:19
131:1
officially
68:13, 14
oftentimes
54:23
Oh  30:12
95:7  176:2
192:22
194:12
okay  9:15,
18, 21  10:1,
18, 19
11:19  12:4,
9, 16  13:2,
6, 12, 17
14:10, 15
15:5, 9, 20,
23  16:3, 6,
12, 17  17:1,
5, 17, 20
18:3, 17
19:1, 4, 13
20:15
21:16, 23
22:10
23:14, 17,

22  24:2, 9,
20  25:18,
22  26:3, 13
27:7, 11, 14,
17, 19  28:2,
7, 13, 21
29:3, 7, 12,
19  30:3, 7,
22  31:1, 17,
23  32:5, 8,
18, 20, 23
33:11, 20,
23  34:21
35:10, 13
36:1, 4
37:18  38:4,
8, 16, 21
39:4, 10, 22
40:3, 8, 12,
16  41:5, 9,
15, 18, 22
42:13, 16,
23  43:17,
21  44:4, 12,
22  45:3, 6,
12, 21
46:11, 13,
17, 21  47:9,
12, 17, 21
48:3, 12, 20,
23  49:5, 21
50:7, 12, 13,
15, 20  51:2,
4, 8, 12, 15,
19  52:11,
14  53:2, 18
54:4, 8, 13
55:10, 14,
17  56:2, 5,
15  57:13,
23  58:3, 16
59:7, 10, 19

Video Deposition of Clay Segrest

60:*2, 5, 9, 15, 19* 61:*3, 8, 14, 18, 22* 62:*5, 20* 63:*7, 11* 64:*11* 65:*10* 67:*9, 23* 68:*5, 9, 16, 22* 69:*4, 7, 18, 23* 71:*8, 12, 17, 21* 72:*3, 8, 12, 16, 22* 73:*4, 7, 9, 13, 18, 21* 74:*6, 10, 12, 19, 23* 75:*12* 76:*4, 14, 17, 21* 77:*3, 11, 16* 78:*13, 18* 79:*1, 5* 80:*4, 9, 13* 81:*2, 17* 82:*14* 83:*2, 23* 84:*18* 85:*13, 20* 86:*11, 16* 87:*14, 21* 88:*1, 6, 9, 14, 17, 22* 89:*6, 9, 14* 90:*4, 14, 17* 91:*9, 14* 92:*7, 12, 21* 93:*3, 8, 13, 14, 17* 94:*10, 19* 95:*1, 16* 96:*23* 97:*8, 23* 98:*9, 11, 17* 99:*13,*

*18, 23* 100:*3, 10, 18* 101:*1, 6, 8, 12, 15, 22* 103:*7, 12, 16, 20* 104:*2, 6, 12* 105:*12, 19, 22* 106:*5, 8, 21* 107:*4, 9, 12, 16, 21* 108:*7, 12, 17, 19* 109:*10, 13, 16, 19, 23* 110:*5, 16, 20* 111:*2, 12, 23* 112:*8, 23* 113:*6, 9* 114:*11* 115:*1, 10, 17* 116:*8* 117:*4, 7, 9, 19, 21* 118:*4, 13, 18, 23* 119:*3, 8* 120:*2, 7, 11* 121:*3, 8, 23* 122:*8, 18, 22* 123:*13, 16* 124:*2, 11* 125:*5, 17* 126:*11, 18* 127:*16* 128:*14* 129:*7, 11* 130:*1, 6, 12, 16, 20* 131:*3, 12, 16* 132:*23*

133:*19* 134:*22* 135:*2, 12, 17, 20* 136:*5, 8, 15, 20* 137:*7, 11, 15, 17, 19* 138:*1, 22* 139:*2, 15* 140:*9, 13* 141:*11* 142:*1* 143:*10* 145:*5, 8, 16* 146:*1, 21* 147:*11* 148:*4, 15, 18* 149:*1, 9, 21* 150:*16, 23* 151:*5, 21* 152:*14* 153:*2, 16* 154:*3* 155:*6* 156:*7* 157:*21* 159:*8* 160:*7, 9, 11, 21* 162:*6, 11, 18* 163:*3, 14* 165:*16* 166:*4, 16, 19* 168:*23* 169:*12, 23* 170:*7, 12* 171:*1, 13, 19* 172:*1, 3, 6, 10, 14* 173:*7, 9, 14, 21* 174:*3, 9, 13, 23*

175:*8, 14, 23* 176:*2, 9* 177:*12* 178:*4* 179:*6, 11, 18* 180:*5, 16, 21* 181:*4, 19* 183:*8, 15* 184:*7, 14, 17, 19* 185:*7* 187:*1, 7, 10, 20* 188:*3* 189:*9* 190:*1, 11, 15* 191:*3, 6, 17* 192:*3, 10, 20* 193:*5* 194:*9, 10, 12* 195:*3, 8* 197:*6, 12, 22* 198:*4* 199:*14, 22* 200:*3, 16* 202:*14* 203:*11, 15, 19* 204:*2* 205:*4, 7* 206:*6* 207:*12, 21* 209:*8* 210:*9, 13* 211:*5*

**old** 173:*19, 23*

**once** 36:*19* 83:*7* 159:*22* 181:*20, 23*

**one-on-one** 82:*23*

**ones** 13:*8* 58:*21* 168:*7*

**one-third** 56:*13*

**open** 83:*9*

**open-ended** 84:*11, 22* 163:*10*

**opening** 163:*7*

**operates** 140:*10*

**operating** 180:*9*

**opinion** 152:*1*

**opponents** 20:*7*

**opportunities** 79:*11* 83:*9* 177:*3*

**opportunity** 54:*17* 78:*3, 19* 79:*13* 84:*4* 92:*5* 93:*21* 94:*1* 177:*6, 8, 15* 186:*10, 23* 192:*6* 196:*6*

**opposition** 69:*16*

**Option** 112:*16* 186:*10*

**options** 21:*20* 37:*5* 195:*2*

**oral** 7:*9*

order  68:2
201:7

organization
194:23
organize
59:22  61:6,
17  192:18
originally
111:19
outline
72:9
overall
37:16
51:21
52:21
overlap
95:15

< P >
P  2:1  6:1
P.C  2:7
6:9, 17  7:6
PAGE  4:2,
8  11:22
34:15  35:6
39:9  40:16
42:16  44:2
45:7, 14
49:21
52:14
91:19
101:7
106:23
112:10
113:17
115:20
116:14
131:6
175:14
193:16
194:8, 9

198:17, 18
199:15
pages
40:20  44:3
45:7  51:19,
20  168:22
paid  22:6
120:16, 20
121:9
122:19
127:13
129:13
136:23
208:7
PALMER
4:3  6:4, 5
8:4  9:2, 4
26:13  34:2
66:12
134:12
138:16
155:19, 22
156:4, 15
167:19
168:3
170:19
171:6
176:15, 17
200:5, 11
209:8
210:9
211:4
paper
16:13
49:23
paperwork
170:3
paragraph
173:17
175:16, 23
177:13
194:6, 7

parents
206:10, 12
part  29:18
41:1  42:2
77:4  85:23
100:16
105:6
106:18
112:17
116:9, 19,
23  120:5, 8
143:16
144:2
149:15
156:5
179:3
183:15, 16
186:3
192:7
202:20
203:6
participate
85:7, 11
participatio
n  195:14
particular
44:16  69:5
70:1, 6, 11
75:15
99:20
102:1
118:14
129:20
134:23
157:18
167:11
172:19
186:23
194:1, 13
199:10

parties  2:3,
22  209:20
212:15
partner
106:2
partnership
24:16
parts
128:21
pass
193:21
194:5, 15,
23
passed
130:2, 7
208:23
path  82:13
145:14
148:6
161:14
Patricia  9:6
pay  12:14
22:7, 8, 11
39:23  40:9
45:8  52:1
70:6
paying
52:2  63:20
91:20
pays  91:7
Pender
132:3, 15,
17
people
65:9, 11
73:17, 21
74:1, 4
75:5  78:7
85:19
97:12
142:13, 20
161:4

164:19
189:6
percent
22:21  23:1,
4  36:9
40:2  49:2
91:3, 4, 20
92:1, 7, 8
100:17
101:2
103:6, 21
104:4, 5
107:6, 9, 18,
19  108:2, 5
112:19, 20
113:11, 12
129:13
percentage
22:13
25:10
36:19
63:19
103:17, 18
Perfect
9:21  26:7
performanc
e  51:21
122:17
123:23
124:5, 6, 10,
12, 17
126:8
141:12
196:2
period
57:20  98:7
189:1
person
31:10  55:8
61:15
88:10, 12
96:3, 6, 9

Video Deposition of Clay Segrest

1/31/2024

personal
62:*21*
130:*21*
171:*3*
182:*12*
personally
79:*12*
100:*1*
165:*2*
personnel
38:*5*
perspective
31:*12*
53:*17*  96:*8*
phase  27:*3*
phased
35:*4*
phone
17:*2, 6, 23*
18:*4*  29:*16*
88:*8*
197:*13, 17*
phones
18:*22*
198:*1*
piece
24:*15*
75:*18, 22*
94:*8*  102:*3*
108:*17, 21*
111:*18*
198:*21*
199:*5*
pieces
72:*17*
PL  93:*18*
94:*22*
place
68:*15*
150:*22*

placed
116:*13*
146:*21*
placement
185:*5*
placing
209:*21*
Plaintiff
1:*8*  6:*3*
8:*3, 5, 7*
209:*15*
PLAINTIFF'
S  4:*8*
11:*10, 13,
16*  15:*11*
33:*16, 17*
34:*7*  37:*19,
20, 23*
44:*20*
46:*23*
66:*22*  67:*2,
10*  89:*21*
90:*15, 18,
22*  97:*1, 2,
17*  106:*22*
109:*23*
110:*2*
112:*2, 5*
115:*11, 14,
17*  117:*11,
14*  119:*3, 5*
131:*4*
132:*11*
135:*21*
136:*1, 11*
138:*17*
168:*12, 14*
183:*22, 23*
184:*4, 8*
187:*13, 15,
17*  191:*23*
192:*3*

193:*15, 16*
196:*8, 10*
200:*8, 11*
203:*15, 16*
plan
177:*18*
178:*11*
planned
192:*9*
plans
172:*12*
179:*20*
plays  71:*9*
please  8:*2,
11*  67:*18*
168:*18*
203:*10*
pleased
84:*1*
plus  117:*2*
187:*1, 6, 22*
194:*10*
point
30:*19*
43:*21*  49:*5,
8*  50:*1*
66:*19*
96:*13*
101:*20*
130:*1*
142:*22*
151:*1*
175:*22*
190:*4*
194:*20*
pointing
159:*14, 19*
points
154:*3*
policies
13:*13*  25:*9*
103:*2, 7*

104:*14*
155:*12*
156:*21*
157:*7, 13*
209:*19*
policy
13:*16*
25:*13*  27:*6*
63:*3, 23*
68:*6, 8, 12*
87:*15*  94:*5*
110:*13*
111:*22*
116:*15, 16,
17, 20, 23*
118:*9*
153:*23*
154:*6, 8, 18*
156:*3, 11,
12, 17, 20,
22*  157:*1, 2,
4, 6, 19*
209:*18*
pool
126:*20*
127:*3, 6, 8,
12, 13, 15*
128:*20*
129:*4*
207:*22*
208:*4*
portion
111:*21*
position
19:*9*  20:*13,
21, 22*  26:*1*
34:*18*  35:*8,
22*  36:*5*
38:*10, 12*
50:*4, 8*
74:*8*  89:*9*
132:*5*

positions
20:*17*  59:*3*
positive
40:*22*
67:*13, 14*
103:*22*
110:*11*
119:*12, 15*
131:*7*
158:*15*
163:*17*
169:*3*
180:*7*
184:*10*
187:*16*
193:*23*
196:*17*
200:*18*
204:*10*
possibility
84:*14*
144:*2*
possible
153:*18*
154:*17*
possibly
124:*9*
140:*1*
Post
176:*10*
post-Covid
28:*14, 19*
potential
51:*21*
81:*23*
161:*3*
186:*10*
power
128:*7*
practices
156:*17*

practicing
75:*17*
**Prayed**
12:*6*
**pre-2020**
49:*15*
**pre-Covid**
28:*19*
**predate**
18:*1*
**preexisted**
118:*19*
**premium**
22:*13, 15*
52:*20*
53:*17*
54:*16*
63:*14* 64:*3*
72:*10*
106:*23*
107:*2, 3*
111:*13, 14,
21* 115:*21*
116:*4, 11*
117:*1*
199:*13*
**preparation**
15:*16*
**prepare**
12:*1, 4*
**prepared**
113:*19*
**preparers**
113:*22*
**PRESENT**
6:*22* 24:*18*
82:*23*
135:*3*
149:*13*
150:*18*
**presented**
158:*8*

**presenting**
94:*12*
170:*22*
**president**
19:*6* 42:*14*
**press** 72:*6*
**pressed**
115:*9*
**pretty**
29:*17*
34:*17*
88:*23*
98:*12*
**previous**
109:*4*
132:*22*
176:*20*
186:*13*
**previously**
33:*13*
131:*4*
**price** 21:*21*
**prices**
116:*10*
**pricing**
31:*12*
**print** 64:*20*
65:*1*
**printout**
38:*1*
**prior** 3:*2*
141:*10, 20*
**privacy**
93:*22* 94:*6*
**ProAssuran
ce** 166:*18*
**Probably**
26:*12*
28:*12, 20*
33:*8* 57:*3*
75:*9, 10*
76:*12*

81:*15* 99:*9*
100:*16*
101:*4*
102:*13*
125:*10*
133:*11*
139:*6*
143:*16*
175:*12*
184:*13*
185:*20*
**problem**
18:*22*
**Procedure**
7:*4*

**proceedings**
7:*10*
**process**
26:*22*
29:*18* 72:*1,
4* 75:*21*
76:*3* 87:*22*
88:*4* 105:*2*
106:*19*
202:*1*
**produce**
17:*14*
171:*21*
**produced**
17:*13, 14*
203:*22*
**producer**
80:*2* 84:*20*
105:*3*
**producing**
80:*6*
**production**
71:*6* 79:*23*
80:*2, 17*
81:*8, 19*
82:*3, 13, 20*

83:*8* 84:*14,
17* 135:*7*
145:*4*
163:*7*
**production-
type** 163:*8*
**products**
19:*17*
21:*15*
50:*18, 23*
**professional**
21:*18* 36:*3*
37:*10*
42:*14*
67:*16* 73:*1*
93:*5* 94:*20*
96:*8, 10*
173:*5*
187:*2, 21*
**program**
22:*22* 59:*1*
76:*15, 18*
77:*4, 10, 12,
22* 78:*7*
79:*4, 6, 17,
22* 87:*15,
18* 88:*13*
89:*7, 10*
146:*22*
**programs**
19:*16*
**progress**
81:*21*
163:*13*
166:*10*
180:*17*
**progressed**
166:*11*

**progression**

163:*5*
166:*4*
**progressivel
y** 165:*23*
166:*1*
**promise**
115:*12*
**promote**
161:*4, 7*
**promotion**
39:*13*
161:*10*
**proof** 99:*4*
**property**
184:*18*
185:*3, 5, 8,
19*
**proposal**
24:*18*
**proposals**
24:*19* 37:*3*
94:*12*
**proposed**
40:*1* 56:*7*
**proprietary**
209:*17*
**provide**
62:*10*
123:*9*
127:*8, 17*
146:*4*
171:*13, 18,
19* 182:*10*
204:*1, 2*
**provided**
7:*3* 17:*9*
89:*2*
**providing**
59:*23*
**Public** 2:*6*
7:*2* 210:*1*
**pulse** 37:*9*

Video Deposition of Clay Segrest

purchased 186:*21*
purpose 59:*19* 140:*2* 147:*10, 11* 209:*14*
purposes 141:*18* 155:*12, 16, 17* 157:*18*
pursue 93:*23*
push 139:*4*
put 24:*14* 44:*7* 59:*5* 72:*16* 99:*16* 122:*4* 143:*9, 10* 155:*10* 158:*21* 169:*23* 177:*14, 17* 189:*12* 201:*6* 202:*10, 12*
putting 24:*22*

< Q >
Q 9:*3, 17, 21* 10:*1, 11, 15, 20* 11:*2, 6, 9, 16, 19* 12:*4, 7, 9, 11, 16, 20* 13:*2, 6, 9, 12, 17, 21, 23* 14:*10, 15, 18* 15:*5, 11, 20, 23*

16:*3, 6, 8, 12, 17, 20* 17:*1, 5, 9, 17, 20, 23* 18:*3, 8, 10, 17, 19* 19:*4, 10, 13* 20:*4, 6, 9, 13, 15, 20* 21:*3, 6, 9, 12, 16, 23* 22:*3, 6, 10, 14, 23* 23:*3, 7, 11, 14, 17, 22* 24:*2, 6, 9, 20* 25:*3, 7, 14, 18, 22* 26:*3, 7, 13* 27:*7, 11, 14, 17, 19, 23* 28:*2, 4, 7, 10, 13, 17, 21* 29:*3, 5, 7, 12, 19* 30:*3, 6, 13, 15, 19, 22* 31:*1, 14, 17, 23* 32:*5, 8, 15, 18, 23* 33:*7, 11, 16, 20, 23* 34:*7, 11, 15, 18, 21* 35:*5, 9, 11, 14, 20* 36:*1, 4, 8, 12, 15, 20* 37:*18, 23* 38:*4, 8, 16, 22* 39:*2, 4, 9, 11, 16, 18, 22* 40:*4, 8, 12, 16, 23* 41:*5, 9, 12,*

15, *18, 22* 42:*1, 9, 13, 16, 23* 43:*10, 13, 15, 18, 21* 44:*2, 5, 12, 14, 19, 23* 45:*3, 6, 13, 18, 22* 46:*5, 11, 13, 17, 21* 47:*4, 9, 12, 17, 21* 48:*3, 8, 12, 18, 23* 49:*5, 8, 11, 13, 17, 21* 50:*7, 12, 14, 20* 51:*2, 5, 8, 12, 15, 19* 52:*5, 11, 14* 53:*2, 13, 18* 54:*4, 6, 8, 13* 55:*7, 10, 14, 17, 20* 56:*2, 5, 15, 18, 21* 57:*2, 5, 9, 13, 15, 19, 23* 58:*3, 5, 7, 16, 19* 59:*4, 7, 10, 19* 60:*2, 5, 9, 15, 19* 61:*3, 8, 18, 22* 62:*2, 5, 10, 14, 20* 63:*1, 7, 11, 22* 64:*4, 7, 11, 17, 23* 65:*5, 10, 13, 17, 20* 66:*1, 4, 12, 17, 21* 67:*1, 5, 10,*

15, *23* 68:*5, 9, 16, 19, 22* 69:*4, 7, 10, 13, 18, 23* 70:*9, 12, 17, 22* 71:*8, 12, 16, 21* 72:*3, 8, 12, 16, 19, 22* 73:*4, 7, 9, 13, 18, 21* 74:*2, 6, 8, 10, 12, 16, 19, 23* 75:*4, 12* 76:*4, 11, 14, 17, 21* 77:*1, 3, 6, 11, 13, 16, 21* 78:*1, 10, 13, 18* 79:*1, 5, 15, 20* 80:*4, 9, 13, 18, 21* 81:*2, 6, 17* 82:*5, 9, 14, 18* 83:*2, 11, 18, 23* 84:*3, 7, 12, 16, 18* 85:*2, 7, 10, 13, 18, 20, 23* 86:*3, 5, 11, 13, 16, 19, 22* 87:*4, 7, 9, 14, 17, 21* 88:*1, 6, 14, 17, 22* 89:*1, 6, 9, 14, 17, 21* 90:*1, 4, 11, 14, 21* 91:*7, 9, 14, 16* 92:*7, 12, 15, 17, 21, 23*

93:*3, 8, 12, 14, 17* 94:*4, 10, 13, 19* 95:*1, 5, 7, 9, 16, 19, 22* 96:*3, 12, 18, 20, 23* 97:*8, 17, 23* 98:*9, 12, 17* 99:*13, 18, 23* 100:*3, 7, 10, 18, 21* 101:*1, 6, 9, 12, 15, 22* 102:*6, 10, 14, 18* 103:*1, 4, 7, 10, 12, 16, 20, 23* 104:*2, 6, 12, 20* 105:*1, 6, 12, 19, 22* 106:*5, 8, 14, 16, 18, 21* 107:*4, 9, 12, 16, 21* 108:*1, 4, 7, 12, 15, 19* 109:*7, 10, 13, 16, 19, 23* 110:*5, 12, 16, 20* 111:*2, 5, 12, 23* 112:*5, 9, 12, 16, 23* 113:*6, 9, 15, 21* 114:*2, 5, 7, 9, 11, 18* 115:*1, 10, 17* 116:*3, 8, 14* 117:*4, 7, 14, 21*

Video Deposition of Clay Segrest

118:*4, 6, 13, 18, 21, 23*
119:*3, 8, 13, 16, 18*
120:*2, 7, 11, 15, 18, 22*
121:*3, 6, 8, 14, 18, 20, 23*  122:*5, 8, 13, 18, 22*
123:*7, 13, 16, 21*
124:*2, 11, 16, 21*
125:*1, 5, 8, 11, 13, 17*
126:*1, 4, 11, 14, 16, 18, 22*  127:*2, 5, 16, 20*
128:*9, 11, 14, 16, 22*
129:*2, 7, 11, 17*  130:*1, 6, 12, 16, 20*
131:*3, 8, 12, 16*  132:*1, 3, 5, 8, 11, 14, 23*  133:*5, 8, 12, 16, 19, 21*  134:*1, 4, 12, 16, 22*
135:*2, 4, 12, 17, 20*
136:*1, 5, 8, 10, 15, 17, 20*  137:*5, 7, 11, 15, 19, 21*  138:*1, 5, 16, 22*
139:*2, 7, 11, 15, 17, 21*

140:*2, 6, 9, 13, 17*
141:*2, 5, 11*
142:*1, 8, 23*
143:*4, 6, 10, 17*  144:*3, 9, 11, 17, 20*
145:*5, 8, 16, 20*  146:*1, 4, 11, 15, 21*
147:*5, 11, 14, 17, 22*
148:*4, 9, 15, 18*  149:*1, 6, 11, 17, 21*
150:*6, 10, 14, 17, 23*
151:*5, 10, 15, 18*
152:*4, 9, 14, 21*  153:*2, 7, 13, 15, 17, 21*  154:*3, 8, 12, 14, 19*
155:*6, 14*
156:*15, 19*
157:*18, 21, 23*  158:*3, 7, 13, 16*
159:*1, 3, 8, 13, 18, 22*
160:*2, 7, 9, 15, 21*
161:*9, 18*
162:*2, 6, 11, 18, 21, 23*
163:*14, 18*
164:*6, 12, 14*  165:*9, 16*  166:*4, 6, 12, 16, 19, 21*  167:*3,*

10  168:*3, 6, 12, 17, 21*
169:*1, 4, 9, 13, 16, 23*
170:*5, 7, 12*
171:*6, 11, 13, 16, 19, 21*  172:*1, 3, 6, 9, 14, 17, 22*  173:*1, 7, 9, 12, 15, 21*
174:*3, 9, 13, 23*  175:*4, 8, 14, 23*
176:*3, 5, 7*
177:*4, 8, 12, 20*  178:*4, 8, 11, 14*
179:*6, 11, 18, 23*
180:*3, 5, 8, 16, 21*
181:*2, 4, 10, 16, 19, 23*
182:*10, 17, 20, 22*
183:*3, 8, 12, 15, 19, 22*
184:*3, 7, 11, 14, 17, 19*
185:*7, 11, 23*  186:*8, 15*  187:*1, 4, 7, 10, 13, 15, 20*  188:*3, 6, 11, 15, 20*
189:*3, 9, 11, 15, 18, 22*
190:*1, 6, 11, 15, 18*
191:*3, 6, 12, 17, 20*

192:*3, 11, 20*  193:*5, 8, 13, 20*
194:*1, 6, 9, 11, 13, 19*
195:*3, 8, 14, 19, 23*
196:*8, 13, 18*  197:*1, 6, 12, 16, 20, 22*  198:*4, 10, 15*
199:*1, 9, 14, 22*  200:*3, 11, 16, 19, 22*  201:*2, 10, 13, 17, 19, 22*
202:*14, 18*
203:*1, 5, 11, 15, 20*
204:*2, 5, 9, 11, 23*
205:*4, 7, 12, 16, 19*
206:*1, 4, 6, 9, 13, 18*
207:*1, 4, 7, 12, 15, 21*
208:*3, 6, 9, 14, 16, 21*
209:*4*
210:*9, 13, 17, 21, 23*
**question**
10:*15, 20, 21*  16:*2*
24:*2*  98:*22*
104:*19*
113:*8*
120:*5*
138:*10*

146:*10*
150:*14*
165:*6*
173:*11*
184:*7*
**questions**
2:*21, 22*
15:*6*
109:*20*
168:*19*
210:*4, 14*
212:*8*
**quit**
205:*18, 20*
206:*14*
**quite**
124:*4*
208:*19*
**quotation**
116:*15*
**quote**   99:*6, 9, 15, 19*
114:*14*
152:*13*
208:*17*
**quoted**
111:*19*
**quotes**
114:*10, 22*
**quoting**
208:*11*

**< R >**
**R**   6:*1*
212:*1*
**Rachel**
6:*18*   8:*8*
12:*12*   34:*2*
39:*13*
210:*5*
**raise**   46:*5, 6, 8, 11*

Video Deposition of Clay Segrest

1/31/2024

**raised**
149:2
**raising**
151:19
**range**
128:7
**rare**  23:6
86:10, 12
**reach**
19:11, 14
206:15, 21
**reached**
19:12
**read**  8:21
16:4  66:4
67:21
111:23
116:11
117:15
156:16
168:17, 20
199:1
**reading**
2:12  176:9
**ready**
137:20
202:16
203:3
**real**  18:21
19:21
115:19
**really**  30:5
67:19
80:23
82:16, 21
99:21
142:11
146:9
176:21
179:3
181:12
186:17, 22

190:23
204:20
205:6
**reason**
11:3  39:18
130:9, 13,
15  194:1,
13
**reasons**
80:22
191:19
**reassign**
167:11
**reassigned**
164:17
167:4
168:7
**recall**
13:17
15:15, 20
28:7  34:23
39:2, 4
46:7, 10, 17
47:18
56:11, 21
57:5  63:2
65:10  79:5
80:14, 22
81:12
82:19  83:2
97:16
123:13
130:1
134:22
145:16
146:2
147:14, 17
148:3, 4, 15,
21  149:7,
11  151:5,
10  152:4, 9
154:22

159:4, 14,
18  181:23
186:15
189:18
191:19, 20,
22  192:17
195:8
204:23
**receive**
14:1  47:9,
10, 12, 14
69:23
153:7
183:16
**received**
9:13  18:21
28:22
44:19  46:5
87:9
**receiving**
23:19
**recess**
66:8  134:8
167:22
209:12
**recipient**
13:3
**recognize**
33:17
**recollection**
125:13, 17
133:12
**recommend**
**ed**  77:19
**record**
7:13  8:3
10:13  59:5
66:5, 11
116:11
134:7, 11,
13  167:21
168:2

209:11
210:2
**records**
38:5
**redact**
209:23
210:6
**REDACTED**
115:22
116:3
117:2, 5
**redo**  99:15
**reference**
88:14
**referenced**
31:14  52:5
**referencing**
61:9  125:1
159:4
203:21
**referring**
50:15  53:1
58:14
163:21
**refill**  66:5
134:5
**reflect**
47:1, 5
99:3
136:21
**reflects**
182:6
**regard**
81:7, 18
123:8
**regards**
12:14
**regularly**
63:8  64:8
181:16
**regurgitatin**
**g**  150:4

**Reich**
55:19
184:11
**Reich's**
56:8
**rein**  164:4
**relate**
18:12
**related**
13:10, 12
15:13, 17
31:8  65:21
82:19
121:13
122:1
123:22
124:13
141:12
142:2, 3
152:18
178:16
179:7, 13,
14  209:17
210:18
211:1
**relates**
116:10
156:2
**relating**
2:16
**relation**
122:9
212:14
**relationship**
24:10
29:23  30:1
37:17  55:5
**relationship**
**s**  37:2, 13
51:23
97:11, 13
173:19, 23

Video Deposition of Clay Segrest

1/31/2024

95

**relaying**
154:*20*
**release**
67:*18*
71:*17, 18*
75:*6*
114:*10*
**releases**
73:*14*
**remain**
175:*2*
**remainder**
127:*15*
**remaining**
107:*14*
**remember**
12:*16, 20*
13:*7* 14:*18*
34:*12*
35:*18*
46:*15*
54:*19*
88:*18, 19*
89:*4*
100:*14*
128:*18, 19*
140:*16*
148:*13*
158:*16*
159:*10*
160:*8, 14*
182:*18*
188:*10*
190:*10*
193:*10*
**renewal**
26:*15, 17*
29:*8, 15*
33:*4* 67:*20*
69:*3, 9, 13,
14* 70:*1, 15*
75:*8, 21*

102:*3*
104:*18*
108:*9*
109:*1, 5, 18*
111:*17*
112:*7*
185:*2*
**renewals**
26:*14* 27:*1*
32:*5, 21*
54:*3* 59:*23*
75:*13*
108:*7*
109:*11, 13,
15* 114:*12,
14* 166:*8*
168:*6*
**renewed**
185:*1, 13,
22*
**renews**
114:*3*
**repeated**
150:*2*
**rephrase**
10:*17*
96:*17*
165:*6*
203:*9*
**reply**
200:*13*
**report** 38:*8*
44:*19* 46:*1,
22* 64:*23*
65:*6, 14*
108:*10*
109:*8*
114:*21*
115:*2, 5*
119:*21*
**reported**
120:*1*

**reporter**
7:*16* 8:*11,
19* 10:*5*
116:*21*
176:*13*
210:*4*
**Reporting**
7:*17*
**reports**
65:*13*
119:*23*
**represent**
9:*5* 136:*11*
196:*19*
**representati
on** 148:*23*
**representati
ve** 47:*13,
16* 196:*20*

**represented**
136:*10*
138:*17*
**represents**
212:*10*
**request**
44:*6, 14, 17,
21* 46:*11*
77:*18*
**requested**
23:*23* 37:*3*
43:*22*
**requests**
44:*7*
202:*11*
**require**
99:*13*
162:*3*

**requirement**
78:*15*

**respected**
19:*23*
**respective**
2:*3*
**response**
40:*22*
67:*13, 14*
82:*5* 83:*23*
103:*22*
110:*11*
119:*12, 15*
131:*7*
138:*12*
142:*20*
148:*18*
149:*1, 5*
158:*15*
163:*17*
169:*3*
180:*7*
184:*10*
187:*16*
193:*23*
195:*9*
196:*17*
200:*18*
204:*10*
**responsibilit
ies** 31:*7*
50:*4, 8, 16,
18* 179:*21*
180:*15*
201:*9*
202:*4, 6*
**responsibilit
y** 54:*2*
60:*14* 65:*5*
76:*2* 91:*10,
18* 104:*21*
143:*13*
161:*16*
166:*10*

178:*15*
179:*2*
**responsible**
60:*6, 10, 16,
17* 65:*11*
103:*13*
108:*15, 18*
119:*18*
146:*16*
207:*20*
**rest** 59:*12*
127:*8*
**restart**
138:*14*
**restrict**
164:*1*
**result**
151:*16, 19*
212:*16*
**retail** 15:*2*
21:*14*
36:*23* 53:*6*
73:*5*
173:*18*
**retailer**
22:*1, 7*
24:*1, 4, 19*
30:*2* 54:*21*
55:*6* 72:*2*
107:*11, 12*
108:*2, 4*
**retailers**
91:*1* 196:*7*
**retain**
67:*20* 69:*3*
**retired**
96:*18*
**re-up** 191:*1*
**revenue**
52:*3* 55:*11,
15, 22, 23*
56:*10, 19*

Video Deposition of Clay Segrest

1/31/2024

57:*16, 22*
60:*7, 11, 13,*
*18, 23* 61:*6*
62:*22*
63:*16, 22*
69:*23*
70:*10, 15,*
*18, 19, 23*
71:*5, 7, 14*
91:*11* 92:*9*
94:*3*
123:*20*
124:*4*
129:*4, 13,*
*20* 130:*3*
131:*18, 20*
135:*8, 13,*
*14, 18*
139:*22*
140:*3*
143:*19*
144:*7*
183:*12*
**revenues**
63:*4* 124:*7*
**review**
12:*7, 9*
16:*10, 20*
17:*6* 51:*6*
81:*20*
83:*19* 85:*4*
**reviewed**
12:*10, 17*
13:*3, 8*
14:*11*
15:*16*
16:*13* 17:*1*
**reviews**
51:*9* 85:*5,*
*8, 10* 86:*1*
126:*9*
193:*21*

**Richards**
148:*5*
**right** 9:*3*
11:*2* 13:*9*
14:*4* 21:*8*
22:*2, 23*
23:*8, 11*
24:*6, 9*
25:*3, 7, 10*
26:*11* 27:*8*
31:*5* 32:*6,*
*11* 33:*12,*
*14* 34:*8, 10,*
*14, 22*
35:*17, 21*
36:*2, 12*
38:*19* 40:*5,*
*18* 41:*4, 7*
45:*4* 46:*1*
47:*2, 3*
50:*15*
53:*13* 55:*7,*
*8* 57:*8*
59:*4* 61:*19*
62:*9* 64:*3*
65:*2, 19*
66:*1, 12*
67:*21* 68:*6,*
*19, 20*
69:*10, 21*
70:*12, 17,*
*20* 72:*18*
74:*22, 23*
75:*3* 85:*18*
87:*7* 91:*8*
94:*15*
95:*17*
97:*21*
103:*1, 3*
104:*8*
105:*3, 6*
106:*17*

107:*20*
108:*4, 6, 13*
109:*9*
111:*12*
112:*13, 22*
113:*3*
114:*11*
119:*2, 11*
123:*21*
127:*4*
131:*23*
132:*9*
134:*6*
137:*14*
138:*4, 19*
139:*18, 20,*
*22* 140:*3,*
*14, 22*
141:*17*
144:*3, 20*
146:*13, 18*
150:*14*
151:*18*
152:*23*
153:*4*
155:*22*
156:*15, 19*
159:*3*
169:*10, 12,*
*16* 174:*4*
177:*6, 9*
181:*2, 5, 6*
182:*7*
184:*6*
187:*23*
189:*11*
190:*5*
197:*13*
200:*23*
201:*10, 11,*
*14, 17, 22*
203:*5*

204:*6*
206:*4, 10*
207:*23*
208:*2*
209:*10*
**right-hand**
38:*9*
**ringer**
198:*17*
**ringing**
198:*16*
199:*11*
**rings** 199:*6*
**risk** 27:*2*
50:*2, 3, 7,*
*17, 19* 51:*1*
102:*2*
**Ritenour**
74:*3, 6*
80:*11*
81:*17, 18*
102:*6, 7*
**road** 81:*1*
82:*4*
161:*23*
162:*4, 8, 19*
164:*13, 16*
165:*4*
202:*10*
**Robertson**
89:*7*
**role** 24:*10*
69:*14*
71:*10* 80:*1,*
*2, 17* 82:*3,*
*10* 83:*8*
84:*2* 85:*15*
132:*18*
133:*9*
163:*7, 9*
188:*6, 10*
190:*7, 14*

**roles**
161:*16*
**roll** 189:*3,*
*6* 191:*16,*
*18* 194:*17*
**rolled** 42:*7*
188:*14*
**rolling**
195:*7*
**Ross** 89:*6,*
*9, 12, 15*
**rough**
28:*10*
93:*15*
**roughly**
28:*23* 29:*8*
102:*10, 15*
103:*10*
169:*13*
**rounding**
110:*10*
**RPR** 2:*6*
7:*1* 212:*20*
**RSUI** 185:*2*
**rude** 10:*12*
**rule** 55:*4*
**rules** 2:*16*
7:*4* 10:*2*
**run** 28:*15*
55:*1*
100:*12*
108:*10*
109:*1, 7*
114:*22*
**running**
55:*11*
109:*4*
**Rusty**
42:*11*
89:*18*
151:*2, 6*
189:*23*

Video Deposition of Clay Segrest

1/31/2024

97

192:5
194:21
195:1

< S >
S   2:1   6:1
s/Tanya
212:19
safe   10:21
SAITH
211:11
salary
38:12
43:23
129:3
131:18, 19
208:4
sales   32:9,
12, 15, 17,
21
Sam
188:13
190:22
Sanders
47:19
73:23   75:9
80:11, 14
100:11
119:9
121:3
165:19
170:5, 8
196:16
198:18
200:22
Sarah
207:1, 4, 7
save   64:21
saw   16:4
81:22
203:22

saying
14:9   29:20
33:1   50:21,
22   61:11
68:13   69:2
83:5   99:21
128:19
137:11
149:7
152:10
158:16
163:22
170:21
175:6
179:17
180:23
182:6, 7
194:22
says   33:22
35:9, 16
36:9   38:17
39:13   40:1,
23   42:20
43:3   44:5
50:2   51:7,
22   67:16
71:17   72:5
99:1   107:2
115:20, 21
129:12
130:6
158:3
170:3, 17
173:17
176:10
177:13
180:20
181:3
184:8
190:2
202:15

scenarios
81:16
schedule
119:14
132:14
school
19:20
185:6
186:4
schools
185:14, 23
186:3, 6, 8,
20
seal
116:13
209:22
sealing
209:22
search
18:16
65:20
114:18
198:10
searched
172:3
198:4
210:17, 23
seat   189:8,
12   195:11
second
11:21   35:6
39:9   42:19
50:2   58:10
110:9
112:10
115:20
120:5
131:6
137:17
173:15
175:14, 15
176:1

177:12
193:16
194:4, 6
199:18
secretarial
144:21
145:3
secretary
188:9
security
93:21   94:5,
16
see   10:4
21:1   24:23
35:8   36:8
45:9   50:5
51:5   67:12
82:2   90:3,
9   93:13, 20
110:8
115:8, 22
116:23
117:4
125:15
129:17
133:3
136:8
145:14
164:2
185:8
188:22
191:1
198:5, 11
200:19, 20
202:18
206:22
seen   11:16,
23   51:12
87:20   88:1,
3   131:9, 11
136:2, 7
173:1

SEGREST
1:16   2:5
7:8, 20
8:14   9:4
73:22
114:16
196:15
Segrest's
47:23
48:10
seize
177:15
sell   50:19
94:19
111:8, 15
152:21, 22
186:19
seller
153:2, 13,
14   156:21
selling
50:23
125:1
153:4
send   14:1
26:16, 19
65:18
68:19
71:19, 20
72:2   92:20
sender
13:3
sends
109:14
sense   24:6
33:7   51:2
53:5   62:23
117:10
sent
184:23
201:5

Video Deposition of Clay Segrest

1/31/2024

98

**sentence**
51:*22*
173:*15, 16*
175:*15, 22*
176:*1*
177:*13*
202:*14, 23*
**separate**
42:*7*  47:*14*
116:*15*
**separately**
83:*6*
**server**  62:*7*
**service**
22:*11*
53:*11*
164:*23*
**SERVICES**
1:*10*  7:*21*
109:*10, 13,*
*15*
**servicing**
60:*1*  75:*21*
109:*19, 22*
**set**  22:*14*
44:*16*
70:*17*
108:*7*
180:*12*
**setting**
119:*13*
**seven**
169:*5*
**seventy**
104:*4*
**seventy-**
**eight**  40:*1*
**seventy-**
**five**  54:*20*
100:*16*
101:*1*
103:*19, 20*

**shake**
167:*7*
**shaking**
118:*9*
**sheet**  68:*9*
125:*15*
129:*12*
135:*20*
**sheets**
129:*15*
**shift**  32:*1*
53:*21*  54:*9*
174:*17*
179:*17*
**shifted**
65:*8*
165:*18, 22*
174:*20*
175:*1*
186:*7*
**shifting**
35:*4*
180:*14*
201:*9*
**shifts**
174:*21*
**short**
134:*13*
**shorter**
41:*23*
**shortly**
165:*20*
**show**  11:*9*
33:*12*
37:*18*
51:*14*  63:*3,*
*13, 14, 15*
66:*21*
90:*14*
96:*23*
109:*23*
112:*5*

115:*5, 10*
119:*3*
123:*4*
131:*3*
158:*9*
168:*12*
196:*8*
**showed**
79:*3*
135:*20*
**showing**
79:*6*  99:*21*
**shown**
161:*3*
**shows**
99:*7*  115:*2*
**shred**
141:*2, 21*
**shredded**
140:*21*
**shredder**
122:*4*
**sign**  8:*22*
51:*13*
**signature**
2:*12*
113:*18*
194:*7*
**signed**
171:*7*

**significantly**
125:*18*
138:*5*
**similar**
70:*22*
90:*23*
131:*13*
132:*18*
174:*18, 22*
191:*10*

**simple**
124:*4*
**simply**
24:*14*
**single**
63:*13*
**sit**  51:*8*
133:*1*
**sitting**
34:*12*
150:*11*
167:*17*
**situation**
161:*13*
**six**  58:*21*
111:*22*
141:*10*
169:*18*
**sixty**  26:*20*
**sizable**
199:*5*
**size**
126:*19*
127:*6*
**skip**  115:*13*
**slash**
113:*18, 22*
114:*16*
**slow**  166:*4*
**small**
52:*16, 17*
53:*3, 11*
54:*2*  55:*21*
117:*16*
**smaller**
53:*20*
54:*15*
56:*22*
117:*23*
118:*19*
**Smith**
176:*10, 21*

**so-and-so**
61:*12*
**Society**
37:*10*
187:*3, 5*
**sold**  110:*12*
**solicitation**
29:*14, 18*
109:*14, 16*

**solicitations**
31:*4*
**solicits**
26:*14*  29:*9*
**somebody**
53:*21*
108:*12*
114:*16*
128:*3*
195:*12*
202:*11*
**sorry**  18:*5*
39:*5, 13*
47:*9*  98:*1*
115:*11*
122:*12*
136:*14, 16*
147:*21*
148:*6*
172:*7*
173:*10*
175:*22*
176:*14*
186:*11*
194:*4*
198:*7*
203:*23*
**sort**  26:*22*
56:*16*
59:*23*
163:*10*
164:*4*

sound
40:*5*  41:*4*
58:*8, 11*
147:*22*
152:*14*
169:*10*
sounds
36:*11*
46:*20*
48:*20*
58:*14*
72:*15*
145:*13*
152:*18*
169:*12*
South  6:*6*
Southeast
187:*14*
188:*4, 7, 17*
192:*8*
SOUTHERN
1:*3*  7:*23*
speak
133:*9*
specialize
94:*15*
specific
12:*11, 17*
13:*16*
37:*15*
57:*20*
85:*13*
135:*18*
142:*6*
144:*16*
148:*2, 14*
156:*20*
179:*13*
180:*10*
181:*11*
190:*13, 14*

191:*19*
192:*15*
specifically
15:*17*
21:*17*
47:*23*  62:*2*
84:*3, 7, 10*
102:*7*
126:*12*
152:*9*
159:*4*
161:*22*
189:*20*
192:*7*
speculation
89:*20*
speed  37:*8*
spend  9:*9*
104:*17*
132:*16*
spending
104:*13*
132:*15*
spent  48:*6*
split  29:*10*
56:*10*
167:*7*
splits
158:*23*
spoke  81:*6*
spoken
80:*9*
204:*15*
sponsor
78:*8, 10, 13,
19, 21*  79:*1,
4*  88:*6*
sponsoring
88:*10*
89:*15*

sponsors
78:*11*
190:*16, 19*
sponsorshi
p  88:*4*
spot  84:*4*
Spreadshee
t  58:*4, 5*
61:*19*  62:*3,
5, 11, 14, 18,
19*  63:*3, 7,
12, 15*  64:*4,
5, 13, 17*
70:*20*
130:*21*
131:*1*
staff  86:*20*
87:*1, 6, 10*
staff-
related
13:*18*
stand
14:*10*
182:*17*
Standard
7:*15*  22:*15*
78:*13*
97:*23*  98:*2,
12*  113:*21*
standing
13:*18*
start  45:*8*
106:*15*
120:*18, 19*
128:*4*
138:*12*
155:*20*
started
41:*9*  56:*22*
96:*11*
121:*4*

146:*22*
155:*21*
starting
8:*3*  45:*23*
starts  46:*1*
135:*7, 12*
STATE
212:*3*
stated
157:*16*
statement
152:*1*
154:*23*
155:*14*
157:*15*
161:*5*
STATES
1:*1*  7:*22*
stay  195:*12*
Steele
73:*23*
74:*10, 16,
21*  75:*11,
13, 16*
76:*14*  77:*3*
78:*2, 5, 18,
20*  79:*2, 3,
10*  85:*12*
88:*7, 20*
89:*1*
100:*19*
104:*5, 7, 9,
12*  105:*2,
12, 13, 15,
20, 22*
106:*9, 13*
114:*7*
146:*12, 15,
21*  147:*13*
209:*7*
Steele's
78:*10*

105:*16*
147:*7*
steering
187:*14*
188:*4, 7, 17*
stenotype
212:*8*
step  29:*16*
56:*11*
164:*22*
steps
105:*11*
Stern
188:*13*
STIPULATE
D  2:*2, 11,
18*  3:*3*
stipulation
7:*5*
stipulations
8:*20*
strategizing
183:*1*
strategy
14:*22*
52:*15*
Street  6:*6,
19*
string
17:*10, 13*
110:*9*
112:*6*
strongly
157:*15*
stuff  15:*4*
30:*11*
114:*2*
137:*10*
141:*4*
156:*14*
193:*18*
style  28:*1*

subcommittee 192:8
subject 148:15
submission 26:19 93:6 184:9, 19, 20
submit 24:17
submitted 184:21
substance 15:20 16:1 150:20
substantial 165:12, 15
substantially 165:10
success 94:2, 4
successful 94:2
suggest 121:11
suggested 189:13
suggesting 92:4 117:20
suggestion 91:21, 22 189:16, 22
Suite 2:8 6:6, 11, 19 7:7
summary 68:8
summer 175:8
support 162:15

163:15, 18 174:5, 10
supporting 174:10
supports 181:21
supposed 15:1 173:4 176:11, 20
sure 10:6, 13 12:19 15:10 18:15 26:21 37:8 57:4, 14 60:4 76:13 93:17 98:16 125:12 133:18, 20, 23 137:12 149:4 152:7 157:22 165:21 166:6 173:18 182:15 183:8 185:15 195:18 206:11, 20
surplus 99:1, 11, 12
surprise 162:6, 10, 11, 14
Sutton 48:11 49:6 80:12 125:9

196:16 200:22
Sutton's 125:8
sworn 8:15
system 47:5 57:15 58:20 59:6 62:23 64:22 72:1, 4 108:8 115:1 123:4 130:17 185:6 186:4

< T >
T 2:1 212:1
table 24:5
tadpole 106:16
tag 104:7
take 11:19 27:3 54:1, 15 68:16 71:23 93:23 94:13 98:17 121:20 122:5 133:16 134:4 141:11, 16, 21 142:3 143:12 145:14 161:15 166:9 168:17

180:18 204:18 205:5 209:10
taken 2:5 11:7 44:23 66:9 134:9 140:20 142:21 167:23 182:20 183:9 188:15 209:13 212:7
takes 21:4, 10 135:9 196:1
talk 78:18 82:1, 14 87:5, 11 100:13 126:7 128:5 129:18 142:13 146:11 148:5 158:5 160:9 168:3 191:3, 6 192:11 203:1, 5 208:9
talked 45:10 80:4 81:18, 21 82:12 86:16, 19 91:4 144:19

145:11
149:20, 21
177:19
181:22
186:13
189:19
195:10
207:21
talking 19:22 28:17, 18 33:8, 15 64:5 79:9 84:19 90:23 92:8 101:9 105:14 107:17 115:19 117:17 128:20 130:22 131:9, 22 138:9 142:1 150:12 155:17, 22 156:10 158:13 159:12 171:16 172:11 175:16 176:3, 7 177:16 179:7 193:1, 20 200:19
talks 81:2 198:17
Talsma 48:16

Video Deposition of Clay Segrest

1/31/2024

80:*12*
82:*18*
196:*15*
200:*23*
201:*10*
**Talsma's**
82:*20*
125:*6*
**tandem**
24:*16*
**Tanya** 2:*5*
7:*1, 16*
212:*20*
**target**
52:*22* 53:*9*
178:*2*
**task**
202:*11, 13*
**tasks** 106:*6*
**tax** 31:*5*
**taxes** 27:*6*
72:*10*
97:*19*
98:*19, 22*
99:*3, 5, 7,*
*17, 22*
**team** 14:*22*
21:*1, 2*
26:*4* 27:*8,*
*11, 14, 18*
28:*8, 22*
29:*8, 9*
30:*16, 19*
31:*22*
41:*12, 15,*
*19, 21* 42:*2,*
*8, 10* 46:*14,*
*18* 47:*19*
48:*8* 52:*12*
53:*19* 54:*9*
55:*12, 18,*
*22* 56:*8, 9,*

*21* 59:*11,*
*14* 61:*13,*
*17, 22* 63:*2*
64:*5, 10, 12*
65:*9, 14, 18*
69:*19* 74:*7,*
*19* 78:*14*
79:*16* 80:*5,*
*7* 81:*22*
83:*13* 84:*2*
85:*5* 89:*12,*
*19* 93:*6, 20*
94:*11*
95:*20, 22*
96:*5*
101:*21*
104:*7*
108:*22*
111:*9*
118:*7*
120:*9, 10,*
*12, 20*
121:*6, 10*
122:*10, 19*
123:*8, 9, 18,*
*21* 125:*15*
126:*22*
127:*3, 9, 12,*
*17* 129:*9*
131:*20*
132:*8*
133:*2, 10*
136:*12, 19,*
*22* 137:*2*
138:*18, 21*
139:*4, 12*
140:*10, 12,*
*14* 141:*12*
142:*3, 6*
144:*8*
145:*4*
146:*12*

161:*11*
164:*19, 22*
165:*3*
166:*13*
167:*3*
172:*12*
184:*9*
185:*4, 5*
196:*21*
197:*1, 7, 11,*
*16, 23*
198:*22*
199:*6*
200:*16*
201:*3, 6*
202:*16, 20*
203:*3, 7*
207:*6, 22*
208:*20, 21*
**teammate**
39:*11*
127:*14*
**teammates**
14:*22*
**teams** 42:*7*
52:*19*
95:*14*
113:*23*
184:*21*
**team's**
65:*3*
135:*13*
136:*18*
139:*22*
142:*15*
**tech** 18:*20*
**technically**
71:*6* 109:*5*
120:*8*
173:*16*
**tee-niny**
131:*5*

**tell** 10:*1*
14:*15*
15:*23*
20:*17, 20*
26:*5* 30:*16*
31:*1* 58:*19*
77:*6* 83:*18*
84:*23*
88:*11*
90:*17*
110:*15, 17*
111:*3*
113:*5, 7*
114:*22*
117:*15*
126:*4, 9, 11*
127:*20*
142:*8, 16*
143:*4, 7*
144:*20*
145:*5, 9*
149:*21*
151:*13*
162:*14*
167:*16*
169:*7*
181:*8*
194:*8*
198:*19*
**telling**
32:*20*
97:*18*
110:*9*
111:*10*
145:*17*
147:*17*
162:*8*
**temporarily**
164:*16*
**ten** 22:*19*
40:*15* 46:*6*
54:*20*

107:*6, 9*
108:*2, 3, 4,*
*5* 112:*19,*
*20* 113:*12*
**tenure**
139:*16*
**Teresa**
67:*18*
71:*17*
72:*23*
**term** 71:*18*
145:*2*

**terminology**
35:*3* 59:*1,*
*2*
**terms**
24:*18* 25:*8,*
*9, 12* 31:*15,*
*18* 143:*22*
157:*7*
163:*11*
180:*13*
**terrorism**
116:*6, 16,*
*17, 22*
117:*3, 8*
**testified**
8:*16*
197:*12*

**TESTIMONY**
1:*15* 20:*16*
58:*7* 66:*18*
116:*10*
134:*14*
170:*16*
209:*23*
210:*11*
212:*11*
**Text** 4:*23*
5:*4* 12:*13*

Video Deposition of Clay Segrest

15:*12, 16,*
*21*  16:*1, 4,*
*6, 8, 10, 13,*
*21*  17:*2, 6,*
*10, 12, 23*
18:*3, 10, 11,*
*20*  196:*13,*
*20*  197:*2, 8,*
*10*  198:*4,*
*11, 15*
199:*22*
203:*20, 23*
204:*3*
**texts**  199:*1*
**Thank**
8:*22*  15:*5*
18:*17*  26:*7*
48:*18*
64:*12*  82:*6*
84:*20*
112:*1*
**Thanks**
204:*12*
**thereto**  3:*2*
212:*8*
**thing**
39:*12*  88:*5*
176:*23*
192:*23*
196:*4*
199:*7*
**things**
21:*19*  25:*6,*
*14*  36:*22*
42:*18*
105:*4*
109:*21*
122:*8, 13*
126:*8*
135:*9*
141:*5*
153:*11*

156:*22*
174:*4*
175:*1*
180:*6*
181:*6*
195:*22*
197:*5*
**think**  13:*5*
17:*16*
40:*11*
41:*20*
44:*13*  52:*1,*
*7*  56:*6, 10*
57:*8*  59:*22*
78:*5*  83:*12*
85:*2*  88:*12*
89:*18*
91:*17*
94:*14*
118:*22*
120:*2*
121:*1*
132:*6*
139:*7, 11*
143:*15*
152:*2*
155:*1*
157:*16*
160:*10*
162:*13, 22*
163:*3, 10,*
*21*  167:*14,*
*15*  168:*21*
170:*18*
174:*7*
177:*16*
178:*22*
179:*2*
185:*3, 15*
189:*4*
191:*9*
196:*4*

200:*5*
203:*13*
204:*15*
206:*3*
207:*10, 22*
**thinking**
113:*9*
140:*18*
142:*17*
194:*14*
204:*9, 13,*
*22*
**thinks**
150:*3*
**third**  35:*6*
40:*16*
58:*10*
101:*7*
173:*16*
194:*6*
**Thirteen**
147:*22*
**thirty**
26:*21*  36:*9*
66:*14*
102:*17, 18*
103:*13*
104:*4*
**thorough**
11:*4*
**thought**
34:*23*
127:*16*
132:*20, 21*
156:*7, 9*
172:*7*
194:*2*
196:*4*
202:*1*
**thoughts**
20:*1*
121:*11*

**thousand**
46:*6*  52:*21*
53:*7*  54:*20,*
*21, 22*
66:*14*
111:*22*
130:*3, 7*
199:*12*
**three**
28:*12*
36:*18*
42:*23*
48:*21*
51:*19*  58:*8*
73:*17, 21,*
*23*  75:*1*
76:*20*  79:*9*
103:*11*
133:*1*
150:*12*
181:*6*
188:*5*
**three-
month**
189:*1*
**three-
quarters**
56:*13*
**threshold**
54:*18*
129:*23*
**tied**  71:*6*
**Tiffany**
47:*19, 21*
48:*1, 9*
49:*18*
73:*22*
74:*20*  75:*9,*
*13*  80:*11,*
*14, 18*  81:*3,*
*6, 9*  85:*12*
100:*11, 18*

101:*3*
103:*13*
104:*15, 21*
105:*16*
114:*2*
119:*9, 19,*
*23*  120:*4*
121:*3*
132:*14, 16*
133:*21*
165:*19, 23*
166:*9, 12,*
*13*  167:*3,*
*12*  168:*8*
170:*5, 7*
174:*4, 6, 9,*
*18, 21, 22,*
*23*  175:*1*
179:*22*
180:*5, 15*
183:*6*
186:*5, 7*
196:*16*
198:*18*
200:*22*
201:*8, 9*
202:*4*
209:*6*
**Tiffany's**
104:*10*
119:*13*
166:*10*
168:*9*
**time**  2:*23*
3:*1*  7:*15*
18:*9*  19:*7*
27:*20*  31:*6*
35:*1*  36:*10*
42:*9*  44:*5,*
*7, 14, 21, 23*
48:*5, 17*
49:*2, 11*

Video Deposition of Clay Segrest

52:19  54:8
57:5, 20
66:7  70:5
75:20  87:6
93:9  96:13
98:7
104:14, 18
106:13
108:9, 20
123:5
124:23
134:7
136:7
141:4, 17
159:10, 13,
18  165:20
166:1
167:21
169:6
174:7
180:18
181:6, 13
182:11
188:11, 13,
15, 16, 18,
23  189:6
191:13
204:16
209:11
211:7
**times**  19:9
36:18
49:13
66:14  85:3
128:5
134:18
146:1
**timing**
123:3
182:7
183:10
**Ting**  99:20

**title**  38:12
190:10, 13
**today**  9:9
11:4, 20
12:2, 5
14:19
18:13  29:1
115:12
192:23
209:15
**today's**
42:10
**told**  45:17
77:21  82:2
87:22
140:18
163:14, 15
194:17
195:8
196:1
204:23
205:11
**tone**  158:4
**top**  38:9,
16  103:5
107:1
119:11
192:4
196:14
**torch**
193:21
194:5, 15,
23
**total**
107:15, 18
117:5
**tough**
28:11
**Towne**
176:5, 10,
23

**track**
57:16, 21
63:22  65:3
115:1
131:1
**tracked**
62:3  63:23
70:19
**tracking**
62:2
**trail**  115:5
**training**
35:3  153:7,
11
**transcribed**
212:9
**transcript**
212:7, 11
**transcriptio
n**  212:10
**transfer**
50:19
118:10
132:20
**transferred**
117:18
118:1, 15,
17
**transferring**
55:20
56:22
**transition**
56:17
175:13
183:11
**travel**
35:21  36:4,
9, 13, 23
37:7, 13
80:23
82:14

163:22
164:19
**traveling**
36:17, 19,
20, 21  74:5
**treated**
154:4, 10
**treatment**
155:15
**trees**
115:12
**Trey**  55:19
56:8
184:11, 15,
16, 17
185:5, 18
**Trey's**
184:9
**TRIA**
116:19, 22
**trial**  3:1
**tried**  52:19
**tries**  93:19
**trigger**
153:18
154:6
156:2, 3, 13
157:1, 5
**triggers**
154:18
**Troy**  67:18
71:18
72:23
**true**  56:4
118:12
212:11
**TRUIST**
1:10, 11
8:9  9:7
153:10
**try**  21:19,
20  24:15

37:1  52:15
90:7  93:20,
23  111:9
145:13
165:7
178:5, 23
**trying**
10:12  33:2
52:22  58:1
72:16
75:16, 18
95:9  165:9
191:1
192:23
207:15
**turn**  49:23
**twelve**
148:11
155:8
176:20
**twenty**
22:20  23:1,
4  52:21
91:3, 4, 20
92:1, 7, 8
107:18, 19
108:3
113:11
**twenty-five**
100:17
102:17, 18
103:12, 21
**twice**  19:7
**twisted**
150:15
**two**  31:21,
23  39:22
45:14
47:14
51:20
59:13
74:18, 23

Video Deposition of Clay Segrest

75:2  76:20
78:11
111:12
113:22
142:13
150:17
168:21
184:21
188:23
**two-thirds**
  56:13
**Tyler**  89:19
**type**  83:8
  102:4
  109:5
  115:18
  117:9
  141:20
  161:16
  171:20, 21
**typed**
  113:18
**types**  98:1,
  3, 13  122:8,
  12, 13
  141:5
**typically**
  22:20

**< U >**
**U**  2:1
**Uh-huh**
  40:22
  67:13
  103:22
  110:11
  119:12, 15
  131:7
  158:15
  163:17
  169:3
  180:7

184:10
187:16
193:23
196:17
200:18
204:10
**ultimately**
  52:9  129:1
**unable**
  120:13
**understand**
  10:8, 16, 21
  13:21  14:5,
  8  18:8, 22
  27:7  50:17
  78:2  127:2,
  6  129:2
  143:17
  153:3
  156:21
  190:8
  201:23
**understandi**
**ng**  15:8
  31:2  32:8
  39:3  50:3,
  23  67:7
  113:16
  119:20
  153:17, 21
  155:19, 23
  156:1, 5
  163:4
  190:6
**understood**
  136:12, 21
  137:22
  138:2, 18
**Underwood**
  92:14
**underwriter**
**s**  15:3

187:21
188:2
190:23
196:6
**Underwritin**
**g**  37:10
  187:2
**undisputed**
  170:22, 23
**Unfairly**
  154:13
**unfamiliar**
  43:14
**unhappy**
  191:13
**UNITED**
  1:1  7:22
**upper**
  157:11
**use**  57:21,
  23  58:23
  59:8
**user**  115:9
**usual**  8:19
**usually**
  108:15
**utilize**
  62:14

**< V >**
**V**  7:21
  148:5, 6, 9
  158:1
  159:9, 10,
  11
**vacation**
  44:15
**varies**
  22:18, 19
  24:13
  36:16

**various**
  21:20
  73:19
**vary**  22:16
  33:10
  36:15
  157:7
**verbal**
  121:18
  157:9
**verbatim**
  152:18
**version**
  42:11
  155:6
**versus**
  13:18  14:5
  69:14, 17
**vice**  188:12
**VIDEO**
  1:15  2:4
  7:19
**Videograph**
**er**  6:22
  7:13  8:10
  10:6  66:6,
  10  134:6,
  10  167:20
  168:1
  209:10
  210:7
  211:6
**visit**  36:23
  164:21
  182:15
**visited**
  61:15
**vital**  139:12
**vote**  77:9
**Vreeland**
  19:15

**vs**  1:9

**< W >**
**W-2**  47:10,
  12
**waived**
  2:13  3:5
**want**  28:5,
  11  42:17
  46:16, 21
  50:1  59:18
  66:2  67:6
  76:19
  80:16  83:8
  86:14  95:6
  110:7
  111:3
  112:9
  131:3
  143:15
  162:4, 5, 19
  164:1
  168:20
  169:1
  173:17
  174:3
  184:3
  185:21
  189:7
  194:2, 22,
  23  202:12
  204:5
  208:9
**wanted**
  35:15  82:1
  143:7, 22
  144:22
  145:6
  161:15, 18
  163:11
  176:23
  178:23

Video Deposition of Clay Segrest

1/31/2024

105

191:*2, 16,*
*17* 194:*2,*
*17* 201:*7*
204:*21*
**wanting**
144:*12*
194:*15*
**wants** 99:*9*
**warrants**
199:*10*
**waves**
36:*17*
**way** 20:*3*
34:*4* 43:*2*
49:*23*
53:*15* 61:*6*
114:*18*
123:*22*
125:*23*
134:*3*
135:*21, 22*
136:*15*
143:*6, 9*
145:*20*
146:*17*
154:*11, 22*
158:*22*
165:*11*
174:*17, 18*
178:*14*
182:*14*
191:*10*
**ways** 165:*3*
**webinar**
153:*11*
**week**
16:*23* 17:*1,*
*5* 119:*16*
132:*23*
133:*6*
136:*9*
204:*4*

**Well** 23:*9*
30:*11*
32:*20*
36:*12*
48:*17* 53:*5*
54:*14*
61:*10, 14*
72:*20*
75:*15*
85:*16* 90:*9*
91:*2* 97:*6*
98:*9, 21*
101:*18*
103:*17*
117:*9*
119:*1*
123:*3*
124:*3*
130:*23*
132:*21*
140:*5, 12*
159:*9*
163:*21*
165:*19*
170:*15*
177:*3*
187:*23*
190:*23*
191:*10*
201:*4*
204:*18*
205:*1*
**went** 16:*12*
61:*15* 78:*7*
83:*22* 90:*8,*
*9* 111:*11*
144:*6*
164:*15*
166:*2*
173:*11*
193:*10*
207:*9*

**We're** 7:*16*
8:*21* 9:*8*
15:*1* 26:*21*
28:*17*
29:*17*
33:*15* 37:*8*
40:*20*
46:*22*
52:*21* 53:*5,*
*10* 64:*4*
75:*16* 92:*8*
99:*1* 123:*5*
163:*23*
171:*16*
176:*3*
178:*10*
181:*12*
193:*16*
200:*19*
201:*8*
**we've** 9:*13*
20:*15* 43:*1*
44:*19* 45:*8,*
*10, 19, 20*
63:*9* 67:*15*
81:*13*
94:*14*
115:*18*
167:*14*
172:*17*
181:*7*
207:*21*
**whichever**
99:*16*
**Whitney**
20:*9*
**wholly**
119:*18*
**Wilkinson**
2:*7* 6:*9, 10*
7:*6, 20* 8:*6*
9:*6* 210:*3*

**William**
6:*22* 7:*15*
**willing** 36:*9*
**willingness**
54:*15*
**Willis**
177:*16, 18,*
*19, 20*
183:*3, 4, 19*
**Willis-
Chicago**
178:*2, 12,*
*16, 18*
183:*13*
**window**
28:*10*
**witness**
2:*13* 7:*8*
8:*12* 26:*11*
138:*13*
168:*23*
176:*9*
184:*6*
212:*12*
**woman**
148:*11*
155:*8*
**women**
152:*20*
**women's**
192:*8, 12*
**wondering**
24:*21*
176:*8*
181:*10*
195:*4*
**Woodward**
54:*4, 10, 14*
55:*1, 10, 16,*
*18, 21* 56:*7,*
*23* 117:*18*

118:*1, 6, 15,*
*18*
**word**
151:*22*
**words**
58:*17, 19*
80:*3*
210:*15*
**work** 19:*10*
20:*11* 22:*3*
24:*16*
32:*10* 49:*3,*
*18* 67:*18*
68:*1, 22*
69:*3, 8, 12,*
*20, 21* 86:*7,*
*14* 93:*6*
110:*9*
123:*22*
124:*5*
132:*19*
139:*8*
141:*12*
144:*19*
147:*16*
158:*10*
167:*5*
180:*17*
183:*19*
204:*19*
205:*2*
207:*1, 3, 4,*
*9*
**Workday**
4:*10* 38:*1,*
*2, 4* 44:*6,*
*10* 47:*4*
51:*16, 17*
**worked**
42:*1, 5, 6*
48:*16*
69:*19* 70:*4*

Video Deposition of Clay Segrest

93:*4*
144:*18*
166:*1*
178:*21*
201:*15*
**Worker**
42:*19*
**working**
48:*2, 4, 6,
22*  57:*6*
63:*1*  70:*13*
106:*3, 9*
121:*4*
138:*2*
166:*2*
181:*12*
192:*22*
**workload**
168:*10*
**works**  9:*14*
20:*10*
60:*20, 21*
71:*1*  183:*6*
**worksheets**
136:*2, 6*
**Wow**  34:*1*
206:*3*
**write**  53:*15*
88:*7*  141:*5*
171:*20*
**writes**
93:*18*
123:*18*
**writing**
88:*3, 19*
97:*8*
123:*21*
131:*5*
141:*3*
157:*9*
**written**
35:*19*

87:*15, 19,
20*  157:*14*
186:*17*
**wrong**
91:*14*
112:*1*
140:*18*
194:*8*
**wrongful**
157:*4*
**wrote**  97:*6,
7, 14, 15*
142:*5*
178:*6*
**WSIA**  37:*11*

**< X >**
**X**  4:*1*
**XX**  115:*21*
116:*3*
117:*1, 2*
**XXXX**
117:*1, 5*

**< Y >**
**y'all**  113:*2*
**y'all's**
108:*8*
117:*23*
**Yeah**
14:*20*
18:*10*  20:*6*
21:*11*
28:*11, 16*
29:*23*
30:*12*  33:*9,
14*  34:*5, 9*
35:*9, 20*
36:*17*  41:*7*
42:*6*  46:*2*
48:*20*
53:*23*

58:*18*  61:*4,
21*  63:*1*
65:*12*  66:*4*
67:*22*  68:*4*
69:*8*  72:*16,
18*  76:*12,
13*  77:*2*
84:*12*
88:*16*
89:*23*  91:*6*
93:*4*  98:*9*
102:*21*
103:*11*
104:*1, 3*
107:*2, 23*
108:*3*
111:*5*
112:*15*
113:*9, 20*
116:*2*
117:*19*
122:*13*
125:*9*
128:*22*
130:*23*
132:*1*
133:*7*
135:*22*
137:*17, 22*
140:*17*
141:*1*
142:*11*
144:*15, 17*
151:*15*
153:*7*
157:*3, 20*
159:*11*
168:*21*
172:*9, 23*
175:*6*
176:*2, 6, 16,
18*  177:*19*

178:*8*
181:*14*
182:*23*
184:*22*
185:*13*
193:*18, 20*
194:*12, 17*
198:*21*
199:*9*
200:*21*
201:*12*
202:*3*
**year**  41:*21*
56:*6, 10, 12,
21*  58:*2*
67:*19*
68:*23*
74:*14*
76:*22*
109:*4*
130:*5*
141:*20*
147:*12*
169:*14*
175:*13*
188:*10*
190:*10, 12*
191:*15*
194:*10*
**years**
28:*12, 15*
34:*5*  40:*13,
15*  52:*18*
65:*8*
134:*23*
147:*19, 21,
22*  148:*11,
14*  155:*8*
186:*19*
188:*5*
208:*20*

**yellow**
11:*11*
**Yep**  40:*22*
49:*16*  58:*6*
176:*4*
**yeses**  10:*8*
**YouTube**
199:*16, 19*
**yowza**
206:*3*
**Yvette**
48:*16, 21*
49:*1, 4, 17*
74:*20*
80:*11*
82:*18, 19*
83:*1, 5*
86:*1, 6, 7*
125:*5*
139:*1, 3, 8,
12, 17*
164:*11, 17*
166:*3*
174:*19*
196:*15*
200:*23*
201:*10, 13,
15*

**< Z >**
**zero**  113:*16*