FILED

2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 11

# Video Deposition of Susan Phillips

January 23, 2024

Hendrix v. CRC Insurance Services, Inc., et al.

2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1  IN THE UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF ALABAMA

3        SOUTHERN DIVISION

4

5  CASE NUMBER: 2:21-CV-0300-MHH

6

7  KATHRYN HENDRIX,

8        Plaintiff,

9        vs.

10  CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL

11  CORP., and TRUIST BANK,

12        Defendants.

13

14

15  VIDEO DEPOSITION TESTIMONY OF:

16        SUSAN PHILLIPS

17

18

19        JANUARY 23, 2024

20        2:03 P.M.

21

22

23

Page 2

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED by and

3  between the parties through their respective

4  counsel that the video deposition of SUSAN

5  PHILLIPS may be taken before Tanya D. Cornelius,

6  RPR, CSR, and Notary Public, at the offices of

7  Wilkinson Law Firm, P.C., 1717 3rd Avenue North,

8  Suite A, Birmingham, Alabama, on the 23rd day of

9  January, 2024, commencing at approximately 2:03

10  p.m.

11        IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and the reading of the

13  deposition by the witness is NOT waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws

16  and rules of Court relating to the taking of

17  depositions.

18        IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any

20  objections to be made by counsel to any

21  questions, except as to form or leading

22  questions, and that counsel for the parties may

23  make objections and assign grounds at the time

Page 3

1  of the trial, or at the time said deposition is

2  offered in evidence, or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4  that notice of filing of the deposition by the

5  Commissioner is waived.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

1        I N D E X

2  EXAMINATION BY:                PAGE NUMBER

3        MS. PALMER                8

4

5        * * * * * * * * * * * * * *

6

7        EXHIBIT INDEX

8  PLAINTIFF'S EXHIBIT NO:        PAGE NUMBER

9  39  Notice of Deposition        8

10  40  Text Messages              74

11

12

13

14

15

16

17

18

19

20

21

22

23

Video Deposition of Susan Phillips                1/23/2024
                                                   2 (5 - 8)

Page 5

APPEARANCES

1    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4       PALMER LAW, LLC

5       BY: Leslie A. Palmer, Esq.

6       104 23rd Street South, Suite 100

7       Birmingham, Alabama  35233

8

9       WILKINSON LAW FIRM, P.C.

10      BY: Cynthia Forman Wilkinson, Esq.

11      1717 3rd Avenue North, Suite A

12      Birmingham, Alabama 35203

13

14   FOR THE DEFENDANTS:

15      BAKER, DONELSON, BEARMAN, CALDWELL

16          & BERKOWITZ, P.C.

17      BY: Rachel Barlotta, Esq.

18      420 North 20th Street, Suite 1400

19      Birmingham, Alabama  35203

20

21   ALSO PRESENT: Kat Hendrix

22      Taylor Holland,

23      Videographer

Page 6

1       I, Tanya D. Cornelius, RPR, CSR, and

2    Notary Public, acting as Commissioner, certify

3    that on this date, as provided by the Federal

4    Rules of Civil Procedure, and the foregoing

5    stipulation of counsel, there came before me at

6    the offices of Wilkinson Law Firm, P.C., 1717 3rd

7    Avenue North, Suite A, Birmingham, Alabama,

8    beginning at 2:03 p.m., SUSAN PHILLIPS, witness

9    in the above cause, for oral examination,

10   whereupon the following proceedings were had:

11

12

13      VIDEOGRAPHER:  We are going on the

14   record.  The date is January 23rd, 2024.  The

15   time on the monitor is 2:03 p.m. Central Time.

16   My name is Taylor Holland, and our court reporter

17   is Ms. Tanya Cornelius.  We're here on behalf of

18   Cite Court Reporting out of Montgomery, Alabama.

19      This is the video deposition of Ms.

20   Susan Phillips, which was noticed by attorney

21   Cynthia Wilkinson, for the case Hendrix V. CRC

22   Insurance Services, Incorporated, et al., filed

23   in the U.S. District Court for the Northern

Page 7

1    District of Alabama, Southern Division, Case

2    Number 2:21-CV-0300-MHH.

3       Counsel, please identify yourselves

4    for the record, and we'll start with the

5    plaintiffs.

6       MS. PALMER:  Leslie Palmer for the

7    plaintiff, Kathryn Hendrix.

8       MS. WILKINSON:  Cynthia Wilkinson for

9    the plaintiff, Kathryn Hendrix.

10      MS. BARLOTTA:  Rachel Barlotta for

11   defendants, CRC Insurance and Truist.

12      VIDEOGRAPHER:  Thank you.

13      Will our court reporter please

14   administer the oath to the witness.

15

16      SUSAN PHILLIPS,

17      being first duly sworn, was

18      examined and testified as follows:

19

20      THE REPORTER:  Will this be usual

21   stipulations?

22      MS. BARLOTTA:  We're going to read

23   and sign.  Thank you.

Page 8

1       EXAMINATION

2    BY MS. PALMER:

3       Q.   All right. Ms. Phillips, we

4    introduced ourselves earlier.  My name is Leslie

5    Palmer, and I represent Kathryn Phillips --

6    Kathryn Hendrix.  I'm going to do that all day.

7    And we have called you here today for your

8    deposition regarding your employment with CRC and

9    any information you may have related to Kathryn's

10   employment.

11      Is it okay if I call you Susan?

12   **A.   Uh-huh (positive response), yes.**

13      Q.   And I'm Leslie.  So just -- I don't

14   know that I would know who a Ms. Palmer was.

15      (Whereupon, Plaintiff's Exhibit No.

16   39 was marked for identification and a copy of

17   same is attached hereto.)

18      Q.   I'm going to show you what I have

19   previously marked as Plaintiff's Exhibit 39, and

20   this is a re-notice of the deposition of Susan

21   Phillips.  Have you seen this document before?

22   **A.   No.**

23      Q.   Okay.  So what this document did was

Page 9

1  provide notice to CRC's counsel that we were
2  taking your deposition today, January 23rd at
3  2:00 p.m.
4        If you'll flip for me to the second
5  page there at the top, it lists a couple of
6  things that we wanted you to bring with you.  So
7  the first one there is documents used by you to
8  prepare for your deposition.
9        And I apologize there's a typo there.
10 That's what I get for using a form.
11       Did you look at any documents before
12 coming here today?
13    **A.   Just some texts.**
14    Q.   Some text messages?  Okay.  And
15 you'll see that second one is any text messages,
16 e-mails, or documents discussing Kathryn Hendrix,
17 including her employment, medical leave, or
18 complaints.
19       So the text messages that you looked
20 at, did they involve Kathryn?
21    **A.   They were hers.**
22    Q.   Okay.  They were from her?
23    **A.   Uh-huh (positive response).**

Page 10

1     Q.   Were you in those text messages,
2  texts to and from you?
3     **A.   Talked about but not in.**
4     Q.   Did you bring those with you today?
5     **A.   I don't have them.**
6     Q.   Okay.  Did anybody at CRC ask you to
7  check your cellphone to see if you had text
8  messages with Kat?
9     **A.   No.**
10    Q.   Did anybody ask you to check your
11 e-mail at CRC or your personal e-mail to see if
12 you had any e-mails related to Kat?
13    **A.   No.  But I'm retired.**
14    Q.   Okay.  When did you retire?
15    **A.   October 2nd.**
16    Q.   And I had heard that you had retired.
17 I wasn't sure when.  Congratulations.
18    **A.   Thank you.**
19    Q.   How is retired life?
20    **A.   It's okay as long as I'm busy.  It's**
21 **when you don't have anything to do that it gets**
22 **kind of like, What am I doing here.**
23    Q.   I think that's the hard part.

Page 11

1     **A.   But other than that, it's been very**
2  **nice.**
3     Q.   Yeah.  Both of my parents recently
4  retired, and I feel like it's one extreme or the
5  other.  I either can't get them to do anything or
6  I can't get them to stop.  So there's no happy
7  medium.
8     **A.   No.**
9     Q.   Have you ever given a deposition
10 before?
11    **A.   Yes.**
12    Q.   How many times?
13    **A.   Twice.**
14    Q.   Twice, okay.  And I'm going to just
15 kind of touch on the rules.  I'm sure you know
16 them since you've done that before, but we have a
17 court reporter here today taking down your
18 testimony.  So we need you to answer audibly,
19 okay?
20    **A.   (Witness nods head.)**
21    Q.   Is that a yes?
22    **A.   Yes.**
23    Q.   So that's exactly my point.  If I ask

Page 12

1  you if that's a yes or if that's a no, I'm not
2  trying to be rude.  I'm just trying to make sure
3  we get a clear record.  It's our habit to kind of
4  nod or shake our heads.
5     **A.   Yeah.**
6     Q.   We also have a videographer here
7  today just to make sure that we have the record
8  fully preserved, and they're taking it down as
9  well.
10       So is there any particular reason why
11 you wouldn't be able to give truthful and honest
12 and complete testimony today?
13    **A.   No.**
14    Q.   Okay.  Tell me about the other
15 depositions that you gave.  Were they personal or
16 business related?
17    **A.   They were CRC.**
18    Q.   CRC.  Okay.  When -- you said two of
19 them?
20    **A.   (Witness nods head.)**
21    Q.   Do you recall when the first one was,
22 roughly?
23    **A.   Back in the '90s or early 2 -- a long**

Video Deposition of Susan Phillips

1/23/2024
4 (13 - 16)

Page 13

1  time ago.

2  Q.  Nirvana on the radio and --

3  A.  Maybe not that long ago, but --

4  Q.  -- flannel?

5  A.  -- a long time ago.

6  Q.  What was the topic of that

7  deposition?

8  A.  They were both insurance agents, E&O.

9  One was against CRC, and one was against one of

10  my agents.  So I was there more as a witness than

11  actually being sued myself for CRC.

12  Q.  And E&O, is that a type of insurance

13  coverage?

14  A.  Errors and omissions, insurance

15  agents.

16  Q.  So were you there because CRC had

17  been sued or because CRC had provided coverage?

18  A.  CRC had been sued because of coverage

19  we provided.

20  Q.  Okay.  Sued by an insurer?

21  A.  An insurer.

22  Q.  What type of E&O coverage were they

23  seeking?  Do you remember like what the

Page 14

1  underlying claim was?

2  A.  The underlying claim, there was no

3  coverage for their -- for what they wanted

4  covered, and so they came back against us and the

5  insurance carrier because they didn't have

6  coverage.

7  Q.  Do you recall what they were looking

8  to cover, what acts or errors?

9  A.  They wanted coverage for their

10  directors and officers for -- it had to do with

11  property, real estate, and the value of what they

12  told them they would pay them if other people

13  received more money, but they received more money

14  because it was based on a side tract and not the

15  actual manufacturing facility itself.  And so

16  they were suing the board of directors for not

17  paying them what they thought they were owed.

18  Q.  Okay.

19  A.  So then the board came back against

20  the RSUI and CRC.

21  Q.  So was that -- was it similar in both

22  lawsuits?

23  A.  The other one was a -- it was an

Page 15

1  agent -- it was one of my agents who had placed a

2  medical malpractice policy, and the insured chose

3  to cancel the policy and purchase a one-year ERP.

4  And they had a claim, of course, one year and a

5  month after.

6  Q.  Certainly.

7  A.  And so they came back against the

8  agent, which was just a -- nothing happened.

9  Q.  Okay.  So neither of those had

10  anything to do with any employment practices

11  liability?

12  A.  No.

13  Q.  Okay.  Since you retired on October

14  2nd, have you had any contact with anybody from

15  CRC?

16  A.  Actually, nobody since my party.

17  Q.  Goodness.  What kind of party did

18  they throw you?

19  A.  It was up at The Club, just a little

20  department thing.

21  Q.  Hopefully they got you a good cake

22  from Edgar's.

23  A.  No.  We had good wine, though.

Page 16

1  Q.  Okay.  That's better.  Only way it

2  could be better if it was both, I think.

3  Are you friends with any of them on

4  social media, any of the CRC employees?

5  A.  I don't do social media.

6  Q.  You don't have social media?  Who got

7  your book when you retired?

8  A.  It was all my team.  Part of it went

9  to -- the medical part went to Lee McClure, and

10  the non-medical went to David Sloneker as far as

11  I know.

12  Q.  Okay.

13  A.  That is what I suggested.  I don't

14  know what they actually decided.

15  Q.  Okay.  So you made a suggestion --

16  A.  Yeah.

17  Q.  -- but you --

18  A.  I don't know how they divided it up.

19  But that was reasonable.

20  Q.  Okay.  And the suggestion that you

21  made, did you make that suggestion to Dave and

22  Lee?

23  A.  Uh-huh (positive response).

Video Deposition of Susan Phillips
1/23/2024
5 (17 - 20)

Page 17

1    Q.   Or to John Cadden?

2    A.   No.  Dave and Lee.  It's our team.

3    Q.   Okay.  So I have here a -- kind of, I

4  guess, a bio of you of when you were at CRC.  And

5  I'm not going to produce this or anything, but it

6  says at this point you had been with the

7  professional liability for over twenty-five

8  years.  How long were you at CRC ultimately?

9    A.   Thirty-two years and some months.

10   Q.   Wow.  Was CRC like your first career

11 or did you do something before that?

12   A.   I was with AIG for ten years before

13 that, and then my career before that was hotel

14 restaurant management.

15   Q.   Bless you.  When you started at CRC,

16 what was the position that you started in?

17   A.   Account exec -- actually, no.

18 Technical assistant.

19   Q.   We've heard that a little bit.

20   A.   We did not have account execs back

21 then.

22   Q.   Are they basically the same thing?

23 Is it --

Page 18

1    A.   No.  A technical -- you're talking

2  back in the '90s.

3    Q.   I know.

4    A.   It was an assistant position.

5    Q.   What we would kind of consider like a

6  true secretarial type?

7    A.   No.  It was processing quotes and

8  binders and surplus lines and --

9    Q.   Is that what the account execs kind

10 of do now?

11   A.   Yeah.

12   Q.   Yeah?  Did you move -- when did you

13 move -- obviously, you did move up.  When did you

14 move up from the technical assistant?

15   A.   One year.  I moved to the

16 professional department as a broker.

17   Q.   And we've heard a little bit of

18 testimony in some other depositions about inside

19 brokers, associate brokers, senior brokers.  Did

20 you -- you moved in as like a full on broker, no

21 word before it, right?

22   A.   We did not have those titles back

23 then.

Page 19

1    Q.   It was just broker?

2    A.   And even our business cards didn't

3  have titles on them.

4    Q.   Okay.  Did your business card have --

5  did it say broker or just said your name?

6    A.   Susan Phillips.

7    Q.   Okay.  Do you remember what year you

8  would have moved into the broker position?  Just

9  roughly.

10   A.   If I started in '91, it would have

11 been '92.

12   Q.   Okay.  All right.  And tell me a

13 little bit about that.  When you moved into that

14 position, what types of accounts did you have?

15   A.   I had no -- we did not have a -- it

16 was a starting up new department.  Betsy had been

17 there a couple of years.  And I had no book.  I

18 had to develop my own book.  And I started pretty

19 much writing nonprofit D&O is how the book got

20 started.

21      THE REPORTER:  Say that again.

22      THE WITNESS:  Nonprofit D&O.

23   Q.   (BY MS. PALMER:)  Okay.  So that

Page 20

1  would have been you going out and just drumming

2  up business, right?

3    A.   Uh-huh (positive response).

4  Primarily the Southeast.

5    Q.   Did that require a lot of travel?

6    A.   Yes.

7    Q.   I guess that was before prevalent

8  e-mail days and Zoom meetings?

9    A.   This was back with the Yellow Book

10 and Yellow Pages, and you go find agents and go

11 call on them.

12   Q.   So when you started working there,

13 were you working under Betsy?

14   A.   Uh-huh (positive response).

15   Q.   Okay.  So was Betsy --

16      MS. BARLOTTA:  Is that a yes?

17   A.   Yes, Betsy Barnett, yes.

18   Q.   So was Betsy over the professional

19 liability department?

20   A.   We were the department.

21   Q.   Okay.  So you and Betsy.  Was anybody

22 else in the professional liability department?

23   A.   There was one assistant.  Betsy had

Page 21

1  an assistant.
2      Q.   Okay.  And where did the department
3  move from there?  Do you remember who you brought
4  in next?
5      A.   No.
6      Q.   At some point we know that it became
7  what it is now.
8      A.   Uh-huh (positive response).
9      Q.   And in 2017, '18, when Kathryn was
10 there, we know a little bit about the makeup
11 there.
12          Is there anybody between when you
13 started the department with Betsy and 2017 who
14 stands out to you as I know when we brought this
15 person in, and this was their job?
16          MS. BARLOTTA:  Object to the form.
17     A.   No.  I mean -- no.
18     Q.   Okay.
19     A.   There was very little turnover.
20     Q.   Just kind of adding people as you
21 grew?
22     A.   Uh-huh (positive response).
23     Q.   Okay.  When did Rusty Hughes join the

Page 22

1  department?
2      A.   I don't know.  He started out as
3  Betsy's assistant.
4      Q.   Okay.  Was Rusty the assistant that
5  you mentioned when the department first started?
6      A.   No, no.
7      Q.   Okay.
8      A.   Her name was Amy.
9      Q.   Okay.  What about John Cadden?  Was
10 he ever part of that department?
11     A.   No.
12     Q.   So we heard testimony from Rusty --
13 we heard testimony from Rusty last week about
14 there being seven teams in the professional
15 department.  Does that sound about right in, say,
16 2019?
17     A.   Probably.  I worked remote since
18 2016, but I -- yes, very proud of them, and yes.
19     Q.   Okay.  So would you be able to tell
20 me who those seven teams were as far as the
21 leadership of the teams?
22          MS. BARLOTTA:  Object to form.
23     A.   I'll do the best I can.

Page 23

1      Q.   Okay.
2      A.   There was our team, Lee and Dave and
3  Susan, and then James Powell, and then Trey
4  Reich, Rusty, Corey.  That's only like five.  Oh,
5  they may be counting underwriting.  We have an
6  underwriting department.
7      Q.   Okay.
8      A.   That's all I can think of.
9      Q.   Okay.  Are you familiar with the
10 launch program that the brokers use?
11     A.   I know it's new, and I think it's a
12 developmental program, but --
13     Q.   No experience?
14     A.   No.
15     Q.   Do you have any knowledge of who the
16 Birmingham office has put into the launch
17 program?
18     A.   No.
19          MS. BARLOTTA:  Object to form.  Let
20 me get my objection in.
21          THE WITNESS:  Do what?
22          MS. BARLOTTA:  Just pause a minute
23 and let me get my objection in.

Page 24

1          THE WITNESS:  I'm sorry.
2          MS. BARLOTTA:  No, you're not doing
3  anything wrong, just to make the record clear.
4          THE WITNESS:  That was easy.
5      Q.   (BY MS. PALMER:)  You made reference
6  a couple of times about our team, and I know that
7  it was you and Dave, and then at some point Lee
8  McClure joined; is that correct?
9      A.   Correct.
10     Q.   Okay.  And so when we were speaking
11 with Rusty last week, it seemed as though Lee
12 came in, and you guys decided Lee would be the
13 team leader; is that accurate?
14     A.   After many years.  That was just --
15 yes.  It was Dave and myself, and Lee joined my
16 team because the broker he was working with left.
17     Q.   Okay.  So take me there and tell me
18 like how did that happen?  How did you end up
19 teamed up with Dave, and then how did you end up
20 bringing Lee in?
21          MS. BARLOTTA:  Object to form.
22     A.   Okay.
23          MS. BARLOTTA:  You can answer.

Video Deposition of Susan Phillips                                    1/23/2024
                                                                    7 (25 - 28)

Page 25

1    Q.   Yeah, how did you end up teamed up
2  with Dave first?
3        MS. BARLOTTA:  Same objection.  You
4  can answer.
5    A.   Okay.  Neither one of our books were
6  -- we needed a group to -- so we could have, you
7  know -- we didn't have enough production to be
8  individual, so they put us together, which worked
9  out well.  And we were like that for -- I can't
10 tell you when we started, but for many years.
11   Q.   Do you know who made the decision to
12 put you and Dave together?
13   A.   Oh, we did.  I think it was probably
14 Betsy -- I don't remember if it was Betsy or
15 Rusty, but just between us, we decided it would
16 be better if we were together.
17   Q.   Okay.  And at some point, they also
18 brought Lee in; is that correct?
19       MS. BARLOTTA:  Object to the form.
20   A.   Lee worked for another broker who
21 quit, and so they needed to find a place to put
22 Lee, so they asked me to take Lee on my team.
23   Q.   Okay.  Why would they need to find a

Page 26

1  place to put Lee?  Was he not a full broker?
2    A.   Correct.
3    Q.   Okay.  What would have been his
4  position when he first joined your team?
5    A.   Broker.
6    Q.   Okay.  But maybe back into that
7  assistant broker, senior broker, whatever that
8  was?
9        MS. BARLOTTA:  Object to the form.
10   A.   I can't help you.
11   Q.   How long did Lee work on your team
12 before he became the team leader?
13   A.   Oh, he just became -- probably three
14 or four years.
15   Q.   Do you remember what year he would
16 have joined your team?
17   A.   No.
18   Q.   Are we talking recently that he
19 became the leader, like --
20   A.   Uh-huh (positive response).
21   Q.   -- 2015 or --
22   A.   Oh, no.  He only became the leader
23 '19 or '20, maybe even during Covid.  Just

Page 27

1  recently, because my retirement has kind of been
2  coming, you know.
3    Q.   Okay.
4    A.   It's been in the works.  And so he
5  was always going to take over the team.
6    Q.   Okay.
7    A.   It was just a matter of when we did
8  it.
9    Q.   Okay.  And so before 2019 or 2020,
10 you were the team lead?
11   A.   Dave and I were together.
12   Q.   Co?
13   A.   Uh-huh (positive response).
14   Q.   Okay.  So as the co-team leads prior
15 to 2019, would it be up to you and Dave to
16 determine how bonuses were distributed on your
17 team?
18   A.   We would each do our own.
19   Q.   Okay.  How do you determine who you
20 give bonuses to if you're co-leads?  Like --
21   A.   He had a bucket for his production,
22 and I had a bucket for my production.
23   Q.   Okay.

Page 28

1    A.   So we each had a set amount of money.
2  So we didn't commingle --
3    Q.   Your revenues?
4    A.   -- our revenues.
5    Q.   Okay.  That makes sense.  And did you
6  have staff that was just your staff or did you
7  also share staff among the team?
8    A.   Dave had his staff, and I had my
9  staff.
10   Q.   Okay.  Who was your staff?  And I'm
11 talking about 2017 to '19.
12   A.   Well, back then, it probably would
13 have just been Rhonda Brasher and Lee.
14   Q.   Okay.  And so if Lee was on your
15 staff, would Lee have his own revenue pool or
16 would his be under your bucket?
17   A.   His would be under my book.
18   Q.   Okay.  And do you recall during that
19 same time period who was on Dave's staff?
20   A.   He just had Vandalyn, and he hired
21 somebody, but I don't know when he hired him.  I
22 think Brandon.  I don't know when he was actually
23 hired.

Page 29

1   Q.   Brandon Hayes?
2   A.   Yeah.  But I don't know when he
3   entered the picture.
4   Q.   Okay.  Do you recall what position he
5   hired Brandon Hayes for?
6   A.   A broker.
7   Q.   Would that be -- you said that the
8   two of you joined up because your --
9   A.   Production wasn't high.
10  Q.   Production, right.  So would it be
11  usual to hire someone in as a broker if your
12  production wasn't high enough to be on your own?
13        MS. BARLOTTA:  Object to form.
14  A.   They were trying to develop more
15  business and get production.
16  Q.   Did -- how did you calculate the
17  bonuses that you would distribute from your
18  bucket?  Is there like a set -- I guess, factors
19  that you look at?
20  A.   No.  For Rhonda, it was based on
21  showing up at work, doing a good job, not making
22  mistakes, being a reliable employee.
23        Lee was based more on his production

Page 30

1   and a percentage of that.  But hers was not based
2   on production.
3   Q.   Okay.  And was she a -- was Rhonda an
4   account executive?
5   A.   Yes.
6   Q.   Did you have Rhonda doing any
7   brokering?
8   A.   No.
9   Q.   Is that the correct term?
10  A.   It is, but no.
11  Q.   Okay.  Do you recall the -- and it
12  can be an estimate, but the largest bonus that
13  you ever paid Rhonda?
14        MS. BARLOTTA:  Object to form.
15  A.   Fifty, sixty thousand.
16  Q.   Okay.  And that would be that
17  biannual bonus?
18  A.   That would be total together.
19  Q.   Total.  Okay.  So maybe twenty-five
20  each time?
21  A.   Or something, depending on -- you
22  know, the first one is usually a little bit lower
23  to cover for the second half of the year, and

Page 31

1   then by then you have all your results, and you
2   can, you know, do a little bit better.
3   Q.   And do you recall what the largest
4   bonus that Lee would have received when he was
5   under your bucket?
6        MS. BARLOTTA:  Object to the form.
7   A.   No.
8   Q.   Would it have been larger or smaller
9   than two hundred?
10  A.   Smaller.
11  Q.   Larger or smaller than a hundred?
12  A.   Between both of the times, it could
13  have been more than that.
14  Q.   Okay.
15  A.   But it was based on his production.
16  Q.   How was that production tracked?
17  A.   By how it was coded in the system.
18  Q.   Is that that AIMS system --
19  A.   Uh-huh (positive response).
20        MS. BARLOTTA:  Object to the form.
21  Q.   -- that CRC has?
22        MS. BARLOTTA:  Object to the form.
23  A.   Yes.

Page 32

1   Q.   And so when Lee would work on a
2   matter, would he go into the system and code it a
3   certain way?
4        MS. BARLOTTA:  Object to form.
5   A.   It would be Susan, Lee -- and Lee, or
6   Susan, Lee, and Lauren.
7   Q.   Okay.
8   A.   Lee would have been that second spot.
9   Q.   Okay.  So Lauren, who is Lauren?
10  A.   She worked with Lee on his accounts.
11  Q.   And since he just became the team
12  lead in 2019, when Lauren was on Lee's accounts,
13  would those accounts of Lee's still be considered
14  your accounts as well?
15        MS. BARLOTTA:  Object to the form.
16  A.   Yes.
17  Q.   Kind of like an upstream?
18  A.   (Witness nods head.)
19        MS. BARLOTTA:  Object.
20  Q.   Is that a yes?
21  A.   Yes, in between the objection.
22  Q.   Would there be a way for Lauren to be
23  listed in that AIMS system as working on an

Page 33

1   account?
2         MS. BARLOTTA:  Object to form.
3         A.   She would be listed in the third spot
4   as the assistant on the account.
5         Q.   Okay.  What would it take for her to
6   be able to be listed in the second spot?
7         MS. BARLOTTA:  Object to form.
8         A.   To be a broker with her own book.
9         Q.   And when you say a broker with her
10  own book, could that be a book that someone
11  passed off to her, like accounts that she was
12  wholly managing?
13        MS. BARLOTTA:  Object to form.
14        A.   On our team, no.  She would have
15  stayed in that third spot, because those are
16  Lee's accounts that she's working.
17        Q.   Okay.
18        A.   So on my team, she would have been in
19  that third spot.
20        Q.   Okay.  And then after 2019 when Lee
21  became the team lead, could Lauren have slid into
22  that second spot at that point?
23        MS. BARLOTTA:  Object to form.

Page 34

1         A.   I don't know how he set it up with
2   her.  I don't know.
3         Q.   Okay.  So that would be a specific
4   deal between the two of them?
5         A.   Yeah.
6         Q.   Okay.  Did you have any say in the
7   hiring of Brandon Hayes?
8         A.   No.
9         Q.   Did anybody ask you if they needed
10  another associate broker?
11        A.   No.
12        Q.   Did you get to interview him?
13        A.   No.
14        Q.   Would you have liked to interview
15  him?
16        A.   No.
17        Q.   Did you have any involvement in
18  setting his bonuses?
19        A.   No.
20        Q.   And that's because he was on Dave's
21  bucket?
22        A.   (Witness nods head.)
23        Q.   Did Brandon ever work on any of your

Page 35

1   cases?  I say cases like --
2         A.   Yeah, like you're a life insurance
3   agent.  I referred him some accounts.
4         Q.   Okay.
5         A.   To help him get developed.  Again, as
6   I'm moving on and getting ready to set up my
7   retirement, trying to help him, I would throw him
8   some new business or maybe a new agent that I
9   thought he might be interested in working with.
10        Q.   Okay.  And so in throwing him some
11  accounts, is the purpose of that twofold, like
12  one is to help him develop his book; and two, to
13  keep it within your team with Dave?
14        A.   Yeah.  It would have always stayed on
15  our team, but it was just kind of to help him get
16  started or get some accounts to work on and
17  figure out how to work on them.
18        Q.   Okay.  So kind of help him progress
19  through the industry?
20        A.   Uh-huh (positive response), yes.
21        Q.   Who is Truitt Taylor?
22        A.   He was my -- he came -- he was one of
23  my brokers.

Page 36

1         Q.   Okay.  So do you remember what years
2   he would have been a broker under you?
3         A.   No.  We hired him right out of
4   college, and I did not even really interview him.
5   He was given to me.
6         Q.   Okay.  Who interviewed him?  Do you
7   know?
8         A.   Probably Tom Curtain and Betsy
9   Barnett.  And I did eventually, but they did all
10  the, Is he okay, you know, and do we want him on
11  our team or did we want him at CRC.
12        Q.   And do you get the final like, Okay,
13  we had lunch, he's good, he can come on?
14        A.   Yeah.  And if I hadn't taken him, he
15  probably would have gone with another team.  CRC
16  wanted him.
17        Q.   Okay.  Is that how it generally would
18  work at CRC is someone higher up would say, We
19  are going to bring in this person, do you want
20  them?
21        MS. BARLOTTA:  Object to form.
22        A.   If you had an opening or, you know,
23  if they knew I needed help or something, yes, or

Page 37

1  they thought I would be good at developing that
2  person --
3      Q.   Okay.
4      A.   -- they would come and ask.
5      Q.   Did they ever -- I'm sorry.  Let me
6  be more specific.  Did CRC ever make any effort
7  to specifically place a female broker with you?
8          MS. BARLOTTA:  Object to form.
9      A.   I don't know.  I never interviewed
10 any.
11     Q.   Okay.  And as far as you know, no one
12 asked you --
13     A.   No.
14     Q.   -- about --
15         MS. BARLOTTA:  Object to form.
16     Q.   What is Truitt Taylor's position now?
17     A.   He is a senior broker, very
18 successful.
19     Q.   And he has his own team?
20     A.   Uh-huh (positive response).
21     Q.   Is that a yes?
22     A.   Yes.  I'm sorry.  Yes.
23     Q.   That's okay.  How long was Truitt

Page 38

1  under your tutelage before he moved on to his own
2  team?
3      A.   Probably five or six years.
4      Q.   Is that an average span or was he a
5  higher performer?
6          MS. BARLOTTA:  Object to form.
7      A.   I don't know what the average would
8  be.  Some still are on the same teams.  They
9  don't ever spin out.
10     Q.   Okay.  What does a broker have to do
11 to spin out at CRC?
12         MS. BARLOTTA:  Object to form.
13     A.   Have a book of business to support
14 himself or herself.
15     Q.   Okay.  And is there a particular
16 dollar amount that goes along with that?
17     A.   No.
18     Q.   In your experience at CRC, is that
19 something -- spinning out, is that something that
20 like upper management would come and ask, Hey, do
21 you want your own team, or would the person have
22 to ask upper management?
23         MS. BARLOTTA:  Object to form.

Page 39

1      A.   It could go both ways.
2      Q.   So there's no set policy?
3      A.   No.
4      Q.   One of the types of insurance you
5  sold or brokered -- is that the right word,
6  brokered?
7      A.   Either one.
8      Q.   Is EPL insurance, right?
9      A.   Uh-huh (positive response).
10     Q.   And what is EPL insurance?
11     A.   Employment practices liability.
12     Q.   What types of liability would EPL
13 insurance cover?
14     A.   Can you restate that or --
15     Q.   Yeah, yeah.  So as a broker, were you
16 aware of the products that you were selling?
17 Like would you read the policies?
18     A.   Oh, we did.  We were the first
19 wholesale broker to sell employment practices.
20     Q.   Okay.  And so what types of claims
21 would generally be made under the employment
22 practices policies?
23         MS. BARLOTTA:  Object to form.

Page 40

1      A.   Discrimination was probably the
2  biggest one.
3      Q.   Okay.  And what do you understand
4  discrimination to be?
5          MS. BARLOTTA:  Object to form.
6      A.   It could be discrimination of race,
7  age, all types of discrimination, that you feel
8  you have not been given a fair chance, you were
9  discriminated against.
10     Q.   Would a denial of opportunities fall
11 into discrimination in your opinion?
12         MS. BARLOTTA:  Object to form.
13     A.   I think it would be a covered claim.
14     Q.   I'm going to show you what has
15 previously been marked as Exhibit 23.
16         MS. PALMER:  And, Rachel, this is
17 that small bonus thing.  So I'm going to also
18 show her on my iPad so that she can zoom in.
19         MS. BARLOTTA:  Okay.
20         MS. PALMER:  And it's just this --
21 it's four pages.  It's Bates labels 4995, 6, 7,
22 and 8.  Yeah.
23     Q.   (BY MS. PALMER:)  So, Susan, if

Page 41

1   you'll hold onto my iPad for me for a second, and
2   this is Plaintiff's Exhibit 23.  It's the same.
3   Do you see that that's the same document?
4       A.   (No response.)
5       Q.   Do you see that's the same document,
6   Susan?
7       A.   Yes.
8       Q.   And I've given it to you on my iPad
9   because the print on the paper copy is so small.
10      A.   Uh-huh (positive response).
11      Q.   So feel free, you can use two fingers
12  to kind of zoom in and out on that document.
13  Have you seen anything like that document before,
14  like Plaintiff's Exhibit 23?
15           MS. BARLOTTA:  Object to form.
16      A.   Yes, for my team.
17      Q.   Okay.  And is Plaintiff's Exhibit 23
18  the -- how you would calculate the bonuses for
19  your pool?
20           MS. BARLOTTA:  Object to form.
21      A.   Do what?
22      Q.   Like how you would calculate the
23  bonuses to come from your bucket to your team?

Page 42

1       A.   This is just where you write it down
2   at.
3       Q.   Okay.  How would you keep your
4   documents?  Like was it always a paper copy or
5   was it on the computer?
6       A.   It evolved over time.
7       Q.   Okay.  Most recently, let's say from
8   2017.
9       A.   It was on the computer.
10      Q.   Okay.  Was that document saved to a
11  server or like on the computer or in an e-mail?
12           MS. BARLOTTA:  Object to form.
13      A.   I would complete it and forward it to
14  Rusty and John Cadden.
15      Q.   Okay.  And the numbers that you used
16  to complete the form -- flip for me to the second
17  page.  And that's the one that I said is so tiny.
18  Are those numbers on that second page provided by
19  Truist or BB&T?
20      A.   Yes.
21      Q.   And then from the second page, you
22  would determine what to put on that first page,
23  right?

Page 43

1       A.   This basically just tells you what
2   you have to spend.
3       Q.   Okay.  Take a look for me back at
4   that first page if you would.  The bonuses that
5   are listed there in the handwriting in the last
6   column, does that seem pretty normal to you?  Are
7   those numbers that --
8       A.   I don't have any -- it's not relative
9   to me.  I don't know what it's relative to or how
10  they decide.  I don't know how he decided.
11      Q.   Did the teams talk about bonuses with
12  each other?
13      A.   No.
14      Q.   Did the brokers talk about revenues
15  with each other?
16      A.   Well, that was public information.
17      Q.   Okay.
18      A.   I mean, you could see what every
19  broker produced, what that total revenue was.
20      Q.   Okay.  Thank you.
21      A.   And that was available on their
22  computer system.
23      Q.   On like the dashboard?

Page 44

1           MS. BARLOTTA:  Object to form.
2       A.   Yeah.
3       Q.   So because you and Dave were on the
4   same team, was your revenue tracked separately
5   because of that spot one in the AIMS system?  You
6   said there was spot one, spot two?
7       A.   Uh-huh (positive response).
8       Q.   So yours would be in one, and Dave --
9       A.   Yeah, and Susan would be the -- I
10  don't even remember what it was, the first slot.
11      Q.   So Susan, Dave, and Lee -- no, no,
12  no.  I'm sorry.  Lee would be under you.
13      A.   It would be Susan, Lee, Rhonda or
14  Susan, Lee, Lauren or --
15      Q.   And then Dave would be Dave whoever?
16      A.   Dave, Vandalyn.
17      Q.   Were there any that you and Dave were
18  on together?
19      A.   No.
20      Q.   Do you recall taking any
21  discrimination or diversity training through
22  BB&T?
23      A.   Yes.

Page 45

1   Q.   Okay.  And what type of training
2   would that be?
3        A.   Both that you mentioned.
4        Q.   Okay.  Was it classes that you sat
5   through?
6        A.   They were online.
7        Q.   Like click-through modules?
8        A.   Yes.
9        Q.   I'm going to show you what we've
10  already marked as Plaintiff's Exhibit 36.  Does
11  that exhibit -- does Plaintiff's Exhibit 36 look
12  like one of those modules you might have sat
13  through?
14       A.   Something like this, but I don't know
15  that this was exactly how ours was set up, that
16  Insights.  But definitely they had diversity, and
17  they had discrimination and money laundering.
18       Q.   All that sort of annual training?
19       A.   Yeah.  But this looks a little bit
20  different from what I remember.  But yes, I did
21  have them.
22       Q.   Okay.  Well, hang on to that for me
23  if you would, please.

Page 46

1        A.   Okay.
2        Q.   And when I call out a Bates number,
3   I'm talking about those numbers that are down in
4   the bottom right-hand corner, and that's just
5   going to help us identify on the record what
6   pages we're talking about, okay?
7             So flip for me if you will to Bates
8   Number 5207.  And it's about four pages back.
9        A.   Uh-huh (positive response).
10       Q.   There on the bottom slide, there's a
11  quote, and it says:  Diversity is being asked to
12  the party.  Inclusion is being asked to dance.
13            Have you ever heard anything like
14  that before?
15       A.   Not that I remember.
16       Q.   Okay.  Do you understand -- do you
17  have a personal understanding of the difference
18  in diversity and inclusion?
19            MS. BARLOTTA:  Object to form.
20       A.   I haven't thought about it.
21       Q.   What do you understand diversity to
22  mean?
23            MS. BARLOTTA:  Object to the form.

Page 47

1        A.   Inclusion of all, you know, that
2   diversity means that everyone is different, and
3   it's okay to include them all.
4        Q.   How do you feel about the diversity
5   at CRC?
6            MS. BARLOTTA:  Object to form.
7        A.   I have not been there since 2016, so
8   I really --
9        Q.   Okay.
10       A.   -- can't answer that.
11       Q.   So what about when you were there in
12  2016?  Did you feel like it was a diverse place
13  then?
14            MS. BARLOTTA:  Object to form.
15       A.   Diverse meaning --
16       Q.   What you defined it to be, inclusion
17  of everyone.
18       A.   Yeah.
19       Q.   Did you feel like CRC made an effort
20  to make sure that there was diversity represented
21  at every stage of employment?
22            MS. BARLOTTA:  Object to form.
23       A.   I don't know.

Page 48

1        Q.   Flip for me to Page 5209.  It's two
2   more pages back from where you are.  There on the
3   top section, it's talking about barriers to
4   diversity.  And in the center section there under
5   Poor Interviewing Skills, it says:  We don't try
6   to conduct poor interviews, but our own
7   stereotypes and biases can get in our way.
8            Do you agree with that statement?
9            MS. BARLOTTA:  Object to form.
10       A.   I don't think so.
11       Q.   You don't think that stereotypes and
12  biases can get in the way of promoting diversity?
13            MS. BARLOTTA:  Object to form.
14       A.   I did very little interviewing, so I
15  probably don't have the interview skills to even
16  do the interviewing.
17       Q.   Understood.
18       A.   Yeah.
19       Q.   And thank you for correcting that.
20       A.   Because I don't -- I mean, I --
21       Q.   Yeah, I'm not talking about --
22       A.   I would hope myself that I -- that
23  doesn't make sense, but --

Page 49

1    Q.   Right.  And I'm not talking about you
2    interviewing anyone.  I'm just wondering if you
3    agree that stereotypes can sometimes get in the
4    way of promoting diversity?
5         MS. BARLOTTA:  Object to form.
6    A.   I don't know.
7    Q.   You've been in the brokerage --
8    wholesale insurance brokerage business for over
9    thirty years.
10   A.   Uh-huh (positive response).
11   Q.   Is it a safe statement to say that
12   that is or was a predominantly male industry?
13        MS. BARLOTTA:  Object to form.
14   A.   That's pretty safe to say.
15   Q.   And as a female who rose through the
16   ranks there --
17   A.   Uh-huh (positive response).
18   Q.   -- what types of stereotypes did you
19   experience throughout your career?
20        MS. BARLOTTA:  Object to form.
21   A.   I don't -- I can't really name any.
22   Q.   Did you feel like you were always
23   included in opportunities?

Page 50

1         MS. BARLOTTA:  Object to form.
2    A.   What's an opportunity?
3    Q.   Networking.  Were you always invited
4    to the networking events?
5    A.   Yes.
6    Q.   From the beginning?
7    A.   Yes.
8    Q.   Did you feel as though you were given
9    your fair shake as far as agencies?
10        MS. BARLOTTA:  Object to form.
11   A.   I had to go find my own agents.
12   Q.   I understand.
13   A.   So yes.
14   Q.   While you were at CRC, did you
15   experience other agents being given books from
16   brokers that were leaving or moving on?
17        MS. BARLOTTA:  Object to form.
18   A.   No, because we never had many leave.
19   Q.   When Betsy Barnett left, what
20   happened to her book?
21   A.   She had three young -- two men, James
22   and Rusty, and they basically handled the book.
23   How they divided it up, I don't remember or know,

Page 51

1    but there was a little perpetuation program that
2    stayed within our team.  I remember that.
3    Q.   Do you remember George?
4    A.   Bennett.
5    Q.   George Bennett?
6    A.   Uh-huh (positive response).
7    Q.   Who was George Bennett?
8    A.   He was a broker they hired.
9    Q.   What -- do you remember what
10   department he brokered in?
11   A.   Professional, with us.
12   Q.   And did George Bennett leave at some
13   point?
14   A.   Yes.
15   Q.   When George Bennett left, what
16   happened to his book?
17   A.   It went to Rusty's team.
18   Q.   Did anybody ask if you were
19   interested in any of those agents?
20        MS. BARLOTTA:  Object to form.
21   A.   No.
22   Q.   Would you have been interested in any
23   of those agents?

Page 52

1         MS. BARLOTTA:  Object to form.
2    A.   No.
3    Q.   Why not?
4    A.   We all have our relationships with
5    our agents, and I don't think I would have gotten
6    along very well with his agents.
7    Q.   Why so?
8         MS. BARLOTTA:  Object to form.
9    A.   People work differently.  They
10   establish their own relationships, and it's hard
11   to go in and pick up someone else's relationship.
12   So no.  And I had at that time plenty of my own
13   book to worry with.
14   Q.   So one of the comments we hear a lot
15   is like the customer is always right?
16   A.   Yes.
17   Q.   Do you think that that's an accurate
18   statement in a sales industry like insurance
19   brokerage?
20        MS. BARLOTTA:  Object to form.
21   A.   Yes.
22   Q.   And while you were at CRC, did you
23   have any experience with particular agents not

Video Deposition of Susan Phillips

1/23/2024

14 (53 - 56)

Page 53

1  wanting to deal with a female broker?

2       MS. BARLOTTA: Object to form.

3       A.  I don't know.  I mean, I went out and

4  got my own agents.  It's not like someone said, I

5  don't want to work with you because you're

6  female, so I don't know.

7       Q.  Did you feel as though you were ever

8  being overlooked because someone just didn't want

9  you in the room?

10      MS. BARLOTTA: Object to form.

11      A.  Maybe, but I don't think it's because

12  I was a female.

13      Q.  Okay.  Why was it?

14      A.  Maybe they don't like what I had to

15  say or how I said it or, you know, I give them a

16  bad premium or bad coverage, and they didn't like

17  it.  So I don't take it that it was because I was

18  female.

19      Q.  Okay.  So when we're talking about

20  stereotypes, is -- would you agree with me that

21  in some situations, a female can be judged more

22  about something that she said or the way she said

23  it versus a male?

Page 54

1       MS. BARLOTTA: Object to form.

2       A.  No, because I know a lot of agents

3  didn't like what the men had to say to them

4  either.  So I think that -- it's business.

5       Q.  Right.  But they still did business

6  with them, right?

7       A.  Yeah.

8       Q.  Can you think of any gender

9  stereotypes that you're familiar with?

10      MS. BARLOTTA: Object to form.

11      A.  I don't know what you're asking.

12      Q.  Did you ever hear anything at CRC

13  about women not wanting to travel?

14      MS. BARLOTTA: Object to form.

15      A.  I -- that's a choice.  I mean, my

16  job, what I did, I had to travel every other week

17  at least two or three days a week.  That was my

18  choice.

19      Q.  Did you ever hear any of the other

20  brokers make any comments about some of their

21  staff not wanting to travel?

22      A.  No, not really.

23      Q.  Did you ever have any conversations

Page 55

1  with any of the female employees at CRC about

2  their desires to move up within the company?

3       MS. BARLOTTA: Object to form.

4       A.  Yeah.  I would promote them if they

5  wanted to -- I would promote them to talk to

6  their bosses if they were interested in moving

7  up, but, you know, there was a small group of us.

8  There weren't that many, like we sat around and

9  talked about it all the time.

10      Q.  Right.  Tell me a little bit about

11  that.  Does anybody stand out to you?  And I have

12  a list here somewhere, some of the folks that

13  have been there for a long time.

14          So I know Rhonda Brasher was on your

15  team.  Did you ever talk to Rhonda about whether

16  she wanted to move up?

17      A.  She never -- she's an account exec,

18  and that's what she will be, and she's been there

19  almost as long as I have, and that's her job.

20  She's still there.

21      Q.  What about Cathryn Reeves?

22      A.  Cathy Reeves had her job, and she was

23  happy with her job, and she never had any

Page 56

1  interest in -- I mean, she was an inside broker.

2  She came to us as an inside broker.

3       Q.  Okay.  Did you ask Cathy if she was

4  happy in her job?

5       A.  I -- no.  I mean, she was there for

6  many years and did it and liked it.  I mean, she

7  would have left if she didn't.

8       Q.  Yeah.  Did you ever ask her if she

9  wanted to be a broker?

10      A.  No.  But I --

11      Q.  What about Yvette Talsma, did you

12  ever have a conversation with her about

13  advancement?

14      A.  No.

15      Q.  Andrea Sutton?

16      A.  No.

17      Q.  What about Lauren Lindberg?

18      A.  No.

19      Q.  You said she was on --

20      A.  She was on our team.

21      Q.  On your team.  Did you ever talk to

22  her about advancement?

23      A.  Not really.

Page 57

1   Q.   You said not really.

2   A.   Because she worked for Lee, okay?  It

3   was Susan, Lee, Lauren.

4   Q.   Okay.  Did you ever ask her if she

5   wanted to be more than Lee's --

6   A.   No.

7   Q.   Why not?

8   A.   I guess if she had said something to

9   me, that would have been different, but she was

10  doing her job, and she wasn't really with us all

11  that long.  She came to us from property and was

12  there a couple of years.  And, again, I was

13  working remote, so I wasn't sitting around

14  talking to people.

15  Q.   Right, you weren't with them.

16  A.   Yeah.

17  Q.   That makes sense.  If Lauren had

18  expressed an interest in advancement but there

19  wasn't a spot on your team, would she have been

20  able to move to another team?

21       MS. BARLOTTA:  Object to form.

22  A.   I guess she could if she wanted to.

23  Q.   Is that something that's allowed at

Page 58

1   CRC?

2       MS. BARLOTTA:  Object to form.

3   A.   Uh-huh (positive response).  Everyone

4   has to agree.

5   Q.   Who is everyone?

6   A.   Whoever team you're on, letting them

7   go, and the team they're going to wanting to take

8   them, has a place for them.

9   Q.   Okay.  So if a -- if someone's team

10  they didn't want to let them go, they wouldn't be

11  able to move?

12       MS. BARLOTTA:  Object to form.

13  A.   I don't know.

14  Q.   Is that kind of like a staffing, we

15  need somebody in the spot type of situation?

16  A.   Yeah.  Yeah.

17  Q.   Were you considered a manager?

18  A.   Of my team.

19  Q.   Okay.  Did you go through specific

20  manager training?

21       MS. BARLOTTA:  Object to form.

22  A.   Yes, many years ago.

23  Q.   Okay.  Tell me, if you can, about

Page 59

1   that training.

2   A.   It was probably when like BB&T bought

3   us in 2000, you know, and they do a managers

4   something for all the team leaders, but it was

5   not that -- it wasn't anything that stands out.

6   Q.   Was that just a one-time training

7   that you recall?

8   A.   Yes.

9   Q.   And do you recall whether that

10  training involved how to handle complaints of

11  discrimination?

12       MS. BARLOTTA:  Object to form.

13  A.   I don't remember that being covered

14  in that specific, but that is something that's

15  covered every year when they do their annual --

16  you've got to do your annual online training, and

17  they refer you to, you know, 1-800, policies and

18  procedures on the website and where to go to get

19  help.

20  Q.   Okay.  As a manager of your team,

21  what did you understand your duty to be with

22  regard to complaints of discrimination?

23  A.   Well, it would have been to report

Page 60

1   them -- if somebody had complained about

2   discrimination on my team, I would have contacted

3   HR, Truist, or BB&T and said, you know, We have

4   an issue and, you know, how do I handle it.

5   Q.   What if somebody told you about

6   discrimination on another team?  What would your

7   duty be then?

8       MS. BARLOTTA:  Object to form.

9   A.   I think it's the same.  You go to HR,

10  1-800, or Stefani Petty or whoever and say, you

11  know, A person complained to me, and I would pass

12  it up to the next level.

13  Q.   Okay.  And we've heard a lot about

14  Stefani Petty in our depositions.  Who is Stefani

15  Petty to you?

16  A.   She was the -- she was my contact for

17  HR at Truist.

18  Q.   Okay.  And did you have any occasion

19  to speak with Stefani Petty about any complaints

20  of discrimination?

21  A.   No.

22  Q.   Did Stefani Petty ever reach out to

23  you specifically about Kathryn Hendrix's

Page 61

1  complaints?
2     A.   No.
3     Q.   Are you familiar with Christy Smith?
4     A.   Yeah.
5     Q.   Do you recall what position or what
6  team Christy Smith worked on?
7     A.   I think she was on our underwriting
8  team.
9     Q.   Okay.  Do you know a rough time
10  period of when she would have been on that team?
11     A.   No.
12     Q.   Do you remember having any specific
13  conversations with Christy Smith about her
14  employment?
15     A.   Huh-uh (negative response), no.
16     Q.   What about Karissa Cooley?  Do you
17  know Karissa Cooley?
18     A.   Yeah.
19     Q.   Okay.  Who is Karissa Cooley?
20     A.   She was on Rusty's team.
21     Q.   What was her position on Rusty's
22  team?  Do you know?
23     A.   Account exec.

Page 62

1     Q.   Do you know how long she worked with
2  Rusty as an account exec?
3     A.   No.
4     Q.   Did you have any conversations with
5  Karissa Cooley about her employment with CRC?
6     A.   No.
7     Q.   Do you remember when Karissa Cooley
8  left CRC?
9     A.   She didn't.  She's still there.
10     Q.   She's still employed there?
11     A.   As far as I know.  She's in our IT
12  department.
13     Q.   Okay.  So she moved departments?
14     A.   Yes.  She liked IT.
15     Q.   Did she move to IT within CRC or
16  Truist?
17     A.   Oh, I don't know how -- I know she's
18  our contact when I want to take a computer out of
19  the country.  That's who I talk to.
20     Q.   Understood.  Understood.  Those tech
21  people are super important.
22     A.   Uh-huh (positive response).
23     Q.   What about Sarah Dunston?  Do you

Page 63

1  know Sarah Dunston?
2     A.   Is that her name now?
3     Q.   That's the name I understand.
4     A.   I'm going to say no.
5     Q.   Okay.  She was on James Powell's
6  team.  Does that ring any bells?
7     A.   It's been a long time ago, okay?
8     Q.   I understand.  I understand.
9     A.   I'm glad you remember, but no.
10     Q.   I often joke that I don't remember
11  what I had for breakfast.
12     A.   I don't remember what I wore
13  yesterday.
14     Q.   And then we've already talked about
15  Lauren Lindberg.  Do you know why Lauren left the
16  property department?
17     A.   She was unhappy with the team she was
18  on.
19     Q.   Do you have any information about
20  what she was unhappy about?
21     A.   Well, she worked for Mason, and he
22  said something or did something.  I don't know.
23     Q.   Okay.

Page 64

1     A.   But she wanted to go to another team,
2  and we needed help.  Again, there we go.  We
3  weren't looking for anybody, but they wanted to
4  find her another place, and she wanted to come to
5  professional.
6          So she came down.  And Lee needed
7  help, and he had built up his book enough that he
8  could afford to have help.
9     Q.   Okay.  Do you recall who moved her to
10  the property department, like who -- I'm sorry --
11  from the property department, like who made the
12  decision to approach you?
13     A.   John Cadden is the one that came to
14  -- I'm sure Rusty first and then to me.
15     Q.   Okay.
16     A.   Because Cadden was in the -- is in
17  the property department.
18     Q.   Okay.
19     A.   In addition to being office
20  president, he's also a property broker.
21     Q.   Okay.  And as you understood it, she
22  had a complaint about her supervisor?
23          MS. BARLOTTA:  Object to form.

Video Deposition of Susan Phillips

Page 65

1    A.   Yeah, yeah.

2    Q.   Do you remember the content or the

3    subject of that complaint?

4        MS. BARLOTTA:  Object to form.

5    A.   No, I -- no.  I know she wanted to

6    move.

7    Q.   Talk to me about Rusty Hughes.  Rusty

8    is the head of the professional department,

9    right?

10   A.   Yes.

11   Q.   And at one point, he worked under

12   you?

13   A.   No.

14   Q.   Under Betsy?

15   A.   Yes.

16   Q.   Okay.  And so when Betsy retired, did

17   Rusty just automatically get that head of the

18   department spot?

19       MS. BARLOTTA:  Object to form.

20   A.   Betsy talked to both Dave and myself,

21   and we both agreed that Rusty would be a good

22   candidate to take over the job.

23   Q.   And as head of the department, would

Page 66

1    one of Rusty's duties be to handle complaints of

2    discrimination within the department?

3        MS. BARLOTTA:  Object to form.

4    A.   Yes.

5    Q.   Did you ever make any statements to

6    Rusty about the number of female brokers at CRC?

7    A.   No.

8    Q.   Did you ever make any statements to

9    Rusty about the number of female account

10   executives at CRC?

11       MS. BARLOTTA:  Object to form.

12   A.   No.

13   Q.   Do you have any information about

14   whether anyone else made any statements to Rusty

15   about the number of female brokers at CRC?

16       MS. BARLOTTA:  Object to form.

17   A.   I don't know.

18   Q.   You never heard any of that type of

19   talk?

20   A.   No.

21   Q.   Did you have dealings with John

22   Cadden on, let's say, like a weekly basis before

23   you went remote?

Page 67

1    A.   No.

2    Q.   Is that because he's in a different

3    department?

4    A.   On a different floor, different

5    department, and yeah.  I mean, we both -- he had

6    been there like a year or two longer than me.  So

7    we both had been there, but no, we just didn't

8    sit around and talk.

9    Q.   And John is the president of CRC?

10   A.   Of the office in Birmingham.

11   Q.   Okay.  And so would Rusty report to

12   John?

13   A.   Yes.

14   Q.   Would Betsy have reported to John

15   when she was the head of the department?

16   A.   I don't think they made him office

17   president until -- there wasn't an office

18   president, I don't think, until she had left.

19   Q.   Okay.  Do you recall whether you had

20   a lunch with Betsy and all the other brokers at

21   Gianmarco's after she left CRC?

22       MS. BARLOTTA:  Object to form.

23   Q.   Like just a broker lunch at --

Page 68

1    specifically at Gianmarco's?

2    A.   I don't remember.

3    Q.   Okay.  Would that have been unusual?

4        MS. BARLOTTA:  Object to form.

5    A.   No.

6    Q.   Do you have any recollection of Betsy

7    making any statement to the other brokers that

8    she was disappointed that females -- disappointed

9    at how females were being treated in the

10   department?

11       MS. BARLOTTA:  Object to form.

12   A.   I don't remember.

13   Q.   Are you saying it didn't happen or

14   you just don't remember?

15   A.   I don't remember.

16       MS. BARLOTTA:  Object to form.

17   A.   I'm not saying it didn't happen.

18   That sounds very much like her to say, I'm very

19   disappointed with something.  So I'm not going to

20   say it didn't happen.  I just don't remember.

21   Q.   I understand that, and I also

22   understand that Betsy recently passed.  I'm

23   sorry.

Video Deposition of Susan Phillips
1/23/2024
18 (69 - 72)

Page 69

1    A.   Yeah, two weeks ago.

2    Q.   I know you must have been very close.

3    A.   We lived about a couple of miles from

4 each other.

5    Q.   Oh, gosh. I hope you got to spend

6 some time with her.

7    A.   Yeah, a couple of times.

8    Q.   So you're not denying that she made

9 that statement. You just don't have any specific

10 knowledge?

11    A.   I just don't remember any specifics

12 to say yes, I remember that.

13      MS. BARLOTTA: Object to form.

14    Q.   Do you recall any of the other

15 brokers talking about anything like that?

16      MS. BARLOTTA: Object to form.

17    Q.   Talking about anything regarding

18 Betsy being disappointed in the department's

19 treatment of women?

20      MS. BARLOTTA: Object to form.

21    A.   No.

22    Q.   Okay.

23    A.   There wasn't a lot of people to talk

Page 70

1 to, you know, so -- and again, I wasn't there.

2    Q.   You say that, but I look at this

3 list, and I get everybody all mixed up. I don't

4 know who all those people are. I have me,

5 myself, and I. That is it.

6    A.   And you mentioned the ones I know.

7 There's -- I bet I don't know half the people in

8 the department now.

9    Q.   Because it's grown that much?

10    A.   Uh-huh (positive response).

11    Q.   Do you think CRC is a successful

12 business?

13      MS. BARLOTTA: Object to form.

14    A.   Very.

15    Q.   And you had a big part in that,

16 didn't you?

17    A.   I like to think so.

18    Q.   Did you get any accolades or awards?

19      MS. BARLOTTA: Object to form.

20    A.   Talking about the crystal tower

21 office about this big (indicating)?

22    Q.   Yeah, of course.

23    A.   I got one.

Page 71

1    Q.   Where did that come from?

2    A.   Truist.

3    Q.   Okay. Is that like a service award?

4    A.   (Witness nods head.)

5    Q.   Yeah?

6    A.   Yeah.

7    Q.   Was that for your retirement?

8    A.   Yeah.

9    Q.   Okay. What about before that? Did

10 CRC ever do anything to recognize your

11 accomplishments?

12      MS. BARLOTTA: Object to form.

13    A.   They would hold, and I assume they

14 still do, million dollar producer events, that if

15 you produce a million dollars, you know, you went

16 to -- the group as a whole would go to California

17 or Florida, and they treated you very nice.

18    Q.   Okay. How many of those did you get

19 to go to?

20    A.   I don't know. Ten, twelve maybe.

21    Q.   Do you recall who from Birmingham

22 would have gotten to go to those with you?

23    A.   Anybody that was a million dollar

Page 72

1 producer was invited.

2    Q.   Yeah. Does anybody stand out to you

3 as this person always seemed to be there with me?

4    A.   Well, there was -- yeah, it's usually

5 the same group, you know.

6    Q.   Rusty Hughes?

7    A.   Rusty, Corey, James, Betsy. Dave

8 didn't go. From our department, that would have

9 been probably it.

10    Q.   Okay. And that's because you met a

11 certain level of revenue?

12    A.   Yes.

13    Q.   Do you remember taking a trip to

14 Colorado in 2018 with CRC?

15    A.   Uh-huh (positive response), yes.

16    Q.   What was the purpose of that trip?

17    A.   It was a professional meeting to

18 discuss markets.

19    Q.   Okay. And so that would have been --

20 was it like all -- like a bunch of employees from

21 CRC nationwide or was it open to other companies

22 as well?

23    A.   It was CRC, professional. There was

Page 73

1  usually a day of medical and a day of
2  non-medical.
3      Q.   Okay.  Did you come home right after
4  the meetings?
5      A.   No.  A group of us went up to
6  Colorado Springs.
7      Q.   Who was in that group?
8      A.   Kathryn, myself, Lauren, and Cathy
9  Reeves.
10     Q.   Tell me how that trip to Colorado
11 Springs came about.  Whose idea was it?
12     A.   Probably mine.
13     Q.   Okay.  Do you know how you
14 communicated to them that you wanted to take this
15 trip?
16     A.   An e-mail.
17     Q.   Okay.  Would that have been -- if so,
18 would that have been on your CRC e-mail?
19     A.   Oh, yeah.
20     Q.   Did you invite anybody other than
21 Kathryn, Cathy, and Lauren?
22     A.   No.  It was just four.  We all knew
23 each other, and so -- and I hadn't been there, or

Page 74

1  I hadn't been there since I was a kid, so I
2  wanted to go, so I wanted someone to go with me.
3      Q.   I understand you guys had a good
4  time.
5      A.   We did.
6      Q.   Is that what you recall?
7      A.   Yes.  Snowing up on Pikes Peak in the
8  middle of summer.
9      Q.   Did you go skiing?
10     A.   No, but I had shorts on.
11     Q.   Were you freezing?
12     A.   Yes.
13     Q.   I think I've seen some pictures of
14 you wrapped in a blanket, so that makes sense.
15          All right.  I'm going to show you
16 Plaintiff's Exhibit 40.
17          (Whereupon, Plaintiff's Exhibit No.
18 40 was marked for identification and a copy of
19 same is attached hereto.)
20     Q.   And this is a string of text
21 messages, and it's got the bubbles back and
22 forth.  And if you'll look up at the top, it
23 says, Messages, Cathy Reeves and Susan Phillips

Page 75

1  and Lauren Lindberg.
2          Does this Exhibit 40 appear to be the
3  group text between you, Cathy Reeves, Lauren
4  Lindberg, and Kathy Hendrix while you guys were
5  in Colorado?
6      A.   It sounds like we're heading down to
7  get breakfast before the meeting or something.
8      Q.   Okay.  Flip for me to page -- on the
9  bottom, it says Hendrix000498.  What's that
10 picture right there?
11     A.   Oh, that's me at the game.
12     Q.   Is that like a -- that's baseball,
13 right?
14     A.   Baseball.
15     Q.   Whose baseball, the Rockies?
16     A.   Colorado Rockies.
17     Q.   I saw the Cubs in Chicago, and that
18 was an experience there.
19          The next page, the bottom of Page
20 499, Lauren Lindberg sends a link, and it looks
21 like to an Enneagram test.  Do you remember
22 taking an Enneagram Personality Test?
23     A.   I don't know what that is.

Page 76

1      Q.   So you don't remember you guys
2  talking about personality tests and what type of
3  personality people have?
4      A.   I don't know what that is.
5      Q.   Okay.  And then the next page, Page
6  500, towards the bottom there's a text from you:
7  As soon as everyone ready, if okay we'll drive
8  straight to Pikes Peak.  Let's shoot for 8:15,
9  8:30.
10     A.   Uh-huh (positive response).
11     Q.   That looks like it was on July 12th,
12 2018.  So is that the day that you guys drove up
13 to Pikes Peak?
14     A.   Well, that's what it says here, so I
15 would go with what it says here.
16     Q.   Okay.  How long did you stay at Pikes
17 Peak?
18     A.   Just that Friday to Sunday or Friday
19 to Monday.  Just -- I don't even remember, maybe
20 it was Thursday.  What day is the 12th?
21     Q.   Oh, I have no idea, but just a couple
22 of days?
23     A.   It was like two nights.

Page 77

1    Q.   Okay.  Did y'all stay at a hotel?
2    A.   It was like a cabin thing.
3    Q.   Okay.  Was it like a cabin where you
4  guys were all in the cabin together with
5  different rooms?
6    A.   I think there was two rooms.
7    Q.   Okay.  Who shared rooms?
8    A.   Lauren and Kathryn shared, and Cathy
9  and I shared.
10   Q.   Okay.  What do you recall
11  specifically about that trip to Pikes Peak other
12  than it snowing?
13   A.   We had a good time.  It was snowing.
14  We did a -- I think we did a rafting trip.  We --
15  yeah, took a boat -- a train ride.
16   Q.   Okay.  And did you have a
17  conversation with Kat during that trip about Dave
18  Sloneker requesting her as a broker at some
19  point?
20   A.   I don't remember that.
21   Q.   Okay.  Are you saying it didn't
22  happen or you just don't remember?
23   A.   I don't remember, no.

Page 78

1    Q.   Do you remember Dave Sloneker
2  requesting Kat at some point?
3    A.   No.
4    Q.   Did you have a conversation with Kat
5  during that trip about you requesting Kat as a
6  broker at some point?
7    A.   No.
8    Q.   Are you saying it didn't happen or
9  you --
10   A.   That didn't happen, because I didn't
11  have any -- any places on my team.  I could not
12  have anyone else on my team.
13   Q.   Okay.  So if Dave wanted someone for
14  his team that was already employed at CRC, would
15  he have to talk to Rusty and John about it?
16       MS. BARLOTTA:  Object to form.
17   A.   Yes.
18   Q.   And you don't remember talking to Kat
19  about Dave going to Rusty and John and them not
20  letting it happen?
21       MS. BARLOTTA:  Object to form.
22   A.   Yeah, I don't remember that.
23   Q.   But you're not saying it didn't

Page 79

1  happen.  You just don't remember?
2       MS. BARLOTTA:  Object to form.
3    A.   I'm not saying, yeah, it didn't
4  happen.  I know there was a space available and
5  that she may have been interested, but I don't
6  know how the -- how it went after that.
7    Q.   Yeah.  How do you know that she may
8  have been interested?
9    A.   She told me.
10   Q.   Okay.  When did she tell you that?
11   A.   I don't know.
12   Q.   Do you remember like anything about
13  that conversation?
14   A.   No, just that she was interested in
15  moving into a broker position, and I said, You
16  need to talk to Corey and Rusty and talk it out.
17   Q.   Okay.  And if she was interested in
18  moving to a broker position, she -- with manager
19  approval, she could have done that outside of
20  Corey's team, right?
21       MS. BARLOTTA:  Object to form.
22   A.   I guess.
23   Q.   Do you recall on your Colorado trip

Page 80

1  talking to Kat about the noncompete that CRC had
2  her sign?
3       MS. BARLOTTA:  Object to form.
4    A.   No.
5    Q.   Do you recall her saying that her
6  lawyer never charged her to look at the
7  noncompete?
8       MS. BARLOTTA:  Object to form.
9    A.   No.
10   Q.   Do you recall telling her that it was
11  probably because he knew he would see her again
12  at some point?
13   A.   See her again?
14   Q.   That the lawyer would likely see her
15  again?
16       MS. BARLOTTA:  Object to form.
17   A.   No.
18   Q.   Okay.  Are you saying it didn't
19  happen or you just don't remember?
20       MS. BARLOTTA:  Object to form.
21   A.   Yeah, I don't remember that
22  conversation.
23   Q.   Okay.  Do you recall saying anything

Page 81

1  about that the lawyer may see the rest of us, me,
2  Betsy, Leann, Kathy?  Does that sound familiar at
3  all?
4      **A.   I don't even know what we're talking**
5  **about.**
6      Q.   So you don't recall talking to Kat at
7  all about that the women at CRC may have a reason
8  they need to speak to a lawyer?
9          MS. BARLOTTA:  Object to form.
10     **A.   No.**
11     Q.   Okay.  Do you remember anybody ever
12  talking to you about overtime at CRC?
13         MS. BARLOTTA:  Object to form.
14     **A.   What do you mean?**
15     Q.   Do you recall having a conversation
16  with any account executive about them being told
17  to just put 8:00 to 5:00 in their time regardless
18  of what they worked?
19         MS. BARLOTTA:  Object to form.
20     **A.   I'm going to say I'm a little**
21  **confused, because most of the account exec**
22  **positions were nonexempt.  So you couldn't have**
23  **overtime.**

Page 82

1      Q.   Okay.
2      **A.   Or is it exempt?  Exempt, which --**
3      Q.   You were right, it's nonexempt,
4  right.
5      **A.   Nonexempt, and the account exec**
6  **positions at one time were -- you could not get**
7  **overtime.  Now, I think sometime over the years,**
8  **they may have changed that status to where they**
9  **could get overtime.  But it was not -- on my**
10  **team, it was just not an issue.**
11     Q.   Okay.
12     **A.   I don't remember talking to anybody**
13  **about it.**
14     Q.   Did you have to sign off on your
15  employees' time?
16         MS. BARLOTTA:  Object to form.
17     **A.   I don't know, because I did not -- my**
18  **team did not have overtime.**
19     Q.   Okay.  Did you ever go to lunch with
20  Kat?
21     **A.   I think we went once or twice, yes.**
22     Q.   Do you remember going to lunch at
23  Slice Pizza?

Page 83

1          MS. BARLOTTA:  Object to form.
2      **A.   Was that a group or was that just us?**
3  **I don't know.  I don't remember.**
4      Q.   It would have been a group.
5      **A.   Oh, yeah, probably.  I do remember**
6  **going there once.**
7      Q.   Okay.  Did -- would you have any
8  reason to dispute if Kat said that that lunch was
9  when she talked to you about her desires to move
10  up into a broker role?
11         MS. BARLOTTA:  Object to form.
12     **A.   I would have no reason to dispute**
13  **that.**
14     Q.   I love Slice Pizza, by the way.
15     **A.   I've only been there that one time, I**
16  **think.  That's why I had to ask.**
17     Q.   You have to go back and get the
18  wings.  I like the wings more than the pizza.
19         We have been going right about just
20  over an hour.  Let's take a quick break and let
21  me chat with my folks here, and then we --
22  hopefully, we'll wrap you up real quick.
23     **A.   That's only an hour?**

Page 84

1      Q.   It's only an hour.  It feels like
2  forever, doesn't it?
3          If you get up, just take your mic off
4  so that you don't walk away with it, and then
5  they'll have to read us off the record.
6          VIDEOGRAPHER:  All right.  We are off
7  the record at 3:16 p.m.
8          (Whereupon, a brief recess was
9  taken.)
10         VIDEOGRAPHER:  We are back on the
11  record at 3:24 p.m.
12     Q.   (BY MS. PALMER:)  All right, Susan.
13  So we took a quick break.  Is there anything
14  about your testimony you want to change?
15     **A.   I've been to Slice twice, not once.**
16     Q.   That is an important distinction.
17     **A.   That's right.**
18     Q.   Because you brought that up, I want
19  to talk specifically about that.  Kat says that
20  the two of you stepped outside at Slice when you
21  were with the group and smoked a cigarette.  Do
22  you smoke?
23     **A.   I did.  Quit 2018.**

Page 85

1   Q.   Congratulations.  My dad quit cold
2   turkey last year, and I could not believe it.  It
3   is hard.
4       A.   I pretty much did, too; but if they
5   ever tell me I have lung cancer, I'll be buying
6   me a carton and heading to the Middle East.
7       Q.   I think he said the same thing.
8            So she says that the two of you
9   stepped outside to have a cigarette and had a
10  discussion, and during that discussion you said,
11  I asked for you, and that that would have been
12  just before your team hired Lauren Lindberg.
13           Does that ring any bells at all?
14           MS. BARLOTTA:  Object to form.
15      A.   No, because I don't remember asking
16  for Lauren.
17      Q.   Okay.  But you had a need on your
18  team --
19      A.   Maybe I asked on behalf of her, but I
20  cannot say -- like for Dave maybe I asked on
21  behalf or I asked, but I don't remember, because
22  my team, it only would have been to be Lee's
23  assistant would have been all we would have had

Page 86

1   on my team.
2       Q.   Okay.  And would it have been
3   possible for Lee's assistant to eventually move
4   up in the ranks?
5            MS. BARLOTTA:  Object to form.
6       A.   I don't know.
7       Q.   Is that a path that some account
8   executives take?
9            MS. BARLOTTA:  Object to form.
10      A.   I don't know.
11      Q.   You were with CRC for, what did you
12  say, thirty --
13      A.   Two.
14      Q.   Thirty-two years.  And in that time,
15  you and Betsy were the only women in professional
16  liability, right?
17           MS. BARLOTTA:  Object to form.
18      Q.   I'm sorry.  The only female brokers
19  in professional liability?
20      A.   That's not true.
21      Q.   Okay.  Who else would have been in
22  professional liability?
23      A.   Leann Sherer was there for a short --

Page 87

1   not a short period of time, several years,
2   because she helped start the healthcare portion
3   of it.  I do think she's the only other female
4   broker we had in our department.
5       Q.   Okay.  How many brokers do you think
6   were there in 2019?
7       A.   Oh, I don't know.
8       Q.   More or less than twenty?
9       A.   What are you calling broker, named
10  brokers or just anybody they call inside,
11  outside, associate?  I don't know.
12      Q.   You tell me.  Who's a broker?
13           MS. BARLOTTA:  Object to form.
14      A.   Well, we went through and listed them
15  earlier.  It was --
16      Q.   Well, those were the team leads,
17  right?
18      A.   Yeah, team leaders.
19      Q.   But under those team leaders could
20  have been other revenue-producing brokers, right?
21           MS. BARLOTTA:  Object to form.
22      A.   I don't know how the other teams
23  operated.  I had Lee on my team, and he was a

Page 88

1   revenue producer.
2       Q.   Okay.  Do you have any estimate of
3   the number of revenue-producing brokers in the
4   professional liability department around 2019?
5            MS. BARLOTTA:  Object to form.
6       A.   No.
7       Q.   Do you think it would be more or less
8   than twenty?
9            MS. BARLOTTA:  Object to form.
10      A.   I don't know, because I don't know
11  who was on -- I don't know the titles of all the
12  people on the other teams.
13      Q.   Okay.  So I have here a list.
14      A.   If I had a list, maybe I could look.
15      Q.   And it's -- this one is all marked
16  up.
17           MS. PALMER:  Cynthia, do we have
18  another list?  Or maybe we can just count them
19  out.
20      Q.   (BY MS. PALMER:)  Daniel O'Connor,
21  Tyler O'Connor?
22      A.   That's Tyler.
23      Q.   Is he a broker?

Page 89

1    A.   Yes.

2    Q.   Okay.  Dave Sloneker?

3    A.   Yes.

4    Q.   Clay Segrest?

5    A.   Yes.

6    Q.   Cathy Cochran?

7    A.   I don't know who that is.

8    Q.   Rhonda Brasher was not.  Kathryn

9    Hendrix, Brandi Russell, Vandalyn Green, Maria

10   Powe.

11        MS. WILKINSON:  Leslie, hold on one

12   second.  Did you bring the exhibits?

13        THE REPORTER:  Yes.

14        MS. WILKINSON:  Are they on the

15   table?

16        THE REPORTER:  Uh-huh (affirmative

17   response.)

18        MS. WILKINSON:  It's Number 27 on the

19   table.  That may help.

20        MS. PALMER:  It will.

21   A.   There you go.

22   Q.   (BY MS. PALMER:)  Let me show you

23   Plaintiff's Exhibit 27.  Look for me through that

Page 90

1    list and see if you can count the number of what

2    you would consider revenue-producing brokers.

3    A.   I just don't know how other teams

4    did.

5    Q.   Okay.

6    A.   Okay.  So I know Tyler produced

7    business.  Dave produced business.  James

8    produced business.  Lee produced business.  Alex,

9    Trey, Corey, Truitt, Susan.  Okay.  So what's

10   that up to, eight or nine?

11   Q.   I've got nine.

12   A.   I don't know about Corey Woodward.  I

13   don't know about Ross.  I don't know about

14   Jonathan.  I don't know what -- if they did or

15   didn't or what their job responsibilities were on

16   their team.

17   Q.   Okay.  So we've got nine, possibly

18   twelve?

19   A.   I don't know about the other ones.

20   Q.   Okay.  When did you say Betsy left?

21   A.   I didn't.

22   Q.   Okay.  Fair enough.  When did Betsy

23   retire?

Page 91

1    A.   I don't know.

2    Q.   You don't know?  Did Betsy retire

3    before 2016?

4    A.   I would say '15 or '16.

5    Q.   Okay.  Right around there?  Okay.  So

6    let's say Betsy is still there when these nine

7    folks, and we'll go with the lower number that

8    you gave me, the nine folks were brokers, and

9    that of those nine that you listed, we'll add

10   Betsy to make ten, and only you and Betsy were

11   the only females, right?

12   A.   Yes.

13   Q.   Okay.  And so is that how it

14   basically always was was you and Betsy?

15   A.   Uh-huh (positive response), yes.

16   Q.   Did you see that as a problem?

17   A.   No.

18        MS. BARLOTTA:  Object to form.

19   Q.   Why not?

20        MS. BARLOTTA:  Object to form.

21   A.   I didn't.

22   Q.   If I changed it up a little and I

23   said there were ten brokers and only two of them

Page 92

1    were black, would that be a problem?

2        MS. BARLOTTA:  Object to form.

3    A.   No.  I -- not for me, no.  If -- I

4    mean, if we had two blacks, that would be great,

5    but we don't.

6    Q.   Would that reveal a potential race

7    discrimination issue within the department?

8        MS. BARLOTTA:  Object to form.

9    A.   I don't know.  It didn't, and we

10   didn't talk about this stuff.  I don't -- so it

11   wasn't something we discussed.

12   Q.   Okay.  Do you think it's something

13   that should be discussed?

14        MS. BARLOTTA:  Object to form.

15   A.   Again, I wasn't there that long to

16   sit and -- no.  We all went to our offices, and

17   we worked, and we didn't sit around and really

18   talk about the dynamics of the people in the

19   department.  We all just worked, and everybody, I

20   thought, was very happy working.

21   Q.   Do you think you could have made the

22   same amount of money working anywhere other than

23   CRC as a female?

Video Deposition of Susan Phillips                    1/23/2024
                                                      24 (93 - 96)

Page 93

1    A.  Nope.  No.
2    Q.  Do you think that was a common belief
3  of the females at CRC?
4        MS. BARLOTTA:  Object to form.
5    A.  I don't know.
6    Q.  Did you ever hear anybody talking
7  about that?
8    A.  No.  I just know I was very blessed
9  to have my job.
10   Q.  Would you have liked to have seen
11 more women promoted?
12       MS. BARLOTTA:  Object to form.
13   A.  It was not -- that was not in my
14 world of -- I just was there to produce my book
15 of business, and I did not really -- other than
16 like trying to help Kathryn, you know, or tell
17 her to go talk to her -- you know, Corey, I did
18 not -- office politics or whatever, I was not
19 involved in it.
20   Q.  Did you think it was strange that you
21 talked to Kat in 2016 about her desires to move
22 up --
23   A.  Uh-huh (positive response).

Page 94

1    Q.  -- and then by 2019, she's still not
2  moved up?
3        MS. BARLOTTA:  Object to form.
4    A.  I don't know when she got promoted or
5  when she got her -- they did make her a broker,
6  correct?
7    Q.  We've heard testimony that it was a
8  title promotion.
9        MS. BARLOTTA:  Object to form.
10   A.  Okay.  I don't know.
11       MS. BARLOTTA:  Object to form.
12   A.  I didn't -- I didn't know until I
13 think all this came up that -- what she was
14 doing.
15   Q.  Okay.  You said when you came in and
16 started this deposition that you were shown some
17 text messages to prepare for this deposition; is
18 that right?
19   A.  Yes.
20   Q.  Tell me about those text messages.
21   A.  They were text messages between
22 Kathryn and Lauren.
23   Q.  Okay.  And who showed you those?

Page 95

1    A.  I just had a brain lapse.
2        MS. BARLOTTA:  It's all right.
3    Q.  Rachel?
4    A.  Rachel.
5        THE WITNESS:  I'm sorry.
6    Q.  (BY MS. PALMER:)  But Rachel didn't
7  show you any other text messages?
8    A.  Huh-uh (negative response), no.
9    Q.  What was the content of those text
10 messages?
11   A.  Their discussions about how the teams
12 and the department was operating.
13   Q.  Was there anything in the messages
14 that stood out to you?
15       MS. BARLOTTA:  Object to form.
16   A.  Nothing that specifically stood out
17 other than I was very disappointed.
18   Q.  Why so?
19   A.  Because of what they were saying to
20 each other about how they thought teams should be
21 ran.
22   Q.  Okay.  And what do you mean by how
23 they thought teams should be run?

Page 96

1    A.  How they thought the workload should
2  be different than what it was, and that Dave and
3  I should retire and get out of there and make
4  room for young people.
5    Q.  And that's pretty hurtful, isn't it?
6    A.  Yeah.
7    Q.  Did you see within those text
8  messages the back and forth that they had about
9  their frustrations about not being able to move
10 up within the company?
11       MS. BARLOTTA:  Object to form.
12   A.  I don't remember that as much as just
13 their workload.
14   Q.  Okay.  Do you see how a heavy
15 administrative workload would prevent someone
16 from moving into a broker role?
17       MS. BARLOTTA:  Object to form.
18   A.  No, because we all had to do it until
19 we got our books up to -- up to where we could
20 afford somebody.  You know, we all worked our own
21 books, including --
22   Q.  How do you work a book if you have
23 forty hours a week of administrative work?

Page 97

1    A.   Well, I don't know.  Manage time.
2    Q.   Would it require overtime?
3         MS. BARLOTTA:  Object to form.
4    A.   But, again, brokers aren't overtime
5    paid, you know.  You're paid on your production.
6    And I handled my own quotes and binders and
7    policies and everything.  Lee handled his own
8    quotes and binders.  Truitt did.  We all did.
9    Q.   Do you understand -- I guess in your
10   experience, has it -- have you ever said some
11   things out of frustration that you didn't
12   actually mean?
13        MS. BARLOTTA:  Object to form.
14   A.   I can't think of anything off the top
15   of my head.
16   Q.   You never got a little flustered with
17   a situation you were in and said something and
18   then later realized maybe it wasn't the nicest
19   thing to say?
20        MS. BARLOTTA:  Object to form.
21   A.   Not the nicest thing, but I would get
22   frustrated over accounts or not getting quotes or
23   things like that.  But yeah, I've probably said a

Page 98

1    lot of things I would like to take back.
2    Q.   And that doesn't make you a bad
3    person, right?
4         MS. BARLOTTA:  Object to form.
5    A.   No.  That just means I talk too much.
6    Q.   We all do.
7         Do you like football?
8    A.   Yes.
9    Q.   Do you remember CRC having a fantasy
10   football league?
11   A.   Yeah.  Very stressful.
12   Q.   Do you remember the fantasy football
13   league splitting off when women began to join
14   from the office?
15        MS. BARLOTTA:  Object to form.
16   A.   Oh, that was funny, yeah.
17   Q.   Tell me about that.
18   A.   It didn't go -- it didn't go -- women
19   won all the time, and they didn't like it.  So
20   they started their own, but it didn't go past
21   first base.
22        THE REPORTER:  It didn't go what?
23        THE WITNESS:  Past first.

Page 99

1    Q.   (BY MS. PALMER:)  Didn't pass first.
2    A.   They wanted to put these teams
3    together, about a thousand dollars per team, and
4    girls were complaining.  So they said, Okay,
5    fine, you can have a team, too.  It costs a
6    thousand dollars.  Okay, fine.  We're in.  We're
7    ready to go.  Then they shut it all down.  They
8    didn't do it.
9    Q.   Because they didn't like to be beat
10   by the girls?
11   A.   Yeah.  It was kind of funny.  I
12   forgot all about that.
13   Q.   I never joined any of those fantasy
14   leagues.  I'm very bad with names, so I don't
15   know that I would be very good at it.
16        We heard some testimony from Rusty on
17   Friday that sometimes there might be beer or wine
18   in the office.  Does that sound like something
19   you may have experienced at all?
20        MS. BARLOTTA:  Object to form.
21   A.   That was back in the old days.
22   Q.   Back in the old days?  Was it common
23   for the brokers to go out and drink as a group?

Page 100

1         MS. BARLOTTA:  Object to form.
2    A.   Not common.
3    Q.   Does Wine Down Wednesday mean
4    anything to you?
5    A.   To some of us, yes.
6    Q.   Okay.  What is Wine Down Wednesday?
7    A.   The Tavern has Wednesday half price
8    wine, and a bunch of the older people, all
9    retired except Dave and Melissa, would go there
10   for lunch on Wednesdays.  And even as a retired
11   group, we go there once a month now.
12   Q.   Okay.  So you meet up now with who on
13   Wine Down Wednesdays once a month?
14   A.   Whoever.  Oh, the names you may not
15   recognize.  Martha Hosey, Leann, Cathy Reeves,
16   Dave, Ron Helveston comes sometimes.  They all
17   don't show up all the time.  Charlie Wood.
18   There's probably a group of about twelve.  Kristi
19   Sauter, but usually only four or five, six show
20   up at any one time.
21   Q.   Have you been to any of those Wine
22   Down Wednesdays since you retired October 2nd?
23   A.   No, I have not.

Video Deposition of Susan Phillips

1/23/2024
26 (101 - 104)

Page 101

1   Q.   Well, you should go.
2   **A.   I've been out of town.**
3   Q.   Getting all that traveling in.
4   **A.   Uh-huh (positive response).**
5   Q.   Did you have a CRC phone?
6   **A.   Yes.**
7   Q.   Did you take that with you when you
8   left?
9   **A.   No.  It was a company asset.**
10   Q.   Did they let you transfer your phone
11   number?
12   **A.   Yes.**
13   Q.   Okay.  Did anybody ask you to
14   preserve anything on your phone related to
15   Kathryn Hendrix?
16   MS. BARLOTTA:  Object to form.
17   **A.   No, but I wouldn't know how to do**
18   **that.**
19   Q.   Right.  Did you turn that phone back
20   in when you retired?
21   MS. BARLOTTA:  Object to form.
22   **A.   Uh-huh (positive response), yes.**
23   Q.   Do you recall if you've got a new

Page 102

1   phone any time between 2017 and your retirement?
2   **A.   Oh, I'm sure I did, yes.**
3   Q.   And when you got a new phone, would
4   that go to IT to transfer everything for you?
5   MS. BARLOTTA:  Object to form.
6   **A.   However they do that, yes.**
7   Q.   So it comes to you out of the box
8   ready to go?
9   **A.   Yeah.  I don't know how to do those**
10   **things.**
11   Q.   Were you in any group texts with the
12   other brokers, like a just broker group text?
13   **A.   No.  I don't -- no.**
14   Q.   They didn't invite you to all the
15   golf outings?
16   **A.   No.  But that's okay, because I don't**
17   **golf with them.**
18   Q.   With them.  Why not?
19   **A.   No.  I just -- no, I -- no, I have no**
20   **group texts period, other than my brothers and**
21   **sisters.  And I'm surprised at this thing.  Yeah,**
22   **I don't remember having that, but I guess we set**
23   **it up for that trip.**

Page 103

1   Q.   Okay.
2   MS. PALMER:  That is all I have for
3   you right now, Ms. Susan.
4   THE WITNESS:  Get my sign-out paper?
5   MS. PALMER:  Sign-out paper?  Unless
6   Rachel has something for you.
7   THE WITNESS:  Rachel?
8   MS. BARLOTTA:  I did want to ask you
9   one thing.
10
11   EXAMINATION
12   BY MS. BARLOTTA:
13   Q.   You said -- let me look back at my
14   notes.  In relation to Ms. Lindberg's hiring, I
15   believe your testimony was that Lee, being Mr.
16   McClure, needed help, and he built up a book
17   enough that he could hire help.
18   **A.   Yes.**
19   Q.   Did I get that right?
20   **A.   Yes.**
21   Q.   What did you mean by that?
22   **A.   He had enough revenue that he could**
23   **afford to have -- we could have another person on**

Page 104

1   our team.
2   Q.   When Truitt Taylor was on your team,
3   did he have -- when he was first out of college,
4   did he have someone assigned to him, an account
5   executive, to handle all of his administrative
6   duties?
7   **A.   No.**
8   Q.   Who did those?
9   **A.   He did.**
10   MS. BARLOTTA:  All right.  Thank you.
11   MS. PALMER:  Anything else?
12   Okay.  We're done.  Just let him read
13   us off the record.
14   VIDEOGRAPHER:  That will conclude our
15   deposition at 3:44 p.m.
16
17
18
19   FURTHER DEPONENT SAITH NOT
20
21
22
23

Page 105

1        C E R T I F I C A T E

2

3  STATE OF ALABAMA  )

4  JEFFERSON COUNTY  )

5

6        I HEREBY CERTIFY that the above

7  and foregoing transcript was taken down by me in

8  stenotype, and the questions and answers thereto

9  were transcribed by means of computer-aided

10  transcription, and that the foregoing represents

11  a true and correct transcript of the testimony

12  given by said witness.

13        I FURTHER CERTIFY that I am

14  neither of counsel, nor of any relation to the

15  parties to the action, nor am I anywise

16  interested in the result of said cause.

17

18  _____

19     /s/Tanya D. Cornelius

20     TANYA D. CORNELIUS, RPR

21     ACCR #378 Expires 10/1/2024

22     Notary Expires 9/13/26

23

Please return the signature page, correction sheet, and transcript within 30 days.  The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

 Tanya Cornelius
Certified Court Reporter

WITNESS SIGNATURE PAGE


In Re:  Read and sign of Video Deposition of Susan Phillips


I, _____, hereby certify that I have read the

foregoing transcript of my deposition and it is a true and correct transcript of the

testimony given by me at the time and place stated with the corrections, if any, and the

reasons therefore noted on a separate sheet of paper and attached hereto.




                                    _____
                                    Video Deposition of Susan Phillips



SWORN TO AND SUBSCRIBED before me this _____ day of _____,
202____.



                                    _____
                                    NOTARY PUBLIC



                        MY COMMISSION EXPIRES:

                                    _____

Video Deposition of Susan Phillips

Errata Sheet

Page Number          Line Number                        Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORD INDEX**

< 1 >
10/1/2024
 105:21
100  5:6
104  5:6
12th  76:11, 20
1400  5:18
15  91:4
16  91:4
1717  2:7
 5:11  6:6
18  21:9
1-800
 59:17
 60:10
19  26:23
 28:11

< 2 >
2  12:23
2:00  9:3
2:03  1:20
 2:9  6:8, 15
2:21-CV-0300-MHH
 1:5  7:2
20  26:23
2000  59:3
2015  26:21
2016  22:18
 47:7, 12
 91:3  93:21
2017  21:9, 13  28:11
 42:8  102:1
2018  72:14
 76:12
 84:23

2019  22:16
 27:9, 15
 32:12
 33:20  87:6
 88:4  94:1
2020  27:9
2024  1:19
 2:9  6:14
20th  5:18
23  1:19
 40:15  41:2, 14, 17
23rd  2:8
 5:6  6:14
 9:2
27  89:18, 23
2nd  10:15
 15:14
 100:22

< 3 >
3:16  84:7
3:24  84:11
3:44  104:15
35203  5:12, 19
35233  5:7
36  45:10, 11
378  105:21
39  4:9
 8:16, 19
3rd  2:7
 5:11  6:6

< 4 >
40  4:10
 74:16, 18
 75:2
420  5:18

499  75:20
4995  40:21

< 5 >
5:00  81:17
500  76:6
5207  46:8
5209  48:1

< 6 >
6  40:21

< 7 >
7  40:21
74  4:10

< 8 >
8  4:3, 9
 40:22
8:00  81:17
8:15  76:8
8:30  76:9

< 9 >
9/13/26
 105:22
90s  12:23
 18:2
91  19:10
92  19:11

< A >
A  2:1, 8
 5:1, 5, 11
 6:7  8:12,
 14, 16, 20,
 22  9:5, 9,
 10, 13, 21,
 23  10:3, 5,
 9, 13, 15, 18,
 20  11:1, 8,
 9, 11, 13, 16,

20, 21, 22
 12:1, 3, 5, 6,
 13, 17, 20,
 23  13:3, 5,
 8, 10, 12, 14,
 18, 21  14:2,
 9, 14, 19, 23
 15:1, 3, 4, 7,
 8, 12, 16, 19,
 21, 23  16:5,
 8, 13, 15, 16,
 18, 23  17:2,
 3, 4, 9, 12,
 17, 19, 20
 18:1, 4, 5, 7,
 11, 15, 16,
 17, 20, 22
 19:2, 6, 10,
 12, 15, 16,
 17  20:3, 5,
 6, 9, 14, 16,
 17, 20, 23
 21:5, 8, 10,
 17, 19, 22
 22:2, 6, 8,
 11, 17, 23
 23:2, 8, 11,
 14, 18, 22
 24:6, 9, 14,
 22  25:5, 6,
 13, 20, 21,
 23  26:1, 2,
 5, 10, 13, 17,
 20, 22  27:4,
 7, 11, 13, 18,
 21, 22  28:1,
 4, 8, 12, 17,
 20  29:2, 6,
 9, 11, 14, 18,
 20, 21, 22
 30:1, 3, 5, 8,
 10, 15, 18,

21, 22  31:2,
 7, 10, 11, 12,
 15, 17, 19,
 23  32:1, 2,
 5, 8, 10, 16,
 18, 20, 21,
 22  33:3, 8,
 9, 10, 14, 18
 34:1, 3, 5, 8,
 11, 13, 16,
 19, 22  35:2,
 5, 8, 14, 20,
 22  36:2, 3,
 8, 14, 22
 37:4, 7, 9,
 13, 17, 20,
 21, 22  38:3,
 4, 7, 10, 13,
 15, 17  39:1,
 3, 7, 9, 11,
 14, 15, 18
 40:1, 6, 8,
 10, 13  41:1,
 4, 7, 10, 16,
 21  42:1, 4,
 6, 9, 10, 13,
 20  43:1, 3,
 8, 13, 16, 18,
 21  44:2, 7,
 9, 13, 16, 19,
 23  45:3, 6,
 8, 14, 19
 46:1, 2, 9,
 10, 15, 17,
 20  47:1, 7,
 10, 12, 15,
 18, 23
 48:10, 14,
 18, 20, 22
 49:6, 10, 11,
 12, 14, 15,
 17, 21  50:2,

Video Deposition of Susan Phillips

1/23/2024

5, 7, 11, 13, 18, 21  51:1, 4, 6, 8, 11, 14, 17, 21 52:2, 4, 9, 14, 16, 18, 21  53:1, 3, 11, 12, 14, 15, 21, 23 54:2, 7, 11, 15, 17, 22 55:4, 7, 10, 12, 13, 17, 22  56:5, 9, 10, 12, 14, 16, 18, 20, 23  57:2, 6, 8, 12, 16, 19, 22  58:3, 6, 8, 9, 13, 14, 16, 17, 18, 22  59:2, 3, 6, 8, 13, 20, 23  60:9, 11, 13, 16, 21 61:2, 4, 7, 9, 11, 15, 18, 20, 23  62:3, 6, 9, 11, 14, 17, 18, 22 63:2, 4, 7, 9, 12, 17, 21 64:1, 13, 16, 19, 20, 22 65:1, 5, 10, 13, 15, 20, 21  66:4, 7, 12, 17, 20, 22  67:1, 2, 4, 6, 10, 13, 16, 20, 23 68:2, 5, 12,

15, 17  69:1, 3, 7, 11, 21, 23  70:6, 10, 11, 14, 15, 17, 20, 23 71:2, 3, 4, 6, 8, 13, 15, 16, 20, 23  72:4, 7, 10, 12, 13, 15, 17, 20, 23  73:1, 5, 8, 12, 16, 19, 22  74:1, 3, 5, 7, 10, 12, 14, 18, 20 75:6, 11, 12, 14, 16, 20, 23  76:4, 6, 10, 14, 18, 21, 23  77:1, 2, 3, 6, 8, 13, 14, 15, 16, 18, 20, 23 78:3, 4, 5, 7, 10, 17, 22 79:3, 4, 9, 11, 14, 15, 18, 22  80:4, 9, 13, 17, 21 81:4, 7, 8, 10, 14, 15, 20  82:2, 5, 12, 17, 21 83:2, 4, 5, 10, 12, 15, 20, 23  84:8, 13, 15, 17, 21, 23  85:4, 6, 9, 15, 17, 19  86:6, 7, 10, 13, 20, 23  87:1, 7,

9, 12, 14, 18, 22, 23  88:6, 10, 13, 14, 22, 23  89:1, 3, 5, 7, 21 90:3, 6, 12, 19, 21  91:1, 4, 12, 15, 16, 17, 21, 22 92:1, 3, 6, 9, 15, 23  93:1, 2, 5, 8, 13, 23  94:4, 5, 7, 10, 12, 19, 21  95:1, 4, 8, 11, 16, 19 96:1, 6, 12, 14, 16, 18, 22, 23  97:1, 4, 14, 16, 17, 21, 23  98:2, 5, 8, 9, 11, 16, 18  99:2, 3, 5, 11, 21, 23  100:2, 5, 7, 8, 10, 11, 13, 14, 18, 23  101:2, 4, 5, 6, 9, 12, 17, 22, 23 102:2, 3, 6, 9, 12, 13, 16, 19  103:16, 18, 20, 22 104:7, 9 105:1, 11
**able**  12:11 22:19  33:6 57:20 58:11  96:9
**accolades** 70:18

**accomplishments** 71:11
**Account** 17:17, 20 18:9  30:4 33:1, 4 55:17 61:23  62:2 66:9  81:16, 21  82:5 86:7  104:4
**accounts** 19:14 32:10, 12, 13, 14 33:11, 16 35:3, 11, 16 97:22
**ACCR** 105:21
**accurate** 24:13 52:17
**acting**  6:2
**action** 105:15
**acts**  14:8
**actual** 14:15
**add**  91:9
**adding** 21:20
**addition** 64:19
**administer** 7:14
**administrative**  96:15, 23  104:5

**advancement**  56:13, 22  57:18
**affirmative** 89:16
**afford**  64:8 96:20 103:23
**age**  40:7
**agencies** 50:9
**agent**  15:1, 8  35:3, 8
**agents** 13:8, 10, 15 15:1  20:10 50:11, 15 51:19, 23 52:5, 6, 23 53:4  54:2
**ago**  13:1, 3, 5  58:22 63:7  69:1
**agree**  48:8 49:3  53:20 58:4
**AGREED** 2:2, 11, 18 3:3  65:21
**AIG**  17:12
**AIMS** 31:18 32:23  44:5
**al**  6:22
**ALABAMA** 1:1  2:8 5:7, 12, 19 6:7, 18  7:1 105:3
**Alex**  90:8
**allowed** 57:23

Video Deposition of Susan Phillips

1/23/2024

34

**amount**
28:1  38:16
92:22
**Amy**  22:8
**an**  13:20,
21  14:23
18:4  21:1
23:5  30:3,
12  32:17,
23  36:22
38:4  42:11
47:19  50:2
52:17
55:17  56:1,
2  57:18
60:4  62:2
67:17
73:16
75:18, 21,
22  82:10
83:20, 23
84:1, 16
104:4
**and**  1:11
2:2, 6, 11,
12, 14, 16,
18, 22, 23
3:3  6:1, 4,
16  7:4, 11,
18, 23  8:5,
7, 8, 13, 16,
19  9:9, 14
10:2, 16
11:4, 14
12:8, 11, 12
13:2, 9, 12,
14  14:4, 10,
11, 14, 15,
20  15:2, 3,
4, 7  16:9,
20, 21  17:2,
4, 9, 13

18:7, 8, 17
19:2, 12, 17,
18  20:1, 8,
10, 21  21:2,
9, 13, 15
22:18  23:2,
3, 11, 23
24:6, 7, 10,
12, 15, 17,
19  25:9, 12,
17, 21  27:4,
9, 11, 15, 22
28:5, 8, 10,
13, 14, 18,
20  29:15
30:1, 3, 11,
16, 23  31:1,
3  32:1, 2, 5,
6, 11  33:9,
20  34:20
35:6, 10, 12,
16  36:4, 8,
9, 10, 12, 14
37:4, 11, 19
38:15, 20
39:10, 20
40:3, 16, 20,
22  41:1, 8,
12, 17
42:13, 14,
15, 17, 21
43:21  44:3,
8, 9, 11, 15,
17  45:1, 16,
17  46:2, 4,
8, 11, 18
47:2  48:4,
7, 11, 19
49:1, 15
50:22
51:12  52:5,
10, 11, 12,

22  53:3, 16
55:8, 11, 18,
19, 22, 23
56:6  57:10,
11, 12  58:7
59:3, 9, 16,
17, 18  60:3,
4, 10, 11, 13,
18  63:14,
21  64:2, 4,
6, 7, 14, 21
65:11, 16,
20, 21, 23
67:5, 8, 9,
11, 20
68:21  70:1,
3, 5, 6, 15
71:13, 17
72:10, 19
73:1, 8, 21,
23  74:18,
20, 21, 22,
23  75:1, 4,
17, 20  76:2,
5  77:8, 9,
16  78:15,
18, 19  79:4,
15, 16, 17
82:5  83:17,
20, 21  84:4,
21  85:2, 6,
9, 10, 11
86:2, 14, 15
87:14, 23
88:15  90:1
91:7, 8, 10,
13, 14, 22,
23  92:9, 16,
17, 19
93:15  94:1,
15, 22, 23
95:12, 22

96:2, 3, 5, 8
97:6, 7, 8,
17  98:2, 19
99:3, 23
100:8, 9, 10
102:1, 3, 20,
21  103:16
105:7, 8, 10,
11
**Andrea**
56:15
**annual**
45:18
59:15, 16
**answer**
11:18
24:23  25:4
47:10
**answers**
105:8
**anybody**
10:6, 10
15:14
20:21
21:12  34:9
51:18
55:11  64:3
71:23  72:2
73:20
81:11
82:12
87:10  93:6
101:13
**anywise**
105:15
**apologize**
9:9
**appear**
75:2
**approach**
64:12

**approval**
79:19
**approximate
ly**  2:9
**asked**
25:22
37:12
46:11, 12
85:11, 19,
20, 21
**asking**
54:11
85:15
**asset**  101:9
**assign**  2:23
**assigned**
104:4
**assistant**
17:18  18:4,
14  20:23
21:1  22:3,
4  26:7
33:4  85:23
86:3
**associate**
18:19
34:10
87:11
**assume**
71:13
**attached**
8:17  74:19
**attorney**
6:20
**audibly**
11:18
**automaticall
y**  65:17
**available**
43:21  79:4

**Avenue** 2:*7* 5:*11* 6:*7*
**average** 38:*4*, *7*
**award** 71:*3*
**awards** 70:*18*
**aware** 39:*16*

**< B >**
**Back** 12:*23* 14:*4*, *19* 15:*7* 17:*20* 18:*2*, *22* 20:*9* 26:*6* 28:*12* 43:*3* 46:*8* 48:*2* 74:*21* 83:*17* 84:*10* 96:*8* 98:*1* 99:*21*, *22* 101:*19* 103:*13*
**bad** 53:*16* 98:*2* 99:*14*
**BAKER** 5:*15*
**BANK** 1:*11*
**Barlotta** 5:*17* 7:*10*, *22* 20:*16* 21:*16* 22:*22* 23:*19*, *22* 24:*2*, *21*, *23* 25:*3*, *19* 26:*9* 29:*13* 30:*14* 31:*6*, *20*, *22* 32:*4*, *15*, *19* 33:*2*, *7*, *13*, *23* 36:*21* 37:*8*, *15* 38:*6*, *12*, *23* 39:*23* 40:*5*, *12*, *19* 41:*15*, *20* 42:*12* 44:*1* 46:*19*, *23* 47:*6*, *14*, *22* 48:*9*, *13* 49:*5*, *13*, *20* 50:*1*, *10*, *17* 51:*20* 52:*1*, *8*, *20* 53:*2*, *10* 54:*1*, *10*, *14* 55:*3* 57:*21* 58:*2*, *12*, *21* 59:*12* 60:*8* 64:*23* 65:*4*, *19* 66:*3*, *11*, *16* 67:*22* 68:*4*, *11*, *16* 69:*13*, *16*, *20* 70:*13*, *19* 71:*12* 78:*16*, *21* 79:*2*, *21* 80:*3*, *8*, *16*, *20* 81:*9*, *13*, *19* 82:*16* 83:*1*, *11* 85:*14* 86:*5*, *9*, *17* 87:*13*, *21* 88:*5*, *9* 91:*18*, *20* 92:*2*, *8*, *14* 93:*4*, *12* 94:*3*, *9*, *11* 95:*2*, *15* 96:*11*, *17* 97:*3*, *13*, *20* 98:*4*, *15* 99:*20* 100:*1* 101:*16*, *21* 102:*5* 103:*8*, *12* 104:*10*
**Barnett** 20:*17* 36:*9* 50:*19*
**barriers** 48:*3*
**base** 98:*21*
**baseball** 75:*12*, *14*, *15*
**based** 14:*14* 29:*20*, *23* 30:*1* 31:*15*
**basically** 17:*22* 43:*1* 50:*22* 91:*14*
**basis** 66:*22*
**Bates** 40:*21* 46:*2*, *7*
**BB&T** 42:*19* 44:*22* 59:*2* 60:*3*
**BEARMAN** 5:*15*
**beat** 99:*9*
**beer** 99:*17*
**began** 98:*13*
**beginning** 6:*8* 50:*6*
**behalf** 6:*17* 85:*19*, *21*
**belief** 93:*2*
**believe** 85:*2* 103:*15*
**bells** 63:*6* 85:*13*
**Bennett** 51:*4*, *5*, *7*, *12*, *15*
**BERKOWITZ** 5:*16*
**best** 22:*23*
**bet** 70:*7*
**Betsy** 19:*16* 20:*13*, *15*, *17*, *18*, *21*, *23* 21:*13* 25:*14* 36:*8* 50:*19* 65:*14*, *16*, *20* 67:*14*, *20* 68:*6*, *22* 69:*18* 72:*7* 81:*2* 86:*15* 90:*20*, *22* 91:*2*, *6*, *10*, *14*
**Betsy's** 22:*3*
**better** 16:*1*, *2* 25:*16* 31:*2*
**biannual** 30:*17*
**biases** 48:*7*, *12*
**big** 70:*15*, *21*
**biggest** 40:*2*
**binders** 18:*8* 97:*6*, *8*
**bio** 17:*4*

**Birmingham** 2:*8* 5:*7*, *12*, *19* 6:*7* 23:*16* 67:*10* 71:*21*
**bit** 17:*19* 18:*17* 19:*13* 21:*10* 30:*22* 31:*2* 45:*19* 55:*10*
**black** 92:*1*
**blacks** 92:*4*
**blanket** 74:*14*
**Bless** 17:*15*
**blessed** 93:*8*
**board** 14:*16*, *19*
**boat** 77:*15*
**bonus** 30:*12*, *17* 31:*4* 40:*17*
**bonuses** 27:*16*, *20* 29:*17* 34:*18* 41:*18*, *23* 43:*4*, *11*
**book** 16:*7* 19:*17*, *18*,

Video Deposition of Susan Phillips

*19* 20:*9*
28:*17* 33:*8,*
*10* 35:*12*
38:*13*
50:*20, 22*
51:*16*
52:*13* 64:*7*
93:*14*
96:*22*
103:*16*
**books**
25:*5* 50:*15*
96:*19, 21*
**bosses**
55:*6*
**bottom**
46:*4, 10*
75:*9, 19*
76:*6*
**bought**
59:*2*
**box** 102:*7*
**brain** 95:*1*
**Brandi** 89:*9*
**Brandon**
28:*22* 29:*1,*
*5* 34:*7, 23*
**Brasher**
28:*13*
55:*14* 89:*8*
**break**
83:*20*
84:*13*
**breakfast**
63:*11* 75:*7*
**brief** 84:*8*
**bring** 9:*6*
10:*4* 36:*19*
89:*12*
**bringing**
24:*20*

**broker**
18:*16, 20*
19:*1, 5, 8*
24:*16*
25:*20* 26:*1,*
*5, 7* 29:*6,*
*11* 33:*8, 9*
34:*10* 36:*2*
37:*7, 17*
38:*10*
39:*15, 19*
43:*19* 51:*8*
53:*1* 56:*1,*
*2, 9* 64:*20*
67:*23*
77:*18* 78:*6*
79:*15, 18*
83:*10* 87:*4,*
*9, 12* 88:*23*
94:*5* 96:*16*
102:*12*
**brokerage**
49:*7, 8*
52:*19*
**brokered**
39:*5, 6*
51:*10*
**brokering**
30:*7*
**brokers**
18:*19*
23:*10*
35:*23*
43:*14*
50:*16*
54:*20* 66:*6,*
*15* 67:*20*
68:*7* 69:*15*
86:*18* 87:*5,*
*10, 20* 88:*3*
90:*2* 91:*8,*
*23* 97:*4*

99:*23*
102:*12*
**brothers**
102:*20*
**brought**
21:*3, 14*
25:*18*
84:*18*
**bubbles**
74:*21*
**bucket**
27:*21, 22*
28:*16*
29:*18* 31:*5*
34:*21*
41:*23*
**built** 64:*7*
103:*16*
**bunch**
72:*20*
100:*8*
**business**
12:*16* 19:*2,*
*4* 20:*2*
29:*15* 35:*8*
38:*13* 49:*8*
54:*4, 5*
70:*12* 90:*7,*
*8* 93:*15*
**busy** 10:*20*
**buying**
85:*5*

**< C >**
**cabin** 77:*2,*
*3, 4*
**Cadden**
17:*1* 22:*9*
42:*14*
64:*13, 16*
66:*22*
**cake** 15:*21*

**calculate**
29:*16*
41:*18, 22*
**CALDWELL**
5:*15*
**California**
71:*16*
**call** 8:*11*
20:*11* 46:*2*
87:*10*
**called** 8:*7*
**calling** 87:*9*
**cancel** 15:*3*
**cancer**
85:*5*
**candidate**
65:*22*
**card** 19:*4*
**cards** 19:*2*
**career**
17:*10, 13*
49:*19*
**carrier** 14:*5*
**carton** 85:*6*
**CASE** 1:*5*
6:*21* 7:*1*
**cases** 35:*1*
**Cathryn**
55:*21*
**Cathy**
55:*22* 56:*3*
73:*8, 21*
74:*23* 75:*3*
77:*8* 89:*6*
100:*15*
**cause** 6:*9*
105:*16*
**cellphone**
10:*7*
**center** 48:*4*
**Central**
6:*15*

**certain**
32:*3* 72:*11*
**Certainly**
15:*6*
**certify** 6:*2*
105:*6, 13*
**chance**
40:*8*
**change**
84:*14*
**changed**
82:*8* 91:*22*
**charged**
80:*6*
**Charlie**
100:*17*
**chat** 83:*21*
**check** 10:*7,*
*10*
**Chicago**
75:*17*
**choice**
54:*15, 18*
**chose** 15:*2*
**Christy**
61:*3, 6, 13*
**cigarette**
84:*21* 85:*9*
**Cite** 6:*18*
**Civil** 6:*4*
**claim** 14:*1,*
*2* 15:*4*
40:*13*
**claims**
39:*20*
**classes**
45:*4*
**Clay** 89:*4*
**clear** 12:*3*
24:*3*

Video Deposition of Susan Phillips

1/23/2024
37

click-through 45:7
close 69:2
Club 15:19
Cochran 89:6
code 32:2
coded 31:17
cold 85:1
co-leads 27:20
college 36:4 104:3
Colorado 72:14 73:6, 10 75:5, 16 79:23
column 43:6
come 36:13 37:4 38:20 41:23 64:4 71:1 73:3
comes 100:16 102:7
coming 9:12 27:2
commencing 2:9
comments 52:14 54:20
commingle 28:2
Commissioner 3:5 6:2

common 93:2 99:22 100:2
communicated 73:14
companies 72:21
company 55:2 96:10 101:9
complained 60:1, 11
complaining 99:4
complaint 64:22 65:3
complaints 9:18 59:10, 22 60:19 61:1 66:1
complete 12:12 42:13, 16
compliance 2:15
computer 42:5, 9, 11 43:22 62:18
computer-aided 105:9
conclude 104:14
conduct 48:6
confused 81:21
Congratulations 10:17 85:1

consider 18:5 90:2
considered 32:13 58:17
contact 15:14 60:16 62:18
contacted 60:2
content 65:2 95:9
conversation 56:12 77:17 78:4 79:13 80:22 81:15
conversations 54:23 61:13 62:4
Cooley 61:16, 17, 19 62:5, 7
copy 8:16 41:9 42:4 74:18
Corey 23:4 72:7 79:16 90:9, 12 93:17
Corey's 79:20
Cornelius 2:5 6:1, 17 105:19, 20
corner 46:4
CORP 1:11
correct 24:8, 9 25:18 26:2

30:9 94:6 105:11
correcting 48:19
costs 99:5
co-team 27:14
counsel 2:4, 20, 22 6:5 7:3 9:1 105:14
count 88:18 90:1
counting 23:5
country 62:19
COUNTY 105:4
couple 9:5 19:17 24:6 57:12 69:3, 7 76:21
course 15:4 70:22
COURT 1:1 2:16 6:16, 18, 23 7:13 11:17
cover 14:8 30:23 39:13
coverage 13:13, 17, 18, 22 14:3, 6, 9 53:16
covered 14:4 40:13 59:13, 15
Covid 26:23

CRC 1:10 6:21 7:11 8:8 10:6, 11 12:17, 18 13:9, 11, 16, 17, 18 14:20
15:15 16:4 17:4, 8, 10, 15 31:21 36:11, 15, 18 37:6 38:11, 18 47:5, 19 50:14 52:22 54:12 55:1 58:1 62:5, 8, 15 66:6, 10, 15 67:9, 21 70:11 71:10 72:14, 21, 23 73:18 78:14 80:1 81:7, 12 86:11 92:23 93:3 98:9 101:5
CRC's 9:1
crystal 70:20
CSR 2:6 6:1
Cubs 75:17
Curtain 36:8
customer 52:15
Cynthia 5:10 6:21

7:8  88:17

< D >
D   2:5   4:1
6:1   105:19,
20
D&O   19:19,
22
dad   85:1
dance
46:12
Daniel
88:20
dashboard
43:23
date   6:3, 14
Dave
16:21   17:2
23:2   24:7,
15, 19   25:2,
12   27:11,
15   28:8
35:13   44:3,
8, 11, 15, 16,
17   65:20
72:7   77:17
78:1, 13, 19
85:20   89:2
90:7   96:2
100:9, 16
Dave's
28:19
34:20
David
16:10
day   2:8
8:6   73:1
76:12, 20
days   20:8
54:17
76:22
99:21, 22

deal   34:4
53:1
dealings
66:21
decide
43:10
decided
16:14
24:12
25:15
43:10
decision
25:11
64:12
Defendants
1:12   5:14
7:11
defined
47:16
definitely
45:16
denial
40:10
denying
69:8
department
15:20
18:16
19:16
20:19, 20,
22   21:2, 13
22:1, 5, 10,
15   23:6
51:10
62:12
63:16
64:10, 11,
17   65:8, 18,
23   66:2
67:3, 5, 15
68:10   70:8
72:8   87:4

88:4   92:7,
19   95:12
departments
62:13
department's
69:18
depending
30:21
DEPONENT
104:19
DEPOSITION
1:15
2:4, 13, 14
3:1, 4   4:9
6:19   8:8,
20   9:2, 8
11:9   13:7
94:16, 17
104:15
depositions
2:17   12:15
18:18
60:14
desires
55:2   83:9
93:21
determine
27:16, 19
42:22
develop
19:18
29:14
35:12
developed
35:5
developing
37:1
developmental   23:12
difference
46:17

different
45:20   47:2
57:9   67:2,
4   77:5
96:2
differently
52:9
directors
14:10, 16
disappointed   68:8, 19
69:18
95:17
discriminated   40:9
Discrimination   40:1, 4,
6, 7, 11
44:21
45:17
59:11, 22
60:2, 6, 20
66:2   92:7
discuss
72:18
discussed
92:11, 13
discussing
9:16
discussion
85:10

discussions
95:11
dispute
83:8, 12
distinction
84:16
distribute
29:17
distributed
27:16

DISTRICT
1:1   6:23
7:1
diverse
47:12, 15
diversity
44:21
45:16
46:11, 18,
21   47:2, 4,
20   48:4, 12
49:4
divided
16:18
50:23
DIVISION
1:3   7:1
document
8:21, 23
41:3, 5, 12,
13   42:10
documents
9:7, 11, 16
42:4
doing
10:22   24:2
29:21   30:6
57:10
94:14
dollar
38:16
71:14, 23
dollars
71:15   99:3,
6
DONELSON
5:15
drink   99:23
drive   76:7
drove
76:12

Video Deposition of Susan Phillips

1/23/2024
39

drumming
20:1
duly 7:17
Dunston
62:23 63:1
duties
66:1 104:6
duty 59:21
60:7
dynamics
92:18

< E >
E 4:1 5:1
105:1
E&O 13:8,
12, 22
earlier 8:4
87:15
early 12:23
East 85:6
easy 24:4
Edgar's
15:22
effect 2:14
effort 37:6
47:19
eight 90:10
either 11:5
39:7 54:4
else's
52:11
e-mail
10:11 20:8
42:11
73:16, 18
e-mails
9:16 10:12
employed
62:10
78:14

employee
29:22
employees
16:4 55:1
72:20
82:15

employment
8:8, 10
9:17 15:10
39:11, 19,
21 47:21
61:14 62:5
Enneagram
75:21, 22
entered
29:3
EPL 39:8,
10, 12
ERP 15:3
Errors
13:14 14:8
Esq 5:5,
10, 17
establish
52:10
estate
14:11
estimate
30:12 88:2
et 6:22
events
50:4 71:14
eventually
36:9 86:3
everybody
70:3 92:19
evidence
3:2
evolved
42:6

exactly
11:23
45:15
EXAMINATI
ON 4:2
6:9 8:1
103:11
examined
7:18
exec 17:17
55:17
61:23 62:2
81:21 82:5
execs
17:20 18:9
executive
30:4 81:16
104:5
executives
66:10 86:8
exempt
82:2
EXHIBIT
4:7, 8 8:15,
19 40:15
41:2, 14, 17
45:10, 11
74:16, 17
75:2 89:23
exhibits
89:12
experience
23:13
38:18
49:19
50:15
52:23
75:18
97:10

experienced
99:19

Expires
105:21, 22
expressed
57:18
extreme
11:4

< F >
F 105:1
facility
14:15
factors
29:18
fair 40:8
50:9 90:22
fall 40:10
familiar
23:9 54:9
61:3 81:2
fantasy
98:9, 12
99:13
far 16:10
22:20
37:11 50:9
62:11
Federal 6:3
feel 11:4
40:7 41:11
47:4, 12, 19
49:22 50:8
53:7
feels 84:1
female
37:7 49:15
53:1, 6, 12,
18, 21 55:1
66:6, 9, 15
86:18 87:3
92:23

females
68:8, 9
91:11 93:3
Fifty 30:15
figure
35:17
filed 6:22
filing 3:4
final 36:12
FINANCIAL
1:10
find 20:10
25:21, 23
50:11 64:4
fine 99:5, 6
fingers
41:11
Firm 2:7
5:9 6:6
first 7:17
9:7 12:21
17:10 22:5
25:2 26:4
30:22
39:18
42:22 43:4
44:10
64:14
98:21, 23
99:1 104:3
five 23:4
38:3
100:19
flannel
13:4
flip 9:4
42:16 46:7
48:1 75:8
floor 67:4
Florida
71:17

Video Deposition of Susan Phillips

1/23/2024
40

flustered 97:*16*
folks 55:*12* 83:*21* 91:*7, 8*
following 6:*10*
follows 7:*18*
football 98:*7, 10, 12*
force 2:*14*
foregoing 6:*4* 105:*7, 10*
forever 84:*2*
forgot 99:*12*
form 2:*21* 9:*10* 21:*16* 22:*22* 23:*19* 24:*21* 25:*19* 26:*9* 29:*13* 30:*14* 31:*6, 20, 22* 32:*4, 15* 33:*2, 7, 13, 23* 36:*21* 37:*8, 15* 38:*6, 12, 23* 39:*23* 40:*5, 12* 41:*15, 20* 42:*12, 16* 44:*1* 46:*19, 23* 47:*6, 14, 22* 48:*9, 13* 49:*5, 13, 20* 50:*1, 10, 17* 51:*20* 52:*1,*

*8, 20* 53:*2, 10* 54:*1, 10, 14* 55:*3* 57:*21* 58:*2, 12, 21* 59:*12* 60:*8* 64:*23* 65:*4, 19* 66:*3, 11, 16* 67:*22* 68:*4, 11, 16* 69:*13, 16, 20* 70:*13, 19* 71:*12* 78:*16, 21* 79:*2, 21* 80:*3, 8, 16, 20* 81:*9, 13, 19* 82:*16* 83:*1, 11* 85:*14* 86:*5, 9, 17* 87:*13, 21* 88:*5, 9* 91:*18, 20* 92:*2, 8, 14* 93:*4, 12* 94:*3, 9, 11* 95:*15* 96:*11, 17* 97:*3, 13, 20* 98:*4, 15* 99:*20* 100:*1* 101:*16, 21* 102:*5*
Forman 5:*10*
forth 74:*22* 96:*8*
forty 96:*23*
forward 42:*13*

four 26:*14* 40:*21* 46:*8* 73:*22* 100:*19*
free 41:*11*
freezing 74:*11*
Friday 76:*18* 99:*17*
friends 16:*3*
frustrated 97:*22*
frustration 97:*11*
frustrations 96:*9*
full 2:*15* 18:*20* 26:*1*
fully 12:*8*
funny 98:*16* 99:*11*
FURTHER 2:*11, 18* 3:*3* 104:*19* 105:*13*

< G >
game 75:*11*
gender 54:*8*
generally 36:*17* 39:*21*
George 51:*3, 5, 7, 12, 15*
getting 35:*6* 97:*22* 101:*3*

Gianmarco's 67:*21* 68:*1*
girls 99:*4, 10*
give 12:*11* 27:*20* 53:*15*
given 11:*9* 36:*5* 40:*8* 41:*8* 50:*8, 15* 105:*12*
glad 63:*9*
go 20:*10* 32:*2* 39:*1* 50:*11* 52:*11* 58:*7, 10, 19* 59:*18* 60:*9* 64:*1, 2* 71:*16, 19, 22* 72:*8* 74:*2, 9* 76:*15* 82:*19* 83:*17* 89:*21* 91:*7* 93:*17* 98:*18, 20, 22* 99:*7, 23* 100:*9, 11* 101:*1* 102:*4, 8*
goes 38:*16*
going 6:*13* 7:*22* 8:*6, 18* 11:*14* 17:*5* 20:*1* 27:*5* 36:*19* 40:*14, 17* 45:*9* 46:*5* 58:*7* 63:*4*

68:*19* 74:*15* 78:*19* 81:*20* 82:*22* 83:*6, 19*
golf 102:*15, 17*
good 15:*21, 23* 29:*21* 36:*13* 37:*1* 65:*21* 74:*3* 77:*13* 99:*15*
Goodness 15:*17*
gosh 69:*5*
gotten 52:*5* 71:*22*
great 92:*4*
Green 89:*9*
grew 21:*21*
grounds 2:*23*
group 25:*6* 55:*7* 71:*16* 72:*5* 73:*5, 7* 75:*3* 83:*2, 4* 84:*21* 99:*23* 100:*11, 18* 102:*11, 12, 20*
grown 70:*9*
guess 17:*4* 20:*7* 29:*18* 57:*8, 22* 79:*22* 97:*9* 102:*22*

Video Deposition of Susan Phillips

1/23/2024

41

guys 24:12
74:3  75:4
76:1, 12
77:4

< H >
habit  12:3
half  30:23
70:7  100:7
handle
59:10  60:4
66:1  104:5
handled
50:22  97:6,
7
handwriting
43:5
hang  45:22
happen
24:18
68:13, 17,
20  77:22
78:8, 10, 20
79:1, 4
80:19
happened
15:8  50:20
51:16
happy
11:6  55:23
56:4  92:20
hard  10:23
52:10  85:3
Hayes
29:1, 5
34:7
head  11:20
12:20
32:18
34:22  65:8,
17, 23

67:15  71:4
97:15
heading
75:6  85:6
heads  12:4
healthcare
87:2
hear  52:14
54:12, 19
93:6
heard
10:16
17:19
18:17
22:12, 13
46:13
60:13
66:18  94:7
99:16
heavy
96:14
help  26:10
35:5, 7, 12,
15, 18
36:23  46:5
59:19  64:2,
7, 8  89:19
93:16
103:16, 17
helped
87:2
Helveston
100:16
HENDRIX
1:7  5:21
6:21  7:7, 9
8:6  9:16
75:4  89:9
101:15
Hendrix0004
98  75:9

Hendrix's
60:23
hereto
8:17  74:19
Hey  38:20
high  29:9,
12
higher
36:18  38:5
hire  29:11
103:17
hired
28:20, 21,
23  29:5
36:3  51:8
85:12
hiring  34:7
103:14
hold  41:1
71:13
89:11
Holland
5:22  6:16
home  73:3
honest
12:11
hope
48:22  69:5
Hopefully
15:21
83:22
Hosey
100:15
hotel
17:13  77:1
hour  83:20,
23  84:1
hours
96:23
HR  60:3, 9,
17

Hughes
21:23  65:7
72:6
Huh-uh
61:15  95:8
hundred
31:9, 11
hurtful  96:5

< I >
I  2:1  4:1
6:1  8:5, 11,
13, 14, 18
9:9, 10
10:5, 16, 17,
22, 23  11:4,
5, 6, 23
13:10  16:2,
5, 11, 13, 18
17:3, 12
18:3, 15
19:10, 15,
17, 18  20:7
21:14, 17
22:2, 17, 18,
23  23:8, 11
24:6  25:9,
13, 14
26:10
27:11, 22
28:8, 21, 22
29:2, 18
34:1, 2
35:1, 3, 7, 8
36:4, 9, 14,
23  37:1, 9
38:7  40:13
42:13, 17
43:8, 9, 10,
18  44:9
45:14, 20
46:2, 15, 20

47:7, 8, 23
48:10, 14,
20, 22  49:6,
21  50:11,
12, 13  51:2
52:5, 12
53:3, 4, 6,
11, 12, 14,
15, 17  54:2,
4, 11, 15, 16
55:4, 5, 11,
14, 19  56:1,
5, 6, 10
57:8, 12, 13,
22  58:13
59:13  60:2,
4, 9, 11
61:7  62:11,
17, 18, 19
63:3, 8, 10,
11, 12, 22
65:5  66:17
67:5, 16, 18
68:2, 12, 15,
20, 21  69:2,
5, 11, 12
70:1, 2, 3, 4,
5, 6, 7, 17,
23  71:13,
20  73:23
74:1, 2, 3,
10, 13
75:17, 23
76:4, 14, 19,
21  77:6, 9,
14, 20, 23
78:10, 11,
22  79:4, 5,
11, 15, 22
80:21  81:4
82:7, 12, 17,
21  83:3, 5,

12, 14, 15,
16, 18
84:18, 23
85:2, 4, 5, 7,
11, 15, 19,
20, 21  86:6,
10  87:3, 7,
11, 22, 23
88:10, 11,
13, 14  89:7
90:3, 6, 12,
13, 14, 19,
21  91:1, 4,
21, 22  92:3,
9, 10, 15, 19
93:5, 8, 14,
15, 17, 18
94:4, 10, 12
95:1, 17
96:3, 12
97:1, 6, 9,
14, 21  98:1,
5  99:11, 13,
14, 15
100:23
101:17
102:2, 9, 13,
16, 19, 22
103:2, 8, 14,
19  105:1, 6,
13, 15
**idea**  73:11
76:21
**identificatio
n**  8:16
74:18
**identify**
7:3  46:5
**important**
62:21
84:16

**include**
47:3
**included**
49:23
**including**
9:17  96:21
**Inclusion**
46:12, 18
47:1, 16
**Incorporate
d**  6:22
**INDEX**  4:7
**indicating**
70:21
**individual**
25:8
**industry**
35:19
49:12
52:18
**information**
8:9  43:16
63:19
66:13
**inside**
18:18  56:1,
2  87:10
**Insights**
45:16

**INSURANCE**
1:10  6:22
7:11  13:8,
12, 14  14:5
35:2  39:4,
8, 10, 13
49:8  52:18
**insured**
15:2
**insurer**
13:20, 21

**interest**
56:1  57:18
**interested**
35:9  51:19,
22  55:6
79:5, 8, 14,
17  105:16
**interview**
34:12, 14
36:4  48:15
**interviewed**
36:6  37:9
**Interviewing**
48:5, 14, 16
49:2
**interviews**
48:6
**introduced**
8:4
**invite**
73:20
102:14
**invited**
50:3  72:1
**involve**
9:20
**involved**
59:10
93:19

**involvement**
34:17
**iPad**  40:18
41:1, 8
**issue**  60:4
82:10  92:7

**< J >**
**James**
23:3  50:21

63:5  72:7
90:7
**JANUARY**
1:19  2:9
6:14  9:2
**JEFFERSO
N**  105:4
**job**  21:15
29:21
54:16
55:19, 22,
23  56:4
57:10
65:22
90:15  93:9
**John**  17:1
22:9  42:14
64:13
66:21  67:9,
12, 14
78:15, 19
**join**  21:23
98:13
**joined**
24:8, 15
26:4, 16
29:8  99:13
**joke**  63:10
**Jonathan**
90:14
**judged**
53:21
**July**  76:11

**< K >**
**Karissa**
61:16, 17,
19  62:5, 7
**Kat**  5:21
10:8, 12
77:17  78:2,
4, 5, 18

80:1  81:6
82:20  83:8
84:19
93:21
**KATHRYN**
1:7  7:7, 9
8:5, 6  9:16,
20  21:9
60:23  73:8,
21  77:8
89:8  93:16
94:22
101:15
**Kathryn's**
8:9
**Kathy**  75:4
81:2
**keep**  35:13
42:3
**kid**  74:1
**kind**  10:22
11:15  12:3
15:17  17:3
18:5, 9
21:20  27:1
32:17
35:15, 18
41:12
58:14
99:11
**knew**
36:23
73:22
80:11
**know**  8:14
11:15
16:11, 14,
18  18:3
21:6, 10, 14
22:2  23:11
24:6  25:7,
11  27:2

Video Deposition of Susan Phillips

1/23/2024

43

28:21, 22
29:2  30:22
31:2  34:1,
2  36:7, 10,
22  37:9, 11
38:7  43:9,
10  45:14
47:1, 23
49:6  50:23
53:3, 6, 15
54:2, 11
55:7, 14
58:13  59:3,
17  60:3, 4,
11  61:9, 17,
22  62:1, 11,
17  63:1, 15,
22  65:5
66:17  69:2
70:1, 4, 6, 7
71:15, 20
72:5  73:13
75:23  76:4
79:4, 6, 7,
11  81:4
82:17  83:3
86:6, 10
87:7, 11, 22
88:10, 11
89:7  90:3,
6, 12, 13, 14,
19  91:1, 2
92:9  93:5,
8, 16, 17
94:4, 10, 12
96:20  97:1,
5  99:15
101:17
102:9
**knowledge**
23:15
69:10

**Kristi**
100:18

**< L >**
**L**  2:1
**labels**
40:21
**lapse**  95:1
**larger**  31:8,
11
**largest**
30:12  31:3
**launch**
23:10, 16
**laundering**
45:17
**Lauren**
32:6, 9, 12,
22  33:21
44:14
56:17  57:3,
17  63:15
73:8, 21
75:1, 3, 20
77:8  85:12,
16  94:22
**Law**  2:7
5:4, 9  6:6
**laws**  2:15
**lawsuits**
14:22
**lawyer**
80:6, 14
81:1, 8
**lead**  27:10
32:12
33:21
**leader**
24:13
26:12, 19,
22

**leaders**
59:4  87:18,
19
**leadership**
22:21
**leading**
2:21
**leads**
27:14
87:16
**league**
98:10, 13
**leagues**
99:14
**Leann**
81:2  86:23
100:15
**leave**  9:17
50:18
51:12
**leaving**
50:16
**Lee**  16:9,
22  17:2
23:2  24:7,
11, 12, 15,
20  25:18,
20, 22  26:1,
11  28:13,
14, 15
29:23  31:4
32:1, 5, 6, 8,
10  33:20
44:11, 12,
13, 14  57:2,
3  64:6
87:23  90:8
97:7
103:15
**Lee's**
32:12, 13

33:16  57:5
85:22  86:3
**left**  24:16
50:19
51:15  56:7
62:8  63:15
67:18, 21
90:20
101:8
**Leslie**  5:5
7:6  8:4, 13
89:11
**letting**
58:6  78:20
**level**  60:12
72:11
**liability**
15:11  17:7
20:19, 22
39:11, 12
86:16, 19,
22  88:4
**life**  10:19
35:2
**liked**  34:14
56:6  62:14
93:10
**Lindberg**
56:17
63:15  75:1,
4, 20  85:12
**Lindberg's**
103:14
**lines**  18:8
**link**  75:20
**list**  55:12
70:3  88:13,
14, 18  90:1
**listed**
32:23  33:3,
6  43:5

87:14  91:9
**lists**  9:5
**little**  15:19
17:19
18:17
19:13
21:10, 19
30:22  31:2
45:19
48:14  51:1
55:10
81:20
91:22
97:16
**lived**  69:3
**LLC**  5:4
**long**  10:20
12:23  13:3,
5  17:8
26:11
37:23
55:13, 19
57:11  62:1
63:7  76:16
92:15
**longer**  67:6
**look**  9:11
29:19  43:3
45:11  70:2
74:22  80:6
88:14
89:23
103:13
**looked**
9:19
**looking**
14:7  64:3
**looks**
45:19
75:20
76:11

lot 20:*5*
52:*14* 54:*2*
60:*13*
69:*23* 98:*1*
love 83:*14*
lower
30:*22* 91:*7*
lunch
36:*13*
67:*20, 23*
82:*19, 22*
83:*8*
100:*10*
lung 85:*5*

< M >
makeup
21:*10*
making
29:*21* 68:*7*
male 49:*12*
53:*23*
malpractice
15:*2*
Manage
97:*1*
managemen
t 17:*14*
38:*20, 22*
manager
58:*17, 20*
59:*20*
79:*18*
managers
59:*3*
managing
33:*12*
manufacturi
ng 14:*15*
Maria 89:*9*
marked
8:*16, 19*

40:*15*
45:*10*
74:*18*
88:*15*
markets
72:*18*
Martha
100:*15*
Mason
63:*21*
matter
27:*7* 32:*2*
McClure
16:*9* 24:*8*
103:*16*
mean
21:*17*
43:*18*
46:*22*
48:*20* 53:*3*
54:*15* 56:*1,
5, 6* 67:*5*
81:*14* 92:*4*
95:*22*
97:*12*
100:*3*
103:*21*
meaning
47:*15*
means
47:*2* 98:*5*
105:*9*
media 16:*4,
5, 6*
medical
9:*17* 15:*2*
16:*9* 73:*1*
medium
11:*7*
meet
100:*12*

meeting
72:*17* 75:*7*
meetings
20:*8* 73:*4*
Melissa
100:*9*
men 50:*21*
54:*3*
mentioned
22:*5* 45:*3*
70:*6*
Messages
4:*10* 9:*14,
15, 19* 10:*1,
8* 74:*21, 23*
94:*17, 20,
21* 95:*7, 10,
13* 96:*8*
met 72:*10*
mic 84:*3*
middle
74:*8* 85:*6*
miles 69:*3*
million
71:*14, 15,
23*
mine 73:*12*
minute
23:*22*
mistakes
29:*22*
mixed 70:*3*
modules
45:*7, 12*
Monday
76:*19*
money
14:*13* 28:*1*
45:*17*
92:*22*
monitor
6:*15*

Montgomer
y 6:*18*
month
15:*5*
100:*11, 13*
months
17:*9*
move
18:*12, 13,
14* 21:*3*
55:*2, 16*
57:*20*
58:*11*
62:*15* 65:*6*
83:*9* 86:*3*
93:*21* 96:*9*
moved
18:*15, 20*
19:*8, 13*
38:*1* 62:*13*
64:*9* 94:*2*
moving
35:*6* 50:*16*
55:*6* 79:*15,
18* 96:*16*

< N >
N 2:*1* 4:*1*
5:*1*
name 6:*16*
8:*4* 19:*5*
22:*8* 49:*21*
63:*2, 3*
named
87:*9*
names
99:*14*
100:*14*
nationwide
72:*21*
necessary
2:*19*

need 11:*18*
25:*23*
58:*15*
79:*16* 81:*8*
85:*17*
needed
25:*6, 21*
34:*9* 36:*23*
64:*2, 6*
103:*16*
negative
61:*15* 95:*8*
neither
15:*9* 25:*5*
105:*14*
Networking
50:*3, 4*
never 37:*9*
50:*18*
55:*17, 23*
66:*18* 80:*6*
97:*16*
99:*13*
new 19:*16*
23:*11* 35:*8*
101:*23*
102:*3*
nice 11:*2*
71:*17*
nicest
97:*18, 21*
nights
76:*23*
nine 90:*10,
11, 17* 91:*6,
8, 9*
Nirvana
13:*2*
nod 12:*4*
nods
11:*20*
12:*20*

Video Deposition of Susan Phillips

1/23/2024

45

32:*18*
34:*22*  71:*4*

**noncompete**
80:*1, 7*
**nonexempt**
81:*22*  82:*3,
5*
**non-**
**medical**
16:*10*  73:*2*
**nonprofit**
19:*19, 22*
**Nope**  93:*1*
**normal**
43:*6*
**North**  2:*7*
5:*11, 18*
6:*7*
**NORTHERN**
1:*1*  6:*23*
**Notary**  2:*6*
6:*2*  105:*22*
**notes**
103:*14*
**notice**  3:*4*
4:*9*  9:*1*
**noticed**
6:*20*
**NUMBER**
1:*5*  4:*2, 8*
7:*2*  46:*2, 8*
66:*6, 9, 15*
88:*3*  89:*18*
90:*1*  91:*7*
101:*11*
**numbers**
42:*15, 18*
43:*7*  46:*3*

**< O >**

**O**  2:*1*
**oath**  7:*14*
**Object**
21:*16*
22:*22*
23:*19*
24:*21*
25:*19*  26:*9*
29:*13*
30:*14*  31:*6,
20, 22*  32:*4,
15, 19*  33:*2,
7, 13, 23*
36:*21*  37:*8,
15*  38:*6, 12,
23*  39:*23*
40:*5, 12*
41:*15, 20*
42:*12*  44:*1*
46:*19, 23*
47:*6, 14, 22*
48:*9, 13*
49:*5, 13, 20*
50:*1, 10, 17*
51:*20*  52:*1,
8, 20*  53:*2,
10*  54:*1, 10,
14*  55:*3*
57:*21*  58:*2,
12, 21*
59:*12*  60:*8*
64:*23*  65:*4,
19*  66:*3, 11,
16*  67:*22*
68:*4, 11, 16*
69:*13, 16,
20*  70:*13,
19*  71:*12*
78:*16, 21*
79:*2, 21*
80:*3, 8, 16,
20*  81:*9, 13,*

19  82:*16*
83:*1, 11*
85:*14*  86:*5,
9, 17*  87:*13,
21*  88:*5, 9*
91:*18, 20*
92:*2, 8, 14*
93:*4, 12*
94:*3, 9, 11*
95:*15*
96:*11, 17*
97:*3, 13, 20*
98:*4, 15*
99:*20*
100:*1*
101:*16, 21*
102:*5*
**objection**
23:*20, 23*
25:*3*  32:*21*
**objections**
2:*20, 23*
**obviously**
18:*13*
**occasion**
60:*18*
**O'Connor**
88:*20, 21*
**October**
10:*15*
15:*13*
100:*22*
**offered**  3:*2*
**office**
23:*16*
64:*19*
67:*10, 16,
17*  70:*21*
93:*18*
98:*14*
99:*18*

**officers**
14:*10*
**offices**  2:*6*
6:*6*  92:*16*
**Oh**  23:*4*
25:*13*
26:*13, 22*
39:*18*
62:*17*  69:*5*
73:*19*
75:*11*
76:*21*  83:*5*
87:*7*  98:*16*
100:*14*
102:*2*
**okay**  8:*11,
23*  9:*14, 22*
10:*6, 14, 20*
11:*14, 19*
12:*14, 18*
13:*20*
14:*18*  15:*9,
13*  16:*1, 12,
15, 20*  17:*3*
19:*4, 7, 12,
23*  20:*15,
21*  21:*2, 18,
23*  22:*4, 7,
9, 19*  23:*1,
7, 9*  24:*10,
17, 22*  25:*5,
17, 23*  26:*3,
6*  27:*3, 6, 9,
14, 19, 23*
28:*5, 10, 14,
18*  29:*4*
30:*3, 11, 16,
19*  31:*14*
32:*7, 9*
33:*5, 17, 20*
34:*3, 6*
35:*4, 10, 18*

36:*1, 6, 10,
12, 17*  37:*3,
11, 23*
38:*10, 15*
39:*20*  40:*3,
19*  41:*17*
42:*3, 7, 10,
15*  43:*3, 17,
20*  45:*1, 4,
22*  46:*1, 6,
16*  47:*3, 9*
53:*13, 19*
56:*3*  57:*2,
4*  58:*9, 19,
23*  59:*20*
60:*13, 18*
61:*9, 19*
62:*13*  63:*5,
7, 23*  64:*9,
15, 18, 21*
65:*16*
67:*11, 19*
68:*3*  69:*22*
71:*3, 9, 18*
72:*10, 19*
73:*3, 13, 17*
75:*8*  76:*5,
7, 16*  77:*1,
3, 7, 10, 16,
21*  78:*13*
79:*10, 17*
80:*18, 23*
81:*11*  82:*1,
11, 19*  83:*7*
85:*17*  86:*2,
21*  87:*5*
88:*2, 13*
89:*2*  90:*5,
6, 9, 17, 20,
22*  91:*5, 13*
92:*12*
94:*10, 15,*

23 95:22
96:14 99:4,
6 100:6, 12
101:13
102:16
103:1
104:12
old 99:21,
22
older 100:8
omissions
13:14
once 82:21
83:6 84:15
100:11, 13
ones 70:6
90:19
one-time
59:6
one-year
15:3
online
45:6 59:16
open 72:21
opening
36:22
operated
87:23
operating
95:12
opinion
40:11
opportunitie
s 40:10
49:23
opportunity
50:2
oral 6:9
outings
102:15
outside
79:19

84:20 85:9
87:11
overlooked
53:8
overtime
81:12, 23
82:7, 9, 18
97:2, 4
owed 14:17

< P >
P 2:1 5:1
P.C 2:7
5:9, 16 6:6
P.M 1:20
2:10 6:8,
15 9:3
84:7, 11
104:15
PAGE 4:2,
8 9:5
42:17, 18,
21, 22 43:4
48:1 75:8,
19 76:5
Pages
20:10
40:21 46:6,
8 48:2
paid 30:13
97:5
PALMER
4:3 5:4, 5
7:6 8:2, 5,
14 19:23
24:5 40:16,
20, 23
84:12
88:17, 20
89:20, 22
95:6 99:1

103:2, 5
104:11
paper 41:9
42:4 103:4,
5
parents
11:3
part 10:23
16:8, 9
22:10
70:15
particular
12:10
38:15
52:23
parties 2:3,
22 105:15
party
15:16, 17
46:12
pass 60:11
99:1
passed
33:11
68:22
path 86:7
pause
23:22
pay 14:12
paying
14:17
Peak 74:7
76:8, 13, 17
77:11
people
14:12
21:20 52:9
57:14
62:21
69:23 70:4,
7 76:3
88:12

92:18 96:4
100:8
percentage
30:1
performer
38:5
period
28:19
61:10 87:1
102:20
perpetuatio
n 51:1
person
21:15
36:19 37:2
38:21
60:11 72:3
98:3
103:23
personal
10:11
12:15
46:17
Personality
75:22 76:2,
3
Petty
60:10, 14,
15, 19, 22
PHILLIPS
1:16 2:5
6:8, 20
7:16 8:3, 5,
21 19:6
74:23
phone
101:5, 10,
14, 19
102:1, 3
pick 52:11
picture
29:3 75:10

pictures
74:13
Pikes 74:7
76:8, 13, 16
77:11
Pizza
82:23
83:14, 18
place
25:21 26:1
37:7 47:12
58:8 64:4
placed 15:1
places
78:11
Plaintiff
1:8 5:3
7:7, 9
plaintiffs
7:5
PLAINTIFF'
S 4:8 8:15,
19 41:2, 14,
17 45:10,
11 74:16,
17 89:23
please 7:3,
13 45:23
plenty
52:12
point
11:23 17:6
21:6 24:7
25:17
33:22
51:13
65:11
77:19 78:2,
6 80:12
policies
39:17, 22
59:17 97:7

policy 15:2, 3 39:2
politics 93:18
pool 28:15 41:19
Poor 48:5, 6
portion 87:2
position 17:16 18:4 19:8, 14 26:4 29:4 37:16 61:5, 21 79:15, 18
positions 81:22 82:6
positive 8:12 9:23 16:23 20:3, 14 21:8, 22 26:20 27:13 31:19 35:20 37:20 39:9 41:10 44:7 46:9 49:10, 17 51:6 58:3 62:22 70:10 72:15 76:10 91:15 93:23 101:4, 22
possible 86:3
possibly 90:17

potential 92:6
Powe 89:10
Powell 23:3
Powell's 63:5
practices 15:10 39:11, 19, 22
predominan tly 49:12
premium 53:16
prepare 9:8 94:17
PRESENT 5:21
preserve 101:14
preserved 12:8
president 64:20 67:9, 17, 18
pretty 19:18 43:6 49:14 85:4 96:5
prevalent 20:7
prevent 96:15
previously 8:19 40:15
price 100:7
Primarily 20:4
print 41:9
prior 3:2 27:14

Probably 22:17 25:13 26:13 28:12 36:8, 15 38:3 40:1 48:15 59:2 72:9 73:12 80:11 83:5 97:23 100:18
problem 91:16 92:1
Procedure 6:4
procedures 59:18

proceedings 6:10
processing 18:7
produce 17:5 71:15 93:14
produced 43:19 90:6, 7, 8
producer 71:14 72:1 88:1
production 25:7 27:21, 22 29:9, 10, 12, 15, 23 30:2 31:15, 16 97:5
products 39:16

professional

17:7 18:16 20:18, 22 22:14 51:11 64:5 65:8 72:17, 23 86:15, 19, 22 88:4
program 23:10, 12, 17 51:1
progress 35:18
promote 55:4, 5
promoted 93:11 94:4
promoting 48:12 49:4
promotion 94:8
property 14:11 57:11 63:16 64:10, 11, 17, 20
proud 22:18
provide 9:1
provided 6:3 13:17, 19 42:18
Public 2:6 6:2 43:16
purchase 15:3
purpose 35:11 72:16
put 23:16 25:8, 12, 21

26:1 42:22 81:17 99:2

< Q >
Q 8:3, 13, 18, 23 9:14, 22 10:1, 4, 6, 10, 14, 16, 19, 23 11:3, 9, 12, 14, 21, 23 12:6, 14, 18, 21 13:2, 4, 6, 12, 16, 20, 22 14:7, 18, 21 15:6, 9, 13, 17, 21 16:1, 6, 12, 15, 17, 20 17:1, 3, 10, 15, 19, 22 18:3, 5, 9, 12, 17 19:1, 4, 7, 12, 23 20:5, 7, 12, 15, 18, 21 21:2, 6, 9, 18, 20, 23 22:4, 7, 9, 12, 19 23:1, 7, 9, 13, 15 24:5, 10, 17 25:1, 11, 17, 23 26:3, 6, 11, 15, 18, 21 27:3, 6, 9, 12, 14, 19, 23 28:3, 5, 10, 14, 18 29:1, 4, 7, 10, 16 30:3, 6, 9, 11, 16, 19 31:3, 8,

Video Deposition of Susan Phillips

1/23/2024
48

11, 14, 16, 18, 21  32:1, 7, 9, 11, 17, 20, 22  33:5, 9, 17, 20  34:3, 6, 9, 12, 14, 17, 20, 23  35:4, 10, 18, 21  36:1, 6, 12, 17  37:3, 5, 11, 14, 16, 19, 21, 23  38:4, 10, 15, 18  39:2, 4, 8, 10, 12, 15, 20  40:3, 10, 14, 23  41:5, 8, 11, 17, 22  42:3, 7, 10, 15, 21  43:3, 11, 14, 17, 20, 23  44:3, 8, 11, 15, 17, 20  45:1, 4, 7, 9, 18, 22  46:2, 10, 16, 21  47:4, 9, 11, 16, 19  48:1, 11, 17, 19, 21  49:1, 7, 11, 15, 18, 22  50:3, 6, 8, 12, 14, 19  51:3, 5, 7, 9, 12, 15, 18, 22  52:3, 7, 14, 17, 22  53:7, 13, 19  54:5, 8, 12, 19, 23  55:10, 21

56:3, 8, 11, 15, 17, 19, 21  57:1, 4, 7, 15, 17, 23  58:5, 9, 14, 17, 19, 23  59:6, 9, 20  60:5, 13, 18, 22  61:3, 5, 9, 12, 16, 19, 21  62:1, 4, 7, 10, 13, 15, 20, 23  63:3, 5, 8, 10, 14, 19, 23  64:9, 15, 18, 21  65:2, 7, 11, 14, 16, 23  66:5, 8, 13, 18, 21  67:2, 9, 11, 14, 19, 23  68:3, 6, 13, 21  69:2, 5, 8, 14, 17, 22  70:2, 9, 11, 15, 18, 22  71:1, 3, 5, 7, 9, 18, 21  72:2, 6, 10, 13, 16, 19  73:3, 7, 10, 13, 17, 20  74:3, 6, 9, 11, 13, 20  75:8, 12, 15, 17  76:1, 5, 11, 16, 21  77:1, 3, 7, 10, 16, 21  78:1, 4, 8, 13, 18, 23  79:7, 10, 12,

17, 23  80:5, 10, 14, 18, 23  81:6, 11, 15  82:1, 3, 11, 14, 19, 22  83:4, 7, 14, 17  84:1, 12, 16, 18  85:1, 7, 17  86:2, 7, 11, 14, 18, 21  87:5, 8, 12, 16, 19  88:2, 7, 13, 15, 20, 23  89:2, 4, 6, 8, 22  90:5, 11, 17, 20, 22  91:2, 5, 13, 16, 19, 22  92:6, 12, 21  93:2, 6, 10, 20  94:1, 7, 15, 20, 23  95:3, 6, 9, 13, 18, 22  96:5, 7, 14, 22  97:2, 9, 16  98:2, 6, 9, 12, 17  99:1, 9, 13, 22  100:3, 6, 12, 21  101:1, 3, 5, 7, 10, 13, 19, 23  102:3, 7, 11, 14, 18  103:1, 13, 19, 21  104:2, 8
**questions**
2:21, 22  105:8

**quick**
83:20, 22  84:13
**quit**  25:21  84:23  85:1
**quote**
46:11
**quotes**
18:7  97:6, 8, 22

**< R >**
**R**  5:1  105:1
**race**  40:6  92:6
**Rachel**
5:17  7:10  40:16  95:3, 4, 6  103:6, 7
**radio** 13:2
**rafting**
77:14
**ran**  95:21
**ranks**
49:16  86:4
**reach**
60:22
**read**  7:22  39:17  84:5  104:12
**reading**
2:12
**ready**  35:6  76:7  99:7  102:8
**real**  14:11  83:22
**realized**
97:18

**really**  36:4  47:8  49:21  54:22  56:23  57:1, 10  92:17  93:15
**reason**
12:10  81:7  83:8, 12
**reasonable**
16:19
**recall**
12:21  14:7  28:18  29:4  30:11  31:3  44:20  59:7, 9  61:5  64:9  67:19  69:14  71:21  74:6  77:10  79:23  80:5, 10, 23  81:6, 15  101:23
**received**
14:13  31:4
**recess**  84:8
**recognize**
71:10  100:15
**recollection**
68:6
**record**
6:14  7:4  12:3, 7  24:3  46:5  84:5, 7, 11  104:13
**Reeves**
55:21, 22  73:9  74:23

Cite, LLC

Video Deposition of Susan Phillips

1/23/2024

49

75:*3*
100:*15*
**refer** 59:*17*
**reference**
24:*5*
**referred**
35:*3*
**regard**
59:*22*
**regarding**
8:*8* 69:*17*
**regardless**
81:*17*
**Reich** 23:*4*
**related** 8:*9*
10:*12*
12:*16*
101:*14*
**relating**
2:*16*
**relation**
103:*14*
105:*14*
**relationship**
52:*11*
**relationship**
**s** 52:*4, 10*
**relative**
43:*8, 9*
**reliable**
29:*22*
**remember**
13:*23* 19:*7*
21:*3* 25:*14*
26:*15* 36:*1*
44:*10*
45:*20*
46:*15*
50:*23* 51:*2,*
*3, 9* 59:*13*
61:*12* 62:*7*
63:*9, 10, 12*

65:*2* 68:*2,*
*12, 14, 15,*
*20* 69:*11,*
*12* 72:*13*
75:*21* 76:*1,*
*19* 77:*20,*
*22, 23* 78:*1,*
*18, 22* 79:*1,*
*12* 80:*19,*
*21* 81:*11*
82:*12, 22*
83:*3, 5*
85:*15, 21*
96:*12* 98:*9,*
*12* 102:*22*
**remote**
22:*17*
57:*13*
66:*23*
**re-notice**
8:*20*
**report**
59:*23*
67:*11*
**reported**
67:*14*
**reporter**
6:*16* 7:*13,*
*20* 11:*17*
19:*21*
89:*13, 16*
98:*22*
**Reporting**
6:*18*
**represent**
8:*5*
**represented**
47:*20*
**represents**
105:*10*

**requesting**
77:*18* 78:*2,*
*5*
**require**
20:*5* 97:*2*
**respective**
2:*3*
**response**
8:*12* 9:*23*
16:*23* 20:*3,*
*14* 21:*8, 22*
26:*20*
27:*13*
31:*19*
35:*20*
37:*20* 39:*9*
41:*4, 10*
44:*7* 46:*9*
49:*10, 17*
51:*6* 58:*3*
61:*15*
62:*22*
70:*10*
72:*15*
76:*10*
89:*17*
91:*15*
93:*23* 95:*8*
101:*4, 22*
**responsibilit**
**ies** 90:*15*
**rest** 81:*1*
**restate**
39:*14*
**restaurant**
17:*14*
**result**
105:*16*
**results**
31:*1*
**retire**
10:*14*

90:*23* 91:*2*
96:*3*
**retired**
10:*13, 16,*
*19* 11:*4*
15:*13* 16:*7*
65:*16*
100:*9, 10,*
*22* 101:*20*
**retirement**
27:*1* 35:*7*
71:*7* 102:*1*
**reveal** 92:*6*
**revenue**
28:*15*
43:*19* 44:*4*
72:*11* 88:*1*
103:*22*
**revenue-**
**producing**
87:*20* 88:*3*
90:*2*
**revenues**
28:*3, 4*
43:*14*
**Rhonda**
28:*13*
29:*20* 30:*3,*
*6, 13* 44:*13*
55:*14, 15*
89:*8*
**ride** 77:*15*
**right** 8:*3*
18:*21*
19:*12* 20:*2*
22:*15*
29:*10* 36:*3*
39:*5, 8*
42:*23* 49:*1*
52:*15* 54:*5,*
*6* 55:*10*
57:*15* 65:*9*

73:*3* 74:*15*
75:*10, 13*
79:*20* 82:*3,*
*4* 83:*19*
84:*6, 12, 17*
86:*16*
87:*17, 20*
91:*5, 11*
94:*18* 95:*2*
98:*3*
101:*19*
103:*3, 19*
104:*10*
**right-hand**
46:*4*
**ring** 63:*6*
85:*13*
**Rockies**
75:*15, 16*
**role** 83:*10*
96:*16*
**Ron** 100:*16*
**room** 53:*9*
96:*4*
**rooms**
77:*5, 6, 7*
**rose** 49:*15*
**Ross** 90:*13*
**rough** 61:*9*
**roughly**
12:*22* 19:*9*
**RPR** 2:*6*
6:*1* 105:*20*
**RSUI** 14:*20*
**rude** 12:*2*
**rules** 2:*16*
6:*4* 11:*15*
**run** 95:*23*
**Russell**
89:*9*
**Rusty**
21:*23* 22:*4,*

Video Deposition of Susan Phillips

1/23/2024
50

12, 13   23:4
24:11
25:15
42:14
50:22   62:2
64:14   65:7,
17, 21   66:6,
9, 14   67:11
72:6, 7
78:15, 19
79:16
99:16
**Rusty's**
51:17
61:20, 21
66:1

**< S >**
**S**   2:1   5:1
**s/Tanya**
105:19
**safe**   49:11,
14
**SAITH**
104:19
**sales**   52:18
**Sarah**
62:23   63:1
**sat**   45:4,
12   55:8
**Sauter**
100:19
**saved**
42:10
**saw**   75:17
**saying**
68:13, 17
77:21   78:8,
23   79:3
80:5, 18, 23
95:19

**says**   17:6
46:11   48:5
74:23   75:9
76:14, 15
84:19   85:8
**second**
9:4, 15
30:23   32:8
33:6, 22
41:1   42:16,
18, 21
89:12
**secretarial**
18:6
**section**
48:3, 4
**see**   9:15
10:7, 11
41:3, 5
43:18
80:11, 13,
14   81:1
90:1   91:16
96:7, 14
**seeking**
13:23
**seen**   8:21
41:13
74:13
93:10
**Segrest**
89:4
**sell**   39:19
**selling**
39:16
**sends**
75:20
**senior**
18:19   26:7
37:17
**sense**   28:5
48:23

57:17
74:14
**separately**
44:4
**server**
42:11
**service**
71:3
**SERVICES**
1:10   6:22
**set**   28:1
29:18   34:1
35:6   39:2
45:15
102:22
**setting**
34:18
**seven**
22:14, 20
**shake**   12:4
50:9
**share**   28:7
**shared**
77:7, 8, 9
**Sherer**
86:23
**shoot**   76:8
**short**
86:23   87:1
**shorts**
74:10
**show**   8:18
40:14, 18
45:9   74:15
89:22   95:7
100:17, 19
**showed**
94:23
**showing**
29:21
**shown**

94:16
**shut**   99:7
**side**   14:14
**sign**   7:23
80:2   82:14
**signature**
2:12
**sign-out**
103:4, 5
**similar**
14:21
**sisters**
102:21
**sit**   67:8
92:16, 17
**sitting**
57:13
**situation**
58:15
97:17
**situations**
53:21
**six**   38:3
100:19
**sixty**   30:15
**skiing**   74:9
**Skills**   48:5,
15
**Slice**   82:23
83:14
84:15, 20
**slid**   33:21
**slide**   46:10
**Sloneker**
16:10
77:18   78:1
89:2
**slot**   44:10
**small**
40:17   41:9
55:7

**smaller**
31:8, 10, 11
**Smith**   61:3,
6, 13
**smoke**
84:22
**smoked**
84:21
**Snowing**
74:7   77:12,
13
**social**   16:4,
5, 6
**sold**   39:5
**somebody**
28:21
58:15   60:1,
5   96:20
**someone's**
58:9
**soon**   76:7
**sorry**   24:1
37:5, 22
44:12
64:10
68:23
86:18   95:5
**sort**   45:18
**sound**
22:15   81:2
99:18
**sounds**
68:18   75:6
**South**   5:6
**Southeast**
20:4
**SOUTHERN**
1:3   7:1
**space**   79:4
**span**   38:4
**speak**
60:19   81:8

speaking 24:*10*
specific 34:*3* 37:*6* 58:*19* 59:*14* 61:*12* 69:*9*
specifically 37:*7* 60:*23* 68:*1* 77:*11* 84:*19* 95:*16*
specifics 69:*11*
spend 43:*2* 69:*5*
spin 38:*9, 11*
spinning 38:*19*
splitting 98:*13*
spot 32:*8* 33:*3, 6, 15, 19, 22* 44:*5, 6* 57:*19* 58:*15* 65:*18*
Springs 73:*6, 11*
staff 28:*6, 7, 8, 9, 10, 15, 19* 54:*21*
staffing 58:*14*
stage 47:*21*
stand 55:*11* 72:*2*
stands 21:*14* 59:*5*

start 7:*4* 87:*2*
started 17:*15, 16* 19:*10, 18, 20* 20:*12* 21:*13* 22:*2, 5* 25:*10* 35:*16* 94:*16* 98:*20*
starting 19:*16*
STATE 105:*3*
statement 48:*8* 49:*11* 52:*18* 68:*7* 69:*9*
statements 66:*5, 8, 14*
STATES 1:*1*
status 82:*8*
stay 76:*16* 77:*1*
stayed 33:*15* 35:*14* 51:*2*
Stefani 60:*10, 14, 19, 22*
stenotype 105:*8*
stepped 84:*20* 85:*9*
stereotypes 48:*7, 11* 49:*3, 18* 53:*20* 54:*9*

STIPULATED 2:*2, 11, 18* 3:*3*
stipulation 6:*5*
stipulations 7:*21*
stood 95:*14, 16*
stop 11:*6*
straight 76:*8*
strange 93:*20*
Street 5:*6, 18*
stressful 98:*11*
string 74:*20*
stuff 92:*10*
subject 65:*3*
successful 37:*18* 70:*11*
sued 13:*11, 17, 18, 20*
suggested 16:*13*
suggestion 16:*15, 20, 21*
suing 14:*16*
Suite 2:*8* 5:*6, 11, 18* 6:*7*
summer 74:*8*
Sunday 76:*18*

super 62:*21*
supervisor 64:*22*
support 38:*13*
sure 10:*17* 11:*15* 12:*2, 7* 47:*20* 64:*14* 102:*2*
surplus 18:*8*
surprised 102:*21*
SUSAN 1:*16* 2:*4* 6:*8, 20* 7:*16* 8:*11, 20* 19:*6* 23:*3* 32:*5, 6* 40:*23* 41:*6* 44:*9, 11, 13, 14* 57:*3* 74:*23* 84:*12* 90:*9* 103:*3*
Sutton 56:*15*
sworn 7:*17*
system 31:*17, 18* 32:*2, 23* 43:*22* 44:*5*

< T >
T 2:*1* 105:*1*
table 89:*15, 19*
take 24:*17* 25:*22* 27:*5*

33:*5* 43:*3* 53:*17* 58:*7* 62:*18* 65:*22* 73:*14* 83:*20* 84:*3* 86:*8* 98:*1* 101:*7*
taken 2:*5* 36:*14* 84:*9* 105:*7*
talk 43:*11, 14* 55:*5, 15* 56:*21* 62:*19* 65:*7* 66:*19* 67:*8* 69:*23* 78:*15* 79:*16* 84:*19* 92:*10, 18* 93:*17* 98:*5*
Talked 10:*3* 55:*9* 63:*14* 65:*20* 83:*9* 93:*21*
talking 18:*1* 26:*18* 28:*11* 46:*3, 6* 48:*3, 21* 49:*1* 53:*19* 57:*14* 69:*15, 17* 70:*20* 76:*2* 78:*18* 80:*1* 81:*4, 6, 12* 82:*12* 93:*6*
Talsma 56:*11*

Video Deposition of Susan Phillips

1/23/2024

52

Tanya  2:5
6:1, 17
105:20
Tavern
100:7
Taylor
5:22  6:16
35:21
104:2
Taylor's
37:16
team  16:8
17:2  23:2
24:6, 13, 16
25:22  26:4,
11, 12, 16
27:5, 10, 17
28:7  32:11
33:14, 18,
21  35:13,
15  36:11,
15  37:19
38:2, 21
41:16, 23
44:4  51:2,
17  55:15
56:20, 21
57:19, 20
58:6, 7, 9,
18  59:4, 20
60:2, 6
61:6, 8, 10,
20, 22  63:6,
17  64:1
78:11, 12,
14  79:20
82:10, 18
85:12, 18,
22  86:1
87:16, 18,
19, 23

90:16  99:3,
5  104:1, 2
teamed
24:19  25:1
teams
22:14, 20,
21  38:8
43:11
87:22
88:12  90:3
95:11, 20,
23  99:2
tech  62:20
Technical
17:18  18:1,
14
Tell  12:14
19:12
22:19
24:17
25:10
55:10
58:23
73:10
79:10  85:5
87:12
93:16
94:20
98:17
telling
80:10
tells  43:1
ten  17:12
71:20
91:10, 23
term  30:9
test  75:21,
22
testified
7:18

TESTIMONY

1:15  11:18
12:12
18:18
22:12, 13
84:14  94:7
99:16
103:15
105:11
tests  76:2
Text  4:10
9:14, 15, 19
10:1, 7
74:20  75:3
76:6  94:17,
20, 21  95:7,
9  96:7
102:12
texts  9:13
10:2
102:11, 20
Thank
7:12, 23
10:18
43:20
48:19
104:10
thereto  3:2
105:8
thing
15:20
17:22
40:17  77:2
85:7  97:19,
21  102:21
103:9
things  9:6
97:11, 23
98:1
102:10
think
10:23  16:2
23:8, 11

25:13
28:22
40:13
48:10, 11
52:5, 17
53:11  54:4,
8  60:9
61:7  67:16,
18  70:11,
17  74:13
77:6, 14
82:7, 21
83:16  85:7
87:3, 5
88:7  92:12,
21  93:2, 20
94:13
97:14
third  33:3,
15, 19
thirty  49:9
86:12
Thirty-two
17:9  86:14
thought
14:17  35:9
37:1  46:20
92:20
95:20, 23
96:1
thousand
30:15  99:3,
6
three
26:13
50:21
54:17
throw
15:18  35:7
throwing
35:10

Thursday
76:20
time  2:23
3:1  6:15
13:1, 5
28:19
30:20  42:6
52:12  55:9,
13  61:9
63:7  69:6
74:4  77:13
81:17  82:6,
15  83:15
86:14  87:1
97:1  98:19
100:17, 20
102:1
times
11:12  24:6
31:12  69:7
tiny  42:17
title  94:8
titles  18:22
19:3  88:11
today  8:7
9:2, 12
10:4  11:17
12:7, 12
told  14:12
60:5  79:9
81:16
Tom  36:8
top  9:5
48:3  74:22
97:14
topic  13:6
total  30:18,
19  43:19
touch
11:15
tower

Video Deposition of Susan Phillips

1/23/2024

53

70:*20*
**town**  101:*2*
**tracked**
  31:*16*  44:*4*
**tract**  14:*14*
**train**  77:*15*
**training**
  44:*21*  45:*1*,
  *18*  58:*20*
  59:*1, 6, 10,*
  *16*
**transcribed**
  105:*9*
**transcript**
  105:*7, 11*
**transcriptio
n**  105:*10*
**transfer**
  101:*10*
  102:*4*
**travel**  20:*5*
  54:*13, 16,*
  *21*
**traveling**
  101:*3*
**treated**
  68:*9*  71:*17*
**treatment**
  69:*19*
**Trey**  23:*3*
  90:*9*
**trial**  3:*1*
**trip**  72:*13,*
  *16*  73:*10,*
  *15*  77:*11,*
  *14, 17*  78:*5*
  79:*23*
  102:*23*
**true**  18:*6*
  86:*20*
  105:*11*

**TRUIST**
  1:*10, 11*
  7:*11*  42:*19*
  60:*3, 17*
  62:*16*  71:*2*
**Truitt**
  35:*21*
  37:*16, 23*
  90:*9*  97:*8*
  104:*2*
**truthful**
  12:*11*
**try**  48:*5*
**trying**  12:*2*
  29:*14*  35:*7*
  93:*16*
**turkey**  85:*2*
**turn**  101:*19*
**turnover**
  21:*19*
**tutelage**
  38:*1*
**twelve**
  71:*20*
  90:*18*
  100:*18*
**twenty**
  87:*8*  88:*8*
**twenty-five**
  17:*7*  30:*19*
**Twice**
  11:*13, 14*
  82:*21*
  84:*15*
**two**  12:*18*
  29:*8*  31:*9*
  34:*4*  35:*12*
  41:*11*  44:*6*
  48:*1*  50:*21*
  54:*17*  67:*6*
  69:*1*  76:*23*
  77:*6*  84:*20*

85:*8*  86:*13*
91:*23*  92:*4*
**twofold**
  35:*11*
**Tyler**
  88:*21, 22*
  90:*6*
**type**  13:*12,*
  *22*  18:*6*
  45:*1*  58:*15*
  66:*18*  76:*2*
**types**
  19:*14*  39:*4,*
  *12, 20*  40:*7*
  49:*18*
**typo**  9:*9*

**< U >**
**U**  2:*1*
**U.S**  6:*23*
**Uh-huh**
  8:*12*  9:*23*
  16:*23*  20:*3,*
  *14*  21:*8, 22*
  26:*20*
  27:*13*
  31:*19*
  35:*20*
  37:*20*  39:*9*
  41:*10*  44:*7*
  46:*9*  49:*10,*
  *17*  51:*6*
  58:*3*  62:*22*
  70:*10*
  72:*15*
  76:*10*
  89:*16*
  91:*15*
  93:*23*
  101:*4, 22*
**ultimately**
  17:*8*

**underlying**
  14:*1, 2*
**understand**
  40:*3*  46:*16,*
  *21*  50:*12*
  59:*21*  63:*3,*
  *8*  68:*21, 22*
  74:*3*  97:*9*
**understandi
ng**  46:*17*
**Understood**
  48:*17*
  62:*20*
  64:*21*
**underwritin
g**  23:*5, 6*
  61:*7*
**unhappy**
  63:*17, 20*
**UNITED**  1:*1*
**unusual**
  68:*3*
**upper**
  38:*20, 22*
**upstream**
  32:*17*
**use**  23:*10*
  41:*11*
**usual**  7:*20*
  29:*11*
**usually**
  30:*22*  72:*4*
  73:*1*
  100:*19*

**< V >**
**V**  6:*21*
**value**  14:*11*
**Vandalyn**
  28:*20*
  44:*16*  89:*9*

**versus**
  53:*23*
**VIDEO**
  1:*15*  2:*4*
  6:*19*
**Videograph
er**  5:*23*
  6:*13*  7:*12*
  12:*6*  84:*6,*
  *10*  104:*14*
**vs**  1:*9*

**< W >**
**waived**
  2:*13*  3:*5*
**walk**  84:*4*
**want**  36:*10,*
  *11, 19*
  38:*21*  53:*5,*
  *8*  58:*10*
  62:*18*
  84:*14, 18*
  103:*8*
**wanted**  9:*6*
  14:*3, 9*
  36:*16*  55:*5,*
  *16*  56:*9*
  57:*5, 22*
  64:*1, 3, 4*
  65:*5*  73:*14*
  74:*2*  78:*13*
  99:*2*
**wanting**
  53:*1*  54:*13,*
  *21*  58:*7*
**way**  16:*1*
  32:*3, 22*
  48:*7, 12*
  49:*4*  53:*22*
  83:*14*
**ways**  39:*1*

**website** 59:*18*

**Wednesday** 100:*3, 6, 7*

**Wednesdays** 100:*10, 13, 22*

**week** 22:*13* 24:*11* 54:*16, 17* 96:*23*

**weekly** 66:*22*

**weeks** 69:*1*

**well** 12:*9* 25:*9* 28:*12* 32:*14* 43:*16* 45:*22* 52:*6* 59:*23* 63:*21* 72:*4, 22* 76:*14* 87:*14, 16* 97:*1* 101:*1*

**went** 16:*8, 9, 10* 51:*17* 53:*3* 66:*23* 71:*15* 73:*5* 79:*6* 82:*21* 87:*14* 92:*16*

**We're** 6:*17* 7:*22* 46:*6* 53:*19* 75:*6* 81:*4* 99:*6* 104:*12*

**We've** 17:*19* 18:*17* 45:*9* 60:*13*

**website** 63:*14* 90:*17* 94:*7*

**wholesale** 39:*19* 49:*8*

**wholly** 33:*12*

**Wilkinson** 2:*7* 5:*9, 10* 6:*6, 21* 7:*8* 89:*11, 14, 18*

**wine** 15:*23* 99:*17* 100:*3, 6, 8, 13, 21*

**wings** 83:*18*

**witness** 2:*13* 6:*8* 7:*14* 11:*20* 12:*20* 13:*10* 19:*22* 23:*21* 24:*1, 4* 32:*18* 34:*22* 71:*4* 95:*5* 98:*23* 103:*4, 7* 105:*12*

**women** 54:*13* 69:*19* 81:*7* 86:*15* 93:*11* 98:*13, 18*

**won** 98:*19*

**wondering** 49:*2*

**Wood** 100:*17*

**Woodward** 90:*12*

**word** 18:*21* 39:*5*

**wore** 63:*12*

**work** 26:*11* 29:*21* 32:*1* 34:*23* 35:*16, 17* 36:*18* 52:*9* 53:*5* 96:*22, 23*

**worked** 22:*17* 25:*8, 20* 32:*10* 57:*2* 61:*6* 62:*1* 63:*21* 65:*11* 81:*18* 92:*17, 19* 96:*20*

**working** 20:*12, 13* 24:*16* 32:*23* 33:*16* 35:*9* 57:*13* 92:*20, 22*

**workload** 96:*1, 13, 15*

**works** 27:*4*

**world** 93:*14*

**worry** 52:*13*

**Wow** 17:*10*

**wrap** 83:*22*

**wrapped** 74:*14*

**write** 42:*1*

**writing** 19:*19*

**wrong** 24:*3*

**< X >**

**X** 4:*1*

**< Y >**

**y'all** 77:*1*

**Yeah** 11:*3* 12:*5* 16:*16* 18:*11, 12* 25:*1* 29:*2* 34:*5* 35:*2, 14* 36:*14* 39:*15* 40:*22* 44:*2, 9* 45:*19* 47:*18* 48:*18, 21* 54:*7* 55:*4* 56:*8* 57:*16* 58:*16* 61:*4, 18* 65:*1* 67:*5* 69:*1, 7* 70:*22* 71:*5, 6, 8* 72:*2, 4* 73:*19* 77:*15* 78:*22* 79:*3, 7* 80:*21* 83:*5* 87:*18* 96:*6* 97:*23* 98:*11, 16* 99:*11* 102:*9, 21*

**year** 15:*4* 18:*15* 19:*7* 26:*15* 30:*23* 59:*15* 67:*6* 85:*2*

**years** 17:*8, 9, 12* 19:*17*

24:*14* 25:*10* 26:*14* 36:*1* 38:*3* 49:*9* 56:*6* 57:*12* 58:*22* 82:*7* 86:*14* 87:*1*

**Yellow** 20:*9, 10*

**yesterday** 63:*13*

**young** 50:*21* 96:*4*

**Yvette** 56:*11*

**< Z >**

**Zoom** 20:*8* 40:*18* 41:*12*