FILED

2024 May-30  PM 12:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 21

# Video Deposition of John Cadden

## January 31, 2024

## Hendrix v. CRC Insurance Services, Inc., et al.

## 2:21-CV-0300-MHH



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1    IN THE UNITED STATES DISTRICT COURT

        NORTHERN DISTRICT OF ALABAMA

3      SOUTHERN DIVISION

4

5  CASE NUMBER: 2:21-CV-0300-MHH

6

7  KATHRYN HENDRIX,

8       Plaintiff,

9       vs.

10  CRC INSURANCE SERVICES, INC., TRUIST FINANCIAL

11  CORP., and TRUIST BANK,

12      Defendants.

13

14

15     VIDEO DEPOSITION TESTIMONY OF:

16        JOHN CADDEN

17

18

19      JANUARY 31, 2024

20        1:39 P.M.

21

22

23

Page 2

1        S T I P U L A T I O N

2      IT IS STIPULATED AND AGREED by and

3  between the parties through their respective

4  counsel that the video deposition of JOHN CADDEN

5  may be taken before Tanya D. Cornelius, RPR,

6  CSR, and Notary Public, at the offices of

7  Wilkinson Law Firm, P.C., 1717 3rd Avenue North,

8  Suite A, Birmingham, Alabama, on the 31st day of

9  January, 2024, commencing at approximately 1:39

10  p.m.

11      IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and the reading of the

13  deposition by the witness is NOT waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws

16  and rules of Court relating to the taking of

17  depositions.

18      IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any

20  objections to be made by counsel to any

21  questions, except as to form or leading

22  questions, and that counsel for the parties may

23  make objections and assign grounds at the time

Page 3

1  of the trial, or at the time said deposition is

2  offered in evidence, or prior thereto.

3      IT IS FURTHER STIPULATED AND AGREED

4  that notice of filing of the deposition by the

5  Commissioner is waived.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 4

1        I N D E X

2  EXAMINATION BY:        PAGE NUMBER

3    MS. WILKINSON          8

4

5    * * * * * * * * * * * * * *

6

7      EXHIBIT INDEX

8  PLAINTIFF'S EXHIBIT NO:    PAGE NUMBER

9  58   Rule 26 Disclosures    25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 5

1          A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4       PALMER LAW, LLC

5       BY:  Leslie A. Palmer, Esq.

6       104 23rd Street South, Suite 100

7       Birmingham, Alabama  35233

8

9       WILKINSON LAW FIRM, P.C.

10      BY:  Cynthia Forman Wilkinson, Esq.

11      1717 3rd Avenue North, Suite A

12      Birmingham, Alabama 35203

13

14

15  FOR THE DEFENDANTS:

16      BAKER, DONELSON, BEARMAN, CALDWELL

17          & BERKOWITZ, P.C.

18      BY:  Rachel Barlotta, Esq.

19      420 North 20th Street, Suite 1400

20      Birmingham, Alabama  35203

21

22  ALSO PRESENT:  William Byrd, Videographer

23          Kat Hendrix

Page 6

1          I, Tanya D. Cornelius, RPR, CSR, and

2   Notary Public, acting as Commissioner, certify

3   that on this date, as provided by the Federal

4   Rules of Civil Procedure, and the foregoing

5   stipulation of counsel, there came before me at

6   the offices of Wilkinson Law Firm, P.C., 1717

7   3rd Avenue North, Suite A, Birmingham, Alabama,

8   beginning at 1:39 p.m., JOHN CADDEN, witness in

9   the above cause, for oral examination, whereupon

10  the following proceedings were had:

11

12

13          VIDEOGRAPHER:  We are on the record.

14  It is January 31st, 2024 at 1:39 p.m. Central

15  Standard Time.  My name is William Byrd, and the

16  court reporter is Tanya Cornelius.  We're here on

17  behalf of Cite Court Reporting of Montgomery,

18  Alabama.

19          This is the video deposition of John

20  Cadden, which was noticed by Cynthia Wilkinson,

21  for case Hendrix V. CRC Insurance Services, Inc.,

22  et al., in the United States District Court for

23  the Northern District of Alabama, Southern

Page 7

1   Division, Case Number 2:21-CV-0300-MHH.

2          Counsel, please identify yourselves

3   for the record, starting with the plaintiff.

4          MS. WILKINSON:  Cynthia Wilkinson for

5   the plaintiff, Kathryn Hendrix.

6          MS. PALMER:  Leslie Palmer for the

7   plaintiff, Kathryn Hendrix.

8          MS. BARLOTTA:  Rachel Barlotta for

9   CRC Insurance and Truist.

10         VIDEOGRAPHER:  Will the court

11  reporter please administer the oath to the

12  witness.

13

14          JOHN CADDEN,

15      being first duly sworn, was

16      examined and testified as follows:

17

18         THE REPORTER:  Will this be usual

19  stipulations?

20         MS. BARLOTTA:  We're going to read

21  and sign.  Thank you.

22         MS. WILKINSON:  Otherwise, yes.

23

Page 8

1              EXAMINATION

2   BY MS. WILKINSON:

3       Q.   Mr. Cadden, will you state your full

4   name for the record?

5       A.   John Charles Cadden.

6       Q.   Mr. Cadden, I'm Cynthia Wilkinson.  I

7   introduced myself earlier, and I'm one of the

8   lawyers that represents Kathryn Hendrix in her

9   lawsuit that she's filed against CRC and Truist,

10  and we're here today to take your deposition.

11          Have you ever been deposed before?

12      A.   I have.

13      Q.   How many times?

14      A.   This will be my third.

15      Q.   Okay.  And did any of the prior

16  depositions have anything to do with CRC or

17  Truist?

18      A.   Yes.

19      Q.   What were they about?  What were the

20  lawsuits about?

21      A.   One was an errors and omissions

22  claim, and the other one was -- it was also an

23  errors and omissions claim.

Page 9

1    Q.   You said there were three.
2    A.   Well, this will be the third.
3    Q.   Did any of those have to do with any
4    employees making any complaints?
5    A.   No.
6    Q.   What did you do to prepare for your
7    deposition today?
8    A.   I met with my lawyer.
9    Q.   And I don't want to know today about
10   anything that you've discussed with counsel for
11   CRC or Truist.  That's confidential.  I don't
12   want to know.  When did you meet with your
13   lawyer, though?
14   A.   Yesterday -- no, two days ago.
15   Q.   And how long did you meet?
16   A.   From about 10:00 to about 1:15.
17   Q.   Did you review any documents?
18   A.   Oh, yeah.
19   Q.   Do you recall what documents you
20   reviewed?
21   A.   Some text messages, some payroll
22   information.  I think that was about it.
23   Q.   And the text messages that you

Page 10

1    reviewed, who -- what were the individuals that
2    were involved in either sending or receiving
3    those text messages?
4    A.   It was one -- well, the only text
5    message was from me to Kathryn Hendrix.
6    Q.   And what was that about?
7    A.   I reached out to see how she was
8    doing, asked her to call me.  I called her -- I
9    called before I texted her actually, and she
10   chose not to respond back to either one of those.
11   Q.   When you called her, did you call her
12   on a personal phone or a phone that was owned by
13   either CRC or Truist?
14   A.   I called her on my CRC phone.
15   Q.   And did she at some point have a
16   phone that was issued by either CRC or Truist, a
17   company phone?
18   A.   I don't know.
19   Q.   Do you recall when you called Kat
20   Hendrix?
21   A.   It's in my phone.  I could find that
22   for you if you would like.
23   Q.   Did you leave a message?

Page 11

1    A.   I did actually.
2    Q.   Do you recall what you said in your
3    message?
4    A.   Basically what I said in my text
5    message.
6    Q.   Why did you reach out to Kathryn
7    Hendrix?
8    A.   Ron Helveston called me in his office
9    and said that he had had breakfast with her.  I
10   believe it was a breakfast meeting, I believe,
11   and that she was unhappy and for me to -- he
12   would appreciate it if I could reach out to her
13   and see if I could see what the problem was and
14   see if I could fix it, which I did.
15   Q.   And did Mr. Helveston say anything
16   else about Kathryn's complaints, why she was
17   unhappy?
18   A.   I don't recall.
19   Q.   I'm sorry?
20   A.   I don't recall.  That was four years
21   ago.
22   Q.   Did the conversation you had with Mr.
23   Helveston take place over the phone or in person?

Page 12

1    A.   No, it was in his office.
2    Q.   Was anybody else present?
3    A.   No.
4    Q.   Do you know how long that
5    conversation took?
6    A.   I don't know, a few minutes.  I would
7    say ten minutes.  I'm sure we talked about other
8    things as well.
9    Q.   So the testimony has been that
10   Kathryn and Mr. Helveston had -- they met for --
11   at a restaurant, and Kathryn complained to Mr.
12   Helveston, and this was sometime in June of 2019.
13   Do you recall when you had this conversation with
14   Ron Helveston?
15        MS. BARLOTTA:  Object to form.
16   A.   It was -- it's going to be on the
17   text message.  It was the same day of the text
18   message that I sent.
19   Q.   And was it the same day that Mr.
20   Helveston had spoken with Kathryn Hendrix?
21   A.   I do not know.
22   Q.   Tell me everything you recall about
23   that conversation that Mr. Helveston said.

Video Deposition of John Cadden                          1/31/2024
                                                         4 (13 - 16)

Page 13

1    A.   Like I said, he asked me to call her,
2    she was unhappy, see if I could figure out what
3    was wrong, and how to make her happy.  I did.
4    She didn't respond back.
5    Q.   And did you ask Mr. Helveston any
6    questions when he told you to contact Kathryn
7    Hendrix?
8    A.   No.
9    Q.   Did you ask him why Kat was unhappy?
10   A.   I don't recall.  I don't know.  That
11   was four years ago.  I don't know.
12   Q.   So you could have?  You just don't
13   recall?
14        MS. BARLOTTA:  Object to form.
15   A.   I don't recall, no.  I don't recall.
16   Q.   And for the record, Kat -- Kathryn
17   goes by Kat as well; is that your understanding?
18   A.   I'm not that close with her.  I don't
19   know.
20   Q.   What did you refer to her as,
21   Kathryn?
22   A.   Kathryn.
23   Q.   And do you know how long Kathryn had

Page 14

1    been employed at the time that you had this
2    conversation with Mr. Helveston?
3    A.   I don't.
4    Q.   It had been many years, though,
5    right?
6        MS. BARLOTTA:  Object to form.
7    A.   I don't know.  We can go back and
8    look, but --
9    Q.   Sure.  Let me show you a document
10   that might help.  At least I hope it will.
11       Let me show you, Mr. Cadden, what we
12   previously marked as Plaintiff's Exhibit 27.
13   Have you ever seen this document before?
14   A.   I have.
15   Q.   And when did you see this document?
16   A.   Tuesday.  Tuesday, I believe.
17   Earlier this week.
18   Q.   In preparation for your deposition?
19   A.   Yes.
20   Q.   Yes?
21   A.   Yes.
22   Q.   And, Mr. Cadden, one of the things
23   that I didn't go over, but let me go over it

Page 15

1    really quickly -- by the way, I love your
2    glasses.
3    A.   Thank you.
4    Q.   In depositions we have to be sure --
5    because while there is a video, the court
6    reporter is also taking down a transcript.  So if
7    you would, just be sure to answer verbally --
8    A.   Sure.
9    Q.   -- yes or no.  I say uh-huh (positive
10   response) and huh-uh (negative response) because
11   I grew up southern.  So if you do that, I might
12   try to correct you to say yes or no.
13   A.   Sure.
14   Q.   I'm not trying to be rude.  I just
15   want to make sure the record is clear.
16   A.   No.
17   Q.   So you had not seen this prior to
18   counsel showing it to you last week?
19   A.   Correct.  Earlier this week.
20   Q.   Earlier this week.  So do you know
21   where that document, that chart came from?
22   A.   I mean, it was generated in our
23   computer system, but that's about all I've got

Page 16

1    for you.
2    Q.   You don't know who generated it?
3    A.   I have no idea.
4    Q.   Did you see Kathryn Hendrix's EEOC
5    charge?
6    A.   I did not.
7    Q.   Did you know that she filed a charge
8    of discrimination?
9    A.   I did.
10   Q.   How did you find out about that?
11   A.   I believe Stefani Petty in our HR
12   department let me know that.
13   Q.   And when did Ms. Petty let you know
14   that Kathryn had filed a charge of
15   discrimination?
16   A.   I can't recall exactly.  I'm sure it
17   was right after that happened.
18   Q.   What did she tell you about the
19   charge?
20       MS. BARLOTTA:  No, no, no. The Court
21   has already ruled they can't get into this.
22   We're not going to talk about that.
23   Q.   What do you understand that Ms.

Page 17

1   Hendrix was complaining about when she filed her
2   charge with the EEOC?
3        MS. BARLOTTA:  Object to form.  If
4   that involves anything that was discussed in that
5   call, you shouldn't testify as to that.
6   A.   I do not -- I can't recall.
7   Q.   You just don't know?
8   A.   I don't.  It's something that our HR
9   people took off running with, and I'm not
10  involved in that day-to-day.
11  Q.   Okay.  We'll come back to that.
12       Looking at Plaintiff's Exhibit 27, do
13  you see Ms. Hendrix's name?
14  A.   I do.
15  Q.   And what is her hire date?
16  A.   It looks like 10/1/23 -- no, I'm
17  sorry -- 2006.
18  Q.   Okay.  So she had -- by the time --
19  and we're going back to this conversation with
20  Mr. Helveston.  By the time that you had had this
21  conversation with Mr. Helveston about Kathryn
22  being unhappy, she had been working there -- and
23  this happened in 2019 -- for almost, what,

Page 18

1   thirteen years?
2   A.   At the time.
3        MS. BARLOTTA:  Object to form.
4   Q.   And during that thirteen-year time
5   period, were you also employed at CRC or Truist?
6   A.   I was.
7   Q.   And did you know who Kathryn Hendrix
8   was at the time that you had this conversation
9   with Mr. Helveston?
10  A.   I did.
11  Q.   Okay.  And does CRC or Truist have a
12  policy where they like to keep good employees?
13       MS. BARLOTTA:  Object to form.
14  A.   We want to keep all good employees.
15  I don't think we have a policy about that, but --
16  Q.   And your current position is what?
17  A.   Office president.
18  Q.   And how long have you been the
19  president?
20  A.   2009, I believe.
21  Q.   And is that for the Birmingham office
22  or does it extend beyond Birmingham?
23  A.   The Birmingham office.

Page 19

1   Q.   Okay.  And prior to being president,
2   had you worked for CRC or Truist?
3   A.   Yes.
4   Q.   What was your position prior to being
5   president?
6   A.   I was a property broker.
7   Q.   How long were you a property broker?
8   A.   Well, I still am.  I've been there
9   since 1990.
10  Q.   So you have a dual role as president
11  and property broker?
12  A.   I do.
13  Q.   And was Kathryn in the property
14  department?
15  A.   She was not.
16  Q.   And tell me how long you were just a
17  property broker before you became president.  How
18  long were you a property broker?
19  A.   From 1990 until 2009, I believe.
20  Q.   Okay.  Any other job title that you
21  have held with either CRC or Truist?
22  A.   No.
23  Q.   Were you hired on in 1990?

Page 20

1   A.   I was.
2   Q.   And as the president, and even as a
3   property broker, do you like to keep good
4   employees?
5        MS. BARLOTTA:  Object to form.
6   A.   Yes.
7   Q.   And does it cost the company money to
8   train new employees?
9        MS. BARLOTTA:  Object to form.
10  A.   Yes.
11  Q.   And to your knowledge, by the time
12  that you had this conversation with Mr.
13  Helveston, was Kathryn a good employee?
14       MS. BARLOTTA:  Object to form.
15  A.   I never had any dealings with her.
16  I'm not sure.  She reported to somebody else
17  besides me.
18  Q.   Are you aware of any issues with her
19  performance at the time that you were having this
20  conversation with Mr. Helveston?
21  A.   No.
22  Q.   And if you've got an employee that's
23  been there thirteen years and you're told that

Page 21

1  they're unhappy, do you want to find out why?
2        MS. BARLOTTA: Object to form.
3     **A.  Yes.**
4     Q.   And wouldn't it have been important
5  to ask Mr. Helveston why?
6        MS. BARLOTTA: Object to form.
7     **A.  I thought it was more important to**
8  **ask Ms. Hendrix, so I called her.**
9     Q.   But would it be important to also ask
10 Mr. Helveston?
11       MS. BARLOTTA: Asked and answered.
12 Object to the form.
13    **A.  Sure.  And we may have discussed it.**
14 **That was --**
15    Q.   You just don't know?
16    **A.  That was four years ago.  I'm sure we**
17 **discussed it.**
18    Q.   Okay.  What was Mr. Helveston's title
19 at the time that y'all had this conversation?
20    **A.  He was president of the company, the**
21 **entire brokerage division of the company.**
22    Q.   Okay.  And explain that to us for the
23 record.  You were the president for Birmingham,

Page 22

1  and he was president for the entire company.
2  What's the difference?
3     **A.  I oversee one office.  He oversaw**
4  **all -- I'm not sure how many offices we had at**
5  **the time, but all the offices.**
6     Q.   Do you recall any other offices?
7        MS. BARLOTTA: Object to form.
8     **A.  We have like fifty, every major city**
9  **in the country, so --**
10    Q.   Okay.  Did you know at the time that
11 you had this conversation with Mr. Helveston
12 about Kathryn being unhappy and you tried to call
13 her, that Kathryn was on family medical leave?
14    **A.  I did not know that.**
15       MS. BARLOTTA: Object to form.
16    Q.   Did you have a conversation at that
17 time -- when Mr. Helveston came to you and said
18 Kathryn is unhappy and y'all discussed why, did
19 you have any conversations with anybody in human
20 resources?
21    **A.  I can't recall that.**
22    Q.   Did you have any conversations with
23 anybody else in the department that Kathryn

Page 23

1  worked about her being out, her being unhappy,
2  anything about Kathryn Hendrix at that time?
3        MS. BARLOTTA: Object to form.
4     **A.  If I would have did it, it would have**
5  **been Rusty Hughes.  I'm sure -- it was his**
6  **department, so I'm sure I would have reached out**
7  **to Rusty.**
8     Q.   Okay.  Do you recall what you and
9  Rusty would have talked about?
10       MS. BARLOTTA: Object to form.
11    **A.  I'm sure we would have talked about**
12 **what was going on.  I reached out to her, and she**
13 **hadn't called me back at the time.**
14    Q.   What did Rusty tell you?
15    **A.  I don't recall that.**
16    Q.   Do you recall anything that Rusty
17 told you?
18       MS. BARLOTTA: Object to form.
19    **A.  I don't.**
20    Q.   Did you take any notes or jot
21 anything down when you had this conversation with
22 Mr. Helveston or Rusty Hughes?
23    **A.  I did not.**

Page 24

1     Q.   Do you recall sitting here today any
2  of the reasons that you and Mr. Helveston
3  discussed as to why Kathryn was unhappy?
4     **A.  I do not.**
5     Q.   Did Mr. Helveston indicate to you
6  that Kathryn had issues with gender
7  discrimination?
8        MS. BARLOTTA: Object to form.
9  Assumes facts not in evidence.
10    **A.  I don't recall that.**
11    Q.   Did Mr. Helveston indicate anything
12 to you that Kathryn had raised issues or concerns
13 that had anything to do with her being treated
14 differently because of her gender?
15       MS. BARLOTTA: Object to form.
16    **A.  I don't recall any of that.**
17    Q.   So you're not saying it didn't
18 happen.  You're just saying sitting here today
19 you don't recall?
20       MS. BARLOTTA: Object to form.
21    **A.  Yeah, I'm saying I don't recall.  He**
22 **just asked me to call her, she was unhappy, and I**
23 **did.**

Page 25

1     Q.   Mr. Cadden, let me show you what I'm
2   going to mark as Plaintiff's Exhibit 58.
3          (Whereupon, Plaintiff's Exhibit No.
4   58 was marked for identification and a copy of
5   same is attached hereto.)
6     Q.   These are initial Rule 26
7   disclosures, and that's a lawyer term for the
8   parties have to share information about potential
9   witnesses.
10         Did you know that your name was
11  listed as an individual that had discoverable
12  information regarding Kathryn Hendrix and her
13  claims?
14    A.   I'm not sure exactly what you just
15  said, but --
16    Q.   Okay.
17    A.   Maybe.  I don't know.  I'm not sure
18  what you said, so could you ask that question
19  differently maybe?
20    Q.   Sure.  Look at Number 6.  It's on
21  Page 3, Mr. Cadden.
22    A.   Okay.
23    Q.   Do you see your name?

Page 26

1     A.   I do.
2     Q.   And it says:  Mr. Cadden was
3   Birmingham's office president and has knowledge
4   of plaintiff's job performance and the concerns
5   plaintiff voiced to Mr. Helveston.
6          Anything else that you recall about
7   the concerns that Kathryn Hendrix reported to Mr.
8   Helveston other than what you've already told us?
9     A.   No.
10    Q.   And what information do you have
11  about Kathryn Hendrix's job performance?
12    A.   I'm sorry.  Say that again.
13    Q.   Sure.  What information do you have
14  about Ms. Hendrix's job performance?
15    A.   What are you specifically looking
16  for?  I don't have anything about her job
17  performance.
18    Q.   Okay.  The --
19    A.   I'm sure there's a -- I don't have
20  any -- I don't have anything for her performance.
21  That goes to, what do you call it, performance
22  review possibly, but that's --
23    Q.   Did you review any performance --

Page 27

1     A.   I didn't.
2     Q.   -- reviews that Ms. Hendrix was
3   given?
4     A.   No.
5     Q.   Did anybody discuss her performance
6   with you at any time?
7     A.   No.
8     Q.   As president and a property broker,
9   would you have an occasion to have had any input
10  in any performance evaluation for Kathryn
11  Hendrix?
12    A.   No.
13    Q.   Okay.  Did anybody raise any
14  performance issues to you about Kathryn Hendrix?
15         MS. BARLOTTA:  Object to form.
16    A.   No.
17    Q.   When you had this conversation with
18  Mr. Helveston, did he tell you that he had
19  offered to move Kathryn to another department?
20         MS. BARLOTTA:  Object to form.
21    A.   I do not recall that.
22    Q.   Okay.  So you're not saying it didn't
23  happen.  You're just saying you don't recall?

Page 28

1          MS. BARLOTTA:  Object to form.
2     A.   Yes, I don't recall.
3     Q.   Okay.  Did you and Mr. Helveston
4   e-mail each other at any point about Kathryn's
5   complaints to him?
6     A.   Not to my knowledge, no.
7     Q.   Did you or Mr. Helveston say anything
8   about contacting human resources with regard to
9   the complaints that Kathryn had reported to Mr.
10  Helveston?
11         MS. BARLOTTA:  Object to form.
12    A.   No.
13    Q.   Where was HR located?
14         MS. BARLOTTA:  Object to form.
15    Q.   In 2019?
16         MS. BARLOTTA:  Object to form.
17    A.   North Carolina.
18    Q.   Okay.  There wasn't an on-site human
19  resources person in the Birmingham office?
20    A.   No, not at that time.
21    Q.   And who -- in 2019, do you recall who
22  would have been the head of human resources?
23         MS. BARLOTTA:  Object to form.

Page 29

1    A.   I -- I don't recall.  Stefani Petty
2    maybe.  I'm not sure.
3    Q.   And in 2019, had Stefani Petty ever
4    visited the Birmingham office?
5         MS. BARLOTTA:  Object to form.
6    A.   I'm sure she had.
7    Q.   Do you recall specifically?  I don't
8    want you to guess.  I mean, do you recall her
9    coming to the office in 2019?
10        MS. BARLOTTA:  Object to form.
11   A.   No.
12   Q.   Do you recall from -- I'm trying to
13   keep my time limits, you know, so you'll know
14   we're all on the same page what we're talking
15   about.  2019, 2020, do you have any idea if Ms.
16   Petty visited Birmingham and, if so, how often?
17        MS. BARLOTTA:  Object to form.
18   A.   I'm not sure she came at all.  I
19   don't.
20   Q.   While you've worked at CRC or
21   Truist -- and for the record, Truist purchased
22   CRC; is that correct?
23   A.   Correct.

Page 30

1    Q.   Okay.  Do you recall what year?
2    A.   2000, I believe, 2001.
3    Q.   And while you've worked at CRC --
4         MS. WILKINSON:  Would you hand me a
5    big clip if you don't mind?
6    Q.   -- or Truist, have you ever seen --
7    have you ever seen the employee handbook?
8    A.   I have.
9    Q.   Let me show you what we previously
10   marked as Plaintiff's Exhibit 26.  And, Mr.
11   Cadden, if you need to unclip that, feel free to
12   do so.  They are numbered, so it's perfectly
13   okay.
14        This is a 2019 Excellence Associate
15   Handbook.  Did this handbook apply to all
16   employees?
17   A.   Yes.
18   Q.   Including you?
19   A.   Absolutely.
20   Q.   Was there a separate handbook for
21   people in management or people at your level?
22   A.   No.
23   Q.   Okay.  And was this a handbook that

Page 31

1    went into effect after Truist purchased CRC?
2         MS. BARLOTTA:  Object to form.
3    A.   Yes.
4    Q.   Did CRC have an employee handbook
5    before Truist purchased CRC?
6    A.   I'm sure we did.
7    Q.   When Truist purchased CRC, was Truist
8    known at that time as BB&T?
9    A.   Correct.
10   Q.   Did you have any involvement or
11   participation in the sale of CRC to Truist?
12   A.   No.
13   Q.   Who did?
14   A.   The board, CRC board.
15   Q.   And would Mr. Helveston have been
16   involved with that?
17   A.   Yes.
18   Q.   Okay.  Did anybody discuss with you,
19   Mr. Helveston, or anybody, about BB&T taking over
20   CRC?
21   A.   Not until after they did.
22   Q.   And did you have any concerns about
23   that happening?

Page 32

1         MS. BARLOTTA:  Object to form.
2    A.   No.
3    Q.   And had you heard of BB&T before they
4    purchased CRC?
5    A.   Yes.
6    Q.   And they were at that time primarily
7    a banking industry?
8    A.   Correct.
9    Q.   And had you had any dealings with
10   them professionally prior to them acquiring CRC?
11   A.   No.
12   Q.   And when CRC was acquired by BB&T,
13   was Kelly King the president?
14   A.   Yes -- no, that is not correct.  John
15   Allison was president.
16   Q.   John Allison?
17   A.   Uh-huh (positive response).
18   Q.   Do you recall when Kelly King became
19   the president?
20   A.   I do not.
21   Q.   Okay.  Look in Plaintiff's Exhibit
22   26.  Mr. Cadden, at the very bottom you'll see
23   CRC/Hendrix, and those are what we call Bates

Page 33

1  numbers.  If you'll flip to 288, please.
2      **A.   Okay.**
3      Q.   Let me ask you this:  Were you ever
4  trained on this 2019 handbook, either
5  electronically or in person?
6      MS. BARLOTTA:  Object to form.
7      **A.   Trained may be the -- we were asked**
8  **to read it and sign documents that we did read it**
9  **and that we agreed to abide by it.**
10     Q.   And who would have asked you to read
11  the handbook and sign a document saying you have
12  read it and you will agree to abide by it?
13     **A.   It's an e-mail that comes from**
14  **Truist.  I'm not sure who sent it, but --**
15     Q.   Would you have done that
16  electronically?
17     **A.   Yes.**
18     Q.   And is that done every year by
19  Truist?
20     **A.   Yes.**
21     Q.   So there would be an e-mail from all
22  the employees when this 2019 handbook came out
23  where they have signed off that they've read it

Page 34

1  and agreed to abide by it; is that correct?
2      MS. BARLOTTA:  Object to form.
3      **A.   There should be, but, I mean, I would**
4  **think Truist would follow up on that if they**
5  **didn't.  So I'm not sure to be accurate.**
6      Q.   As president for the Birmingham
7  office, did you have any responsibility to make
8  sure that the employees were trained on the
9  handbook?
10     MS. BARLOTTA:  Object to form.
11     **A.   No.  That was a Truist thing.**
12     Q.   Okay.  Was there anybody on-site that
13  had responsibility to make sure employees were
14  trained on the handbook?
15     MS. BARLOTTA:  Object to form.
16     **A.   No.**
17     Q.   Under BB&T's history, it talks about
18  the Civil War.  Did you know that the founders of
19  BB&T were -- that they fought in the Civil War
20  for the Confederacy?
21     MS. BARLOTTA:  Object to form.
22     **A.   Not until now.**
23     Q.   Did you know that they were

Page 35

1  plantation owners?
2      MS. BARLOTTA:  Object to the form.
3      **A.   Not until now.**
4      Q.   Did you know that they owned slaves?
5      MS. BARLOTTA:  Object to form.
6      **A.   No.**
7      Q.   Did you know that they took slaves as
8  collateral?
9      MS. BARLOTTA:  Object to form.
10     **A.   No.**
11     MS. BARLOTTA:  Cynthia, what has this
12  got to do with this case?
13     Q.   Did you ever see the statements sent
14  out by the president of BB&T renouncing this
15  prior racist history?
16     **A.   No.**
17     MS. BARLOTTA:  Cynthia, you did this
18  with Rusty.  Like what -- please, like explain
19  how this is proper under Rule 26.  This has
20  nothing to do with Ms. Hendrix's claims.
21     Q.   Have you seen anything at BB&T or
22  Truist --
23     MS. BARLOTTA:  Don't answer the

Page 36

1  question until I have a response, because she's
2  way outside the scope of Rule 26.
3      Q.   Have you seen anything at BB&T and
4  Truist indicating that they are implementing
5  policies to make sure specifically that blacks
6  and women are represented in the company?
7      MS. BARLOTTA:  During when, what
8  timeframe?
9      Q.   Since 2019, 2020.
10     MS. BARLOTTA:  Who?  Like separate
11  from the handbook?
12     Q.   Have you seen anything separate from
13  the handbook, any e-mails or notices to indicate
14  that BB&T/Truist was going to review and make an
15  effort to make sure that women and blacks were
16  represented in the company?
17     MS. BARLOTTA:  If you understand the
18  question.  I don't understand.  If you understand
19  the question, you can answer it.
20     Q.   Let me -- I'll rephrase it.  So I
21  googled the company.
22     **A.   Okay.**
23     Q.   And that's where I found out that the

Page 37

1  founders were racists and that they took slaves
2  and that the president had renounced it and
3  issued a statement to the press.  It's all over
4  Google.
5          And that as a result of that,
6  BB&T/Truist implemented practices to review the
7  workforce in 2019, 2020, I think it was actually
8  in 2020, to make sure that specifically blacks
9  and women were fairly represented in the
10 workforce.
11         Did you see any policies stating that
12 in 2020?
13         MS. BARLOTTA:  Object.  Move to
14 strike counsel's testimony in the case.
15 **A.   Can I answer that?**
16 Q.   Sure.
17         MS. BARLOTTA:  If you understand,
18 yeah, answer.
19 **A.   I just want to make sure I answer**
20 **your question.  Are you asking me did the**
21 **company -- did the company send an e-mail or a**
22 **communication to the employees to hire blacks and**
23 **women?**

Page 38

1  Q.   Or to do a review of the number of
2  black employees and female employees.
3  **A.   No, I've never seen that or never**
4  **heard anything about that.**
5  Q.   Has anybody in Birmingham since 2020
6  come in and done a review of the number of black
7  employees and female employees in the workforce
8  in Birmingham in all positions and departments?
9          MS. BARLOTTA:  Object to form.
10 **A.   If they have, I do not know about it.**
11 Q.   Okay.  You've never done that?
12 **A.   No.**
13 Q.   And you're not aware of that being
14 done in Birmingham?
15 **A.   I'm not.**
16 Q.   Okay.
17         MS. WILKINSON:  Have we marked this?
18         MS. PALMER:  Maybe 41.
19 Q.   (BY MS. WILKINSON:)  Did you -- do
20 you know, Mr. Cadden, that BB&T/Truist has an
21 affirmative action policy?
22         MS. BARLOTTA:  Object to form.
23 **A.   No, I didn't know that.**

Page 39

1  Q.   Look at Bates Number 305 -- I'm
2  sorry -- 304.
3  **A.   Okay.**
4  Q.   Do you see on the right-hand side
5  where the heading is Equal Opportunity and
6  Affirmative Action?
7  **A.   I do.**
8  Q.   And this would have been a handbook
9  that you would have been trained on and signed
10 off on in 2019?
11 **A.   Yes.**
12 Q.   Flip to the next page, Bates Number
13 305.  Do you see on the right-hand up at the top
14 where it says Affirmative Action?
15 **A.   I do.**
16 Q.   It says:  BB&T is an affirmative
17 action employer and strives to make certain that
18 women, people of color, the disabled, and
19 protected or disabled veterans are fairly
20 represented at all levels within the
21 organization.
22         Did I read that correctly?
23 **A.   I believe so.**

Page 40

1  Q.   And you didn't aware that that was
2  the policy -- sitting here today, you were not
3  aware that that was the policy until I showed
4  that to you?
5  **A.   Yes.**
6  Q.   Okay.  Do you see that it
7  specifically references women and people of
8  color?
9  **A.   I do see that.**
10 Q.   And disabled people and disabled
11 veterans?
12 **A.   I see that.**
13 Q.   Those are the only protected
14 categories listed in that section; is that
15 correct?
16         MS. BARLOTTA:  Object to form.
17 **A.   I believe so.**
18 Q.   Have you as the president ever done a
19 review of the Birmingham office to determine how
20 many women versus how many men are in particular
21 positions?
22 **A.   I have not, no.**
23 Q.   Is it safe to say that the broker

Page 41

1  business at CRC, Truist is a male dominated
2  field?
3       MS. BARLOTTA:  Object to form.
4       A.  The wholesale business?
5       Q.  Your business.
6       A.  It's not male dominated.
7       Q.  When Kathryn Hendrix was there, when
8  she raised these concerns to Mr. Helveston, do
9  you know how many female brokers worked in her
10 department?
11      MS. BARLOTTA:  Object to form.
12      A.  2019?  Two maybe.  Susan Phillips
13 would be one, Cathy Reeves.  Who else?  Probably
14 at that time.
15      Q.  Look back -- keep the handbook open,
16 but look back at Plaintiff's Exhibit 27, Mr.
17 Cadden, the chart that I showed you earlier.
18      This was sent by CRC and Truist to
19 the Equal Employment Opportunity Commission in
20 response to Kathryn Hendrix's EEOC charge, and it
21 lists the gender of everyone.  How many female
22 brokers do you see?
23      MS. BARLOTTA:  Object to form.

Page 42

1       A.  One.
2       Q.  And how many property brokers are you
3  aware of that have been female?
4       A.  Property brokers, one -- well, at
5  what timeframe are you looking for?
6       Q.  Since you've been involved with the
7  property broker department.
8       A.  One, two, three, four -- four.
9       Q.  Out of how many?
10      A.  We have five brokerage teams
11 currently.
12      Q.  Are there four women out of five
13 brokers?
14      A.  No, not today.  You said from the
15 time of CRC.  So the company has grown, and some
16 of those people have left our employment, and one
17 has passed away.
18      Q.  So name the females that you were
19 referring to.
20      A.  Alison Oliphant, Suzanne Brandt, by
21 the way, our largest brokerage production person
22 in our company at the time.  Leslie Jordan, who's
23 deceased.  Melissa Raspino, who's currently

Page 43

1  employed.
2       Q.  Did you hire Melissa Raspino?
3       A.  I did not.
4       Q.  Who did?
5       A.  I would imagine Tom Curtain -- well,
6  Skip Cooper would have hired her.  He ran the
7  department at the time.
8       Q.  And she's the only one that's still
9  there?
10      A.  Correct, in Birmingham.
11      Q.  So there's only one out of five in
12 Birmingham right now?
13      A.  Correct.
14      Q.  And when did Leslie -- did she leave
15 before she passed away?
16      A.  Yes.
17      Q.  When did she leave?
18      A.  Pre-Covid.  She moved to Mobile.  But
19 I can't tell you exactly when.  She passed away
20 last year.
21      Q.  When was Melissa Raspino hired?
22      A.  1991, '92.
23      Q.  Okay.  And when was Leslie hired?

Page 44

1       A.  I can't recall.  I mean, I could go
2  find that information, but I can't recall that.
3       Q.  Who replaced Leslie?  A male broker?
4       MS. BARLOTTA:  Object to form.
5       A.  No.  That job just kind of -- her
6  book got just dissolved, spread to brokers around
7  the office.
8       Q.  Who were the brokers that got her
9  book?
10      A.  I can't recall that, but I would say
11 Paul Martin, Trey Nelson, maybe Melissa may have
12 got some of that.  I'm not sure.
13      Q.  So you don't know if Melissa got any?
14      MS. BARLOTTA:  Object to form.
15      A.  I don't -- I don't recall.
16      Q.  Are you certain --
17      A.  It wasn't that big a book to
18 disburse, but --
19      Q.  But Paul and Trey did get a portion
20 of Leslie's book?
21      A.  I don't recall.  Paul -- she worked
22 with Paul previously, so he may have -- some of
23 those accounts were probably his, and he probably

Page 45

1    took them back, so -- I got one of those.  I
2    should say I got one.
3        Q.   What about Ms. Brandt?  When was she
4    hired?
5        A.   Oh, before we sold it to Truist.
6    1993-ish, '4-ish.
7        Q.   Is she still employed there?
8        A.   She's not.
9        Q.   And who replaced her?
10       A.   Alison Oliphant.
11       Q.   And why did Ms. Brandt leave?
12       A.   She moved to Atlanta.  I can't -- I
13   don't -- I was just a co-worker.  I didn't have
14   anything to do with that.
15       Q.   Do you recall when Ms. Brandt left?
16       A.   It was right after -- it was after we
17   sold to Truist, so 2000 -- I don't know.  I don't
18   know.  2003, '4, somewhere in there maybe.
19       Q.   And when did Alison Oliphant get
20   hired?
21       A.   I don't know.  That was -- I'm not
22   sure.  I don't recall.
23       Q.   Who hired Ms. Oliphant?

Page 46

1        A.   Skip Cooper.
2        Q.   And Ms. Oliphant, is she still there?
3        A.   She's not.
4        Q.   When did she leave?
5        A.   2000 -- I don't know.  2015, '16,
6    somewhere in there maybe, '17.
7        Q.   And who were the male brokers in
8    property?
9        A.   Paul Martin, myself, Trey Nelson,
10   Phillip Young.
11       Q.   Any other male brokers that have
12   worked in property?
13       A.   Mason Johnston.  He's no longer with
14   the company.
15       Q.   Why did he leave?
16       A.   He had a better opportunity somewhere
17   else, I guess.
18       Q.   Where did he go?
19       A.   RT Specialty.
20       Q.   When did he leave?
21       A.   August the 30th of 2020, I believe it
22   was.
23       Q.   Did Lauren Lindberg work around Mason

Page 47

1    Johnston?
2        A.   She did.
3        Q.   And is Lauren still there?
4        A.   She's not.
5        Q.   And what was her position?
6        A.   She was at -- well, she was an
7    account executive in property, I believe, and
8    then she had the opportunity to go to our
9    professional liability department.  She did with
10   Lee McClure, and she became an inside broker
11   there.
12           And she moved to Arizona, I believe,
13   somewhere west, and worked for us remotely for a
14   while, and then resigned.  She decided she didn't
15   want to be in the insurance business any longer.
16       Q.   When did she move from property to
17   professional liability?
18       A.   I don't have that data.  I could
19   figure it out.
20       Q.   Before or after Covid?
21       A.   Before Covid.
22       Q.   Do you know why she moved from
23   property to professional liability?

Page 48

1        A.   She had the opportunity to make more
2    money going to the professional liability
3    department.
4        Q.   Did Lauren Lindberg ever complain to
5    you about Mason Johnston?
6        A.   I'm sure she did.  A lot of people
7    complained about Mason Johnston.
8        Q.   What were some of the complaints
9    about Mason Johnston?
10       A.   He was just hard to work with.
11       Q.   Why was he hard to work with?
12       A.   He was just -- some people are hard
13   to work with, and some aren't.  He was just very
14   demanding.
15       Q.   Since you've gone over the handbook
16   every year since you've been employed with either
17   CRC or Truist, did you understand that gay people
18   should not be discriminated against?
19       A.   Yeah.
20           MS. BARLOTTA:  Object to form.
21       Q.   And you understand that it was
22   against the policy to make derogatory comments
23   about gay people?

Page 49

1     MS. BARLOTTA: Object to form.
2  A.  I'm sorry.  Say that again.
3  Q.  That it was against the policy to
4  make derogatory comments about gay people.
5     MS. BARLOTTA: Object to form.
6  A.  Yes.  I don't need a handbook to tell
7  me that, but yes.
8  Q.  Okay.  And did Lauren Lindberg
9  complain to you about an e-mail she got from
10  Mason Johnston where he said all gay people need
11  to go to hell?
12     MS. BARLOTTA: Object to form.
13  A.  I do not know anything about that.
14  Q.  Was Lauren Lindberg at the time she
15  was in property openly gay?
16  A.  I mean, I knew she was gay, but I
17  don't know if she was just walking around with a
18  -- telling everybody.
19  Q.  Did she make any comments about Mason
20  Johnston making derogatory comments about her
21  being gay?  Did she complain about that to you at
22  all?
23     MS. BARLOTTA: Object to form.  Asked

Page 50

1  and answered.
2  A.  No.
3  Q.  Because she says she complained to
4  you about it and said she was going to quit.  You
5  don't remember that?
6     MS. BARLOTTA: Object to --
7  A.  No.
8     MS. BARLOTTA: Object to form.
9  Q.  Do you recall seeing an e-mail from
10  Mason Johnston where he said all gay people go to
11  hell?
12     MS. BARLOTTA: Object to form.
13  A.  I don't recall seeing that.  If I
14  did, I don't recall that, but --
15  Q.  Do you recall anybody talking about
16  an e-mail from Mason Johnston where he made
17  reference to all gay people going to hell?
18     MS. BARLOTTA: Object to form.  Asked
19  and answered.
20  A.  I don't recall that.
21  Q.  And if Mason Johnston sent this
22  e-mail to Lauren Lindberg or anybody and said,
23  All gay people go to hell, or words to that

Page 51

1  effect, that would violate CRC/Truist's policies,
2  right?
3     MS. BARLOTTA: Object to form.
4  A.  Yes.
5  Q.  And CRC and Truist have a zero
6  tolerance policy when it comes to discrimination,
7  correct?
8     MS. BARLOTTA: Object to form.
9  A.  Yes.
10  Q.  And why is there a zero tolerance
11  policy when it comes to discrimination?
12     MS. BARLOTTA: Object to form.
13  A.  Because it's wrong.
14  Q.  It's illegal?
15     MS. BARLOTTA: Object to form.
16  Q.  Correct?
17  A.  Yes.
18  Q.  And it can subject the company to
19  liability, correct?
20     MS. BARLOTTA: Object to form.
21  A.  Yes.
22  Q.  And if Mason Johnston sent an e-mail
23  saying all gay people go to hell, should he have

Page 52

1  been fired?
2     MS. BARLOTTA: Object to form.
3  A.  Did he send that e-mail?
4  Q.  He did.
5     MS. BARLOTTA: She -- if he sent it,
6  it hasn't been produced.  I haven't seen it, so
7  I --
8  A.  I haven't seen that e-mail.  I don't
9  recall seeing that e-mail.
10     MS. BARLOTTA: And if they have it,
11  they haven't turned it over or produced it.
12     MS. WILKINSON: We don't have the
13  e-mail.  We wish that y'all would give it to us.
14  Q.  (BY MS. WILKINSON:)  But it is our
15  understanding from talking to witnesses that
16  Lauren complained directly to you, said she would
17  quit, and you moved her out of the department?
18  A.  I believe you said she showed me a
19  copy of the e-mail, and I don't think I said that
20  -- I don't believe I saw that.  I'm comfortable I
21  didn't see it or I would have done something
22  about it, so --
23  Q.  Did she verbally tell you about this

Page 53

1  e-mail?
2      A.  No.  What you said was she showed me
3  an e-mail.  That's what you said, that she showed
4  me an e-mail.
5      MS. BARLOTTA:  She's going to say a
6  lot of things today whether it's accurate or not,
7  so just be warned.
8      A.  I'll give you honest answers, but
9  give me honest questions.
10     Q.  Well, I --
11     A.  That's not an honest question.
12  That's not an honest question.
13     Q.  John, did Lauren ever complain to you
14  or say to you anything to indicate that Mr. Mason
15  has said anything to her about gays or made any
16  derogatory comments about gays?
17     A.  She said Mason was an ass, but that
18  has nothing to do with -- I mean, he was an ass
19  about a lot of things.
20     Q.  Yes or no, did Lauren Lindsey [sic]
21  ever say to you that Mason had said anything to
22  her negative about her being gay?
23     A.  No.

Page 54

1      MS. BARLOTTA:  Object to the form.
2  Asked and answered.
3      Q.  Did she ever indicate to you that
4  Mason had ever done or said anything negative or
5  derogatory about gay people?
6      MS. BARLOTTA:  That's the same
7  question.  Asked and answered.
8      A.  No.
9      Q.  You never had that conversation with
10  Lauren?  Because --
11     MS. BARLOTTA:  Cynthia, enough.
12  No, you don't need to answer.  You've
13  answered it twenty times.  Move on.
14     Q.  I just want to make sure I'm clear
15  before I move on to this, because --
16     MS. BARLOTTA:  You -- just because
17  you don't like his answer, doesn't mean you get
18  to keep asking the same question over and over
19  again.  Move on.
20     Q.  I'm sorry your lawyer is interrupting
21  me.
22     MS. BARLOTTA:  I'm sorry you're not
23  asking -- you keep asking him the same questions

Page 55

1  over and over because you don't like his answers.
2      Q.  Did anybody at any point ever
3  complain about Mason Johnston saying anything
4  that was derogatory or negative about gay people?
5      MS. BARLOTTA:  Object to form.
6      A.  I've never heard Mason Johnston say
7  anything negative about gay people.
8      Q.  That wasn't my question, Mr. Cadden.
9  My question was --
10     A.  That's all I have knowledge to.
11  That's all I have.
12     Q.  Okay.  Did any employee, any employee
13  ever say anything that you're aware of or raise
14  any concerns about Mason Johnston saying anything
15  that was derogatory about gay people?
16     MS. BARLOTTA:  Object to form.  Asked
17  and answered.
18     A.  No, not that I know of.  Not that I
19  recall.  I don't know.  We would have dealt with
20  that.
21     Q.  Was Mason Johnston ever disciplined
22  for saying anything derogatory about gay people?
23     MS. BARLOTTA:  Object to form.  Asked

Page 56

1  and answered.
2      A.  Not -- not in direction of mine.  I
3  don't recall him ever doing that, and no, I --
4  no.
5      Q.  When you said that you -- you said
6  that Lauren Lindsey told you that Mason Johnston
7  was an ass.  Did she say why she believed that
8  Mason Johnston is an ass?
9      A.  I'm sure she did.
10     Q.  Do you recall what she said?
11     A.  I can't recall what she said or what
12  other people have said, so I'm -- I can't recall
13  that.
14     Q.  Other than Lauren Lindsey, who
15  else -- can you name anybody else that had raised
16  any concerns about Mason Johnston?
17     MS. BARLOTTA:  Object to form.  Asked
18  and answered.
19     A.  No.
20     Q.  After Ms. Lindsey complained to you
21  that Mason Johnston was an ass, did Mason
22  continue to work in your department as a broker?
23     A.  Yes.

Page 57

```
 1          MS. BARLOTTA:  Object to form.
 2      Q.  Do you know how long?
 3      A.  No.  No, I don't.
 4      Q.  Do you still stay in touch with
 5  Lauren -- I believe it's Lindberg, not Lindsey --
 6  Lauren Lindberg?
 7      A.  It is, but I know what you're talking
 8  about.  No, I don't actually.  I was thinking
 9  about her the other day, as a matter of fact,
10  but --
11      Q.  Do you still stay in touch with Mason
12  Johnston?
13      A.  I see him occasionally, but only when
14  we run into each other.
15      Q.  And how do y'all have an occasion to
16  run into each other?
17      A.  We're members of Vestavia Country
18  Club.
19      Q.  How often do you see him?
20      A.  Once or twice a month maybe.
21      Q.  Have you ever talked to him about
22  this lawsuit filed by Kathryn Hendrix?
23      A.  No.
```

Page 58

```
 1      Q.  Have you ever been trained on the
 2  types of comments that would constitute a
 3  complaint of gender discrimination?
 4          MS. BARLOTTA:  Object to form.
 5      A.  I don't believe so.
 6      Q.  If an employee said to you, I'm
 7  concerned that there's a lack of female brokers,
 8  I'm concerned that we don't have enough female
 9  brokers, would you understand that to be an
10  employee raising a concern about possible gender
11  discrimination?
12          MS. BARLOTTA:  Object to form.
13      A.  No.
14      Q.  Why not?
15      A.  I just -- I don't think it's gender
16  discrimination.
17      Q.  Why not?
18      A.  Because I don't think that.  You just
19  asked me what I thought.  I don't -- no.  That's
20  the answer to my question is no.
21      Q.  If an employee came to you and said,
22  I'm a little concerned we don't have enough or
23  the lack of black brokers, would that indicate to
```

Page 59

```
 1  you a complaint of racial discrimination or a
 2  concern about racial discrimination?
 3          MS. BARLOTTA:  Object to form.
 4      A.  No.  We're not quota filling.  We are
 5  hiring qualified people.  And if somebody
 6  approaches our -- submits a resume that's
 7  qualified, whether they're a woman or a black, we
 8  are going to consider hiring.
 9      Q.  Are you aware that in the city of
10  Birmingham that women -- there are more women
11  than there are men?
12      A.  I don't have the statistics, but that
13  sounds about right.
14      Q.  And that there are more blacks than
15  there are whites?
16          MS. BARLOTTA:  Object to form.
17      A.  I'm -- that doesn't surprise me.
18      Q.  One second, Mr. Cadden.
19      A.  Take your time.
20      Q.  Sure.
21          MS. WILKINSON:  Didn't you mark this
22  -- there it is.
23      Q.  (BY MS. WILKINSON:)  Mr. Cadden, let
```

Page 60

```
 1  me show you what we marked earlier as Plaintiff's
 2  Exhibit 42.  Have you ever seen this document
 3  before?
 4      A.  I don't believe so, but just let me
 5  look at it for a minute if you don't mind.
 6      Q.  Sure.
 7      A.  No, I'm not sure what this is
 8  actually.
 9      Q.  These are documents related to the
10  employment of Clay Segrest and his performance
11  and his goals.  Have you seen documents similar
12  to this regarding any employees?
13          MS. BARLOTTA:  Object to form.
14      A.  I'm not sure what this is exactly, so
15  I'm going to go with no.
16      Q.  Mr. Cadden, are you familiar with
17  Workday?
18      A.  I am.
19      Q.  Okay.  Are you familiar with
20  information that's contained in Plaintiff's
21  Exhibit 42 being information that is
22  electronically stored in Workday?
23          MS. BARLOTTA:  Object to form.
```

Page 61

1  A.  Yes.

2  Q.  Okay.

3  A.  Now I think you've cleared that up.

4  Now I know where you're going.

5  Q.  Okay.  Look at Bates number -- Mr.

6  Cadden, it's going to be 4687.  Do you see at the

7  bottom where it says Performance Reviews?

8  A.  I do.

9  Q.  And is that information that's

10  contained electronically in Workday?

11  A.  I believe so, yes.

12  Q.  And do you fill out performance

13  reviews for the employees on your team?

14  A.  On my team, yes.

15  Q.  Okay.  And if you pull it up in

16  Workday, does it look similar to this?

17  A.  Yes.

18  Q.  Okay.  Would you ever have an

19  occasion to review any of the performance reviews

20  for Clay Segrest?

21  A.  No.

22  Q.  Look at the next page, Bates Number

23  4688.  When you do a performance evaluation for

Page 62

1  employees, are they given goals for the upcoming

2  year?

3  A.  Yes.

4  Q.  Do you see under individual goals for

5  Mr. Segrest, that section down at the bottom?

6  A.  I do.

7  Q.  And do you see for one of his 2020

8  goals, it's diversity and inclusion?

9  A.  I do.

10  Q.  And it says it's associated with his

11  progress review?

12  A.  I do.

13  Q.  And on the bullet point under the

14  description, it says:  Promote diversity and

15  inclusion at a team and office level.  What does

16  diversity mean to you?

17  MS. BARLOTTA:  Object to form.

18  A.  Diversity means to me, I mean, I

19  guess we wouldn't -- we wouldn't -- I'm not sure

20  how to answer the question, to be honest with

21  you.  Just bear with me a minute.

22  Q.  Sure.  Take all the time you want.

23  A.  I think the answer to that question

Page 63

1  is we're not going to hinder, keep anybody back

2  because they may be different than the norm --

3  than our makeup of a team, right, and --

4  Q.  Okay.

5  A.  I don't know if I have the best

6  answer to that.  I'm not sure.  We promote

7  diversity.  We're not trying to -- I mean, we

8  hire people that are qualified regardless of what

9  -- who they are.  I think that's where that

10  probably should be our goal.  We hire qualified

11  people.

12  Q.  Has it been your goal as the

13  president of the Birmingham office to promote

14  from within?

15  MS. BARLOTTA:  Object to form.

16  A.  We do promote from within.

17  Q.  And is that important to you since

18  you've been president?

19  MS. BARLOTTA:  Object to form.

20  A.  It is important.  It's not a driving

21  force, but we try to find the best talent.

22  Q.  Why is it important to promote from

23  within?

Page 64

1  MS. BARLOTTA:  Object to form.

2  A.  Well, people that are qualified that

3  show they can do different tasks, we like to give

4  them the opportunity if they want it.

5  Q.  Is it cost-effective to promote from

6  within?

7  A.  Yes.

8  Q.  It saves the company money?

9  MS. BARLOTTA:  Object to form.

10  A.  If it works, yeah.

11  Q.  And you don't have to train them to

12  be an employee of CRC or Truist.  They already

13  know kind of how the business works, so you save

14  on that and other training, right?

15  MS. BARLOTTA:  Object to form.

16  A.  Yes.  That's part of it.

17  Q.  And you also reward good employees to

18  promote from within, correct?

19  MS. BARLOTTA:  Object to form.

20  A.  It's a reward to good employees to

21  get promoted?

22  MS. BARLOTTA:  Object to form.

23  A.  No.  A reward would be a bonus.  It's

Page 65

1  an opportunity to be promoted.
2      Q.   If you get promoted, do you make more
3  money?
4          MS. BARLOTTA:  Object to form.
5      A.   Possibly.
6      Q.   Isn't that the definition of
7  promotion?
8          MS. BARLOTTA:  Object to form.
9      A.   I mean, we have people that have been
10 promoted a long time that do well.
11     Q.   What does inclusion mean, promote
12 diversity and inclusion at a team and office
13 level?  What does inclusion mean?
14     A.   I would tell you that means we're not
15 excluding.  We are a very inclusive company.
16     Q.   And how is CRC, Truist a very
17 inclusive company?
18         MS. BARLOTTA:  Object to form.
19     A.   We don't discriminate against race or
20 gender.
21     Q.   How do you know that?
22         MS. BARLOTTA:  Object to form.
23     A.   Because we have a lot of women

Page 66

1  employees.  We have a lot of black employees.  We
2  have a lot of gay employees.
3      Q.   Look back of the our chart that we've
4  been talking about in Exhibit 37.  How many black
5  employees are on that chart?
6          MS. BARLOTTA:  Object to form.
7      Q.   Can you --
8      A.   Oh, on this chart, one, and she's
9  been at the company as long as I have.
10     Q.   There are, it looks like, thirty-six
11 employees listed here.  So one out of thirty-six
12 is black?
13     A.   If that's correct.
14         MS. BARLOTTA:  Object to form.
15     A.   We have a hundred and something
16 people.
17     Q.   I'm talking about just this chart.
18     A.   Yes, but this chart is not
19 representative of our company.
20     Q.   Who's the black person that you're
21 referring to on the chart?
22     A.   Yvette Talsma.  132923 I think you
23 have her listed.

Page 67

1      Q.   And then what's Yvette's position?
2      A.   She's an account executive.
3      Q.   And is that the lowest position in
4  the department?
5          MS. BARLOTTA:  Object to form.
6      A.   A technical assistant is the lowest
7  position that we have as a company.
8      Q.   I'm talking about in the department.
9      A.   I'm sure they have them.  On this
10 chart that's the lowest position.
11     Q.   On this chart, is this the lowest
12 position?
13         MS. BARLOTTA:  Object to form.
14     A.   Yes.
15     Q.   Did you ever talk to Yvette Talsma
16 about being a broker?
17     A.   I do not talk to Yvette about that;
18 but if that was a conversation that was going to
19 be had, Corey would have that conversation with
20 her.
21     Q.   Do you know how many account
22 executives listed on this chart are female?
23     A.   I could count them real quick.  One,

Page 68

1  two, three, four, five --
2          MS. BARLOTTA:  We can probably
3  stipulate to that if it would save time.
4      Q.   There are fifteen.
5      A.   If you say so.
6      Q.   Do you know how many account
7  executives on the chart are women?  There are
8  thirteen.  Does that concern you that thirteen
9  out of the fifteen are women?
10         MS. BARLOTTA:  Object to form.
11     A.   No.
12     Q.   Does it concern you that Yvette
13 Talsma started the same time as you and she's
14 just an account executive?
15         MS. BARLOTTA:  Object to form.
16     A.   No.
17     Q.   You said this is only like a
18 snapshot.  So for us to be able to see if your
19 testimony is true that the company doesn't
20 discriminate, we would need to see a chart like
21 this for the whole department, the whole
22 Birmingham office, right?
23         MS. BARLOTTA:  Object to form.

Page 69

1    A.   If you want it, I guess you can have
2    it, I guess.  You'll have to talk to somebody
3    about that, but we can provide that for you.
4    Q.   But we would need to look at that to
5    see if it's accurate that the company doesn't
6    discriminate?
7         MS. BARLOTTA:  Object to form.
8    A.   I --
9         MS. BARLOTTA:  Accurate by -- under
10   the law?
11   A.   I'm not asking you to determine
12   what's accurate or not.  But that's offensive to
13   me.  Our company does not discriminate.
14   Q.   What have you done, Mr. Cadden, to
15   review whether or not there's been any gender
16   discrimination as to who gets promoted to a
17   broker position?
18        MS. BARLOTTA:  Object to form.
19   A.   We don't make the determination
20   because of gender.
21   Q.   I'm not asking that question, Mr.
22   Cadden.  I'm asking you as the person who's
23   sitting here claiming to be offended by my

Page 70

1    questions, what have you done to review whether
2    or not there's been any gender discrimination as
3    to who gets selected to be a broker?
4         MS. BARLOTTA:  Object to form.
5    A.   We haven't changed our practices.  We
6    haven't changed anything.  We haven't done
7    anything.
8    Q.   Have you at any point ever done any
9    kind of review to see who moves from account
10   executive to broker, whether they're men or
11   women?
12        MS. BARLOTTA:  Object to form.
13   A.   No, I haven't done -- we have not
14   done that.
15   Q.   Have you had a conversation with any
16   of the thirteen account executives listed on
17   Plaintiff's Exhibit 27 that are female, have you
18   had any conversations with any of them about
19   whether or not they ever expressed an interest to
20   be a broker?
21        MS. BARLOTTA:  Object to form.
22   A.   I haven't.  Rusty -- on this list
23   that you generated, Rusty Hughes would probably

Page 71

1    run point on that.
2    Q.   At some point you become aware that
3    Kathryn Hendrix was raising concerns of gender
4    discrimination, correct?
5         MS. BARLOTTA:  Object to form.
6    A.   I think --
7         MS. BARLOTTA:  You mean after the
8    lawsuit was filed?
9         MS. WILKINSON:  At any point.
10   A.   I think when I realized, understood
11   all this was going on is after she filed the
12   lawsuit, yes.
13   Q.   (BY MS. WILKINSON:)  At any point
14   have you -- after you became aware that Kathryn
15   Hendrix was raising concerns about gender
16   discrimination, did you ever do any kind of
17   review yourself to see if there was gender
18   discrimination in who got picked to be a broker?
19   A.   No.
20        MS. BARLOTTA:  Object to form.
21   Q.   Or who got to move from account
22   executive to broker?
23        MS. BARLOTTA:  Object to form.

Page 72

1    A.   No.
2    Q.   Why not?  Why didn't you do that?
3         MS. BARLOTTA:  Object to form.
4    A.   Because I didn't think it was
5    necessary.
6    Q.   Why wasn't it necessary?
7         MS. BARLOTTA:  Object to form.
8    A.   Because -- because we think we
9    operate properly.
10   Q.   Well, I want to know what you base
11   that on, because you haven't done a review.  You
12   haven't talked to any of the women that are
13   account executives to see how many of them ever
14   wanted to be a broker.  What do you base that on?
15        Are you just saying that because it
16   sounds good or do you base that on anything that
17   you've done to conduct a review?
18        MS. BARLOTTA:  Object to form.
19   A.   I have not conducted a review.
20   Q.   And you're not aware of anybody
21   conducting that kind of review, are you?
22        MS. BARLOTTA:  Object to form.
23   A.   No.

Page 73

1    Q.   Do you know why one of the goals for
2    Mr. Segrest in 2022 was to promote diversity and
3    inclusion at a team and office level?
4         MS. BARLOTTA:  Object to form.
5    **A.   I do not.**
6    Q.   And when it says office level, that's
7    the Birmingham office?
8    **A.   It is.**
9    Q.   Was that ever on any performance
10   evaluation that you gave any of your employees?
11        MS. BARLOTTA:  Object to form.
12   **A.   This is a standard thing.  I don't**
13   **know.  To answer your question honestly, I don't**
14   **know.**
15   Q.   Has that ever been on any performance
16   evaluation that you've ever received?
17        MS. BARLOTTA:  Object to form.
18   **A.   No, not to my knowledge, no.**
19   Q.   Who reviews your performance?
20   **A.   Brent Tredway.**
21   Q.   Who is ultimately the highest level
22   person over the Birmingham office?  Is that you
23   that's on-site?

Page 74

1    **A.   That's me.**
2    Q.   Okay.  So it's your job, because
3    you've said that every year you have to sign off
4    that you're going to uphold the policies, it's
5    your job to make sure that there is no
6    discrimination taking place at the Birmingham
7    office, right?
8         MS. BARLOTTA:  Object to form.
9    **A.   Yes.**
10   Q.   Okay.  The next bullet point under
11   Mr. Segrest's performance evaluation for a goal
12   for 2022 is to commit to recruiting and building
13   a diverse workforce.  What does that mean to you?
14        MS. BARLOTTA:  Object to form.
15   **A.   Again, we hire qualified people.**
16   **We're not -- we're not discriminating.  We want a**
17   **-- we have a diverse workplace.**
18   Q.   Have you ever looked to see how many
19   women versus how many men have applied either
20   internally or externally to be a broker?
21        MS. BARLOTTA:  Object to form.
22   **A.   No.**
23   Q.   Have you ever reviewed the

Page 75

1    qualifications of every female compared to every
2    male that has received a broker position and
3    every female that has applied for a broker
4    position?  Have you done that?
5    **A.   No.**
6    Q.   Was Kathryn Hendrix qualified to be a
7    broker?
8         MS. BARLOTTA:  Object to form.
9    **A.   I'm not sure.**
10   Q.   Did you ever do a review in 2023 to
11   see if this goal had been met to see if
12   Birmingham had increased their diversity and
13   inclusion?
14        MS. BARLOTTA:  Object to form.
15   **A.   No.**
16   Q.   Or had increased their female
17   employees, their employees of color?
18        MS. BARLOTTA:  Object to form.
19   **A.   I didn't do a survey, no.**
20   Q.   Any black employees in your
21   department?
22   **A.   No.**
23   Q.   Have there ever been?

Page 76

1         MS. BARLOTTA:  Object to form.
2    **A.   Yes.**
3    Q.   Who?
4    **A.   Ernest Cesar.  He's no longer**
5    **employed with our company.  He left to pursue**
6    **other things.**
7    Q.   What was his position?
8    **A.   He was an account executive, worked**
9    **with Mason Johnston.**
10   Q.   Do you recall when he left?
11   **A.   No.  It was pre-Covid.**
12   Q.   How long was he there?
13   **A.   A couple of years maybe.**
14   Q.   Did you hire him?
15   **A.   I knew he was getting hired.  I**
16   **wasn't involved in the process, no.**
17   Q.   Who hired him?
18   **A.   Mason hired him.**
19   Q.   And what's his last name?
20   **A.   Cesar, Ernest Cesar.**
21   Q.   Can you spell that?
22   **A.   C-e-s-a-r, I believe.**
23   Q.   Was he transferred to the file room?

Page 77

1        MS. BARLOTTA: Object to form.
2        A.  I don't -- I don't recall that.  I
3    don't recall.  Maybe he was.  Maybe he wasn't.
4        Q.   Any other black employees in your
5    department?
6        A.  Not currently, no.
7        Q.   While you've been over the property
8    department and you've been president, that's the
9    only black employee you can name?
10       MS. BARLOTTA: Object to the form.
11       Q.   In your department?
12       A.  In our department, yes.
13       Q.   How many work out of the Birmingham
14   office?  How many black employees in Birmingham
15   that you're aware of ever since you've been
16   employed there?
17       A.  I couldn't tell you.  I've had black
18   employees my entire career at our company, but I
19   can't give you a head count, no.
20       Q.   Are you aware of any -- other than
21   Ernest, any black brokers in any department in
22   Birmingham?
23       A.  No.

Page 78

1        Q.   Look at -- and, again, we're in
2    Plaintiff's Exhibit 42, Bates Number 4689.  For
3    2021 goals for Mr. Segrest, he had the same
4    goals, promote diversity and inclusion at a team
5    and office level.  Commit to recruiting and
6    building a diverse workforce.  Participate in
7    diversity and inclusion events to broaden
8    knowledge and understanding.
9        Were those ever goals that you put in
10   any performance evaluation you issued to any
11   employee?
12       MS. BARLOTTA: Object to form.
13       A.  I don't recall, no.
14       Q.   Have there been in 2020 through 2023
15   any diversity and inclusion events that have been
16   held at the Birmingham office?
17       A.  No.
18       Q.   Have you ever attended or
19   participated in any diversity and inclusion
20   events?
21       A.  No.
22       Q.   Have you ever been trained on
23   diversity and inclusion?

Page 79

1        MS. BARLOTTA: Object to form.
2        A.  No, other than reading the handbook.
3        Q.   Let me show you Plaintiff's Exhibit
4    36.  Did you ever take this diversity promoting
5    inclusion training?
6        A.  If this is a Truist thing, yes.
7        Q.   Do you recall when?
8        A.  I don't recall, ma'am.  I -- no.
9        Q.   You don't?
10       A.  No, I don't recall.
11       Q.   How many times?
12       A.  I don't recall.
13       Q.   But you know sitting here today
14   you've taken some diversity training?
15       A.  Yes.
16       Q.   You don't recall there being any
17   diversity training, though, until BB&T/Truist
18   took over, right?
19       MS. BARLOTTA: Object to form.
20       A.  I can't recall.  That's been a long
21   time.  That's been since 2001.
22       Q.   Have you ever been trained on
23   implicit biases?

Page 80

1        MS. BARLOTTA: Object to form.
2        A.  I don't believe so.
3        Q.   Do you know what that term means?
4        A.  I'm struggling, but go ahead.
5        Q.   Okay.  Do you know what it means to
6    have a bias?
7        A.  Uh-huh (positive response).
8        Q.   What does bias mean to you?
9        A.  You feel something -- you feel a way
10   -- you feel something about something just
11   because -- I guess implicit bias would be -- I
12   don't know.  A bias is you have an opinion about
13   something.
14       Q.   A bias about a group or a person or
15   something?
16       A.  Anything.
17       Q.   Okay.  Have you ever been trained on
18   beliefs that can be implicit biases?
19       MS. BARLOTTA: Object to form.
20       A.  I'm sorry.  Could you ask that
21   question again?
22       Q.   While you've been at CRC,
23   BB&T/Truist, have you ever been trained on

Page 81

1  beliefs that people have that can create a bias
2  in the workforce?
3      A.  I don't believe so.
4      Q.  Comments like:  Women don't like to
5  travel.  Have you ever been trained that that can
6  be an implicit bias that could indicate gender
7  discrimination?
8          MS. BARLOTTA:  Object to form.
9      A.  No.
10     Q.  Women need to stay home and be
11 married and have babies, have you ever been
12 trained that that can be an implicit bias?
13         MS. BARLOTTA:  Object to form.
14     A.  No, not implicit bias.  I've just
15 been told it was wrong.  My mother told me that
16 was wrong, so --
17     Q.  Who did you understand that an
18 employee could complain to if they had any kind
19 of issue with regard to discrimination,
20 harassment, things like that?
21         MS. BARLOTTA:  Object to form.
22     A.  We have an open door policy.  You can
23 complain to your team lead.  You can voice your

Page 82

1  concerns to your team lead; to the department
2  manager, that would be Rusty Hughes in this case;
3  Ron Helveston at the time, who was in my office;
4  myself; our HR people; they have a 1-800 number
5  that you're free to call.  I think it's open
6  twenty-four hours a day.
7          So there's several people if you have
8  concerns to reach out to.
9      Q.  Based on -- I'm sorry.  I didn't mean
10 to cut you off.
11     A.  No, we have an open door policy at
12 CRC if you've got a concern, and we tell
13 everybody that.  Everybody that -- everybody
14 knows that.
15     Q.  And is that because the company,
16 Truist, wants to know if there are any concerns
17 with regard to discrimination, harassment, things
18 like that?
19         MS. BARLOTTA:  Object to form.
20     A.  Well, the rest -- all those people I
21 gave you names of work at CRC, not Truist.  So we
22 are all concerned about people that have concerns
23 or issues of any problem -- of any kind.

Page 83

1      Q.  Once an employee raises a concern --
2  well, let me ask you this, Mr. Cadden:  Does an
3  employee have to put any kind of concern with
4  regard to discrimination in writing or can they
5  make that concern verbally?
6      A.  They can make that concern verbally.
7      Q.  If an employee came to you and said,
8  Hey, Mr. Cadden, you know, I don't think women
9  are being fairly represented in the workforce,
10 I'm concerned that there's a lack of female
11 brokers, but I'm just kind of making this
12 complaint informally to you, would you still have
13 to consider that a complaint of discrimination?
14         MS. BARLOTTA:  Object to form.
15     A.  I'm not sure -- I'm not sure that's a
16 complaint.  Hey, I've got this question about
17 there's not any female brokers.  I'm not sure
18 just that's -- that's a complaint.
19     Q.  You've never been trained that that
20 would be a complaint?
21         MS. BARLOTTA:  Object to form.
22     A.  I don't -- I'm not sure it is a
23 complaint.  Hey, I've been wrong is -- and I

Page 84

1  don't like this, but just I'm not sure there's
2  enough female brokers, I'm not sure that's a
3  complaint.  That's an observation.
4      Q.  What if the employee also said, Look,
5  I'm concerned that there's a lack of female
6  brokers and I haven't been promoted to broker.  I
7  want to be a broker.  I'm concerned there aren't
8  women brokers.  Would you consider that to be a
9  complaint of discrimination?
10         MS. BARLOTTA:  Object to form.
11     A.  Well, I would not say it's a
12 complaint.  I would say I would think the person
13 that that was raised to that was her manager
14 would try to figure out how to see if that's a
15 possibility.  We promote.  We promote people in
16 our company.
17     Q.  If an employee raises concerns about
18 discrimination, what are you supposed to do?  If
19 you know about that complaint at any of those
20 levels you've told me about, people that can
21 receive complaints, what are you supposed to do?
22     A.  We will elevate that to -- if it was
23 a complaint, we would elevate that to Stefani

Page 85

1   Petty in our HR department.

2       Q.   If you know that an employee is

3   raising any kind of concern that could

4   potentially be discrimination, are you supposed

5   to report that to human resources, Stefani Petty?

6       A.   If it's a complaint, yes.

7       Q.   And, again, a complaint can be

8   verbal, general, doesn't have to be in writing,

9   right?

10      A.   Yeah, I -- yeah.

11      Q.   And once you elevate that or report

12  that to human resources, what's supposed to

13  happen?

14      A.   They take off and run with that.

15  That's out of my purview at that point.

16      Q.   Did you understand that any complaint

17  dealing with discrimination, harassment, things

18  like that had to be investigated?

19      A.   I turn it over to Stefani Petty, and

20  what she does with that after that, I'm not sure.

21      Q.   Did you understand from the handbook

22  that all complaints had to be investigated?

23      A.   You know, I didn't memorize the

Page 86

1   handbook, ma'am.  I'm sure it says -- if it says

2   it in there, then there's no sense in us arguing

3   about that, no.

4       Q.   Look in the handbook -- it's, again,

5   Plaintiff's Exhibit 26 -- at Bates Number 306.

6       A.   I'm sorry.  Say that again.

7       Q.   It's right there.  Yeah, it will be

8   in the bottom right-hand corner, Mr. Cadden, 306.

9       A.   Okay.

10      Q.   Do you see the section under

11  Investigations?

12      A.   Uh-huh (positive response).

13      Q.   Yes?

14      A.   Yes, I do.

15      Q.   And it says that BB&T will

16  thoroughly, promptly, and fairly investigate all

17  claims of harassment or discrimination.

18      A.   I do see that.

19      Q.   Okay.  Have you ever been trained on

20  retaliation at any time while you've been with

21  CRC or BB&T/Truist?

22      A.   I know that it's not tolerated in our

23  company.

Page 87

1       Q.   What is retaliation under the policy?

2       A.   We --

3           MS. BARLOTTA:  Object to form.

4       A.   Punishing someone, treating someone

5   unfairly after they made a complaint.

6       Q.   Were you ever aware that Kathryn

7   Hendrix had made -- I'm not talking about the

8   conversation with Mr. Helveston.  Prior to that,

9   that Kathryn Hendrix had raised any concerns

10  about there being gender discrimination?

11      A.   To whom?

12      Q.   To anybody.

13      A.   Not to my knowledge.

14      Q.   Did Rusty ever talk to you about any

15  complaints that Kathryn Hendrix made to him?

16      A.   Not to my knowledge.

17      Q.   Were you ever aware that Kathryn had

18  reported to both Corey and Clay that there were

19  -- she was concerned about there being a lack of

20  female brokers and that the company had not hired

21  a woman in over twelve years?

22          MS. BARLOTTA:  Object to form.

23      Q.   Were you aware that she had raised

Page 88

1   those concerns to either Clay or Corey?

2           MS. BARLOTTA:  Object to form.

3       A.   I'm not.

4       Q.   Okay.  If Kathryn had reported those

5   concerns to Clay or Corey, is that something they

6   should have told you about?

7           MS. BARLOTTA:  Object to form.

8       A.   Yes.

9       Q.   And is that something that human

10  resources should have been involved with?

11          MS. BARLOTTA:  Object to form.

12      A.   If it was a -- if it was actually

13  done, yes.

14      Q.   When Mason left, did Mason have a

15  noncompete agreement with the company?

16      A.   He did.

17      Q.   But he went to work for a competitor.

18  How did that happen with him having a noncompete?

19      A.   He just couldn't call on his existing

20  business, which he honored.

21      Q.   Okay.  Do you have any input in the

22  job duties that are assigned to positions, like

23  an account executive position, if it's outside

Page 89

1   your department?

2       A.   The job duties are pretty much

3   segmented.  The technical assistant stuff,

4   regardless of what department or whatever, the

5   size of the team really determines.  You can have

6   all the titles you would like, but, you know, in

7   our world, if something needs to get done, it

8   needs to get done whether it's below my job

9   function or not.

10      Q.   There's been a lot of testimony about

11  discretion, that bonuses are discretionary, and

12  how they're awarded and what's considered is up

13  to the discretion of the person over the team.

14      A.   That's correct.

15      Q.   That job duties that are assigned to

16  employees is up to the discretion of the person

17  over the team.  Does that concern you that there

18  are no set policies, that it's up to the

19  discretion of the person over the team and that

20  each team is handling things differently?

21          MS. BARLOTTA:  Object to form.

22      A.   No, that doesn't concern me.

23      Q.   Have you ever been trained or taught

Page 90

1   that discretion sometimes can equal

2   discrimination?

3           MS. BARLOTTA:  Object to form.

4       A.   No.

5       Q.   Do you believe that that could

6   potentially create a problem of discrimination?

7           MS. BARLOTTA:  Object to form.

8       A.   No.

9       Q.   Why do you have policies?  What's the

10  purpose of having a policy?

11          MS. BARLOTTA:  Like any policy in the

12  world?  Any policy against CRC, any policy --

13  hypothetical policies?

14      Q.   What's the purpose of CRC, Truist,

15  BB&T having policies?

16          MS. BARLOTTA:  You're asking him why

17  the people in CRC and Truist implemented those

18  policies or what his opinion is on why they

19  implemented them.

20      Q.   Mr. Cadden, if you don't understand

21  my question, I expect you to tell me and let me

22  know, and I will certainly correct it and fix it,

23  not that your lawyer needs to coach you on any

Page 91

1   response or answer.

2           MS. BARLOTTA:  Well, I need

3   clarification --

4       Q.   You're the president of the

5   Birmingham office.

6           MS. BARLOTTA:  -- so I know whether

7   or not I need to object.

8       Q.   You are trained every year on

9   policies and the handbook.  Why does Truist, CRC

10  have policies?

11          MS. BARLOTTA:  Again, I'm going to

12  have to ask for clarification if you're asking

13  him to testify -- he's not here in a 30(b)(6)

14  capacity.  So if you're asking his opinion on why

15  CRC or Truist implemented any policy or if he has

16  specific knowledge of what those reasons were --

17      Q.   I'm asking you what is your

18  understanding as somebody who's been trained

19  every year since you've been employed by CRC,

20  Truist, BB&T on the handbook and policies, what

21  is your understanding of why they have such

22  policies?

23          MS. BARLOTTA:  Object to form.  If

Page 92

1   you understand the question, you can answer.

2       A.   It would be a guide of how to

3   operate.

4       Q.   And why is that guide important?

5           MS. BARLOTTA:  Asking him why it's

6   important to him or are you asking him --

7           MS. WILKINSON:  Sure.

8       Q.   (BY MS. WILKINSON:)  As the

9   president, why is that important to you?  The

10  highest ranking person for the Birmingham office,

11  why is that important to you?

12          MS. BARLOTTA:  Any particular policy

13  or the --

14      A.   Yeah, we've got policies about a lot

15  of stuff.  What policy would you --

16      Q.   Why is it important to have those

17  policies, those written policies?

18          MS. BARLOTTA:  Object to form.  It's

19  very vague.

20      A.   Again, all I can say is so you have

21  some consistency in what we're doing.

22      Q.   Is one of the reasons to tell the

23  employees what you expect from them?

Page 93

1           MS. BARLOTTA:  Object to form.
2       A.  Yes.
3       Q.   And to let the employees know in part
4   what they can expect from the company?
5           MS. BARLOTTA:  Object to form.
6       A.  Yes.
7       Q.   And are all employees supposed to be
8   treated equally?
9           MS. BARLOTTA:  Object to form.
10      A.  Yes.
11      Q.   And one of the ways that you can make
12  sure that employees are treated equally is to
13  have policies on how things are to be handled.
14  Would you agree?
15          MS. BARLOTTA:  Object to form.
16      A.  Yes.
17      Q.   So if you don't have policies and if
18  people get to use their discretion, do you think
19  that sometimes that can result in employees not being
20  treated equally?
21          MS. BARLOTTA:  Object to form.
22      A.  I suppose it could.
23      Q.   Have you ever done anything to do a

Page 94

1   review of bonuses that were given to employees to
2   determine if men were given higher bonuses than
3   women?
4           MS. BARLOTTA:  Object to form.
5       A.  No.  I do review the bonuses, but no,
6   I haven't done a review, no.
7       Q.   Based on gender you have not done
8   that review?
9       A.  No, because we don't base stuff on
10  gender.  We base stuff on people's performance
11  and their capabilities.  The bonuses are -- it's
12  not about the bonus.  It's about the total comp.
13      It's -- some people's base is larger
14  than others.  Some people's bonus is bigger than
15  others.  It's the total comp that counts.
16      Q.   Well, there's a pot of money that
17  gets bonuses for a team, right?
18      A.  Correct.
19      Q.   And -- but that bonus amount is
20  determined by the head of that team, right?
21      A.  Yes.
22      Q.   And you sign off on all bonuses?
23      A.  I review all bonuses.

Page 95

1       Q.   Do you have to approve them?
2       A.  No.
3       Q.   What do you get to review all
4   bonuses, what information or documentation?
5       A.  I get a spreadsheet with people's
6   bonus information.  If there's something that
7   looks out of line to me, I will question it.  And
8   if it doesn't look out of line to me, I don't
9   question it.
10      Q.   And you've gotten those spreadsheets
11  ever since you've been president?
12      A.  Yes.
13      Q.   And even since you've been over your
14  department?
15          MS. BARLOTTA:  Object to form.
16      A.  Yes.
17      Q.   And you've seen those spreadsheets
18  that have bonuses for Kathryn Hendrix?
19          MS. BARLOTTA:  Object to form.
20      A.  I'm sure I have, yes.
21      Q.   And have you seen bonuses that listed
22  Kathryn Hendrix as an account executive and then
23  at some point as a broker?

Page 96

1           MS. BARLOTTA:  Object to form.
2       A.  I don't recall her title, no.  But
3   I'm -- if it's on the sheet, it's on the sheet
4   I'm sure.
5       Q.   And was there any written policy
6   about how bonuses were determined for a broker?
7           MS. BARLOTTA:  Object to form.
8       A.  Well, a written policy, yes, for
9   brokers, absolutely.
10      Q.   And what is that --
11      A.  Or for the lead broker on the team.
12      Q.   Not the lead broker.
13      A.  That's all the -- everything else
14  is -- for the most part is subjective.
15      Q.   Everything is up to the discretion of
16  the lead broker to determine how much to give the
17  brokers below that person?
18      A.  The brokers and the account
19  executives and the technical assistants and
20  everybody under them, yes.
21      Q.   Have you ever reviewed the bonuses
22  for -- when you got these spreadsheets, just show
23  -- kind of tell me on a spreadsheet for each

Video Deposition of John Cadden                                1/31/2024
                                                               25 (97 - 100)

Page 97

1  department, how many employees on average total
2  would it be?
3      A.   I get a spreadsheet for each team.
4      Q.   Okay.  For teams, sorry.  For each
5  team, about how many employees would it be?
6      A.   Six or seven, depends on the size of
7  the team.
8      Q.   Not many?
9      A.   Right.
10     Q.   And for each team, that would include
11 brokers at different levels and account
12 executives?
13     A.   And broker assistants and technical
14 assistants, yes.
15     Q.   Okay.  And you could tell from
16 looking at that who would be a female and who
17 would be a male employee?
18     A.   Well, I know most of them, so yeah.
19     Q.   Because you're in the department,
20 you're in the office, you walk around, you know
21 them?
22     A.   I do.
23     Q.   Okay.  Where was your office in

Page 98

1  relation to where Kathryn Hendrix worked?
2      A.   I was on the fourth floor.  She's
3  on --
4      Q.   What floor was she on?
5      A.   The third floor.
6      Q.   Would you ever go down to the third
7  floor?
8      A.   I do.
9      Q.   How often?
10     A.   A couple of times a week.  It
11 depends.  It depends on my day.
12     Q.   So you were around Kathryn?
13     A.   Yeah, I mean, I -- yeah.
14     Q.   So when you were reviewing these team
15 bonus sheets, how many teams would there be on
16 average where you would get the bonus sheets to
17 approve?
18     A.   We have eighteen --
19          MS. BARLOTTA:  Object to form.
20     A.   We have eighteen brokerage teams, so
21 I got all of them.
22     Q.   When you were reviewing those, did
23 you ever look to see any kind of comparison about

Page 99

1  the men versus the women?  Let's say you're
2  looking at one team, there are about six people
3  on it.  Did you ever look to compare the bonus
4  for men versus women?
5      A.   No.  I looked at the bonus from
6  probably two years ago.  We bonus twice a year.
7  So I would look back to see if the bonuses are in
8  line.  And if the team was up, I expected the
9  bonuses to be up.  If the team was down, the
10 bonus could be -- most of our -- well, most of
11 our brokerage teams do not adjust the support
12 staff's bonuses if they're down.  They just eat
13 the -- they eat the shortfall.
14     Q.   At some point did you understand that
15 one of Ms. Hendrix's claims is that she didn't
16 receive bonuses comparable to male employees?
17          MS. BARLOTTA:  Object to form.
18     A.   No, I didn't.
19     Q.   You didn't know that?
20     A.   No.
21     Q.   And have you ever done a review to
22 compare bonuses received by Kathryn Hendrix in
23 comparison to male employees?

Page 100

1          MS. BARLOTTA:  Object to form.
2      A.   No.
3      Q.   Could you do that easily if you
4  wanted to?
5          MS. BARLOTTA:  Object to form.
6      A.   Sure.
7      Q.   And when you get these spreadsheets
8  from these eighteen teams with around six
9  employees on each team, do you keep those or save
10 them somewhere?
11          MS. BARLOTTA:  Object to form.
12     A.   Yeah, they're on -- yes.
13     Q.   Where do you save them?
14          MS. BARLOTTA:  Object to form.
15     A.   They're in our computer system.
16     Q.   And can you pull them up at any time?
17          MS. BARLOTTA:  Object to form.
18     A.   They can get pulled up, I suppose.
19     Q.   You mean you might not be able to
20 technically do it, but you can get somebody to do
21 it?
22     A.   Yeah.
23          MS. BARLOTTA:  Object to form.

Page 101

1    Q.   You've lost your mic.

2    A.   Oh, I'm sorry.

3    Q.   That's okay.  Thank you.

4    A.   Now (indicating).

5    Q.   How far back could you go if you

6    wanted to pull up these bonus sheets from the

7    eighteen teams with about six employees on them?

8         MS. BARLOTTA:  Object to form.

9    A.   I'm sure our accounting department

10   could pull up whatever we need.

11   Q.   You could go back to 2018, 2019,

12   2020?

13        MS. BARLOTTA:  Object to form.

14   A.   I'm sure we could.

15   Q.   Have you been asked to do that?

16        MS. BARLOTTA:  Object to form.

17   A.   No.

18   Q.   Are -- and I don't know anything

19   about your industry.  So if I say anything wrong,

20   let me know.  But it's my understanding that

21   there are some social events around either

22   obtaining business or keeping clients; is that

23   correct?

Page 102

1    A.   Sure.

2         MS. BARLOTTA:  Object to form.

3    Q.   And are there social events that are

4    sponsored by some of the clients or underwriters?

5    A.   There are.

6    Q.   And are there social events that are

7    sponsored by CRC or Truist?

8         MS. BARLOTTA:  Object to form.

9    A.   Yes.

10   Q.   And at those social events, do some

11   of those include dinners?

12        MS. BARLOTTA:  Object to form.

13   A.   Yes.

14   Q.   And do some of those include

15   retreats?

16        MS. BARLOTTA:  Object to form.

17   A.   Yes.

18   Q.   Who gets to decide who goes to these

19   social events, whether it's a dinner or a

20   retreat?  Who gets to determine who on the team

21   attends the social events?

22        MS. BARLOTTA:  Object to form.

23   A.   The lead -- the lead broker or it

Page 103

1    depends on how big of event it is, obviously, but

2    if it's a dinner with the client, the lead broker

3    would determine that.  And if it's not beneficial

4    to go, then we don't send the whole staff.  We

5    don't bombard our clients.

6    Q.   And underwriters attend these events?

7    A.   Sometimes, but usually we have

8    underwriter events, and then we have client

9    events.

10   Q.   At any of these social events during

11   the time that Kathryn Hendrix worked for CRC or

12   Truist, were there ever any complaints by female

13   employees that attended them that they were

14   subjected to any type of harassment?

15        MS. BARLOTTA:  Object to form.

16   A.   Not to my knowledge.

17   Q.   Or that they were subjected to any

18   type of offensive comments?

19        MS. BARLOTTA:  Object to form.

20   A.   Not to my knowledge.

21   Q.   Was there any discussion about women

22   not needing to attend any social event sponsored

23   either by CRC or Truist or somebody else because

Page 104

1    the men couldn't be men?

2         MS. BARLOTTA:  Object to form.

3    A.   No.

4    Q.   Okay.  And is there drinking at these

5    social events?

6    A.   Absolutely.

7    Q.   And is there drinking in the office?

8    A.   Occasionally, but not regularly.

9    Q.   Is there alcohol or alcoholic

10   beverages, rather, that are kept in the office?

11   A.   Sure.

12   Q.   And during Kat's employment, did

13   employees keep alcoholic beverages in their own

14   personal offices?

15   A.   They could have.

16   Q.   And did employees actually have

17   refrigerators in their office where they kept

18   alcoholic beverages?

19   A.   I'm -- yes.

20   Q.   And those were also kept and

21   maintained by the company in the community break

22   room or refrigerator?

23   A.   I don't know that to be true, but I

Page 105

1  -- if you need more refrigerator space for your
2  beer, I guess you could put it in the company's
3  fridge, yes, I guess.
4       Q.   And while you've been president, if
5  an employee cracked a beer at 3:00, you wouldn't
6  have a problem with that?
7       MS. BARLOTTA:  Object to form.
8       A.   No.
9       Q.   Do you recall -- let me ask you this:
10  Do you attend these --
11       MS. BARLOTTA:  I need a bathroom
12  break when you get a chance.
13       MS. WILKINSON:  What now?
14       MS. BARLOTTA:  I said whenever you
15  get a chance, I need a break.
16       MS. WILKINSON:  Let me go through
17  some of this, and we will.
18       Q.   (BY MS. WILKINSON:)  Do you attend
19  these social events, the dinners and retreats?
20       A.   More than I would like.
21       Q.   And are you there because it's
22  important for the clients and customers to see
23  your face?

Page 106

1       A.   Yes.
2       Q.   And for you to talk to them and make
3  sure they're happy, keep the business?
4       A.   Yes.
5       Q.   How much business annually does the
6  Birmingham office generate in dollars?
7       A.   In dollars, last year was one billion
8  one hundred and seventy million dollars.
9       Q.   How many clients/customers in the
10  Birmingham office?
11       A.   Hundreds.  I couldn't -- probably
12  over a thousand.
13       Q.   Were you aware that Kathryn Hendrix
14  attended a dinner, and a male underwriter was
15  talking about, I'm just going to quote, pussy?
16       MS. BARLOTTA:  Object to form.
17       Q.   A female's vagina?
18       MS. BARLOTTA:  Object to form.
19  Assumes facts not in evidence.
20       Q.   And that he said to Kat and the other
21  men that were around, This is why you should not
22  be here, referring to Kathryn Hendrix being a
23  female?  Were you aware of that?

Page 107

1       MS. BARLOTTA:  Object to the form.
2       A.   I was not aware of that.
3       MS. BARLOTTA:  Assumes facts not in
4  evidence, and move to strike counsel's testimony.
5       Q.   I can ask you about things, Mr.
6  Cadden, that have not come up in this case so
7  far.  In fact, that's what depositions are for,
8  and that's what I'm doing.
9       Are you aware --
10       MS. BARLOTTA:  She shouldn't present
11  things to you as being fact when they're not or
12  lead you to believe that they're factual and that
13  they're undisputed when they're not.  So we're
14  going to clarify that on the record.
15       She's also not supposed to testify.
16  You're supposed to be able to testify.
17       Q.   Are you aware of any conversations
18  like this ever happening at any of these social
19  functions where either customers or employees of
20  CRC or Truist were talking about sex, women's
21  anatomy, breast implants, things like that, at
22  any of these events?
23       A.   Not to my knowledge.

Page 108

1       MS. BARLOTTA:  Object to form.
2       Q.   Did any of the female employees ever
3  complain that there seemed to be a certain type
4  of female employee that got invited to these
5  social functions, female employees that maybe had
6  their breasts augmented?  Did any of the female
7  employees ever complain about that?
8       MS. BARLOTTA:  Object to form.
9       A.   No.
10       MS. BARLOTTA:  Move to strike.
11       Q.   Did you ever hear any female
12  employees complain about not being asked to
13  attend any of these social functions with
14  customers or clients, either dinners or retreats?
15       MS. BARLOTTA:  Object to form.
16       A.   No.
17       Q.   Were you aware that Kat had
18  complained, Kathryn had complained about not
19  being allowed to attend an event; in fact, was so
20  upset that she was crying?  Were you ever aware
21  of that?
22       MS. BARLOTTA:  Object to form.
23       A.   No.

Page 109

1    Q.  Did you ever talk to Rusty about
2  Kathryn raising any concerns about being excluded
3  from these events?
4        MS. BARLOTTA:  Object to form.
5    A.  No.
6    Q.  What's the benefit to a broker to
7  attend these events?
8    A.  Well, it depends on the event; but if
9  it's a client event, it's to solidify a
10  relationship.  If it's a market event, it's to
11  strengthen or start a relationship with that
12  market.
13    Q.  So it can help your book of business?
14    A.  Very helpful.
15    Q.  Make more money?
16    A.  Yes.
17    Q.  Who gets to decide which broker that
18  a customer works with?  Is that CRC/Truist or
19  does the customer get to decide?
20    A.  The customer ultimately decides who
21  they do business with.
22    Q.  So if a customer said, I don't want
23  to work with any black brokers, would you honor

Page 110

1  that?
2        MS. BARLOTTA:  Object to form.
3    A.  I've never had that.  No, we would
4  take issue with that.
5    Q.  And if a customer said, I don't want
6  to work with any female brokers, would you take
7  issue with that?
8        MS. BARLOTTA:  Object to form.
9    A.  We would take issue with that.
10    Q.  And would that be discrimination to
11  say, I'm not going to work with any female
12  brokers?
13        MS. BARLOTTA:  Object to form.
14    A.  Yeah.
15    Q.  Are you aware of that ever happening?
16    A.  No.
17        MS. BARLOTTA:  Object to form.
18    Q.  Okay.  Let's take a break for just a
19  minute, Mr. Cadden.  If you need anything, let me
20  know, okay?
21    A.  Restroom would be great.
22    Q.  Yeah, it's right out the door to the
23  left by the water fountain.

Page 111

1        VIDEOGRAPHER:  We are taking a break.
2  The time is 3:17.
3        (Whereupon, a brief recess was
4  taken.)
5        VIDEOGRAPHER:  We are back on the
6  record.  It is 3:33.
7    Q.  (BY MS. WILKINSON:)  All right.  Mr.
8  Cadden, we're back on the record after taking a
9  break.  Is there anything you want to change
10  about your prior testimony?
11    A.  I don't believe so.
12    Q.  Okay.  Did anybody ever talk to you
13  or were you ever aware of any of the female
14  employees not wanting to work under Clay Segrest?
15        MS. BARLOTTA:  Object to form.
16    A.  No.
17    Q.  Were you aware of any concerns raised
18  by any female employees about the way that Clay
19  Segrest would treat them?
20    A.  No.
21    Q.  Do you know Yvette -- we talked about
22  that -- Yvette Talsma and Andrea Sutton?
23    A.  Uh-huh (positive response).

Page 112

1    Q.  Were you ever aware that they had
2  raised any concerns about Clay Segrest?
3        MS. BARLOTTA:  Object to form.
4    A.  No.
5    Q.  When you talked with Mr. Helveston
6  about Kathryn's complaints -- I'm taking you back
7  a little bit, kind of where we began today -- did
8  Mr. Helveston ever tell you that Kathryn had
9  reported that it was an equality issue, that
10  there was an equality issue within the Birmingham
11  office?
12        MS. BARLOTTA:  Object to form.
13    A.  No.
14    Q.  Did he tell you that Kathryn had
15  complained that the men are not allowing the
16  women the same opportunities?
17        MS. BARLOTTA:  Object to form.
18    A.  No.
19    Q.  Are you certain of that or could he
20  have told you that and you just don't recall?
21        MS. BARLOTTA:  Object to form.
22    A.  No, he didn't say that to me.
23    Q.  And certainly if Kathryn had told

Page 113

1    that to Mr. Helveston, it's an equality issue,

2    the men are not allowing the women the same

3    opportunities, you would understand that to be a

4    concern of gender discrimination?

5         MS. BARLOTTA:  Object to form.

6    **A.   I would -- yes.**

7    Q.   And that should be elevated to human

8    resources?

9         MS. BARLOTTA:  Object to form.

10    **A.   If it was a complaint, yes.**

11    Q.   Well, even if she just made that

12    comment, you couldn't ignore it, could you?

13         MS. BARLOTTA:  Object to form.

14    **A.   Should not ignore it, yeah.**

15    Q.   Because you would understand that

16    that could be potential discrimination, right?

17         MS. BARLOTTA:  Object to form.

18    **A.   Yes.**

19    Q.   Okay.  And if Kathryn had said to

20    Clay Segrest and to Corey, and I'll mispronounce

21    his name, Corey Daugherty?

22    **A.   Uh-huh (positive response), that's**

23    **good enough, close enough.**

Page 114

1    Q.   Close enough, okay.  That the

2    Birmingham corporate office has not hired a woman

3    broker in over twelve years; that is a problem.

4    I can't believe that BB&T is allowing it to

5    happen.  We sell EPL, so we all know the

6    liability.  If Kathryn had made that comment to

7    Clay and Corey, would you understand that to be a

8    complaint regarding discrimination?

9         MS. BARLOTTA:  Object to form.

10    **A.   That -- no, that's not a complaint.**

11    **That's an observation.**

12    Q.   Would it be an observation that there

13    could be discrimination in the workplace?

14         MS. BARLOTTA:  Object to form.

15    **A.   I guess that could be her opinion,**

16    **yeah.**

17    Q.   And if she expressed that opinion to

18    Clay and Corey, is that something that should be

19    reported to human resources?

20         MS. BARLOTTA:  Object to form.

21    **A.   That's not a complaint.  That was her**

22    **opinion.  So I would say no.**

23    Q.   What is EPL?  If Kathryn made the

Page 115

1    comment, We sell EPL, what do you understand EPL

2    to be?

3    **A.   I'm going to tell you everything I**

4    **know about EPL right here.  Employment practices**

5    **liability, and we need to stop right there,**

6    **because I sell property insurance, and I'm not**

7    **going to go chase that rabbit, so --**

8    Q.   And fair enough.  My next question

9    was going to be do you have anything to do with

10    selling EPL?

11    **A.   No.**

12    Q.   You don't review those policies?

13    **A.   No.  I don't know anything about**

14    **that.**

15    Q.   Okay.  Fair enough.

16    **A.   We have a staff that handles that.  I**

17    **would be happy to recommend you to them.**

18    Q.   On your team, how do you determine

19    who gets to go to one of these social events that

20    we were talking about, either a dinner or a trip

21    or a retreat, things like that?  How do you pick?

22         MS. BARLOTTA:  Object to form.

23    **A.   If it's beneficial for the team.  It**

Page 116

1    **depends on -- there's a host of factors.  I mean,**

2    **does one person do business with this underwriter**

3    **or this client?  It just depends on -- you know,**

4    **we just try to keep the cost down for whoever is**

5    **paying, whether it be us or our client.  We just**

6    **don't send everybody.  It needs to have a**

7    **business reason.**

8    Q.   At these events, does it tend to be

9    more men than women?

10         MS. BARLOTTA:  Object to form.

11    **A.   I've never polled it, but possibly.**

12    Q.   What is the Curtain Cup?

13    **A.   That is an award that was established**

14    **honoring Tom Curtain, who is the founder of our**

15    **company.  And it's the largest or the -- well, it**

16    **was supposed to be the largest office, and we've**

17    **changed it.**

18    **It was pre-Covid.  It just started**

19    **like in, I don't know, two years before pre-Covid**

20    **maybe, and it's awarded to the office, but we've**

21    **kind of changed that.  It's kind of gone by the**

22    **wayside since Covid, to be honest with you.**

23    Q.   But it's still referred to as the

Page 117

1  Curtain Cup after Tom?
2      A.  Sure.
3      Q.  And Tom would be the person that
4  Lauren complained was an ass?
5      MS. BARLOTTA:  Object to form.
6      A.  No.  Nobody has ever said that Tom
7  Curtain was an ass.
8      Q.  Oh, I'm sorry.  You're right.  I was
9  thinking about Mason Johnston.
10     Do you ever recall an e-mail sent by
11  Tom Curtain that had racist comments in it?
12     MS. BARLOTTA:  Object to form.
13     A.  No.
14     Q.  You don't recall that being talked
15  about at the company?
16     MS. BARLOTTA:  Object to form.
17     A.  No.
18     Q.  Do you recall there being any
19  concerns made about Tom Curtain with regard to
20  any type of discrimination?
21     MS. BARLOTTA:  Object to form.
22     A.  No.
23     Q.  Who determines -- I'm not talking

Page 118

1  about bonuses, but just the base pay for an
2  employee?  Let's just say for your team, who gets
3  to determine that?
4      MS. BARLOTTA:  Object to form.
5      A.  Well, we try to pay -- I'm not sure
6  who determines that.  We have -- I don't want to
7  say schedule, but we have a range, I guess, just
8  because depending on people's work experience.
9  And, I mean, obviously, we pay somebody right out
10  of college a lot less money than we pay somebody
11  that's got ten years' experience, that kind of
12  stuff.
13     Q.  Does seniority factor into what an
14  employee is paid?
15     MS. BARLOTTA:  Object to form.
16     A.  Not necessarily, no.  It's more on
17  effort.  I mean, if you look at our salaries,
18  they're predominant pretty low, the base salaries
19  are low.  We're trying to promote growth.  People
20  that do more make more.  We don't do raises just
21  because of their age.
22     THE REPORTER:  Just because what?
23     THE WITNESS:  Because of their age.

Page 119

1      A.  We're a sales organization.  You get
2  paid for selling stuff, not for trying to sell
3  stuff.
4      Q.  (BY MS. WILKINSON:)  Is the pay range
5  that you're talking about, is it written down
6  anywhere?  Is it in a policy or a document?
7      A.  It possibly could be somewhere in the
8  Truist HR -- it's not in a CRC thing that I know
9  of.
10     Q.  And is there a pay range for an
11  account executive that you can use to award base
12  salary, not promotions?  I mean --
13     MS. BARLOTTA:  Object to the form.
14     A.  Again, it depends on -- we have
15  account executives we hire out of college that
16  are at the bottom of our pay scale.  And we have
17  some that maybe become account executives that
18  have ten years' experience.  We're going to pay
19  them more money.
20     Q.  What's the pay scale for an account
21  executive?
22     A.  I knew you would ask me that.  I
23  can't recall that off -- I can tell you we start

Page 120

1  college kids today, 2024, they're going to start
2  somewhere in the fifty-two to fifty-five range
3  maybe, but that's 2024, not 2030.
4      Q.  Okay.  Like Yvette Talsma was hired
5  in 1990.  She's been an account executive how
6  long, her entire career?
7      A.  No.  She started off in the -- she
8  started out as our receptionist actually and has
9  moved up.
10     Q.  How long has she been -- how many
11  years has she been an account executive?
12     A.  I couldn't tell you, to be honest
13  with you.
14     Q.  More than ten?
15     A.  A long time, yeah.
16     Q.  Did -- when other account executives
17  are hired in any department, any team, do you go
18  back and look at what the long-term account
19  executive employees are making to see if you need
20  to adjust their salary?
21     A.  We do not.
22     Q.  Why not?
23     A.  Because we -- their bonus, like I

Page 121

1   mentioned earlier, their bonus income is most --
2   larger than their base income.
3       Q.   Well, do you take into account when
4   you're giving bonuses that, let's say, Yvette
5   Talsma has been there since 1990, and she's
6   making less than employees who were hired, you
7   know, in 2015?
8       I mean, do you take into account when
9   you're giving a bonus, hey, we need to make up
10  for what somebody is being paid, because they're
11  paid less than other account executives?
12      A.   Their base pay may be less or
13  greater, but it's the total comp.  We look at the
14  total comp, not --
15      Q.   Well, and maybe I'm not asking it
16  right, Mr. Cadden.  My question is:  Let's say
17  you've got an account executive making thirty
18  something and one making fifty something, but the
19  thirty something has been there fifteen years
20  longer than the one making more.
21      Do you go, oh, wait a minute, we need
22  to give this person more bonus to make up for
23  that so that their -- you kind of -- you're not

Page 122

1   raising their base, but you're giving a bonus to
2   compensate for that?  Does that make sense?
3       A.   We're not giving a bonus because
4   somebody else makes more money.  We're giving a
5   bonus because the -- for their production level
6   of the team.
7       Q.   Well, looking at Plaintiff's Exhibit
8   27, Mr. Cadden, and out of the thirteen women,
9   Ross Robertson was paid more than nine of the
10  women, hired after all of them.  There are other
11  male employees that are paid more than these
12  women.
13      Have you ever looked at that and
14  said, Wait a minute; we've got some male
15  employees that are making a whole lot more than
16  these females?
17      MS. BARLOTTA:  Object to form.
18      A.   I don't think you heard me a minute
19  ago.  We're looking at -- we look at total comp.
20  Bases are -- it depends on -- let's pick on Ross
21  for a minute since you brought him up.
22      Ross came from a company in
23  Mississippi, had experience.  We're going to pay

Page 123

1   him a larger base than somebody that's not.  But
2   his total comp may be less than Yvette or Brandi
3   Russell or pick somebody off this page.
4       Q.   So the number where it says
5   compensation on Plaintiff's Exhibit 27, that's
6   the base?
7       A.   That's their base salary.  And these
8   numbers are -- some of these people have
9   multiple -- numbers are multiples of what's on
10  their base.
11      Q.   Do you know if Yvette's total
12  compensation was ever increased because she was
13  making so much less than Ross?
14      MS. BARLOTTA:  Object to form.
15      A.   I would say her compensation has
16  nothing to do with Ross' compensation, nor does
17  his with hers.
18      Q.   Has there been any talk about needing
19  to adjust any of the female employees that have
20  been account executives since, you know, the '90s
21  or early 2000s?
22      A.   Again, we -- it's their adjustments
23  are -- usually those people are on large teams,

Page 124

1   and they get their bonus substantially.  And we
2   do bonus -- and to be fair, we do have merit
3   increases.  So some of these numbers are probably
4   not accurate from when you got from this -- I'm
5   not sure when this document was presented to you.
6       Q.   The company sent it to the EEOC.
7       A.   Okay.  So some of these people may
8   have had a merit adjustment since then, and it's
9   going to be a three percent.  That has nothing to
10  do with being a female or black or male.  It's
11  just three percent is the max that you can get.
12      Q.   I hear you, but did you ever have any
13  conversations with anybody about needing to
14  adjust the salary of some of the female
15  employees, the base salary?
16      A.   No.
17      Q.   Okay.  Or did you ever have a
18  conversation with anybody about, Look, we've got
19  some women who were paid much less than the men
20  on the base salary, let's make sure we compensate
21  for them on bonuses?
22      MS. BARLOTTA:  Object to form.
23      Q.   Did you ever have that conversation

Page 125

1  with any of the team leads?
2      A.  No, I did not.
3      Q.  What's the launch program?
4      A.  It's a relatively new program that
5  we've established.  I'm not sure exactly when.  I
6  have nothing to do with it.  Jessica Marshall
7  runs that program.
8          We find -- young would be the
9  wrong -- young not necessarily being age, but new
10  producers, new people in our business that we see
11  the ability of them to become a producer, an
12  outside producing broker, and they have
13  additional training.  They have additional like
14  sales training in small aspects of the company.
15          We bring in outside people, and it's
16  a three-year -- three- to four-year program.  And
17  then the goal is for them to be a producing
18  broker, either on their own or on a team.
19      Q.  When did the launch program start,
20  what year?
21      A.  That's a great question.  I -- I'm
22  going to say after -- no.  After Covid maybe,
23  2022.  Three or four years, let's just say.

Page 126

1      Q.  After Kathryn was no longer employed?
2      A.  Correct.
3      Q.  Okay.  So you think it was maybe
4  2021, 2022?
5      A.  I would hate to speculate on that,
6  but somewhere in there, I think.
7      Q.  Whose idea was the launch program?
8      A.  I have no idea.  That's above my pay
9  grade.
10      Q.  Were there any documents or e-mails
11  about the launch program when it first started?
12      A.  I'm sure there are, but I don't know.
13  I don't recall seeing them.  I'm sure there's
14  obviously something in writing somewhere.
15      Q.  How did you find out about the launch
16  program?
17      A.  I mean, I've got people in my office
18  that are in it.  We've talked about it trying to
19  figure out how to grow talent, grow our company,
20  what can we do to give our young people an edge.
21  And so I've been in several meetings about it.
22      Q.  Is there a document that says, Here's
23  what the launch program is and what you will do

Page 127

1  in the launch program?
2          MS. BARLOTTA:  Object to form.
3      A.  I don't know the answer to that
4  question.
5      Q.  Is there a document that says, Here's
6  how you select who gets to go to the launch
7  program?
8          MS. BARLOTTA:  Object to form.
9      A.  I'm sure there is, but I don't --
10  I've never seen that to my knowledge.
11      Q.  Have you sent any of the employees on
12  your team to the launch program?
13      A.  I have not.
14      Q.  Do you know how you get to go to the
15  launch program?
16      A.  You're nominated by your team lead.
17      Q.  And do you discuss -- since you're
18  the president of the Birmingham office, do you
19  discuss with any of the team leads about who gets
20  nominated for the launch program?
21      A.  Yes, we do discuss that.
22          MS. BARLOTTA:  Object.
23      Q.  And who -- is that something that

Page 128

1  they're required to get your input on?
2      A.  I don't know about required, but --
3      Q.  But they do?
4      A.  For the most part, we talk about it.
5      Q.  And who have -- tell me the names of
6  the team leaders you've had conversations with
7  about who should be nominated for the launch
8  program.
9      A.  I've talked to Rusty about Ross
10  Robertson.  Andrew Baker has a young gentleman on
11  his team that started, Peyton.
12      Q.  Peyton?
13      A.  Peyton.  I can't recall Peyton's last
14  name.  And then Trey Nelson has a -- our first
15  Covid hire, Charles Fisher, who is in the launch
16  program, and then my son is in the launch
17  program.
18      Q.  Steele Cadden?
19      A.  He is, yes.
20      Q.  Whose team is your son on?
21      A.  Corey Daugherty.
22      Q.  And Corey is the one that nominated
23  Steele?

Page 129

1    A.  He did.

2    Q.  What's Steele's position?

3    A.  He is an account executive currently.

4    Q.  Who determined Steele Cadden's base

5    pay?

6    A.  That's what -- that's what Corey

7    decided to pay him.  I did not.

8    Q.  You had to approve it, though, right?

9    A.  I approved his hiring.  I have

10   nothing to do with my son.  I stay more than an

11   arm's length away from him.

12   Q.  You approve his bonuses, right?

13       MS. BARLOTTA:  Object to form.

14   A.  I see his bonuses, but I do not have

15   any involvement with it whatsoever.

16   Q.  Do you know what your son made

17   starting out as an account executive?

18   A.  Probably somewhere high fifties, low

19   sixties, maybe sixty thousand dollars.

20   Q.  And when was he hired?

21   A.  Two and a half years ago maybe.

22   Q.  And Ross Robertson, what was his

23   position when he went into the launch program?

Page 130

1    A.  I'm sure he was an account executive.

2    Q.  What is his position now?

3    A.  I don't know if they changed their

4    titles when they go to the launch program or not,

5    to be honest with you.  I'm not sure what the --

6    I'm not involved in that on a day-to-day basis,

7    so I'm not sure what they do.

8    Q.  Do you know what year Ross was

9    nominated?

10   A.  I don't.  I mean, he's still in it,

11   so it's less than -- it's less than three years.

12   Q.  Within the past -- so sometime

13   between 2021 and now?

14   A.  Yes.

15   Q.  Okay.  And what about Peyton, do you

16   know when Peyton --

17   A.  I don't believe he's been nominated.

18   He just started with us, for heaven sakes.  We're

19   just -- he's --

20   Q.  Y'all are talking about putting him

21   in?

22   A.  Yeah, he's a very motivated young

23   man.

Page 131

1    Q.  What's his position?

2    A.  He's an account executive.

3    Q.  What does he make a year?

4        MS. BARLOTTA:  Object to form.

5    A.  I would have to go look at that.  I'm

6    sure in the fifty, fifty-five, sixty, somewhere

7    in there.

8    Q.  When was he hired, Mr. Cadden?

9    A.  Last May maybe.

10   Q.  May of '23?

11   A.  Yeah.  Yes.

12   Q.  And then Ross Robertson, when did he

13   go into the launch program?

14   A.  We just mentioned two or three years

15   ago.  I'm not --

16   Q.  Oh, I'm sorry.  You're right.

17       Is Trey Nelson in the launch or was

18   he the one that nominated --

19   A.  No.  Trey Nelson is a broker.

20   Q.  Ross Fisher?

21   A.  Charles Fisher.

22   Q.  Charles.  Okay.  When did Charles

23   Fisher go into the program?

Page 132

1    A.  A year or two ago.

2    Q.  And was he an account executive when

3    he went into the position?

4    A.  He was.

5    Q.  And that's the one Trey Nelson

6    nominated?

7    A.  Yes.

8    Q.  Okay.  And Corey nominated your son.

9    When did he nominate your son?

10   A.  He just started in July.  So sometime

11   prior to that.

12   Q.  And are there any written

13   requirements that you are aware of about how a

14   team lead would nominate -- what requirements

15   there are, criteria to nominate somebody for the

16   launch program?

17   A.  I'm sure there's -- Jessica Marshall

18   probably has those -- that information.

19   Q.  Have you ever seen them?

20       MS. BARLOTTA:  Object to form.  Asked

21   and answered.

22   A.  Possibly.

23   Q.  What are the requirements to nominate

Page 133

1  somebody?  Because they come talk to you about
2  it.  So what are the requirements?
3       MS. BARLOTTA:  Object to form.
4       A.  No, we just talk about --
5       MS. BARLOTTA:  Move to strike.
6       A.  We just talk when they come to me,
7  Hey, I've got this person that I think would be
8  great, and it's a great opportunity for them, and
9  so that's where -- the level of conversation I
10  have.
11       I don't review their -- I don't check
12  the box to make sure they have -- everything
13  they've done.  That's somebody else's
14  responsibility, not mine.
15       Q.  What happened -- whose responsibility
16  is that?  Who does that?
17       A.  That would be the lead broker.
18       Q.  Lee who?
19       A.  The lead broker of the team.  We
20  would fill out all the -- the form, the
21  paperwork.
22       Q.  And then who does it go?
23       A.  I'm assuming Jessica Marshall, and

Page 134

1  there's the whole interview process that I have
2  nothing to do with.  It's a huge --
3       Q.  What's Jessica's title?
4       A.  Chief -- I think it's chief -- she
5  just got promoted chief marketing officer.  I
6  believe that's correct.
7       Q.  Is she in Birmingham?
8       A.  No, she's in Dallas, Texas.
9       Q.  Are you aware of any females being
10  nominated for launch?
11       A.  Across the company, I'm sure we have
12  several.
13       Q.  Out of Birmingham?
14       A.  Not to my knowledge, no.  Not at this
15  point.
16       Q.  There are fifteen total, just on the
17  list that we've got, Plaintiff's Exhibit 27,
18  fifteen total female account executives, and none
19  of them have been nominated.  Do you know why?
20       A.  I do not.
21       MS. BARLOTTA:  Object to form.
22       Q.  Have you talked to any of them about
23  whether they wanted to go to launch?

Page 135

1       A.  I have not.
2       Q.  Have you asked them if they're even
3  aware of the launch program?
4       MS. BARLOTTA:  Object to form.
5       A.  I have not.
6       Q.  Why not?
7       A.  I haven't had the -- I haven't had
8  the need to.  I don't -- I mean, I'm -- I'll walk
9  around their office and visit with people when
10  they have problems to say hello.  I don't sit
11  down and talk to them.  I have my own book of
12  business that I'm doing, and just I haven't.
13       Q.  Well, do you ever have meetings for
14  the whole Birmingham office?
15       A.  Occasionally.  We're not a big
16  meeting -- we're not big into meetings in our
17  office, but --
18       Q.  Do you send out e-mails to everybody
19  in the office from time to time to let them know
20  things?
21       A.  I do.
22       Q.  Did you send out an e-mail to say,
23  Hey, we're starting this new launch program, I

Page 136

1  want to let y'all know?
2       A.  I did not.
3       Q.  Why not?
4       A.  Because the people that handled the
5  launch program did.
6       Q.  Why didn't you want to let your
7  office know?
8       MS. BARLOTTA:  Object to form.
9       A.  They know.  They get the same e-mail
10  I get.
11       Q.  So it's your testimony that everybody
12  in the office got an e-mail about the launch?
13       A.  I don't know about everybody, but
14  every team lead did.
15       Q.  Well, what about the account
16  executives?  Do you know if they've ever been
17  informed?
18       A.  I'm not sure.
19       MS. BARLOTTA:  Object to form.
20       A.  I don't know.  I don't know the
21  answer to that question.  I'm sorry.
22       Q.  Well, wouldn't that be something that
23  would be important to know to see if -- since

Page 137

1  it's all men that have been nominated so far?
2      A.  I'm not sure it's all men that's been
3  nominated or maybe it's all men in our office,
4  but --
5      Q.  I'm talking about just the Birmingham
6  office right now.
7      A.  I know, but we have eighty-one
8  offices across the country, and we have five
9  thousand employees.  We have lots of women.
10     Q.  You don't manage those other offices?
11     A.  Absolutely not.
12     Q.  You're just responsible for
13  Birmingham.  That's all I'm talking about right
14  now.
15     A.  Correct.
16     Q.  Don't you think it's odd that there
17  are fifteen account executives on this list who
18  are women, and none of them in the past three
19  years this launch program has been in existence
20  have been nominated?
21         MS. BARLOTTA:  Object to form.
22     A.  No.
23     Q.  What about Yvette?  She's a really

Page 138

1  good account executive, isn't she?
2      A.  She's awesome.
3          MS. BARLOTTA:  Object to form.
4      Q.  She would be a great broker, wouldn't
5  she?
6          MS. BARLOTTA:  Object to form.
7      A.  I don't know that.  I'm not sure she
8  wants to be a broker.
9      Q.  Well, did you ever ask anybody --
10  whose team is she on?
11     A.  She was Corey.
12     Q.  When Corey nominated your son, did
13  you ever say, Wait a minute, Corey, wait a
14  minute, we've got Yvette on your team.  I know
15  Yvette is a great employee.  Why aren't we
16  nominating her?
17         MS. BARLOTTA:  Object to form.
18     A.  No, I did not.
19     Q.  What about all the other women on
20  Corey's team?  Did you ever say, Wait a minute,
21  Corey, we've got -- my son started working here
22  just recently, and he's nominated.  What about
23  all these account executives who are women that

Page 139

1  have been on your team for years and years?  Why
2  aren't you nominating any of them?  Did you ever
3  ask him about that?
4          MS. BARLOTTA:  Object to form.
5      A.  I did not.
6      Q.  Why not?
7      A.  I just didn't.
8      Q.  Well, whose job was it to ask that
9  question?  It was yours, wasn't it, Mr. Cadden?
10         MS. BARLOTTA:  Object to form.
11  Assumes facts not in evidence that it's his job
12  to ask a specific question about why someone has
13  been nominated or not.
14     A.  I didn't.
15     Q.  But you're the one responsible for
16  making sure there's no discrimination in the
17  Birmingham office, right?
18         MS. BARLOTTA:  Object to form.
19     A.  Yes.
20     Q.  What did your son do before he
21  started working for your Birmingham office?
22     A.  He worked at AmRisk.
23     Q.  At where?

Page 140

1      A.  AmRisk.
2      Q.  Doing what?
3      A.  He was a -- I think their version of
4  an account executive.
5      Q.  How long was he there?
6      A.  A year possibly.
7      Q.  Why did he leave there?
8      A.  He had an opportunity to come to CRC.
9      Q.  Were there any issues with his
10  performance at the prior employer?
11         MS. BARLOTTA:  Object to form.
12     A.  Not to my knowledge.
13     Q.  And where did he work before that
14  employer?
15     A.  Worked at -- he worked for a trucking
16  company downtown.  What's the name of it?  He was
17  a trucking broker for a while, and then he went
18  to work for an agency.  I can't think of the name
19  of the agency.  Stand by.  It'll come to me.
20     Q.  So he had less than a year account
21  executive experience when he came to CRC, your
22  Birmingham office, right?
23         MS. BARLOTTA:  Object to form.

Page 141

1    A.   No, it was about approximately a
2    year, yes.
3    Q.   About a year?
4    A.   He was in the insurance business for
5    a year or two prior to that.
6    Q.   Did Steele, your son, apply for the
7    position?
8    A.   Yes.
9    Q.   And who else applied when Steele
10   Cadden was hired as an account executive?
11   A.   I don't know the answer to that
12   question.  We have people all the time apply for
13   jobs.
14   Q.   Was it announced within the
15   department within the Birmingham office that
16   there was an account executive position open when
17   your son got it?
18   A.   It was published on our website.
19   Q.   Was it posted outside of the office?
20        MS. BARLOTTA:  Object to form.
21   A.   That would be a question for the
22   recruiters.
23   Q.   And he was hired in July of '23?

Page 142

1    A.   I'd have to check that.
2    Q.   Last summer sometime?
3    A.   No.  He's been with us -- I'm sorry.
4    I misspoke.  He's been with us two years.  I
5    apologize.
6    Q.   But he started the launch program
7    last summer?
8    A.   Yes.
9    Q.   Okay.  I may have had that messed up.
10   Sorry about that, Mr. Cadden.
11        Well, who had more experience as
12   account executive, Yvette or Steele?
13        MS. BARLOTTA:  Object to form.
14   A.   Yvette.
15   Q.   Did you know Cathy Cochran?
16   A.   Cathy Cochran?  Does she have a
17   different last name by chance?
18   Q.   She may.  She may have gotten
19   married.  Russo?
20   A.   Roussell?
21   Q.   Roussell?
22   A.   Yeah, I know Cathy.
23   Q.   And who had more experience as

Page 143

1    account executive, Cathy Roussell or your son?
2        MS. BARLOTTA:  Object to form.
3    A.   Cathy has been there longer, yes.
4    Q.   She's been there for a long time,
5    hasn't she?
6    A.   She has.
7    Q.   What about Rhonda Brasher?  Do you
8    know Rhonda Brasher?
9    A.   I do.
10   Q.   Been there for a long time, hasn't
11   she?
12   A.   She has.
13   Q.   Who had more experience as an account
14   executive, Rhonda Brasher or your son?
15        MS. BARLOTTA:  Object to form.
16   A.   Rhonda did.
17   Q.   Safe to say that Cathy, Rhonda,
18   Yvette had substantially more experience as
19   account executive than your son?
20        MS. BARLOTTA:  Object to form.
21   A.   Yes.
22   Q.   What about Brandi Russell?  Do you
23   know her?

Page 144

1    A.   I do.  She works for Rusty Hughes.
2    Q.   Safe to say she had substantially
3    more experience as an account executive than your
4    son?
5    A.   She did.
6    Q.   Marie Powe, do you know her?
7    A.   Maria, yes.
8    Q.   Maria.  Substantially more experience
9    as an account executive than your son?
10   A.   Yes.
11   Q.   Denise Lovoy?
12   A.   Denisa, uh-huh (positive response).
13   Q.   Substantially more experience as an
14   account executive than your son?
15        MS. BARLOTTA:  Object to form.
16   A.   Correct.
17   Q.   Is it safe to say that these
18   individuals also had -- the women that I've just
19   named -- substantially more experience than Ross
20   Robertson, Charles Fisher, and Peyton?
21        MS. BARLOTTA:  Object to form.
22   A.   Yes.
23   Q.   Do you know Andrea Sutton?

Page 145

1    A.  I do.
2    Q.   Is it fair to say that she had
3  substantially more experience than all of the men
4  that got to go to the launch program, Ross
5  Robertson, Charles Fisher, Peyton, and your son?
6        MS. BARLOTTA:  Object to form.
7    A.  Yes, she has more experience.
8    Q.   Danielle Levingston, do you know her,
9  Danielle Levingston?
10   A.  Yes.
11   Q.   Substantially more experience than
12  your son, Steele Cadden, Charles Fisher, Peyton,
13  and Ross Robertson?
14       MS. BARLOTTA:  Object to form.
15   A.  Yes.
16   Q.   Sarah Dunston, do you know her?
17   A.  I do.
18   Q.   Safe to say she has substantially
19  more experience as an account executive than Ross
20  Robertson, Charles Fisher, Peyton, and Steele
21  Cadden?
22   A.  Oh, she's --
23       MS. BARLOTTA:  She's wasn't there.

Page 146

1    A.  She's no longer with the firm.  She
2  left to go pursue a job in London.
3    Q.   Good for her.  When did she leave?
4    A.  I -- years ago.
5    Q.   Okay.
6    A.  And she was terribly missed, and we
7  had high hopes for her.
8    Q.   So when did she leave?
9    A.  I couldn't tell you, but it's been
10  years.
11   Q.   Like --
12   A.  Way pre-Covid.
13   Q.   Certainly before 2019?
14   A.  Yes.
15   Q.   Okay.  But she's on the list.  So
16  this was sent to the EEOC in 2020, so I'm not
17  real sure why she's listed as a current employee.
18       What about Spencer Whitlock, do you
19  know Spencer Whitlock?
20       MS. BARLOTTA:  I don't know that
21  she's listed on here as a current employee.
22       MS. WILKINSON:  I'm looking right at
23  her, Sarah Dunston.

Page 147

1        MS. BARLOTTA:  Yeah, but does it say
2  that she's currently employed?
3        MS. WILKINSON:  That's what this list
4  represents.
5        MS. BARLOTTA:  According to who?
6  It's a list of people who were employed when
7  Kathryn was there.
8    Q.   Do you know Spencer Whitlock?
9        MS. BARLOTTA:  No, no, no. Let's
10  clear the record.  I think that this was a list
11  of the people that were there when Kathryn was
12  there.  So I don't know that there's a
13  representation in sending this that she was
14  employed at the time.  So I just want to make
15  that clear for the record.
16   Q.   Do you know Spencer Whitlock?
17   A.  I don't --
18   Q.   And that's okay if you don't know.
19   A.  I don't recall that name, but --
20   Q.   What about Amber Varner?
21   A.  I do know Amber Varner.
22   Q.   Substantially more experience than
23  the four males?

Page 148

1        MS. BARLOTTA:  Object to form.
2    A.  She's been there longer, yes.
3    Q.   Tonya Vance, do you know Tonya?
4    A.  She's got to have a different last
5  name. I'm not sure who Tonya Vance is.
6    Q.   Okay.  Andrea Moore?
7    A.  I don't -- where do you see Andrea
8  Moore, ma'am?  I'm sorry.  I don't see it.
9    Q.   That's okay.  If you don't know them,
10  that's okay, Mr. Cadden.  I'm just asking about
11  if you know --
12   A.  I should know them, so I don't see
13  her.  Andrea Moore?
14   Q.   Tiffany Sanders, do you know her?
15   A.  Yes.
16   Q.   Okay.  Does she have substantially
17  more experience than the four male employees?
18       MS. BARLOTTA:  Object to form.
19   Q.   As an account executive?
20   A.  I'm not sure how long she's been with
21  the company.
22   Q.   Since 2018.
23       MS. BARLOTTA:  Object to form.

Page 149

1    A.   Yes.
2    Q.   Okay.  Do you know Mandy Pender?
3    A.   I do.
4    Q.   And she has substantially more
5    experience as an account executive than the four
6    males that got to go to the launch program?
7         MS. BARLOTTA:  Object to form.
8    A.   Yes.
9    Q.   Does this concern you, that I've just
10   named off thirteen, fourteen women with
11   substantially more experience as account
12   executives than these four men who got to go to
13   the launch program?
14        MS. BARLOTTA:  Object to form.
15   A.   No.
16   Q.   Does that indicate to you that there
17   might be a problem with gender discrimination?
18        MS. BARLOTTA:  Object to form.
19   A.   No.
20   Q.   Or that out of the fifteen account
21   executives, only two are men?
22        MS. BARLOTTA:  Object to form.
23   Q.   On this chart?

Page 150

1    A.   No.
2    Q.   Okay.  Why doesn't that indicate to
3    you that there could be a gender problem?
4         MS. BARLOTTA:  Object to form.
5    A.   It just doesn't.  I mean, it just
6    doesn't.
7    Q.   What if I flipped it and said all
8    these thirteen, fourteen women are actually black
9    employees who had more experience than four white
10   employees that got to go to the launch program,
11   substantially more experience, would that
12   indicate to you that there could be a racial
13   problem?
14        MS. BARLOTTA:  Object to form.
15   A.   No.  I -- no.
16   Q.   Okay.  Fair enough.
17        Mr. Cadden, have you seen any of the
18   discovery responses that Kathryn Hendrix
19   submitted in this lawsuit?
20   A.   I have not.
21   Q.   Okay.  Have you reviewed any of the
22   deposition testimony of any of the individuals
23   who were deposed before you?

Page 151

1    A.   I have not.
2    Q.   Have you talked with any of the
3    individuals about their deposition testimony?
4    A.   I have not.
5         MS. WILKINSON:  Okay.  Let's take a
6    break for just a minute and let me regroup on my
7    thoughts, and then I'm probably close to being
8    finished, certainly sooner than I thought.
9         MS. BARLOTTA:  Yeah.
10        MS. WILKINSON:  So we'll get Rachel
11   home before time for her to have childcare.
12        MS. BARLOTTA:  Thank you.
13        VIDEOGRAPHER:  We are taking a break.
14   The time is 4:08.
15        (Whereupon, a brief recess was
16   taken.)
17        VIDEOGRAPHER:  We are back on the
18   record.  The time is 4:23.
19        MS. WILKINSON:  Mr. Cadden, I don't
20   have anything else.
21        MS. BARLOTTA:  Great.
22        THE WITNESS:  Awesome.
23        MS. WILKINSON:  Further deponent

Page 152

1    saith not.
2         VIDEOGRAPHER:  This concludes our
3    deposition.  The time is 4:23.
4
5         FURTHER DEPONENT SAITH NOT
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 153

```
 1        C E R T I F I C A T E

 2

 3   STATE OF ALABAMA  )

 4   JEFFERSON COUNTY  )

 5

 6        I HEREBY CERTIFY that the above

 7   and foregoing transcript was taken down by me in

 8   stenotype, and the questions and answers thereto

 9   were transcribed by means of computer-aided

10   transcription, and that the foregoing represents

11   a true and correct transcript of the testimony

12   given by said witness.

13        I FURTHER CERTIFY that I am

14   neither of counsel, nor of any relation to the

15   parties to the action, nor am I anywise

16   interested in the result of said cause.

17

18

19   /s/Tanya D. Cornelius

20   TANYA D. CORNELIUS, RPR

21   ACCR #378 Expires 10/1/2024

22   Notary Expires 9/13/26

23
```

Video Deposition of John Cadden                                    1/31/2024
                                                                         40

Please return the signature page, correction sheet, and transcript within 30
days.  The list of corrections will be attached to the original deposition and all
parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

 Tanya Cornelius
Certified Court Reporter

WITNESS SIGNATURE PAGE


In Re:  Read and sign of Video Deposition of John Cadden


I, _____, hereby certify that I have read the

foregoing transcript of my deposition and it is a true and correct transcript of the

testimony given by me at the time and place stated with the corrections, if any, and the

reasons therefore noted on a separate sheet of paper and attached hereto.




                                    _____
                                    Video Deposition of John Cadden



SWORN TO AND SUBSCRIBED before me this _____ day of _____,
202____.



                                    _____
                                    NOTARY PUBLIC



                        MY COMMISSION EXPIRES:

                                    _____

Video Deposition of John Cadden                     1/31/2024

Errata Sheet

Page Number        Line Number               Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WORD INDEX**

**< 1 >**
**1:15** 9:*16*
**1:39** 1:*20*
 2:*9* 6:*8, 14*
**10/1/2024**
 153:*21*
**10/1/23**
 17:*16*
**10:00** 9:*16*
**100** 5:*6*
**104** 5:*6*
**132923**
 66:*22*
**1400** 5:*19*
**16** 46:*5*
**17** 46:*6*
**1717** 2:*7*
 5:*11* 6:*6*
**1-800** 82:*4*
**1990** 19:*9,*
*19, 23*
 120:*5*
 121:*5*
**1991** 43:*22*
**1993-ish**
 45:*6*

**< 2 >**
**2:21-CV-**
**0300-MHH**
 1:*5* 7:*1*
**2000** 30:*2*
 45:*17* 46:*5*
**2000s**
 123:*21*
**2001** 30:*2*
 79:*21*
**2003** 45:*18*
**2006** 17:*17*

**2009** 18:*20*
 19:*19*
**2015** 46:*5*
 121:*7*
**2018**
 101:*11*
 148:*22*
**2019** 12:*12*
 17:*23*
 28:*15, 21*
 29:*3, 9, 15*
 30:*14* 33:*4,*
*22* 36:*9*
 37:*7* 39:*10*
 41:*12*
 101:*11*
 146:*13*
**2020** 29:*15*
 36:*9* 37:*7,*
*8, 12* 38:*5*
 46:*21* 62:*7*
 78:*14*
 101:*12*
 146:*16*
**2021** 78:*3*
 126:*4*
 130:*13*
**2022** 73:*2*
 74:*12*
 125:*23*
 126:*4*
**2023** 75:*10*
 78:*14*
**2024** 1:*19*
 2:*9* 6:*14*
 120:*1, 3*
**2030** 120:*3*
**20th** 5:*19*
**23** 131:*10*
 141:*23*
**23rd** 5:*6*
**25** 4:*9*

**26** 4:*9*
 25:*6* 30:*10*
 32:*22*
 35:*19* 36:*2*
 86:*5*
**27** 14:*12*
 17:*12*
 41:*16*
 70:*17*
 122:*8*
 123:*5*
 134:*17*
**288** 33:*1*

**< 3 >**
**3** 25:*21*
**3:00** 105:*5*
**3:17** 111:*2*
**3:33** 111:*6*
**30(b)(6**
 91:*13*
**304** 39:*2*
**305** 39:*1,*
*13*
**306** 86:*5, 8*
**30th** 46:*21*
**31** 1:*19*
**31st** 2:*8*
 6:*14*
**35203** 5:*12,*
*20*
**35233** 5:*7*
**36** 79:*4*
**37** 66:*4*
**378** 153:*21*
**3rd** 2:*7*
 5:*11* 6:*7*

**< 4 >**
**4** 45:*18*
**4:08** 151:*14*

**4:23**
 151:*18*
 152:*3*
**41** 38:*18*
**42** 60:*2, 21*
 78:*2*
**420** 5:*19*
**4687** 61:*6*
**4688** 61:*23*
**4689** 78:*2*
**4-ish** 45:*6*

**< 5 >**
**58** 4:*9*
 25:*2, 4*

**< 6 >**
**6** 25:*20*

**< 8 >**
**8** 4:*3*

**< 9 >**
**9/13/26**
 153:*22*
**90s** 123:*20*
**92** 43:*22*

**< A >**
**A** 2:*1, 8*
 5:*1, 5, 11*
 6:*7* 8:*5, 12,*
*14, 18, 21*
 9:*2, 5, 8, 14,*
*16, 18, 21*
 10:*4, 7, 12,*
*14, 15, 16,*
*18, 21, 23*
 11:*1, 4, 8,*
*10, 18, 20*
 12:*1, 3, 6,*
*11, 16, 21*

 13:*1, 8, 10,*
*15, 18, 22*
 14:*3, 7, 9,*
*14, 16, 19,*
*21* 15:*3, 5,*
*6, 8, 13, 16,*
*19, 22* 16:*3,*
*6, 7, 9, 11,*
*14, 16* 17:*6,*
*8, 14, 16*
 18:*2, 6, 10,*
*11, 14, 15,*
*17, 20, 23*
 19:*3, 6, 7, 8,*
*10, 12, 15,*
*16, 18, 19,*
*22* 20:*1, 2,*
*6, 10, 13, 15,*
*21* 21:*3, 7,*
*13, 16, 20*
 22:*3, 8, 14,*
*16, 21* 23:*4,*
*11, 15, 19,*
*23* 24:*4, 10,*
*16, 21* 25:*4,*
*7, 14, 17, 22*
 26:*1, 9, 12,*
*15, 19* 27:*1,*
*4, 7, 8, 12,*
*16, 21* 28:*2,*
*6, 12, 17, 20*
 29:*1, 6, 11,*
*18, 23* 30:*2,*
*4, 8, 14, 17,*
*19, 20, 22,*
*23* 31:*3, 6,*
*9, 12, 14, 17,*
*21* 32:*2, 5,*
*7, 8, 11, 14,*
*17, 20* 33:*2,*
*7, 11, 13, 17,*
*20* 34:*3, 11,*

| | | | | |
|---|---|---|---|---|
| 16, 22  35:3, 6, 10, 16 36:1, 22 37:3, 5, 15, 19, 21  38:1, 3, 6, 10, 12, 15, 23  39:3, 7, 8, 11, 15, 23  40:5, 9, 12, 17, 18, 22  41:1, 4, 6, 12  42:1, 4, 8, 10, 14, 20  43:3, 5, 10, 13, 16, 18, 22  44:1, 3, 5, 10, 15, 17, 19, 21 45:5, 8, 10, 12, 13, 16, 21  46:1, 3, 5, 9, 13, 16, 19, 21  47:2, 4, 6, 13, 18, 21  48:1, 6, 10, 12, 19 49:2, 6, 13, 16, 17  50:2, 7, 13, 20 51:4, 5, 9, 10, 13, 17, 21  52:3, 8, 18  53:2, 5, 8, 11, 17, 19, 23  54:8 55:6, 10, 18 56:2, 9, 11, 19, 22, 23 57:3, 7, 9, 13, 17, 20, 23  58:2, 5, 7, 10, 13, 15, | 18, 22  59:1, 4, 6, 7, 12, 17, 19  60:4, 5, 7, 14, 18  61:1, 3, 8, 11, 14, 17, 21, 23  62:3, 6, 9, 12, 15, 18, 21, 23  63:3, 5, 16, 20  64:2, 7, 10, 16, 20, 23  65:5, 9, 10, 12, 14, 15, 16, 19, 23  66:1, 2, 8, 13, 15, 18, 22  67:2, 6, 7, 9, 14, 16, 17, 18, 23  68:5, 11, 16, 17, 20  69:1, 8, 11, 16, 19  70:3, 5, 13, 15, 20, 22  71:6, 10, 18, 19  72:1, 4, 8, 11, 14, 17, 19, 23  73:3, 5, 8, 12, 18, 20  74:1, 9, 11, 13, 15, 16, 17, 20, 22  75:2, 3, 5, 6, 9, 10, 15, 19, 22  76:2, 4, 8, 11, 13, 15, 18, 20, 22  77:2, 6, 12, 17, 19, 23  78:4, 6, 13, | 17, 21  79:2, 6, 8, 10, 12, 15, 20  80:2, 4, 6, 7, 9, 12, 14, 16, 20  81:1, 3, 9, 14, 22  82:4, 6, 11, 12, 20  83:1, 6, 10, 13, 15, 18, 20, 22  84:2, 5, 7, 8, 11, 14, 22, 23  85:6, 7, 10, 14, 19, 23  86:6, 9, 12, 14, 18, 22  87:2, 4, 5, 11, 13, 16, 19, 21  88:3, 8, 12, 14, 16, 17, 18, 19  89:2, 10, 14, 22  90:4, 6, 8, 10  91:13 92:2, 14, 20  93:2, 6, 10, 16, 22, 23  94:5, 6, 9, 16, 17, 18, 21, 23  95:2, 5, 12, 16, 20, 23  96:2, 6, 8, 11, 13, 18, 23  97:3, 6, 9, 13, 16, 17, 18, 22  98:2, 5, 8, 10, 13, 18, 20  99:5, 6, 18, 20, 21  100:2, 6, 12, 15, 18, 22 | 101:2, 4, 9, 14, 17  102:1, 5, 9, 13, 17, 19, 23  103:2, 7, 16, 20  104:3, 6, 8, 11, 15, 19, 23  105:5, 6, 8, 11, 12, 15, 20  106:1, 4, 7, 11, 12, 14, 17, 22  107:2, 23  108:3, 9, 16, 23  109:5, 6, 8, 9, 10, 11, 14, 16, 18, 20, 22  110:3, 5, 9, 14, 16, 18, 21  111:1, 3, 8, 11, 16, 20, 23  112:4, 7, 13, 18, 22  113:3, 6, 10, 14, 18, 22  114:2, 3, 7, 10, 15, 21  115:3, 11, 13, 16, 20, 21, 23  116:1, 6, 11, 13  117:2, 6, 13, 17, 22  118:5, 7, 10, 16  119:1, 6, 7, 8, 10, 14, 22  120:7, 12, 15, 21, 23  121:9, 12, 21 | 122:1, 3, 4, 14, 15, 18, 21, 22  123:1, 7, 15, 22  124:7, 8, 9, 10, 16, 17  125:2, 4, 11, 16, 17, 18, 21  126:2, 5, 8, 12, 17, 22  127:3, 5, 9, 13, 16, 21  128:2, 4, 9, 10, 13, 14, 19, 21  129:1, 3, 6, 9, 14, 18, 21  130:1, 3, 6, 10, 14, 17, 22  131:2, 3, 5, 9, 11, 14, 19, 21  132:1, 4, 7, 10, 13, 17, 22  133:4, 6, 8, 17, 19, 23  134:2, 4, 8, 11, 14, 20  135:1, 5, 7, 15, 21  136:2, 4, 9, 13, 18, 20  137:2, 7, 11, 15, 22, 23  138:2, 4, 7, 8, 11, 13, 15, 18, 20  139:5, 7, 12, 14, 19, 22  140:1, 3, 6, 8, 12, 15, 17, 20  141:1, 3, |

*4, 5, 8, 11,*
*18, 21*
*142:1, 3, 8,*
*14, 16, 20,*
*22   143:3, 4,*
*6, 9, 10, 12,*
*16, 21*
*144:1, 5, 7,*
*10, 12, 16,*
*22   145:1, 7,*
*10, 15, 17,*
*22   146:1, 2,*
*4, 6, 9, 12,*
*14, 17, 21*
*147:6, 10,*
*12, 17, 19,*
*21   148:2, 4,*
*7, 12, 15, 20*
*149:1, 3, 8,*
*15, 17, 19*
*150:1, 3, 5,*
*12, 15, 20*
*151:1, 4, 5,*
*6, 13, 15*
*153:1, 11*
**abide**   33:*9,*
*12*   34:*1*
**ability**
*125:11*
**able**   68:*18*
*100:19*
*107:16*
**Absolutely**
*30:19*   96:*9*
*104:6*
*137:11*
**account**
*47:7*   67:*2,*
*21*   68:*6, 14*
*70:9, 16*
*71:21*
*72:13*   76:*8*

88:*23*
95:*22*
96:*18*
97:*11*
119:*11, 15,*
*17, 20*
120:*5, 11,*
*16, 18*
121:*3, 8, 11,*
*17*   123:*20*
129:*3, 17*
130:*1*
131:*2*
132:*2*
134:*18*
136:*15*
137:*17*
138:*1, 23*
140:*4, 20*
141:*10, 16*
142:*12*
143:*1, 13,*
*19*   144:*3, 9,*
*14*   145:*19*
148:*19*
149:*5, 11,*
*20*
**accounting**
*101:9*
**accounts**
*44:23*
**ACCR**
*153:21*
**accurate**
*34:5*   53:*6*
*69:5, 9, 12*
*124:4*
**acquired**
*32:12*
**acquiring**
*32:10*
**acting**   6:*2*

**action**
*38:21*   39:*6,*
*14, 17*
*153:15*
**additional**
*125:13*
**adjust**
*99:11*
*120:20*
*123:19*
*124:14*
**adjustment**
*124:8*

**adjustments**
*123:22*
**administer**
*7:11*
**affirmative**
*38:21*   39:*6,*
*14, 16*
**age**   118:*21,*
*23*   125:*9*
**agency**
*140:18, 19*
**ago**   9:*14*
*11:21*
*13:11*
*21:16*   99:*6*
*122:19*
*129:21*
*131:15*
*132:1*
*146:4*
**agree**
*33:12*
*93:14*
**AGREED**
*2:2, 11, 18*
*3:3*   33:*9*
*34:1*

**agreement**
*88:15*
**ahead**   80:*4*
**al**   6:*22*
**ALABAMA**
*1:1*   2:*8*
*5:7, 12, 20*
*6:7, 18, 23*
*153:3*
**alcohol**
*104:9*
**alcoholic**
*104:9, 13,*
*18*
**Alison**
*42:20*
*45:10, 19*
**Allison**
*32:15, 16*
**allowed**
*108:19*
**allowing**
*112:15*
*113:2*
*114:4*
**Amber**
*147:20, 21*
**amount**
*94:19*
**AmRisk**
*139:22*
*140:1*
**an**   8:*21, 22*
*20:22*
*25:11*   27:*9*
*28:18*   31:*4*
*33:13, 21*
*36:14*
*37:21*
*38:20*
*39:16*   47:*6,*
*10*   49:*9*

*50:9, 16*
*51:22*   53:*3,*
*4, 11, 12, 17,*
*18*   56:*7, 8,*
*21*   57:*15*
*58:6, 9, 21*
*61:18*
*64:12*   65:*1*
*67:2*   68:*14*
*70:19*   76:*8*
*80:12*   81:*6,*
*12, 17, 22*
*82:11*   83:*1,*
*2, 7*   84:*3,*
*17*   85:*2*
*88:23*
*95:22*
*105:5*
*108:19*
*112:9, 10*
*113:1*
*114:11, 12*
*116:13*
*117:4, 7, 10*
*118:1, 13*
*119:10, 20*
*120:5, 11*
*121:17*
*125:11*
*126:20*
*129:3, 10,*
*17*   130:*1*
*131:2*
*132:2*
*135:22*
*136:12*
*140:4, 8, 18*
*141:10, 16*
*143:13*
*144:3, 9, 13*
*145:19*

148:*19*
149:*5*
**anatomy**
107:*21*
**and**  1:*11*
2:*2, 6, 11,*
*12, 14, 16,*
*18, 22, 23*
3:*3*  6:*1, 4,*
*15*  7:*9, 16,*
*21*  8:*7, 9,*
*10, 15, 21,*
*22, 23*  9:*9,*
*15, 23*  10:*6,*
*9, 15*  11:*9,*
*11, 13, 15*
12:*10, 11,*
*12, 19*  13:*3,*
*5, 16, 23*
14:*7, 15, 22*
15:*10*
16:*13*  17:*9,*
*15, 19, 22*
18:*4, 7, 11,*
*16, 18, 21*
19:*1, 11, 13,*
*16*  20:*2, 7,*
*11, 22, 23*
21:*4, 11, 13,*
*22*  22:*1, 12,*
*17, 18*  23:*8,*
*12*  24:*2, 22*
25:*4, 7, 12*
26:*2, 3, 4,*
*10*  27:*8*
28:*3, 21*
29:*3, 16, 21*
30:*3, 10, 23*
31:*15, 22*
32:*3, 6, 9,*
*12, 23*  33:*8,*
*9, 10, 11, 12,*

*18*  34:*1*
36:*3, 6, 14,*
*15, 23*  37:*1,*
*2, 5, 9, 22*
38:*2, 6, 7, 8,*
*13*  39:*5, 8,*
*9, 17, 18*
40:*1, 7, 10*
41:*18, 20*
42:*2, 15, 16*
43:*8, 14, 23*
44:*19, 23*
45:*9, 11, 19*
46:*2, 7*
47:*3, 5, 7,*
*10, 12, 13,*
*14*  48:*13,*
*21*  49:*8*
50:*1, 4, 19,*
*21, 22*  51:*5,*
*10, 18, 22*
52:*10, 17,*
*19*  54:*2, 7,*
*18*  55:*1, 17*
56:*1, 3, 18*
57:*15*
58:*21*  59:*5,*
*14*  60:*10,*
*11*  61:*9, 12,*
*15*  62:*7, 8,*
*10, 13, 14,*
*15*  63:*3, 17*
64:*11, 14,*
*17*  65:*12,*
*16*  66:*8, 15*
67:*1, 3*
68:*13*
72:*20*  73:*2,*
*3, 6*  74:*12*
75:*2, 12*
76:*19*  77:*8*
78:*1, 4, 5, 7,*

*8, 15, 19, 23*
81:*10, 11*
82:*12, 15*
83:*7, 23*
84:*6*  85:*7,*
*11, 14, 19*
86:*15, 16*
87:*18, 20*
88:*9*  89:*11,*
*12, 19*
90:*17, 21,*
*22*  91:*9, 20*
92:*4*  93:*3,*
*7, 11, 17*
94:*11, 19,*
*22*  95:*7, 10,*
*13, 17, 21,*
*22*  96:*5, 10,*
*18, 19*
97:*10, 11,*
*13, 15, 16*
99:*8, 21*
100:*7, 16*
101:*18*
102:*3, 6, 10,*
*14*  103:*3, 6,*
*8*  104:*4, 7,*
*12, 16, 20*
105:*4, 17,*
*19, 21, 22*
106:*2, 8, 14,*
*20*  107:*4, 8,*
*12*  110:*5,*
*10*  111:*22*
112:*20, 23*
113:*7, 19,*
*20*  114:*7,*
*17, 18*
115:*5, 6, 8*
116:*15, 16,*
*20*  117:*3*
118:*9*

119:*10, 16*
120:*8, 18*
121:*5, 15,*
*18*  122:*8,*
*13*  123:*7*
124:*1, 2, 8*
125:*12, 15,*
*16*  126:*21,*
*23*  127:*17,*
*23*  128:*5,*
*14, 16, 22*
129:*20, 21,*
*22*  130:*13,*
*15*  131:*12*
132:*2, 5, 8,*
*12, 21*
133:*8, 22,*
*23*  134:*18*
135:*9, 11,*
*12*  137:*8,*
*18*  138:*22*
139:*1*
140:*13, 17*
141:*9, 23*
142:*23*
144:*20*
145:*5, 13,*
*20*  146:*6*
147:*18*
149:*4*
150:*7*
151:*6, 7*
153:*7, 8, 10,*
*11*
**Andrea**
111:*22*
144:*23*
148:*6, 7, 13*
**Andrew**
128:*10*
**announced**
141:*14*

**annually**
106:*5*
**answer**
15:*7*  35:*23*
36:*19*
37:*15, 18,*
*19*  54:*12,*
*17*  58:*20*
62:*20, 23*
63:*6*  73:*13*
91:*1*  92:*1*
127:*3*
136:*21*
141:*11*
**answered**
21:*11*  50:*1,*
*19*  54:*2, 7,*
*13*  55:*17*
56:*1, 18*
132:*21*
**answers**
53:*8*  55:*1*
153:*8*
**anybody**
12:*2*  22:*19,*
*23*  27:*5, 13*
31:*18, 19*
34:*12*  38:*5*
50:*15, 22*
55:*2*  56:*15*
63:*1*  72:*20*
87:*12*
111:*12*
124:*13, 18*
138:*9*
**anywise**
153:*15*
**apologize**
142:*5*
**applied**
74:*19*  75:*3*
141:*9*

apply
30:*15*
141:*6, 12*
appreciate
11:*12*
approaches
59:*6*
approve
95:*1*  98:*17*
129:*8, 12*
approved
129:*9*
approximate
ly  2:*9*
141:*1*
arguing
86:*2*
Arizona
47:*12*
arm's
129:*11*
asked  10:*8*
13:*1*  21:*11*
24:*22*  33:*7,
10*  49:*23*
50:*18*  54:*2,
7*  55:*16, 23*
56:*17*
58:*19*
101:*15*
108:*12*
132:*20*
135:*2*
asking
37:*20*
54:*18, 23*
69:*11, 21,
22*  90:*16*
91:*12, 14,
17*  92:*5, 6*
121:*15*
148:*10*

aspects
125:*14*
ass  53:*17,
18*  56:*7, 8,
21*  117:*4, 7*
assign  2:*23*
assigned
88:*22*
89:*15*
assistant
67:*6*  89:*3*
assistants
96:*19*
97:*13, 14*
Associate
30:*14*
associated
62:*10*
Assumes
24:*9*
106:*19*
107:*3*
139:*11*
assuming
133:*23*
Atlanta
45:*12*
attached
25:*5*
attend
103:*6, 22*
105:*10, 18*
108:*13, 19*
109:*7*
attended
78:*18*
103:*13*
106:*14*
attends
102:*21*
augmented
108:*6*

August
46:*21*
Avenue
2:*7*  5:*11*
6:*7*
average
97:*1*  98:*16*
award
116:*13*
119:*11*
awarded
89:*12*
116:*20*
aware
20:*18*
38:*13*  40:*1,
3*  42:*3*
55:*13*  59:*9*
71:*2, 14*
72:*20*
77:*15, 20*
87:*6, 17, 23*
106:*13, 23*
107:*2, 9, 17*
108:*17, 20*
110:*15*
111:*13, 17*
112:*1*
132:*13*
134:*9*
135:*3*
awesome
138:*2*
151:*22*

< B >
babies
81:*11*
back  10:*10*
13:*4*  14:*7*
17:*11, 19*
23:*13*

41:*15, 16*
45:*1*  63:*1*
66:*3*  99:*7*
101:*5, 11*
111:*5, 8*
112:*6*
120:*18*
151:*17*
BAKER
5:*16*
128:*10*
BANK  1:*11*
banking
32:*7*
Barlotta
5:*18*  7:*8,
20*  12:*15*
13:*14*  14:*6*
16:*20*  17:*3*
18:*3, 13*
20:*5, 9, 14*
21:*2, 6, 11*
22:*7, 15*
23:*3, 10, 18*
24:*8, 15, 20*
27:*15, 20*
28:*1, 11, 14,
16, 23*  29:*5,
10, 17*  31:*2*
32:*1*  33:*6*
34:*2, 10, 15,
21*  35:*2, 5,
9, 11, 17, 23*
36:*7, 10, 17*
37:*13, 17*
38:*9, 22*
40:*16*  41:*3,
11, 23*  44:*4,
14*  48:*20*
49:*1, 5, 12,
23*  50:*6, 8,
12, 18*  51:*3,

8, 12, 15, 20*
52:*2, 5, 10*
53:*5*  54:*1,
6, 11, 16, 22*
55:*5, 16, 23*
56:*17*  57:*1*
58:*4, 12*
59:*3, 16*
60:*13, 23*
62:*17*
63:*15, 19*
64:*1, 9, 15,
19, 22*  65:*4,
8, 18, 22*
66:*6, 14*
67:*5, 13*
68:*2, 10, 15,
23*  69:*7, 9,
18*  70:*4, 12,
21*  71:*5, 7,
20, 23*  72:*3,
7, 18, 22*
73:*4, 11, 17*
74:*8, 14, 21*
75:*8, 14, 18*
76:*1*  77:*1,
10*  78:*12*
79:*1, 19*
80:*1, 19*
81:*8, 13, 21*
82:*19*
83:*14, 21*
84:*10*  87:*3,
22*  88:*2, 7,
11*  89:*21*
90:*3, 7, 11,
16*  91:*2, 6,
11, 23*  92:*5,
12, 18*  93:*1,
5, 9, 15, 21*
94:*4*  95:*15,
19*  96:*1, 7*

Video Deposition of John Cadden

1/31/2024

49

98:*19*
99:*17*
100:*1, 5, 11,
14, 17, 23*
101:*8, 13,
16* 102:*2, 8,
12, 16, 22*
103:*15, 19*
104:*2*
105:*7, 11,
14* 106:*16,
18* 107:*1, 3,
10* 108:*1, 8,
10, 15, 22*
109:*4*
110:*2, 8, 13,
17* 111:*15*
112:*3, 12,
17, 21*
113:*5, 9, 13,
17* 114:*9,
14, 20*
115:*22*
116:*10*
117:*5, 12,
16, 21*
118:*4, 15*
119:*13*
122:*17*
123:*14*
124:*22*
127:*2, 8, 22*
129:*13*
131:*4*
132:*20*
133:*3, 5*
134:*21*
135:*4*
136:*8, 19*
137:*21*
138:*3, 6, 17*
139:*4, 10,*

*18* 140:*11,
23* 141:*20*
142:*13*
143:*2, 15,
20* 144:*15,
21* 145:*6,
14, 23*
146:*20*
147:*1, 5, 9*
148:*1, 18,
23* 149:*7,
14, 18, 22*
150:*4, 14*
151:*9, 12,
21*
**base** 72:*10,
14, 16* 94:*9,
10, 13*
118:*1, 18*
119:*11*
121:*2, 12*
122:*1*
123:*1, 6, 7,
10* 124:*15,
20* 129:*4*
**Based**
82:*9* 94:*7*
**Bases**
122:*20*
**Basically**
11:*4*
**basis** 130:*6*
**Bates**
32:*23* 39:*1,
12* 61:*5, 22*
78:*2* 86:*5*
**bathroom**
105:*11*
**BB&T** 31:*8,
19* 32:*3, 12*
34:*19*
35:*14, 21*

36:*3* 39:*16*
86:*15*
90:*15*
91:*20*
114:*4*

**BB&T/Truist**
36:*14* 37:*6*
38:*20*
79:*17*
80:*23*
86:*21*
**BB&T's**
34:*17*
**bear** 62:*21*
**BEARMAN**
5:*16*
**beer** 105:*2,
5*
**began**
112:*7*
**beginning**
6:*8*
**behalf** 6:*17*
**beliefs**
80:*18* 81:*1*
**believe**
11:*10*
14:*16*
16:*11*
18:*20*
19:*19* 30:*2*
39:*23*
40:*17*
46:*21* 47:*7,
12* 52:*18,
20* 57:*5*
58:*5* 60:*4*
61:*11*
76:*22* 80:*2*
81:*3* 90:*5*
107:*12*

111:*11*
114:*4*
130:*17*
134:*6*
**believed**
56:*7*
**beneficial**
103:*3*
115:*23*
**benefit**
109:*6*
**BERKOWITZ** 5:*17*
**best** 63:*5,
21*
**better**
46:*16*
**beverages**
104:*10, 13,
18*
**beyond**
18:*22*
**bias** 80:*6,
8, 11, 12, 14*
81:*1, 6, 12,
14*
**biases**
79:*23*
80:*18*
**big** 30:*5*
44:*17*
103:*1*
135:*15, 16*
**bigger**
94:*14*
**billion**
106:*7*

**Birmingham**
2:*8* 5:*7, 12,
20* 6:*7*
18:*21, 22,*

23 21:*23*
28:*19* 29:*4,
16* 34:*6*
38:*5, 8, 14*
40:*19*
43:*10, 12*
59:*10*
63:*13*
68:*22* 73:*7,
22* 74:*6*
75:*12*
77:*13, 14,
22* 78:*16*
91:*5* 92:*10*
106:*6, 10*
112:*10*
114:*2*
127:*18*
134:*7, 13*
135:*14*
137:*5, 13*
139:*17, 21*
140:*22*
141:*15*

**Birmingham's** 26:*3*
**bit** 112:*7*
**black** 38:*2,
6* 58:*23*
59:*7* 66:*1,
4, 12, 20*
75:*20* 77:*4,
9, 14, 17, 21*
109:*23*
124:*10*
150:*8*
**blacks**
36:*5, 15*
37:*8, 22*
59:*14*

Video Deposition of John Cadden

1/31/2024

board
 31:*14*
bombard
 103:*5*
bonus
 64:*23*
 94:*12, 14,
 19*  95:*6*
 98:*15, 16*
 99:*3, 5, 6,
 10*  101:*6*
 120:*23*
 121:*1, 9, 22*
 122:*1, 3, 5*
 124:*1, 2*
bonuses
 89:*11*  94:*1,
 2, 5, 11, 17,
 22, 23*  95:*4,
 18, 21*  96:*6,
 21*  99:*7, 9,
 12, 16, 22*
 118:*1*
 121:*4*
 124:*21*
 129:*12, 14*
book   44:*6,
 9, 17, 20*
 109:*13*
 135:*11*
bottom
 32:*22*  61:*7*
 62:*5*  86:*8*
 119:*16*
box   133:*12*
Brandi
 123:*2*
 143:*22*
Brandt
 42:*20*  45:*3,
 11, 15*

Brasher
 143:*7, 8, 14*
break
 104:*21*
 105:*12, 15*
 110:*18*
 111:*1, 9*
 151:*6, 13*
breakfast
 11:*9, 10*
breast
 107:*21*
breasts
 108:*6*
Brent   73:*20*
brief   111:*3*
 151:*15*
bring
 125:*15*
broaden
 78:*7*
broker
 19:*6, 7, 11,
 17, 18*  20:*3*
 27:*8*  40:*23*
 42:*7*  44:*3*
 47:*10*
 56:*22*
 67:*16*
 69:*17*  70:*3,
 10, 20*
 71:*18, 22*
 72:*14*
 74:*20*  75:*2,
 3, 7*  84:*6, 7*
 95:*23*  96:*6,
 11, 12, 16*
 97:*13*
 102:*23*
 103:*2*
 109:*6, 17*
 114:*3*

125:*12, 18*
131:*19*
133:*17, 19*
138:*4, 8*
140:*17*
brokerage
 21:*21*
 42:*10, 21*
 98:*20*
 99:*11*
brokers
 41:*9, 22*
 42:*2, 4, 13*
 44:*6, 8*
 46:*7, 11*
 58:*7, 9, 23*
 77:*21*
 83:*11, 17*
 84:*2, 6, 8*
 87:*20*  96:*9,
 17, 18*
 97:*11*
 109:*23*
 110:*6, 12*
brought
 122:*21*
building
 74:*12*  78:*6*
bullet
 62:*13*
 74:*10*
business
 41:*1, 4, 5*
 47:*15*
 64:*13*
 88:*20*
 101:*22*
 106:*3, 5*
 109:*13, 21*
 116:*2, 7*
 125:*10*

135:*12*
141:*4*
Byrd   5:*22*
 6:*15*

< C >
CADDEN
 1:*16*   2:*4*
 6:*8, 20*
 7:*14*   8:*3, 5,
 6*   14:*11, 22*
 25:*1, 21*
 26:*2*   30:*11*
 32:*22*
 38:*20*
 41:*17*   55:*8*
 59:*18, 23*
 60:*16*   61:*6*
 69:*14, 22*
 83:*2, 8*
 86:*8*   90:*20*
 107:*6*
 110:*19*
 111:*8*
 121:*16*
 122:*8*
 128:*18*
 131:*8*
 139:*9*
 141:*10*
 142:*10*
 145:*12, 21*
 148:*10*
 150:*17*
 151:*19*
Cadden's
 129:*4*
CALDWELL
 5:*16*
call   10:*8,
 11*  13:*1*
 17:*5*  22:*12*

24:*22*
26:*21*
32:*23*  82:*5*
88:*19*
called   10:*8,
 9, 11, 14, 19*
 11:*8*  21:*8*
 23:*13*
capabilities
 94:*11*
capacity
 91:*14*
career
 77:*18*
 120:*6*
Carolina
 28:*17*
CASE   1:*5*
 6:*21*   7:*1*
 35:*12*
 37:*14*  82:*2*
 107:*6*
categories
 40:*14*
Cathy
 41:*13*
 142:*15, 16,
 22*  143:*1, 3,
 17*
cause   6:*9*
 153:*16*
Central
 6:*14*
certain
 39:*17*
 44:*16*
 108:*3*
 112:*19*
certainly
 90:*22*
 112:*23*

146:*13*
151:*8*
**certify**  6:*2*
153:*6, 13*
**Cesar**  76:*4,*
*20*
**C-e-s-a-r**
76:*22*
**chance**
105:*12, 15*
142:*17*
**change**
111:*9*
**changed**
70:*5, 6*
116:*17, 21*
130:*3*
**charge**
16:*5, 7, 14,*
*19*  17:*2*
41:*20*
**Charles**
8:*5*  128:*15*
131:*21, 22*
144:*20*
145:*5, 12,*
*20*
**chart**
15:*21*
41:*17*  66:*3,*
*5, 8, 17, 18,*
*21*  67:*10,*
*11, 22*  68:*7,*
*20*  149:*23*
**chase**
115:*7*
**check**
133:*11*
142:*1*
**Chief**
134:*4, 5*

**childcare**
151:*11*
**chose**
10:*10*
**Cite**  6:*17*
**city**  22:*8*
59:*9*
**Civil**  6:*4*
34:*18, 19*
**claim**  8:*22,*
*23*
**claiming**
69:*23*
**claims**
25:*13*
35:*20*
86:*17*
99:*15*
**clarification**
91:*3, 12*
**clarify**
107:*14*
**Clay**  60:*10*
61:*20*
87:*18*  88:*1,*
*5*  111:*14,*
*18*  112:*2*
113:*20*
114:*7, 18*
**clear**  15:*15*
54:*14*
147:*10, 15*
**cleared**
61:*3*
**client**
103:*2, 8*
109:*9*
116:*3, 5*
**clients**
101:*22*
102:*4*
103:*5*

105:*22*
108:*14*
**clients/cust**
**omers**
106:*9*
**clip**  30:*5*
**close**
13:*18*
113:*23*
114:*1*
151:*7*
**Club**  57:*18*
**coach**
90:*23*
**Cochran**
142:*15, 16*
**collateral**
35:*8*
**college**
118:*10*
119:*15*
120:*1*
**color**
39:*18*  40:*8*
75:*17*
**come**
17:*11*  38:*6*
107:*6*
133:*1, 6*
140:*8, 19*
**comes**
33:*13*  51:*6,*
*11*

**comfortable**
52:*20*
**coming**
29:*9*
**commencin**
**g**  2:*9*
**comment**
113:*12*

114:*6*
115:*1*
**comments**
48:*22*  49:*4,*
*19, 20*
53:*16*  58:*2*
81:*4*
103:*18*
117:*11*
**Commissio**
**n**  41:*19*
**Commissio**
**ner**  3:*5*
6:*2*
**commit**
74:*12*  78:*5*
**communicat**
**ion**  37:*22*
**community**
104:*21*
**comp**
94:*12, 15*
121:*13, 14*
122:*19*
123:*2*
**company**
10:*17*  20:*7*
21:*20, 21*
22:*1*  36:*6,*
*16, 21*
37:*21*
42:*15, 22*
46:*14*
51:*18*  64:*8*
65:*15, 17*
66:*9, 19*
67:*7*  68:*19*
69:*5, 13*
76:*5*  77:*18*
82:*15*
84:*16*
86:*23*

87:*20*
88:*15*  93:*4*
104:*21*
116:*15*
117:*15*
122:*22*
124:*6*
125:*14*
126:*19*
134:*11*
140:*16*
148:*21*
**company's**
105:*2*
**comparable**
99:*16*
**compare**
99:*3, 22*
**compared**
75:*1*
**comparison**
98:*23*
99:*23*

**compensate**
122:*2*
124:*20*
**compensati**
**on**  123:*5,*
*12, 15, 16*
**competitor**
88:*17*
**complain**
48:*4*  49:*9,*
*21*  53:*13*
55:*3*  81:*18,*
*23*  108:*3, 7,*
*12*
**complained**
12:*11*  48:*7*
50:*3*  52:*16*
56:*20*

Video Deposition of John Cadden

1/31/2024

52

108:*18*
112:*15*
117:*4*

**complaining**
*17:1*
**complaint**
*58:3  59:1*
*83:12, 13,*
*16, 18, 20,*
*23  84:3, 9,*
*12, 19, 23*
*85:6, 7, 16*
*87:5*
*113:10*
*114:8, 10,*
*21*
**complaints**
*9:4  11:16*
*28:5, 9*
*48:8  84:21*
*85:22*
*87:15*
*103:12*
*112:6*
**compliance**
*2:15*
**computer**
*15:23*
*100:15*
**computer-**
**aided**  153:*9*
**concern**
*58:10  59:2*
*68:8, 12*
*82:12  83:1,*
*3, 5, 6  85:3*
*89:17, 22*
*113:4*
*149:9*
**concerned**
*58:7, 8, 22*

82:*22*
83:*10  84:5,*
*7  87:19*
**concerns**
*24:12  26:4,*
*7  31:22*
*41:8  55:14*
*56:16  71:3,*
*15  82:1, 8,*
*16, 22*
*84:17  87:9*
*88:1, 5*
*109:2*
*111:17*
*112:2*
*117:19*
**concludes**
*152:2*
**conduct**
*72:17*
**conducted**
*72:19*
**conducting**
*72:21*
**Confederac**
**y**  34:*20*
**confidential**
*9:11*
**consider**
*59:8  83:13*
*84:8*
**considered**
*89:12*

**consistency**
*92:21*
**constitute**
*58:2*
**contact**
*13:6*
**contacting**
*28:8*

**contained**
*60:20*
*61:10*
**continue**
*56:22*
**conversatio**
**n**  11:*22*
*12:5, 13, 23*
*14:2  17:19,*
*21  18:8*
*20:12, 20*
*21:19*
*22:11, 16*
*23:21*
*27:17  54:9*
*67:18, 19*
*70:15  87:8*
*124:18, 23*
*133:9*
**conversatio**
**ns**  22:*19,*
*22  70:18*
*107:17*
*124:13*
*128:6*
**Cooper**
*43:6  46:1*
**copy**  25:*4*
*52:19*
**Corey**
*67:19*
*87:18  88:1,*
*5  113:20,*
*21  114:7,*
*18  128:21,*
*22  129:6*
*132:8*
*138:11, 12,*
*13, 21*
**Corey's**
*138:20*

**Cornelius**
*2:5  6:1, 16*
*153:19, 20*
**corner**  86:*8*
**CORP**  1:*11*
**corporate**
*114:2*
**correct**
*15:12, 19*
*29:22, 23*
*31:9  32:8,*
*14  34:1*
*40:15*
*43:10, 13*
*51:7, 16, 19*
*64:18*
*66:13  71:4*
*89:14*
*90:22*
*94:18*
*101:23*
*126:2*
*134:6*
*137:15*
*144:16*
*153:11*
**correctly**
*39:22*
**cost**  20:*7*
*116:4*
**cost-**
**effective**
*64:5*
**counsel**
*2:4, 20, 22*
*6:5  7:2*
*9:10  15:18*
*153:14*
**counsel's**
*37:14*
*107:4*

**count**
*67:23*
*77:19*
**country**
*22:9  57:17*
*137:8*
**counts**
*94:15*
**COUNTY**
*153:4*
**couple**
*76:13*
*98:10*
**COURT**
*1:1  2:16*
*6:16, 17, 22*
*7:10  15:5*
*16:20*
**Covid**
*47:20, 21*
*116:22*
*125:22*
*128:15*
**co-worker**
*45:13*
**cracked**
*105:5*
**CRC**  1:*10*
*6:21  7:9*
*8:9, 16*
*9:11  10:13,*
*14, 16  18:5,*
*11  19:2, 21*
*29:20, 22*
*30:3  31:1,*
*4, 5, 7, 11,*
*14, 20  32:4,*
*10, 12  41:1,*
*18  42:15*
*48:17  51:5*
*64:12*
*65:16*

80:*22*
82:*12, 21*
86:*21*
90:*12, 14,*
*17*  91:*9, 15,*
*19*  102:*7*
103:*11, 23*
107:*20*
119:*8*
140:*8, 21*
**CRC/Hendri**
**x**  32:*23*
**CRC/Truist**
109:*18*
**CRC/Truist'**
**s**  51:*1*
**create**
81:*1*  90:*6*
**criteria**
132:*15*
**crying**
108:*20*
**CSR**  2:*6*
6:*1*
**Cup**
116:*12*
117:*1*
**current**
18:*16*
146:*17, 21*
**currently**
42:*11, 23*
77:*6*  129:*3*
147:*2*
**Curtain**
43:*5*
116:*12, 14*
117:*1, 7, 11,*
*19*
**customer**
109:*18, 19,*

*20, 22*
110:*5*
**customers**
105:*22*
107:*19*
108:*14*
**cut**  82:*10*
**Cynthia**
5:*10*  6:*20*
7:*4*  8:*6*
35:*11, 17*
54:*11*

**< D >**
**D**  2:*5*  4:*1*
6:*1*  153:*19,*
*20*
**Dallas**
134:*8*
**Danielle**
145:*8, 9*
**data**  47:*18*
**date**  6:*3*
17:*15*
**Daugherty**
113:*21*
128:*21*
**day**  2:*8*
12:*17, 19*
57:*9*  82:*6*
98:*11*
**days**  9:*14*
**day-to-day**
17:*10*
130:*6*
**dealing**
85:*17*
**dealings**
20:*15*  32:*9*
**dealt**  55:*19*
**deceased**
42:*23*

**decide**
102:*18*
109:*17, 19*
**decided**
47:*14*
129:*7*
**decides**
109:*20*
**Defendants**
1:*12*  5:*15*
**definition**
65:*6*
**demanding**
48:*14*
**Denisa**
144:*12*
**Denise**
144:*11*
**department**
16:*12*
19:*14*
22:*23*  23:*6*
27:*19*
41:*10*  42:*7*
43:*7*  47:*9*
48:*3*  52:*17*
56:*22*  67:*4,*
*8*  68:*21*
75:*21*  77:*5,*
*8, 11, 12, 21*
82:*1*  85:*1*
89:*1, 4*
95:*14*  97:*1,*
*19*  101:*9*
120:*17*
141:*15*
**department**
**s**  38:*8*
**depending**
118:*8*
**depends**
97:*6*  98:*11*

103:*1*
109:*8*
116:*1, 3*
119:*14*
122:*20*
**deponent**
151:*23*
152:*5*
**deposed**
8:*11*
150:*23*
**DEPOSITIO**
**N**  1:*15*
2:*4, 13, 14*
3:*1, 4*  6:*19*
8:*10*  9:*7*
14:*18*
150:*22*
151:*3*
152:*3*
**depositions**
2:*17*  8:*16*
15:*4*  107:*7*
**derogatory**
48:*22*  49:*4,*
*20*  53:*16*
54:*5*  55:*4,*
*15, 22*
**description**
62:*14*
**determinati**
**on**  69:*19*
**determine**
40:*19*
69:*11*  94:*2*
96:*16*
102:*20*
103:*3*
115:*18*
118:*3*

**determined**
94:*20*  96:*6*
129:*4*
**determines**
89:*5*
117:*23*
118:*6*
**difference**
22:*2*
**different**
63:*2*  64:*3*
97:*11*
142:*17*
148:*4*
**differently**
24:*14*
25:*19*
89:*20*
**dinner**
102:*19*
103:*2*
106:*14*
115:*20*
**dinners**
102:*11*
105:*19*
108:*14*
**direction**
56:*2*
**directly**
52:*16*
**disabled**
39:*18, 19*
40:*10*
**disburse**
44:*18*
**disciplined**
55:*21*
**Disclosures**
4:*9*  25:*7*
**discoverabl**
**e**  25:*11*

discovery
150:*18*
discretion
89:*11, 13,*
*16, 19* 90:*1*
93:*18*
96:*15*
discretionar
y 89:*11*

discriminate
65:*19*
68:*20* 69:*6,*
*13*
discriminate
d 48:*18*
discriminati
ng 74:*16*
discriminati
on 16:*8, 15*
24:*7* 51:*6,*
*11* 58:*3, 11,*
*16* 59:*1, 2*
69:*16* 70:*2*
71:*4, 16, 18*
74:*6* 81:*7,*
*19* 82:*17*
83:*4, 13*
84:*9, 18*
85:*4, 17*
86:*17*
87:*10* 90:*2,*
*6* 110:*10*
113:*4, 16*
114:*8, 13*
117:*20*
139:*16*
149:*17*
discuss
27:*5* 31:*18*
127:*17, 19,*
*21*

discussed
9:*10* 17:*4*
21:*13, 17*
22:*18* 24:*3*
discussion
103:*21*
dissolved
44:*6*
DISTRICT
1:*1* 6:*22,*
*23*
diverse
74:*13, 17*
78:*6*
diversity
62:*8, 14, 16,*
*18* 63:*7*
65:*12* 73:*2*
75:*12* 78:*4,*
*7, 15, 19, 23*
79:*4, 14, 17*
DIVISION
1:*3* 7:*1*
21:*21*
document
14:*9, 13, 15*
15:*21*
33:*11* 60:*2*
119:*6*
124:*5*
126:*22*
127:*5*
documentati
on 95:*4*
documents
9:*17, 19*
33:*8* 60:*9,*
*11* 126:*10*
doing 10:*8*
56:*3* 92:*21*
107:*8*

135:*12*
140:*2*
dollars
106:*6, 7, 8*
129:*19*
dominated
41:*1, 6*
DONELSON
5:*16*
door 81:*22*
82:*11*
110:*22*
downtown
140:*16*
drinking
104:*4, 7*
driving
63:*20*
dual 19:*10*
duly 7:*15*
Dunston
145:*16*
146:*23*
duties
88:*22* 89:*2,*
*15*

< E >
E 4:*1* 5:*1*
153:*1*
earlier 8:*7*
14:*17*
15:*19, 20*
41:*17* 60:*1*
121:*1*
early
123:*21*
easily
100:*3*
eat 99:*12,*
*13*

edge
126:*20*
EEOC 16:*4*
17:*2* 41:*20*
124:*6*
146:*16*
effect 2:*14*
31:*1* 51:*1*
effort
36:*15*
118:*17*
eighteen
98:*18, 20*
100:*8*
101:*7*
eighty-one
137:*7*
either 10:*2,*
*10, 13, 16*
19:*21* 33:*4*
48:*16*
74:*19* 88:*1*
101:*21*
103:*23*
107:*19*
108:*14*
115:*20*
125:*18*
electronicall
y 33:*5, 16*
60:*22*
61:*10*
elevate
84:*22, 23*
85:*11*
elevated
113:*7*
else's
133:*13*
e-mail 28:*4*
33:*13, 21*
37:*21* 49:*9*

50:*9, 16, 22*
51:*22* 52:*3,*
*8, 9, 13, 19*
53:*1, 3, 4*
117:*10*
135:*22*
136:*9, 12*
e-mails
36:*13*
126:*10*
135:*18*
employed
14:*1* 18:*5*
43:*1* 45:*7*
48:*16* 76:*5*
77:*16*
91:*19*
126:*1*
147:*2, 6, 14*
employee
20:*13, 22*
30:*7* 31:*4*
55:*12* 58:*6,*
*10, 21*
64:*12* 77:*9*
78:*11*
81:*18* 83:*1,*
*3, 7* 84:*4,*
*17* 85:*2*
97:*17*
105:*5*
108:*4*
118:*2, 14*
138:*15*
146:*17, 21*
employees
9:*4* 18:*12,*
*14* 20:*4, 8*
30:*16*
33:*22* 34:*8,*
*13* 37:*22*
38:*2, 7*

60:*12*
61:*13*  62:*1*
64:*17, 20*
66:*1, 2, 5,*
*11*  73:*10*
75:*17, 20*
77:*4, 14, 18*
89:*16*
92:*23*  93:*3,*
*7, 12, 19*
94:*1*  97:*1,*
*5*  99:*16, 23*
100:*9*
101:*7*
103:*13*
104:*13, 16*
107:*19*
108:*2, 5, 7,*
*12*  111:*14,*
*18*  120:*19*
121:*6*
122:*11, 15*
123:*19*
124:*15*
127:*11*
137:*9*
148:*17*
150:*9, 10*
**employer**
39:*17*
140:*10, 14*
**Employmen**
**t**  41:*19*
42:*16*
60:*10*
104:*12*
115:*4*
**entire**
21:*21*  22:*1*
77:*18*
120:*6*

**EPL**  114:*5,*
*23*  115:*1, 4,*
*10*
**Equal**  39:*5*
41:*19*  90:*1*
**equality**
112:*9, 10*
113:*1*
**equally**
93:*8, 12, 20*
**Ernest**
76:*4, 20*
77:*21*
**errors**  8:*21,*
*23*
**Esq**  5:*5,*
*10, 18*
**established**
116:*13*
125:*5*
**et**  6:*22*
**evaluation**
27:*10*
61:*23*
73:*10, 16*
74:*11*
78:*10*
**event**
103:*1, 22*
108:*19*
109:*8, 9, 10*
**events**
78:*7, 15, 20*
101:*21*
102:*3, 6, 10,*
*19, 21*
103:*6, 8, 9,*
*10*  104:*5*
105:*19*
107:*22*
109:*3, 7*

115:*19*
116:*8*
**everybody**
49:*18*
82:*13*
96:*20*
116:*6*
135:*18*
136:*11, 13*
**evidence**
3:*2*  24:*9*
106:*19*
107:*4*
139:*11*
**exactly**
16:*16*
25:*14*
43:*19*
60:*14*
125:*5*
**EXAMINATI**
**ON**  4:*2*
6:*9*  8:*1*
**examined**
7:*16*
**Excellence**
30:*14*
**excluded**
109:*2*
**excluding**
65:*15*
**executive**
47:*7*  67:*2*
68:*14*
70:*10*
71:*22*  76:*8*
88:*23*
95:*22*
119:*11, 21*
120:*5, 11,*
*19*  121:*17*
129:*3, 17*

130:*1*
131:*2*
132:*2*
138:*1*
140:*4, 21*
141:*10, 16*
142:*12*
143:*1, 14,*
*19*  144:*3, 9,*
*14*  145:*19*
148:*19*
149:*5*
**executives**
67:*22*  68:*7*
70:*16*
72:*13*
96:*19*
97:*12*
119:*15, 17*
120:*16*
121:*11*
123:*20*
134:*18*
136:*16*
137:*17*
138:*23*
149:*12, 21*
**EXHIBIT**
4:*7, 8*
14:*12*
17:*12*  25:*2,*
*3*  30:*10*
32:*21*
41:*16*  60:*2,*
*21*  66:*4*
70:*17*  78:*2*
79:*3*  86:*5*
122:*7*
123:*5*
134:*17*
**existence**
137:*19*

**existing**
88:*19*
**expect**
90:*21*
92:*23*  93:*4*
**expected**
99:*8*
**experience**
118:*8, 11*
119:*18*
122:*23*
140:*21*
142:*11, 23*
143:*13, 18*
144:*3, 8, 13,*
*19*  145:*3, 7,*
*11, 19*
147:*22*
148:*17*
149:*5, 11*
150:*9, 11*
**Expires**
153:*21, 22*
**explain**
21:*22*
35:*18*
**expressed**
70:*19*
114:*17*
**extend**
18:*22*
**externally**
74:*20*

**< F >**
**F**  153:*1*
**face**  105:*23*
**fact**  57:*9*
107:*7, 11*
108:*19*
**factor**
118:*13*

Video Deposition of John Cadden

1/31/2024

**factors**
116:*1*
**facts**  24:*9*
106:*19*
107:*3*
139:*11*
**factual**
107:*12*
**fair**  115:*8,*
*15*  124:*2*
145:*2*
150:*16*
**fairly**  37:*9*
39:*19*  83:*9*
86:*16*
**familiar**
60:*16, 19*
**family**
22:*13*
**far**  101:*5*
107:*7*
137:*1*
**Federal**  6:*3*
**feel**  30:*11*
80:*9, 10*
**female**
38:*2, 7*
41:*9, 21*
42:*3*  58:*7,*
*8*  67:*22*
70:*17*  75:*1,*
*3, 16*  83:*10,*
*17*  84:*2, 5*
87:*20*
97:*16*
103:*12*
106:*23*
108:*2, 4, 5,*
*6, 11*  110:*6,*
*11*  111:*13,*
*18*  123:*19*

124:*10, 14*
134:*18*
**females**
42:*18*
122:*16*
134:*9*
**female's**
106:*17*
**field**  41:*2*
**fifteen**
68:*4, 9*
121:*19*
134:*16, 18*
137:*17*
149:*20*
**fifties**
129:*18*
**fifty**  22:*8*
121:*18*
131:*6*
**fifty-five**
120:*2*
131:*6*
**fifty-two**
120:*2*
**figure**  13:*2*
47:*19*
84:*14*
126:*19*
**file**  76:*23*
**filed**  8:*9*
16:*7, 14*
17:*1*  57:*22*
71:*8, 11*
**filing**  3:*4*
**fill**  61:*12*
133:*20*
**filling**  59:*4*
**FINANCIAL**
1:*10*
**find**  10:*21*
16:*10*  21:*1*

44:*2*  63:*21*
125:*8*
126:*15*
**finished**
151:*8*
**fired**  52:*1*
**Firm**  2:*7*
5:*9*  6:*6*
146:*1*
**first**  7:*15*
126:*11*
128:*14*
**Fisher**
128:*15*
131:*20, 21,*
*23*  144:*20*
145:*5, 12,*
*20*
**five**  42:*10,*
*12*  43:*11*
68:*1*  137:*8*
**fix**  11:*14*
90:*22*
**flip**  33:*1*
39:*12*
**flipped**
150:*7*
**floor**  98:*2,*
*4, 5, 7*
**follow**  34:*4*
**following**
6:*10*
**follows**
7:*16*
**force**  2:*14*
63:*21*
**foregoing**
6:*4*  153:*7,*
*10*
**form**  2:*21*
12:*15*
13:*14*  14:*6*

17:*3*  18:*3,*
*13*  20:*5, 9,*
*14*  21:*2, 6,*
*12*  22:*7, 15*
23:*3, 10, 18*
24:*8, 15, 20*
27:*15, 20*
28:*1, 11, 14,*
*16, 23*  29:*5,*
*10, 17*  31:*2*
32:*1*  33:*6*
34:*2, 10, 15,*
*21*  35:*2, 5,*
*9*  38:*9, 22*
40:*16*  41:*3,*
*11, 23*  44:*4,*
*14*  48:*20*
49:*1, 5, 12,*
*23*  50:*8, 12,*
*18*  51:*3, 8,*
*12, 15, 20*
52:*2*  54:*1*
55:*5, 16, 23*
56:*17*  57:*1*
58:*4, 12*
59:*3, 16*
60:*13, 23*
62:*17*
63:*15, 19*
64:*1, 9, 15,*
*19, 22*  65:*4,*
*8, 18, 22*
66:*6, 14*
67:*5, 13*
68:*10, 15,*
*23*  69:*7, 18*
70:*4, 12, 21*
71:*5, 20, 23*
72:*3, 7, 18,*
*22*  73:*4, 11,*
*17*  74:*8, 14,*
*21*  75:*8, 14,*

*18*  76:*1*
77:*1, 10*
78:*12*  79:*1,*
*19*  80:*1, 19*
81:*8, 13, 21*
82:*19*
83:*14, 21*
84:*10*  87:*3,*
*22*  88:*2, 7,*
*11*  89:*21*
90:*3, 7*
91:*23*
92:*18*  93:*1,*
*5, 9, 15, 21*
94:*4*  95:*15,*
*19*  96:*1, 7*
98:*19*
99:*17*
100:*1, 5, 11,*
*14, 17, 23*
101:*8, 13,*
*16*  102:*2, 8,*
*12, 16, 22*
103:*15, 19*
104:*2*
105:*7*
106:*16, 18*
107:*1*
108:*1, 8, 15,*
*22*  109:*4*
110:*2, 8, 13,*
*17*  111:*15*
112:*3, 12,*
*17, 21*
113:*5, 9, 13,*
*17*  114:*9,*
*14, 20*
115:*22*
116:*10*
117:*5, 12,*
*16, 21*
118:*4, 15*

Video Deposition of John Cadden                    1/31/2024

119:*13*
122:*17*
123:*14*
124:*22*
127:2, *8*
129:*13*
131:*4*
132:*20*
133:3, *20*
134:*21*
135:*4*
136:8, *19*
137:*21*
138:3, *6, 17*
139:*4, 10,*
*18*  140:*11,*
*23*  141:*20*
142:*13*
143:2, *15,*
*20*  144:*15,*
*21*  145:*6,*
*14*  148:*1,*
*18, 23*
149:*7, 14,*
*18, 22*
150:*4, 14*
**Forman**
5:*10*
**fought**
34:*19*
**found**
36:*23*
**founder**
116:*14*
**founders**
34:*18*  37:*1*
**fountain**
110:*23*
**four**  11:*20*
13:*11*
21:*16*  42:8,
*12*  68:*1*

125:*23*
147:*23*
148:*17*
149:*5, 12*
150:*9*
**fourteen**
149:*10*
150:*8*
**fourth**  98:*2*
**four-year**
125:*16*
**free**  30:*11*
82:*5*
**fridge**
105:*3*
**full**  2:*15*
8:*3*
**function**
89:*9*
**functions**
107:*19*
108:*5, 13*
**FURTHER**
2:*11, 18*
3:*3*  151:*23*
152:*5*
153:*13*

< G >
**gay**  48:*17,*
*23*  49:*4, 10,*
*15, 16, 21*
50:*10, 17,*
*23*  51:*23*
53:*22*  54:*5*
55:*4, 7, 15,*
*22*  66:*2*
**gays**  53:*15,*
*16*
**gender**
24:6, *14*
41:*21*  58:3,

*10, 15*
65:*20*
69:*15, 20*
70:2  71:*3,*
*15, 17*  81:*6*
87:*10*  94:*7,*
*10*  113:*4*
149:*17*
150:*3*
**general**
85:*8*
**generate**
106:*6*
**generated**
15:*22*  16:*2*
70:*23*
**gentleman**
128:*10*
**getting**
76:*15*
**give**  52:*13*
53:8, *9*
64:*3*  77:*19*
96:*16*
121:*22*
126:*20*
**given**  27:*3*
62:*1*  94:*1,*
*2*  153:*12*
**giving**
121:*4, 9*
122:*1, 3, 4*
**glasses**
15:*2*
**go**  14:*7, 23*
44:*1*  46:*18*
47:*8*  49:*11*
50:*10, 23*
51:*23*
60:*15*  80:*4*
98:*6*  101:*5,*
*11*  103:*4*

105:*16*
115:*7, 19*
120:*17*
121:*21*
127:6, *14*
130:*4*
131:5, *13,*
*23*  133:*22*
134:*23*
145:*4*
146:*2*
149:*6, 12*
150:*10*
**goal**  63:*10,*
*12*  74:*11*
75:*11*
125:*17*
**goals**
60:*11*  62:*1,*
*4, 8*  73:*1*
78:3, *4, 9*
**goes**  13:*17*
26:*21*
102:*18*
**going**  7:*20*
12:*16*
16:*22*
17:*19*
23:*12*  25:*2*
36:*14*  48:*2*
50:*4, 17*
53:*5*  59:*8*
60:*15*  61:*4,*
*6*  63:*1*
67:*18*
71:*11*  74:*4*
91:*11*
106:*15*
107:*14*
110:*11*
115:*3, 7, 9*
119:*18*

120:*1*
122:*23*
124:*9*
125:*22*
**good**
18:*12, 14*
20:*3, 13*
64:*17, 20*
72:*16*
113:*23*
138:*1*
146:*3*
**Google**
37:*4*
**googled**
36:*21*
**gotten**
95:*10*
142:*18*
**grade**
126:*9*
**great**
110:*21*
125:*21*
133:*8*
138:*4, 15*
151:*21*
**greater**
121:*13*
**grew**  15:*11*
**grounds**
2:*23*
**group**
80:*14*
**grow**
126:*19*
**grown**
42:*15*
**growth**
118:*19*
**guess**  29:*8*
46:*17*

Video Deposition of John Cadden

62:19  69:1,
2  80:11
105:2, 3
114:15
118:7
**guide**  92:2,
4

**< H >**
**half**  129:21
**hand**  30:4
**handbook**
30:7, 15, 20,
23  31:4
33:4, 11, 22
34:9, 14
36:11, 13
39:8  41:15
48:15  49:6
79:2  85:21
86:1, 4
91:9, 20
**handled**
93:13
136:4
**handles**
115:16
**handling**
89:20
**happen**
24:18
27:23
85:13
88:18
114:5
**happened**
16:17
17:23
133:15
**happening**
31:23

107:18
110:15
**happy**
13:3  106:3
115:17
**harassment**
81:20
82:17
85:17
86:17
103:14
**hard**  48:10,
11, 12
**hate**  126:5
**head**  28:22
77:19
94:20
**heading**
39:5
**hear**
108:11
124:12
**heard**  32:3
38:4  55:6
122:18
**heaven**
130:18
**held**  19:21
78:16
**hell**  49:11
50:11, 17,
23  51:23
**hello**
135:10
**help**  14:10
109:13
**helpful**
109:14
**Helveston**
11:8, 15, 23
12:10, 12,
14, 20, 23

13:5  14:2
17:20, 21
18:9  20:13,
20  21:5, 10
22:11, 17
23:22  24:2,
5, 11  26:5,
8  27:18
28:3, 7, 10
31:15, 19
41:8  82:3
87:8  112:5,
8  113:1
**Helveston's**
21:18
**HENDRIX**
1:7  5:23
6:21  7:5, 7
8:8  10:5,
20  11:7
12:20  13:7
17:1  18:7
21:8  23:2
25:12  26:7
27:2, 11, 14
41:7  57:22
71:3, 15
75:6  87:7,
9, 15  95:18,
22  98:1
99:22
103:11
106:13, 22
150:18
**Hendrix's**
16:4  17:13
26:11, 14
35:20
41:20
99:15
**hereto**  25:5

**Hey**  83:8,
16, 23
121:9
133:7
135:23
**high**
129:18
146:7
**higher**  94:2
**highest**
73:21
92:10
**hinder**  63:1
**hire**  17:15
37:22  43:2
63:8, 10
74:15
76:14
119:15
128:15
**hired**
19:23  43:6,
21, 23  45:4,
20, 23
76:15, 17,
18  87:20
114:2
120:4, 17
121:6
122:10
129:20
131:8
141:10, 23
**hiring**  59:5,
8  129:9
**history**
34:17
35:15
**home**
81:10
151:11

**honest**
53:8, 9, 11,
12  62:20
116:22
120:12
130:5
**honestly**
73:13
**honor**
109:23
**honored**
88:20
**honoring**
116:14
**hope**  14:10
**hopes**
146:7
**host**  116:1
**hours**  82:6
**HR**  16:11
17:8  28:13
82:4  85:1
119:8
**huge**  134:2
**Hughes**
23:5, 22
70:23  82:2
144:1
**huh-uh**
15:10
**human**
22:19  28:8,
18, 22  85:5,
12  88:9
113:7
114:19
**hundred**
66:15
106:8
**Hundreds**
106:11

hypothetical
90:13

< I >
I 2:1 4:1
6:1 8:6, 12
9:8, 9, 11,
22 10:7, 8,
9, 14, 18, 21
11:1, 4, 9,
10, 12, 13,
14, 18, 20
12:6, 18, 21
13:1, 2, 3,
10, 11, 15,
18 14:3, 7,
10, 14, 16,
23 15:1, 9,
11, 14, 22
16:3, 6, 9,
11, 16 17:6,
8, 14 18:6,
10, 15, 20
19:6, 8, 12,
19 20:1, 15
21:7, 8
22:3, 14, 21
23:4, 6, 12,
15, 19, 23
24:4, 10, 16,
21, 22
25:17 26:1,
16, 19, 20
27:1, 21
28:2 29:1,
7, 8, 18
30:2, 8
32:20 34:3
36:1, 18, 20,
23 37:7, 15,
19 38:10,

23 39:7, 15,
22, 23 40:3,
9, 12, 17, 22
41:17 43:3,
5, 19 44:1,
2, 10, 15, 21
45:1, 2, 12,
13, 17, 21,
22 46:5, 17,
21 47:7, 12,
18 49:6, 13,
16 50:13,
14, 20 52:6,
7, 8, 18, 19,
20, 21
53:10, 18
54:14, 15
55:10, 11,
18, 19 56:2,
3, 11, 12
57:3, 5, 7, 8,
13 58:5, 15,
18, 19
59:12 60:4,
18 61:3, 4,
8, 11 62:6,
9, 12, 18, 23
63:5, 7, 9
65:9, 14
66:9, 22
67:17, 23
69:1, 2, 8
70:13, 22
71:6, 10
72:4, 10, 19
73:5, 12, 13
75:19
76:15, 22
77:2, 17, 18
78:13 79:8,
10, 12, 20
80:2, 11

81:3 82:5,
9, 20 83:8,
22, 23 84:6,
11, 12
85:10, 19,
23 86:14,
18, 22
90:21, 22
91:2, 6, 7
92:20
93:22 94:5,
6, 23 95:5,
7, 8, 20
96:2 97:3,
18, 22 98:2,
8, 13, 21
99:5, 7, 8,
18 100:18
101:18, 19
104:23
105:2, 3, 11,
14, 15, 20
106:11
107:2, 5
109:22
110:5
111:11
113:6
114:4, 15,
22 115:3, 6,
13, 16
116:1, 19
117:8
118:6, 7, 9,
17 119:8,
12, 22, 23
120:12, 23
121:8
122:18
123:15
124:12
125:2, 5, 21

126:5, 6, 8,
12, 13, 17
127:3, 9, 13
128:2, 13
129:7, 9, 10,
14 130:3,
10, 17
131:5
133:7, 9, 11
134:1, 4, 5,
20 135:1, 5,
7, 8, 10, 11,
12, 21, 23
136:2, 10,
13, 20
137:7
138:7, 14,
18 139:5, 7,
14 140:3,
18 141:11
142:4, 9, 22
143:9
144:1
145:1, 17
146:4, 9, 20
147:10, 12,
14, 17, 19,
21 148:7, 8,
12 149:3
150:5, 7, 15,
20 151:1, 4,
8, 19 153:1,
6, 13, 15
idea 16:3
29:15
126:7, 8
identificatio
n 25:4
identify 7:2
ignore
113:12, 14

illegal
51:14
imagine
43:5
implants
107:21
implemente
d 37:6
90:17, 19
91:15
implementin
g 36:4
implicit
79:23
80:11, 18
81:6, 12, 14
important
21:4, 7, 9
63:17, 20,
22 92:4, 6,
9, 11, 16
105:22
136:23
include
97:10
102:11, 14
Including
30:18
inclusion
62:8, 15
65:11, 12,
13 73:3
75:13 78:4,
7, 15, 19, 23
79:5
inclusive
65:15, 17
income
121:1, 2
increased
75:12, 16
123:12

increases
 124:3
**INDEX** 4:7
indicate
 24:5, 11
 36:13
 53:14  54:3
 58:23  81:6
 149:16
 150:2, 12
indicating
 36:4  101:4
individual
 25:11  62:4
individuals
 10:1
 144:18
 150:22
 151:3
industry
 32:7
 101:19
informally
 83:12
information
 9:22  25:8,
 12  26:10,
 13  44:2
 60:20, 21
 61:9  95:4,
 6  132:18
informed
 136:17
initial  25:6
input  27:9
 88:21
 128:1
inside
 47:10

INSURANCE
 1:10  6:21

7:9  47:15
 115:6
 141:4
interest
 70:19
interested
 153:16
internally
 74:20
interrupting
 54:20
interview
 134:1
introduced
 8:7
investigate
 86:16

investigated
 85:18, 22
Investigatio
ns  86:11
invited
 108:4
involved
 10:2  17:10
 31:16  42:6
 76:16
 88:10
 130:6

involvement
 31:10
 129:15
involves
 17:4
issue
 81:19
 110:4, 7, 9
 112:9, 10
 113:1

issued
 10:16  37:3
 78:10
issues
 20:18  24:6,
 12  27:14
 82:23
 140:9
It'll  140:19

< J >
JANUARY
 1:19  2:9
 6:14
JEFFERSO
N  153:4
Jessica
 125:6
 132:17
 133:23
Jessica's
 134:3
job  19:20
 26:4, 11, 14,
 16  44:5
 74:2, 5
 88:22  89:2,
 8, 15  139:8,
 11  146:2
jobs  141:13
JOHN  1:16
 2:4  6:8, 19
 7:14  8:5
 32:14, 16
 53:13
Johnston
 46:13  47:1
 48:5, 7, 9
 49:10, 20
 50:10, 16,
 21  51:22
 55:3, 6, 14,

21  56:6, 8,
 16, 21
 57:12  76:9
 117:9
Jordan
 42:22
jot  23:20
July
 132:10
 141:23
June  12:12

< K >
Kat  5:23
 10:19  13:9,
 16, 17
 106:20
 108:17
KATHRYN
 1:7  7:5, 7
 8:8  10:5
 11:6  12:10,
 11, 20  13:6,
 16, 21, 22,
 23  16:4, 14
 17:21  18:7
 19:13
 20:13
 22:12, 13,
 18, 23  23:2
 24:3, 6, 12
 25:12  26:7,
 11  27:10,
 14, 19  28:9
 41:7, 20
 57:22  71:3,
 14  75:6
 87:6, 9, 15,
 17  88:4
 95:18, 22
 98:1, 12
 99:22

103:11
 106:13, 22
 108:18
 109:2
 112:8, 14,
 23  113:19
 114:6, 23
 126:1
 147:7, 11
 150:18
Kathryn's
 11:16  28:4
 112:6
Kat's
 104:12
keep  18:12,
 14  20:3
 29:13
 41:15
 54:18, 23
 63:1  100:9
 104:13
 106:3
 116:4
keeping
 101:22
Kelly
 32:13, 18
kept
 104:10, 17,
 20
kids  120:1
kind  44:5
 64:13  70:9
 71:16
 72:21
 81:18
 82:23  83:3,
 11  85:3
 96:23
 98:23
 112:7

116:*21*
118:*11*
121:*23*
**King**   32:*13, 18*
**knew**
49:*16*
76:*15*
119:*22*
**know**   9:*9, 12*   10:*18*
12:*4, 6, 21*
13:*10, 11, 19, 23*   14:*7*
15:*20*   16:*2, 7, 12, 13*
17:*7*   18:*7*
21:*15*
22:*10, 14*
25:*10, 17*
29:*13*
34:*18, 23*
35:*4, 7*
38:*10, 20, 23*   41:*9*
44:*13*
45:*17, 18, 21*   46:*5*
47:*22*
49:*13, 17*
55:*18, 19*
57:*2, 7*
61:*4*   63:*5*
64:*13*
65:*21*
67:*21*   68:*6*
72:*10*   73:*1, 13, 14*
79:*13*   80:*3, 5, 12*   82:*16*
83:*8*   84:*19*
85:*2, 23*

86:*22*   89:*6*
90:*22*   91:*6*
93:*3*   97:*18, 20*   99:*19*
101:*18, 20*
104:*23*
110:*20*
111:*21*
114:*5*
115:*4, 13*
116:*3, 19*
119:*8*
121:*7*
123:*11, 20*
126:*12*
127:*3, 14*
128:*2*
129:*16*
130:*3, 8, 16*
134:*19*
135:*19*
136:*1, 7, 9, 13, 16, 20, 23*   137:*7*
138:*7, 14*
141:*11*
142:*15, 22*
143:*8, 23*
144:*6, 23*
145:*8, 16*
146:*19, 20*
147:*8, 12, 16, 18, 21*
148:*3, 9, 11, 12, 14*
149:*2*
**knowledge**
20:*11*   26:*3*
28:*6*   55:*10*
73:*18*   78:*8*
87:*13, 16*
91:*16*

103:*16, 20*
107:*23*
127:*10*
134:*14*
140:*12*
**known**   31:*8*
**knows**
82:*14*

**< L >**
**L**   2:*1*
**lack**   58:*7, 23*   83:*10*
84:*5*   87:*19*
**large**
123:*23*
**larger**
94:*13*
121:*2*
123:*1*
**largest**
42:*21*
116:*15, 16*
**launch**
125:*3, 19*
126:*7, 11, 15, 23*
127:*1, 6, 12, 15, 20*
128:*7, 15, 16*   129:*23*
130:*4*
131:*13, 17*
132:*16*
134:*10, 23*
135:*3, 23*
136:*5, 12*
137:*19*
142:*6*
145:*4*
149:*6, 13*
150:*10*

**Lauren**
46:*23*   47:*3*
48:*4*   49:*8, 14*   50:*22*
52:*16*
53:*13, 20*
54:*10*   56:*6, 14*   57:*5, 6*
117:*4*
**Law**   2:*7*
5:*4, 9*   6:*6*
69:*10*
**laws**   2:*15*
**lawsuit**   8:*9*
57:*22*   71:*8, 12*   150:*19*
**lawsuits**
8:*20*
**lawyer**   9:*8, 13*   25:*7*
54:*20*
90:*23*
**lawyers**   8:*8*
**lead**   81:*23*
82:*1*   96:*11, 12, 16*
102:*23*
103:*2*
107:*12*
127:*16*
132:*14*
133:*17, 19*
136:*14*
**leaders**
128:*6*
**leading**
2:*21*
**leads**
125:*1*
127:*19*
**leave**
10:*23*

22:*13*
43:*14, 17*
45:*11*   46:*4, 15, 20*
140:*7*
146:*3, 8*
**Lee**   47:*10*
133:*18*
**left**   42:*16*
45:*15*   76:*5, 10*   88:*14*
110:*23*
146:*2*
**length**
129:*11*
**Leslie**   5:*5*
7:*6*   42:*22*
43:*14, 23*
44:*3*
**Leslie's**
44:*20*
**level**   30:*21*
62:*15*
65:*13*   73:*3, 6, 21*   78:*5*
122:*5*
133:*9*
**levels**
39:*20*
84:*20*
97:*11*
**Levingston**
145:*8, 9*
**liability**
47:*9, 17, 23*
48:*2*   51:*19*
114:*6*
115:*5*
**limits**   29:*13*
**Lindberg**
46:*23*   48:*4*
49:*8, 14*

50:*22*  57:*5, 6*

**Lindsey**
  53:*20*  56:*6, 14, 20*  57:*5*
**line**  95:*7, 8*  99:*8*
**list**  70:*22*  134:*17*  137:*17*  146:*15*  147:*3, 6, 10*
**listed**
  25:*11*  40:*14*  66:*11, 23*  67:*22*  70:*16*  95:*21*  146:*17, 21*
**lists**  41:*21*
**little**  58:*22*  112:*7*
**LLC**  5:*4*
**located**
  28:*13*
**London**
  146:*2*
**long**  9:*15*  12:*4*  13:*23*  18:*18*  19:*7, 16, 18*  57:*2*  65:*10*  66:*9*  76:*12*  79:*20*  120:*6, 10, 15*  140:*5*  143:*4, 10*  148:*20*
**longer**
  46:*13*  47:*15*  76:*4*

121:*20*  126:*1*  143:*3*  146:*1*  148:*2*
**long-term**  120:*18*
**look**  14:*8*  25:*20*  32:*21*  39:*1*  41:*15, 16*  60:*5*  61:*5, 16, 22*  66:*3*  69:*4*  78:*1*  84:*4*  86:*4*  95:*8*  98:*23*  99:*3, 7*  118:*17*  120:*18*  121:*13*  122:*19*  124:*18*  131:*5*
**looked**
  74:*18*  99:*5*  122:*13*
**Looking**
  17:*12*  26:*15*  42:*5*  97:*16*  99:*2*  122:*7, 19*  146:*22*
**looks**
  17:*13*  66:*10*  95:*7*
**lost**  101:*1*
**lot**  48:*6*  53:*6, 19*  65:*23*  66:*1, 2*  89:*10*  92:*14*

118:*10*  122:*15*
**lots**  137:*9*
**love**  15:*1*
**Lovoy**
  144:*11*
**low**  118:*18, 19*  129:*18*
**lowest**
  67:*3, 6, 10, 11*

**< M >**
**ma'am**
  79:*8*  86:*1*  148:*8*
**maintained**
  104:*21*
**major**  22:*8*
**makeup**
  63:*3*
**making**
  9:*4*  49:*20*  83:*11*  120:*19*  121:*6, 17, 18, 20*  122:*15*  123:*13*  139:*16*
**male**  41:*1, 6*  44:*3*  46:*7, 11*  75:*2*  97:*17*  99:*16, 23*  106:*14*  122:*11, 14*  124:*10*  148:*17*
**males**
  147:*23*

149:*6*
**man**  130:*23*
**manage**
  137:*10*
**management**  30:*21*
**manager**
  82:*2*  84:*13*
**Mandy**
  149:*2*
**Maria**
  144:*7, 8*
**Marie**  144:*6*
**mark**  25:*2*  59:*21*
**marked**
  14:*12*  25:*4*  30:*10*  38:*17*  60:*1*
**market**
  109:*10, 12*
**marketing**
  134:*5*
**married**
  81:*11*  142:*19*
**Marshall**
  125:*6*  132:*17*  133:*23*
**Martin**
  44:*11*  46:*9*
**Mason**
  46:*13, 23*  48:*5, 7, 9*  49:*10, 19*  50:*10, 16, 21*  51:*22*  53:*14, 17, 21*  54:*4*  55:*3, 6, 14, 21*  56:*6, 8,*

16, 21
57:*11*  76:*9, 18*  88:*14*  117:*9*
**matter**  57:*9*
**max**  124:*11*
**McClure**
  47:*10*
**mean**
  15:*22*  29:*8*  34:*3*  44:*1*  49:*16*  53:*18*  54:*17*  62:*16, 18*  63:*7*  65:*9, 11, 13*  71:*7*  74:*13*  80:*8*  82:*9*  98:*13*  100:*19*  116:*1*  118:*9, 17*  119:*12*  121:*8*  126:*17*  130:*10*  135:*8*  150:*5*
**means**
  62:*18*  65:*14*  80:*3, 5*  153:*9*
**medical**
  22:*13*
**meet**  9:*12, 15*
**meeting**
  11:*10*  135:*16*
**meetings**
  126:*21*  135:*13, 16*

Video Deposition of John Cadden

1/31/2024

63

**Melissa**
42:*23*  43:*2, 21*  44:*11, 13*
**members**
57:*17*
**memorize**
85:*23*
**men**  40:*20*
59:*11*
70:*10*
74:*19*  94:*2*
99:*1, 4*
104:*1*
106:*21*
112:*15*
113:*2*
116:*9*
124:*19*
137:*1, 2, 3*
145:*3*
149:*12, 21*
**mentioned**
121:*1*
131:*14*
**merit**
124:*2, 8*
**message**
10:*5, 23*
11:*3, 5*
12:*17, 18*
**messages**
9:*21, 23*
10:*3*
**messed**
142:*9*
**met**  9:*8*
12:*10*
75:*11*
**mic**  101:*1*
**million**
106:*8*

**mind**  30:*5*
60:*5*
**mine**  56:*2*
133:*14*
**minute**
60:*5*  62:*21*
110:*19*
121:*21*
122:*14, 18, 21*  138:*13, 14, 20*
151:*6*
**minutes**
12:*6, 7*
**mispronounce**  113:*20*
**missed**
146:*6*
**Mississippi**
122:*23*
**misspoke**
142:*4*
**Mobile**
43:*18*
**money**
20:*7*  48:*2*
64:*8*  65:*3*
94:*16*
109:*15*
118:*10*
119:*19*
122:*4*
**Montgomery**  6:*17*
**month**
57:*20*
**Moore**
148:*6, 8, 13*
**mother**
81:*15*
**motivated**
130:*22*

**move**
27:*19*
37:*13*
47:*16*
54:*13, 15, 19*  71:*21*
107:*4*
108:*10*
133:*5*
**moved**
43:*18*
45:*12*
47:*12, 22*
52:*17*
120:*9*
**moves**  70:*9*
**multiple**
123:*9*
**multiples**
123:*9*

**< N >**
**N**  2:*1*  4:*1*
5:*1*
**name**  6:*15*
8:*4*  17:*13*
25:*10, 23*
42:*18*
56:*15*
76:*19*  77:*9*
113:*21*
128:*14*
140:*16, 18*
142:*17*
147:*19*
148:*5*
**named**
144:*19*
149:*10*
**names**
82:*21*
128:*5*

**necessarily**
118:*16*
125:*9*
**necessary**
2:*19*  72:*5, 6*
**need**  30:*11*
49:*6, 10*
54:*12*
68:*20*  69:*4*
81:*10*  91:*2, 7*  101:*10*
105:*1, 11, 15*  110:*19*
115:*5*
120:*19*
121:*9, 21*
135:*8*
**needing**
103:*22*
123:*18*
124:*13*
**needs**  89:*7, 8*  90:*23*
116:*6*
**negative**
15:*10*
53:*22*  54:*4*
55:*4, 7*
**neither**
153:*14*
**Nelson**
44:*11*  46:*9*
128:*14*
131:*17, 19*
132:*5*
**never**
20:*15*  38:*3, 11*  54:*9*
55:*6*  83:*19*
110:*3*

116:*11*
127:*10*
**new**  20:*8*
125:*4, 9, 10*
135:*23*
**nine**  122:*9*
**nominate**
132:*9, 14, 15, 23*
**nominated**
127:*16, 20*
128:*7, 22*
130:*9, 17*
131:*18*
132:*6, 8*
134:*10, 19*
137:*1, 3, 20*
138:*12, 22*
139:*13*
**nominating**
138:*16*
139:*2*

**noncompete**
88:*15, 18*
**norm**  63:*2*
**North**  2:*7*
5:*11, 19*
6:*7*  28:*17*
**NORTHERN**
1:*1*  6:*23*
**Notary**  2:*6*
6:*2*  153:*22*
**notes**
23:*20*
**notice**  3:*4*
**noticed**
6:*20*
**notices**
36:*13*
**NUMBER**
1:*5*  4:*2, 8*

Video Deposition of John Cadden

1/31/2024

64

7:*1*  25:*20*
38:*1, 6*
39:*1, 12*
61:*5, 22*
78:*2*  82:*4*
86:*5*  123:*4*
**numbered**
30:*12*
**numbers**
33:*1*  123:*8,*
*9*  124:*3*

**< O >**
**O**  2:*1*
**oath**  7:*11*
**Object**
12:*15*
13:*14*  14:*6*
17:*3*  18:*3,*
*13*  20:*5, 9,*
*14*  21:*2, 6,*
*12*  22:*7, 15*
23:*3, 10, 18*
24:*8, 15, 20*
27:*15, 20*
28:*1, 11, 14,*
*16, 23*  29:*5,*
*10, 17*  31:*2*
32:*1*  33:*6*
34:*2, 10, 15,*
*21*  35:*2, 5,*
*9*  37:*13*
38:*9, 22*
40:*16*  41:*3,*
*11, 23*  44:*4,*
*14*  48:*20*
49:*1, 5, 12,*
*23*  50:*6, 8,*
*12, 18*  51:*3,*
*8, 12, 15, 20*
52:*2*  54:*1*
55:*5, 16, 23*

56:*17*  57:*1*
58:*4, 12*
59:*3, 16*
60:*13, 23*
62:*17*
63:*15, 19*
64:*1, 9, 15,*
*19, 22*  65:*4,*
*8, 18, 22*
66:*6, 14*
67:*5, 13*
68:*10, 15,*
*23*  69:*7, 18*
70:*4, 12, 21*
71:*5, 20, 23*
72:*3, 7, 18,*
*22*  73:*4, 11,*
*17*  74:*8, 14,*
*21*  75:*8, 14,*
*18*  76:*1*
77:*1, 10*
78:*12*  79:*1,*
*19*  80:*1, 19*
81:*8, 13, 21*
82:*19*
83:*14, 21*
84:*10*  87:*3,*
*22*  88:*2, 7,*
*11*  89:*21*
90:*3, 7*
91:*7, 23*
92:*18*  93:*1,*
*5, 9, 15, 21*
94:*4*  95:*15,*
*19*  96:*1, 7*
98:*19*
99:*17*
100:*1, 5, 11,*
*14, 17, 23*
101:*8, 13,*
*16*  102:*2, 8,*
*12, 16, 22*

103:*15, 19*
104:*2*
105:*7*
106:*16, 18*
107:*1*
108:*1, 8, 15,*
*22*  109:*4*
110:*2, 8, 13,*
*17*  111:*15*
112:*3, 12,*
*17, 21*
113:*5, 9, 13,*
*17*  114:*9,*
*14, 20*
115:*22*
116:*10*
117:*5, 12,*
*16, 21*
118:*4, 15*
119:*13*
122:*17*
123:*14*
124:*22*
127:*2, 8, 22*
129:*13*
131:*4*
132:*20*
133:*3*
134:*21*
135:*4*
136:*8, 19*
137:*21*
138:*3, 6, 17*
139:*4, 10,*
*18*  140:*11,*
*23*  141:*20*
142:*13*
143:*2, 15,*
*20*  144:*15,*
*21*  145:*6,*
*14*  148:*1,*
*18, 23*

149:*7, 14,*
*18, 22*
150:*4, 14*
**objections**
2:*20, 23*
**observation**
84:*3*
114:*11, 12*
**obtaining**
101:*22*
**obviously**
103:*1*
118:*9*
126:*14*
**occasion**
27:*9*  57:*15*
61:*19*
**occasionally**  57:*13*
104:*8*
135:*15*
**odd**  137:*16*
**offended**
69:*23*
**offensive**
69:*12*
103:*18*
**offered**  3:*2*
27:*19*
**office**  11:*8*
12:*1*  18:*17,*
*21, 23*  22:*3*
26:*3*  28:*19*
29:*4, 9*
34:*7*  40:*19*
44:*7*  62:*15*
63:*13*
65:*12*
68:*22*  73:*3,*
*6, 7, 22*
74:*7*  77:*14*
78:*5, 16*

82:*3*  91:*5*
92:*10*
97:*20, 23*
104:*7, 10,*
*17*  106:*6,*
*10*  112:*11*
114:*2*
116:*16, 20*
126:*17*
127:*18*
135:*9, 14,*
*17, 19*
136:*7, 12*
137:*3, 6*
139:*17, 21*
140:*22*
141:*15, 19*
**officer**
134:*5*
**offices**  2:*6*
6:*6*  22:*4, 5,*
*6*  104:*14*
137:*8, 10*
**Oh**  9:*18*
45:*5*  66:*8*
101:*2*
117:*8*
121:*21*
131:*16*
145:*22*
**Okay**  8:*15*
17:*11, 18*
18:*11*  19:*1,*
*20*  21:*18,*
*22*  22:*10*
23:*8*  25:*16,*
*22*  26:*18*
27:*13, 22*
28:*3, 18*
30:*1, 13, 23*
31:*18*
32:*21*  33:*2*

Video Deposition of John Cadden

1/31/2024

34:*12*
36:*22*
38:*11, 16*
39:*3*  40:*6*
43:*23*  49:*8*
55:*12*
60:*19*  61:*2,*
*5, 15, 18*
63:*4*  74:*2,*
*10*  80:*5, 17*
86:*9, 19*
88:*4, 21*
97:*4, 15, 23*
101:*3*
104:*4*
110:*18, 20*
111:*12*
113:*19*
114:*1*
115:*15*
120:*4*
124:*7, 17*
126:*3*
130:*15*
131:*22*
132:*8*
142:*9*
146:*5, 15*
147:*18*
148:*6, 9, 10,*
*16*  149:*2*
150:*2, 16,*
*21*  151:*5*
**Oliphant**
42:*20*
45:*10, 19,*
*23*  46:*2*
**omissions**
8:*21, 23*
**Once**
57:*20*  83:*1*
85:*11*

**on-site**
28:*18*
34:*12*
73:*23*
**open**
41:*15*
81:*22*  82:*5,*
*11*  141:*16*
**openly**
49:*15*
**operate**
72:*9*  92:*3*
**opinion**
80:*12*
90:*18*
91:*14*
114:*15, 17,*
*22*
**opportunitie**
**s**  112:*16*
113:*3*

**Opportunity**
39:*5*  41:*19*
46:*16*  47:*8*
48:*1*  64:*4*
65:*1*  133:*8*
140:*8*
**oral**  6:*9*

**organization**
39:*21*
119:*1*
**outside**
36:*2*  88:*23*
125:*12, 15*
141:*19*
**oversaw**
22:*3*
**oversee**
22:*3*

**owned**
10:*12*  35:*4*
**owners**
35:*1*

**< P >**
**P**  2:*1*  5:*1*
**P.C**  2:*7*
5:*9, 17*  6:*6*
**P.M**  1:*20*
2:*10*  6:*8,*
*14*
**PAGE**  4:*2,*
*8*  25:*21*
29:*14*
39:*12*
61:*22*
123:*3*
**paid**
118:*14*
119:*2*
121:*10, 11*
122:*9, 11*
124:*19*
**PALMER**
5:*4, 5*  7:*6*
38:*18*
**paperwork**
133:*21*
**part**  64:*16*
93:*3*  96:*14*
128:*4*
**Participate**
78:*6*
**participated**
78:*19*
**participatio**
**n**  31:*11*
**particular**
40:*20*
92:*12*

**parties**  2:*3,*
*22*  25:*8*
153:*15*
**passed**
42:*17*
43:*15, 19*
**Paul**  44:*11,*
*19, 21, 22*
46:*9*
**pay**  118:*1,*
*5, 9, 10*
119:*4, 10,*
*16, 18, 20*
121:*12*
122:*23*
126:*8*
129:*5, 7*
**paying**
116:*5*
**payroll**
9:*21*
**Pender**
149:*2*
**people**
17:*9*  30:*21*
39:*18*  40:*7,*
*10*  42:*16*
48:*6, 12, 17,*
*23*  49:*4, 10*
50:*10, 17,*
*23*  51:*23*
54:*5*  55:*4,*
*7, 15, 22*
56:*12*  59:*5*
63:*8, 11*
64:*2*  65:*9*
66:*16*
74:*15*  81:*1*
82:*4, 7, 20,*
*22*  84:*15,*
*20*  90:*17*
93:*18*  99:*2*

118:*19*
123:*8, 23*
124:*7*
125:*10, 15*
126:*17, 20*
135:*9*
136:*4*
141:*12*
147:*6, 11*
**people's**
94:*10, 13,*
*14*  95:*5*
118:*8*
**percent**
124:*9, 11*
**perfectly**
30:*12*
**performanc**
**e**  20:*19*
26:*4, 11, 14,*
*17, 20, 21,*
*23*  27:*5, 10,*
*14*  60:*10*
61:*7, 12, 19,*
*23*  73:*9, 15,*
*19*  74:*11*
78:*10*
94:*10*
140:*10*
**period**  18:*5*
**person**
11:*23*
28:*19*  33:*5*
42:*21*
66:*20*
69:*22*
73:*22*
80:*14*
84:*12*
89:*13, 16,*
*19*  92:*10*
96:*17*

116:2
117:3
121:22
133:7
**personal**
10:12
104:14
**Petty**
16:11, 13
29:1, 3, 16
85:1, 5, 19
**Peyton**
128:11, 12,
13  130:15,
16  144:20
145:5, 12,
20
**Peyton's**
128:13
**Phillip**
46:10
**Phillips**
41:12
**phone**
10:12, 14,
16, 17, 21
11:23
**pick**
115:21
122:20
123:3
**picked**
71:18
**place**
11:23  74:6
**Plaintiff**
1:8  5:3
7:3, 5, 7
26:5
**PLAINTIFF'S**  4:8
14:12

17:12  25:2,
3  26:4
30:10
32:21
41:16  60:1,
20  70:17
78:2  79:3
86:5  122:7
123:5
134:17
**plantation**
35:1
**please**  7:2,
11  33:1
35:18
**point**
10:15  28:4
55:2  62:13
70:8  71:1,
2, 9, 13
74:10
85:15
95:23
99:14
134:15
**policies**
36:5  37:11
51:1  74:4
89:18  90:9,
13, 15, 18,
19  91:9, 10,
20, 22
92:14, 17
93:13, 17
115:12
**policy**
18:12, 15
38:21  40:2,
3  48:22
49:3  51:6,
11  81:22
82:11  87:1

90:10, 11,
12  91:15
92:12, 15
96:5, 8
119:6
**polled**
116:11
**portion**
44:19
**position**
18:16  19:4
47:5  67:1,
3, 7, 10, 12
69:17  75:2,
4  76:7
88:23
129:2, 23
130:2
131:1
132:3
141:7, 16
**positions**
38:8  40:21
88:22
**positive**
15:9  32:17
80:7  86:12
111:23
113:22
144:12
**possibility**
84:15
**possible**
58:10
**possibly**
26:22  65:5
116:11
119:7
132:22
140:6
**posted**

141:19
**pot**  94:16
**potential**
25:8
113:16
**potentially**
85:4  90:6
**Powe**  144:6
**practices**
37:6  70:5
115:4
**Pre-Covid**
43:18
76:11
116:18, 19
146:12
**predominant**  118:18
**preparation**
14:18
**prepare**  9:6
**PRESENT**
5:22  12:2
107:10
**presented**
124:5
**president**
18:17, 19
19:1, 5, 10,
17  20:2
21:20, 23
22:1  26:3
27:8  32:13,
15, 19  34:6
35:14  37:2
40:18
63:13, 18
77:8  91:4
92:9  95:11
105:4
127:18
**press**  37:3

**pretty**  89:2
118:18
**previously**
14:12  30:9
44:22
**primarily**
32:6
**prior**  3:2
8:15  15:17
19:1, 4
32:10
35:15  87:8
111:10
132:11
140:10
141:5
**Probably**
41:13
44:23
63:10  68:2
70:23  99:6
106:11
124:3
129:18
132:18
151:7
**problem**
11:13
82:23  90:6
105:6
114:3
149:17
150:3, 13
**problems**
135:10
**Procedure**
6:4

**proceedings**
6:10

Video Deposition of John Cadden

1/31/2024

process
76:*16*
134:*1*
produced
52:*6, 11*
producer
125:*11*
producers
125:*10*
producing
125:*12, 17*
production
42:*21*
122:*5*

professional
47:*9, 17, 23*
48:*2*
professional
ly   32:*10*
program
125:*3, 4, 7,
16, 19*
126:*7, 11,
16, 23*
127:*1, 7, 12,
15, 20*
128:*8, 16,
17*  129:*23*
130:*4*
131:*13, 23*
132:*16*
135:*3, 23*
136:*5*
137:*19*
142:*6*
145:*4*
149:*6, 13*
150:*10*
progress
62:*11*

Promote
62:*14*  63:*6,
13, 16, 22*
64:*5, 18*
65:*11*  73:*2*
78:*4*  84:*15*
118:*19*
promoted
64:*21*  65:*1,
2, 10*  69:*16*
84:*6*  134:*5*
promoting
79:*4*
promotion
65:*7*
promotions
119:*12*
promptly
86:*16*
proper
35:*19*
properly
72:*9*
property
19:*6, 7, 11,
13, 17, 18*
20:*3*  27:*8*
42:*2, 4, 7*
46:*8, 12*
47:*7, 16, 23*
49:*15*  77:*7*
115:*6*
protected
39:*19*
40:*13*
provide
69:*3*
provided
6:*3*
Public   2:*6*
6:*2*

published
141:*18*
pull   61:*15*
100:*16*
101:*6, 10*
pulled
100:*18*
Punishing
87:*4*
purchased
29:*21*  31:*1,
5, 7*  32:*4*
purpose
90:*10, 14*
pursue
76:*5*  146:*2*
purview
85:*15*
pussy
106:*15*
put   78:*9*
83:*3*  105:*2*
putting
130:*20*

< Q >
Q   8:*3, 6,
13, 15, 19*
9:*1, 3, 6, 9,
15, 17, 19,
23*  10:*6, 11,
15, 19, 23*
11:*2, 6, 15,
19, 22*  12:*2,
4, 9, 19, 22*
13:*5, 9, 12,
16, 20, 23*
14:*4, 9, 15,
18, 20, 22*
15:*4, 9, 14,
17, 20*  16:*2,
4, 7, 10, 13,*

*18, 23*  17:*7,
11, 15, 18*
18:*4, 7, 11,
16, 18, 21*
19:*1, 4, 7,
10, 13, 16,
20, 23*  20:*2,
7, 11, 18, 22*
21:*4, 9, 15,
18, 22*  22:*6,
10, 16, 22*
23:*8, 14, 16,
20*  24:*1, 5,
11, 17*  25:*1,
6, 16, 20, 23*
26:*2, 10, 13,
18, 23*  27:*2,
5, 8, 13, 17,
22*  28:*3, 7,
13, 15, 18,
21*  29:*3, 7,
12, 20*  30:*1,
3, 6, 9, 18,
20, 23*  31:*4,
7, 10, 13, 15,
18, 22*  32:*3,
6, 9, 12, 16,
18, 21*  33:*3,
10, 15, 18,
21*  34:*6, 12,
17, 23*  35:*4,
7, 13, 21*
36:*3, 9, 12,
20, 23*
37:*16*  38:*1,
5, 11, 13, 16,
19*  39:*1, 4,
8, 12, 16*
40:*1, 6, 10,
13, 18, 23*
41:*5, 7, 15*
42:*2, 6, 9,*

*12, 18*  43:*2,
4, 8, 11, 14,
17, 21, 23*
44:*3, 8, 13,
16, 19*  45:*3,
7, 9, 11, 15,
19, 23*  46:*2,
4, 7, 11, 15,
18, 20, 23*
47:*3, 5, 16,
20, 22*  48:*4,
8, 11, 15, 21*
49:*3, 8, 14,
19*  50:*3, 9,
15, 21*  51:*5,
10, 14, 16,
18, 22*  52:*4,
14, 23*
53:*10, 13,
20*  54:*3, 9,
14, 20*  55:*2,
8, 12, 21*
56:*5, 10, 14,
20*  57:*2, 4,
11, 15, 19,
21*  58:*1, 6,
14, 17, 21*
59:*9, 14, 18,
20, 23*  60:*6,
9, 16, 19*
61:*2, 5, 9,
12, 15, 18,
22*  62:*4, 7,
10, 13, 22*
63:*4, 12, 17,
22*  64:*5, 8,
11, 17, 20*
65:*2, 6, 11,
16, 21*  66:*3,
7, 10, 17, 20*
67:*1, 3, 8,
11, 15, 21*

Video Deposition of John Cadden

68:4, 6, 12,
17  69:4, 14,
21  70:8, 15
71:2, 13, 21
72:2, 6, 10,
20  73:1, 6,
9, 15, 19, 21
74:2, 10, 18,
23  75:6, 10,
16, 20, 23
76:3, 7, 10,
12, 14, 17,
19, 21, 23
77:4, 7, 11,
13, 20  78:1,
14, 18, 22
79:3, 7, 9,
11, 13, 16,
22  80:3, 5,
8, 14, 17, 22
81:4, 10, 17
82:9, 15
83:1, 7, 19
84:4, 17
85:2, 7, 11,
16, 21  86:4,
7, 10, 13, 15,
19  87:1, 6,
12, 14, 17,
23  88:4, 9,
14, 17, 21
89:10, 15,
23  90:5, 9,
14, 20  91:4,
8, 17  92:4,
8, 16, 22
93:3, 7, 11,
17, 23  94:7,
16, 19, 22
95:1, 3, 10,
13, 17, 21
96:5, 10, 12,

15, 21  97:4,
8, 10, 15, 19,
23  98:4, 6,
9, 12, 14, 22
99:14, 19,
21  100:3, 7,
13, 16, 19
101:1, 3, 5,
11, 15, 18
102:3, 6, 10,
14, 18
103:6, 10,
17, 21
104:4, 7, 9,
12, 16, 20
105:4, 9, 18,
21  106:2, 5,
9, 13, 17, 20
107:5, 17
108:2, 11,
17  109:1, 6,
13, 15, 17,
22  110:5,
10, 15, 18,
22  111:7,
12, 17, 21
112:1, 5, 14,
19, 23
113:7, 11,
15, 19
114:1, 12,
17, 23
115:8, 12,
15, 18
116:8, 12,
23  117:3, 8,
14, 18, 23
118:13
119:4, 10,
20  120:4,
10, 14, 16,
22  121:3,

15  122:7
123:4, 11,
18  124:6,
12, 17, 23
125:3, 19
126:1, 3, 7,
10, 15, 22
127:5, 11,
14, 17, 23
128:3, 5, 12,
18, 20, 22
129:2, 4, 8,
12, 16, 20,
22  130:2, 8,
12, 15, 20
131:1, 3, 8,
10, 12, 16,
20, 22
132:2, 5, 8,
12, 19, 23
133:15, 18,
22  134:3, 7,
9, 13, 16, 22
135:2, 6, 13,
18, 22
136:3, 6, 11,
15, 22
137:5, 10,
12, 16, 23
138:4, 9, 12,
19  139:6, 8,
15, 20, 23
140:2, 5, 7,
9, 13, 20
141:3, 6, 9,
14, 19, 23
142:2, 6, 9,
15, 18, 21,
23  143:4, 7,
10, 13, 17,
22  144:2, 6,
8, 11, 13, 17,

23  145:2, 8,
11, 16, 18
146:3, 5, 8,
11, 13, 15
147:8, 16,
18, 20, 22
148:3, 6, 9,
14, 16, 19,
22  149:2, 4,
9, 16, 20, 23
150:2, 7, 16,
21  151:2
qualification
s  75:1
qualified
59:5, 7
63:8, 10
64:2  74:15
75:6
question
25:18  36:1,
18, 19
37:20
53:11, 12
54:7, 18
55:8, 9
58:20
62:20, 23
69:21
73:13
80:21
83:16
90:21  92:1
95:7, 9
115:8
121:16
125:21
127:4
136:21
139:9, 12
141:12, 21

questions
2:21, 22
13:6  53:9
54:23  70:1
153:8
quick  67:23
quickly
15:1
quit  50:4
52:17
quota  59:4
quote
106:15

< R >
R  5:1
153:1
rabbit
115:7
race  65:19
Rachel
5:18  7:8
151:10
racial  59:1,
2  150:12
racist
35:15
117:11
racists
37:1
raise  27:13
55:13
raised
24:12  41:8
56:15
84:13  87:9,
23  111:17
112:2
raises  83:1
84:17
118:20

Video Deposition of John Cadden                    1/31/2024
                                                         69

raising
  58:*10* 71:*3,*
  *15* 85:*3*
  109:*2*
  122:*1*
ran  43:*6*
range
  118:*7*
  119:*4, 10*
  120:*2*
ranking
  92:*10*
Raspino
  42:*23* 43:*2,*
  *21*
reach  11:*6,*
  *12* 82:*8*
reached
  10:*7* 23:*6,*
  *12*
read  7:*20*
  33:*8, 10, 12,*
  *23* 39:*22*
reading
  2:*12* 79:*2*
real  67:*23*
  146:*17*
realized
  71:*10*
really  15:*1*
  89:*5*
  137:*23*
reason
  116:*7*
reasons
  24:*2* 91:*16*
  92:*22*
recall  9:*19*
  10:*19* 11:*2,*
  *18, 20*
  12:*13, 22*
  13:*10, 13,*

  *15*  16:*16*
  17:*6* 22:*6,*
  *21* 23:*8, 15,*
  *16* 24:*1, 10,*
  *16, 19, 21*
  26:*6* 27:*21,*
  *23* 28:*2, 21*
  29:*1, 7, 8,*
  *12* 30:*1*
  32:*18* 44:*1,*
  *2, 10, 15, 21*
  45:*15, 22*
  50:*9, 13, 14,*
  *15, 20* 52:*9*
  55:*19* 56:*3,*
  *10, 11, 12*
  76:*10* 77:*2,*
  *3* 78:*13*
  79:*7, 8, 10,*
  *12, 16, 20*
  96:*2* 105:*9*
  112:*20*
  117:*10, 14,*
  *18* 119:*23*
  126:*13*
  128:*13*
  147:*19*
receive
  84:*21*
  99:*16*
received
  73:*16* 75:*2*
  99:*22*
receiving
  10:*2*
receptionist
  120:*8*
recess
  111:*3*
  151:*15*
recommend
  115:*17*

record
  6:*13* 7:*3*
  8:*4* 13:*16*
  15:*15*
  21:*23*
  29:*21*
  107:*14*
  111:*6, 8*
  147:*10, 15*
  151:*18*
recruiters
  141:*22*
recruiting
  74:*12* 78:*5*
Reeves
  41:*13*
refer  13:*20*
reference
  50:*17*
references
  40:*7*
referred
  116:*23*
referring
  42:*19*
  66:*21*
  106:*22*
refrigerator
  104:*22*
  105:*1*

refrigerators
  104:*17*
regard
  28:*8* 81:*19*
  82:*17* 83:*4*
  117:*19*
regarding
  25:*12*
  60:*12*
  114:*8*

regardless
  63:*8* 89:*4*
regroup
  151:*6*
regularly
  104:*8*
related
  60:*9*
relating
  2:*16*
relation
  98:*1*
  153:*14*
relationship
  109:*10, 11*
relatively
  125:*4*
remember
  50:*5*
remotely
  47:*13*
renounced
  37:*2*
renouncing
  35:*14*
rephrase
  36:*20*
replaced
  44:*3* 45:*9*
report  85:*5,*
  *11*
reported
  20:*16* 26:*7*
  28:*9* 87:*18*
  88:*4* 112:*9*
  114:*19*
reporter
  6:*16* 7:*11,*
  *18* 15:*6*
  118:*22*
Reporting
  6:*17*

representati
  on  147:*13*
representati
  ve  66:*19*

represented
  36:*6, 16*
  37:*9* 39:*20*
  83:*9*
represents
  8:*8* 147:*4*
  153:*10*
required
  128:*1, 2*
requirement
  s  132:*13,*
  *14, 23*
  133:*2*
resigned
  47:*14*
resources
  22:*20* 28:*8,*
  *19, 22* 85:*5,*
  *12* 88:*10*
  113:*8*
  114:*19*
respective
  2:*3*
respond
  10:*10* 13:*4*
response
  15:*10*
  32:*17* 36:*1*
  41:*20* 80:*7*
  86:*12* 91:*1*
  111:*23*
  113:*22*
  144:*12*
responses
  150:*18*

Video Deposition of John Cadden                    1/31/2024

**responsibility**  34:*7, 13*  133:*14, 15*
**responsible**  137:*12*  139:*15*
**rest**  82:*20*
**restaurant**  12:*11*
**Restroom**  110:*21*
**result**  37:*5*  93:*19*  153:*16*
**resume**  59:*6*
**retaliation**  86:*20*  87:*1*
**retreat**  102:*20*  115:*21*
**retreats**  102:*15*  105:*19*  108:*14*
**review**  9:*17*  26:*22, 23*  36:*14*  37:*6*  38:*1, 6*  40:*19*  61:*19*  62:*11*  69:*15*  70:*1, 9*  71:*17*  72:*11, 17, 19, 21*  75:*10*  94:*1, 5, 6, 8, 23*  95:*3*  99:*21*  115:*12*  133:*11*

**reviewed**  9:*20*  10:*1*  74:*23*  96:*21*  150:*21*
**reviewing**  98:*14, 22*
**reviews**  27:*2*  61:*7, 13, 19*  73:*19*
**reward**  64:*17, 20, 23*
**Rhonda**  143:*7, 8, 14, 16, 17*
**right**  14:*5*  16:*17*  43:*12*  45:*16*  51:*2*  59:*13*  63:*3*  64:*14*  68:*22*  74:*7*  79:*18*  85:*9*  86:*7*  94:*17, 20*  97:*9*  110:*22*  111:*7*  113:*16*  115:*4, 5*  117:*8*  118:*9*  121:*16*  129:*8, 12*  131:*16*  137:*6, 13*  139:*17*  140:*22*  146:*22*

**right-hand**  39:*4, 13*  86:*8*
**Robertson**  122:*9*  128:*10*  129:*22*  131:*12*  144:*20*  145:*5, 13, 20*
**role**  19:*10*
**Ron**  11:*8*  12:*14*  82:*3*
**room**  76:*23*  104:*22*
**Ross**  122:*9, 20, 22*  123:*13, 16*  128:*9*  129:*22*  130:*8*  131:*12, 20*  144:*19*  145:*4, 13, 19*
**Roussell**  142:*20, 21*  143:*1*
**RPR**  2:*5*  6:*1*  153:*20*
**RT**  46:*19*
**rude**  15:*14*
**Rule**  4:*9*  25:*6*  35:*19*  36:*2*
**ruled**  16:*21*
**rules**  2:*16*  6:*4*

**run**  57:*14, 16*  71:*1*  85:*14*
**running**  17:*9*
**runs**  125:*7*
**Russell**  123:*3*  143:*22*
**Russo**  142:*19*
**Rusty**  23:*5, 7, 9, 14, 16, 22*  35:*18*  70:*22, 23*  82:*2*  87:*14*  109:*1*  128:*9*  144:*1*

**< S >**
**S**  2:*1*  5:*1*
**s/Tanya**  153:*19*
**safe**  40:*23*  143:*17*  144:*2, 17*  145:*18*
**saith**  152:*1, 5*
**sakes**  130:*18*
**salaries**  118:*17, 18*
**salary**  119:*12*  120:*20*  123:*7*  124:*14, 15, 20*
**sale**  31:*11*

**sales**  119:*1*  125:*14*
**Sanders**  148:*14*
**Sarah**  145:*16*  146:*23*
**save**  64:*13*  68:*3*  100:*9, 13*
**saves**  64:*8*
**saw**  52:*20*
**saying**  24:*17, 18, 21*  27:*22, 23*  33:*11*  51:*23*  55:*3, 14, 22*  72:*15*
**says**  26:*2*  39:*14, 16*  50:*3*  61:*7*  62:*10, 14*  73:*6*  86:*1, 15*  123:*4*  126:*22*  127:*5*
**scale**  119:*16, 20*
**schedule**  118:*7*
**scope**  36:*2*
**second**  59:*18*
**section**  40:*14*  62:*5*  86:*10*
**see**  10:*7*  11:*13, 14*  13:*2*  14:*15*  16:*4*  17:*13*

25:*23*
32:*22*
35:*13*
37:*11*  39:*4,
13*  40:*6, 9,
12*  41:*22*
52:*21*
57:*13, 19*
61:*6*  62:*4,
7*  68:*18, 20*
69:*5*  70:*9*
71:*17*
72:*13*
74:*18*
75:*11*
84:*14*
86:*10, 18*
98:*23*  99:*7*
105:*22*
120:*19*
125:*10*
129:*14*
136:*23*
148:*7, 8, 12*
**seeing**
  50:*9, 13*
  52:*9*
  126:*13*
**seen**  14:*13*
  15:*17*  30:*6,
7*  35:*21*
  36:*3, 12*
  38:*3*  52:*6,
8*  60:*2, 11*
  95:*17, 21*
  127:*10*
  132:*19*
  150:*17*
**segmented**
  89:*3*
**Segrest**
  60:*10*

61:*20*  62:*5*
73:*2*  78:*3*
111:*14, 19*
112:*2*
113:*20*
**Segrest's**
  74:*11*
**select**
  127:*6*
**selected**
  70:*3*
**sell**  114:*5*
  115:*1, 6*
  119:*2*
**selling**
  115:*10*
  119:*2*
**send**  37:*21*
  52:*3*  103:*4*
  116:*6*
  135:*18, 22*
**sending**
  10:*2*
  147:*13*
**seniority**
  118:*13*
**sense**  86:*2*
  122:*2*
**sent**  12:*18*
  33:*14*
  35:*13*
  41:*18*
  50:*21*
  51:*22*  52:*5*
  117:*10*
  124:*6*
  127:*11*
  146:*16*
**separate**
  30:*20*
  36:*10, 12*

**SERVICES**
  1:*10*  6:*21*
**set**  89:*18*
**seven**  97:*6*
**seventy**
  106:*8*
**sex**  107:*20*
**share**  25:*8*
**sheet**  96:*3*
**sheets**
  98:*15, 16*
  101:*6*
**shortfall**
  99:*13*
**show**  14:*9,
11*  25:*1*
  30:*9*  60:*1*
  64:*3*  79:*3*
  96:*22*
**showed**
  40:*3*  41:*17*
  52:*18*  53:*2,
3*
**showing**
  15:*18*
**sic**  53:*20*
**side**  39:*4*
**sign**  7:*21*
  33:*8, 11*
  74:*3*  94:*22*
**signature**
  2:*12*
**signed**
  33:*23*  39:*9*
**similar**
  60:*11*
  61:*16*
**sit**  135:*10*
**sitting**
  24:*1, 18*
  40:*2*  69:*23*
  79:*13*

**Six**  97:*6*
  99:*2*  100:*8*
  101:*7*
**sixties**
  129:*19*
**sixty**
  129:*19*
  131:*6*
**size**  89:*5*
  97:*6*
**Skip**  43:*6*
  46:*1*
**slaves**
  35:*4, 7*
  37:*1*
**small**
  125:*14*
**snapshot**
  68:*18*
**social**
  101:*21*
  102:*3, 6, 10,
19, 21*
  103:*10, 22*
  104:*5*
  105:*19*
  107:*18*
  108:*5, 13*
  115:*19*
**sold**  45:*5,
17*
**solidify**
  109:*9*
**somebody**
  20:*16*  59:*5*
  69:*2*  91:*18*
  100:*20*
  103:*23*
  118:*9, 10*
  121:*10*
  122:*4*
  123:*1, 3*

132:*15*
133:*1, 13*
**son**  128:*16,
20*  129:*10,
16*  132:*8, 9*
  138:*12, 21*
  139:*20*
  141:*6, 17*
  143:*1, 14,
19*  144:*4, 9,
14*  145:*5,
12*
**sooner**
  151:*8*
**sorry**
  11:*19*
  17:*17*
  26:*12*  39:*2*
  49:*2*  54:*20,
22*  80:*20*
  82:*9*  86:*6*
  97:*4*  101:*2*
  117:*8*
  131:*16*
  136:*21*
  142:*3, 10*
  148:*8*
**sounds**
  59:*13*
  72:*16*
**South**  5:*6*
**SOUTHERN**
  1:*3*  6:*23*
  15:*11*
**space**
  105:*1*
**Specialty**
  46:*19*
**specific**
  91:*16*
  139:*12*

Video Deposition of John Cadden

1/31/2024

72

specifically
26:*15*  29:*7*
36:*5*  37:*8*
40:*7*
speculate
126:*5*
spell  76:*21*
Spencer
146:*18, 19*
147:*8, 16*
spoken
12:*20*
sponsored
102:*4, 7*
103:*22*
spread
44:*6*

spreadsheet
95:*5*  96:*23*
97:*3*
spreadsheet
s  95:*10, 17*
96:*22*
100:*7*
staff  103:*4*
115:*16*
staff's
99:*12*
Stand
140:*19*
Standard
6:*15*  73:*12*
start
109:*11*
119:*23*
120:*1*
125:*19*
started
68:*13*
116:*18*
120:*7, 8*

126:*11*
128:*11*
130:*18*
132:*10*
138:*21*
139:*21*
142:*6*
starting
7:*3*  129:*17*
135:*23*
state  8:*3*
153:*3*
statement
37:*3*
statements
35:*13*
STATES
1:*1*  6:*22*
stating
37:*11*
statistics
59:*12*
stay  57:*4,
11*  81:*10*
129:*10*
Steele
128:*18, 23*
129:*4*
141:*6, 9*
142:*12*
145:*12, 20*
Steele's
129:*2*
Stefani
16:*11*  29:*1,
3*  84:*23*
85:*5, 19*
stenotype
153:*8*
stipulate
68:*3*

STIPULATE
D  2:*2, 11,
18*  3:*3*
stipulation
6:*5*
stipulations
7:*19*
stop  115:*5*
stored
60:*22*
Street  5:*6,
19*
strengthen
109:*11*
strike
37:*14*
107:*4*
108:*10*
133:*5*
strives
39:*17*
struggling
80:*4*
stuff  89:*3*
92:*15*  94:*9,
10*  118:*12*
119:*2, 3*
subject
51:*18*
subjected
103:*14, 17*
subjective
96:*14*
submits
59:*6*
submitted
150:*19*
substantiall
y  124:*1*
143:*18*
144:*2, 8, 13,
19*  145:*3,*

*11, 18*
147:*22*
148:*16*
149:*4, 11*
150:*11*
Suite  2:*8*
5:*6, 11, 19*
6:*7*
summer
142:*2, 7*
support
99:*11*
suppose
93:*22*
100:*18*
supposed
84:*18, 21*
85:*4, 12*
93:*7*
107:*15, 16*
116:*16*
sure  12:*7*
14:*9*  15:*4,
7, 8, 13, 15*
16:*16*
20:*16*
21:*13, 16*
22:*4*  23:*5,
6, 11*  25:*14,
17, 20*
26:*13, 19*
29:*2, 6, 18*
31:*6*  33:*14*
34:*5, 8, 13*
36:*5, 15*
37:*8, 16, 19*
44:*12*
45:*22*  48:*6*
54:*14*  56:*9*
59:*20*  60:*6,
7, 14*  62:*19,
22*  63:*6*

67:*9*  74:*5*
75:*9*  83:*15,
17, 22*  84:*1,
2*  85:*20*
86:*1*  92:*7*
93:*12*
95:*20*  96:*4*
100:*6*
101:*9, 14*
102:*1*
104:*11*
106:*3*
117:*2*
118:*5*
124:*5, 20*
125:*5*
126:*12, 13*
127:*9*
130:*1, 5, 7*
131:*6*
132:*17*
133:*12*
134:*11*
136:*18*
137:*2*
138:*7*
139:*16*
146:*17*
148:*5, 20*
surprise
59:*17*
survey
75:*19*
Susan
41:*12*
Sutton
111:*22*
144:*23*
Suzanne
42:*20*
sworn  7:*15*

Video Deposition of John Cadden

1/31/2024

73

system
15:23
100:15

< T >
T  2:1
153:1
take  8:10
11:23
23:20
59:19
62:22  79:4
85:14
110:4, 6, 9,
18  121:3, 8
151:5
taken  2:5
79:14
111:4
151:16
153:7
talent
63:21
126:19
talk  16:22
67:15, 17
69:2  87:14
106:2
109:1
111:12
123:18
128:4
133:1, 4, 6
135:11
talked  12:7
23:9, 11
57:21
72:12
111:21
112:5
117:14
126:18

128:9
134:22
151:2
talking
29:14
50:15
52:15  57:7
66:4, 17
67:8  87:7
106:15
107:20
115:20
117:23
119:5
130:20
137:5, 13
talks  34:17
Talsma
66:22
67:15
68:13
111:22
120:4
121:5
Tanya  2:5
6:1, 16
153:20
tasks  64:3
taught
89:23
team  61:13,
14  62:15
63:3  65:12
73:3  78:4
81:23  82:1
89:5, 13, 17,
19, 20
94:17, 20
96:11  97:3,
5, 7, 10
98:14  99:2,
8, 9  100:9

102:20
115:18, 23
118:2
120:17
122:6
125:1, 18
127:12, 16,
19  128:6,
11, 20
132:14
133:19
136:14
138:10, 14,
20  139:1
teams
42:10  97:4
98:15, 20
99:11
100:8
101:7
123:23
technical
67:6  89:3
96:19
97:13
technically
100:20
Tell  12:22
16:18
19:16
23:14
27:18
43:19  49:6
52:23
65:14
77:17
82:12
90:21
92:22
96:23
97:15
112:8, 14

115:3
119:23
120:12
128:5
146:9
telling
49:18
ten  12:7
118:11
119:18
120:14
tend  116:8
term  25:7
80:3
terribly
146:6
testified
7:16
testify
17:5  91:13
107:15, 16

TESTIMONY
1:15  12:9
37:14
68:19
89:10
107:4
111:10
136:11
150:22
151:3
153:11
Texas
134:8
text  9:21,
23  10:3, 4
11:4  12:17
texted  10:9
Thank
7:21  15:3

101:3
151:12
thereto  3:2
153:8
thing
34:11
73:12  79:6
119:8
things
12:8  14:22
53:6, 19
76:6  81:20
82:17
85:17
89:20
93:13
107:5, 11,
21  115:21
135:20
think  9:22
18:15  34:4
37:7  52:19
58:15, 18
61:3  62:23
63:9  66:22
71:6, 10
72:4, 8
82:5  83:8
84:12
93:18
122:18
126:3, 6
133:7
134:4
137:16
140:3, 18
147:10
thinking
57:8  117:9
third  8:14
9:2  98:5, 6

thirteen
18:1  20:23
68:8  70:16
122:8
149:10
150:8
thirteen-
year  18:4
thirty
121:17, 19
thirty-six
66:10, 11
thoroughly
86:16
thought
21:7  58:19
151:8
thoughts
151:7
thousand
106:12
129:19
137:9
three  9:1
42:8  68:1
124:9, 11
125:16, 23
130:11
131:14
137:18
three-year
125:16
Tiffany
148:14
time  2:23
3:1  6:15
14:1  17:18,
20  18:2, 4,
8  20:11, 19
21:19  22:5,
10, 17  23:2,
13  27:6

28:20
29:13  31:8
32:6  41:14
42:15, 22
43:7  49:14
59:19
62:22
65:10  68:3,
13  79:21
82:3  86:20
100:16
103:11
111:2
120:15
135:19
141:12
143:4, 10
147:14
151:11, 14,
18  152:3
timeframe
36:8  42:5
times  8:13
54:13
79:11
98:10
title  19:20
21:18  96:2
134:3
titles  89:6
130:4
today  8:10
9:7, 9  24:1,
18  40:2
42:14  53:6
79:13
112:7
120:1
told  13:6
20:23
23:17  26:8
56:6  81:15

84:20  88:6
112:20, 23
tolerance
51:6, 10
tolerated
86:22
Tom  43:5
116:14
117:1, 3, 6,
11, 19
Tonya
148:3, 5
top  39:13
total  94:12,
15  97:1
121:13, 14
122:19
123:2, 11
134:16, 18
touch  57:4,
11
train  20:8
64:11
trained
33:4, 7
34:8, 14
39:9  58:1
78:22
79:22
80:17, 23
81:5, 12
83:19
86:19
89:23  91:8,
18
training
64:14  79:5,
14, 17
125:13, 14
transcribed
153:9

transcript
15:6  153:7,
11
transcriptio
n  153:10
transferred
76:23
travel  81:5
treat
111:19
treated
24:13  93:8,
12, 20
treating
87:4
Tredway
73:20
Trey  44:11,
19  46:9
128:14
131:17, 19
132:5
trial  3:1
tried  22:12
trip  115:20
trucking
140:15, 17
true  68:19
104:23
153:11
TRUIST
1:10, 11
7:9  8:9, 17
9:11  10:13,
16  18:5, 11
19:2, 21
29:21  30:6
31:1, 5, 7,
11  33:14,
19  34:4, 11
35:22  36:4
41:1, 18

45:5, 17
48:17  51:5
64:12
65:16  79:6
82:16, 21
90:14, 17
91:9, 15, 20
102:7
103:12, 23
107:20
119:8
try  15:12
63:21
84:14
116:4
118:5
trying
15:14
29:12  63:7
118:19
119:2
126:18
Tuesday
14:16
turn  85:19
turned
52:11
twelve
87:21
114:3
twenty
54:13
twenty-four
82:6
twice
57:20  99:6
two  9:14
41:12  42:8
68:1  99:6
116:19
129:21
131:14

132:*1*
141:*5*
142:*4*
149:*21*
**type**
103:*14, 18*
108:*3*
117:*20*
**types** 58:*2*

**< U >**
**U** 2:*1*
**uh-huh**
15:*9* 32:*17*
80:*7* 86:*12*
111:*23*
113:*22*
144:*12*
**ultimately**
73:*21*
109:*20*
**unclip**
30:*11*
**understand**
16:*23*
36:*17, 18*
37:*17*
48:*17, 21*
58:*9* 81:*17*
85:*16, 21*
90:*20* 92:*1*
99:*14*
113:*3, 15*
114:*7*
115:*1*
**understandi**
**ng** 13:*17*
52:*15* 78:*8*
91:*18, 21*
101:*20*
**understood**
71:*10*

**underwriter**
103:*8*
106:*14*
116:*2*
**underwriter**
**s** 102:*4*
103:*6*
**undisputed**
107:*13*
**unfairly**
87:*5*
**unhappy**
11:*11, 17*
13:*2, 9*
17:*22* 21:*1*
22:*12, 18*
23:*1* 24:*3,*
*22*
**UNITED**
1:*1* 6:*22*
**upcoming**
62:*1*
**uphold**
74:*4*
**upset**
108:*20*
**use** 93:*18*
119:*11*
**usual** 7:*18*
**usually**
103:*7*
123:*23*

**< V >**
**V** 6:*21*
**vagina**
106:*17*
**vague**
92:*19*
**Vance**
148:*3, 5*

**Varner**
147:*20, 21*
**verbal** 85:*8*
**verbally**
15:*7* 52:*23*
83:*5, 6*
**version**
140:*3*
**versus**
40:*20*
74:*19* 99:*1,*
*4*
**Vestavia**
57:*17*
**veterans**
39:*19*
40:*11*
**VIDEO**
1:*15* 2:*4*
6:*19* 15:*5*
**Videograph**
**er** 5:*22*
6:*13* 7:*10*
111:*1, 5*
151:*13, 17*
152:*2*
**violate** 51:*1*
**visit** 135:*9*
**visited**
29:*4, 16*
**voice** 81:*23*
**voiced** 26:*5*
**vs** 1:*9*

**< W >**
**wait**
121:*21*
122:*14*
138:*13, 20*
**waived**
2:*13* 3:*5*

**walk** 97:*20*
135:*8*
**walking**
49:*17*
**want** 9:*9,*
*12* 15:*15*
18:*14* 21:*1*
29:*8* 37:*19*
47:*15*
54:*14*
62:*22* 64:*4*
69:*1* 72:*10*
74:*16* 84:*7*
109:*22*
110:*5*
111:*9*
118:*6*
136:*1, 6*
147:*14*
**wanted**
72:*14*
100:*4*
101:*6*
134:*23*
**wanting**
111:*14*
**wants**
82:*16*
138:*8*
**War** 34:*18,*
*19*
**warned**
53:*7*
**water**
110:*23*
**way** 15:*1*
36:*2* 42:*21*
80:*9*
111:*18*
146:*12*
**ways** 93:*11*

**wayside**
116:*22*
**website**
141:*18*
**week**
14:*17*
15:*18, 19,*
*20* 98:*10*
**Well** 9:*2*
10:*4* 12:*8*
13:*17* 19:*8*
42:*4* 43:*5*
47:*6* 53:*10*
64:*2* 65:*10*
72:*10*
82:*20* 83:*2*
84:*11* 91:*2*
94:*16* 96:*8*
97:*18*
99:*10*
109:*8*
113:*11*
116:*15*
118:*5*
121:*3, 15*
122:*7*
135:*13*
136:*15, 22*
138:*9*
139:*8*
142:*11*
**went** 31:*1*
88:*17*
129:*23*
132:*3*
140:*17*
**We're** 6:*16*
7:*20* 8:*10*
16:*22*
17:*19*
29:*14*
57:*17* 59:*4*

Video Deposition of John Cadden

1/31/2024

63:1, 7
65:14
74:16  78:1
92:21
107:13
111:8
118:19
119:1, 18
122:3, 4, 19, 23  130:18
135:15, 16, 23
west  47:13
we've  66:3
92:14
116:16, 20
122:14
124:18
125:5
126:18
134:17
138:14, 21
whatsoever
129:15
white  150:9
whites
59:15
Whitlock
146:18, 19
147:8, 16
wholesale
41:4
Wilkinson
2:7  4:3
5:9, 10  6:6, 20  7:4, 22
8:2, 6  30:4
38:17, 19
52:12, 14
59:21, 23
71:9, 13
92:7, 8

105:13, 16, 18  111:7
119:4
146:22
147:3
151:5, 10, 19, 23
William
5:22  6:15
wish  52:13
witness
2:13  6:8
7:12
118:23
151:22
153:12
witnesses
25:9  52:15
woman
59:7  87:21
114:2
women
36:6, 15
37:9, 23
39:18  40:7, 20  42:12
59:10
65:23  68:7, 9  70:11
72:12
74:19  81:4, 10  83:8
84:8  94:3
99:1, 4
103:21
112:16
113:2
116:9
122:8, 10, 12  124:19
137:9, 18
138:19, 23

144:18
149:10
150:8
women's
107:20
words
50:23
work  46:23
48:10, 11, 13  56:22
77:13
82:21
88:17
109:23
110:6, 11
111:14
118:8
140:13, 18
Workday
60:17, 22
61:10, 16
worked
19:2  23:1
29:20  30:3
41:9  44:21
46:12
47:13  76:8
98:1
103:11
139:22
140:15
workforce
37:7, 10
38:7  74:13
78:6  81:2
83:9
working
17:22
138:21
139:21

workplace
74:17
114:13
works
64:10, 13
109:18
144:1
world  89:7
90:12
writing
83:4  85:8
126:14
written
92:17  96:5, 8  119:5
132:12
wrong
13:3  51:13
81:15, 16
83:23
101:19
125:9

< X >
X  4:1

< Y >
y'all  21:19
22:18
52:13
57:15
130:20
136:1
yeah  9:18
24:21
37:18
48:19
64:10
85:10  86:7
92:14
97:18
98:13

100:12, 22
110:14, 22
113:14
114:16
120:15
130:22
131:11
142:22
147:1
151:9
year  30:1
33:18
43:20
48:16  62:2
74:3  91:8, 19  99:6
106:7
125:20
130:8
131:3
132:1
140:6, 20
141:2, 3, 5
years
11:20
13:11  14:4
18:1  20:23
21:16
76:13
87:21  99:6
114:3
116:19
118:11
119:18
120:11
121:19
125:23
129:21
130:11
131:14
137:19
139:1

Video Deposition of John Cadden                    1/31/2024
                                                        77

142:*4*
146:*4, 10*
**Yesterday**
9:*14*
**Young**
46:*10*
125:*8, 9*
126:*20*
128:*10*
130:*22*
**Yvette**
66:*22*
67:*15, 17*
68:*12*
111:*21, 22*
120:*4*
121:*4*
123:*2*
137:*23*
138:*14, 15*
142:*12, 14*
143:*18*
**Yvette's**
67:*1*
123:*11*

**< Z >**
**zero**  51:*5,*
*10*