FILED
2026 Sep-30 AM 10:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KATHRYN HENDRIX,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:21-cv-00300-MHH** |
| | } | |
| **CRC INSURANCE SERVICES, INC., *et al*.,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION AND ORDER**

Kathryn Hendrix worked for CRC Insurance Services from 2006 until 2019. After she left the company, Ms. Hendrix filed this action against CRC, Truist Financial Corp, and Truist Bank. (Doc. 1).[1] Ms. Hendrix alleges that CRC promoted a sexist work environment that led to her constructive discharge. (Doc. 1; Doc. 79). Ms. Hendrix asserts a Title VII claim for sex-based discrimination and retaliation, and she asserts an Equal Pay Act claim. (Doc. 1). The defendants have moved for

[1] Truist Bank is the principal subsidiary of Truist Financial and is subject to Truist Financial's human resources policies and procedures. (Doc. 1, p. 3, ¶ 9; Doc. 43, p. 3, ¶ 9; Doc. 8, pp. 1–2, ¶¶ 3–4). CRC is a subsidiary of Truist Bank. (Doc. 1, p. 2, ¶ 8; Doc. 43, p. 2, ¶ 8; Doc. 8 Doc. 8, p. 1, ¶¶ 1–2). Ms. Hendrix alleges that Truist Financial and Truist Bank (CRC's parent companies) are liable to her because they controlled CRC's human resources policies and procedures. (Doc. 1, pp. 2–3, 5, 9–12, ¶¶ 6–11, 31, 63–64, 75–78, 84); *see also* (Doc. 8) (corporate disclosure statement with explanation of current entities and their predecessors). In their summary judgment briefing, the parties have not argued that the three defendants should be treated differently, and they refer to the defendants and their predecessors generically as "CRC" when discussing Ms. Hendrix's employment. The Court has followed the parties' lead.

judgment in their favor on Ms. Hendrix's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 74; Doc. 76).[2]

To resolve the summary judgment motion, the Court first states the standard that governs Rule 56 motions. Then, consistent with that standard, the Court summarizes the summary judgment evidence, presenting the evidence in the light most favorable to Ms. Hendrix, the non-movant. Finally, the Court analyzes the evidence under the substantive law that governs Ms. Hendrix's claims to determine whether there are disputed questions of material fact for a jury to resolve.

***

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute of a material fact, a party must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P.

[2] CRC also filed a motion to strike summary judgment evidence. (Doc. 83). Consistent with the Court's previous order, (Doc. 93), the Court considers the defendants' arguments concerning Ms. Hendrix's evidence in this opinion.

56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Accordingly, in this opinion, the Court presents the summary judgment evidence in the light most favorable to Ms. Hendrix.

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2); *see also* FED. R. CIV. P. 56(c)(1)(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "[I]nadmissible hearsay cannot be considered on a motion for summary judgment" unless it can be "reduced to admissible evidence at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (citations omitted); *see also* FED. R. CIV. P. 56(c). "The possibility that unknown witnesses will emerge to provide testimony on [a] point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial." *Jones*, 683 F.3d at 1294. "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56 advisory committee's note to 2010 amendment; *see also* FED. R. EVID. 104(a) ("The court must decide any preliminary question about

whether a witness is qualified, a privilege exists, or evidence is admissible."). The proponent must prove admissibility by a preponderance of the evidence. *See, e.g.*, *Nutrien AG Sols., Inc. v. Anderson*, No. 21-cv-1035, 2025 WL 2743414 (N.D. Ala. Mar. 31, 2025) (first citing FED. R. EVID. 104(a), and then citing *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1268 (11th Cir. 2015)) (stating that for purposes of Rule 56(c), "[w]hether [hearsay evidence] meet[s] the requirements of the [hearsay] exception is a preliminary determination made by the court by a preponderance of the evidence."). Additionally, "a court [may] disregard an affidavit as a matter of law when, without explanation, [the witness's affidavit] flatly contradicts his or her own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016).

A party cannot amend a complaint through argument in a brief in opposition to a defendant's summary judgment motion. *Monaghan v. Worldplay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (quoting *Miccosukee Tribe of Indians v. United States*, 716 F.3d 535, 559 (11th Cir. 2013)). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P.15(a)." *Miccosukee Tribe*, 716 F.3d at 559 (citation omitted). In addition, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 927 (11th Cir.

2018) (quoting *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)). Thus, to create a genuine dispute of material fact, a party opposing a motion for summary judgment may address the legal theories in the operative complaint and present evidence that contradicts the moving party's evidence. *See Monaghan*, 955 F.3d at 859; *Jefferson*, 891 F.3d at 927. Accordingly, in this opinion, the Court evaluates Ms. Hendrix's Title VII sex discrimination claim, Title VII retaliation claim, and Equal Pay Act claim. (*See* Doc. 1).[3]

---

[3] In her summary judgment brief, Ms. Hendrix mentions a "disparate impact claim," although she does not clearly distinguish it from a pattern and practice or job classification theory of intentional sex discrimination. (Doc. 79, p. 22–23). In a footnote in her brief, Ms. Hendrix argues that these claims are properly pleaded in her complaint. (Doc. 79, pp. 24–25 n.7). The defendants disagree. (Doc. 87, pp. 5–7).

Disparate impact claims are distinguishable from sex discrimination (i.e., disparate treatment) and retaliation claims. *See EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016) (internal brackets omitted) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)) (noting that disparate treatment theory and disparate impact theory "are not interchangeable, and 'courts must be careful to distinguish' between them"). To sufficiently plead a disparate impact claim, Ms. Hendrix had to identify "a specific, facially-neutral, employment practice causally responsible for an identified statistical disparity." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1268 (11th Cir. 2000); *see also See Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1314 (11th Cir. 1999) (overruled on other grounds) (listing the elements of a disparate impact discrimination claim). Ms. Hendrix did not exhaust and has not pleaded a disparate impact claim.

Even if Ms. Hendrix had pleaded a disparate impact claim, it would fail. In her response brief, Ms. Hendrix argues that "CRC adopted a policy of team-lead discretion in terms and conditions of employment and compensation and did not utilize published job descriptions." (Doc. 79, p. 19). A policy of giving discretion to supervisors is "the opposite of a uniform employment practice" and does not support a disparate impact or disparate treatment claim unless an improper and "common mode of exercising discretion . . . pervades the entire company." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355–56 (2011). Ms. Hendrix has not cited evidence showing that supervisors exercised their discretion in a common manner by choosing the same facially neutral, disparate-impact-producing hiring, promotion, or pay criteria. Although she notes that CRC's brokers were mostly male and CRC's account executives were mostly female, (Doc. 79, pp. 15–16, 24), "Title VII liability [can]not be based solely on 'bottom line' statistical imbalances in an employer's workforce" because "employers possess no *affirmative* duty to redress workforce imbalances not attributable to their own corporate conduct." *Joe's Stone Crab*, 220 F.3d at 1276

***

CRC, a commercial insurance wholesale brokerage firm, generates business by helping its clients, commercial insurance agencies, find insurance coverage for their clients, prospective insureds. (Doc. 72-2, p. 2, ¶ 2; Doc. 72-9, p. 8, tpp. 21–22).[4] When a prospective insured selects an insurance policy, the insurance company pays CRC a commission. (Doc. 72-2, p. 2, ¶ 2). CRC derives its revenue solely from the commissions it receives from these transactions. (Doc. 72-2, p. 2, ¶ 2). CRC has offices throughout the United States, including offices in Birmingham, Alabama and Houston, Texas. (Doc. 72-3, pp. 6, 10, tpp. 14, 32).

Betsy Barnette started CRC's Professional Liability Department. (Doc. 72-6, p. 37, tpp. 143–44). The department consisted of seven broker teams. (Doc. 76-3, p. 12; Doc. 72-3, p. 7, tpp. 17–19). In 2018, Corey Daugherty, Rusty Hughes, Susan Phillips, James Powell, Trey Reich, David Sloneker, and Truitt Taylor led the broker

(emphasis in *Joe's Stone Crab*) (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 992–93 (1988)).

[4] Ms. Hendrix objects to Mr. Daugherty's declaration, (Doc. 72-2), because Mr. Daugherty's signature appears on the final page of the document, but there is "no audit trail of the remainder of the document." (Doc. 79, p. 5). Mr. Daugherty's declaration complies with 28 U.S.C. § 1746. *See Roy v. Ivy*, 53 F.4th 1338, 1348 (11th Cir. 2022) (quoting 28 U.S.C. § 1746) ("In short, § 1746 has these statutory requirements for an unsworn statement to substitute for a sworn affidavit: The declarant must (1) date and sign the document, and (2) subscribe its content as 'true,' (3) under 'penalty of perjury,' (4) in substantially the above-quoted pattern language."). Accordingly, the Court overrules Ms. Hendrix's objection.

teams. (Doc. 76-3, p. 12).[5] The teams competed against one another. (Doc. 72-1, p. 61, tpp. 233–34).

Although each team varied, a team typically included a senior broker or broker, an associate broker, and one or more account executives; some teams included an inside broker or broker assistant. (Doc. 72-3, pp. 7–9, tpp. 17–26; Doc. 78-13; Doc. 76-3, p. 12).[6] Account executives maintained CRC's relationships with agents, created and monitored the policy files, generated quotes, issued policies, and solicited renewals. (Doc. 72-6, pp. 23–25, tpp. 87–98). Senior brokers, brokers, and associate brokers were expected to bring in new business, but account executives, inside brokers, and broker assistants were not. (Doc. 72-3, pp. 7–8, 39, tp. 19–22, 145; Doc. 72-18, p. 3, ¶ 9). The "essential duties and responsibilities" of inside brokers were as follows:

> Develop, maintain, and cultivate client and agent relationships.
>
> Solicit, market, quote, bind, and confirm new and existing business.
>
> Negotiate the best terms and coverages available with accessible markets.

---

[5] Apparently reflecting later retirements and/or promotions, Mr. Daugherty identified the team leads as himself, Mr. Hughes, Mr. Powell, Mr. Reich, Mr. Truitt, Alex Gould, and Lee McClure. (Doc. 72-3, p. 7, tpp. 17–19). CRC's 2018 pay spreadsheet lists Mr. McClure as part of Ms. Phillips' team and Mr. Gould as part of Mr. Powell's team. (Doc. 76-3, p. 12).

[6] Witnesses sometimes used "broker" generically to refer to senior brokers, brokers, associate brokers, or inside brokers.

> Ensure submissions reflect accurate data such as risks and coverages.
>
> Monitor accounts to ensure compliance with the firm's policies and procedures.
>
> Assist broker to meet or exceed production goals assigned by CRC.
>
> Maintain current knowledge of the insurance industry and sales ideas through regular attendance at workshops, seminars, literature review, and/or formal continuing education.
>
> Maintain necessary licenses to produce business.

(Doc. 78-3, p. 2).

Members of the broker teams received a salary and bonuses tied to the team's performance. (*See, e.g.*, Doc. 72-2, p. 4, ¶ 23; Doc. 72-3, p. 10–11, tpp. 31–36). Annually, CRC provided bonuses in February and in August. (Doc. 72-2, p. 5, ¶ 24; Doc. 72-3, pp. 10–11, tpp. 32–33).[7] CRC used a formula to determine the bonus pool available to each team. (Doc. 72-3, pp. 10–11, tp. 32–33). Team leaders had discretion to set a bonus for each team member. (Doc. 72-1, p. 62, tpp. 237–240; Doc. 72-3, p. 11, tpp. 33–36).[8] Mr. Daugherty testified that "the things that are taken into consideration by me personally [in awarding bonuses] are tenure at the firm, experience, how long you've been in in the insurance production side," "tenure with the team, . . . [r]elationships that are being handled, accounts that are being handled,

---

[7] August bonuses typically were smaller than February bonuses. (Doc. 72-2, p. 5, ¶ 24).

[8] CRC tended to increase pay through bonuses rather than base salary increases. (Doc. 72-21, p. 32–34, tpp. 118–124; Doc. 72-2, p. 4, ¶ 23).

the volume of premium . . . knowledge, and whether that individual is responsible for any level of individual production." (Doc. 72-3, pp. 11, 38, tpp. 35–36, 144).

Ms. Hendrix began working for CRC in 2006. (Doc. 72-4, p. 2). She started as an internal auditor. (Doc. 74-2, p. 2; Doc. 72-6, pp. 15–16, tpp. 53–54). As an auditor, Ms. Hendrix travelled to CRC offices to review information for audits. (Doc. 72-6, p. 16, tpp. 55). As an auditor, she was not involved in sales. (Doc. 72-6, p. 17, tpp. 60–61). Auditors did not produce revenue. (Doc. 72-6, pp. 17–19, tpp. 60–61, 65–66).

In 2014, Mr. Daughtery needed an account executive for his team. (Doc. 72-3, p. 33, tp. 123). He was the lead broker for his team, and his team members were associate broker Clay Segrest, account executive Yvette Talsma, and account executive Andrea Sutton. (Doc. 72-3, p. 9, tpp. 27–28; Doc. 76-3, p. 12). Mr. Daugherty offered Ms. Hendrix the account executive position, and she accepted, effective July 21, 2014. (Doc. 72-3, p. 33, tpp. 123–24; Doc. 72-6, p. 41, tpp. 160–61; Doc. 78-1, pp. 3–4, ¶¶ 11–15). This was Ms. Hendrix's first production-side role. (Doc. 72-6, pp. 20–22, 41, tpp. 78–83, 160–61). As an account executive, Ms. Hendrix understood that she was to maintain relationships with agents, create and fill policy files, and create quotes with CRC's Agency Information Management

system. (Doc. 72-6, p. 23, tpp. 87–88).[9] Ms. Hendrix explained during her interview that she intended to pursue a broker role. (Doc. 78-1, pp. 3–4, ¶¶ 11–15).

In August 2017, Ms. Hendrix went to lunch with Mr. Daughtery and Mr. Segrest. She expected to receive a promotion to inside broker. (Doc. 72-6, p. 30, tp. 118). Ms. Hendrix believed that the promotion would reduce the administrative work she was doing as an account executive, (Doc. 72-6, pp. 31–32, tpp. 119–26), and would allow her to receive higher bonuses, (Doc. 72-6, p. 59, tpp. 231–32). At the time, there was one inside broker in the Professional Liability Department, Cathy Reeves. (Doc. 72-2, p. 3, ¶ 11; Doc. 72-6, pp. 36–37, tpp. 142–43; Doc. 76-3, p. 15). Ms. Hendrix did not consult with Ms. Reeves to form or confirm her beliefs about the amount of administrative work inside brokers perform or the bonuses inside brokers earn. (Doc. 72-6, pp. 31–32, tpp. 120–26).

At lunch, Mr. Daughtery explained to Ms. Hendrix that he wanted her to continue to learn about CRC sales. (Doc. 72-6, p. 30, tp. 118). When Ms. Hendrix realized that the lunch's purpose was not to offer her a promotion, Ms. Hendrix stated that CRC's failure to hire a female broker over a 12-year period was problematic, and she expressed her interest in becoming a broker. (Doc. 72-6, pp. 30, 36, tpp. 118, 140–41).

---

[9] AIM is an account management system that CRC used to document files and issue quotes and policies. (Doc. 72-3, p. 15, tp. 52).

After that lunch, Mr. Daugherty returned to the office and began completing the paperwork to transition Ms. Hendrix to an inside broker position. (Doc. 72-6, p. 37, tp. 144). Ms. Hendrix received an employment agreement containing a noncompete clause, which was not abnormal for brokers at CRC. (Doc. 72-6, pp. 37–38, tpp. 144–48). Ms. Hendrix believed that the employment agreement was intended to deter her from becoming a broker, but she did not think it "would have been considered a problem for any of the [male brokers]." (Doc. 72-6, pp. 37–38, tpp. 144–48) (brackets added). Ms. Hendrix signed the agreement after her attorney reviewed it, and in late 2017 or early 2018, Ms. Hendrix became an inside broker on Team Daugherty. (Doc. 72-6, pp. 38–39, tpp. 148–54).[10] CRC did not identify Ms. Hendrix as an inside broker on the company's website. (Doc. 78-1, p. 6, ¶ 39; Doc. 72-6, p. 52, tpp. 204–05).

Ms. Hendrix understood that as an inside broker, she was to market and grow existing business. (Doc. 72-6, pp. 33–34, tpp. 127–34). Ms. Hendrix understood that she was not expected to build her own book of business. (Doc. 72-6, p. 34, tpp. 133–34). Ms. Hendrix testified that she pursued an inside broker role rather than an

[10] Ms. Hendrix argues that "whether there was actually a promotion is in direct dispute in this litigation." (Doc. 79, p. 9). She contends that the "non-compete was effective November 1, 2017, but on her April 2018 evaluation, [Mr.] Daugherty noted she 'moved' to an Inside Broker role effective January 1, 2018. Yet Defendants did not give [Ms.] Hendrix a pay increase until April 1, 2018." (Doc. 79, p. 9; *see also* Doc. 72-6, pp. 38–39, tpp. 150–54). Because an earlier promotion date may be more favorable to Ms. Hendrix for certain issues, such as comparing salaries with male brokers, the Court will not attempt to determine the exact date in this opinion.

associate broker role because "[b]eing an associated broker, it would have been harder," as "[t]he associate broker is supposed to build their book and bring in all of the business that they work on." (Doc. 72-6, pp. 32–33, tpp. 126–127).

In January 2018, CRC hired Tiffany Sanders to fill Ms. Hendrix's former account executive position. (Doc. 72-2, pp. 3–4, ¶ 17; *see also* Doc. 76-3, p. 12). Thus, in 2018, Ms. Hendrix's first full year as an inside broker, Team Daugherty had six team members: a broker (Mr. Daugherty), an associate broker, an inside broker (Ms. Hendrix), and three account executives. (Doc. 76-3, p. 12; Doc. 78-13, p. 2).

In March 2018, Ms. Hendrix and Mr. Daugherty attended a meeting in Chicago, Illinois and networked with prospective clients and underwriters. (Doc. 72-6, p. 87, tpp. 343–45). When they returned from the trip, Mr. Daugherty invited Ms. Hendrix, an account executive, and an underwriter to dinner with a company that Mr. Daugherty predicted would "be a key relationship for [CRC]" in the senior living marketplace. (Doc. 72-6, pp. 87–88, tpp. 346–47) (brackets added).[11] Later that summer, Ms. Hendrix travelled with Mr. Daugherty to Denver to attend a professional liability meeting. (Doc. 72-6, p. 88, tp. 348). Following the Denver meeting, Mr. Daugherty encouraged Ms. Hendrix to travel often, but Ms. Hendrix's

---

[11] The senior living marketplace contributed significantly to the Professional Liability Department's revenue. (Doc. 72-3, p. 20, tp. 69; Doc. 72-6, pp. 104, 229).

"full account executive load . . . hindered [her] travel." (Doc. 72-6, p. 88, tpp. 348–49) (brackets added).

In the fall of 2018, CRC and TDC Specialty Underwriters held a summit at Willow Point. (Doc. 72-6, p. 88, tp. 350).[12] Originally, Ms. Hendrix was not invited. (Doc. 72-6, p. 88, tp. 350). A TDC employee created an email chain for the event but did not include Ms. Hendrix. (Doc. 72-6, p. 88, tp. 350). Mr. Daugherty contacted the email originator and asked that Ms. Hendrix and Lauren Lindberg, an account executive on Team Phillips/McClure, receive the invite. (Doc. 72-4, p. 78; Doc. 72-6, p. 88, tp. 350).

Near that time, Ms. Hendrix attended at least four client or prospective client meetings; Mr. Daugherty appears to have initiated Ms. Hendrix's involvement in at least two of these meetings by copying her on emails. (Doc. 72-6, p. 89, tpp. 351–354). In 2018, Ms. Hendrix did not receive an invitation to an overnight event one of CRC's larger carriers hosted, but CRC permitted Ms. Hendrix to attend and covered the expenses. (Doc. 72-6, pp. 47–48, tpp. 186–88). In early 2019, Ms. Hendrix attended a dinner with one of CRC's clients. (Doc. 72-6, pp. 89–90, tpp. 354–355).

---

[12] CRC sometimes hosted these events, but clients also hosted the events. (Doc. 72-1, p. 46; Doc. 72-6, pp. 42–43; Doc. 72-7, p. 17).

TDC Specialty Underwriters, Inc. is a professional liability insurance underwriting firm. (Doc. 72-6, p. 27, tp. 105).

In her 2018 performance review, Mr. Daughtery praised Ms. Hendrix's performance, stating that she was developing in brokering and negotiating new business and renewals. (Doc. 72-6, p. 41, tpp. 161–62). Mr. Daughtery explained in the review that he expected to rely heavily on Ms. Hendrix in 2019 to help promote annual growth. (Doc. 72-6, p. 41, tp. 162).

Ms. Hendrix's salary increased from $60,000 to $65,000 when she became an inside broker. (Doc. 72-3, p. 38, tp. 144; Doc. 76-3, p. 8). In time, her bonuses also increased; Ms. Hendrix observed that the increase was in "the same increments that they were when I was an account executive." (Doc. 7-7, p. 59, tp. 231). Ms. Hendrix's February 2015 bonus was $5000, her August 2015 bonus was $5000, her February 2016 bonus was $12,500, her February 2017 bonus was $17,500, her August 2017 bonus was $15,000; after she became an inside broker, her March 2018 bonus was $17,500, her August 2018 bonus was $17,000, her February 2019 bonus was $22,000, and her August 2019 bonus was $20,000. (Doc. 76-3, pp. 8, 12, 17–18; Doc. 72-6, p. 51, tp. 20:14–19; Doc. 78-12, p. 2).[13] Ms. Hendrix had the second highest base salary on Team Daugherty, lagging only Mr. Daugherty, but Ms. Hendrix was second to last in total bonuses for the 2018 period. (Doc. 76-3, p. 12). On team Daugherty, only Ms. Sanders, who had just completed her first year at CRC,

[13] There is no record of Ms. Hendrix being paid a bonus in August 2014, the month after she started as an account executive.

received lower total bonuses for that period. (Doc. 76-3, p. 12). In combined salary and bonuses, Ms. Hendrix was second to last on her team. (Doc. 76-3, p. 12).

Between 2018 and January 2019, Ms. Hendrix complained to Mr. Daugherty and others about her administrative responsibilities; she believed the male brokers were not assigned similar administrative duties. (Doc. 72-3, pp. 26–28, 30–32, tpp. 96–97, 102–04, 110–112, 114–20; Doc. 72-6, pp. 42–43, 62–63, 77, 82–85, tpp. 163, 168–70, 246–47, 303–05, 325–38; Doc. 78-1, pp. 8–9, ¶¶ 53–57; Doc. 78-10; Doc. 72-19, p. 2, ¶ 8). Mr. Daugherty restructured job assignments several times to allow Ms. Hendrix "to do more marketing of business, negotiation and placement of business, and to focus on new business more from existing retail clients that [CRC] partnered with." (Doc. 72-3, pp. 28, 31–32, tpp. 102–04, 114–20; *see also* Doc. 72–6, pp. 84–85, tpp. 334–38; Doc. 78-12, p. 3). In or around 2019, Ms. Hendrix complained to Mr. Daugherty that Ms. Talsma was still sending her quotes to handle, even though Ms. Talsma should have handled the task as an account executive. (Doc. 72-6, pp. 56–57, tpp. 219–21). Mr. Daugherty confirmed that Ms. Talsma should be doing that work but told Ms. Hendrix to discuss it with Ms. Talsma. (Doc. 72-6, pp. 56–57, tpp. 220–22). Ms. Hendrix did not attempt to discuss the issue with Ms. Talsma because Ms. Talsma "was the veteran on the team." (Doc. 72-6, pp. 56–57, tpp. 222–24).

On June 28, 2019, Ms. Hendrix met with CRC's CEO, Ron Helveston, to discuss her concerns regarding gender discrimination. (Doc. 78-1, p. 11, ¶¶ 83–85). Ms. Hendrix complained that there was "an equality issue and that women throughout the department were being overlooked, including [her]." (Doc. 78-1, p. 12, ¶ 88) (brackets added). She stated that CRC had not hired a female broker in more than a decade. (Doc. 78-1, p. 12, ¶ 89). She stated that she had been "bootstrapped as an account executive with a broker title while males slid right into the 'Good ole' boy club.'" (Doc. 78-1, p. 12, ¶ 90). Mr. Helveston replied that if he discussed Ms. Hendrix's concerns with Mr. Hughes, Mr. Daugherty, or Mr. Segrest, Ms. Hendrix would not be able to work with them. (Doc. 78-1, p. 12, ¶ 92; Doc. 72-6, p. 60, tpp. 237–38). Mr. Helveston asked Ms. Hendrix if she wanted to be transferred to another team or department. (Doc. 78-1, p. 12, ¶ 92; Doc. 72-6, p. 60, tp. 238). Nothing improved after this conversation. (Doc. 78-1, pp. 12–13, ¶¶ 94, 96–98).

In July 2019, Ms. Hendrix's therapist placed her on medical leave. (Doc. 78-1, p. 13, ¶ 99). Based on her previous conversation with Mr. Helveston, Ms. Hendrix believed that CRC would not allow her to return to Team Daugherty. (Doc. 78-1, p. 13, ¶ 100). While Ms. Hendrix was on leave, Mr. Helveston informed John Cadden, the president of CRC's Birmingham Office, of Ms. Hendrix's complaints. (Doc. 72-7, pp. 6, 18, tpp. 13, 63–64). On August 28, 2019, Mr. Cadden texted Ms. Hendrix

and explained that he would like to meet to discuss her complaints in person or over the phone. (Doc. 72-4, p. 75). Ms. Hendrix did not respond. (Doc. 72-6, p. 63, tp. 249).

On September 2, 2019, Ms. Hendrix emailed CRC's benefits department and requested severance. (Doc. 78-1, p. 13, ¶¶ 100–01; Doc. 78-15, p. 2). On September 3, 2019, Kristina Kelley from the department responded: "Thank you for reaching out. I wanted to let you know that I have forwarded your letter to your Regional Associates Relations Manager, Stefani Petty, for review. Stefani is the HR contact for your area who will be working with you to address your concerns regarding your work environment." (Doc. 72-4, p. 28; Doc. 72-6, p. 69, tp. 271). Ms. Kelley provided Ms. Petty's phone number and email address. (Doc. 72-4, p. 28). Later that day, Ms. Petty emailed Ms. Hendrix and asked to schedule a meeting. (Doc. 72-4, p. 25). Ms. Petty explained that severance was not an option because Ms. Hendrix's position was not eliminated. (Doc. 72-4, p. 25). Ms. Petty indicated that Ms. Hendrix could extend her leave if medically necessary by having her physician submit updated paperwork. (Doc. 72-4, p. 25). Ms. Hendrix did not respond. (Doc. 72-4, p. 25). Three days later, on September 6, 2019, Ms. Petty emailed Ms. Hendrix again. (Doc. 72-4, p. 25). Ms. Hendrix did not respond. (Doc. 72-6, p. 67, tp. 266). In a November 22, 2019 letter to Ms. Petty, Ms. Hendrix stated that no one had

contacted her about her discrimination allegations, and she resigned. (Doc. 72-4, p. 26; Doc. 72-6, p. 69, tpp. 272–73).

On December 3, 2019, Ms. Hendrix filed an EEOC charge against CRC Insurance Services, Inc. and BB&T Corporation (the Truist entities' predecessor). (Doc. 1-1; Doc. 72-4, pp. 15–16; Doc. 8). The EEOC split the charge into two cases. (Doc. 1-1). On November 20, 2020, the EEOC issued a Dismissal and Notice of Rights letter for both charges. (Doc. 72-4, p. 27). On February 24, 2021, Ms. Hendrix brought this action against CRC Insurance Services, Truist Financial Corporation, and Truist Bank. Ms. Hendrix asserts Title VII claims for sex discrimination and retaliation and a claim under the Equal Pay Act for gender-based pay disparities. (Doc. 1).

***

In their motion for summary judgment, the defendants have split Ms. Hendrix's Title VII sex discrimination claims into two categories, one concerning Ms. Hendrix's claim that she was paid less than she would otherwise have been because of her sex, (Doc. 76-1, pp. 29–34), and the other concerning Ms. Hendrix's other Title VII discrimination claims, including those based on the terms and conditions of her employment, "promotional opportunities, her work assignments, and 'tools of the trade,'" (Doc. 76-1, pp. 34–39). The defendants argue that the second category of claims is time-barred because "[a]ll alleged actions occurred

more than 180 days before [Ms. Hendrix's] December EEOC Charge on December 3, 2019," i.e., before June 6, 2019. (Doc. 39, p. 43). Ms. Hendrix did not address the timeliness of her claims in her response. (*See* Doc. 79). In reply, the defendants argue that this failure to respond constitutes abandonment of those claims. (Doc. 87, pp. 2–5, 9–10).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[] . . . separate actionable 'unlawful employment practice[s]'" and "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002). The summary judgment evidence indicates that other than the alleged pay discrimination, the alleged discriminatory acts occurred before June 6, 2019. (*See, e.g.*, Doc. 76-1, p. 39) (collecting citations for when alleged adverse employment actions occurred).[14]

---

[14] Though the statute of limitations technically bars a failure-to-promote claim, *see Morgan*, 536 U.S. at 113–14 (listing failure to promote as a discrete act that may be time-barred), Ms. Hendrix may recover if CRC paid her less within the statute of limitations period because of that failure to promote or because of another time-barred discriminatory decision. Under 42 U.S.C. § 2000e-5(e)(3)(A), "an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." Congress enacted this provision to address *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), a case in which the United States Supreme Court held that a plaintiff could raise a wage discrimination claim only if the wage-affecting decision was within the statutory period. *See* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (2009) (codified in relevant part at 42 U.S.C. § 2000e-5(e)(3)); *Stanley v. City of Sanford*, 83 F.4th 1333, 1342–43 (11th Cir. 2023) (discussing change in law), *aff'd*, 606 U.S. 46 (2025). Thus, the statute of limitations does not bar Ms. Hendrix's claims that she was paid less because she was passed over for promotion.

For other reasons, Ms. Hendrix's pay discrimination claims fail as a matter of law.[15] First, Ms. Hendrix wanted an inside broker position, not an associate broker position. (Doc. 72-6, pp. 32–34, 48–50, 52–53, 71–72, tpp. 126–34, 190–91, 196–98, 203–04, 210, 282–84). Ms. Hendrix acknowledges that "[b]eing an associate broker . . . [is] harder" than being an inside broker because associate brokers must "build their book and bring in all of the business that they work on." (Doc. 72-6, pp. 32–33, tpp. 126:23–127:8). Under Title VII and the Equal Pay Act, employers may

[15] The defendants argue that Ms. Hendrix cannot prove her Title VII pay discrimination claim because she cannot point to a strict comparator under the *McDonnell Douglas* test, (Doc. 76-1, pp. 29–32). Ms. Hendrix argues that she need not provide a strict comparator because she is not relying on the *McDonnell Douglas* framework, but rather on the "convincing mosaic" framework. (Doc. 79, pp. 25–26, 33–34).

Ms. Hendrix is correct; a plaintiff can prove a Title VII claim without using the *McDonnell Douglas* framework. "*McDonnell Douglas* is 'only one method by which the plaintiff can prove discrimination by circumstantial evidence,'" and is not itself "a substantive standard of liability." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945–46 (11th Cir. 2023). "[T]he *McDonnell Douglas* framework and the convincing mosaic approach are two paths to the same destination—the ordinary summary judgment standard." *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024). "If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment." *Tynes*, 88 F.4th at 947; *see also Tynes*, 88 F.4th at 955 (Newsom, J., concurring) ("Summary judgment turns on the existence of a genuine factual dispute; courts deciding summary-judgment motions don't weigh evidence, and they don't decide (let alone announce) whether they're convinced."). This evidence may include, "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). "[I]t is possible [for] . . . comparators [to be] insufficient[ly similarly situated] to establish a prima facie case [under *McDonnell Douglas*] yet still [be] relevant to the ultimate question of intentional discrimination," *Tynes*, 88 F.4th at 947, but summary judgment for an employer may be warranted if loosely related "comparators are the *only* evidence of discrimination [the plaintiff] points to," *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1310 (11th Cir. 2026) (emphasis in *Johnson*). A plaintiff may cite an employer's acts prior to the statute of limitations period as "background evidence [of discriminatory intent] in support of a timely claim." *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1303 (11th Cir. 2023) (quoting *Morgan*, 536 U.S. at 113).

differentiate among employees upon the basis of sex in determining the amount of the wages or compensation paid to employees of the employer based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 42 U.S.C. § 2000e-2(h); 29 U.S.C. § 206. Thus, the higher difficulty and responsibilities of associate broker positions are a valid basis to pay associate brokers more than inside brokers.

Ms. Hendrix attempts to identify statistical evidence to support her claims. She notes that account executives and inside brokers who performed primarily administrative tasks were overwhelmingly female, while associate brokers and brokers were overwhelmingly male. (Doc. 79, pp. 16–18). The Eleventh Circuit has held that numerical differences in which sexes hold which jobs, without more, ordinarily will not suffice to prove discriminatory intent. *See, e.g.*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) (finding it irrelevant that less than 5% of vice president openings had been filled with females because there was no context for the data point)*, abrogated in part on other grounds*, *Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). Under *Wilson*, though the evidence shows that CRC account executives and inside brokers were primarily female and CRC's associate brokers, brokers, and senior brokers were primarily male, "[t]his statistical evidence is not even probative of pretext because [Ms.

Hendrix] has not provided any other relevant information, including the number of women who expressed interest in [the broker] positions." *Wilson*, 376 F.3d at 1089. Ms. Hendrix has not submitted evidence that indicates that a female applied for a CRC associate broker position and was rejected.[16] Thus, Ms. Hendrix has not presented evidence that would allow her to prove that CRC prevented her from holding an associate broker position and receiving an associate broker's wage because of her gender.

As for the salaries of male inside brokers, Jonathan Morgan was hired into an inside broker role in October 2018 and was the only male inside broker leading up to Ms. Hendrix's resignation. (Doc. 72-6, pp. 43, 53 tpp. 168–169, 209–210; Doc.

---

[16] Ms. Hendrix's statement in her declaration that "Hughes informed me that [Sara] Dunston had complained that women were getting overlooked in the department and asked if I agreed," is inadmissible hearsay to the extent Ms. Hendrix offers it to prove that women were being overlooked. FED. R. EVID. 801, 802, 805. Ms. Hendrix has not provided a statement by Ms. Dunston or indicated that she will testify at trial; accordingly, Ms. Hendrix cannot use this hearsay statement to defeat summary judgment. *See* FED. R. CIV. P. 56(c); (Doc. 83, p. 5) (objecting to consideration of statement). Ms. Hendrix has not provided evidence that would establish that Ms. Dunston "participat[ed] in the employment decision or policy of [CRC]," as would make her statement admissible as the statement of a party opponent under Rule 801(d)(2)(D). *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1209 (11th Cir. 2013) (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)).

In her declaration, Lauren Lindberg states that she sought either an associate broker or inside broker role and that she was eventually promoted to inside broker in 2020, five years after she began working at CRC. (Doc. 78-2, pp. 3–5, ¶¶ 7, 13–16). Ms. Lindberg states that before her promotion to inside broker, David Sloneker hired an inexperienced male, Brandon Hays, as an associate broker without advertising the opening. (Doc. 78-2, p. 4, ¶ 14; Doc. 86-2). Ms. Hendrix acknowledges that she was aware of the opening. (Doc. 72-6, p. 52, tpp. 203–04). The defendants have submitted a copy of the job posting. (Doc. 86-2, p. 4). Without more, CRC's failure to clearly broadcast an associate broker opening does not create a disputed fact concerning Ms. Hendrix's allegation that CRC engaged in a pattern of discrimination that affected her.

72-1, pp. 36, 63–64, tp. 136, 241–245; Doc. 72-3, pp. 23–24, 42–43, tpp. 81–86, 160–161; Doc. 76-3, pp. 5, 9; Doc. 72-5, p. 36, tpp. 135–36). His base salary in his first year with CRC was $60,000. (Doc. 76-3, pp. 9, 12). Ms. Hendrix's base salary the same year, her first as an inside broker, was $65,000. (Doc. 76-3, p. 12).[17] Ms. Hendrix's bonuses for 2018 after her promotion to inside broker were $17,000 and $22,000. (Doc. 76-3, p. 12). Mr. Morgan's bonus for 2018 was $2,500, prorated for his three months at CRC in 2018. (Doc. 76-3, p. 9). His next bonus for work performed in 2019 was $7,000; Ms. Hendrix's bonus for the same time was $20,000. (Doc. 76-3, pp. 8, 9). Although Mr. Morgan did not have the CRC auditor and account executive experience that Ms. Hendrix had, he had prior experience in the wholesale insurance industry. (Doc. 72-13, p. 2, ¶ 2). Accordingly, Mr. Morgan's compensation does not support an inference of discrimination.

CRC's Professional Liability Department hired four employees between December 2017 and February 2018: Amanda Pender (female account executive), Brandon Hays (male associate broker), Tiffany Sanders (female account executive), and Ross Robertson (male account executive). (Doc. 76-3, p. 12; Doc. 72-1, p. 32, tp. 120; Doc. 72-12, p. 2, ¶ 3; Doc. 72-3, p. 9, ¶¶ 27–28; Doc. 86-2). Each was on a different team. (Doc. 76-3, p. 12). Ms. Hendrix complains that there was a "$12,500

[17] In 2018, Ms. Hendrix had been with CRC for 12 years. (Doc. 74-2, p. 2). She had been on Mr. Daugherty's production team since 2014. (Doc. 72-3, p. 33, tpp. 123–24; Doc. 72-6, p. 41, tpp. 160–61; Doc. 78-1, pp. 3–4, ¶¶ 11–15).

gender gap [in total compensation for 2018] between [Mr.] Robertson and [Ms.] Sanders." (Doc. 79, p. 31). Mr. Robertson earned $80,000, and Ms. Sanders earned $67,500. Mr. Robertson and Ms. Sanders were hired less than one month apart. Ms. Sanders was on Team Daughtery, Team Daugherty earned a total of $1,572,481 in 2018, and Mr. Daugherty earned a total of $885,981 in 2018. Mr. Roberston was on Team Hughes, Team Hughes earned a total of $1,538,625 in 2018, and Mr. Hughes earned a total of $595,417 in 2018. Despite two teams earning similar amounts, Mr. Roberston earned significantly more than Ms. Sanders. This may be some evidence of gender discrimination in pay that a juror could, in combination with other evidence, conclude supports an inference of discrimination. But without more information to help jurors understand the pay differential between Ms. Sanders and Mr. Robertson and other tiles of circumstantial evidence, this bit of evidence cannot, by itself, create a convincing mosaic.

Ms. Hendrix argues CRC discriminated against her by requiring her to perform account executive duties after her promotion to inside broker. (Doc. 79, pp. 10–11, 23–24). Ms. Hendrix assumed her account executive duties would cease upon her promotion. (Doc. 72-6, pp. 31–32, tpp. 119–26). This was an "educated assumption" on Ms. Hendrix's part based on her audit experience, but she does not not recall anyone telling her that inside brokers did not perform account executive duties. (Doc. 72-6, pp. 31–32, tpp. 122–26). Ms. Hendrix indicated that she knew

that Ms. Reeves, an inside broker in the Professional Liability Department at the time, still had account executive duties:

> Q. Okay. Well, what I'm trying to get at, though, is, did somebody tell you that when you become an inside broker, that you no longer have to do administrative duties, all you have to focus on is learning how to be a broker?
>
> A. No. But there weren't any other brokers besides Cathy Reeves that had that responsibility on them.
>
> Q. What do you mean? Have what responsibility?
>
> A. Account executive duties. And I knew -- I had been told up until that point that a broker is a broker.

(Doc. 72-6, p. 31, tpp. 120:20–121:10).[18] Women promoted to inside broker after Ms. Hendrix had account executive duties. In her declaration, Ms. Lindberg stated that her duties remained largely the same for a year after her promotion from account executive to inside broker. (See Doc. 78-2, p. 6, ¶ 24). In her declaration, Amber Varner stated that she knew she "knew when [she] became an inside broker [she] would still need to do [account processing] tasks and ultimately be supporting the brokers on [her] team." (Doc. 72-16, p. 3, ¶ 9). From this evidence, jurors could find that female inside brokers were required to perform account executive duties, minimizing the time these brokers had to engage in activities that could generate

[18] Ms. Reeves's history at the company is not entirely clear from the record. Viewing the evidence in the light most favorable to Ms. Hendrix, it appears that CRC hired Ms. Reeves in 2005 to work as an account executive for George Bennett in the Professional Liability Department. (Doc. 76-3, p. 12; Doc. 72-1, pp. 23–24, tpp. 84–86; Doc. 72-15, p. 2, ¶ 6; Doc. 72-6, p. 40, tpp. 156–57). In August 2014, after Mr. Bennett retired, Ms. Reeves transferred to Mr. Hughes's team and became an inside broker. (Doc. 76-3, p. 15; Doc. 72-1, pp. 23–24, tpp. 84–86; Doc. 72-15, p. 2, ¶ 6; Doc. 72-6, pp. 36–37, 40, tpp. 140–43, 156–57; Doc. 72-9, pp. 12–13, tpp. 40–41; Doc. 72-8, ¶ 5).

higher bonuses. Mr. Morgan, the only male inside broker who overlapped with Ms. Hendrix, stated that he "did not have help" from account executives on administrative tasks "for several years," and he performed "administrative tasks on [his] accounts including loss runs, quotes, and binding." (Doc. 72-13, p. 2, ¶ 4).

CRC has cited evidence showing male employees performed some administrative tasks after being promoted or hired into inside broker, associate broker, or undefined broker roles. (Doc. 72-2, p. 2, ¶¶ 4–7, 12; Doc. 72-8, pp. 2–3, ¶¶ 2, 6–7, 11, 13; Doc. 72-10, p. 2–3, ¶¶ 4–5, 9; Doc. 72-12, p. 2, ¶¶ 5–6; Doc. 72-13, p. 2, ¶ 4; Doc. 72-17, pp. 2–4, ¶¶ 7–13; Doc. 72–14, p. 2, ¶ 5). In his declaration, Mr. McClure stated that he hired Darrin Kurth, who had previous insurance underwriting experience, into an inside broker role, that he required Mr. Kurth to perform the same account executive duties that the previous female inside broker on his team, Ms. Lindberg, was required to perform, and that he was "not aware of anyone in CRC Birmingham's Professional Liability Department who was able to delegate almost all binding, marketing, and quoting to focus solely on generating business within the first 2 years of becoming an inside or associate broker." (Doc. 72-8, pp. 3–4, ¶¶ 13, 18). Ross Robertson, another male inside broker, stated in his declaration that "when [he] became an inside broker, [he] did not have account executive duties taken away. [He] was not assigned an assistant to help [him] with

paperwork. [He] continued to perform these same tasks while also developing business." (Doc. 72-12, p. 2, ¶¶ 5–6).[19]

Ms. Hendrix believes that she may have received more business had she been placed on CRC's website, but she did not ask to be included on the website, and Ms. Hendrix did not know of a broker who had gotten a new client because the client saw them on the website. (Doc. 72-6, pp. 52–53, tpp. 204–05, 208–09). Amber Varner stated that she was added to the website when she sent her picture to the marketing department, (Doc. 72-16, p. 3, ¶ 10; *see also* Doc. 72-17, p. 4, ¶ 16), and Mr. Daugherty indicated that there was a spot on the intranet where employees could update their website presence, (Doc. 72-3, p. 23, tpp. 83–84; *see also* Doc. 72-5, p. 36, tpp. 135–36).

[19] In her declaration, Ms. Hendrix stated that "I two [sic] males being hired directly into broker roles, not requiring them to work as an account executive as I had been required to do." (Doc. 78-1, p. 9, ¶ 65). The defendants moved to exclude this statement as hearsay. (Doc. 83, pp. 6–7; Doc. 89, p. 3). In her deposition, Ms. Hendrix testified that her beliefs about "things [the male brokers] weren't having to do" were based on "talk[ing] to the other women about it." (Doc. 72-6, p. 43, tp. 170:12–21). Ms. Hendrix has not submitted statements or deposition testimony from anyone she talked with except Ms. Lindberg. The Eleventh Circuit has held that similar hearsay statements are not competent summary judgment evidence. *See, e.g.*, *Peterson v. Bd. of Trs. of the Univ. of Alabama*, 644 Fed. Appx. 951, 954 (11th Cir. 2016) (upholding exclusion of portion of declaration by plaintiff's coworker stating that she had heard complaints from other African-American employees about plaintiff's supervisor); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (finding that plaintiff's supervisor's email statement that unnamed coworkers "make racial remarks to him all the time" could not be used to support motion for summary judgment where declarant's sworn testimony contradicted hearsay). Accordingly, Ms. Hendrix has not met her "burden . . . [as] the [evidence] proponent to show [by a preponderance of the evidence] that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56 advisory committee's note to 2010 amendment; *see also* FED. R. EVID. 104(a).

Ms. Hendrix also complains that CRC delayed adding her to the Birmingham professional brokers listserv, but CRC added her in late 2017 or early 2018 shortly after she became an inside broker, and Ms. Hendrix has not produced evidence of business conducted through the listserv from which she was excluded. (Doc. 72-6, pp. 70–71, tpp. 277–82). Shortly after Ms. Hendrix was added, female account executives asked to be included as well, so Rusty Hughes instructed the department to use the Birmingham professional all listserv, which included account executives, to talk about business events and dinners moving forward. (Doc. 72-6, pp. 70–71, tpp. 277–282). Therefore, the evidence does not support Ms. Hendrix's contention that CRC excluded her from networking opportunities.

On this record, Ms. Hendrix has not produced enough circumstantial evidence—a convincing mosaic of circumstantial evidence—to raise a reasonable inference of intentional discrimination with respect to pay. *Tynes*, 88 F.4th at 947; *see also, e.g.*, *McCreight*, 117 F.4th at 1333 (noting that even under the convincing mosaic test, "'[b]its and pieces' of evidence . . . are not enough"); *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004) (citation omitted) ("A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."). Because Ms. Hendrix's other Title VII discrimination

claims are time-barred, the Court grants the defendants' summary judgment motion on Ms. Hendrix's Title VII discrimination claims and her Equal Pay Act claim.[20]

***

Turning to Ms. Hendrix's Title VII retaliation claim, "[t]o establish a claim of retaliation, [a plaintiff] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). "[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006)); *Monaghan v. Worldplay US, Inc.*, 955 F.3d 855 (11th Cir. 2020) (same). A plaintiff "may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent." *Berry v. Crestwood Healthcare, LP*, 84 F.4th 1300, 1310–11 (11th Cir. 2023).

[20] To establish a claim under the EPA, a plaintiff must show that the employer hired members of the opposite sex for substantially similar work but paid them more. *See, e.g.*, *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526–27, 1532–33 (11th Cir. 1992) (comparing EPA and Title VII). The evidence concerning Mr. Morgan's compensation as an inside broker defeats Ms. Hendrix's EPA claim. In any event, the defendants moved for summary judgment on the claim, (Doc. 76-1, pp. 29–34); Ms. Hendrix did not respond. (Doc. 79). *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 592, 599 (11th Cir. 1995) (stating that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

"[E]mployee resignations are presumed to be voluntary." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (per curiam); *Jones v. Allstate Ins. Co.*, 707 Fed. Appx. 641, 646 (11th Cir. 2017) (citing *Hargray*, 57 F.3d at 1568). Evidence of duress may overcome this presumption. *Hargray*, 57 F.3d at 1567. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)). To establish constructive discharge, a plaintiff must demonstrate that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant*, 575 F.3d at 1298; *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings. Instead, we employ an objective standard.").

Ms. Hendrix's retaliation claim rests on her meeting with Mr. Helveston. During this meeting, Ms. Hendrix complained that CRC was discriminating against female employees by failing to provide to female employees the advancement and income opportunities the company provided to male employees. (Doc. 78-1, pp. 11–12, ¶¶ 85–90). Ms. Hendrix asserted that her new position as inside broker was a promotion in name only given the amount of administrative work she still was

assigned. (Doc. 78-1, p. 12, ¶ 90). According to Ms. Hendrix, Mr. "Helveston did nothing in response to Hendrix's complaints." (Doc. 78-1, p. 13, ¶ 97; Doc. 79, pp. 20, 42–43). According to Ms. Hendrix, she was constructively discharged because CRC did not respond to her complaints of discrimination, and Mr. Helveston told her that "if he reported her complaints to her team, she could not return to work with them, and asked if she would be willing to transfer." (Doc. 79, pp. 41–42; Doc. 78-1, p. 12, ¶ 91; Doc. 72-6, p. 60, tpp. 237–38).

Though Mr. Helveston did not respond to Ms. Hendrix, Mr. Cadden and Ms. Petty did. Both sent email messages to Ms. Hendrix to try to discuss her complaints of discrimination, but Ms. Hendrix did not reply. (Doc. 72-6, pp. 63–70, 73, tpp. 247–275, 287–88). When Ms. Hendrix requested severance pay, Ms. Petty explained that severance was not an option because Ms. Hendrix's position was not eliminated. (Doc. 72-4, p. 25). On this record, Ms. Hendrix did not behave like a reasonable employee; she did not give CRC, through the president of CRC's Birmingham Office or CRC's HR Department, an opportunity to address her complaints. If Ms. Hendrix felt that she could not return to work after Ms. Helveston's statement regarding a possible transfer, her belief was not objectively reasonable. *See Hipp*, 252 F.3d at 1231.

Accordingly, the Court grants the defendants' motion for summary judgment on Ms. Hendrix's retaliation claim.

***

For the reasons discussed above, the Court grants the defendants' motion for summary judgment on Ms. Hendrix's claims. The Clerk shall please TERM Doc. 74. The Court will enter a final judgment.

**DONE** and **ORDERED** this September 30, 2026.

Madeline H. Haikala

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE